## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ROBERT THOMAS, Individually,

      Plaintiff,

    vs.

COUNTY OF ALLEGHENY, PENNSYLVANIA; Allegheny County Police Superintendent COLEMAN MCDONOUGH in his Official Capacity as Chief Policy-Maker; Allegheny County Police Homicide Command Officer SCOTT SCHERER, Individually; Allegheny County Police Homicide Detectives STEPHEN HITCHINGS, TODD DOLFI, THOMAS FOLEY, PATRICK MILLER, and PATRICK KINAVEY, Individually; and, Pittsburgh Police Detective ANDREW MILLER, Individually,

      Defendants.

Civil Action No.: 2:22-cv-196

### PLAINTIFF'S COMPLAINT

Plaintiff ROBERT JAMES THOMAS, by his attorneys PAUL JUBAS LAW, P.C., and MAX PETRUNYA, P.C., hereby alleges as follows:

### INTRODUCTION

1.      Plaintiff Robert James Thomas ("Rob Thomas") spent nearly four (4) years in jail facing death penalty charges for a crime he did not commit.

2.      Plaintiff was accused of participating in what was described as one of the worst crimes in the history of Allegheny County, known colloquially as the "Wilkinsburg Massacre."

3.      Plaintiff Robert Thomas was dismissed from all charges on the first day of his death

penalty trial (February 3, 2020) for a lack of evidence linking him to any aspect of this crime.

4.      Plaintiff brings the within claims based on the conduct of the Defendants, which caused Plaintiff to serve four (4) years of unnecessary jail time while waiting to be tried with his life in the balance.

*Wilkinsburg Massacre*

5.      On March 9, 2016, five adults and one unborn child were brutally murdered in the Wilkinsburg area of Allegheny County when these victims were shot in the evening at a backyard gathering. Three other individuals were also injured during the shooting.

6.      One of the injured victims, who was paralyzed during the Wilkinsburg Massacre and continued to suffer from his injuries for the next four years, passed away on September 15, 2020. This brings the total deceased victims of the massacre to six adults and one unborn child.

7.      The Wilkinsburg Massacre shocked the City of Pittsburgh, the Wilkinsburg community, Allegheny County, as well as the rest of the nation.

8.      In the ensuing weeks following the massacre, with the investigation still not producing any promising leads and pressure mounting to find the perpetrators, Allegheny County Police ("ACP") Homicide Detectives and Allegheny County prosecutors engaged in multiple acts of misconduct to cobble together a case by any means necessary.

9.      Plaintiff Rob Thomas, through his friendship with Cheron Shelton, was one of the victims of that malfeasance.

10.     Mr. Thomas, along with Cheron Shelton, is innocent of all claims brought against him related to the Wilkinsburg Massacre. He had nothing to do with the crime and has no knowledge of the real perpetrator or perpetrators.

11.     In order to close the case, Defendants engaged in numerous constitutionally violative tactics to arrest Mr. Thomas: 1) they illegally arrested him on a three-year old criminal case that had been withdrawn twice before, and which was dismissed a third time because of its unconstitutionality; 2) Mr. Thomas was immediately housed in the same pod as Kendall Mikell, a prolific and unreliable confidential informant that had already been designated by Allegheny County Judge in June 2016 as an "Agent of the State" due to his cooperation with law enforcement by receiving five confessions from homicide suspects dating back to 2014; 3) law enforcement perjured itself in an effort to attempt to gain information connecting Plaintiff to this crime; 4) the Defendants relied solely on the fabricated information provided by confidential informants and ignored exclusionary evidence in their possession clearly indicating that Plaintiff could not have been involved in this crime and clearly indicated that the information provided to law enforcement was false; 5) withheld critical exculpatory evidence in violation of Plaintiff's Constitutional rights and in violation of <u>Brady</u> requirements for Plaintiff to be provided with all exculpatory information; 6) developed additional fabricated testimony from another confidential informant in an effort to continue prosecution of Plaintiff for the Wilkinsburg Massacre after confidential witnesses were deemed uncredible; 7) purposely withheld critical exculpatory information which was only provided on the eve of trial and only discovered through the efforts of defense counsel for Plaintiff Robert Thomas' based on his work in other unrelated cases.

12.     Defendants never produced any physical evidence or eyewitness testimony that the Plaintiff Robert Thomas committed the crimes charged.

13.     Defendants brought their charges against the Plaintiff Robert Thomas based solely on unsupported and unsubstantiated statements from unreliable confidential jailhouse informants.

14.     Furthermore, the statements provided by the confidential informants were

disproved by evidence already in the possession of the Defendants.

15.     Defendants also failed to timely produce exculpatory evidence to Plaintiff Robert Thomas throughout the pendency of the criminal proceedings and ignored critical evidence which proved that Plaintiff had no connection or involvement to the shooting.

16.     Based on all of the foregoing, Plaintiff Robert Thomas served four (4) years in jail for a death penalty crime that he did not commit.

## JURISDICTION and VENUE

17.     This action is brought pursuant to 42 U.S.C. §1983, to redress the deprivation under color of law of Plaintiff's rights as secured by the United States Constitution.

18.     This Court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

19.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367(a).

20.     Venue is proper within the Western District of Pennsylvania under 28 U.S.C. §1391(b) in that this is the District in which the claims arose.

## JURY DEMAND

21.     Plaintiff demands a trial by jury on all issues and claims set forth in this Complaint, pursuant to the Seventh Amendment of the United States Constitution and Federal Rule of Civil Procedure 38(b).

## PARTIES

22.     Plaintiff ROBERT JAMES THOMAS is and was at all times relevant a resident of

the Commonwealth of Pennsylvania.

23.    Plaintiff was arrested on April 5, 2016 as pretext for the Defendants efforts to attempt to coerce and manufacture a claim against Plaintiff Thomas related to his involvement in the Wilkinsburg Massacre.

24.    Despite having no physical evidence, eyewitness testimony, or DNA evidence[1] linking Plaintiff to the events of the Wilkinsburg Massacre, Plaintiff was incarcerated for over four (4) years pending investigation and prosecution of the Wilkinsburg Massacre.

25.    All charges brought against Plaintiff Robert Thomas were based on unsupported and unreliable information provided by jailhouse informants, and information manufactured by confidential informants coerced by law enforcement and the district attorney in exchange for immunity related to other crimes.

26.    Finally, on February 3, 2020, following the Defendants' failed efforts to support its claims against Plaintiff Robert Thomas with the use of three failed and unreliable confidential informants, all charges against Plaintiff Robert Thomas were dismissed by Allegheny County Court of Common Pleas Judge Edward J. Borkowski.

27.    Throughout the entirety of the investigation and prosecution of this matter, Plaintiff maintained his innocence.

28.    Plaintiff's Constitutional rights were deprived throughout the entirety of the four (4) years he was incarcerated while pending a death penalty trial related to his alleged involvement

---

[1] In fact, the physical evidence associated with Plaintiff's shoe against the cast of the footprint found at the scene and Plaintiff's saliva tested against the saliva found at the scene of the Wilkinsburg Massacre indicates that Plaintiff Robert Thomas was not the individual who perpetrated the crime and should have led the Defendants to not file any charges against Plaintiff for the Wilkinsburg Massacre.

in the Wilkinsburg Massacre.

29.    Defendant COUNTY OF ALLEGHENY was and is a county that is a political subdivision of the Commonwealth of Pennsylvania, and was the employer of Defendants COLEMAN MCDONOUGH, SCOTT SCHERER, THOMAS FOLEY, TODD DOLFI, PATRICK MILLER, PATRICK KINAVEY, and STEVEN HITCHINGS, and is and was at all times relevant to this Complaint responsible for the policies, practices, and customs of the Allegheny County Police Department, Homicide Detectives, and District Attorney's Office. All of the Defendants working for Defendant Allegheny County acted under color of state law and consistent with the customs, patterns, and practices established by the Defendant.

30.    Defendant Detective THOMAS FOLEY, at all times relevant to this Complaint, was a homicide detective for the Allegheny County Police, and is identified as one of the Primary Officers in the Wilkinsburg Massacre. At all times relevant hereto, Defendant THOMAS FOLEY was acting under color of state law and was one of the prosecuting officers in the investigation of the Wilkinsburg Massacre and the arrest, incarceration, and prosecution of Plaintiff Robert Thomas.

