Case 2:22-cv-00125B Document 30-3 Filed 02/02/22 Page 1 of 25
Allegheny County Clerk of Courts Filed 1/30/2020 6:30 PM
Allegheny County Clerk of Courts Filed 1/30/2020 6:30 PM

1

IN THE COURT OF COMMON PLEAS OF
ALLEGHENY COUNTY, PENNSYLVANIA

- - - - -

COMMONWEALTH OF PENNSYLVANIA

vs.

CHERON SHELTON
ROBERT THOMAS

CRIMINAL DIVISION

OTN G 747177-4 (Shelton)
CR-5056-2016

OTN G 747176-3 (Thomas)
CR-5058-2016

PROCEEDING:
Homicide Preliminary Hearing

BEFORE: David Barton,
Magisterial District Judge

DATE:
July 29, 2016

Reported and transcribed by:
Mary Beth Perko, RMR
Official Court Reporter

COUNSEL OF RECORD:

For the Commonwealth:
Kevin Chernosky, ADA
Lisa Pellegrini, ADA
Alicia Werner, ADA

For the Defendant Shelton:
Randall McKinney, Esq.

For the Defendant Thomas:
Casey White, Esq.

```
 1                              - - -

 2                          I-N-D-E-X

 3

 4                       July 29, 2016

 5

 6                                                    PAGE

 7

 8    Stipulations                                     7

 9    WITNESSES:

10

11    Sergeant Michael Adams
           Direct by Mr. Chernosky                    15
12         Cross by Mr. McKinney                       28
           Cross by Mr. White                          35
13         Redirect by Mr. Chernosky                   44
           Recross by Mr. White                        44

14

15    John Krah
           Direct by Mr. Chernosky                    45
16         Cross by Mr. White                          49

17    Detective Todd Dolfi
           Direct by Mr. Chernosky                    50
18         Cross by Mr. McKinney                       58
           Cross by Mr. White                          59
19

20    Detective Kevin McCue
           Direct by Mr. Chernosky                    61
21         Cross by Mr. McKinney                       77
           Cross by Mr. White                          83
22         Redirect by Mr. Chernosky                   85

23

24    Detective Feeney
           Direct by Mr. Chernosky                    86
25         Cross by Mr. McKinney                       92
```

3

1

**Detective Patrick Miller**
2       Direct by Mr. Chernosky                         94
        Cross by Mr. McKinney                          103
3       Cross by Mr. White                             106
        Redirect by Mr. Chernosky                      112
4


5

**Inspector William Palmer**
6       Direct by Mr. Chernosky                        115
        Cross by Mr. McKinney                          122
7       Cross by Mr. White                        124, 131
        Redirect by Mr. Chernosky                      128
8

9   **Detective Feeney**
        By Mr. Chernosky
10                                                      134


11  **Detective Michael Caruso**
        Direct by Mr. Chernosky                        135
12      Cross by Mr. McKinney                          146
        Cross by Mr. White                             151
13


14  **Closing Arguments**
        By Mr. McKinney                                155
15      By Mr. White                                   160
        By Mr. Chernosky                               163
16

17                          - - -

18

19

20

21

22

23

24

25

MARY BETH PERKO, RMR    (412) 350-5414

Case 2:22-cv-00126-2B Document 130-8 Filed 02/02/22 Page 4 of 25

1    THE COURT:  Thank you, Detective.  You
2    may step down.  Commonwealth may call its
3    next witness.
4    MR. CHERNOSKY:  Thank you, Your Honor.
5    Commonwealth would call Detective Patrick
6    Miller.
7    THE WITNESS:  Good afternoon, sir.
8                    - - -
9    <u>DETECTIVE PATRICK MILLER</u>
10   a witness herein, having been first duly sworn, was
11   examined and testified as follows:
12   <u>DIRECT EXAMINATION</u>
13   <u>BY MR. CHERNOSKY</u>:
14   Q.   Detective Miller, how are you employed?
15   A.   I'm employed by the Allegheny County Police
16        Department assigned to the Homicide Unit.
17   Q.   How long have you been employed by Allegheny County?
18   A.   I am in my 20th year.
19   Q.   And how long as a detective in the Homicide
20        Division?
21   A.   I've been in the Homicide Unit for ten years.
22   Q.   Were you assigned to participate in the
23        investigation of multiple deaths that occurred at
24        1304 Franklin Avenue in Wilkinsburg?
25   A.   Yes, sir.

