1

2          IN THE COURT OF COMMON PLEAS OF
                ALLEGHENY COUNTY, PA
3
                      -----
4
   COMMONWEALTH OF          ) CRIMINAL DIVISION
5  PENNSYLVANIA             )
                            ) No.  201608964
6       vs.                 )
                            ) TYPE OF PROCEEDING:
7  CHERON SHELTON           )  Jury Trial
                            )
8                           ) REPORTED BY:
                            )  Michele A. Murawski
9                           )  Official Court Reporter
                            )
10                          ) DATE:   Thursday,
                            )         February 6, 2020
11                          ) to
                            )         Friday,
12                          )         February 14, 2020
                            )
13                          ) BEFORE:
                            )  Hon. Edward J. Borkowski
14                          )
                            ) COUNSEL OF RECORD
15                          )  FOR THE COMMONWEALTH:
                            )
16                          ) Lisa Pellegrini,
                            ) Assistant District Attorney
17                          )
                            ) Kevin Chernosky,
18                          ) Deputy District Attorney
                            )
19                          ) COUNSEL OF RECORD:
                            )
20                          )  FOR THE DEFENDANT,
                            )    CHERON SHELTON:
21                          )
                            ) Randall H. McKinney, Esq.
22                          ) Wendy L. Williams, Esq.

23                    -----

24
                   VOLUME II
25

1                          I N D E X

2
                    Thursday, February 6, 2020
3
       <u>WITNESS</u>                                            <u>PAGE</u>
4
       Matthew Rosenberg
5         Direct Examination by Mr. Chernosky....     9

6      Thomas Foley
          Direct Examination by Mr. Chernosky....    15
7         Cross-Examination by Mr. McKinney......    23

8      Todd Dolfi
          Direct Examination by Mr. Chernosky....    26
9         Cross-Examination by Mr. McKinney......    34

10     Steven Hitchings
          Direct Examination by Mr. Chernosky....    36
11        Cross-Examination by Mr. McKinney......    43

12     Channel Falls
          Direct Examination by Mr. Chernosky....    44
13        Cross-Examination by Mr. McKinney......    53

14     Desdrene Smith
          Direct Examination by Mr. Chernosky....    63
15        Cross-Examination by Mr. McKinney......    66

16     Brittany Shelton
          Direct Examination by Mr. Chernosky....    70
17        Cross-Examination by Mr. McKinney......    74

18     Scott Towne
          Direct Examination by Mr. Chernosky....    76
19        Cross-Examination by Mr. McKinney......    84

20     Patrick Miller
          Direct Examination by Mr. Chernosky....    88
21

22

23

24

25

```
1                    I N D E X

2         Thursday, February 6, 2020 (cont.)

3    WITNESS                                    PAGE

4    Thomas Morgan
         Direct Examination by Ms. Pellegrini...   91
5        Cross-Examination by Mr. McKinney......  103

6    Steven Hitchings
         Direct Examination by Mr. Chernosky....  113
7        Cross-Examination by Mr. McKinney......  114

8    Patrick Kinavey
         Direct Examination by Mr. Chernosky....  116
9        Cross-Examination by Mr. McKinney......  121

10   Marla Priestly
         Direct Examination by Ms. Pellegrini...  127
11
     Elizabeth Wisbon
12       Direct Examination by Ms. Pellegrini...  141
         Cross-Examination by Mr. McKinney......  163
13
     Baiyang Xu
14       Direct Examination by Ms. Pellegrini...  172

15
               Friday, February 7, 2020
16
     In chambers.............................  202
17
     WITNESS
18
     Baiyang Xu
19       Direct Examination by Ms. Pellegrini...  204

20   Willis Ashton Ennis
         Direct Examination by Ms. Pellegrini...  216
21
     Venerando Costa
22       Direct Examination by Mr. Chernosky....  241
         Cross-Examination by Mr. McKinney......  242
23
     Joseph Sierra
24       Direct Examination by Mr. Chernosky....  246

25   Motion..................................  265
```

```
1                    I N D E X

2              Monday, February 10, 2020

3      WITNESS                                    PAGE

4      Ryan Burke
          Direct Examination by Mr. Chernosky....   285
5         Cross-Examination by Mr. McKinney......   301
          Redirect-Examination by Mr. Chernosky..   306
6
       Jessica Dwyer
7         Direct Examination by Ms. Pellegrini...   307

8      Thomas Morgan
          Direct Examination by Ms. Pellegrini...   331
9         Cross-Examination by Mr. McKinney......   334

10     Motion...................................   337

11     Desdrene Smith
          Direct Examination by Mr. McKinney.....   338
12
       Points for Charge........................   343
13
       Cheron Shelton - Colloquy................   345
14
       Closing Arguments
15        by Mr. McKinney.......................   349
          by Mr. Chernosky......................   386
16
       Jury Charge
17        by Honorable Edward J. Borkowski.......   408

18
                 Tuesday, February 11, 2020
19
       Jury Question............................   457
20
       Motion...................................   460
21

22               Wednesday, February 12, 2020

23     Jury Question............................   464

24

25
```

1                    I N D E X

2

3             Thursday, February 13, 2020

                                                PAGE
4
        Jury Deliberations continue............    469
5

6                 Friday, February 14, 2020

7       Verdict...............................    469

8
        Reporter's certificate................    474
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                P R O C E E D I N G S

 2                        -----

 3                (Thursday, February 6, 2020 -

 4      Open court - Jury not present.)

 5                        -----

 6                THE COURT:  As to Juror No. 16

 7      and the incident that happened yesterday, the

 8      Court has appointed Dave Obara to represent the

 9      actor.  The Sheriff's Department will be

10      interviewing the juror this morning for

11      possible other criminal charges other than the

12      contempt proceeding that I'm about to do this

13      morning.  I will do that immediately at 9:00 in

14      open court and proceed to the trial.

15                Under the circumstances, I think it

16      would be best and most expeditiously to excuse

17      No. 16 because I don't want to delay the trial

18      while she is being interviewed and this is a

19      new pressure and circumstance and I don't think

20      it is fair for her to continue.  Do you agree

21      with that?

22                MR. CHERNOSKY:  Yes, Your Honor.

23                MR. McKINNEY:  Yes, Your Honor.

24      And whether now or 9:00, I would like to

25      address the Court on Burke's testimony.
```

```
 1                    MR. CHERNOSKY:  As long as we are
 2       on the record, I would like to address some
 3       matters.  Agent Burke, the custodian of records
 4       right now, I'll know at the lunch break today
 5       or tomorrow afternoon, if Agent Burke cannot be
 6       here until Monday.  I'm waiting to confirm
 7       that.
 8                    THE COURT:  If I'm not persuaded
 9       otherwise, I will allow you to call him on
10       Monday.  All right.
11                    MR. McKINNEY:  Thank you.
12                    -----
13                    (Open court - Jury present.)
14                    -----
15                    THE COURT:  Good morning.  You
16       will notice, of course, by now that one of your
17       fellow jurors is no longer with us.  Nothing to
18       do with her conduct, of course.  As I told you
19       in my opening remarks, we zealously guard the
20       juror's right and protocol that you be free of
21       any outside influences.  That is why you are
22       told not to talk about the case with each other
23       or follow any media accounts.
24                    The circumstance with this particular
25       juror was that during the course of the
```

1   proceedings, a civilian positioned himself in

2   close proximity to that juror and attempted to

3   influence the juror.  So as I also told you if

4   that occurred that I would deal with it swiftly

5   and appropriately, I dealt with it swiftly.

6   Whether it was appropriately will be determined

7   perhaps by the Superior Court of Pennsylvania

8   if he should choose to appeal it but that

9   person is lodged in the Allegheny County Jail.

10          So notice is served to everyone,

11   regardless of what side of the aisle you're on,

12   if you attempt to influence these jurors or

13   contact them in any way, there is a similar

14   place for you.  Mr. Chernosky.

15          MR. CHERNOSKY:  Thank you, Your

16   Honor.  The Commonwealth would re-call William

17   Best and offer for cross.

18                    -----

19                 WILLIAM BEST,

20   a witness herein, having been previously first

21   duly sworn, was examined and testified as

22   follows:

23                    -----

24          MR. McKINNEY:  Your Honor, the

25   defense has no questions for Mr. Best.

M. Rosenberg - Direct by Mr. Chernosky

1                    THE COURT:  Thank you, Mr. Best.

2     Call your next witness.

3                    MR. CHERNOSKY:  The Commonwealth

4     calls Matt Rosenberg.

5                         -----

6                    MATTHEW ROSENBERG,

7     a witness herein, having been first duly sworn,

8     was examined and testified as follows:

9                         -----

10                   DIRECT EXAMINATION

11                        -----

12    BY MR. CHERNOSKY:

13         Q.  Mr. Rosenberg, could you state your

14    first and last name and spell your last name

15    for the court reporter?

16         A.  Matthew Rosenberg, R-O-S-E-N-B-E-R-G.

17         Q.  How are you employed?

18         A.  With the Allegheny County Police.

19         Q.  In what capacity are you employed with

20    the Allegheny County Police?

21         A.  I am the mobile device computer

22    forensic examiner.

23         Q.  Could you tell the jury what a mobile

24    device computer examiner does?

25         A.  I extract data from cell phones,

M. Rosenberg - Direct by Mr. Chernosky

1    computers, tablets, drones, any electronic

2    device.

3        Q.  How long have you been employed with

4    the Allegheny County Police?

5        A.  Five years.

6        Q.  How long as a mobile forensic examiner?

7        A.  Five years.

8        Q.  Directing your attention to the month

9    of March of 2016, were you employed in the

10   capacity that you just described at that point

11   in time?

12       A.  Yes, sir.

13       Q.  During the course of your employment

14   there, did you process several phones relative

15   to the Wilkinsburg investigation?

16       A.  Yes, sir.

17       Q.  Could you tell the jury how physically

18   a phone download is accomplished?

19       A.  So I receive phones from detectives

20   that provide them to me via a search warrant or

21   a consent to search at which point in time I

22   examine the device, identify any damage,

23   cracked screen, anything of that nature.  I

24   power the device on and I hook up the device to

25   a program and that software extracts all the

M. Rosenberg - Direct by Mr. Chernosky

1    data off of the device for me to view.

2        Q.   That extraction process that you just

3    referenced, is it always successful?

4        A.   There are times that it is not.

5        Q.   And times when it is not successful,

6    are you able to produce a result?

7        A.   Yeah, there are other options besides

8    the software.   There are technical processes

9    where I can take apart a phone down to the

10   memory chip and actually extract the data off

11   the memory chip itself.

12       Q.   Could you tell the jury, in general

13   terms, what is produced after the cell phone is

14   downloaded, what is the end product?

15       A.   So the end product, we initially can't

16   see it because it comes out as Xs and Os.   So

17   the software makes it able to view in normal

18   viewing terms.   You see the text messages,

19   calls or deleted content, web history, things

20   of that nature.

21       Q.   At the end of that process, is it

22   possible to reduce that material that is

23   produced by the software down to a report?

24       A.   Yes, it is.

25       Q.   How is that done?

M. Rosenberg - Direct by Mr. Chernosky

1      A.  Once the data is officially parsed out

2   and put in a viewable format for us to see, we

3   put it in a PDF program.  That allows me to put

4   it onto a disk or thumb drive for the

5   detectives to review.

6      Q.  Is it fair to say a PDF is essentially

7   a principle paper document?

8      A.  Yeah, I refer to it in layman's term as

9   a Word document that can be changed or altered.

10   That is what we use it as.

11      Q.  How does the software break down the

12   data that is contained in a cell phone

13   download?

14      A.  It will break it down to your call logs

15   will be one line and text messages or your SMS

16   section that shows up as a green bubble, your

17   MMS messages, your multi-media if you send a

18   picture or text message video.  You break it

19   down to your web searches or anything that you

20   may have searched on your phone.  Contacts, as

21   well, may be in that as well.

22      Q.  Does it also break it down into a

23   section referred to as a timeline?

24      A.  Yes, the timeline will actually show

25   from the moment you started your phone

M. Rosenberg - Direct by Mr. Chernosky

1    everything that you've done on the phone in

2    chronological order.

3        Q.  Is there a section in the download for

4    the term analytics?

5        A.  Phone analytics, yes.

6        Q.  What is generally contained in that

7    section?

8        A.  Generally phone analytics will show you

9    if you have contacts in your phone, how many

10   times you've spoken to that person, in which

11   ways you've spoken to that person, whether

12   you've talked to them via text mostly or called

13   them and it will give you the exact number of

14   times that you've done that.

15       Q.  With respect to the download of any

16   particular phone, how long is the PDF?

17       A.  So I've had some PDFs that are a page

18   and some that are over 30,000 pages.

19       Q.  I show you what I've marked as

20   Commonwealth Exhibits 438 and 439.  I'll just

21   ask you if 438 and 439 are just samples of the

22   cell phone download that you just described?

23       A.  Yes, it is.

24       Q.  Are the first two pages of most of the

25   downloads similar?

M. Rosenberg - Direct by Mr. Chernosky

1      A.   Yes, they are.

2      Q.   How so?

3      A.   On the first two pages, there is a

4    summary and it provides the device information

5    so it will provide you with the phone number of

6    the phone, the type of phone model, and all the

7    innerworkings of the phone, numbers,

8    identification, things like that.

9                MR. CHERNOSKY:  Your Honor, I

10   move for Commonwealth Exhibits 438 and 439.

11               THE COURT:  Admitted without

12   objection.

13               MR. CHERNOSKY:  No further

14   questions of this witness.  I offer for cross.

15               THE COURT:  Any questions?

16               MR. McKINNEY:  No questions, Your

17   Honor.

18               THE COURT:  Thank you,

19   Mr. Rosenberg.

20               MR. McKINNEY:  Your Honor, I

21   would ask that the witness be made available

22   for the defense's case in the event that he is

23   called.

24               THE COURT:  Okay, you remain

25   under subpoena.

T. Morgan - Direct by Mr. Chernosky

 1                 MR. CHERNOSKY:  Can he be excused

 2     for the day?

 3                 THE COURT:  You can be excused

 4     for the day.  You are not going on vacation?

 5                 THE WITNESS:  Back to the office.

 6                 THE COURT:  You will be there?

 7                 THE WITNESS:  Yeah.

 8                 THE COURT:  Call your next

 9     witness.

10                 MR. CHERNOSKY:  The Commonwealth

11     calls Detective Tom Foley.

12                 -----

13                 THOMAS FOLEY,

14     a witness herein, having been first duly sworn,

15     was examined and testified as follows:

16                 -----

17                 DIRECT EXAMINATION

18                 -----

19     BY MR. CHERNOSKY:

20         Q.  Detective Foley, could you state your

21     first and last name and spell your last name

22     for the court reporter?

23         A.  Yes, Thomas Foley, F-O-L-E-Y.

24         Q.  How are you currently employed?

25         A.  I'm a police officer with the Allegheny

T. Morgan - Direct by Mr. Chernosky

1    County Police.

2        Q.   How long have you been employed with

3    the Allegheny County Police?

4        A.   I am finishing my 11th year with the

5    Allegheny County Police.

6        Q.   Prior to working for the Allegheny

7    County Police, did you work with any other law

8    enforcement department?

9        A.   I did, I worked with the City of

10   Pittsburgh Police for 20 years and I retired.

11       Q.   Are you assigned to any particular

12   section within the county police?

13       A.   I am, I'm assigned to the homicide

14   unit.

15       Q.   Were you working in the homicide unit

16   in March of 2016?

17       A.   Yes, I was.

18       Q.   Were you assigned along with other

19   detectives to investigate the shooting deaths

20   that occurred at 1304 Franklin in the Borough

21   of Wilkinsburg?

22       A.   Yes, I was.

23       Q.   Relative to that, did you have, during

24   the course of your investigation, any

25   familiarity with an individual by the name of

T. Morgan - Direct by Mr. Chernosky

1    Robert Thomas?

2         A.  Yes, I did.

3         Q.  Are you aware of what Robert Thomas's

4    height and weight was?

5         A.  Yes, we did some research.  A

6    government document showed that he was listed

7    as 5'8" and 150 pounds.

8         Q.  During the course of your

9    investigation, did you have an opportunity to

10   conduct an interview with a person by the name

11   of Ashley Smith?

12        A.  Yes, I did.

13        Q.  And are you aware of Ashley Smith's

14   relationship to the defendant Cheron Shelton?

15        A.  Yes, I am.

16        Q.  What is that?

17        A.  She is one of his sisters.

18        Q.  Do you recall what day you were able to

19   interview Ms. Smith?

20        A.  Yes, it was March 12th, Saturday

21   March 12, 2016.

22        Q.  Where did that interview take place?

23        A.  It took place at our office.

24        Q.  Does the Allegheny County Police have

25   the ability to video and audio record

                T. Morgan - Direct by Mr. Chernosky

1    interviews?

2        A.  Yes, we do.

3        Q.  Was that done in this instance?

4        A.  Yes, sir.

5        Q.  During the course of your interview,

6    did you obtain consent from Ms. Smith to

7    process her cellular phone?

8        A.  Yes, I did.

9        Q.  I'm going to show you what I will mark

10   as Commonwealth Exhibit 451 and ask you what is

11   contained on Commonwealth's Exhibit 451?

12       A.  Exhibit 451 is marked Ashley Smith's

13   phone.

14       Q.  For purposes of the record is 451 a

15   disk that contains the download of Ms. Smith's

16   phone?

17       A.  Yes.

18              MR. CHERNOSKY:  Your Honor, I

19   move for the admission of 451.

20              THE COURT:  Admitted without

21   objection.

22       Q.  When you received consent to have that

23   phone processed, what did you physically do

24   with it?

25       A.  We placed it in our storage and turned

T. Morgan - Direct by Mr. Chernosky

1    it over to Mr. Rosenburg to have him download

2    it on Monday.  That was a Saturday, he was off

3    that weekend.  We gave it to him to download on

4    Monday.

5        Q.  I'm going to direct your attention

6    to -- I'm going to show you what I'll mark as

7    Commonwealth Exhibits 440 through 450 and ask

8    you if generally those exhibits are indicative

9    of content of the download of Ms. Smith's

10   phone?

11       A.  Yes, they are.

12            MR. CHERNOSKY:  Your Honor, I

13   move for the admission of Commonwealth 440

14   through 450.

15            THE COURT:  Admitted without

16   objection.

17       Q.  First, with respect to Commonwealth's

18   440, could you tell us what phone number was

19   assigned to Ashley Smith's phone at that time?

20       A.  The phone number was (412) 294-7344.

21       Q.  Directing your attention to the contact

22   section of Ms. Smith's phone, do you recall how

23   many contacts were in Ms. Smith's phone?

24       A.  It listed that there were 637 contacts.

25       Q.  Directing your attention to contact

T. Morgan - Direct by Mr. Chernosky

1    137, could you tell us, the jury, who was

2    listed as contact four?

3        A.   (412) 892-0447.

4        Q.   Then Commonwealth Exhibit 442, is that

5    the same exhibit with the number highlighted?

6        A.   Yes, sir.

7        Q.   Directing your attention to the SMS

8    messages section of Ms. Smith's phone and

9    directing your attention to SMS message 233, is

10   there a contact between that phone number and

11   892-0447?

12       A.   Yes.

13       Q.   What is the listed date and time of

14   that phone call or contact?

15       A.   The first date is 12/25/15.

16       Q.   What is the content?

17       A.   There are two message.  One is Merry

18   Christmas to you and the family.  The second

19   message from that date is Merry Christmas big

20   sis.

21       Q.   Directing your attention to messages

22   from January of 2016, what is the content of

23   that message?

24       A.   Happy New Year's.

25       Q.   Directing your attention to

T. Morgan - Direct by Mr. Chernosky

 1    Commonwealth Exhibit 445 on the screen behind
 2    you, with respect to that number in the
 3    analytic section, how many total contacts
 4    listed with that number?
 5         A.   Actually 40, I believe it is 40.
 6         Q.   Directing your attention to the total
 7    number of contacts in the fourth column over,
 8    how many contacts are listed with that number?
 9         A.   13.
10         Q.   With respect to Commonwealth Exhibit
11    No. 446 on the screen behind you, directing
12    your attention to contact 65, what is listed as
13    that number?
14         A.   At 65 the number is (412) 689-2889.
15         Q.   On Commonwealth Exhibit 447, is that
16    contact highlighted?
17         A.   Yes, sir.
18         Q.   Directing your attention to
19    Commonwealth Exhibit 448 on the screen behind
20    you, in the fourth column, how many total
21    contacts are listed with that number?
22         A.   Seven.
23         Q.   Directing your attention to Exhibit 449
24    on the screen behind you, did that phone
25    contain a contact listed with the name Tara?

T. Morgan - Direct by Mr. Chernosky

 1      A.   Yes, it did.

 2      Q.   What was the number associated with the

 3   contact by the name Tara?

 4      A.   (412) 651-5092.

 5      Q.   Directing your attention to the same

 6   analytic section for the name Tara, how many

 7   total contacts listed with that?

 8      A.   26.

 9      Q.   Lastly, directing your attention to the

10   multi-media section of the phone, is there a

11   multi-media message between this phone and the

12   contact known as Tara?

13      A.   Yes.

14      Q.   Does it appear to have an attachment

15   listed with it?

16      A.   Yes.

17      Q.   Clicking on that attachment, is that

18   picture below?

19      A.   Yes, it is.

20      Q.   What does that attachment appear to be?

21      A.   It appears to be a birthday invitation

22   for Robert, Jr. and gives the date of Saturday,

23   02/18/15, and the address of 7754 Tioga Street

24   from 4:00 to 7:30.

25      Q.   During this investigation, did you

T. Morgan - Cross by Mr. McKinney

1    become familiar with a person by the name of

2    Tara Gomez?

3         A.  Yes, I did.

4         Q.  Are you familiar with the address

5    listed there as 7754 Tioga Street?

6         A.  Yes.

7         Q.  What residence is that?

8         A.  That is where Ms. Gomez lives.

9              MR. CHERNOSKY:  No further

10   questions.  I offer for cross.

11             THE COURT:  Any questions?

12             MR. McKINNEY:  Yes.

13                  -----

14             CROSS-EXAMINATION

15                  -----

16   BY MR. McKINNEY:

17        Q.  Detective, you said that you

18   interviewed Ashley Smith on March 12, 2016; is

19   that correct?

20        A.  Yes.

21        Q.  How long did that interview last?

22        A.  She was at our office for maybe four or

23   five hours.

24        Q.  Do you know what time that interview

25   started?

T. Morgan - Cross by Mr. McKinney

1      A.  I don't.  It was sometime after 7:00.

2  When we did the search warrant on the house on

3  Nolan, she came back with us.

4      Q.  Was she in the house on Nolan when the

5  search warrant was executed on the 12th?

6      A.  I believe she was.  She was either in

7  the house or at the house, in that vicinity.

8      Q.  When you interviewed her, did you tell

9  her that her brother was a suspect in the

10  Wilkinsburg shootings?

11      A.  I believe we talked about that, yes.

12      Q.  Well, for four or five hours, would you

13  agree that you asked her some questions about

14  her brother?

15      A.  Yes.

16      Q.  Would you agree with me that in the

17  course of those four or five hours reference to

18  the Wilkinsburg shootings was mentioned?

19      A.  Yes.

20      Q.  Now, do you know if after that

21  interview she communicated with her brother,

22  after that March 12th interview?

23      A.  I don't know.

24      Q.  Did you pour through all of her

25  communications when you looked through her

T. Morgan - Cross by Mr. McKinney

1    phone dump?

2        A.  Her phone was dumped.

3        Q.  Did you look through the

4    communications?

5        A.  I looked through it.  I'm sure somebody

6    else analyzed it.

7        Q.  Okay.  As part of your investigation

8    with respect to whether her brother was

9    involved, would you agree with me that you did

10   look through Ms. Smith's phone records, if not

11   extensively and exhaustively, you did look at

12   them, correct?

13       A.  Yes.

14               MR. McKINNEY:  No additional

15   questions.  Thank you.

16               THE COURT:  Anything else?

17               MR. CHERNOSKY:  No redirect.

18               THE COURT:  Call your next

19   witness.

20               MR. CHERNOSKY:  The Commonwealth

21   calls Detective Todd Dolfi.

22

23

24

25

T. Dolfi - Direct by Mr. Chernosky

1                        -----

2                    TODD DOLFI,

3      a witness herein, having been previously first

4      duly sworn, was examined and testified as

5      follows:

6                        -----

7                   DIRECT EXAMINATION

8                        -----

9      BY MR. CHERNOSKY:

10          Q.   Detective Dolfi, all the credentials

11     that you testified to earlier are still

12     relevant and valid?

13          A.   Correct.

14          Q.   Directing your attention to March of

15     2016, did you have an opportunity to interview

16     Brittany Shelton?

17          A.   Yes, I did.

18          Q.   With respect to that interview of

19     Brittany Shelton, where did that take place?

20          A.   That took place at Allegheny County

21     Police headquarters.

22          Q.   Do you recall the date that it took

23     place?

24          A.   March 12, 2016.

25          Q.   Does the Allegheny County Police have

T. Dolfi - Direct by Mr. Chernosky

1    the ability to record both audio and video

2    interviews?

3        A.   Yes.

4        Q.   Did it happen in this occasion?

5        A.   Yes, it did.

6        Q.   During the course of your interview

7    with Brittany Shelton, did you request

8    permission to process her cellular phone?

9        A.   Yes.

10       Q.   Did she grant you that permission?

11       A.   Yes.

12       Q.   After she granted you that permission,

13   what did you physically do with the phone?

14       A.   That phone was taken and placed into

15   evidence until our cell phone technician was

16   available for download.

17       Q.   Do you, in situations like that, make a

18   request for the phone to be processed?

19       A.   Yes.

20       Q.   I'm going to show you what I marked as

21   Commonwealth Exhibit 464 and ask you what is

22   contained on 464?

23       A.   464 is a DVD disk listed as Brittany

24   Shelton's phone.

25                  MR. CHERNOSKY:  Your Honor, I

T. Dolfi - Direct by Mr. Chernosky

1    move for the admission of Commonwealth 464.

2                THE COURT:  Admitted without

3    objection.

4        Q.  I show you what I marked as 452 through

5    463 and ask you if that represents the content

6    from Brittany Shelton's phone?

7        A.  Yes.

8                MR. CHERNOSKY:  Your Honor, I

9    move for the admission of those exhibits.

10               THE COURT:  Admitted without

11   objection.

12       Q.  With respect to Commonwealth

13   Exhibit 452, could you tell the jurors what

14   phone number was associated with Brittany

15   Shelton's phone?

16       A.  Associated phone number is

17   (412) 320-3203.

18       Q.  I'm directing your attention to the

19   contact section of Brittany Shelton's phone.

20   Is there a contact (412) 892-0447?

21       A.  Yes, there was.

22       Q.  Does that contact number have an

23   associated name with it?

24       A.  Yes, it did.

25       Q.  What was that?

T. Dolfi - Direct by Mr. Chernosky

1          A.  Bro, B-R-O.

2          Q.  I'm directing your attention to the SMS

3    message section of Brittany Shelton's phone,

4    specifically SMS message 6559.  Was there a

5    message from that contact marked Bro?

6          A.  Yes, there was.

7          Q.  What is the date and time of the

8    message?

9          A.  It was on 12/25/15.

10         Q.  What is the content of that message?

11         A.  The content of that message is Merry

12   Christmas little sis.

13         Q.  Directing your attention to message

14   6561, is there a message to that contact listed

15   as Bro?

16         A.  Yes.

17         Q.  What is the date and time of that

18   message?

19         A.  12/25/15, at 12:11 p.m., same to you,

20   bro.

21         Q.  Directing your attention to the phone

22   analytic section of Brittany Shelton's phone,

23   how many total contacts in the fourth column

24   are listed with that phone?

25         A.  Could you repeat that?

30

T. Dolfi - Direct by Mr. Chernosky

1      Q.   How many total contacts in the fourth
2    column are listed with that phone?
3      A.   12.
4      Q.   Directing your attention to the contact
5    section of Ms. Shelton's phone at contact No.
6    154, is there a contact (412) 378-3461?
7      A.   Yes, there is.
8      Q.   I'm directing your attention to the
9    message section of Ms. Shelton's phone.  Are
10    there messages with that phone number,
11    (412) 378-3461?
12      A.   Yes, there are.
13      Q.   Directing your attention to that
14    message, what is the date and time of that
15    message?
16      A.   That is February 1, 2016, at 1:47 p.m.
17    The message reads, hey, it's Rob, need you to
18    call me.
19      Q.   Directing your attention to a series of
20    messages at 7133 through 7139, could you read
21    the content of those messages?
22      A.   Yes.  The first message says, Yo, when
23    you get a chance, call my mom.  The next
24    message reads tonight or in the morning.  The
25    following message reads she home, I was going

T. Dolfi - Direct by Mr. Chernosky

1     to go over there.  The next message reads no.

2     Followed by what time she get off or what's her

3     number.  The next is 10:30 followed by okay.

4          Q.  Directing your attention to the

5     continued SMS message section, messages 7169

6     through 7175, could you read that series?

7          A.  Correct.  The first one, 7169, reads,

8     hey, followed by hey, if you want, can you give

9     my mom a call, she's at home.  The next is

10    what's the numb?  Followed by (412) 731-2605

11    follow by 2607.

12         Q.  Directing your attention to the phone

13    analytic session, how many contacts are listed

14    in the fourth column for that phone?

15         A.  18.

16         Q.  Directing your attention to the contact

17    section of Ms. Shelton's phone, is there a

18    contact with number (412) 689-2889?

19         A.  Yes, there is.

20         Q.  Directing your attention to 461 on the

21    screen behind you, the call log section of

22    Ms. Shelton's phone and directing your

23    attention to call log numbers 5567, 5568, and

24    5569, could you tell the jury the date and time

25    of those calls?

T. Dolfi - Direct by Mr. Chernosky

1      A.   I can.   It is a little blurry for me,

2    this slide, but I believe it is March 11, 2016,

3    at 5:43 p.m. and the phone number is

4    (412) 892-0447.

5      Q.   Does the name appear below that phone

6    number?

7      A.   Yes, the name that appears is Bro.

8      Q.   Directing your attention to message

9    5570, what is the date and time of that phone

10   call?

11     A.   Again, blurry to me but March 11, 2016,

12   and it appears at 6:05 p.m.   The contact name

13   is Ashley and it appears the number is

14   (412) 294-7344.

15     Q.   Directing your attention to the series

16   of the phone calls at call log numbers 5572,

17   5573, and 5574, could you tell the jury the

18   date and time and contact number for those

19   calls?

20     A.   It appears March 11, 2016, at 7:01 p.m.

21   and the number is -- the number is blurry.   Is

22   there another slide?   That number for message

23   5572 is (412) 689-2889.

24     Q.   Directing your attention to the SMS

25   section of Ms. Shelton's phone and series of

T. Dolfi - Direct by Mr. Chernosky

1    messages from message numbers 8274 through

2    8284, are you able to read the number on that

3    contact?

4         A.   Yes, that phone number is

5    (412) 689-2889.

6         Q.   What is the time those series of

7    messages begin?

8         A.   March 11, 2016, at 10:48 p.m.

9         Q.   Can you read the contents of those

10   messages in sequential order?

11        A.   Yes.   The first one begins hey, you

12   busy?  What is your plan for tonight?  Followed

13   by none, why, what's up?  Next is wanted to

14   know if I could use your car?  Followed by,

15   yeah, I guess.  Followed by I'm over here by

16   Ash way.  Call you when I need you.  Next is

17   okay.  Followed by not going out and that is

18   blurry, I cannot read that message.

19        Q.   I'm showing you the physical copy of

20   the download of Ms. Shelton's phone.  Could you

21   read the content on that?

22        A.   Yes, the last one reads, message 8284,

23   not going out and don't you tell ma my moves

24   like that.

25        Q.   Directing your attention to 463 on the

T. Dolfi - Cross by Mr. McKinney

1    screen behind you, the analytics that is at

2    115, how many total contacts listed with the

3    2889 number?

4         A.  16.

5         Q.  During the course of your interview of

6    Ms. Shelton, did you become aware of her

7    relationship to the defendant Cheron Shelton?

8         A.  Yes.

9         Q.  What is that?

10        A.  They are brother and sister.

11             MR. CHERNOSKY:  No further

12   questions.  I offer for cross.

13             THE COURT:  Questions?

14             MR. McKINNEY:  Yes.

15                     -----

16                 CROSS-EXAMINATION

17                     -----

18   BY MR. McKINNEY:

19        Q.  You interviewed Brittany on March 12,

20   2016?

21        A.  Yes, sir.

22        Q.  You told her that her brother was a

23   suspect in the Wilkinsburg shootings?

24        A.  I believe we did, yes.

25        Q.  Do you know after that March 12th

T. Dolfi - Cross by Mr. McKinney

1    conversation if she had any additional

2    communication with her brother?

3        A.   I'm not aware if she did or did not.

4        Q.   When you were looking through her cell

5    phone dump, did you look through all of the

6    messages or just the messages that potentially

7    related to her brother?

8        A.   We looked through all the messages.

9        Q.   Did you see any messages with Dontay

10   Reed?

11       A.   I don't recall.

12       Q.   How about Justin Gomez?

13       A.   I don't recall.

14               MR. McKINNEY:  Thank you.

15               THE COURT:  Anything else,

16   Mr. Chernosky?

17               MR. CHERNOSKY:  No redirect, Your

18   Honor.

19               THE COURT:  Call your next

20   witness.

21               MR. CHERNOSKY:  The Commonwealth

22   calls Detective Steve Hitchings.

23

24

25

S. Hitchings - Direct by Mr. Chernosky

```
 1                        -----
 2                STEVEN HITCHINGS,
 3    a witness herein, having been first duly sworn,
 4    was examined and testified as follows:
 5                        -----
 6                DIRECT EXAMINATION
 7                        -----
 8    BY MR. CHERNOSKY:
 9         Q.   Detective Hitchings, could you state
10    your first and last name and spell your last
11    name for the court reporter?
12         A.   Steven Hitchings, H-I-T-C-H-I-N-G-S.
13         Q.   How are you employed?
14         A.   I'm a police officer with the Allegheny
15    County Police Department currently assigned to
16    the homicide section.
17         Q.   How long have you been working for the
18    Allegheny County Police?
19         A.   11 years.
20         Q.   How long in the homicide section?
21         A.   Ten-and-a-half.
22         Q.   Prior to your employment with the
23    county police, did you have employment with any
24    other police departments?
25         A.   Yes, I spent 20 years with the City of
```

S. Hitchings - Direct by Mr. Chernosky

1    Pittsburgh Police Department of which I was in

2    patrol for two years then narcotics then my

3    last nine years I spent in city homicide.

4        Q.   Were you, on March 9th of 2016,

5    assigned to investigate along with other

6    detectives the shooting deaths of 1304 Franklin

7    Avenue in Wilkinsburg?

8        A.   Yes.

9        Q.   Pursuant to that, did you conduct an

10    interview of a person by the Channel Falls?

11        A.   Yes.

12        Q.   Where was that interview done?

13        A.   At the Allegheny County Police

14    headquarters.  At that time it was at Point

15    Breeze at the Rockwell Center.

16        Q.   Was that interview recorded?

17        A.   Yes.

18        Q.   During the course of your interview,

19    did you request from Ms. Falls permission to

20    search her cell phone?

21        A.   Yes.

22        Q.   Did she consent to a download of her

23    cell phone?

24        A.   Yes, she did.

25        Q.   I show what you I will mark as

S. Hitchings - Direct by Mr. Chernosky

1    Commonwealth Exhibit 466.  I ask you what is

2    contained on Commonwealth Exhibit 466?

3       A.  This would be the information that was

4    obtained from her cell phone, and the dump, it

5    was conducted by Matt Rosenberg.

6              MR. CHERNOSKY:  I move for

7    admission of 466.

8              THE COURT:  Admitted without

9    objection.

10      Q.  During the course of your interview or

11   prior to that, were you aware of the

12   relationship of Ms. Falls to the defendant

13   Cheron Shelton?

14      A.  Yes.

15      Q.  What was that relationship?

16      A.  They lived together for about five

17   years.  They were together about seven years

18   and had, I think, two kids together.

19      Q.  I'm going to show you what I marked as

20   Commonwealth Exhibits 467 through 471.  I ask

21   you generally if they are indicative of some of

22   the content on Ms. Falls's phone?

23      A.  Yes.

24              MR. CHERNOSKY:  Your Honor, I

25   move for the admission of Commonwealth

S. Hitchings - Direct by Mr. Chernosky

1    Exhibits 467 through 471.

2              THE COURT:  Admitted without

3    objection.

4        Q.  I direct your attention to the screen

5    behind you.  First, with respect to

6    Commonwealth Exhibit 467, what is the telephone

7    number that was assigned to Ms. Falls's phone

8    at the time it was produced?

9        A.  It was area code (412) 592-9604.

10       Q.  Directing your attention to the contact

11   section of Ms. Falls's cell phone, contact No.

12   21, what was the number listed at contact 21?

13       A.   It is listed in her phone as Baby

14   Cakes, the phone number is (412) 892-0447.

15       Q.  Directing your attention to

16   Commonwealth Exhibit 469, the phone analytic

17   section, the fourth column, how many contacts

18   listed with that phone number (412) 892-0447?

19       A.  51.  I'm sorry, total calls 51 and

20   total text message is 67.

21       Q.  I direct your attention to the fourth

22   column.

23       A.  118.

24       Q.  Now, directing your attention to the

25   timeline section of Ms. Falls's phone,

S. Hitchings - Direct by Mr. Chernosky

1    Commonwealth Exhibit 470, starting with

2    timeline number 5152, can you tell the jurors

3    what is represented at that entry?

4        A.   51 -- I'm not sure where you are.

5        Q.   The first column.

6        A.   5152.

7        Q.   Could you step down and see if you can

8    see it better?

9        A.   515 -- the first, 5152, is a call log

10   from Baby Cakes to her at 12:12 p.m.

11       Q.   Directing your attention to the call

12   log at the timeline entry of 5223, what is

13   listed at that entry?

14       A.   Another call from Baby Cakes at

15   2:12 p.m.

16       Q.   Directing your attention to the

17   timeline entry of 5188, what is listed at that

18   entry?

19       A.   That is another call from Baby Cakes at

20   1:54 p.m.

21       Q.   Directing your attention to the

22   timeline entry of 5267, what is there?

23       A.   That is a text message to Baby Cakes

24   from Channel, that was at 10:41 p.m.

25       Q.   What is the content of the text message

S. Hitchings - Direct by Mr. Chernosky

1    at 10:41 p.m.?

2        A.  It says SMH shaking my head.  I already

3    see where this is going.  Just going to keep

4    calm and watch you lose everything right before

5    your very eyes.

6        Q.  Directing your attention to call

7    timeline entry of 5275, could you tell us what

8    is that entry?

9        A.  That is a call to Channel from Baby

10   Cakes at 11:24 p.m.

11       Q.  The entry at 5276?

12       A.  A call from Baby Cakes at 11:25 p.m.

13       Q.  And entry 5277?

14       A.  That is a call from Baby Cakes at 11:25

15   p.m.

16       Q.  And the content at 5357?

17       A.  That is a text message from Baby Cakes

18   to Channel at 1:48 a.m.  It says be there in

19   20.

20       Q.  Directing your attention to the entry

21   of 3538?

22       A.  That is a call from Channel to Baby

23   Cakes at 2:07 a.m.

24       Q.  Directing your attention to 3539?

25       A.  That is a call from Baby Cakes to

S. Hitchings - Direct by Mr. Chernosky

1    Channel at 2:30.

2        Q.   0630?

3        A.   That is a call to Baby Cakes from

4    Channel at 2:59 a.m.

5        Q.   The entry at 5631.

6        A.   That is a call to Baby Cakes from

7    Channel at 3:17 a.m.

8        Q.   The last entry, 5362?

9        A.   That is a text message to Baby Cakes

10   from Channel at 3:42 a.m.  It says, yo, let's

11   go, I'm getting tired, I got to work in the

12   morning.

13       Q.   Directing your attention to the contact

14   section of Ms. Falls's phone, contact number

15   106, is there a contact listed as Tara?

16       A.   Yes.

17       Q.   What is the number associated with that

18   contact listed?

19       A.   It is (412) 651-5092.

20       Q.   Directing your attention to the SMS

21   message section of Ms. Falls's phone, message

22   number 33, could you tell us what that is?

23       A.   Yeah, that is a message sent by Channel

24   to Tara on March 11, 2016, at 9:55 p.m., it

25   says, hey, Tara, you okay, have you heard from

S. Hitchings - Cross by Mr. McKinney

1    him?

2                    MR. CHERNOSKY:  No further

3    questions.  I offer for cross.

4                    THE COURT:  Mr. McKinney.

5                    -----

6                CROSS-EXAMINATION

7                    -----

8    BY MR. McKINNEY:

9       Q.  Detective, do you remember when you

10   interviewed Channel Falls, was it around

11   March 12, 2016?

12      A.  I believe it was right after midnight

13   from the 11th to the 12th, or the 12th to the

14   13th.

15      Q.  Okay, that makes more sense, okay.  You

16   would agree with me that you informed her that

17   Cheron was a suspect in the Wilkinsburg

18   shootings?

19      A.  Yes.

20      Q.  Do you know if after that interview she

21   had any communication with Cheron?

22      A.  Yes, I do.

23                    MR. McKINNEY:  No additional

24   questions.  Thank you.

25                    THE COURT:  Thank you, Detective.

C. Falls - Direct by Mr. Chernosky

1    You may step down.

2              MR. CHERNOSKY:  Your Honor, we

3    call Channel Falls.

4              MR. McKINNEY:  We ask that the

5    detective be released but we understand that

6    the Commonwealth will be calling him for

7    another case.

8              THE COURT:  He will be available.

9                    -----

10              CHANNEL FALLS,

11   a witness herein, having been first duly sworn,

12   was examined and testified as follows:

13                   -----

14              DIRECT EXAMINATION

15                   -----

16   BY MR. CHERNOSKY:

17       Q.  Ms. Falls, could you state your first

18   and last name and spell your last name for the

19   court reporter?

20       A.  Channel Falls, F-A-L-L-S.

21       Q.  Spell your first name, I apologize.

22       A.  C-H-A-N-N-E-L.

23       Q.  Do you know the defendant, Cheron

24   Shelton?

25       A.  I do.

C. Falls - Direct by Mr. Chernosky

1      Q.   How do you know him?

2      A.   He is my boyfriend and child's father.

3      Q.   Were you in a relationship with him in

4   March of 2016?

5      A.   I was.

6      Q.   On March of 2016, were you in Nolan

7   Court?

8      A.   Yes.

9      Q.   With him?

10      A.   Yes.

11      Q.   Were you also with your children?

12      A.   Yes.

13      Q.   What were you doing in Nolan Court that

14   day?

15      A.   The kids were playing outside.  I was

16   out there talking with his family.

17      Q.   What time did you leave Nolan Court?

18      A.   I can't really recall a time.  I want

19   to say around 8:00.

20      Q.   Where did you go when you left Nolan

21   Court?

22      A.   Home.

23      Q.   How far away is home from Nolan Court?

24      A.   Seven-minute drive or eight.

25      Q.   When you went home, did the defendant

C. Falls - Direct by Mr. Chernosky

1    come with you?

2         A.  He dropped us off.

3         Q.  You said he dropped you off.  Where was

4    he going after he left you?

5         A.  He was supposed to go to get us some

6    hamburger buns.

7         Q.  What time ultimately did you see him

8    next?

9         A.  Not until late, 3:00ish, I don't know.

10        Q.  The time that you guys were at Nolan

11   Court and he dropped you off, what was he

12   wearing?

13        A.  A black shirt, some jeans, and some

14   tennis shoes.

15        Q.  When you saw him again in the early

16   morning hours, what was he wearing?

17        A.  I don't remember, sir.

18        Q.  Was he wearing the same clothes or

19   different clothes?

20        A.  It was different clothes.

21        Q.  Did he give you an explanation for why

22   he was wearing different clothing?

23        A.  He threw-up on himself.

24        Q.  When he said that he was leaving to go

25   get some food, did you expect him to come back

47

C. Falls - Direct by Mr. Chernosky

1    rather quickly?

2        A.   I did.

3        Q.   Did that happen?

4        A.   No.

5        Q.   Over the course of the night, were you

6    trying to reach him?

7        A.   I did.

8        Q.   How?

9        A.   I tried calling him.

10       Q.   What number did you try calling him on?

11       A.   I don't remember.

12       Q.   Do you remember what contact you had

13   him under in your phone at the time?

14       A.   Baby Cakes.

15       Q.   How many times would you estimate that

16   you tried to reach out to him during that time

17   period?

18       A.   Probably four or five.

19       Q.   Back in 2016, what type of car did you

20   have?

21       A.   A Buick LaCrosse.

22       Q.   What color was the car?

23       A.   Gold.

24       Q.   Was there anything distinctive about

25   the car?

C. Falls - Direct by Mr. Chernosky

1    A.  What do you mean?

2    Q.  Did the hood match?

3    A.  Yeah.

4    Q.  So if I showed you a picture of the

5  Buick LaCrosse, it would have a matching hood?

6    A.  I recall.

7    Q.  After he gets back in the early morning

8  hours, what did you do?

9    A.  I dropped him off back up his moms.

10    Q.  Why did you drop him back off up at his

11  mother's?

12    A.  Because he came home late.

13    Q.  Did you guys have an argument about him

14  coming home late?

15    A.  No.

16    Q.  Did you tell him that he wasn't welcome

17  to stay at your house that night?

18    A.  No, I met him outside and told him that

19  I was driving him back up to his mom's.

20    Q.  Were you mad at him when you told him

21  that you were driving him back up to his

22  moms's?

23    A.  Yes.

24    Q.  You were interviewed by the county

25  police, right?

C. Falls - Direct by Mr. Chernosky

1    A.   I don't remember.  I guess so.

2    Q.   Did you sit in an interview room for a

3    few hours with detectives?

4    A.   Yes.

5    Q.   During that interview, do you remember

6    they showed you a picture from Nolan Court?

7    A.   Yes.

8    Q.   They asked you if you recognized the

9    individual in that picture?

10   A.   Yes.

11   Q.   I show you what has already been marked

12   as Commonwealth Exhibit 299.  I ask you if you

13   recognize the individual in this picture?

14   A.   Yes, but he doesn't smoke cigarettes.

15   Q.   So who is the person in that picture?

16   A.   I think it might be him.  It could be

17   him.

18   Q.   Now, you've been to Nolan Court before,

19   correct?

20   A.   Yes.

21   Q.   Have you been to that fenced in

22   backyard area?

23   A.   Not really.

24   Q.   Do you recognize that to be the back of

25   Cheron's mother's house?

C. Falls - Direct by Mr. Chernosky

1      A.   I recognize that to be the back of the

2    area but I don't know if it is his mom's house.

3      Q.   Are you still in a relationship with

4    the defendant?

5      A.   Yes.

6      Q.   When is the last time you talked to

7    him?

8      A.   Yesterday.

9      Q.   Did you talk about any of your

10   testimony today?

11     A.   No.

12     Q.   Prior to 2016, did the defendant have a

13   friend by the name of Calvin Doswell?

14     A.   He did.

15     Q.   What happened to Calvin Doswell?

16     A.   He was murdered.

17     Q.   Do you remember approximately when he

18   was murdered?

19     A.   I don't.

20     Q.   Did Cheron take it pretty hard?

21     A.   Yes, he was hurt.

22     Q.   Was he angry about that?

23     A.   No, more so sad.

24     Q.   Did Cheron ever express to you that he

25   thought Lamont Powell had something to do with

C. Falls - Direct by Mr. Chernosky

1      the murder of his friend?

2          A.   No.

3          Q.   Do you know a Rob Thomas?

4          A.   I do.

5          Q.   Is that a friend of Cheron's?

6          A.   Yes.

7          Q.   Do you know a Tara Gomez?

8          A.   I do.

9          Q.   Who is that in relation to Rob Thomas?

10         A.   That is his child's mother.

11         Q.   Were you friends with Tara?

12         A.   Kind of.

13         Q.   Do you remember if you had her cell

14     phone number at the time in 2016?

15         A.   No.

16         Q.   If there is a contact in your phone by

17     the name of Tara, that isn't Tara Gomez?

18         A.   I don't think so.

19         Q.   And if there is an invitation to a

20     birthday party in your phone listed to Tara,

21     that wouldn't be Tara Gomez?

22         A.   That depends on the address.

23         Q.   7754 Tioga Street?

24         A.   I believe that is her address.

25         Q.   During the end of your interview or

C. Falls - Direct by Mr. Chernosky

1    near the end of your interview with the county

2    police, they asked you if they could search

3    your cell phone.  Do you remember that

4    conversation?

5         A.  Yes.

6         Q.  You said that they could?

7         A.  Yes.

8         Q.  I'm going to show you what has already

9    been admitted as Commonwealth Exhibit 470.

10   I'll direct you to the message number 5267 on

11   Commonwealth Exhibit 470.  Could you just read

12   that message out loud?

13        A.  Shaking my head, I already see where

14   this is going, just going to keep calm and

15   watch you lose everything right before your

16   very eyes.

17        Q.  That is a message that you sent to

18   Cheron on March 9, 2016.  What did you mean?

19        A.  Basically that he didn't mean -- that

20   he wasn't taking our relationship seriously.

21             MR. CHERNOSKY:  No further

22   questions.  I offer for cross.

23

24

25

C. Falls - Cross by Mr. McKinney

1                        -----

2                 CROSS-EXAMINATION

3                        -----

4    BY MR. McKINNEY:

5         Q.  Hi, Ms. Falls.

6         A.  Hi.

7         Q.  Mr. Chernosky asked you about your

8    relationship with Cheron.  You two are still

9    together?

10        A.  Yes.

11        Q.  Would you lie for him in open court?

12        A.  No.

13        Q.  How long have the two of you been

14   together?

15        A.  For about 11, going on 12 years.

16        Q.  How old are the children that you two

17   share?

18        A.  We have a six-year-old and a

19   ten-year-old.

20        Q.  What are their names?

21        A.  Cheron Shelton, Jr., and Isaiah

22   Shelton.

23        Q.  Has your relationship with Cheron been

24   on and off over the course of the 11 years?

25        A.  Yes.

C. Falls - Cross by Mr. McKinney

1          Q.  How old are you now?

2          A.  I am 33.

3          Q.  You might have had a birthday recently,

4     I don't know.  Is Cheron about the same age?

5          A.  Yes, he just had a birthday.

6          Q.  So you two have been on and off since

7     your early 20s; is that safe to say?

8          A.  Yes.

9          Q.  Now, on the day in question, you would

10    agree with me that Cheron had just recently

11    been released from jail; is that correct?

12         A.  Correct.

13         Q.  Had he been in jail for a long time or

14    a short period of time?

15         A.  I want to say a short period of time.

16         Q.  Do you recall how long?

17         A.  I don't, like a month or like three

18    weeks.

19         Q.  Okay.  So certainly less than two

20    months?

21         A.  Correct.

22         Q.  Is it safe to say that he was happy to

23    get out of jail?

24         A.  Absolutely.

25         Q.  Did you pick him up from jail or did he

C. Falls - Cross by Mr. McKinney

1    get a ride to your place?

2         A.   No, I picked him up.

3         Q.   You two lived together?

4         A.   Correct.

5         Q.   That was on Ross Garden?

6         A.   Correct.

7         Q.   How long had you two lived together

8    with the children?

9         A.   Probably 11 years.  I'm sorry, not 11

10   before he got incarcerated this time.

11        Q.   Right.  Do you remember what he was in

12   jail for?

13        A.   I don't, I don't remember.

14        Q.   If I were to tell you that it had

15   something to do with either an argument that

16   you two had or drugs, does that sound like

17   something that he could be in jail for?

18        A.   Probably so, yes.

19        Q.   Do you remember Cheron ever having any

20   steady employment?

21        A.   No, not steady employment but he did

22   work every here and there.

23        Q.   Would you agree with me that he derived

24   the majority of his income from drug dealing?

25        A.   Yes.

C. Falls - Cross by Mr. McKinney

1          Q.   Do you know -- let me ask you this.

2     Did he include you in on the drug dealing or

3     try to keep that away from you?

4          A.   No, that was a separate life from us.

5          Q.   Is it safe to say that you probably

6     didn't want any part of that activity?

7          A.   No, no.

8          Q.   Did you express that to him, that you

9     weren't approving of his lifestyle?

10         A.   Yes.

11         Q.   Did it stop him from continuing to sell

12    drugs?

13         A.   It slowed him down.  He signed his self

14    up for school.

15         Q.   After he got out of the jail, did he

16    sign himself up at school for Triangle Tech?

17         A.   No, he was already enrolled.  I don't

18    know but he was trying to get back into it.

19         Q.   When you and he and your two children

20    went to 1214 Nolan to see his mother, could you

21    describe what he was doing that day at the

22    house?

23         A.   He had a few -- he would be drinking.

24    He would go to, I don't know, I guess the other

25    court to hang with his friends but would come

C. Falls - Cross by Mr. McKinney

1    back to us to check on us to make sure we were

2    all right.

3        Q.  The other court, what is the name of

4    that court?

5        A.  Ferris.

6        Q.  So you are saying that he was hanging

7    out with you and the family at 1214 Nolan and

8    bouncing over to spend time with his friends?

9        A.  Correct.

10       Q.  Because he had just gotten out of jail,

11   right?

12       A.  Correct.

13       Q.  Now, at some point you leave 1214 Nolan

14   and he stays there; is that correct?

15       A.  I guess so.

16       Q.  I guess you don't know what he did, you

17   left?

18       A.  Yeah, I went first.

19       Q.  Now, let me ask you this, having lived

20   with Cheron for 11 or 12 years, is it

21   completely out of the ordinary for him to be

22   working in the evening?  Let me ask that a

23   better way.

24       A.  Yeah.

25       Q.  I mean, as a drug dealer, would you

C. Falls - Cross by Mr. McKinney

1  agree with me that oftentimes he is selling

2  drugs or working in the evening hours?

3      A.  If you're asking me, no, he wouldn't be

4  home but he would be out, yes.  But we don't

5  discuss that.

6      Q.  So you may not necessarily know what he

7  was doing but you agree there would be times

8  where he would be out in the evenings; is that

9  fair to say?

10      A.  Correct.

11      Q.  Would that happen often?

12      A.  Like what do you mean?  When he started

13  school, things started to slow down.  He would

14  come home.

15      Q.  When he was out that night and you were

16  communicating with him trying to get him to

17  come back home, was that something that had

18  never happened before or had there been other

19  times when he would be out and you were trying

20  to get him back home?

21      A.  Yeah, he does that.

22      Q.  Now, Mr. Chernosky showed you a

23  photograph.  I believe you indicated that the

24  person in the photograph looked like Cheron but

25  Cheron doesn't smoke.  But other than that,

C. Falls - Cross by Mr. McKinney

1   does that look like him?

2       A.  Yes.

3       Q.  Based on the photographs that he showed

4   you, it seemed like it was difficult for you to

5   figure out if it was him or not.  Is that

6   because the photograph looked a little blurry?

7       A.  A little blurry and the cigarette threw

8   me off.

9       Q.  You've known Cheron for over a decade

10  and it was difficult for you to look at that

11  photograph and identify it being him?

12      A.  Correct.

13      Q.  With respect to Cheron's mother's house

14  at 1214 Nolan, do you know any of the

15  neighbors?

16      A.  I don't, really.  I really would just

17  hang out with his mom and would stay at her

18  house.  Or if his aunt was around, go up the

19  street a little further.

20      Q.  Do you know a woman by the name of

21  Millie Walker?

22      A.  I don't.

23      Q.  Now, I believe you said on direct

24  examination that when Cheron got home, he was

25  in a different set of clothing?

60

C. Falls - Cross by Mr. McKinney

1     A.   Correct.

2     Q.   His explanation to you was that he

3  threw-up?

4     A.   Yes.

5     Q.   You seen him drinking.  Do you know

6  exactly how much he had drunk?

7     A.   Well, when I was up there, no.  No, I

8  don't know how much he had to drink.

9     Q.   There was a point in time when you left

10  so you have no idea how much alcohol he may

11  have consumed after that?

12     A.   Correct.

13     Q.   Do you know if he was ever into any

14  other kind of drugs in terms of usage?  Do you

15  know if he smoked weed?

16     A.   Yes, he would smoke marijuana.

17     Q.   Was that something that he would do on

18  a relatively consistent basis?

19     A.   Yes.

20          MR. McKINNEY:  One moment, Your

21  Honor.

22     Q.   Just to clarify in case I didn't

23  earlier, he had gotten out of jail, what was

24  it, the day before or the night before; do you

25  remember?

61

C. Falls - Cross by Mr. McKinney

 1         A.   I don't remember but it was probably
 2    the day before but I'm uncertain.
 3              MR. CHERNOSKY:  Your Honor, may
 4    we approach?
 5              (Sidebar discussion held as
 6    follows.)
 7              MR. CHERNOSKY:  Your Honor, I
 8    just wanted to address two, possibly one
 9    issues.  I think Mr. McKinney opened the door
10    on her conviction for hindering apprehension in
11    relation to hiding Mr. Shelton after, when they
12    were looking for him, because he asked would
13    she lie in open court.  Certainly it is
14    relevant that she would hinder hiding.
15              THE COURT:  She was charged?
16              MR. CHERNOSKY:  She was convicted
17    of M3.
18              THE COURT:  Okay.
19              MR. CHERNOSKY:  With respect to
20    Brittany Shelton, she will be the witness after
21    next, I know she has an attorney appointed, do
22    you know if they had time to talk to her or
23    should we call her later?
24              THE COURT:  I don't know.  I was
25    busy with other matters.

C. Falls - Cross by Mr. McKinney

1              MR. CHERNOSKY:  I thought there

2    was a third issue.

3              MR. McKINNEY:  I'll address the

4    first one.  I did specifically ask if she would

5    lie in open court for Cheron.  She said no.  I

6    don't think that necessarily opens the door to

7    a prior conviction for hindering which

8    obviously isn't lying in open court.  I didn't

9    specifically ask if she would lie after on the

10   stand to specifically avoid opening the door to

11   this issue.

12             THE COURT:  Okay.  I'm not going

13   to allow it.

14             (Sidebar discussion concluded.)

15             THE COURT:  Anything else?

16             MR. CHERNOSKY:  Nothing else.

17             THE COURT:  Ma'am, you may step

18   down.

19             MS. PELLEGRINI:  Your Honor, I

20   ask that she be allowed to stay in the

21   courtroom if she is no longer going to be

22   re-called.

23             THE COURT:  Okay.

24             MR. CHERNOSKY:  The Commonwealth

25   calls Desdrene Smith.

D. Smith - Direct by Mr. Chernosky

```
 1                        -----

 2                   DESDRENE SMITH,

 3     a witness herein, having been first duly sworn,

 4     was examined and testified as follows:

 5                        -----

 6                  DIRECT EXAMINATION

 7                        -----

 8     BY MR. CHERNOSKY:

 9          Q.   Ms. Smith, could you state your first

10     and last name and spell both your first and

11     last name for the court reporter?

12          A.   Desdrene, D-E-S-D-R-E-N-E, Smith.

13          Q.   How do you know Cheron Shelton?

14          A.   I'm his mother.

15          Q.   In March of 2016 where were you living?

16          A.   Nolan Court.

17          Q.   What was your address specifically in

18     Nolan Court?

19          A.   1214.

20          Q.   Who lived there in Nolan Court with

21     you?

22          A.   Me, my two daughters, and their two

23     sons.

24          Q.   What are your two daughters' names?

25          A.   Ashley and Brittany.
```

D. Smith - Direct by Mr. Chernosky

1      Q.   In March of 2016, how many vehicles did

2   you have?

3      A.   I had two.

4      Q.   What type of vehicles did you have?

5      A.   I had a Lincoln and a truck.

6      Q.   When you say a truck, do you mean an

7   SUV or a truck with a bed?

8      A.   SUV.

9      Q.   When you were living at 124 Nolan

10   Court, did Cheron have keys to the house?

11      A.   Yes.

12      Q.   Did he sometimes come and go from the

13   house without you being there, without you

14   knowing?

15      A.   Yeah, if I was at work.

16      Q.   With respect to the vehicle that you

17   described to the jury, was he able to use those

18   vehicles?

19      A.   Yes.

20      Q.   Did he need to ask you first?

21      A.   No.

22      Q.   Where would you guys keep the keys to

23   the vehicle?

24      A.   Just laying around.

25      Q.   On March 29, 2016, do you remember if

D. Smith - Direct by Mr. Chernosky

1    Cheron asked to use your vehicle at all?

2        A.  No.

3        Q.  Do you recall specifically telling him

4    that he could use your vehicle?

5        A.  No.

6        Q.  I show you what has already been

7    admitted as Commonwealth Exhibit 289.  Do you

8    recognize the vehicle that is depicted in

9    Commonwealth Exhibit 289?

10       A.  That is one of my cars.

11       Q.  Which of the two cars that you just

12   described?

13       A.  The Lincoln.

14       Q.  Were you aware that during the

15   investigation of this case that the police

16   found a bunch of weapons in your house?

17       A.  Yeah.

18       Q.  Whose weapons were those?

19       A.  They could have been anybody's because

20   my daughter was licensed to carry.

21       Q.  Are you aware that on one of the

22   weapons --

23            MR. McKINNEY:  Just objection,

24   Your Honor, to the mischaracterization.  I

25   think there was one weapon and ammunition.

D. Smith - Cross by Mr. McKinney

1                    MR. CHERNOSKY:  I apologize.

2          Q.  If I ask you the question again, is the

3     answer the same with respect to the weapon and

4     ammunition that was found in the house, do you

5     know whose it was?

6          A.  No, I do not.

7          Q.  Are you aware that the firearm that was

8     found in the basement --

9          A.  I didn't have a basement.

10         Q.  Sorry -- in the lower level, that

11    Cheron's fingerprint was on there?

12         A.  No.

13         Q.  Did you ever personally bring that red

14    suitcase into your house?

15         A.  No.

16                   MR. CHERNOSKY:  No further

17    questions.  I offer for cross.

18                   THE COURT:  Mr. McKinney, further

19    questions?

20                   MR. McKINNEY:  Yes.

21                        -----

22                   CROSS-EXAMINATION

23                        -----

24    BY MR. McKINNEY:

25         Q.  Desdrene, you lived on 1214 Nolan back

D. Smith - Cross by Mr. McKinney

1    on March 9, 2016?

2        A.  Yes.

3        Q.  Who else lived with you at the time?

4        A.  Myself, Ashley, Brittany, my two

5    daughters and their two kids.  Cheron's father

6    would come every now and then.

7        Q.  Is that government subsidized housing

8    up there?

9        A.  Yes.

10       Q.  Now, would you agree with me that

11   Cheron has never consistently held a legitimate

12   job?

13       A.  He was in school.

14       Q.  What jobs has he held?

15       A.  Well, he did work where I lived at like

16   landscaping and stuff.

17       Q.  All right.  Would you agree with me at

18   times he would sell drugs?

19       A.  Yes.

20       Q.  Now, is that something that you

21   approved of?

22       A.  No.

23       Q.  Did you let him know that was something

24   that you disapproved of?

25       A.  Yes.

D. Smith - Cross by Mr. McKinney

1        Q.   Did it necessarily stop him?

2        A.   No.

3                  MR. CHERNOSKY:  Your Honor, at

4        this point I object to the line of questioning

5        as beyond the scope of my direct examination.

6                  THE COURT:  Objection sustained.

7                  MR. McKINNEY:  Your Honor, I have

8        no additional questions.  I will re-call

9        Ms. Smith as a witness in my case.

10                 THE COURT:  You are excused.

11       Mr. McKinney may want to re-call you as a

12       witness.  You will have to talk to him about

13       that, okay.  Call your next witness.

14                 MR. CHERNOSKY:  Your Honor, at

15       this point the Commonwealth would call Brittany

16       Shelton.

17                 THE COURT:  Actually, we're going

18       to take a short break.  Remain seated and quiet

19       while the jury leaves the room.

20                      -----

21                 (Open court - Jury not present.)

22                      -----

23                 THE COURT:  What is the offer of

24       proof on Brittany Shelton?

25                 MR. CHERNOSKY:  Your Honor, the

D. Smith - Cross by Mr. McKinney

1    Commonwealth will call Brittany Shelton for her
2    recollection of the night of the incident
3    similar to Ms. Smith who had access to the
4    vehicle and how the vehicle was accessed.  And
5    with respect to the surveillance of Nolan
6    Court, she was interviewed and said that
7    individual looked like Cheron Shelton.
8                        THE COURT:  Okay.
9                            -----
10                       (Brief recess taken.)
11                           -----
12                       (Open court - Jury not present.)
13                           -----
14                       THE COURT:  Any preliminary
15   matters?
16                       MR. McKINNEY:  Not that I
17   believe.
18                       THE COURT:  Okay, bring in the
19   jury.
20                           -----
21                       (Open court - Jury present.)
22                           -----
23
24
25

B. Shelton - Direct by Mr. Chernosky

1                        -----

2                 BRITTANY SHELTON,

3      a witness herein, having been first duly sworn,

4      was examined and testified as follows:

5                        -----

6                 DIRECT EXAMINATION

7                        -----

8      BY MR. CHERNOSKY:

9           Q.  Ms. Shelton, could you state your first

10     and last name and spell your last name?

11          A.  Brittany Shelton, S-H-E-L-T-O-N.

12          Q.  Do you know the defendant, Cheron

13     Shelton?

14          A.  Yes.

15          Q.  What is his relationship to you?

16          A.  Brother.

17          Q.  Is he, in terms of your age, older or

18     younger than you?

19          A.  Older.

20          Q.  Where were you living on March 9, 2016?

21          A.  1214 Nolan Court.

22          Q.  Who was living with you?

23          A.  Me and my mother and my child.

24          Q.  At that time, did you have a vehicle

25     registered to yourself and your mother?

B. Shelton - Direct by Mr. Chernosky

1        A.   Yes.

2        Q.   What type of vehicle was that?

3        A.   A white Lincoln.

4        Q.   Do you remember if it had four doors or

5   two?

6        A.   Four.

7        Q.   On March 29, 2016, do you remember

8   seeing your brother, Cheron, at all?

9        A.   Yes.

10        Q.   What time did you see him?

11        A.   Probably the evening of that day.  He

12   had just gotten out of jail.

13        Q.   Without telling me where you work, do

14   you work early in the morning?

15        A.   Yes.

16        Q.   What time do you have to get up to go

17   to work?

18        A.   4:30, 5:00.

19        Q.   In the evening hours after about 10:00

20   at night, did you see Cheron at your house at

21   all?

22        A.   Yes.

23        Q.   Where and when did you see him?

24        A.   He was with his family and children at

25   my mom's house.

B. Shelton - Direct by Mr. Chernosky

1    Q.   What about after 10:00?

2    A.   I was probably asleep.

3    Q.   Has Cheron ever used that white Lincoln

4    before?

5    A.   Occasionally.

6    Q.   Does he have to specifically ask you

7    for permission to use it?

8    A.   No.

9    Q.   Does he have to specifically ask your

10   mother for permission to use it?

11   A.   No.

12   Q.   In March of 2016, including the vehicle

13   that was registered to both you and your

14   mother, how many vehicles did your mother have?

15   A.   She had two vehicles.

16   Q.   What is the other vehicle?

17   A.   A truck.

18   Q.   Do you remember in March of 2016 if

19   that truck was working or broken down?

20   A.   I can't recall.

21   Q.   As far as your vehicle, where do you

22   keep the keys to it?

23   A.   They usually just lay around for

24   everybody to have access to them.  They are not

25   in a specific place.

B. Shelton - Direct by Mr. Chernosky

1    Q.  As far as when you go to bed at night,

2    do you lock your doors?

3    A.  Depends.

4    Q.  Did Cheron have a key to that house?

5    A.  I'm not sure.

6    Q.  Do you remember sitting and being

7    interviewed by the Allegheny County Police?

8    A.  Parts of it.

9    Q.  I'm going to show you what has already

10   been marked as Commonwealth Exhibit 299.  Do

11   you recognize the person in that picture?

12   A.  Not really.  When I was being

13   interviewed I said the person resembled my

14   brother but my brother never smoked cigarettes.

15   Q.  I'm going to show you a picture of what

16   was admitted as Commonwealth Exhibit 290.  Do

17   you recognize the vehicle pictured in

18   Commonwealth Exhibit 290?

19   A.  Yeah.

20   Q.  What vehicle is that?

21   A.  It looks like a vehicle, my mom's

22   vehicle.

23   Q.  Is that the vehicle that is registered

24   to both and your mom?

25   A.  Uh-huh.

74

B. Shelton - Cross by Mr. McKinney

1    Q.  Did you ever lend that vehicle to

2    strangers before?

3    A.  No.

4            MR. CHERNOSKY:  No further

5    questions.

6            THE COURT:  Any questions?

7            MR. McKINNEY:  A couple

8    questions.  Thank you.

9                -----

10              CROSS-EXAMINATION

11                -----

12   BY MR. McKINNEY:

13   Q.  Ms. Shelton, I'm going to show you

14   Commonwealth Exhibit 299.  Could you take a

15   look at it and I'm going to ask you a few

16   questions.  Would you agree with me that that

17   photo is a little fuzzy?

18   A.  Yes.

19   Q.  You've known Cheron for your entire

20   life, right?

21   A.  Uh-huh.

22   Q.  Even knowing him for your entire life,

23   would you agree that it is difficult to

24   determine whether that photograph is a

25   photograph of him?

B. Shelton - Cross by Mr. McKinney

1          A.  Yes.

2          Q.  But when you spoke to the detectives,

3     were you honest with them?

4          A.  Yes.

5          Q.  Did you tell them that it did favor

6     your brother?

7          A.  Yes, but.

8               MR. McKINNEY:  I have no

9     additional questions.

10              THE COURT:  Okay, thank you,

11    ma'am.  You are excused.  Call your next

12    witness.

13              MR. CHERNOSKY:  Your Honor, at

14    this point the Commonwealth would call Scott

15    Towne.

16              MR. McKINNEY:  Your Honor, I do

17    not plan on calling Ms. Shelton in my case and

18    ask that she be allowed to remain in the

19    gallery.

20              MR. CHERNOSKY:  No objection,

21    Your Honor.  Your Honor, prior to Detective

22    Towne taking the stand, the Commonwealth would

23    seek to admit as Commonwealth Exhibit 472, a

24    copy of the certified cell phone records from

25    T-Mobile for cell phone number (412) 892-0447

S. Towne - Direct by Mr. Chernosky

1    for a time period of March 8, 2016, at 14:18:35

2    UTC or 09:18:35 eastern time and for 03/14/16

3    21:34:00 UTC or 4:34 eastern time.

4              THE COURT:  Any objection?

5              MR. CHERNOSKY:  They are

6    accompanied by a certification letter that they

7    are accurate and kept in the regular course of

8    business.

9              THE COURT:  They are admitted

10   without objection.

11                    -----

12              SCOTT TOWNE,

13   a witness herein, having been first duly sworn,

14   was examined and testified as follows:

15                    -----

16              DIRECT EXAMINATION

17                    -----

18   BY MR. CHERNOSKY:

19       Q.  Detective Towne, could you state your

20   first and last name and spell your last name

21   for the court reporter?

22       A.  Scott Towne, T-O-W-N-E.

23       Q.  How are you currently employed?

24       A.  Currently employed by the Pennsylvania

25   Superior Court.

S. Towne - Direct by Mr. Chernosky

1    Q.   How long have you been in that

2   position?

3    A.   Almost two years.

4    Q.   Prior to going to work at the Superior

5   Court, where did you work?

6    A.   I retired from the Allegheny County

7   Police in June of 2016.

8    Q.   How long did you work for the Allegheny

9   County Police?

10   A.   23 years.

11   Q.   Were you assigned to any particular

12  section within the county police?

13   A.   I was.

14   Q.   What section were you assigned to?

15   A.   I was assigned to the homicide section.

16   Q.   Were you working in that capacity in

17  March of 2016?

18   A.   I was.

19   Q.   Were you and other detectives assigned

20  to various tasks and duties with respect to the

21  murders that occurred at 1304 Franklin Avenue

22  in the Borough of Wilkinsburg?

23   A.   Yes.

24   Q.   Did you apply, in connection with those

25  duties, for a court order for cell phone

S. Towne - Direct by Mr. Chernosky

1    records for the number (412) 892-0447?

2         A.   I did.

3         Q.   Could you explain a little bit about

4    the physical process of applying, what do you

5    have to do?

6         A.   There is a document, an affidavit, that

7    basically states the facts and circumstances of

8    the case thus far.  You type it up, again the

9    affidavit with all the information that we have

10   at that point, then we went through the Deputy

11   District Attorney to approve the court order

12   and ultimately it was signed by a Common Pleas

13   judge.

14        Q.   Do you provide that to the cell phone

15   provider?

16        A.   It is, it was.

17        Q.   Then you wait on your results?

18        A.   Correct.

19        Q.   When you received the records back from

20   that provider, did you notice contact between

21   that (412) 892-0447 and (412) 378-3461?

22        A.   Yes.

23        Q.   Specifically of interest to you, did

24   you notice contacts in and around the time

25   period of the homicides on Franklin Avenue?

S. Towne - Direct by Mr. Chernosky

1          A.  Yes.

2          Q.  I'm going to show you what I will mark

3     as Commonwealth Exhibits 473, 474, 475, 476,

4     and 477 -- actually, I apologize.  I will show

5     you what I marked as 474 through 476.  When you

6     receive cell phone records, how large are they?

7          A.  They are very large.

8          Q.  The exhibits that I just handed you

9     represent snippets from the cell phone records?

10         A.  Yes.

11         Q.  Specifically, are they screen shots or

12    cut and pastes of contact between 892-0447 and

13    378-3461?

14         A.  Yes.

15              MR. CHERNOSKY:  Your Honor, I

16    move for the admission of Commonwealth

17    Exhibits 473 through 476.

18              THE COURT:  Admitted without

19    objection.

20         Q.  Now, when you received the records from

21    the provider, were they in what is commonly

22    referred to as coordinated universal time or

23    UTC?

24         A.  Yes, they are.

25         Q.  Is there a conversion that is necessary

S. Towne - Direct by Mr. Chernosky

1    to convert those records from UTC to eastern

2    time?

3        A.  Yes, you have to subtract five hours.

4        Q.  So the exhibits that are displayed,

5    looking at Commonwealth Exhibit 473 displayed

6    on the screen, are those depicted in UTC time?

7        A.  Yes, they are.

8        Q.  So on March 10, 2016, at 1:04 UTC, what

9    time does that convert to in eastern time?

10       A.  8:04 p.m.

11       Q.  Is there a contact listed on 8:04 p.m.

12   on March 9, 2016, between 0447 and 3461?

13       A.  Yes.

14       Q.  Directing your attention to the next

15   sequential contact, what time is that?

16       A.  9:36 p.m.

17       Q.  Directing your attention to the next

18   contact, what time is that?

19       A.  9:39:38 p.m.

20       Q.  The one after that?

21       A.  9:47 p.m.

22       Q.  Moving along chronologically, what is

23   the next contact between those numbers?

24       A.  2:48:35 p.m. on March 9th.

25       Q.  What does that convert to in eastern

S. Towne - Direct by Mr. Chernosky

1    time?

2         A.   9:48.

3         Q.   Directing your attention to the contact

4    after that?

5         A.   9:49 p.m.

6         Q.   Now, directing you to Commonwealth

7    Exhibit 475 on the screen behind you, is there

8    a continued list of contact between those two

9    numbers that night?

10        A.   Yes.

11        Q.   Directing your attention to the first

12   listing on that sheet, what time was that in

13   eastern time?

14        A.   10:08 p.m.

15        Q.   And the next contact after that?

16        A.   10:19 p.m.

17        Q.   After that?

18        A.   10:21.

19        Q.   Continuing chronologically?

20        A.   10:22:22.

21        Q.   The following one?

22        A.   10:24.

23        Q.   After that?

24        A.   10:31.

25        Q.   Is there a contact listed at 10:34?

S. Towne - Direct by Mr. Chernosky

1        A.   There is.

2        Q.   And after that, 10:46?

3        A.   Correct.

4        Q.   Directing your attention to Exhibit

5    No. 476 displayed on the screen, could you take

6    us through the sequential contacts and their

7    eastern time conversions?

8        A.   Do you want the seconds or minutes?

9        Q.   Just the minutes.

10        A.   The first one reads 10:56 p.m.,

11    10:56 p.m., the third one would be 3:58 p.m.

12    Continuing, I'm sorry, I apologize, 10:58 p.m.

13    The next one is 11:03 p.m., 11:09 p.m.,

14    11:09 p.m., 11:10 p.m., 11:14 p.m., 11:17 p.m.,

15    11:17 p.m.

16        Q.   I'm directing your attention to

17    Commonwealth Exhibit 477 on the screen behind

18    you, could you take us through sequentially

19    through the contacts between 892-0447 and

20    378-0461 that night?

21        A.   11:18 p.m., 11:22 p.m., 11:27 p.m.,

22    11:27 p.m., 11:27 p.m., 11:27 p.m., 11:43 p.m.,

23    11:44 p.m., 12:14 a.m., 12:15 a.m.

24        Q.   Thank you.  Did you also, in looking at

25    those records, see on the night of the homicide

S. Towne - Direct by Mr. Chernosky

1    frequent contact between (412) 892-0447 and

2    (412) 519-9604?

3        A.  Yes.

4        Q.  I show what you I marked as

5    Commonwealth Exhibit 477.  Is 477 a similar

6    screen shot, for lack of a better word, of

7    those contacts?

8        A.  It is.

9              MR. CHERNOSKY:  I move for the

10   admission of Commonwealth Exhibit 477.

11             MR. McKINNEY:  No objection.

12       Q.  Directing your attention to

13   Commonwealth 477 on the screen behind you,

14   could you take us sequentially through the

15   contact and their conversion times?

16       A.  The first one would be 5:04 p.m.,

17   12:01 a.m., 12:12 p.m., 1:54 p.m., 10:41 p.m.,

18   11:24 p.m., 11:25 p.m., 11:25 p.m.

19             MR. CHERNOSKY:  No further

20   questions.  I offer this witness for cross.

21             THE COURT:  Any questions?

22             MR. McKINNEY:  Yes, Your Honor.

23

24

25

S. Towne - Cross by Mr. McKinney

1                        -----

2                  CROSS-EXAMINATION

3                        -----

4    BY MR. McKINNEY:

5        Q.   Detective, did you review all of the

6    phone records from 892-0447?

7        A.   In part but not completely, yes.

8        Q.   You agree with me that there are

9    multiple other phone calls and multiple other

10   communications and multiple other text messages

11   other than the ones that were shown on the

12   exhibits that you just testified to, correct?

13       A.   That's correct.

14       Q.   You would agree with me that those

15   other communications are interspersed within

16   the communications that you just testified to

17   on that exhibit, correct?

18       A.   Right.

19       Q.   So, essentially, what you were shown

20   wasn't actually communications in the order

21   that they occurred, it was an exhibit made for

22   the purpose of just pointing out the

23   communication between two numbers?

24       A.   That's correct, yes.

25       Q.   So there were multiple other contacts

S. Towne - Cross by Mr. McKinney

1    within those time frames, correct?

2        A.  Yes, there were.

3        Q.  When you authored the search warrant

4    for the court order for these phone numbers,

5    you indicated that based on your experience

6    individuals who may have committed a crime may

7    sometimes communicate with each other or

8    potentially the victims via phone

9    communication, correct?

10       A.  Yes.

11       Q.  Would you agree with me that if two

12   individuals were together as you and I are

13   right now in this room, it would be unlikely

14   that you and I would be calling each other if

15   we were five to ten feet away from each other?

16       A.  I can say in my own house, my kids

17   being in the same house as me, we communicate

18   while we are in the same structure.

19       Q.  Would they communicate with you 20

20   times?  Would they call you 20 times over the

21   course of two or three minutes?  I would hope

22   not.

23       A.  No, but there have been times.

24       Q.  Certainly that is possible but in your

25   experience that is unlikely that two

S. Towne - Cross by Mr. McKinney

1    individuals who are together would be

2    communicating, calling each other or texting

3    each other if they were in the same location?

4              MR. CHERNOSKY:  Your Honor, I

5    object that this calls for speculation.

6              THE COURT:  Objection sustained.

7              MR. McKINNEY:  No additional

8    questions, Your Honor.

9              MR. CHERNOSKY:  No redirect.

10   Your Honor, at this point the Commonwealth will

11   call Detective Pat Miller.

12         Your Honor, prior to Detective Miller

13   taking the stand, the Commonwealth would seek

14   to admit as 4478, the certified records from

15   T-Mobile for (412) 378-3461 for the time period

16   March 8, 2016, 00:19 hours UTC or 7:19 p.m.

17   eastern time through March 28th at 02:17 UTC or

18   9:17 p.m. eastern time.

19              THE COURT:  Any objection?

20              MR. McKINNEY:  Yes, and

21   permission to approach.

22              THE COURT:  Okay.

23              (Sidebar discussion held as

24   follows.)

25              MR. McKINNEY:  Your Honor, it

S. Towne - Cross by Mr. McKinney

1    appears as though the Commonwealth is looking

2    to submit the cell phone records for a phone

3    number that allegedly was Mr. Thomas's.  I

4    don't think they authenticated that as being

5    Mr. Thomas's phone.

6                    MR. CHERNOSKY:  Your Honor, as a

7    baseline, we did put in some information with

8    the cell phone downloads that that was

9    Mr. Thomas's phone.

10                   THE COURT:  Who was that?

11                   MR. CHERNOSKY:  The download of

12   Brittany Shelton and the text message, hey,

13   it's Rob, I need you to call me.  Additionally,

14   after the admission of these records, Detective

15   Miller's testimony is limited to those records,

16   there is contact with a number for Tara Gomez

17   that was put in through the cell phone

18   downloads.

19                   MR. McKINNEY:  I argue, hey, it

20   is Rob certainly isn't authentication it is Rob

21   Thomas.

22                   THE COURT:  You can authenticate

23   a number directly or circumstantially.  That is

24   what you are trying to do here so I'll overrule

25   your objection.

P. Miller - Direct by Mr. Chernosky

1              (Sidebar discussion concluded.)

2                  MR. CHERNOSKY:  Your Honor, I

3      move for the admission of 478 if it hasn't been

4      admitted already.

5                  THE COURT:  Admitted.

6                        -----

7                  PATRICK MILLER,

8      a witness herein, having been first duly sworn,

9      was examined and testified as follows:

10                        -----

11                  DIRECT EXAMINATION

12                        -----

13     BY MR. CHERNOSKY:

14          Q.  Could you please state your name for

15     the record?

16          A.  Patrick Miller.

17          Q.  How are you employed?

18          A.  With the Allegheny County Police

19     Department.

20          Q.  How long?

21          A.  Almost 24 years.

22          Q.  In March of 2016, were you working for

23     the Allegheny County Police?

24          A.  Yes.

25          Q.  Were you assigned duties with respect

P. Miller - Direct by Mr. Chernosky

1    to the shooting deaths of 1304 Franklin Avenue

2    in the Borough of Wilkinsburg?

3        A.  Yes.

4        Q.  Pursuant to those duties, did you at

5    some point apply for a court order for T-Mobile

6    records for (412) 378-3461?

7        A.  Yes.

8        Q.  In reviewing those numbers, did you

9    find any contacts with the cell phone

10   (412) 651-5092?

11       A.  Yes.

12       Q.  How many contacts total over the period

13   of time that you applied for the records?

14       A.  Between March, the beginning of

15   March 8th through March 28th there were 301

16   contacts between those two phone numbers.

17       Q.  I show you what I'll mark as

18   Commonwealth Exhibit 479 and ask you if

19   Commonwealth Exhibit 479 represents contact

20   between that phone numbers that you just listed

21   on the night of the homicides?

22       A.  Yes.

23           MR. CHERNOSKY:  Your Honor, I

24   move for the admission of Commonwealth

25   Exhibit 479.

P. Miller - Direct by Mr. Chernosky

1              THE COURT:  It will be admitted

2    subject to the sidebar discussion.

3              MR. CHERNOSKY:  Okay.

4        Q.  In reference to these timestamps, is

5    there a conversion to get eastern time?

6        A.  Yes.

7        Q.  What do you have to do?

8        A.  You have to subtract five hours.

9        Q.  Could you tell us sequentially what the

10   contacts were with that number?

11       A.  So on 03/09/16 at 19:34:33 there is an

12   outgoing call from the 378-3461 to 651-5092.

13   The duration, four.  I don't know if that is

14   seconds or minutes.

15       Q.  What does that time period convert to

16   in eastern time?

17       A.  That would be 2:34 p.m.

18       Q.  Then on the next sequential call?

19       A.  That is 11:56 p.m.  Incoming call from

20   651-5092.  So if you subtract five hours, that

21   is 6:56 p.m.

22              MR. CHERNOSKY:  No further

23   questions.  I offer for cross.

24              THE COURT:  Any questions?

25              MR. McKINNEY:  Your Honor, no

T. Morgan - Direct by Ms. Pellegrini

1    questions on cross with the understanding with

2    the Commonwealth that this witness will likely

3    be re-called to discuss another matter.

4                THE COURT:  Is that accurate?

5                MR. CHERNOSKY:  We discussed it,

6    Your Honor.  That is accurate.

7                THE COURT:  Okay, thank you.  Who

8    is your next witness?

9                MS. PELLEGRINI:  Tom Morgan, Your

10   Honor.  The Commonwealth calls Tom Morgan.

11               THE COURT:  Okay.

12                         -----

13                    THOMAS MORGAN,

14   a witness herein, having been previously first

15   duly sworn, was examined and testified as

16   follows:

17                         -----

18               THE COURT:  You still remain

19   under oath.

20               THE WITNESS:  Yes, sir.

21               THE COURT:  As with your

22   testimony, unless your position has changed,

23   Mr. McKinney, he will be allowed to refer to

24   his notes freely.

25               MR. McKINNEY:  Thank you, Your

T. Morgan - Direct by Ms. Pellegrini

1    Honor.  And permission to approach briefly?

2                    THE COURT:  Has your position

3    changed?

4                    MR. McKINNEY:  Not with respect

5    to that.

6                    (Sidebar discussion held as

7    follows.)

8                    MR. McKINNEY:  Your Honor, as I

9    see Ms. Pellegrini preparing to conduct her

10   direct examination, I'm concerned she may be

11   waving around the .22 rifle again.  The Court's

12   ruling with respect to that gun was the

13   scientist that fingerprinted it could show it

14   to where the fingerprint was lifted but any

15   other demonstrative of that firearm was

16   precluded.

17                   THE COURT:  Do you plan to use

18   the weapon?

19                   MS. PELLEGRINI:  I'm not going to

20   handle it.

21                   THE COURT:  Refer to it?

22                   MS. PELLEGRINI:  Yeah.

23                   (Sidebar discussion concluded.)

24

25

T. Morgan - Direct by Ms. Pellegrini

1                      -----

2            DIRECT EXAMINATION

3                      -----

4    BY MS. PELLEGRINI:

5        Q.  Mr. Morgan, you have been previously

6    qualified as a firearms expert, correct?

7        A.  Yes.

8        Q.  Could you explain to this jury what it

9    means to be an expert in firearms examination?

10       A.  For the firearms examination portion of

11   what I do, it is very simple.  It is the

12   ability to correctly identify what the firearm

13   is by its type, its caliber, its make, its

14   model, and a serial number.  Also to understand

15   how the firearm functions, and as I previously

16   testified to, how that function of the firearm

17   leads to the spent cartridge casings and

18   bullets when they are discharged from it.

19       Q.  Mr. Morgan, we heard earlier testimony

20   that there were two different types of guns

21   that were fired on March 9th, two different

22   types of firearms -- or ballistic evidence that

23   was found probably is a better way to put it?

24       A.  Yes.

25       Q.  Starting with what you referred to as

T. Morgan - Direct by Ms. Pellegrini

1    the .40-caliber ballistic evidence, could you

2    explain to us how that semiautomatic weapon

3    works?

4        A.  Well, with regard to the .40 S&W

5    caliber cartridge cases, of course at one time

6    being part of the full live round, if you will,

7    or live cartridge .40 S&W cartridge, I

8    mentioned prior when referring to 7.62 by

9    39 millimeter caliber cartridges, the contrast

10   of that is that the .40 S&W is overwhelming

11   used in semiautomatic pistols.  There are some

12   rifles that can discharge them but in Allegheny

13   County the vast majority of those types of

14   firearms are automatic pistols and designed to

15   be fired from the hand and have a shorter

16   barrel.

17       Q.  Explain how that firearm works?

18       A.  In a bit more detail than perhaps what

19   I had described previously on Tuesday, when you

20   take any semiautomatic handgun, you take the

21   live cartridge and load them into the magazine

22   by hand.

23       Q.  People normally refer to that as a

24   clip?

25       A.  Yes, a clip would be another slang term

T. Morgan - Direct by Ms. Pellegrini

1    for the magazine.  You load the cartridge into

2    the magazine or clip.  The magazine is usually

3    inserted for a pistol in the handle or the grip

4    of a firearm.  For a semiautomatic pistol, you

5    grab ahold of the slide, I may have explained

6    this before in my previous testimony, you have

7    to manually pull it back and it compresses a

8    spring.  When you release that, the interlocked

9    mechanism of the firearm takes one of the

10   cartridges, interacts with it in the magazine,

11   and pushes it up into the chamber of the

12   firearm.  In doing so as well, it also cocks

13   the firearm and gets it ready for discharge.

14   Once you get to that point, all you have to do

15   now is pull the trigger.  That will cause the

16   firing signals to be begin.

17            The firing pin strikes something on the

18   cartridge known as the primer which is the

19   first four components for the cartridge.  It is

20   strike sensitive.  When it gets hit, it ignites

21   a rapid burn.  That rapid burn releases or

22   burns the gunpowder which is the second part of

23   the cartridge and it releases a lot of gas.

24   That gas pressure pushes the bullet down the

25   barrel, as we described on Tuesday, and causes

T. Morgan - Direct by Ms. Pellegrini

1    the cartridge case to swell and interact with

2    the inner chamber of the firearm.  The bullet

3    of the cartridge case are the last two

4    components of the live round.  That force, as I

5    explained before, pushes the bullet down the

6    barrel and then the equal and opposite force of

7    that push causes the slide to move backwards

8    and starts compressing that spring.  There are

9    other springs inside of the firearm.  The other

10   tools, known as the extractor or ejector, grips

11   onto the cartridge case and pulls it out of the

12   chamber and it is now swollen and scraping

13   against the chamber, ejects the cartridge case.

14   When that spring tension overcomes the rearward

15   pressure, then it pushes the slide back on its

16   own to the closed or battery position cocking

17   the firearm again, loading another cartridge

18   into the chamber, and it is now ready to fire.

19   For the semiautomatic portion, you have to

20   release the trigger and pull up one more time

21   and fire.  You can do that as many times as you

22   want or until you run out of ammunition in the

23   magazine.

24        Q.  What happens to the casing, how is it

25   ejected?

T. Morgan - Direct by Ms. Pellegrini

1      A.   The cartridge case is extracted from

2    the chamber and is ejected outside of the

3    firearm.  Where it can go, there is actually a

4    lot of variability on that.  But if the sights

5    are aligned along the top of the slide as they

6    are intended to by the manufacturer, the

7    overwhelming majority of the holes that they

8    come out of on the ejector side are on the

9    right side, so typically they will fly through

10   the air to the right of the shooting position.

11   If all of those conditions are as I described,

12   they will be somewhere near the shooting

13   position.

14      Q.   Now, we've heard that there was

15   ballistic evidence, casings, found at the scene

16   in the area off the side by the porch that were

17   7.62 by 39 casings?

18      A.   Yes.

19      Q.   What type of weapon will fire those,

20   the 7.62 by 39?

21      A.   Again, based on my -- I previously

22   testified on Tuesday that with those type of

23   cartridges, the overwhelming majority, at least

24   in this county that we see them discharged

25   from, are rifles but, again, there are pistols

T. Morgan - Direct by Ms. Pellegrini

1     that can discharge them.

2          Q.   What is an assault rifle?

3          A.   Do you mean a semiautomatic rifle?

4          Q.   Let me try it this way.  That may not

5     be the proper scientific term for it but what

6     is generally referred to such as Commonwealth

7     Exhibit No. 338, what is this?

8          A.   That is, if my memory serves me

9     correctly, a .22 long rifle caliber Colt rifle.

10         Q.   Does it fire 7.62 rounds?

11         A.   It does not.  It fires .22 long rifle.

12         Q.   That is not an assault rifle?

13         A.   In the way that it is commonly used in

14     the media and referred to in other ways, I

15     would not refer to it as that based on the

16     cartridge that it fires.

17         Q.   What, in your experience here in

18     Allegheny County, fires a 7.62 by 39?

19         A.   The overwhelming majority, as I said,

20     would be a semiautomatic rifle.

21         Q.   Give me some examples of a

22     semiautomatic rifle.

23         A.   Specifically, as it refers to the 7.62

24     by 39 caliber cartridge, you'd be looking at

25     what a lot of people recognize as the AK-47

T. Morgan - Direct by Ms. Pellegrini

1    style rifle or AK platform rifle.  The pistol

2    that they are discharged from may appear very

3    similar to that AK style platform.  There are

4    other platforms known as a SKS style platform

5    referred to as a more sporting platform.  That

6    is more of a rifle.  It is a rifle I should

7    say.

8         Q.  So Commonwealth Exhibit 335, do you

9    recognize what this type of ammunition is?

10        A.  Yes.

11        Q.  What type of ammunition is this?

12        A.  In reading directly from the headstamp,

13   that is a 7.62 by 39 caliber Wolf cartridge.

14        Q.  Does a semiautomatic rifle fire this

15   the type of ammunition?

16        A.  Yes.

17        Q.  Explain to us how a semiautomatic rifle

18   works?

19        A.  A semiautomatic rifle works essentially

20   the exact same way as a semiautomatic pistol

21   does.  The biggest difference between the rifle

22   and the pistol, obviously, the rifle is

23   designed to be fired from the shoulder so we

24   have a shoulder stock.  It gives you another

25   point of support in order to steady the rifle

T. Morgan - Direct by Ms. Pellegrini

1    or steady the firearm in order to make a more

2    accurate shot.  There is an additional benefit

3    to the rifle as well as it typically has a

4    longer barrel, by law it has a longer barrel.

5    When you have a longer point between the front

6    sight that is often on the muzzle end of the

7    firearm and the rear sight which is typically

8    on the receiver or back towards the action or

9    operating portion of the firearm, you have less

10   play and less error between the front sight and

11   the rear sight for you to kind of make sighting

12   errors.  A little bit of play will cause the

13   sights not to align properly.  That would be

14   the biggest difference between in addition to

15   the fact that the 7.62 by 39 millimeter caliber

16   cartridge versus the .40 in our small universe

17   of firearms that we are discussing, they will

18   discharge their projectile at a muzzle velocity

19   which is roughly twice, if not more than twice,

20   as the S&W cartridge?

21        Q.   What happens when this hits a target?

22   What does this do?

23        A.   If I may be able to backtrack real

24   quick and explain the flight?  When the bullet

25   comes out of the barrel of the firearm, I

T. Morgan - Direct by Ms. Pellegrini

1    explained on Tuesday how there is rifling in

2    the barrel and it grips the bullet so it spins

3    on its axis ideally how you would throw a nice

4    tight spiral down the football field, that

5    stabilizes the bullet for a more accurate

6    flight path.  But contrasting the 7.62 bullet

7    versus the .40 caliber bullet, the 7.62 bullet

8    is longer.  When it hits things, they become

9    destabilized and they start to tumble.

10       Q.  So that ammunition can't be fired out

11    of that weapon, right?

12       A.  Not the firearm that is sitting on the

13    floor in front of me, no.

14       Q.  So you need a semiautomatic weapon to

15    fire that?

16       A.  That weapon is also a semiautomatic

17    firearm.

18       Q.  I'm sorry, I didn't phrase that

19    properly.  You would need a completely

20    different type of firearm to fire this?

21       A.  That's correct.

22       Q.  Can you make a semiautomatic rifle fire

23    automatically, like in rapid succession?

24       A.  Two different questions technically,

25    the answer is yes to both of them.

T. Morgan - Direct by Ms. Pellegrini

1      Q.  Could you explain?

2      A.  As far as making a semiautomatic

3   firearm fire rapidly, just generally, of

4   course, you could make a semiautomatic firearm

5   fire as fast as you want just by how quickly

6   you pull the trigger.  You are not necessarily

7   restricted to a nice rhythmic discharge.  You

8   can squeeze just as quickly as you can

9   depending on why you are firing it or how you

10   feel.

11           As far as making a semiautomatic fire

12   fully at automatic, that requires some

13   knowledge base and probably some, at least,

14   manufacturing or altering of a semiautomatic

15   firearm for that to occur.

16      Q.  But that can be done, right?

17      A.  It can be done.

18      Q.  The energy that happens with a .40,

19   what is that energy when the bullet is fired?

20      A.  Gosh.  Well, as far as what the muzzle

21   energy is, I can't think of that.  I already

22   explained -- let me say it is muzzle velocity.

23      Q.  It was an inarticulate way to phrase

24   the question, I'm sorry.

25      A.  What I know basically off the top of my

T. Morgan - Cross by Mr. McKinney

1    head is that the muzzle velocity of a .40 S&W

2    cartridge as it comes out of the muzzle as it

3    exits the firearm, they are typically around

4    1,000 to 1,200 feet per second.

5        Q.   What about the semiautomatic rifle?

6        A.   Specifically referring to the 7.62 by

7    39 millimeter cartridge, they are typically

8    anywhere between 2,200 as 2,700 feet per second

9    when it comes out of the muzzle of the firearm.

10       Q.   Do you hold your opinion to a

11   scientific certainty in your field?

12       A.   What we say now is I believe that

13   another qualified examiner following accredited

14   laboratory procedures just as I am going

15   through a similar round of peer review would

16   reach the same conclusions that I have.

17            MS. PELLEGRINI:   That is all I

18   have.

19            THE COURT:   Any questions?

20            MR. McKINNEY:   Yes.

21                 -----

22            CROSS-EXAMINATION

23                 -----

24   BY MR. McKINNEY:

25       Q.   Mr. Morgan, just to clarify, the gun in

T. Morgan - Cross by Mr. McKinney

1    that box cannot fire 7.62 ammunition?

2        A.   If it is the firearm that I did, in

3    fact, examine which I believe it is, that's

4    correct, it cannot fire the 7.62 by 39 caliber

5    cartridge.

6        Q.   Ms. Pellegrini was talking to you about

7    turning a semiautomatic into an automatic; do

8    you remember those questions?

9        A.   Yes.

10       Q.   It sounds like you need some kind of

11   kit or maybe a bump stock?

12       A.   Those are actually two different ways

13   that you can do it.  There are other ways of

14   doing it.  In this day and age, the Google

15   machine can help you out a lot.

16       Q.   With respect to this case, have you

17   been presented with any kits or bump stocks in

18   relation to this case?

19       A.   I have not.

20            MR. McKINNEY:  Okay, thank you.

21            THE COURT:  Anything else?

22            MS. PELLEGRINI:  No.

23            THE COURT:  You are excused.

24   Thank you.  We'll take your afternoon recess

25   and ask you to be back at 1:45.

T. Morgan - Cross by Mr. McKinney

1                              -----

2                    (Open court - Jury not present.)

3                              -----

4                    THE COURT:  Scheduling for this

5        afternoon?

6                    MS. PELLEGRINI:  Yes, Your Honor,

7        we would request the Court to make a decision

8        with regard to the CAD issue.

9                    MR. McKINNEY:  Your Honor, can we

10       have that conversation at sidebar?

11                   (Sidebar discussion held as

12       follows.)

13                   MR. CHERNOSKY:  The computer

14       dispatch sheet from the other day that Miller

15       had that the Commonwealth did not have, the one

16       that shows the plate was run at 1:19 in the

17       morning and 3:50 a.m.

18                   THE COURT:  I thought you said --

19                   MR. CHERNOSKY:  We're not going

20       to use it.  The only thing that I mentioned

21       that I said when we were not going to use is it

22       hamstrings Mr. McKinney.  He can't have the

23       question answered, yes, I did, and here's the

24       proof.

25                   THE COURT:  Asked of who?

T. Morgan - Cross by Mr. McKinney

1           MR. CHERNOSKY:  Detective Miller

2     or any other detective that he would ask.

3           MR. McKINNEY:  Your Honor, I

4     understand Mr. Chernosky's position.  But my

5     argument is I should certainly be allowed to

6     cross-examine the detectives on the fact that

7     they did not run that information because based

8     on the discovery that was disclosed to us in

9     the trial, to stop me from going full steam

10    ahead on my best legal argument of this case, I

11    think it would be prejudicial and I know the

12    Commonwealth didn't do it purposely but it

13    takes the wind out of my sails.

14          THE COURT:  The detective will

15    commit perjury.

16          MR. CHERNOSKY:  The suggestion

17    that I would have, and I discussed it with

18    Mr. McKinney, I don't know how you would feel

19    about it, if the Commonwealth does not use in

20    the offense and Mr. McKinney doesn't ask any

21    further questions on defensive, he would be in

22    his right to close to the jury that you never

23    heard any information that it was run.  I think

24    that would be a fair compromise if we go that

25    route.

T. Morgan - Cross by Mr. McKinney

1          THE COURT:  That is how you are
2     going to have to do it.  You now know it to be
3     false.
4          MR. CHERNOSKY:  That is fair.
5          MR. McKINNEY:  So it sounds that
6     I won't cross-examine and force them to commit
7     perjury but I can argue in my closing.
8          THE COURT:  You have to phrase it
9     delicately.
10         MR. McKINNEY:  Sure.
11         THE COURT:  I don't think you can
12    any longer call Adams a liar because there is
13    substantial corroboration that he did.
14         MR. McKINNEY:  I would hope that
15    I could argue to the jury you never heard any
16    other witness or detective confirm that they
17    were given this information?
18         THE COURT:  You can argue that.
19         MR. McKINNEY:  One other issue,
20    the other issue is with Agent Burke.
21         THE COURT:  Are you prepared to
22    argue that now?
23         MR. McKINNEY:  Just looking
24    through the motions that were filed in this
25    case, on June 9th of 2017 there was a defense

T. Morgan - Cross by Mr. McKinney

1    motion to compel.  That motion contained a
2    letter written by Attorney White on the defense
3    team from six months prior which was June 19,
4    2017.  The letter to the Commonwealth indicated
5    that we wanted any results or reports of
6    scientific tests or expert opinions.  That was
7    a motion filed June 9th of 2017.  Your Honor,
8    in May, which was approximately a year later,
9    of 2018 we started to get that correspondence
10   about Gladiator and us not being able to open
11   it.  That was a year later.  The letter that we
12   have from the Commonwealth from Ms. Werner
13   indicates that we are turning over the raw data
14   to you since although we have not personally
15   viewed the data ourselves, are requesting the
16   FBI to organize it for us for use at trial.
17   That was May 31, 2018.
18              THE COURT:  What was the date?
19              MR. McKINNEY:  May 31, 2018.
20   They didn't indicate that they were certain
21   they were going to use that data.  However in
22   June of 2018, a month later, Ryan Burke authors
23   this report so I would argue clearly they were
24   anticipating using this information and at that
25   point they still didn't give it to us.  In June

T. Morgan - Cross by Mr. McKinney

 1     of 2018, after a month earlier they told us

 2     that they may be using it, then six months

 3     later during jury selection in January they

 4     comply with a motion to compel that we filed

 5     two years ago and they give us not even the

 6     whole report, just a slide show that we have no

 7     technical knowledge to decipher.

 8                    THE COURT:  You filed a motion to

 9     compel.  There wasn't any order that was

10     generated from that.

11                    MR. McKINNEY:  That is true,

12     although with Judge Cashman, because it was in

13     front of him at that time, there was

14     significant conversation on the record with

15     respect to discovery motions.  There was not

16     necessarily, from what I've been able to find

17     in the last three or four hours, an order.  But

18     it is hard to try to pull transcripts on such

19     short notice so I would never try to tell the

20     Court for sure that Judge Cashman ordered or

21     the Commonwealth agreed because I don't have

22     the transcript in front of me but I'm making

23     the Court aware of the fact that we've been

24     trying to get this information for a long time

25     through formal and informal measures and it

T. Morgan - Cross by Mr. McKinney

1    wasn't that we waited until the eve of trial

2    for this information.  We've been asking for

3    it.

4                MR. CHERNOSKY:  The only thing

5    that I will add to this, I don't think I

6    supplemented the record with this thus far, the

7    defense has been aware since the inception of

8    the case the location of various cell phones.

9    They were provided charts that the ATF did in

10   the second round of discovery and rudimentary

11   maps that the county police did.  In that

12   respect, they have been on notice that the cell

13   phone towers were in place since then.

14                With respect to Mr. McKinney's

15   position, that we had the PowerPoint slide of

16   Agent Burke, for lack of a better word, since

17   June of 2018, we did, but we were not decided

18   whether we were going to use it or not, so.

19                THE COURT:  I'm not suggesting

20   that the Commonwealth has completely clean

21   hands here but.

22                MR. McKINNEY:  If I could, just

23   briefly.

24                THE COURT:  No, let me finish

25   here.  In a certain respect, you are allowed to

T. Morgan - Cross by Mr. McKinney

1    lay in the tall grass as a defense attorney but

2    you, more or less, came out of the tall grass

3    with all this correspondence and you're asking

4    for and Ms. Williams castigated the

5    Commonwealth how are we supposed to prepare for

6    stuff we can't see?  That is a summary of what

7    she said.  The matter should have been pursued

8    with the Court.  At the same time the

9    Commonwealth has a continuing duty to disclose.

10   I recognize that.  I took that into

11   consideration.

12        My final decision, your final decision,

13   okay, that is why the remedy I fashioned was

14   limited to the first part of that which, again,

15   I find to be routine and continually confronted

16   about the defense in this modern age.

17        MR. McKINNEY:  I would agree with

18   that, Your Honor, and every single defense

19   attorney in this courthouse faced with a

20   similar scenario anticipated that the

21   examination of Mr. Rosenberg, which I am fully

22   prepared for because he is the only expert, the

23   only witness that the Commonwealth ever called

24   in my experience with respect to this issue so

25   we've been ready for cross-examination of that

T. Morgan - Cross by Mr. McKinney

1    witness but this is a witness that no one ever
2    heard of before.  No one that I've spoken to.
3    Never called in any of my cases so I would hope
4    that the Court would consider the remedy being
5    allowing Mr. Rosenberg to testify to the things
6    that the defense is typically prepared for
7    because it is a matter of course in this
8    courthouse.  For this new witness, we didn't
9    get any information about him.  Not completely
10   our fault.  Maybe we could have been more
11   diligent.  I do think it tips the scale, Your
12   Honor, because it is something that was
13   unanticipated and to the extent that the
14   Commonwealth hid the ball, not purposely, I
15   don't think it was devious but we did the best
16   we could with what we had.  I'm asking to allow
17   Mr. Rosenberg to testify as opposed to the FBI
18   agent.
19                THE COURT:  I will reconsider and
20   let you know when we reconvene.
21                MR. McKINNEY:  Thank you.
22                     -----
23                (Luncheon recess taken.)
24                     -----
25

S. Hitchings - Direct by Mr. Chernosky

1                          -----

2                  (Open court - Jury present.)

3                          -----

4              MR. CHERNOSKY:  Your Honor, the

5    Commonwealth would re-call Detective Steve

6    Hitchings.

7                          -----

8                  STEVEN HITCHINGS,

9    a witness herein, having been previously first

10   duly sworn, was examined and testified as

11   follows:

12                         -----

13              DIRECT EXAMINATION

14                         -----

15   BY MR. CHERNOSKY:

16       Q.  Detective Hitchings, directing your

17   attention to March 14, 2016, did you have an

18   opportunity to interview Melloyora Walker?

19       A.  Yes.

20       Q.  Where did that interview take place?

21       A.  It took place, we met her at her

22   residence which was 1216 Nolan Court and took

23   her back to our office to interview her.

24       Q.  Did you speak to her about any

25   observations that she may have made on March 9,

S. Hitchings - Cross by Mr. McKinney

1    2016?

2        A.  Yes.

3        Q.  Now, directing your attention to

4    March 25, 2016, were you present at the time

5    that Cheron Shelton was taken into custody on a

6    probation violation?

7        A.  Yes, I was working and I was at the

8    office when he was brought in, yes.

9        Q.  At your office, did you have an

10   opportunity to search his person?

11       A.  Yes.  Prior to being put into the

12   interview room, he was searched and a battery

13   Kyocera cellular telephone was recovered in the

14   front pant pocket.

15           MR. CHERNOSKY:  No further

16   questions.  I offer for cross.

17           THE COURT:  Any questions?

18           MR. McKINNEY:  Yes, Your Honor.

19   Thank you.

20               -----

21           CROSS-EXAMINATION

22               -----

23   BY MR. McKINNEY:

24       Q.  Detective, you said Melloyora Walker

25   was the resident at 1216 Nolan Court.  You

S. Hitchings - Cross by Mr. McKinney

1    recognize that is right next door to 1214 Nolan

2    Court?

3        A.  Yes.

4        Q.  Did you review the surveillance video

5    that was behind Nolan Court and all the

6    surveillance that was presented to the jury?

7        A.  For the most part, yes.

8        Q.  Did you see an individual walk into

9    1214 Nolan Court but prior to entering the

10   residence having a conversation with the people

11   outside of 1216 Nolan Court?

12       A.  Yes.

13       Q.  Are you aware that Ms. Walker is the

14   sister of Lamont Powell?

15       A.  Yes.

16       Q.  Did you confirm whether or not the

17   individual walking into 1214 actually was

18   speaking to Ms. Walker before he entered that

19   residence?

20       A.  She said she had spoken to Cheron prior

21   to the shooting, put it that way.

22       Q.  Did she indicate that the conversation

23   was pleasant?

24                MR. CHERNOSKY:  I object at this

25   point that his questioning calls for hearsay,

P. Kinavey - Direct by Mr. Chernosky

1    Your Honor.

2              THE COURT:  He can answer what

3    was the nature of the conversation as

4    described.

5        A.   I believe she was sitting on her house

6    at 10:20 in the evening.  Mr. Shelton pulls in,

7    he walks past her residence.

8              THE COURT:  I don't want you to

9    tell us what she said.  Did she indicate there

10   was anything unusual about the conversation?

11             THE WITNESS:  I believe it was

12   just a hello, of that nature, just nothing.

13             MR. McKINNEY:  Okay, no

14   additional questions.  Thank you.

15             THE COURT:  Anything else?

16             MR. CHERNOSKY:  No, Your Honor.

17             THE COURT:  Call your next

18   witness.

19             MR. CHERNOSKY:  The Commonwealth

20   calls Detective Patrick Kinavey.

21                    -----

22                 PATRICK KINAVEY,

23   a witness herein, having been first duly sworn,

24   was examined and testified as follows:

25                    -----

P. Kinavey - Direct by Mr. Chernosky

1                          -----

2                 DIRECT EXAMINATION

3                          -----

4    BY MR. CHERNOSKY:

5         Q.   Detective Kinavey, I called you

6    yesterday but I don't believe we got into any

7    of your background.  How are you currently

8    employed?

9         A.   I'm currently employed as a detective

10   with the Allegheny County Police Department

11   assigned to the homicide unit.

12        Q.   How many years have you been with the

13   Allegheny County Police Department?

14        A.   I've been with the Allegheny County

15   Police Department 15 years.

16        Q.   How many of those 15 years were you in

17   the homicide division?

18        A.   I've started my 13th year.

19        Q.   Prior to your employment with the

20   Allegheny County Police, did you hold any law

21   enforcement employment?

22        A.   I did.

23        Q.   Where did you serve that?

24        A.   I was hired by the City of Pittsburgh

25   Police Department in 1995 where I served two

P. Kinavey - Direct by Mr. Chernosky

1    years in the uniform division patrolling the

2    Zone 6 station, Zone 6 area of the City of

3    Pittsburgh.  In 1997 I was reassigned to the

4    narcotics and vice unit where I stayed assigned

5    until 2005 and left the Pittsburgh Police

6    Department and joined the Allegheny County

7    Police Department.

8        Q.  Directing your attention to March of

9    2016, were you and other detectives assigned to

10   the shooting deaths at 1304 Franklin Avenue in

11   the Borough of Wilkinsburg?

12       A.  Yes, I was.

13       Q.  On March 26, 2016, did you participate

14   in a surveillance detail at the Allegheny

15   County Jail?

16       A.  Was it April 6th of 2016?

17       Q.  I'm sorry, April 6th of 2016.

18       A.  That is correct.

19       Q.  Did that part of the investigation

20   involve the placement of a camera in the

21   interview room at the Allegheny County Jail?

22       A.  It did.

23       Q.  Following the placement of the camera,

24   did you receive a copy of the video of that

25   interview?

P. Kinavey - Direct by Mr. Chernosky

1        A.  Yes, I did.

2        Q.  I show you what I have marked

3    previously as Commonwealth Exhibit 437.  I ask

4    you what is contained on Commonwealth

5    Exhibit 437?

6        A.  This is the CDR recording of the

7    recorded interview or recorded meeting between

8    Cheron Shelton and his father, Robert Shelton,

9    taken at the Allegheny County Jail Interview

10   Room 2.  It is labeled FBI hot files.

11              MR. CHERNOSKY:  I ask for the

12   admission of Commonwealth Exhibit 437.

13              THE COURT:  Admitted without

14   objection.

15              MR. CHERNOSKY:  I seek to play it

16   for the jury.

17              THE COURT:  Okay.

18              MR. CHERNOSKY:  Your Honor, for

19   purposes of the record, this is contained in

20   three clips.  At the end of each clip, I will

21   be accessing the next clip.

22              THE COURT:  Okay.

23              (Video played for the jury.)

24        Q.  Detective Kinavey, that video that we

25   just saw has no audio portion?

P. Kinavey - Direct by Mr. Chernosky

1      A.   That is correct.

2      Q.   Could you tell the jury a little bit

3   about the decision not to record audio?

4      A.   So the camera that was installed was

5   equipped with both an audio and video function.

6   In discussions with the District Attorney's

7   Office, the audio portion was disabled due to

8   the potential wiretapping violations that we

9   may have incurred so in an abundance of

10   caution, we chose not to intercept it via the

11   camera.  But there were receivers there that

12   what you are supposed to use face-to-face, it

13   is supposed to be picked up by the inmate and

14   visitors and that can be intercepted by jail

15   regulation.

16      Q.   Do you need special permission or

17   authority to do a wiretap to intercept

18   someone's conversation without their knowledge?

19      A.   Yes, this would be a non-consensual

20   intercept.  The non-consensual part which is

21   wire three intercept and you would have to show

22   vigorous attempts to intercept the

23   conversation.

24           MR. CHERNOSKY:  No further

25   questions.  I offer for cross.

P. Kinavey - Cross by Mr. McKinney

1                         -----

2                  CROSS-EXAMINATION

3                         -----

4    BY MR. McKINNEY:

5         Q.   Detective, you do know that the

6    District Attorney's Office obtained the service

7    of a lip reader for that communication?

8         A.   Yes.

9         Q.   That was on April 6th of 2016?

10        A.   Yes, that is correct.

11        Q.   Would you agree with me that an arrest

12   warrant for this case wasn't issued for Cheron

13   Shelton the next day?

14        A.   It was not.

15        Q.   Or the next day?

16        A.   It was not.

17        Q.   Not until about two-and-a-half months

18   later in June of 2016?

19        A.   I'm not exactly sure of the date but

20   that sounds about right.

21        Q.   If I were to show you a copy of the

22   Affidavit of Probable Cause for this case,

23   would that possibly refresh your recollection?

24        A.   It would give me the exact date, yes.

25        Q.   Okay.

P. Kinavey - Cross by Mr. McKinney

1            MR. CHERNOSKY:  Your Honor, the
2    Commonwealth will stipulate that the arrest was
3    June 23, 2016.
4            THE COURT:  June 23rd of 2016, so
5    stipulated.
6        Q.  Now, Detective --
7            THE COURT:  One second, I don't
8    think I commented on a stipulation.  Ladies and
9    gentlemen of the jury, a stipulation is nothing
10   more than the parties agreeing that the content
11   of the stipulation is true and accurate.  No
12   further proof of that particular representation
13   is needed.  How it fits into the body of
14   evidence is entirely up to you.
15           MR. McKINNEY:  Thank you, Your
16   Honor.
17       Q.  Detective, you would agree with me that
18   it took an additional approximately
19   two-and-a-half months to file the criminal
20   charges in this case against Mr. Shelton after
21   that video?
22       A.  Yes, that is correct.
23       Q.  You would agree with me that that video
24   was recorded after the March 12th search of
25   Nolan Court where Cheron's mother lived,

P. Kinavey - Cross by Mr. McKinney

1    correct?

2        A.   It was.

3        Q.   And you would also agree with me that

4    that video was recorded after the alleged

5    identification by Detective Adams of Cheron

6    Shelton?

7        A.   It was.

8        Q.   And that video was recorded after the

9    surveillance was viewed by you and other

10   officers and Allegheny County Police of

11   Mr. Shelton behind Nolan Court

12       A.   Yes, that's correct.

13       Q.   And that video was also recorded after

14   you guys intercepted the letter Cheron had

15   between his family?

16       A.   That's correct.

17       Q.   From April 6th, when the video was

18   recorded, to June 23rd, when Mr. Shelton was

19   actually charged, what additional evidence came

20   to light?

21              MR. CHERNOSKY:   Your Honor, I

22   will just object to the relevance.

23              THE COURT:   Objection is

24   overruled.

25       A.   So we continued to work the case.

P. Kinavey - Cross by Mr. McKinney

1    Obviously, we conducted surveillance.  This
2    portion of the investigation that I was
3    involved in essentially was to conduct
4    surveillance of Cheron Shelton's father in an
5    attempt to recover the weapon that was used in
6    the homicide.
7        Q.  Isn't it true that you and other
8    detectives followed Mr. Shelton's father from
9    the jail after these visits?
10        A.  That's correct.
11        Q.  Did he lead you to any weapons?
12        A.  He did not.  We did not recover any
13    weapons that day.
14        Q.  How long did you follow him?
15        A.  I believe it was approximately three
16    hours.
17        Q.  After the April 6th visit, you followed
18    Mr. Shelton's father for three hours and then
19    from that point up until June of 2016 what
20    additional evidence did you find?
21        A.  Personally, I did not, any other
22    evidence regarding the case.  This was
23    primarily my portion of the investigation.
24        Q.  Are you aware of any additional
25    evidence against Mr. Shelton that was found

P. Kinavey - Cross by Mr. McKinney

1    from April 6th to June 23rd?

2    A.  I am not, no.

3    Q.  Okay.  So you don't know why it took an

4    additional two-and-a-half months given the fact

5    that there was no additional evidence that was

6    found?

7    A.  Like, I know the recording was real

8    time.  We weren't viewing it in real time.

9    Once the recording was gathered, we went back

10   and reviewed the recording itself, just the

11   video portion.

12   Q.  Would you agree with me that you

13   probably viewed it within a couple of days of

14   the recording being made?

15   A.  Yes, probably within a couple of days.

16   Q.  Now, when Mr. Shelton was in the

17   Allegheny County Jail, prior to this video on

18   April 6th being recorded, did you know that old

19   charges from 2013 that had previously been

20   dismissed against him was refiled?

21           MR. CHERNOSKY:  Your Honor, at

22   this point I object.

23           THE COURT:  Objection sustained.

24           MR. McKINNEY:  Your Honor, may I

25   respond?

P. Kinavey - Cross by Mr. McKinney

1            THE COURT:  We'll discuss this at

2      sidebar at the conclusion of the day.  If I

3      deem it relevant, you can re-call the officer

4      if appropriate information.

5          Q.  Did you know shortly before that

6      April 6th recorded video Mr. Shelton had just

7      been charged with possession of a .22-caliber

8      assault rifle found in his mother's house?

9          A.  I know that one was recovered.  I don't

10     know if he was charged or not in relation to

11     that.

12         Q.  Do you know that his fingerprint was

13     allegedly found on the rifle?

14         A.  At that time, I did not.

15         Q.  Have you since learned that?

16         A.  I believe so, yes.

17            MR. McKINNEY:  One brief moment,

18     Your Honor.

19            THE COURT:  Whatever time you

20     need.

21         Q.  Detective, the video has been broken

22     down into three smaller subsections based on

23     what we saw; is that correct?

24         A.  It is, yes.

25         Q.  Do you know if that is the entire video

M. Priestly - Direct by Ms. Pellegrini

1      or was it in any way edited?

2           A.  It was not.  That was the entire video.

3                MR. McKINNEY:  Thank you,

4      Detective.  No further questions.

5                THE COURT:  Anything else?

6                MR. CHERNOSKY:  No further

7      questions, Your Honor.

8                THE COURT:  Thank you, Detective.

9      Be available if we need you.

10               THE WITNESS:  I will be

11     available.

12               THE COURT:  Call your next

13     witness.  Does anybody need a break?

14               MS. PELLEGRINI:  The Commonwealth

15     calls Marla Priestly.

16                       -----

17               MARLA PRIESTLEY,

18     a witness herein, having been first duly sworn,

19     was examined and testified as follows:

20                       -----

21               DIRECT EXAMINATION

22                       -----

23     BY MS. PELLEGRINI:

24          Q.  Good afternoon.

25          A.  Good afternoon.

M. Priestly - Direct by Ms. Pellegrini

1      Q.   Could you please state your full name,

2   spelling your last name for the court reporter?

3      A.   My name is Marla Priestley,

4   P-R-I-E-S-T-L-E-Y.

5      Q.   How are you employed?

6      A.   I'm a latent print examiner at the

7   Allegheny County Office of the Medical Examiner

8   in the forensic laboratory.

9      Q.   Could you detail for this jury your

10   educational background and training?

11      A.   Sure, I graduated from the University

12   of Pittsburgh in 2007 with a Bachelor's degree

13   in physical anthropology specializing in

14   forensic anthropology.  Once being hired at the

15   laboratory in 2007, I successfully completed

16   multiple classes hosted by the Federal Bureau

17   of Investigations, the Pennsylvania State

18   Police, as well as the International

19   Association of Identification through whom

20   which I'm a certified latent print examiner.

21      Q.   Have you testified before as an expert

22   in the field of latent print examination?

23      A.   Yes, I have.

24      Q.   How many times?

25      A.   Approximately 40.

M. Priestly - Direct by Ms. Pellegrini

1            MS. PELLEGRINI:  I offer

2    Ms. Priestley for voir dire for her

3    qualifications as a latent print expert.

4            THE COURT:  Any questions?

5            MR. McKINNEY:  No.

6            THE COURT:  Are you offering her

7    as an expert?

8            MS. PELLEGRINI:  Yes, please.

9            THE COURT:  She is so accepted.

10   The instruction that I gave you to expert

11   witnesses applies.

12       Q.  I show you, Ms. Priestley, what has

13   been marked as Commonwealth Exhibits 480

14   through 485.  Do you recognize those slides?

15       A.  Yes, I do.  These are slides of the

16   latent prints and known prints that I compared

17   in this case.

18       Q.  Did you prepare them in preparation for

19   your testimony today to aid the jury in

20   understanding your testimony?

21       A.  Yes, I did.

22            MS. PELLEGRINI:  I move for the

23   admission of 480 through 485.

24            THE COURT:  Admitted without

25   objection.

M. Priestly - Direct by Ms. Pellegrini

1        Q.  Ms. Priestley, I'm going to show you
2    what is marked as Commonwealth Exhibit No. 430.
3    Do you recognize this item?
4        A.  Yes, I do.
5        Q.  What laboratory item number is it for
6    you?
7        A.  It is laboratory Item 56.
8        Q.  Could you tell us what the lab case
9    number is for the record?
10       A.  Lab 16LAB02222.
11       Q.  Now, contained in Commonwealth Exhibit
12   No. 430, is this a letter that you examined for
13   latent prints?
14       A.  Yes, this is.
15       Q.  Could you tell us which of the letters,
16   the letter that you examined and found prints
17   on?
18       A.  So here there are three separate pages
19   of a letter.  This first one does not have any
20   of my markings on it therefore there were no
21   fingerprints developed on this one.
22       Q.  That letter starts with Pops?
23       A.  Correct.
24       Q.  And is signed Cheron?
25       A.  Correct.

M. Priestly - Direct by Ms. Pellegrini

1    Q.  The next page that you examined?

2    A.  This next page I was able to develop

3    three areas of friction ridge detail or latent

4    prints on this item, one on one side and two on

5    the other.  They're marked with adhesive scales

6    that we use in our section to mark prints.

7    Q.  That page begins with victory that is

8    worth it?

9    A.  Correct.

10   Q.  The final page that begins with my

11   Brown Suga, did you find any latent prints on

12   that page?

13   A.  No, no latent prints of value on this

14   page.

15           MS. PELLEGRINI:  May

16   Ms. Priestley step down?

17           THE COURT:  Yes.

18   Q.  We heard from Mr. Clark yesterday

19   describing the science of latent print

20   examination and how it is done and how you

21   ultimately come to an analysis for a print.

22   A.  Uh-huh.

23   Q.  So we're sort of going to pick up from

24   there.  We heard from Mr. Clark that you had an

25   inked fingerprint card from the defendant,

M. Priestly - Direct by Ms. Pellegrini

1    Cheron Shelton?

2        A.  Correct.

3        Q.  Now, how did you process -- strike

4    that.  He explained to us how he processed the

5    .22 assault rifle and how the print was lifted

6    off of that.  How do you do that with a piece

7    of paper?

8                THE WITNESS:  Your Honor, may I

9    approach my notes?

10                THE COURT:  Yes.  Any objection?

11   Go ahead.

12       A.  So for this particular item, since it

13   was three white lined pieces of paper with

14   handwriting on both sides, I began by doing a

15   photograph of how it was received overall.

16   Then I did a visual examination of the papers

17   themselves to see if there were any visible

18   areas of friction ridge detail.  Afterwards, I

19   used a chemical called, it is called DFO and

20   you spray it onto the paper.  The DFO reacts

21   with amino acids that are in fingerprint

22   residue which accounts for about half of a

23   percent of what all fingerprints are made of.

24   That reaction however can only be seen under an

25   alternate light source and it will fluoresce.

M. Priestly - Direct by Ms. Pellegrini

1          After this chemical had been applied

2     and allowed to process for 20 minutes, I then

3     looked at the paper under our alternate light

4     source and found that there were three areas of

5     friction ridge detail of value for me to

6     collect.  After I was done using that chemical

7     on the paper, I then moved on to another

8     chemical called Ninhydrin.  Now Ninhydrin is

9     similar to DFO in that it also reacts to the

10    amino acids but instead of needing an alternate

11    light source, it will turn any potential prints

12    a bright purple color and allows us to see it

13    with the naked eye.

14          After applying this, I noted no

15    additional areas of friction ridge detail

16    developed and also no further improvements to

17    the ones that were already developed.

18    Q.   I show you what is marked as

19    Commonwealth Exhibit 480.  Could you describe

20    for the jury what is in this slide?

21    A.   On this slide over here, when we

22    develop prints on an item of evidence, as I

23    said earlier, this item was Item 56.  Any

24    prints that are then developed on this

25    particular item receive a sub item number.  So

M. Priestly - Direct by Ms. Pellegrini

1    the three prints in total that were developed

2    were collectively designated as Item 56-A.

3    From there, the three prints were given their

4    own designation.  The one that we are looking

5    at here, as you can see, is the first one and

6    it is Item 56-A-1.  This is the impression as

7    it was photographed with the fluorescent light

8    on it.  So that is why the ridges are actually

9    the orange color and the background or the

10   furrow is the darker color.  So this is

11   actually a print that is fluorescing.

12        On this side here, this is the known

13   exemplar that I used for comparison against

14   this latent print.  This known exemplar is the

15   number one right thumb or Cheron Lamont Shelton

16   and his SID number.

17        Q.  481, please?

18        A.  So this here is depicting the same

19   latent print on this side, Item 56-A-1.  It was

20   on the side of the paper.  Again, this is the

21   same known that you just saw, the number one

22   right thumb.  As you can see, I have gone

23   around and numbered specifically 15 areas or

24   minutia that are in common between the two

25   prints.  As you can see as we start off here

M. Priestly - Direct by Ms. Pellegrini

1   with area one, we have a bifurcation heading

2   down.  Here it is right over here, down to this

3   ending.  It is right here.  We have one

4   intervening ridge that goes to an additional

5   ending, one intervening and that goes to there.

6   We count over one, two, three, four, five, and

7   then the sixth one should be ending up, and

8   then one, two, three, four, five, and then the

9   sixth there.  We can then follow this one down

10  and over two and we should have a bifurcation.

11  So, again, following it down, over two, and

12  there is that bifurcation.  It comes down to

13  another bifurcation.  I'm sorry, these numbers

14  are cut off here, but this is the sixth over

15  here.  One more intervening down with an ending

16  ridge and another ending ridge above it.  Here

17  is that ending.  Then two down, you have an

18  additional two endings next to each other.

19  Then we have that right here again, right

20  there.

21         We also can go up from there.  If we

22  count up from this ending one, two, three,

23  four, we should have this bifurcation going up.

24  We start here, one, two, three, four, and there

25  it is, right there.

1          Finally, we enter the core of the print

2     or the approximate center and going up we have

3     a bifurcation going down right here which you

4     can see right here to an ending going up which

5     is the exact print.  As we go up from here, it

6     is actually easier to start back from number

7     one, we can go down to and bi over.  And lastly

8     we can go up one, two, three, and have a

9     bifurcation opening to the right.  Again, one,

10    two three, there it is right there.

11         So all 15 of those areas were found to

12    be in common with one another with no

13    dissimilarities.

14         Q.  Photograph 482?

15         A.  This is the second image.  Again, this

16    is now 56-A-2 so we moved on to the second

17    print that was developed.  This is an image of

18    how the photo was taken as it was on the paper.

19    Just to show you, this image was then rotated

20    into the proper orientation, which would be

21    fingertip up.  So we're looking at the top area

22    of a fingerprint here.

23         Q.  Slide 483.

24         A.  So this is that same print that I was

25    saying here.  We have the tip of the print

1    going up again here, again on the side of the
2    paper.  Here we have the known exemplar again
3    of the number one right thumb of Cheron Lamont
4    Shelton.  This one I simply used some red dots
5    to show you exactly the same thing that I
6    showed you with numbers before but just a
7    little neater.

8        As you can see, we start with two
9    intervening and ending, one intervening and
10   ending, two intervening and ending, one
11   intervening and ending.  We have this back and
12   forth ending going on right here.  One
13   intervening from that, there is a bifurcation
14   down to a bi up, another one down.  Again, you
15   can see that right here, bi down, back up and
16   back down.  We can catch one intervening.  We
17   can catch this little ending right here.
18   Again, one intervening ending right here.  If
19   we start back there again, we go one, two,
20   three, we have bifurcation to ending.  Again,
21   we have one, two, bifurcation, one ending and
22   one intervening and ending.  Finally, we go one
23   intervening down and there should be this
24   bifurcation right there.  One intervening down
25   and right there is the bifurcation on that one.

1          Again, all of these points were in

2     similarity to each other with no unexplained

3     differences.

4          Q.   This is Commonwealth Exhibit 484.

5          A.   This is the final of the three photos

6     so the photo designation was the case number

7     with .3.  This is Item 56-A-3.  Again, this is

8     the photograph of the image as it was taken.

9     Then this is the photograph of the image in its

10    proper alignment once we rotated it.

11         Q.   Finally, slide 485.

12         A.   Again, this is the charting between the

13    latent print Item 56-A-3 and the known print of

14    the number one right thumb of Cheron Lamont

15    Shelton.  Here, again, we have that back and

16    forth that we start off with here.  It was a

17    little more difficult to see this up and down

18    just because of the print so however we can

19    just go straight across, one, two, three, and

20    we have a bifurcation down.  One, two, three,

21    bifurcation down.  If we head from that

22    bifurcation, two intervening.  We pick up that

23    bifurcation to that ending that we saw before,

24    there and there.  One intervening to that end

25    being one intervening there.  Then we pick up

1     that lower bifurcation with one intervening

2     down right here and right there.  Follow it

3     down to these two endings right on top of each

4     other.  Follow it down, there they are right

5     there.  One intervening to these two right next

6     to each other.  And, finally, one intervening

7     ridge down, we get another two that are stacked

8     on top of each other.  Again, one intervening

9     down and there it is there and there.

10          Again, all of these red minutia points

11    are all in alignment with these with no

12    explained differences.

13          Q.  Thank you, Ms. Priestley.  Do you hold

14    your opinions to a scientific expertise in your

15    field?

16          A.  Any latent print examiner who has had

17    the years that I put in who had the same amount

18    of training would come to the same conclusions.

19                MS. PELLEGRINI:  Thank you.  I

20    offer for cross.

21                THE COURT:  Any questions?

22                MR. McKINNEY:  No questions, Your

23    Honor.

24                THE COURT:  Thank you.  You are

25    free to go.  We're going to take a break, okay.

 1    Remain seated and quiet as the jury leaves the

 2    room.

 3                          -----

 4                (Open court - Jury not present.)

 5                          -----

 6                THE COURT:  Anything else?  I

 7    need to see a copy of the autopsy so I can

 8    start to figure out these photographs.

 9                MS. PELLEGRINI:  Certainly.  They

10    are in the order in which I intend to present

11    them.

12                THE COURT:  After this expert,

13    you have the pathologist?

14                MS. PELLEGRINI:  I would like to

15    do Dr. Xu next who performed the autopsies on

16    Shada Mahone and Tina Shelton.  He will be

17    quite lengthy.  And Dr. Ennis performed the

18    autopsy on Brittany Powell and he will be quite

19    lengthy.  And on Monday Dr. Dwyer will testify.

20                THE COURT:  We will do what we

21    can today.  Have you agreed on photographs?

22                MS. WILLIAMS:  Your Honor, the

23    photographs that we got were quite cumulative

24    and duplicative.

25                THE COURT:  Can you answer the

E. Wisbon - Direct by Ms. Pellegrini

1    question?

2                    MS. WILLIAMS:  No, I got them at

3    lunchtime and no.

4                    MS. PELLEGRINI:  Your Honor,

5    they've had them.

6                    THE COURT:  I understand.

7                    MS. WILLIAMS:  Yeah.

8                    THE COURT:  Okay.

9                         -----

10                   (Brief recess taken.)

11                        -----

12                   (Open court - Jury present.)

13                        -----

14                   ELIZABETH WISBON,

15   a witness herein, having been first duly sworn,

16   was examined and testified as follows:

17                        -----

18                   DIRECT EXAMINATION

19                        -----

20   BY MS. PELLEGRINI:

21       Q.  Good afternoon.  Please state your full

22   name, spelling your last name for the court

23   reporter?

24       A.  Elizabeth Wisbon, W-I-S-B-O-N.

25       Q.  How are you employed?

E. Wisbon - Direct by Ms. Pellegrini

1    A.   I'm a scientist at the Allegheny County

2    Office of Medical Examiner forensic laboratory.

3    Q.   What is your profession?

4    A.   I work in the forensic biology section.

5    Q.   Could you detail for this jury your

6    educational background and training?

7    A.   I earned my Bachelor of Science from

8    Duquesne University in 2007.  My Master's of

9    Science in forensic science and law also from

10   Duquesne University in 2008.  I have been

11   trained under numerous qualified scientists

12   while being employed at the Medical Examiner's

13   Office.

14   Q.   Have you testified as an expert in the

15   field of forensic biology and DNA analysis?

16   A.   Yes?

17   Q.   Approximately how many times?

18   A.   30 times.

19            MS. PELLEGRINI:  I offer

20   Ms. Wisbon for voir dire on her qualifications

21   and expertise.

22            THE COURT:  Any questions?

23            MR. McKINNEY:  No questions.

24            THE COURT:  She will be accepted

25   as an expert in her chosen field.

E. Wisbon - Direct by Ms. Pellegrini

1                   MS. PELLEGRINI:  Thank you.

2        Q.  Ms. Wisbon, before your testimony here

3    today did I ask you to prepare a PowerPoint

4    presentation to aid the jury in your testimony

5    here today so that they could understand what

6    you are going to testify about?

7        A.  Yes.

8        Q.  I show you Commonwealth Exhibits 486

9    through 493.  Are those the slides that you

10   prepared to aid in your testimony here today?

11       A.  Yes.

12                  MS. PELLEGRINI:  I move for the

13   admission of 486 through 493.

14                  THE COURT:  Admitted without

15   objection.

16       Q.  Before we get started with the slides,

17   could you please tell the jury what forensic

18   biology is?

19       A.  Forensic biology is the examination of

20   physical evidence to determine if different

21   physiological or body fluids can be present.

22   What we do is perform a visual examination to

23   identify any possible areas of staining.  Then

24   we perform a variety of tests to determine if

25   that staining could, indeed, be blood, semen,

E. Wisbon - Direct by Ms. Pellegrini

1    or saliva.  After that determination is made,
2    portions of the stained areas are then sampled
3    and tested using DNA analysis to see if we can
4    provide any information to identify the source
5    of the staining material and DNA that was
6    present.
7        Q.   What is DNA?  I'm going to start with
8    Commonwealth Exhibit 486.
9        A.   Sure.  As you can see on the slide, DNA
10   stands for deoxyribonucleic.  It is material
11   that is present within all cells in your body
12   that contains a nucleus.  It contains the
13   hereditary information that provides
14   development and function of most living
15   organisms.  Each individual's DNA is unique to
16   them except in the case of identical twins.
17   Over 99.7 percent of the DNA in each of our
18   bodies is the same between people.  It is less
19   than 0.3 percent or approximately three million
20   base pairs that make us unique between
21   individuals.
22       Q.   487?
23       A.   This slide shows the basic structure of
24   DNA.  This is what is called the double helix
25   which is two long strands of complimentary base

E. Wisbon - Direct by Ms. Pellegrini

1    pairs which are entwined around one another to

2    form a double helix.  These long molecules are

3    then tightly wound up to make chromosomes.

4    These chromosomes are then found in the nucleus

5    of the cells.  Humans have 46 pairs of

6    chromosomes, half of which you receive from

7    your biological mother, the other half from

8    your biological father.

9        Q.  488?

10       A.  Because there is variety within DNA, we

11   are able to distinguish between people based on

12   the number of times a segment is repeated at a

13   particular location.  In the DNA analysis we

14   perform at the laboratory, we look at a variety

15   of locations.  The number of repeat is simply

16   designated by a number.  So if a segment is

17   repeated ten times, the number is ten at that

18   location.  As I mentioned earlier, each parent

19   passes along their DNA.  So you have repeated

20   segments from your biological mother and

21   repeated segments from your biological father.

22   If mom has six repeats that she passes on to

23   you, that number at that location from mom is

24   six.  If dad has eight repeats at that same

25   location, he passes on a number eight.  So at

E. Wisbon - Direct by Ms. Pellegrini

1     that particular location, your DNA profile

2     would be 6/8.

3          Q.   489?

4          A.   To make it a little simpler to

5     understand, I like to use an analogy of a map

6     and a street.  Imagine that the DNA in your

7     body is represented as a map of Downtown

8     Pittsburgh.  Our bodies all have the exact same

9     streets within them but we don't have the same

10    number of buildings on those particular

11    streets.  Person A has 10 buildings on the

12    right side of Grant Street and 12 buildings on

13    the left side of Grant Street.  So we can see

14    that they have a 10 and a 12 for the location

15    of Grant Street.  Person B has 17 on the right

16    side of Grant Street and 23 on the left side.

17    So we can see person B 17/23 at Grant Street.

18    And person C, 18 buildings on the right side of

19    Grant Street and 18 on the left side.  What is

20    done is we simply compare the number of

21    buildings on each side of the street to see if

22    the maps match.  So we can see we looked at

23    Grant, Forbes, and Fifth.  Person A has 10/12

24    at Grant, person B is 17/23 at Grant, and

25    person C is 18/18 at Grant so there are

E. Wisbon - Direct by Ms. Pellegrini

1    differences and therefore there is not a match

2    between person A, person B, and person C.

3        Q.  Now, the slide for DNA analysis which

4    is 490.

5        A.  This slide has the steps that are

6    performed in order for an analyst to be able to

7    look at a DNA profile.  As I mentioned earlier,

8    a cutting of a stain area is taken.  The first

9    step is extraction.  This is simply the

10   separation of the DNA from that stained area so

11   that it can be released into the sample.  The

12   next step is quantitation.  This is the

13   determination of approximately how much DNA is

14   in the sample.  The next step is amplification

15   which is where we make many copies of the DNA

16   locations of interest that are in that

17   particular sample.  Next we separate the copied

18   DNA based on those number of repeats at each

19   location as well as the size of the copied DNA

20   location.  The last step is analysis.  This is

21   where the data obtained from the separation

22   step is analyzed to first determine if it is

23   interpretable, meaning is there sufficient

24   quantities of DNA present that I would be able

25   to render a conclusion on?  Applicable

E. Wisbon - Direct by Ms. Pellegrini

1    comparisons are then made and the report is

2    written.

3        Q.  You may retake the stand.  Now, during

4    the course of the testimony from Mr. Morgan and

5    Mr. Best, we heard that a number of items were

6    collected pursuant to search warrants.  Now,

7    for instance, there were items that were

8    collected from the Chevy Impala.  Do you

9    remember that?

10       A.  Yes.

11       Q.  Now the jury saw photographs of a towel

12   that was submitted that had red-brown staining

13   on it.  Could you tell us about the five areas

14   of 15-A, B, and C that you examined?

15       A.  Sure.

16                THE WITNESS:  Your Honor, may I

17   please review my notes?

18                THE COURT:  You may.

19                THE WITNESS:  Thank you.

20       A.  Item 15 is described as a multi-colored

21   towel with a floral pattern.  After performing

22   a visual examination, I observed two near

23   circular dark red-brown stains that were

24   approximately 1.5 centimeters by 1.0

25   centimeters in size.  I also observed numerous

E. Wisbon - Direct by Ms. Pellegrini

1    irregularly shaped lighter brown stains that

2    were covering the majority of the towel.  I

3    observed several irregularly shaped red-brown

4    stains ranging in size from approximately

5    3.5 centimeters by 7.0 centimeters to 8.0

6    centimeters by 12.5 centimeters along the edges

7    of the towel.

8        Q.  Ms. Wisbon, what is a buccal swab?

9        A.  A buccal swab or a buccal swab is a

10   swab of an individual's cheek which is provided

11   to the laboratory to serve as a reference

12   profile which means that we know the source of

13   the DNA on this particular buccal sample.

14       Q.  Did you receive a buccal sample from

15   the defendant Cheron Shelton?

16       A.  Yes, I did.

17       Q.  Did you also receive a buccal swab from

18   an individual known as Rob Thomas?

19       A.  Yes.

20       Q.  Did you also receive a buccal swab from

21   the deceased -- I'm sorry, not a buccal swab --

22   strike that.  How do you receive a DNA profile

23   from a deceased victim?

24       A.  A DNA profile from a deceased victim

25   could be submitted in one or two ways.  It

E. Wisbon - Direct by Ms. Pellegrini

1    would simply be a cheek swabbing of that

2    individual or sometimes we might receive a

3    liquid blood sample.

4        Q.  Did you also receive a buccal swab from

5    the surviving victims, John Ellis and Lamont

6    Powell?

7        A.  Yes.

8        Q.  Now, we are also going to talk about

9    you received a profile from an unknown man

10   regarding the saliva in the yard.  We'll come

11   back to that, but let's talk about the

12   bloodstaining on the multi-colored towel from

13   the Impala first.

14       A.  For samples 15-A, possible

15   bloodstaining on the towel, 15-B, possible

16   staining on the towel, and 15-C, possible

17   bloodstaining on the edges of the towel, the

18   DNA profiles obtained from these three samples

19   matched each other.  This profile is from an

20   unknown female.  All of the reference samples

21   which we just described were excluded as being

22   a distributor to the DNA in this particular

23   sample.

24       Q.  So all of the deceased victims, Jerry,

25   Chanetta, Brittany, Tina, and Shada were all

E. Wisbon - Direct by Ms. Pellegrini

1    excluded?

2        A.   Correct.

3        Q.   The defendant was also excluded?

4        A.   Correct.

5        Q.   Lamont Powell and John Ellis were also

6    excluded?

7        A.   Correct.

8        Q.   And Rob Thomas was also excluded?

9        A.   Correct.

10        Q.   The profile from the saliva in the

11    yard, that profile was also excluded?

12        A.   That's correct.

13        Q.   Also found in the Impala was a

14    pillowcase with possible bloodstaining on the

15    center of that pillowcase.  Could you tell me

16    about that?

17        A.   Sure.  The DNA results?

18        Q.   Yes, please.

19        A.   For item 17-A, this was a two-person

20    mixture profile.  The major profile is an

21    unknown female which matches the same unknown

22    female observed in samples 15-A, 15-B, and 15-C

23    at all of the resolved locations.  Robert

24    Thomas, Jerry Shelton, Cheron Shelton, John

25    Ellis, Chanetta Powell, Brittany Powell, Tina

E. Wisbon - Direct by Ms. Pellegrini

1    Shelton, and Shada Mahone, Lamont Powell and

2    the unknown male profile from the saliva were

3    excluded from the major profile.  Due to the

4    low levels of data observed in the minor

5    profile, no conclusions were made.

6        Q.   Why is that?

7        A.   In instances where we observe DNA but

8    it is smaller quantities, we tend not to make

9    conclusions because we know we're not seeing

10    all of the DNA present so therefore we don't

11    want to render a conclusion when we know that

12    there might be information that is missing.

13        Q.   Now, Item 17-B.

14        A.   17-B was a mixture profile of four or

15    more individuals.

16        Q.   Was that part of the pillowcase as

17    well?

18        A.   Yes.  And due to the amount of DNA

19    which was observed from this sample, I was

20    unable to render any conclusions for this

21    particular sample.

22        Q.   Could you explain why?

23        A.   Just as cases where we have too little

24    DNA, sometimes there can be too much DNA for us

25    to be able to determine who all of the peaks

E. Wisbon - Direct by Ms. Pellegrini

1    that we are observing might belong to.  I like

2    to use a radio analogy to help explain mixture

3    profiles.  So in this case I said it is a

4    mixture of four or more people.  That means a

5    minimum of four people.  If we were to turn on

6    four different radios and put four different

7    songs on each of those and play them in a room,

8    we would be able to tell that there are

9    different songs playing but it would be

10   difficult for us to determine which radio is

11   playing which song just because there is a lot

12   of noise and music that we hear.

13        Q.  Now, there were items selected from the

14   Lincoln Continental, correct?

15        A.  Yes.

16        Q.  There were swabbings done from the

17   Lincoln Continental?

18        A.  Yes.

19        Q.  I'm going to move to the swabbing of

20   the front passenger door of the Lincoln

21   Continental which is your laboratory Item 10-A.

22        A.  For this particular item, a partial

23   profile was observed.  No conclusions were

24   rendered.  Again, this would be DNA was

25   observed but not enough for me to be able to

E. Wisbon - Direct by Ms. Pellegrini

1    make a conclusion.

2        Q.   Item 10-B, the swabbing of the rear

3    passenger's side door of the Lincoln.

4        A.   This was a partial mixture profile of

5    one or more contributors.  No conclusion was

6    rendered again due to the amount of DNA which

7    was observed.

8        Q.   Item 10-C, a swabbing of the rear

9    driver side door of the Lincoln?

10       A.   This was a mixture profile of three or

11   more individuals.  Due to the amount of data

12   observed, again, I was unable to render any

13   conclusions.

14       Q.   Now, Item 10-D, the swabbing of the

15   driver's door of the Lincoln Continental.

16       A.   This was a two-person mixture, meaning

17   that two individuals are contributing to the

18   profile and I was able to determine that the

19   major profile was from an unknown female.

20       Q.   Who was excluded?

21       A.   Robert Thomas, Jerry Shelton, Cheron

22   Shelton, John Ellis, Chanetta Powell, Brittany

23   Powell, Tina Shelton, Shada Mahone, Lamont

24   Powell, and the unknown saliva stain were

25   excluded from the major contributor profile.

E. Wisbon - Direct by Ms. Pellegrini

1    Again, the minor contributor profile had

2    limited amounts of DNA so I could not render

3    any conclusions regarding the minor profile.

4        Q.   Item 10-E, the swabbing of the steering

5    wheel and gear shift of the Lincoln.

6        A.   Item 10-E was a mixture profile of two

7    or more individuals.  No conclusions were

8    rendered again due to the lower amounts of DNA

9    observed.

10       Q.   Item 21-A-1, possible bloodstain from

11   the front passenger floorboard of the Lincoln?

12       A.   This was a single source profile

13   belonging to an unknown male.  I excluded

14   Robert Thomas, Jerry Shelton, Cheron Shelton,

15   John Ellis, Chanetta Powell, Brittany Powell,

16   Tina Shelton, Shada Mahone, Lamont Powell, and

17   the unknown male from the saliva stain.

18       Q.   Item 21-B, possible bloodstain Area A

19   from front passenger floor mat from the Lincoln

20   Continental.

21       A.   This was a partial profile.  No

22   conclusions were rendered again due to the low

23   amounts of DNA observed.

24       Q.   Item 21-B-2, possible bloodstain Area B

25   from the front passenger floor mat of the

E. Wisbon - Direct by Ms. Pellegrini

1  Lincoln Continental.

2      A.  A mixture profile of three or more

3  individuals and no conclusions were rendered.

4      Q.  Item 21-C-1, possible bloodstain Area A

5  from the carpet of the Lincoln Continental.

6      A.  This was a mixture profile of two or

7  more individuals and, again, no conclusions

8  were rendered.

9      Q.  Did I stop at 21-C-1?

10     A.  Yes.

11     Q.  Did we talk about that one?

12     A.  Yes.

13     Q.  Sorry, I lost my place on the sheet.

14  21-C-2, possible bloodstain Area B from the

15  carpet of the Lincoln Continental.

16     A.  No conclusions were rendered in this

17  instance because no DNA profile was observed.

18  So I did not observe any DNA data.

19     Q.  So if the jury has heard about a saliva

20  stain -- well, saliva was found in the area of

21  the yard of 1306 Franklin Avenue?

22     A.  Yes.

23     Q.  And that was swabbed and brought to

24  you, correct?

25     A.  Yes.

E. Wisbon - Direct by Ms. Pellegrini

1    Q.   That is your Item 2-A?

2    A.   Yes.

3    Q.   Tell us about the suspected saliva from

4    the rear yard of 1306 Franklin.

5    A.   A single source DNA profile was

6    obtained from the suspected saliva from rear

7    yard 1306.

8    Q.   Who was excluded?

9    A.   This DNA profile was from an unknown

10   male.  Robert Thomas, Jerry Shelton, Cheron

11   Shelton, John Ellis, Chanetta Powell, Brittany

12   Powell, Tina Shelton, Shada Mahone, and Lamont

13   Powell were excluded.

14   Q.   Were you also supplied 13 buccal swabs

15   from first responders such as detectives,

16   medics, uniformed officers, a number of people

17   that could be documented that were at the scene

18   that evening?

19   A.   Yes.

20   Q.   What was your conclusion regarding the

21   first responders' buccal swabs?

22   A.   All of the first responders which were

23   submitted to the laboratory were excluded as

24   being a source of the DNA in that possible

25   saliva stain.

E. Wisbon - Direct by Ms. Pellegrini

1        Q.  Ms. Wisbon, I'm going to show you what

2    has been marked as Commonwealth Exhibit 431.

3    Do you recognize this packaging and your

4    initials on this item?

5        A.  Yes, I do.

6        Q.  Could you take the item out of the

7    packaging?  Did you examine Commonwealth

8    Exhibit 431?

9        A.  Yes, I did.

10       Q.  What is that?  Can you identify for the

11   jury and then we'll see a slide of it soon,

12   could you identify it for the court reporter,

13   what it says on the front?

14       A.  Sure.  It is a white envelope that is

15   addressed to Pat Annie Taylor, 6914 Hartman

16   Lane, Pittsburgh, PA 15206.  The name is Cheron

17   Shelton with a DOC and pod number 8-E-141788

18   and preprinted on the label is Allegheny County

19   Jail.

20       Q.  Did you examine that item, that

21   envelope, for possible DNA analysis?

22       A.  Yes, I did.

23              MS. PELLEGRINI:  May I have the

24   lights, please?  Ms. Wisbon, would you please

25   step down off of the --

E. Wisbon - Direct by Ms. Pellegrini

1              THE WITNESS:  Sure.

2       Q.  I'm going to show you what was marked

3    and admitted as Commonwealth Exhibit 491.  Is

4    that a photograph of the envelope that you just

5    took out of Commonwealth Exhibit 431?

6       A.  Yes, it is.

7       Q.  Could you tell us about your

8    examination of this envelope?

9       A.  I started by performing a visual

10   examination to determine if there were any

11   visible areas of staining.  I did not observe

12   any because this is an envelope and it is

13   possible that some envelopes could be licked to

14   be sealed or some have an adhesive sticker.

15   The laboratory takes a portion of the seal of

16   the envelope and performs a test for the

17   presumptive presence of saliva to determine if

18   it is possible that that envelope was, indeed,

19   licked.  In this case, the test for possible

20   saliva was positive and a portion of the

21   envelope flap was then sent on for DNA testing.

22      Q.  492.

23      A.  This is a photograph of the reverse

24   side of the envelope.

25      Q.  Now, again, you had profiles from all

E. Wisbon - Direct by Ms. Pellegrini

1    of the individuals that we talked about before,

2    Robert Thomas, Jerry Shelton, Cheron Shelton

3    the defendant, John Ellis, Brittany Powell,

4    Tina Shelton, Chanetta Powell, and the unknown

5    male saliva from the rear yard to compare it

6    to, correct?

7        A.   That's correct.

8        Q.   I'm going to show you Commonwealth

9    Exhibit 493.  Can you tell us what this chart

10   is?

11       A.   This chart shows the obtained DNA

12   profile for Item 57-A which was the cutting of

13   the envelope flap, possible saliva.  So on the

14   far left are the different locations that were

15   tested.  In this particular column is the DNA

16   profile that was obtained for the envelope

17   flap, the unknown sample.  Once I determined

18   that this DNA was interpretable, I then

19   compared it to all of the references that were

20   submitted to me in this particular case.  So

21   the other columns that we see are the DNA

22   profiles from the different reference samples.

23   The first column is Robert Thomas and you can

24   see their DNA profile at all of the different

25   locations.  Jerry Shelton, Cheron Shelton, John

E. Wisbon - Direct by Ms. Pellegrini

1    Ellis, Chanetta Powell, Tina Shelton, Brittany

2    Powell, Shada Mahone, and the suspected saliva

3    from the rear yard of 1306.  What I do is look

4    at the numbers in my unknown column and compare

5    them to the numbers of my references to see if

6    any of the numbers match at each particular

7    location or if there are differences.  If there

8    are differences at these locations, the

9    individual is excluded as providing that DNA

10   profile.  If all of the locations match, in

11   this case of Cheron Shelton, there is a 13/15

12   in the unknown sample, a 13/15 at that same

13   location from the reference profile so I

14   declare there is a match from this unknown

15   profile and this known reference sample.

16        Q.   Who does that known reference sample

17   belong to?

18        A.   That matches Cheron Shelton.

19        Q.   And are all the other individuals

20   excluded?

21        A.   Yes.

22        Q.   Did that conclude your analysis in this

23   case?

24        A.   The only other information that I would

25   have provided in this particular match is a

E. Wisbon - Direct by Ms. Pellegrini

1    statistic to show and explain how rare the

2    observed DNA profile is.

3         Q.  Could you tell us about that statistic?

4         A.  The probability of randomly selecting

5    an unrelated individual from either the

6    Caucasian, African-American, or Hispanic

7    populations whose DNA profile would match this

8    DNA profile from the unknown sample is

9    approximately one in one hundred and

10   thirty-four septillion for the Caucasian

11   population.  A septillion is a one that would

12   be followed by 24 zeros.  For the

13   African-American population, it is one in one

14   point eighty-seven sextillion which is a one

15   followed by 21 zeros.  For the Hispanic

16   population it is one in eight hundred and two

17   sextillions, again a one followed by 21 zeros.

18        Q.  Ms. Wisbon, do you hold your

19   conclusions to a scientific certainty in the

20   field of your expertise?

21        A.  Yes, I do.  Any qualified individual

22   who is using the same procedures that I

23   utilized would come to the same conclusions

24   that I testified to today.

25                   MS. PELLEGRINI:  I offer for

E. Wisbon - Cross by Mr. McKinney

1      cross.

2                    MR. McKINNEY:  Thank you, Your

3      Honor.

4                           -----

5                    CROSS-EXAMINATION

6                           -----

7      BY MR. McKINNEY:

8          Q.  Good afternoon, Ms. Wisbon.

9          A.  Good afternoon.

10         Q.  With respect to the saliva sample in

11     the rear of 1306 Franklin Avenue, based on your

12     research and scientific studies, you have

13     excluded Cheron Shelton and Robert Thomas being

14     contributors to that saliva; is that correct?

15         A.  That is correct.

16         Q.  I have a couple of other questions.  It

17     might help if I reference which part of your

18     report to give you a heads-up.

19         A.  That would be great, thank you.

20         Q.  16LAB02222, report No. 20, page 3.

21     With respect to, it looks like Exhibits 21-B,

22     21-C, 21-C, possible bloodstain Area A from the

23     passenger floor mat of Lincoln Continental,

24     possible bloodstain Area B from the front

25     passenger floor mat of the Lincoln Continental,

E. Wisbon - Cross by Mr. McKinney

1    possible bloodstain Area A from the Lincoln

2    Continental, possible bloodstain Area B from

3    Lincoln Continental.  Is there a reason you

4    indicated possible bloodstaining as opposed to

5    actual bloodstaining?

6        A.  The test that the laboratory uses to

7    determine if blood may or may not be present on

8    an item of evidence are considered presumptive

9    blood tests.  A presumptive blood test

10   tentatively tells us if something is present or

11   not present.  Because it is presumptive, it is

12   possible that there are other substances that

13   could also give us a positive result other than

14   blood which is why when we observe a positive

15   result, we still only call it possible blood.

16       Q.  Is there any kind of in-depth testing

17   that you could do above and beyond what you

18   normally would to determine if that substance

19   is actually blood or not?

20       A.  There is a confirmatory test for blood

21   which is called the Takayama test, the

22   laboratory used to perform it, but because it

23   is a confirmatory test, the level of

24   sensitivity is very low meaning that when we

25   are using the sample and we know that blood is

E. Wisbon - Cross by Mr. McKinney

1    present so if we're doing training testing, we

2    could test a dilution of blood and get a

3    negative result so with this confirmatory test,

4    just because it would be negative, doesn't mean

5    that blood is not present.  We have found that

6    the DNA testing that we utilize is more

7    specific in that it is human specific so if

8    there was human DNA present, it would be

9    detected further down the line for analysis.

10       Q.  Based on your direct examination,

11   obviously DNA is found in saliva; is that safe

12   to say?

13       A.  Yes.

14       Q.  Found in blood as well?

15       A.  Yes.

16       Q.  Sweat?

17       A.  Yes.

18       Q.  Any other ways that it can be secreted?

19       A.  Lots of other bodily fluids, saliva

20   vaginal secretions.  There is also what is

21   known as touch DNA which is low level of

22   cellular material that can be transferred to

23   items when you handle them for a prolonged

24   period of time.

25       Q.  It seems like based on your direct

E. Wisbon - Cross by Mr. McKinney

1    examination that you spent a significant amount

2    of time working on the DNA profile belonging to

3    the author of the letter from the jail?

4       A.  Yes, the process in and of itself is

5    time-consuming.

6       Q.  That letter, did you see that it was

7    written by, or purportedly written by, Cheron

8    Shelton based on what was written on the

9    envelope?

10      A.  Correct.  I only observed the actual

11   envelope, I did not receive the letter itself.

12      Q.  And, generally, with respect to this

13   case at least, who directed the testing that

14   you performed?

15      A.  So typically in certain cases I may

16   meet with detectives and the DA's Office to

17   discuss the items of evidence which were

18   submitted to the laboratory but as far as

19   determining what specific testing is performed

20   on particular items of evidence, that is

21   generally left up to the analyst themselves

22   while following our standard operating

23   procedures.

24              MR. McKINNEY:  Those are all the

25   questions I have.  Thank you.

E. Wisbon - Cross by Mr. McKinney

1                    THE COURT:  Thank you.  You are

2        excused.

3                    THE WITNESS:  Thank you, Your

4        Honor.

5                    THE COURT:  Is the pathologist

6        the next witness?

7                    MS. PELLEGRINI:  Yes, Your Honor.

8                    THE COURT:  We are going to take

9        a short recess but we will continue.  Remain

10       seated and quiet as the jury leaves the room.

11                             -----

12                    (Open court - Jury not present.)

13                             -----

14                    MS. PELLEGRINI:  Judge, so you

15       are aware how the trial is progressing, the

16       Commonwealth will rest no later than lunch on

17       Monday.  We told this jury approximately

18       15 days.  I think we are moving along

19       expeditiously.  I would ask the Court's

20       indulgence since we have to resolve autopsy

21       photos and Dr. Xu can be on the stand for an

22       hour-and-a-half.  We don't often ask for that.

23       We can have him back and ready to go first

24       thing tomorrow morning.  When we conclude with

25       him and Dr. Ennis, we have a couple of other

E. Wisbon - Cross by Mr. McKinney

1    witnesses.  I think we are moving along quite
2    expeditiously as I said.
3                    THE COURT:  You can excuse
4    Dr. Ennis for today.  As to Dr. Xu, I reviewed
5    the photographs of Shada Mahone.  There were 19
6    photographs.  The Court finds that none of them
7    are inflammatory.  Consequently, they are all
8    potentially admissible without further notice.
9                    You are permitted to use as to the
10   gunshot wound to the right shoulder -- you
11   better write this down -- as to gunshot wound
12   number one as to Ms. Mahone, you can use two
13   photographs of your choosing of the right
14   shoulder.  One, a gross shot to give the jury
15   where on the body the entrance wound and a
16   close-up shot to demonstrate the recovery site.
17   As to gunshot wound number two, the same
18   applies, a gross shot of both the entrance and
19   exit and a close-up shot for each of those so a
20   total of four photographs of your choosing.  As
21   to gunshot wound number three, similarly, total
22   of four of your choosing under that same
23   notion.  As to gunshot wound of the chin, there
24   are two photographs from what I saw.  They are
25   approximately, they are the same, duplicate, so

E. Wisbon - Cross by Mr. McKinney

1    you can pick one of those two.  The photographs

2    of the hand are admissible.

3              As to Tina Shelton, it is unlikely that

4    we will get to her today, but the Court has

5    reviewed what I believe to be 26 photos.  That

6    excludes, in terms of the 19 that I referred to

7    earlier, that excludes the photographs of the

8    projectiles but I have 26 photos of

9    Ms. Shelton.  21 of those the Court deems to be

10   absolutely non-inflammatory.  There are five

11   photographs of the gunshot wound to the head.

12   The Court finds that, in the context of the

13   analysis, that they are potentially

14   inflammatory but in terms of what jurors are

15   exposed to in today's world, TV movies, on the

16   internet, the Court does not find them

17   presumptively inflammatory.  I will allow you

18   to use the photograph of the gross photograph

19   as I have described it earlier of the gunshot

20   wound to the left temple, a second photograph

21   of the entrance wound of your choosing, then

22   that would leave this.  It looks to me, and you

23   are more familiar with it than I am, that

24   appears to be a gunshot wound that runs for

25   some distance.  It almost could be perceived by

E. Wisbon - Cross by Mr. McKinney

1    the naked eye and non-expert to be one wound.

2    Is that correct?

3                    MS. PELLEGRINI:  That's correct.

4                    THE COURT:  So you can use those

5    photographs, any and all of those five

6    photographs for Dr. Xu.  I will give a

7    cautionary instruction although I do not

8    believe it is necessary because I am not

9    finding it inflammatory.  I will give the

10   cautionary instruction in an abundance of

11   caution.  The remaining photographs, remaining

12   wounds, the Court finds they are

13   non-inflammatory.  The Court finds two

14   photographs that are potentially insensitive.

15   I identified what I will refer to as her

16   abdomen, that lower region, those are cropped

17   preliminarily with yellow paper.  You can do a

18   more professional job overnight in that regard.

19   So I plan on doing Dr. Xu with Ms. Mahone and

20   then we'll recess.

21                   MS. WILLIAMS:  Your Honor, I just

22   want the Court to note our exception.

23                   MS. PELLEGRINI:  Your Honor, it

24   is going to take a few moments for Mr. Delaney

25   to make the changes in the PowerPoint.

E. Wisbon - Cross by Mr. McKinney

1                          -----

2                 (Brief recess taken.)

3                          -----

4             MS. PELLEGRINI:  Your Honor, are

5     we just doing Ms. Mahone?

6             THE COURT:  Are you ready?

7             MS. PELLEGRINI:  I can do

8     Ms. Mahone.  I can't make the changes to Tina

9     Shelton

10            THE COURT:  Are you going to have

11    questions?

12            MR. McKINNEY:  None.

13            THE COURT:  Okay.

14                       -----

15            (Open court - Jury present.)

16                       -----

17            THE COURT:  Ladies and gentlemen,

18    we're entering the phase of the trial with

19    further expert testimony.  This expert

20    testimony will be coming from the forensic

21    pathologist, the autopsies.  Associated with

22    those autopsies are photographs.  The

23    photographs are not necessarily pleasant to

24    look at.  They are admitted for a limited

25    purpose.  The first purpose is to allow the

B. Xu - Direct by Ms. Pellegrini

1    forensic pathologist to better explain his

2    testimony and for you to understand it.  The

3    second purpose, of course, is this is a

4    criminal homicide case.  The Commonwealth is

5    seeking first degree murder convictions

6    involved with the specific intent to kill.  The

7    nature and extent of the wounds or injuries may

8    or may not reflect on that.  The photographs,

9    in addition to helping explain the

10   pathologist's testimony itself, the photographs

11   may reflect on that issue depending on how

12   you've viewed them, okay.  But, importantly,

13   don't allow the photographs to conjure up any

14   passions or emotions to the prejudice of the

15   defendant.  They are there for those two

16   purposes and those two purposes alone.  Dr. Xu.

17              MS. PELLEGRINI:  May I have just

18   one moment, Your Honor?

19                   -----

20              BAIYANG XU,

21   a witness herein, having been first duly sworn,

22   was examined and testified as follows:

23                   -----

24

25

B. Xu - Direct by Ms. Pellegrini

1                          -----

2              DIRECT EXAMINATION

3                          -----

4   BY MS. PELLEGRINI:

5        Q.   Dr. Xu, please state your first and

6   last name for the court reporter.

7        A.   My name is Baiyang Xu, B-A-Y-A-I-N-G,

8   last name X-U.

9        Q.   How are you employed?

10       A.   I'm working as a forensic pathologist

11   at the Medical Examiner's Office.

12       Q.   What is your profession?

13       A.   Forensic pathologist.

14       Q.   Keep your voice up, sir.  You are a

15   forensic pathologist?

16       A.   Yes.

17       Q.   Could you tell us about your training

18   and expertise?

19       A.   Yeah, I graduated from Harbin Medical

20   University in China, got my M.D.  I got my

21   pathology training, residency training, in

22   medical center in Ohio.  I got my forensic

23   pathology fellowship in Harris County Medical

24   Examiner's Office in Houston, Texas.

25       Q.   Doctor, as a forensic pathologist, is

B. Xu - Direct by Ms. Pellegrini

1    it your role to examine the body of a deceased

2    individual?

3        A.   Yes.

4        Q.   Is it your duty as a forensic

5    pathologist to determine the cause of death?

6        A.   Yes.

7        Q.   What are causes of death?

8        A.   So disease or trauma.

9        Q.   And manner of death are homicide,

10   accidental, and undetermined?

11       A.   Yeah.  You have five manner of deaths.

12   The first thing is natural, due to natural

13   disease.  The rest of them is unnatural

14   including suicide, homicide, accidental, and

15   also undetermined.

16       Q.   Doctor, were you tasked to perform the

17   autopsy on Shada Denise Mahone on March 10,

18   2016?

19       A.   Yes.

20       Q.   Are your findings at case number

21   16CORONER01952?

22       A.   Yes.

23       Q.   Is that your signature on page 2?

24       A.   Yeah.

25                  MS. PELLEGRINI:  Your Honor, for

B. Xu - Direct by Ms. Pellegrini

1    the purposes of the record only, I'm going to

2    mark the autopsy protocol as Commonwealth

3    Exhibit 494.

4                    THE COURT:  Admitted for purposes

5    of the record without objection.

6         Q.  Let me show you what I've marked as

7    Commonwealth Exhibit 494 to 511.  During the

8    course of the examination of the deceased, are

9    photographs taken to document your findings?

10        A.  Yes.

11        Q.  At 495 to 511, are these the

12   photographs of Shada Mahone that you selected

13   to aid in your testimony here today?

14        A.  Yes.

15                   MS. PELLEGRINI:  I move for the

16   admission of 495 to 511.

17                   THE COURT:  Admitted without

18   objection.

19                   MS. PELLEGRINI:  495 to 511.

20                   THE COURT:  Okay.

21        Q.  Doctor, when you write your protocol

22   and you list wounds, you number them?

23        A.  Yes.

24        Q.  Is that the order in which the wounds

25   are inflicted?

B. Xu - Direct by Ms. Pellegrini

1      A.   No.

2      Q.   How do you begin to decide what is

3   wound number one, wound number two, wound

4   number three, et cetera?

5      A.   So we assign it a number to each wound

6   based on the location of the wound on the body

7   and basically it is from the top to the lower

8   body and from the right to the left so it

9   doesn't mean the order of shooting and

10   distance.

11      Q.   Doctor, did you do what is called a

12   gross examination of Ms. Mahone's body?

13      A.   Yes.

14      Q.   Did you find that she did not have any

15   disease or natural disease or anything of that

16   nature?

17      A.   Yeah, right.

18      Q.   Doctor, I think it might be easier if

19   you could keep your voice up because the screen

20   is behind you, if you could step down.

21              THE COURT:   Whatever you are most

22   comfortable with, Doctor.

23      Q.   Doctor, we're going to begin with what

24   you have stated as pathological diagnoses

25   number one, a penetrating gunshot wound of the

B. Xu - Direct by Ms. Pellegrini

1    right shoulder.  Could you tell us what we are

2    seeing here?

3        A.  Yes, this is a gunshot entrance wound.

4    I have that number one.  Here is the right ear

5    and so the right shoulder.

6        Q.  496, is this a close-up?

7        A.  Yes.

8        Q.  Can you describe for us the path of

9    this bullet, how it went anatomically?

10        A.  This wound go down.

11        Q.  Where is the entrance wound?

12        A.  The entrance wound here is right

13    posterior shoulder.

14        Q.  Where is the right posterior shoulder,

15    show it on your body?

16        A.  Oh, it was here.

17        Q.  Were there any stippling or powder

18    burns on this?

19        A.  No.

20        Q.  What is stippling?

21        A.  Stippling is the fact that unburned or

22    incomplete burn of gunpowder that comes out

23    from the bullet, from the muzzle of the gun,

24    and if the gun is close to the body, to the

25    surface of the body, and distance, unburned

B. Xu - Direct by Ms. Pellegrini

1   gunpowder is also heat and make tiny skin

2   defect.  We call that gunpowder stippling but

3   in this case we didn't see that.

4       Q.  Describe to this jury the path of the

5   bullet, how it perforates the skin and where it

6   goes from the skin.

7       A.  First, perforated the skin and soft

8   tissue underneath the skin and entered I think

9   from the right upper anterolateral.

10      Q.  What is the right lateral intercostal

11  space, what is that?

12      A.  The chest cavity, the skin and soft

13  tissue and rib.  Then the rib has from counting

14  down, the number one so from the upper.  And

15  intercostal space is the space between the two

16  ribs but we number that first intercostal space

17  is the space underneath, beneath the first rib.

18  And the second intercostal space is the space

19  between the second.  And the third rib.

20      Q.  Does it then perforate the right upper

21  and middle lobes of the lung?

22      A.  Yes.

23      Q.  What are the lobes of the lung, what

24  are those?

25      A.  So people have two lobes of the right

B. Xu - Direct by Ms. Pellegrini

1    lung and two lobes of the left lung.  So this

2    bullet hit in the chest cavity, further

3    continued and hit and perforated the upper lobe

4    of the right lung.

5        Q.  After it passed through the upper and

6    middle lobes of the right lung, did it lacerate

7    the pericardium?

8        A.  I think, yes.

9        Q.  It lacerated the pericardium, correct?

10       A.  Yeah.

11       Q.  That is the sac around the heart?

12       A.  The sac, it is the membraneous tissue

13   that covers the heart and between the heart is

14   the pericardium.  That space had a little bit

15   of blood.

16       Q.  Then did it continue on into the right

17   posterior atrium?

18       A.  Yes.  The heart has four chambers so

19   upper is right and left atrium.  The lower is

20   right and left ventricle.  So this bullet also

21   lacerated the right atrium.

22       Q.  Did it then continue its path into the

23   right central diaphragm and left lobe of the

24   liver?

25       A.  Yes.

B. Xu - Direct by Ms. Pellegrini

1        Q.   What is the diaphragm?

2        A.   The diaphragm is the membraneous tissue

3    that divides the chest cavity and the abdominal

4    cavity.  That is across the body and the bullet

5    hit the central area of that.

6        Q.   Then it hit the liver.  Where is the

7    liver on your body?

8        A.   The liver mainly is on the right side

9    but it is over a little bit, the midline to the

10   left, so we call it from the midline on the

11   right side, right lobe on the left side.  We

12   call it left lobe of the liver.  So the bullet

13   hit that left lobe of the liver.

14       Q.   Then did it perforate the stomach,

15   small intestine, and mesentery?

16       A.   Yes.

17       Q.   So it continued on from the liver and

18   then it went into the stomach?

19       A.   Yes, into the stomach.

20       Q.   And then the small intestine?

21       A.   Yes.

22       Q.   What is mesentery?

23       A.   Mesentery is a long structure.  The

24   mesentery is the membraneous tissue connecting

25   to the intestine.  The nervous system, it goes

B. Xu - Direct by Ms. Pellegrini

1    to the intestine to that kind of membraneous

2    tissue.  It also hit.

3        Q.  Doctor, would this have been a fatal

4    wound?

5        A.  Yes.

6        Q.  As you examined, it looks like a fairly

7    small entrance wound here, did you begin to

8    examine it and then open it up a little bit?

9        A.  The entrance wound?

10       Q.  Yes.

11       A.  Yes.

12       Q.  I'm going to show you Commonwealth

13   Exhibit 497.  What do we see in this

14   photograph?

15       A.  This is bullet recovered from gunshot

16   wound.  This location, a little photo that

17   shows the location of the left lower lateral

18   abdominal wall.

19       Q.  So it entered up here in the right

20   shoulder and traveled through her body and

21   ended up almost to her back?

22       A.  Yes.

23       Q.  Did you recover what you termed as a

24   large yellow metal jacketed bullet?

25       A.  Yes.

B. Xu - Direct by Ms. Pellegrini

1      Q.  I'm going to show you pictures 498

2   through 504.  Did you document the recovery and

3   place this bullet in an evidence envelope to

4   then be further examined by the firearm

5   section?

6      A.  Yes.

7      Q.  Is this the bullet?

8      A.  Yes, this is the bullet recovered and

9   this envelope marks the general description of

10   the bullet and put it in this envelope and

11   submitted it to the lab.

12      Q.  This is a close-up?

13      A.  Yes, a close-up of the bullet,

14   different angle to see.

15      Q.  Before we move on, Doctor, I show you

16   what I marked as Commonwealth 512.  Contained

17   in this Commonwealth Exhibit 512, is this the

18   evidence envelope containing that yellow

19   jacketed bullet?

20      A.  Yeah.

21          MS. PELLEGRINI:  Move for the

22   admission of 512.

23          THE COURT:  Admitted without

24   objection.

25      Q.  Doctor, we are going to move on to what

B. Xu - Direct by Ms. Pellegrini

1   you have described as gunshot wound -- I'm

2   sorry.  Going back, if we go back for a moment

3   before we talk about gunshot wound number two,

4   the associated injuries from gunshot wound

5   number one, that was the fatal wound, you had a

6   right hemothorax of 1,500 milliliters.  What

7   does that mean?

8       A.   During the autopsy examination, the

9   chest cavity, central structure, the right

10  chest and left chest, we collected 1,400 blood

11  on the right side of the chest cavity.  So that

12  is a whole body blood.

13      Q.   She lost extreme amounts of blood

14  internally, correct?

15      A.   Yes.

16      Q.   What was the next associated injury,

17  number under subpart D?

18      A.   Under subpart D for the first gunshot

19  wound, yeah, okay.

20      Q.   What is number two?  What is that?

21      A.   That means also we collect the blood in

22  abdominal cavity.

23      Q.   That was 200 milliliters?

24      A.   Yes.

25      Q.   Did you determine the direction of the

B. Xu - Direct by Ms. Pellegrini

1     bullet to be downward, leftward, and slightly

2     forward?

3          A.  Yes.

4          Q.  Doctor, now what you've described as

5     gunshot wound number two, as you're moving down

6     the body, at Commonwealth Exhibit No. 505,

7     could you describe what you're seeing here?

8          A.  Yeah, I assigned number two to this

9     gunshot entrance wound.  This wound was through

10    and through.  It hit, I think, this fracture of

11    the upper portion of the bone, the humerus

12    bone.

13         Q.  You didn't find any stippling again, no

14    indication that this was a close contact wound,

15    correct?

16         A.  Yeah, right.

17         Q.  It perforated the skin, the

18    subcutaneous tissue, and broke the top of her

19    humerus?

20         A.  Yeah.

21         Q.  Where was the exit wound?

22         A.  The exit wound is on the posterior left

23    shoulder.

24         Q.  Is this a close-up of the wound?

25         A.  Yes.

B. Xu - Direct by Ms. Pellegrini

1        Q.   Is this a picture of the exit wound?

2        A.   Yes, yes, close-up.

3        Q.   The exit was in the left posterior

4    shoulder, the direction was backward?

5        A.   Yes.

6        Q.   Now, you found, you labeled as gunshot

7    wound number three a perforating gunshot wound

8    of the left shoulder.  This is Commonwealth

9    Exhibit No. 507.  Can you tell me about this?

10   Is this exit, does this enter the left shoulder

11   and subcutaneous tissue, exit the left anterior

12   shoulder and leftward and slightly downward?

13       A.   So you're talking about not here?

14       Q.   Sorry.  Doctor, let's move on.  You

15   have a grazed gunshot wound of the chin?

16       A.   Yes.

17       Q.   Could you explain what a grazed wound

18   is?

19       A.   Graze wound is a wound that the bullet

20   superficially hits skin and make this kind of

21   elongated defect of the skin.  For this, the

22   direction of the bullet was from left to right

23   or from the right to left but the wound itself

24   is perforating the skin and also superficially

25   penetrating the subcutaneous soft tissue.

B. Xu - Direct by Ms. Pellegrini

1      Q.   That is subcutaneous tissue.  Was there

2    a grazed wound of Ms. Mahone's hand?

3      A.   Yes, gunshot wound because that is

4    location and the thing that this gunshot hit is

5    the tip of the right index finger and also the

6    fracture of the wound and I think this also

7    cannot tell the direction.

8      Q.   Doctor, since I had made a mistake on

9    the numbering of the pictures, let me go back

10   for one moment.  I'm going to show you

11   Commonwealth Exhibit No. 505.  Doctor, the

12   grazed wound, actually the third wound here,

13   correct?

14     A.   The entrance wound of the gunshot

15   number two, okay.

16     Q.   Okay, what are these two?

17     A.   They are also gunshot wounds but these

18   are superficial.  You can see here is one

19   wound, here is one wound.  There is skin

20   braiding between the two and there is

21   perforated underneath the skin so that means

22   that the bullet went under here and out and

23   also possible, I'm not sure, but possible

24   separate shot.  Possible because the patient is

25   in motion, still possible that same bullet hit

B. Xu - Direct by Ms. Pellegrini

1    here, up, and entered there because at that

2    specific location, if the arm is like this, it

3    is possible.  So that I classified this as

4    entrance.

5                    MS. PELLEGRINI:  Doctor, you may

6    retake the stand.

7        Q.   Doctor, do you have an opinion as to

8    the cause of death of Shada Mahone?

9        A.   Yes.

10       Q.   What was her cause of death?

11       A.   The cause of death is gunshot wound to

12   the trunk and the manner of death is homicide.

13       Q.   Do you hold those opinions to a

14   reasonable degree of medical certainty?

15       A.   Yes.

16                   MS. PELLEGRINI:  With regard to

17   Ms. Mahone, those are all the questions that I

18   have of Dr. Xu.  He will be continuing to

19   testify as to Tina Shelton.

20                   THE COURT:  Any questions?

21                   MR. McKINNEY:  No, Your Honor.

22                   THE COURT:  Okay.  Dr. Xu, you

23   are excused for today.  Please be back tomorrow

24   morning no later than quarter-after-nine.

25                   THE WITNESS:  Okay.

```
 1                    THE COURT:  Ladies and gentlemen,
 2     we will recess for today.  Please be here by
 3     9:00 tomorrow morning.  We should be able to
 4     start more promptly tomorrow morning.  I
 5     apologize for the delay this morning but I had
 6     to address the matter with the juror and the
 7     civilian interference, so to speak.  That is
 8     why we got a late start.  I appreciate your
 9     patience and perseverance.
10              Remain seated and quiet as the jury
11     leaves the room.
12                          -----
13                    (Open court - Jury not present.)
14                          -----
15                    THE COURT:  Are you set up to do
16     the next one?
17                    MS. PELLEGRINI:  I will have it
18     done in the morning.  The question is would it
19     be possible in the morning before we start with
20     Dr. Xu so that Mr. Delaney can go and make any
21     deletions that we have while Dr. Xu is on the
22     stand?  Can we meet at 9:00 in order to do
23     that?
24                    THE COURT:  To do what?
25                    MS. PELLEGRINI:  You have the
```

1    Brittany Powell photographs.  You were going to

2    review them overnight.

3                    THE COURT:  Well, I'm going to

4    give you those.  My tipstaff is copying them.

5    I had to number them because they are so

6    numerous so we'll go over these right now as

7    soon as he gets back.

8                    MR. McKINNEY:  Is the Court still

9    contemplating his ruling on FBI Agent Burke?

10                   THE COURT:  I had heard nothing

11   to change my mind so the ruling stands.

12                   MR. McKINNEY:  If I could, for

13   the record supplement my argument on the

14   exhibits?

15                   THE COURT:  Okay.  Do you have a

16   set of colored copies?

17                   MS. WILLIAMS:  I do, sir.

18                   THE COURT:  What I'm giving you

19   is a reference.

20                   MS. WILLIAMS:  I have a lot more

21   than you do.

22                   THE COURT:  You don't have to

23   worry because they are not seeking to admit

24   them.  You have more than me if you have the

25   projectiles.  I didn't include the projectiles.

1    Number one, my number one is -- what is that a
2    picture of?
3                    MS. PELLEGRINI:  That is a
4    picture of the entrance wound, Your Honor.
5                    THE COURT:  Gunshot wound number
6    one?
7                    MS. PELLEGRINI:  This should be
8    gunshot wound number one, penetrating gunshot
9    wound of posterior left aspect of the head.
10                   THE COURT:  The Court finds --
11   and we'll make my set part of the record for
12   appellate purposes just in case the Court would
13   need it -- number one, the Court finds it is
14   not inflammatory.  That is admissible and can
15   be used.  My number two --
16                   MS. PELLEGRINI:  That is going to
17   be the exit wound, Your Honor.
18                   THE COURT:  For gunshot number
19   one?
20                   MS. PELLEGRINI:  Yes.
21                   THE COURT:  I note your objection
22   but the Court finds that this is admissible.  I
23   will give a cautionary instruction again if
24   necessary.  Now, how is number three, is that
25   -- what is that?  Obviously, it is a gunshot

1    wounds to her face.

2              MS. PELLEGRINI:  That is correct,

3    Your Honor.  It enters her face.  There are

4    also fragments and things that hit her cheek

5    and her nose.

6              THE COURT:  Okay.

7              MS. PELLEGRINI:  The bullet just

8    sort of exploded.  That is what 7.62s do.

9              THE COURT:  Okay.  This is

10   potentially inflammatory however the Court

11   finds probative value outweighs any prejudicial

12   effect and may be used.  Number four, what is

13   that?

14             MS. PELLEGRINI:  Exit wound.

15             THE COURT:  For that, okay.

16   Again, the Court finds probative value

17   outweighs any prejudicial effect.  As to number

18   five?

19             MS. PELLEGRINI:  Number five

20   would be showing the direction and path of the

21   bullet.

22             THE COURT:  Of which wound?  The

23   wound that we just talked about?

24             MS. PELLEGRINI:  Yes, Your Honor.

25   And we have that listed currently in black and

 1     white.

 2                    THE COURT:  Okay.  Is that a

 3     fatal wound?  It is not.

 4                    MS. PELLEGRINI:  It is not a

 5     fatal wound.

 6                    THE COURT:  I'm going to exclude

 7     five.  The Court finds it is unnecessary.  It

 8     is a non-fatal wound.  The pathologist can

 9     explain.  The Court, although it is in black

10     and white, it has what I imagine is a

11     directional probe that the Court finds

12     unnecessary.  As to number six.

13                    MS. PELLEGRINI:  That would be

14     under subpart three, perforating and

15     penetrating gunshot wound to the face.  The

16     entrance is the lower lip.

17                    MS. WILLIAMS:  Our argument is it

18     is identical to the other photo.

19                    THE COURT:  Pardon me?

20                    MS. WILLIAMS:  Our argument is it

21     is identical.

22                    THE COURT:  I'm going to get to

23     that.  You can choose between number three and

24     number six, not both of them.

25                    MS. WILLIAMS:  Has the Court

1  considered our request, I'm assuming, using

2  black and white instead of color?

3              THE COURT:  What I'm reviewing

4  are the color.

5              MS. WILLIAMS:  Part of our motion

6  is asking that any photos that the Court does

7  allow them to use make them all black and

8  white.

9              THE COURT:  Your objection is

10  overruled in that regard.  What is number

11  seven?

12              MS. PELLEGRINI:  It is beginning

13  the sixth perforating and penetrating gunshot

14  wound of torso -- I'm sorry.

15              THE COURT:  My number seven.

16              MS. PELLEGRINI:  I apologize,

17  Your Honor.  This is, again, depicting the

18  bottom half of her face where, again, the

19  bullet fragment destroys the tissue as it

20  enters.  It doesn't enter as a clean wound like

21  you would see with a .40.

22              THE COURT:  What does that do to

23  number six?

24              MS. PELLEGRINI:  We can choose

25  between three and six, okay.

1              THE COURT:  All right.

2              MS. PELLEGRINI:  No problem.

3              THE COURT:  As to number eight,

4     the Court finds that is not inflammatory.  Use

5     at your discretion.  Similarly with

6     Commonwealth numbers 9, 10, 11, 12, and 13.  Of

7     course, her face but also depicts a further

8     gunshot wound circled FF.

9              MS. WILLIAMS:  Your Honor, we ask

10    that that photo be cropped.

11             THE COURT:  What is FF, is that

12    a --

13             MS. PELLEGRINI:  That is

14    penetrating, the penetrating -- hold on one

15    second.  That is the penetrating gunshot wound

16    of the right breast.  That depicts the entrance

17    wound, Your Honor.

18             THE COURT:  Is there an exit

19    wound to that?

20             MS. PELLEGRINI:  The exit wound

21    is medial aspect of the right breast.

22             THE COURT:  Okay, you can use

23    that if you crop out --

24             MS. PELLEGRINI:  Crop the face.

25             THE COURT:  -- the face.  There

```
 1    is enough of it, enough of her right shoulder.
 2    Where is one of the two tipstaffs?  Something
 3    like that.
 4                  MS. PELLEGRINI:  Yeah, that's
 5    fine.  I got it.
 6                  THE COURT:  The Court finds my
 7    number 14, again, non-inflammatory.  The same
 8    with 15 but don't duplicate things.
 9                  MS. PELLEGRINI:  Okay.
10                  THE COURT:  Number 16, that wound
11    is, that is a non-fatal wound, correct, black
12    and white?
13                  MS. PELLEGRINI:  Yes.  Yes, it is
14    a through and through.
15                  THE COURT:  Okay.
16                  MS. PELLEGRINI:  I can eliminate
17    that, Your Honor.
18                  THE COURT:  All right.  Number
19    17.
20                  MS. PELLEGRINI:  I can crop the
21    face here, Your Honor, and just show the wound
22    to the abdomen and leg.
23                  THE COURT:  Okay.  Number 18, the
24    Court, although there is a graphic wound to the
25    back of her right arm, the Court will admit
```

1    that.  Number 19, non-inflammatory.  As to

2    number 20, can you pick between the earlier

3    photograph?

4              MS. PELLEGRINI:  I'm sorry, 19 is

5    okay, Your Honor?

6              THE COURT:  Yes.  20, can you

7    pick between that and the earlier photograph

8    which my number --

9              MS. PELLEGRINI:  18.

10             THE COURT:  18, okay.  21

11   non-inflammatory.  22, that is a non-fatal.

12   That is an entrance and exit.

13             MS. PELLEGRINI:  I can remove

14   that, Your Honor.

15             THE COURT:  The Court finds 23 a

16   bit insensitive but, nonetheless, you can use

17   that.  24, similarly non-inflammatory.  As to

18   25, insensitive to the victim.  Should be, if

19   possible, cropped further but you can use it if

20   you choose to put that in front of the jury.

21   26, non-inflammatory.

22             MS. PELLEGRINI:  Your Honor,

23   could you hold on for one second, please?

24   Okay, 26.

25             THE COURT:  26 is

```
 1    non-inflammatory.  27, non-inflammatory.  Now,
 2    28, is there anything on there that hasn't been
 3    depicted?
 4              MS. PELLEGRINI:  M and N.
 5              THE COURT:  That is the front of
 6    what we talked about earlier?
 7              MS. PELLEGRINI:  I'm sorry, I
 8    can't hear you.
 9              THE COURT:  M and N been depicted
10    at all?  The back of her right arm?
11              MS. PELLEGRINI:  Right but not
12    the front.
13              THE COURT:  You crop that out.
14              MS. PELLEGRINI:  Crop the face?
15              THE COURT:  Crop the face.
16    Mr. Irvin, hand that to Ms. Pellegrini.  29.
17              MS. PELLEGRINI:  You want the
18    face cropped out, just the face?
19              THE COURT:  As much as I
20    suggested with the yellow piece of paper.
21              MS. PELLEGRINI:  All right.
22              THE COURT:  You can hold on to
23    that.  Just return it to me tomorrow.  What
24    does 29 depict?
25              MS. PELLEGRINI:  It is a close --
```

```
 1    just one moment, Your Honor.  It is a close-up

 2    of the exit wound on number 12 of the right arm

 3    and anterior aspect of the left arm and

 4    recovery of the large caliber bullet.

 5                    THE COURT:  Is the bullet in

 6    here?

 7                    MS. PELLEGRINI:  I can't tell

 8    from the black and white photo, Your Honor.

 9                    THE COURT:  I don't find it

10    inflammatory.  If you want to use it, fine.

11    Similarly with 30.  The earlier photograph

12    might be a close-up of 30.

13                    MS. PELLEGRINI:  That is Q and R.

14                    THE COURT:  The Court finds those

15    non-inflammatory.  I think we covered 31.  The

16    Court finds it insensitive to the victim.

17                    MS. PELLEGRINI:  Hold on one

18    second, Your Honor.  I can remove 31.

19                    THE COURT:  Okay.  32,

20    non-inflammatory.  My 33, non-inflammatory.

21    34, similarly.  35 and 36.  What is my number

22    37?  Is that the top of her head?

23                    MS. PELLEGRINI:  Could you hold

24    on one moment, Your Honor, until I catch up

25    with you?  These are the bullet fragments from
```

1    the top of her head that were recovered that

2    didn't penetrate.

3                    THE COURT:  They are what?

4                    MS. PELLEGRINI:  Bullet fragments

5    from the top of her head that did not

6    penetrate.  They were collected and analyzed.

7                    MS. WILLIAMS:  With respect to 37

8    in the colored photos, they are very bloody and

9    we ask that they be in black and white.

10                   THE COURT:  I'll sustain.  The

11   pathologist can describe where they were

12   recovered from without offending the surviving

13   family members or any, bluntly put, those two

14   photographs are just a bloody mess.  I'm sorry

15   to say that, that is what they are.  38 is

16   recovery of a projectile.

17                   MS. PELLEGRINI:  Yes.

18                   THE COURT:  Is that her

19   underwear?

20                   MS. PELLEGRINI:  It is her shirt.

21                   THE COURT:  What is it?

22                   MS. PELLEGRINI:  Her shirt.

23                   THE COURT:  The Court finds that

24   non-inflammatory and may be used.  What is 39?

25                   MS. PELLEGRINI:  They are more

1    bullet fragments in her hair.

2                    THE COURT:  Well, if you can crop

3    that better?

4                    MS. PELLEGRINI:  I can just take

5    it out, Your Honor.

6                    THE COURT:  What is my number 40?

7    Is it recovery of a fragment?

8                    MS. PELLEGRINI:  Hold on one

9    moment, Your Honor.  It is part of the shirt --

10   I'll take it out.

11                   THE COURT:  All right.  Are you

12   calling witnesses?

13                   MR. McKINNEY:  Yes, Your Honor.

14                   THE COURT:  How many do you have

15   approximately?

16                   MR. McKINNEY:  One or two and to

17   the extent that I re-call witnesses, their

18   testimony will be brief.

19                   THE COURT:  All right.

20                   MS. PELLEGRINI:  May I have the

21   names and dates of birth of any witnesses?

22                   MR. McKINNEY:  Desdrene Smith and

23   any other possible witnesses are on your list.

24                   MS. PELLEGRINI:  May I have the

25   dates of birth?

1                    MR. CHERNOSKY:  May I make the

2          Court aware, the custodian, the plan is he is

3          coming right to the courthouse.  Depending on

4          how long our autopsy testimony goes, I don't

5          know if he will be here before 11:15 and 11:30.

6                    THE COURT:  We have two autopsies

7          to get through.

8                    MS. PELLEGRINI:  Yes, Your Honor.

9                    THE COURT:  Who is picking him up

10         at the airport?

11                   MR. CHERNOSKY:  He is taking an

12         Uber.

13                   MS. PELLEGRINI:  Would you like

14         to have a detective pick him up?

15                   THE COURT:  You have five or six

16         standing around outside.

17                   MS. PELLEGRINI:  Although we

18         anticipate not finishing until Monday with

19         Dr. Dwyer and the FBI agent, we may run out of

20         witnesses tomorrow.

21                   MR. McKINNEY:  While we are on

22         the record, I let the Commonwealth know that I

23         would like to call Daniel Wolf from the crime

24         lab.

25                   MS. PELLEGRINI:  Yes, they were

In Chambers

1      to make him available.  I will send a text.  I

2      did talk to Tom about that.

3                    THE COURT:  Okay.

4                    MS. PELLEGRINI:  I will make him

5      available Monday for you.

6                    (Court adjourned for the day.)

7                         -----

8                    (Friday, February 7, 2020 - In

9      chambers discussion held as follows.)

10                        -----

11                    THE COURT:  We are likely losing

12     another juror.  No. 15, she called Kevin to

13     talk to me last evening, actually not that long

14     after we left, and told me that she has had

15     anxiety attacks for the past ten years that

16     have become a lot worse lately.  She indicated

17     upon inquiry, I asked her why she didn't bring

18     this up at the time of the voir dire process.

19     She said that she realized it was her civic

20     duty to try to serve but she has been anxious

21     since she received the jury summons.

22                    Actually, she thought she would be able

23     to do it.  She indicated that in the immediate

24     aftermath she was ready to bring it up but she

25     understood that she was an alternate and that

In Chambers

1    eased her anxiety to the point where she

2    thought she would continue to serve.  She

3    indicated she had loss of appetite,

4    sleeplessness, and during the past few months

5    in addition to the anxiety attacks, she has

6    developed claustrophobia.  She indicated that

7    she was having trouble on the elevators during

8    this last week and that she was in tears when

9    she was talking to me.  So I don't see any

10   reason to keep her.  Do you?

11              MR. McKINNEY:  On behalf of

12   Mr. Shelton, I agree.

13              MS. PELLEGRINI:  On behalf of the

14   Commonwealth, we agree.

15              THE COURT:  Okay.  Two of the

16   attorneys walked in late.  There were

17   representatives from each side.  You can read

18   that back to them, Michele.

19              MS. PELLEGRINI:  I caught the

20   gist of it.

21                    -----

22              (Open court - Jury present.)

23                    -----

24              THE COURT:  Ms. Pellegrini.

25              MS. PELLEGRINI:  We call Dr. Xu

B. Xu - Direct by Ms. Pellegrini

1    for his continuous testimony.  Remember you're

2    still under oath, sir.

3                        -----

4                    BAIYANG XU,

5    a witness herein, having been previously first

6    duly sworn, was examined and testified as

7    follows:

8                        -----

9               DIRECT EXAMINATION

10                       -----

11   BY MS. PELLEGRINI:

12        Q.   Doctor, did you perform the autopsy on

13   the deceased Tina Shelton?

14        A.   Yes.

15        Q.   I'm going to show you what I marked --

16             MS. PELLEGRINI:  Again,

17   Mr. McKinney, the protocol is for purposes of

18   the record only.

19        Q.   Did you perform the autopsies on

20   March 10, 2016?

21        A.   Yes.

22        Q.   Are your anatomic diagnoses contained

23   at case 16CORNER19506?

24        A.   Yes.

25        Q.   I marked this as Commonwealth Exhibit

B. Xu - Direct by Ms. Pellegrini

1    No. 3.  Is this your signature on page 3?

2    A.  Yes.

3           MS. PELLEGRINI:  I move for the

4    admission for purposes of the record only the

5    autopsy protocol of Tina Shelton?

6           THE COURT:  It is admitted.

7    Q.  Doctor, I show you what I marked as

8    Commonwealth Exhibit Nos. 514 to 543.  Are

9    these the photographs that were taken at

10   autopsy that you prepared for the jury to aid

11   in your testimony here today?

12   A.  Yes.

13          MS. PELLEGRINI:  I move for the

14   admission of 514 through 543.

15          THE COURT:  Admitted subject to

16   our earlier discussion on the record.

17   Q.  Doctor, again, we remind the jury that

18   although you numbered these wounds, that in no

19   way reflects on how they were inflicted, right?

20   A.  Right.

21   Q.  As you stated yesterday, you just start

22   at the top of the head and work your way down?

23   A.  Yes.

24   Q.  Doctor, I'm going to start with

25   Commonwealth Exhibit No. 514.  Beginning with

B. Xu - Direct by Ms. Pellegrini

1   the top of the head of Tina Shelton, was there

2   a perforating gunshot wound to the head?

3        A.   Yeah.

4        Q.   Did the path enter the right temporal

5   scalp?

6        A.   Yes.

7        Q.   Using the laser pointer, show the

8   entrance wound to the jury.

9        A.   This entrance wound, this exit wound.

10       Q.   Again, you found no stippling to

11  indicate that this was a close contact gunshot

12  wound, correct?

13       A.   Yeah, right.

14       Q.   Describe for us the path of the bullet?

15       A.   The bullet first perforated the skin

16  and subcutaneous and soft tissue and also

17  perforated the temporal skull, the right

18  temporal skull and cranial cavity and hit the

19  right temporal occipital lobe of the brain and

20  then exited at the right scalp.

21       Q.   Did this cause diffuse subdural and

22  subarachnoid hemorrhage of the temporal lobe of

23  the brain?

24       A.   Yes.

25       Q.   What are subdural hemorrhages?

B. Xu - Direct by Ms. Pellegrini

1          A.   Membraneous tissue covers the brain.

2     They call that dura membrane.  Then the bone,

3     the trauma, some hemorrhage beneath that.  That

4     means between the dura membrane and the brain,

5     that are spaces that collected blood.  We call

6     that subdural hemorrhage.

7          Q.   What does that do to the function of

8     the brain?

9          A.   That cannot function, the brain.

10         Q.   Did it also cause a skull fracture?

11         A.   Yes.

12         Q.   What are cortical contusions involving

13    the bilateral frontal temporal lobes of the

14    brain?

15         A.   Because at that time the bullet went

16    into the cranial cavity, it makes the pressure

17    in the cavity increase, so the brain will move

18    and so to move against the inner surface of the

19    skull, the brain tissue is very soft, the

20    surface causes contusions.

21         Q.   That would cause increase pressure on

22    the brain?

23         A.   Yes, like trauma.

24         Q.   The direction of the wound was

25    backward?

B. Xu - Direct by Ms. Pellegrini

1        A.   Yes.

2        Q.   I'm going to show you the next photo.

3    Is that a close-up of the gunshot wound number

4    one?

5        A.   Yes.

6        Q.   Now, gunshot wound number two I'm

7    showing you at 516.  This is on the left

8    shoulder?

9        A.   Yes.

10       Q.   I'm going to show you a close-up of

11   this.

12       A.   Yes.

13       Q.   Could you tell me, this goes in through

14   the left anterior shoulder with no stippling?

15       A.   Yeah, right.

16       Q.   Does it perforate the skin and

17   subcutaneous tissue?

18       A.   Yes.

19       Q.   The upper edge of the scapula?

20       A.   Yes.

21       Q.   What is the scapula?

22       A.   The scapula is the butterfly shape on

23   the upper back.  It is the bone and the muscle

24   and the ligaments so it holds the arm up so

25   this type of bone.

B. Xu - Direct by Ms. Pellegrini

1      Q.   The direction of that bullet was

2   backward?

3      A.   Yes.

4      Q.   Now, gunshot wound which you labeled

5   number three is a penetrating gunshot wound of

6   the right trunk?

7      A.   Yes.

8      Q.   That enters the right lateral abdomen

9   with no stippling.  Could you show on your body

10  where it entered?

11     A.   I think the entrance like this area and

12  the bullet recovered here and that side of the

13  entrance wound.

14     Q.   So it goes into the skin and the

15  subcutaneous tissue.  It does not go into the

16  abdominal cavity?

17     A.   Right.

18     Q.   This is a close-up of that wound?

19     A.   Yes.

20     Q.   And in that wound you found a yellow

21  metal jacketed lead core bullet that was

22  recovered in the subcutaneous tissue?

23     A.   Yes.

24     Q.   The direction was frontward and

25  leftward?

B. Xu - Direct by Ms. Pellegrini

1        A.   Yes.

2        Q.   Gunshot wound that you labeled of the

3   right buttock, numbers four and five, I show

4   you Commonwealth Exhibit 520.  I'm sorry, I got

5   them out of order.  Give me one second.

6             MS. PELLEGRINI:  Your Honor, may

7   I have one moment, please?

8        Q.   Before we move on -- I mixed up my

9   exhibits up, sorry -- before I move on to the

10   gunshot wound to the right buttock, let's talk

11   about the right trunk again.  Show us where the

12   bullet wounds are?

13        A.   Here is that entrance wound, here.

14        Q.   I'm sorry, that was 520.  521 is a

15   close-up?

16        A.   Yes.  This is the entrance wound close

17   picture.

18        Q.   And 522, is this the yellow jacketed

19   lead core that was removed?

20        A.   Yeah.

21        Q.   A close-up?

22        A.   A different angle.

23        Q.   Of 523?

24        A.   Yeah.

25        Q.   Thank you, Doctor.  Now on the right

B. Xu - Direct by Ms. Pellegrini

1    buttock, there were two gunshot wounds numbers

2    four and five?

3         A.   Yes.

4         Q.   Commonwealth Exhibit No. 524?

5         A.   Yeah.  So here is the back, the lower

6    back.  Here is the right leg, left leg.  There

7    is the right buttock.  There is gunshot

8    entrance wound.

9         Q.   Right there?

10        A.   Yes, that is a closer view just to show

11   the two entrance wounds.

12        Q.   Did this penetrate the skin and

13   subcutaneous tissue and right pelvic muscular

14   tissue?

15        A.   Yes.

16        Q.   And exited the right groin?

17        A.   Yes.

18        Q.   Now the direction of that was

19   frontward.  You did not recover any bullet or

20   fragment?

21        A.   No.

22        Q.   It went in and went right back out?

23        A.   Yes.

24        Q.   Commonwealth Exhibit 526, could you

25   tell us what you're looking at here?

B. Xu - Direct by Ms. Pellegrini

1        A.    This is right groin, there are two

2    gunshot wounds.

3        Q.    That is showing what we looked at

4    earlier.  Now, you had a penetrating gunshot

5    wound of the left thigh?

6        A.    Yeah.

7        Q.    It is Commonwealth Exhibit No. 528 that

8    you found gunshot number six, you found a

9    gunshot wound of the left thigh, the left lower

10   anterior left thigh, no stippling?

11       A.    Yeah, right.

12       Q.    It perforated the skin and subcutaneous

13   tissue?

14       A.    Yes.

15       Q.    Is that a close-up?

16       A.    Yes.

17       Q.    Did you recover a gray metal bullet

18   fragment in the muscular tissue of the mid

19   thigh?

20       A.    Yes.

21       Q.    Is that the bullet fragments that you

22   recovered and that is 530?

23       A.    Yeah.

24       Q.    Is there a close-up, 531?

25       A.    Yeah.

B. Xu - Direct by Ms. Pellegrini

1      Q.   532?

2      A.   Yes.

3      Q.   And 533?

4      A.   Yes.

5      Q.   Now, did you find that there is a

6    penetrating gunshot wound of the left lower

7    leg?

8      A.   Yeah.

9      Q.   Could you show that to the jury?

10     A.   This entrance.

11     Q.   What is pseudo stippling?

12     A.   No stippling.

13     Q.   No stippling?

14     A.   No.

15     Q.   You have perforated the leg, it

16   perforated the skin and subcutaneous soft

17   tissue?

18     A.   Right.

19     Q.   And a close-up?

20     A.   Yeah, closer.

21     Q.   That is 535?

22     A.   Yeah.

23     Q.   Again, you recovered a gray metal

24   bullet fragment and subcutaneous tissue and

25   underlying entrance wound?

B. Xu - Direct by Ms. Pellegrini

1          A.   Yes.

2          Q.   That is 536?

3          A.   Yes.

4          Q.   537?

5          A.   Yeah.

6          Q.   538?

7          A.   Yes.

8          Q.   539?

9          A.   Yes.

10         Q.   Again, 540?

11         A.   This is a different angle of it.

12         Q.   And 541?

13         A.   Yes.

14         Q.   Now, you found some additional

15    injuries, correct?

16         A.   Yes.

17         Q.   What did you find on her left hand?

18         A.   On the right hand there is a

19    superficial defect.

20         Q.   Is that a close-up?

21         A.   Yes.

22         Q.   That would be 542 and 543?

23         A.   Okay, yeah.

24         Q.   Doctor, the ballistic evidence, the

25    yellow metal jacketed lead core that you

B. Xu - Direct by Ms. Pellegrini

1    recovered as well as the bullet fragments that

2    you recovered, did you have those packaged and

3    are they contained in Commonwealth Exhibit

4    No. 544?

5        A.  Yes.

6              MS. PELLEGRINI:  I move for the

7    admission of 544.

8              THE COURT:  Admitted without

9    objection.

10       Q.  Was this sent to the firearms section

11   for further examination?

12       A.  Yes.

13       Q.  What was the cause of death to Tina

14   Shelton?

15       A.  Multiple gunshot wounds to the head,

16   trunk, and extremities.

17       Q.  What was her manner of death?

18       A.  Homicide.

19       Q.  Do you hold those opinions to a

20   reasonable degree of medical certainty?

21       A.  Yes.

22              MS. PELLEGRINI:  I offer for

23   cross.

24              THE COURT:  Any questions?

25              MR. McKINNEY:  No questions.

W. Ennis - Direct by Ms. Pellegrini

1            THE COURT:  Thank you, Dr. Xu.

2            THE WITNESS:  Thank you.

3            THE COURT:  You are excused.

4            MS. PELLEGRINI:  The Commonwealth

5    calls Dr. Ennis.

6            THE COURT:  I want to thank you

7    for appearing in a timely fashion this morning

8    under difficult circumstances.  I know that you

9    come from all different parts of the county.

10   The challenges were different but you've been

11   extraordinarily diligent and patient.  I

12   certainly appreciate that as do the parties.

13                      -----

14            WILLIS ASHTON ENNIS,

15   a witness herein, having been first duly sworn,

16   was examined and testified as follows:

17                      -----

18            THE COURT:  My instructions as we

19   began with Dr. Xu as to the photographs

20   applies, of course, to this witness and any

21   ensuing witnesses.  Some of the photographs are

22   graphic and not necessarily pleasant to look

23   at.  They are admitted for one or both purposes

24   that I told you about yesterday, to help the

25   doctor explain his testimony as well as it may

W. Ennis - Direct by Ms. Pellegrini

1    relate to the specific intent to kill or malice

2    as I will define those terms for you during my

3    closing instructions.  Ms. Pellegrini.

4                        -----

5                  DIRECT EXAMINATION

6                        -----

7    BY MS. PELLEGRINI:

8        Q.   Good morning, Dr. Ennis.

9        A.   Good morning.

10       Q.   Could you please state your full name

11   and spell your last name for the court

12   reporter?

13       A.   Willis Ashton Ennis, E-N-N-I-S.

14       Q.   How are you employed?

15       A.   I work at the Allegheny County Medical

16   Examiner's Office.

17       Q.   What is your profession?

18       A.   Forensic pathologist.

19       Q.   Can you detail for the jury your

20   educational background and training?

21       A.   In order to become a forensic

22   pathologist, you have to go to a four-year

23   college or university.  During that time, it is

24   required that you do quite a bit of research,

25   volunteer work, et cetera to get into medical

W. Ennis - Direct by Ms. Pellegrini

1   school.  During that time I also received a

2   post baccalaureate in anatomy and neurobiology

3   after beginning in med school.  I spent four

4   years in med school which is standard.  Then to

5   a residency here at Allegheny General in

6   pathology which was also a four-year program.

7   After four years of pathology, I became

8   certified in anatomic pathology and clinical

9   and I began a year-long program which is a

10  fellowship.  After that I went to work in

11  Philadelphia for a year.  After I worked in

12  Philadelphia for a year, I worked for two years

13  in Kentucky both of those jobs being as a

14  forensic pathologist.  For the last four years,

15  it will be five this summer, I've been working

16  in Allegheny County.

17       Q.   Doctor, have you testified as an expert

18  in the field of forensic pathology?

19       A.   Yes, I have.

20       Q.   About how many times?

21       A.   I don't know, less than 50, probably

22  maybe 20.  I haven't been keeping count.

23            MS. PELLEGRINI:  I offer

24  Dr. Ennis for voir dire on his qualifications.

25            THE COURT:  He is accepted as an

W. Ennis - Direct by Ms. Pellegrini

1    expert without further inquiry.

2         Q.  Could you explain to us what forensic

3    pathology is?

4         A.  Certainly.  Forensic pathology has a

5    few different, it is the study of pathology for

6    court.

7         Q.  What is an autopsy, explain to the jury

8    what is the process when you examine a body and

9    why you do so?

10        A.  Sure.  Before we begin an autopsy, we

11   begin with a set of information.  We'll often

12   get that information from the police or we'll

13   get that information from investigators, maybe

14   we'll get medical records, but it usually

15   begins sort of a review with what is going on

16   with the case.

17             After that, we present ourselves to the

18   autopsy room where we begin by x-raying the

19   decedent.  We do an overall body x-ray to look

20   for metallic fragments and things such as

21   bullets or objects.  After the x-ray, we go to

22   the external examination.  We first review the

23   decedent with their clothes on should they come

24   with clothes.  Then we review the decedent

25   after the clothes have been removed.  And,

W. Ennis - Direct by Ms. Pellegrini

1    finally, again after they've been cleaned.

2           After the external examination, after

3    we look for signs of natural disease, et

4    cetera, we begin with the internal examination.

5    We form a Y shaped incision and remove the

6    skin, subcutaneous tissue, and abdomen and

7    chest plate exposing the internal organs from

8    the neck down.  Each organ is removed by the

9    technician and dissected by myself.  We remove

10   the scalp and skull.  We remove the brain and

11   dissect that as well.

12       Q.  Now, do you do this to determine the

13   cause of death of an individual?

14       A.  The cause and manner of death.

15       Q.  What are some types of causes of death?

16       A.  There are multiple different causes of

17   death, more than I can count.  They vary from

18   gunshot wounds to heart disease to car

19   accidents, things like that.

20       Q.  What are the manners of death that you

21   determine?

22       A.  Well, there are five.  We can determine

23   death to be homicide, suicide, accident,

24   undetermined, or other.

25       Q.  Did you examine the body of Brittany

W. Ennis - Direct by Ms. Pellegrini

1    Renee Powell?

2        A.  Yes, I did.

3        Q.  For the purposes of the record, I've

4    marked as Commonwealth Exhibit 545 your final

5    diagnoses regarding the body of Brittany

6    Powell.  Did you perform the autopsy on

7    March 10, 2016?

8        A.  Yes, I did.

9        Q.  Are your findings found at case

10   16CORNER1055?

11       A.  Yes, they are.

12       Q.  Is that your signature?

13       A.  Yes, it is.

14            MS. PELLEGRINI:  I move for the

15   admission for purposes of the record of 545.

16            THE COURT:  Admitted for such

17   purpose.  He is accepted as an expert without

18   further inquiry.

19            MS. PELLEGRINI:  May he step

20   down?

21            THE COURT:  Okay.  I thought I

22   already did that.

23       Q.  Doctor, in the process of determining

24   and doing your final diagnoses and drafting

25   your report, do you look at crime scene photos?

W. Ennis - Direct by Ms. Pellegrini

1      A.   Yes.

2      Q.   In this particular case, did you view

3   the photo of the rear porch of the residence at

4   1304 Franklin Avenue?

5      A.   Yes, I did.

6      Q.   Did the detectives identify the body of

7   Brittany Powell as being the body that was on

8   top of the other victims?

9      A.   As I remember it, yes.

10      Q.   She was pronounced deceased at the

11   scene?

12      A.   I believe so.

13      Q.   Now, we're going to begin with some

14   photographs.  You have the laser pointer there,

15   Doctor.  Roughly, is it fair to say she was

16   shot multiple times?

17      A.   Yes, it is.

18      Q.   Doctor, we're going to begin -- again,

19   we explained to the jury earlier the numbering

20   doesn't have to do with how they were

21   inflicted, just how you began to examine the

22   body.

23      A.   There is no physical finding to

24   determine the order of how the gunshot wound

25   was incurred.

W. Ennis - Direct by Ms. Pellegrini

1    Q.   We're going to begin with Commonwealth

2    Exhibit No. 546.  Could you begin to explain to

3    this jury exactly what you labeled as gunshot

4    wound of the posterior aspects of the head and

5    why did you use letters after each of these

6    wounds?

7    A.   Well, I used letters because there are

8    multiple gunshot wounds in this case and I

9    needed to keep them straight.

10   Q.   Could you describe the entrance wound?

11   A.   Certainly.  It is right here.  I

12   apologize, the image is a little blurry.  This,

13   I determined, to be the entrance of the gunshot

14   wound.  This is the decedent's head, it is to

15   the back of the head.

16   Q.   Doctor, once the gunshot entered the

17   head of the victim, tell us what happened, what

18   occurred.

19   A.   Sure, the bullet perforated the skin

20   and tissue beneath the skin on the back of the

21   head.  It went through the scalp and skull.

22   There is a layer around the brain called the

23   dura.  It perforated that and went through the

24   brain.  After it went through the brain, it

25   exited the dura on the other side.  Then it

W. Ennis - Direct by Ms. Pellegrini

1    went through the skull and subcutaneous tissue

2    and skin on the left side of the head and left

3    ear.

4         Q.  I'm going to show you Commonwealth

5    Exhibit 57.

6         A.  This is the exit wound from the gunshot

7    wound.  Here is the injury itself.  You can see

8    that it partially involves the ear and brain

9    matter here.

10        Q.  What was the direction?

11        A.  The direction of this gunshot wound is

12   back to front, right to left, and slightly up.

13        Q.  What associated injuries did you find?

14        A.  Well, there was hemorrhage around the

15   different layers, around the different

16   protective layers of the brain.  We discussed

17   one, dura.  There was also hemorrhage above the

18   dura, below the dura, and below another layer

19   of the dura.  There were multiple fractures of

20   the skull.  I use the term comminuted and

21   diastatic.  If you picture an eggshell and

22   there is a line, if you drop it, it breaks into

23   multiple pieces.  That is a comminuted

24   fracture.  Diastatic is those fractures that

25   involve the tissue line, when the skull plate

W. Ennis - Direct by Ms. Pellegrini

1    comes together.  When you tear those apart, you

2    have a diastatic fracture.  There are skin

3    lacerations between the left ear.  I'm afraid

4    you can barely see them.  Maybe here.

5    Hemorrhage and destruction along the bullet

6    pathway.

7        Q.  Would this have been a fatal wound?

8        A.  Yes.

9        Q.  Doctor, what you labeled as number two

10   which is shown at 548, could you describe what

11   you see here that you described as penetrating

12   and perforating gunshot wound of face, A and D?

13       A.  Yes.  And/or penetrating perforating.

14   So just ignore that until the next gunshot

15   wound.  We'll talk about this here.  It comes

16   in like this.  What you're seeing here is the

17   edge of it but what it has done is entered the

18   nostril and goes deeper into the face.  What

19   you might initially think is this is a small

20   injury but it is quite a large injury to the

21   skin.  The gunshot wound entered the left

22   nostril and the nasal septum, the dividing

23   portion of the nose, went through the skin and

24   subcutaneous tissue as well as cartilage around

25   the area.  It went through the bone on the top

W. Ennis - Direct by Ms. Pellegrini

1    of the jaw called the maxilla above the upper

2    teeth.  It went through the teeth on the right

3    side of the mouth and exited the subcutaneous

4    tissue and skin of the check, right here.

5        Q.  Doctor, I'm going to stop you there for

6    one second and come back to this photo in a

7    moment.

8        A.  Yes.

9        Q.  Commonwealth Exhibit 549, is this the

10   exit wound?

11       A.  Yes, it is.

12       Q.  Did you recover a deformed bullet

13   fragment and a gray bullet core?

14       A.  Yes, I did.  Now the thing to remember

15   is some of the bullets that were recovered are

16   from a high powered rifle.  What that means is

17   the bullet moves very fast, even more quickly

18   than this one.  With bullets, in general, they

19   create an area of destruction around just the

20   perforation of the bullet.  That is why bullets

21   do so much more damage.  If you picture a boat

22   going through the water, a boat leaves a wake.

23   As a bullet passes through a body, it leaves a

24   wake of destruction.  The destruction is wider

25   than the bullet's diameter.  You can see, given

W. Ennis - Direct by Ms. Pellegrini

1    the high speed, the wake of destruction created

2    a very large exit wound.  That is not

3    necessarily true for every gunshot wound in

4    this case.  One of the reasoning is because as

5    a bullet passes through a body, it can yaw and

6    turn and not pass straight through and create

7    more destruction.  By not passing more of the

8    bullet on, you can see the bullet exit is

9    large, it may be small.

10        Q.  We heard that in Tina Shelton there was

11   an intact bullet found in the body?

12        A.  Yes.

13        Q.  How can that happen?

14        A.  One of the scenarios where you might

15   find an intact bullet, where the bullet doesn't

16   strike something very hard, if you shoot a

17   bullet into water, it tends not to be deformed.

18   Subcutaneous fat or muscle may not deform a

19   bullet.  They do travel at such a high velocity

20   that it is possible that they do deform.

21   Ballistics is the study of how a bullet travels

22   through people.  There are a lot of

23   variabilities.  So sometimes the bullets do

24   deform, sometimes they don't.

25        Q.  What causes a bullet to fragment?

W. Ennis - Direct by Ms. Pellegrini

1      A.   The force.   The bullets are traveling

2    at exceptionally fast speeds.   These particular

3    types of bullets travel at exceptionally fast

4    speed.   They are going to likely strike bones,

5    they can destroy them or break them apart.

6    Passing through tissue can break them apart

7    because of their energy.

8      Q.   We are going to go back to Commonwealth

9    Exhibit 548.   Could you talk about the wound to

10    her chin?

11      A.   We have a perforating or penetrating

12    gunshot wound to the face.   Again, this is

13    gunshot wound B that exits at E.   This wound

14    and the wound through the face may have

15    deposited the fragment that we discussed

16    earlier.   But given the destruction is much

17    wider than the entrance an exit, given that

18    they overlap, I cannot determine given the

19    fragments were found basically in her mouth,

20    determine which gunshot wound left those

21    fragments.   So I labeled them under each

22    gunshot wound and made a note that it could be

23    from either.

24      Q.   We go to Commonwealth Exhibit 550.   Are

25    these the fragments that you were discussing?

W. Ennis - Direct by Ms. Pellegrini

1    A.  Yes, they are.  This is a fragment of

2    the copper color metal, the fragment of the

3    bullet core.

4    Q.  And 551?

5    A.  A picture of the same thing.

6    Q.  Now, moving on, Doctor, to 552?

7    A.  So this is one of many entrances that I

8    fortunately had to clump together in my autopsy

9    report.  If you remember, I discussed with you

10   how a boat travels through water and leaves a

11   wake of destruction.  A wake just like a bullet

12   passes through a person, it leaves a wake of

13   destruction.  The destruction could be often

14   very large or very small depending on the

15   bullet.

16        In the torso there were multiple bullet

17   wounds that overlapped and intersected.  So

18   when I did the autopsy, I opened up the body

19   and followed the path of the destruction from

20   the entrance and exit gunshot wound and try to

21   give the information as to where the bullet

22   traveled.

23        In the torso, in this lady, the areas

24   of destruction overlap so much that I do not

25   believe that you could confidently give exact

W. Ennis - Direct by Ms. Pellegrini

1    paths as they pass through the torso.

2    Essentially, when I opened up the body, I found

3    multiple rib fractures, multiple tears in the

4    tissue between the ribs, I found five tears in

5    the aorta, I found a hole in the esophagus.

6    The sac that holds the heart, which is a tissue

7    sac that holds the heart, there was a rupture

8    of that sac.  There was, as I described it, a

9    near complete pulpefaction of the heart.

10        Q.  Doctor, can I stop you for one second?

11    This is Exhibit 553.

12        A.  Yes, so that last entrance wound that

13    we saw and this one, this one, this one, and

14    this one, all of their parts co-mingled in such

15    a way I could not differentiate the wound path.

16    There was pulpefaction, I mean enough

17    destruction of the lung and the front of the

18    heart, they sort of lost their integrity.  So

19    the wound paths couldn't be delineated.  The

20    multiple perforations on the right side of the

21    diaphragm, laceration of the right kidney, the

22    magnification of the liver and blood in the

23    pleural cavities since there were tissue

24    separating the left and right pleural cavity

25    was compromised and blood in the entire chest.

W. Ennis - Direct by Ms. Pellegrini

1        Q.  Would this have been fatal?

2        A.  Yes.

3        Q.  To count, there were six of these

4   wounds here, correct?

5        A.  Yes.  I believe you're correct.

6        Q.  Doctor, I'm going to show you 554.

7   What are we seeing here?

8        A.  These are the exit wounds that I

9   managed to correlate with the exit wounds H and

10  K.

11       Q.  And 555?

12       A.  This is exit wound P on the arm.

13       Q.  And 556?

14       A.  This is II and JJ, sort of on the top

15  left of the back.

16       Q.  Did you recover a large, medium to

17  large caliber intact copper colored jacketed

18  bullet from the right pleural cavity?

19       A.  Yes.

20       Q.  Is that shown in Commonwealth

21  Exhibit 557?

22       A.  Yes, it is.

23       Q.  Doctor, could you describe for us what

24  the associated injuries were for all of these?

25       A.  Well, we discussed it before.  As I

W. Ennis - Direct by Ms. Pellegrini

1    said, there was the hemorrhage from destruction

2    along each of the paths where I could

3    differentiate them, multiple rib fractures,

4    perforation of the tissue between the ribs,

5    five tears into the aorta.

6        Q.  Let me stop you there.  What is the

7    aorta?

8        A.  The aorta is the main artery that comes

9    out of the heart to supply blood for the rest

10   of the body.

11       Q.  If you have a dissection of the aorta,

12   that is fatal?

13       A.  Yes.

14       Q.  Were you able to determine the

15   direction of all of these wounds?

16       A.  Well, in total, I believe that my

17   determination was that they were right to left

18   and slightly up but, of course, I had to look

19   at the mass of the gunshot wounds together.

20       Q.  At Commonwealth Exhibit 558, describe

21   these gunshot wounds for the jury.

22       A.  So this is a gunshot wound that I could

23   separate from the rest of them.  It is on the

24   side of the right breast, on the outside of the

25   right breast.  If you could go to the next

W. Ennis - Direct by Ms. Pellegrini

1    slide?

2         Q.   This would be 559?

3         A.   Yes.  This is the exit from that

4    gunshot wound.  Essentially, this bullet passed

5    through only the soft tissue of the breast.

6         Q.   What you labeled as perforating gunshot

7    wound here of the abdomen, what do you see in

8    560?

9         A.   This is also a perforated gunshot wound

10   but this time to the left breast.

11        Q.   I'm sorry, that was my mistake.  To the

12   left breast?

13        A.   Yes.

14        Q.   Did this, again, perforate just the

15   tissue?

16        A.   Yes.

17        Q.   Again, you found hemorrhage and

18   destruction along the wound pathway?

19        A.   Yes.

20        Q.   Commonwealth Exhibit 561?

21        A.   This is the exit from gunshot wound J,

22   on the outside of the left breast.

23        Q.   And now moving on to the abdomen.

24        A.   Yes.

25        Q.   Could you describe what we're seeing

W. Ennis - Direct by Ms. Pellegrini

1    here?

2        A.   This is a gunshot wound to the right

3    lower abdomen.  It traveled through the

4    subcutaneous fat coming to rest in the

5    subcutaneous tissue fat in the top left of the

6    belly or the abdomen.  There is the bullet that

7    I recovered.

8        Q.   That is 563 and that is a medium to

9    large caliber copper colored jacketed bullet

10   from the left upper quadrant of the abdomen?

11       A.   Yes.

12       Q.   Is that a close-up, sir?

13       A.   Yes, it is.

14       Q.   Moving on to 570, what do we see in

15   570?

16       A.   So we're going to start with LL.  Here

17   is the gunshot wound.  I call it a distal

18   bottom right side of the back.  It traveled

19   through the skin and subcutaneous tissue and

20   subcutaneous fat only perforating the soft

21   tissue.  If you skip to the next one?

22       Q.   571.

23       A.   Here is the soft tissue of the back

24   where it exits.

25       Q.   Let me back up for one second, okay,

W. Ennis - Direct by Ms. Pellegrini

1    because I want to correct the record.  I'm

2    going to back up here for a moment.  I labeled

3    this as 569 because I can't read my own

4    handwriting.  It is 564.  The next photo,

5    Doctor, is 565.  Then advancing again, 566 and

6    567.

7        A.   Yes.  This is a good time to stop

8    because the next gunshot wound is MM and NN.

9    Essentially, you can see the path here.  We are

10   not all square, we are rounded, so it passed

11   through the soft tissue in this direction on

12   what we might call the right flank or toward

13   the back.

14       Q.   Moving on to 568?

15       A.   This gunshot wound to the right

16   buttock, O.

17       Q.   And Commonwealth Exhibit 569?

18       A.   It is exit here.

19       Q.   Now, what is shown in 570?

20       A.   Well, the first one I think we should

21   talk about is the one I labeled EE.  This is a

22   perforation of mons pubis which is the fat

23   between the protuberance of the soft tissue of

24   genitalia and the abdomen.  Here is the exit

25   wound for that gunshot wound where it

W. Ennis - Direct by Ms. Pellegrini

1    essentially traveled through soft tissue of the

2    hip.

3        Q.   Now, you found gunshot wounds of the

4    right arm, correct?

5        A.   Yes.

6        Q.   572?

7        A.   Yes.  So there were three entrance

8    gunshot wounds to the right arm, XX, VV, and

9    WW.  Once again, these gunshot wounds, much

10   like the one of the abdomen area, caused

11   destruction and overlapped and difficult to

12   differentiate.  In my autopsy report I brought

13   them together much like I did in the torso.  So

14   there were also an exit wound.  The right arm

15   was isolated in such a way these three gunshot

16   wounds caused the exit wound.  We found a

17   bullet inside the arm so my thought is that one

18   of the bullets fragmented and created two exit

19   gunshot wounds leaving three in, three out, one

20   bullet in.

21       Q.   Now, moving ahead to 573, could you

22   explain what you're looking at here?

23       A.   You can see here the gunshot exit

24   wounds are much larger.

25       Q.   Is this a close-up of the exit wounds?

W. Ennis - Direct by Ms. Pellegrini

1      A.  Yes.  The first two pictures, the first

2   two exit wounds, this is the final one.  These

3   bullets perforated the skin and soft tissue of

4   the right arm and shoulder and struck the

5   humerus, the large bone.

6      Q.  You began to describe that you found a

7   large intact copper colored jacketed bullet

8   from the right arm?

9      A.  Yes.

10      Q.  Is that at 575?

11      A.  Yes.

12      Q.  Again at 576?

13      A.  Yes.

14      Q.  Now, moving along to the left forearm

15   at 577.

16      A.  Yes.  The entrance was here passing

17   through the forearm and exiting at R.  Now

18   there were two bones.  The long bone is called

19   the radius.  This bullet struck and fractured

20   the radius leaving two very deformed fragments

21   of bullet core.

22      Q.  And 578?

23      A.  Yes.

24      Q.  And then a close-up?

25      A.  Yes.

W. Ennis - Direct by Ms. Pellegrini

1    Q.   And 580?

2    A.   Yes.

3    Q.   Now, moving along to 581, what are we

4    looking at here?  Actually, if you could go

5    back to the picture with the mons pubis, that

6    is the entrance wound for this exit?

7    A.   So entrance wound U led to exit here on

8    the right thigh only striking soft tissue.

9    Q.   Now, moving on to 582.

10   A.   Here we have an entrance and exit

11   gunshot wound of the right leg, the entrance

12   being W and the exit being here.

13   Q.   And then at 583?

14   A.   Entrance and exit of the left thigh,

15   entrance being AA and exit being Y.

16   Q.   And then what you've labeled at 584?

17   A.   Entrance wound to the left thigh.

18   Q.   Commonwealth Exhibit 585?

19   A.   Here we have entrance and then exit of

20   the left leg.

21   Q.   Then did you find additional bullet

22   fragments?

23   A.   Yes, I can explain those if you move

24   forward.  Here we have some bullet fragments

25   first from the hair of the decedent.  Before we

W. Ennis - Direct by Ms. Pellegrini

1    start the autopsy, we go through the body very

2    closely and look for any sort of evidence.

3    This is some of the evidence that we did find

4    in her hair.

5        Q.   I'm going to forward you to 587?

6        A.   This is the picture of where we found

7    the next set of bullet fragments on the

8    external surfaces of her body, between the back

9    and between the skin and shirt.  This is the

10   right shoulder and her face.

11       Q.   That is a close-up?

12       A.   Yes.

13       Q.   Close-up again at 589?

14       A.   Yes.

15       Q.   And 590?

16       A.   This is a picture of the copper colored

17   bullet jacket that was in the right sleeve of

18   her clothing.

19       Q.   That is the close-up?

20       A.   Yes.

21       Q.   Doctor, I'm going to show you what I

22   marked as Commonwealth 592.  All of the

23   ballistic evidence that you recovered from the

24   body and the clothing of Brittany Powell, are

25   they contained within 592?

W. Ennis - Direct by Ms. Pellegrini

1      A.  I can open it up and see.

2      Q.  Sure.

3      A.  I believe so.  These are envelopes that

4  probably contain my envelopes.  They are

5  labeled according to the way we label them in

6  my office.

7      Q.  The items that you recovered at

8  autopsy, they were then forwarded on to the

9  firearms section, correct?

10     A.  Yes.

11     Q.  So your envelope would have been placed

12 in additional envelopes after examination?

13     A.  Yes.

14          MS. PELLEGRINI:  I move for the

15 admission of 592.

16          THE COURT:  Admitted without

17 objection.

18     Q.  Finally, Dr. Ennis, do you have an

19 opinion as to the cause of death of Brittany

20 Renee Powell?

21     A.  Yes.  I use the term that she died as a

22 result of multiple gunshot wounds.

23     Q.  What was the manner of death?

24     A.  Homicide.

25     Q.  Do you hold those opinions to a

V. Costa - Direct by Mr. Chernosky

1    reasonable degree of medical certainty?

2        A.  As I understand that statement, yes.

3            MS. PELLEGRINI:  With that, I

4    offer for cross.

5            MR. McKINNEY:  No questions, Your

6    Honor.

7            THE COURT:  You are excused,

8    Doctor.  Thank you.  Call your next witness.

9            MR. CHERNOSKY:  The Commonwealth

10   calls Detective Costa.

11            -----

12            VENERANDO COSTA,

13   a witness herein, having been first previously

14   duly sworn, was examined and testified as

15   follows:

16            -----

17            DIRECT EXAMINATION

18            -----

19   BY MR. CHERNOSKY:

20       Q.  I apologize, I demoted you in rank.

21   Lieutenant Costa.  During your participation in

22   the Wilkinsburg investigation, did you request

23   to get a search warrant for a Kyocera cell

24   phone?

25       A.  I did.

V. Costa - Cross by Mr. McKinney

1      Q.   What date was that?

2      A.   March 28th, I believe.  I'm not sure of

3    the date I authored the search warrant but I

4    know the day I served it.

5      Q.   Where was the Kyocera cell phone

6    recovered from?

7      A.   Channel Falls's purse.

8      Q.   At the time, were you aware of a

9    battery for a Kyocera cell phone from Cheron

10   Shelton?

11     A.   I was.

12     Q.   Did you provide that to Matthew

13   Rosenberg for processing?

14     A.   Yes.

15     Q.   What was the contact number?

16     A.   (412) 689-2889.

17            MR. CHERNOSKY:  No further

18   questions.  I offer for cross.

19            THE COURT:  Any questions?

20               -----

21            CROSS-EXAMINATION

22               -----

23   BY MR. McKINNEY:

24     Q.   Detective, the battery that was

25   recovered, did you actually recover that

V. Costa - Cross by Mr. McKinney

1    yourself?

2         A.   I do not believe so.

3         Q.   Do you know who recovered that battery?

4         A.   I do not.

5                   THE COURT:  Anything else?

6                   MR. McKINNEY:  No additional

7    questions.

8                   THE COURT:  Anything else?

9                   MR. CHERNOSKY:  No further

10   questions.

11                  THE COURT:  Thank you, Detective

12   Lieutenant.

13                  MR. CHERNOSKY:  Your Honor, may

14   we approach?

15                  (Sidebar discussion held as

16   follows.)

17                  MR. CHERNOSKY:  Your Honor, the

18   remaining witness for today is the records

19   custodian from T-Mobile.  His flight was

20   delayed till 11:06.

21                  THE COURT:  When is he to get

22   here?

23                  MR. CHERNOSKY:  11:06 is when he

24   lands.  That will be our last witness for

25   today.

V. Costa - Cross by Mr. McKinney

1           THE COURT:  Okay.  I'll let the

2     jury go and we'll talk.

3           (Sidebar discussion concluded.)

4           THE COURT:  Ladies and gentlemen,

5     you have an early lunch today.  We have, at

6     least, one more witness today.  You can also

7     look forward to going home early today.  We

8     have testimony that is set for Monday.  Those

9     witnesses cannot be here until Monday.  We have

10    another witness who is on his way, so to speak.

11    He will not be here for some period of time.

12    So you will have your luncheon recess, it will

13    be a long one.  I ask you to be back at 1:00.

14    So your lunches have been ordered.  They will

15    be here at 12:00.  During that period of time,

16    you are free to come and go as you please.

17    Stay off the third, fourth, and fifth floors of

18    this building.  Remember my instruction not to

19    talk about the case and discuss the case with

20    anyone including your fellow jurors until such

21    time you are charged with that responsibility

22    at the very end of the case.

23          Remain seated and quiet as the jury

24    leaves the room.

25

V. Costa - Cross by Mr. McKinney

```
 1                        -----
 2              (Open court - Jury not present.)
 3                        -----
 4              THE COURT:  We'll reconvene at
 5    12:30.  We will start to address the motion
 6    most recently filed on behalf of the defense,
 7    second motion for extraordinarily relief and
 8    disqualify the Allegheny County District
 9    Attorney's Office.
10              MS. PELLEGRINI:  Your Honor, at
11    some time today you will have reviewed the
12    pictures for Monday?
13              THE COURT:  Right.
14              MS. PELLEGRINI:  Okay, thank you.
15              THE COURT:  We'll do that at
16    12:30, too.
17              MS. PELLEGRINI:  Thank you.
18                        -----
19              (Luncheon recess taken.)
20                        -----
21              THE COURT:  I denied your motion
22    at 12:30.  Do you have your witness available?
23              MR. CHERNOSKY:  He is in the
24    hallway.
25              MS. WILLIAMS:  Sir, I don't think
```

J. Sierra - Direct by Mr. Chernosky

1    I heard you.

2               THE COURT:  I told you to be back

3    at 12:30.

4               MS. WILLIAMS:  We were in Judge

5    Cashman's.  He asked us to come.  He wanted

6    both parties there to accept the sealing of the

7    exhibits to the motions because there were

8    three exhibits filed and requested under seal

9    and the clerk sent us for --

10              THE COURT:  Okay, that is

11   acceptable.  I'll reopen the matter at the

12   jury's convenience.

13                    -----

14             (Open court - Jury present.)

15                    -----

16              THE COURT:  Mr. Chernosky.

17              MR. CHERNOSKY:  Your Honor, at

18   this point the Commonwealth would call Joseph

19   Sierra.

20                    -----

21                 JOSEPH SIERRA,

22   a witness herein, having been first duly sworn,

23   was examined and testified as follows:

24                    -----

25

J. Sierra - Direct by Mr. Chernosky

1                          -----

2                  DIRECT EXAMINATION

3                          -----

4    BY MR. CHERNOSKY:

5         Q.   Mr. Sierra, could you state your first

6    and last name and spell your last name for the

7    court reporter?

8         A.   Joseph Sierra, S-I-E-R-R-A.

9         Q.   How are you currently employed?

10        A.   T-Mobile USA, Incorporated as a

11   custodian of records.

12        Q.   How long have you been employed with

13   T-Mobile, Incorporated?

14        A.   Just over ten years.

15        Q.   Have you been employed that entire time

16   as a custodian of records?

17        A.   Yes.

18        Q.   Could you tell the jury, first, what

19   T-Mobile, Incorporated is?

20        A.   It is a telecommunications company.

21        Q.   What services do they provide?

22        A.   We provide cellular service to cell

23   phones, data devices, as well as a few other

24   products.

25        Q.   Does T-Mobile also serve as a retailer

J. Sierra - Direct by Mr. Chernosky

 1    of cellular phones?

 2        A.  Yes.

 3        Q.  What, in general, is a custodian of

 4    records?

 5        A.  As a custodian, I travel across the

 6    United States to enter telecommunications

 7    records as evidence at trials.

 8        Q.  You've been doing that exclusively for

 9    ten years?

10        A.  Yes.

11        Q.  Pursuant to your subpoena to be here

12    today, did you review cell phone records for a

13    phone number 412-892-0447?

14        A.  Yes, I did.

15        Q.  I'm going to show you what has already

16    been marked as Commonwealth Exhibit 872.  I

17    just ask you to glance at these.  Do you

18    recognize that document?

19        A.  Yes, I do.

20        Q.  What is that?

21        A.  This is going to be subscriber

22    information and call detail records for phone

23    number (412) 892-0447 as well as the

24    certification to the authenticity of these

25    records.

J. Sierra - Direct by Mr. Chernosky

1    Q.  Are those authentic T-Mobile records?

2    A.  Yes.

3    Q.  I'm going to show you what has already

4   been marked as Commonwealth Exhibit 478.  Take

5   a glance at these.  Do you recognize what that

6   document is?

7    A.  Yes, I do.

8    Q.  What is that?

9    A.  This is going to be a certification

10  letter and call detail record with cell site

11  information for (412) 378-3461.

12    Q.  Are those authentic records?

13    A.  Yes.

14    Q.  Could you give the jury an idea for

15  information that is contained in cell phone

16  records from T-Mobile?

17    A.  So the cell phone record aspect is

18  going to be essentially what you see in your

19  cell phone bill, the date, the time, the number

20  communicated with, the type of transaction, and

21  the duration for voice transactions.  Call

22  detail records with cell site information is

23  just an expanded call detail record.  It

24  includes the antenna that broadcasted the

25  signal that communicated with your cell phone

J. Sierra - Direct by Mr. Chernosky

1    as well as the call detail information.

2        Q.  What is the purpose for maintaining,

3    for T-Mobile to maintain, that second bit of

4    information that you just testified to?

5        A.  The purpose of keeping the cell site

6    information is so that we have a better

7    understanding of how our customers utilize our

8    network.  If we know what cell tower you

9    connected to at the beginning and ending of

10   your phone call, we know usage, and if we know

11   that, we know where to provide antennas to

12   provide better service to our customers.

13       Q.  I show you what I will mark as

14   Commonwealth Exhibits 593 through 597 and ask

15   you, in general terms, are those representative

16   of the first ten calls in the records for

17   (412) 892-0447?

18       A.  Yes.

19           MR. CHERNOSKY:  Your Honor, I

20   move for the admission of Commonwealth

21   Exhibits 593 through 597.

22           THE COURT:  Admitted without

23   objection.

24       Q.  Directing your attention to Exhibit 593

25   on the screen behind you, in reference to

J. Sierra - Direct by Mr. Chernosky

1    Exhibit 593, could you take us through the

2    first column of the call detail records, what

3    information is provided there?

4        A.   Yes.   So starting from the left going

5    to the right, the first column is going to be

6    the date, this is going to be the date that the

7    transaction occurred.   The next column is going

8    to be the time.   This is recorded in military

9    UTC time so a 24-hour period.   UTC is

10   coordinated universal time.   It is a standard

11   time.   It is not a time zone in and of itself.

12   It has the same starting point as GMT,

13   Greenwich Mean Time.   In order to understand

14   the difference in time between UTC starting

15   point and the time zone you're in, it is

16   basically counting how many time zones are in

17   between.   Again, the starting point of the UTC

18   is the Greenwich Mean Time.   Going from there,

19   the eastern time zone is five time zones to the

20   left.   So you need to subtract five from the

21   UTC in order to get the time here in

22   Pittsburgh.   So, for example, let's just use

23   this.   17:44 is one of the timestamps.   You

24   subtract five.   That would be noon.   So the

25   time here in Pittsburgh would be 12:44 p.m.

J. Sierra - Direct by Mr. Chernosky

1    just as an example.

2        Q.  Directing your attention to column

3    number three, what information is contained in

4    this column?

5        A.  This is going to be duration.  This is

6    going to be the length of the transaction

7    measured in seconds.  Now the only caveat for

8    this is that you will see here in the call type

9    column, this column allows us to know what type

10   of transaction occurred, whether a voice

11   message or a text message.  Any time you see in

12   the call type column SMS, that would be a text

13   message and you have a duration of 60 seconds.

14   So whenever you see this phrase SMS and MSC, as

15   we see multiple times in this record, that

16   means a text message went through the switch

17   and the duration is 60 seconds because

18   60 seconds is equal to one minute or one text

19   message.  As I previously stated, call type

20   just let's me know whether it is a voice call

21   or a text message.  Anything that doesn't have

22   the phrase SMS in it or the 60 second duration

23   is going to be a voice transaction.  Now to

24   know whether it is an incoming or outgoing

25   transaction is the next column, direction.

J. Sierra - Direct by Mr. Chernosky

1          The next column is calling number.
2   This allows us to know what number placed that
3   transaction.  The column after that is the
4   dialed number.  This is the number that was
5   entered into the handset.  Called number is the
6   receiving party.  And destination number is the
7   true or translated number.  So, essentially,
8   the dialed number, called number, and
9   destination number on most occasions will have
10  the same exact information across all three
11  columns.  The reason we split it up into three
12  different sections is because of the fact that
13  you could have certain situations like speed
14  dial occur.

15          Just to use that as an example, let's
16  say your cell phone number is placing a call,
17  you have a calling number.  You're trying to
18  call your home phone but you decide to use
19  speed dial.  Let's say your home phone number
20  is speed prompt number two.  So in the calling
21  column you have your cell phone number, in the
22  dialed number you would see a two or pound two,
23  the same for the called number, but in the
24  destination number you would see your whole
25  home phone number because that is the true or

J. Sierra - Direct by Mr. Chernosky

1    translated number, that is ultimately what you

2    were connected to.

3         The last column on this page is IMSI,

4    the International Mobile Subscriber Identifier.

5    This is a lot like your social security number

6    on the T-Mobile network.  This identifies the

7    subscriber no matter what changes they make.

8    In T-Mobile, since we utilize SIM cards, you

9    can take out your SIM card and put it into a

10   new phone, you can change your phone number,

11   you can change your device, you can change the

12   type of plan you have.  Because of all these

13   changes, we need one number that identifies

14   you.  Like your social security number, you can

15   change your address or your name but your

16   social security number is always your social

17   security number.

18       Q.  Can I back you up a little bit?  In the

19   column marked dialed number there are some

20   places that are blank.  Is that because that is

21   an incoming call and therefore you didn't dial

22   a number?

23       A.  Well, it can show in the record as

24   blank but it really depends on the technology

25   because whether it's a 3G tower or a 4G tower,

J. Sierra - Direct by Mr. Chernosky

1    these are just satellite technologies,

2    information can be captured in a little bit of

3    a different way but typically it will be

4    because of the fact it is an incoming

5    transaction as well as text messages don't

6    necessarily need to have dialed numbers because

7    you are necessary dialing it, you are sending a

8    message.

9        Q.   Now, taking us away from the first ten

10   calls just briefly, directing your attention to

11   the call on Commonwealth Exhibit 594, that top

12   call indicates in the call type column a

13   terminating call and a call forwarding, what is

14   going on when you see those two designations?

15       A.   So these records are utilized by our

16   engineers.  As you can see, this is different

17   than what a typical phone bill looks like.  The

18   information we see here is every literal action

19   a cell phone makes when placing a call.  So if

20   you are receiving a phone call and then it goes

21   to voicemail, that is a two-step process.  So

22   your phone starts to ring, after 30 seconds it

23   gets kicked to voicemail or you manually put it

24   to voicemail, and then an outgoing call goes

25   from your cell phone to the voicemail box.

J. Sierra - Direct by Mr. Chernosky

1    This is what we see here, first the incoming
2    call going to the target number, 0447, followed
3    by an outgoing call showing the user who is
4    calling going to (805) 637-7249.  That is
5    T-Mobile's voicemail number.  Anytime you see
6    this number, that means that contact in the
7    calling number is being pushed to voicemail.
8    That is what we see here.
9        Q.  Directing your attention to the two
10    calls below that, the call type there is listed
11    as MOC and MTC, what do those stand for?
12        A.  This is going to be mobile originating
13    call, and mobile terminating call.  Just as an
14    example using the same page, you see MS
15    terminating and you see MTC.  They both show
16    incoming.  It just means it is an incoming
17    voice call.  Previously I spoke about the
18    differences in technology, MS terminating is
19    utilized by 3G technology.  MTC is utilized by
20    4G technology.  It means the same exact thing,
21    incoming voice call, it is just the technology
22    hardware reads the information slightly
23    different.
24        Q.  Now directing our attention back to the
25    first ten calls in those records for

J. Sierra - Direct by Mr. Chernosky

1    demonstrative purposes, could you tell us what

2    the next column maintains?

3        A.   The next column is the IMEI, the

4    International Equipment Mobile Identifier.

5    This is a lot like your VIN number for your

6    car.  This is the serial number for your cell

7    phone.  It is unique to every single device.

8            The next column is completion code.

9    This is, again, an engineering report.  This

10   just talks about the default pathway that a

11   cell phone goes through which through our

12   network your cell phone connects to a cell

13   tower, a cell tower to a base station, a base

14   station to a switch, a then the switch to the

15   public telephone system.  If it is a landline,

16   it goes from the public telephone system

17   straight to the landline.  If it's another cell

18   phone, it will go to -- let's just say AT&T, if

19   you are calling an AT&T customer, it will do

20   the same process in the inverse, AT&T switch,

21   AT&T base station, AT&T tower to the AT&T

22   customer.  That is a default pathway of a cell

23   phone call from cell phone to cell phone and as

24   I previously stated from cell phone to

25   landline.  In the event it travels a different

J. Sierra - Direct by Mr. Chernosky

1    way, that is where you see an abnormal

2    completion.  For example, voicemail is an

3    example of abnormal completion.  Call-waiting

4    is an example of abnormal completion.

5    Conference call, abnormal completion because of

6    the fact that you had something occur other

7    than the default one-to-one connection.

8        Q.  The next category?

9        A.  It is going to be answered.  This just

10    lets us know whether the call was answered by

11    the network or not.  A caveat of this is

12    voicemail, can't show as answered because it

13    was answered by the network.

14        Q.  What is listed in the fourth column on

15    that page?

16        A.  The next column is service code.  This

17    will allow us to know more about what occurred

18    during that phone call.  So I gave a few

19    examples before, call-waiting, conference call.

20    This will show up here numerically.  If it was

21    pushed to voicemail, that would also show

22    numerically.  For example, 29, call forward

23    mobile subscriber busy.  If you saw 29 in this

24    column, that would mean it was pushed to

25    voicemail either because the user was on the

J. Sierra - Direct by Mr. Chernosky

1    phone or manually hit the ignore button, I

2    guess you could say, and was pushed to

3    voicemail.

4         The next column is the disconnecting

5    party.  This just allows us to understand based

6    off of the network who initiated disconnection

7    of that transaction.

8         Service indicator, this is always going

9    to be blank.  The same with SMS delivery

10   status.  This is if it is an SMS record, it is

11   not, it is a call detail record so this

12   information will always be blank in this.

13        The next column is the switch name.

14   The switch is essentially what I explained

15   before, it is part of the cell phone's default

16   pathway.  It holds two functions; one, to route

17   the call to its destination; the second, to

18   forward the information to billing.  So all the

19   information we've seen previous to this, the

20   date, time, number communicated with, that gets

21   forwarded to our billing systems by the switch.

22   The switch is basically named after major

23   cities.  So, for example, NV is Nashville, NY,

24   New York, PT, Pittsburgh, et cetera.

25        Q.  Directing your attention to the next

J. Sierra - Direct by Mr. Chernosky

1    slide?

2       A.   This entire page is now going to be

3    your cell site information.  These are going to

4    be unique identifiers for the cell towers,

5    their numerical identifiers as well as the

6    details for that tower, where it is located,

7    what direction it is facing, et cetera.

8           So the first column we have here is the

9    first LTE site ID.  LTE is 4G technology.  If

10   it was utilizing a 4G tower, this column would

11   be filled.  In this case it looks like we're

12   utilizing 3G towers so we have the next two

13   columns filled.  We have the first LAC.  This

14   is the first location area code.  Think of the

15   LAC as kind of like your zip code or area code

16   of your phone number.  It allows you to

17   establish a geographical region.  The first LID

18   think of like your street address.  It

19   identifies the actual location within that

20   geographical region.  For example, Martin

21   Luther King, Jr. Boulevard, right, there is one

22   of those in pretty much every major city.  In

23   order to know it is Martin Luther King, Jr.

24   Boulevard in Pittsburgh as opposed to New York,

25   Florida, California, I would need to look at

J. Sierra - Direct by Mr. Chernosky

1    the LAC for the region and the LID would tell

2    me where it was located on MLK Boulevard.

3              The next column is going to be the

4    first tower azimuth.  This allows us to know

5    the direction that the tower is facing.  So

6    here is where a little geometry comes into

7    play.  Each tower typically covers 360 degrees,

8    a full circle, a radius.  If I know the

9    azimuth, I know which direction the center of

10   that antenna is facing.  So if it is zero, I

11   know that antenna is facing due north.  If it

12   is 90 degrees, east; 180, south, et cetera.

13   For example -- I actually cannot tell.  It is a

14   little blurry what that number is.

15        Q.  Let me show you the physical exhibit of

16   597.

17        A.  Okay, so the azimuth listed here is 195

18   so technically that would be south, southwest.

19   The next we have first tower lat and first

20   tower long.  Just like these two, it is a

21   combination number.  The latitude and longitude

22   is a geographical location on planet earth.

23   This information allows us to basically put it

24   into any mapping software, Google Maps,

25   MapQuest, actual mapping like Microsoft streets

J. Sierra - Direct by Mr. Chernosky

1    and trips and you can find the location where

2    the antenna located.  Anybody can do it.  It is

3    fairly simple.  You take this information, put

4    it into Google Maps, separate it by a comma and

5    you have the location.  To make it even easier

6    for people, we provide the actual

7    administrative address or a property address of

8    where the tower is located which is what we see

9    here with first tower address, first tower

10   city, first tower state, and first tower zip.

11       Q.  Now I refer you to 197.

12       A.  197 is actually going to be the same

13   information but the last tower.  If you recall

14   previously I stated that we captured the

15   beginning and ending tower to understand where

16   our customers come and go.  It is going to be

17   the same information, the cell site ID, LAC,

18   SID, azimuth, latitude, longitude, and address

19   but for the tower at the end of the call or the

20   text message.

21       Q.  For example, if you were to start a

22   phone call in one location and end a phone call

23   in another location, where would that, how

24   would that data be reflected?

25       A.  You would see a difference in the

J. Sierra - Direct by Mr. Chernosky

1    actual cell tower.  Let's say, for example, I'm

2    in Los Angeles and I decide to drive to Las

3    Vegas.  We are looking at about a four- to

4    five-hour drive.  I'm on the phone the whole

5    time.  I will see the beginning of that phone

6    call starting at a cell tower in Los Angeles

7    and end at a cell tower in Las Vegas.  These

8    cell towers are pretty short range.  They

9    usually have a maximum radius of two-and-half

10   to three miles.  That is what we tune our

11   towers to maximum.  As you get into our urban

12   environments, those ranges decrease, but the

13   maximum range is two-and-a-half to three miles.

14   So if you see a significant difference in

15   distance between two points, you can assume

16   that that cell phone is traveling.

17        Q.  In the example that you just gave from

18   L.A. to Las Vegas, the towers you hit in

19   between there, so the middle towers, for lack

20   of a better term, are they recording at all?

21        A.  No, we do not collect intermediate

22   towers.

23        Q.  Is that the technical term for towers

24   in the middle?

25        A.  Yes.

J. Sierra - Direct by Mr. Chernosky

1    Q.   I want to direct you back to azimuth

2    information.   What would be the situation if

3    there was no azimuth recorded in the record?

4    A.   If it is blank, that would technically

5    be a byproduct of Excel.   We send these files

6    in a locked Excel format so Excel doesn't, by

7    default, record zeros so we would assume that

8    the azimuth is a zero if it's blank.

9              MR. CHERNOSKY:   No further

10   questions.   I offer for cross.

11             MR. McKINNEY:   No questions, Your

12   Honor.

13             THE COURT:   Thank you.   You are

14   excused.   Anything else that we can do with the

15   jury in the box today?

16             MR. CHERNOSKY:   No, Your Honor.

17             MR. McKINNEY:   No, Your Honor.

18             THE COURT:   Okay.   You will

19   receive an early out today.   Be back Monday

20   morning at 9:00.   Please remember my order not

21   to talk about the case between yourselves or

22   any member of your family, friends, et cetera.

23   Also do not read any media accounts, print, TV,

24   or internet.   You've come a long way.   Don't

25   compromise your oath at this juncture.   Of

Motion

1    course, we are relying on you.

2             Remain seated and quiet while the jury

3    leaves the room.

4                          -----

5             (Open court - Jury not present.)

6                          -----

7             THE COURT:  Is there anything

8    that we can address on this most recently filed

9    motion today?

10            MR. McKINNEY:  Yes.

11            THE COURT:  I'm not asking you to

12   do so.  From your perception?

13            MR. CHERNOSKY:  Your Honor, we

14   can begin to address it.  I don't know if we

15   will be able to completely address it today.

16            THE COURT:  Well, we'll get done

17   what we can get done.  We'll keep Mr. Shelton

18   here.  Tell him he can release the jurors but

19   to give them instruction to immediately leave

20   the building.

21            First, as to the photograph that will

22   be used in conjunction with the testimony on

23   Monday from the pathologist as to Mr. Jerry

24   Shelton, first and foremost, I note that there

25   are -- from my perception there are surviving

Motion

```
 1    family members that may be part of the Powell
 2    and/or Shelton family.  I'm not going to show
 3    these photographs but I'm going to refer to
 4    them bluntly in order to make my ruling.  So if
 5    you do not want to hear that, please remove
 6    yourself from the courtroom.  My apologies to
 7    you in that regard but, again, this is legally
 8    necessary.
 9         First, as to Mr. Jerry Shelton, I
10    received a packet of photographs.  As I did
11    with the earlier photographs, I numbered them
12    for purposes of discussion in Mr. Shelton's
13    case 1 through 33.  I've distributed those
14    photographs to the parties.  As to my number
15    one --
16         MS. PELLEGRINI:  Excuse me, Your
17    Honor, I don't believe that we received them.
18         THE COURT:  You don't have them?
19         MS. WILLIAMS:  No, sir.
20         THE COURT:  As to the other
21    matter you referenced in your motion, filings
22    that were done under seal and also to explain
23    why you were late for this afternoon's
24    proceedings which I have excused, of course,
25    but were those filings done in front of Judge
```

Motion

1    Cashman as acting administrative judge?

2              MR. McKINNEY:  Yes.

3              THE COURT:  As to Mr. Shelton, my

4    number one, the Court finds that

5    non-inflammatory.  It will be admissible.

6    Similarly with my Exhibit Nos. 2, 3, 4, 5, 6.

7    As to 7 and 8, the Court notes that they are

8    photographs of the back of Mr. Shelton's head

9    that depicts an entrance wound.  As to No. 7,

10   the Court will find you can use that.  As to

11   No. 8, the Court finds that No. 7 adequately

12   covers the entry.  There is no further

13   informative information that could facilitate

14   or further inquiry that could not be done with

15   No. 7.  As to Nos. 9 and 10, No. 9 will be

16   excluded.  You can use No. 10 and No. 11 will

17   be excluded.  The Court finds that Nos. 12, 13,

18   14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25

19   are not inflammatory and may be used so long as

20   you don't duplicate the matter covered in the

21   photographs.  As to 26, 27, 28, and 29, they

22   are excluded.  Commonwealth 30 may be used.  It

23   can be better cropped.  32 is excluded.  33 is

24   excluded.

25              MS. PELLEGRINI:  Your Honor, can

Motion

```
 1    I go back.  30 is in?

 2                MS. WILLIAMS:  He suggested

 3    cropping it.

 4                MS. PELLEGRINI:  30 is in and you

 5    want it cropped.

 6                THE COURT:  You may use 30 but I

 7    want that better cropped.

 8                MS. PELLEGRINI:  Okay.  And then

 9    31?

10                THE COURT:  31, 32, and 33 are

11    excluded.  As to Chanetta Powell, Ms. Powell

12    suffered two gunshot wounds to the head.  Both,

13    I imagine, the pathologist will testify are

14    potentially fatal and were fatal.  The

15    photographs that I've given you, I'm going to

16    work backwards with this particular victim.

17    10 --

18                MS. PELLEGRINI:  I'm sorry?

19                THE COURT:  My numbers, 10, 9, 8,

20    7.

21                MS. WILLIAMS:  Your Honor, I

22    don't have a 10.

23                THE COURT:  Pardon me?

24                MS. WILLIAMS:  I don't have a 10

25    if it is photo.  I have unmarked bullet
```

Motion

1    fragments, it is marked 9 and 10.

2                THE COURT:  So whether it is 9 or

3    10, the photograph marked 9 in the bottom

4    right-hand corner.

5                MS. WILLIAMS:  Okay.

6                THE COURT:  The Court finds that

7    that photograph is non-inflammatory and may be

8    used.  This photograph marked is different.

9    The next ones, 9 and 8, are non-inflammatory

10   and may be used.  They are all non-inflammatory

11   and may be used as long as they don't duplicate

12   a matter that needs to be covered.  The Court

13   finds 3 perhaps insensitive but, if necessary,

14   can be used if better cropped.  As to my number

15   6, it shows an entry wound to the right side of

16   Ms. Powell's head, face, corner of her eye.

17   The Court will admit that.  It is necessary to

18   depict the entry wounds.  As to what I've

19   marked as 4 and 5, the Court will exclude 5,

20   allow number 4.

21               As to Commonwealth number 1, the -- not

22   Commonwealth number 1, I'm sorry, my number

23   1 -- it is my perception, and you can correct

24   me if I'm wrong, that both those gunshot wounds

25   exited at or near the same time and at or

Motion

1    through the left side of her face and have

2    substantially destroyed the left side of her

3    face, most especially and importantly around

4    her eye and forehead area.  Unless the

5    Commonwealth, after conferring with the

6    pathologist, can demonstrate more of an

7    importance of that photograph, the Court is

8    excluding it.  However, you may have the

9    pathologist describe the destruction, what I'll

10   refer to loosely as the mass destruction, on

11   the left side of her face.  But, again, as of

12   right now, I'm excluding it unless you can

13   offer further proof of its importance for some

14   reason in terms of explaining the pathologist's

15   testimony.

16            MS. PELLEGRINI:  What about

17   number 2, Your Honor?

18            THE COURT:  My No. 3?

19            MS. PELLEGRINI:  I have a 2 and a

20   3.

21            THE COURT:  Okay.  2 is

22   Ms. Powell laying down, I'm excluding that,

23   again, unless you can offer up Monday the

24   importance through the pathologist.

25            MS. PELLEGRINI:  No. 3, Your

Motion

```
 1    Honor, we'll voluntarily remove.  For the
 2    record, Your Honor, Ms. Powell was eight months
 3    pregnant at the time.  We have not submitted
 4    nor did the baby suffer any trauma.  He died as
 5    a result of his mother.  We never intended to
 6    show any pictures of the baby.
 7              THE COURT:  Okay.  The reason for
 8    the Court's ruling, as I've explained to the
 9    jury, is to help explain the pathologist's
10    testimony, also the potential of a first degree
11    murder conviction and the specific intent to
12    kill and as I will explain the deadly weapon
13    inference to the jury in my closing remarks.
14    Also I reviewed the case law again.  The Courts
15    have admitted very graphic and detailed and
16    even large photographs of deceased persons,
17    people on meat hooks in warehouses, blow-ups on
18    screens of a young child's genital area so it
19    is in the context of what I perceive is a very
20    liberal standard in Pennsylvania if, in fact,
21    the relevancy of probative value is established
22    and in the context of homicide cases the Courts
23    have always found the Courts are not to
24    insulate the actor from the horrendous nature
25    of his acts by virtue of what are perceived as
```

Motion

```
 1    prejudicial or inflammatory photographs.
 2    Again, that is the context of my ruling.
 3             Now, as to the most recent motion, is
 4    there anything you want to state beyond the
 5    four corners of the motion, Mr. McKinney or
 6    Ms. Williams?
 7             MR. McKINNEY:  Yes, Your Honor.
 8    I would actually like to address what is in the
 9    four corners of the motion as well.
10             THE COURT:  Okay, I will allow
11    you to go outside the four corners and repeat
12    what is in the motion so far as you need a
13    context for your argument.
14             MR. McKINNEY:  Your Honor, for
15    the second time in 30 days the Commonwealth has
16    been caught providing financial assistance to a
17    jailhouse witness in exchange for his
18    testimony, and based on my motion, fabricated
19    testimony.
20             THE COURT:  Okay, let me stop you
21    there.  When you say the Commonwealth has been
22    caught, that assumes the credibility of your
23    witness who you have assailed for
24    three-and-a-half years.
25             MR. McKINNEY:  Your Honor, it
```

Motion

1    does assume the credibility of my witness who
2    was actually the Commonwealth's witness first,
3    so they found him credible when they included
4    his information in the affidavit of probable
5    cause which they used to charge my client with
6    capital murder.  They found him credible.  In
7    addition, his statement with respect to
8    off-the-books payments received by the
9    Allegheny County Police Department, the
10   Commonwealth of Pennsylvania, the Allegheny
11   County District Attorney's Office, and the ATF
12   is corroborated by a lawyer of good standing
13   that practices consistently in this courthouse
14   and is available to testify on Monday to
15   corroborate that instance.  So I understand the
16   Court's question but I believe that the witness
17   is credible.
18         But moreover, Your Honor, when I say
19   caught, I mean, we have a 60-minute recorded
20   conversation which the Court does have a
21   transcript of where the witness, through no
22   prodding by the defense attorneys, is
23   proactively giving us information that he would
24   have only known but for his close intimate
25   relationship with Ms. Pellegrini, with

Motion

1    detectives from the Allegheny County Police

2    Department, and agents from the ATF.

3            So, Your Honor, before I get ahead of

4    myself, and I appreciate the Court giving me

5    the opportunity to make oral argument, another

6    concern I have, Your Honor, is this motion was

7    filed as was the transcript not under seal

8    because it is a matter of grave public concern

9    given the Allegheny County District Attorney's

10   Office, their recent conduct in this case which

11   has lead to the dismissal of capital murder

12   charges against a man who spent four years in

13   jail pending trial looking at execution who is

14   now home because of the conduct of this office.

15           Your Honor, it is a pattern and it is

16   intentional.  They are paying witnesses without

17   telling us, and in this case, paying witnesses

18   and giving witnesses information that only law

19   enforcement would know to assist those

20   witnesses in gaining more information about our

21   clients to bury them, to cause a conviction.

22   So this is not a one-time happenstance, Your

23   Honor.  It is a pattern.  There were multiple

24   search warrants that were issued as a result of

25   this witness's information.

Motion

1          And the charging document, Your Honor,

2    part of my cross-examination of Detective

3    Kinavey was that all the evidence that has been

4    presented to this jury the Commonwealth had on

5    April 6th of 2016.  They never filed murder

6    charges until June because they were waiting on

7    their snitches to get this work done.

8    Two-and-a-half months, no charges were filed

9    until they get witness one and witness two.

10   Witness one's statement that he provided

11   defense counsel on record, and he is willing to

12   testify on Monday as well, is that he was told

13   to get close to Mr. Shelton by agents of the

14   Allegheny County Police Department, that he was

15   told to speak to Mr. Shelton and get

16   Mr. Shelton to talk about the case, to

17   implicate himself in some way.  He was told

18   facts about the case so he could use those

19   questions to get information about Mr. Shelton.

20   The witness chose not to.  Instead he

21   implicated Robert Thomas and by way of his

22   implication of Robert Thomas claimed that

23   Robert Thomas told witness one that Cheron

24   Shelton was also involved.

25          Once we started asking the Commonwealth

Motion

1    can we have any information with respect to

2    financial papers to witness one, what are you

3    giving him in exchange, we were always told

4    nothing.  In our sealed exhibit, Your Honor, we

5    have proof that the Commonwealth confirmed that

6    he was receiving no benefit but his lawyer and

7    he says otherwise.  There are text messages in

8    our sealed exhibits from this witness with

9    Allegheny County Police Department detectives

10   and ATF agents confirming these communications.

11        Your Honor, we're asking for a mistrial

12   at the very least.  We're asking for an

13   opportunity for this witness to be heard in

14   open court given the nature of this capital

15   case, given the consistent prosecutorial

16   misconduct that the Commonwealth, we believe

17   that Ms. Pellegrini is going to be a necessary

18   witness in this hearing, we ask that she be

19   disqualified from this case.

20        Your Honor, in order for Mr. Shelton to

21   have a fair trial where his life is on the

22   line, we can't go backwards.  We can't, after

23   he is possibly convicted, start looking at this

24   information when it is before us now.  This is

25   the only time we have an opportunity to do the

Motion

1    right thing.  It may delay the trial a day or
2    two but that is a small sacrifice for this
3    man's life.  To be honest, Your Honor, everyone
4    in this room deserves to know the truth.  So I
5    understand the court is moving at a pretty
6    brisk pace.  We told this jury that this would
7    be a 15-day trial.  We are in day five.  We are
8    asking for Monday's hearing that would slow the
9    trial down by three hours to give everyone an
10   opportunity to know the truth.
11          Your Honor, in addition to what I've
12   already argued in my motion and what is
13   contained in the transcript, my last request,
14   Your Honor, is that I didn't file these under
15   seal, and that was for a reason, because the
16   public deserves to know.  So I ask that in
17   addition, obviously to my arguments that I'm
18   making in open court, I've been told by other
19   attorneys in this courthouse who have requested
20   my filings that they've been told by this Court
21   or the clerk's office that they do not have a
22   right to access those documents.  I'm not sure
23   what the motivation is behind that, Your Honor,
24   but I'm asking whatever is happening be stopped
25   and everyone have an opportunity to read the

Motion

1    transcript and judge for themselves because

2    this is a matter of grave concern.  Thank you,

3    Your Honor.

4              THE COURT:  Mr. Chernosky.

5              MR. CHERNOSKY:  Your Honor, I

6    will briefly respond to what I'm able to at

7    this point.  We were only served this document

8    this morning at 9:00 a.m. so we've been reading

9    through it.

10              First, and foremost, the allegations by

11    Mr. McKinney that anyone from the District

12    Attorney's Office or anybody from the county

13    police told this witness facts of the case and

14    asked for him to get close to Mr. Shelton is an

15    absolute fabrication either on the part of this

16    witness or in combination with this witness and

17    others.  The witness who allegedly had this

18    information about being paid waited apparently

19    until the first day of the trial to make

20    contact with the defense team, likely because

21    of the stories a week before about the issues

22    in that case we were dealing with.

23              To be honest with you, this is a

24    distraction to the case at bar.  It is not

25    relevant.  This witness isn't being called in

Motion

1    the Commonwealth's case-in-chief.  Had he been

2    postured as that last witness, the remedy I

3    would suggest is to exclude his testimony.  We

4    aren't even there because this witness isn't

5    testifying.

6            The facts as they relate to this

7    witness as far as a timeline goes is that

8    sometime in 2017 a case come down from the

9    Superior Court declaring him an agent of the

10   state.  He was on our witness list as far as

11   giving a statement --

12              THE COURT:  Sorry, go back over

13   that.

14              MR. CHERNOSKY:  Sometime in 2017

15   a case came down from the Superior Court

16   wherein he was declared an agent of the state

17   for having testified prior.  At that point we

18   were in a position where we had to decide

19   whether we would still use him or whether we

20   would not use him.  We spent the next six,

21   eight, ten months making that decision.  Before

22   we had a hearing, we spent some time gathering

23   information on his prior cases before

24   ultimately telling the defense that we weren't

25   going to use him as a witness.  And I have an

Motion

1      e-mail string with both of the defense

2      attorneys discussing at least their first

3      inquiry about whether we would use him after

4      that first case came down and subsequent

5      inquiries.

6             The other suggestion that has been made

7      here is factually inaccurate.  The witness that

8      they are referring to came forward in April of

9      2016, after the Wilkinsburg homicides, the day

10     that Rob Thomas got arrested and lodged in the

11     Allegheny County Jail.  That, in part, is the

12     reason why we decided that his initial

13     credibility seemed valid because it was the

14     first day that anybody had access to get a

15     statement.  He was interviewed by the county

16     detectives the next day.  To say that he came

17     forward on the 23rd of June and that is why we

18     finally filed the charges is an absolute

19     mischaracterization of the facts, Your Honor.

20            As to -- I can tell you with regard to

21     any protection of this witness, that was turned

22     over prior to the hearing wherein we ultimately

23     determined prior to the hearing we weren't

24     going to use the evidence.

25            I'm aware of at least one instance

Motion

```
 1    where this witness attempted to make contact
 2    with Ms. Pellegrini after a court proceeding in
 3    this very case and attempted to threaten her.
 4                THE COURT:  Anything else?
 5                MR. CHERNOSKY:  That is all I
 6    have at this point, Your Honor.  To be honest
 7    with you, Your Honor, we don't see a need for a
 8    hearing.  We need to continue this case without
 9    a distraction from a witness who is not
10    relevant.
11                MR. McKINNEY:  Your Honor,
12    similar to what we just experienced with
13    witness three, you know, I don't think it is
14    fair for the Commonwealth to take these actions
15    and then because they no longer want to call
16    the witness, it is no longer relevant what
17    they've done.  My co-counsel made an excellent
18    argument with respect to Mr. Thomas's case when
19    we were upstairs, it is like a shoplifter
20    getting caught and then deciding to pay for the
21    food.  You can't have it both ways.  They made
22    their bed and they should be forced to lie in
23    it.  Given the consequences of a conviction and
24    how important it is, everyone should know the
25    truth about what happened in this case.
```

Motion

1          Just to clarify, I have not argued that

2     witness one made a statement on June 23rd and

3     that is why charges were filed.  My recitation

4     of the facts were they were working with him

5     for several months because they couldn't file

6     charges on April 6th because they had not

7     enough evidence so they were working with him

8     for several months and then eventually filed

9     charges on June 23rd after who knows how many

10    meetings because we can never get the truth.

11              THE COURT:  Is the witness local?

12              MR. McKINNEY:  The witness is not

13    local but he is prepared to travel over the

14    weekend and be in Pittsburgh by Monday.

15              THE COURT:  All right.  As to the

16    motion for extraordinary relief, the Court at

17    the time I granted the habeas on Mr. Thomas

18    indicated that at times the Commonwealth is

19    forced, in the absence of more solid citizens

20    coming forward if available or if willing,

21    sometimes attempts to navigate the treacherous

22    waters of cooperating witnesses and at times is

23    successful and other times not so.

24          The Court finds in this instance that

25    for me to conduct a hearing in what you

Motion

1    postulate to be three hours is not realistic.

2    Even a day.  As I got through the transcript as

3    best I could, there are potentially 20 or 30

4    witnesses who could be called on this matter,

5    county police, Allegheny County Jail personnel,

6    police officers, federal probation officers,

7    attorneys, persons in a different state,

8    subpoena of documents to corroborate or not

9    corroborate certain aspects of what this

10   witness may or may not say.

11           The Court, in this regard, this witness

12   has come forward and been part of the

13   Commonwealth's case, now has come forward and

14   is part of the defense case in terms of a

15   motion to dismiss ultimately.  While both of

16   you want, at different times have chose to

17   navigate those treacherous waters with a

18   cooperating witness, the Court will not allow

19   this witness to blow up or terminate this trial

20   or even delay the trial.  Your motion is not

21   granted.  We'll resume Monday morning.

22           MS. PELLEGRINI:  Thank you, Your

23   Honor.

24           MR. McKINNEY:  Your Honor,

25   related or unrelated, would the Court allow the

Motion

```
 1    motion to be docketed and allow the motion to

 2    remain unsealed?

 3                    THE COURT:  The Court will keep

 4    it under seal until the conclusion of this

 5    trial.

 6                    (Court adjourned for the day.)

 7                          -----

 8                    (Monday, February 10, 2020 - Open

 9    court - Jury present.)

10                          -----

11                    THE COURT:  Ms. Pellegrini,

12    Mr. Chernosky.

13                    MR. McKINNEY:  Your Honor, may we

14    approach briefly with respect to the next

15    witness?

16                    THE COURT:  Come on up.

17                    (Sidebar discussion held as

18    follows.)

19                    MR. McKINNEY:  Your Honor, with

20    respect to Mr. Burke, I don't believe the

21    Commonwealth has authenticated the number that

22    they are purporting to be Rob Thomas's phone to

23    Rob Thomas.  Any testimony with respect to that

24    phone number is not relevant.

25                    THE COURT:  As I commented the
```

R. Burke - Direct by Mr. Chernosky

1    other day, what was circumstantial evidence has

2    given rise to that is his number.  You can

3    cross-examine.

4              (Sidebar discussion concluded.)

5              MR. CHERNOSKY:  The Commonwealth

6    calls Ryan Burke.

7                   -----

8                   RYAN BURKE,

9    a witness herein, having been first duly sworn,

10   was examined and testified as follows:

11                  -----

12             DIRECT EXAMINATION

13                  -----

14   BY MR. CHERNOSKY:

15       Q.  Agent Burke, could you state your full

16   name and spell your last name for the court

17   reporter?

18       A.  Ryan Burke, B-U-R-K-E.

19       Q.  How are you currently employed?

20       A.  I'm a special agent with the Federal

21   Bureau of Investigation.

22       Q.  Are you assigned to any particular

23   division in the FBI?

24       A.  Yes, I'm assigned to the cellular

25   analysis survey team otherwise known as CAST.

R. Burke - Direct by Mr. Chernosky

1      Q.   Prior to joining the FBI, did you have

2    any law enforcement experience?

3      A.   I did.  I was a police officer in the

4    Boston area for two years.

5      Q.   Could you give the jury an

6    understanding of your educational and

7    experience background?

8      A.   I have a Bachelor's degree in sociology

9    and Master's degree in criminal justice both

10   from the University of Massachusetts.

11     Q.   What is the cellular -- what is the

12   FBI's Cellular Analysis Survey Team?

13     A.   We're a team managed out of the FBI

14   headquarters in Washington, D.C. that provides

15   assistance to local, state, federal, and, on

16   occasion, law enforcement agencies in the field

17   of historical cell site analysis.

18     Q.   What kind of work do you guys do?  How

19   do you get a request?

20     A.   So we receive requests either

21   personally from investigators in need of help

22   or we have an in-take process at headquarters

23   where people can make requests and oftentimes

24   the major cellular providers will often refer

25   people to the FBI CAST.

R. Burke - Direct by Mr. Chernosky

1    Q.   How many members does CAST have in the

2    FBI?

3    A.   There is 70 of us nationwide.

4    Q.   Once you're in the FBI, how do you get

5    selected to become a member of CAST?

6    A.   Initially through practical experience

7    there is a certification process that consists

8    of 300 plus hours in the field of radio

9    frequency theory, records analysis, drive

10   testing, cellular and network architecture.

11   Additionally we receive training from the four

12   major cellular providers.

13   Q.   Is there a certification process to be

14   certified as a CAST member?

15   A.   Yes, once those 300 hours are

16   satisfied, we consider someone a member of the

17   CAST.

18   Q.   The cellular providers that you

19   referenced, do they all work independent of one

20   another?

21   A.   They do.

22   Q.   What type of training do you do with

23   them?

24   A.   So during our initial certification

25   process, we meet with AT&T, Verizon, Sprint,

R. Burke - Direct by Mr. Chernosky

1    T-Mobile, and US Cellular as well.  We meet

2    with them on an annual basis to receive updates

3    on their networks, how to accurately interpret

4    their records and so on.

5        Q.  Could you tell the jury what a cell

6    phone tower does?

7        A.  So a cell phone tower essentially

8    broadcasts wireless signals in the form of

9    radio waves so mobile devices and phones can

10   access the cellular network to make calls, send

11   text messages, use the internet, et cetera.

12       Q.  So cell phone towers provides coverage

13   to a given area?

14       A.  That's correct.

15       Q.  Could you explain to the jury what a

16   sector is on a cell phone tower?

17       A.  Most cell phone towers as they

18   broadcast their signal is split into three

19   sectors meaning three sets of antennas that

20   each face a certain direction.  Those three

21   sectors broadcast signals that are unique

22   compared to the other sectors on that tower and

23   other towers in the vicinity.

24       Q.  Can you explain to the jury briefly how

25   a cell phone interacts with a tower, how they

R. Burke - Direct by Mr. Chernosky

1    engage one another?

2        A.   Cell phones are constantly scanning

3    their environment for a detectable cell signal.

4    It does that so when you use your phone or

5    receive a call it knows what tower and sector

6    is going to access the network.

7        Q.   In your experience, do cell phone

8    companies maintain records of the activity of

9    cell phones on their network?

10       A.   They do.  When the phone does actually

11   access the network for a phone call or a text

12   message, et cetera, the cellular company,

13   mostly for billing purposes, makes a record of

14   that activity.

15       Q.   What do they call those records?

16       A.   They are call detail records or CDRs.

17       Q.   In your experience do cell phone

18   providers also maintain a list of towers that

19   they operate their network on?

20       A.   They do.

21       Q.   What do they call those?

22       A.   Generically, tower lists.

23       Q.   How do you estimate the coverage area

24   of a given sector on the cell phone tower?

25       A.   We use the tower list and call detail

R. Burke - Direct by Mr. Chernosky

1    records to determine what towers are used by a

2    phone and then we look at the tower as a whole

3    to see exactly where the neighboring towers

4    are.  We can look at the proximity of a tower

5    with neighboring towers and generally what the

6    coverage area of that tower is.

7         Q.  Could you tell the jury what a drive

8    test is?

9         A.  A drive test is the act of going out

10   with a scanner and passively collecting

11   measurements of a cell signal in an area.  In

12   the same way that a phone sort of monitors a

13   cell signal that it detects, we do a drive test

14   in a particular area so we can record

15   measurements of the cell signal so instead of

16   estimating the coverage area of the tower, we

17   can map out specifically where the coverage

18   stops and starts.

19        Q.  In this particular case, did you

20   perform a drive test?

21        A.  Yes.

22        Q.  Is it possible to know where a cell

23   phone is located within a network at all times?

24        A.  No.

25        Q.  Could you explain that to a jury?

R. Burke - Direct by Mr. Chernosky

1      A.   So what we're working off of is the

2   call details records maintained by the cellular

3   provider.  Typically, unless the phone is used

4   to make a voice call or a text message, we have

5   no way to know where it was at a given time.

6   We can only look at the activity that occurred.

7      Q.   Does a cell phone always select the

8   tower that is geographically closest to it?

9      A.   No, it does not.  It usually does but

10  there are many factors to include obstructions

11  which could shift a cell phone from using the

12  closest tower to a slightly more distant tower.

13     Q.   Does a cell phone have to be within the

14  sector of a given tower to use that sector?

15     A.   It does.

16     Q.   Are you ever able to pinpoint the exact

17  location of a phone?

18     A.   No.

19     Q.   As part of your job, do you regularly

20  work with cell phone activity logs?

21     A.   On a daily basis.

22     Q.   Have you testified to cell phones and

23  historical cell site data before in court?

24     A.   Very commonly.

25     Q.   So could you tell the jury in this case

R. Burke - Direct by Mr. Chernosky

1    what you did?

2        A.   So I received a request to analyze two

3    sets of T-Mobile records to approximate their

4    whereabouts in March of 2016.

5        Q.   I show you what I marked as

6    Commonwealth Exhibits 598 through 610.  In

7    preparation for your testimony today, did you

8    prepare a PowerPoint presentation with regard

9    to some of the subjects that we just talked

10   about?

11       A.   Yes, I did.

12       Q.   I ask you if Commonwealth Exhibits 598

13   to 610 represent slides from that presentation?

14       A.   Yes, this is my report.

15            MR. CHERNOSKY:  Your Honor, I

16   move for the admission of Commonwealth

17   Exhibits 598 to 610.

18            THE COURT:  Admitted without

19   objection save, of course, our prior

20   discussions are all incorporated for present

21   purposes.

22            MR. CHERNOSKY:  Thank you.

23       Q.   I direct your attention to Commonwealth

24   Exhibit 599.  Could you tell us what we're

25   looking at in Commonwealth's Exhibit 599?

R. Burke - Direct by Mr. Chernosky

1        A.   This is an overview of T-Mobile and

2   Sprint's cellular network in March of 2016.

3   We'll focus on the T-Mobile cellular network.

4   All the tower locations are represented by the

5   green dots.

6        Q.   Could you -- there is a laser pointer

7   in front of you -- could you show us where the

8   towers are represented by the green dots?

9             THE COURT:   If you want to stand

10   up, you can.   Make certain that you keep your

11   voice up because the court reporter has to hear

12   you, also.

13        A.   So this is an overview of T-Mobile and

14   Sprint's network in March of 2016.   It is tough

15   to differentiate here but these dots that you

16   see on the map are tower locations associated

17   with the T-Mobile and Sprint network.   So the

18   network engineers will install towers in areas

19   where the customers are.   If there are more

20   customers, there will be more towers each

21   covering smaller areas as opposed to rural

22   areas with less customers and less towers but

23   they cover larger areas.   So we use sort of the

24   overview of the network to approximate

25   coverages, et cetera.

R. Burke - Direct by Mr. Chernosky

1      Q.  Directing your attention to

2   Commonwealth 600, is that an example of what

3   cell towers can look like?

4      A.  Yes, it is.  We got sort of a

5   camouflaged tower on the right and an

6   uncamouflaged on the left.  I mentioned

7   sectors, this is a good example of

8   sectorization.  You can see these triangular

9   brackets each with a set of antennae facing in

10   a particular direction.  Again, when the call

11   detail records are recorded, not only is the

12   tower listed but the sector that was utilized

13   in a given transaction is also recorded.

14      Q.  Directing your attention to

15   Commonwealth Exhibit 601 on the screen, could

16   you tell the jury what they're looking at in

17   601?

18      A.  So without a drive test, we will

19   estimate the coverage area of a tower and

20   sector that was used by a phone in order to

21   approximate the phone's location at that given

22   time.  So we represent the use of a tower

23   sector so long as it is a three-sector tower

24   with a 120 degree wedge.  Again, in areas,

25   rural areas, the coverage areas will be much

R. Burke - Direct by Mr. Chernosky

1    larger because of less towers and in an area

2    like downtown Pittsburgh where there are more

3    towers, it is covering a much smaller area.

4        Q.  Directing your attention to

5    Commonwealth's Exhibit 602, could you tell the

6    jury what is depicted in 602?

7        A.  Because we did a drive test for this

8    particular case -- let me back up.  We went out

9    and mapped the relevant area where the phones

10   were located and we went out with a passive

11   scanner and collected measurements and then

12   post processed that information so we could

13   display specifically where the coverage is for

14   the relevant towers identified in the call

15   detail records.  Instead of using these

16   approximated wedges, we are instead going to

17   actually show a color coded version of where

18   the signal actually exists.

19           So you can see this two shades of

20   purple here as an example.  The darker shaded

21   area is the dominant coverage area where the

22   signal from that tower and sector is better

23   than any other tower and sector in the

24   vicinity.  The lighter shaded area is possible

25   coverage area, that is where the signal from

R. Burke - Direct by Mr. Chernosky

1    that tower and sector is existent and still

2    usable but not the strongest signal in that

3    area so it is a bit of an overlap so calls

4    aren't dropped when they go from one tower to

5    the next.

6        Q.  Can I stop you there for a second and

7    have you describe, you said that you used a

8    passive monitor system, could you explain how

9    that works or what that is?

10       A.  We used an autonomous receiver.  It is

11   essentially a scanner that we put into the car,

12   power it from the vehicle.  We have antennae on

13   top of the vehicle.  We have a receive antenna

14   to collect measurements of the cellular signal

15   the same way the phone does.  And we also have

16   a GPS antenna so when we drive around, we can

17   record measurements of the cell signal with a

18   corresponding GPS measurement so we know where

19   the signal was collected.  Then we have

20   software that post processes that information

21   and can actually display the dominant coverage

22   and possible coverage.

23       Q.  Did you make several maps with respect

24   to your testimony today?

25       A.  I did.

R. Burke - Direct by Mr. Chernosky

1    Q.   I direct you to Commonwealth Exhibit
2    603.  What is this in 603?
3    A.   This is just a map alleging the
4    T-Mobile towers which we focused on represented
5    by green dots, the crime scene will be
6    represented by a CS icon, and the number one
7    will represent a residence owned by the
8    defendant's mother at 1214 Nolan Court.
9    Q.   When you place these addresses on your
10   map legend, how do you receive them?
11   A.   I received it from the investigative
12   team.
13   Q.   Directing your attention to
14   Commonwealth Exhibit 604, we are now moving
15   into the historical cell site analysis that you
16   performed on this case?
17   A.   Yes, that is correct.
18   Q.   605, could you explain what we're
19   looking at in 605?
20   A.   This is a map of the activity on
21   March 9, 2016, between 10:15 and 10:40 for both
22   the T-Mobile phones that were provided to me
23   for analysis.  So I'll walk through this slowly
24   and pull up a map here so I can reference time.
25   The two phones were active within the coverage

R. Burke - Direct by Mr. Chernosky

1  area displayed there by purple and green.  The

2  phone ending in 0447, which is associated with

3  the defendant, used this green -- well, excuse

4  me, this tower and sector which is represented

5  by this green shaded area at 10:31 and some

6  other time specified in this caption box here

7  was utilizing this tower and sector which is

8  represented by the purple shaded area.

9      Q.  The box broken out to the right of each

10  of those sectors, is that the specific phone

11  calls that were made while utilizing the sector

12  shaded next to it?

13      A.  That's correct.

14      Q.  Directing your attention to

15  Commonwealth Exhibit 606, what is being

16  represented in Commonwealth Exhibit 606?

17      A.  So this is the time frame of 10:40 to

18  11:00 p.m. which encompassed the approximate

19  time of the shooting.  Now both phones are

20  utilizing at various times a tower and sector

21  that provides service to the area where this

22  purple is located.  There were also the two

23  phones communicating with one another which is

24  detailed here in this box at 10:46, you can see

25  a 247 second call, just about four-and-a-half

R. Burke - Direct by Mr. Chernosky

1    minutes, that occurred between the phone

2    associated with the defendant and the phone

3    associated with Mr. Robert Thomas.

4        Q.   Directing your attention to

5    Commonwealth Exhibit 607, what is depicted in

6    Commonwealth Exhibit 607?

7        A.   This is the activity following the

8    approximate time of the shootings, meaning

9    11:00 to 11:30.  This is strictly for the phone

10   associated with the defendant ending in 0447.

11   You can see the phone moved away from the tower

12   that was located here that was providing the

13   purple coverage, in that area, and has now

14   traveled east from that location.  At times,

15   specified in this caption box the person in the

16   gray, or coverage represented by the gray

17   shaded area, and then following that utilized

18   the tower represented by the purple shaded

19   area.

20       Q.   Directing your attention to 608, what

21   is depicted in Commonwealth Exhibit 608?

22       A.   So this is specific to the phone

23   associated with Mr. Thomas from 11:00 to 11:15.

24   It was a bit more active so it is broken down

25   into 15 minute increments here.  The phone is

R. Burke - Direct by Mr. Chernosky

1    utilizing the towers providing service to the

2    purple shaded area and also the green shaded

3    area.

4        Q.  Directing your attention to

5    Commonwealth Exhibit 609 on the screen, what is

6    represented in 609?

7        A.  Again, for the phone associated with

8    Mr. Thomas, the next 15 minutes we can see

9    still use of this tower and sector here

10   represented in purple.  Then this phone also

11   travels in an easterly direction by way of the

12   green and purple shaded areas.

13       Q.  Directing your attention to

14   Commonwealth Exhibit 610, what is depicted in

15   Commonwealth Exhibit 610?

16       A.  Now from 11:30 p.m. on the 9th to

17   1:00 p.m. on the 10th, this displays activity

18   for both phones.  They were utilizing this same

19   tower and sector represented in purple and same

20   tower and sector represented in green.

21            MR. CHERNOSKY:  No further

22   questions.  I offer for cross.

23            THE COURT:  Mr. McKinney, any

24   questions?

25            MR. McKINNEY:  Yes, Your Honor.

R. Burke - Cross by Mr. McKinney

1    Thank you.

2                          -----

3                    CROSS-EXAMINATION

4                          -----

5    BY MR. McKINNEY:

6        Q.  Agent Burke, when was this drive test

7    completed?

8        A.  It was completed on May 1, 2016.

9        Q.  At some point after completing the

10   drive test, did you produce this slide show

11   that we just saw?

12       A.  I did.

13       Q.  You would agree with me that you didn't

14   produce this slide show until June 13, 2018?

15       A.  That's correct.

16       Q.  That was about two years after the

17   drive test?

18       A.  Correct.

19       Q.  Did you know that the defense just got

20   this about three weeks ago?

21               MR. CHERNOSKY:  Objection to

22   relevance, Your Honor.

23               THE COURT:  Objection sustained.

24       Q.  Agent Burke, you testified on direct

25   examination that based on your analysis you

R. Burke - Cross by Mr. McKinney

1    can't really pinpoint where a phone is at a

2    specific point in time, correct?

3        A.   Correct.  We can only identify the

4    coverage area of the tower and sector that was

5    used.

6            MR. McKINNEY:  Mr. Chernosky, if

7    you could go to Commonwealth Exhibit 605?  We

8    made need the lights again, Agent Burke,

9    because I'm going to ask you a couple questions

10   about this one.

11       Q.   This is Commonwealth Exhibit 605.  Am I

12   correct when I state that the cell phone

13   associated with 0447 could have been located

14   anywhere in the purple area or anywhere in the

15   green area during this time frame; is that

16   correct?

17       A.   That's correct.  So it is difficult to

18   see but this activity here at 10:31 for the

19   defendant's phone, the phone was located

20   somewhere in the green shaded area.  For the

21   majority or remainder of the time it was

22   somewhere in the purple shaded area.

23       Q.   So at 10:31 you're saying that it was

24   probably more likely in the green area?

25       A.   Well, it was in the area represented by

R. Burke - Cross by Mr. McKinney

1    that.

2        Q.   What time does it cross over to the

3    purple area?

4        A.   So for the phone 0447 associated with

5    the defendant there is some activity at 10:19

6    in the purple, 10:21 in the purple shaded area,

7    10:22 in the purple, 10:24 in the purple shaded

8    area then at 10:31 we have the phone located

9    somewhere in the green shaded area and then for

10   this slide, 10:34, in the area represented by

11   the green.

12       Q.   With respect to the purple area, do you

13   know how many neighborhoods are encompassed in

14   the purple?

15       A.   No, I don't.

16       Q.   You are not from Pittsburgh, you are

17   from Boston?

18       A.   Right.

19       Q.   Looking at -- because I believe your

20   exhibits are a little more clear -- would you

21   agree with me that on your exhibit there is

22   purple area in a neighborhood called Regent

23   Square; do you see that?

24       A.   Yes.

25       Q.   There is a purple area called Homewood

R. Burke - Cross by Mr. McKinney

1    North?

2        A.   That's correct.

3        Q.   There is a purple area called Homewood

4    South?

5        A.   Correct.

6        Q.   There is a purple area in Wilkinsburg?

7        A.   That's correct.

8        Q.   And it looks like there is purple area

9    up near Woodland Hills Junior/Senior High

10   School?

11       A.   That's correct.

12       Q.   Do you know what neighborhood that is

13   in?

14       A.   No.

15       Q.   Has anyone told you that is Turtle

16   Creek?

17       A.   No.

18       Q.   If you don't mind standing, I have a

19   couple more questions.  If we can go back to

20   Commonwealth Exhibit 606.  Agent Burke, with

21   respect to this exhibit, similar questions, the

22   phone could have been anywhere in the purple

23   area?

24       A.   That's correct.  There is no way with

25   the records that T-Mobile obtained for billing

R. Burke - Cross by Mr. McKinney

1    purposes to determine where --

2                    THE COURT:  Keep your voice up,

3    please.

4        Q.  If you want to repeat yourself.

5        A.  So that is correct, there is no way to

6    determine with the records we have in what area

7    of the purple shaded area here where the phone

8    was located.  It could have been anywhere.

9        Q.  So between 10:40 and 11:00 p.m. on

10   March 9, 2016, based on your records, the phone

11   could have been in any of this purple area

12   including your legend number one which is

13   Mr. Shelton's house?

14       A.  Correct.

15       Q.  So based on your own data in this

16   twenty minute time frame, he could have been at

17   home?

18       A.  That is correct.

19       Q.  Are you aware that the shooting

20   happened at 10:53 p.m.?

21       A.  I am.

22       Q.  Okay.  So it is possible based on your

23   data that when the shooting occurred the

24   defendant was sitting in his living room,

25   that's possible?

R. Burke - Redirect by Mr. Chernosky

1      A.   That is possible.  The tower and sector

2  does provide coverage to both the crime scene

3  and that residence.

4           MR. McKINNEY:  I have no

5  additional questions.  Thank you.

6           THE COURT:  Anything else?

7           MR. CHERNOSKY:  Just briefly.

8                -----

9           REDIRECT-EXAMINATION

10               -----

11  BY MR. CHERNOSKY:

12      Q.   Just to correct Mr. McKinney's last

13  question, it is possible that the phone was

14  sitting in the house?  These records tell you

15  the sector the phone used?

16      A.   Yes, that is correct.  It is specific

17  to the phone, not necessarily the person.

18      Q.   Investigatively on the whole is it

19  possible to compare his cell phone data with

20  other information to get a better picture of

21  where the phone was located?

22      A.   Yes.

23      Q.   So in a situation like this, you could

24  use the cell sector and say a video?

25      A.   That's correct.

J. Dwyer - Direct by Ms. Pellegrini

1      Q.  Or a cell sector and say an eyewitness?

2      A.  Correct.

3              MR. CHERNOSKY:  No further

4  questions.

5              THE COURT:  Thank you, sir.  You

6  are excused.  Thank you for your presence.

7  Call your next witness.

8              MS. PELLEGRINI:  The Commonwealth

9  calls Dr. Jessica Dwyer.

10                     -----

11                  JESSICA DWYER,

12  a witness herein, having been first duly sworn,

13  was examined and testified as follows:

14                     -----

15                DIRECT EXAMINATION

16                     -----

17  BY MS. PELLEGRINI:

18      Q.  Good morning, Dr. Dwyer.  Could you

19  please state your full name spelling your last

20  name for the court reporter?

21      A.  Good morning.  My name is Dr. Jessica

22  Dwyer, J-E-S-S-I-C-A, D-W-Y-E-R.

23      Q.  What is your profession?

24      A.  I am a forensic pathologist also known

25  as a medical examiner.

J. Dwyer - Direct by Ms. Pellegrini

1     Q.   Where are you employed?

2     A.   I am currently employed as a staff

3 forensic pathologist with the Dallas County

4 Medical Examiner's Office.

5     Q.   Could you detail for this jury your

6 educational background and training?

7     A.   Sure.  To start with, I have a Bachelor

8 of Science degree in animal science from Texas

9 A&M University in College Station, Texas.  I

10 then obtained a medical degree from the

11 University of Texas Health Science Center in

12 San Antonio, Texas.  I then completed a

13 combined anatomic and clinical pathology

14 residency with the University of Pittsburgh

15 Medical Center in Pittsburgh, Pennsylvania and

16 completed a one year fellowship in forensic

17 pathology with the Allegheny County Office of

18 Medical Examiner also here in Pittsburgh,

19 Pennsylvania.

20     Q.   Then ultimately you left and went to

21 Dallas to work?

22     A.   Yes, ma'am.

23     Q.   Now, when you were doing your

24 fellowship here in Pittsburgh, did you perform

25 the autopsy on two of the victims in this case,

J. Dwyer - Direct by Ms. Pellegrini

1    Jerry Shelton and Chanetta Powell?

2        A.   Yes, ma'am.

3        Q.   Dr. Dwyer, before we begin, I show you

4    what I marked as Commonwealth Exhibit 611 for

5    the purposes of the record only.  Is this your

6    autopsy protocol dated March 11, 2016, for the

7    autopsy you performed on Jerry Michael Shelton?

8        A.   Yes, ma'am.

9        Q.   Are your findings contained at case

10   number 16CORONER01957?

11       A.   Yes, ma'am.

12       Q.   Is this your signature as well as

13   Dr. Shakir, the deputy medical examiner?

14       A.   Yes, ma'am.

15            MS. PELLEGRINI:  For the purposes

16   of the record, I move for the admission of

17   Commonwealth Exhibit 611.

18            THE COURT:  Admitted without

19   objection.

20       Q.   I placed a laser pointer there.

21   Dr. Dwyer, I'm going to show you what I marked

22   as 612 through 638.  Are these the autopsy

23   photos that you've prepared to aid in your

24   testimony here today?

25       A.   Yes, ma'am.

J. Dwyer - Direct by Ms. Pellegrini

1            MS. PELLEGRINI:  I move for the

2       admission of 612 through of 638.

3            THE COURT:  Admitted without

4       objection other than our earlier discussions.

5       Again, ladies and gentlemen, the photographs

6       that apply to this particular victim as well as

7       the second as the doctor will testify about,

8       they are not pleasant to look at.  They are for

9       the purpose of helping her explain her

10      testimony to you and her findings and

11      conclusions also as it may relate to the degree

12      of murder if she should so find.  They are not

13      to stir up any emotion to the prejudice of the

14      defendant.  Ms. Pellegrini.

15           Q.  Dr. Dwyer, in preparing your ultimate

16      diagnoses and your findings, do you also review

17      crime scene photos?

18           A.  Yes, ma'am.

19           Q.  I'm going to show you what has been

20      marked previously as Commonwealth Exhibit

21      No. 31.  Now the jury has previously seen this,

22      using the laser pointer, could you show us

23      where Jerry Shelton, where his body finally

24      came to rest?

25           A.  Now I'm trying to remember.  I think he

J. Dwyer - Direct by Ms. Pellegrini

1      is the front one.

2          Q.   Yes.   He was partially in and out of

3      the door?

4          A.   That's correct, yes.

5          Q.   Now, let's begin with your findings,

6      Doctor.   Beginning with Commonwealth Exhibit

7      No. 612, could you tell us what we're looking

8      at here?

9          A.   So there are a standard set of

10     photographs that we take on every case.   This

11     is one photograph that we take on every case no

12     matter what kind it is.   This is a picture of

13     the upper half of the body including the head.

14     You can also note there are some injuries that

15     are visible on his head and trunk here.

16         Q.   Now, the next photograph, did you find

17     any injuries on the lower half of his body?

18         A.   No, ma'am.

19         Q.   Commonwealth Exhibit 614?

20         A.   This is also a standard photograph we

21     take on every case.   It is called an

22     identification shot.   It is just a dedicated

23     photograph of the face and head that someone

24     needs to be visually identified.   What you can

25     also appreciate from this picture is he has

J. Dwyer - Direct by Ms. Pellegrini

1    several injuries of his face including a wound

2    that is here on the right side of his head.

3         Q.   You see his eyes are swollen and

4    discolored, what does that indicate to you?

5         A.   Even though they look like bruises, it

6    is actually a secondary effect of the injuries

7    to the base of the skull.  They are called

8    periorbital ecchymoses.  You can think of it as

9    the base of the skull is the roof to the eyes.

10   When you have fractures of the skull, it is

11   like a leaky roof where blood and fluids

12   accumulate around both eyes.

13        Q.   What is this that you see here?

14        A.   So this is actually a collection of

15   several abrasions and superficial lacerations.

16   They are superficial injuries likely from a

17   terminal collapse meaning somebody falls flat

18   on their face.  So these again are secondary

19   injuries.

20        Q.   What do we see up here on the right

21   side?

22        A.   That is a large gunshot wound to the

23   right side of his head.

24        Q.   Could you describe that wound to us?

25        A.   So, to begin with, it is a gunshot

J. Dwyer - Direct by Ms. Pellegrini

1    wound so there is an entrance and there is an

2    exit.  The entrance wound is on the back right

3    side so we call that the right occipital scalp.

4    The bullet itself actually perforated the skin,

5    the subcutaneous soft tissues of the right side

6    of the scalp, and also a bone that is on the

7    back of the head called the right side of the

8    occipital skull and lacerated the portion of

9    the right side of the brain and right occipital

10   and right parietal lobes and it is going to

11   fracture and exit out the skull from a region

12   on the right side of the head called the right

13   parietal scalp, right parietal skull.  It is

14   kind of on the top of the right side of the

15   head.  You can see a little bit of that exit

16   wound in this photograph.

17        Q.  Now, would that wound have been fatal?

18        A.  You have damage to the brain, so, yes,

19   he would have been rapidly unconscious and

20   fatal.

21        Q.  Essentially, using the back of my head,

22   could you show the jury?

23        A.  On the back side the head here and the

24   exit is closer to the top of the head in this

25   area.

J. Dwyer - Direct by Ms. Pellegrini

1      Q.  Now, the next photo, that is just a

2    close-up of the cuts and abrasions on his face,

3    correct?

4      A.  Yes, ma'am.

5      Q.  Now, if he had gone through that glass

6    door or the glass had been shattered there,

7    that is likely to have caused that?

8      A.  That is possible, yes.

9      Q.  Moving to Commonwealth Exhibit 616, is

10    this the wound that you described to us?

11      A.  This is the entrance wound.  This is a

12    portion of the exit wound.

13      Q.  Moving on to 617, could you tell us

14    what you observed here?

15      A.  This is a photograph of the back of the

16    upper half of his body.  You can see the back

17    of his head here.  There are several wounds on

18    the left side of his lower back and back of the

19    left shoulder and you can also appreciate

20    several wounds on his left arm.

21      Q.  618?

22      A.  So to reorient, this is the same --

23    we're also still on his back but his head would

24    be up here, his feet would be down here.  This

25    is the left side of his body.  There are two

J. Dwyer - Direct by Ms. Pellegrini

1    wounds here on the left side of the lower back

2    and the left buttock.  Both of these are

3    gunshot entrance wounds.

4         Q.  Is this a close-up of the entrance

5    wound?

6         A.  This is a close-up of the entrance

7    wound on the left side of the low back, yes.

8         Q.  620, what are we looking at here?

9         A.  This is a close-up picture of the

10   entrance wound of the left buttock.

11        Q.  Could you tell us with these two

12   wounds, what damage occurred to the body?

13        A.  The reason why I described them

14   together is because in the body, their wound

15   paths are very similar and overlapping so it is

16   hard to say with certainty which bullet caused

17   which wound path because they are so close

18   together and so they are described together.

19             So collectively the injuries in the

20   body that perforated the skin and subcutaneous

21   soft tissues and muscles of the left buttock,

22   it fractures a bone in the left side of the

23   pelvis called the left iliac bone and enters

24   the abdominal cavity.  The bullet from the left

25   side of the lower back perforated the skin and

J. Dwyer - Direct by Ms. Pellegrini

1    subcutaneous soft tissues and muscles of the

2    left back and also enters the abdominal cavity.

3    It fractures the posterior aspect of the left

4    twelfth rib and portions of the bones that make

5    up the lower part of the spine called the

6    lumbar vertebrae.  But in the abdominal cavity

7    the bullet lacerated the left kidney, the left

8    hemidiaphragm, the left lung including the

9    airway leading into the left lung called the

10   left main bronchus.

11                THE COURT:  Could you slow down a

12   little bit?

13                THE WITNESS:  Sure.  It is a lot,

14   I understand.

15       A.  One bullet then angles slightly

16   anteriorly and actually lacerates the sac that

17   surrounds the heart called the pericardium,

18   lacerates portions of the heart including the

19   left ventricle that supplies blood to the

20   entire body, also lacerates the thoracic aorta,

21   the largest artery in the body.  The bullet

22   came to rest in the anterior chest wall.

23                The other bullet continued going upward

24   from the left lung and actually exited the left

25   chest by fracturing the posterior aspect of the

J. Dwyer - Direct by Ms. Pellegrini

1    first intercostal space which is a fancy word

2    for the space between two ribs and we recovered

3    both bullets.

4        Q.  Would those wounds have been fatal to

5    Mr. Shelton?

6        A.  Yes.

7        Q.  Now I show you Commonwealth Exhibit

8    Nos. 621 and 622.  Is this the first bullet

9    that you recovered in the trunk of the body

10   that you just described?

11       A.  Yes, ma'am.

12       Q.  And 623 and 624.  Now, what type of

13   bullet is this?

14       A.  These look like rifle bullets.

15       Q.  What does a rifle bullet do to the

16   body?

17       A.  So rifles are a long arm, like a

18   shotgun, meaning that the barrel is very long

19   compared to say something like a handgun.  The

20   other thing with rifles, bullets are fired out

21   of a rifle moving at a very high velocity, some

22   of the highest velocity bullets compared to

23   that of a handgun.  When you increase the

24   velocity of the bullet, you increase the amount

25   of damage to the target.  In the body, these

J. Dwyer - Direct by Ms. Pellegrini

1    are known for causing rapid soft tissue

2    injuries and fractures to bones.  They are

3    typically very destructive because they are a

4    high velocity weapon.

5        Q.   I'm going to show you what I marked as

6    Commonwealth Exhibit No. 625.  Could you

7    describe the wounds that you see here?

8        A.   So this is the front of his body now.

9    We're looking at his chest.  You can appreciate

10   both nipples.  So the head would be here.  The

11   feet would be down here.  This is a gunshot

12   entrance wound on the right side of the lower

13   chest near the midline of the lower body.

14       Q.   Commonwealth Exhibit 626?

15       A.   So this is a photograph now of the left

16   side of his body.  You can see the left side of

17   his face here.  Specifically, this is an exit

18   wound for the entrance wound that we just

19   described.  The exit wound is on the lateral

20   left side of the chest.

21       Q.   What did this wound do to the body?

22       A.   So it perforated the skin, the

23   subcutaneous soft tissues and muscles on the

24   right side of the lower chest.  It fractured

25   multiple left ribs, specifically ribs seven

J. Dwyer - Direct by Ms. Pellegrini

1    through nine.  It lacerated portions of the

2    liver, the stomach, the transverse colon, the

3    left hemidiaphragm, and then exited out of the

4    left side of the chest by perforating the left

5    eighth intercostal space and also fractured the

6    lateral aspect of the left rib nine.

7        Q.  Now, I'm going to move to 627.  What is

8    this right here?

9        A.  So this is the exit wound on the left

10   lateral side of the chest I just described.

11   This injury specifically is an injury secondary

12   to several wounds that are on his left arm.  A

13   lot of the wounds on his left arm are on the

14   medial aspect of the left arm meaning adjacent

15   to the body.  These are some abrasions that are

16   associated with injuries on his left arm.

17       Q.  Is this a close-up of the exit wound?

18       A.  Yes, ma'am.

19       Q.  Now, Commonwealth Exhibit No. 629, what

20   do we see here?

21       A.  So this is another wound on his back.

22   It is on the back of his left shoulder.  You

23   can see his head here, his feet would be down

24   here so we're looking at his back.  This is

25   what we call a grazed wound.  The bullet does

J. Dwyer - Direct by Ms. Pellegrini

1    not actually enter the body but just kind of

2    skims across the surface of the body and

3    creates these elongated, what we call a graze

4    wound.

5         Q.   Is that a close-up?

6         A.   Yes, ma'am.

7         Q.   Moving on to 631, what do we see here?

8         A.   So this is another photograph of his

9    lower back and buttock.  You have a gunshot

10   entrance wound here on the left buttock

11   separate from the other wound on his left

12   buttock that we described previously and one on

13   his left back.  This is a separate wound all

14   together.

15        Q.   633?

16        A.   This is a close-up of the entrance

17   wound on his left buttock.

18        Q.   And Commonwealth Exhibit No. 634?

19        A.   So just to reorient, this body is

20   upward.  So this is the anterior surface of his

21   body.  His buttock is against the table.  His

22   head would be here, his feet would be here.

23   There is an exit wound on the lateral aspect of

24   his left buttock.

25        Q.   Now, Doctor, we saw earlier portions of

J. Dwyer - Direct by Ms. Pellegrini

1    the arm that had a lot of trauma to it?

2         A.   Yes, ma'am.

3         Q.   This is a close-up of that wound.  Now,

4    I asked you, this is a diagram that you prepare

5    in every case, correct?

6         A.   Yes, ma'am.

7         Q.   Can we talk about the left arm, the

8    damage that the bullet caused to his arm?

9         A.   So collectively in the left arm, there

10   are two gunshots wounds and additional injuries

11   that are secondary to shrapnel or some sort of

12   intermediate object.  So to start with, the

13   first gunshot wound on his left arm, so the

14   medial aspect of his upper arm, so that's

15   designated by the portion of his arm between

16   the shoulder and elbow.  So he has an entrance

17   wound on the medial aspect of the upper arm.

18   That bullet penetrated the skin subcutaneous

19   soft tissue and we recovered a bullet from the

20   deep soft tissues of the left upper arm.  Then

21   the second gunshot wound is on the back of his

22   left forearm.  So specifically that is the

23   dorsal aspect of the left forearm and that

24   bullet perforated the skin, the subcutaneous

25   tissues and muscles and fractured the bone in

J. Dwyer - Direct by Ms. Pellegrini

1    the arm, the ulna bone, and exited from the

2    inside of the forearm so we call that the

3    ventral aspect of the left forearm.  There are

4    multiple lacerations, large gaping wounds, that

5    could be associated with some of these gunshot

6    wounds but also I actually recovered fragments

7    of debris, glass, paint from these wounds so

8    that could also be shrapnel injuries.

9              THE COURT:  What number is that

10   body diagram?

11             MS. PELLEGRINI:  I was going to

12   introduce that.  636, Your Honor.

13        Q.   636 describes the totality of his

14   wounds?

15        A.   These are all of his wounds, yes.

16        Q.   Now the devastating wound to his left

17   arm, could that have been a fatal wound?

18        A.   Potentially because you have multiple

19   large vasculature veins and arteries in your

20   arm that if transected can extinguinate

21   quickly.

22        Q.   And Commonwealth Exhibit 637, is this

23   the bullet that you recovered in the left

24   shoulder?

25        A.   Yes.

J. Dwyer - Direct by Ms. Pellegrini

1      Q.   And a close-up of the deformed bullet?

2      A.   Yes, ma'am.

3      Q.   Doctor, do you have an opinion as to

4   the cause of death of Jerry Michael Shelton?

5      A.   Yes, multiple gunshot wounds of the

6   head, trunk, and left upper extremity.

7      Q.   Manner of death?

8      A.   Homicide.

9      Q.   Doctor, I'm going to show you what I've

10   marked as Commonwealth Exhibit 639.  Is this

11   the Allegheny County Medical Examiner's

12   envelope containing all the ballistic evidence

13   that you recovered from the body of Jerry

14   Shelton?

15      A.   Yes, ma'am.

16           MS. PELLEGRINI:  I move to admit

17   639.

18           THE COURT:  Admitted without

19   objection.

20      Q.   Doctor, did you then perform an autopsy

21   on the body of Chanetta Powell?

22      A.   Yes.

23      Q.   I'm going to show you what has been

24   marked as 640.  Are these your findings at lab

25   case number 16CORONER01954, the autopsy

J. Dwyer - Direct by Ms. Pellegrini

1    performed on Chanetta Powell on March 10, 2016?

2        A.   Yes, ma'am.

3        Q.   Is this your signature as well as the

4    signature of Dr. Xu on the last page?

5        A.   Yes, ma'am.

6            MS. PELLEGRINI:  I move for the

7    admission for record purposes only 640.

8            THE COURT:  Admitted without

9    objection.

10       Q.   Doctor, did you become aware when you

11   began the autopsy that Chanetta Powell was

12   pregnant?

13       A.   I did not become aware of that until we

14   x-rayed her.

15       Q.   Was there initially some confusion from

16   the first responders of which of the female

17   victims was actually pregnant?

18       A.   Yes.

19       Q.   Now, Doctor, I show you what I marked

20   as Commonwealth Exhibits 641 to 648.  Is this

21   the body diagram as well as the photographs

22   that you have prepared to aid in your testimony

23   here today?

24       A.   Yes, ma'am.

25           MS. PELLEGRINI:  I move for the

J. Dwyer - Direct by Ms. Pellegrini

1    admission of 641 through 648.

2                    THE COURT:  Admitted without

3    objection.

4         Q.  641, is this the body diagram that was

5    prepared when you did your examination of

6    Ms. Powell?

7         A.  Yes, ma'am.

8         Q.  Could you just point out for the jury

9    the various injuries of which she suffered?

10        A.  There are two gunshot wounds on the

11   head and one gunshot wound through the left

12   upper arm.

13        Q.  Beginning with Commonwealth

14   Exhibit 642, could you describe for this jury

15   the gunshot wounds of Ms. Powell's face and

16   head?

17        A.  So this is an entrance wound that is on

18   the right side of her forehead.  It is a little

19   elongated probably because the bullet skimmed

20   the surface before it actually penetrated and

21   entered the right side of her forehead.  So

22   this is the entrance wound.

23        Q.  Where was the exit wound?

24        A.  The exit wound was actually around the

25   left eye area, essentially the entire left eye

J. Dwyer - Direct by Ms. Pellegrini

1    area was disrupted.

2        Q.   The jury has seen crime scene photos in

3    which she was facedown and you examined those

4    photographs as well?

5        A.   Yes.

6        Q.   When she was laying down, that was

7    brain matter and tissue, correct?

8        A.   Yes.

9        Q.   So her entire, this entire portion of

10   her face was gone?

11       A.   Yes.

12       Q.   Could you describe the trauma to her

13   brain that incurred from this gunshot wound?

14       A.   So the bullet entered from the right

15   side of the forehead and perforated the skin

16   and subcutaneous soft tissue and muscle of the

17   forehead and actually fractured that right side

18   of that portion of the skull called the frontal

19   bone.  It perforated both anterior lobes of her

20   brain and also the base of her skull and then

21   again exited out the skin and subcutaneous soft

22   tissues and muscle and left orbital area around

23   the left eye.

24       Q.   Is this wound fatal?

25       A.   Yes.

J. Dwyer - Direct by Ms. Pellegrini

1      Q.   Now, Doctor, Commonwealth Exhibit

2    No. 643, is this the -- could you describe what

3    this is to us?

4      A.   So, again, we're looking at the right

5    side of her face.  This is her right eye.  This

6    is actually an entrance wound on the lateral

7    aspect of the right eye, another gunshot

8    entrance wound.

9      Q.   Where is the exit wound?

10     A.   It also exits out the left eye area.

11     Q.   Where that eye is completely gone?

12     A.   Yes.

13     Q.   Could you tell us the associated

14   injuries with this gunshot wound?

15     A.   The direct injuries or secondary

16   injuries?

17     Q.   Both.

18     A.   So the direct injuries, this bullet

19   perforated the skin and subcutaneous soft

20   tissues and muscles of the right orbit, right

21   eye, fractures the zygomatic bone, essentially

22   the cheekbone, perforated the right eye, also

23   fractured the right maxilla, another facial

24   bone that makes up the cheek, the nasal bones

25   which are here at the base of the nose, and

J. Dwyer - Direct by Ms. Pellegrini

1    perforated the skin, subcutaneous soft tissues,

2    muscles, and bones of the left eye area.

3             Injuries that are associated with both

4    gunshot wound one and two are you have

5    hemorrhage under the scalp, you have fractures

6    of the skull including the base of the skull,

7    you have bleeding on the brain, contusions of

8    the brain which is basically a bruise of the

9    brain, and bleeding on the brain which I

10   already mentioned.

11        Q.  Now, Doctor, Commonwealth Exhibit

12   No. 644, could you describe this injury to the

13   jury?

14        A.  So to orient, this is her head so she

15   is face-up.  This is her left arm, specifically

16   the upper arm, again between the shoulder and

17   the elbow, and there is a gunshot entrance

18   wound on the dorsal aspect of her left upper

19   arm.

20        Q.  Is this a close-up of that at 645?

21        A.  Yes, ma'am.

22        Q.  What are the associated injuries to

23   that?

24        A.  So the bullet perforated the skin, the

25   subcutaneous soft tissues, muscles of the left

J. Dwyer - Direct by Ms. Pellegrini

1    upper arm and actually fractures the bone in

2    that portion of that arm called the left

3    humerus bone.

4        Q.  646?

5        A.  This is actually an exit wound that is

6    on the medial aspect of her left upper arm.

7        Q.  Is this a close-up of the exit wound?

8        A.  Yes, ma'am.

9        Q.  Then you recovered bullet fragments in

10   that wound, correct?

11       A.  That's correct.

12       Q.  And that is contained at 648?

13       A.  Yes, ma'am.

14       Q.  Now, Doctor, you may retake the stand.

15   Doctor, the bullet fragments that you recovered

16   from the body of Chanetta Powell, are they

17   contained at 649?

18       A.  Yes, ma'am.

19            MS. PELLEGRINI:  I move for the

20   admission of 649.

21            THE COURT:  Admitted without

22   objection.

23       Q.  So you said that when you x-rayed

24   Ms. Powell you determined she was pregnant.

25   Why did you x-ray the body?

J. Dwyer - Direct by Ms. Pellegrini

1      A.   Anytime there is a victim that has

2   penetrating trauma, whether gunshot wound or a

3   stabbing, it is routine to x-ray them.

4      Q.   So what did you find?

5      A.   In addition to those fragments,

6   anything that remained would be visible on an

7   x-ray.  So you could see the bullet fragments

8   in her arm and see the intact spinal column

9   consistent with the fetus in her pelvis.

10      Q.   What was the age of the fetus?

11      A.   Based on fetal measurements, it fit

12   best to 32 weeks which would be the third

13   trimester.

14      Q.   Boy or girl?

15      A.   A male fetus.

16      Q.   Did the baby suffer any gunshot wound

17   or trauma to the body?

18      A.   No, ma'am.

19      Q.   Why did the baby die?

20      A.   Because the mother is dead.

21      Q.   What is the cause of death of Chanetta

22   Powell and her unborn child?

23      A.   Multiple gunshot wounds.

24      Q.   What is the manner of death?

25      A.   Homicide.

T. Morgan - Direct by Ms. Pellegrini

1    Q.  Do you hold your opinions to a

2    reasonable degree of medical certainty?

3    A.  Yes, ma'am.

4              THE COURT:  I offer for cross.

5              MR. McKINNEY:  No questions, Your

6    Honor.

7              THE COURT:  You are excused.

8    Thank you, Doctor.  Call your next witness.

9              MS. PELLEGRINI:  Yes, Your Honor,

10   the Commonwealth re-calls Tom Morgan.

11                   -----

12              THOMAS MORGAN,

13   a witness herein, having been previously first

14   duly sworn, was examined and testified as

15   follows:

16                   -----

17              THE COURT:  You remain under

18   oath.

19              THE WITNESS:  Yes, Your Honor.

20                   -----

21              DIRECT EXAMINATION

22                   -----

23   BY MS. PELLEGRINI:

24    Q.  Mr. Morgan, when you were here last

25   week, you testified about processing the scene

T. Morgan - Direct by Ms. Pellegrini

1    at 1304 Franklin Avenue?

2        A.  Yes.

3        Q.  We saw a picture of the back porch

4    where the victims were located as well as the

5    railing?

6        A.  Yes.

7        Q.  I'm going to show you Commonwealth

8    Exhibit No. 650.  Is this the railing from the

9    side porch that was collected and entered into

10   evidence?

11       A.  Yes, it is.

12              MS. PELLEGRINI:  I move for the

13   admission of the 650.

14              THE COURT:  Admitted without

15   objection.

16       Q.  Now, Mr. Morgan, did you examine the

17   ballistics evidence that was recovered during

18   autopsy in this case?

19       A.  Yes, I did, in the laboratory.

20       Q.  Just for the record, I'm going to read

21   in the numbers.  Commonwealth Exhibit 544, the

22   ballistics evidence from Tina Shelton, you

23   examined the ballistics evidence at 512 from

24   Shada Mahone, you examined the ballistics

25   evidence for Brittany Shelton at 592, the

T. Morgan - Direct by Ms. Pellegrini

1    ballistics evidence from Jerry Shelton at 639,

2    finally the ballistic evidence from Chanetta

3    Powell at 649; is that correct?

4        A.  Yes, that would be correct.

5        Q.  Mr. Morgan, did you determine out of

6    the bodies of Jerry Shelton and Brittany Powell

7    that there were 7.62 millimeter caliber bullets

8    that were recovered from each of their bodies?

9        A.  Yes, bullets and/or fragments that were

10   at least at one time part of the 7.62

11   millimeter caliber bullets.

12       Q.  Do the 7.62 bullet items that you were

13   able to determine from Jerry Shelton and

14   Brittany Powell, were they fired from the same

15   weapon?

16       A.  After an in-laboratory examination

17   which involved microscopic similar to the

18   examinations that I performed on the cartridge

19   cases, I was able to determine that there were

20   a number of 7.62 millimeter caliber bullets

21   that had been discharged from the same firearm.

22       Q.  Did you also determine that there were

23   .40-caliber bullet items recovered from the

24   body of Jerry Shelton, Chanetta Powell, Tina

25   Shelton, and Shada Mahone?

T. Morgan - Cross by Mr. McKinney

1      A.   Yes.

2      Q.   What was your analysis of those items?

3      A.   Again, after a microscopic examination

4  in the lab, I was able to determine that the

5  .40-caliber bullets that you're referencing did

6  match each other and came from the same

7  firearm.

8      Q.   Do you hold your opinions to a degree

9  of expertise in your field?

10     A.   Yes.  Again, the same answer I've given

11 before, we believe someone who had similar

12 training following similar accredited

13 procedures and undergoing review would reach

14 the same conclusions that I did.

15           MS. PELLEGRINI:  Thank you,

16 Mr. Morgan.

17                -----

18           CROSS-EXAMINATION

19                -----

20 BY MR. McKINNEY:

21     Q.   Mr. Morgan, did you do any microscopic

22 analysis when comparing the shell casings from

23 the crime scene to the ammunition at

24 1214 Nolan?

25     A.   The cartridge cases from the crime

T. Morgan - Cross by Mr. McKinney

1    scene and the ammunition to the cartridges

2    recovered at 1214 Nolan, yes, I did.

3         Q.  We talked about the fact in your

4    previous testimony that the headstamps from

5    those two different kinds of ammunition did not

6    match; do you remember that testimony?

7         A.  Yes, I do.

8         Q.  Essentially your testimony was that the

9    manufacturer of the bullets at 1214 Nolan was

10   different than the manufacturer of the shell

11   casings found at 1304 Franklin Avenue, correct?

12        A.  To paraphrase, yes.

13        Q.  With respect to any microscopic

14   analyzing that you did, comparing those two

15   different sets of casings and bullets, what did

16   you find?

17        A.  Essentially, to summarize what I had

18   found during my microscopic analysis, is that I

19   looked for marks on the live cartridges that

20   were recovered at 1214 Nolan Court that were

21   consistent of a cartridge that was cycled

22   through the action of a firearm or at least

23   loaded into a magazine.  After my analysis, I

24   could not make class associations let alone any

25   microscopic analyses.  So essentially I have a

T. Morgan - Cross by Mr. McKinney

1  verbose report that says I'm unable to make any

2  determinations whatsoever.

3      Q.  So you can't make any class

4  association, likely comparisons, between those

5  two different kinds of ammunitions?

6      A.  With respect to the tool marks on

7  there, again, I testified previously that the

8  cartridge cases and the cartridge were 7.62 by

9  39 millimeter caliber.  As an overall class

10  association, that would be one.  But as far as

11  microscopic markings to say that they were one

12  time cycled through the action of the same

13  firearm or loaded into the same magazine, I

14  cannot.

15      Q.  So last question, I promise you, you

16  cannot definitively say that the individual

17  that fired these shots at 1304 Franklin Avenue

18  obtained those bullets from 1214 Nolan,

19  correct?

20      A.  Well, with regard to the microscopic

21  analyses, I can't say that but I can't

22  eliminate that possibility either at this

23  point.

24          MR. McKINNEY:  Thank you,

25  Mr. Morgan.

Motion

```
 1                    THE COURT:  Anything else?
 2                    MS. PELLEGRINI:  No.  Thank you.
 3                    THE COURT:  Thank you.  You are
 4      excused.
 5                    MR. CHERNOSKY:  Your Honor, with
 6      respect to the case of the Commonwealth versus
 7      Cheron Shelton at CC 201608964, the
 8      Commonwealth rests.
 9                    THE COURT:  Remain seated and
10      quiet as the jury leaves the room.
11                            -----
12                    (Open court - Jury not present.)
13                            -----
14                    THE COURT:  Mr. McKinney.
15                    MR. McKINNEY:  Your Honor, at
16      this point I argue that the Commonwealth has
17      not met its burden.
18                    THE COURT:  Okay, motion denied.
19      We'll take a 15-minute recess and start with
20      your witnesses.
21                    MR. McKINNEY:  Okay.
22                            -----
23                    (Brief recess taken.)
24                            -----
25
```

D. Smith - Direct by Mr. McKinney

```
 1                      -----
 2              (Open court - Jury present.)
 3                      -----
 4              THE COURT:  Mr. McKinney.
 5              MR. McKINNEY:  Your Honor, the
 6     defense calls Desdrene Smith.
 7                      -----
 8                  DESDRENE SMITH,
 9     a witness herein, having been first duly sworn,
10     was examined and testified as follows:
11                      -----
12                 DIRECT EXAMINATION
13                      -----
14     BY MR. McKINNEY:
15          Q.   Good afternoon, Ms. Smith.  Could you
16     state your full name for the record?
17          A.   Desdrene Smith.
18          Q.   How do you spell your first name?
19          A.   D-E-S-D-R-E-N-E.
20          Q.   Do you know Cheron Shelton?
21          A.   Yes, that's my son.
22          Q.   On March 9, 2016, did you see Cheron?
23          A.   Yes.
24          Q.   Where did you see him at?
25          A.   At my house.
```

D. Smith - Direct by Mr. McKinney

1    Q.  Had he recently been released from

2    jail?

3    A.  Yes.

4    Q.  How long had he been in jail before you

5    saw him on March 9th?

6    A.  It was a couple weeks.

7    Q.  Do you know why he was in jail?

8    A.  Yeah, him and Channel had a falling

9    out.

10   Q.  Did he come to your house with Channel?

11   A.  Yes, and the kids.

12   Q.  How many kids do they have?

13   A.  Two.

14   Q.  Do you remember around what time he got

15   to your house?

16   A.  About 6:00.

17   Q.  What was he doing when he was there?

18   A.  Well, we sat out front or stood in

19   front of my house talking.  Then he went up the

20   next court and came back with a baby bottle but

21   it had liquor in it.  He was drinking out of

22   it.  He just stood there and played with the

23   kids and stuff.

24   Q.  He was drinking liquor out of a baby

25   bottle?

D. Smith - Direct by Mr. McKinney

1        A.   Yes.

2        Q.   What kind of liquor was it?

3        A.   Hennessy.

4        Q.   Was he a big drinker?

5        A.   No.

6        Q.   Could you describe for the jury what

7    his mood was like that day?

8        A.   He was in good spirits, good mood.

9        Q.   Did he seem happy to get out of jail

10   even though he hadn't been in that long?

11       A.   Yes.

12       Q.   Did he seem angry to you at all?

13       A.   No.

14       Q.   Do you know a woman by the name of

15   Millie Walker?

16       A.   That was my next door neighbor.

17       Q.   So do you live at 1214 Nolan Court?

18       A.   That is where I used to live.

19       Q.   Did Millie live at 1216 Nolan?

20       A.   Yes.

21       Q.   Do you know if Millie Walker is related

22   to Lamont Powell?

23       A.   Yes.

24       Q.   What is their relation?

25       A.   Brother and sister.

D. Smith - Direct by Mr. McKinney

1      Q.   Do you know if Cheron ever had any

2   interactions with Millie when he would visit

3   your apartment?

4      A.   Well, that same day she came over and

5   talked with us and asked if him and Channel

6   wanted to smoke a blunt with them.

7      Q.   That was on March 9th?

8      A.   Yes.

9      Q.   Speaking of a blunt, did Cheron sell

10   drugs?

11      A.   Yes.

12      Q.   Do you know what kinds of drugs he

13   sold?

14      A.   Crack and refer.

15      Q.   Did you approve of him selling drugs?

16      A.   No.

17      Q.   Did you ever tell him to stop?

18      A.   Yeah, I told him before but he kept on.

19      Q.   Do you know if he ever sold drugs or

20   stored drugs at your house?

21      A.   Yes.

22      Q.   Did you tell him not to do that?

23      A.   Yes.

24      Q.   Did you live in government subsidized

25   housing at the time?

D. Smith - Direct by Mr. McKinney

```
 1          A.  Yes.
 2          Q.  What would have happened if drugs would
 3     have been found in your house?
 4          A.  I would have been evicted.
 5          Q.  Did you tell Cheron that?
 6          A.  Yes.
 7          Q.  Do you know whether or not even though
 8     you told him not to, do you know whether or not
 9     he was still selling drugs or storing drugs in
10     your house?
11          A.  Yeah, I know.  We kind of bickered.
12                   MR. McKINNEY:  One moment, Your
13     Honor.
14                   THE COURT:  Anytime you need.
15          Q.  Desdrene, where did Cheron live back in
16     March of 2016?
17          A.  He lived with Channel.
18          Q.  Do you know, did the kids also live
19     there?
20          A.  Yeah, at their house.
21          Q.  Do you know if he ever stored or sold
22     drugs out of that location?
23          A.  I don't know because we live far apart.
24                   MR. McKINNEY:  Your Honor, no
25     additional questions.  Thank you.
```

Points for Charge

1          THE COURT:  Mr. Chernosky,

2    Ms. Pellegrini.

3          MR. CHERNOSKY:  No questions,

4    Your Honor.

5          THE COURT:  Thank you, ma'am.

6    Call your next witness.

7          MR. McKINNEY:  Your Honor, the

8    defense rests.

9          MR. CHERNOSKY:  No rebuttal, Your

10   Honor.

11         THE COURT:  Ladies and gentlemen

12   of the jury, we're going to take a short recess

13   and proceed to closing arguments.  Thank you.

14               -----

15         (Open court - Jury not present.)

16               -----

17         THE COURT:  As to the instruction

18   to the jury, as to criminal homicide, I would

19   instruct on first degree murder.  Is there any

20   request from the defense or the prosecution as

21   to third degree murder?

22         MR. McKINNEY:  Yes, Your Honor,

23   we would like that instruction.

24         THE COURT:  I will include that

25   then.  As to criminal homicide of unborn child,

Points for Charge

1    I will instruct -- I have no evidence as to

2    second degree -- I will instruct third degree

3    murder as to that charge.  No other degree.

4    Any argument on that?

5              MS. PELLEGRINI:  No argument,

6    sir.

7              MR. McKINNEY:  No.

8              THE COURT:  Aggravated assault,

9    multiple counts of conspiracy as in the

10   information, attempted murder.  I will instruct

11   as to liability to conduct of another person

12   both as a conspirator and accomplice for

13   purposes of first degree murder and, more

14   generally, as it relates to the other charges.

15   There is a specific as we know liability for

16   conduct of another person requires shared

17   specific intent as it goes to first degree

18   murder.  I'll instruct as to motive, we'll do a

19   colloquy shortly.  As to Mr. Shelton, I will

20   give the instruction as to no adverse

21   inference.  Do you want that instruction?

22             MR. McKINNEY:  Yes.

23             THE COURT:  Okay.  Expert

24   testimony, inflammatory photographs, evidence

25   of other offenses as substantive proof of

C. Shelton - Colloquy

1    guilt, I will give that instruction as it

2    relates to the testimony regarding

3    Mr. Shelton's drug activity.

4                        MR. McKINNEY:  And domestic, Your

5    Honor.

6                        THE COURT:  And domestic.  I will

7    give instruction as to circumstantial evidence

8    as to intent, knowledge, other states of mind,

9    that is standard instruction 7.02(B).  I will

10   repeat the instruction regarding the absence of

11   Mr. Thomas and his charges and I will give an

12   instruction as to prior inconsistent

13   statements, that they may be treated for

14   impeachment purposes or substantive proof of

15   the content.  I haven't heard that much

16   actually except for Detective Adams.  Anything

17   else?

18                        MR. CHERNOSKY:  No, Your Honor.

19                        MR. McKINNEY:  No, Your Honor.

20                        THE COURT:  Okay.

21                        MR. McKINNEY:  Your Honor, do you

22   want to do a colloquy of Mr. Shelton?

23                        THE COURT:  Yes, come up, sir.

24   Mr. Shelton, are you clear-headed today, sir?

25                        THE DEFENDANT:  Yes.

C. Shelton - Colloquy

1          THE COURT:  Have you had enough

2     time to speak to Mr. McKinney and Ms. Williams

3     about two possibilities, one is the potential

4     that you could call character evidence in this

5     case?  Character evidence, if, in fact,

6     believed by the jury, as to some relative

7     character trait and reputation in the community

8     for non-violence and peaceable nature could be

9     considered by them and in and of itself may

10    require them, if believed, to enter a verdict

11    of not guilty.  Of course, that is subject to

12    cross-examination by the DA potentially of your

13    history or other reputation in the community.

14    But, in any event, have you talked with

15    Mr. McKinney about the potential of calling

16    character witnesses?

17          THE DEFENDANT:  Yes, I have, sir.

18          THE COURT:  Mr. McKinney, have

19    you talked with Mr. Shelton about that

20    potential?

21          MR. McKINNEY:  Yes, I have.

22          THE COURT:  Do you believe he

23    understands the concept?

24          MR. McKINNEY:  I do.

25          THE COURT:  Have you made a

C. Shelton - Colloquy

1   decision not to call character witnesses?

2                  THE DEFENDANT:  Yes, I have.

3                  THE COURT:  Has anyone threatened

4   or promised you anything to force you to make

5   that decision?

6                  THE DEFENDANT:  No, sir.

7                  THE COURT:  The second area of

8   the law that I want to discuss with you quickly

9   -- not quickly, but comprehensively -- at this

10  juncture of the trial, you have the opportunity

11  to testify in this case; do you understand

12  that?

13                 THE DEFENDANT:  Yes, sir.

14                 THE COURT:  You have an absolute

15  right under the Constitution of this

16  Commonwealth as well as that of United States

17  of America to testify in this matter; do you

18  understand that?

19                 THE DEFENDANT:  Yes, sir.

20                 THE COURT:  Although Mr. McKinney

21  and Ms. Williams may offer you the benefit of

22  their advice, their take on the case, their

23  posture of the case, where it stands, the

24  pluses and minuses, and they, themselves, may

25  have an opinion about whether or not you should

C. Shelton - Colloquy

1    testify, it is not their decision.  It is

2    solely your decision whether or not to testify;

3    do you understand that?

4                    THE DEFENDANT:  Yes, sir.

5                    THE COURT:  Mr. McKinney, do you

6    believe that you've had enough time to speak to

7    Mr. Shelton about the potential about

8    testifying?

9                    MR. McKINNEY:  I do.

10                   THE COURT:  Do you believe he

11   understands the concept and the principles that

12   attach?

13                   MR. McKINNEY:  I do.

14                   THE COURT:  Mr. Shelton, have you

15   had enough time to speak to Mr. McKinney about

16   this?

17                   THE DEFENDANT:  Yes, sir.

18                   THE COURT:  Have you made a

19   decision whether or not to testify?

20                   THE DEFENDANT:  Yes, I have, Your

21   Honor.

22                   THE COURT:  Will you be

23   testifying?

24                   THE DEFENDANT:  No, sir.

25                   THE COURT:  Has anyone threatened

Closing Argument - by Mr. McKinney

1   or promised you anything in that regard?

2                    THE DEFENDANT:  No, sir.

3                    THE COURT:  Mr. McKinney, do you

4   share that perception and that statement?

5                    MR. McKINNEY:  I do.

6                    THE COURT:  Anything else that

7   you want to put on the record about either of

8   these two decisions?

9                    MR. McKINNEY:  No, Your Honor.

10                   THE COURT:  Thank you.

11                        -----

12                   (Brief recess taken.)

13                        -----

14                   (Open court - Jury present.)

15                        -----

16                   THE COURT:  Ladies and gentlemen,

17  you have heard the evidence that you will have

18  to consider in this case, what remains are the

19  closing statements of the attorneys and

20  instructions of this Court.  We will begin with

21  will McKinney.

22                   MR. McKINNEY:  Thank you, Your

23  Honor.  May it please the Court, opposing

24  counsel, ladies and gentlemen of the jury.

25                   This has been an emotional trial.  One

Closing Argument - by Mr. McKinney

1    of the few things that Mr. Chernosky and I can

2    agree on is that you will be tested.  You're

3    going to be tested because there were a lot of

4    people hurt, there were a lot of people killed.

5    When you're reviewing the evidence in this

6    case, sometimes you feel that you have to hold

7    someone accountable for the madness and mayhem

8    that you see on that scene.  In this case there

9    is only one person seated at defense table.

10   Cheron Shelton.  You may have that urge because

11   there is no one else to blame to hold him

12   accountable for what happened.  You have to

13   resist that because the evidence in this case,

14   the lack of evidence in this case, proves to

15   you that the only appropriate verdict is not

16   guilty.

17           Now, at the conclusion of this case

18   when you go back to deliberate, you will be

19   talking about whether or not the Commonwealth

20   has proven their case beyond a reasonable

21   doubt.  The Judge is going to give you a formal

22   instruction of what reasonable doubt is but I'm

23   going to give you a preview.  A reasonable

24   doubt is a doubt that would cause a reasonable

25   person to pause or hesitate when making an

Closing Argument - by Mr. McKinney

1     important decision.  There are so many things

2     about this case that should give you pause and

3     should give you hesitation but I want to spend

4     a little more time talking about reasonable

5     doubt.  The best way to think about it is the

6     criminal justice process is a long straight

7     road.  At the beginning, you have the arrest.

8     Towards the end, you have the trial.  The very

9     last stop on that road is a finding of guilt.

10    The Commonwealth is trying to take Cheron

11    Shelton from the trial to the guilty verdict

12    but there is a huge brick wall right between

13    those last two stops.

14              THE COURT:  One second,

15    Mr. McKinney.  Turn that screen off, please.

16    Thank you.

17              MR. McKINNEY:  That brick wall

18    represents any and all reasonable doubts you

19    may have about this case, and the Commonwealth

20    is obligated, required, to remove every single

21    brick of that wall in order for you to return a

22    verdict of guilty.  The wall can't be standing,

23    there can't be any bricks scattered on the

24    road.  Every single brick must be gone for you

25    to find Cheron Shelton guilty.

Closing Argument - by Mr. McKinney

1          The most critical, the most important

2     piece of evidence in this case proves his

3     innocence.  You will remember at the crime

4     scene there were two different sets of shell

5     casings, .40-caliber casings in the alleyway

6     behind 1304 Franklin Avenue, and then there was

7     that side yard at 1306 Franklin, there were

8     7.62 shell casings there.  In the midst of

9     those shell casings, right where the

10    Commonwealth's theory is Cheron Shelton was

11    standing with that rifle when he assaulted,

12    caused all this madness and mayhem on March 9,

13    2016, in that exact location of the shell

14    casings was saliva.  The Commonwealth tested

15    that saliva because they believed it belonged

16    to the shooter.  Based on their experience and

17    expertise and detective work they focused on

18    that saliva because they knew it would lead

19    them to the culprit.  And it did.  But it is

20    not Cheron Shelton.  He is excluded as a match

21    to that DNA.  It is not Robert Thomas.  He is

22    excluded as a match to that DNA.  It was also

23    compared to the victims, excluded.  First

24    responders, excluded.

25          So when I talk about reasonable doubt,

Closing Argument - by Mr. McKinney

1    I could, quite frankly, end my closing argument

2    at this point.  When you think about this case,

3    when you go back and deliberate, the DNA

4    profile of an unknown male -- so this person

5    exists, we just don't know who he is -- it is

6    found in the midst of the shell casings that

7    caused all this carnage.

8          Now, either some unknown stranger

9    within two minutes of the crime happening

10   strolled on to 1306 Franklin and spit in the

11   backyard in the midst of all those shell

12   casings or the shell casings belonged to the

13   killer, the DNA belongs to the killer, and it

14   doesn't match Cheron Shelton.  This isn't a not

15   guilty situation, it proves his innocence.

16   He's not the guy.

17         Speaking of shell casings, there were

18   30 of them from the 7.62, the rifle that the

19   Commonwealth claims Mr. Shelton used.  They

20   never attempted to fingerprint those 30 shell

21   casings, didn't even try.  Never attempted to

22   lift DNA from those shell casings, didn't even

23   try.  How is that fair to Mr. Shelton?  They

24   had the resources.  We spent 45 minutes looking

25   at DNA profiles and fingerprints from a letter

Closing Argument - by Mr. McKinney

1    Cheron wrote from the jail that we're not even

2    contesting so they spend all the time focused

3    on things that don't matter.

4         Why don't you focus on the things that

5    do?  If the results come back inconclusive, who

6    cares.  They have the resources to pay for it.

7    Why didn't they ask for those tests?  The

8    Allegheny County Police Department, the

9    Allegheny District Attorney's Office, all of

10   these resources and they're keeping us

11   guessing.  Maybe, maybe the results of the

12   shell casings would go the way of the results

13   of the saliva.  Not Cheron Shelton.  But we'll

14   never know.

15        We also know that there was a boot

16   impression found at the crime scene.  The

17   Commonwealth's theory is whoever left that

18   impression used it to either get into the crime

19   scene or get out.  They made a cast of that

20   impression to try to compare it to the person

21   responsible for all this carnage.  They never

22   bothered to compare it to Mr. Shelton.  They

23   never bothered to compare it to Mr. Thomas.

24   How is that fair?  What sense does that make?

25            So you've got saliva that definitively

Closing Argument - by Mr. McKinney

1    doesn't match.  Shell casings and a foot
2    impression that they never cared to attempt to
3    match.  See, there are going to be witnesses
4    that I'm going to talk about, but witnesses are
5    human.  Science is not.  So the only forensic
6    evidence at the scene exonerates Mr. Shelton.
7    Any other attempt at science was never tried.
8    So in terms of objective unbiased evidence at
9    the crime scene, innocent.  They didn't even
10   try.
11          Now, I want to talk about some of the
12   subjective testimony.  Because the Commonwealth
13   can't place Cheron Shelton at the scene with
14   science, they had to rely on Detective Adams.
15   I spent a lot of time talking about Detective
16   Adams in my opening.  He is the Wilkinsburg
17   police detective who arrives on scene within
18   two minutes of the shots being fired.  He sat
19   in this witness stand and he identified the
20   person he saw that night as Cheron Shelton.
21   Now, let's pull the layers back on this, right?
22   This isn't a criminal complaint anymore.  This
23   isn't just a filing of charges.  This isn't
24   just words on paper.  When you think about
25   Detective Adams's testimony, I submit to you

Closing Argument - by Mr. McKinney

1    that it make absolutely no sense.

2            Within two minutes he is on scene.  He

3    hears the shots prior to.  He is creeping up

4    Marlboro Avenue.  He is scanning the sidewalks,

5    looking for a victim or a suspect or a witness.

6    He doesn't see anyone.  He makes a left onto

7    Princeton Boulevard still scanning and still

8    looking, traveling at a rate of 5 to 8 miles

9    per hour because he is so focused on finding

10   anyone, someone.  He takes that left onto

11   Franklin.  He knows that the crime scene is in

12   the 1300 block.  He is in the 1400 block.  He

13   is five to eight houses away hearing people

14   scream.  His testimony is he sees the first

15   human sole that he makes contact with and he

16   doesn't in any way try to interview this

17   person, try to detain this person.  Does that

18   make any sense to you?  A detective's job is to

19   investigate and solve crime.  Does it make

20   sense to you that a detective on the force for

21   20 plus years would hear 20 plus shots at 11:00

22   at night, see someone, and pay them no

23   attention?  It doesn't make sense.

24           But it gets worse.  The detective says

25   he strolled up in his police cruiser as he saw

Closing Argument – by Mr. McKinney

1    this person get into the driver's seat of their

2    car and while idling his vehicle, the detective

3    says he stared at this driver for 60 seconds.

4    Do you see how awkward that felt and that was

5    ten seconds?  Does it make sense to you that a

6    detective would stare at someone for 60 seconds

7    after they just heard these shots, dispatch is

8    informing him that the crime scene is five to

9    eight houses away, that they would stare at

10   someone and not do anything?  I can tell you

11   how ridiculous that 60 seconds sounds because

12   Detective Adams was running away from it on the

13   stand.  On direct examination he told

14   Mr. Chernosky it was five seconds.  Cool.  On

15   cross-examination when I confronted him with

16   his prior sworn testimony under oath he

17   conceded it was 60 seconds.  We went through

18   his prior testimony.  I was surprised at the

19   time.  I said, Detective, are you sure, are you

20   sure?  He confirmed on three occasions it was

21   60 seconds.  I submit to you he realized how

22   ridiculous that sounded which is why at trial

23   he said five.

24          Ladies and gentlemen, it is an awesome

25   responsibility to be a juror but it is also

Closing Argument - by Mr. McKinney

1    simple.  Use your common sense.  Does Detective

2    Adams's testimony makes any sense at all to

3    you?

4           He also testified that he wasn't

5    suspicious enough of the driver to stop him but

6    he was suspicious enough to drive the cruiser

7    five to eight feet forward and through the side

8    view mirror look at the license plate.  But

9    then I asked him how could you see the license

10   plate of that car when the driver never turned

11   on the ignition?  He had no lights illuminating

12   his car at all.  The detective's response was

13   we have very strong brake lights at the police

14   department and that is how I was able to see

15   the plate.  Okay, you wrote it down, right?

16   Yes.  Who did you give that piece of paper to?

17   I don't know.  There is absolutely no

18   corroboration for Detective Adams's testimony.

19   There is nothing supporting it.

20          Detective Adams testified that he

21   didn't stop this person because he hadn't been

22   given a description of a suspect.  Is that how

23   policing works now?  I would think that

24   responding to multiple shots fired you would

25   want to stop whoever you came across even just

Closing Argument - by Mr. McKinney

1    to ask a couple of basic questions but he never

2    did.

3              When Detective Dolfi testified, he told

4    you he came on scene within 10 to 15 minutes.

5    He and eight Allegheny County police detectives

6    were actively investigating this case.

7    Detective Adams never told Detective Dolfi,

8    hey, this is some information that you might

9    want to have because I saw a potential suspect

10   or a witness on my way to the crime scene.

11   Detective Dolfi's testimony is that not only

12   did Detective Adams never tell him that, there

13   were daily briefings, March 9th, March 10th,

14   March 11th.  The purpose of those was to

15   develop leads and suspects.  So in order to

16   believe Detective Adams, you essentially have

17   to believe that the Allegheny County Police

18   Department isn't interested in solving crimes

19   because daily briefing, March 10th, the purpose

20   is for the detectives to share information that

21   they've received.  According to Detective

22   Dolfi, there were no suspects, no leads on

23   March 10th.  March 11th, another briefing,

24   Detective Dolfi's testimony, no leads, no

25   suspects.  So who did Detective Adams talk to?

Closing Argument - by Mr. McKinney

1    There has been no corroboration that he spoke

2    to anybody.  I submit to you that it is an

3    attempt to place Cheron Shelton at the scene

4    because the science didn't work.

5         Now Detective Adams on redirect

6    examination was asked do you get a bonus for

7    solving crimes?  Obviously, the insinuation is

8    was he going to get a financial incentive for

9    claiming he saw Cheron Shelton?  Now that is

10   just silly but he has been a long-term

11   detective in Wilkinsburg.  He has been tied to

12   that community for a long time.  This case was

13   important to him.

14        So now let me talk to you about how

15   Cheron Shelton actually became a suspect in

16   this case because it wasn't the science and it

17   wasn't Detective Adams's alleged

18   identification.  What actually happened,

19   anonymous sources.  Anonymous sources, and

20   Detective Dolfi admitted this because it is in

21   his Affidavit of Probable Cause which is the

22   charging document, anonymous sources led police

23   to Hilltop.  Not even to 1214 Nolan Court but

24   to Hilltop.  They don't get up there until

25   March 11th which was two days after the

Closing Argument - by Mr. McKinney

1    shootings.  Detective McCue's testimony is they
2    reviewed the surveillance, 48 hours worth, from
3    16 different cameras, the entire Hilltop
4    section of Homewood, and based on reviewing
5    that surveillance, they saw what they deemed to
6    be suspicious activity.  That is when they got
7    Cheron Shelton in their sights.  We got him.
8    He's acting suspicious.  He went out the front
9    door, put something out of the back door, and
10   got in a car and left.  Tunnel vision starts.
11            So the next day, which was March 12th,
12   so we're now three days after the shooting, a
13   detective, who we'll never know because he was
14   never called as a witness and never testified,
15   sent a text message to Detective Adams.  This
16   is three days after the shooting.  The text
17   message contains photographs from the
18   surveillance of Nolan Court that they just
19   viewed the day before.  So they locked on to
20   Shelton.  They just needed confirmation.  So
21   they send a text message to Detective Adams on
22   March 12th.
23            Now, we'll never know what was in that
24   text message because conveniently for Detective
25   Adams, his cell phone was run over by a car.

Closing Argument - by Mr. McKinney

1    But I submit to you that based on the evidence,
2    this is what the text message said, we've got a
3    suspect, is this suspect the person that you
4    saw?  Or we got a suspect, we got a house, we
5    got a car, we need some help.  Do you see
6    because they couldn't get into Mr. Shelton's
7    house, his mother's house, or the car until
8    they got a search warrant.  You can't get a
9    search warrant without probable cause.  So they
10   needed Detective Adams to see Cheron Shelton.
11   The problem is, Detective Adams saw him three
12   days after.  So Detective Adams responds, yep,
13   the picture you just sent me, three days later,
14   that is the guy I saw, yeah, that guy.
15        So the detectives have everything they
16   need to hit the house.  They go straight in
17   1214 Nolan, the same day they get a warrant.
18   The Lincoln Continental, the same day they get
19   a warrant.  What do they find?  At 1214 Nolan
20   Court, I submit to you, they found a red
21   herring.  That is a clue that is meant to
22   mislead you or distract you.  That is that
23   .22-caliber rifle that Ms. Pellegrini was
24   waving around during the trial, it has nothing
25   to do with this case.  It is supposed to scare

Closing Argument - by Mr. McKinney

1    you.  He is a bad guy.  He had a big gun.  That

2    gun could not have possibly fired the bullets

3    that caused the madness and mayhem at 1304

4    Franklin Avenue, physically impossible.  Don't

5    fall for the red herring.

6            They also find 7.62 ammunition.

7    Eureka, right, because 7.62 ammunition is the

8    same kind of ammunition used at the crime

9    scene.  Like everything else in this case, when

10   you peel the layers back, it doesn't fit.  You

11   know from my questioning of multiple witnesses

12   that the manufacturers of the 7.62 casings

13   found at the crime scene are completely

14   different than the manufacturers of the 7.62

15   bullets found at 1214 Nolan.  They are not

16   connected.  That's like someone committing a

17   crime wearing Nikes and the police arresting

18   someone because they are wearing Reeboks.  They

19   are both shoes, they are both bullets, but they

20   don't match.  It is a red herring.  Do not let

21   it distract you.

22           At the end of the day, the killer, the

23   shooter, that used that 7.62 ammunition at the

24   crime scene, there is no evidence that he

25   obtained those bullets from 1214 Nolan.  That's

Closing Argument - by Mr. McKinney

1     the point that I'm trying to make.

2              Now, after the police conduct these

3     searches of 1214 Nolan and of the Lincoln

4     Continental, they want you to think that they

5     had a case.  They didn't.  They didn't file

6     charges so clearly they didn't think their case

7     was that strong.  They are going to try to tell

8     you that what they found at 1214 Nolan was the

9     Holy Grail.  We got him.  Cool.  It took you

10    three more months to charge him so clearly you

11    didn't believe that you had a strong case at

12    that point.

13             So after the search, they question

14    Cheron's sister, Cheron's other sister,

15    Cheron's mother, Cheron's girlfriend and they

16    tell all of these witnesses we believe that

17    your brother, your loved one, your son, your

18    boyfriend was involved in the Wilkinsburg

19    shootings.  Then they put out a warrant for his

20    arrest for a probation violation.

21             Now, I will submit to you that

22    Mr. Shelton was likely in close contact with

23    his loved ones.  Quite frankly, probably just

24    really didn't want to go to jail.  So he is

25    aware that they believe that he is a suspect in

Closing Argument - by Mr. McKinney

1    a mass murder.  He lays low for a couple of
2    weeks.  In late March, he is finally arrested
3    at the home of Adrien Falls who is his
4    girlfriend's father.  Also in the home when
5    Mr. Shelton is arrested is Channel Falls.
6    Obviously, you heard from her, she is his
7    girlfriend.  They have two children together.
8    As a result of that arrest, Cheron Shelton goes
9    to jail.  Channel Falls is charged with
10   hindering apprehension.  A felony.  They
11   charged his girlfriend.  When you read these
12   letters, which I'm going to talk about briefly,
13   when Cheron is talking about sorry for his
14   actions, sorry for the position he put her in,
15   he is talking about the fact that he is sorry
16   that he got her charged with a felony because
17   he just wanted to spend a little more time with
18   his kids.  So I want you to think about that
19   when you start reading these letters.
20          Now the police have Cheron in jail.
21   They don't have nearly enough information to
22   charge him but they're building a case.  So
23   they put him in the most isolated restrictive
24   unit of the jail, 8-E, restricted housing.  A
25   representative from the jail said that is where

Closing Argument - by Mr. McKinney

 1    they put all the high profile inmates.  How is

 2    Cheron high profile?  He hasn't been charged.

 3    They put him up there for a reason.  They cut

 4    him off from the outside.  They put him in a

 5    cell 23 hours a day and for the one hour that

 6    he was out for rec, he is shackled, cuffed, and

 7    tethered.  So he is in a room for extended

 8    periods of time with no communication and no

 9    interaction with anybody.  I would submit using

10    your common sense and logical inference, the

11    wheels are turning.  He knows that he is a

12    suspect in this terrible crime.  All of the

13    information that he references in these

14    letters, which we will get to in a minute, is

15    information that is provided to him from the

16    outside.  The limited opportunities that he has

17    to speak to his lawyer or his family, they are

18    telling him you're a suspect.  His lawyer, me

19    at the time, said based on the letters they

20    think they can put you at the scene.  So when

21    you're reading these letters, which I want you

22    to, I really do, when you're reading them, just

23    give them context.  He is expressing to his

24    sister what he is being told while he is at the

25    jail.  These aren't confessions.  He is not

Closing Argument - by Mr. McKinney

 1    charged after the police receive them.  So
 2    clearly even when they get the letters they
 3    don't think it is enough but they want you to
 4    think it is.
 5         I talked a little about tunnel vision
 6    and how after watching that video on Nolan
 7    Court the detectives were locked in on Cheron
 8    Shelton.  They stopped following any other
 9    leads.  Do you remember the paramedic John Krah
10    who testified in his trip sheet there was a
11    download from dispatch?  The download said at
12    the time of the crime there was a silver
13    Hyundai fleeing the scene at excessive speeds.
14    Did you hear any follow-up or any investigation
15    on that car?  No, because they saw the video on
16    March 11th and were completely focused on that
17    man.  So when you're deliberating and thinking
18    about reasonable doubt and saliva that
19    exonerates him, think about the silver Hyundai
20    that was never followed up on.  Is it possible,
21    does that create a reasonable doubt for you, a
22    pause or hesitation, when there is a legitimate
23    alternative theory that was never followed up
24    on?
25         With respect to the letter that he

Closing Argument - by Mr. McKinney

1    wrote from jail that we're not contesting, when
2    you read it, it is clear that he's trying to
3    find ways to make money.  He's in jail so he
4    can no longer sell drugs but he knows he got
5    this probation violation, he is looking at
6    these more serious charges, so he got to find a
7    way to make income.  He is talking about a
8    stack, $1,300, can you guide my people to this
9    item and every week and week-and-a-half
10   essentially we're going to reup.  He is
11   conspiring not to get rid of a weapon but to
12   make money.  You don't have to take my word for
13   that, you will read the letters yourself.  You
14   are smart people.
15           Now, when the Commonwealth seizes this
16   letter that he wrote on, I believe it was
17   April 1st, approximately 20 days after the
18   homicide, he wrote the letter that was seized
19   that he never in a million years would have
20   thought that the police would have gotten their
21   hands on it.  You heard Detective Costa testify
22   that they don't typically go down to the jail
23   and start taking inmates' mail.  This was the
24   first search warrant that he executed on inmate
25   mail.  So when he thinks no one is listening or

Closing Argument - by Mr. McKinney

1    no one is reading, he doesn't implicate himself

2    in a murder.  He talks about getting money,

3    flipping drugs, getting rid of a package,

4    reupping a week-and-a-half later so when you

5    read these letters, give them proper context.

6           One of the things that the letters do

7    show is that Cheron was a loving son.  He had a

8    close relationship with his girlfriend's

9    father, a father I never had.  He had a close

10   relationship with his girlfriend, Channel, you

11   made me a better man.  I won't get into the

12   entire letters because you will have them to

13   read for yourselves but, if anything, what

14   these letters do is humanize him.  They shed

15   him in a light of someone that loves his

16   family, who loves his sons, who wants them to

17   be raised well.  He is proud of the limited

18   achievements that he's made trying to turn his

19   life around, going to Triangle Tech and

20   enrolling in school.  When you read those

21   letters, do they sound like something that

22   would have been written by someone who could

23   commit the kind of crime that he is charged

24   with?  Is anything he is saying consistent with

25   that kind of behavior?  Do you read anything in

Closing Argument - by Mr. McKinney

1    those letters that has absolutely no respect

2    for human life?  He's scared.  He knows that

3    they are trying to pin a murder on him.  He

4    talks about that.  But nothing he says provides

5    any information that he wasn't provided from

6    the outside.  Think about that when you're

7    reviewing those letters.

8         It is also important to note that

9    after the police seize the letter they execute

10   seven to eight search warrants all over the

11   City of Pittsburgh because they think we got

12   him.  He must be talking about a weapon, let's

13   go to all of these different houses where we

14   believe he may be hiding it so we can find it.

15   They never find anything.  He's not talking

16   about a weapon.  A weapon is never found.

17        Five days later he has a visit with

18   his father.  You've seen video and I'm sure

19   you'll see more.  Throughout the video, he is

20   smiling.  He is happy to talk to his father who

21   he doesn't see often.  I believe this was his

22   actual father's first visit at the jail since

23   Cheron had been incarcerated, one of their

24   first communications.  They're having a

25   conversation.  Unbeknownst to them, the

Closing Argument - by Mr. McKinney

1    Commonwealth is watching because they are still

2    trying to build a case.  The March 12th red

3    herring search isn't enough.  The search of the

4    Lincoln Continental isn't enough.  The letter

5    isn't enough so we need more.  So they get this

6    video.

7            In the video, Cheron Shelton, I would

8    submit the evidence shows, is communicating

9    with his father.  We know a few things.  We

10   know that he is in jail on a probation

11   violation, all of his family was questioned,

12   multiple houses searched, he knows he is a

13   suspect.  We know his fingerprints came up on

14   the .22-caliber rifle at 1214 Nolan.  He is

15   communicating with his father and sharing all

16   this information.  The Commonwealth wants you

17   to believe that this video is some kind of

18   confession, that his actions are consistent

19   with him confessing to his father what he had

20   done.  There are two things.  One, if you truly

21   believe that, you didn't even charge him.  If

22   you think this is such a smoking gun, if this

23   is such strong evidence for you, you reviewed

24   the video, you followed his father out of the

25   jail for three hours looking for a weapon, you

Closing Argument - by Mr. McKinney

1    didn't charge him.  So it is so strong you

2    decided to wait two-and-a-half months to charge

3    him.  Two, we can't tell exactly what was said.

4    If you use your common sense based on knowing

5    what Cheron knew at the time and trying to

6    communicate with his father, it is clear that

7    he was just trying to keep him informed of what

8    was going on.  They think I'm responsible for

9    this.  A gun with my fingerprint was found

10   here.  So when you are watching that video,

11   keep all of that in context as well.  It is

12   important to watch these things while knowing

13   what was in his mind.

14            Now, I want to talk about motive.  The

15   Commonwealth has tried to prove motive to you.

16   They are trying to tell you that Cheron Shelton

17   was so hell bent on vengeance to kill Lamont

18   Powell because of what happened to Calvin

19   Doswell three years earlier.  Like everything

20   else with the Commonwealth's case, sounds good

21   to them until you actually pay attention.

22   Lamont Powell testified.  First of all, no one

23   is going to expect Lamont Powell to admit to

24   killing Calvin Doswell so I'm not going to go

25   there but the Commonwealth's support for that

Closing Argument - by Mr. McKinney

1    theory is hearsay evidence from people that
2    heard it through second, third, fourth parties
3    that Lamont Powell was somehow responsible for
4    the death of Calvin Doswell.  Neighborhood
5    talk.  Did the Commonwealth put a detective on
6    the stand to say, yes, we believe Lamont Powell
7    was the suspect in the death of Calvin Doswell
8    based on A, B, C, D, and E?  They need to give
9    you a motive so they put random people up on
10   the stand from the neighborhood to tell you,
11   yeah, I heard from someone at some time that
12   maybe Lamont was responsible.  Is that how we
13   do trials in this county?  Hearsay from people
14   third or fourth hand?  That is their theory for
15   a motive?  They want to act as if Cheron
16   Shelton had been in jail for such a long period
17   of time and as soon as he got out he was going
18   to exact revenge.  He was in jail for three
19   weeks for a domestic.  Lamont Powell didn't
20   leave Pittsburgh, Pennsylvania as the
21   Commonwealth suggested in their questioning to
22   go to Washington County because he was
23   definitely afraid of payback.  He was in
24   college.  He enrolled before this alleged
25   murder of Calvin Doswell.  He came back in

Closing Argument - by Mr. McKinney

1    2015.  He was in Pittsburgh back and forth

2    probably while he was in college but he was in

3    Pittsburgh for at least a year before the

4    March 9th shootings occurred.

5         Now, Lamont Powell did have some

6    heroin in his pocket.  That is in no way

7    related to the motive.  Can it be argued that

8    had something to do with it?  I'm not going to

9    go there.  I can't say that.  It was a bundle,

10   ten bags.  I think it is important to make

11   credibility statements and arguments so I'm not

12   going to say someone had drug dealing revenge

13   on him.  Is it possible?  Sure, it is.

14        But Cheron Shelton on the night in

15   question was in a celebratory mood.  He was

16   happy to spend time with his kids and his

17   girlfriend and his mom and his friends.  If he

18   was trying to slaughter Lamont Powell and his

19   entire family, why did he spend three minutes

20   talking to Millie Walker who is Lamont's

21   sister?  When you watch the video from 1214

22   Nolan -- and watch the actual video, not the

23   edited one by the Commonwealth -- Cheron

24   Shelton is talking to Millie Walker for three

25   or four minutes.  Detective Hitchings's

Closing Argument - by Mr. McKinney

 1  testimony was that it was a pleasant

 2  conversation.  So the Commonwealth wants you to

 3  believe that he was a menace, wanted to

 4  slaughter an entire family, but just about 10

 5  to 15 minutes before, he was having a very nice

 6  pleasant conversation with a member of that

 7  family.  Does that make any sense to you?  I

 8  would submit to you that it doesn't.

 9         Let's talk about what actually

10  happened based on the evidence on March 9,

11  2016.  Cheron Shelton got out of jail the day

12  before.  He went to his mom's house with his

13  girlfriend and his two kids and he spent time

14  with his family.  He also wanted to spend some

15  time with his boys so he went to Ferris Court.

16  You heard testimony from Commonwealth witnesses

17  that he was on Ferris Court with multiple

18  people.  While on Ferris Court he has some

19  drinks because he is happy to be out of jail.

20  He is in a good mood.  He comes back to Nolan

21  Court where he sees his mother.  Channel and

22  the kids go back to where they live.  Cheron

23  stays around Nolan Court still hanging out with

24  his buddies.  He continues to drink.  He had

25  been drinking earlier, that continues.  Now, it

Closing Argument - by Mr. McKinney

1    is about 9:00, 9:30, family time over, time to

2    hang with the boys.  He consumes some alcohol,

3    has some drinks.  We get closer to 10:00,

4    10:30, now it is time to make some money.  We

5    know he is a drug dealer.  His mother has

6    testified to that, his girlfriend has testified

7    to that.  I believe the evidence supports that.

8         So later in the evening he is trying to

9    make some cash.  His own letters from the jail

10   that he never thought anyone would read are

11   evidence that he is a drug dealer.  This isn't

12   just some convenient defense theory that we're

13   coming up with now.  His own letters confirm

14   it.  You will read them.

15        So late in the evening he is trying to

16   make money.  His mother lives in government

17   housing.  If drugs are found in her house, she

18   gets evicted.  She is essentially homeless.  So

19   the evidence would suggest that any drugs that

20   Cheron is holding there or any drugs that he is

21   dealing there, he has to do in secret.  So when

22   the Commonwealth looks at that surveillance

23   video and tries to argue to you that he was

24   putting an assault rifle out the window, that

25   he picked it up, took it to the car and then

Closing Argument - by Mr. McKinney

1    drove off, please watch the video, watch the

2    video.  What is under that coat is not a rigid

3    object.  It flops, it bounces, the coat does.

4    Don't take my word for it, watch it.  It is

5    certainly not a gun or a long rifle.  I would

6    submit to you that the evidence shows that it

7    was drugs.  He was trying to find a way to

8    continue his business without pissing his mom

9    off.  It is a logical explanation, but you

10   watch the video and you make the determination

11   but watch it very closely.

12          Now, there is a phone communication

13   between Channel Falls and Cheron Shelton on

14   March 9th.  The Commonwealth has hitched on to

15   this communication and they believe, I submit,

16   it helps them prove their theory of the case.

17   It is a text message from Channel Falls to

18   Cheron Shelton, something to the effect of

19   shaking my head as I watch you throw your life

20   away.  Now, their theory is that was Channel

21   Falls commenting to Cheron about the fact that

22   he was about to go kill five people.  You saw

23   Channel testify.  Do you think for a minute if

24   she knew that that was about to happen, that

25   that was his plan, that she would have been so

Closing Argument - by Mr. McKinney

1    subtle?  She probably would have written what

2    the hell are you doing, no, stop, because if

3    she really thought that he was going to throw

4    his whole life away, kill all these people,

5    remove himself from the family unit potentially

6    forever, do you think she would have said that?

7    I think she would have been a lot more

8    aggressive in her tone.  When she answered the

9    question by Mr. Chernosky, or it may have been

10   by Ms. Pellegrini, what did you mean by that

11   statement, well, I meant that he wasn't taking

12   the relationship seriously.  It had been an 11

13   year off-and-on relationship between these two.

14   He just got out of jail and he's being an idiot

15   again.  He is drinking Hennessy out of a baby

16   bottle.  She wants him home.  You were supposed

17   to get hamburger buns.  That is what the

18   message is about.

19          All these phones that were dumped,

20   Ashley Smith, Brittany Shelton, Channel Falls,

21   did you see any messages in those phones from

22   Cheron Shelton with whatever phone number he

23   had that proved the Commonwealth's case?  These

24   are hundreds of communications.  Not one text

25   that says anything in any way related to Cheron

Closing Argument - by Mr. McKinney

1    Shelton committing this crime.  There is

2    nothing.

3                Now the Lincoln Continental that

4    Detective Michael Adams didn't see Cheron in,

5    but the Lincoln Continental was searched.

6    Scientist Wisbon testified that there was

7    possible bloodstain but she couldn't

8    definitively say it was blood so she uses DNA

9    to be sure because it is much more reliable.

10   So whoever committed this act would have been

11   covered based on the shell casings and the

12   crime scene photos and the detectives

13   testifying about tissue, bone, and blood and

14   there is absolutely no DNA from any of the

15   victims in the Lincoln Continental.  The murder

16   car, allegedly, has absolutely no evidence of

17   murder.  How does that make sense?  This is

18   another instance of science not proving the

19   Commonwealth's case.  Actually, proving the

20   opposite.  So they rely on innuendo from

21   surveillance video to prove their case.  They

22   want you to parse the words in these letters so

23   harshly that you find some way to justify a

24   conviction.

25               I think one of the more interesting

Closing Argument - by Mr. McKinney

1      things about this case is that Cheron Shelton,

2      after he allegedly slaughters an entire family,

3      goes to Penn Hills, right?  Like he kills all

4      these people and then he goes to Penn Hills to

5      wander around vacant properties in a

6      residential neighborhood.  Does that even make

7      sense because what makes more sense is that he

8      was being a drunk idiot, he was out in Penn

9      Hills, saw the police, he was intoxicated,

10     couldn't find his phone, ends up walking down

11     Hebron to make his way back to Nolan Court.

12     The police searched everywhere he was and they

13     found nothing.  So you'll have to be the

14     arbiter as to whether or not his actions are

15     consistent with someone who was just out making

16     money being drunk and stupid or committing mass

17     murder and then deciding to find himself in

18     Penn Hills where he was converged on by three

19     police officers.  If he actually committed this

20     crime, don't you think his initial immediate

21     response would be to run as fast as he could in

22     the opposite direction?  He is compliant,

23     respectable, answers all their questions cool,

24     calm and collected and he was by himself.  His

25     actions, when he is interacting with the Penn

Closing Argument - by Mr. McKinney

1    Hills Police Department, aren't indicative of

2    someone who just committed multiple major

3    felonies, ungodly acts.  They are consistent

4    with someone who is out drinking, lost his

5    bearings.

6            I know that the officers from the Penn

7    Hills Police Department have testified that

8    they did not believe that he was under the

9    influence.  I'm not here to tell you that all

10   police officers are untruthful because I don't

11   believe that to be true.  Detective Adams, yes.

12   The Penn Hills Police Department, they weren't

13   looking for signs of intoxication.  They don't

14   know Cheron Shelton.  We've all been in

15   situations where we all know someone that has

16   been under the influence and don't act as if.

17   They may have a full conversation with you and

18   their alcohol content is twice the legal limit

19   to drive.  Just because the Penn Hills police

20   said he wasn't under the influence, doesn't

21   necessarily make it so.

22           A couple more points and I'll wrap it

23   up, I promise.  When you look at the

24   surveillance from Franklin Avenue, the

25   individuals that the Commonwealth wants you to

Closing Argument - by Mr. McKinney

1    believe are the shooters or one of the shooters

2    are wearing light-colored clothing so make sure

3    you check the tape on that one.  Detective

4    Adams's testimony was Cheron was wearing dark

5    clothes.  That is not consistent with the

6    Commonwealth's own surveillance video.

7          The impetus, according to

8    Mr. Chernosky's opening statement, was a

9    Facebook posting.  Has the Commonwealth shown

10   you a Facebook post?  It is a social

11   networking.  It lasts forever.  They haven't

12   shown you that.  They haven't shown you

13   anything from Instagram.  I'm not saying that

14   there wasn't some mention about the cookout on

15   Facebook but they haven't shown you anything

16   that leads you to believe that based on that

17   information that Mr. Shelton or Mr. Thomas

18   could use that to try to identify where they

19   were located.  So all this talk about Facebook,

20   but like the rest of the Commonwealth's case,

21   it sounds good until you start peeling back the

22   layers and then it stinks.

23          We know that Wilkinsburg is a

24   dangerous neighborhood.  That is based on

25   Detective Adams's testimony.  Terry Morgan had

Closing Argument - by Mr. McKinney

1    16 surveillance cameras on his house because it
2    is a dangerous neighborhood.  That is based on
3    Detective Adams's testimony.  Terry Morgan had
4    16 surveillance cameras on his house.  I think
5    that is something that you need to take into
6    consideration.  This is terrible, what happened
7    is awful, but it wouldn't be the first time
8    shots are fired in Wilkinsburg.  It certainly
9    doesn't make it right but something for you to
10   consider.
11           I want to talk also about Commonwealth
12   witness Robert McNeal.  He was the guy that
13   homicide detectives harassed when he was at the
14   hospital to get him to confirm his phone
15   number.  As I was questioning him on
16   cross-examination, just trying to flush out
17   some information, he said the cops asked me if
18   I think they did it, meaning Cheron and Robert.
19   I said no.  When you read these letters, these
20   loving, beautiful letters that Cheron wrote to
21   Channel and Adrien, he does not seem like the
22   person who could commit this act.
23           Agent Burke testified today.  His
24   testimony was that Cheron Shelton, when these
25   crimes were committed, could have been on his

Closing Argument - by Mr. McKinney

1    living room couch.  So I don't know what the

2    purpose of that testimony was.  I'm sure

3    Mr. Chernosky will tell you.

4          So in closing, there are three

5    different burdens of proof in the law.  There

6    is beyond a preponderance of the evidence.

7    That is the lowest burden of proof.  That is

8    what they use in civil court.  So if Edgar

9    Snyder is litigating on your behalf, no fee

10   unless he gets money for you, that is the

11   burden of proof that is more likely than not.

12   One side has to prove their case slightly more

13   than the other, 50.1 percent, because the thing

14   that they're litigating in civil court, it

15   doesn't matter but it is money.

16         The second highest burden of proof in

17   the law is in family law, the things that

18   really matter, custody, divorce, it is family,

19   it is important, so it is a higher burden, it

20   is clear and convincing evidence.  Hard to put

21   a number on it but about 75 percent.  So if you

22   are going to prevail in family court, you got

23   to be significantly more right than the other

24   person.

25         Then there is criminal court, the

Closing Argument - by Mr. McKinney

1    highest burden in the law, because of what you

2    do here matters so much to so many people.

3            Now, when you deliberate, the hope is

4    that you come to a unanimous verdict, that you

5    all agree.  Obviously, my hope is that you come

6    to a unanimous verdict of not guilty.  You will

7    all come into the courtroom, you will elect a

8    foreperson who will get up, read the verdict,

9    and you will all walk back out onto Grant

10   Street or Ross Street and continue on with your

11   daily lives.  But this case will stay with you.

12   You will think about whether you got it right.

13   You will think about, you know, that unknown

14   male whose saliva was in the middle of those

15   shell casings, whose was that?  Do you know

16   that silver Hyundai that fled the scene that no

17   one ever investigated, whose was that?  Do you

18   know those shell casings that the Commonwealth

19   never bothered to test, I wonder whose prints

20   would have been on those?  I submit to you that

21   that brick wall that I was talking about

22   before, there is no way that the Commonwealth

23   has removed those bricks.  This case and that

24   road is riddled with reasonable doubt.  I ask

25   you to return a verdict of not guilty.  Thank

Closing Argument - by Mr. Chernosky

1    you.

2              THE COURT:  Thank you,

3    Mr. McKinney.  Does anybody need a break?

4    Okay, Mr. Chernosky.

5              MR. CHERNOSKY:  Thank you.

6    Ms. Pellegrini, Ms. Williams, ladies and

7    gentlemen of the jury.  I was a little

8    surprised to hear Mr. McKinney say that he

9    wasn't going to stand up here and tell you that

10   all police fail to tell the truth because that

11   is where this case was going in his opening.

12   In a certain respect, I understand why he has

13   to go after Detective Adams.

14             Detective Adams is in possession of a

15   terribly inconvenient and damning fact.  He

16   sees Cheron Shelton minutes after the shooting

17   on Franklin Avenue.  He picks him out of a

18   picture.  He tells you in court that is the

19   person he saw.  Now they have to go after

20   Detective Adams.  I don't want to get too high

21   and mighty about this but how dare they.

22   Detective Adams is a 25-year veteran of that

23   force.  He's patrolled that community.  This

24   isn't the suburbs.  This is a tough community.

25   He is there every day doing what he can.  They

Closing Argument - by Mr. Chernosky

1    want you to buy into some vast conspiracy that
2    Detective Adams, prompted by the county police
3    to help them solve a particularly tough case,
4    make ups an identification, says that he saw
5    someone he didn't.  That is simply not true.
6    First of all, do you know how many people it
7    would take to pull that off?  Secondly, he can
8    lie a lot better than the pneumonic device he
9    told you, Jiffy Butter Peanut 2200.  It is
10   comically simple but that is how he remembered
11   it.
12        There is almost this unspoken
13   suggestion that the second that Detective Adams
14   sees this person getting into that white
15   Lincoln that he instantly knows that that is a
16   suspect, that's a witness.  Remember what Adams
17   told you, he's scanning, looking for anything
18   that could have alerted him to a shooting.  He
19   sees the defendant, pauses briefly, considers
20   whether he is going to get his attention.  It
21   is really awkward because the defendant looks
22   forward the entire time.  He is going to motion
23   if he could get his attention to roll down his
24   window before he is alerted to the screaming at
25   the bottom of the street.  In this circumstance

Closing Argument - by Mr. Chernosky

1    he can take in a little bit of information but

2    his sole focus is getting to wherever this

3    shooting might be.  When he starts hearing the

4    screaming, that's his focus, that's what he has

5    to move on to.  So he does what he can, gets a

6    plate, and later he turned it over.

7         You've been told because you haven't

8    heard from anyone that he turned it over to

9    that he must not have done it.  He is lying

10   about that part, right?  There is a saying out

11   there if you can't change the facts, change the

12   focus.  Now they want you to focus on the fact

13   that you never heard from another detective

14   that got that license plate.  You haven't seen

15   a slip of paper that has that license number on

16   it.  I submit to you that if we had that slip

17   of paper that had that license plate number on

18   it, they would then tell you that we didn't

19   fingerprint it.  We don't have the original

20   tablet it came from to compare the ripped edges

21   to show you that that piece of paper came from

22   that tablet.  If you can't change the facts,

23   change the focus.

24        The evidence that Detective Adams got

25   that license plate is all over this case.

Closing Argument – by Mr. Chernosky

1    You've seen it in the video.  You've seen it in
2    the cell phones.  You've seen it in the video
3    of 1282 of that car driving past that location.
4    I'll take you through all of this.  Don't let
5    them change the focus.
6          Telling you that Detective Adams
7    couldn't have gotten that because he can't tell
8    you who he gave it to or he doesn't have the
9    slip of paper is like telling someone that went
10   to college, unless you can show me your notes,
11   you don't have a degree.  That is not how it
12   works.  The evidence is elsewhere.
13         The sad fact of the matter is that the
14   day that Detective Adams was on the stand,
15   there was a murder in Wilkinsburg.  There will
16   be a murder next month and maybe the month
17   after that.  Detective Adams will help on the
18   ones he can, but to think that somehow he
19   manufactured this so he could be the hero of
20   03/09/16, let me just assure you, there will be
21   no parade for Detective Adams, there is no
22   statue on Main Street of Detective Adams.
23   Until his testimony was focused on at length by
24   the defense in this trial, I would almost
25   guarantee that some of the victims' family

Closing Argument - by Mr. Chernosky

1    don't know who he is or the role that he played

2    in this case.

3            Lastly, you are the sole judges of

4    credibility.  Remember his testimony, remember

5    the way he acted on the stand, remember the

6    answers he gave, and ask yourself was Detective

7    Adams lying to you?  I submit the answer will

8    be no.

9            Detective Dolfi made it clear to you

10   when he testified that we essentially get one

11   shot at the scene of any crime.  So you grab

12   what you can.  You take pictures of what you

13   can.  You take what you can.  You don't know

14   how it is going to play out.  In an ideal

15   world, in a normal crime scene, nobody would

16   have gotten in or out.  If you don't realize by

17   now that this isn't an ideal world and that

18   that wasn't an ordinary crime scene, I don't

19   know what else I can show you to make you

20   realize that.

21           The street was pandemonium afterwards.

22   Though they secured it, there were many first

23   responders, tons of agencies that just stopped

24   by to see if they could lend a hand.  Five dead

25   people, eight victims total, is an unusual

Closing Argument - by Mr. Chernosky

1    occurrence anytime it happens.  So we grab the
2    saliva from the scene.  It doesn't come back to
3    Rob Thomas or Cheron Shelton or the first round
4    of first responders that we compared it to.
5    But I assure you it belongs to someone who had
6    access to that crime scene.  We don't know the
7    name of the guy that grabbed the dog from over
8    the fence because he was just helping out,
9    doing what he could.  Don't let that be the
10   thing that determines this case for you.  To do
11   that, you have to ignore all the other evidence
12   that tells you that Cheron Shelton was the
13   person that fired that AK-47.
14         By way of example, I just want to
15   remind you that in the pictures from the crime
16   scene that you saw that day, in the back
17   alleyway amongst the .40-caliber casings, was a
18   hair weave.  We marked it, photographed it, and
19   took it.  They would be just as good to argue
20   that the real killer walked around bald because
21   they left their weave behind.  That is not
22   reasonable.  We grabbed it because we didn't
23   know what role it would play.
24         This case is probably best understood
25   through the timeline.  If you actually look at

Closing Argument - by Mr. Chernosky

1    the case and the evidence that you've been

2    shown, the timeline is about 25 minutes from

3    the time that Cheron Shelton leaves 1214 Nolan

4    Court until the shots are fired.  I want to

5    address, first, something that I don't think I

6    have to address because of the way Mr. McKinney

7    closed but I'll address it.  The person that

8    you see moving around on that video, the tall

9    slender African-American male with the goatee,

10   that is Cheron Shelton.  Just in case there is

11   a part of you that thinks that it isn't, let me

12   just go through the circumstances that identify

13   him as the person on the video.

14          He arrives in his girlfriend's car.  He

15   goes into 1214 Nolan Court where you heard he

16   has keys.  He doesn't need to knock.  He

17   doesn't need to kick in the door.  He leaves

18   shortly thereafter and he goes into a white

19   Lincoln that we heard so much about that is

20   registered to both his mom and his sister.  He

21   pulls around back, leaves again.  Later, at

22   11:45, two individuals jump the fence.  I

23   submit to you that one of them is wearing the

24   puffy coat with the fur collar that was

25   previously used to carry the gun out of 1214

Closing Argument - by Mr. Chernosky

1    Nolan Court.  Keep in mind, this is a 65 degree

2    day so a winter coat with a fur collar is not

3    necessarily needed unless you are trying to

4    obscure your identity.  They both go into the

5    back of 1214 Nolan Court.

6         Twenty minutes later, they emerge.

7    They go into a third car of the second sister

8    of Cheron Shelton, a tan Chevy Malibu or tan

9    Chevy.  They drive up on to Heart Court.  There

10    are two pictures where you, yourself, as

11    jurors, can make the identification that that

12    is Cheron Shelton.  The one behind Nolan Court

13    and the zoomed in one on Heart Court, that is

14    Cheron Shelton in that picture.

15         Now, when we talk about the timeline, I

16    want you to pay particular attention to the

17    testimony from Todd Dolfi about the

18    time-distance study.  That wasn't in there for

19    no reason.  The time-distance is a fancy way of

20    saying this is how we drive from this location

21    to that location.  The end result is a range

22    because we take different routes.  The range is

23    from 9 to 11 minutes.

24         At exactly 11 minutes after that car,

25    that white Lincoln, leaves Nolan Court at

Closing Argument - by Mr. Chernosky

1      10:42 p.m., that same car is driving past 1282

2      Franklin Avenue.  The one thing I want you to

3      know is that if you watch the video of that, it

4      goes very fast.  It is probably a second.  The

5      reason that you are provided still images is

6      because the still images are important.  In the

7      video of the car leaving Nolan Court, you can

8      see a front license plate holder.  Front

9      license plate holders in Pennsylvania are rare

10     anyway because we don't have front license

11     plates.  The video as it crosses 1282, in one

12     of the still frames you can make out a front

13     license plate holder.

14          That car is distinct in other ways.  It

15     is a white four-door sedan and it got a big

16     black strip across the middle of the door to

17     prevent you from denting your doors when you

18     open them.  Just below that is a section of

19     damage and rust.  You can make that out on the

20     video from 1282 Franklin Avenue.  I direct you

21     and ask you to look at those again.  That car

22     goes past 1282 Franklin Avenue at 10:42.

23          The Commonwealth is not asking you to

24     believe Adams in and of himself but the

25     combined effect of that car leaving Nolan Court

Closing Argument - by Mr. Chernosky

1    at the exact amount of time it takes to get to

2    Franklin Avenue and driving past the camera on

3    Franklin Avenue and then being seen by

4    Detective Adams after the shooting tells you

5    that Cheron Shelton was the one at Nolan Court

6    that was seen -- or at Franklin Avenue that was

7    seen by Detective Adams.

8         Now layer on top of that the

9    communications that you've heard, the number we

10   associated with Cheron Shelton.  10:31, the

11   minute he goes off of Nolan Court a contact

12   with the number associated with Robert Thomas.

13   Leading up to the crime there is a series of

14   communications but the most important of which

15   is a four-and-a-half minute phone call at

16   10:46.  They arrive separately.  Watch that

17   other video from 1282.  The video of the alley

18   of 1282, there is a shorter individual that

19   makes his way to the alley.  I would submit

20   based on where Detective Adams told you that he

21   saw Cheron Shelton, Cheron Shelton makes his

22   way to the alley from the other side.  It

23   wouldn't appear on the video from 1282.

24        There is a four-and-a-half minute phone

25   call.  That is the meet-up.  I got here, are

Closing Argument - by Mr. Chernosky

1     you here, where are we going?  That call wraps

2     up at 10:50, 10:51ish if you look at the time.

3     The shots ring out two minutes later.  There

4     are absolutely no calls, no contacts, no texts,

5     at the time the shooting is going on at

6     10:53 p.m.  Then another flurry of calls and

7     texts leading directly up to 11:44, the time

8     when the two individuals jump the back fence,

9     that is the meet-up again.  It is them going

10    back there.

11          Mr. McKinney didn't address at all that

12    the two individuals, Cheron Shelton and Rob

13    Thomas, who come out of 1214 Nolan Court have

14    taken the liberty of changing their clothing,

15    not just changing their clothing but one of

16    them has a garbage bag in his hands that they

17    promptly throw in the back of that tan car.

18    They needed to change their clothes.  You saw

19    the scene.  You saw how bad this was.

20          The one thing I do want to draw your

21    attention to is the text message between

22    Channel Falls and the defendant.  It is 10:43.

23    So it is about 10 to 15 minutes before the

24    shots go off.  Inasmuch as you've been told by

25    her and the defense that that was a text about

Closing Argument - by Mr. Chernosky

 1    their relationship, he wasn't acting right,
 2    that is not what it says.  It says I'm going to
 3    sit back and watch you lose everything, I
 4    already see how this is going to end.  She
 5    knows.  She knows what is going to happen.  She
 6    knows about the grudge he holds with Lamont
 7    Powell.  She knows what is going to happen.
 8    There are other ways to tell someone that you
 9    think they are not treating your relationship
10    properly.  You can say you are going to lose me
11    or the kids but you don't say you are going to
12    lose everything.  She knew what he was going to
13    do.  Maybe she thought he was just going to go
14    after Lamont Powell but she knew what he was
15    going to do.
16            The letters that were seized from the
17    jail, I want you to pay attention to so many
18    things in those but, first of all, pay
19    attention to what he says and how he says it,
20    okay.  Realistically, on their surface, if you
21    don't go any deeper, they are just
22    communications.  You saw the envelope.  They're
23    not addressed to the actual people they are
24    intended to.  There is an alias on the front or
25    a name that isn't part of the case that I know

Closing Argument - by Mr. Chernosky

1    of.  In there content, there is an apology.

2    It's not just an apology for getting arrested

3    this time and being back in jail, it is an

4    apology for his actions that night.  It is an

5    apology for putting the streets better and

6    higher than his family.  You heard her say that

7    they lived separate lives.  I will get into

8    that a little bit more in a second.

9    Essentially, he got this family life, he got

10   the street life.  The street life doesn't just

11   include dealing drugs which is what he is

12   telling you.  It includes payback, revenge,

13   business, guns, that is the street life.  That

14   is the life that he doesn't really want to

15   expose her to but she knows about it.

16          On another level I want you to pay

17   attention to his tone.  In both letters, at

18   some point, he indicates that he received a

19   swab, the swab for his DNA, the swab of his

20   mouth.  He explains what he thinks is trying to

21   be done with it but the tone isn't the

22   righteous indignance.  It is not the absolutely

23   convinced we are not going to find anything.

24   The answer about how long it takes to get back

25   is we'll see.  Ask yourself if you were placed

Closing Argument - by Mr. Chernosky

1    in this situation, if your response would be

2    they came and swabbed my mouth, we'll see.  No,

3    it would be they came and swabbed my mouth, it

4    isn't going to amount to anything.  You know I

5    wasn't there.  I know I wasn't there.  No, that

6    is not what he says.  He says we'll see.

7         The letter to pops, which is his

8    girlfriend's father, is very complimentary,

9    very thankful, very apologetic on the first

10   page.  Then it switches gears.  It switches

11   gears to hold on, on some real shit, I need you

12   to do this, it is instructions.  It is not

13   instructions about keeping the business going.

14   It is instructions about getting rid of

15   something.  It is instructions about getting

16   rid of a gun.  You see, he got wrapped up so

17   quick, he didn't have time to do that.  He

18   needed someone to get rid of it.

19        When it comes to the jail surveillance,

20   which I want you to watch again, I want you to

21   see and I'll direct you to at least three clips

22   that I'll put up here quickly.  First of all,

23   this is the first interaction where, I will

24   submit to you, he is learning that we just got

25   his letter.  He didn't think we would have it.

Closing Argument - by Mr. Chernosky

1    Now we have it.  He knows what he means when he
2    says on some real shit I need you to get rid of
3    something.  This is when he is first finding
4    out about it.  There are a few universals in
5    this world, right?  The universal sign for
6    choking, you hold your hand up to your throat.
7    Everybody knows that one.  He motions out a pen
8    as in talking about a letter.  Then you're
9    being led to believe that he is talking about
10   his current case, just trying to get details
11   out, that he is smiling through the whole
12   thing.  I will tell you there are probably
13   parts where he smiles but this is someone who
14   is shocked learning new information for the
15   first time.  He is shocked and he is upset
16   because he just learned that we got that
17   letter, that letter that is directing someone
18   to get rid of something.
19        Now, continuing on that, everybody
20   knows that there is universal signs for a gun.
21   If you pull your finger like a trigger, that is
22   a gun.  In this instance he doesn't do just the
23   trigger motion but he supports it with his
24   other hand.  He is talking about a rifle, and
25   not the rifle that we found at 1214 Nolan

Closing Argument - by Mr. Chernosky

1    Court, but the rifle that is still out there

2    that he wants tossed that is wrapped up and

3    ready to go that he refers to in his letter.

4    This doesn't come in in a vacuum.  We have the

5    letter we seized.  He is upset.  He is

6    agitated.  He is scared.  He knows that we have

7    the key to trying to find that rifle and he is

8    afraid.

9         Watch how careful he is about

10   everything he says there.  Before he is going

11   to relay important information, he looks behind

12   him, he walks behind him and makes sure no one

13   is listening because he doesn't want anybody to

14   hear what he is talking about.  He goes to

15   great lengths to not use the one piece of

16   equipment that he could actually use words and

17   say what needs to be said.  He doesn't pick up

18   the phone.  He doesn't use words.  He

19   physically acts it out.

20        I submit to you that that was part of a

21   scheme, I guess.  You heard him and his sister,

22   he is talking in code that entire time.  I

23   would submit to you that it was apparent to him

24   that his sister just wasn't getting it.  That

25   avenue wasn't going to be the right avenue.  So

Closing Argument - by Mr. Chernosky

1    he learns that his dad is coming down and he

2    decides that is the way he is going to get the

3    message out.

4                Any one of the things that we talked

5    about in this case, any one of the things that

6    has been put in front of you, would be

7    innocent, but the combined effect of all of

8    them is not.  When you add them all together,

9    it is not innocence.  It is evidence.  I don't

10   want you to think for a second that all the

11   talk about that .22-caliber rifle was just to

12   scare you.  The entire reason to show you that

13   and the reason to tell you that his fingerprint

14   was on it, because despite what his mother

15   tried to tell you about how it could be

16   anyones, that group of weapons was his, right?

17   You've been told that the shell casings from

18   the scene had different headstamps and the

19   shells from the actual magazine from 1214 Nolan

20   Court had different headstamps.  I want you to

21   keep something in mind, this is not the

22   collection of a sportsman or a hunter, right?

23   This is a collection of someone in the streets.

24   There is no brand loyalty when it comes to

25   bullets in the streets.  It is whatever you can

Closing Argument - by Mr. Chernosky

1    get, it is whatever you can use, and that is

2    exactly what the two shells have in common.

3    There is no loyalty.  There is no consistency

4    in the branding, right?  The magazines for a

5    7.62 combined with the lack of any 7.62 that

6    goes with it is suspicious but not when you

7    consider the facts of the case, right?

8          Murder 101, get rid of the gun.  I'll

9    submit to you that is why he was wandering

10   aimlessly in Penn Hills at 2:30 in the morning,

11   has not a good explanation for why he is out

12   there.  The other thing that I want you to keep

13   in mind is that this might be one of the first

14   times where the thoroughness and the patience

15   of an investigation is being used as a weapon,

16   right?  Oh, their case must not have been good

17   enough on day A because they didn't charge that

18   day and not good enough on day B because they

19   didn't charge.  Cheron Shelton was in jail.  He

20   was no longer a threat to the public while the

21   Commonwealth worked on its case.  With that

22   respect, there is no day that you have to

23   charge to prove that your case is better or

24   worse than anything else, right?

25          This case is a circumstantial case.

Closing Argument - by Mr. Chernosky

1    Sometimes that comes off with a bad

2    connotation, right?  In some respects,

3    circumstantial evidence is better than direct

4    because the circumstances don't lie to you.

5    The video is what it is.  The timeline is what

6    it is.

7          Ladies and gentlemen, the timeline

8    shows you that Cheron Shelton left his house,

9    went right to 1304 Franklin Avenue, that he

10   went there with a gun that he retrieved from

11   1214 Nolan Court, that this railing was the

12   only thing between him and the victims in this

13   case, that he opened fire unmercifully, you

14   will hear those shots if you listen to them if

15   you ask, there are times where he stops, times

16   where he could have stopped for good but he

17   didn't.  The Commonwealth has shown you what he

18   did and why he did it.  We ask you for a

19   verdict of guilty on all counts.  Thank you.

20              THE COURT:  What remains is my

21   instructions to you.  It will probably be about

22   an hour long at a minimum.  We'll take a

23   15-minute break.  Your lunches are here so the

24   break can be as long as an hour and 15 minutes.

25   I was going to take a recess.  Come to a

Closing Argument - by Mr. Chernosky

1    consensus whether you want to eat your lunch or

2    come back and hear my charge and eat your lunch

3    later.  It is your decision.  I'll accommodate

4    you.  You send word down to me as soon as you

5    reach it which is near immediately however, all

6    right.

7                              -----

8                    (Luncheon recess taken.)

9                              -----

10                   (Open court - Jury not present.)

11                             -----

12                   THE COURT:  You've had a change

13   of heart in strategy, so to speak.

14                   MR. McKINNEY:  I have, Your

15   Honor.  After conferring with my client, we do

16   not want a charge of third degree murder

17   instruction.

18                   THE COURT:  So that would

19   eliminate the request for involuntary

20   intoxication.

21                   MR. McKINNEY:  Yes, it would.

22                   MS. PELLEGRINI:  The Commonwealth

23   would like an instruction on third degree.

24                   MR. McKINNEY:  If I may argue,

25   Your Honor?

Closing Argument - by Mr. Chernosky

1          THE COURT:  Okay.

2          MR. McKINNEY:  If there was ever

3    a case that represents premeditation, it would

4    be this one.  The evidence that we heard was

5    that the shooter, the individual with the rifle

6    appeared over the fence with the firearm before

7    firing the shots.  This is clearly a plan by

8    two separate co-conspirators.  They schemed.

9    There is certainly no argument for no

10   premeditation.

11         THE COURT:  If I give third, do

12   you want the voluntary intoxication?

13         MR. McKINNEY:  Yes.

14         THE COURT:  Do you understand

15   what is going on here, Mr. Shelton?

16         THE DEFENDANT:  Yes, sir.

17         THE COURT:  Ordinarily, when

18   voluntary intoxication is presented, it is

19   usually a circumstance where the defendant

20   acknowledges the conduct that underlies the

21   killing.  This is merely a matter of his state

22   of mind.  So I will have to fashion a little

23   bit different instruction.

24         MS. PELLEGRINI:  Your Honor, we

25   would object.  First of all, it would be

Closing Argument - by Mr. Chernosky

1    prejudicial to the Commonwealth.  You went over

2    the charges before we closed.  There was no

3    mention of voluntary intoxication.  We would

4    also argue there has been no evidence that the

5    defendant was intoxicated at the time of the

6    murder at 10:53.  There was evidence that he

7    was consuming alcohol earlier in the evening,

8    perhaps even smoking marijuana, but not at the

9    time of the crime.  Also there was no expert

10   testimony to that.

11            THE COURT:  It doesn't have to be

12   supported by expert testimony.  What you may

13   perceive is very weak evidence of his

14   intoxication, thoroughly rebutted from your

15   perception by the three Penn Hills police

16   officers, but you can't have it both ways.  You

17   can't have me give third and then walk away

18   from the voluntary intoxication.

19            MS. PELLEGRINI:  Fine.

20            THE COURT:  So I will instruct as

21   to third and I will instruct as to the

22   voluntary intoxication.  Is that what you want?

23            MR. McKINNEY:  If you're

24   instructing to third, yes.

25            THE COURT:  Okay.  Do you

Jury Charge - by Hon. Borkowski

1    understand that?

2                    THE DEFENDANT:  Yes, sir.

3                    THE COURT:  Okay.

4                         -----

5                    (Open court - Jury present.)

6                         -----

7                    THE COURT:  Good afternoon,

8    ladies and gentlemen.  Thank you for your

9    attentiveness during the course of this trial

10   and patience and perseverance.  Myself, as well

11   as the parties, appreciate that.

12           You have been selected and sworn to

13   determine the facts and render a verdict in the

14   case of the Commonwealth of Pennsylvania

15   against Cheron Shelton.  As you know by now, of

16   course, Mr. Shelton is charged with five counts

17   of criminal homicide, one count of criminal

18   homicide of an unborn child, three counts of

19   aggravated assault, and six counts of

20   recklessly endangering another person and a

21   count of conspiracy.

22           In that regard, you should not consider

23   or speculate about the fact that Mr. Thomas is

24   not being tried together with the defendant.

25   Your function is to consider the evidence

Jury Charge - by Hon. Borkowski

1    against Mr. Shelton who is on trial and decide

2    whether the elements of the crimes charged

3    against him have been proven beyond a

4    reasonable doubt.

5        I will instruct you as to the law that

6    applies to this case.  The law applicable to

7    this case is contained in these instructions

8    and it is your duty to strictly follow these

9    instructions.  You should consider these

10   instructions as a whole.  You may not pick out

11   one instruction and disregard others.

12       I caution you not to allow sympathy,

13   prejudice, or any other emotion to influence

14   you.  It is your duty to base your decision

15   strictly on the evidence.  The evidence which

16   you are to consider in reaching your decision

17   consists of the testimony of the witnesses that

18   you heard and the exhibits which you saw

19   introduced into evidence.  You must consider

20   all of the testimony of the witnesses and

21   exhibits but you must not consider any

22   testimony or exhibit to which I have sustained

23   an objection or which I have ordered stricken

24   from your consideration or from the record.

25   You are here for one purpose and one purpose

Jury Charge - by Hon. Borkowski

1    alone, that is to discover the truth of the

2    facts and apply the law to the facts as you

3    have determined them.

4        A fundamental principle in our criminal

5    justice system is that a person accused of a

6    crime is presumed to be innocent.  The mere

7    fact that the defendant was arrested and

8    accused of a crime is not any evidence against

9    the defendant.  In addition, there is no

10   inference of guilt created by the fact that

11   there was an information, that is the charging

12   document, or even that there is a trial.

13   Furthermore, the defendant is presumed innocent

14   throughout the trial unless and until you

15   conclude based on a careful and impartial

16   consideration of the evidence that the

17   Commonwealth has proved the defendant guilty

18   beyond a reasonable doubt.

19       Now, note that it is entirely up to

20   every defendant in any criminal trial whether

21   or not testify.  He has an absolute right

22   founded under the Constitution to remain

23   silent.  You must not draw any inference of

24   guilt or any other inference adverse to the

25   defendant from the fact that he did not

Jury Charge - by Hon. Borkowski

1    testify.

2         Now, you've also heard evidence tending

3    to prove that the defendant was involved in

4    other criminal activity or offenses for which

5    he is not on trial.  I'm speaking of the

6    testimony regarding the sale of the delivery of

7    drug or drugs and the incident of domestic

8    violence.  This evidence is before you for a

9    limited purpose, that is the limited purpose

10   that the defense alleges to be an explanation

11   of the certain conduct and circumstances that

12   unfolded during the time of the alleged crimes

13   that occurred here.  It is entirely up to you

14   to evaluate that evidence and determine its

15   credibility and whether it fits into this case.

16   You must not regard that evidence as showing

17   that the defendant is a person of bad character

18   or criminal tendencies from which you may be

19   inclined to infer guilt in this matter.

20        It is not the defendant's burden to

21   prove that the defendant is not guilty.

22   Instead, it is the Commonwealth that always has

23   the burden of proving each and every element of

24   the crimes charged beyond a reasonable doubt.

25   A person accused of a crime is not required to

Jury Charge - by Hon. Borkowski

1    present evidence or prove anything in his own

2    defense.  If the Commonwealth fails to meet its

3    burden, then your verdict must be not guilty.

4    On the other hand, if the Commonwealth does

5    prove beyond a reasonable doubt that the

6    defendant is guilty, then your verdict should

7    be guilty.

8              Although the Commonwealth has the

9    burden of proving the defendant guilty beyond a

10   reasonable doubt, this does not mean that the

11   Commonwealth must prove its case beyond all

12   doubt or to a mathematical certainty nor must

13   it demonstrate the complete impossibility of

14   innocence.  A reasonable doubt is a doubt that

15   would cause a reasonably careful and sensible

16   person to pause or hesitate before acting in a

17   matter of importance in his or her own affairs.

18   A reasonable doubt must fairly arise out of the

19   evidence that was presented or out of the lack

20   of evidence presented with respect to some

21   element of the crimes charged.

22             A reasonable doubt must be a real

23   doubt.  It may not be an imagined one nor may

24   it be a doubt merely manufactured to avoid

25   carrying out an unpleasant duty.  To summarize,

Jury Charge - by Hon. Borkowski

1    you may not find defendant guilty based on the

2    mere suspicion of guilt.  The Commonwealth has

3    the burden of proving the defendant guilty

4    beyond a reasonable doubt.  If it meets that

5    burden, the defendant is no longer presumed to

6    be innocent and you should find him guilty.  On

7    the other hand, if the Commonwealth does not

8    meet its burden, then you must find the

9    defendant not guilty.

10            Note that the arguments of the

11   attorneys are not actual evidence and cannot be

12   considered as such.  However in deciding the

13   case, you should carefully consider the

14   evidence in light of the various reasons and

15   arguments which each lawyer presented in

16   advance.  The case has been well tried by very

17   competent attorneys and it is the right and

18   duty of each lawyer to discuss the evidence in

19   a manner which is most favorable to the side

20   that he or she represents.  Counsels' personal

21   beliefs as to guilt or innocence or as to any

22   other disputed questions, if they were

23   expressed, are irrelevant and immaterial and

24   should not be considered by you.

25            You may be guided by the lawyers'

Jury Charge - by Hon. Borkowski

1      arguments to the extent that they are actually

2      supported by the evidence and insofar as they

3      apply to your own good judgment, reason, and

4      common sense.  You are not required, of course,

5      to accept the arguments of any lawyer.  It is

6      for you and you alone to decide the case based

7      on the evidence as it was presented and in

8      accordance with these instructions.

9           Generally, evidence is of two

10     different types.  On the one hand, there is

11     direct evidence which is testimony by a witness

12     from the witness's own personal knowledge such

13     as something that the witness saw or heard him

14     or herself.  The other type of evidence is

15     called circumstantial evidence which is

16     testimony about facts which point to the

17     existence of other facts which are in question.

18          Whether or not circumstantial evidence

19     is proof of the other facts in question depends

20     in part upon the application of common sense

21     and human experience.  You should recognize

22     that it is sometimes necessary to rely in whole

23     or in part upon circumstantial evidence in

24     criminal cases.

25          In deciding whether or not to accept

Jury Charge - by Hon. Borkowski

1    circumstantial evidence as proof of the facts

2    in question, you must be satisfied, first, that

3    the testimony of the witness is truthful and

4    accurate and, second, that the existence of the

5    facts to which the witness testified leads to

6    the conclusion that the facts in question also

7    occurred.

8            Circumstantial evidence alone may be

9    sufficient to prove a defendant's guilt.  If

10   there are several separate pieces of

11   circumstantial evidence, it not necessary that

12   each piece standing separately convinces you of

13   the defendant's guilt beyond a reasonable

14   doubt.  Instead, before you may find the

15   defendant guilty, all the pieces of

16   circumstantial evidence when considered

17   together must reasonably and naturally lead to

18   the conclusion that the defendant is guilty and

19   must convince you of his guilt beyond a

20   reasonable doubt.  In other words, you may find

21   the defendant guilty based on circumstantial

22   evidence alone but only if the total amount and

23   quality of that evidence convinces you of his

24   guilt beyond a reasonable doubt.

25            A duty which accompanies the judging

Jury Charge - by Hon. Borkowski

1    of the facts and, of course, which is central

2    and critical to that is the duty of appraising

3    the credibility of witnesses.  Obviously, you

4    cannot find the facts in this case based

5    largely upon the oral testimony of the

6    witnesses unless you decide who you will or

7    will not believe.  You go about appraising

8    credibility by taking into consideration all of

9    the conditions that surround the appearance of

10   the witness on the witness stand, the witness's

11   demeanor, the witness's responsiveness or

12   evasiveness as the case may be, or the

13   witness's knowledge or lack of knowledge of the

14   subject matter at hand, the witness's

15   opportunity for observation and for memory, the

16   witness's interest, if any, in the outcome of

17   the case, and all other circumstances and

18   details which ordinary experience and common

19   sense indicate are the usual and common indicia

20   of truthfulness or lack of truthfulness.

21          You have heard testimony that a

22   witness made a statement on a prior occasion

23   that was inconsistent with the testimony given

24   at trial.  There were three types of

25   circumstances where this applies.  Some

Jury Charge - by Hon. Borkowski

1    statements in this circumstance, the statements

2    must be verbatim recorded statements.  In other

3    words, the exact words of the person we're

4    referring to as opposed to the witness making a

5    statement, someone taking notes and writing a

6    report, that is not what we're talking about

7    with this type of testimony and concept.  In

8    this circumstance, it was largely limited to

9    the prior statements under oath at a

10   preliminary hearing.

11          As a general rule, you may consider

12   evidence of a prior inconsistent statement for

13   one purpose only, that is you may consider such

14   statements to help you judge the credibility

15   and weight of the testimony given by the

16   witness at this trial.  You may not consider

17   such statements as proof of the truth of

18   anything said in those statements.  That is

19   what I'm referring to.  If someone else takes

20   down what you said and records it in the

21   report, that is not a verbatim statement of

22   what you said.  It is someone's interpretation

23   of what you said.

24          In any event, special rules apply when

25   the prior inconsistent statements were made

Jury Charge - by Hon. Borkowski

1    under oath and taken down in a transcript.  In

2    such a case, you may, if you choose, consider

3    this evidence as proof of the truth of anything

4    that the witness said in their earlier

5    statement.  You may also consider this evidence

6    or statements to help you judge the credibility

7    and weight of the testimony given by the

8    witness at this trial.

9         Stated differently, where the prior

10   inconsistent statements were given under oath

11   at a prior proceeding, you may consider these

12   statements just as though the witness that

13   testified to them before you at this trial if

14   you decide the witness is being truthful on the

15   prior occasion.  On the other hand, if you

16   decide that the witness gave truthful testimony

17   before you at this trial about the matter or

18   matters which were the subject of the prior

19   inconsistent statement or statements, you may

20   choose to rely on the trial testimony instead

21   of the prior statements.  As with any witness,

22   you may believe all, part, or none of the

23   witness's testimony.

24        Photographs in this case were admitted

25   for the purposes I have gone over with you many

Jury Charge - by Hon. Borkowski

1    times, to explain the crime scene and help you

2    understand what may or may not have happened;

3    the autopsy photographs, to help you understand

4    the pathologists' testimony and also

5    potentially to assess the degree of guilt, if

6    any.  These photographs were not pleasant to

7    look at.  You should not let the photographs

8    stir up emotions or prejudice of the defendant.

9    Your verdict must be based on a rational and

10   fair consideration of all the evidence and not

11   on passion or prejudice against the defendant,

12   the Commonwealth, or anyone else associated

13   with this case.

14           I've permitted several witnesses to

15   testify as experts in this matter.  I gave you

16   a brief description of how to evaluate or treat

17   expert testimony.  I will give you a longer

18   instruction as promised.  An expert witness is

19   a person who has special knowledge or skill in

20   some science, art, profession, occupation, or

21   subject that the witness has acquired by

22   training, education, or experience.  Because

23   the expert has special, that is out of the

24   ordinary knowledge or skill, that witness may

25   be able to supply jurors with specialized

Jury Charge - by Hon. Borkowski

1    information, explanations, and/or opinions or

2    conclusions that may help you decide a case or

3    an issue in the case.

4          Ordinary witnesses are bound by two

5    limitations that do not apply to an expert

6    witness.  First, ordinary witnesses generally

7    can testify only about things they've

8    personally perceived, something that they saw

9    or heard themselves.  Second, ordinary

10    witnesses are not allowed to express opinions

11    about matters that require special knowledge or

12    skill.

13          By contrast, an expert is allowed to

14    express an opinion about a matter that is

15    within the area of the witness's expertise.

16    Furthermore, while an expert may base an

17    opinion on things personally perceived, that

18    witness may also base an opinion on factual

19    information learned from other sources.  If an

20    expert witness bases an opinion or conclusion

21    on things not personally perceived, the witness

22    can describe the information on which the

23    witness relied, identify the source, its role

24    in his or her opinion and conclusion, and how

25    it fits into the explanation of the conclusion

Jury Charge - by Hon. Borkowski

1     or opinion.

2          Remember, you, the jurors, are the sole

3     judges of the credibility and the weight of all

4     testimony.  The fact that the lawyers and I may

5     have referred to certain witnesses as experts

6     and the witness may have special knowledge or

7     skill does not mean that their opinion and

8     testimony are necessarily correct.  When you

9     are determining credibility or weight of an

10    expert's testimony or opinion, consider all the

11    factors that I described earlier that were

12    relevant when evaluating the testimony of any

13    witness.  You should also consider all other

14    things bearing on credibility and the weight

15    including the training, education, and

16    experience and ability of each expert, the

17    factual information on which the witness based

18    an opinion or conclusion, and the source and

19    reliability of that information, and the

20    reasonableness of any explanation the witness

21    gave to support the opinion.  Again, you are

22    free to believe all, part, or none of an expert

23    witness's testimony as with any witness.

24          In my instructions, I will give you

25    the legal definitions of the crimes charged.

Jury Charge - by Hon. Borkowski

1    Motive is not part of the definition of any of
2    crimes.  The Commonwealth is not required to
3    prove a motive for the commission of any crime
4    charged.  However you should consider the
5    evidence of motive or lack of motive.
6    Knowledge of human nature tells us that an
7    ordinary person is more likely to commit a
8    crime if he or she has a motive than if he has
9    none.  You should weigh and consider the
10   evidence tending to show motive or absence of
11   motive along with all other evidence in
12   deciding whether the defendant is guilty or not
13   guilty.  It is entirely up to you to determine
14   what weight should be given to the evidence
15   concerning motive.
16         You must not decide the case based on
17   which side has presented the greater number of
18   witnesses or the greater amount of evidence.
19   Instead you should decide which witnesses to
20   believe, if any, on the basis of whether or not
21   the testimony is found to be credible or
22   believable.  In deciding which witnesses to
23   believe, it is proper for you to consider
24   whether or not the testimony of each witness is
25   supported by other evidence in the case.  You

Jury Charge - by Hon. Borkowski

1    must recognize it is entirely possible for a

2    single witness to give truthful and accurate

3    testimony and that this testimony may be

4    believed even though a greater number of

5    witnesses of apparent or equal reliability

6    contradict that witness.  The question to

7    decide is not who produced the most evidence or

8    the most witnesses but which evidence to

9    believe and upon which evidence you will base

10   your conclusion.

11        If you determine that there is a

12   conflict or discrepancy in the testimony, you,

13   the jury, have a duty to decide which testimony

14   to believe but you should first try to

15   reconcile, that is fit together, any conflicts

16   or discrepancies in the testimony if you can

17   fairly do so.  Discrepancies and conflicts in

18   testimony may or may not cause you to

19   disbelieve some or all of the testimony.

20        Remember that persons witnessing an

21   incident may see or hear it happen differently.

22   It is not uncommon for a witness to be mistaken

23   in his or her recollection or observation of

24   how something occurred.  If you cannot

25   reconcile the conflicts and discrepancies,

Jury Charge - by Hon. Borkowski

1    however, it is for you to decide which
2    testimony, if any, to believe and which to
3    reject as being untrue or inaccurate.  In
4    making this decision, please consider whether
5    or not the conflicts or discrepancies are a
6    matter of importance or merely some extraneous
7    detail.  Also consider whether or not it is an
8    intentional falsehood or innocent mistake.
9         Note that there is a charge of
10   conspiracy and multiple crimes, different
11   crimes.  I'm going to explain to you initially
12   a general concept then I have a more specific
13   instruction about this concept as it applies to
14   first degree murder.
15        There are two basic ways that one
16   defendant may be criminally responsible for the
17   conduct committed by another person.  These two
18   ways may apply even if the defendant in
19   question was not present at the time and place
20   when a particular act occurred.  The first way
21   is for the defendant to be a member of a
22   conspiracy.  In a few moments I will define for
23   you what a conspiracy is and how it may be
24   proven.  For our purposes presently, it is
25   enough to understand that a conspiracy exists

Jury Charge - by Hon. Borkowski

1    when two or more people agree to commit a crime

2    or a series of crimes and one commits an act to

3    further the goal of the agreement.  If it is

4    proven beyond a reasonable doubt that the

5    defendant was indeed a member of a conspiracy,

6    he may be held responsible for the act or acts

7    of another person if each of the following

8    elements is proved beyond a reasonable doubt.

9    That the other person that committed a specific

10   act was also a member of the conspiracy, that

11   the crime in question was also committed while

12   the conspiracy was in existence, and that the

13   crime in question was committed to further the

14   goals of the conspiracy.

15        There is a separate and second way that

16   one defendant can be proved liable for the

17   conduct of another person, that is when the

18   defendant is an accomplice of the person who

19   actually committed the crime at issue.  There

20   is a basic difference between being an

21   accomplice and being a co-conspirator.  In a

22   conspiracy, people agree to act jointly.  To be

23   an accomplice, the person does not have to

24   agree to help someone else.  The person is an

25   accomplice if he, on his own, acts to help the

Jury Charge - by Hon. Borkowski

1  other person commit a crime.  More

2  specifically, the defendant is an accomplice of

3  another for a particular crime if the following

4  elements have been proven beyond a reasonable

5  doubt, that the defendant had the intent of

6  promoting or facilitating the commission of

7  that crime or crimes, that the defendant

8  solicited, commanded, encouraged, or requested

9  the other person to commit it or aided or

10  agreed to aid or attempted to aid the other

11  person planning or committing it.  It is

12  important to understand that a person is not an

13  accomplice merely because he is present when a

14  crime is committed or he has knowledge that a

15  crime is being committed.

16          As to the crime of first degree

17  murder.  First degree murder is a murder in

18  which the actor has the specific intent to

19  kill.  To find the defendant guilty of this

20  offense, you must find that the following

21  elements have been proven beyond a reasonable

22  doubt.  First, that the victim is dead.

23  Second, that the defendant killed him or her.

24  Third, that the defendant did so with the

25  specific intent to kill and with malice.  A

Jury Charge - by Hon. Borkowski

1    person has the specific intent to kill if he

2    has a fully formed intent to kill and is

3    conscious of his own intention.

4            Now, malice is a term that applies to

5    first and third degree murder.  If the person

6    has the specific intent to kill, for purposes

7    of the law, he does have malice.  A killing is

8    with the specific intent to kill if it is

9    willful, deliberate, and premeditated.  The

10   specific intent to kill including the

11   premeditation needed for first degree murder

12   does not require planning or previous thought

13   for any particular length of time.  It can

14   occur quickly.  All that is necessary is that

15   there be time enough so that the defendant can

16   and does fully form an intent to kill and is

17   conscious of that intention.

18           When deciding whether or not the

19   defendant had the specific intent to kill, you

20   should consider all the evidence regarding his

21   words and conduct and attending circumstances

22   that may show his state of mind.  If you

23   believe that the defendant intentionally used a

24   deadly weapon on a vital part of the victim's

25   body, you may regard that as an item of

Jury Charge - by Hon. Borkowski

1    circumstantial evidence that you may, if you

2    choose, infer that the defendant had the

3    specific intent to kill.

4          I'm only going to read the definition

5    of first degree murder and third degree murder

6    once and REAP but it applies to every one of

7    the charges as to each victim.

8          Now, I told you the general rules of

9    how one person can be responsible for a crime

10   that was committed by another person.  I'll

11   explain the special rules that apply to first

12   degree murder.  When two or more people are

13   charged with the crime of first degree murder

14   and one or more of the accused did not actually

15   commit the murder, the person who did not

16   actually cause the death may be guilty of first

17   degree murder only if either of the following

18   two conditions are met.  The first condition is

19   where the defendant was a member of the

20   conspiracy that had as its specific goal, or

21   one of its specific goals, the commission of

22   first degree murder.  In other words, as

23   applied in this case you may find the defendant

24   guilty of murder in the first degree if you

25   find beyond a reasonable doubt that, first, the

Jury Charge - by Hon. Borkowski

1    goal of the conspiracy was to commit first

2    degree murder and, second, the defendant

3    knowingly entered into such a conspiratorial

4    agreement.  If the conspiracy does not have

5    first degree murder as its intended goal and a

6    member of that conspiracy other than the

7    defendant commits such a murder, the defendant

8    is not guilty of first degree murder merely

9    because he was part of a conspiracy to commit

10   some other offense.

11        A person can also be guilty of first

12   degree murder when he did not cause the death

13   personally when the Commonwealth proves beyond

14   a reasonable doubt that he was an accomplice in

15   a murder.  To be an accomplice in a murder, the

16   defendant must have himself intended that a

17   first degree murder would occur and that the

18   defendant then solicited, commanded,

19   encouraged, or requested the other person to

20   commit it or aided, agreed to aid, or attempted

21   to aid the other person in planning or

22   committing.

23        To summarize, a defendant may not be

24   found guilty of the crime of first degree

25   murder where the death is caused by another

Jury Charge - by Hon. Borkowski

1    unless the defendant himself as a conspirator

2    or an accomplice had the specific intent or

3    goal of bringing about murder in the first

4    degree.

5            Third degree murder is any killing

6    with malice that is not first or second degree

7    murder.  Second degree murder is not in this

8    case at all.  The defendant, one possible

9    verdict, the defendant has been charged by the

10   nature of the information with third degree

11   murder.  To find the defendant guilty of this

12   offense, you must find the following elements

13   have been proven beyond a reasonable doubt.

14   First, that the victim is dead.  Second, that

15   the defendant killed the victim.  Third, that

16   the defendant did so with malice.

17           The word malice as I am using it has a

18   special legal meaning.  It does not mean simply

19   hatred, spite, or ill-will.  Malice is a

20   shorthand way of referring to a particular

21   mental state that the law regards as bad enough

22   to make a killing murder.

23           For murder of the third degree, a

24   killing is with malice if the perpetrator's

25   action show his wanton and willful disregard of

Jury Charge - by Hon. Borkowski

1    an unjustified and extremely high risk that his

2    conduct would result in death or serious bodily

3    injury to another.  In this form of malice the

4    Commonwealth need not prove that the

5    perpetrator specifically intended to kill

6    another.  The Commonwealth must prove, however,

7    that the perpetrator took action while

8    consciously, that is knowingly, disregarding

9    the most serious risk that he was creating and

10   that by his disregard of that risk, the

11   perpetrator demonstrated his extreme

12   indifference to the value of human life.

13        In deciding whether the defendant acted

14   with malice, you should consider all the

15   evidence regarding his words, conduct, and

16   attendant circumstances that may show his state

17   of mind.  If you believe that the defendant

18   intentionally used a deadly weapon on a vital

19   part of the victim's body, you may regard that

20   as an item of circumstantial evidence which you

21   may, if you choose, infer that the defendant

22   acted with malice.

23        The defendant has been charged with

24   criminal homicide of the unborn child of

25   Chanetta Powell.  To find the defendant guilty

Jury Charge - by Hon. Borkowski

1    of third degree murder of the unborn child, you

2    must find that the defendant caused the death

3    of the unborn child with malice.  I have just

4    defined that term for you and it applies to

5    this particular charge.

6              The Commonwealth's theory of the case,

7    and one that you are free to contemplate and

8    accept or reject, is that the defendant and/or

9    his co-conspirator or accomplice intended to

10   kill Lamont Powell and conspired to do so.  In

11   so doing, they actually caused, one or more,

12   one or both of them caused the death of another

13   person.  If you find beyond a reasonable doubt

14   that the defendant or his co-conspirator,

15   accomplice, intended to kill or conspired with

16   the intent to kill Lamont Powell and were

17   acting with that intent at the time the others

18   were, in fact, killed, you may find that the

19   defendant acted with the specific intent to

20   kill under what the law calls the Doctrine of

21   Transferred Intent.  What this means is that

22   what the defendant intended differed from what

23   they actually contemplated.  Only because a

24   different person or persons than the one

25   actually intended was killed, the element of

Jury Charge - by Hon. Borkowski

1    causing the death with the specific intent to

2    kill is still established.

3            The crime of aggravated assault.

4    This, again, applies to the separate victims,

5    separate charges.  There are two forms of

6    aggravated assault.  One is where there was an

7    attempt to cause serious bodily injury and

8    serious bodily injury was not necessarily

9    inflicted.  There is a second form where

10   serious bodily injury was actually inflicted.

11           As to the charge of aggravated

12   assault, attempted serious bodily injury, to

13   find the defendant guilty of this offense, you

14   must find the following elements have been

15   proven beyond a reasonable doubt.  First, that

16   the defendant attempted to cause serious bodily

17   injury to the victim.  Serious bodily injury is

18   bodily injury that would create a substantial

19   risk of death if it would cause serious

20   permanent disfigurement or the protracted loss

21   or impairment of a function of any bodily

22   member or organ.  In order to find that the

23   defendant attempted to do this, you must find

24   that he engaged in conduct which constituted a

25   substantial step toward causing serious bodily

Jury Charge - by Hon. Borkowski

1    injury to the victim and that the defendant's

2    conduct in this regard was intentional.  In

3    other words, it was his conscious object or

4    purpose to cause such serious bodily injury.

5        It is important that you understand

6    how these two elements relate to each other in

7    order to assess whether they have been proven

8    beyond a reasonable doubt.  In proving this

9    type of aggravated assault, the Commonwealth

10   need not prove that serious bodily injury was

11   actually inflicted on the victim.  The

12   Commonwealth must prove however that the

13   defendant took an action, that is a substantial

14   step, of such a nature that there is no

15   reasonable doubt that it was his intention,

16   that is his conscious object and purpose, to

17   cause such a life-threatening injury to the

18   victim.  To make this determination, you may

19   find it useful to ask why the alleged victim

20   did not actually suffer serious bodily injury

21   as a result of the incident.  If you find that

22   such injury did not occur only because of

23   something outside of the control of the

24   defendant such as intervention of a third

25   party, the inability of the victim to avoid the

Jury Charge - by Hon. Borkowski

1    full brunt of the attack, or the prompt

2    administration of medical attention that

3    prevented the injuries from developing the kind

4    that meets the definition of serious bodily

5    injury, then you may consider that as evidence

6    as to whether the defendant's substantial step

7    was done that required the intent to support a

8    verdict of guilty on this type of form of

9    aggravated assault.

10           Any particular action by a defendant

11   although serious such as pointing a weapon at

12   another is not sufficient evidence that you may

13   find that he intended to cause serious bodily

14   injury.  This is so because any such action may

15   also be evidence that some less serious outcome

16   that the defendant actually intended such as to

17   simply scare the alleged victim or cause less

18   serious injury.

19           It is only after consideration of all

20   of the evidence that you conclude if you do so

21   beyond a reasonable doubt that the defendant's

22   action was a substantial step in a chain of

23   events that he consciously set in motion with

24   his intended result being that the victim would

25   actually suffer serious bodily injury, you

Jury Charge - by Hon. Borkowski

1    should find him guilty of this type or form of

2    aggravated assault.  Otherwise you must find

3    the defendant not guilty of that form of

4    aggravated assault.

5            Now, the second form of aggravated

6    assault has the following elements that have to

7    be proven beyond a reasonable doubt.  First,

8    that the defendant caused serious bodily injury

9    to the victim.  Serious bodily injury is bodily

10   injury that creates a substantial risk of death

11   or that causes serious permanent disfigurement

12   or the protracted loss or impairment of any

13   bodily member or organ.  Second, that the

14   defendant acted intentionally, knowingly, and

15   recklessly under circumstances manifesting an

16   extreme indifference to the value of human

17   life.

18           A person acts intentionally with

19   respect to serious bodily injury when it is his

20   conscious object or purpose to cause such

21   injury.  A person acts knowingly with respect

22   to serious bodily injury when he is aware that

23   it is practically certain that his conduct will

24   cause such a result.  A person acts recklessly

25   with respect to serious bodily injury when he

Jury Charge - by Hon. Borkowski

1    consciously disregards a substantial and

2    unjustifiable risk that serious bodily injury

3    will result from his conduct.  The risk must be

4    of such a nature and degree that considering

5    the nature and intent of the defendant's

6    conduct and the circumstances known to him, his

7    disregard involves a gross deviation from the

8    standard of conduct that a reasonable person

9    would observe in the defendant's situation.  It

10   is shown by that kind of reckless conduct from

11   which a life-threatening injury is almost

12   certain to occur.

13          The defendant is also charged with

14   attempted murder.  To find the defendant guilty

15   of this offense, you must find the following

16   elements have been proven beyond a reasonable

17   doubt.  First, that the defendant did a certain

18   act, that is shooting the victim.  Second, that

19   at the time of this alleged act the defendant

20   had the specific intent to kill the victim and

21   that is, he had a fully formed intent to kill

22   and was conscious of his own intention.  Third,

23   that the act constituted a substantial step

24   toward the commission of the killing that the

25   defendant intended to bring about.  A

Jury Charge - by Hon. Borkowski

1    substantial step toward the commission of a
2    crime is, one, if it is a major step toward the
3    commission of the crime and also strongly
4    corroborates your belief that the person at the
5    time he did the act had a firm intent to commit
6    that crime.  An act can be a substantial step
7    even though other steps would have to be taken
8    before the crime could be carried out.  Those
9    are the elements of attempted murder.
10          The crime of conspiracy.  The defendant
11   has been charged with conspiracy to commit
12   murder and/or aggravated assault.  In
13   Pennsylvania, joining a conspiracy or creating
14   a conspiracy is itself a crime.  Even if the
15   crime that people are planning is not carried
16   out, the members of the conspiracy are still
17   responsible for that distinct crime of
18   conspiracy.  In general terms, a conspiracy is
19   an agreement between two or more persons to
20   commit a crime.  A conspiracy exists once two
21   conditions are met, that there is an agreement
22   and one of the members then commits some act to
23   help achieve the goal of the conspiracy.
24          The first element of the conspiracy is
25   an agreement.  It can be stated in words or

Jury Charge - by Hon. Borkowski

1    unspoken but acknowledged, but it must be an
2    agreement in a sense that two or more people
3    have come to an understanding that they agree
4    to act together to commit a crime or crimes.
5    Their agreement does not have to cover the
6    details of how the crime will be committed nor
7    does it have to call for all of them to
8    participate in actually committing the crime or
9    crimes.  They can agree that one of them will
10   do the job.  What is necessary is that the
11   parties do agree.  In other words, they do come
12   to a firm common understanding that a crime
13   will be committed.  The agreement itself is the
14   essence of the conspiracy.
15          A defendant cannot be convicted of
16   conspiracy unless he or a fellow conspirator
17   does something more, an overt act, in
18   furtherance of the conspiracy.  The overt act
19   is an act by any member of the conspiracy to
20   further serve the goal of the conspiracy.  An
21   overt act can be criminal or non-criminal in
22   itself as long as it is designed to put the
23   conspiratorial agreement in effect.  This is to
24   show that the parties have a firm agreement and
25   are not just thinking or talking about

Jury Charge - by Hon. Borkowski

1    committing the crime.  The overt act shows that

2    the conspiracy has reached the action stage.

3    If a conspirator actually attempts to commit

4    the agreed upon crime, that, obviously, would

5    be an overt act in furtherance of the

6    conspiracy.  But a small act or step that is

7    much more preliminary and a lot less

8    significant can satisfy the overt act

9    requirement.

10         The Commonwealth may prove a

11    conspiracy by direct evidence or by

12    circumstantial evidence.  People who conspire

13    often do their conspiring secretly and then try

14    to cover up afterwards.  In many conspiracy

15    trials, circumstantial evidence is the best or

16    only evidence on the question of whether there

17    was an agreement, that is that common

18    understanding, and whether the conspirator

19    shared the intent to promote or facilitate

20    committing the object crime or crimes.

21         Thus, you may if you think it is

22    proper, infer that there was a conspiracy from

23    the relationship, conduct, and acts of the

24    defendant and his alleged co-conspirator and

25    circumstances surrounding their activities.

Jury Charge - by Hon. Borkowski

1    However, the evidence of this must support your

2    conclusion beyond a reasonable doubt.

3          A defendant cannot be convicted

4    because he was present with others or even

5    because he knew what the others were planning

6    or doing.  There must be proof of an agreement

7    between the defendant and the other person or

8    persons to form or continue the conspiracy.  To

9    be proved guilty of being a conspirator, the

10    defendant must have intended to act jointly

11    with the other charged and must have intended

12    that the crime or crimes alleged to be the goal

13    of the conspiracy would be committed.

14          The information alleges at count ten

15    that the defendant conspired with Robert Thomas

16    as the alleged co-conspirator.  The information

17    also alleges that the crime of criminal

18    homicide and/or aggravated assault was the

19    object of the conspiracy.  The information

20    alleges that the following actions were the

21    overt acts as I explained that concept to you,

22    that is shooting Jerry Shelton and/or Brittany

23    Powell and/or Tina Shelton and/or Chanetta

24    Powell and/or Shada Mahone and/or Lamont Powell

25    and/or John Ellis and/or Tonjia Cunningham.

Jury Charge - by Hon. Borkowski

1          Before any juror can convict, the 12

2    jurors must all agree on the same person the

3    defendant allegedly conspired with, the same

4    object crime, and the same overt act.  In order

5    to find the defendant guilty of conspiracy to

6    commit one or both crimes, you must be

7    satisfied that the following elements have been

8    proven beyond a reasonable doubt.  First, that

9    the defendant agreed with the other person,

10   Mr. Thomas, that one or both of them would

11   engage in conduct for the planning and/or

12   commission of the crime of criminal homicide

13   and/or aggravated assault.  Second, that the

14   defendant and the other person intended to

15   promote or facilitate the committing of one or

16   both of those crimes.  In other words, they

17   shared the intention to bring about that crime

18   or crimes or to make it easier for that crime

19   or crimes to be committed and that the

20   defendant or the other person did the act or

21   acts that are alleged to have been the overt

22   act or acts and did them in furtherance of

23   their conspiracy.

24          As a general rule, if conspirators have

25   agreed to commit a crime and after that one of

Jury Charge - by Hon. Borkowski

1    the conspirators does any act to advance their

2    agreement, then he has done an overt act in

3    furtherance of the conspiracy.  The other

4    conspirators do not have to participate in the

5    act or even know about it.  In a sense, they

6    are partners, and as partners, they are

7    responsible for each other's actions.

8         There are multiple counts of

9    recklessly endangering another person.  The

10   names of the victims will be on the verdict

11   sheet that you will be given except the

12   Commonwealth alleges that there were young

13   persons, juveniles, who were recklessly

14   endangered by the conduct, they will be listed

15   on the information as John or Jane Doe.

16        The defendant has been charged with

17   recklessly endangering another person.  To find

18   the defendant guilty of this offense, you must

19   find that the defendant did something

20   recklessly that placed or may have placed the

21   victim in danger of death or serious bodily

22   injury.  A person acts recklessly with respect

23   to serious bodily injury when he consciously

24   disregards or ignores a great and unjustifiable

25   risk that what he is doing would cause another

Jury Charge - by Hon. Borkowski

1    person to be seriously injured.  The risk must
2    be so serious that considering what a defendant
3    did and what his intentions were, he acted in a
4    way that amounted to a gross deviation from the
5    standard of conduct that a reasonable person
6    would observe or conduct himself in such a
7    situation.

8          If after considering all of the
9    evidence you find that the Commonwealth has
10   proven beyond a reasonable doubt that the
11   defendant recklessly placed any or all of the
12   victims in danger of death or serious bodily
13   injury, you should find the defendant guilty of
14   that offense.  Otherwise you must find the
15   defendant not guilty.

16         As I've told you, one of the elements
17   of the crimes, especially that is the criminal
18   homicide charges and/or aggravated assault, is
19   that the defendant had a certain state of mind.
20   Ordinarily, it is not possible to prove state
21   of mind by direct evidence unless, for example,
22   there is evidence that the defendant made a
23   statement concerning his state of mind.
24   However, state of mind, like any other matter,
25   may be proven by circumstantial evidence, that

Jury Charge - by Hon. Borkowski

1    is by inference that may be reasonably drawn

2    from all facts and circumstances which may have

3    been shown by evidence in this case.  Thus, you

4    may conclude that the defendant had a certain

5    state of mind based on circumstantial evidence

6    alone but only if the circumstantial evidence

7    is strong enough to convince you that the

8    Commonwealth has established that state of mind

9    beyond a reasonable doubt.

10          The defendant has raised as a

11    potential defense voluntary intoxication and

12    drug condition as a defense to first degree

13    murder.  I will begin with some general rules

14    about intoxication.  Generally speaking, a

15    person who voluntarily used intoxicants is not

16    allowed to claim as a defense that he was so

17    intoxicated that he was legally incapable of

18    committing a crime nor is a person allowed to

19    rely on evidence of his own intoxication to

20    prove that he lacked an intent, knowledge, or

21    other mental state required for a particular

22    crime.  This general rule or rules do not apply

23    to the charge of first degree murder.  The

24    defendant is permitted to claim as a defense

25    that he was so overpowered by intoxicants that

Jury Charge - by Hon. Borkowski

1    the defendant had lost control of his faculties

2    and was incapable of forming the specific

3    intent to kill required for first degree

4    murder.  The Commonwealth has the burden of

5    disproving this defense.  Thus you cannot find

6    the defendant guilty of first degree murder

7    unless you are satisfied beyond a reasonable

8    doubt that the defendant, despite any

9    intoxicated condition, was at the time capable

10    of forming a specific intent to kill and did,

11    in fact, form that intent.

12           As I told you earlier, specific intent

13    to kill means a conscious fully formed

14    intention to kill.  Voluntary intoxication may

15    reduce murder from first degree murder to third

16    degree murder but no lower.  These general

17    rules apply to lesser crimes.  They prevent a

18    defendant from using his own voluntary

19    intoxication in any way to defend himself

20    against an accusation of third degree murder.

21           Those are the crimes charged and the

22    elements of those crimes.

23           Before you retire to decide this case,

24    I'll provide you some final guidelines for the

25    way in which you may conduct your deliberations

Jury Charge - by Hon. Borkowski

1    and how you may properly arrive at a verdict.

2    You will be provided with part of my

3    instructions in writing.  This is a relatively

4    recent phenomenon in the Commonwealth of

5    Pennsylvania.  We provide you with the written

6    portion of these charges that defines the

7    crimes.  We finally recognized that we put

8    jurors in positions to be exposed to all this

9    legalese so to speak and especially as it

10   regards to the crimes, the elements that must

11   be proven beyond a reasonable doubt.  I will

12   give you the definition of the elements to aid

13   you in your analysis and deliberations but that

14   is the only part that you will be given along

15   with the defense of voluntary intoxication.

16   You have to consider, as I've told you, my

17   instructions as a whole.  Those written

18   instructions are just to facilitate your

19   analysis.

20          It has been my responsibility to decide

21   all questions of law.  You must follow and

22   accept my rulings and instructions as to

23   matters of law.  I am not to decide the facts

24   concerning the charges.  You are the sole

25   judges of the facts.  It is your responsibility

Jury Charge - by Hon. Borkowski

1    to consider the evidence, find the facts and

2    apply the law to the facts as you have found

3    them to be and therefore decide whether or not

4    the Commonwealth has met its burden of proving

5    the defendant guilty beyond a reasonable doubt.

6            You're decision in this case as in

7    every case is of considerable importance.

8    Remember, you are to base your verdict on the

9    evidence and law as it has been provided to

10   you.  However, in deciding the facts, you may

11   properly apply common sense and draw on your

12   everyday knowledge of life as each of you has

13   experienced it.  You must keep your

14   deliberations free from bias or prejudice.

15   Both the Commonwealth and the defendant have a

16   right to expect you to consider the evidence

17   conscientiously and apply the law as I've

18   outlined it in these instructions.

19           In arriving at your verdict, you must

20   not concern yourself with the possible

21   consequences of your verdict including what the

22   penalty might be if you should find the

23   defendant guilty.

24           Upon retiring to deliberate, you should

25   select one of you to be the foreperson of the

Jury Charge - by Hon. Borkowski

1    jury.  That person will stand in open court at

2    the conclusion of your deliberations and

3    announce the verdict.  Your verdict must be

4    unanimous which means all 12 must agree.  You

5    have a duty to consult with each other and

6    deliberate with a view toward reaching an

7    agreement if this can be done without doing any

8    violence to your individual judgment.

9         Each of you must decide the case for

10   him or herself only after there has been an

11   impartial consideration and discussion with

12   your fellow jurors.  In the course of the

13   deliberations each juror must not hesitate to

14   re-examine his or her own view and change that

15   opinion if, in fact, you are convinced it is

16   erroneous.  However, none of you should

17   surrender an honest conviction as to the weight

18   or effect of the evidence solely on the opinion

19   of your fellow jurors for the purpose or

20   convenience of reaching a verdict.

21        I have not attempted to indicate my

22   opinion concerning the weight to give to the

23   evidence or any part of it.  I do not want you

24   to think that I have.  If during the course of

25   the trial I have asked any question of a

Jury Charge - by Hon. Borkowski

1    witness, do not attach any more significance to

2    those questions or answers as to any other

3    question or answer.  If during the trial I

4    exhibited what you felt was annoyance or

5    displeasure toward any witness or lawyer, if I

6    made any or displayed any facial expressions or

7    emotion, I am not attempting to lead you to

8    render a particular verdict because, of course,

9    I am not.

10            Any proposed modifications or

11    additions?

12              MR. CHERNOSKY:  None from the

13    Commonwealth.

14              MS. WILLIAMS:  On behalf of

15    Mr. Shelton, may we approach?

16              (Sidebar discussion held as

17    follows.)

18              MS. WILLIAMS:  Your Honor, I

19    don't recall your exact wording but the Court

20    has given the instruction of third degree

21    murder.  That objection is to your language

22    when you were talking about involuntary

23    intoxication, the defendant is offering the

24    defense of involuntary intoxication.  We asked

25    for that because the Court was giving the third

Jury Charge - by Hon. Borkowski

1    degree murder charge over our objection.  I

2    don't want the jury to think that we're

3    offering the offense of involuntary

4    intoxication.  Only over our objection that had

5    to be given.  The Court included some type of

6    language that the defense is offering.

7                THE COURT:  You did offer.  You

8    asked for it.

9                MS. WILLIAMS:  We asked for the

10   instruction because you were giving third.

11                THE COURT:  This morning, you

12   asked for it outright.

13                MS. WILLIAMS:  And Randall

14   withdrew that after talking to the defendant,

15   the wording.

16                THE COURT:  Anything else?

17                MS. WILLIAMS:  No.

18                (Sidebar discussion concluded.)

19                THE COURT:  Ladies and gentlemen,

20   you will be given the verdict slip.  It will

21   be, more or less, self-explanatory in the

22   context of my instructions.  As I said, I only

23   defined the charges once but it applies to each

24   and every one of the charges for the different

25   victims.

Jury Charge - by Hon. Borkowski

1          You will be given that verdict slip.

2     If after careful consideration of the testimony

3     and the law you've reached the conclusion that

4     the Commonwealth failed to meet the burden of

5     proof required as to any or all of the charges,

6     then your verdict must read not guilty next to

7     the appropriate charge or charges on that

8     verdict slip.  On the other hand, members of

9     the jury, if you reach the conclusion that the

10    Commonwealth has met the required burden of

11    proof beyond a reasonable doubt on any or all

12    of the charges, you should write in guilty next

13    to the appropriate charge or charges on the

14    verdict slip.

15          As to the alternate jurors, you may

16    resume your normal activities.  However you

17    remain under oath and subject to the

18    instructions and authority of this Court.  Do

19    not discuss the case with anyone.  Do not allow

20    anyone to discuss the case with you.  The full

21    body of instructions that I gave still apply to

22    you.  It is possible that you will be recalled

23    and become part of the deliberative process

24    with your fellow jurors.  It is not likely but

25    it is possible.  If something should happen to

Jury Charge - by Hon. Borkowski

1    any of the 12 principal jurors and they would

2    be unable to complete their service, you will

3    be summoned to return to the court so you must

4    follow my instructions in terms of discussing

5    the case or following any media accounts

6    without reservation and strictly do so.  You

7    will be contacted by this Court, Mr. Irvin and

8    Mr. Perillo, once a verdict has been reached or

9    if you are needed to resume your service.

10   Until that time, strictly adhere to all the

11   instructions that I have previously given.

12            The circumstances presently, it is

13   4:00.  A lot of evidence.  It has been a long

14   day for you.  You will go to your jury room and

15   I suggest that you select a foreperson.  You

16   can begin your deliberations.  The evidence has

17   to be gathered up and put in a form that

18   maintains its integrity.  You are subject to

19   any discussion I might have otherwise, you are

20   entitled to view and have with you all of the

21   evidence.  We will set up a laptop in your jury

22   room to allow you to view the evidence at your

23   convenience and in whatever order that you

24   like.  Certain things like the weapon we don't

25   send up of course but any of the evidence as

Jury Charge - by Hon. Borkowski

1    far as I can see, I have to review it closer,

2    but in this circumstance, all the evidence that

3    was admitted is available to you for your

4    consideration as you see fit.

5        If during the course of your

6    deliberations you have any question on matters

7    related to the case, you should direct them to

8    me in writing signed by the foreperson.

9    Mr. Irvin and Mr. Perillo, of course, will be

10   available to tend to your needs during your

11   deliberations and as a liaison between you and

12   the Court.  The one thing, you are permitted to

13   take notes so it is not my practice to read

14   back testimony of any sort.  That is why you

15   were told to pay close attention during the

16   course of the trial, to take as many or as few

17   notes as you saw fit.

18       As to the length of deliberations

19   today, as I said, it has been a long day.  If

20   you want to elect a foreperson today and go

21   home, that is fine with me.  If you want to

22   stay later, you can stay.  I won't keep you any

23   later than 6:00, bear that in mind, but at this

24   juncture the pace of the deliberations is more

25   or less at your discretion so elect a

Jury Charge - by Hon. Borkowski

1    foreperson and let me know through Mr. Irvin

2    what you want to do today.

3            Ladies and gentlemen of the jury, with

4    that, consistent with your oath and obligation,

5    you are charged with the responsibility of

6    fairly and honestly evaluating the case of the

7    Commonwealth versus Cheron Shelton and reaching

8    a verdict consistent with the evidence and the

9    law.  Remain seated and quiet as the jury

10    leaves the room.

11                        -----

12            (Open court - Jury not present.)

13                        -----

14            MS. WILLIAMS:  I do have

15    something to put on the record of the victim

16    impact statements that I received at 4:30.

17    With respect to a lot of what I just read, the

18    victim impact statements, the family is

19    directing comments to Cheron exactly.  They

20    cannot say that his conduct was premeditated or

21    remorse or lack of remorse.  They can talk

22    about the uniqueness of the victim impact of

23    the loss.  Virtually all the proffered

24    statements are objectionable.  In addition, I

25    have pamphlets and fliers from funeral homes

Jury Charge - by Hon. Borkowski

 1    and poems and Bible verses, Stop the Violence,
 2    Keep the Peace, Let Jesus Take the Wheel that
 3    we argue are improper.  Some of the things I
 4    have aren't -- some are signed best friend.  It
 5    is our position that only family members should
 6    be offering victim impact.  I want to say that
 7    no one advised the family that they cannot
 8    address Cheron directly in court or point or
 9    accuse him.  I'm saying that because that is
10    what much of the letters do.  I want to stress
11    anyone that speaks in court, it is
12    objectionable for them to directly address
13    Cheron or accuse or comment on him.  It don't
14    seem that they have been advised based on the
15    impact statements.
16              MS. PELLEGRINI:  I disagree.
17    They were instructed numerous times.  I edited
18    them down and reviewed them.  They are allowed
19    to speak about the violent night and impact
20    that that night had upon their family and I
21    think that is what they've done.  I will look
22    at them again.
23              THE COURT:  I think she stated
24    that it goes beyond.
25              MS. PELLEGRINI:  I will look at

Jury Question

 1    them again.

 2                    THE COURT:  We recognize and

 3    accept the fact that they are allowed to speak

 4    about the impact on their lives and immediate

 5    family members but community violence and

 6    unidentified persons, take a look, I haven't

 7    seen it.

 8                    MS. WILLIAMS:  I understand.  I

 9    wanted to raise that now.

10                    (Court adjourned for the day.)

11                         -----

12                    (Tuesday, February 11, 2020 -

13    Open court - Jury not present.)

14                         -----

15                    THE COURT:  Note the presence of

16    Mr. Shelton and all concerned parties.  I

17    received the following communication from the

18    members of the jury.  Question number one:  Who

19    does the prosecution allege held the

20    .40-caliber and the rifle?  Question two:  Can

21    we get copies of T-Mobile phone records and the

22    highlights?  Question two is easy enough.  I

23    will provide that to the jurors.  Any comment

24    as to question number one?

25                    MR. McKINNEY:  Your Honor, I do

Jury Question

1    have comment with respect to comment number

2    two.  There are edited versions around,

3    exhaustive versions that contain all

4    communications.  We are asking that they get

5    the exhausted records, not the edited ones.

6    That has been done.

7                    THE COURT:  Show Mr. McKinney.  I

8    asked for the records.  They have been copied.

9                    MR. McKINNEY:  No objection, Your

10   Honor.

11                   THE COURT:  As to question number

12   two?

13                   MR. CHERNOSKY:  On behalf of the

14   Commonwealth, it is the Commonwealth's position

15   that is a factual determination so they would

16   be instructed to follow their collective

17   memories.

18                   THE COURT:  Anything else?

19                   MR. McKINNEY:  Your Honor, the

20   defense agrees with the Commonwealth's

21   assessment as well as we would like the written

22   questions to be entered into the record.

23                   THE COURT:  You would like the

24   written questions?

25                   MR. McKINNEY:  The written

```
 1    questions from the jurors to be entered into

 2    the record.

 3              THE COURT:  What makes you think

 4    that I won't do that?

 5              MR. McKINNEY:  I don't think you

 6    wouldn't, Your Honor, but I thought I would

 7    ask.

 8              THE COURT:  Okay, bring the jury

 9    in.

10                        -----

11              (Open court - Jury present.)

12                        -----

13              THE COURT:  Good afternoon.  I

14    received your questions, of course.  I can

15    answer it quickly.  Question number two, it

16    will be provided with those records and the

17    instrument you requested, also.  As to question

18    number one, who does the prosecution allege had

19    the .40-caliber and the rifle?  That is a

20    question of fact that you must resolve from the

21    evidence that was presented, lack of evidence

22    presented, the law that I have instructed you

23    on, and the arguments of counsel and so far as

24    they address or did not address that, okay.

25              All right, remain seated and quiet as
```

Motion

1      the jury leaves the room.

2                  (Jury dismissed to continue

3      deliberations.)

4                            -----

5                  (Open court - Jury not present.)

6                            -----

7                  THE COURT:  What is on your

8      minds?

9                  MS. WILLIAMS:  Your Honor, on

10     behalf of Mr. Shelton, we wanted to make a

11     motion we feel is extremely important.  We feel

12     that the releasing of the exhibits,

13     specifically the audio of the automatic weapon

14     gunfire of approximately 30 shots released to

15     the media that is now being played on all media

16     outlets, peoples' phones -- I walked into the

17     lobby of the Frick Building and at least three

18     people I could hear were playing it on their

19     phones -- violates Mr. Shelton's right to a

20     fair trial and his due process rights.  It is a

21     violation of his Fifth Amendment right to

22     counsel because it was done without a hearing

23     or without giving us a chance to object and his

24     rights under the Sixth, Eighth, and Fourteenth

25     Amendments and the corresponding State

Motion

 1    Constitutional Amendments.  This is a capital

 2    murder trial.  We would hope that people would

 3    err on the side of caution.

 4         We have a jury that is not sequestered

 5    that have their cell phones right now that if

 6    they turn their phones on, they get news alerts

 7    and breaking news.  It is impossible not to get

 8    the audio of the gunfire being played on the

 9    breaking news clips.  We have jurors not

10    sequestered in contact with relatives and

11    friends exposed to this.  They will be

12    returning home and exposed to the television,

13    et cetera.

14         Our position is that there is no legal

15    legitimate reason to release exhibits, and

16    inflammatory exhibits, to the media while a

17    capital jury is deliberating, and we feel that

18    for this to occur, I mean I did consult death

19    penalty scholars including the Atlantic Center

20    for Capital Representation and they feel

21    because there was a gag order in the case and

22    the Court sua sponte sealed certain motions and

23    exhibits that were favorable to Mr. Shelton,

24    that this is just viewed by us as an outrageous

25    violation of Mr. Shelton's rights to a fair

Motion

1    trial.

2        We ask the Court to grant a mistrial

3    based on this being released to the media while

4    the jury is deliberating and they have access

5    to it while they are deliberating.  Thank you.

6        THE COURT:  The exhibits

7    themselves became part of the public record

8    when they were introduced into evidence.  There

9    is a continual tension between the media

10   getting access to matters that they are

11   actually entitled to as part of the public

12   record and the Court's perception that they

13   should not be released during the trial because

14   the jury, at that time, although they've heard

15   and seen the exhibits, do not have the entirety

16   of the context by virtue of the arguments of

17   counsel and the law that is ultimately given to

18   the jury during the Court's final instruction.

19   They now have the benefit of the entirety of

20   the body of evidence they are to consider, they

21   have the benefit of the arguments of counsel,

22   and the Court's instruction.  Consequently, the

23   Court feels, believes, that I have no legal

24   recourse to keep those matters sealed and they

25   were released.

Motion

1              As to what you may perceive as

2      favorable, the only thing that is kept under

3      seal presently is your final motion filed

4      during the course of the trial.  The Court has

5      to evaluate that for potential Grand Jury

6      disclosures.  That will be released at my next

7      earliest convenience if I see so fit.  The

8      motion is denied.

9              MS. WILLIAMS:  Thank you, Your

10     Honor.  I do want to point out that witness

11     number one was not a Grand Jury witness or

12     Grand Jury materials contained within witness

13     number one.

14             THE COURT:  I thought he was a

15     Grand Jury witness.

16             MS. WILLIAMS:  No, he was not,

17     Kendall Mikell, he was not a Grand Jury

18     witness.

19             THE COURT:  I'll probably release

20     that tomorrow.  I'll reread the transcript.

21     Anything else?

22             MR. CHERNOSKY:  No, Your Honor.

23             MS. WILLIAMS:  Thank you for your

24     time, sir.

25             THE COURT:  All right.

Jury Question

```
 1                    (Court adjourned for the day.)

 2                              -----

 3                    (Wednesday, February 12, 2020 -

 4         Open court - Jury not present.)

 5                              -----

 6                    THE COURT:  The Court notes the

 7         presence of all parties.  I have received the

 8         following communication from the members of the

 9         jury which has been shared with counsel.  Where

10         is defense document D?  Can we have a copy of

11         it?  Of course, document D was used during the

12         cross-examination of Detective Adams.  The

13         document itself was a copy of the testimony of

14         Detective Adams during the pretrial motion

15         hearing.  It was never admitted into evidence.

16         So a short preliminary discussion with counsel

17         when I showed them the question, it was

18         defense's position that the record be reopened,

19         is that correct, what your position is?

20                    MR. McKINNEY:  Yes, we would like

21         the record to be reopened to supplement the

22         record with the exhibit.

23                    THE COURT:  The Commonwealth's

24         position?

25                    MR. CHERNOSKY:  The Commonwealth
```

Jury Question

 1    would object to reopening the record for that

 2    or any other defense exhibit that wasn't

 3    admitted.

 4                THE COURT:  Okay, I'm not

 5    sustaining your objection.  I told the jury

 6    during my opening remarks to pay close

 7    attention to what was said and allow them the

 8    opportunity to take notes.  It is not my

 9    practice to read back testimony.  This may be

10    an exception.  I don't know what the context or

11    how they are leaning in terms of their

12    evaluation.  Obviously, it is part of their

13    evaluation of the case.  In fairness to the

14    defense and fairness to the Commonwealth and

15    the witnesses themselves, what I propose to do

16    is I will read back part of the

17    cross-examination where he is confronted with

18    the document but I will also read back the

19    questions leading up to that and the questions

20    and answers in the aftermath of that.  I think

21    that presents a fair and evenhanded picture of

22    how it could be used for impeachment purposes

23    or giving the witness an opportunity to explain

24    his answer.  So if you, Michele, read out loud

25    where I propose to start.  Okay, any further

Jury Question

1    comments?

2              MR. CHERNOSKY:  Nothing from the

3    Commonwealth.

4              MR. McKINNEY:  No, Your Honor.

5              THE COURT:  Okay, bring in the

6    jury.  I'm also going to remind them how to

7    treat prior inconsistent statements.  They can

8    treat it either way.

9                      -----

10              (Open court - Jury present.)

11                      -----

12              THE COURT:  Good morning.  I

13    received your communication.  I did tell you in

14    my opening remarks that -- let me, first of

15    all, say Defense Exhibit D was used during the

16    cross-examination of Detective Adams.  It was

17    never admitted into evidence as a document.

18    Its contents were used in order for

19    Mr. McKinney at the time to conduct an

20    examination of Detective Adams.  So the answer,

21    the short answer, to your question is, no, you

22    can't have it because it was never introduced

23    into evidence.  However, if you remember during

24    my opening remarks, it is my practice,

25    protocol, not to read back testimony.  Once you

Jury Question

```
 1   open the door to can I hear the testimony of B,
 2   C, and D, what we'll hear all day, we will be
 3   reading back testimony.  I just don't do it
 4   because you were allowed to take notes and 12
 5   individual memories are at work here.  However,
 6   insofar as you find that information important
 7   in your evaluation of the case or witness, I am
 8   going to have a portion of Detective Adams's
 9   testimony read back to you by the court
10   reporter which will include the questions and
11   answers about or contained in Defense Exhibit
12   D, okay.  I think you understand that.  Oh, it
13   will be multiple questions before that
14   particular document is used and multiple
15   questions after the document is used so you
16   have a context of the questions and answers and
17   that is in fairness to the defense and in
18   fairness to the Commonwealth and in fairness to
19   the witness himself, all right?
20          So in that regard, I gave you an
21   instruction how to consider prior inconsistent
22   statements.  This is one of those prior
23   inconsistent statements that was recorded by a
24   stenographer so it could be treated in one or
25   two ways, it can be treated as the impeachment
```

Jury Question

1    that is a prior inconsistent statement

2    reflected badly on the credibility or

3    evaluation of a witness regarded by the defense

4    or it may be treated as substantive evidence

5    that it may be treated for the truth of the

6    matter said in a prior statement because it was

7    recorded or it may be argued as a prior

8    inconsistent statement that reflects on

9    credibility so if you need to hear that

10   instruction again, I'll give it to you.

11          So, Ms. Murawski, will you read that

12   portion of the transcript?

13                (Whereupon, testimony was read

14   back to the jury.)

15                THE COURT:  Ladies and gentlemen,

16   hopefully, that addresses the heart of the

17   matter without the actual transcript which was

18   not moved into evidence.  If you have any

19   further questions, bring them to my attention.

20   Thank you.

21                (Jury dismissed to continue

22   deliberations.)

23                (Court adjourned for the day.)

24                     -----

25

Verdict

```
 1                        -----
 2                   (Thursday, February 13, 2020 -
 3     Jury continues deliberations.)
 4                   (Court adjourned for the day.)
 5                        -----
 6                   (Friday, February 14, 2020 - Open
 7     court - Jury present.)
 8                        -----
 9                   THE COURT:  Ladies and gentlemen,
10     you have reached a verdict; is that correct?
11                   THE JURY:  Yes.
12                   THE COURT:  As to the rendering
13     of the verdict, understand that there will be
14     disappointments on one side of the aisle or the
15     other.  You've conducted yourselves
16     appropriately and with great dignity during the
17     course of this trial despite the circumstances
18     that unfolded.  I would ask you to continue to
19     do the same regardless of your disappointment
20     or your satisfaction with the verdict.  Keep
21     your emotions in check.  The sheriff, without
22     further instructions from this Court, is
23     directed to remove anybody immediately who does
24     not follow that admonition.
25                   Who was the foreperson?  Juror No. 11.
```

Verdict

1              THE CLERK:  Please render your

2      verdict.

3              THE FOREPERSON (JUROR NO. 11):

4      As to all the charges, we find the defendant,

5      Cheron Shelton, not guilty.

6              THE COURT:  Does the prosecution

7      want the jury polled as to the individual

8      charges?

9              MR. CHERNOSKY:  No, Your Honor.

10              THE COURT:  Mr. Halloran, record

11      the verdict.

12              THE CLERK:  Members of the jury,

13      as the Court recorded in the issue joined

14      between the Commonwealth of Pennsylvania and

15      Cheron Shelton, you find the defendant, Cheron

16      Shelton, not guilty as charged.  So say you

17      all?

18              THE JURY:  Yes.

19              THE COURT:  Ladies and gentlemen,

20      with the rendition of your verdict, you will be

21      discharged in short order.  You have performed

22      a valuable function for not only the criminal

23      justice system but for the greater community.

24      You were a very attentive jury.  You appeared

25      to follow the instructions of the Court

Verdict

1    throughout the trial.  You should be proud of

2    the service that you have rendered.

3            At this point in time, of course, that

4    is once you are discharged, you are free to

5    speak or not speak with anyone about the case,

6    your family members, friends, sometimes members

7    of the community.  Sometimes the attorneys want

8    to talk to you about your service, your

9    perception, the evidence.  I've never found

10   that to be done in less than a cordial and

11   nonconfrontational manner.

12           As to the publicity that this case has

13   garnered, you have the opportunity, if you

14   choose, to discuss it freely with anyone

15   including members of the media.  If you so

16   choose, you are not required to speak with the

17   case with anyone.  I'll explain that in further

18   detail when I take the opportunity to speak

19   with you privately and in confidence following

20   your release from the courthouse.  But, in any

21   event, you have the thanks of all the parties

22   and the Court.

23           Remain seated and quiet as the jury

24   leaves the room.

25

Verdict

```
 1                        -----
 2             (Open court - Jury not present.)
 3                        -----
 4             THE COURT:  Mr. Shelton has other
 5    matters in front of the Court which are
 6    scheduled for trial.  So that bond will remain
 7    revoked until such time as those matters are
 8    resolved.  As to any other matters from the
 9    attorneys.
10             MS. PELLEGRINI:  Yes, Your Honor.
11    At this point, since the case is completed, we
12    ask that the Court lift the gag order.
13             THE COURT:  Well, there is no
14    reason to actually keep it in place, no legal
15    imperative for me to do so.  So it will be
16    lifted by formal written order today but you
17    are released from it presently.
18             As for the purposes of the media, the
19    names and addresses of the jurors are sealed.
20    They will remain sealed until I have the
21    opportunity to consult with them as to a timely
22    release, timely release in what they perceive
23    as their safety, their privacy, and my
24    interpretation of the statement.  It may be
25    sealed for a matter of hours, it may be sealed
```

Verdict

1    for a matter of days.  I understand the legal

2    principles that apply and they will be defined

3    by their privacy interests and perception of

4    their safety, okay.

5        You can take Mr. Shelton down.  Remain

6    seated and quiet until the defendant leaves the

7    room.

8        Let me publically acknowledge and thank

9    the sheriffs of Allegheny County, the command

10   staff, and the individual deputies who have

11   maintained order and decorum during the course

12   of these proceedings in the face of difficult

13   circumstances.

14

15                        -----

16

17

18

19

20

21

22

23

24

25

1

2

3

4                    <u>REPORTER'S CERTIFICATION</u>

5

6              I, Michele A. Murawski, Official Court

7    Reporter for the Court of Common Pleas of

8    Allegheny County, Pennsylvania, do hereby

9    certify that the proceedings and evidence are

10   contained fully and accurately in the

11   stenographic notes taken by me on the hearing

12   of the within cause and that this is a correct

13   transcript of the same.

14

15

16

17

18                    _____
                      Michele A. Murawski
19                    Official Court Reporter
                      Registered Professional Reporter
20

21

22

23

24

25