# In The Matter Of:

## CHERON SHELTON/ROBERT THOMAS v. COUNTY OF ALLEGHENY, et al.

## MICHAEL HOFFMAN
### May 21, 2024

## AA COURT REPORTERS
### 428 Boulevard of the Allies, Suite 300
### Pittsburgh, PA 15219
### 412.288.5370
### anthony@aacourtreporters.com

Original File HOFFMAN-052124.txt
**Min-U-Script® with Word Index**

CHERON SHELTON/ROBERT THOMAS v.
COUNTY OF ALLEGHENY, et al.

MICHAEL HOFFMAN
May 21, 2024

---

AA COURT REPORTERS  412-288-5370  **Page 1**

```
 1              IN THE UNITED STATES DISTRICT COURT
 2         FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 3
 4    CHERON SHELTON/ROBERT        )
 5    THOMAS,                      )
 6                                 )
 7            Plaintiffs,          )
 8                                 )
 9      vs.                        )  No. 22-CV-196/266
10                                 )
11    COUNTY OF ALLEGHENY, et al., )
12                                 )
13            Defendants.          )
14    _____      )
15
16
17         DEPOSITION OF MICHAEL HOFFMAN
18            TUESDAY, MAY 21, 2024
19                10:00 A.M.
20          PITTSBURGH, PENNSYLVANIA
21
22
23
24     REPORTED BY:  ANTHONY JUDE CORDOVA, CSR 12943
25        JOB NO. HOFFMAN-052124
```

---

AA COURT REPORTERS  412-288-5370  **Page 2**

```
 1         BE IT REMEMBERED THAT, on May 21, 2024,
 2  commencing at the hour of 10:00 a.m. of the said day, at
 3  Allegheny County Law Department, 445 Fort Pitt
 4  Boulevard, Pittsburgh, Pennsylvania, before me, ANTHONY
 5  JUDE CORDOVA, CSR 12943, a Certified Shorthand Reporter
 6  and Notary Public, appeared Michael Hoffman, produced as
 7  a witness in the above-titled court and cause, who,
 8  being by me first duly sworn, was examined in said
 9  cause.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

AA COURT REPORTERS  412-288-5370  **Page 3**

```
 1                  - - - -
 2                 APPEARANCES
 3
 4    FOR THE PLAINTIFFS:
 5    Max Petrunya, Esq.
 6    Paul Jubas, Esq.
 7    MAX PETRUNYA, P.C.
 8    5 Bayard Road, Unit 917
 9    Pittsburgh, PA  15213
10    412.720.3497
11    mpetrunya@gmail.com
12    pjubasesq@gmail.com
13
14
15    FOR THE DEFENDANTS:
16    Dennis Biondo, Jr., Esq.
17    Shelley Rohrer, Esq.
18    ALLEGHENY COUNTY LAW DEPARTMENT
19    445 Fort Pitt Boulevard, Suite 300
20    Pittsburgh, PA  15219
21    412.350.1120
22    dennis.biondojr@alleghenycounty.us
23    srohrer@alleghenycounty.us
24
25
```

---

AA COURT REPORTERS  412-288-5370  **Page 4**

```
 1  INDEX:
 2  Examination by Mr. Jubas                    5
 3  Examination by Mr. Petrunya               143
 4
 5
 6  EXHIBITS:
 7  EX 1  Follow Up Report                      30
 8  EX 2  Arrest Report                         85
 9  EX 3  Case Report                           90
10  EX 4  Follow Up Report                      92
11  EX 5  Extraction Report                    151
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

CHERON SHELTON/ROBERT THOMAS v.
COUNTY OF ALLEGHENY, et al.

MICHAEL HOFFMAN
May 21, 2024

AA COURT REPORTERS 412-288-5370                    Page 5

1                    - - - -
2              MICHAEL HOFFMAN,
3          Being by me first duly sworn,
4       Was examined and testified as follows:
5                    - - - -
6              EXAMINATION
7                    - - - -
8  BY MR. JUBAS:
9  Q.    So, Detective, my name is Attorney Paul Jubas
10 and this is my co-counsel Max Petrunya.  We represent
11 the plaintiffs in this matter against a number of
12 Allegheny County Police homicide detectives.  Basically
13 just going to go over some ground rules and ask you some
14 basic questions at the beginning before we get into any
15 of the details.
16 A.    Okay.
17 Q.    So, what did you do to prepare for today?
18 A.    I was told this was going to be about the
19 Shaquan Roberts part of it, so I reviewed my reports for
20 that case.
21 Q.    Did you review generally your interactions in
22 the Wilkinsburg massacre investigation?
23 A.    I reviewed some of the reports I have, but there
24 were some reports that were presented to me that I don't
25 remember ever doing but --

AA COURT REPORTERS 412-288-5370                    Page 6

1  Q.    Okay.  Is that something that comes with the
2  territory of being a homicide detective?
3  A.    Unfortunately.
4  Q.    Why is that?
5  A.    Because you get involved in so many cases,
6  there's times you'll be working one case and then there
7  will be another homicide and they say are you doing
8  anything right now, hey, can you help us out with this,
9  sure.
10 Q.    Got you.  So, have you ever been involved in a
11 deposition before?
12 A.    Never.
13 Q.    Okay.  So, you've never been sued before?
14 A.    Never.
15 Q.    Okay.  Are you on any drugs today?
16 A.    Just like heart medication, blood thinners.
17 Q.    Anything that would inhibit your ability to
18 understand or answer questions?
19 A.    No.  Nothing that would impair me.
20 Q.    How long have you been a police officer?
21 A.    31 years.
22 Q.    Before your career as an officer, what was your
23 education?
24 A.    I did some college while I was in the military.
25 I was in the Air Force for five years.  I got out,

AA COURT REPORTERS 412-288-5370                    Page 7

1  became a Pittsburgh city police officer or 20 years and
2  then I joined the Allegheny County Police in 2013.
3  Q.    When did you start working for the
4  Pittsburgh Police?  What year?
5  A.    January '94.  January 3rd of 1994.
6  Q.    And you were there for 20 years?
7  A.    Yes.
8  Q.    What roles or what positions did you hold
9  throughout those --
10 A.    For --
11 Q.    -- 20 years?
12 A.    I'm sorry.  For four years, I was a zone 5
13 police officer, uniform.  Then I went to narcotics
14 impact squad for about ten years.  I worked on narcotics
15 and vice.  Then I became a homicide detective for the
16 city for about three years, and then I became a
17 sergeant, went back to zone 5, and then they sent me
18 back to narcotics.  So, I retired as a sergeant of
19 narcotics under the city.
20 Q.    Okay.  And you said that you -- what did you do
21 before working for narcotics for ten years?
22 A.    I was uniform police officer in zone 5 which
23 encompasses East Liberty, Homewood, Lincoln-Lemington.
24 Q.    Okay.  And then when you were in narcotics for
25 ten years -- when did you start working in narcotics?

AA COURT REPORTERS 412-288-5370                    Page 8

1  A.    I want to say 1998.
2  Q.    So, about '98 through '08, 2008?
3  A.    About ten.  Yeah.
4  Q.    Okay.  And then in 2008, started working
5  homicide?
6  A.    Yeah.
7  Q.    Till about 2011?
8  A.    Around there.  Yes.
9  Q.    And then in 2011, is that when you became a
10 sergeant?
11 A.    About 2011, 2012.  '11.
12 Q.    And then what year did you retire?
13 A.    2013.  July.
14 Q.    Okay.  And then did you start working right away
15 for Allegheny County?
16 A.    Yeah.  I retired July 5th and then I started
17 July 8th for Allegheny County.
18 Q.    So, you already had that position lined up when
19 you were --
20 A.    Yes.
21 Q.    -- retiring, so that was part of the plan?
22 A.    Yes.
23 Q.    Got it.  Okay.  What was it that made you want
24 to do Allegheny County after you retired from the city?
25 A.    I wanted to continue police work.  I took the

CHERON SHELTON/ROBERT THOMAS v.
COUNTY OF ALLEGHENY, et al.

MICHAEL HOFFMAN
May 21, 2024

1  police test and figured I'd just come out here. I
2  thought I'd like to go to the airport and retire, relax
3  out there. Having done everything I did, it was,
4  undoubtedly, the most boring thing I've ever
5  experienced.
6  Q.    So, you have done that?
7  A.    Go the airport? Oh, yeah.
8  Q.    When did you do that?
9  A.    I did that 2013 for about 18 months.
10 Q.    Okay. So, and that's through Allegheny County
11 Police?
12 A.    Yes.
13 Q.    Okay. And what was your designation at that
14 time?
15 A.    Just patrolman.
16 Q.    And what happened at the end of that 18 months?
17 A.    I put in for narcotics and homicide and I wound
18 up getting homicide. So, I was in that position for
19 seven years.
20 Q.    Okay. What year did you start working in
21 homicide?
22 A.    2015.
23 Q.    When did you stop in homicide?
24 A.    The end of 2022.
25 Q.    What caused you to stop in 2022?

1  A.    I got tired of the on-calls and callouts. I was
2  never home. My kids are older and I actually sat down
3  with them at a picnic and I apologized to them for
4  missing so much of their lives.
5  Q.    Police work is pretty tough, not just on you but
6  on the family, as well?
7  A.    Oh, yeah, yeah. I've been married once before,
8  so -- my wife's a police officer. She's very
9  understanding, but holidays, you get called out.
10 Q.    Can't imagine. Okay. Are you still employed
11 with the Allegheny County Police?
12 A.    Yes. I'm in narcotics. I started in January of
13 2023.
14 Q.    Is there an end in sight or are you just doing
15 it?
16 A.    I probably got another four years, but I'm
17 trying to see financially because of this, what
18 happened. Possibly, I can leave this July or not, but
19 we'll see.
20 Q.    Okay.
21        MS. ROHRER: So the record could reflect, you
22 were pointing to your heart?
23 A.    I'm sorry. I had a heart attack April 6th.
24        MS. ROHRER: Thank you.
25 BY MR. JUBAS:

1  Q.    Did you ever teach any courses, instruct any
2  courses, police courses?
3  A.    No.
4  Q.    But you've received training?
5  A.    Yes.
6  Q.    So, would it be correct to assume that you had
7  training on the basics like writing reports and basic
8  investigation techniques?
9  A.    Correct.
10 Q.    Okay. Interviewing witnesses?
11 A.    Yes.
12 Q.    Were you ever trained on the use of cellphone
13 evidence?
14 A.    No.
15 Q.    Is that something that is essentially learned on
16 the job?
17 A.    A lot of this is unfortunately OJT, on-the-job
18 training.
19 Q.    Who was your partner when you first came into
20 the county police?
21 A.    In uniform? Oh, my gosh. I worked night shift,
22 so we didn't really have partners. You just would show
23 up and they would pair you up with different people each
24 night if it was a two-man post. Majority of posts out
25 at the airport were single-person.

1  Q.    How about at the time that the massacre occurred
2  back in March of 2016? Did you --
3  A.    Mike Caruso. C-A-R-U-S-O. He has since retired
4  a couple years ago.
5  Q.    Do you recall approximately what year you
6  started partnering with Mr. Caruso?
7  A.    It was right away. 2013. No. Wait. I'm
8  sorry. 2015.
9  Q.    When you started partnering with Caruso back in
10 2015, who was the more senior in Allegheny County
11 Police?
12 A.    Caruso.
13 Q.    Do you recall by how many years?
14 A.    Gosh. No, I don't.
15 Q.    Was it a few? Was it considerable?
16 A.    It was considerable.
17 Q.    Okay. Is he older than you?
18 A.    No. He's younger, actually, but he looks older.
19 He looks like Danny DeVito.
20 Q.    That's good to know.
21 A.    He reported that. I'm sorry. Sorry, Mike.
22        MR. PETRUNYA: He probably won't see this, so --
23 BY MR. JUBAS:
24 Q.    Did he have more experience in homicide
25 investigations than you when you started working with

CHERON SHELTON/ROBERT THOMAS v.
COUNTY OF ALLEGHENY, et al.

MICHAEL HOFFMAN
May 21, 2024

1 him?
2 A.    He had three years -- I'd say we were about
3 equal, but the fact he had more in the county. So, when
4 I went over there, I was learning more about the county
5 ways, paperwork and stuff.
6 Q.    Do you recall what shift you were on when the
7 massacre occurred?
8 A.    I was in Florida that week, so I learned about
9 it actually on television.
10 Q.    Did you learn about it on television in Florida?
11 A.    Yeah. Yes.
12 Q.    What was your reaction, impression?
13 A.    I'll be honest with you. I'm like a worker, so
14 when I saw that, I was like, wow, usually when I'm gone,
15 but it is what it is. I was shocked, called the guys
16 up, asked what happened and they were busy running
17 around. So, they couldn't take my calls.
18 Q.    Is that something that you were looking forward
19 to going back and diving into?
20 A.    Not really looking forward to it, but I knew
21 when I got back, we probably were going to be helping
22 out.
23 Q.    Do you recall what date you got back?
24 A.    No, I don't. I think it was like two or
25 three days later.

1 Q.    So, about, say, approximately 11th or 12th --
2 A.    I believe so. Yeah.
3 Q.    -- of March?
4 A.    Yeah.
5 Q.    Had Caruso been working on the case prior to you
6 getting back?
7 A.    I believe so. Yes.
8 Q.    What was the first thing you got involved in
9 when it comes to this case once you did return from
10 vacation?
11 A.    God. I can't really say a hundred percent what
12 I got involved in. I just knew when we came back, they
13 had briefings and I was like on the periphery of the
14 case, like listening to some of what was going on, and
15 then if like they needed a search warrant filled out, I
16 was new, so if you were new, it was expected that you
17 would like do like the jobs that nobody really wants.
18 I'm not -- I don't like typing. I don't like paperwork.
19 So, if they needed help with a search warrant or
20 something, I would help out, but I really can't recall
21 specifically what I did.
22 Q.    Okay. Do you recall whether an identification
23 of Cheron Shelton was made by the time that you
24 returned?
25 A.    No.

1 Q.    You don't recall?
2 A.    I don't recall.
3 Q.    Do you recall learning that an identification of
4 Cheron Shelton was made?
5 A.    Yes.
6 Q.    Do you recall approximately when that was?
7 A.    I would have to say probably two, three days
8 when I got back, I started learning what was going on
9 with the case. So, I had -- that might have been it.
10 I'm not a hundred percent.
11 Q.    So, you were basically in those days just
12 getting your feet under you and doing what you could do
13 as somebody like a low man on the totem pole?
14          MR. BIONDO: Object to form.
15 A.    Yeah.
16          MR. BIONDO: Go ahead. That's fine.
17 BY MR. JUBAS:
18 Q.    The pieces of the investigation that you were
19 handling early on, was this as a result of being
20 instructed by a supervisor to do these things?
21 A.    Yes.
22 Q.    Okay. Was it both Sergeant Scherer and
23 Lieutenant Schurman or just one of them giving you
24 instructions?
25 A.    I believe both.

1 Q.    Were there daily briefings?
2 A.    Yeah. And if I recall, we used to call them like
3 homeroom, and in the morning they would go over what
4 needs done, what has been done, and I would just sit and
5 listen.
6 Q.    What shift were you on at the time?
7 A.    Oh, God. I can't recall. For whatever reason
8 is stuck in my head 4 to 12, the afternoon shift.
9 Q.    So, 4 AM to 12 PM?
10 A.    4 PM to 12 AM, midnight.
11 Q.    Okay. Do you recall approximately when you
12 started believing that Cheron Shelton was the guy?
13          MR. BIONDO: I'll object to form. But go ahead
14 and answer, if you can.
15 A.    Not so much believing the fact -- like I said, I
16 was on the periphery of the case. There were a lot of
17 details and stuff that I wasn't aware of. But if they
18 needed help on something, I would help them. But
19 believing he was the guy, I don't know if it's believing
20 or per se knowing that he might be the guy based on what
21 people were talking about.
22 BY MR. JUBAS:
23 Q.    Okay. So, based on the things that you're
24 hearing during briefings and around the department, you
25 think that Cheron might be the guy?

CHERON SHELTON/ROBERT THOMAS v.
COUNTY OF ALLEGHENY, et al.

MICHAEL HOFFMAN
May 21, 2024

1    MR. BIONDO: Object to form. But go ahead. Go
2  ahead.
3  A.    Based on whether believing or not, I believe
4  that the other detectives believe he was the guy
5  because, like I said, I didn't know everything that was
6  done or investigated.
7  BY MR. JUBAS:
8  Q.    Got it. So, fair to say that early on in the
9  investigation, you didn't have access to the video that
10  was -- that detectives purportedly developed of Cheron?
11  A.    I had access to it, but I didn't watch it
12  because I was like busy doing other stuff.
13  Q.    What do you mean that you had access to it?
14  A.    In other words, if I wanted to look at it or if
15  they told me to go look at it, I could probably get to
16  it and watch it, but I just never did because we were so
17  busy working on other stuff.
18  Q.    Is that something that you or other detectives
19  would have done just on their own, go to look at videos
20  in an investigation?
21    MR. BIONDO: I'll object to form. But go ahead
22  and answer, if you can.
23  A.    I can't speak for other detectives, but I just
24  know that like in some investigations, people like, what are
25  talking about something and you go like, man, what are

1  they talking about. I myself would go watch the video
2  and go, oh, this is what they're talking about.
3  BY MR. JUBAS:
4  Q.    Did you review any evidence before interviewing
5  any witnesses in this case?
6  A.    No.
7  Q.    Do you recall how many witnesses you interviewed
8  in this case?
9  A.    I know Shaquan, but as far as other ones, I
10  don't believe so. I don't recall.
11  Q.    How did you come to interview Shaquan?
12  A.    I was sitting in the office with my partner and
13  they had done a search warrant on 1244 Nolan Court, I
14  believe, and I got a phone call I believe -- I'm not
15  going to say it's from Steve Hitchings, but somebody
16  that was on scene said hey, we're sending this guy back,
17  can you interview him. So, I asked what happened. They
18  gave me a briefing of what happened and then myself and
19  Detective Caruso interviewed him.
20  Q.    Okay. Do you recall -- strike that.
21    To the extent that you can remember, provide me
22  with what you were told in that briefing prior to
23  interviewing Shaquan.
24  A.    If I could recall, basically, I think it was we
25  hit the house, there was an individual inside, we got

1  him with marijuana, he's under arrest for the marijuana,
2  he's going to be sent back, ask him what he knows about
3  1244 or why he was there.
4  Q.    Okay. Generally speaking, when you are
5  authoring a report, what is your thought process with
6  regards to what you put into the report?
7  A.    It depends on what kind of report it is. You
8  try and put in points that you feel are possibly the
9  most important, but in like an interview report, I
10  always make it a point to put it in there that this is a
11  brief summation of the interview; to get a better
12  understanding of what the interview's about, review the
13  footage of the interview.
14  Q.    Okay. Have you ever been a lead detective on a
15  homicide case?
16  A.    Yes.
17  Q.    Are the responsibilities of a lead detective on
18  a given case different from other detectives working on
19  that case?
20  A.    If I was a lead detective on the case, I would
21  make sure I pretty much tried to know everything that's
22  going on and who's doing what. So, if you authored a
23  report, I would want to review that report, and if
24  there's something in there I need to know, like an
25  interview, I would possibly go over that disk. That's

1  just me, though. I can't speak for other detectives.
2  Q.    In the process of going over the evidence, would
3  you also speak with the detective that brought that
4  evidence in?
5  A.    Sometimes, yes, or I would just review the
6  report and look at the evidence myself.
7  Q.    Okay. So, would you agree with me that it's
8  important to be as thorough as possible when it comes to
9  including a report?
10    MR. BIONDO: Object to form. If you can answer,
11  go ahead.
12  A.    Ask it again.
13  BY MR. JUBAS:
14  Q.    Would you agree that it is important to be as
15  thorough as possible when you are authoring a report?
16    MR. BIONDO: Object to form. Go ahead.
17  A.    Yes. You can try to be. What some people's
18  thoroughness in a report could be different than what
19  mine is because I've read detectives' reports and going,
20  oh, I probably would have put that in there or I
21  wouldn't have put that in there, what does that have to
22  do with it.
23  BY MR. JUBAS:
24  Q.    So, it's variable based on --
25  A.    It's variable.

CHERON SHELTON/ROBERT THOMAS v.
COUNTY OF ALLEGHENY, et al.

MICHAEL HOFFMAN
May 21, 2024

1 Q.    -- the detective, the interview --
2 A.    Correct.
3 Q.    -- all kinds of stuff?
4 A.    The content.
5 Q.    And just to -- for some basic housecleaning,
6 let's make sure that we're not talking over each other.
7 So, I'll let you finish, you let me finish --
8 A.    I got you.
9 Q.    -- so that Anthony's life is easier.
10         MR. BIONDO: And, also, speak up a little bit.
11 I don't know if you're having trouble. I'm a little
12 further away.
13 A.    Okay.
14         MR. BIONDO: Thank you.
15 BY MR. JUBAS:
16 Q.    As you are investigating a case and reviewing
17 other detectives' reports, do you consider reports to be
18 gospel that are absolutely true?
19         MR. BIONDO: I'll object to form. But go ahead
20 and answer, if you can.
21 A.    Yes. I don't see any reason why a detective
22 would put lies in there or make stuff up.
23 BY MR. JUBAS:
24 Q.    Okay. Is it fair to say that you've never seen
25 a detective place false information in a report?

1 A.    Correct.
2 Q.    Have you -- since you've worked in the county
3 police, have you ever become aware of internal
4 investigations into any homicide detectives?
5 A.    No.
6 Q.    While you were working in this time period for
7 Allegheny County Police, were you ever instructed to
8 hide evidence?
9 A.    No.
10 Q.    Were you ever aware of any other detectives
11 being instructed to hide evidence?
12 A.    No.
13 Q.    And I'm not just talking with this case.
14 Generally speaking, have you or any detectives ever
15 been, to your knowledge, instructed to hide evidence in
16 a case?
17 A.    No.
18 Q.    Okay. Have you ever instructed or suggested to
19 other detectives to hide evidence in a case?
20 A.    No.
21 Q.    Did you receive instruction on how to write
22 affidavits?
23         MR. BIONDO: I'll object to form. But go ahead
24 and answer, if you can.
25 A.    I was just told how the county does it. They'll

1 ask you to add like certain lines, but you're not lying.
2 You're just -- it's a better format, I guess, how they
3 do it, the form, how you do it.
4 BY MR. JUBAS:
5 Q.    What do you mean by that?
6 A.    When I did affidavits in the city -- like
7 especially in the county, they're really big on like
8 your biography, your narrative up top, I'm detective
9 blah blah blah, even for the most minor cases, whereas
10 in the city, if there's an important case, we would do
11 that. We would put it up top. If it was like a minute
12 case or a small case, we wouldn't put it in there.
13 Q.    Getting back to Shaquan.
14 A.    Yeah.
15 Q.    I think you said you were at the department when
16 Hitchings or another detective called you and gave you a
17 briefing about Shaquan?
18 A.    Yes.
19 Q.    Okay. And then he was brought in and that's
20 when you interviewed him?
21 A.    Yes.
22 Q.    Okay. Did you receive any instructions as to
23 what to talk to him about or what to do with him?
24 A.    No. It was just basically asked us to interview
25 him about the apartment, about the marijuana.

1 Q.    Okay.
2 A.    And if he knew anything about the homicide.
3 Q.    Was this Hitchings, to your recollection?
4 A.    I can't recall a hundred percent, but I know
5 Steve's the one who arrested him. So --
6 Q.    Do you know if -- do you remember if you spoke
7 with anybody besides Hitchings about -- prior to
8 interviewing Shaquan?
9 A.    I can't recall.
10 Q.    Do you know what a person of interest is?
11 A.    Yes.
12 Q.    How would you define that?
13 A.    Someone that you think whose name may have come
14 up in investigation, possibly might be involved in an
15 investigation but not 100 percent.
16 Q.    Is that different than a suspect?
17 A.    To be honest with you, I don't like using that
18 term, person of interest. Suspect is somebody that you
19 pretty much have an idea that, yeah, you think they're
20 involved. Person of interest might be somebody -- in my
21 mind is somebody who may have been there that I need to
22 definitely talk to about what happened. Did they do it
23 or not? I'm not -- I don't know, but I definitely want
24 to talk to them.
25 Q.    Why don't you like using the term person of

CHERON SHELTON/ROBERT THOMAS v.
COUNTY OF ALLEGHENY, et al.

MICHAEL HOFFMAN
May 21, 2024

1  interest?
2  A.      To be honest with you, that to me is like a
3  Hollywood term. I just never liked using it. Suspect.
4  Witness. Somebody I want to talk to. I'd rather use
5  that.
6  Q.      Got it. Whether before or after your interview
7  with Shaquan, did you ever consider him a witness or a
8  suspect in this case?
9  A.      Not at all.
10 Q.      So, you never considered him a witness?
11 A.      A witness? After talking to him, he basically
12 knew nothing. So, no.
13 Q.      Do you recall where Shaquan was from?
14 A.      I knew his mother was from Nolan Court, but I
15 can't recall his address.
16 Q.      Do you recall whether he was from Nolan Court?
17 A.      Formerly, yes. He was a Hilltop boy, as he said
18 he was.
19 Q.      And do you recall whether he knew Cheron
20 Shelton?
21 A.      Yes.
22 Q.      Do you recall whether he knew Lamont Powell?
23 A.      Yes.
24 Q.      Did you believe Shaquan Roberts in his
25 interview?