31.    Defendant Detective TODD DOLFI, at all times relevant to this Complaint, was a homicide detective with the Allegheny County Police, and is identified as the Investigating Detective for the Wilkinsburg Massacre. At all times relevant hereto, Defendant TODD DOLFI was acting under color of state law and was one of the prosecuting officers in the investigation of the Wilkinsburg Massacre and the arrest, incarceration, and prosecution of Plaintiff Robert Thomas.

32.    Defendant Detective PATRICK KINAVEY, at all times relevant to this Complaint, was a homicide detective with the Allegheny County Police, and is identified as the Investigating

Detective for the Wilkinsburg Massacre. At all times relevant hereto, Defendant PATRICK KINAVEY was acting under color of state law and was one of the prosecuting officers in the investigation of the Wilkinsburg Massacre and the arrest, incarceration, and prosecution of Plaintiff Robert Thomas.

33.    Defendant Detective STEVEN HITCHINGS, at all times relevant to this Complaint, was a homicide detective with the Allegheny County Police, and is identified as the Investigating Detective for the Wilkinsburg Massacre. At all times relevant hereto, Defendant STEVEN HITCHINGS was acting under color of state law and was one of the prosecuting officers in the investigation of the Wilkinsburg Massacre and the arrest, incarceration, and prosecution of Plaintiff Robert Thomas.

34.    Defendant Commander SCOTT SCHERER, at all times relevant to this Complaint, was the Commanding Homicide Detective Officer for the Allegheny County Police and is identified as the Commanding Officer for the investigation of the Wilkinsburg Massacre. At all times relevant hereto, Defendant SCOTT SCHERER was acting under color of state law and was one of the prosecuting officers and supervisors responsible for the oversight of the Wilkinsburg Massacre, including the arrest, incarceration, and prosecution of Plaintiff Robert Thomas.

35.    Defendant Detective ANDREW MILLER, at all times relevant to this Complaint, was a detective with the City of Pittsburgh Police, and is identified as one of the officers responsible for the handling of a confidential informant used to testify regarding the Wilkinsburg Massacre. At all times relevant hereto, Defendant ANDREW MILLER was acting under color of state law and was one of the officers engaged in the conspiracy to deprive Plaintiff Robert Thomas of his constitutional rights.

36.    Defendant Superintendent COLEMAN MCDONOUGH was the Superintendent of

the Allegheny County Police and was the Chief Policy Maker for the County Police. At all times relevant herein, Defendant COLEMAN MCDONOUGH was operating under color of state law and was responsible for the management, operation, oversight, training, and policies and procedures associated with the investigation of criminal activity, homicide investigations, and the patterns and practices associated with the investigation of crimes. Defendant MCDONOUGH is sued in his Official Capacity as the Chief Policymaker for the Allegheny County Police.

## FACTUAL ALLEGATIONS

### *Six[2] adults and one unborn child murdered during the "Wilkinsburg Massacre"*

37.     On March 9, 2016 shortly before 11 p.m., two gunmen executed a plot to kill attendees of a backyard barbeque on the outskirts of Pittsburgh, Pennsylvania.

38.     From an alley behind the yard where the cookout was being held, a gunman wielding a pistol began firing.

39.     At that time of the initial shooting, the victims were bunched together attempting to take selfies.

40.     As the shooting began, the victims turned and attempted to reach safety by running up the back porch stairs towards the back door of the house.

41.     The victims didn't realize they were running into a well-executed trap as they clamored together onto the back porch.

42.     A gunman wielding an assault rifle was lying in wait behind the neighbor's fence -

---

[2] As detailed previously, one of the victims was paralyzed from the Wilkinsburg Massacre and suffered for four years before passing away at the young age of 51 on September 15, 2020. This brings the total victims of the massacre to six adults and one unborn child.

only a few feet away from the porch.

43.     As the victims attempted to run into the house, the gunman unleashed a volley of thirty (30) rounds from an assault rifle into the victims, hitting each of them numerous times and striking each of them with headshots.

44.     The gunman was close enough that blood, flesh, and bone sprayed the fencing and the location from where he was shooting.

45.     A puddle of fresh saliva was left within the pile of spent casings and body parts, indicating that the gunman was foaming at the mouth/drooling as he executed the victims during the ferocious volley.

46.     This saliva was recovered from the scene and was valuable DNA evidence which could be used to rule out potential suspects of the massacre.

47.     Shortly after the shooting, the Wilkinsburg Police were called to 1304 Franklin Avenue in Wilkinsburg for numerous deceased victims as a result of multiple gunshot wounds.

48.     Wilkinsburg Police requested the investigative assistance of the Allegheny County Police Homicide Unit given the nature of the crime.

49.     Numerous items of ballistic evidence were recovered at the scene, including thirty (30) spent 7.62 x 39 caliber casings and eighteen (18) .40 caliber casings in two separate locations.

50.     In addition to the DNA saliva evidence found on the ground next to where one of the shooters was positioned, a boot print was also found near the pile of shell casings/flesh/bone that fell at the feet of the gunman wielding the assault rifle.

51.     This boot print was cast by the Allegheny County Medical Examiner's office and represents another piece of direct evidence available to officers and investigators to rule out

potential suspects.

*Overview of Wilkinsburg Massacre Investigation and Criminal Prosecution*

52.     The investigation and prosecution of the Wilkinsburg Massacre event took place from March 9, 2016 and concluded on February 14, 2020.

53.     The two suspects arrested and accused of the Wilkinsburg Massacre were Cheron Shelton and Plaintiff Robert Thomas.

54.     As detailed more fully herein, and as the incidents forming the basis of Plaintiff's Complaint, all charges against Robert Thomas were dismissed on February 3, 2020 by the Honorable Edward J. Borkowski in the Court of Common Pleas of Allegheny County.

55.     Cheron Shelton was acquitted by an Allegheny County Jury on February 14, 2020.

56.     To date, no alternative suspects have been arrested, questioned, or identified by Allegheny County related to the still unsolved Wilkinsburg Massacre.

57.     Additionally, by way of background for a better understanding for the basis of Plaintiff's claims, no physical evidence, DNA evidence, eyewitnesses or testimony, weapons, clothing, or any direct evidence related to the Wilkinsburg Massacre has been discovered by Allegheny County.

58.     All evidence examined during the investigation of this matter excluded Plaintiff Robert Thomas from any involvement in the crime.

*From the Outset, Allegheny County Homicide Detectives Focused on Cheron Shelton*

59.     On his way to the scene, Wilkinsburg Police Officer Michael Adams claimed to have seen a non-suspicious Black male getting into a white Lincoln sedan a few blocks from the

crime scene.

60.    Officer Adams did not stop to talk to the male even though he was on the lookout for suspects and witnesses.

61.    Officer Adams was of the belief that this male may have been on his way to work.

62.    Officer Adams drove past the male and purportedly noted the Lincoln's license plate by reading it through his rearview mirror. Officer Adams then proceeded to the scene of the crime.

63.    Officer Adams did not mention or note any other individuals with Cheron Shelton at the time he allegedly saw him enter this vehicle.

64.    Three days passed following the Wilkinsburg Massacre with law enforcement having generated no leads as to the suspects.

65.    Throughout this time, officials from Allegheny County and the Allegheny County District Attorney's offices made statements regarding the nature of the crime and the continued investigation to find the perpetrators of the Wilkinsburg Massacre.

66.    Desperate to find a suspect, law enforcement focused their attention on Cheron Shelton.

67.    Mr. Shelton had just been released from prison on March 8, 2016 and was alleged to have been seen by Officer Adams getting into the Lincoln sedan on March 9, 2016.

68.    The Lincoln sedan was owned by a family member who resided in the neighborhood known as "Hilltop."

69.    While on vacation on March 12, 2016, Officer Adams purportedly received a text

message from an Allegheny County Homicide Detective that included a picture of Cheron Shelton.

70.    Officer Adams purportedly identified the picture of Cheron Shelton as the Black male that he saw getting into the white Lincoln on the evening of the massacre.

71.    Based upon this purported identification, Cheron Shelton was arrested and brought into custody to attempt to gain further information about his alleged involvement in the Wilkinsburg Massacre.

72.    Cheron Shelton was placed on Pod 7D at the Allegheny County Jail where Defendants knew unreliable confidential jail informants resided.

73.    Cheron Shelton was only housed on 7D overnight and maintained his innocence whenever he was allegedly asked about his involvement in the Wilkinsburg Massacre.