1    Q.   During the course of your investigation did you
2         develop a phone number to be associated with Cheron
3         Shelton during the time of the homicide?
4    A.   Yes.
5    Q.   What was it?
6    A.   412-892-0447.
7              MR. McKINNEY:  Your Honor, I'm going to
8         ask for additional foundation to determine
9         how this detective determined that that
10        number is associated with my client.
11             MR. CHERNOSKY:  Thank you, Your Honor.
12   Q.   How were you able to determine that phone number was
13        associated with Mr. Shelton?
14   A.   Through an interview conducted with his girlfriend
15        Chanel Falls.
16   Q.   What did Ms. Falls tell you?
17   A.   She told me that she purchased that cell phone for
18        Mr. Shelton upon his release from jail on unrelated
19        matters.
20   Q.   Based on this information, did you obtain a court
21        order for the call detail and/or text detail logs of
22        that phone number?
23   A.   Yes.  On March 15 a court order was sent out to
24        T-Mobile for those records.
25   Q.   During the course of your investigation did you

1          develop information for a cell phone number that was

2          associated with Rob Thomas?

3     A.   Yes.

4     Q.   What was that number?

5     A.   412-378-3461.

6     Q.   And how were you able to develop that number?

7     A.   That number was developed through a couple different

8          means, the first of which was an interview conducted

9          with Brittany Shelton on March 12.

10              MR. WHITE:  Your Honor, at this point

11         I'm going to object to the nature of the

12         testimony.  This is hearsay on hearsay.  He's

13         testifying what Brittany Shelton is telling

14         him.

15    Q.   Actually, did Brittany Shelton tell you anything?

16    A.   No, sir.

17              MR. WHITE:  Then I would object to any

18         testimony relevant to Brittany Shelton

19         telling somebody about Rob Thomas's cell

20         phone.

21              MR. CHERNOSKY:  May I continue, Your

22         Honor?

23              THE COURT:  One second, Mr. Chernosky.

24         Let's object to specific questions.  He'll

25         repeat the question.  If you have an

1          objection, you can object.  If not, the

2          witness will answer.

3               Mr. Chernosky, you can repeat the

4          question.

5               MR. CHERNOSKY:  Thank you.

6     Q.   How is it that you developed Robert Thomas's cell

7          phone during the time of the murders?

8     A.   Through a phone download of Brittany Shelton's

9          phone.

10    Q.   Was that conducted by the county police?

11    A.   Yes, it was.

12    Q.   What do the cell download records reveal with regard

13         to Robert Thomas?

14    A.   Well, first it revealed a contact in her contact log

15         as Millhouze, M-i-l-l-h-o-u-z-e, with that

16         associated phone number.

17    Q.   What was the associated phone number?

18    A.   412-378-3461.

19    Q.   What else did the download of Brittany Shelton's

20         phone reveal?

21    A.   A text message received on February 1 of this year

22         from Millhouze, same 378 number.  In the text, body

23         of the text, it said "Hey, it's Rob.  I need you to

24         call me."