1  A.      Yes.
2  Q.      So, is it fair to say that you believed what he
3  was telling you?
4  A.      Yes.
5  Q.      Do you recall whether Shaquan mentioned being
6  with other individuals from Hilltop on the night of the
7  massacre?
8  A.      Yes. They were at an IHOP on The Waterfront.
9  Q.      Do you recall the names of those individuals?
10 A.      I can't say verbatim what they -- they are. No.
11 Q.      Did you make any attempts at finding the
12 identity of the individuals that Shaquan said that he
13 was with on the night of the massacre?
14 A.      We passed along that information to the lead
15 detectives or other detectives that were working the
16 case.
17 Q.      Do you recall who the lead detective was?
18 A.      I believe it was Dolfi and Tom Foley.
19 Q.      Would you have passed this information on to the
20 lead detectives soon after the interview?
21 A.      Yes.
22 Q.      Okay. Approximately how soon?
23 A.      If they were in the office, more than likely --
24 this is not all the time and I can't recall exactly, but
25 most of the time, if we do an interview like this, a

1  lead detective collects what they say and then we'll
2  pass it on or we'll type the report first, get the video
3  downloaded and then we'll pass it on to them, like give
4  them a better idea what was said. So, that could be
5  that day, that could be the next day.
6  Q.      When you are interviewing a witness and
7  obtaining video evidence, what is your responsibility
8  when it comes to placing evidence in a case file?
9  A.      If we obtain the report or that case evidence,
10 we'll request a download, and as soon as I get that
11 download, my job is to write a report on it, attach it,
12 the download of the report or interview to the report,
13 and then we put it in a box and we tell our clerk --
14 Rose McMahon I guess it was -- and then she would place
15 it inside the file.
16 Q.      Do you recall whether you received any
17 instructions from the lead detectives in this case
18 generally?
19 A.      I don't recall any instructions.
20 Q.      From the lead detectives?
21 A.      I don't recall.
22 Q.      So, any instructions that you would get would be
23 coming from supervisors?
24 A.      It could be coming from the lead detectives. It
25 could also be coming from the supervisors. But I don't

1  remember exact conversations we had with the lead
2  detectives or the supervisors.
3  Q.      Okay. Do you recall submitting affidavits in
4  support of a court order for subscription information
5  connected to phones that were in contact with Cheron
6  Shelton's phone number?
7  A.      Do I remember doing an affidavit? I'm sorry.
8  Is that what you're asking?
9  Q.      Yes.
10 A.      I don't recall it, but it was brought to my
11 attention on a prior interview with them.
12 Q.      Okay. So, did you review any of the
13 documentation pertaining to that?
14 A.      Not at all.
15 Q.      Okay. Is it fair to say you don't have any
16 recollection of that?
17 A.      I don't.
18 Q.      Okay. We'll try to parse that a little bit to
19 the extent that we can. Do you recall being instructed
20 by anybody to follow up on cellphone evidence for phone
21 numbers connected to Cheron Shelton?
22 A.      I do now when they gave us the report.
23 Q.      Okay. Do you recall having any conversations
24 with other detectives about that?
25 A.      No. I don't.

1 Q.     Okay.  Did you read the report?
2 A.     Yes.
3 Q.     Okay.  Now, after reading the report, what is
4 your understanding of your role during this time?
5 A.     Earlier, I talked about how you're sitting in a
6 room, they ask you to do something.  I believe this was
7 one of those situations.  Probably wasn't thrilled about
8 it.  I typed it, submitted -- or sent in the court
9 orders, but usually at that time, I'm just going to
10 explain -- I can't explain verbatim what happened with
11 this case, but usually what happens, I'd get the
12 information back and I will put it in the electronic
13 case file that we have on the computer, write a report
14 if I received it or I will pass along that information
15 to the lead detectives, maybe put their emails in there
16 to receive the answers to the court orders, but at that
17 time, unfortunately, it was a situation where we would
18 submit like affidavits and any information or results
19 would get forwarded to the detectives.  I would not
20 review them.
21 Q.     Okay.  Do you recall whether -- do you recall
22 what date that was?
23 A.     No.
24        MR. JUBAS: Okay.  What I'm going to do is I'm
25 not going to mark this as evidence right now.  This is

1 what I'm going to show him.
2 Q.     Okay, Detective.  So, I just handed you a copy
3 of a followup report.  Did you author that?
4 A.     Yes, I did.
5 Q.     And what date does that say?
6 A.     Oh. I'm sorry.  April 2, 2016.
7 Q.     Okay.  And take your time and review that, that
8 report.
9 A.     Okay.
10        MR. JUBAS: And you know what?  I might as
11 well -- I'll just mark this.  So, I'll mark this as
12 Exhibit 1.
13        (Exhibit 1 was marked for identification.)
14        MS. ROHRER: Paul, are those pages with the
15 Bates number at the bottom starting with 000746, are
16 they in order or --
17        MR. JUBAS: So, we have -- yes, they are.
18 They're Bates 746 through 758.
19        MS. ROHRER: Thank you.
20 BY MR. JUBAS:
21 Q.     Okay, Detective.  And is this a followup report?
22 A.     Yes.
23 Q.     This is a very commonsense question, but can you
24 explain to me the purpose of a followup report?
25 A.     Yeah.  Followup is you receive information or

1 something during a homicide and -- like in situations
2 like this, they're asking for if you could get
3 subscriber information.  So, I'm doing a followup to the
4 main report of the investigation.
5 Q.     What is subscriber information?
6 A.     That is when you're trying to find out the names
7 of the persons who belong to a certain phone number.
8 Q.     Could you have requested additional information
9 beyond subscriber information?
10 A.     No.  Not with these.  If it would be for that, I
11 would have to get a search warrant.
12 Q.     Okay.  So, for example, if you were trying to
13 get cell site location, you would need a search warrant?
14 A.     If I remember correctly back in the day -- like
15 right now, we have to use search warrants for subscriber
16 information and turn the phone on.  With this, all we
17 were asking for was subscriber information, like names,
18 dates -- not names, dates.  Names and addresses, if I
19 recall correctly.
20 Q.     Why did you not attempt to get cellphone
21 downloads for these phone numbers?
22 A.     That was part of the investigation where in
23 these types of things, if they're asking for subscriber
24 information for phone numbers, I would forward that
25 information to the detectives and they would determine

1 which numbers that they would follow up on as far as
2 downloads and stuff like that.
3 Q.     Do you need the cellphone itself in order to get
4 a cellphone download?
5 A.     No.
6 Q.     What would you consider to be a cellphone
7 download?
8 A.     Like call detail records.  As far as nowadays,
9 messages, text messages, calls in and out, contacts,
10 things like that.
11 Q.     Those are all types of information that you
12 could get without having the physical cellphone?
13 A.     Correct.
14 Q.     Okay.  Is there a different type of report that
15 you can get if you have a cellphone?
16 A.     No. It's pretty much the same.
17 Q.     Okay.  So, have you ever used Cellebrite
18 software?
19 A.     Yes.
20 Q.     Are the reports that that can create different
21 than the reports that we've been discussing?
22 A.     As far as call detail records and cell site and
23 all that stuff?
24 Q.     Yes.
25 A.     Yes.

CHERON SHELTON/ROBERT THOMAS v.
COUNTY OF ALLEGHENY, et al.

MICHAEL HOFFMAN
May 21, 2024

1 Q. How are they different?
2 A. I'm not saying they're different. They're
3 pretty much the same. Sorry.
4 Q. Okay. Did you get Shaquan Roberts' cellphone?
5 A. Yes.
6 Q. And did he give that to you consensually?
7 A. Yes. He did.
8 Q. What's the difference between obtaining a
9 cellphone without consent and obtaining a cellphone with
10 consent?
11 A. I mean, with consent, we always appreciate that
12 because we are able to get the codes or the security
13 code to it and we have the person's permission which I
14 think shows a lot to that person being cooperative.
15 Without it, I would have to get a search warrant to seize
16 -- seize their phone and then get into the phone.
17 Q. So, if they give consent, you don't need to get
18 a search warrant?
19 A. Correct.
20 Q. Okay. And that makes your life a lot easier?
21 A. I think so.
22 Q. When you obtained the Shaquan Roberts cellphone,
23 were you aware of whether other cellphone evidence was
24 already developed in the case?
25 A. No.

1 Q. That April 2nd report that we had discussed, was
2 that the second interaction that you had when it came to
3 cellphone evidence in this case?
4 A. I believe so.
5 Q. Was there any subsequent interactions that you
6 had in this investigation with cellphone evidence?
7 A. Not that I recall.
8 Q. After obtaining the cellphone consensually from
9 Shaquan, did you have any sort of interaction with Matt
10 Rosenberg?
11 A. I'm not sure who gave him Shaquan's phone, but I
12 can't recall the interactions I had with Matt in this
13 case.
14 Q. Who is Matt Rosenberg?
15 A. He's our mobile device forensic analyst. He's
16 the one they take the phones to download it, and if you
17 have a question, he can possibly explain what's going
18 on.
19 Q. Okay. Did you say that you don't recall having
20 an interaction with Rosenberg in this case?
21 A. Correct.
22 Q. If you are a lead on a case, can you go to
23 Rosenberg to give you reports for cellphones that have
24 been developed in that case?
25 A. He can show you the downloads that were done on

1 his computer, if that's what you're asking. Yeah.
2 Q. Is it possible for you as an investigator or a
3 lead investigator to get the software report itself?
4 A. Meaning a download? Yeah.
5 Q. So, I just want to be thorough here. So, are
6 you able to get PDF reports from Rosenberg pertaining to
7 a cellphone download?
8 A. What? Him writing a report?
9 Q. A PDF report from the cellphone download. An
10 extraction report, if you will.
11 A. Yeah.
12 Q. Okay. And that's a PDF file?
13 A. Yes.
14 Q. Are you familiar with what a PDF is?
15 A. When it comes to the phones and what Matt can
16 do, I'm not too well-versed, to be honest with you. I
17 know what a PDF is. So --
18 Q. We'll come at it from a different angle. Have
19 you been a police officer at a time when cellphone
20 evidence was not common?
21 A. Yes. I started on the job when we would write
22 our reports.
23 Q. Is it fair to say that since that time,
24 cellphone evidence has developed considerably?
25 A. Yes.

1 Q. Is cellphone evidence a strong form of evidence?
2    MR. BIONDO: Object to the form. But go ahead
3 and answer, if you can.
4 A. It's evidence. Yeah.
5 Q. Okay. Is cellphone evidence a stronger form of
6 evidence than, say, a jailhouse witness?
7    MR. BIONDO: Object to the form. But go ahead
8 and answer, if you can.
9 A. It could be equal.
10 BY MR. JUBAS:
11 Q. Could you elaborate on that?
12 A. Yeah. It could be the content of what the
13 individual has to state in the jail firsthand whereas
14 cellphone evidence could put a person someplace. A jail
15 informant could say what the person was saying or doing
16 at the time they were put at that place.
17 Q. Have you ever been trained on the use of
18 jailhouse witnesses?
19 A. No.
20 Q. Is that something that you figure out
21 experientially, as well?
22 A. Yeah. On-the-job training. Yes.
23 Q. Had you had a lot of experience with jailhouse
24 witnesses during your time in narcotics?

AA COURT REPORTERS 412-288-5370                        Page 37

1  A.    No. If you're looking for somebody that would
2  say -- let me ask -- go ahead. Keep going. Go ahead.
3  Q.    Okay. When you first started working for the
4  city, you were in zone 5, I think you said?
5  A.    Yes.
6  Q.    And that included the Homewood section?
7  A.    Yes.
8  Q.    And how long were you in zone 5?
9  A.    Four years in uniform. But in narcotics and
10  impact, we worked there all the time.
11  Q.    One moment. So, from 1998 through 2008, you
12  worked a lot in Homewood?
13  A.    Yes.
14  Q.    And then for three years after that, you worked
15  homicide for the city; correct?
16  A.    Yes.
17  Q.    Did you still work in Homewood a lot?
18  A.    If we were called out there for shootings or
19  homicides, yes.
20  Q.    In your experience with the City of Pittsburgh
21  Police, did you have any interactions with any of the
22  witnesses or defendants in the Wilkinsburg massacre
23  investigation?
24  A.    Yes. I did.
25  Q.    Could you name them?

AA COURT REPORTERS 412-288-5370                        Page 38

1  A.    Cheron, I knew. Shaquan, I had met. And
2  Powell. But as for what the circumstances are, I can't
3  tell you that because there were people up there days
4  in, days out. I would just roll up on five people on
5  the corner and just start BS'ing with them. Not
6  necessarily any interaction I had with people was bad.
7  So, I can't say for -- say what our interaction was.
8  Q.    Do you recall whether you had ever investigated
9  or charged either of these three?
10  A.    No.
11  Q.    Do you recall ever having any interactions with
12  Robert Thomas?
13  A.    No.
14  Q.    Did you inform the lead detectives that you had
15  previous experience with either of these three
16  individuals?
17  A.    I might have told them I knew their names, but I
18  can't recall.
19  Q.    Okay. Do you recall when about you would have
20  had that conversation with them?
21  A.    Not at all.
22  Q.    While you were working for the
23  Pittsburgh Police, was there a city intelligence unit?
24  A.    Yes.
25  Q.    Were you ever part of that?

AA COURT REPORTERS 412-288-5370                        Page 39

1  A.    No.
2  Q.    What is the city intelligence unit?
3  A.    They're the ones that would receive information
4  like street names. They would go over officer arrest
5  reports, and then in the arrest reports, they would see
6  certain individuals' names and they would document names
7  of certain neighborhoods. If they had their nicknames
8  on there, they would document that. Basically, they
9  would go out and talk to people on the street or
10  community individuals and try and find out if there are
11  gangs or groups of kids causing problems, who they
12  associate with this, what their colors are.
13  Q.    Is that a detective?
14  A.    Yes.
15  Q.    So, officers working in the city intel would
16  have been detectives?
17  A.    Yes.
18  Q.    Okay. Do you recall having any interactions
19  with city intel detectives during this case?
20  A.    No.
21  Q.    Do you recall learning of city intel's
22  involvement in this case?
23  A.    No.
24  Q.    At the time in 2016, did you have relationships
25  with any of the detectives in city intel?

AA COURT REPORTERS 412-288-5370                        Page 40

1  A.    Yes. If we were working other cases and I
2  needed a name, I would call them, hey, do you know
3  this -- who this guy is.
4  Q.    Can you give me their names?
5  A.    No. I couldn't. I can't remember who was
6  working at the time.
7  Q.    And is that something that Allegheny County
8  Police homicide detectives would regularly do?
9  A.    Sometimes. Yes.
10  Q.    Because that could help an investigation?
11  A.    Yes.
12  Q.    Would that be the first place that you as an
13  Allegheny County Police homicide detective would go if
14  you were investigating a nickname?
15      MR. BIONDO: Object to the form. But go ahead
16  and answer, if you can.
17  A.    We would check our databases of people we know
18  and then we would maybe call them up as a secondary
19  source.
20      BY MR. JUBAS:
21  Q.    Are there ways that their information would be
22  more robust than what Allegheny County Police may have?
23      MR. BIONDO: Object to the form. But go ahead
24  and answer, if you can.
25  A.    I have no idea. It depends on how current the

AA COURT REPORTERS 412-288-5370                    Page 41

1  information is. Like we might stop an individual in
2  Homewood and her name is Mary. City of
3  Pittsburgh Police may have never stopped her and they
4  don't know her name is Mary. So, it would depend on how
5  recent their information is.
6  BY MR. JUBAS:
7  Q.    If you did interact with city intel on a given
8  case and you obtained a nickname from city intel, would
9  they give you a report?
10 A.    No.
11 Q.    How would they tell you that?
12 A.    Probably the phone or on the computer.
13 Q.    And if that was important to the case, you would
14 then write that down in a report?
15 A.    Some people do. Some people don't.
16 Q.    Would it be beneficial to write that in a report
17 if it is important to a case?
18 A.    It could be. Yeah.
19 Q.    Why could it be?
20 A.    Because if they ask like how did you obtain this
21 individual's information, I could say I spoke to a
22 detective so and so from the city, he gave us the
23 nickname, we corroborated it, followed up on it and
24 wound up being true.
25 Q.    So, would you agree that that could help you

AA COURT REPORTERS 412-288-5370                    Page 42

1  prove your case in court?
2  A.    It could.
3  Q.    Would that attempt at corroborating that
4  evidence be better than not having that detective that
5  you spoke to in court? I can rephrase if you want me
6  to.
7          MR. BIONDO: Yeah.
8  BY MR. JUBAS:
9  Q.    So, if you didn't write a report about a
10 nickname you received from county police, could you be
11 risking not being able to corroborate your testimony in
12 court?
13         MR. BIONDO: I'm still going to object. But go
14 ahead and answer, if you can.
15 A.    I mean, if you know where you got that
16 information, you can corroborate it and then you
17 request that detective to show up in court.
18 BY MR. JUBAS:
19 Q.    Okay. Would a report help that?
20         MR. BIONDO: I'll object to the form. But go
21 ahead and answer, if you can.
22 A.    It could. Depends on who's like possibly
23 working in the case. But, also, when I was in the city,
24 the individual like a DA or somebody would come to me
25 and say hey, how did you get this information. Well, I

AA COURT REPORTERS 412-288-5370                    Page 43

1  talked to so and so on the phone. Oh. Okay. Are you
2  able to get them into court. Yes, I could.
3  BY MR. JUBAS:
4  Q.    So, are you saying basically that as long as you
5  can get that detective in court, it's not that big of a
6  deal if you don't write a report about it?
7          MR. BIONDO: I'll object to the form. But go
8  ahead and answer.
9  A.    I'm not saying that at all.
10 BY MR. JUBAS:
11 Q.    Would you agree that it's important to put that
12 in a report?
13 A.    It would help expedite should somebody need to
14 read the file. Oh, this is where they got the name
15 from. Okay.
16 Q.    So, could that -- strike that.
17         By putting nickname information in a report can
18 help a lead detective in a case?
19 A.    When I was in the city, it did help me. I can't
20 speak for other detectives. I say it would help me.
21 Q.    So, if a detective got a nickname that is
22 important to a case that you were the lead investigator
23 on, would it help you if that detective included --
24 A.    Yes.
25 Q.    -- the details in a report?

AA COURT REPORTERS 412-288-5370                    Page 44

1  A.    Yes.
2  Q.    Okay. Because that would allow you then to pull
3  the report, know what the nickname is and know the
4  detective that provided it; right?
5  A.    Yes.
6  Q.    And then that would allow you to line that
7  detective up to testify to corroborate this information?
8  A.    If needed, yes.
9  Q.    Okay. Drawing your attention back to Exhibit 1,
10 I'm going to ask you to turn to page 755, bottom
11 right-hand corner. And is this a T-Mobile subpoena
12 dated April 2, 2016?
13 A.    Yes.
14 Q.    Do you see where it says re court order to
15 provide telephone records?
16 A.    Yes.
17 Q.    Under that, it provides an Allegheny County
18 Police Department case report number?
19 A.    Yes.
20 Q.    And, generally speaking, what number do you
21 associate with this type of record?
22 A.    That would probably be the homicide report.
23 Q.    Okay. So, the ACPD case report number would
24 reflect the homicide investigation --
25 A.    Usually, yes.

AA COURT REPORTERS 412-288-5370                    Page 45

1 Q.     -- that it's a part of?
2 A.     Yes.
3 Q.     And then drawing your attention to urgent
4 request for assistance, do you see where numbers are
5 listed?
6 A.     Yes.
7 Q.     And could you read for me the first phone
8 number?
9 A.     412-378-3461.
10 Q.    Do you recall ever learning that that phone
11 number was a suspect phone number?
12 A.    No.
13 Q.    Do you know what I mean when I say suspect phone
14 number?
15 A.    Yes.
16 Q.    What does that mean?
17 A.    That could possibly be one of the individuals
18 involved in this homicide.
19 Q.    Did you have any discussions with any detectives
20 that indicated that that 3461 number was one of the
21 suspect phones?
22 A.    Not that I recall.
23 Q.    Do you recall why you requested court -- or
24 phone records for these particular cellphone numbers?
25 A.    I can't recall the exact reason, but I would

AA COURT REPORTERS 412-288-5370                    Page 46

1 assume just the fact that these numbers probably were
2 individuals that called around the time of the homicide
3 to the target phone.
4 Q.     Do you recall whether Matt Rosenberg had
5 constructed some sort of document with all the phone
6 numbers that had been compiled per -- compiled in the
7 case?
8 A.     No.
9 Q.     Okay.  So, are you saying that you don't
10 remember or you know that there wasn't one?
11 A.    I don't remember.  I'm assuming there might have
12 been, but I can't say.
13 Q.    Is it fair to say that you did not have one at
14 your disposal --
15 A.    Correct.
16 Q.    -- when you filled out these reports?
17 A.    Right.
18 Q.    Okay.  Do you recall whether Shaquan Roberts'
19 phone number was included in any of these requests that
20 you made on April 2nd?
21 A.    No.  I do not.
22 Q.    Since you were tasked on April 2nd with getting
23 these reports for these phone numbers, were you then
24 part of the cellphone investigation?
25 A.    No.

AA COURT REPORTERS 412-288-5370                    Page 47

1        MR. BIONDO:  Object to the form.  Go ahead.
2 A.     Sorry.
3        MR. BIONDO:  That's fine.
4 BY MR. JUBAS:
5 Q.     Why not?
6 A.     Because we were -- like I said, we were on the
7 periphery of the investigation.  I was just told to
8 obtain the information.  I would forward it on to the
9 rest of them.  We were still having cases come in like
10 suicides and stuff like that.  So, that's what Mike and
11 I were had basically tasked with what to do.
12 Q.    Do you recall ever learning that 3461 phone
13 number was in contact with Shaquan Roberts?
14 A.    No.
15 Q.    Did any detectives at any point in time in the
16 investigation approach you to discuss Shaquan Roberts
17 and his potential involvement in the investigation?
18 A.    No.
19        MR. BIONDO:  Object to the form.
20 BY MR. JUBAS:
21 Q.    Are you saying that you don't recall or that it
22 didn't happen?
23 A.    I'm saying I don't recall.
24 Q.    Okay.  Do you think that the Shaquan Roberts
25 evidence should be placed in the Wilkinsburg massacre

AA COURT REPORTERS 412-288-5370                    Page 48

1 case file?
2        MR. BIONDO:  Objection to form.
3 A.     Do you mean his reports?
4 BY MR. JUBAS:
5 Q.     Yeah.  Any reports --
6 A.     Anything involving his arrest or anything like
7 that?
8 Q.     So, the interview, any reports, arrest reports,
9 do you think all of that evidence or parts of that
10 evidence should have been included in the Wilkinsburg
11 massacre case file?
12        MR. BIONDO:  Objection to form.  Go ahead and
13 answer, if you can.
14 A.     My opinion, no, because I thought it would be
15 easier -- we were told to make it two separate cases.
16 It's a separate individual with his own charges.  So, in
17 the interview, we're also talking about his marijuana
18 and stuff, but we're also talking about the homicide.
19 If anybody wanted to know what was happening with
20 Shaquan Roberts, instead of pilfering through a huge
21 binder and trying to find reports, because if I was to
22 submit four reports, it doesn't mean they all go into
23 the homicide binder together.  It could be as other
24 reports are received.  This way, if anybody asks, hey,
25 Shaquan Roberts, what did he say or do, hey, go to the

CHERON SHELTON/ROBERT THOMAS v.
COUNTY OF ALLEGHENY, et al.

MICHAEL HOFFMAN
May 21, 2024

1  Shaquan Roberts report, everything that dealt with
2  Shaquan Roberts is right here in this file. So --
3  BY MR. JUBAS:
4  Q.    Were you responsible for placing the Shaquan
5  Roberts documentation in a different case file than the
6  Wilkinsburg massacre investigation case file?
7  A.    I was instructed to make it two separate files.
8  Q.    Who instructed you?
9  A.    I honestly couldn't tell you, but I'm pretty
10 sure it's going to be one of the supervisors, but I
11 don't know which one.
12       MR. JUBAS: We'll take five here.
13       (There was a pause in the proceedings.)
14 BY MR. JUBAS:
15 Q.    Detective Hoffman, we were talking about your
16 involvement with Shaquan Roberts evidence.
17 A.    Yes.
18 Q.    And you indicated that a supervisor instructed
19 you to place the evidence in a different case file?
20 A.    Yes.
21 Q.    How many times in previous investigations did
22 you do something like that?
23       MR. BIONDO: Objection to form. Go ahead and
24 answer, if you can.
25 A.    Did I experience that? I don't recall. I don't

1  think it was a lot.
2  BY MR. JUBAS:
3  Q.    Do you recall in what folder you placed the
4  evidence in, the Shaquan Roberts evidence?
5  A.    His folder, I guess. Are you talking about the
6  marijuana crime labs --
7  Q.    Any Shaquan Roberts evidence.
8  A.    Anything that has to do with Shaquan stays in
9  his folder.
10 Q.    So, are you saying that it would have been in a
11 Shaquan-Roberts-specific folder?
12 A.    Yes.
13 Q.    So, that's where you placed it?
14 A.    That's where I would get it, and I would suspect
15 it should go in that folder if it's Shaquan Roberts.
16 Q.    Did you, in preparation for today, go to the
17 folder?
18 A.    Yes. I pulled up the interview report.
19 Q.    Okay. So, you went to the Shaquan Roberts
20 folder?
21 A.    Correct.
22 Q.    And is it labeled as Shaquan Roberts?
23 A.    It's labeled as narcotics arrest with Shaquan
24 Roberts' name on it.
25 Q.    Are you saying that it was not in a

1  miscellaneous folder?
2  A.    It's in a miscellaneous -- well, it's called a
3  miscellaneous file cabinet. So, when you go there, it's
4  MISC 2016. That's where I know to find everything but
5  homicides, suicides, ag assaults, motor vehicle
6  collisions. So, any like side arrests, if you arrest
7  somebody for retail theft, it goes in there.
8  Q.    Were you involved with any arrests stemming from
9  an investigation into a 2013 case in this --
10 A.    Yes.
11 Q.    -- in this investigation?
12 A.    I'm sorry. Yes.
13 Q.    Which arrests were you involved with?
14 A.    We had revitalized a search warrant that
15 occurred at 900 Hill Avenue. It involved Cheron
16 Shelton, Robert Thomas, Justin Gomez and Ashley Smith
17 and Aemond Knight who was deceased.
18 Q.    Was he deceased at the time?
19 A.    Well, not at the time of the original case. But
20 when it was ours, he was. That's actually my homicide
21 case.
22 Q.    So, you were investigating the Aemond Knight
23 homicide?
24 A.    Yes.
25 Q.    Do you recall where that happened?