74.    Plaintiff Robert Thomas was brought to this same pod on April 6, 2016, with the same plan to have confidential informants question and fabricate information regarding the Wilkinsburg Massacre.

75.    Upon information and belief, both Cheron Shelton and Robert Thomas were placed on 7D to provide the pretext to secure unsubstantiated and fabricated statements from jailhouse witnesses to implicate both Cheron Shelton and Robert Thomas for the Wilkinsburg Massacre.

*Allegheny County Homicide Detectives Arrest Plaintiff Robert Thomas on Pretextual, Unconstitutional 2013 Case in Order to Interrogate Him, Fabricate Evidence for Use in <u>Application for Court Order for Records Pertaining to Phone Number (412)378-3461.</u>*

76.    Late in the evening on April 5, 2016, Plaintiff Robert Thomas was arrested and taken into custody by the Allegheny County Police Homicide Unit under an arrest warrant on a case that was originally filed by the Wilkinsburg Police Department on February 21, 2013.

77.    This was the third time the case used to arrest Plaintiff Robert Thomas had been re-

filed, but the first time in which it was filed by the Allegheny County Police Department.

78.    Instead of customarily taking Mr. Thomas to the Allegheny County Jail to be arraigned for the underlying case, Defendant Allegheny County Homicide Detectives took Mr. Thomas to the Allegheny County Police Homicide Unit to be interrogated about the March 9, 2016 Wilkinsburg Massacre.

79.    Defendant ACP Det. Stephen Hitchings placed Mr. Thomas in an interrogation room and chained him to the floor.

80.    Defendant ACP Det. Hitchings verbally read Mr. Thomas his *Miranda* warnings.

81.    Mr. Thomas then gave Def. ACP Det. Hitchings a statement before invoking his right to counsel. During the statement, Mr. Thomas' telephone number came into question.

82.    Defendant ACP Det. Hitchings began the interrogation by requesting basic information such as name, nickname, address, date of birth, and phone number (s). Mr. Thomas stated that his phone number is, "(412)953-1023." Unsatisfied, Defendant ACP Det. Hitchings to no avail attempts to badger Mr. Thomas into confirming that (412)378-3461 is or was his phone number.

83.    On April 6, 2016, Defendant ACPD Det. Patrick Miller submitted an Application and sworn Affidavit requesting that an Order Authorizing Disclosure of Records Concerning Electronic Service for the telephone number (412)378-3461. The Order was signed by Judge David Cashman the same day. (Exhibit "A" ). The Application states:

> "Allegheny County Homicide Detectives obtained call detail records from
> T-Mobile for 412-892-0447 by way of an Order of Court authorized by the
> Honorable David Dr. Cashman. Call details records were analyzed and revealed
> frequent contact with the phone 412-378-3461 prior to and after the commission of
> the homicides. The last contact between the two telephones ceased at 9:50 p.m. on

March 9, 2016, and resumed again at 11:19 p.m. on March 9, 2016. The shooting occurred at approximately 10:54 p.m. on March 9, 2016. The aforementioned phone number of 412-378-3461, was identified as a T-Mobile phone number. The number was checked through the Locate Plus Database and showed it belonged to a female, Lisa Passafiume. Further research showed that Ms. Passfiume died in 2011 thus the number has been recycled. Link analysis on both Cheron and Brittany Shelton's cell phones showed contact with the 412-378-3461 phone number.

It has been the experience of your affiant in conducting homicide and death investigations that individuals who have committed the crime of homicide often have telephone contact with the homicide victim, persons who may have witnessed and/or assisted them with the homicide. it has been your affiant's experience that cellular telephone companies provide varying degrees of information pertaining to the usage of cellular telephones to include incoming and outgoing call records, text message records, text message details, cellular tower site data and location information. Your affiant contends that often time's criminals use cellular telephones in the planning and commission of crimes."

84.    The above was Defendants' entire theory and the basis for why they had a right to obtain this cellular information. The entirety of this statement within the Application was **fabricated**.

85.    Based on the foregoing, Defendant ACP Det. Patrick Miller should be at the very least charged and subject to the penalties proscribed in; 18 Pa.C.S.A. §4903 (False Swearing) and 18 Pa.C.S.A. § 5301 (Official Oppression).

86.    At no point during the interrogation did Plaintiff Robert Thomas confirm that this was his phone number, nor did he provide the information used by the Defendant Officer to support his affidavit of probable cause.

87.    Additionally, Plaintiff Thomas' shoe was taken off of his person during this interrogation, ostensibly to be tested against the boot print found at the scene of the Wilkinsburg Massacre.

88.    This was done in spite of the fact that Plaintiff Thomas' shoe size did not match the size of the boot print found at the scene of the Wilkinsburg Massacre.

89.     Regardless of this evidence not connecting Plaintiff Thomas to the massacre shooting, Allegheny County continued its plan to attempt to manufacture evidence against Plaintiff Robert Thomas to arrest and convict him of the Wilkinsburg Massacre.

*Upon Incarceration at Allegheny County Jail, Robert Thomas was Placed in Pod 7D with a* <u>*Prolific and Unreliable Jailhouse Informant in Order to Fabricate Confession From Plaintiff*</u>

90.     On April 6, 2016, following Plaintiff's interrogation by detectives, Plaintiff was incarcerated in Pod 7D of the Allegheny County Jail.

91.     Plaintiff Thomas was placed in the same pod as prolific informant Kendall Mikell, who had been cooperating with law enforcement on numerous homicide cases by obtaining "confessions" from homicide suspects since 2014. *See* 4/6/16 Inmate Housing Report – Pod 7D, attached hereto as Exhibit "B".

92.     Allegheny County investigators, including the Individual Defendants, purposefully conspired to place Plaintiff Thomas on this pod knowing that Kendall Mikell, who was already designated as an agent of the state, would be there to "corroborate" information about the Wilkinsburg Massacre and provide "evidence" against Plaintiff Thomas for his involvement in the shooting.

93.     At some point prior to his conversations with Plaintiff Robert Thomas on Pod 7D, Kendall Mikell was provided with instructions from law enforcement regarding how to communicate with body language on jail cameras while speaking to potential suspects to indicate points in the conversation where he was allegedly obtaining incriminating information.

94.     According to Kendall Mikell, he did exactly as instructed by using body language and hand signals while speaking with Plaintiff on April 6, 2016.

95.     The following day, on April 7, 2016, Kendall Mikell was taken to Allegheny County Police Headquarters and interviewed by detectives.

96.    Prior to his interview, upon information and belief, Kendall Mikell was given preliminary instructions by detectives about how to respond to questions which would be asked in the interrogation room by Allegheny County Detectives.

97.    During his recorded interview with detectives, Kendall Mikell provided detectives with fabricated information which would form the basis of the criminal complaint filed against Plaintiff Robert Thomas.

98.    Kendall Mikell is identified as "Witness 1" in the criminal complaint filed against Plaintiff Robert Thomas, and attached hereto as Exhibit "C".

99.    The criminal complaint, which was filed on June 23, 2016, contains a number of factual allegations which Defendants knew, or should have known, were not true or unreliable based on evidence already obtained as of June 23, 2016.

*Alleged "Evidence" Offered by Kendall Mikell*

*Urination at the Scene of the Crime*

100.    According to the Criminal Complaint filed on June 23, 2016 against Plaintiff Robert Thomas, one "fact" which allegedly concerned Plaintiff Robert Thomas was that he allegedly urinated in a garage just two houses down from the Wilkinsburg Massacre.

101.    As of April 7, 2016, and to this day, no urine was found in the area nor collected around the scene.

102.    The only DNA evidence recovered from the scene of the Wilkinsburg Massacre was saliva found in the yard next to the shooting amongst the spent casings from the assault rifle used to shoot the victims.

103.    April 7, 2016 is the first time any individual identified urine allegedly at or around the scene of the shooting.

16

104.    This is clearly false and unreliable information as it is virtually impossible that investigators of the worst crime in Allegheny County history would miss the collection of urine evidence just two houses down from the scene of the crime.

105.    Furthermore, if this was the first time that potential urine evidence was brought to the attention of investigators by this informant, there is no indication that any of the detectives followed up on this evidence with the medical examiner's office, detectives, or Wilkinsburg Police to attempt to collect this evidence, identify it, or corroborate Kendall Mikell's statement.