25    Q.   Are you aware of an interview conducted with Robert

Case 2:20-cv-01362-JB Document 130-8 Filed 02/02/22 Page 8 of 25

1      Thomas himself at the Allegheny County Police
2      Department?
3  A.  Yes.  He was interviewed April 5 of this year.
4  Q.  Was he asked if he goes by any aliases or nicknames?
5           MR. WHITE:  Your Honor, at this point
6      I'm going to object because it's hearsay.
7      It's not admissible.  It's hearsay on hearsay
8      because the detective did not interview my
9      client.
10          THE COURT:  Mr. Chernosky.
11          MR. CHERNOSKY:  Your Honor, the
12     objection was, if I'm correct, that there was
13     no foundation from which the witness could
14     testify that he knows or was aware of a phone
15     number that was associated with Rob Thomas.
16     I am simply laying the foundation.
17          Mr. White's objection requires him to
18     explain how he knows it.  He knows that an
19     interview was conducted with Rob Thomas
20     himself wherein he admitted that he goes by
21     the fake name that was found in a download on
22     someone's phone associated with a certain
23     number.
24          Further, the detective is aware that
25     that download produced a text message wherein

1   the owner of that purported phone number

2   says, "It's Rob.  Give me a call back."

3        Those things combined lay a foundation

4   for why the witness can testify that he is

5   aware this phone number was associated with

6   Rob Thomas.

7        MR. WHITE:  Your Honor, my objection is

8   that my client purportedly made a statement

9   against interest.  That is obviously a

10  hearsay exception.  This detective did not

11  interview my client specifically, so this

12  detective's going to testify to what another

13  detective told him.  So, therefore, you can't

14  have hearsay on hearsay.

15       I understand the ruling in Ricker, but

16  you can't just have hearsay upon hearsay.

17  You can't just let the whole thing in.

18       THE COURT:  It wouldn't be hearsay on

19  hearsay, but it's hearsay as to this witness.

20  Under Ricker I'm going to overrule the

21  objection.  You can cross-examine him on who

22  interviewed your client.

23       Mr. Chernosky, would you repeat the

24  question for the witness, please.

25       MR. CHERNOSKY:  Thank you, Your Honor.

Case 2:05-cr-00036-B Document 130-8 Filed 02/20/22 Page 10 of 25

1    Q.   I believe the question was, are you aware of an

2         interview of the defendant Rob Thomas himself

3         wherein he was asked if he went by any nicknames?

4    A.   Yes, sir.

5    Q.   And did he acknowledge in that interview that he

6         goes by the nickname Millhouze or Houze?

7    A.   Yes, he did.

8    Q.   Further, are you aware that he was connected with

9         this phone number itself and asked if that was his

10        phone number at the time?

11   A.   Yes, he was.

12   Q.   And are you aware of what his response in that

13        regard was?

14   A.   He stated that he agreed with the detective that

15        that probably was his number at the time of the

16        homicides.

17   Q.   Based on the information you had regarding both of

18        these cell phone numbers, did you retrieve or apply

19        for court orders for call detail logs and text

20        message logs for both numbers?

21   A.   Yes.  The first court order was sent on March 12 by

22        Detective Scott Towne, T-o-w-n-e.  That would have

23        been for the 412-892-0447 number, and then on

24        April 6 I applied for a court order and sent one out

25        for 412-378-3461.

1    Q.    With regard to both of those call detail and text

2          detail logs, what can you tell the Court with regard

3          to communication between the number associated with

4          Cheron Shelton and the number associated with Robert

5          Thomas the night of the murders?

6    A.    There was a lot of contact via text message and

7          incoming/outgoing calls between the two.

8          Specifically there were 37 instances where the

9          phones contacted one another between 8:00 p.m. and

10         midnight on the 10th.

11   Q.    I'm going to direct your attention specifically to

12         the time period around 10:30.  Is there contact

13         between phones associated with either individual

14         between one another at 10:30?

15   A.    At 10:31, yes, there was a text message sent from

16         Mr. Thomas to Mr. Shelton which was then returned, a

17         return text three minutes later at 10:34.

18   Q.    Moving past that, is there a contact after

19         10:34 p.m.?

20   A.    There is a four-minute, 55-second phone call at

21         10:46 p.m.

22   Q.    And if you can, was that from the phone number

23         associated with Cheron Shelton or from the phone

24         number associated with Rob Thomas?