1  A.    Yeah. McKeesport at his girlfriend's house
2  about two days before Christmas.
3  Q.    Of 2015?
4  A.    I think it was. Yes.
5  Q.    So, it's fair to say that you didn't get to
6  speak with Mr. --
7  A.    Knight?
8  Q.    -- Knight about this investigation?
9  A.    No. Unfortunately, no.
10 Q.    Did you close the Aemond Knight homicide
11 investigation?
12 A.    Not at all.
13 Q.    Is it still open?
14 A.    Yes.
15 Q.    Was there any overlap between this investigation
16 and the Aemond Knight homicide investigation?
17 A.    No.
18 Q.    Do you recall learning whether Aemond Knight was
19 from Hilltop?
20 A.    No. I remember he would loaf in Homewood.
21 That's how I knew him. But I don't recall Hilltop.
22 Q.    What do you mean by loaf?
23 A.    That's an old-school term. I'm sorry. I only
24 learned that here in Pittsburgh. Loafing. He would
25 hang out in Homewood. I would see him in bars and stuff

CHERON SHELTON/ROBERT THOMAS v.
COUNTY OF ALLEGHENY, et al.

MICHAEL HOFFMAN
May 21, 2024

1  like that.
2  Q.    And Hilltop is a part of Homewood?
3  A.    Yes.
4  Q.    Is Homewood part of the City of Pittsburgh?
5  A.    Yes.
6  Q.    Would homicides in Homewood be handled by city
7  police?
8  A.    Yes.
9  Q.    And McKeesport is not in the city?
10 A.    Correct.
11 Q.    When you were a city cop, were you at all
12 involved in the investigation of the Calvin Doswell
13 homicide?
14 A.    That was brought up to me.  I think I was
15 thinking of another person.  I was currently with the
16 county police when Doswell was killed.
17 Q.    Do you recall having any conversations with any
18 city detectives or officers about Calvin Doswell?
19 A.    No.
20 Q.    Did Calvin Doswell enter your part of the
21 investigation at all?
22 A.    Which investigation?
23 Q.    The Wilkinsburg massacre investigation.
24 A.    Yes.
25 Q.    Okay.  How did he get involved in your part of

1  the investigation?
2  A.    Shaquan had brought up that Doswell had been
3  killed and everybody liked Doswell.  Called him Caleo, I
4  guess.  Everybody liked him and I guess they were
5  blaming Powell for it.
6  Q.    Did you have any preconceived opinions about
7  Lamont Powell before you spoke with Shaquan Roberts?
8        MR. BIONDO: Objection to form.  But go ahead
9  and answer, if you can.
10 A.    We had heard that like a lot of people were mad
11 at him, they didn't like him.
12      BY MR. JUBAS:
13 Q.    Was that before the interview with Shaquan?
14 A.    Correct.
15 Q.    Can you elaborate on that at all?
16 A.    I think that came about -- I can't recall.  It's
17 not a hundred percent, but I want to say it stems from
18 the fact that why would anybody do this, and then I
19 guess they started checking -- I don't want to say
20 background -- the victims and I guess that was brought
21 up and talked about.
22 Q.    Did you have any role in handling Lamont
23 Powell's cellphone?
24 A.    No.  I did not.
25 Q.    Did any detectives or the lead detectives in the

1  Wilkinsburg massacre investigation have any
2  conversations with you about Lamont Powell?
3  A.    I can't recall.
4  Q.    Do you recall what Lamont Powell's occupation
5  was in the streets?
6  A.    No.  Well, legal or illegal, I hear he might
7  have been selling drugs.
8  Q.    Did you ever learn that he was potentially a
9  stickup boy?
10 A.    No.
11 Q.    Do you know what a stickup boy is?
12 A.    Oh, yeah.
13 Q.    What's a stickup boy?
14 A.    He likes to rob people, rob people of their
15 money or their drugs.
16 Q.    If evidence was obtained in this investigation
17 that Lamont Powell robbed two people and killed them,
18 would that surprise you?
19      MR. BIONDO: Objection to form.  Go ahead and
20 answer, if you can.
21 A.    That he killed somebody, yes.
22      BY MR. JUBAS:
23 Q.    And robbed them?
24 A.    And robbed them?  I guess it would kind of
25 surprise me.

1  Q.    Why is that?
2  A.    Because I never knew Lamont Powell to have
3  killed anybody besides Doswell.
4  Q.    Does that jive with the fact that you knew that
5  he might be a stickup boy?
6        MR. BIONDO: Object to form.  Go ahead and
7  answer, if you can.
8  A.    Ask it again differently.
9        BY MR. JUBAS:
10 Q.    So, did you know that he may have been a stickup
11 boy?
12 A.    No.
13 Q.    Okay.
14 A.    I just knew he was a drug dealer.
15 Q.    Okay.  So, are you saying you don't recall
16 learning throughout this investigation that Lamont
17 Powell was a stickup boy?
18 A.    Correct.
19 Q.    Is it important to investigate the cellphones of
20 victims in a given homicide investigation?
21      MR. BIONDO: Object to the form.  But go ahead
22 and answer, if you can.
23 A.    Sometimes, yes.
24      BY MR. JUBAS:
25 Q.    Is that generally for the same reason that you

CHERON SHELTON/ROBERT THOMAS v.
COUNTY OF ALLEGHENY, et al.

MICHAEL HOFFMAN
May 21, 2024

AA COURT REPORTERS 412-288-5370                              Page 57

1  would investigate any witness's or defendant's cellphone
2  in an investigation?
3  A.    Correct.
4  Q.    Would you be surprised if Lamont Powell's phone
5  was not downloaded in this case?
6          MR. BIONDO: Objection to form. Go ahead and
7  answer, if you can.
8  A.    Yeah. I would.
9  BY MR. JUBAS:
10 Q.    Why?
11 A.    Because, usually, I mean, you would want their
12 cooperation, especially seeing how possibly his family
13 members were killed.
14 Q.    Do you recall learning whether Lamont Powell
15 cooperated in this case?
16 A.    No. I don't.
17 Q.    We're jumping around here. I apologize about
18 that.
19 A.    Do what you got to do.
20 Q.    When you were instructed by one of the
21 supervisors to place the Shaquan Roberts evidence in
22 another case file, did that strike you as odd at all?
23         MR. BIONDO: Object to form. But go ahead.
24 A.    Not at all. Not at all.
25 BY MR. JUBAS:

AA COURT REPORTERS 412-288-5370                              Page 58

1  Q.    Did you say that you thought that Shaquan
2  Roberts provided information pertinent to the homicide
3  investigation?
4          MR. BIONDO: I'm going to object to form.
5  A.    No.
6  BY MR. JUBAS:
7  Q.    You did not think that?
8  A.    No. I did not say that, I don't think.
9  Q.    Do you think that Shaquan Roberts provided
10 information pertinent to the Wilkinsburg massacre
11 homicide investigation?
12 A.    At the time of the interview, no, I don't, other
13 than the fact that everybody liked Caleo, nobody liked
14 Powell but --
15 Q.    Do you recall him, Shaquan, saying that he never
16 knew Cheron Shelton to be involved in something big?
17 A.    I don't recall it. I'm not saying he didn't say
18 it. I just don't recall.
19 Q.    Do you know what exculpatory evidence is?
20 A.    Explain it to me.
21 Q.    I'm just asking if you know what it is.
22 A.    I do, but right now, I'm drawing a blank for
23 some reason.
24 Q.    Do you know what inculpatory evidence is?
25 A.    No. Block here.

AA COURT REPORTERS 412-288-5370                              Page 59

1  Q.    So, are you ever trained on the Brady rule as a
2  police officer?
3  A.    What's the Brady rule? What is it?
4  Q.    Are you?
5  A.    I think so but --
6  Q.    Okay. What makes you think so?
7  A.    Probably in legal updates.
8  Q.    Would it ring a bell to learn that Brady means
9  that law enforcement has to turn over all exculpatory
10 evidence to the defense?
11 A.    Yes.
12 Q.    Does that ring a bell as to what exculpatory
13 evidence is?
14 A.    Yeah. Evidence that could possibly shed a bad
15 light on some -- any individual.
16 Q.    Would you agree that it is evidence that may
17 tend to disprove a person's involvement in a given case?
18 A.    Correct. Yes.
19 Q.    And why would it be important to turn over
20 exculpatory evidence?
21 A.    Why would it be important?
22 Q.    Yes.
23 A.    For discovery. And God forbid it shows up later
24 on, it could damage your case.
25 Q.    Why would it damage your case?

AA COURT REPORTERS 412-288-5370                              Page 60

1  A.    Because then it shows they possibly -- it
2  could -- somebody could insinuate they are possibly
3  hiding evidence or not presenting all the evidence that
4  could show this person might be innocent or that person
5  might be guilty.
6          (There was a pause in the proceedings.)
7          MR. BIONDO: So, we just came back on the
8  record. Detective Hoffman, our witness today, recently
9  had a medical procedure that affected his -- some of his
10 mental thinking at times. So, he did have an issue
11 where he couldn't recall a previous line of questioning
12 that I think we were in the process of clearing up and
13 maybe totally cleared up.
14         MR. JUBAS: I agree.
15 BY MR. JUBAS:
16 Q.    And if that happens, just --
17 A.    Part of my memory, too, the guy said you're
18 going to have that problem just for a little bit.
19 Q.    Okay. I appreciate that.
20 A.    Yeah. I'm not trying to hide anything.
21 Q.    No. Of course not. Do you recall whether any
22 documentation pertaining to Shaquan Roberts was in the
23 Wilkinsburg massacre case file?
24 A.    I don't know. I don't recall that.
25 Q.    Did you look in the Wilkinsburg massacre case

1 file for Shaquan Roberts evidence?
2 A.    No. I haven't.
3 Q.    Did you just go to the miscellaneous file?
4 A.    Just to the miscellaneous.
5 Q.    Okay. Did you have any conversations with any
6 other Allegheny County Police homicide detectives before
7 today about Shaquan Roberts?
8 A.    Steve Hitchings.
9 Q.    Okay. And what was that conversation?
10 A.    He grabbed me in the hallway said hey, you're
11 about to be deposed. I said Steve, what did you do, and
12 he said they brought up Shaquan Roberts, and I said who
13 the hell is Shaquan Roberts. So, I had to go and look.
14 So --
15 Q.    Okay. And what was the rest of that
16 conversation?
17 A.    Just about they want to ask about his phone
18 download, cellphone download.
19 Q.    Did he give any sort of indication of what it
20 meant?
21 A.    The only thing he brought up was the fact that I
22 guess a name was brought up, Millhouse, and I said who
23 the hell is Millhouse. I thought it was the kid from --
24 Q.    Did Detective Hitchings give any indication to
25 you about his search for Shaquan Roberts evidence?

1 A.    No.
2 Q.    Did he tell you that he initially looked in the
3 Wilkinsburg massacre investigation case file but didn't
4 find anything?
5 A.    No. He didn't tell me anything about that.
6 Q.    Would that surprise you that he didn't find it
7 in the Wilkinsburg massacre investigation case file?
8 A.    Correct. Because it's under the miscellaneous
9 file.
10 Q.    Do you see how that could prevent detectives
11 from finding Shaquan Roberts evidence?
12      MR. BIONDO: Object to form. Go ahead.
13 A.    Understandable. But at the time, everybody knew
14 that it was two separate files. So, I would not doubt
15 with this amount of time that people just forgot about
16 it.
17 BY MR. JUBAS:
18 Q.    What makes you say that at the time, everyone
19 knew about it?
20 A.    Because when we interviewed Shaquan Roberts,
21 like I said, lead detectives, supervisors knew about it.
22 If anybody would ask hey, where do you find the file, we
23 would just tell them -- because we are all in the same
24 office together. Now you got Mike who's retired, me in
25 narcotics. We're in separate parts of the building.

1 Had I been in the office, Steve would have asked and I
2 would have told him, hey, it's in the Shaquan Roberts
3 file.
4 Q.    You said everybody knew about it. Could you
5 explain how everybody knew about it?
6 A.    The fact that they knew that we interviewed
7 Shaquan, that he was stopped inside the residence 1244
8 Nolan and the fact that -- our squad is huge, so I'm not
9 going to say everybody. That's kind of an exaggeration.
10 I would say a majority of people involved in this case
11 probably knew.
12 Q.    Did you, to your recollection, have any
13 discussions with Detective Hitchings during the
14 investigation about Shaquan Roberts?
15 A.    I can't recall. I'm sure we did, but I can't
16 recall what it was.
17 Q.    Do you recall whether you had any conversations
18 with Detective Miller about Shaquan?
19 A.    No. I don't recall that at all.
20 Q.    Had you ever worked on cases with Detective
21 Miller previously?
22 A.    Prior to the massacre?
23 Q.    Yes.
24 A.    I might have. I was kind of new in the squad
25 and we weren't partners. So, I'm sure I might have

1 helped out.
2 Q.    At the time of the investigation, did you ever
3 learn about Detective Miller's reputation as a police
4 officer?
5 A.    The one thing I only knew, he was a good
6 detective and he was really good at search warrants.
7 Q.    What do you mean that he was really good at
8 search warrants?
9 A.    Like what I learned in the county police, like
10 each individual like had their like thing they were good
11 at. Like Lori McKeel, a detective, was really good at
12 cellphone search warrants that if you needed something
13 or help with it, you would go to her. Pat Miller was
14 the type that he would always volunteer to help with or
15 do search warrants. If you needed wording to help you
16 out, you would go see him.
17 Q.    Have you, not with this case, but in other
18 investigations as a lead detective or just working on a
19 case as a detective, have you ever applied for a search
20 warrant for a cellphone download?
21 A.    Yes.
22 Q.    Do you as a detective -- strike that.
23      I'm going to just give you a hypothetical
24 situation here. Let's say that you've interviewed a
25 witness and that witness is in communication with a

1  suspect.
2  A.    Okay.
3  Q.    And let's say that that witness gives you --
4  does not give you consent to search their cellphone and
5  I'm -- I'll clean that up. Let's say that the witness
6  does not give you consent. Would you get a search
7  warrant for that witness's cellphone?
8        MR. BIONDO: Objection to form. Go ahead and
9  answer, if you can.
10 A.    If I can prove that they were in contact with
11 the person we're talking about, if I have enough
12 suspicion, probable cause, yeah, I would.
13 BY MR. JUBAS:
14 Q.    Do you need to get the phone number for that
15 phone prior to getting a search warrant for the full
16 cellphone download?
17       MR. BIONDO: Objection to form.
18 A.    Whose phone? The witness?
19 BY MR. JUBAS:
20 Q.    The witness's phone.
21 A.    Or the bad guy's?
22 Q.    The witness's phone.
23 A.    Usually, we have the number talking to the
24 witness. They'll give us a number and I've actually had
25 it where like I ask the witness can you give us consent

1  to search your cellphone, they tell you no and we didn't
2  have enough to get it, so we had nothing to do with
3  their phone.
4  Q.    Let's say that you do have enough to get it
5  through a search warrant. Do you need the number for
6  that cellphone before you can obtain a full cellphone
7  download?
8  A.    As far as I know, yes.
9  Q.    Okay. Are you able to get a search warrant for
10 a phone download that's in your possession without
11 having the cellphone number associated with it?
12       MR. BIONDO: Objection to form. Go ahead and
13 answer, if you can.
14 A.    I'm a low-tech person, so I'm going to assume
15 that you would need that number.
16 BY MR. JUBAS:
17 Q.    Do you know whether you can learn what the
18 cellphone number is through the cellphone download?
19 A.    Yes.
20 Q.    So, would you agree with me that you don't need
21 the cellphone number in order to get a cellphone --
22       MR. BIONDO: Object to form.
23 A.    Well, you're right. Yes. We need a search
24 warrant to seize their phone. Now we need a search
25 warrant to turn the phone on and then we could get in

1  the phone. If that's what you're asking, yes. I got
2  you. Yes. Yes.
3  BY MR. JUBAS:
4  Q.    So, would you agree with me that it's
5  unnecessary to obtain a cellphone's number prior to
6  getting a cellphone download?
7        MR. BIONDO: Objection to form.
8  A.    Yes. Yes.
9  BY MR. JUBAS:
10 Q.    Because you can get the cellphone number from
11 the cellphone download; right?
12 A.    Right.
13 Q.    Did you ever learn that the Shaquan Roberts
14 evidence was never disclosed to the defendants in the
15 underlying criminal matter in this case?
16 A.    No.
17 Q.    So, Hitchings didn't tell you that it wasn't
18 turned over?
19       MR. BIONDO: Objection to form. Go ahead and
20 answer, if you can.
21 A.    No.
22 BY MR. JUBAS:
23 Q.    And no other officers told you that the Shaquan
24 Roberts evidence wasn't turned over?
25 A.    No.

1  Q.    Do you think it should have been turned over?
2  A.    For discovery reasons?
3  Q.    Yes.
4  A.    Depends on what the evidence -- I mean, yes,
5  probably be turned over.
6  Q.    Why?
7  A.    Because you don't want to -- I mean -- help or
8  hurt the case. You don't want it to appear as if you're
9  hiding something.
10 Q.    Does the fact that it wasn't turned over rub you
11 the wrong way since you were the one that was instructed
12 to keep it out of the case file?
13       MR. BIONDO: I'll object to form. Go ahead and
14 answer, if you can.
15 A.    Does it rub me the wrong way?
16 BY MR. JUBAS:
17 Q.    Yes.
18 A.    Right now, I think it's more of a question of
19 why they didn't turn it over, if that's true. Yeah. I
20 don't know why they wouldn't.
21 Q.    Would you agree that that kind of puts the onus
22 on your doorstep to have to answer for why it wasn't
23 turned over?
24       MR. BIONDO: Object to form. But go ahead and
25 answer, if you can.

1 A. It kind of does, but, I mean, like I told you,
2 I've turned over everything. So, it wasn't up to me to
3 do that. So, if it comes back, I'd gladly explain it
4 like I did right now. I have nothing to hide.
5     MR. JUBAS: Okay. We'll take five.
6     (There was a pause in the proceedings.)
7 BY MR. JUBAS:
8 Q. We are back on the record. We were discussing
9 Shaquan Roberts.
10 A. Okay.
11 Q. Would you agree with me it's your opinion that
12 Shaquan Roberts evidence should have been disclosed to
13 the defendants in the underlying criminal case?
14 A. Okay. The evidence. You mean in the report?
15 Q. The Shaquan Roberts evidence generally.
16     MR. BIONDO: I'll object to the form. But go
17 ahead and answer, if you can.
18 A. That it should have been released at the time --
19 say it again.
20 BY MR. JUBAS:
21 Q. That it should have been disclosed to Mr.
22 Shelton and Thomas during the underlying criminal case?
23 A. Yes.
24 Q. Yes, it should have been disclosed?
25 A. Yes.

1 Q. And you also said that a number of the homicide
2 detectives involved in the investigation were aware of
3 Shaquan Roberts' involvement in the investigation?
4 A. At the time of the incident, yes.
5 Q. Do you know whether Detectives Foley or Dolfi
6 were aware of the Shaquan Roberts evidence?
7 A. No. I don't.
8 Q. What makes you sure that at least some
9 detectives knew about Shaquan Roberts?
10 A. Because after the interview, I knew Hitchings
11 knows about it because he's the one who arrested him.
12 They were aware of the incident that occurred on Nolan
13 Court, that somebody was arrested and they were there,
14 but I do recall individuals being in the hallway asking
15 did he say anything, talked about the interview.
16 Q. And you don't recall who those individuals were?
17 A. Not at all.
18 Q. Okay. Did you ever become aware that Shaquan
19 Roberts' cellphone was in contact with one of the
20 suspect phone numbers in this case?
21 A. Later on, I did.
22 Q. When did you become aware of that,
23 approximately?
24 A. Probably when Steve Hitchings told me about this
25 deposition.

1 Q. When was that?
2 A. Last week.
3 Q. So, is it fair to say that during the time of
4 the investigation, you were not aware that Shaquan
5 Roberts' cellphone was in contact with one of the
6 suspect phones?
7 A. That's correct.
8 Q. Had you been aware of that, what would you have
9 done?
10     MR. BIONDO: Object to the form. But go ahead
11 and answer, if you can.
12 A. Well, I'm going to answer it this way. As soon
13 as we got the phone, it was downloaded. I never knew
14 about it, but had I did, other detectives knew about it
15 before I did.
16 BY MR. JUBAS:
17 Q. What makes you say that?
18 A. For the fact that I didn't know anything about
19 it till last week, but then I'm getting told by Steve
20 Hitchings that the phone related to Millhouse, and then
21 like I said, I asked Steve who the hell is Millhouse,
22 and I found out I guess it was this Robert Thomas. So,
23 I only knew about that last week.
24 Q. Okay. So, is it accurate to say that you
25 subsequently learned that the suspect phone number was

1 in Shaquan's phone under Millhouse?
2 A. Yes.
3 Q. Were you ever made aware that that phone number
4 was only saved as Millhouse in Shaquan's phone and no
5 other phones?
6 A. No.
7 Q. So, this is the first time that you're here
8 finding that today?
9 A. Yes.
10 Q. Did you know that the suspect phone number
11 connected to Millhouse was one of the important ways
12 that Rob Thomas was connected to the Wilkinsburg
13 massacre investigation?
14     MR. BIONDO: Objection to form. Go ahead and
15 answer.
16 A. I didn't know it at the time, but I'm suspecting
17 we had to have learned it.
18 BY MR. JUBAS:
19 Q. Did Hitchings give you any indication of the
20 dates or times that Shaquan's number was in contact with
21 the suspect phone number?
22 A. Not at all. We didn't go to that detail.
23 Q. And we'll go through some records, but if
24 Shaquan was in contact with the suspect phone number in
25 the lead-up to the massacre and in the days after the

1  massacre, would that be significant for the Wilkinsburg
2  massacre investigation?
3          MR. BIONDO: Objection to form.
4  A.     My opinion after having talked to him, I never
5  at any time suspected he was a suspect or thought he was
6  one. So, if you were to tell me later on, yeah, his
7  phone number was before and after the lead-up and all
8  that, I would say at no time do I think he was a
9  suspect.
10 BY MR. JUBAS:
11 Q.     Okay. Would it be -- based off of what you know
12 now about Shaquan Roberts and his contact with the
13 suspect phone number, would it have been important to
14 follow up with Shaquan about those contacts?
15         MR. BIONDO: I'll object to form. Go ahead and
16 answer, if you can.
17 A.     It depends on what the contents of the text
18 messages were. I mean -- but, I mean, could have.
19 BY MR. JUBAS:
20 Q.     Should you have?
21         MR. BIONDO: Object to form.
22 A.     Me personally, I possibly would have brought him
23 back in and asked him.
24 BY MR. JUBAS:
25 Q.     What would you have asked him?

1  A.     What is your relationship with him, do you
2  recall any of the conversations.
3  Q.     Did you review Shaquan Roberts' cellphone
4  download?
5  A.     No.
6  Q.     Have you ever reviewed it?
7  A.     No.
8  Q.     Are you aware that the number for the suspect
9  phone was saved as Millhouse in that phone now?
10 A.     Now I know.
11 Q.     If there's no indication of who Millhouse is in
12 his cellphone, would you ask him who is Millhouse?
13         MR. BIONDO: Objection to form. Go ahead and
14 answer, if you can.
15 A.     At the time, no, because I have absolutely no
16 reason to know who Millhouse was. I didn't even know
17 Millhouse's name was brought up.
18 BY MR. JUBAS:
19 Q.     Now in retrospect that you know this, would you
20 have asked him who is Millhouse?
21 A.     Yes.
22 Q.     And this is common sense, but why would you ask
23 him who is Millhouse?
24 A.     Because I'm assuming at the time of -- I don't
25 know how they obtained the name Millhouse. I don't even

1  know if he was a suspect at the time or possibly a
2  witness, but, yeah, I would ask him where did that come
3  from, why do you call him that, do you know who it is.
4  Q.     And it's your position that Shaquan Roberts was
5  truthful with you?
6  A.     Yes.
7  Q.     Now knowing what you know, could you provide
8  this information to homicide detectives that are
9  investigating the Wilkinsburg massacre?
10 A.     What am I providing? The Millhouse and all
11 that?
12 Q.     The Shaquan Roberts information that we've been
13 discussing.
14         MR. BIONDO: I'll object to form. Go ahead and
15 answer, if you can.
16 A.     Would I provide it to the homicide detectives?
17 BY MR. JUBAS:
18 Q.     Could you?
19 A.     I'm a little lost. What do you mean?
20 Q.     So, we've established that Shaquan Roberts was
21 in contact with one of the suspects before and after the
22 massacre; correct?
23 A.     Correct.
24         MR. BIONDO: Object to form.
25 A.     I didn't know that, but now I know that.