### *Timing of the Alleged Urination*

106.    The timeline provided by Witness 1, Kendall Mikell, related to this alleged "urination" by Plaintiff Robert Thomas is also contradicted by direct evidence in possession of investigators at the time of filing the Criminal Complaint.

107.    Specifically, Witness 1 relays that the alleged perpetrators, Robert Thomas and Cheron Shelton, "hung" in a garage near the scene of the shooting for some time waiting to get the drop on their alleged target.

108.    The problem with this information, which was relied upon by the Defendants to justify bringing charges against Plaintiff, is that Allegheny County was in possession of video evidence and statements from witnesses indicating that this timeline of waiting and urinating would be impossible.

109.    Specifically, on March 15, 2016, Allegheny County Detective McCue went to the public housing complex known as "Hilltop" where Cheron Shelton's mother resides.

110.    The white Lincoln sedan which Shelton was allegedly seen driving just minutes after the Wilkinsburg Massacre by Officer Adams is identified on the video cameras taken from the public housing authority.

111.    The video shows that Cheron Shelton is seen leaving with the vehicle at approximately 10:30 p.m. and returning the vehicle to "Hilltop" at approximately 3:00 a.m.

112.    Defendants collected photographs taken from residential cameras on "Hilltop" that they claimed show Cheron Shelton on video at approximately 10:30 p.m. A true and correct copy of these time stamped photos is attached hereto as Exhibit "D."

113.    The Wilkinsburg Massacre shooting took place at approximately 10:50 p.m.

114.    Given Defendant's reliance on direct video evidence showing the location of the vehicle and purported location of Cheron Shelton at the time of 10:30 p.m. on March 9, 2016, it would be impossible for Shelton and Plaintiff Robert Thomas to have been situated in a garage near the scene of the crime at least thirty minutes before the shooting, let alone have enough time for Plaintiff to urinate in the area.

115.    Furthermore, on May 9, 2016, information was obtained from a witness who indicated that both Cheron Shelton and Robert Thomas were seen on "Hilltop" at approximately 9:00 p.m. having drinks on a neighbor's porch.

116.    Given this eyewitness testimony and the video evidence, detectives knew, or should have known, that the information provided by Witness 1 was unreliable, false, and could not provide probable cause to arrest Plaintiff Robert Thomas for the Wilkinsburg Massacre.

*DNA Evidence at the Scene Excluded Robert Thomas as of April 11, 2016*

117.    In addition to the factual inconsistencies associated with the information provided by Witness 1 and found in the Criminal Complaint, as of April 11, 2016, Robert Thomas's DNA was excluded by scientific testing as not being linked to the DNA found at the scene of the Wilkinsburg Massacre. *See* 4/11/16 DNA Report, attached hereto as Exhibit "E."

118.    Despite this fact, and the fact that no physical evidence was found of the weapons

used in the massacre, the alleged urine around the scene, or any other evidence linking Robert

Thomas to the Wilkinsburg Massacre, Plaintiff Robert Thomas was arrested and charged with

these crimes on June 23, 2016.

*Prolific Informant Kendall Mikell Designated as "Agent of the State" by*
*Allegheny County Court of Common Pleas Judge*

119.    On June 21, 2016, an Allegheny County Court of Common Pleas Judge designated

Mikell as an "Agent of the State" in a separate homicide case. *See Comm v. Howard*[3], No. 1771

WDA 2015, at p. 5, *citing* Suppression Court Opinion, 7/21/16, at p. 9-10, attached hereto as

Exhibit "F." The Court noted the following about Mikell:

> "there was an understanding on Mikell's part that providing information to
> law enforcement regarding various inmates could be valuable in seeking a
> recommendation for a sentence reduction. In addition, it is clear that law
> enforcement conveyed to Mikell, at least by implication, that it was willing to
> receive information regarding various inmates, as it did not only on Little Proctor,
> but also on Mitchell, McGraw and [Howard]."

The court found "Mikell was well aware of what he had to do while in jail," and, although the

government may not have instructed Mikell to obtain information regarding Howard specifically,

there was still an implied agreement that Mikell should obtain information from inmates generally

in exchange for a potential sentence reduction. The court also pointed to Mikell's transfer to the

federal facility shortly after Howard was transferred there, indicating that the Commonwealth was

willing to facilitate interaction between them. Based on these facts, the court concluded that Mikell

had been acting as a government agent since **July 2014** and at all times when he elicited

information from Howard. *Id*. (emphasis added).

---

[3] In a 6/21/17 opinion affirming the lower court's suppression in a separate case of Mikell's statement on Sixth
Amendment grounds, the Pennsylvania Superior Court noted: "In these circumstances, it is reasonable to conclude
the government implicitly encouraged Mikell to elicit deliberately information from other inmates, thereby fostering
his hope that his efforts would pay off in the form of a lenient recommendation down the road… The sheer number
of 'confessions' obtained by Mikell indicates that Mikell was not merely a passive listener or the unexpected
recipient of incriminating information.         *Id*.

120.    Accordingly, based on the year that Kendall Mikell was designated as a state's witness in 2014, Allegheny County knew that he was an agent of the state at the time Allegheny County placed Plaintiff Robert Thomas on the 7D pod at Allegheny County Jail, and further knew that Kendall Mikell would provide information to law enforcement which would allow them to proceed with charges against Plaintiff Robert Thomas related to the Wilkinsburg Massacre, even though the information Kendall Mikell provided was false and contradicted evidence already in possession of the Defendants.

121.    Defendants' efforts to use Kendall Mikell as an agent of the state to obtain information from Plaintiff Robert Thomas related to the Wilkinsburg Massacre violated Plaintiff's Sixth Amendment Right to Counsel while being questioned by an individual acting under color of state law.

122.    The use of Kendall Mikell and his alleged "interrogation" of Plaintiff Robert Thomas is one of the bases for Plaintiff's Civil Conspiracy claims against the individual defendants and Allegheny County.

*Defendants' Use of Another Confidential Informant – Witness 2*

123.    The Defendants also relied on the fabricated and unsubstantiated testimony of another confidential jailhouse informant who was also on Pod 7D with Plaintiff Robert Thomas.

124.    Identified as Witness 2 in the Criminal Complaint, Frederick Collins provided virtually identical information to that relayed by Witness 1, Kendall Mikell, on the same day and at the exact same time as Witness 1 was providing his statement to law enforcement.

125.    According to the criminal complaint, Plaintiff Robert Thomas relayed the urination story to Witness 2, and also indicated that Thomas and Shelton were waiting in the garage nearby for a long time before they began shooting.

126.    Again, given the physical video evidence in the possession of Allegheny County at the time of this statement, Defendants knew, or should have known, that the information provided by Witness 2, Frederick Collins, was false.

127.    In fact, according to Kendall Mikell, he heard Fredrick Collins giving his statement to detectives at the Allegheny County Police Headquarters and told detectives that the information Witness 2 was giving detectives wouldn't hold up in court and that Witness 2 was just doing exactly was Witness 1 was doing because Mikell told Collins his plan to provide allegedly false information to law enforcement as a state's witness.

128.    Even more troubling are the circumstances by which Witness 2, Frederick Collins, contacted law enforcement to ask them to take his statement.

129.    In Allegheny County Jail, inmates are given prepaid phone cards and inmate specific pins used to place calls to outside phone numbers from inside the jail.

130.    In order to complete a phone call, the person on the receiving end of the call must answer and accept the call coming from the Allegheny County Jail.

131.    Inmates are not able to leave voicemails when calling out because no one is available to answer the call and accept it.

132.    From phone records obtained from Allegheny County Jail on April 6, 2016, Frederick Collins had an identifying pin and had completed one personal phone call earlier in the day.

133.    All calls made by Frederick Collins while in jail should thus be identified by name and will have a corresponding charge associated with the call.

134.    Despite this sophisticated outgoing call system, at approximately 8:51 p.m. (20:51), on April 6, 2016, an outgoing call is placed by a caller identified by Pin 253 (identified by audio

recording as Frederick Collins) to a local number whereby Witness 2, Frederick Collins, leaves a voicemail stating that he has information related to the Wilkinsburg Massacre.

135.    The number was later discovered to be registered to a citizen of Allegheny County who is not connected to or working in law enforcement.