25   A.    It was from Mr. Thomas to Mr. Shelton.

1    Q.    And how long is that phone call?

2    A.    Four minutes and 55 seconds.

3    Q.    When did it originate?

4    A.    10:46 p.m.

5    Q.    So what time does that phone call end?

6    A.    I'm sorry?

7    Q.    What time, if you were with to do the math, does

8          that phone call end?

9    A.    Roughly 10:51.

10   Q.    What time is the shooting?

11   A.    10:53.

12   Q.    Is there any contact between the phone number

13         associated with Rob Thomas and the phone number

14         associated with Cheron Shelton during the shooting?

15   A.    No.

16   Q.    What is the first contact between the phone number

17         associated with Cheron Shelton and the phone number

18         associated with Rob Thomas after the shooting?

19   A.    10:56 p.m.

20   Q.    How many total contacts are there from the time

21         after the shooting until later that night?

22   A.    There were a total of 12 between incoming and

23         outgoing and text messages.

24   Q.    I'm going to show you what I will mark as

25         Commonwealth's Exhibit 72.  Is Commonwealth's

1      Exhibit 72 a visual depiction of the information

2      that you just testified to?

3  A.  Yes.

4          MR. CHERNOSKY:  Move for the admission

5      of Commonwealth's Exhibit 72.

6          MR. McKINNEY:  No objection.

7          MR. WHITE:  No objection.

8          MR. CHERNOSKY:  No further questions

9      for the witness.  I'll offer for cross.

10         THE COURT:  Mr. McKinney?

11             - - -

12          <u>CROSS-EXAMINATION</u>

13  <u>BY MR. McKINNEY</u>:

14  Q.  Detective, would you agree with me that the only way

15      you're able to attribute that cell phone that you're

16      attributing to Mr. Shelton is based solely on the

17      statement made by Chanel Falls?

18  A.  I would say that to be accurate.

19  Q.  So you don't have any subscriber information that,

20      in fact, connects that phone to Mr. Shelton?

21  A.  No.  The subscriber information did not come back to

22      him directly, no, sir.

23  Q.  Who did it come back to?

24  A.  I don't recall.  It was not Mr. Shelton's name.  A

25      fictitious name.  I don't recall.

Case 2:25-cv-00136-23B Document 130-8 Filed 02/02/22 Page 14 of 25

1    Q.   It was a fictitious name?

2    A.   I believe so, yes.

3    Q.   So your testimony on direct was Chanel Falls told

4         you that she bought him that phone?

5    A.   Yes.

6    Q.   But now you're also saying that it was a fictitious

7         name that was used to purchase that phone?

8    A.   It's fictitious in the sense you are not required to

9         show ID when you purchase a cell phone from, say, a

10        Walgreens or Target or somebody.  You can buy a

11        generic flip phone or a TracFone, something of that

12        nature where you're not required to show ID.  That's

13        what I mean by that.

14   Q.   Got you.  So is there a name associated with the

15        subscriber information for that phone?

16   A.   I believe there is, sir.  I just don't recall what

17        it is at this time.

18   Q.   Not to pressure you, do you know whether the name is

19        Chanel Falls?

20   A.   I don't think so.

21   Q.   And when Chanel told you that she bought the phone

22        for Cheron, was that statement recorded in writing?

23        I.e., did she write down a statement saying "I

24        bought the phone for Cheron Shelton"?

25   A.   I believe it was conducted at headquarters and, if

MARY BETH PERKO, RMR   (412) 350-5414

1           so, it would have been recorded, yes.

2       Q.  Now, you're aware that the allegation in this case

3           is that the defendants committed this act together

4           at the same time?  Are you aware of that?

5       A.  Yes.

6       Q.  Yet your testimony is that on 37 separate instances

7           they were communicating via phone conversation or

8           text message; is that correct?