1  BY MR. JUBAS:
2  Q.     And we also -- do we agree that that is
3  significant to the Wilkinsburg massacre investigation?
4          MR. BIONDO: Object to form.
5  A.     I would say that's definitely something we might
6  want to follow up on.
7  BY MR. JUBAS:
8  Q.     Okay. Are you aware of whether the Wilkinsburg
9  massacre investigation is still open?
10 A.     I believe it is.
11 Q.     Will you take this information to the homicide
12 detectives that are running the Wilkinsburg massacre
13 investigation?
14         MR. BIONDO: Object to form. Go ahead and
15 answer, if you can.
16 A.     I would tell them about this, but then they're
17 going to ask me do you think he's a suspect. I don't.
18 I went at him pretty hard in that interview. I was kind
19 of being ignorant for a little bit there, but he never
20 changed his story and he gave us consent to check his
21 phone and that to me is a big thing that if, God forbid,
22 he was a suspect, why the hell would you give me your
23 phone and consent. Very cordial. Never got upset. No
24 indication I feel he was a suspect.
25 BY MR. JUBAS:

CHERON SHELTON/ROBERT THOMAS v.
COUNTY OF ALLEGHENY, et al.

MICHAEL HOFFMAN
May 21, 2024

AA COURT REPORTERS 412-288-5370                                    Page 77

1  Q.    Is it your position that Allegheny County
2  homicide detectives should not follow up with Shaquan
3  Roberts?
4       MR. BIONDO: Object to form. Go ahead and
5  answer.
6  A.    Not as a suspect, but as a witness.
7  BY MR. JUBAS:
8  Q.    So, as a witness, would you agree that a
9  homicide detective could re-interview Shaquan and say
10  who is this phone number?
11  A.    Yeah. They could.
12  Q.    Will you take this information and provide it to
13  homicide detectives so that they can do that?
14       MR. BIONDO: Objection to form.
15  A.    Would I?
16  BY MR. JUBAS:
17  Q.    Will you?
18  A.    I don't think I have to because this
19  conversation we've had, they already know that and I'm
20  not a homicide detective anymore. So --
21  Q.    What makes you sure that the homicide detectives
22  know about Shaquan Roberts?
23  A.    Because you've been talking to me about it and
24  we've talked about Hitchings about it.
25  Q.    And so is it your assumption that a detective

AA COURT REPORTERS 412-288-5370                                    Page 78

1  has subsequently gone to the homicide detectives
2  handling the investigation and provided them this
3  information?
4       MR. BIONDO: Objection to form. Go ahead and
5  answer.
6  A.    I'm not assuming, but if you're asking should I
7  go to them, Detective Hitchings, as we stated, is well
8  aware of the fact that Shaquan's phone had Millhouse in
9  it. So, he already knows about it so -- and knowing
10  he's been deposed, I would not doubt if you asked him
11  the same thing. So --
12  BY MR. JUBAS:
13  Q.    So, you're assuming that somebody has talked to
14  --
15  A.    I'm not -- I haven't assumed that at all.
16  Q.    So, since we're not going to assume that
17  somebody has provided this information to the current
18  homicide detectives working that investigation, will you
19  provide it to be sure?
20       MR. BIONDO: Object to form. Go ahead and
21  answer, if you can.
22  A.    I'll go in there and ask them.
23  BY MR. JUBAS:
24  Q.    And who would you talk to?
25  A.    I would go to Detective Hitchings and ask, since

AA COURT REPORTERS 412-288-5370                                    Page 79

1  we've already had all this conversation, if he might
2  have talked to somebody.
3  Q.    When you spoke with Shaquan, did you ask him
4  about Robert Thomas?
5  A.    I don't believe at that time his name had come
6  up, but I believe in the interview, I don't think we
7  did.
8  Q.    Do you recall having a conversation with Shaquan
9  Roberts about the suspect phone number attributed to Rob
10  Thomas?
11  A.    I don't recall that.
12  Q.    Did you have conversations with anybody besides
13  Detective Hitchings about Shaquan Roberts recently?
14  A.    Huh-uh.
15       MR. BIONDO: That's a no?
16  A.    Yeah. No.
17  BY MR. JUBAS:
18  Q.    So, you never discussed it with Detectives
19  Kinavey or McCue?
20  A.    No.
21  Q.    And you never discussed it with Rosenberg?
22  A.    No.
23  Q.    You're aware that the Shaquan Roberts evidence
24  didn't make it into the Wilkinsburg massacre
25  investigation case file; right?

AA COURT REPORTERS 412-288-5370                                    Page 80

1  A.    Shaquan's reports didn't make it in?  No.
2  Q.    Are you aware that they didn't make it in?
3  A.    I wasn't aware -- I knew that Shaquan had his
4  own file, and like I explained earlier, we were directed
5  to do that so, that way, should somebody want Shaquan's
6  stuff, all his stuff, it's easily in this file right
7  here.  If I were to turn it over for the fact that he's
8  his own person, he had his own charges, he was
9  prosecuted for it, he pled guilty to 13A16, 13A32, I
10  believe it was in August of that year, but at the time
11  of the incident, we were directed to do that with the
12  understanding that people knew should you need something
13  from Shaquan Roberts, here is his file, this is
14  everything you need because God forbid it would go into
15  this main file, and like I told you before, if I was to
16  turn in the reports and other people turn in their
17  reports, it's not necessarily it goes into chronological
18  order. So, you could be reading a report about Cheron,
19  just for instance. Then the next one would be Shaquan.
20  Another report could be a canvas.  This way, it was easy
21  access to this file and everything was in there.
22  Q.    Did you ever have any interactions in this case
23  with Ashley Smith?
24  A.    Yes.
25  Q.    What were those interactions?

CHERON SHELTON/ROBERT THOMAS v.
COUNTY OF ALLEGHENY, et al.

MICHAEL HOFFMAN
May 21, 2024

AA COURT REPORTERS  412-288-5370                                    Page 81

1 A.     We arrested her for the drugs that were found in
2 her apartment at 900 Hill Avenue and then she got
3 arrested. I never personally talked to her. I saw her,
4 but other individuals, I believe, knew her.
5 Q.     Were you involved in the -- in her arrest?
6 A.     I got the warrants for them. Yes. I did not
7 arrest her.
8 Q.     Okay. Did you receive the same instruction from
9 supervisors about Ashley Smith's case, to place it in a
10 different file?
11 A.     Yeah. That entire case was placed into a
12 separate file. It was almost like a separate incident.
13 So, just because you have Cheron Shelton with this and
14 this, it's not -- one person, one file. It's two
15 separate incidents. That's how we consider it to be.
16 Q.     Why would the evidence pertaining to Ashley
17 Smith in the 2013 case, why would that have made its way
18 into the Wilkinsburg massacre investigation file?
19 A.     I don't know why it would have made it in there.
20 The only thing I know, Mike Caruso and I worked our
21 case, the revitalization of the homicide case -- or I
22 mean drug case in our own file. If anything made it in
23 there, I don't know why it would have wound up in there.
24 Q.     So, are you saying that it should -- that Ashley
25 Smith should not have been included in the Wilkinsburg

AA COURT REPORTERS  412-288-5370                                    Page 82

1 massacre investigation file?
2 A.     As far as I know, it should not have been, but,
3 I mean, why somebody would put it in there, I have no
4 idea. Maybe they had a reason to do it. I personally
5 did not do that. My knowledge is that anything that had
6 to do with Justin Gomez, Ashley Smith, Cheron or Robert
7 Thomas for the other case would have stayed in this file
8 over here. That's what we worked on right here.
9 Q.     Would that have been the miscellaneous file?
10 A.     Yeah. That would have been the miscellaneous
11 file.
12 Q.     Okay. Do you recall whether Rob Thomas was a
13 suspect when he was arrested for the 2013 case, a
14 suspect for the Wilkinsburg massacre?
15 A.     For our case, I don't recall that.
16 Q.     Okay. So, let me clean that up. When you --
17 A.     Worked on the case and made an arrest, did we
18 know Thomas was -- was a suspect in the case?
19 Q.     In the Wilkinsburg massacre case.
20         MR. BIONDO: Can you ask it again just to make
21 it clear?
22    BY MR. JUBAS:
23 Q.     Okay. So, do you recall working on a 2013
24 case --
25 A.     Yes.

AA COURT REPORTERS  412-288-5370                                    Page 83

1 Q.     -- involving Robert Thomas?
2 A.     Yes.
3 Q.     And would you agree that your work on that 2013
4 case resulted in charges for Robert Thomas on that case
5 in early April of 2016?
6 A.     Yes.
7 Q.     At the time that he was arrested, do you recall
8 whether he was a suspect in the massacre investigation?
9 A.     I'm thinking that -- I think he was, but I can't
10 be a hundred percent, to be honest with you. I know
11 definitely Cheron.
12 Q.     Do you know why you were instructed to
13 revitalize the 2013 case?
14 A.     Yeah. They, I want to say, didn't know about
15 Rob Thomas but I'm not a hundred percent. We were
16 instructed to do that, to get these -- I want to say the
17 suspects off the street for their safety and possibly an
18 opportunity to possibly talk to them, I guess.
19 Q.     Okay. So, based on that representation, it does
20 kind of sound like he was already a suspect?
21 A.     I want to say he was, but I'm going to tell you
22 straight up I'm not a hundred percent.
23 Q.     But are you saying that to your recollection,
24 you were instructed to get the two suspects off of the
25 street?

AA COURT REPORTERS  412-288-5370                                    Page 84

1 A.     Yeah. I was instructed to revitalize the case,
2 to get them off the street, right, basically for their
3 protection and to talk to them if possible about what
4 happened.
5 Q.     Were you ever told -- at this time, were you
6 told why Rob Thomas was a suspect?
7 A.     No. Or how he became a suspect? Is that what
8 you're asking?
9 Q.     Yes.
10 A.     No.
11 Q.     Do you recall whether you were involved in the
12 arrest of Rob Thomas?
13 A.     I don't recall. I believe I stayed in the
14 office while everybody went out and grabbed these guys.
15 Q.     Do you recall having any conversations with
16 Hitchings around the time of the 2013 case?
17         MR. BIONDO: Object to form.
18 A.     I'm sure we talked. I don't know about what.
19    BY MR. JUBAS:
20 Q.     Do you recall whether you and Hitchings talked
21 about Rob Thomas's involvement as a suspect in the
22 Wilkinsburg massacre?
23 A.     No. I don't recall that.
24 Q.     When you make an arrest, how many different
25 reports do you author?

CHERON SHELTON/ROBERT THOMAS v.
COUNTY OF ALLEGHENY, et al.

MICHAEL HOFFMAN
May 21, 2024

AA COURT REPORTERS  412-288-5370                    Page 85

1        MR. BIONDO: Object to form. Go ahead and
2   answer, if you can.
3   A.     If you make one arrest, if I arrest you, you do
4   a -- like an activity report to state where you got
5   arrested. Then you'll do an arrest sheet. It states
6   location, charges, if you were searched, Mirandized,
7   interviewed, and then if there was a warrant, you would
8   clear the warrant.
9        MR. JUBAS: I'm going to show him what I'm
10  marking as Exhibit 2.
11       (Exhibit 2 was marked for identification.)
12  BY MR. JUBAS:
13  Q.     And this is an Allegheny County Police
14  Department arrest report for Shaquan Roberts, and take
15  your time to review that.
16  A.     Go ahead.
17  Q.     Okay. Could you turn to the last page?
18       MR. BIONDO: What's the number at the bottom
19  right?
20       MR. JUBAS: It's page 5 of 5 of the arrest
21  report and the Bates number is AC 419.
22       MR. BIONDO: Thank you.
23  BY MR. JUBAS:
24  Q.     And have you had time to review that last page?
25  A.     Yes.

AA COURT REPORTERS  412-288-5370                    Page 86

1   Q.     Does this indicate that you authored this
2   report?
3   A.     Yes.
4   Q.     And do you see where it says Detective Hoffman,
5   Michael, AP017664?
6   A.     Yes.
7   Q.     What is that AP --
8   A.     That's my MPOETC number.
9   Q.     Let me finish the question. What is AP017664?
10  A.     That is my MPOETC number.
11  Q.     And could you spell that, MPOETC?
12  A.     M-P-O-T-E-C.
13  Q.     And what is that?
14  A.     That's a number that you're given to show that
15  you qualified Act 120 and that you're certified as a
16  police officer.
17  Q.     And then there is a date, 3/15/2016, 5:27:34 PM?
18  A.     Right.
19  Q.     Does this indicate that you authored this report
20  on the same day that you interviewed Shaquan Roberts?
21  A.     Arrest date. Yes.
22  Q.     Is there any indication in this report that this
23  arrest is connected to the Wilkinsburg massacre
24  investigation?
25  A.     No.

AA COURT REPORTERS  412-288-5370                    Page 87

1   Q.     Is that because he was charged for a separate
2   crime?
3   A.     Correct. Separate incident.
4   Q.     And would you agree with me that in the
5   narrative section, you made no reference to the
6   Wilkinsburg massacre?
7   A.     Correct.
8   Q.     Did you say that you pulled the Shaquan Roberts
9   case file --
10  A.     Yes.
11  Q.     -- in preparation for today?
12  A.     I'll be honest with you. All I read was the
13  interview report.
14  Q.     Do you recall what date the interview report
15  was?
16  A.     No.
17       MR. JUBAS: Okay. One moment.
18       (There was a pause in the proceedings.)
19  BY MR. JUBAS:
20  Q.     We were talking about an interview report for
21  Shaquan Roberts; right?
22  A.     Right.
23  Q.     And, generally speaking, what is an interview
24  report?
25  A.     You're documenting the interview you conducted

AA COURT REPORTERS  412-288-5370                    Page 88

1   with an individual that you talked to on the date and
2   time inside of an interview room or outside.
3   Q.     What is the importance of an interview report?
4   A.     One, let people know that you did interview
5   somebody, but also possibly the content of what the
6   interview was about.
7   Q.     So, is this something that could help a lead
8   investigator if they're just reviewing the evidence?
9   A.     Yes.
10  Q.     Okay. What date was the interview report for
11  Shaquan Roberts?
12  A.     3/15, maybe. What's the date of his arrest?
13  I'm going to assume it's the same date.
14  Q.     And I'm not going to introduce this. I'm just
15  going to ask if this is what you're referring to.
16  A.     This is not per se the interview report, but
17  it's basically documenting that we asked for consent for
18  his phone.
19  Q.     I'm going to show you a few documents. At a
20  later point, we'll go through them in more detail. I'm
21  just trying to see if we can pin down which report
22  you're talking about. You have the arrest report;
23  right?
24  A.     Right here.
25  Q.     And that's marked as Exhibit 2?

CHERON SHELTON/ROBERT THOMAS v.
COUNTY OF ALLEGHENY, et al.

MICHAEL HOFFMAN
May 21, 2024

1  A.   Yes.
2  Q.   Is it fair to say that is not the interview
3  report that you're discussing?
4  A.   That's fair to say.  Yes.
5  Q.   Do you know what a court case disposition is?
6  A.   Yes.  I do.
7  Q.   Is it fair to say that that is not the interview
8  report that you're discussing?
9  A.   Yes.
10 Q.   Do you know what a request for AV evidence
11 processing form is?
12 A.   Yes.
13 Q.   Fair to say that that is not an interview
14 report?
15 A.   Yes.
16 Q.   I'm not going to mark this yet.  I'm going to
17 hand you a case report for -- from reporting officer
18 Detective Michael Hoffman.  Please take your time to
19 review that.  Did you have the opportunity to review
20 that?
21 A.   Yes.
22 Q.   Is this document the interview report that
23 you're discussing?
24 A.   No.
25 Q.   Okay.  Can I get that back, please?

1  A.   Sure.
2  Q.   Did you happen to bring a copy of that interview
3  report with you?
4  A.   I did not.
5  Q.   Are you aware of what evidence Detective
6  Hitchings provided regarding Shaquan Roberts?
7  A.   No.
8  Q.   He never told you?
9  A.   No.
10 Q.   Did you review the Shaquan Roberts case file
11 subsequent to Detective Hitchings' recent review of the
12 Shaquan Roberts case file?
13 A.   Yes.  Like I said earlier, the only thing I read
14 was the interview report.
15 Q.   Did you see any documentation, notes or reports
16 from Hitchings regarding his recent review of the case
17 file?
18 A.   No.
19 Q.   Do you know if there's evidence in the Shaquan
20 Roberts case file which was not turned over by Detective
21 Hitchings?
22 A.   No.
23      MR. JUBAS: Okay.  Alright.  I'm going to mark
24 this as Exhibit 3.
25      (Exhibit 3 was marked for identification.)

1  BY MR. JUBAS:
2  Q.   Okay.  So, mark this case report as Exhibit 3.
3  This is the case report that you and I were just
4  discussing.  Feel free to take a second.
5  A.   No problem.  Go ahead.
6  Q.   Alright.  Drawing your attention to the last
7  page, is this a report that you authored?
8  A.   Yes.
9  Q.   Did you have the chance to look at the
10 narrative?
11 A.   Yes.
12 Q.   Did you note anything in this narrative about
13 the Wilkinsburg massacre investigation discussions that
14 you had with Mr. Roberts?
15 A.   No.
16 Q.   Why didn't you include that in the narrative for
17 this case report?
18 A.   This case report narrative gets disseminated to
19 the media and other individuals who want to have a basic
20 idea of like what transpired.  You never put like strong
21 facts into it.  You just give them basic idea what
22 happened.  I did not put that in there for the fact for
23 his safety if, God forbid, this should get out that
24 people will assume that he's talking about it and he
25 would get labeled as a snitch and possibly get hurt.

1  Q.   I'm just going to represent that we were not
2  provided the interview report that you were discussing.
3  Do you recall what date that interview report was
4  authored?
5  A.   It was either authored that night or the next
6  day.
7  Q.   Okay.  Do you recall whether any information was
8  placed in that report about what was discussed between
9  you and Mr. Roberts about the Wilkinsburg massacre?
10 A.   I don't recall particulars.
11 Q.   And are you saying that was the only piece of
12 evidence that you reviewed in the Shaquan Roberts case
13 file?
14 A.   Yes.
15      (Exhibit 4 was marked for identification.)
16 BY MR. JUBAS:
17 Q.   Handing you what I've marked as Exhibit 4,
18 please take your time to review that.
19 A.   Go ahead.
20 Q.   Okay, Detective.  So, would you agree with me
21 that this is an Allegheny County Police Department
22 followup report?
23 A.   Yes.
24 Q.   And this is -- this followup report is being
25 conducted with regards to consent to search Roberts'

AA COURT REPORTERS 412-288-5370                Page 93

1  cellphone?
2  A.    Yes.
3  Q.    And would you agree that this followup report is
4  referring to Shaquan Roberts?
5  A.    Yes.
6  Q.    And would you agree with me that the date of the
7  this report is July 9, 2018?
8  A.    Correct.
9  Q.    Okay. Could you please -- could you verify that
10 this is your report?
11 A.    Yes.
12 Q.    Could you please read into the record the
13 contents of this report beginning on Tuesday,
14 March 15th?
15 A.    The whole thing?
16 Q.    Yes, please.
17 A.    On Tuesday March 15, 2016 at approximately
18 13:20 hours, I, Detective Hoffman, along with Detective
19 Caruso conducted an interview of Shaquan Roberts.
20 Shaquan Roberts was arrested by Detectives Hitchings
21 along with Allegheny County Sheriff Deputies Feeney and
22 Venezia at 1244 Nolan Court in the City of Pittsburgh.
23 Allegheny County homicide detectives and deputies were
24 searching for a Dontay Reed who was wanted for probation
25 violations when they encountered Shaquan Roberts at 1244

AA COURT REPORTERS 412-288-5370                Page 94

1  Nolan Court. For officers' safety, Detectives and
2  Deputies Feeney and Venezia were going to conduct a
3  pat-down search for weapons and asked Shaquan Roberts if
4  he had anything on him that could harm the officers to
5  which he responded I have some weed in my pockets.
6       Deputies and detectives recovered 17 individual
7  knotted baggies that contained marijuana in Shaquan
8  Roberts' right front pocket. The interview started at
9  3:20 PM. During the interview at around 3:59 PM, we,
10 Detectives Hoffman and Caruso, asked Roberts if he would
11 give us permission to look at his phone. He stated that
12 we could. We advised him that we were looking for names
13 and possible numbers of individuals that may be useful
14 to our investigations concerning this drug case and the
15 homicide of the six individuals in Wilkinsburg that
16 occurred on March 9, 2016.
17      He stated we could and even gave us his security
18 code number 581200 to unlock his phone. At 4:09 PM, I
19 handed him the Allegheny Police county consent to search
20 form, form C5, which would give us permission to take
21 his phone and download the contents. Roberts read the
22 form and at -- I'm sorry -- at 4:10 PM, he signed the
23 form giving us permission. End of report and my
24 initials MRH.
25 Q.    Are you saying that this is not the interview

AA COURT REPORTERS 412-288-5370                Page 95

1  report that you reviewed in preparation for today?
2  A.    Yes.
3  Q.    It is not?
4  A.    Yes. Correct. It is not.
5  Q.    Would you agree with me that the date of this
6  report is more than two years after your interview with
7  Shaquan Roberts?
8  A.    Correct.
9  Q.    Why did you write this report two years after
10 the interview?
11 A.    I can't recall why. The only thing I could
12 think is the fact that I started the report at the time
13 of the incident and other stuff might have come up and I
14 just forgot to complete it and I was directed to do so
15 prior to the trial.
16 Q.    Who directed you to do that?
17 A.    More than likely, our supervisors, because what
18 we have is what we call is a case review and then
19 they'll look at the files or on the computer and say
20 hey, Hoffman, you have an incomplete report and I would
21 more than likely, part of my language, look ah, shit,
22 yeah, I did forget about this because I was tied up with
23 other stuff.
24 Q.    So, it's your assumption that you finished
25 writing this report in 2018 because one of the

AA COURT REPORTERS 412-288-5370                Page 96

1  supervisors in preparation for trial said you need to
2  complete this report?
3  A.    That's what I think happened. I'm not a hundred
4  percent, but I'm going to say that's what it is.
5  Q.    Okay. And the trial that we're speaking about
6  is the Wilkinsburg massacre trial?
7  A.    Yes.
8  Q.    In 2018, was Lieutenant Schurman still the
9  lieutenant?
10 A.    I believe he was. Yes.
11 Q.    Was Sergeant Scherer still the sergeant?
12 A.    He might not have been. I'm not a hundred
13 percent with him.
14 Q.    So, is it fair to say that Sergeant Scherer left
15 before Lieutenant Schurman left?
16 A.    Yes.
17 Q.    Who became sergeant after Lieutenant Scherer --
18 after Sergeant Scherer, rather?
19 A.    Sergeant Ruckel, R-U-C-K-E-L.
20 Q.    Do you recall whether Sergeant Ruckel gave you
21 this instruction?
22 A.    I don't recall.
23 Q.    Is it safe to assume that if you were instructed
24 to finish this report in preparation for the Wilkinsburg
25 massacre trial, that evidence pertaining to Shaquan

CHERON SHELTON/ROBERT THOMAS v.
COUNTY OF ALLEGHENY, et al.

MICHAEL HOFFMAN
May 21, 2024

1  Roberts was still in the Wilkinsburg investigation case
2  file?
3          MR. BIONDO: Objection to form. But go ahead
4  and answer, if you can.
5  A.     Am I assuming that his reports and stuff were
6  still in the Wilkinsburg?
7  BY MR. JUBAS:
8  Q.     Yes.
9  A.     Would I assume they were? No. I would assume
10 that they were in his file.
11 Q.     Would you assume that whoever gave you this
12 instruction knew about Shaquan Roberts and his
13 involvement in the Wilkinsburg massacre investigation?
14         MR. BIONDO: Objection to form. Go ahead and
15 answer, if you can.
16 A.     Not a hundred percent, but I would believe so.
17 BY MR. JUBAS:
18 Q.     That's probably why they instructed you to write
19 the report in preparation for the Wilkinsburg massacre
20 trial; right?
21 A.     What happens is when we enter these reports and
22 we would put like percent signs after it so if you were
23 to bring up the list of reports, there would be percent
24 signs after it and that's an indicator to people who would
25 look at it that it's an incomplete report. So, I have

1  no idea what the sergeant did or lieutenant did, if they
2  were even the ones that instructed me to do that. It
3  could even be the case agent. We do that sometimes
4  ourselves. We'll look on it, like, hey, so and so, you
5  owe me a report on that. So, that's possibly what could
6  have happened.
7  Q.     You referred to percentages next to a report?
8  A.     Yeah. The title. And so it would have said
9  consent to search Roberts cellphone and there would have
10 been percent signs. Something the county came up with
11 that if I was to scroll down, it would be the title and
12 the percent signs, hey, you owe me a report.
13 Q.     Is this a software program that you're referring
14 to?
15 A.     Yeah.
16 Q.     What's the software program?
17 A.     I don't know. We just call it RMS.
18 Q.     RMS?
19 A.     Yeah. And it's gone through several changes
20 since.
21 Q.     And you had mentioned that a supervisor could
22 scroll through RMS to see which reports are
23 incomplete --
24 A.     Yes.
25 Q.     -- for a given case?