136.    Furthermore, the fact that Witness 2, Frederick Collins, was able to leave a voice message while calling from jail less than twelve (12) hours before providing "incriminating" information implicating Cheron Shelton and Robert Thomas in the Wilkinsburg Massacre shows that the statement of Collins was staged, and the information fabricated to pursue criminal claims against both Robert Thomas and Cheron Shelton.

*Defendant ACP Det. Todd Dolfi Charges Plaintiff for Role in Wilkinsburg Massacre Relying Heavily on Purported Confession Provided by "Agent of the State", Second Informant, and Perjured Statement from Defendant ACP Det. Miller.*

137.    On June 23, 2016, Defendant ACP Det. Dolfi charged Plaintiff for playing a role in the Wilkinsburg Massacre. *See* 6/23/16 Robert Thomas Criminal Complaint, attached hereto as Exhibit "C."

138.    The affidavit supporting charges against Plaintiff relied upon the perjured statements Defendant ACP Det. Miller obtained during his initial interview with Plaintiff Thomas; the fabricated "confession" provided by "Agent of the State" Kendall Mikell; and a second "confession" provided to Defendant ACP Detectives Michal Caruso and Kevin McCool by cooperating witness Freddie Collins.

139.    The entirety of the purported evidence against Plaintiff cited within the Criminal Complaint against him would be exposed as unreliable, and eliminated from the evidentiary landscape in 2018, as discussed further detailed later in this Complaint.

140.    Defendant Dolfi, along with the other Individual Defendants, conspired to bring

charges against Plaintiff Robert Thomas in violation of his Constitutional Rights.

141.    Furthermore, as a pattern and practice, Defendant Allegheny County along with Defendant McDonough, engaged in similar conspiratorial conduct to bring charges against other individuals using known informants providing unreliable and unsubstantiated information.

*No Additional Evidence Gathered Against Robert Thomas from April 7, 2016 onward*

142.    The entirety of the basis for charges brought against Plaintiff Robert Thomas for the Wilkinsburg Massacre as of April 7, 2016 was cellphone evidence purportedly attributed to Plaintiff, and acquired through a perjured application, as well as the information provided by Witness 1 and 2.

143.    From April 7, 2016 onward, all additional evidence gathered and reviewed as part of the investigation related to the Wilkinsburg Massacre excluded Robert Thomas from involvement in the crime, and contradicted information provided by the confidential informants.

144.    This includes the lack of recovery of any physical evidence or eyewitness testimony that Robert Thomas was around the Wilkinsburg Massacre at the time it happened; exclusionary DNA evidence which showed that Robert Thomas' saliva was not the saliva found at the scene; eyewitness testimony from a witness indicating that Robert Thomas was on "Hilltop" at approximately 9:00 p.m. on March 9, 2016, thus proving that he could not have been waiting in a garage for hours before the shooting; the absence of any murder weapons or any DNA or clothing found linking Robert Thomas to any victims; no DNA evidence found in the Lincoln sedan which, ostensibly, would have been covered in blood from the victims if either Robert Thomas or Cheron Shelton were in proximity to the victims during the time of the shooting; and lack of physical evidence from Robert Thomas' shoes matching the boot print found at the scene.

145.    Despite the fact that no additional information had come to light from April 7, 2016 onward, and despite the fact that just two days before the filing of the criminal complaint Kendall Mikell was designated an agent of the state and his testimony was excluded from another homicide trial, Defendant detectives brought the charges related to the Wilkinsburg Massacre.

146.    Due to the failure of adequate monitoring, oversight, policies and procedures in Allegheny County and Defendant McDonough, criminal charges were filed against Plaintiff Robert Thomas which were ultimately terminated in his favor related to the Wilkinsburg Massacre.

147.    Both Defendant McDonough and Scherer, as commanding and supervising officers, failed to monitor the investigation and failed to discipline the named homicide detectives when they knew, or should have known, that the detectives were coercing and using fabricated information to substantiate the claims against Plaintiff Robert Thomas.

148.    The actions and inactions of these supervisory defendants also form the basis for Plaintiff's Failure to Intervene claims when they knew, or should have known, that deprivations of Plaintiff's Constitutional rights were occurring.

*Oversight failures of Allegheny County Related to Monell Claims*

149.    As a pattern and practice, Allegheny County, through the District Attorney and Police Department, failed to provide exculpatory evidence to criminal defendants, ratified such conduct by failing to discipline employees for this prior conduct, and failed to provide adequate monitoring and oversight to prevent such continued behavior from occurring as it related to the charges brought and prosecution of Plaintiff Robert Thomas.

150.    With proper training, monitoring, and oversight of the Constitutional rights violations orchestrated by law enforcement in this matter would not have occurred, and

exculpatory information would have been provided to Plaintiff Robert Thomas such that charges against him could have been dropped prior to February 3, 2020.

151.    Furthermore, as a pattern and practice, law enforcement used perjured testimony to obtain information related to the case and failed to intervene to bring this information to light.

152.    The actions and inactions of Allegheny County also form the basis for Plaintiff's *Monell* claims when related to the pattern and practice of the County which led to the deprivations of Plaintiff's Constitutional rights.

*Defendant Allegheny County Homicide Detective Commits Perjury During Plaintiff's* <u>*Preliminary Hearing*</u>

153.    On July 29, 2016, a preliminary hearing was held where Detective Miller testified to the above referenced telephone contact between telephone numbers (412)378-3461 and (412)892-0447.

154.    To assist in his testimony, he produced an exhibit labeled as "Commonwealth's Exhibit 72" and Detective Miller testified to the following on direct examination:

> Q:    Based on the information you had regarding both of these cell phone numbers, did you retrieve or apply for court orders for call detail logs and text message logs for both numbers?
>
> A:    Yes. The first court order was sent on March 12 by Detective Scott Towne…. That would have been for the 412-892-0447m number, and then on April 6 I applied for a court order and sent one out for 412-378-3461.
>
> Q:    With regard to both of those call detail and text detail logs, what can you tell the Court with regard to communication with regard to communication between number associated with Robert Thomas the night of the murders?
>
> A:    There was a lot of contact via text message and incoming/outgoing calls between the two. Specifically there were 37 instances where the phones contacted one another between 8:00 p.m. and midnight on the 10th.
>
> Q:    I'm going to direct your attention specifically to the time period around 10:30. Is there contact between phones associated with either individual between one another at 10:30?

A:      At 10:31, yes, there was a text message sent from Mr. Thomas to Mr. Shelton which was then returned, a return text three minutes later at 10:34.

Q:      Moving past that, is there a contact after 10:34 p.m.?

A:      There is a four-minute, 55 second phone call at 10:46 p.m.

Q:      And if you can, was that from the phone number associated with Cheron Shelton or from the phone number associated with Rob Thomas?

A: It was from Mr. Thomas to Mr. Shelton.

Q:      And how long is that phone call?

A:      Four minutes and 55 seconds.

Q:      When did it originate?

A:      10:46 p.m.

Q:      So what time does that phone call end?

…

A:      Roughly 10:51.

Q:      What time is the shooting?

A:      10:53.

Q:      Is there any contact between the phone number associated with Rob Thomas and the phone number associated with Cheron Shelton during the shooting?

A:      No.

Q:      What is the first contact between the phone number associated with Cheron Shelton and the phone number associated with Rob Thomas after the shooting?

A:      10:56 p.m.

Q:      How many total contacts are there from the time after the shooting until later that night?

A:      There were a total of 12 between incoming and outgoing and text messages.

Q:      I'm going to show you what I will mark as Commonwealth's Exhibit 72. Si Commonwealth's Exhibit 72 a visual depiction of the information that you testified to?

A:      Yes.

*See* NT Preliminary Hearing, at   102-03, attached hereto as Exhibit "G" , *see also*

"Commonwealth's Exhibit 72, attached as Exhibit "H."

155.    This testimony **completely contradicts** his sworn Affidavit, specifically:

"Call detail records were analyzed and revealed request contact with the phone 412-378-3461 prior to and after the commission of the homicides. The last contact

between the two phones ceased at 9:50 p.m. on March 9, 2016, and resumed again at 11:19 p.m. on March 9, 2016. The shooting occurred at approximately 10:54 p.m. on March 9, 2016. The aforementioned phone number of 412-378-3461…"

*See* 4/6/16 Def. ACP Det. Miller Application for Phone Records, attached hereto as Exhibit "A."