9       A.  Yes.

10      Q.  Would you agree with me that it would be unusual for

11          two people who were together --

12              MR. CHERNOSKY:  Objection, Your Honor.

13          This calls for speculation on behalf of

14          the --

15              MR. McKINNEY:  I think it's a fair

16          question.  Can I at least finish the question

17          before the Court rules on it?

18              THE COURT:  I'll let you finish the

19          question and then Mr. Chernosky can decide

20          whether he wants to object at that time.

21      Q.  Would you agree with me that if two people are in

22          close proximity -- i.e., right next to each other --

23          it would be unusual for them to communicate via cell

24          phone on 37 separate instances?

25              MR. CHERNOSKY:  I object, Your Honor.

Case 2:2295-vr-00-1960-ZB  Document 130-8  Filed 02/20/222  Page 16 of 25

1           Calls for speculation.

2                    THE COURT:  Sustained.

3     Q.    Now, you would agree with me that you don't know

4           what the content of those text messages was;

5           correct?

6     A.    I do not.

7     Q.    And you don't know what the substance of those phone

8           communications was; correct?

9     A.    I do not.

10    Q.    Were you ever able to recover either cell phone?

11    A.    No.  Well -- No.  Mr. Thomas and Mr. Shelton?  The

12          378 and 892 numbers?  No, we were not.

13                    MR. McKINNEY:  No additional questions,

14          Your Honor.  Thank you.

15                    THE COURT:  Mr. White?

16                    MR. WHITE:  Thank you.

17                         - - -

18                    <u>CROSS-EXAMINATION</u>

19    <u>BY MR. WHITE</u>:

20    Q.    Detective Miller, the telephone number 412-378-3461,

21          who is that number subscribed to?

22    A.    I don't recall.

23    Q.    Is there a name?

24    A.    There is a name but it's not Mr. Thomas.

25    Q.    And would that be reflected in your notes or in any

1          report?

2    A.    I'm sure it is, yes.

3    Q.    And where was that cell phone purchased?

4    A.    I do not know the answer to that.

5    Q.    And where do the bills for that cell phone go to?

6    A.    I don't know.

7    Q.    Do they have an address or location?

8    A.    They do.  It's on the call detail records.  I just

9          don't know it at this time.

10   Q.    But it's not Mr. Thomas' house; correct?

11   A.    No, sir.

12   Q.    And this interview done by my client where he said

13         it was probably his number, you used the term

14         "probably"; is that correct?

15   A.    I believe I said the term "agreed."  He agreed with

16         the detectives that that was most likely his phone

17         at the time of the crime, yes.

18   Q.    But he said "most likely" or "probably" his phone?

19         He wasn't certain it was his phone; correct?

20   A.    That's what he said, yes.

21   Q.    And this interview was recorded; correct?

22   A.    As far as I know, yes.

23   Q.    This was done with Detective Hitchings; correct?

24   A.    Sounds appropriate, yes.

25   Q.    And before you on Exhibit 72 you have about 32 forms

1                of communication between purportedly Mr. Shelton's

2                phone and purportedly my client's phone?

3       A.     I believe it was 37, but yes.

4       Q.     Do you have any idea what was said during those

5                phone conversations if and when these two

6                individuals talked or spoke?

7       A.     I do not.

8       Q.     And these text messages, these SMS text messages,

9                what do they say?

10      A.     I have no idea.

11      Q.     And you don't have that information back at the

12               station; is that correct?

13      A.     That is not part of the call detail records, no.

14      Q.     And during that same interview you alluded to of

15               Mr. Thomas, Mr. Thomas indicated where he was during

16               the time of the shootings; is that correct?

17      A.     Yes, he did.

18      Q.     And he doesn't place himself at the shootings; is

19               that correct?

20      A.     No, he doesn't.

21      Q.     I'm going to draw your attention to what I'll mark

22               as Defendant's Exhibit A.

23                       MR. WHITE:  May I approach, Your Honor?

24                       THE COURT:  Yes.

25      Q.     I'm going to show you what I'll mark as Defendant's

1            Exhibit A.  Do you recognize that document?

2     A.    Sort of looks similar to the document I just saw,

3            much smaller text.