1  A.     Yeah. If it has a percent sign, they're going
2  to assume. I'm going to assume that they're assuming
3  that.
4  Q.     Okay. Are reports organized according to the
5  investigations that they're a part of?
6          MR. BIONDO: Objection to form. But go ahead
7  and answer, if you can.
8  A.     If you punch in a case number, an event number
9  like in this case, at that time, this system, it would
10 show a list of all the reports and the titles and then
11 it would have the detective's name.
12 BY MR. JUBAS:
13 Q.     So, is it your assumption that in RMS, the
14 report that is labeled as Exhibit 4 was organized in a
15 Wilkinsburg massacre file, an overarching file?
16         MR. BIONDO: Objection to form. But go ahead
17 and answer, if you can.
18 A.     It would go under whatever the case number,
19 event number it is. As in this case, this would have
20 been his arrest, Shaquan's arrest. It could have been
21 under that file.
22 BY MR. JUBAS:
23 Q.     So, is it accurate to say that on Exhibit 4,
24 this report has no information connecting it to the
25 Wilkinsburg massacre?

1  A.     That's right.
2  Q.     How would a supervisor have known to have you
3  complete this report in preparation for the Wilkinsburg
4  massacre trial if it's not connected to the Wilkinsburg
5  massacre?
6  A.     I'm not going to assume anything. All I could
7  think is that possibly they knew about Shaquan Roberts
8  and how they got his phone and then they might have gone
9  into this file to see if there were any reports that
10 were possibly needed. I have no idea how they would
11 have done that. I'm just letting you know what I think.
12 Q.     Got it. Now, the portion that I had you read --
13 I had you read the whole thing. I'm going to read this
14 part to you. We advised him that we were looking for
15 names and possible numbers of individuals that may be
16 useful to our investigations concerning this drug case
17 and the homicide of the six individuals in Wilkinsburg.
18 That's accurate; right?
19 A.     Yes.
20 Q.     As part of this report, did you check on whether
21 his cellphone was in communications with any other
22 numbers connected to the Wilkinsburg massacre
23 investigation?
24 A.     I did not.
25 Q.     Do you know if anybody conducted that

CHERON SHELTON/ROBERT THOMAS v.
COUNTY OF ALLEGHENY, et al.

MICHAEL HOFFMAN
May 21, 2024

1  investigation into Shaquan Roberts?
2  A.    No.
3  Q.    Do you think that that investigation should have
4  been conducted?
5  A.    I mean, you're asking me if they should have
6  followed up on his phone with the numbers?
7  Q.    Yes.
8  A.    I assume that it was.  So --
9  Q.    Have you ever known Allegheny County Police
10  detectives to delete evidence out of a cellphone before
11  getting it downloaded?
12        MR. BIONDO: Object to form.  Go ahead and
13  answer, if you can.
14  A.    No.
15  BY MR. JUBAS:
16  Q.    Were you instructed by anybody in Allegheny
17  County Police Department to delete evidence in Mr.
18  Roberts' phone before it was downloaded?
19  A.    No.
20  Q.    Have you ever been a lead detective on a case
21  where during the investigation, you obtained a cellphone
22  download from the physical cellphone and cell data
23  information from the subscriber, two separate reports?
24  A.    Yes.
25  Q.    Would you agree with me that in those

1  circumstances, that both of those forms of cellphone
2  reports provide different but valuable pieces of
3  evidence?
4  A.    They could.  Yes.
5  Q.    They could tell you two different pieces to the
6  same cellphone story, essentially?
7  A.    Yes.
8  Q.    Did you say that it has happened before where
9  you've had both reports for the same phone number for
10  the same cellphone?
11  A.    Yes.
12  Q.    Is it important in that circumstance to make
13  sure that the reports parallel each other?
14        MR. BIONDO: Object to form.  But go ahead and
15  answer, if you can.
16  A.    Let me explain.  I'm not denying your answer.
17  When it comes to cellphone stuff, I'm not too
18  well-versed in it at all.  I usually let other people
19  handle that stuff.  I usually have to go to Matt
20  Rosenberg that you talked about to explain 90 percent of
21  what's going on.  Usually, when we get the downloads,
22  I'll forward it to my partner.  At the time, it wasn't
23  Caruso but -- like right now.  It used to be my partner
24  Ranko, a younger guy.  But those are the guys that --
25  usually, I would turn the phone stuff over to them.  So,

1  when it comes to cellphone stuff, you're asking me this,
2  I'm going to be honest with you.  I'm not too
3  well-versed at it.
4  BY MR. JUBAS:
5  Q.    Okay.  Hypothetically, if you had these two
6  reports --
7  A.    Yes.
8  Q.    -- if there were inconsistencies, so, for
9  example, calls in one that are not reflected in the
10  other report --
11  A.    Okay.
12  Q.    -- what would you do in that situation?
13        MR. BIONDO: Object to form.  But go ahead and
14  answer, if you can.
15  A.    I've actually had that situation.  I've gone to
16  Matt Rosenberg and asked him what he thought and he's
17  given me different answers, and right now, I just cannot
18  tell you exactly what the technical reasons are for it
19  but --
20  BY MR. JUBAS:
21  Q.    So, there could be technical reasons for the
22  inconsistencies between two reports for the same phone?
23  A.    From what I understand with talking with Matt,
24  yes.
25  Q.    In an investigation, if this phone number, this

1  hypothetical phone number in these two reports, if there
2  are inconsistencies in those reports for the same phone,
3  would it be important to investigate the nature of those
4  inconsistencies?
5        MR. BIONDO: Objection to form.  But go ahead
6  and answer, if you can.
7  A.    I felt like I answered if there are
8  inconsistencies, like I said, my idea of the
9  investigation would be to go to Matt Rosenberg and ask
10  why.  He's more well-versed than I would ever be.
11  BY MR. JUBAS:
12  Q.    Is that -- an investigation of these
13  hypothetical inconsistencies, would that be important
14  for a lead investigator to iron out prior to proceeding
15  to trial with this evidence?
16  A.    I've had it where the DA's asked why is this,
17  why is this, and we've explained why and they usually
18  have -- this is just on the case that I was on -- they
19  would have Matt Rosenberg testify as to why there were
20  the inconsistencies.
21  Q.    Do you recall whether there were ever any
22  discussions about inconsistencies between Shaquan
23  Roberts' phone report and the phone report for the
24  suspect phone number that Shaquan was in contact with?
25        MR. BIONDO: Objection to form.  Go ahead.

AA COURT REPORTERS 412-288-5370     Page 105

1  A.    I don't recall any of that.
2    BY MR. JUBAS:
3  Q.    Okay.  I handed you an exhibit with regards to
4  cellphone evidence that you were requesting.  Or did I
5  not?
6  A.    Yeah.  Exhibit 1.
7  Q.    Okay.  That's Exhibit 1.  Does it -- does that
8  follow -- that's a followup report.  Was that followup
9  authored by you?
10 A.    Yes.
11      MR. BIONDO: It's Exhibit 4, I think.
12 A.    746.  Exhibit 1?
13     BY MR. JUBAS:
14 Q.    Okay.  And the front page of Exhibit 1, that was
15 authored by you?
16 A.    Yes.
17 Q.    The next page, if you could, and what number is
18 at the bottom of that?
19 A.    000747.
20 Q.    Okay.  And do you provide any contact
21 information for the requested information to be sent to?
22 A.    I believe I gave him possibly my cell or email
23 or possibly one of the lead detective's on the case.
24 Q.    Can you read that part into the record, please,
25 where you provide contact information?

AA COURT REPORTERS 412-288-5370     Page 106

1  A.    I'm sorry.  This information can be faxed to
2  412-473-1375 or emailed to me, michael.hoffman to --
3  @alleghenycounty.us.
4  Q.    Do you recall whether you received an email with
5  that information?
6  A.    I don't recall.
7  Q.    Jumping back and forth again, do you know what a
8  statute of limitations is?
9  A.    Yeah.  It's the amount of time that you have to
10 have something completed.
11 Q.    Do you know what in particular you have to have
12 completed?
13 A.    For prosecutions?  Is that what you're talking
14 about?
15 Q.    Yes.
16 A.    Yeah.
17 Q.    Do you know what the Pennsylvania statute of
18 limitation is on a drug case?
19 A.    I'm not sure.
20 Q.    Are you trained on statutes of limitation?
21 A.    Yeah.  But that was years ago.
22 Q.    Does a statute of limitation ever come into your
23 consideration when you're investigating a case?
24 A.    Not so much investigating.  As far as
25 prosecuting, like the rule 600.

AA COURT REPORTERS 412-288-5370     Page 107

1  Q.    Can you explain your thought process when it
2  comes to rule 600?
3  A.    365 days.
4  Q.    So, you have 365 days to prosecute from the time
5  that they were charged?
6  A.    Yes.
7  Q.    Does it refresh your recollection if you were to
8  learn that Pennsylvania has a two-year statute of
9  limitations for a drug case?
10 A.    Okay.  I believe you.
11 Q.    So, you're just taking my word for it?  That's
12 not something that rings any bells for you?
13 A.    I always thought it was like one and a half, two
14 years.
15 Q.    And you were ordered to revitalize the 2013 case
16 in 2016; right?
17 A.    Correct.
18 Q.    You would agree with me that's more than two
19 years?
20 A.    Yes.
21 Q.    Were there any discussions between you or any of
22 the detectives involved or the supervisors about the
23 2013 case being beyond the statute of limitations?
24 A.    Yes.  I did ask him if it was a good case, if we
25 were allowed to do it, and Kevin Chernosky and Law

AA COURT REPORTERS 412-288-5370     Page 108

1  Claus -- I don't know if you know him -- they made --
2  they assured me it was good to go, for lack of a better
3  phrase.
4  Q.    Do you recall the context of how you brought
5  that up to them?
6  A.    Yeah.  I asked them -- I said this is kind of a
7  while ago and they said it's alright for the fact that
8  the case was withdrawn due to the detective not showing
9  up for court.
10 Q.    Was that an initial concern for you, that it was
11 a little too old to be prosecuting?
12 A.    Yes.
13 Q.    Was that a situation where you followed chain of
14 command rather than your own intuition?
15 A.    Well, that's why I questioned Law Claus and
16 Kevin Chernosky and they assured me that we were able to
17 prosecute.
18 Q.    And do you recall whether that discussion took
19 place before or after you had revitalized it?
20 A.    It was before.
21 Q.    Were you instructed by the DA's office or were
22 you instructed by one of your supervisors to revitalize
23 the 2013 case?
24 A.    I was instructed -- it was actually Kevin
25 Chernosky and Lieutenant Schurman.

Case 2:22-cv-00196-CB   Document 79-8   Filed 07/01/24   Page 29 of 50

CHERON SHELTON/ROBERT THOMAS v.                    MICHAEL HOFFMAN
COUNTY OF ALLEGHENY, et al.                           May 21, 2024

AA COURT REPORTERS 412-288-5370                    Page 109

1 Q.   Together?
2 A.   Together, if I recall correctly. Yes.
3 Q.   Did you have any separate conversations with
4 Lieutenant Schurman without Chernosky being there about
5 your concerns about the case being too old?
6 A.   No.
7 Q.   Was the only time that you voiced your concerns
8 about the age of the case when you had a discussion with
9 Schurman and Chernosky about it?
10 A.   Yes.
11 Q.   And just for -- to clear up. I apologize if I
12 already asked you this. Was the instruction to you to
13 revitalize the case given at this meeting with Chernosky
14 and Schurman?
15 A.   Yes. If I recall correctly, they both came to
16 me and asked me and my partner to -- presented the case
17 to us. I asked him about the dates and I'm like what
18 happened. Then when they brought up the fact that the
19 case had been withdrawn for the fact that the officer
20 did not show up for the case -- and I stressed the
21 situation -- I said we're good to go with this for the
22 fact that I don't want later on for this to come back
23 and, for lack of a better term, bite us in the ass.
24 Q.   Is it fair to say that there was a little
25 self-interest involved in that?

AA COURT REPORTERS 412-288-5370                    Page 110

1      MR. BIONDO: Objection to form. But go ahead
2 and answer, if you can.
3 BY MR. JUBAS:
4 Q.   Just to clarify, I don't mean that in -- in any
5 sort of negative way. I mean that in the sense of, hey,
6 I don't want this to come back on my ass kind of way.
7 A.   No. No. No. First or foremost with me is the
8 case. I don't want this to come back and possibly
9 affect the homicide case as well as our office and then
10 possibly -- and then later on, we go in front of a judge
11 where we look like idiots. You now what I mean? Our
12 credibility is shot. I'm not about that.
13 Q.   Would you agree that you were instructed to
14 revitalize the case in approximately late March 2016?
15 A.   Yes.
16 Q.   When you were instructed to do this, was this
17 the first time that a discussion about the 2013 case had
18 come up in the investigation?
19 A.   As far as I know, yes.
20 Q.   When you were having this discussion with
21 Chernosky and Schurman, was it mainly just involving one
22 of them? Did they both chime in?
23 A.   If I recall correctly, they both kind of chimed
24 in.
25 Q.   Would you agree that the reason for the 2013

AA COURT REPORTERS 412-288-5370                    Page 111

1 case was to arrest Rob Thomas?
2      MR. BIONDO: Objection to form. But go ahead
3 and answer, if you can.
4 A.   If I recall correctly, it was for Cheron Shelton
5 and Thomas, to get them both off the street and for
6 possibly questioning.
7 BY MR. JUBAS:
8 Q.   So, if Shelton was already in jail, would you
9 agree that, practically, the 2013 case would have been
10 the purpose of arresting Rob Thomas?
11     MR. BIONDO: Objection to form. Go ahead and
12 answer.
13 A.   I couldn't even recall if at the time Cheron was
14 locked up at the time.
15 BY MR. JUBAS:
16 Q.   That's what I'm representing to you.
17 A.   That, I can't recall.
18 Q.   I'm representing that to you.
19 A.   I got you.
20 Q.   So, since he was already arrested, is it fair to
21 say that the purpose for the 2013 case was to arrest Rob
22 Thomas?
23     MR. BIONDO: Object to form. Go ahead and
24 answer, if you can.
25 A.   If he was locked up at the time, I would

AA COURT REPORTERS 412-288-5370                    Page 112

1 probably say so. Was Cheron locked up? I'm going to
2 ask you that. I know I'm not supposed to be asking.
3 Was Cheron locked up for this incident or for a search
4 warrant or something --
5 BY MR. JUBAS:
6 Q.   Probation violation.
7 A.   Okay.
8 Q.   So, he was locked up for a probation violation
9 in about the third week of March.
10 A.   Okay. That's what I was going to ask. I got
11 you. I got you 100 percent.
12 Q.   You charged Rob Thomas on the 5th or the 6th of
13 April.
14 A.   I got you. I got the timeline.
15 Q.   So, now that we have that pinned down, you would
16 agree with me that, practically speaking, the 2013 case
17 had the purpose of arresting Rob Thomas?
18     MR. BIONDO: Objection to form. Go ahead and
19 answer.
20 A.   Yes. Get him off the street.
21 BY MR. JUBAS:
22 Q.   And interview him about it?
23 A.   Yes.
24 Q.   About his suspected involvement in the
25 Wilkinsburg massacre?

CHERON SHELTON/ROBERT THOMAS v.
COUNTY OF ALLEGHENY, et al.

MICHAEL HOFFMAN
May 21, 2024

1  A.     I don't know about the suspected involvement.
2  It was my understanding we were going to talk to Justin
3  Gomez, Ashley Smith, if they had any knowledge about
4  anything that happened with the homicide, all of them.
5  I can't recall if -- whether or not if Thomas was
6  definitely a suspect, if I knew about it at that time.
7  Q.     Have you ever revitalized a case similar to this
8  in a separate case?
9  A.     No.
10 Q.     Is that one of the reasons that you were
11 concerned about it?
12 A.     No.  Not at all.
13 Q.     Subsequent to your involvement with revitalizing
14 the 2013 case and arresting Mr. Thomas, is this a tactic
15 that you've used since that time?
16        MR. BIONDO: Object to form. Go ahead and
17 answer, if you can.
18 A.     I've revitalized a case since then.
19 BY MR. JUBAS:
20 Q.     Would you still have the same concerns about
21 statute of limitations?
22 A.     Oh, yeah. That's going to be a concern, if
23 you're allowed to do it or not.
24 Q.     Do you recall what happened with the 2013 case
25 in this case?

1  A.     Yeah. Got withdrawn. I believe it was after a
2  suppression motion because one of the detectives failed
3  to testify that he saw the drugs in plain view, and that
4  was told to me by Judge Cashman.
5  Q.     Why didn't you just approach Rob Thomas to ask
6  him for an interview?
7         MR. BIONDO: Object to form. Go ahead and
8  answer, if you can.
9  A.     One, it wasn't part of my case. Like I said, I
10 can't recall if he was a suspect at that time, but I
11 think this was just a way to also get the other
12 individuals that were there as well to possibly, one,
13 like I said, get them off the street, and if we did
14 approach Thomas like I had with other cases where we ask
15 him, hey, you want to come talk to us, no, I don't want
16 to talk to you, and then they take off.
17 BY MR. JUBAS:
18 Q.     Are you aware of whether Thomas gave a statement
19 after being arrested on the 2013 case?
20 A.     I think he started talking and I do remember
21 Casey White being in the building.
22 Q.     Do you recall whether you had any conversations
23 with Detective Hitchings in preparation for the Rob
24 Thomas interview?
25 A.     I don't recall that at all.

1  Q.     Did you know that Detective Hitchings references
2  ReeRee's cellphone in his interview with Rob Thomas?
3  A.     No. I have no idea.
4  Q.     Are you saying that he didn't have a
5  conversation with you about ReeRee's cellphone?
6  A.     Not at all.
7  Q.     Is it fair to say that Detective Hitchings had
8  access to the Shaquan Roberts cellphone evidence if he
9  brought it up in the Robert Thomas interview?
10        MR. BIONDO: Objection to form. Go ahead and
11 answer, if you can.
12 A.     If the phone was downloaded at that time, I
13 would say so. Yes.
14        MR. JUBAS: We're going to take five.
15        (There was a pause in the proceedings.)
16 BY MR. JUBAS:
17 Q.     Detective Hoffman, Allegheny County Police,
18 there's a narcotics unit and a homicide unit; right?
19 A.     Right.
20 Q.     Why did the homicide unit charge the 2013 case?
21 A.     Just because it was part of the -- they wanted
22 to make it part of the homicide case and they knew I
23 used to work narcotics.
24 Q.     What's the connection between the 2013 case and
25 the 2016 Wilkinsburg massacre investigation?

1  A.     Cheron and Robert.
2  Q.     Are you saying that there's no evidentiary
3  connection between the two?
4  A.     No.
5  Q.     Just the suspects?
6  A.     Correct.
7  Q.     You were involved in charging Rob Thomas for the
8  2013 case; right?
9  A.     Yes.
10 Q.     Why didn't you just charge him for the
11 Wilkinsburg massacre?
12        MR. BIONDO: Objection to form.
13 A.     I wasn't working that part of the case and I
14 don't believe it came to that yet.
15 BY MR. JUBAS:
16 Q.     When you say that you don't believe it came to
17 that yet, what do you mean?
18 A.     I don't believe they had completed their
19 investigation as far as charging.
20 Q.     Do you recall whether you asked Lieutenant
21 Schurman and Chernosky about that?
22 A.     No.
23 Q.     Do you recall whether it was the intention of
24 your supervisors to incarcerate Rob Thomas with
25 jailhouse witnesses?

AA COURT REPORTERS 412-288-5370                     Page 117

1  A.    No.
2        MR. BIONDO: Objection to form. Go ahead.
3  BY MR. JUBAS:
4  Q.    Have you ever known Allegheny County Police
5  officers to do that?
6  A.    To purposefully arrest somebody and put them
7  with a jailhouse witness?
8  Q.    Yes.
9  A.    No.
10 Q.    So, when Rob Thomas was arrested on the 2013
11 case, you would agree with me that he was not charged
12 with the Wilkinsburg massacre at that time?
13 A.    That's right.
14 Q.    Did you become aware that shortly after he was
15 arrested, two jailhouse witnesses came forward saying
16 that he provided them a full confession?
17 A.    I was aware that there were jailhouse witnesses.
18 Yes. I didn't know their names or what was said.
19 Q.    Have you ever worked with jailhouse witnesses on
20 a case?
21 A.    No.
22 Q.    Why not?
23 A.    Because nobody's ever come forward to say hey, I
24 just talked to somebody and they admitted something.
25 Q.    Did you -- were you surprised to learn that Rob

AA COURT REPORTERS 412-288-5370                     Page 118

1  Thomas confessed to two jailhouse witnesses for a crime
2  that he wasn't yet charged with?
3        MR. BIONDO: Objection to form. But go ahead
4  and answer, if you can.
5  A.    I'm not surprised when anybody goes down to the
6  jail and tells their celly or their friends possibly
7  that they did something.
8  BY MR. JUBAS:
9  Q.    Do you think that would be stupid?
10 A.    Do I think that's dumb? Oh, yeah.
11 Q.    So, are you saying that you never had any
12 interactions with Freddy Collins?
13 A.    I don't know who that is. Is he the other
14 witness?
15 Q.    Or Kendall Mikkell?
16 A.    That's the only one I heard named.
17 Q.    So, you have heard prior about Kendall Mikkell?
18 A.    Yeah.
19 Q.    In what context did you know about Kendall
20 Mikkell?
21 A.    That he was one of the jailhouse snitches and I
22 guess he, I guess, went south on them.
23 Q.    Do you recall about approximately when, what
24 year you learned that?
25 A.    Yeah. Right after he did it. The trial.

AA COURT REPORTERS 412-288-5370                     Page 119

1  Q.    It was during the trial in 2020?
2  A.    Yes.
3  Q.    Do you recall the context of what was being
4  discussed among homicide detectives when he did go
5  south?
6  A.    No. Just the fact that I guess he went south
7  and told Randall McKinney, I guess, some stuff.
8  Q.    Have you ever used the district attorney's bank
9  account to pay witnesses?
10       MR. BIONDO: Objection to form. Go ahead and
11 answer, if you can.
12 A.    I've never used the district attorney's. The
13 state AG's, they have a witness protection program.
14 They're the ones I've used.
15 BY MR. JUBAS:
16 Q.    Did you know about the district attorney's bank
17 account for paying witnesses?
18       MR. BIONDO: Objection to form. Go ahead.
19 A.    I knew they had money to -- for like not per se
20 witnesses to pay them like the ones in the jail. Like
21 to fly people back and forth and put them in hotel
22 rooms.
23 BY MR. JUBAS:
24 Q.    And you've never used that before?
25 A.    I've never used the DA's office. I always used

AA COURT REPORTERS 412-288-5370                     Page 120

1  the AG's.
2  Q.    Were you aware of any discussions among homicide
3  detectives in this case about paying witnesses?
4  A.    No.
5        MR. BIONDO: Objection to form.
6  A.    No.
7  BY MR. JUBAS:
8  Q.    Were you trained on how to conduct interviews?
9  A.    I went through some classes. A lot of it's just
10 watching people and sitting in on them.
11 Q.    Were you ever trained or did you receive
12 experiential training on using charges to pressure a
13 witness into cooperating in an investigation?
14       MR. BIONDO: Objection to form. Go ahead and
15 answer, if you can.
16 A.    I've had it where if it's like a minor charge
17 and possibly looking at two years or something like a
18 year in jail and they don't want to do it, it's not so
19 much -- you can explain to them that, hey, you know, if
20 you help us out. You're more or less explaining their
21 options to them that possibly we could talk to the DA or
22 probation officer or judge down the road, possibly help
23 you out. We could tell them, hey, he did help us out.
24 BY MR. JUBAS:
25 Q.    Do you recall having interactions like that with

CHERON SHELTON/ROBERT THOMAS v.
COUNTY OF ALLEGHENY, et al.

MICHAEL HOFFMAN
May 21, 2024

---

AA COURT REPORTERS 412-288-5370                    Page 121

1  Shaquan Roberts during his interview?
2  A.    Yes. I do.
3  Q.    Would it have been possible for you to just not
4  charge Shaquan Roberts if he was willing to cooperate
5  against Cheron Shelton?
6  A.    I could have done that, but I don't make
7  promises and I don't like doing that unless I consult
8  with the DA's office and I always make them aware of the
9  fact.
10 Q.    Do you ever provide nonpublic information to
11 somebody that you're interviewing about a particular
12 investigation?
13        MR. BIONDO: Objection to form. Go ahead and
14 answer, if you can.
15 A.    No.
16 BY MR. JUBAS:
17 Q.    Why not?
18 A.    Because God forbid they do get out or go down
19 the jail, then they start passing off that information,
20 hey, this detective just told me this, and you could put
21 the investigation in jeopardy, or someone's life.
22 Q.    Do you recall where Shaquan was incarcerated
23 after you arrested him?
24 A.    Only thing I knew, he went down to the county
25 jail. I don't know where he went after that for

---

AA COURT REPORTERS 412-288-5370                    Page 122

1  probation violation. He had been incarcerated prior to
2  that at SCI Mercer.
3  Q.    Are you saying that in this circumstance, you
4  wouldn't have wanted to provide Shaquan with nonpublic
5  information about the investigation because he then may
6  have been able to go and give that information to
7  somebody in ACJ?
8  A.    Yes.
9  Q.    And that was on March 15th?
10 A.    I believe so. I guess.
11 Q.    Okay.
12 A.    I'm not sure of the date.
13 Q.    So, you didn't provide him with nonpublic
14 information because you wouldn't want him to be in ACJ
15 saying this is what I know about the Wilkinsburg
16 massacre?
17 A.    Or on the phones or anything like that.
18 Q.    Okay. So, what we are going to do is we are
19 going to play the interview. And this is a sound bar.
20 Hopefully to some extent, this helps us hear it and
21 we'll just go ahead and pause it at certain places and
22 ask questions. Did you review the interview as part of
23 your review for preparation for this?
24 A.    No.
25 Q.    Okay. When detectives are interviewing a

---

AA COURT REPORTERS 412-288-5370                    Page 123

1  witness, is it important for you to tell the truth when
2  you're talking about facts with a witness?
3        MR. BIONDO: Objection to form. Go ahead and
4  answer.
5  A.    I'm not -- there are times that we have -- I
6  don't want to say lie to them, but we didn't tell them
7  everything or we didn't tell them exactly what happened
8  because you could possibly find out, you know, if they
9  do know anything, they correct us or point out like, no,
10 no, no, that's not what happened.
11 BY MR. JUBAS:
12 Q.    Could you get in trouble if you're telling a lie
13 to a witness during an interview?
14        MR. BIONDO: Objection to form.
15 A.    No. No.
16 BY MR. JUBAS:
17 Q.    Why is that?
18 A.    It's like a technique to see if they do know or
19 maybe a little coercion would get them to possibly talk
20 to you a little bit.
21 Q.    Okay. Have you ever known -- in your experience
22 as a police officer, have you ever known another police
23 officer to have committed a crime while on duty?
24 A.    No.
25 Q.    Do you recall telling Mr. Roberts, Shaquan

---

AA COURT REPORTERS 412-288-5370                    Page 124

1  Roberts, that gangs and police are similar?
2  A.    Kind of.
3  Q.    With that being the understanding of what you
4  said, what did you mean by that?
5  A.    We talk amongst each other, stressful
6  situations, talk about certain things that are going on.
7  Q.    And why -- to the extent that you remember, why
8  would that have come into your interaction with Shaquan
9  Roberts?
10 A.    I think the only thing I was talking about was
11 Hilltop because they're a known group when I was back in
12 Homewood. They had their own gang.
13 Q.    So, was it basically you saying I know how
14 communications go among groups?
15 A.    No. I just know that like people talk, that we
16 talk amongst ourselves about stuff. I know they talk
17 about themselves. Did you ask if I reviewed Shaquan's?
18 Q.    Yes.
19 A.    Yes, I did.
20 Q.    You did review the interview?
21 A.    I did review Shaquan's.
22 Q.    Okay. Okay.
23 A.    We were talking about Robert Thomas.
24        MR. BIONDO: I think we jumped from Thomas back
25 to Shaquan.