156.    Examining "Commonwealth's Exhibit 72" from the preliminary hearing, there are nineteen (19) separate times that the two telephone numbers contact each other between the times of 9:50 p.m. and 11:19 p.m., on March 9, 2016. There are seven (7) SMS (text) messages between them, ten (10) voice calls and two (2) unanswered voice calls between the two numbers. *See* Commonwealth's Exhibit 72, attached hereto as Exhibit "H."

<u>*Confidential Informants of the State are Dropped*</u>

157.    By letter on June 6, 2017, the Allegheny County District Attorney's Office informed counsel for Plaintiff Robert Thomas that Frederick Collins would no longer be used as a witness in the case against Plaintiff.

158.    At this point approximately one year had elapsed since criminal charges were filed against Plaintiff Robert Thomas.

159.    Still one year into the prosecution, Allegheny County had still not provided exculpatory evidence related to Witness 2, Fredrick Collins, to the criminal defense attorneys for Robert Thomas, despite their Constitutional obligation to provide this information.

<u>*Pattern and Practice of Failing to Produce Exculpatory Information*</u>

160.    This failure to provide exculpatory evidence by the Defendant Allegheny County constitutes a pattern and practice exhibited by the Defendants.

161.    It is specifically known that the Defendants failed to produce exculpatory video evidence in another homicide trial in the 2010 homicide trial for Freedom Bey.

162.    The failure of the Defendants to turn over video evidence resulted in Mr. Bey's conviction being overturned and a new trial granted in August 2018, eight (8) years after his conviction for the 2008 murder.

163.    The investigation of the Freedom Bey case and the charges brought against Mr. Bey were handled by the Allegheny County Police Department.

164.    Given this prior conduct of Allegheny County, the failure to produce exculpatory evidence is a pattern and practice of the Defendants, which is due to intentional conduct and also failure to provide monitoring, training, oversight, and policies and procedures regarding the Constitutional obligations of law enforcement and prosecutors.

165.    These failures also show that, as a pattern and practice, Defendants engaged in conspiracy to deprive individuals of their Constitutional rights.

*State of the Criminal Case Following Removal of Frederick Collins*

166.    As of June 6, 2017, the only evidence available to Allegheny County against Plaintiff Robert Thomas was the statement provided by Kendall Mikell, identified as Witness 1 in the Criminal Complaint.

167.    All information provided by Witness 2 was thus not available, removing a large chunk of the probable cause used to substantiate claims against Cheron Shelton and Robert Thomas.

168.    During the summer of 2018, the District Attorney's Office would inform defense counsel that they would not be using the testimony of Witness 1, Kendall Mikell, during the criminal prosecution.

169.    Thus, as of summer 2018, there were no confidential witnesses to substantiate the

majority of the information contained in the criminal complaint against Plaintiff Robert Thomas, and thus no evidence to support the charges against Plaintiff Robert Thomas.

170.    The only evidence in the Defendants' possession was that Plaintiff Robert Thomas was with Cheron Shelton at some point on March 9, 2016.

171.    There was still no direct evidence, eyewitness testimony, DNA evidence, or physical evidence in any way implicating Robert Thomas for the Wilkinsburg Massacre.

172.    In order to continue to pursue their claims against Plaintiff Robert Thomas, the Defendants would need the help of another confidential informant, Witness 3.

*Cooperating Witness #3 Gregory Parker Enters the Evidentiary Landscape After Both Prior Cooperating Witness Dropped by Prosecution*

173.    At the point that both confidential informants were dropped from the case, all efforts by Defendant Allegheny County shifted investigative conduct to finding a witness to prove its claims.

174.    This includes the generation and use of fabricated testimony from another confidential informant, identified as Witness 3, later revealed to be Gregory Parker.

175.    Gregory Parker was also on Pod 7D at the time Plaintiff Robert Thomas was in Allegheny County Jail on April 6, 2017.

176.    It is unclear why no one in law enforcement spoke with Gregory Parker about his knowledge of the Wilkinsburg Massacre prior to 2018 given the fact that Plaintiff Robert Thomas purportedly shared information about the Massacre with the inmates on Pod 7D, which includes Gregory Parker.

177.    On February 15, 2018, following the dropping of Frederick Collins from the

prosecution and shortly before Kendall Mikell was dropped as a witness from the case, Gregory Parker provided an interview to law enforcement telling them what Plaintiff Robert Thomas had allegedly told him while on 7D. *See* 2/15/18 Interview of Gregory Parker, attached hereto as Exhibit "I."

178.    Defendant Officer Todd Dolfi conducted the interview of Gregory Parker.

179.    The information provided by Gregory Parker is identical to the information provided by both confidential informants previously and is clearly false based on information already known to law enforcement and prosecutors at the time.

180.    Specifically, Gregory Parker stated that Plaintiff Robert Thomas and Cheron Shelton were waiting in a garage for hours prior to completing the Wilkinsburg Massacre shooting and that Plaintiff urinated in the garage.

181.    This information is clearly contradictory with the fact that it would have been impossible for Cheron Shelton and Robert Thomas to have been waiting in the garage for hours before the shooting given the video evidence in possession of the investigators and the eyewitness testimony indicating that Shelton and Thomas were seen on "Hilltop" on someone's front porch at 9:00 p.m., less than two hours before the Wilkinsburg Massacre.

182.    Conveniently, Gregory Parker's statement matches the prior unreliable statements provided by Witness 1 and Witness 2, who were dropped as witnesses from the case.

183.    Without the testimony of Gregory Parker, there was no evidence against Robert Thomas and his case would have been dismissed in 2018 just as it was in 2020 on the eve of trial.

184.    Gregory Parker testified twice in front of a Grand Jury: once on February 15, 2018; then again on March 29, 2018. Allegheny County Deputy District Attorney Rebecca Walker,

Assistant District Attorney Russell Broman, and Assistant District Attorney Michael Ball represented the Commonwealth throughout the Grand Jury proceedings. On March 29, 2018, Assistant District Attorney Mike Ball questioned Parker regarding his grant of immunity. The following exchange occurred:

> ADA Ball: Mr. Parker, you had testified prior at this grand jury in reference too [REDACTED]. It was on that date we intended to ask you more questions, but I believe your attorney wasn't able to stay the entire day. so we kind of cut it short and that's why you've come back. We've also given you a grant of immunity as far as it concerns a Marcus White, Jr. homicide and the homicide of [REDACTED], that's your understanding as well, correct?
>
> Parker: Yes.

185.    Defendant Allegheny County conspired to withhold this exculpatory information. Five months after granting Parker with immunity for the murder of Baby Marcus and a second homicide, Assistant District Attorney Russell Broman stated the following in an email to Deputy District Attorney Kevin Chernosky:

> "Kevin: Just touching base as I hear you are using Parker as well. So far everything Parker has testified to has born out on my vigil case. I promised him nothing but will bring his cooperation to the court's attention…"

*See* 8/30/18 Email From Assistant District Attorney Russ Broman to Deputy District Attorney Kevin Chernosky, attached hereto as Exhibit "J."

186.    Despite their obligation to provide this exculpatory information to the criminal defense attorneys, Defendant Allegheny County did not produce this evidence until their conspiracy was exposed on January 28, 2020 approximately two years after the grant of immunity, clearly in violation of the rights guaranteed to Plaintiff Robert Thomas.

187.    Additionally, it is unclear how many meetings law enforcement and the District Attorney had with Gregory Parker prior to his February 2018 statement as the extent of all meetings

with Gregory Parker were documented retroactively and only provided to criminal defense counsel
for Plaintiff Robert Thomas days before trial was set to begin.

*Defendants Conspire to Coverup Gregory Parker's Confession to Killing 15-Month-Old in Effort*
*to Heighten His Credibility*

188.    In exchange for his unsubstantiated and uncredible testimony regarding the
Wilkinsburg Massacre, Gregory Parker was granted immunity regarding his involvement in the
murder of Marcus White, Jr., a 15-month-old who was murdered in 2013 during a shooting in the
East Hills neighborhood of Pittsburgh. .

189.    Despite its obligation to turn this information over during the prosecution of the
case, the information regarding Gregory Parker's immunity for this murder and one other homicide
was not provided to criminal defense counsel for Plaintiff Robert Thomas until January 28, 2020,
just days before trial was scheduled to begin for the Wilkinsburg Massacre.

190.    At the time of his false testimony provided to law enforcement, City of Pittsburgh
Detective Defendant Andrew Miller was designated as Gregory Parker's "handler" for
transportation to and from grand jury proceedings, and for coordinating his use in other criminal
investigations.