4     Q.    It's much smaller text.  I apologize.

5     A.    That's all right.

6     Q.    You have from 8:04 p.m. to 11:44 p.m. on the

7            Commonwealth's exhibit; correct?

8     A.    Yes, sir.

9     Q.    And on this document I have from 8:04 p.m. to all

10           the way to 4:11 a.m.; correct?

11    A.    Yes.

12    Q.    Okay.  Is that a document you're familiar with, that

13           graph?

14    A.    I've seen it before, yes.

15    Q.    And in this document, I apologize again for the

16           wording to be so small, but at 12:14 a.m., do you

17           see what that says?

18    A.    "Unanswered voice call" from Shelton to Thomas.

19    Q.    I'm sorry.  What time was that?

20    A.    12:14 and 54 seconds a.m.

21    Q.    And at 12:15 and 22 seconds, what does it depict?

22    A.    Unanswered voice call from Shelton to Thomas.

23    Q.    And based on your investigation, you believe that

24           Shelton and Thomas are together at that time; is

25           that correct?

1     A.   Pardon me, sir?

2     Q.   During the time of those two telephone

3          conversations, those two attempted telephone

4          contacts, are Mr. Shelton and Mr. Thomas purportedly

5          in the same home?

6     A.   I don't know the answer to that.

7     Q.   Well, the shootings happened at approximately a

8          little before 11 p.m.; correct?

9     A.   Yes.  10:53 is the 911 call.

10    Q.   And 11:57 Mr. Thomas purportedly enters the rear of

11         1214 Nolan Court; correct?

12    A.   I don't know that to be factual.

13    Q.   It's on my Defendant's Exhibit A.

14    A.   That doesn't mean it's factual.

15    Q.   That's what's on your exhibit, sir.  It's on the

16         exhibit you produced to the media, so looking at

17         that exhibit, do you recognize that exhibit as --

18    A.   What's the time?

19    Q.   At 11:47 p.m.  It's in the blue.

20    A.   Okay.  Thomas enters rear of 1214 Nolan Court.  I

21         see it.

22    Q.   And the next time depicted is 12:14 a.m. and 54

23         seconds; correct?

24    A.   Yes.

25    Q.   And in there it says that there's an unanswered

1         voice call from Shelton to Thomas, and then below

2         that it says there's an unanswered voice call from

3         Shelton to Thomas; correct?

4    A.   That's correct.

5    Q.   And then the next box depicted in the blue above it

6         it says Shelton and Thomas exit 1214 Nolan Court.

7         Do you see that?

8    A.   Yes.

9    Q.   Okay.  So based on your investigation and based on

10        what you produced in Commonwealth's Exhibit 72, it's

11        your understanding that Mr. Shelton and Mr. Thomas

12        called each other while they're in the same home?

13   A.   If that's what the records reflect.

14             MR. WHITE:  Your Honor, I move for

15          admission of Defendant's Exhibit A into

16          evidence.

17             MR. CHERNOSKY:  No objection.

18             THE COURT:  Defendant's Exhibit A is

19          admitted.

20             MR. WHITE:  I have nothing further,

21          Your Honor.

22             THE COURT:  Redirect?

23             MR. CHERNOSKY:  Just briefly on

24          redirect, Your Honor.

25                              - - -

Case 2:22-cv-00126-5B Document 113-8 Filed 02/02/22 Page 22 of 25

1          REDIRECT EXAMINATION

2     BY MR. CHERNOSKY:

3     Q.    To the extent that Mr. White asked you if his client

4           placed himself elsewhere in the interview with

5           Detective Hitchings --

6     A.    Yes.

7     Q.    -- are you aware that in that interview with

8           Detective Hitchings he acknowledged that it was he

9           who jumped over the fence?