---

CHERON SHELTON/ROBERT THOMAS v.
COUNTY OF ALLEGHENY, et al.

MICHAEL HOFFMAN
May 21, 2024

AA COURT REPORTERS 412-288-5370                                    Page 125

1  A.     Yeah.
2         MR. JUBAS: So, I'm getting the interview ready.
3  We can go off the record.
4         (There was a pause in the proceedings.)
5  BY MR. JUBAS:
6  Q.     Would you agree with me that I am showing you a
7  video that at this point is in an interview room at
8  Allegheny County Police?
9  A.     Yes.
10 Q.     Is this headquarters?
11 A.     It was at the time.  Yes.
12 Q.     And I haven't hit play yet.  Can you see it says
13 2:06 PM?
14 A.     Yes.
15 Q.     Do you see that man in the orange shirt there?
16 A.     Scott Town.
17 Q.     Scott Town.  Okay.  So, I'm going to push play
18 and hopefully his is loud enough for you.  I'm pausing
19 it at 2:07:07 PM, and a few seconds before this, is it
20 accurate to say that you identified Pat Miller as being
21 outside the interview room?
22 A.     Yes.
23 Q.     Okay.  Do you recall, prior to your interview
24 with Shaquan Roberts, whether you had any conversations
25 with Pat Miller about him?

AA COURT REPORTERS 412-288-5370                                    Page 126

1  A.     Huh-uh.  I don't recall.
2  Q.     Do you recall whether you had any conversations
3  with Pat Miller about Shaquan Roberts after the
4  interview?
5  A.     No.
6  Q.     I'm pushing play.  I'm going to pause at 2:07:22
7  PM and I'm just going to fast-forward.
8  A.     That's fine.
9         MR. PETRUNYA: We're not going to make you watch
10 the whole thing.
11 A.     Oh.  Really?
12        MR. PETRUNYA: No.  Not the whole thing.
13 A.     Good.  I hate my voice.
14        MR. PETRUNYA: Same.
15 BY MR. JUBAS:
16 Q.     Pushing play at 2:34:07 PM.  I paused at 2:34:28
17 PM.  I know that's still muffled, but were you able to
18 make that out?
19 A.     Yes.  He went and asked who he was.
20 Q.     So, we'll keep this close to you.  Pushing play
21 at 2:34:43 PM.  Are you able to make any of that out?
22 A.     He said he lives in McKeesport.
23 Q.     We're going to fast-forward.  This was just
24 Detective Town getting some basic info; right?
25 A.     Yep.

AA COURT REPORTERS 412-288-5370                                    Page 127

1  Q.     I'm pushing play at 3:19:44 PM.  I'm going to
2  fast-forward to about 3 minutes and 26 -- or I'm
3  sorry -- about 3:26 PM.  Pausing at 3:27 PM.  Did you
4  hear where he's referring to when he says I was already
5  up there?
6  A.     Ferris Court.
7  Q.     Is Ferris Court part of Hilltop?
8  A.     Yes.
9  Q.     So, is it fair to say that Shaquan Roberts
10 placed himself in Nolan Court on the night of the
11 massacre?
12 A.     Prior to, yes.
13 Q.     In the Hilltop prior to the massacre?
14 A.     Hilltop.  Right.
15 Q.     Pausing at 3:28:01 PM.  Did you hear Shaquan say
16 that he got to the Hilltop the day before Wednesday?
17 A.     Correct.
18 Q.     So, is it fair to say that Shaquan got to
19 Hilltop on March 8th?
20 A.     Uh-huh.
21 Q.     And then was also in the Hilltop on March 9th?
22 A.     Yes.
23 Q.     Okay.  Okay.  So, I'm pausing at 3:29:38 PM, and
24 did you hear Shaquan briefly describe the people that he
25 was with on March 9th?

AA COURT REPORTERS 412-288-5370                                    Page 128

1  A.     Yes.
2  Q.     And did you hear him say that they were all from
3  Hilltop, as well?
4  A.     Yes.  Yes.
5  Q.     Pushing play.  Pausing at 3:31:19 PM.  Did you
6  just hear Shaquan say that he went with these people to
7  IHOP in Waterfront on that evening?
8  A.     Yes.
9  Q.     So, I'm going to fast-forward now to 3:53.
10        MR. BIONDO: What time was that paused at?
11        MR. JUBAS: That was paused at 3:31:19 PM.
12 BY MR. JUBAS:
13 Q.     We're going to fast-forward now to 3:53 PM.
14 Pressing play at 3:53:07 PM.  I'm pausing at 3:53:53 PM.
15 Is that Detective Caruso with you?
16 A.     Yes.
17 Q.     And that's your partner?
18 A.     Yes.
19 Q.     Would you agree with me that shortly before I
20 paused, Detective Caruso asked Shaquan who's Whiz?
21 A.     Yes.
22 Q.     Do you recall whether you and Caruso had
23 conversations about Whiz prior to the beginning of the
24 interview?
25 A.     I don't recall.

CHERON SHELTON/ROBERT THOMAS v.
COUNTY OF ALLEGHENY, et al.

MICHAEL HOFFMAN
May 21, 2024

AA COURT REPORTERS 412-288-5370                          Page 129

1  Q.   Do you know who Whiz is?
2  A.   Cheron.
3  Q.   Pushing play. Did you hear that?
4  A.   No. Something -- something --
5  Q.   Make sure we get that. So, pausing at 3:54:08,
6  we're going back and we might have to go back a little
7  further, but I want to make sure that we get that part.
8  Pausing at 3:53:35 PM. Did you hear yourself ask him if
9  he's looking at two years and whether he wants to do
10 that time?
11 A.   Right.
12 Q.   And that's in line with what we had discussed
13 previously about not necessarily threatening somebody,
14 but giving them the opportunity to help themselves?
15 A.   The options. Yes.
16 Q.   Pausing at 3:54:03. Did you hear Shaquan
17 respond to Detective Caruso's question about Whiz with
18 you mean the person that you showed me a picture of
19 earlier?
20 A.   That I was shown a picture of. Yes.
21 Q.   Can you give me any insight into the picture
22 that he was shown?
23 A.   I have no idea, because if you hear me after
24 that, I say I have no idea.
25 Q.   That's what I thought. Did you ever get any

AA COURT REPORTERS 412-288-5370                          Page 130

1  clarity on who showed him a picture of who?
2  A.   I don't even think we got -- we went back and
3  asked about it to any detectives.
4  Q.   But is it fair to say that one of the detectives
5  showed him pictures of somebody?
6       MR. BIONDO: Object to form. Go ahead and
7  answer.
8  A.   It's possible based off of what he said.
9  BY MR. JUBAS:
10 Q.   Okay. I'm going to pause. Pausing at 3:55:52
11 to about 4 PM. Pushing play at 3:59:51 PM. Okay.
12 Pausing at 4:00:04 PM. Are you and Shaquan now
13 discussing Lamont Powell?
14 A.   Yes.
15 Q.   Did you hear Shaquan refer to Lamont as Murder?
16 A.   Yes.
17 Q.   Did you know that Lamont Powell's nickname was
18 Murder prior to this interview?
19 A.   No.
20 Q.   Pausing at 4 PM and 23 seconds. Did you hear
21 him tell you that he used to be with Lamont Powell a lot
22 and that Lamont told him that he has a lot of enemies?
23 A.   Yes.
24 Q.   To your understanding, does that mean that
25 Lamont Powell has a lot of enemies?

AA COURT REPORTERS 412-288-5370                          Page 131

1  A.   Yes.
2  Q.   Because of what he's done in the past?
3  A.   Possibly, yes.
4       MR. BIONDO: Objection to form.
5  A.   Possibly, yes.
6  BY MR. JUBAS:
7  Q.   Pushing play at 4:23 seconds PM. Paused at
8  4:00:56 PM. And there was more discussion about the
9  enemies that Lamont Powell had; right?
10 A.   Yes.
11 Q.   Okay. And did he indicate that any number of
12 people could have caught up with Lamont at a given time?
13 A.   Yes.
14 Q.   Meaning his enemies?
15 A.   Yes.
16 Q.   Is this -- is that statement that he just made,
17 is this pertinent to the Wilkinsburg massacre
18 investigation?
19 A.   Should we know that? Is that what you're
20 asking? Yes.
21 Q.   Okay. So, it's pertinent to the investigation?
22 A.   Yes.
23 Q.   And do you recall that a big part of Allegheny
24 County's theory when it came to the Wilkinsburg massacre
25 was that it was in retaliation for something that Lamont

AA COURT REPORTERS 412-288-5370                          Page 132

1  Powell did in the past?
2       MR. BIONDO: Objection to form. But go ahead
3  and answer, if you can.
4  A.   I wasn't aware of that, but I just knew that it
5  possibly had to do with Lamont had a lot of enemies.
6  So, I'm going to assume it was possibly something he did
7  in the past, but, yeah, we knew he had a lot of enemies.
8  Or that's what was told to us, I should say.
9  BY MR. JUBAS:
10 Q.   Okay. And just off of this, the fact that he's
11 discussing his previous knowledge of Lamont Powell and
12 Lamont's enemies, does that -- is that enough in and of
13 itself for this to be included within the Wilkinsburg
14 massacre investigation case file?
15      MR. BIONDO: Objection to form. Go ahead and
16 answer, if you can.
17 A.   What he said right here? I don't per se -- I
18 don't want to say it should be included in the file that
19 he said specifically that it's in the file for the fact
20 we did the interview, but we had already known prior to
21 this that he had a lot of enemies and it was assumed
22 that possibly this was a retaliation for what he did.
23 Q.   Okay. I'm pausing at 4 minutes -- 4:01:22 PM.
24 Do you recall whether Shaquan gave you consent to search
25 his phone?

1  A.    Yes.

2  Q.    I don't know that we need to stop and talk about

3  it. Do you recall talking to Shaquan during this

4  interview about whether Shaquan remembers you?

5  A.    Yeah.

6  Q.    What do you remember about your interaction with

7  Shaquan previous to this interview, or interactions?

8  A.    No details. All I remember is -- I remember his

9  name. When I remember his name, I remember kind of his

10 face but I don't -- I don't remember ever arresting him

11 or anything like that, anything negative. I think it

12 was just one of those again where we're up somewhere and

13 we're just talking to people.

14 Q.    It's paused at 4:01 and I am fast-forwarding to

15 4:14. Pushing play at 4:14 PM. I'm going to pause it

16 at 4:15. Fast-forward to 4:18. Did you hear upon you

17 reentering the room saying that you think that Shaquan's

18 holding back?

19 A.    Yeah.

20 Q.    What does that mean to you?

21 A.    Well, actually meant two things. One, we think

22 he did know more because they talk in the streets and

23 he's not telling us but also used it as a way of

24 reenforcing the fact that he doesn't really know what's

25 going on. So, that's when I get a little more

1  aggressive and I go at people, I think you're holding

2  back, you want to go away to jail. It's not a threat or

3  anything like that. It's just letting them know, hey,

4  showing me that you're telling me the truth. I believe

5  that's what he did.

6  Q.    Pushing play at 4:18:50. Pausing at 4:19:54 PM.

7  And did he say I swear to God that I don't know the

8  names of the people that were involved in the

9  Wilkinsburg massacre?

10 A.    Yes.

11 Q.    Pausing at 4:20:17 PM. You would agree with me

12 that you were currently asking about Whiz?

13 A.    Yes.

14 Q.    And that Detective Caruso just asked that you've

15 known Whiz for a long time; right?

16 A.    Yes.

17 Q.    Playing at 4:27 -- 4:20:18 PM. Pausing at

18 4:21:16 PM. Did you hear what you just asked him?

19 A.    Yes.

20 Q.    What did you just ask him?

21 A.    Do you know what he's driving around.

22 Q.    And then did you have a followup to that?

23 A.    Yes. I said he was driving a white Lincoln.

24 Q.    You told him that Cheron was driving a white

25 Lincoln?

1  A.    Right.

2  Q.    And you would agree with me that he didn't tell

3  you that?

4  A.    Correct.

5  Q.    So, would you agree with me that you just

6  provided him a detail of the investigation?

7  A.    I provided him information that we were told

8  that he was possibly driving a car and what kind of car

9  it was.

10 Q.    And where did that information come from?

11 A.    I cannot recall.

12 Q.    Did that come from the investigation?

13 A.    That's possible. Yeah.

14 Q.    Did you -- are you aware that the vehicle that

15 Cheron is alleged to have driven that night was a white

16 Lincoln

17 A.    Okay. I didn't know that. I don't remember

18 that. Let me put it that way.

19 Q.    Does it seem like you were aware of that at the

20 time of this interview?

21 A.    Aware of the fact that he was driving a white

22 Lincoln.

23 Q.    Because you provided that information to

24 Shaquan; right?

25 A.    Yeah. Yes.

1  Q.    Okay. Pushing play at 4:21:16. Pausing at

2  4:22:25 PM. Would you agree that you guys are

3  pressuring him trying to get him to give you more

4  information than he's given previously?

5  A.    Yes. Possibly find out if he does have any more

6  information.

7  Q.    Okay. Pushing play. I am pausing at 4:32:22

8  PM. Fast-forwarding to about 4:31 PM. Pushing play at

9  4:30:18 PM. Pausing at 4:31:20 PM. Did you hear him

10 just say to you what you're doing is you're trying to

11 get more information than I got?

12 A.    Yes.

13 Q.    I'm pausing at 4:32:23 and fast-forward to 4:37.

14 Pushing play at 4:37:09 PM. Pausing at 4:39:22 PM. Did

15 you hear yourself say that you were in the homicide unit

16 when Caleo was killed and you learned who did it?

17 A.    No. We heard who did. Yeah. I wasn't there.

18 I was probably thinking of another homicide.

19 Q.    So, you were mistaken when you told him that you

20 had previous awareness that Lamont Powell killed Kevin

21 Doswell?

22 A.    Yeah. I wasn't lying.

23 Q.    How do you know that you don't recall or you

24 misremembered?

25 A.    How do I what?

CHERON SHELTON/ROBERT THOMAS v.
COUNTY OF ALLEGHENY, et al.

MICHAEL HOFFMAN
May 21, 2024

1 Q.    You're saying you misremembered that?
2 A.    Yeah. Because I remember when I was reviewing
3 the interview, Doswell, and I looked it up -- I looked
4 it up and I was like shit, I wasn't there for that, I
5 must have been thinking of another homicide.
6           MR. JUBAS: Pushing play 4:39:22 PM. Pausing at
7 4:40:34. And that should do it for the interview. I'm
8 going to take five minutes here off the record, see if
9 there's any other questions.
10          (There was a pause in the proceedings.)
11 BY MR. JUBAS:
12 Q.    Do you recall testifying at a November 7, 2017
13 hearing in this matter?
14 A.    No. No.
15 Q.    It was regarding the 2013 case.
16 A.    Oh. Was it a prelim or was it --
17 Q.    Yeah. It was a pretrial motion.
18 A.    Okay. Yes.
19 Q.    Did you review any of the 2013 case information
20 in preparation for today?
21 A.    Some of the stuff.
22 Q.    Do you recall what role Detective Knox in the
23 Wilkinsburg Police Department played in the 2013 case?
24 A.    Yeah. Knox was the original detective that I
25 believe wrote out the search warrant for the residence.

1 He met with the probation officer to go to the
2 residence. He stated in his report that he had seen
3 drugs and heroin in plain view.
4 Q.    So, his observation was critical to the case?
5 A.    Correct.
6 Q.    One moment. So, I'm going to ask you to read
7 part of this transcript into the record. I'm showing
8 you page 76 and I'm going to ask you just to start
9 reading at line 18 on page 76. I'm actually going to
10 ask you to read 77, as well, and into page 78. Okay?
11 A.    Okay.
12 Q.    So, I'll stop you. Okay. Starting with
13 line 18. And, also, I can -- we can zoom in on that.
14 A.    Line 18 on 76?
15 Q.    Yes.
16 A.    Detective Knox still employed with the
17 Wilkinsburg Police Department, Robert Thomas was
18 arrested the third time on April 6, 2016. The answer is
19 no. Who told you that? We actually went out and talked
20 to Detective Knox. We also talked to Cookie Coleman the
21 chief of the Wilkinsburg Police. Question: When did
22 you talk to Detective Knox? My answer: It was about
23 two weeks after the arrests were made. Question: Two
24 weeks after the arrest and you wrote a report about your
25 conversation with Detective Knox? Answer: It is a very

1 vague report. We did not. Very vague interview I guess
2 you would say.
3           Question: Where did the interview take place?
4 My answer: Elementary school in Wilkinsburg. Question:
5 Who was all there? My answer: Myself and Detective
6 Caruso. Question: How long did this interview take
7 place? My answer: About five minutes. Question: And
8 when you say it was vague, can you explain to me why
9 this interview was vague? 18, we walked in, he knew who
10 I was. Officers are saying he wasn't aware who we were
11 because he had issues with like his physical ability and
12 stuff and we explained to him why we were there, showed
13 him the case and he remembered the case. We asked him
14 if he would be available for court and he stated he
15 would. Keep going?
16 Q.    Yeah.
17 A.    And this conversation lasted about five minutes?
18 Answer: About that. Keep going?
19 Q.    Yeah.
20 A.    Question: Okay, and you didn't go back to
21 police headquarters and generate a report after having
22 discussion with the affiant from the 2013 case? Answer:
23 No. Question: Why not? Answer: Because we chalked it
24 up to just police officers being police officers and we
25 made him aware that we would probably be going to be

1 subpoenaing him for the next hearing which never
2 happened. Question: Did you subpoena him for the
3 preliminary hearing held down the hall? No. Question:
4 Why not? Because we didn't talk to him yet -- or I'm
5 sorry -- we didn't talk to him, might have been a little
6 after that. I said it is a couple weeks. I'm not
7 exactly sure of the time when it happened but it was
8 after the preliminary hearing we had.
9 Q.    Okay. That's good.
10 A.    That's it?
11 Q.    Now, when you said you just chalked it up to
12 cops being cops, do you recall what you meant by that?
13 A.    Yeah. We had been told by detectives on the
14 scene, Wilkinsburg detectives, that Chuck Knox was not
15 in his right mind, that he wouldn't talk to us, he
16 wouldn't even know who we were. So, we decided to prove
17 them wrong and go talk to him. So, we found him at the
18 elementary school, walked inside, and he knew who I was
19 right away. We explained why we were there like I said
20 in the statement, asked him if he would be available for
21 court at a later date. He stated he would. So, we were
22 able to get his name and phone number at that time.
23 Q.    What do you mean by cops being cops?
24 A.    Just the fact that trying to find out if he
25 would be available for court and just be -- I had known

AA COURT REPORTERS 412-288-5370                    Page 141

1    him for years.
2 Q.    You had known him for years?
3 A.    Yeah.
4 Q.    Why didn't you talk to him beforehand before you
5    charged?
6 A.    At the time, we were going based off the
7    information that we had, and then it was after that that
8    I knew he had left the Wilkinsburg Police Department and
9    then we had found out talking to the officers, Detective
10    Minton was one of them, stated that he left because he
11    didn't get along with the chief, and then he said Mike,
12    he's got some issues, he probably won't remember you,
13    he's probably not going to remember any of this.  I
14    said, well, we're going to find out.  So, and that's
15    when we decided to go talk to him.
16 Q.    And you're saying that he seems like he had his
17    wits about him?
18 A.    Oh, yeah.  I walked in.  He was very aware of
19    who I was.  I explained the case to him and he literally
20    started like talking back what the case was about, and I
21    said yeah, exactly.  So, what I mean by the cops being
22    cops, it wasn't per se like a formal thing I was
23    directed to go there and talk to him.  I went there as
24    myself as like Chuck's friend and formal -- like we used
25    to work close because Wilkinsburg, zone 6 -- zone 5

AA COURT REPORTERS 412-288-5370                    Page 142

1    touch each other.  So, I went to find out for myself and
2    also to relay to the DA's office would he be available
3    for court.
4 Q.    Okay.  Do you recall when you learned that other
5    police officers were questioning whether he was all
6    there mentally?
7 A.    When we got the reports at the Wilkinsburg
8    Police Department, it was Detective Minton and a couple
9    other detectives that were telling us, oh, yeah, you're
10    never going to find Chuck, he ain't going to talk to
11    you, he ain't going to remember you.  So, whenever I got
12    the report.  I believe it was the end of March,
13    beginning of April.
14 Q.    Did the fact that other officers were indicating
15    some sort of mental problems with Knox, did that ever
16    cause any concern for you with regards to revitalizing
17    the case?
18 A.    Not at all, because we also had Detective Minton
19    and it also stated in the report that Detective Minton
20    and another detective had also seen the stuff underneath
21    the sink in plain view and that's how we were able to
22    get through the prelim.
23         MR. JUBAS: That does it for me.
24              - - - -
25              EXAMINATION

AA COURT REPORTERS 412-288-5370                    Page 143

1              - - - -
2    BY MR. PETRUNYA:
3 Q.    Do you need to take a break?
4 A.    No.  I'm good.
5 Q.    Okay.  We had talked when you talked to my
6    co-counsel earlier -- do you want me to just call you
7    Mike or --
8 A.    Mike's good.
9 Q.    You indicated that you had been involved in law
10    enforcement for 31 years; is that correct?
11 A.    Correct.
12 Q.    It's eight years from the time the Wilkinsburg
13    massacre was perpetrated in 2016; is that fair?
14 A.    Yes.
15 Q.    So, 31 minus eight puts us at?
16 A.    23.
17 Q.    23?  Okay.  You worked, then, in law enforcement
18    for 23 years in some capacity before the Wilkinsburg
19    massacre occurred; correct?
20 A.    Yes.
21 Q.    In the 23 years before the Wilkinsburg massacre
22    occurred, is it my understanding that in your capacity
23    as a law enforcement officer either working in homicide
24    or other parts, you had never revitalized a prior case
25    to arrest someone?

AA COURT REPORTERS 412-288-5370                    Page 144

1 A.    Correct.  Not that I can recall.
2 Q.    Okay.  And then in the eight years subsequent to
3    the Wilkinsburg massacre case in 2016, is it fair that
4    you have not revitalized another case to arrest someone?
5 A.    Right.  Yes.
6 Q.    Okay.  2016, you indicated that there was a
7    meeting which occurred between you, Schurman and Kevin
8    Chernosky related to recharging the 2013 case; correct?
9 A.    Yes.
10 Q.    You had worked in the City of Pittsburgh prior
11    to coming to Allegheny County; correct?
12 A.    Yes.
13 Q.    The City of Pittsburgh has its own homicide
14    department; correct?
15 A.    Yes.
16 Q.    That homicide department is still subject to the
17    jurisdiction of the Allegheny County District Attorney's
18    Office; correct?
19 A.    Yes.
20 Q.    So, the process by which homicide detectives
21    would go about charging individuals in the City of
22    Pittsburgh is more or less similar to the way it works
23    in the county having to have it approved by the DA;
24    correct?
25 A.    Yes.

CHERON SHELTON/ROBERT THOMAS v.
COUNTY OF ALLEGHENY, et al.