191.    Defendant Andrew Miller, along with the other Defendants, engaged in a
conspiracy to prevent the information related to exculpatory evidence of Gregory Parker's
immunity for the Marcus White, Jr. murder from being discovered.

192.    Specifically, Defendant Miller engaged in numerous undocumented meetings and
conversations with Gregory Parker, information which was not provided to Plaintiff Robert
Thomas.

193.    Information regarding the agreement reached with Gregory Parker would never have been discovered if not for the heroic efforts of Attorney Casey White, who only knew about this exculpatory information from his involvement in another criminal proceeding where Gregory Parker was utilized as a witness by Allegheny County.

194.    At the time of producing the exculpatory evidence on January 28, 2020, Gregory Parker was being utilized by Allegheny County as a witness in at least thirteen (13) other cases.

195.    None of this information was provided to the attorney for Robert Thomas, clearly in violation of his rights and in violation of the *Brady* responsibilities.

*Defendant Allegheny County District Attorney's Office Concedes that Defendant ACP Det. Miller Made False Statement in his April 6, 2016 Application for Records Pertaining to 412-378-3461*

196.    On July 6, 2018, the Allegheny County District Attorney's Office conceded that Defendant ACP Det. Miller included a false statement in his April 6, 2016 Application for Court Order for phone records pertaining to 412-378-3461. The specific statement from the Affidavit provides:

> "During the interview, Thomas admitted that the aforementioned 412-378-3461 was in fact his cell phone number."

In its July 6, 2018 filing (Commonwealth's Response to Defense Motion to Suppress Evidence Obtained or Derived From Telephone Number (412)378-3461) conceded the fabrication as follows:

> "In response to [Mr. Thomas'] argument that [Mr. Thomas] did not confirm in his interview that number (412)378-3461 was in fact his own, the Commonwealth concedes."

*See* 7/6/18 Commonwealth's Response to [Mr. Thomas'] Motion to Suppress Evidence Obtained or Derived From Telephone Number (412)378-3461, at ¶ 10, attached hereto as Exhibit "K." .

197.    In light of Defendant Allegheny County District Attorney's Office concession

regarding Defendant ACP Det. Miller's perjury, it is clear that Judge Cashman relied on those sworn statements to have an Order issued for the records of telephone number (412)378-3461 because it was purportedly interconnected with Cheron Shelton's alleged telephone number of (412)892-0447.[4] That same information was then used to draft the criminal complaint.

*Robert Thomas Dismissed February 3, 2020*

198.    After all three confidential witnesses were dropped from the case, and following Defendants' efforts to conceal and withhold exculpatory information associated with the witnesses, all charges were dismissed against Robert Thomas on February 3, 2020 by the Honorable Edward J. Borkowski.

199.    The combined actions of all the Defendants, in conspiring to fabricate claims against Plaintiff Robert Thomas, coercing witnesses to provide false information, ignoring clear evidence proving the falsity of these statements and excluding Plaintiff's involvement in the Wilkinsburg Massacre, form the basis for Plaintiff's claims and the damages he sustained.

## DAMAGES

200.    Defendants' unlawful, intentional, willful, deliberately indifferent, reckless, and/or bad faith acts and omissions caused Plaintiff Robert Thomas to be falsely arrested and imprisoned for approximately four (4) years, including a significant amount of time in solitary confinement.

201.    Not only was Plaintiff Robert Thomas serving jail time for a crime he didn't commit, but Plaintiff Thomas was facing charges which also included the death penalty.

202.    Not only did Plaintiff Thomas have his life and liberty restrained as a result of the

---

[4] Both Magistrate David Barton, who presided over the preliminary hearing and Judge Cashman relied on the assertion that Chanel Falls explicitly told Detective Miller that she purchased the cellphone for Cheron Shelton. It was revealed that Defendant ACP Det. Miller and Chanel Falls never spoke.

actions of the Defendants, but also Plaintiff Thomas had to spend his time in jail contemplating the fact that he could be tried and sentenced to death for a crime he did not commit.

203.     As a direct result of Defendants' intentional, bad faith, willful, wanton, reckless, and/or deliberately indifferent acts and omissions, Plaintiff Thomas sustained injuries and damages, which continue to date and will continue into the future, including: loss of freedom for more than four (4) years; physical pain and suffering; severe mental anguish; emotional distress; loss of family relationships; severe psychological damage; legal expenses; loss of income and career opportunities; humiliation, indignities and embarrassment; degradation; permanent loss of natural psychological development; and restrictions on all forms of his freedoms for which he is entitled to monetary relief.

204.     As a direct result of Defendants' intentional, bad faith, willful, wanton, reckless, and/or deliberately indifferent acts and omissions, Plaintiff Thomas was also deprived of his familiar relationships, including relationships with his children.

205.     Plaintiff Robert Thomas continues to suffer physical, emotional, mental, and psychological damages as a result of the Defendants' conduct.

206.     These injuries and damages to Plaintiff Robert Thomas were foreseeable to Defendants at the time of their acts and omissions.

207.     All of the acts and omissions committed by Defendants were done intentionally, unlawfully, maliciously, wantonly, recklessly, negligently, and/or with bad faith, and said acts meet all of the standards for the imposition of punitive damages.

## COUNT I – 42 U.S.C. § 1983

### Malicious Prosecution – Fourth Amendment

### Plaintiff v. Individual Defendants Dolfi, Foley, Hitchings, Miller, and Kinavey

208.    Plaintiff hereby incorporates all preceding paragraphs of this Complaint, as if set forth more fully herein.

209.    The Individual Defendants caused the initiation of criminal charges against Plaintiff Robert Thomas without probable cause, with malice, and thereby subjected Plaintiff to malicious prosecution in violation of his Constitutional rights under the Fourth Amendment to the United States Constitution.

210.    All charges against Plaintiff Robert Thomas were terminated in his favor on February 4, 2020, when Plaintiff Robert Thomas was dismissed from the Wilkinsburg Massacre Criminal case.

211.    All of the individual Defendants acted under color of state law, and acted intentionally, with reckless disregard for the truth, and with deliberate indifference to Plaintiff Robert Thomas' clearly established Constitutional rights.

212.    All individual Defendants acted maliciously and for a purpose other than bringing Plaintiff Robert Thomas to justice.

213.    As a direct result of the actions and omissions of the Defendants as identified herein, Plaintiff Robert Thomas was injured and suffered a significant deprivation of his liberty, causing damages as detailed herein.

214.    The acts and omissions of the Defendants described herein caused Plaintiff's injuries as the Defendants knew, or should have known, that their conduct would result in the wrongful arrest, prosecution, and incarceration of Plaintiff Robert Thomas.

## COUNT II

### Due Process – Fourteenth Amendment

### Plaintiff v. Individual Defendants Dolfi, Foley, Hitchings, Miller, and Kinavey

215.    Plaintiff hereby incorporates all preceding paragraphs of this Complaint, as if set forth more fully herein.

216.    The Individual Defendants caused the initiation of criminal charges against Plaintiff Robert Thomas without probable cause, with malice, and fabricated evidence and statements against Plaintiff Robert Thomas, and also withholding exculpatory evidence, depriving Plaintiff of his due process rights guaranteed by the Fourteenth Amendment to the United States Constitution.

217.    All of the individual Defendants acted under color of state law, and acted intentionally, with reckless disregard for the truth, maliciously, and with deliberate indifference to Plaintiff Robert Thomas' clearly established Constitutional rights.

218.    As a direct result of the actions and omissions of the Defendants as identified herein, Plaintiff Robert Thomas was injured and suffered a significant deprivation of his Constitutional rights, causing damages as detailed herein.

219.    The acts and omissions of the Defendants described herein caused Plaintiff's injuries as the Defendants knew, or should have known, that their conduct would result in the wrongful arrest, prosecution, and incarceration of Plaintiff Robert Thomas.

## COUNT III

### 42 U.S.C. § 1983 – Civil Rights Conspiracy

### Plaintiff v. All Individual Defendants

220.    Plaintiff hereby incorporates all preceding paragraphs of this Complaint, as if set forth fully herein.

221.    The Individual Defendants, acting within the course and scope of their employment and under color of state law, agreed amongst themselves and with other individuals, to act in concert in order to deprive Plaintiff Robert Thomas of his clearly established Constitutional Rights established under the Fourth and Fourteenth Amendment to be free from malicious prosecution and deprivation of liberty without due process of law.