10              MR. WHITE:  I'm going to object, Your

11          Honor.  That's outside the scope of my cross.

12              MR. CHERNOSKY:  It's not outside the

13          scope of his cross.  He asked if his client

14          put himself elsewhere at the time of the

15          shooting, which directly asked about his

16          client's location.

17              If the detective knows that his client

18          put himself at the scene of Nolan Court where

19          he's on video and tells us that that was him

20          and the detective knows about it, he can

21          testify.

22              MR. WHITE:  He's referencing what

23          happened after the shooting.  I'm asking what

24          happened during the shooting, where my client

25          was.  It has nothing to do with after the

P. Miller - Redirect by Mr. Chernosky     113

1    shooting.
2         THE COURT:  The Court understood your
3    questions pertained to the events that
4    occurred after the shooting.
5         MR. WHITE:  Or before the shooting.  I
6    asked Detective Miller, Did my client place
7    himself at the scene of the shooting?  The
8    answer was no.  He placed him somewhere else,
9    so before and during the shooting.
10        THE COURT:  But your question was phone
11   calls that occurred at 12 something, which is
12   after the shooting.  Your question to him
13   was, You contend they're both in the same
14   house, 1214 Nolan Court at 12 something.
15        MR. WHITE:  I'm not contending that.
16   I'm just --
17        THE COURT:  Well, that was your
18   question, and you asked the witness, Is it
19   your contention that they were in the same
20   house based upon the other testimony when
21   these two calls occurred.
22        MR. WHITE:  I just found it odd two
23   people would call each other when they're in
24   the same home.
25        THE COURT:  I suppose that's why you

MARY BETH PERKO, RMR    (412) 350-5414

P. Miller - Redirect by Mr. Chernosky    114

1          asked the question.  I understand.  I think
2          you opened the door.  I'm going to permit the
3          question.  You can repeat the question, if
4          you can, Mr. Chernosky.
5     Q.   Detective, are you aware of the interview conducted
6          by Detective Hitchings with Robert Thomas?
7     A.   Yes, I am.
8     Q.   Are you aware that Mr. Thomas acknowledges that that
9          is him on the video at Nolan Court wearing the
10         jacket with the fur collar?
11    A.   Yes.
12    Q.   And entering the back of Nolan Court?
13    A.   Yes.
14    Q.   Are you aware that Mr. Thomas acknowledges that that
15         is Mr. Shelton who entered before him?
16    A.   Yes.
17              MR. McKINNEY:  Objection.  Ask that
18         that be stricken from the record on Bruton,
19         Your Honor.  A co-defendant's statement can't
20         be used against -- The Court is well aware.
21              THE COURT:  Mr. Chernosky?
22              MR. CHERNOSKY:  Your Honor, to the
23         extent that Your Honor would consider that,
24         Your Honor would consider that against
25         Mr. Thomas only and not against Mr. Shelton.


                MARY BETH PERKO, RMR    (412) 350-5414

W. Palmer - Direct by Mr. Chernosky          115

1      I believe you're capable of parsing the two

2      out.

3           THE COURT:  The Court will acknowledge

4      that testimony only as to Mr. Thomas, not as

5      to Mr. Shelton.

6           MR. McKINNEY:  Thank you.

7           MR. CHERNOSKY:  No further redirect,

8      Your Honor.

9           MR. McKINNEY:  No recross, Your Honor.

10          MR. WHITE:  No recross, Your Honor.

11          THE COURT:  Thank you, Detective.  You

12     may step down.  Mr. Chernosky, call your next

13     witness.

14          MR. CHERNOSKY:  Thank you, Your Honor.

15     Commonwealth calls Inspector Palmer.

16                      - - -

17              INSPECTOR WILLIAM PALMER

18     a witness herein, having been first duly sworn, was

19     examined and testified as follows:

20               DIRECT EXAMINATION

21     BY MR. CHERNOSKY:

22     Q.   Inspector Palmer, can you state your first and last

23          name and spell your last name for the record.

24     A.   William Palmer, P-a-l-m-e-r.

25     Q.   How are you currently employed?