MICHAEL HOFFMAN
May 21, 2024

AA COURT REPORTERS  412-288-5370                    Page 145

1    MR. BIONDO: Objection to form.
2  A.    Yes.
3  BY MR. PETRUNYA:
4  Q.    In your career working in homicide -- strike
5  that.
6        In your career in the City of Pittsburgh, had
7  you had any meetings with the district attorney and your
8  supervisor to discuss revitalizing or recharging
9  individuals?
10  A.    While I was in Pittsburgh?
11  Q.    Yes.
12  A.    Not that I recall.
13  Q.    In your career leading up to the Wilkinsburg
14  massacre -- so, up to 2016 -- had you ever had meetings
15  which involved your supervisor and the district attorney
16  concurrently?
17  A.    Yes.
18  Q.    What was the context of those meetings or when
19  did that occur?
20  A.    They occurred -- mostly they were
21  police-involved incidents, shootings and stuff like that
22  in the homicide unit.
23  Q.    Was it the first time -- strike that.
24        We know this was the first time you were
25  involved in a meeting with the district's attorney's

AA COURT REPORTERS  412-288-5370                    Page 146

1  office and your supervisor to recharge someone for a
2  prior case. Did you have an understanding when you were
3  called into this meeting of what the purpose of it was
4  or who you were going to be meeting and why?
5  A.    They actually walked up -- I'm trying to
6  recollect it. I remember sitting at my desk and
7  Kevin -- I want to say Kevin and Lieutenant Schurman
8  walked up to us because my partner Mike Caruso's desk
9  was close by. Hey, we got something for you guys, and
10  that's when they both started telling us like what was
11  going on.
12  Q.    Do you have an understanding or do you have any
13  information about whose idea it was to actually reopen
14  that 2013 case?
15  A.    Not at all.
16  Q.    You've worked as a lead detective on homicide
17  files; correct?
18  A.    Yes.
19  Q.    And you've worked as lead detective in the City
20  of Pittsburgh and Allegheny County; correct?
21  A.    Yes.
22  Q.    Now, earlier when we had discussed Shaquan
23  Roberts and how his -- he was identified in the case
24  file per se, you were indicating to me that he had his
25  own case file and that it was understood that if you

AA COURT REPORTERS  412-288-5370                    Page 147

1  needed information from Shaquan related to the
2  Wilkinsburg massacre, you could go directly to his case
3  file; correct?
4  A.    Correct.
5  Q.    Is it fair to say that the lead detective that
6  is responsible for the file itself is also responsible
7  for making sure that all of the evidence being evidence
8  directly linked to the file or evidence outside of the
9  file related to the file gets turned over to the
10  district attorney's office when the charges are brought?
11        MR. BIONDO: Objection to form. Go ahead and
12  answer, if you can.
13  A.    For that case, yes. Well, for any case?
14  BY MR. PETRUNYA:
15  Q.    Well, I guess in general in Allegheny County, is
16  it the responsibility of the lead detective to ensure
17  that all of the evidence gets turned over to the
18  prosecutor?
19  A.    Yes.
20  Q.    And so if you were the lead detective on a case,
21  then it is also your responsibility to understand where
22  the evidence is located and compile it; correct?
23  A.    Yes.
24  Q.    Now, in your work in Allegheny County, is it
25  common for you to have separate files open for

AA COURT REPORTERS  412-288-5370                    Page 148

1  individuals that may provide information related to
2  other cases?
3        MR. BIONDO: Object to form. Go ahead and
4  answer, if you can.
5  A.    Yes. What we've had is like individuals --
6  yeah. It would be like somebody getting arrested in
7  Penn Hills by the Penn Hills Police Department. They
8  come to our office and provide information on a
9  homicide. Their case would not be absorbed into us.
10  They would have their own separate case and we would get
11  copies of that if we're able to. But, yeah, I've had it
12  happen a couple times where we've had two separate files
13  just so that we can track it and we're not looking for
14  the homicide case because the homicide detective has it,
15  where's the file.
16  BY MR. BIONDO:
17  Q.    So, how is it that anyone is supposed to be able
18  to look into a file and know what other files to look
19  into to obtain information?
20        MR. BIONDO: Object to form. But go ahead and
21  answer, if you can.
22  A.    What we have right now -- at the time, we didn't
23  have that. It would just be something that was passed
24  along. Here's the thing. The only time I had that
25  happen was with my case that I had with Shaquan in the

AA COURT REPORTERS 412-288-5370                     Page 149

1   county homicide unit.
2   BY MR. PETRUNYA:
3   Q.    Let me stop you real quick. When you're saying
4   the only time you had that, are you referring to that
5   being that evidence not appearing in the criminal file?
6   A.    No. No. What I'm saying is that we had two
7   separate files, because I had to ask them, I'm like,
8   well, how do you want this handled, it's a separate
9   case, separate individual, we just happened to be
10  talking about this other case over here. Okay. So, it
11  was my understanding that anything that was related to
12  Shaquan stayed in Shaquan's file.
13        I understand that his phone was downloaded, but
14  I did not handle that part of it. So, what you're
15  asking is how would somebody know back then? You would
16  have to reference the lead detectives or the supervisor
17  at the time, but now we have it in our computer system
18  where you can actually put the case number in and then
19  if there's another case, it will say reference this case
20  number so you know, oh, okay, there's more information
21  in his case file.
22  Q.    So, in order for the lead detective or anyone to
23  know about information in another person's case file,
24  they would have to know about that individual in their
25  interview; correct?

AA COURT REPORTERS 412-288-5370                     Page 150

1         MR. BIONDO: Object to form. Go ahead and
2   answer, if you can.
3   A.    Yeah. Like in our case, like they knew we were
4   interviewing Shaquan about what happened. He was in the
5   house that possibly was related to what happened. So,
6   they were aware that we did do an interview.
7   BY MR. PETRUNYA:
8   Q.    When you say they, are you referring to the lead
9   detectives?
10  A.    Yeah. Other detectives. Supervisors.
11  Q.    Okay. So, the idea that they would have come
12  across this evidence for the first time eight years
13  after the Wilkinsburg massacre does not comport with
14  your recollection of what was going on at the time in
15  2016?
16        MR. BIONDO: Object to the form. But go ahead
17  and answer, if you can.
18  A.    My thing is the fact they knew that we talked to
19  Shaquan. Now, they may not have followed up as far as
20  what was actually placed in the file. They might have
21  forgotten about it, wasn't a concern of theirs at the
22  time. I can't speak for them. I'm just stating what I
23  think possibly would have happened.
24  BY MR. PETRUNYA:
25  Q.    Mike, we're here taking your deposition a couple

AA COURT REPORTERS 412-288-5370                     Page 151

1   weeks after it was originally scheduled; correct?
2   A.    Correct.
3   Q.    Before your original deposition was scheduled in
4   April, had you had a conversation with Hitchings about
5   the Shaquan Roberts evidence being disclosed in this
6   case?
7   A.    No. The only thing he told me about is, hey,
8   they're going to depose you about Shaquan Roberts, and
9   like I told him before, who the hell is Shaquan Roberts.
10  So, I had to pull the file. I looked it up, I
11  understand, and that's when he said they're going to ask
12  you something about a phone, we downloaded his phone and
13  that came up with Millhouse, and I'm like who the hell
14  is Millhouse.
15  Q.    Have you looked at phone downloads as part of
16  your -- not this case, but as part of your work as a
17  homicide detective?
18  A.    Yeah.
19  Q.    Would you agree with me phone downloads on the
20  face sheet will also have case identifiers related to
21  the case they correspond with?
22  A.    The ones I've done, yes.
23  Q.    Ans so those case identifiers will tell you the
24  file that's associated with the download; correct?
25  A.    It should. Yes.

AA COURT REPORTERS 412-288-5370                     Page 152

1         (Exhibit 5 was marked for identification.)
2   BY MR. PETRUNYA:
3   Q.    Mike, does this look like a face sheet to a
4   cellphone download that we just discussed before?
5   A.    Yes.
6   Q.    And you will agree with me that the case -- so,
7   the case number that we have identified on this face
8   sheet says Wilkinsburg shooting?
9   A.    Yes.
10  Q.    And that Wilkinsburg shooting would be referring
11  to the Wilkinsburg massacre case that we're talking
12  about?
13  A.    I assume so. Yes.
14  Q.    So, you would agree with me, then, that as this
15  being evidence with the case identifier Wilkinsburg
16  shooting, this should be part of the Wilkinsburg
17  massacre file; correct?
18  A.    Yes.
19  Q.    Sitting here today, do you have any
20  understanding of why this cellphone download report was
21  not included in the Wilkinsburg massacre file that was
22  turned over to the district attorney's office?
23  A.    No.
24  Q.    If you were the lead detective on a case and
25  realized that evidence which was obtained as part of an

CHERON SHELTON/ROBERT THOMAS v.
COUNTY OF ALLEGHENY, et al.

MICHAEL HOFFMAN
May 21, 2024

AA COURT REPORTERS 412-288-5370                                    Page 153

1   investigation had not been turned over to the DA's
2   office, what would you do?
3   A.    I would find that evidence and make the DA aware
4   of it.
5   Q.    Would you ask people in your department why that
6   evidence wasn't turned over?
7   A.    Yeah, if they know about the evidence. Like I
8   said, they might have forgotten about this. So, they
9   didn't know to ask about it because they might have
10  forgot about it. I can't speak for what those
11  detectives did, but me personally, I would ask the
12  detective where's that evidence.
13  Q.    But the case name or the case number is used to
14  designate where a piece of evidence should be located so
15  you don't forget about it; right?
16  A.    Should be. Yes.
17  Q.    And so based upon your review of this face page,
18  then, would you agree with me that this extraction was
19  done on March 16th of 2016 at 9 AM?
20  A.    Yes.
21  Q.    And then you would agree with me, then, that as
22  of March 16th of 2016, if the case number says
23  Wilkinsburg shooting, it should be made part of the
24  file; right?
25  A.    I would think so. Yes.

AA COURT REPORTERS 412-288-5370                                    Page 154

1   Q.    Do you have any discretion as a detective on
2   which evidence to put into a file and which evidence not
3   to if its case identifier is associated with that file?
4   A.    It's my understanding all evidence associated
5   with a case gets put in the case file. I've never had
6   it where I have said no, don't put that in there, yeah,
7   put that in there. I've never done that.
8   Q.    We talked a little bit earlier about Brady;
9   correct? Do you remember that conversation with Paul?
10  A.    Yes.
11  Q.    Brady is a way of talking about just basic
12  criminal procedure; correct?
13  A.    Right.
14  Q.    And criminal procedure requires you as
15  detectives to document the work that you do on a case
16  and turn that over to the district attorney's office;
17  right?
18  A.    Correct.
19  Q.    That includes looking at the investigation that
20  was conducted as it relates to the probable cause that
21  you obtain to arrest someone; correct?
22  A.    Yes.
23  Q.    When I say probable cause, this might seem like
24  a self-explanatory question, but probable cause itself
25  is the concept of the evidence that leads to the

AA COURT REPORTERS 412-288-5370                                    Page 155

1   probable cause to arrest someone for a crime; correct?
2       MR. BIONDO: Object to form. But go ahead and
3   answer.
4   A.    Yes.
5   BY MR. PETRUNYA:
6   Q.    And probable cause itself is based upon evidence
7   that you obtain as part of your investigation as a
8   detective; correct?
9   A.    Yes.
10  Q.    Probable cause does not mean just putting down
11  the correct words on paper to say we can charge this
12  person; right?
13  A.    Right.
14  Q.    So, you actually have to conduct an
15  investigation, follow the leads and direct them to
16  wherever the evidence leads you; correct?
17  A.    Correct.
18  Q.    Do you recall when -- strike that.
19      The first documented time that I have you
20  working on the Wilkinsburg massacre as part of the file
21  is March 14th of 2016 at approximately 3:34 PM. Does
22  that sound about accurate?
23  A.    In light of -- could you tell me what I did?
24  Q.    Yeah. So, there was a search conducted of 1300
25  and 1400 block of Franklin Avenue and Hazel Way, and I

AA COURT REPORTERS 412-288-5370                                    Page 156

1   believe you were looking for the murder weapons that
2   were involved in the massacre.
3   A.    That sounds right.
4   Q.    I think you had mentioned to Paul earlier in
5   your deposition when the massacre actually occurred, you
6   were on vacation?
7   A.    Right.
8   Q.    So, the massacre occurs, you return to vacation,
9   and you're brought in to assist with some of the tasks
10  on the case; correct?
11  A.    Yes.
12  Q.    And the 14th of March would have been five days,
13  approximately, after the Wilkinsburg massacre?
14  A.    Yes.
15  Q.    Okay. And so at this point, were you aware of
16  the fact that an identification of Cheron Shelton had
17  been made by Officer Adams on March 12th of 2016?
18  A.    I don't know if it was Officer Adams. I just
19  learned that, I guess, an individual was seen running up
20  the street and he saw him -- if I'm wrong -- get inside
21  a car and he got a license plate.
22  Q.    Do you know what type of car that was that he
23  was getting into?
24  A.    I figured later on a white Lincoln.
25  Q.    Is that the same white Lincoln that was involved

CHERON SHELTON/ROBERT THOMAS v.
COUNTY OF ALLEGHENY, et al.

MICHAEL HOFFMAN
May 21, 2024

1   in the 2013 case?
2           MR. BIONDO: Objection to form.
3  A.    I didn't know there was a white Lincoln involved
4   in the 2013 case.
5   BY MR. PETRUNYA:
6  Q.    Did you look at the 2013 file before you made
7   the arrest?
8  A.    Yes.
9  Q.    And if that same white Lincoln was involved in
10  the 2013 case, would it surprise you?
11 A.    Yeah. I didn't even know a white Lincoln was
12  involved in the 2013 case.
13 Q.    What about a white Lincoln with the exact same
14  license plate that Cheron Shelton was alleged to have
15  been seen on March 9, 2016?
16 A.    I didn't know anything about a white Lincoln in
17  the 2013 case.
18 Q.    Now, who instructed you to charge Ashley Smith
19  with the 2013 case, as well?
20 A.    Same individuals.
21 Q.    Were you aware of the fact that Ms. Smith wasn't
22  charged initially in the 2013 arrest when that happened?
23 A.    Yes.
24 Q.    What was the rationale behind charging her in
25  the 2013 -- for the 2013 case in 2016?

1  A.    For the fact that it was her residence.
2  Q.    Is it common that your office will charge people
3   if they're the owners of a residence even if they're not
4   on the property at the time?
5  A.    Yes.
6  Q.    And then I believe one of the Gomez brothers was
7   also involved in that arrest; correct?
8  A.    Justin.
9  Q.    Are you aware that Ryan also came in and spoke
10  to police voluntarily?
11 A.    No.
12 Q.    And would it surprise you to learn that Ryan
13  came in because his name was being thrown around as
14  someone that may have been involved in the Wilkinsburg
15  massacre?
16          MR. BIONDO: Object to form. But go ahead and
17  answer.
18 A.    No.
19 BY MR. PETRUNYA:
20 Q.    So, when you started doing the search on
21  March 14th of 2016, then, you were aware that an
22  identification had been made of someone in the area on
23  the night of the shooting; correct?
24 A.    Yes.
25 Q.    And your search of that Hazel Way area and

1    Franklin Avenue yielded no weapons related to the
2    Wilkinsburg massacre; correct?
3  A.    Yes.
4  Q.    You're aware of the fact that none of the
5    weapons involved in the Wilkinsburg massacre to this day
6    have been discovered; correct?
7  A.    Correct.
8  Q.    I don't expect you to know these dates, but do
9    you recall Cheron Shelton and Robert Thomas being
10   charged with the Wilkinsburg massacre on June 23rd of
11   2016?
12 A.    I know they were charged. Like I said, I don't
13   know the date.
14 Q.    So, the Wilkinsburg massacre occurred on March
15   9, 2016. They're charged on June 23, 2016. Okay?
16 A.    Okay.
17 Q.    In your recollection of your work on this case,
18   when had Allegheny County determined that Cheron Shelton
19   was the main suspect in the Wilkinsburg massacre?
20          MR. BIONDO: Object to the form. Go ahead.
21 A.    One of the main individuals that they were
22   investigating was when I got back. So, whatever date
23   that was. The 14th.
24 BY MR. PETRUNYA:
25 Q.    March 14th, 2016?

1  A.    Yeah. He was a suspect.
2  Q.    Were you aware as of March 14th of 2016 that
3   Allegheny County had theorized as well that at least two
4   people were involved in the Wilkinsburg massacre?
5          MR. BIONDO: Object to form.
6  A.    Yes.
7  BY MR. PETRUNYA:
8  Q.    Was that based upon the fact that two different
9   types of shell casings were found at the scene?
10 A.    I believe so. Yes.
11 Q.    So, if you find one individual that you believe
12  is a suspect in a case, it stands to reason that you
13  would want to try to find another individual that's
14  connected to that person; correct?
15 A.    Yes. Yes.
16          MR. BIONDO: Object to form.
17 BY MR. PETRUNYA:
18 Q.    And you want to look at the evidence and where
19  it leads to see if you can support the fact that these
20  individuals may have perpetrated this murder; correct?
21 A.    Yes.
22 Q.    Now, the Wilkinsburg massacre was perpetrated by
23  someone using an AK-47 and a handgun; correct?
24 A.    Yes.
25 Q.    Ideally, in a perfect world, you would want to

CHERON SHELTON/ROBERT THOMAS v.
COUNTY OF ALLEGHENY, et al.

MICHAEL HOFFMAN
May 21, 2024

1  locate the murder weapons; correct?
2  A.    Yes.
3  Q.    Were you asked at any point in the investigation
4  to follow up on database hits that the AK-47 yielded in
5  this matter?
6  A.    Did I?  No.
7  Q.    Were you aware that the NIBIN database came back
8  with two positive hits for the AK-47 bullets that were
9  used in this matter?
10 A.    No.
11 Q.    Does it surprise you to learn that that was
12 discovered in this case?
13 A.    No.
14 Q.    Why not?
15 A.    With a weapon like that possibly being used in
16 another crime doesn't surprise me at all.  Is that what
17 you're asking?
18 Q.    Yeah.
19 A.    Yeah.
20 Q.    Well, would it surprise you that no one from
21 those other crimes was interviewed to determine where
22 that weapon was located or who possessed it at the time
23 that the Wilkinsburg massacre was perpetrated?
24 A.    Would it surprise me?
25 Q.    Yeah.

1  A.    Yeah.
2  Q.    Why?
3  A.    Because in other cases like I do it, you try and
4  find possibly an individual who had a prior that they
5  were possibly involved, you maybe go talk to them which
6  99 percent of the time I've learned to be a lost cause.
7  Q.    But that still doesn't mean that you don't talk
8  to the individual; correct?
9  A.    Correct.  But that's just me.  I can't speak for
10 other detectives or what the circumstances were at the
11 time.
12 Q.    Sure.  And I'm not asking you to speculate as to
13 that.  I'm just asking you as part of the investigation.
14 Did you ever look at the Calvin Doswell murder file in
15 this case?
16 A.    No.
17 Q.    Would it surprise you to learn that Lamont
18 Powell's name doesn't appear anywhere in the Calvin
19 Doswell file?
20        MR. BIONDO: Object to form.  Go ahead and
21 answer.
22 A.    Would it surprise me?
23 BY MR. PETRUNYA:
24 Q.    Yes.
25 A.    No.  I mean, yes, it does.

1  Q.    Why?  Why does it surprise you?
2  A.    Because of his name being linked to that
3  homicide by the individuals we talked to.  Shaquan.
4  Q.    Did you hear talk around the office that Lamont
5  was being difficult to deal with or didn't want to
6  cooperate in helping with the investigation?
7  A.    Yes.
8  Q.    And so I know I might be asking the same
9  question again, but Allegheny County came up with a
10 theory that we'll recharge Cheron Shelton, Robert Thomas
11 Ashley Smith and Justin Gomez for a 2013 drug and gun
12 case; right?
13 A.    Yes.  Yes.
14        MR. BIONDO: Objection to form.
15 BY MR. PETRUNYA:
16 Q.    Did anyone talk about charging Lamont Powell
17 with possession of the heroin that was found on him on
18 the night of the Wilkinsburg massacre to try to get him
19 to cooperate with the investigation?
20        MR. BIONDO: Objection to form.  Go ahead and
21 answer.
22 A.    Was he found with heroin on him that night?
23 BY MR. PETRUNYA:
24 Q.    Yes.
25 A.    Oh.  I didn't know that.

1  Q.    Okay.
2  A.    So, no, I did not hear that.
3  Q.    If you were the lead investigator on this case,
4  would you want to possibly use that as an opportunity to
5  maybe exchange cooperation?
6        MR. PETRUNYA: Objection to the form.
7  A.    You could ask about it, but I found also that
8  I've had -- I've seen individuals get charged for it,
9  like you're almost compelling them to cooperate, and
10 that's been thrown up in court, as well, and it's, in my
11 opinion, fifty-fifty.
12 BY MR. PETRUNYA:
13 Q.    But, again, there's no reason why you couldn't
14 at least approach Lamont and talk to him about the drugs
15 in his possession on that evening to try to see if he
16 could help you?
17 A.    Correct.
18 Q.    In addition to Lamont being one of the suspected
19 targets in the case, you would want to download his
20 cellphone; correct?
21 A.    Yes.
22 Q.    And if you had Lamont's cellphone in your
23 possession, do you know of any reason why Allegheny
24 County wouldn't have downloaded his cellphone?
25 A.    I don't know why they wouldn't if they had it.

AA COURT REPORTERS 412-288-5370                    Page 165

1 Q.    Have you had any conversations with anyone in
2 the homicide department about why Lamont Powell's
3 cellphone was not downloaded?
4 A.    No. I didn't even know it happened.
5 Q.    Have you ever reviewed a cellphone download for
6 Robert Thomas?
7 A.    No.
8 Q.    Are you aware of the fact that Allegheny County
9 possessed Robert Thomas's cellphone when he was arrested
10 on April 6th of 2016?
11 A.   No.
12 Q.   Have you talked to anyone about why they haven't
13 downloaded that?
14 A.   No.
15 Q.   Are you aware of the fact that the FBI provided
16 information to Allegheny County about Lamont Powell
17 being involved in the murder of two drug dealers a
18 couple months before the Wilkinsburg massacre?
19 A.   No.
20 Q.   Is today the first time you're learning that?
21 A.   Yes.
22 Q.   Would it surprise you to learn that Lamont
23 Powell's alleged involvement in the murder of two drug
24 dealers a couple months before the Wilkinsburg massacre
25 where he robbed them of two bricks of heroin and $95,000

AA COURT REPORTERS 412-288-5370                    Page 166

1 in cash was not investigated by Allegheny County?
2        MR. BIONDO: Objection to form.
3 A.    I was not aware of that.
4 BY MR. PETRUNYA:
5 Q.    Would it surprise you to find out that that
6 wasn't investigated?
7        MR. BIONDO: Object to form.
8 A.    Where did it happen at?
9 BY MR. PETRUNYA:
10 Q.   Well, the FBI had information from sources that
11 Lamont Powell had murdered two drug dealers in the
12 Beltzhoover area.
13 A.   That would be the city, first of all. Did he
14 report it or anything? Which I highly doubt. Did the
15 --
16 Q.   No. This was reported through the FBI --
17 A.   I was just asking if it was actually documented
18 or if it was just something that was told to them. It's
19 not reported anywhere about this?
20 Q.   Well, we were able to find on a Google search
21 double homicide in Beltzhoover that remains unsolved --
22 A.   Okay.
23 Q.   -- as of December 2015.
24 A.   Yeah. I probably would have talked to somebody.
25 Q.   Would that be part of the investigation of

AA COURT REPORTERS 412-288-5370                    Page 167

1 looking where the evidence leads?
2 A.    It could be.
3 Q.    You would agree with me that it's not
4 permissible to make false or misleading reports to
5 prosecutors when you're trying to establish probable
6 cause for a crime; correct?
7 A.    Correct.
8 Q.    Would you say it's illegal?
9 A.    Definitely.
10 Q.   And as long as you've been a law enforcement
11 officer for 31 years, would you agree with me that you
12 were aware in some capacity or the other of your
13 obligations pursuant to Brady as we called it or to
14 disclose evidence?
15 A.   Yes.
16 Q.   And would it be fair to say that all of the
17 officers in your department in 2016 were aware of their
18 obligations at that time?
19 A.   I would assume so.
20 Q.   The district attorney ultimately makes the
21 determination based upon the affidavits of probable
22 cause put together whether there's enough to support
23 charges against an individual; correct?
24 A.   Yes.
25 Q.   And so for homicide detectives, until you get

AA COURT REPORTERS 412-288-5370                    Page 168

1 the thumbs up from them that your affidavit of probable
2 cause is good, you can't arrest someone; correct?
3        MR. BIONDO: Objection to form. Go ahead and
4 answer.
5 A.    Right.
6 BY MR. PETRUNYA:
7 Q.    The district attorney is only aware of the
8 evidence that is presented to them as they evaluate the
9 affidavit of probable cause; correct?
10 A.   Yes.
11 Q.   Meaning that if evidence is not disclosed to the
12 district attorney's office or is not part of the file,
13 they have no way of testing reliability of that
14 evidence; correct?
15 A.   Yes.
16 Q.   In the event that you discover evidence that was
17 not added to the file after charges had been brought,
18 what would you do? Do you disclose it to the DA's
19 office?
20 A.   Yes.
21 Q.   And then what other obligations, if any, do you
22 have?
23 A.   I explain it to the DA's office, present it to
24 them and see where we go from there.
25 Q.   Did you have a conversation with Lieutenant

AA COURT REPORTERS  412-288-5370                Page 169

1  Schurman or Kevin Chernosky before refiling the 2013
2  charges about possibly just going out and talking to
3  Robert Thomas, Ashley Smith or Justin Gomez about their
4  involvement or knowledge about the Wilkinsburg massacre?
5  A.    No.
6  Q.    And was it no, you didn't have that conversation
7  --
8  A.    No. We didn't have the conversation. It wasn't
9  even brought up. I didn't think about it.
10 Q.    You were working in the homicide department up
11 until 2022; correct?
12 A.    Yes. The end of it.
13 Q.    So, you were around throughout the investigation
14 of the Wilkinsburg massacre, the dismissal of Robert
15 Thomas in the trial; correct?
16 A.    Yes.
17 Q.    Did you have any conversations with anyone in
18 the department about what happened in the trial or with
19 Robert Thomas's case or what went wrong?
20 A.    No. The only thing I ever heard was the fact
21 that they possibly didn't have enough on Robert Thomas
22 and they were probably going to dismiss him. That was
23 the end of it.
24 Q.    When do you recall hearing that?
25 A.    I think it was even before he got the case

AA COURT REPORTERS  412-288-5370                Page 170

1  dismissed.
2  Q.    So, your understanding from your conversations
3  with people in the homicide department is that before
4  the case got dismissed, the consensus or the
5  understanding was there wasn't enough evidence to go to
6  trial?
7           MR. BIONDO: Objection to form. Go ahead and
8  answer, if you can.
9  A.    No. It wasn't that conversation. It was just
10 the fact that, if I recall correctly before that day, it
11 looks like they're going to probably try to put charges
12 on Robert Thomas.
13 BY MR. PETRUNYA:
14 Q.    Who is the they? The DA's office?
15 A.    I want to say it was the DA's office because it
16 was detectives talking. So --
17 Q.    Is that the only conversation that you recall
18 happening about the Wilkinsburg massacre?
19 A.    As far as dropping the charges, yes.
20 Q.    Now, you didn't testify at the Wilkinsburg
21 massacre; correct?
22 A.    Not at all.
23 Q.    Did you assist in any way with either trial
24 prep, witnesses, gathering evidence?
25 A.    Nothing.