222.    In furtherance of this conspiracy, the Individual Defendants engaged in and facilitated numerous overt acts, including, without limitation, the following:

      a.  Fabricating statements and information for the purpose of unlawfully obtaining evidence against Plaintiff;

      b.  Withholding material exculpatory evidence from defense counsel and the court;

      c.  Wrongfully prosecuting Plaintiff while knowing they lacked probable cause;

      d.  Obtaining unreliable and fabricated statements from confidential witnesses who were state actors and known to be unreliable sources; and,

      e.  Attempting to manufacture witness statements from unreliable informants when prior information from informants was found to be unreliable.

223.    Defendants' act and omissions, as described herein, were the direct and proximate cause of Plaintiff Robert Thomas' injuries as detailed herein.

224.    Defendants knew, or should have known, that their conduct would result in Plaintiff's wrongful arrest, prosecution, and incarceration, which are clear violations of Constitutional rights would have been known to the Defendants at the time they engaged in such conduct.

## COUNT IV

### 42 U.S.C. § 1983 – Failure to Intervene

### Plaintiff v. All Individual Defendants and Supervisor McDonough

225.    Plaintiff hereby incorporates all preceding paragraphs of this Complaint, as if set forth more fully herein.

226.    By their conduct and acting under color of state law, the Defendants, acting within the course and scope of their employment, had meaningful, realistic, and reasonable opportunities to intervene on behalf of Plaintiff Robert Thomas to prevent the Constitutional deprivations he suffered as detailed herein, including the conspiracy to deprive Plaintiff of his Constitutional rights.

227.    With wanton, intentional, reckless, and deliberate indifference to his rights, Defendants failed to intervene when they knew, or should have known, that direct and conspiratorial Constitutional rights violations were being perpetrated against Plaintiff.

228.    The failure of the Defendants to intervene violated Plaintiff's clearly established Constitutional rights as detailed herein.

229.    No reasonable law enforcement officer at the times relevant herein would have believed that failing to intervene to prevent these Defendants from engaging in the conduct detailed herein were lawful actions.

230.    The failure to intervene was a direct and proximate cause of Plaintiff Robert Thomas' injuries, and the Defendants knew, or should have known, that their failure to intervene would result in the wrongful arrest, prosecution, and incarceration of Plaintiff.

## COUNT V

### 42 U.S.C. § 1983 – Supervisor Liability

### Plaintiff v. Supervisor Defendants McDonough and Scherer

231.    Plaintiff hereby incorporates all preceding paragraphs of this Complaint, as if set forth more fully herein.

232.    The Individual Defendants acted with impunity in an environment in which they were not adequately supervised, disciplined, or trained by the Supervisory Defendants, in this case and as a matter of practice.

233.    Supervisory Defendants acted with gross negligence, recklessness, and/or deliberate indifference to the Constitutional rights of citizens by failing to provide adequate training, supervision, and discipline to the Defendant officers and prosecutors, thereby causing the individuals to deprive Plaintiff Robert Thomas of his clearly established Constitutional rights, including the right to be free from false imprisonment, malicious prosecution, and deprivation of his due process rights.

234.    If Supervisory Defendants had not provided grossly inadequate training, supervision, and discipline to the Defendant officers and prosecutors, they would not have engaged in the unlawful, intentional, wanton, reckless, and deliberately indifferent conduct which caused violations of the Constitutional rights of Plaintiff Robert Thomas. Defendants Hitchings, Dolfi, Foley, Kinavey, and Miller were directly involved in the investigation of Plaintiff Robert Thomas

and the Wilkinsburg Massacre, and the Supervisory Defendants directly supervised the specific investigative acts taken by the law enforcement officers and prosecutors in this case.

235.    The grossly negligent, reckless, and/or deliberately indifferent conduct of Supervisory Defendants was done while acting under color of state law, in violation of their clearly established duty to supervise Defendants, and no reasonable law enforcement supervisor or District Attorney would have believed that the grossly negligent, reckless, and/or deliberately indifferent supervision in the face of actual or constructive notice of misconduct by their subordinates was lawful.

236.    As a direct and proximate result of Defendants' actions and inactions, Plaintiff Robert Thomas was wrongfully arrested, prosecuted, and incarcerated for over four (4) years, suffering from the injuries identified herein.

## COUNT VI

### 42 U.S.C. § 1983 – *Monell* Claim

### Plaintiff v. Defendant County of Allegheny

237.     Plaintiff hereby incorporates all prior paragraphs of this Complaint, as if set forth more fully herein.

238.    Defendant County of Allegheny was at all times relevant hereto responsible for the policies, practices, and customs of the Allegheny County Police Department and the Allegheny County District Attorney's Office.

239.    Defendant County of Allegheny had a policy, practice, and custom of unconstitutional misconduct in homicide investigations, including the encouragement and use of unreliable and manufactured confidential informants and witness statements that law enforcement

41

and prosecutors knew, or should have known, were false; the withholding of exculpatory evidence; ignoring evidence which clearly showed the innocence of suspects, including Plaintiff Robert Thomas; conspiracy to commit Civil Rights violations; and the intentional failure to conduct adequate investigation, monitoring, oversight, and prosecution of crimes.

240.    Defendant County of Allegheny, through the actions and inactions of its Supervisors and employees acting under color of state law, engaged in a custom, pattern, practice, and policy of unconstitutional misconduct in homicide investigations and prosecution.

241.    Defendant Allegheny County through the actions of its Policymakers, also ratified the unconstitutional conduct, decisions, and actions of Defendants as described herein.

### COUNT VII

### 42 U.S.C. § 1983 – Sixth Amendment Violation

### Plaintiff v. Defendant County of Allegheny

242.    Plaintiff hereby incorporates all prior paragraphs of this Complaint, as if set forth more fully herein.

243.    At the time Plaintiff was interrogated by Kendall Mikell in April 2016 while in Allegheny County Jail, Kendall Mikell was a known, designated agent of the state and acting under color of state law at the time he solicited information from Plaintiff.

244.    Plaintiff's Sixth Amendment right to counsel was violated by reason of his interrogation by an agent of the state without knowledge of the individual working as a state actor, and without the assistance of counsel guaranteed to him pursuant to the Sixth Amendment to the United States Constitution.

## STATE LAW CAUSES OF ACTION

### COUNT VIII – Pennsylvania State Law Malicious Prosecution/Abuse of Process

### Plaintiff v. Individual Defendants Dolfi

245.    Plaintiff incorporates all prior paragraphs of this Complaint, as if set forth more fully herein.

246.    The Individual Defendants initiated criminal proceedings against Plaintiff Robert Thomas without probable cause, with malice, and the proceedings were ultimately terminated in Plaintiff Robert Thomas's favor on February 3, 2020, when Allegheny County Court of Common Pleas Judge Edward J. Borkowski.

247.    As a direct and proximate result of this malicious prosecution, Plaintiff Robert Thomas sustained the injuries and damages as detailed herein.

**WHEREFORE,** Plaintiff Robert Thomas requests the following:

A. This Honorable Court award compensatory damages to Plaintiff and against all Defendants, in an amount to be determined at trial;

B. This Honorable Court award punitive damages to Plaintiff and against all Individual Defendants in their individual capacity, in an amount to be determined at trial and in an amount that will deter such conduct by Defendants in the future;

C. Trial by Jury;

D. Pre-judgment and post-judgment interest and recovery of Plaintiff's costs, including reasonable attorney's fees pursuant to 42 U.S.C. § 1988 for all 42 U.S.C. § 1983 claims; and,

E.  Any and all other relief for which Plaintiff may be entitled.


**PLAINTIFFS DEMANDS A TRIAL BY JURY.**


Respectfully submitted,


By: /s/ Max Petrunya
MAX PETRUNYA, ESQUIRE
Pa. I.D. No.: 309122

MAX PETRUNYA, P.C.
5 Bayard Rd. Unit 917
Pittsburgh, PA 15213
(412) 720-3497
maxpetrunyapc@gmail.com

By: /s/ Paul Jubas
PAUL JUBAS, ESQUIRE
Pa. I.D. No.: 311832

PAUL JUBAS LAW
P.O. Box 10704
Pittsburgh, PA 15203
(412) 230-0023
pjubasesq@gmail.com


Counsel for Plaintiffs