AA COURT REPORTERS  412-288-5370                Page 171

1  Q.    Did you have any involvement in the Wilkinsburg
2  massacre after the charges were filed on June 23rd of
3  2016?
4  A.    No.
5  Q.    You had indicated before that you were
6  instructed by one of the supervisors at the time to put
7  the Shaquan Roberts evidence in Shaquan Roberts' file;
8  correct?
9  A.    I wasn't instructed per se. It's just something
10 I did that -- filing any reports or anything like that.
11 Actually, I didn't put them in there. I would submit it
12 to our clerk and our clerk knew to put it in there
13 according to the name and the case file on top.
14 Q.    And if a report could be relevant to two
15 different files, you could just provide instruction that
16 they copy it and add it to the other file, as well;
17 correct?
18 A.    Yes.
19 Q.    And that would come from you directly to the
20 clerk?
21 A.    If I was involved in that particular report,
22 yes.
23 Q.    Is that standard protocol at Allegheny County
24 that if you do have reports or information which are
25 relevant to separate cases, you could just make copies

AA COURT REPORTERS  412-288-5370                Page 172

1  and put them in the file?
2  A.    You can. I can't -- like I said, I can't speak
3  for other detectives. I do that.
4  Q.    Okay.
5  A.    But, yeah, probably should do that just so that
6  it winds up in the report.
7  Q.    So, March of 2016, then, Lieutenant Andrew
8  Schurman was the head of the homicide department?
9  A.    Yes.
10 Q.    Scott Scherer was one of your supervisors?
11 A.    Yes.
12 Q.    Was there another one?
13 A.    No.
14 Q.    So, it was either Scherer or Schurman who --
15 going back to your answer previously -- had told you
16 about the Shaquan Roberts evidence; correct?
17           MR. BIONDO: Objection to the form.
18 A.    Tell me what about it?
19 BY MR. PETRUNYA:
20 Q.    Well, I think earlier, we had talked about you
21 had indicated that one of the supervisors had instructed
22 you to just --
23 A.    See, you're screwing me up. You're saying
24 evidence. I'm thinking reports.
25 Q.    Okay.

1 A.    They instructed me to make it two separate
2 things.
3 Q.    Okay.
4 A.    To leave it separate from the homicide because
5 we're talking about separate charges, separate
6 individual. He wasn't a suspect. He was just a
7 witness.
8 Q.    Okay.
9 A.    So, it's two separate files.
10 Q.    Okay. And so what --
11 A.    Anything that I dealt with with Shaquan --
12 Q.    Yeah.
13 A.    -- went into his file.
14 Q.    Okay.
15 A.    So --
16 Q.    And who -- do you recall whether it was Schurman
17 or Scherer that instructed you to do that?
18 A.    I want to say Schurman.
19 Q.    Okay. Schurman?
20 A.    Schurman.
21        MR. PETRUNYA: Okay. We're going to take five
22 minutes.
23        (There was a pause in the proceedings.)
24 BY MR. PETRUNYA:
25 Q.    Is part of the process at Allegheny County when

1 you're reviewing evidence and putting together an
2 affidavit of probable cause, are you consulting with
3 your supervisors about whether to rely on this evidence
4 or use this evidence or whether it should go in the
5 affidavit?
6 A.    No. We would usually just type it up, review it
7 and send it to the DA's office and we consult with them
8 as far as the evidence.
9 Q.    What about the supervisors? Do you have
10 discussions with them about individuals that are
11 providing evidence? Do they make recommendations, as
12 well?
13 A.    Sometimes they do. Yes.
14 Q.    And you would rely on their experience working
15 with witnesses in the past or information they provide
16 you; correct?
17 A.    I would take into consideration what they
18 recommend.
19 Q.    And Scott Scherer at the time was one of the
20 supervisors?
21 A.    Yes.
22 Q.    Would you take into account or consideration his
23 recommendations related to evidence?
24 A.    With some things.
25 Q.    Okay.

1 A.    But I would more or less consult with Schurman.
2 He got more involved with the cases.
3 Q.    Now, two of the witnesses that were used in this
4 case, Kendall Mikkell and Fredrick Collins, both of them
5 were in jail at the time they provided their statements;
6 correct?
7 A.    Yes.
8 Q.    Is it my understanding you were not -- you had
9 no work with or not talked to Fred Collins or Kendall
10 Mikkell before?
11 A.    I had no dealings with either one of those two.
12 Q.    Did you talk to anyone else in your department
13 about those individuals or the information they were
14 providing?
15 A.    No.
16 Q.    Had anyone ever approached you either prior to
17 the massacre charges or after as part of your
18 investigation in utilizing these individuals to provide
19 assistance on your cases?
20 A.    No.
21 Q.    Now, you've worked in law enforcement for 31
22 years. We've established that you've worked as a
23 homicide detective for at least over a decade; correct?
24 A.    Yes.
25 Q.    And so you understand evidence and probable

1 cause; correct?
2 A.    Yes.
3 Q.    So, I want to talk to you about some information
4 in the Wilkinsburg massacre and just kind of get your
5 understanding of it. Okay?
6 A.    Okay.
7 Q.    Now, a recitation of the victims and the actual
8 shell casings that are the scene, you would agree
9 with me that by itself does not provide insight or
10 probable cause in who committed the murder?
11 A.    Yes.
12 Q.    Is that a yes?
13 A.    Correct.
14 Q.    And would you agree with me that speaking on a
15 cellphone to another person does not actually provide
16 indication of committing a murder and pulling a trigger,
17 committing a murder; correct?
18 A.    Correct.
19 Q.    Cellphone evidence may provide you with an
20 understanding of where a person's located at the time,
21 but that doesn't mean that they committed a murder;
22 correct?
23 A.    Correct.
24 Q.    Seeing someone in the area where a crime may
25 have been committed does not actually make that person

CHERON SHELTON/ROBERT THOMAS v.
COUNTY OF ALLEGHENY, et al.

MICHAEL HOFFMAN
May 21, 2024

1  responsible for committing a crime, does it?
2  A.    No.
3  Q.    That may make them someone that you should
4  investigate for the crime; correct?
5  A.    Yes.
6  Q.    But that doesn't mean that they committed the
7  crime; correct?
8  A.    Correct.
9  Q.    Finding weapons that may be similar to weapons
10  that are involved in a crime may provide you with
11  suspicion to investigate someone, but that doesn't mean
12  that that person committed that crime; correct?
13  A.    Correct.
14  Q.    DNA evidence that rules out someone being at the
15  scene of the crime or around the scene of the crime,
16  that may actually be helpful in eliminating someone as a
17  suspect; correct?
18  A.    Possibly, yes.
19        MR. BIONDO: Object to form.
20  BY MR. PETRUNYA:
21  Q.    Are you aware that no DNA evidence was returned
22  in this matter connecting Cheron Shelton or Robert
23  Thomas to the Wilkinsburg massacre?
24  A.    I was not aware of that.
25  Q.    And probable cause is based on looking at the

1  totality of the circumstances; correct?
2  A.    Yes.
3  Q.    Did you have any conversations with individuals
4  in the homicide department as of April 6th of 2016
5  whether there was probable cause to arrest Cheron
6  Shelton and/or Robert Thomas or both for the Wilkinsburg
7  massacre?
8  A.    Not that I recall.
9  Q.    Do you believe there was probable cause as of
10  April 6, 2016 to arrest Cheron Shelton and Robert Thomas
11  for the Wilkinsburg massacre?
12        MR. BIONDO: Object to form. Go ahead.
13  A.    I couldn't give you that answer. Like I said, I
14  was on the periphery of this investigation. Like if
15  they would ask me to help with something, I did. We did
16  not -- I'm probably speaking for my partner Caruso. We
17  did not know a lot of the details or what has been
18  garnered. Like you've asked me several times are you
19  surprised by this, surprised by that. Yeah, I'm
20  surprised because I have absolutely no knowledge of a
21  lot of what happened with this case. So --
22  BY MR. PETRUNYA:
23  Q.    But Allegheny County, your homicide department,
24  you guys work as a team investigating cases; correct?
25        MR. BIONDO: Object to form. Go ahead and

1  answer, if you can.
2  A.    We do.
3  BY MR. PETRUNYA:
4  Q.    And so it's not uncommon for lead detectives to
5  ask other detectives to assist in obtaining evidence or
6  applying for search warrants; correct?
7  A.    Correct.
8  Q.    Now, you had indicated that Patrick Miller was
9  the gentleman who people would go to to help with search
10  warrants?
11  A.    Yes.
12  Q.    Why is that?
13  A.    Like I said, I don't really know for the fact
14  that when I got there, they said if you ever need help
15  with a search warrant -- I guess he typed a lot of them
16  and got a lot of feedback from like DAs, stuff like
17  that, learned from other people like, you know, what to
18  put in a search warrant for particular situations. He
19  had a lot of like templates, I guess you would say. So,
20  if you would ask him like, hey, how would I get a search
21  warrant for, you know, a cellphone, hey, here are the
22  ones that have worked for me, or how do I get a search
23  warrant for a car, this is what I've used.
24  Q.    Did you have a particular specialty within
25  Allegheny County when you were working in homicide?

1  A.    Mine was if you needed somebody to go out and --
2  somebody to be grabbed or gotten, they would send me
3  because, as they call it, I would go city which means I
4  would actually get out of the car and go look for
5  people. I don't care if I was wearing a suit or a tie
6  or anything. I will. If you want to scrap, we'll
7  scrap.
8  Q.    So, you would roll up your sleeves and get --
9  A.    If I had to. If I had to hide in a building and
10  look for somebody, I would do it. I had no problem
11  getting dirty, I guess, is what they say.
12  Q.    Now, we talked about a lot about Shaquan Roberts
13  and how there's some evidence that was turned over
14  related to information he had about the Wilkinsburg
15  massacre that we recently discovered. You recall that
16  line of questioning; correct?
17  A.    Yes.
18  Q.    Sitting here today, are you aware of any other
19  witnesses that may have been questioned as part of the
20  Wilkinsburg massacre either by yourself or other
21  detectives who may have had separate files opened on
22  them that didn't appear in the underlying criminal case?
23  A.    Not at all.
24  Q.    And you don't have that evidence because you're
25  not aware of anyone or --

AA COURT REPORTERS 412-288-5370                           Page 181

1 A.    I'm not aware of anyone being talked to, any
2 other witnesses.
3 Q.    Okay.  If I wanted to know of all the
4 individuals who were interviewed related to whether they
5 had information regarding the Wilkinsburg massacre, who
6 would I need to speak to as part of the investigation
7 team to understand or at least to appreciate that I have
8 all -- that I've looked at all the evidence?  Would that
9 be the lead detective?
10 A.    Lead detective or a supervisor.
11 Q.    And so the lead detective or the supervisor
12 should be aware of the evidence which has been
13 marshalled in any investigation?
14 A.    Correct.
15 Q.    When you talked to Hitchings, did he tell you
16 how he got the Shaquan Roberts evidence?
17 A.    No.
18 Q.    Did he tell you that he discovered the Shaquan
19 Roberts evidence was not in the Wilkinsburg massacre
20 file?
21 A.    No.
22 Q.    If a witness provides information which may be
23 used to obtain probable cause or evidence used against a
24 criminal defendant, you would agree with me that that
25 accused individual has a right to know about that

AA COURT REPORTERS 412-288-5370                           Page 182

1 evidence so that they can investigate that evidence;
2 correct?
3 A.    Yes.
4 Q.    That's required by our Constitution; correct?
5 A.    Correct.
6 Q.    If someone in your department knows of evidence
7 that exists and it's not in the underlying criminal
8 file, is there any way that the district attorney and
9 criminal defense lawyer would know about the existence
10 of that evidence or be able to test the sufficiency of
11 that evidence?
12       MR. BIONDO: Objection to form.  Go ahead and
13 answer, if you can.
14 A.    I mean, if it's not in the file that's presented
15 to both, I don't see how they could.
16 BY MR. PETRUNYA:
17 Q.    Do you believe as a member of law enforcement
18 for 31 years that it undermines the process of searching
19 for the truth in cases if an individual is not given the
20 opportunity to test or investigate all the evidence
21 utilized against them?
22       MR. BIONDO: Objection to form.  Go ahead.
23 A.    Yes.
24 BY MR. PETRUNYA:
25 Q.    Is it up to the detectives to make the

AA COURT REPORTERS 412-288-5370                           Page 183

1 determination on what evidence should or should not be
2 included in criminal files that are turned over?
3 A.    I always leave that to the DA's office.
4 Q.    And in order for the DA to make that
5 determination, that evidence needs to be disclosed to
6 the DA; correct?
7 A.    Correct.
8 Q.    There was never any instruction given to
9 detectives at Allegheny County to cherry-pick evidence
10 to fit a narrative of who they wanted to charge with a
11 case; correct?
12 A.    No.  That's correct.  Yes.  I said no, but,
13 yeah, that's correct.
14 Q.    Right.  So, just for the record, then,
15 absolutely not, never when you're investigating a case
16 should you cherry-pick evidence --
17 A.    Correct.
18 Q.    -- to fit your narrative?
19 A.    Right.
20 Q.    Have you heard the term tunnel vision as it
21 comes to investigations?
22 A.    Yes.
23 Q.    And you would agree with me that that's
24 something that should be avoided; correct?
25 A.    You try to.  Yes.

AA COURT REPORTERS 412-288-5370                           Page 184

1 Q.    And that essentially is saying that if you
2 developed a theory about an individual who you might be
3 suspicious of, you don't bend the evidence to fit the
4 narrative of what you're looking for, you follow the
5 evidence where it leads; correct?
6 A.    Correct.  Yes.  Correct.
7 Q.    So, how did you learn about that concept of
8 tunnel vision or how to avoid those pitfalls when you're
9 conducting an investigation?
10 A.    How I learned about it?
11 Q.    How did you learn about it?
12 A.    OJT, also classes, that you need to keep an open
13 mind when doing an investigation.  Everything may point
14 to one person, but then later on down the road, you may
15 learn, crap, it's not that person.  We had a stabbing in
16 Homewood one time on Formosa Way where this lady was
17 stabbed over 87 times, and the daughter comes up, I came
18 home, my mom was dead.  She was the only one home.  This
19 other lady was the only one home.  The neighbor was,
20 yeah, this lady -- the next-door neighbor saw the lady
21 run out of the house with a knife in her hand and
22 everybody was thinking right away it was this lady.
23       So, we now had a tunnel vision because we're
24 sitting there focussed on this lady when in reality, it
25 was the daughter, and the lady come home, seen the

CHERON SHELTON/ROBERT THOMAS v.
COUNTY OF ALLEGHENY, et al.

MICHAEL HOFFMAN
May 21, 2024

AA COURT REPORTERS 412-288-5370                    Page 185

1  daughter doing what she was doing, grabs the knife out
2  of the daughter's hand and runs out and takes off
3  running and hides because she is terrified and would not
4  come to the police. So, we automatically assume it was
5  this lady, and it was an eye-opener to me and a learning
6  lesson when we finally figured it out that it was the
7  daughter that did it so she could buy a brand-new
8  vehicle on Liberty Avenue.
9  Q.    What year did that happen?
10 A.    Oh, my God. I was in zone 5. '95. '96.
11 Q.    So, that would have been before the Wilkinsburg
12 massacre?
13 A.    Oh, yeah. Way before.
14 Q.    Would you agree with me when it comes to murder
15 investigations, there's no rush as it relates to
16 bringing charges against individuals?
17 A.    That's correct.
18 Q.    You want to follow all the leads, look at all of
19 the evidence before you make the decision to charge
20 someone?
21 A.    That's correct. It was told to me it's not a
22 sprint, it's a marathon.
23 Q.    And included in that marathon would be testing
24 the evidence, reviewing it and ruling out all possible
25 suspects?

AA COURT REPORTERS 412-288-5370                    Page 186

1  A.    Yes.
2  Q.    Do you know if that was done with the
3  Wilkinsburg massacre?
4  A.    Like I said, I was on the periphery. I'm going
5  to have to say I have no idea. I would like to think
6  they did. Yes.
7  Q.    But you don't know if they did or they didn't
8  because you were on the periphery?
9  A.    Right.
10 Q.    Is it true that sometimes you think you might
11 know who committed a crime but you don't have enough
12 evidence to prove that they did it?
13 A.    Yes.
14 Q.    Have you experienced that in your career?
15 A.    That I know an individual did the crime but I
16 just couldn't build a case on them?
17 Q.    Or you think?
18 A.    Yes.
19 Q.    Has that happened in the homicide context?
20 A.    Oh, yes.
21 Q.    And that's happened when you were employed in
22 Allegheny County?
23 A.    Yes.
24 Q.    Is that something that's discouraged in your
25 career to -- or at least are you told no, you need to

AA COURT REPORTERS 412-288-5370                    Page 187

1  make charges against someone at all costs?
2         MR. BIONDO: Object to form. But go ahead and
3  answer, if you can.
4  A.    No.
5  BY MR. PETRUNYA:
6  Q.    So, there's no shame in not charging someone
7  with a crime even if you believe they may have committed
8  it?
9  A.    Correct.
10 Q.    If the evidence doesn't mete out that way, then
11 you just wash it up to either bad luck or bad timing?
12 A.    Yes.
13 Q.    You had indicated that the rationale for
14 reopening those charges and getting Robert Thomas in
15 prison was for his safety; correct?
16        MR. BIONDO: Objection to form. But go ahead
17 and answer, if you can.
18 A.    Yes.
19 BY MR. PETRUNYA:
20 Q.    And was it just his safety or was it Ashley
21 Smith, Justin Gomez and --
22 A.    Cheron?
23 Q.    -- and Cheron's safety?
24 A.    Yes. No. It was just her -- my understanding
25 was Cheron and Robert.

AA COURT REPORTERS 412-288-5370                    Page 188

1  Q.    Why for Robert Thomas's safety?
2  A.    I know we brought this up earlier, the timeline.
3  I want to say it was Robert. I know definitely Cheron.
4  But possibly -- I can't remember how it was set up or
5  what the timeline was, but I just remember they said we
6  need to get them off the street, we need to get them off
7  the street for their safety and then also possibly talk
8  to them about what happened.
9  Q.    And was that because people thought they might
10 be retaliated against for committing a murder?
11 A.    Yes.
12        MR. BIONDO: Object to form. But go ahead.
13 A.    Yes.
14 BY MR. PETRUNYA:
15 Q.    Does your department do that for individuals
16 that they're worried that may be retaliated against?
17 A.    No.
18 Q.    So, this was the first time you had ever heard
19 of this?
20 A.    No. We had ways that -- we had done it once
21 before. We had an individual who had a warrant for
22 something minor like a probation violation and we made
23 every effort to get them off the street so they didn't
24 get retaliated against, we didn't have another homicide.
25 Q.    Did anyone think to do that for Lamont Powell in

CHERON SHELTON/ROBERT THOMAS v.
COUNTY OF ALLEGHENY, et al.

MICHAEL HOFFMAN
May 21, 2024

AA COURT REPORTERS  412-288-5370                              Page 189

1  the three years from the time that Calvin Doswell was
2  murdered until 2016?
3  A.    No.
4        MR. BIONDO: Objection to form.  Go ahead.
5  A.    I wasn't a part of the department, so I'm going
6  to say no probably.
7  BY MR. PETRUNYA:
8  Q.    But if it was common knowledge that Lamont had
9  killed Calvin Doswell and someone was going to retaliate
10 against him, that could also be a reason to get him off
11 the street?
12       MR. BIONDO: Object to the form.  But go ahead.
13 A.    It could be.  If we were to do that with
14 everybody, we wouldn't be investigating a homicide.  You
15 would be too busy trying to rescue -- get them off the
16 street so they're not retaliated against.
17 BY MR. PETRUNYA:
18 Q.    What, if any, information did your department
19 have at the time about credible threats to Robert
20 Thomas's life as of April 6th of 2016 to protect him?
21       MR. BIONDO: Object to form.  But go ahead and
22 answer, if you can.
23 A.    I guess just common sense of individuals
24 knowing -- working what we do, when that many people
25 were killed, it was an assumption, I guess, in our

AA COURT REPORTERS  412-288-5370                              Page 190

1  department to assume that there's probably somebody out
2  there, an angry neighbor or friend, relative that would
3  possibly retaliate.
4  BY MR. PETRUNYA:
5  Q.    And I think you talked to Shaquan Roberts on
6  March 15th of 2016; correct?
7  A.    Right.
8  Q.    And wasn't part of the questioning brought up
9  the fact that someone was going to retaliate for this?
10 A.    Yeah.  He brought up that it's possible that
11 individuals are going to come up to the Hilltop and we
12 were asking why would they do that.
13 Q.    So, was there any rationale before or after that
14 interview to start pulling people from Hilltop because
15 of retaliation?
16 A.    No.  Not that I'm aware of.  They were just
17 focused on, I guess, Cheron at the time.
18       MR. PETRUNYA: I don't have anything further.
19       MR. BIONDO: I don't have anything.  We'll read.
20 You have the option to read or waive.  We're going to
21 ask you to read the transcript, just read through it.
22       (The deposition ended at 3:24 p.m.)
23
24
25

AA COURT REPORTERS  412-288-5370                              Page 191

1                    CERTIFICATE OF REPORTER
2
3        I, ANTHONY JUDE CORDOVA, a Certified Shorthand
4  Reporter and Notary Public, hereby certify that the
5  witness in the foregoing deposition was by me duly sworn
6  to tell the truth in the within-entitled cause;
7        That said deposition was taken down in shorthand by
8  me, a disinterested person, at the time and place
9  therein stated, that review was not waived, and that the
10 testimony of the said witness was thereafter reduced to
11 typewriting, by computer, under my direction and
12 supervision;
13       I further certify that I am not of counsel or
14 attorney for either or any of the parties to the said
15 deposition, nor in any way interested in the event of
16 this cause, and that I am not related to any of the
17 parties thereto.
18
19 DATE:   June 5, 2024
20
21
22 /s/ Anthony Jude Cordova
23 Anthony Jude Cordova, CSR 12943
24 (Certificate Attached)
25

AA COURT REPORTERS  412-288-5370                              Page 192

1        UNITED STATES DISTRICT COURT      )    ERRATA SHEET
2           WESTERN DISTRICT OF PA         )
3
4  SHELTON V. COUNTY
5  I, Michael Hoffman, have read the foregoing pages of my
6  deposition given on May 21, 2024 and wish to make the
7  following, if any, amendments, additions, deletions or
8  corrections:
9
10      PAGE NO.      LINE NO.       REASON FOR CHANGE
11
12
13
14
15
16
17
18
19
20 The transcript is correct in all other respects.
21
22                              _____
23                                   Michael Hoffman
24 Subscribed and sworn before me this ___ day, _____,
25 2024.
                                 _____

CHERON SHELTON/ROBERT THOMAS v.
COUNTY OF ALLEGHENY, et al.

MICHAEL HOFFMAN
May 21, 2024

AA COURT REPORTERS 412-288-5370                              Page 193

```
 1              AA COURT REPORTERS
         428 BOULEVARD OF THE ALLIES, SUITE 300
 2            PITTSBURGH, PENNSYLVANIA  15219
                     412.288.5370
 3

 4    June 5, 2024

 5    TO:  Dennis Biondo, Jr., Esq.

 6    Re:  SHELTON V. COUNTY

 7    Dear Counsel:

 8    Please find enclosed your copy of the deposition of
      Michael Hoffman taken in the above-titled matter on May
 9    21, 2024.  Please have the witness make any changes
      and|or corrections that are deemed necessary on the
10    enclosed errata sheet.

11    After making any changes and|or corrections, have the
      witness sign the errata sheet on the signature line and
12    then have it Notarized.

13    Retain a copy of the errata sheet for attachment to your
      copy of the transcript, and send the original errata
14    sheet to Max Petrunya, Esq., and also copies to all
      other counsel, if applicable.  Also, send a copy to me.
15
      Thank you for your cooperation in this matter.
16
      Sincerely yours,
17
      /s/ Anthony Jude Cordova
18    Anthony Jude Cordova, CSR 12943
      Court Reporter, Notary Public
19
      Cc:  Max Petrunya, Esq.
20         Paul Jubas, Esq.
           Shelley Rohrer, Esq.
21

22

23

24

25
```