IN THE COURT OF COMMON PLEAS OF
ALLEGHENY COUNTY, PENNSYLVANIA

- - - - -

COMMONWEALTH OF PENNSYLVANIA     CRIMINAL DIVISION

vs.                              OTN G 747177-4 (Shelton)
                                 CR-5056-2016

CHERON SHELTON                   OTN G 747176-3 (Thomas)
ROBERT THOMAS                    CR-5058-2016

                                 PROCEEDING:
                                 Homicide Preliminary Hearing

                                 BEFORE:  David Barton,
                                 Magisterial District Judge

                                 DATE:
                                 July 29, 2016

                                 Reported and transcribed by:
                                 Mary Beth Perko, RMR
                                 Official Court Reporter


                                 COUNSEL OF RECORD:

                                 For the Commonwealth:
                                 Kevin Chernosky, ADA
                                 Lisa Pellegrini, ADA
                                 Alicia Werner, ADA

                                 For the Defendant Shelton:
                                 Randall McKinney, Esq.

                                 For the Defendant Thomas:
                                 Casey White, Esq.

2

1                                    - - -

2                              I-N-D-E-X

3

4                           July 29, 2016

5

6                                                           PAGE

7
     Stipulations                                             7
8

9    WITNESSES:

10

     Sergeant Michael Adams
11        Direct by Mr. Chernosky                            15
          Cross by Mr. McKinney                              28
12        Cross by Mr. White                                 35
          Redirect by Mr. Chernosky                          44
13        Recross by Mr. White                               44

14

     John Krah
15        Direct by Mr. Chernosky                            45
          Cross by Mr. White                                 49
16

17   Detective Todd Dolfi
          Direct by Mr. Chernosky                            50
18        Cross by Mr. McKinney                              58
          Cross by Mr. White                                 59
19

20   Detective Kevin McCue
          Direct by Mr. Chernosky                            61
21        Cross by Mr. McKinney                              77
          Cross by Mr. White                                 83
22        Redirect by Mr. Chernosky                          85

23
     Detective Feeney
24        Direct by Mr. Chernosky                            86
          Cross by Mr. McKinney                              92
25

3

1

2    **Detective Patrick Miller**
         Direct by Mr. Chernosky                        94
3        Cross by Mr. McKinney                         103
         Cross by Mr. White                            106
         Redirect by Mr. Chernosky                     112
4

5

6    **Inspector William Palmer**
         Direct by Mr. Chernosky                       115
         Cross by Mr. McKinney                         122
7        Cross by Mr. White                       124, 131
         Redirect by Mr. Chernosky                     128
8

9    **Detective Feeney**
         By Mr. Chernosky                              134
10

11   **Detective Michael Caruso**
         Direct by Mr. Chernosky                       135
12       Cross by Mr. McKinney                         146
         Cross by Mr. White                            151
13

14   **Closing Arguments**
         By Mr. McKinney                               155
15       By Mr. White                                  160
         By Mr. Chernosky                              163
16

17                                      - - -

18

19

20

21

22

23

24

25

4

```
1                    P-R-O-C-E-E-D-I-N-G-S
2                          -  -  -
3           THE COURT:  Good afternoon.  At the
4     risk of repeating, while court is in session,
5     all persons have to be seated.  Once you're
6     in your seats, you have to remain there until
7     there is a recess or the conclusion of the
8     proceeding, and no one will be admitted while
9     court is in session.
10           If you have a cell phone -- this is the
11    third or fourth announcement, I understand --
12    it has to be switched off.  If you disrupt
13    this proceeding it will be taken from you.
14    And let me take a moment to say to the
15    deputies in the courtroom, please check your
16    cell phones.  I don't want to have to take a
17    deputy's cell phone and return it on Monday.
18           No one except the parties or their
19    representatives has standing to address the
20    Court or speak during the time court is in
21    session.  If anyone violates this order, you
22    will be immediately removed from the
23    courtroom without further notice.  Any
24    violations of these orders will be enforced
25    through a summary contempt, incarceration,
```

MARY BETH PERKO, RMR    (412) 350-5414

1    and any other statutes, orders, or rules of

2    court.

3         These are the consolidated preliminary

4    hearings in the matter of Commonwealth versus

5    Cheron Shelton at OTN G 747177-4 and

6    Commonwealth versus Robert Thomas at

7    OTN G 747176-3.

8         Will counsel please identify yourselves

9    for the record.

10        MR. CHERNOSKY:  May it please the

11   Court, Your Honor, Kevin Chernosky on behalf

12   of the Commonwealth.

13        MS. PELLEGRINI:  Lisa Pellegrini on

14   behalf of the Commonwealth.

15        MR. McKINNEY:  Your Honor, Randall

16   McKinney for Cheron Shelton.

17        MR. WHITE:  May it please the Court,

18   Your Honor, Casey White on behalf of Robert

19   Thomas.

20        THE COURT:  These are preliminary

21   hearings designed to determine if there's a

22   prima facie case against these defendants.

23   If there is a prima facie case, the case will

24   be held for court.  If not, the defendant

25   will be discharged.

MARY BETH PERKO, RMR    (412) 350-5414

1                    Mr. McKinney, does the defense desire a

2          formal reading of the charges?

3                    MR. McKINNEY:  No, Your Honor.  We

4          would waive a formal reading and plead not

5          guilty.

6                    THE COURT:  Mr. White, does defense --

7                    MR. WHITE:  I would also echo

8          Mr. McKinney's sentiments.  We'll waive the

9          reading and plead not guilty to all charges.

10                   THE COURT:  I will remind counsel that

11         the microphones aid the court reporter as

12         well as the Court, so please use them.

13         Commonwealth may call its first witness.

14                   MR. CHERNOSKY:  Thank you, Your Honor.

15         Prior to proceeding today, we did discuss at

16         length two relatively lengthy stipulations

17         with the defense, and unless there's an

18         objection, I will enter them on the record at

19         this point.  They were provided in writing

20         prior to today's proceedings to defense

21         counsel.

22                   MR. McKINNEY:  That is correct.  And at

23         this point, Your Honor, on an unrelated

24         matter, I would move for sequestration of

25         government witnesses.

MARY BETH PERKO, RMR    (412) 350-5414

1              MR. CHERNOSKY:  Thank you, Your Honor.

2       With regard to sequestration, I have no

3       problem sequestering our witnesses.  However,

4       with the Court's prior admonition, I just

5       want them to know they can come back in at

6       the time they're called.

7              THE COURT:  Of course.  Yes.

8              MR. CHERNOSKY:  There's quite a few.

9       Do you want to swear them in?

10             THE COURT:  While all the witnesses are

11      in the courtroom, we'll ask the court

12      reporter to swear in the witnesses.

13             THE MINUTE CLERK:  Judge, I'll swear

14      them in.

15             THE COURT:  Thank you, Mr. Creegan.

16             THE MINUTE CLERK:  All those going to

17      testify in this preliminary hearing, please

18      stand up, raise your right hand to be sworn.

19             (Oath administered.)

20             MR. CHERNOSKY:  Your Honor, the parties

21      have a proposed stipulation to the course of

22      hospital treatment in this case.  That is as

23      follows:  one, that, the victim Lamont Powell

24      was present at 1304 Franklin Avenue,

25      Wilkinsburg, Pittsburgh, PA, on March 9 of

MARY BETH PERKO, RMR    (412) 350-5414

1    2016 where he sustained multiple gunshot

2    wounds.  He was transported from the scene to

3    UPMC Mercy Hospital where he was treated and

4    eventually released.

5         2, the victim John Ellis was present at

6    1304 Franklin Avenue, Wilkinsburg, PA, on

7    March 9, 2016, where he sustained multiple

8    gunshot wounds.  He was transported from the

9    scene and taken to UPMC Presbyterian Hospital

10   where he was treated.  He was paralyzed as a

11   result of his injuries and requires follow-up

12   care to this date.

13        3, the victim Tanjia Cunningham,

14   T-a-n-j-i-a, was present at 1304 Franklin

15   Avenue, Wilkinsburg, PA, on March 9 of 2016

16   where she sustained a gunshot wound to the

17   leg.  She was transported from the scene to

18   Forbes Regional Hospital where she was

19   treated for her injury and released.

20        That's the first proposed stipulation,

21   Your Honor.

22        MR. McKINNEY:  So stipulated, Your

23   Honor.

24        MR. WHITE:  Stipulated, Your Honor.

25        MR. CHERNOSKY:  The second proposed

1    stipulation is to the autopsy protocol in

2    this case.  The stipulation is as follows:

3    That the victim in this case Shada,

4    S-h-a-d-a, Denise Mahone was transported from

5    the scene to the Medical Examiner's Office

6    where an autopsy was performed at Autopsy

7    No. 16-COR-01952 by Dr. Xu.  That autopsy was

8    performed March 10 of 2016.

9         Dr. Xu found that the cause of death

10   was multiple gunshot wounds to the trunk,

11   notably five wounds.  Manner of death was

12   homicide.  He made the following findings:

13   (a), a penetrating gunshot wound to the right

14   shoulder, a recovered 7.62 caliber yellow

15   metal jacketed bullet; (b), a perforating

16   gunshot wound to the left shoulder; (c), a

17   superficial perforating gunshot wound to the

18   left shoulder; (d), a graze gunshot wound to

19   the chin; (e), a graze gunshot wound to the

20   right hand.

21        2, that victim Jerry Shelton was

22   transported to the Medical Examiner's Office

23   where an autopsy was performed at Autopsy

24   No. 16-COR-01957 by Dr. Jessica Dwyer.  That

25   autopsy was performed March 11 of 2016.

MARY BETH PERKO, RMR    (412) 350-5414

1    Dr. Dwyer found that the cause of death was

2    multiple gunshot wounds to the head, trunk,

3    and extremity, notably eight, and the manner

4    of death was homicide.

5    Dr. Dwyer made the following findings:

6    (a), a perforating gunshot wound to the head;

7    (b), two penetrating gunshot wounds to the

8    trunk.  Recovered was a minimally deformed

9    full metal jacketed 7.62 caliber bullet and a

10    minimally deformed full metal jacketed 7.62

11    caliber bullet; (c), a perforating gunshot

12    wound to the trunk; (d), a graze gunshot

13    wound to the trunk; (e), a perforating

14    gunshot wound of the left buttock; (f), a

15    penetrating gunshot wound to the left upper

16    arm.  Recovered was a minimally deformed full

17    metal jacketed 7.62 caliber bullet; (g), a

18    perforating gunshot wound to the left

19    forearm.

20    3, victim Brittany Rene Powell was

21    transported to the Medical Examiner's Office

22    where an autopsy was performed at Autopsy

23    No. 16-COR-01955 by Dr. W. Ashton Ennis.

24    That autopsy was performed March 10 of 2016.

25    Dr. Ennis found the cause of death was

1    multiple gunshot wounds, notably 25.  Manner

2    of death was homicide.

3        Dr. Ennis made the following findings:

4    (a), a perforating gunshot wound to the

5    posterior and left aspects of the head; (b),

6    a perforating and/or penetrating gunshot

7    wound to the face.  Recovered were two

8    markedly deformed 7.62 caliber bullet

9    fragments and a gray 7.62 caliber core

10   fragment.  That is noted to have been

11   recovered from the mouth and may have been

12   associated with another gunshot wound.

13       (c), perforating and/or penetrating

14   gunshot wound to the face.  Recovered were

15   two markedly deformed 7.62 caliber bullet

16   fragments and a gray bullet core fragment.

17       (d), six perforating and/or penetrating

18   gunshot wounds to the torso and chest,

19   recovered a medium to large 7.62 caliber

20   intact copper-colored jacketed bullet; (e), a

21   perforating gunshot wound to the right

22   breast; (f), a perforating gunshot wound to

23   the left breast; (g), a perforating gunshot

24   wound to the abdomen.  Recovered was an

25   intact medium to large 7.62 caliber

1    copper-colored jacketed bullet.

2         (h) was a perforating gunshot wound to

3    the back.  (i) was a perforating gunshot

4    wound to the back; (j), perforating gunshot

5    wound to the buttock and right hip; (k),

6    perforating gunshot wound to the mons pubis

7    and right hip; (l), three perforating and/or

8    penetrating indeterminate range gunshot

9    wounds to the right arm.  Recovered was an

10   intact medium to large 7.62 caliber

11   copper-colored jacketed bullet.

12        (m), penetrating gunshot wound to the

13   left forearm.  Recovered were two markedly

14   deformed bullet core fragments.  They were

15   deformed to the extent a caliber could not be

16   identified.

17        (n) was a perforating gunshot wound to

18   the right thigh.  (o) was a perforating

19   gunshot wound to the right leg.  (p) was a

20   perforating gunshot wound to the left thigh.

21   (q) was a perforating gunshot wound to the

22   left thigh.

23        (r) was a perforating gunshot wound to

24   the left leg.  (s) were recovered two

25   fragments of 7.62 bullet core and fragment of

1       a 7.62 bullet jacket from the hair, a

2       fragment of a 7.62 bullet core and fragment

3       of a 7.62 bullet jacket from the proximal

4       left aspect of the back between the skin and

5       shirt, a fragment of a copper-colored bullet

6       jacket from the right sleeve, could not

7       identify the caliber.

8           4, victim Chanetta Lorae Powell was

9       transported to the Allegheny County Medical

10      Examiner's Office where an autopsy was

11      performed at 16-COR-01954 by Dr. Baiyang Xu.

12      That autopsy was performed March 10 of 2016

13      wherein Dr. Xu found that the cause of death

14      was multiple gunshot wounds to the head and

15      left upper extremity, notably three. The

16      manner of death was determined to be

17      homicide.

18          Dr. Xu noted, (a), a perforating

19      gunshot wound to the head; (b), a perforating

20      gunshot wound to the head; (c), a penetrating

21      and perforating gunshot wound to the left

22      upper arm, the recovery of multiple bullet

23      fragments of yellow metal jacketed .40

24      caliber bullets.

25          He noted, (d), a clinical history of

1            third trimester pregnancy and noted that the

2            male fetus, body length measurements fit best

3            to 32 weeks, no trauma to the fetus, died as

4            a result of the death of his mother.

5                  5, Tina Shelton, victim in this case,

6            was transported to the Allegheny County

7            Medical Examiner's Office where an autopsy

8            was performed at 16-COR-01956 by Dr. Baiyang

9            Xu.  That autopsy was performed March 10 of

10           2016.

11                Dr. Xu noted that the cause of death

12           was multiple gunshot wounds to the head,

13           trunk, and extremities, notably six,

14           determined that the manner of death was

15           homicide and noted, (a), a perforating

16           gunshot wound to the head; (b), a perforating

17           gunshot wound to the left shoulder; (c), a

18           penetrating gunshot wound to the right trunk

19           with a recovered yellow metal jacket lead

20           core 7.62 caliber bullet; (d), a perforating

21           gunshot wound to the right buttock; (e), a

22           penetrating gunshot wound to the left thigh;

23           and, (f), a penetrating gunshot wound to the

24           left lower leg with a recovery of a gray

25           metal 7.62 caliber bullet fragment.

1              That is the extent of the second

2         stipulation, Your Honor.

3                   MR. McKINNEY:  So stipulated.

4                   MR. WHITE:  Stipulated, Your Honor.

5                   THE COURT:  Thank you, counsel.

6                   MR. CHERNOSKY:  Thank you, Your Honor.

7         The Commonwealth calls Sergeant Mike Adams.

8                         - - -

9                   **SERGEANT MICHAEL ADAMS**

10        a witness herein, having been first duly sworn, was

11        examined and testified as follows:

12                   **DIRECT EXAMINATION**

13   **BY MR. CHERNOSKY**:

14        Q.   Sergeant Adams, could you state your first and last

15             name and spell your last name for the court

16             reporter.

17        A.   Michael Adams, A-d-a-m-s.

18        Q.   And how are you currently employed?

19        A.   As a police officer with the Borough of Wilkinsburg.

20        Q.   How long have you been employed with the Borough of

21             Wilkinsburg?

22        A.   Since 1994.

23        Q.   And were you working on March 9 of 2016?

24        A.   Yes, I was.

25        Q.   In what capacity were you working that night?

1    A.   As a patrol sergeant working my responsibilities.

2    Q.   And as a patrol sergeant, is it fair to say that you

3         drive around your jurisdiction and respond to any

4         calls that come in?

5    A.   Yes, I do.  That's correct.

6    Q.   Directing your attention to that night at

7         approximately 10:50 p.m., did anything out of the

8         ordinary happen while you were on patrol?

9    A.   Yes.

10   Q.   And generally what happened?

11   A.   While I was on my particular patrol pattern, I heard

12        several gunshots.

13   Q.   Where were you when you heard the gunshots?

14   A.   I was driving in the 1400 block of Marlboro Avenue.

15   Q.   I'll show you what I will mark as Exhibit 1.  Do you

16        recognize what's depicted in Commonwealth's

17        Exhibit 1?

18   A.   Yes.

19   Q.   Does Commonwealth's Exhibit 1 depict an overhead

20        view of an area that contains Marlboro Avenue in

21        Wilkinsburg?

22   A.   Yes, it does.

23   Q.   Does it also depict an area that you were at when

24        you heard the shots?

25   A.   Yes, it does.

M. Adams - Direct by Mr. Chernosky    17

1    MR. CHERNOSKY:  Move for the admission

2         of Commonwealth's Exhibit 1.

3         MR. McKINNEY:  No objection, Your

4         Honor.

5         MR. WHITE:  No objection.

6         THE COURT:  So admitted.

7         MR. CHERNOSKY:  Thank you.

8  Q.   After hearing the shots, were you eventually

9       dispatched to an address?

10 A.   I was eventually dispatched to an address.

11 Q.   What address was that?

12 A.   It was the 1300 block of Franklin Avenue.

13 Q.   Specifically was it 1304 Franklin Avenue?

14 A.   Well, initially it was 1300 block.  In fact, I

15      initially radioed in the call of shots fired, and

16      then I received -- maybe a minute later I received

17      notification from dispatch that several calls were

18      coming in for shots fired in the 1300 block of

19      Franklin Avenue.

20 Q.   So what I'll mark as Commonwealth's Exhibit 2 and 3,

21      do you recognize what's depicted in Commonwealth's

22      Exhibit 2 and 3?

23 A.   Yes.

24 Q.   And what is depicted in Commonwealth's Exhibit 2 and

25      3?

1    A.    It's an overhead view of Franklin Avenue, in one
2          depiction Franklin Avenue, and there's a Midland
3          Street intersection there, and this is a further
4          wider shot of the same area.
5                    MR. CHERNOSKY:  Move for admission of
6          Commonwealth's Exhibits 2 and 3, Your Honor.
7                    MR. McKINNEY:  No objection.
8                    MR. WHITE:  No objection, Your Honor.
9                    THE COURT:  So admitted.
10   Q.    Exhibit 2, is there an indication of where
11         1304 Franklin Avenue is?
12   A.    Yes.
13   Q.    And Commonwealth's Exhibit 3, is that a closer up
14         view?
15   A.    Yes, it is.
16   Q.    Highlighted with a yellow square, is that
17         1304 Franklin Avenue?
18   A.    That appears to be it, yes.
19   Q.    You said that when you were on Marlboro -- Street,
20         is it?
21   A.    Marlboro Avenue.
22   Q.    -- Marlboro Avenue, you heard shots.  Approximately
23         how many shots did you hear?
24   A.    Maybe 10 to 12 rhythmic type shots.
25   Q.    Could you describe the weather that night.

1    A.   It was a really nice day.  I had my windows actually

2         all the way down, both front seat passenger and

3         driver's side.

4    Q.   Where were you when you first heard the shots on

5         Marlboro Avenue?

6    A.   I was entering into the 1400 block, just leaving

7         1300 block, entering into the 1400 block, and I

8         began to hear several gunshots.

9    Q.   Show you what I've marked as Exhibit 4.  In

10        Exhibit 4 is there a delineation of your approximate

11        position on Marlboro Avenue at the time you heard

12        the shots?

13   A.   Yes.

14   Q.   And what is it delineated by or how is it marked?

15   A.   Looks like there's a little blue car depiction.

16   Q.   Does that accurately depict your approximate

17        location when you heard the shots on Marlboro

18        Avenue?

19   A.   Yes, it does.

20             MR. CHERNOSKY:  I move for the

21         admission of Commonwealth's Exhibit 4.

22             MR. McKINNEY:  No objection.

23             MR. WHITE:  No objection, Your Honor.

24             THE COURT:  So admitted.

25   Q.   How many shots did you hear total, if you recall?

1      A.    I really didn't count them but it seemed to last
2            about 10 seconds, 12, 15 seconds, just rhythmic
3            shots.
4      Q.    And for the record, you are sort of slapping your
5            knee in a rhythmic fashion?
6      A.    Yeah.  It sounded like what often happens as
7            officers we go to the firing range.  We take aimed
8            type shots.  It was like bam, bam, bam, bam, bam,
9            bam, bam, bam, bam, like that.
10     Q.    When you heard these shots, did you ascertain the
11           approximate area they were coming from?
12     A.    Yeah.  I notified dispatch that I believed it was
13           coming from it would have been my left side, which
14           is over towards Franklin Avenue, Dell Way, in that
15           couple blocks over to my left.
16     Q.    When you first heard the shots did you stop your
17           police cruiser right away or did you continue while
18           the shots were going on?
19     A.    Well, I initially stopped to listen, and then I
20           began to creep up -- Marlboro is kind of an uphill
21           street.  I kind of slowly with a slow crawl went up
22           the street as I was listening, and then when the
23           shots stopped, I picked up the radio.
24     Q.    Approximately how far did you go before the shots
25           stopped?

1    A.    Maybe 10 houses, maybe 60 feet, something like that.

2    Q.    And then you picked up the radio.  What did you do

3          at that point?

4    A.    I radioed in to County that they may get a call for

5          shots fired in the area of Franklin Avenue and let

6          them know that I would be heading over in that

7          direction.

8    Q.    And did you head over in that direction?

9    A.    Yes.

10   Q.    Which way did you proceed on Commonwealth's

11         Exhibit 4 there?

12   A.    Want me to show you?

13   Q.    Yes.

14   A.    This is the area where I heard the shots.  I slowly

15         drove up a few houses, radioed in that I had to

16         drive all the way up to Princeton Boulevard, so

17         that's what I did.  As I drove up here, I turned

18         left.  I looked down this alley here.  It's almost

19         impassable sometimes, but anyway, I continued till I

20         got to Franklin, and I made a left right here when

21         dispatch notified me that they're receiving multiple

22         calls, so a couple of calls for shots fired also in

23         the 1300 block on Franklin Avenue, the 1300 block,

24         and I began to drive down Franklin.  This is the

25         1400 block here, started driving down.

1    Q.    Thank you, sir.  Can you resume your seat, and I

2          will show you what I've marked as Commonwealth's

3          Exhibit 5 and ask you if you've previously reviewed

4          this with me and if that would aid in your testimony

5          today.

6    A.    Yes, this would aid.

7    Q.    So you described driving for a portion or for a

8          period of time while hearing the shots?

9    A.    Yes.

10   Q.    And Commonwealth's Exhibit 5, there's a blue arrow.

11         Does that indicate the approximate distance that you

12         drove while hearing the shots?

13   A.    Yes.

14   Q.    Then you indicated that you proceeded to Franklin

15         Avenue?

16   A.    Princeton Boulevard first and then left on Princeton

17         to Franklin.

18   Q.    Do those arrows that are indicated in Commonwealth's

19         Exhibit 5 indicate where you proceeded to on

20         Franklin Avenue?

21   A.    Yes, they do.

22   Q.    And when you got on Franklin Avenue you said that

23         you received dispatch for shots fired.  Was there a

24         specific address at that time?

25   A.    I don't believe they gave me an address.  They

1          radioed back to me that there have been calls for

2          shots fired on Franklin Avenue.

3     Q.   So what do you do when you turn onto Franklin

4          Avenue?

5     A.   Well, I began to scan both left and right, you know,

6          looking for a possible victim.  We've done that

7          quite often over my 22 years, scan the area and look

8          for what we call man down as I'm looking left and

9          right as I drive down Franklin Avenue.

10    Q.   As you're scanning left and right going down

11         Franklin Avenue, does anything catch your attention?

12    A.   Yes.

13    Q.   What is that?

14    A.   I see a gentleman.  As I look from left to right, I

15         look back left and I see a gentleman just coming

16         from looks like -- I wasn't sure if he came out of a

17         house or from the rear of a car, but he walks from

18         the rear of the car and gets into the driver's seat

19         of a car.

20    Q.   What did you do upon noticing this individual?

21    A.   He was a short distance in front of me, so once he

22         got in the car, I drove down and just stopped,

23         stopped my police car, looked over into the driver's

24         seat of the car.

25    Q.   What was your thought as you're looking into the

1          driver's seat of the car?

2    A.   I kind of waited for the gentleman to look at me,

3         just thought he would turn his head.

4    Q.   Did that happen?

5    A.   No.

6    Q.   How long did you sit there?

7    A.   Maybe five seconds.

8    Q.   Did you then proceed to the shots fired call?

9    A.   Yes.  I continued -- After looking to my left,

10        looking into the drivers's window, I thought, Okay,

11        he's not going to look at me.  He must be going to

12        work or something, whoever he is, and I continued

13        driving down the street.

14   Q.   Prior to driving down the street did you make any

15        other notations about that vehicle?

16   A.   Well, what I did was after looking I continued

17        driving, still scanning left and right.  I looked in

18        my side view mirror of the police car and decided I

19        better maybe get the plate of that car.  I don't

20        know what it's worth, but I'm going to notate the

21        plate before this guy drives away and just continued

22        down the road.  I notated the plate.

23   Q.   Could you describe the individual that you saw

24        getting into that vehicle?

25   A.   Yeah.  He was a fit individual, well built, 5'10",

1    say 170, 180, pounds, short hair, had a little bit

2    of facial hair.  He had on a black top, like a black

3    shirt, top.  I'm not sure what color his pants were,

4    brown skin, about my complexion.

5    Q.   Do you recall later being shown a still image from

6         video obtained by the county police?

7    A.   Yes.

8    Q.   And when you were shown that still image, did you

9         recognize the individual in that still image?

10   A.   Yes, I did.

11   Q.   Was it the same person that you saw on Franklin

12        Avenue that night?

13   A.   Yes.

14   Q.   You said you wrote down the registration?  What

15        number did you write down?

16   A.   I actually notated it in my head at the moment as I

17        drove down the street.  Before I exited my police

18        car I jotted the plate down in case so I wouldn't

19        forget it on my little notepad, and so that's -- I

20        wrote it down.

21   Q.   What was the number?

22   A.   I remember thinking Jiffy Peanut Butter but it was

23        Jiffy Butter Peanut, switching the letters, 2200.

24   Q.   Did you eventually give that registration number to

25        detectives from the county police?

1    A.    Yes.

2    Q.    Now, let's go on to you proceeding to the shots

3          fired call.  Do you eventually find yourself in the

4          area of the 1300 block, specifically 1304 Franklin

5          Avenue?

6    A.    Yes.

7    Q.    What do you observe when you first get outside or

8          out front?

9    A.    Well, while I was en route to 1304 I could hear --

10         Well, first of all, I noticed my coworker coming up

11         from the 1300 block or, I should say, from Ardmore

12         turning onto Franklin Avenue.  He was in the 1300

13         block, and I was coming down toward the 1500 block

14         from the 1400 block and I could hear a woman

15         screaming.

16   Q.    Did you eventually see the woman that was screaming?

17   A.    Yes.

18   Q.    Where was she?

19   A.    She ran towards my coworker's police car.

20   Q.    Did she say anything to you?

21   A.    She said to both of us -- She was screaming, was

22         saying "Over here.  Over here.  My family's been

23         shot.  He's on the porch.  He's on the porch."  We

24         said, "Who's on the porch?"  She said, "He's been

25         shot.  He's on the porch."

M. Adams - Direct by Mr. Chernosky      27

1          My partner got out of his car first.  He

2      actually engaged with her.  She told him that, but I

3      could hear her telling him, and then I got out of my

4      car and we both went towards 1304 Franklin.

5   Q.  At that point did you know where the shooter or

6      shooters were?

7   A.  No.

8   Q.  What steps did you take when you got on scene?

9   A.  Well, it was a frantic scene, and the woman

10     continued to give us directions.  She said, "Go

11     around back.  Go around back."  She said, "Go around

12     back.  She's pregnant.  They shot my family.  Go

13     around back."  And we didn't know what she meant.

14          She said, "They're around back.  They're

15     around back."  And so we went around back, not

16     really knowing -- it could have been a shooter in

17     the backyard -- until we discovered several victims.

18  Q.  And can you tell the Court generally where the

19     victims were placed when you got around to the rear

20     of the residence.

21  A.  Yeah.  There were four people on the back porch.

22     There were three women and one man on the back

23     porch, and there were two other victims at the foot

24     of the steps of the backyard, just at the bottom of

25     the steps, a man and a woman.

1    Q.    Did you take steps to clear the house and make sure
2          nobody else was in the house?
3    A.    Yes.  Another coworker, a sergeant showed up on
4          scene, and he and I went through the entire house.
5    Q.    Did you contact Emergency Medical Services?
6    A.    Yes.
7    Q.    What was the purpose in contacting EMS?
8    A.    Well, we saw the -- just the visible injuries to the
9          victims, and it appeared that a couple of them were
10         in need of immediate assistance.  So we contacted
11         dispatch, had them dispatch an ambulance.  My
12         partner contacted Allegheny County dispatch as well
13         and asked for the Homicide Unit to respond.
14              MR. CHERNOSKY:  No further questions.
15         I'll offer for cross.  I would move for the
16         admission of Commonwealth's Exhibit 5.
17              MR. McKINNEY:  No objection.
18              MR. WHITE:  No objection, Your Honor.
19              THE COURT:  So admitted.  Mr. McKinney.
20              MR. McKINNEY:  Thank you, Your Honor.
21                          - - -
22                    CROSS-EXAMINATION
23   BY MR. McKINNEY:
24    Q.    Sergeant, you said that you heard approximately 10
25          to 12 shots when you were en route to patrol that

MARY BETH PERKO, RMR    (412) 350-5414

1              night; is that correct?

2    A.    That is correct.

3    Q.    And have you since learned that, in fact, there were

4              48 shots fired that night?

5    A.    I've learned there was more than 10 shots, yes.

6    Q.    And so when you hear these 10 to 12 shots, I think

7              your testimony was you started to creep up Franklin

8              and then the shots stopped, and then you proceeded

9              to I guess respond closer to the scene; is that

10             correct?

11   A.    Correct.  Yes.

12   Q.    And the first human being that you see is this

13             black, slim, slender black male?

14   A.    That was the only person that was moving around or

15             walking when I initially got onto the 1400 block of

16             Franklin.  And as I drive down the 1400 block of

17             Franklin towards 13, I only see one person at that

18             point.

19   Q.    And how soon after the shots were fired did you see

20             that individual?

21   A.    Just over less than two minutes, I would say.

22   Q.    Okay.  And you would agree with me that you thought

23             that this individual was a person of interest

24             because you did eventually conduct further

25             surveillance of this individual; is that correct?

1    A.    Well, I've been a police officer 22 years.  We've

2          gotten several calls of shots fired, and often there

3          are people walking around and we will interview them

4          or ask them if they heard anything and so forth.

5          And I encountered a gentleman who I saw get into a

6          car, and I kind of waited for him to look at me and

7          maybe point down the street or something or maybe

8          flip me the finger or something.  That's what

9          happens.

10               And I just looked over and thought, hmm,

11         maybe he's going to work.  He's just very calm.

12         I'll just proceed.  I just went on down the road.  I

13         just did note the plate because it's something we do

14         if there are people in close proximity.

15   Q.    So you didn't interview this person, though;

16         correct?

17   A.    No.  No.

18   Q.    And you didn't stop them to ask them any questions

19         or detain them in any way; is that correct?

20   A.    That's correct.

21   Q.    You had just heard 10 to 12 shots two minutes prior.

22         This is the first person you see, and essentially

23         all you did was take out your notepad and write down

24         his license plate?

25   A.    I actually wrote it down on my hand initially, but,

1    yes, that's correct.

2   Q.   This individual that you saw, was he carrying
3        anything with him?

4   A.   I did not see anything in his hands, no.

5   Q.   When you first saw him, was he directly behind the
6        car or was he walking down the street towards the
7        car?

8   A.   He was directly behind the car because I had just
9        looked to my right and I looked left, and I just saw
10       a figure sort of from the rear of the car walk
11       toward the driver's seat, get in, you know.  He got
12       in the car.  And I cruised down the street just a
13       little bit and just stopped and then stared into the
14       driver's window.

15  Q.   Did you see any other passengers in the car?

16  A.   No.

17  Q.   Now, this happened at approximately 11 p.m.; is that
18       correct?

19  A.   I think the call came in about six minutes, six or
20       seven minutes to 11.

21  Q.   And would you agree with me that it was dark outside
22       at that time?

23  A.   It was dark, yeah.

24  Q.   And you were able to ascertain the license plate of
25       this car by looking through your side view mirror?

MARY BETH PERKO, RMR    (412) 350-5414

1    A.    Correct.

2    Q.    So you're driving in the opposite direction of the

3          car.  You look in your side view mirror and see the

4          license plate behind you?

5    A.    Correct.

6    Q.    Do you remember what this individual was wearing?

7    A.    He had on a dark top, dark shirt of some sort.  I'm

8          not sure if he had a cigarette or something out of

9          his mouth, but I caught something white up in this

10         area, just on the one shoulder.  Don't know what

11         color pants he had on, but he was thin, wasn't -- he

12         didn't have a belly or anything like that.  He was,

13         you know, a decently built man.

14   Q.    So this was March 9.  Do you remember if this black

15         male had on a jacket or coat of any kind?

16   A.    I don't remember if he had on a coat.

17   Q.    You don't remember if he had on a coat or jacket but

18         you do remember that he was slim?

19   A.    Yes.

20   Q.    How long from the time that you remembered this

21         license plate, how much time elapsed from that

22         moment to the time that you actually wrote down the

23         license plate?

24   A.    Just a few seconds, maybe a minute and a half.  I

25         drove -- after seeing him, after seeing the plate, I

MARY BETH PERKO, RMR    (412) 350-5414

1          continued down Franklin, and then I could hear a

2          woman yelling. She said, "Over here. Over here.

3          Over here. Officers, over here."

4                    And so my partner drove up to the

5          location. I drove down. And before I got out I

6          just thought, Let me write this down real quick, and

7          I just jotted it down and got out of the car.

8     Q.   And when was the earliest that you gave that license

9          plate information to detectives?

10    A.   Couple hours later probably. It was after

11         discovering the scene, calling the medics, county

12         homicide, and several other police agencies

13         responded. It was at least a few hours later. In

14         fact, one of the -- I mentioned to one of the county

15         detectives, "By the way, I have a license plate. I

16         don't know if you need it."

17                   But then I explained it was a car further

18         up the road on Franklin, and I just happened to jot

19         the plate down, saw a guy got in, but he was cool,

20         so -- just very calm, but here's the plate. And I

21         had to go out to the car and get the plate because I

22         had written it. I didn't want to give the wrong

23         plate to the officer.

24    Q.   How much time total do you think you had to observe

25         this individual?

1    A.   Well, I pulled my car right beside his. He was

2        facing in the other direction, and I had both my

3        windows down. I just looked through my window. His

4        windows were up. I just looked at him sitting

5        there. He just sat at the steering wheel. It

6        looked like he was thinking, but he wasn't sweating.

7             I couldn't see any sweat or he wasn't

8        breathing or staring at me or anything, just looked

9        straight ahead, and I said that, This guy's going to

10       work or something. I don't know, you know. And I

11       continued down the road.

12    Q.   So how much time did you spend attempting to look at

13       this person?

14    A.   Five seconds, maybe a little longer, maybe six

15       seconds, just staring through the window, and then I

16       just said, Okay, and I drove down, kept going.

17            MR. McKINNEY: One moment, Your Honor.

18            (Pause)

19            MR. McKINNEY: Your Honor, no

20       additional questions.

21            THE COURT: Mr. White, any questions

22       for this witness?

23            MR. WHITE: Yes, Your Honor.

24              - - -

25

1                    CROSS-EXAMINATION

2    BY MR. WHITE:

3        Q.    Sergeant Adams, you indicated on direct that you

4              were on your regular patrol pattern; is that

5              correct?

6        A.    Correct.

7        Q.    What is your regular patrol pattern?

8        A.    Normally I -- This is Ardmore Boulevard right here.

9        Q.    You're indicating Ardmore Boulevard is on the

10             left-hand side of that photograph?

11       A.    Yes, the main road here.  I'll come up, loop around,

12             way down here.  We have a place called Sherwood.

13             It's part of Wilkinsburg but you have to go through

14             Forrest Hills to get to it, check that area, and

15             then I come back down Ardmore this way.

16                   This particular night I made a right turn.

17             Normally I actually go to Franklin and turn up, and

18             then I go through the neighborhoods and come back,

19             but this night I actually turned on Marlboro and

20             started up this way.

21       Q.    So that evening you traveled southeast on Ardmore

22             Boulevard towards Forest Hills, then turned around

23             and then came back up and made a right up Marlboro;

24             is that correct?

25       A.    Yes, that's correct.

1    Q.    And you'll agree with me that side of Ardmore

2          Boulevard is sloped?

3    A.    Yeah.  Yes, it's sloped coming down.  As you come

4          this way, it's downhill.  Going this way, it's

5          uphill.

6    Q.    And going up Ardmore Avenue, you're heading uphill?

7    A.    Yes.

8    Q.    And you agree with me in between the streets and in

9          between the houses going northwest it's hilly?

10   A.    Yeah.  There's several hills in that neighborhood

11         plan area, yeah.

12   Q.    So I guess the point I'm trying to make is while

13         you're sitting on Marlboro Avenue, you couldn't see

14         the back of the houses on Franklin Avenue; is that

15         correct?

16   A.    No, I can't.

17   Q.    Even in broad daylight you couldn't see them because

18         of the topography of the hillside?

19   A.    Yeah.  And it's pretty wide from here.  Marlboro to

20         Franklin here is wide, but it's very narrow up

21         there, but yeah.

22   Q.    Approximately how many football fields is it from

23         where you were sitting when you heard the gunshots

24         to 1304 Franklin Avenue?

25   A.    Maybe, I don't know, one and a half.

1   Q.   And you went to the top of Marlboro Avenue and made

2        a left on Princeton and then you looked down Hazel

3        Way; correct?

4   A.   Correct.

5   Q.   And Hazel Way is considered an alleyway?  Is that

6        safe to say?

7   A.   Correct.  Yes.

8   Q.   Hazel Way is full of trees and shrubs and overgrown

9        grass for the most part?

10  A.   Well, either side, but the roadway is pretty well

11       damaged.  It's a bad roadway.

12  Q.   Not many cars traveling up and down that roadway?

13       Is that safe to say?

14  A.   That's safe to say.

15  Q.   And when you looked down Hazel Way, you didn't see

16       anybody down Hazel Way; is that correct?

17  A.   Well, again, with the hills, you really can't see

18       all the way from the top of Franklin all the way

19       down Hazel Way to --

20  Q.   From the top of Princeton Avenue --

21  A.   -- Midland.

22  Q.   If I were standing in the back of 1304 Franklin

23       Avenue, could you see me from Princeton Avenue if I

24       were standing there?

25  A.   No.

1    Q.   Even in broad daylight?

2    A.   No, can't see.

3    Q.   And you never saw anybody running and walking up or

4         down Hazel Way that evening?

5    A.   That's correct.  No.

6    Q.   Then you made a left down the hill on Franklin

7         Avenue?

8    A.   Yes.

9    Q.   Okay.  And Franklin Avenue's a two-way street?

10   A.   Yes.

11   Q.   And there's cars parked on each side of the street;

12        is that correct?

13   A.   That's correct.

14   Q.   And were there a lot of cars parked on the street

15        that evening?

16   A.   Normal amount of cars, usually both sides, and if

17        one car's coming up, you almost have to kind of pull

18        over to let that car pass for opposing traffic to go

19        down.

20   Q.   Were any cars traveling up Franklin that evening

21        when you were coming down?

22   A.   No.

23   Q.   And the individual you saw walking up Franklin

24        Avenue -- did you see him walking up Franklin Avenue

25        or did you see him standing behind a car?

1   A.   I just looked back to my left and saw a man come up

2        from the rear of a car and get into it.

3   Q.   And how far away were you from him?

4   A.   From me to the end of this room maybe.

5   Q.   About 40 feet maybe?  I'm not trying to trick you.

6   A.   Yeah.  I'm saying from here to the end of the wall

7        over there.

8   Q.   And he wasn't carrying anything; is that correct?

9   A.   No.  I didn't see him carrying anything.

10  Q.   And he wasn't running?

11  A.   He wasn't running, no.

12  Q.   And he was cool, calm, and collected for the most

13       part?

14  A.   Correct.

15  Q.   He gets in the car, and you drive down and you were

16       parallel with him; correct?

17  A.   I was facing the opposite direction but I was right

18       beside him.

19  Q.   He was facing up in his vehicle and you were going

20       down?

21  A.   Correct.

22  Q.   And you sat there and stared at him for five, six

23       seconds?

24  A.   That's correct.

25  Q.   And he never looked over?

1    A.   Never looked over.

2    Q.   Was he turning the car on?

3    A.   No.  I didn't hear a car ignition or anything, just

4         looked like -- I couldn't see his hands, but the way

5         his body was positioned, it looked like he was

6         leaning forward holding the wheel.

7    Q.   And then you drive down Franklin Avenue; correct?

8    A.   I creeped down just, you know, not quickly, maybe

9         five, eight miles an hour, just continued to cruise

10        looking from sidewalk to sidewalk.

11   Q.   How far did you go before you stopped again?  How

12        far past the car did you travel before you stopped

13        again?

14   A.   Maybe a car length and a half.

15   Q.   Were there any cars behind the vehicle that you saw

16        this individual getting in?

17   A.   No.

18   Q.   So at that point in time it's dark out; correct?

19   A.   Yes.

20   Q.   Is it rainy?

21   A.   No.

22   Q.   You stopped your vehicle.  Are there streetlights on

23        Franklin Avenue?

24   A.   Yes.

25   Q.   Were the streetlights illuminated that evening?

1      A.   Yes.

2      Q.   Did you mark that in your report?

3      A.   No, I don't believe I did.

4      Q.   And you stop your car and you look in your side view

5           mirror?

6      A.   That's correct.

7      Q.   And you mentally jot down these numbers?

8      A.   Just Jiffy Peanut Butter, Jiffy Butter Peanut.

9           Jiffy Butter Peanut was what I said to myself.

10          Jiffy Peanut Butter, said switch Jiffy Butter

11          Peanut.

12     Q.   Did you shine a spotlight on the license plate?

13     A.   No.

14     Q.   And, Sergeant, you'll agree with me that when you

15          read something looking into a mirror, it's

16          backwards?

17     A.   Sure.

18     Q.   And not only is it backwards but the letters or

19          numbers are flipped?

20     A.   I've done this for 22 years.  I know how to unflip

21          them in my mind.  But, yes, they're opposite or

22          reverse.

23     Q.   For instance, an ambulance, it says "ambulance"

24          backwards and flipped the wrong way; correct?

25     A.   So you can read it when you're driving, yes.

1    Q.   But you'll agree with me the license plate that you

2         read was not flipped so you could read it in your

3         side view mirror; is that correct?

4    A.   That's correct.

5    Q.   So your testimony here today is that it was dark

6         out.  You're driving down Franklin Avenue.  You hear

7         about 10 to 15 gunshots, and you stop and you look

8         out your side view mirror and you read a license

9         plate backwards both ways essentially and how

10        they're placed on the --

11   A.   Yes, that's correct.

12   Q.   You did that?

13   A.   Yes.

14   Q.   And then you wrote it on a notepad?

15   A.   Only after I got down to where the woman was

16        screaming.  Before I got out of the car I said, I

17        better write that down.

18   Q.   And you wrote it on a notepad?

19   A.   I wrote it on a piece of paper, yeah, just jotted it

20        on a piece of paper.  We have computers in our car.

21        I just used it as a table, just --

22   Q.   And later on after you canvassed the scene and saw

23        what had occurred, you told a county police

24        detective about this license plate you saw?

25   A.   Correct.  Yes.

1    Q.    And who was that county detective?

2    A.    I don't know his name, actually.

3    Q.    Is he here today?

4    A.    I believe he is here today, yes.

5    Q.    And did you give him the piece of paper?

6    A.    No.  I didn't give him any paper at all.  I just

7          told him, "I have a plate.  I don't know what it's

8          worth, but I'll give it to you if you want it."  And

9          he said yes, so I went to the car.

10   Q.    You saved that piece of paper; is that correct?

11   A.    No, I don't think I did.

12   Q.    You never saved that piece of paper?

13   A.    I don't believe I did.  I may have it, but I don't

14         believe I saved it.

15   Q.    But if you did have it, you would turn it over to

16         the prosecutor; is that correct?

17              MR. CHERNOSKY:  Just object to the

18         relevance at this point.

19              MR. WHITE:  I'll move on, Your Honor.

20   Q.    The person you described as getting into a vehicle

21         on Franklin Avenue at the top near Princeton is not

22         my client, Robert Thomas; is that correct?

23   A.    That's correct.

24              MR. WHITE:  I have nothing further,

25         Your Honor.

MARY BETH PERKO, RMR    (412) 350-5414

1     THE COURT:  Mr. Chernosky?

2     MR. CHERNOSKY:  Just briefly on

3     redirect.

4     - - -

5     **REDIRECT EXAMINATION**

6     **BY MR. CHERNOSKY**:

7     Q.   What color was the vehicle you saw?

8     A.   It was white.

9     Q.   Did you get a make or model?

10    A.   I did.  A white Lincoln, in fact.

11    MR. CHERNOSKY:  No further redirect.

12    MR. McKINNEY:  No recross.

13    - - -

14    **RECROSS-EXAMINATION**

15    **BY MR. WHITE**:

16    Q.   Did you write down the make and model?

17    A.   No, I didn't write the make or model at all.  I just

18    mentioned it to the officer.  I said, "Oh, in

19    fact" -- I gave him the plate.  He asked me, "Did

20    you happen to get the make?  And I said, "I think it

21    was a Lincoln, white," just like that, never wrote

22    that down at all.

23    Q.   But you wrote all this down in your incident report;

24    is that correct?

25    A.   Yeah.  It was in my report, sure.  Uh-huh.

MARY BETH PERKO, RMR    (412) 350-5414

J. Krah - Direct by Mr. Chernosky          45

1              MR. WHITE:  I have nothing further,

2        Your Honor.

3              MR. CHERNOSKY:  I don't have any

4        further questioning for --

5              THE COURT:  Thank you, Sergeant Adams.

6        You may step down.

7              MR. CHERNOSKY:  May Sergeant Adams be

8        excused for the day?  I don't anticipate

9        recalling him.

10             MR. McKINNEY:  No objection.

11             MR. WHITE:  No objection.

12             THE COURT:  Thank you, Sergeant Adams.

13       Have a nice day.  Mr. Chernosky?

14             MR. CHERNOSKY:  Thank you, Your Honor.

15       The Commonwealth will call John Krah.

16                        - - -

17                     <u>**JOHN KRAH**</u>

18       a witness herein, having been first duly sworn, was

19       examined and testified as follows:

20                  <u>**DIRECT EXAMINATION**</u>

21       <u>BY MR. CHERNOSKY</u>:

22       Q.    Mr. Krah, can you state your first and last name and

23             spell your last name for the court reporter.

24       A.    John Krah, K-r-a-h.

25       Q.    How are you employed?

MARY BETH PERKO, RMR    (412) 350-5414

1    A.    Paramedic and supervisor with Eastern Area
2          Ambulance.
3    Q.    Were you working in that capacity on March 9 of
4          2016?
5    A.    Correct.
6    Q.    Prior to the 11:00 hour did you receive a call to
7          proceed to the 1300 block of Franklin Avenue in the
8          Borough of Wilkinsburg?
9    A.    Yes.
10   Q.    Where were you when you received the call?
11   A.    Turtle Creek area.
12   Q.    How long did it take you to get to Wilkinsburg?
13   A.    About six minutes.
14   Q.    Could you explain to the Court what you observed
15         upon arriving on scene.
16   A.    By the time we arrived, the scene was pretty covered
17         with police securing the area.  My unit actually got
18         to pull up on the road on Franklin, approached the
19         house.  We had one victim on the porch speaking to a
20         police officer, was directed around the house.  When
21         we arrived in the backyard we had a female in the
22         yard, multiple gunshot wounds, a male in the yard,
23         also multiple gunshot wounds, and then multiple
24         victims on the porch.
25                    Myself and my partner took the male in the

1    yard.  The Penn Hills team that was coming behind us

2    was directed to the female in the yard, loaded the

3    patient on my stretcher.  My partner started taking

4    care of him.  I started doing triage of the scene.

5  Q.   Let me show you what I will mark as Commonwealth's

6       Exhibit 6.  Do you recognize what's depicted in

7       Commonwealth'Os Exhibit 67?

8  A.   Yes.  Backyard of the house.

9            MR. CHERNOSKY:  Your Honor, I move for

10           the admission of Commonwealth's Exhibit 67.

11           MR. McKINNEY:  No objection.

12           MR. WHITE:  No objection.

13           THE COURT:  So admitted.

14  Q.   You said you were treating an individual with

15       multiple gunshot wounds in the backyard.  You said

16       that was a male you were treating?

17  A.   Correct.

18  Q.   Did you later learn his name?

19  A.   I did for the trip sheet.  I don't --

20  Q.   If I told you his name was John Ellis, would that

21       refresh your recollection?

22  A.   Yes.

23  Q.   Could you indicate on Commonwealth's Exhibit 6 where

24       approximately you were treating John Ellis.

25  A.   The far side of the backyard along the house.

J. Krah - Direct by Mr. Chernosky    48

1    Q.    You indicated that someone was treating the female
2          patient in the yard?
3    A.    Correct.
4    Q.    Where approximately were they treating that patient?
5    A.    Along the sidewalk on the yard, the back sidewalk
6          into the yard on the side.
7    Q.    And then you said there was a female that required
8          treatment on the porch?
9    A.    No.  There was a male on the front porch that
10         required treatment initially and then one more that
11         required minor treatment later on.
12   Q.    All right.  Now, the various emergency response or
13         medical response agencies that come go to different
14         hospitals with each victim; is that contract?
15   A.    Correct.
16   Q.    And ultimately who were you working with that night?
17   A.    I was with Eastern Area.
18   Q.    And do you have a partner in your ambulance?
19   A.    Correct.
20   Q.    Did your partner ultimately leave you?
21   A.    I gave her a response medic to transport their
22         patient.  I stayed on scene as scene commander.
23   Q.    And in your role as scene command, did you
24         ultimately pronounce four individuals deceased?
25   A.    Correct.

1    Q.    The individuals deceased, where were they?

2    A.    Three females on the upper porch, back porch, and

3          then one more male that was in the doorway of that

4          same porch.

5                    MR. CHERNOSKY:  No further questions.

6          I'll offer for cross.

7                    THE COURT:  Mr. McKinney?

8                    MR. McKINNEY:  No questions, Your

9          Honor.

10                         - - -

11                   CROSS-EXAMINATION

12   BY MR. WHITE:

13   Q.    Sir, did anybody indicate who was doing the shooting

14         or who shot them?

15   A.    Not to us, no.

16                   MR. WHITE:  I have no other questions,

17         Your Honor.

18                   THE COURT:  Okay.  Thank you, Mr. Krah.

19         You may step down.

20                   MR. CHERNOSKY:  Thank you.  May

21         Mr. Krah be excused?

22                   MR. McKINNEY:  No objection.

23                   MR. WHITE:  No objection.

24                   THE COURT:  Mr. Krah, you have a great

25         day.

1           THE WITNESS:   Thank you.

2           THE COURT:   Commonwealth may call its

3       next witness.

4           MR. CHERNOSKY:   Thank you.

5       Commonwealth calls Detective Dolfi.

6                   - - -

7               **DETECTIVE TODD DOLFI**

8       a witness herein, having been first duly sworn, was

9       examined and testified as follows:

10              **DIRECT EXAMINATION**

11  **BY MR. CHERNOSKY:**

12      **Q.**   Detective, could you state your first and last name,

13          spell your last name for the court reporter.

14      **A.**   Yes.   It's Todd Dolfi, D-o-l-f-i.

15      **Q.**   How are you currently employed?

16      **A.**   Detective with the Allegheny County Police

17          Department.

18      **Q.**   Were you employed in that capacity on March 9 of

19          2016?

20      **A.**   Yes, I was.

21      **Q.**   And on that date did you begin an investigation in

22          several shooting deaths that occurred at

23          1304 Franklin Avenue in the Borough of Wilkinsburg?

24      **A.**   Yes.

25      **Q.**   Could you explain in general terms what the

**MARY BETH PERKO, RMR   (412) 350-5414**

1           residence of 1304 Franklin Avenue looks like.

2    A.     Yeah.  It's a two, two and a half story brick

3           single-family dwelling, attached front porch that

4           runs the length or the width of the house.  The back

5           porch is smaller.

6    Q.     Show you what I will mark as Commonwealth's

7           Exhibit 7.  Is Commonwealth's Exhibit 7 a photograph

8           of the exterior of 1304?  Is that what's depicted?

9    A.     Yes, it is.

10               MR. CHERNOSKY:  Move to admit

11            Commonwealth's Exhibit 7, Your Honor.

12               MR. McKINNEY:  No objection.

13               MR. WHITE:  No objection.

14               THE COURT:  So admitted.

15   Q.     Upon arriving on scene, where was your primary scene

16          located?

17   A.     Primary scene was in the rear of 1304 and 1306

18          Franklin Avenue.

19   Q.     And looking at Commonwealth's Exhibit 7, where do

20          you have to go to access the rear yard of 1304?

21   A.     From this picture, looking at this picture, you

22          would go to the left of 1304, so in between 1304 and

23          1306 Franklin Avenue.

24   Q.     And could you describe what you observed upon

25          arriving on scene that day.

1    A.   Yes.   When we first got to the front of the house,
2         we noted some blood on the front porch.   We were
3         then directed to the rear of 1304, traveled down the
4         sidewalk in between 1304 and 1306, noted several
5         spent casings and several chunks of body matter on
6         the sidewalk on the side of 1306 Franklin.
7    Q.   Show you what I will mark as Commonwealth's
8         Exhibits 8 and 9.   Could you describe what's
9         depicted in Commonwealth's Exhibits 8 and 9.
10   A.   No. 8 is a picture of the rear of 1304 Franklin
11        Avenue looking from the alley behind that address,
12        and Exhibit 9 is a close-up view depicting the back
13        porch of 1304 Franklin and the sidewalk running
14        between 1304 and 1306.
15             MR. CHERNOSKY:   Move for the admission
16         of Commonwealth's Exhibits 8 and 9.
17             MR. McKINNEY:   No objection.
18             MR. WHITE:   No objection.
19             THE COURT:   So admitted as to both
20         exhibits.
21   Q.   All right.   And Commonwealth's Exhibit 8, what is
22        depicted?   Is that the backyard?
23   A.   Correct.   That's the backyard of 1304 Franklin.
24   Q.   Did you participate in the processing of the scene
25        in the backyard?

MARY BETH PERKO, RMR   (412) 350-5414

1   A.   I did.

2   Q.   Did you recover any ballistic evidence?

3   A.   Yes.

4   Q.   In general terms, could you describe for the Court

5        what ballistic evidence you recovered.

6   A.   There was .40 caliber spent casings recovered in the

7        alley behind 1304 Franklin Avenue.

8   Q.   And in Commonwealth's Exhibit 8, where is the alley

9        that you're referring to, if it were depicted there?

10  A.   You mean on my side of the white picket fence?

11  Q.   In Commonwealth's Exhibit 8 it would be at the lower

12       outer frame?

13  A.   Correct.

14  Q.   And did you recover any 7.62 casings?

15  A.   Yes, we did.

16  Q.   Where did you recover those primarily?

17  A.   Primarily in the rear yard of 1306 Franklin Avenue

18       on the -- Looking at Exhibit 8, they would be close

19       to the house on the left side of 1306 Franklin

20       looking from this direction.

21  Q.   In addition to the shell casings that you described,

22       did you recover spent projectiles or bullet

23       fragments, any other indications of ballistics?

24  A.   Yes, we did.

25  Q.   Did you observe any bullet strikes or bullet holes

1          in the residence?

2     A.   Yes, I did.

3     Q.   Show you what I will mark as Commonwealth's

4          Exhibit 10.  Can you describe what's depicted in

5          Commonwealth's Exhibit 10.

6     A.   Yes.  Exhibit 10 is a sketch of the rear of 1304 and

7          1306 Franklin Avenue.  It's an aerial view sketch

8          looking down on those yards.

9               MR. CHERNOSKY:  Move for the admission

10              of Exhibit 10, Your Honor.

11              MR. McKINNEY:  No objection.

12              MR. WHITE:  No objection.

13              THE COURT:  So admitted.

14    Q.   And Commonwealth's Exhibit 10, could you point out,

15         please, where a visual depiction of the primary

16         grouping of 7.62 and primary grouping of .40 caliber

17         shell casings were.

18    A.   Primary grouping of the .40 caliber would be listed

19         here Items A to R, and the primary grouping of the

20         7.62 would be here Items V to AX.

21    Q.   When you arrived on scene were the deceased victims

22         still on scene?

23    A.   Yes, they were.

24    Q.   Is that depicted in the sketch at Commonwealth's

25         Exhibit 10?

| | | |
|---|---|---|
| 1 | A. | Yes. |
| 2 | Q. | During the course of your investigation did you |
| 3 | | ascertain when a 911 call for shots fired went out? |
| 4 | A. | We were. |
| 5 | Q. | What time was that? |
| 6 | A. | I believe it was 10:54 p.m. was the dispatch time |
| 7 | | for the Wilkinsburg Police Department. |
| 8 | Q. | At 1304 in the backyard, were you able to observe |
| 9 | | areas of blood splatter? |
| 10 | A. | Yes. |
| 11 | Q. | Where? |
| 12 | A. | Blood spatter was noted on the back porch of 1304. |
| 13 | | It was noted on the fence separating 1304 and 1306 |
| 14 | | Franklin Avenue.  It was notated on the side of |
| 15 | | 1306 Franklin Avenue and on the sidewalk that |
| 16 | | separates the two as well. |
| 17 | Q. | Did you process the interior of the house for |
| 18 | | evidence? |
| 19 | A. | We did. |
| 20 | Q. | Did you observe any evidence of ballistic damage on |
| 21 | | the interior of the house? |
| 22 | A. | Yes. |
| 23 | Q. | Show you what I will mark as Commonwealth's |
| 24 | | Exhibit 11.  Can you tell me what's depicted in |
| 25 | | Commonwealth's Exhibit 11. |

1    A.    Exhibit 11 is a sketch of the first floor of

2          1304 Franklin Avenue, bird's eye view sketch from

3          the top looking down.

4                    MR. CHERNOSKY:  Move for the admission

5              of Commonwealth's Exhibit 11, Your Honor.

6                    MR. McKINNEY:  No objection.

7                    MR. WHITE:  No objection.

8                    THE COURT:  Commonwealth's Exhibit 11

9              is admitted.

10   Q.    Could you explain for the Court where you observed

11         ballistic damage in the lower level of 1304 Franklin

12         Avenue.

13   A.    Sure.  Looking at this sketch, the rear porch would

14         be here.  This was a kitchen, and this is a

15         bathroom.  There were multiple strike marks in the

16         walls on both of these rooms.  There were

17         projectiles and fragments recovered from both of

18         those rooms.

19                    This room here I believe was a dining

20         room, and here was a living room.  Strike marks were

21         in the walls separating the kitchen and the dining

22         room, and projectiles and fragments were recovered

23         from the living and dining room as well.

24   Q.    During the course of your investigation did you

25         later learn that there were children in the lower

1           level of this house?

2     A.    At some point I did, yes.

3     Q.    Did you, yourself, participate in what's commonly

4           referred to as a time distance study between the

5           area of 1214 Nolan Court and 1304 Franklin Avenue?

6     A.    Yes.

7     Q.    And just for the Court could you explain what a

8           time-distance study is.

9     A.    Yes.  We traveled different routes between two

10          different locations to try to get an estimate of the

11          mileage and the time taken to travel that distance.

12    Q.    I show you what I'll mark as Commonwealth's

13          Exhibit 12.  What's depicted in Commonwealth's

14          Exhibit 12?

15    A.    This is a pin map aerial view depicting Nolan Court

16          and 1304 Franklin Avenue.

17                MR. CHERNOSKY:  I move for the

18           admission of Commonwealth's Exhibit 12.

19                MR. McKINNEY:  No objection.

20                MR. WHITE:  No objection, Your Honor.

21                THE COURT:  12 is admitted.

22    Q.    What were the results of your time-distance study

23          between 1214 Nolan Court and 1304 Franklin Avenue?

24    A.    I believe I took three different routes, and

25          approximate average for the three routes was

1          approximately three miles and ten minutes travel.

2                    MR. CHERNOSKY:  No further questions of

3               this witness.  I'll offer for cross.

4                              - - -

5                        CROSS-EXAMINATION

6     BY MR. McKINNEY:

7     Q.   Detective, do you know if the shell casings found at

8          the scene have been processed for DNA or

9          fingerprints?

10                    MR. CHERNOSKY:  Objection.  Outside the

11              scope of direct.

12                    MR. McKINNEY:  Your Honor, this officer

13              did say he processed the scene.  His

14              testimony was what he found when he got

15              there, had testified about ballistics inside

16              and outside of the property.

17                    THE COURT:  I think it's outside the

18              scope of direct.  I'll sustain the objection.

19                    MR. McKINNEY:  No additional questions,

20              Your Honor.

21                    THE COURT:  Mr. White?

22                    MR. WHITE:  Mr. Chernosky, can you pull

23              up Exhibit 10, please.

24                              - - -

25


                    MARY BETH PERKO, RMR   (412) 350-5414

1                        CROSS-EXAMINATION

2        BY MR. WHITE:

3        Q.    Detective Dolfi, you indicated that you processed

4              the scene; is that correct?

5        A.    Yes, sir.

6        Q.    And did you create this diagram that's shown on the

7              video screen right now?

8        A.    No, I did not.

9        Q.    Did you process the .40 caliber spent casings in the

10             rear of 1214 Franklin Avenue?

11       A.    Yes, I was a part of that process.

12       Q.    How many spent shell casings were there?

13       A.    I believe there were, without looking at my report,

14             I believe 18 spent .40 caliber casings.

15       Q.    And in one of the photographs there's a white

16             picture fence on that photograph; is that correct?

17       A.    Yes.

18       Q.    Did you dust that fence for fingerprints or DNA?

19                    MR. CHERNOSKY:  Objection.  Outside the

20                 scope of direct.

21                    THE COURT:  Mr. White, response?

22                    MR. WHITE:  Your Honor, he indicated he

23                 processed the scene.  He's gathered evidence

24                 which is presumably being held against my

25                 client.  I think I have a right to explore on

MARY BETH PERKO, RMR    (412) 350-5414

T. Dolfi - Cross by Mr. White          **60**

1          the surface whether or not this has any link

2          to my client.

3                    THE COURT:  I think it's beyond the

4          scope of direct examination.  I'll sustain

5          the objection.

6     Q.   Detective Dolfi, you indicated you did a time-

7          distance study; is that correct?

8     A.   Correct.

9     Q.   Can you describe for me your training in time-

10         distance studies.

11    A.   No formal training.

12    Q.   So it's safe to say you basically took three

13         different routes from 1304 Franklin Avenue to Nolan

14         Court; is that correct?

15    A.   That's correct.

16    Q.   But looking at the map, and I believe it's

17         Exhibit 11 or 12, there are many different routes

18         you can take to get from Point A to Point B; is that

19         correct?

20    A.   Presumably, yes.

21                   MR. WHITE:  I have nothing further,

22         Your Honor.

23                   MR. CHERNOSKY:  No redirect, Your

24         Honor.

25                   THE COURT:  Thank you, Detective.


**MARY BETH PERKO, RMR    (412) 350-5414**

1         THE WITNESS:  Thank you.

2         THE COURT:  Commonwealth may call its

3    next witness.

4         MR. CHERNOSKY:  Commonwealth calls

5    Detective Kevin McCue.

6                   - - -

7              **DETECTIVE KEVIN McCUE**

8    a witness herein, having been first duly sworn, was

9    examined and testified as follows:

10             **DIRECT EXAMINATION**

11   **BY MR. CHERNOSKY**:

12   Q.   Detective McCue, could you state your first and last

13        name and spell your last name for the court

14        reporter.

15   A.   Detective Kevin L. McCue, M-c-C-u-e.

16   Q.   How are you employed?

17   A.   I'm with the Allegheny County Police Homicide Unit.

18   Q.   How long have you been employed with the homicide

19        unit?

20   A.   Three years.

21   Q.   How long with the Allegheny County Police?

22   A.   Ten years.

23   Q.   Were you assigned to participate in the

24        investigation of several homicides that occurred at

25        1304 Franklin Avenue in the Borough of Wilkinsburg?

1    A.    Yes.

2    Q.    During the course of the investigation were you made

3          aware of a vehicle registration that was of interest

4          in the investigation provided by Sergeant Adams of

5          the Wilkinsburg Police Department?

6    A.    Yes.

7    Q.    And what did you do with that information?

8    A.    That information came back to two individuals that

9          owned the vehicle.  JBP-2200 was the plate, came

10         back to Ashley Smith and Desdrene Smith, who reside

11         at 1214 Nolan Court.

12   Q.    I show you what I will mark as Commonwealth's

13         Exhibit 13.  Do you recognize what Commonwealth's

14         Exhibit 13 is?

15   A.    Yes.

16   Q.    What is it?

17   A.    It's a Department of Transportation vehicle record,

18         shows that plate that I just stated, JBP-2200, does,

19         in fact, come back to Brittany Shelton and a

20         Desdrene Smith at 1214 Nolan Court.

21   Q.    Based on that information at the time --

22               MR. CHERNOSKY:  Move admission of

23         Commonwealth's Exhibit 13, Your Honor.

24               MR. McKINNEY:  No objection.

25               MR. WHITE:  No objection.


MARY BETH PERKO, RMR    (412) 350-5414

1            THE COURT:  So admitted.

2    Q.   Based on that information at the time, what did you

3         do?

4    A.   On March 11 I contacted Joy Picar Miller.  She's the

5         Public Safety Coordinator for the City of Pittsburgh

6         Housing Authority.  I asked her if I could come up

7         and review video of Nolan Court.

8    Q.   Were you able to do that?

9    A.   Yes.

10   Q.   Did you do that for certain time periods before and

11        after the time of the shooting?

12   A.   I did, yes.

13   Q.   And just for the Court, what time was the 911 call

14        for the shooting?

15   A.   I believe the 911 call for the shooting was at 10:54

16        on March 9.

17   Q.   What observations did you make of a white sedan in

18        the video from Nolan Court prior to the time of the

19        shooting?

20   A.   Upon reviewing the tape on March 9 at approximately

21        8:48 in the morning a white four-door sedan matching

22        the description provided by Officer Adams arrived at

23        Nolan Court, parked in front of 1248 Nolan Court.

24        An unknown black female is seen getting out of that

25        vehicle and going into 1214 Nolan Court.

MARY BETH PERKO, RMR   (412) 350-5414

1    **Q.**    Does the vehicle make any movement after that?

2    **A.**    No.  That vehicle remains stationary until

3          10:28 p.m. that night.

4    **Q.**    What happens at 10:28 p.m. that night?

5    **A.**    At 10:28 p.m. an unknown black male is observed

6          leaving the residence at 1214 Nolan Court wearing a

7          black shirt, light or tan colored pants, and he

8          enters that vehicle.

9    **Q.**    Does the vehicle move from its parking space?

10    **A.**    It does.  That vehicle makes a left off of Nolan

11          Court onto Mohler Street and is seen backing into a

12          concrete pad off of Mohler Street.

13    **Q.**    During the course of watching these videos did you

14          become aware of the approximate coverage angle of

15          the cameras in Nolan Court?

16    **A.**    Yes.

17    **Q.**    I'm going to show you what I will mark as

18          Commonwealth's Exhibits 14 through 21.

19    **A.**    Exhibit 14 is an overhead aerial view of Nolan

20          Court, Ferris Court, and Mohler Street.  Exhibit 15

21          shows a fixed camera that is located on Mohler

22          Street across from Nolan Court.

23    **Q.**    Is it fair to say in Exhibit 15 it displays the

24          approximate coverage angle of a camera?

25    **A.**    It does.

1    Q.    And is it fair to say Commonwealth's Exhibits 16

2          through 21 are still photos from the video you

3          viewed on Mohler Court?

4    A.    That is correct.

5              MR. CHERNOSKY:   Move for the admission

6          of Commonwealth's Exhibits 14 through 21.

7              MR. McKINNEY:   No objection.

8              MR. WHITE:   No objection, Your Honor.

9              THE COURT:   So admitted.

10   Q.    I'll just move to 15.  What's depicted in

11         Commonwealth's Exhibit 15?

12   A.    There's a fixed camera on Mohler Street.  It covers

13         the concrete pad across the street.

14   Q.    And 16, 17, 18, 19, 20, and 21?

15   A.    That is the same camera that is affixed to the pole

16         that captures that concrete pad in the rear of Nolan

17         Court.

18   Q.    What is the time stamped at Commonwealth's

19         Exhibit 21?

20   A.    22:29:28 seconds.

21   Q.    Did you observe a camera affixed to the back of the

22         building for the time period after this sequence?

23   A.    I did, yes.

24   Q.    And what happens in that camera view?

25   A.    The unknown black male that is seen exiting the

1    vehicle runs to the rear of 1214 Nolan Court.  He

2    retrieves a long, slender, rigid item that appeared

3    to be covered with something, at which time he runs

4    back to the vehicle.

5    Q.    I show you Commonwealth's Exhibit 22 first.  Tell

6    the Court what's depicted in Commonwealth's 22.

7    A.    It's an aerial photograph of the same Ferris Court,

8    Nolan Court, and depicts the camera coverage that's

9    affixed to the rear in between 1208 and 1210 Nolan

10    Court.

11    MR. CHERNOSKY:  Your Honor, I move for

12    the admission of Commonwealth's Exhibit 22.

13    MR. McKINNEY:  No objection.

14    MR. WHITE:  No objection.

15    THE COURT:  So admitted.

16    Q.    I hand you what I will mark as Commonwealth's

17    Exhibits 23 through 34, ask you if they depict frame

18    by frame -- not frame by frame, sorry -- frames of

19    the video you were able to watch of that camera.

20    A.    Yes.

21    MR. CHERNOSKY:  Move for the admission

22    of those exhibits, Your Honor.

23    MR. McKINNEY:  No objection.

24    MR. WHITE:  No objection.

25    THE COURT:  So admitted.

1    Q.   I'm going to run these until that individual obtains
2         the long, slender object that you referred to.  Can
3         you point out the long, slender object that you're
4         referring to?
5    A.   Right here.  Right there (indicating).  If you stop
6         right there, you can actually see it's in his right
7         hand.
8    Q.   The one you indicated I should stop on is
9         Commonwealth's Exhibit 33.  I refer you back to this
10        camera angle.  It's already been admitted.  What is
11        the last time stamp on Commonwealth's Exhibit 34?
12   A.   22:29:44 seconds.
13   Q.   Did you then go back to the camera where the car was
14        parked?
15   A.   That's correct.
16   Q.   I show you what I will mark as Commonwealth's
17        Exhibits 35, 36, 37, 38, 39, and 40.  What happens
18        in the video depicting that parking pad after that
19        person retrieves that item?
20   A.   The individual is seen getting back in the vehicle
21        and placing that item in the vehicle and then
22        driving off fix.
23   Q.   Are the exhibits I just showed you frame depictions
24        of that video that you were able to watch?
25   A.   Yes.

1          MR. CHERNOSKY:  Move for the admission

2      of Commonwealth's Exhibits 35 through 40.

3          MR. McKINNEY:  No objection.

4          MR. WHITE:  No objection, Your Honor.

5          THE COURT:  So admitted.

6   Q.  What is the time stamp in Commonwealth's Exhibit 40?

7   A.  22:30:15.

8          THE COURT:  Mr. Chernosky, are you

9      going to show 35 through 40?  Maybe I

10     blinked.

11         MR. CHERNOSKY:  I apologize.  35, 36,

12     37, 38, 39, and 40.

13         THE COURT:  Thank you.

14         MR. CHERNOSKY:  Sorry about that, Your

15     Honor.

16  Q.  The time stamp in Commonwealth's Exhibit 40 is --

17  A.  22:30:15 seconds.

18  Q.  Did you observe anything else unusual in the video

19     from Nolan Court?

20  A.  Yes.  As we continued to watch the video from Nolan

21     Court, at approximately 11:45 there's two unknown

22     black males seen jumping the fence towards the rear

23     wooden line of Nolan Court.

24  Q.  The two individuals who jumped the fence, what

25     movements do they make on the video?

1    A.    The first male, he stayed to the rear of the

2          buildings as the second male stayed to the front of

3          the buildings.

4    Q.    Where do both males go?

5    A.    Approximately a minute after they jump the fence,

6          the first black male entered the rear of 1214 Nolan

7          Court, and about a minute after that the second male

8          entered the rear of 1214 Nolan Court.

9    Q.    I show you Commonwealth's Exhibits 41 through 49.

10         Can you tell me first what's depicted in

11         Commonwealth's Exhibit 41.

12   A.    The first, again, is the overhead photo of Nolan

13         Court, depicts the direction that the video

14         surveillance camera's angled at.

15               MR. CHERNOSKY:  Move for the admission

16         of Commonwealth's Exhibit 41.

17               MR. McKINNEY:  No objection, Your

18         Honor.

19               MR. WHITE:  No objection.

20               THE COURT:  So admitted.

21   Q.    And Commonwealth's Exhibits 42 through 49?

22   A.    That shows the second male that's seen hopping the

23         fence.

24               MR. WHITE:  Your Honor, I'm going to

25         object at this point, the objection the

1    characterization of a second male jumping the

2    fence.  In exhibits that are in the

3    detective's hands right now, I think 42

4    through 49, there is no depiction of any

5    individual jumping over any fence.

6         There's a picture of what appears to be

7    a person in the photographs, but there's not

8    a single photograph of anybody jumping a

9    fence.

10        THE COURT:  Mr. White, I'm going to

11   sustain the objection as to any label

12   applied.  I think the best evidence of the

13   photograph is the photograph itself.

14        MR. WHITE:  Fair enough.

15        THE COURT:  Other than as to the label,

16   are there any objections as to 42 through 49?

17        MR. WHITE:  No, Your Honor.

18        MR. McKINNEY:  No, Your Honor.

19        THE COURT:  So admitted excepting as

20   any characterization of their contents.

21  **Q.**  Could you tell the Court where an individual that

22   you noticed on the video is located in

23   Commonwealth's Exhibit 42.

24  **A.**  Right here (indicating).

25  **Q.**  And then in 43?

1    A.    Right here (indicating).

2    Q.    44?

3    A.    Right here (indicating).

4    Q.    Then I direct your attention to Commonwealth's

5          Exhibit 45.  Does that also depict the camera angle

6          and the approximate coverage area for that --

7    A.    It does.

8    Q.    And then the individual that we were making

9          reference to, could you point out where they are in

10         Commonwealth's Exhibit 46.

11   A.    Right here (indicating).

12   Q.    47?

13   A.    Right there (indicating).

14   Q.    48?

15   A.    Right here (indicating).

16   Q.    49?

17   A.    Right there (indicating).

18   Q.    Have you been to Nolan Court before your

19         participation in this investigation or prior?

20   A.    Yes.

21   Q.    Where we see that individual in Commonwealth's

22         Exhibit 48, where does that lead?

23   A.    That leads to the rear of 1214 Nolan Court, behind

24         the buildings.

25   Q.    Sorry.  I believe that was 49.  I apologize.

1    A.    Yes.

2    Q.    I'll first show you Commonwealth's Exhibit 50, ask

3          you what's depicted in Commonwealth's Exhibit 50.

4    A.    Again, overhead photo of Nolan Court depicting the

5          direction of camera surveillance.

6                MR. CHERNOSKY:  Move for the admission

7          of Commonwealth's Exhibit 50, Your Honor.

8                MR. McKINNEY:  No objection.

9                MR. WHITE:  No objection, Your Honor.

10               THE COURT:  So admitted.

11   Q.    I'll hand you what's been marked as Commonwealth's

12         Exhibits 51 through 58, ask you what's depicted in

13         Commonwealth's Exhibits 51 through 58.

14   A.    51 through 54 shows a black male walking behind the

15         rear of the buildings towards 1214 Nolan Court.

16               MR. CHERNOSKY:  I move for admission of

17         Commonwealth's 51 through 54.

18               MR. McKINNEY:  No objection.

19               MR. WHITE:  No objection.

20               THE COURT:  So admitted.

21   Q.    Can you point out in Commonwealth's Exhibit 51 where

22         the individual is.

23   A.    Right here (indicating).

24   Q.    And in 52?

25   A.    Right there (indicating).

1    Q.    And then 53?

2    A.    Right there (indicating).

3    Q.    And then on Commonwealth's Exhibit 55, I believe,

4          could you confirm that for me.

5    A.    55 again is an overhead photo depicting the angle of

6          the surveillance camera on Nolan Court.

7    Q.    And then what is depicted in Commonwealth's 56

8          through 58?

9    A.    That shows a black male walking rear of the

10         buildings towards 1214 Nolan Court.

11                 MR. CHERNOSKY:  Move for the admission

12             of Commonwealth's 55 through 58, Your Honor.

13                 MR. McKINNEY:  No objection.

14                 MR. WHITE:  No objection.

15                 THE COURT:  55 through 58 are admitted.

16   Q.    55, could you point out the individual we've been

17         speaking of.

18   A.    Located right here (indicating).

19   Q.    56?

20   A.    Right there (indicating).

21   Q.    57?

22   A.    Right here (indicating).

23   Q.    Take you back to what's already been admitted as

24         Commonwealth's Exhibit 52, the coverage area behind

25         Nolan Court.  I'll show you Commonwealth's Exhibits

1          58 through 60.  What's depicted in Commonwealth's

2          Exhibits 58 through 60?

3    A.    Shows a male walking behind the buildings, 1200

4          block of Nolan Court, and he entered the rear of

5          1214 Nolan Court.

6                    THE COURT:  Mr. Chernosky, I don't want

7               to belabor the point.  I think you used 58

8               twice.  There's a chance I could be mistaken.

9                    MR. CHERNOSKY:  Oh, there's definitely

10              a chance I --

11                   THE COURT:  Or a chance you could be

12              mistaken.  Let's make sure we're clear on the

13              record.  While you double check these

14              exhibits, why don't we take a five-minute

15              recess.

16                   MR. CHERNOSKY:  Thank you, Your Honor.

17                   MR. McKINNEY:  Thank you, Your Honor.

18                   THE MINUTE CLERK:  This Court's in

19              recess for five minutes.

20                   (Short recess taken.)

21                   THE COURT:  Mr. Chernosky, are we clear

22              on the numbers?

23                   MR. CHERNOSKY:  We are, Your Honor.  I

24              am told that 58 has only been marked once.

25              It was admitted with the previous grouping,

1              so I would at this point, with the
2              detective's description of 58, 59, and 60,
3              move for the admission of only 59 and 60 and
4              then display 58 through 60.
5                   MR. McKINNEY:  No objection.
6                   MR. WHITE:  No objection, Your Honor.
7                   THE COURT:  59 and 60 are admitted, 58
8              having been previously admitted.
9                   MR. CHERNOSKY:  Thank you.
10    Q.    Commonwealth's 58, could you point out the
11         individual in 58.
12    A.    Right here (indicating).
13    Q.    And 59?
14    A.    Right there (indicating).
15    Q.    And 60?
16    A.    Right there (indicating).
17    Q.    All right.  And that fenced-in backyard, what
18         residence is that?
19    A.    1214 Nolan Court.
20    Q.    I'm going to show you what I will mark as
21         Commonwealth's Exhibits 61 through 66.  Can you tell
22         me what is depicted in Commonwealth's Exhibits 61
23         through 66 generally.
24    A.    Shows another male walking to the rear of 1214 Nolan
25         Court, walking down the sidewalk and then entering

1        1214 Nolan Court.

2                    MR. CHERNOSKY:  Your Honor, I would

3                move for the admission of Commonwealth's

4                Exhibits 61 through 66.

5                    MR. McKINNEY:  No objection.

6                    MR. WHITE:  No objection.

7                    THE COURT:  So admitted.

8    Q.   And in Commonwealth's Exhibit's 61, can you point

9         out where the individual in 61 is.

10   A.   Right here (indicating).

11   Q.   62?

12   A.   Right here (indicating).

13   Q.   63?

14   A.   Right there (indicating).

15   Q.   64?

16   A.   Right there (indicating).

17   Q.   65?

18   A.   Here (indicating).

19   Q.   66?

20   A.   Sitting here (indicating).

21   Q.   What's the time stamp on Commonwealth's Exhibit 66?

22   A.   22:47 and 33 seconds.

23   Q.   I'll back you up for the last one of the first

24        individual we've been referring to.  What's the time

25        stamp on the video at that still?

1    A.    23:46 and 49 seconds.

2    Q.    During the course of your investigation did you

3          become aware of a relationship between the

4          registered owner of the vehicle whose registration

5          you described and the defendant Cheron Shelton?

6    A.    Yes.

7    Q.    What is their relationship?

8    A.    The occupants of the house are Cheron's mother and

9          sisters.

10   Q.    And the registered owner of that vehicle that's

11         registered at that address, what is their relation?

12   A.    Brittany Shelton is the sister and Desdrene Smith is

13         his mother.

14              MR. CHERNOSKY:  No further questions.

15         I'll offer for cross.

16              THE COURT:  Mr. McKinney?

17              MR. McKINNEY:  Thank you, Your Honor.

18                        - - -

19                  CROSS-EXAMINATION

20   BY MR. McKINNEY:

21   Q.    Detective, when Sergeant Adams from the Wilkinsburg

22         Police Department relayed that information to you

23         with respect to the license plate, did he tell it to

24         you?  Did he give you a piece of paper?  How did

25         that happen?

1    A.    I was not there that night at the initial scene.

2    Q.    Oh, okay.  So you received that information from

3          another detective?  Sergeant Adams didn't relate

4          that information directly to you?

5    A.    That is correct.

6    Q.    Do you know who he relayed that information to?

7    A.    I have no idea.  I wasn't at the scene.

8    Q.    Have you since spoken to any other detectives or

9          officers involved in investigating this case?

10   A.    Since March 9?

11   Q.    Yes.

12   A.    Yes.

13   Q.    And since you first got on this investigation you

14         don't know who Sergeant Adams gave that information

15         to?

16   A.    No.

17   Q.    Who gave it to you?

18   A.    I believe it was a briefing during the day.  We have

19         daily briefings in the morning, and the information

20         was put out.

21   Q.    Do you remember when that was?

22   A.    I cannot recall that.

23   Q.    So it could have been the day after the shooting?

24         It could have been two days after the shooting?

25   A.    Possibly, yes.

MARY BETH PERKO, RMR    (412) 350-5414

1    Q.    And when did you first start reviewing the

2          surveillance?  After you got that information?

3    A.    March 11, about 4 p.m. I went down to Housing

4          Authority where I started reviewing the tape, yes.

5    Q.    I want to direct your attention to Commonwealth's

6          Exhibits 31 through 35.

7              MR. McKINNEY:  Kevin, can you put those

8          on the screen?

9              Exhibit 31 will be the first one.  I'm

10         just going to move through to Exhibit 31.

11         It's going to be when the detective claims

12         there's a long, slender object being

13         transferred.  I believe that's 31 through 35.

14   Q.    Detective, for the record, which exhibit is this

15         one?

16             MR. CHERNOSKY:  Look on the back.

17   A.    It's labeled Exhibit 34.

18   Q.    Detective, do you remember on direct examination

19         saying that you saw this black male holding a long,

20         slender object?

21   A.    Correct.

22   Q.    Would that testimony be referring to this exhibit

23         that we're reviewing right now?

24   A.    Yes.

25   Q.    And as you look at that, you see a long, slender

1          object?

2     A.   If you back up and you actually review the frames,

3          you can see a long object that your client is seen

4          carrying.

5               MR. McKINNEY:  I would object to that

6          testimony, Your Honor, ask it be stricken.

7          My client hasn't been identified yet as being

8          involved.  He's a defendant, but no one has

9          identified him as being this black male,

10         unless I missed it.

11              THE COURT:  You can cross-examine.

12         He's telling you it's your client.  If you

13         want to take issue with that, that's for

14         cross-examination.  That's what

15         cross-examination's all about.

16              Mr. Chernosky, I think Mr. McKinney's

17         asking you to back up two or three frames.

18    Q.   So is that the frame where you see the long slender

19         object?

20    A.   If you go back a few frames -- one more -- I believe

21         the next one -- you can see the defendant pick up an

22         object.  If you go forward actually reviewing the

23         video, you can see there's a long lender object.

24         It's a little hard to depict in this photo here.

25         Kevin, if you go back one, it's actually -- the

MARY BETH PERKO, RMR    (412) 350-5414

1          object is long and slender, and there's an object

2          appeared to be wrapped.

3     Q.   What color is that object that he's holding?

4     A.   I can't tell the color of the object.

5     Q.   Because you can't see the object?

6     A.   I can't see the physical object, no, but I can see

7          that there's a long, slender shape under it, under

8          something that's covering it.

9     Q.   What's covering that object?

10    A.   Appears to be something dark in color.

11    Q.   Does it look like it could be a coat?

12    A.   Could be numerous things.

13    Q.   You have no idea what it is; is that correct?

14    A.   No.

15    Q.   You have no idea if there is anything under this

16         coat.  And if there is, you don't know what it is

17         either.

18    A.   Correct.

19    Q.   And you can't tell us the color of that object;

20         correct?

21    A.   No.

22    Q.   You can't tell us the size?

23    A.   No.

24    Q.   So you're speculating that there's a long, slender

25         object underneath whatever's over top of it; is that

1                correct?

2        A.      Correct.

3        Q.      Now, you reviewed this video, and we're only getting

4                snippets here, surveillance photos, but is there any

5                point in time as far as you know where the two black

6                males you've been referencing were both inside of

7                the vehicle at the same time?

8        A.      No.

9        Q.      And how much surveillance video have you reviewed?

10       A.      Several hours.

11       Q.      And in those several hours you never see who you're

12               alleging to be Cheron Shelton in that vehicle with

13               another black male; is that correct?

14       A.      Correct.

15       Q.      As a matter of fact, you when reviewing the

16               surveillance video cannot even identify Cheron

17               Shelton as being the individual in the white

18               Lincoln; is that correct?

19       A.      That is correct.

20       Q.      So how are you able to determine that Cheron Shelton

21               is the individual in this surveillance video

22               allegedly going in and out of 1214 Nolan?

23       A.      At this time I could not.

24       Q.      So reviewing the video alone, you have no idea if

25               that individual is Cheron Shelton or not?

1   A.   At the time I reviewed the video, correct.

2   Q.   I believe you said on direct examination that one of

3        the black males that got into the Lincoln placed

4        that object that you believe to be a slender, long

5        object into the vehicle; is that correct?

6   A.   That is correct.

7   Q.   Was that object put into the trunk or was it put

8        into the cab of the car?

9   A.   I believe on the video it was put in the cab.

10            MR. McKINNEY:  No additional questions.

11            THE COURT:  Mr. White.

12                        - - -

13                  <u>CROSS-EXAMINATION</u>

14   BY MR. WHITE:

15   Q.   Detective McCue, you watched hours and hours of

16        video on various places on Nolan Court and the

17        Hilltop area; is that correct?

18   A.   That's correct.

19   Q.   There's other people walking in and out of the frame

20        besides the two individuals depicted in these

21        snapshots throughout the time you watched the video;

22        is that correct?

23   A.   During the course of the entire time watching the

24        videos?

25   Q.   Yes.

K. McCue - Cross by Mr. White          84

1    A.   Correct.

2    Q.   Going back to Sergeant Adams' testimony and you

3         learning of this license plate information, how many

4         days after the homicides did this briefing occur?

5    A.   I reviewed the video on March 11.

6    Q.   I'm talking about the briefing.  You learned --

7    A.   Oh, there's a briefing every morning.

8    Q.   So which morning was it when you learned about the

9         license plate?

10   A.   I can't recall.

11   Q.   Who was at the briefing?

12   A.   Daylight personnel for Homicide.

13   Q.   Who holds the briefing?

14   A.   Lieutenant Sherman.

15   Q.   Are there minutes of the briefing?

16             MR. CHERNOSKY:  Object to the relevance

17        at this point.

18             MR. WHITE:  Your Honor, it goes back to

19        the license plate information that's been

20        testified to at length.  I want to learn how

21        this detective, who earlier testimony

22        concluded that this detective learned of this

23        information, linked it to.

24             THE COURT:  Sustained.  You can ask

25        him.

K. McCue - Redirect by Mr. Chernosky     85

1              When I said you can ask him, you can

2          ask him how he learned.  The minutes, I'm

3          sustaining the objection.  Minutes are beyond

4          direct.

5    Q.   You don't know who told you about this license plate

6          information; is that correct?

7    A.   That's correct.

8              MR. WHITE:  I have nothing further,

9          Your Honor.

10             THE COURT:  Thank you.  Any redirect?

11             MR. CHERNOSKY:  Just briefly on

12         redirect.

13                        - - -

14                 REDIRECT EXAMINATION

15   BY MR. CHERNOSKY:

16   Q.   To your knowledge, was anybody ever shown a still

17         image of this video sequence to make an ID of Cheron

18         Shelton?

19   A.   I believe, yes.

20   Q.   Who was that?

21   A.   Brittany Shelton.

22   Q.   When was she shown that?

23   A.   I'm not sure of the date she was interviewed.

24   Q.   Was she able to positively identify Cheron in that

25         video?

1          MR. McKINNEY:  I'll object to hearsay.

2          MR. CHERNOSKY:  Mr. McKinney opened the

3     door by asking him how he can say that that's

4     his client in the video.

5          THE COURT:  I'm going to sustain the

6     defense's objection.

7          MR. CHERNOSKY:  Thank you.  No further

8     questions.

9          THE COURT:  Thank you, Detective.  You

10    may step down.  Commonwealth may call its

11    next witness.

12         MR. CHERNOSKY:  Commonwealth calls

13    Detective Feeney to the stand.

14                    - - -

15              **DETECTIVE FEENEY**

16    a witness herein, having been first duly sworn, was

17    examined and testified as follows:

18              **DIRECT EXAMINATION**

19    BY MR. CHERNOSKY:

20    Q.   Detective Feeney, how are employed?

21    A.   I am a detective for the Allegheny County Police

22         homicide section.

23    Q.   How long have you been employed with the Allegheny

24         County Police?

25    A.   This is my 14th year.

1    **Q.**    How long in the homicide section?

2    **A.**    I'm in my seventh year.

3    **Q.**    Were you assigned to participate in the homicide

4          investigation, the shooting involving multiple

5          deceased individuals at 1340 Franklin Avenue?

6    **A.**    I was.

7    **Q.**    During the course of your participation in the

8          investigation, did you become aware of video from a

9          private residence located on Franklin Avenue?

10   **A.**    Yes, I did.

11   **Q.**    Did you retrieve that video?

12   **A.**    I did.

13   **Q.**    And could you tell the Court what steps you took to

14         retrieve that video.

15   **A.**    I obtained a DVR, digital video recorder, and then

16         utilizing the menu system of that device I conducted

17         an export of the stored video files contained

18         therein from a portion of the time frame on March 9.

19   **Q.**    Subsequent to your retrieval of the video did you

20         become aware of a vehicle of interest in the

21         investigation?

22   **A.**    Yes, I did.

23   **Q.**    Specifically a white sedan?

24   **A.**    Yes.

25   **Q.**    I'm going to show you what I have marked as

1          Commonwealth's Exhibits 67 through 70 and ask you

2          what's depicted in Commonwealth's Exhibits 67

3          through 70.

4     A.   I actually have till 71, if that matters.

5               THE COURT:  It does matter.

6     Q.   Matters very much.  66 through 71, or 67 through 71.

7     A.   The underlying image is the same.  There's a portion

8          of the recorded video in which a white sedan appears

9          to travel from the left side to the right side of

10         the screen in sequential order.

11    Q.   During the course of your recovery of the video did

12         you note the stated time on the DVR that you

13         recovered it from?

14    A.   I did.

15    Q.   Did you note that in relation to realtime or the

16         network time for your cell phone?

17    A.   Yes, I did.

18    Q.   And was there an offset?

19    A.   There was, yes.

20              MR. CHERNOSKY:  Your Honor, I would

21           move for the admission of Commonwealth's

22           Exhibits 67 through 71.

23              MR. McKINNEY:  No objection.

24              MR. WHITE:  No objection, Your Honor.

25              THE COURT:  So admitted.


MARY BETH PERKO, RMR    (412) 350-5414

1    Q.   And Commonwealth's Exhibit 67, can you point out

2         where the vehicle you just referred to is.

3    A.   Yeah.  The apparent white sedan is just to the right

4         of the porch stanchion support, if you will.

5    Q.   And 68?

6    A.   The same image.  The vehicle is farther to the right

7         in this frame.

8    Q.   69?

9    A.   Again, to the right of the porch support, the

10        vehicle is now slightly farther than the prior

11        image.

12    Q.   70?

13    A.   The frame is continuing from the right to the left.

14    Q.   And 71?

15    A.   To the right of the porch support underneath the

16        awning you see a vehicle on the right edge of the

17        screen.

18    Q.   What was it that drew your attention to this

19        particular vehicle?

20    A.   The class characteristics were similar to those of

21        the vehicle that was being identified as a potential

22        suspect vehicle.

23    Q.   When you say "class characteristics," can you list

24        what you were considering when you were watching

25        this video.

1    A.    Specifically the generalizations of the roof line

2          and the hood area, although there's motion blurring,

3          in Exhibit 67, for example, there appears to be an

4          area of the front bumper that has a dark area with a

5          light area in between consistent with a license

6          plate frame holder potentially with no license plate

7          on it, and there's apparent vehicle molding down the

8          passenger side of the vehicle that is consistent

9          with the vehicle that I had seen on the Nolan Court

10         vehicle.

11    Q.    What's the time stamp on the video from Franklin

12         Avenue, the stated time stamp?

13    A.    It's 10:41 and 31 seconds p.m. on March 9.

14    Q.    You noted that at the time you compared the DVR's

15         time stamp to your network time using your cell

16         phone?

17    A.    Correct.  It is approximately 39 seconds slow -- I'm

18         sorry -- 49 seconds behind the benchmark time.

19    Q.    You made reference to a picture from a Mohler Court.

20         I'm going to go back.  Actually, this Commonwealth's

21         Exhibit 67, could you point out -- I know you

22         described them -- the three things that you just

23         listed, the characteristics that you were referring

24         to.

25    A.    Sure.  You want me to use the screen?

1    Q.    Yes, if you don't mind.

2    A.    Judge, the molding is along the passenger's side of

3          the vehicle about halfway up from the ground to the

4          window in between the lighted areas of the car that

5          are more illuminated, being the taillights and

6          headlights.  This area of the front bumper is

7          consistent with the area described of the license

8          plate holder that appeared similar, and then the

9          roof line characteristics that make it a sedan

10         versus another type of a vehicle.

11   Q.    All right.  I'm going to back up several exhibits,

12         and I apologize, to Mohler Court.  Could you point

13         out the characteristics of that vehicle that you

14         were considering when matching the video from

15         Franklin Avenue.  Actually, I'll back it up one

16         more.

17   A.    Thank you.  So, Judge, in this imagine the front

18         bumper has an area of consistent coloring where

19         there's a dark area with a whiter area in between

20         that.  The molding that is on the passenger's side

21         of the vehicle is consistent with that being seen in

22         the Franklin Street video about halfway from the

23         ground up below the windows, and then the

24         characteristics of the roof line, I think it's easy

25         to tell it's not an SUV, for example.  It's a sedan,

1          in my opinion.

2                    MR. CHERNOSKY:   Thank you.   No further

3                questions of this witness.   I'll offer for

4                cross.

5                    THE COURT:   Mr. McKinney.

6                              - - -

7                         CROSS-EXAMINATION

8     BY MR. McKINNEY:

9          Q.    Detective, I want to direct your attention to

10              Exhibit 67 or 70.

11                    Now, when you're looking at Exhibit 67,

12              you see this vehicle.   You would agree with me that

13              you can't tell whether or not that's a Lincoln

14              Continental?

15         A.    I would agree.

16         Q.    And did you conduct any investigation to determine

17              how many vehicles that fit those three

18              characteristics that you outlined are registered to

19              owners in, say, Allegheny County?

20         A.    I did not.

21         Q.    And in Wilkinsburg or Homewood?

22         A.    No.

23         Q.    And you cannot definitively say that that vehicle in

24              Exhibit 67 is the same vehicle that's in the Mohler

25              Court parking spot?

1    A.    Correct.

2    Q.    Now, you mentioned the front license plate holder

3          without a license plate.  Are you able to see that

4          clearly in Exhibit 67?

5    A.    It's an area that I can -- Yes, I believe that I can

6          see an area of white surrounded by darkness that is

7          consistent with what I described.

8    Q.    So that area with the whiteness that's surrounded by

9          darkness, are you talking about this area right

10         here?

11   A.    Yes.

12             MR. McKINNEY:  One moment, Your Honor.

13             (Pause)

14   Q.    When looking at Exhibit 67, are you able to

15         ascertain -- obviously there's a driver.  Are you

16         able to ascertain whether or not there's a passenger

17         in that vehicle?

18   A.    No.

19             MR. McKINNEY:  No additional questions,

20         Your Honor.

21             THE COURT:  Mr. White?

22             MR. WHITE:  I don't have any questions,

23         Your Honor.

24             MR. CHERNOSKY:  No redirect, Your

25         Honor.


MARY BETH PERKO, RMR    (412) 350-5414

1           THE COURT:  Thank you, Detective.  You

2       may step down.  Commonwealth may call its

3       next witness.

4           MR. CHERNOSKY:  Thank you, Your Honor.

5       Commonwealth would call Detective Patrick

6       Miller.

7           THE WITNESS:  Good afternoon, sir.

8                    - - -

9               DETECTIVE PATRICK MILLER

10      a witness herein, having been first duly sworn, was

11      examined and testified as follows:

12                  DIRECT EXAMINATION

13  BY MR. CHERNOSKY:

14      Q.  Detective Miller, how are you employed?

15      A.  I'm employed by the Allegheny County Police

16          Department assigned to the Homicide Unit.

17      Q.  How long have you been employed by Allegheny County?

18      A.  I am in my 20th year.

19      Q.  And how long as a detective in the Homicide

20          Division?

21      A.  I've been in the Homicide Unit for ten years.

22      Q.  Were you assigned to participate in the

23          investigation of multiple deaths that occurred at

24          1304 Franklin Avenue in Wilkinsburg?

25      A.  Yes, sir.

MARY BETH PERKO, RMR    (412) 350-5414

1    Q.   During the course of your investigation did you

2         develop a phone number to be associated with Cheron

3         Shelton during the time of the homicide?

4    A.   Yes.

5    Q.   What was it?

6    A.   412-892-0447.

7              MR. McKINNEY:   Your Honor, I'm going to

8         ask for additional foundation to determine

9         how this detective determined that that

10        number is associated with my client.

11             MR. CHERNOSKY:   Thank you, Your Honor.

12   Q.   How were you able to determine that phone number was

13        associated with Mr. Shelton?

14   A.   Through an interview conducted with his girlfriend

15        Chanel Falls.

16   Q.   What did Ms. Falls tell you?

17   A.   She told me that she purchased that cell phone for

18        Mr. Shelton upon his release from jail on unrelated

19        matters.

20   Q.   Based on this information, did you obtain a court

21        order for the call detail and/or text detail logs of

22        that phone number?

23   A.   Yes.   On March 15 a court order was sent out to

24        T-Mobile for those records.

25   Q.   During the course of your investigation did you

1          develop information for a cell phone number that was

2          associated with Rob Thomas?

3    A.   Yes.

4    Q.   What was that number?

5    A.   412-378-3461.

6    Q.   And how were you able to develop that number?

7    A.   That number was developed through a couple different

8          means, the first of which was an interview conducted

9          with Brittany Shelton on March 12.

10              MR. WHITE:  Your Honor, at this point

11          I'm going to object to the nature of the

12          testimony.  This is hearsay on hearsay.  He's

13          testifying what Brittany Shelton is telling

14          him.

15   Q.   Actually, did Brittany Shelton tell you anything?

16   A.   No, sir.

17              MR. WHITE:  Then I would object to any

18          testimony relevant to Brittany Shelton

19          telling somebody about Rob Thomas's cell

20          phone.

21              MR. CHERNOSKY:  May I continue, Your

22          Honor?

23              THE COURT:  One second, Mr. Chernosky.

24          Let's object to specific questions.  He'll

25          repeat the question.  If you have an

1          objection, you can object.  If not, the

2          witness will answer.

3               Mr. Chernosky, you can repeat the

4          question.

5               MR. CHERNOSKY:  Thank you.

6  Q.   How is it that you developed Robert Thomas's cell

7        phone during the time of the murders?

8  A.   Through a phone download of Brittany Shelton's

9        phone.

10  Q.   Was that conducted by the county police?

11  A.   Yes, it was.

12  Q.   What do the cell download records reveal with regard

13        to Robert Thomas?

14  A.   Well, first it revealed a contact in her contact log

15        as Millhouze, M-i-l-l-h-o-u-z-e, with that

16        associated phone number.

17  Q.   What was the associated phone number?

18  A.   412-378-3461.

19  Q.   What else did the download of Brittany Shelton's

20        phone reveal?

21  A.   A text message received on February 1 of this year

22        from Millhouze, same 378 number.  In the text, body

23        of the text, it said "Hey, it's Rob.  I need you to

24        call me."

25  Q.   Are you aware of an interview conducted with Robert

1          Thomas himself at the Allegheny County Police

2          Department?

3     A.   Yes.  He was interviewed April 5 of this year.

4     Q.   Was he asked if he goes by any aliases or nicknames?

5               MR. WHITE:  Your Honor, at this point

6          I'm going to object because it's hearsay.

7          It's not admissible.  It's hearsay on hearsay

8          because the detective did not interview my

9          client.

10              THE COURT:  Mr. Chernosky.

11              MR. CHERNOSKY:  Your Honor, the

12         objection was, if I'm correct, that there was

13         no foundation from which the witness could

14         testify that he knows or was aware of a phone

15         number that was associated with Rob Thomas.

16         I am simply laying the foundation.

17              Mr. White's objection requires him to

18         explain how he knows it.  He knows that an

19         interview was conducted with Rob Thomas

20         himself wherein he admitted that he goes by

21         the fake name that was found in a download on

22         someone's phone associated with a certain

23         number.

24              Further, the detective is aware that

25         that download produced a text message wherein

1    the owner of that purported phone number

2    says, "It's Rob.  Give me a call back."

3         Those things combined lay a foundation

4    for why the witness can testify that he is

5    aware this phone number was associated with

6    Rob Thomas.

7         MR. WHITE:  Your Honor, my objection is

8    that my client purportedly made a statement

9    against interest.  That is obviously a

10   hearsay exception.  This detective did not

11   interview my client specifically, so this

12   detective's going to testify to what another

13   detective told him.  So, therefore, you can't

14   have hearsay on hearsay.

15        I understand the ruling in Ricker, but

16   you can't just have hearsay upon hearsay.

17   You can't just let the whole thing in.

18        THE COURT:  It wouldn't be hearsay on

19   hearsay, but it's hearsay as to this witness.

20   Under Ricker I'm going to overrule the

21   objection.  You can cross-examine him on who

22   interviewed your client.

23        Mr. Chernosky, would you repeat the

24   question for the witness, please.

25        MR. CHERNOSKY:  Thank you, Your Honor.


MARY BETH PERKO, RMR    (412) 350-5414

1   Q.   I believe the question was, are you aware of an

2        interview of the defendant Rob Thomas himself

3        wherein he was asked if he went by any nicknames?

4   A.   Yes, sir.

5   Q.   And did he acknowledge in that interview that he

6        goes by the nickname Millhouze or Houze?

7   A.   Yes, he did.

8   Q.   Further, are you aware that he was connected with

9        this phone number itself and asked if that was his

10       phone number at the time?

11  A.   Yes, he was.

12  Q.   And are you aware of what his response in that

13       regard was?

14  A.   He stated that he agreed with the detective that

15       that probably was his number at the time of the

16       homicides.

17  Q.   Based on the information you had regarding both of

18       these cell phone numbers, did you retrieve or apply

19       for court orders for call detail logs and text

20       message logs for both numbers?

21  A.   Yes.  The first court order was sent on March 12 by

22       Detective Scott Towne, T-o-w-n-e.  That would have

23       been for the 412-892-0447 number, and then on

24       April 6 I applied for a court order and sent one out

25       for 412-378-3461.

1    Q.    With regard to both of those call detail and text

2          detail logs, what can you tell the Court with regard

3          to communication between the number associated with

4          Cheron Shelton and the number associated with Robert

5          Thomas the night of the murders?

6    A.    There was a lot of contact via text message and

7          incoming/outgoing calls between the two.

8          Specifically there were 37 instances where the

9          phones contacted one another between 8:00 p.m. and

10         midnight on the 10th.

11   Q.    I'm going to direct your attention specifically to

12         the time period around 10:30.  Is there contact

13         between phones associated with either individual

14         between one another at 10:30?

15   A.    At 10:31, yes, there was a text message sent from

16         Mr. Thomas to Mr. Shelton which was then returned, a

17         return text three minutes later at 10:34.

18   Q.    Moving past that, is there a contact after

19         10:34 p.m.?

20   A.    There is a four-minute, 55-second phone call at

21         10:46 p.m.

22   Q.    And if you can, was that from the phone number

23         associated with Cheron Shelton or from the phone

24         number associated with Rob Thomas?

25   A.    It was from Mr. Thomas to Mr. Shelton.

P. Miller - Direct by Mr. Chernosky    **102**

1    Q.   And how long is that phone call?

2    A.   Four minutes and 55 seconds.

3    Q.   When did it originate?

4    A.   10:46 p.m.

5    Q.   So what time does that phone call end?

6    A.   I'm sorry?

7    Q.   What time, if you were with to do the math, does

8        that phone call end?

9    A.   Roughly 10:51.

10   Q.   What time is the shooting?

11   A.   10:53.

12   Q.   Is there any contact between the phone number

13       associated with Rob Thomas and the phone number

14       associated with Cheron Shelton during the shooting?

15   A.   No.

16   Q.   What is the first contact between the phone number

17       associated with Cheron Shelton and the phone number

18       associated with Rob Thomas after the shooting?

19   A.   10:56 p.m.

20   Q.   How many total contacts are there from the time

21       after the shooting until later that night?

22   A.   There were a total of 12 between incoming and

23       outgoing and text messages.

24   Q.   I'm going to show you what I will mark as

25       Commonwealth's Exhibit 72.  Is Commonwealth's

P. Miller - Cross by Mr. McKinney    **103**

1          Exhibit 72 a visual depiction of the information
2          that you just testified to?
3    A.    Yes.
4               MR. CHERNOSKY:  Move for the admission
5          of Commonwealth's Exhibit 72.
6               MR. McKINNEY:  No objection.
7               MR. WHITE:  No objection.
8               MR. CHERNOSKY:  No further questions
9          for the witness.  I'll offer for cross.
10              THE COURT:  Mr. McKinney?
11                        - - -
12                  CROSS-EXAMINATION
13   BY MR. McKINNEY:
14   Q.    Detective, would you agree with me that the only way
15         you're able to attribute that cell phone that you're
16         attributing to Mr. Shelton is based solely on the
17         statement made by Chanel Falls?
18   A.    I would say that to be accurate.
19   Q.    So you don't have any subscriber information that,
20         in fact, connects that phone to Mr. Shelton?
21   A.    No.  The subscriber information did not come back to
22         him directly, no, sir.
23   Q.    Who did it come back to?
24   A.    I don't recall.  It was not Mr. Shelton's name.  A
25         fictitious name.  I don't recall.

MARY BETH PERKO, RMR    (412) 350-5414

P. Miller - Cross by Mr. McKinney    **104**

1  Q.  It was a fictitious name?

2  A.  I believe so, yes.

3  Q.  So your testimony on direct was Chanel Falls told

4      you that she bought him that phone?

5  A.  Yes.

6  Q.  But now you're also saying that it was a fictitious

7      name that was used to purchase that phone?

8  A.  It's fictitious in the sense you are not required to

9      show ID when you purchase a cell phone from, say, a

10     Walgreens or Target or somebody.  You can buy a

11     generic flip phone or a TracFone, something of that

12     nature where you're not required to show ID.  That's

13     what I mean by that.

14  Q.  Got you.  So is there a name associated with the

15      subscriber information for that phone?

16  A.  I believe there is, sir.  I just don't recall what

17      it is at this time.

18  Q.  Not to pressure you, do you know whether the name is

19      Chanel Falls?

20  A.  I don't think so.

21  Q.  And when Chanel told you that she bought the phone

22      for Cheron, was that statement recorded in writing?

23      I.e., did she write down a statement saying "I

24      bought the phone for Cheron Shelton"?

25  A.  I believe it was conducted at headquarters and, if

1          so, it would have been recorded, yes.

2     Q.   Now, you're aware that the allegation in this case

3          is that the defendants committed this act together

4          at the same time?  Are you aware of that?

5     A.   Yes.

6     Q.   Yet your testimony is that on 37 separate instances

7          they were communicating via phone conversation or

8          text message; is that correct?

9     A.   Yes.

10    Q.   Would you agree with me that it would be unusual for

11         two people who were together --

12              MR. CHERNOSKY:  Objection, Your Honor.

13         This calls for speculation on behalf of

14         the --

15              MR. McKINNEY:  I think it's a fair

16         question.  Can I at least finish the question

17         before the Court rules on it?

18              THE COURT:  I'll let you finish the

19         question and then Mr. Chernosky can decide

20         whether he wants to object at that time.

21    Q.   Would you agree with me that if two people are in

22         close proximity -- i.e., right next to each other --

23         it would be unusual for them to communicate via cell

24         phone on 37 separate instances?

25              MR. CHERNOSKY:  I object, Your Honor.

1              Calls for speculation.

2                   THE COURT:  Sustained.

3      Q.    Now, you would agree with me that you don't know

4            what the content of those text messages was;

5            correct?

6      A.    I do not.

7      Q.    And you don't know what the substance of those phone

8            communications was; correct?

9      A.    I do not.

10     Q.    Were you ever able to recover either cell phone?

11     A.    No.  Well -- No.  Mr. Thomas and Mr. Shelton?  The

12           378 and 892 numbers?  No, we were not.

13                  MR. McKINNEY:  No additional questions,

14           Your Honor.  Thank you.

15                  THE COURT:  Mr. White?

16                  MR. WHITE:  Thank you.

17                       - - -

18                  <u>CROSS-EXAMINATION</u>

19     <u>BY MR. WHITE</u>:

20     Q.    Detective Miller, the telephone number 412-378-3461,

21           who is that number subscribed to?

22     A.    I don't recall.

23     Q.    Is there a name?

24     A.    There is a name but it's not Mr. Thomas.

25     Q.    And would that be reflected in your notes or in any

                    MARY BETH PERKO, RMR    (412) 350-5414

1           report?

2   A.     I'm sure it is, yes.

3   Q.     And where was that cell phone purchased?

4   A.     I do not know the answer to that.

5   Q.     And where do the bills for that cell phone go to?

6   A.     I don't know.

7   Q.     Do they have an address or location?

8   A.     They do.  It's on the call detail records.  I just

9          don't know it at this time.

10  Q.     But it's not Mr. Thomas' house; correct?

11  A.     No, sir.

12  Q.     And this interview done by my client where he said

13         it was probably his number, you used the term

14         "probably"; is that correct?

15  A.     I believe I said the term "agreed."  He agreed with

16         the detectives that that was most likely his phone

17         at the time of the crime, yes.

18  Q.     But he said "most likely" or "probably" his phone?

19         He wasn't certain it was his phone; correct?

20  A.     That's what he said, yes.

21  Q.     And this interview was recorded; correct?

22  A.     As far as I know, yes.

23  Q.     This was done with Detective Hitchings; correct?

24  A.     Sounds appropriate, yes.

25  Q.     And before you on Exhibit 72 you have about 32 forms

P. Miller - Cross by Mr. White       **108**

1          of communication between purportedly Mr. Shelton's

2          phone and purportedly my client's phone?

3     A.   I believe it was 37, but yes.

4     Q.   Do you have any idea what was said during those

5          phone conversations if and when these two

6          individuals talked or spoke?

7     A.   I do not.

8     Q.   And these text messages, these SMS text messages,

9          what do they say?

10    A.   I have no idea.

11    Q.   And you don't have that information back at the

12         station; is that correct?

13    A.   That is not part of the call detail records, no.

14    Q.   And during that same interview you alluded to of

15         Mr. Thomas, Mr. Thomas indicated where he was during

16         the time of the shootings; is that correct?

17    A.   Yes, he did.

18    Q.   And he doesn't place himself at the shootings; is

19         that correct?

20    A.   No, he doesn't.

21    Q.   I'm going to draw your attention to what I'll mark

22         as Defendant's Exhibit A.

23              MR. WHITE:  May I approach, Your Honor?

24              THE COURT:  Yes.

25    Q.   I'm going to show you what I'll mark as Defendant's

MARY BETH PERKO, RMR    (412) 350-5414

1              Exhibit A.  Do you recognize that document?

2    A.    Sort of looks similar to the document I just saw,

3          much smaller text.

4    Q.    It's much smaller text.  I apologize.

5    A.    That's all right.

6    Q.    You have from 8:04 p.m. to 11:44 p.m. on the

7          Commonwealth's exhibit; correct?

8    A.    Yes, sir.

9    Q.    And on this document I have from 8:04 p.m. to all

10         the way to 4:11 a.m.; correct?

11   A.    Yes.

12   Q.    Okay.  Is that a document you're familiar with, that

13         graph?

14   A.    I've seen it before, yes.

15   Q.    And in this document, I apologize again for the

16         wording to be so small, but at 12:14 a.m., do you

17         see what that says?

18   A.    "Unanswered voice call" from Shelton to Thomas.

19   Q.    I'm sorry.  What time was that?

20   A.    12:14 and 54 seconds a.m.

21   Q.    And at 12:15 and 22 seconds, what does it depict?

22   A.    Unanswered voice call from Shelton to Thomas.

23   Q.    And based on your investigation, you believe that

24         Shelton and Thomas are together at that time; is

25         that correct?

1    A.    Pardon me, sir?

2    Q.    During the time of those two telephone

3          conversations, those two attempted telephone

4          contacts, are Mr. Shelton and Mr. Thomas purportedly

5          in the same home?

6    A.    I don't know the answer to that.

7    Q.    Well, the shootings happened at approximately a

8          little before 11 p.m.; correct?

9    A.    Yes.  10:53 is the 911 call.

10   Q.    And 11:57 Mr. Thomas purportedly enters the rear of

11         1214 Nolan Court; correct?

12   A.    I don't know that to be factual.

13   Q.    It's on my Defendant's Exhibit A.

14   A.    That doesn't mean it's factual.

15   Q.    That's what's on your exhibit, sir.  It's on the

16         exhibit you produced to the media, so looking at

17         that exhibit, do you recognize that exhibit as --

18   A.    What's the time?

19   Q.    At 11:47 p.m.  It's in the blue.

20   A.    Okay.  Thomas enters rear of 1214 Nolan Court.  I

21         see it.

22   Q.    And the next time depicted is 12:14 a.m. and 54

23         seconds; correct?

24   A.    Yes.

25   Q.    And in there it says that there's an unanswered

1          voice call from Shelton to Thomas, and then below

2          that it says there's an unanswered voice call from

3          Shelton to Thomas; correct?

4     A.   That's correct.

5     Q.   And then the next box depicted in the blue above it

6          it says Shelton and Thomas exit 1214 Nolan Court.

7          Do you see that?

8     A.   Yes.

9     Q.   Okay.  So based on your investigation and based on

10         what you produced in Commonwealth's Exhibit 72, it's

11         your understanding that Mr. Shelton and Mr. Thomas

12         called each other while they're in the same home?

13    A.   If that's what the records reflect.

14              MR. WHITE:  Your Honor, I move for

15         admission of Defendant's Exhibit A into

16         evidence.

17              MR. CHERNOSKY:  No objection.

18              THE COURT:  Defendant's Exhibit A is

19         admitted.

20              MR. WHITE:  I have nothing further,

21         Your Honor.

22              THE COURT:  Redirect?

23              MR. CHERNOSKY:  Just briefly on

24         redirect, Your Honor.

25                        - - -

1                        REDIRECT EXAMINATION

2     BY MR. CHERNOSKY:

3        Q.    To the extent that Mr. White asked you if his client

4              placed himself elsewhere in the interview with

5              Detective Hitchings --

6        A.    Yes.

7        Q.    -- are you aware that in that interview with

8              Detective Hitchings he acknowledged that it was he

9              who jumped over the fence?

10                     MR. WHITE:  I'm going to object, Your

11             Honor.  That's outside the scope of my cross.

12                     MR. CHERNOSKY:  It's not outside the

13             scope of his cross.  He asked if his client

14             put himself elsewhere at the time of the

15             shooting, which directly asked about his

16             client's location.

17                     If the detective knows that his client

18             put himself at the scene of Nolan Court where

19             he's on video and tells us that that was him

20             and the detective knows about it, he can

21             testify.

22                     MR. WHITE:  He's referencing what

23             happened after the shooting.  I'm asking what

24             happened during the shooting, where my client

25             was.  It has nothing to do with after the

                    MARY BETH PERKO, RMR    (412) 350-5414

1    shooting.

2        THE COURT:  The Court understood your

3    questions pertained to the events that

4    occurred after the shooting.

5        MR. WHITE:  Or before the shooting.  I

6    asked Detective Miller, Did my client place

7    himself at the scene of the shooting?  The

8    answer was no.  He placed him somewhere else,

9    so before and during the shooting.

10        THE COURT:  But your question was phone

11    calls that occurred at 12 something, which is

12    after the shooting.  Your question to him

13    was, You contend they're both in the same

14    house, 1214 Nolan Court at 12 something.

15        MR. WHITE:  I'm not contending that.

16    I'm just --

17        THE COURT:  Well, that was your

18    question, and you asked the witness, Is it

19    your contention that they were in the same

20    house based upon the other testimony when

21    these two calls occurred.

22        MR. WHITE:  I just found it odd two

23    people would call each other when they're in

24    the same home.

25        THE COURT:  I suppose that's why you

1              asked the question.  I understand.  I think

2              you opened the door.  I'm going to permit the

3              question.  You can repeat the question, if

4              you can, Mr. Chernosky.

5    Q.    Detective, are you aware of the interview conducted

6          by Detective Hitchings with Robert Thomas?

7    A.    Yes, I am.

8    Q.    Are you aware that Mr. Thomas acknowledges that that

9          is him on the video at Nolan Court wearing the

10         jacket with the fur collar?

11   A.    Yes.

12   Q.    And entering the back of Nolan Court?

13   A.    Yes.

14   Q.    Are you aware that Mr. Thomas acknowledges that that

15         is Mr. Shelton who entered before him?

16   A.    Yes.

17              MR. McKINNEY:  Objection.  Ask that

18         that be stricken from the record on Bruton,

19         Your Honor.  A co-defendant's statement can't

20         be used against -- The Court is well aware.

21              THE COURT:  Mr. Chernosky?

22              MR. CHERNOSKY:  Your Honor, to the

23         extent that Your Honor would consider that,

24         Your Honor would consider that against

25         Mr. Thomas only and not against Mr. Shelton.

MARY BETH PERKO, RMR    (412) 350-5414

1   I believe you're capable of parsing the two

2   out.

3   THE COURT:  The Court will acknowledge

4   that testimony only as to Mr. Thomas, not as

5   to Mr. Shelton.

6   MR. McKINNEY:  Thank you.

7   MR. CHERNOSKY:  No further redirect,

8   Your Honor.

9   MR. McKINNEY:  No recross, Your Honor.

10   MR. WHITE:  No recross, Your Honor.

11   THE COURT:  Thank you, Detective.  You

12   may step down.  Mr. Chernosky, call your next

13   witness.

14   MR. CHERNOSKY:  Thank you, Your Honor.

15   Commonwealth calls Inspector Palmer.

16                - - -

17   **INSPECTOR WILLIAM PALMER**

18   a witness herein, having been first duly sworn, was

19   examined and testified as follows:

20   **DIRECT EXAMINATION**

21   **BY MR. CHERNOSKY:**

22   Q.   Inspector Palmer, can you state your first and last

23   name and spell your last name for the record.

24   A.   William Palmer, P-a-l-m-e-r.

25   Q.   How are you currently employed?

1   A.  I'm an inspector with the Allegheny County Police
2       Department.
3   Q.  How long have you been employed as an inspector with
4       the Allegheny County Police Department?
5   A.  Over 23 years.
6   Q.  Can you tell the Court what your job duties are as
7       inspector with the Allegheny County Police
8       Department.
9   A.  As inspector I am in charge of jail investigations
10      and Internal Affairs.
11  Q.  I'm going to direct your attention to April 7 of
12      2016.  Did you receive notice from the Allegheny
13      County Police Department Homicide Division that they
14      were in possession of a warrant for the outgoing
15      mail of Cheron Shelton?
16  A.  On April 1 I was made aware of that.
17  Q.  April 1.  I apologize.
18  A.  Yes.
19  Q.  And what did you do with respect to the information
20      they gave you about the search warrant they had?
21  A.  An outbound letter from Cheron Shelton had already
22      been recovered from the mailroom of the jail.  Once
23      there was confirmation the search warrant had been
24      obtained for that piece of mail, that letter was
25      opened.

W. Palmer - Direct by Mr. Chernosky    **117**

1    Q.    And upon opening it, did you read it?

2    A.    Yes.

3    Q.    What was contained in the letter?  I'm sorry.

4          Physically what was contained?

5    A.    Physically there was three pieces of lined paper

6          handwritten.  It was two letters, a two-page letter

7          to a female named Brown Shugga and a one-page letter

8          addressed to a Pops.

9    Q.    I'm going to direct your attention to the letter

10         that was dressed to Pops, specifically the second

11         page of that letter, first paragraph.  Do you recall

12         what that said?

13   A.    Yes.

14              MR. McKINNEY:  Your Honor, I would

15          object to this officer testifying and

16          characterizing what the letter said.  The

17          government's in possession of the letter.

18          They can present the letter to the Court.

19              If the Court does allow this officer to

20          testify, or this inspector to testify --

21          sorry -- I would ask that his statements be

22          limited to verbatim precisely what was

23          written in the letter.

24              THE COURT:  Mr. Chernosky?

25              MR. CHERNOSKY:  Your Honor, it is the

MARY BETH PERKO, RMR    (412) 350-5414

1    Commonwealth's option to admit the letter if

2    it wants or have the witness testify to his

3    recollection of the letter. If he doesn't

4    recall what exactly is said in the letter, I

5    can hand him anything I want to refresh his

6    recollection, including the letter itself,

7    without admitting it.

8         MR. WHITE: Your Honor, I'm also going

9    to echo Mr. McKinney's objection, especially

10   under the Best Evidence Rule. If we have the

11   letter, where's the letter? Show us the

12   letter. Why does this officer have to

13   speculate or try to remember what the letter

14   said?

15        Secondly, I also object to whatever's

16   in this letter that's going to be testified

17   to against my client under Bruton. I just

18   want to make sure the Court's aware --

19        THE COURT: The Court won't consider it

20   as to Mr. Thomas. Correcting Mr. Chernosky's

21   statement, the Commonwealth may offer. The

22   Court admits.

23        I'm going to sustain the objection

24   regarding the letter. If we have the letter,

25   let's use the letter.

1          MR. CHERNOSKY:  I can save this for

2      closing remarks.  Your Honor can consider a

3      statement against Mr. Thomas if the letter

4      were to say Mr. Thomas did X, Y, and Z.

5      However, it's the Commonwealth's submission

6      that the content of the letter is actually

7      seeking to reach out to Mr. Thomas, and we

8      are free to argue Mr. Shelton would reach out

9      to Mr. Thomas because Mr. Thomas knows

10      something about the crime.

11          I hope you wouldn't foreclose the

12      Commonwealth from making that argument based

13      on the objection.

14          THE COURT:  That's fine.  The Court

15      understanding is consistent with counsel's

16      recitation.

17          MR. CHERNOSKY:  Is it Your Honor's

18      desire I, in fact, mark the letter before

19      this witness --

20          THE COURT:  It is.

21          MR. CHERNOSKY:  Thank you.

22  Q.   I'll show you what I will mark as Commonwealth's

23      Exhibit 73.

24          MR. WHITE:  Your Honor, may we have a

25      copy of this?

MARY BETH PERKO, RMR    (412) 350-5414

1          MR. CHERNOSKY:  Your Honor, to the

2     extent the Commonwealth would move to admit

3     this letter, it would be public record.  If

4     we don't move to admit it, it will be

5     provided in discovery, but I actually haven't

6     decided whether I would admit it yet or not.

7          THE COURT:  If you're going to use it

8     as an exhibit, I think in fundamental

9     fairness you provide the other side a copy so

10    they can examine it, cross-examine the

11    witness on it.  I think you have to give it

12    to them.  It's not a matter of gamesmanship.

13    It's a matter of fundamental fairness.

14         MR. CHERNOSKY:  It was not my intent to

15    mark it as an exhibit.  It was my intent to

16    have the witness testify to it and, if he

17    can't recall, to read it to him.  Or I can

18    mark it as an exhibit, but I just don't have

19    a copy.

20         THE COURT:  The Court has a copy

21    machine just around the corner, will make two

22    copies, one for each defense counsel, and

23    then we will proceed.  Mr. Creegan.

24         (Pause)

25         (Copies distributed).


MARY BETH PERKO, RMR   (412) 350-5414

1            MR. CHERNOSKY:  May I proceed?

2            THE COURT:  Yes.

3    Q.    Show you what I've marked as Commonwealth's

4          Exhibit 73.  Do you recognize Exhibit 73?

5    A.    Yes.  This was one of the lined letters inside that

6          envelope.

7    Q.    Is it fair to say Commonwealth's Exhibit 73 is, in

8          fact, a photograph of one of the lined letters?

9    A.    Correct.

10   Q.    Could you read the first paragraph of Commonwealth's

11         Exhibit 73.

12   A.    "Pops, I need you on some real shit.  Round the

13         corner at Bubby house I got something there I was

14         working on getting rid of.  You don't got to do

15         nothing but open the door and guide my nigga to it.

16         It's downstair next to the lawn mowers wrapped ready

17         to be toss.  Call 513-6784 or 651-5092.  Ask for

18         Houze.  Don't say much, but y'all got to sit and

19         talk, and explain what I need him to do.  He's a

20         good dude.  He'll take care of it."

21   Q.    I'm going to stop you there.  Does that letter have

22         a salutation at the end, an ending phrase?

23   A.    Yes.

24   Q.    What is it?

25   A.    "Burn this when done reading."

MARY BETH PERKO, RMR    (412) 350-5414

1    Q.   Is it signed?  Does it have a name?

2    A.   It does.  Cheron.

3    Q.   Do you have a recollection what address that letter

4         was addressed to, the original envelope it came in?

5    A.   Yes.  It was addressed to a Pat Annie Taylor at

6         6914 Hartman Lane, Pittsburgh, PA, 15206.

7    Q.   Did that address have any significance to you?

8    A.   To me, no.

9    Q.   At the end of your opening and reading this mail,

10        who took possession of it?

11   A.   Homicide Detective Fernando Costa.

12   Q.   To your knowledge, was it subjected to any

13        serological or scientific testing?

14   A.   I do not know.

15             MR. CHERNOSKY:  No further questions.

16         I'll offer for cross.

17             MR. McKINNEY:  Thank you, Your Honor.

18                      - - -

19                 CROSS-EXAMINATION

20   BY MR. McKINNEY:

21   Q.   Inspector, would you agree with me that there are

22        additional references in this letter to U.S.

23        currency?

24   A.   Yes.

25   Q.   And I'd like to direct your attention to the line

1          that says "also he owes me a few dollars." Can you

2          read that for the Court. It's shortly after the

3          paragraph you just read.

4     A.   Okay. "Also, he owe me a few dollars, damn near a

5          stack and about it and tell him to carry on with

6          Paul Wall for me."

7     Q.   Can you continue?

8     A.   "Let him know it's crunch time and I need him, and

9          if you feel up to it, tell him only time he has a

10         few dollars from Paul Wall give it to you."

11    Q.   Continue, please.

12    A.   "I trust you with the money. It's anywhere from a

13         stack to $1,300 when it's all said and done, about

14         every week maybe, week and a half. He won't give

15         you any lip cause he can tell all this came straight

16         from me."

17    Q.   Okay. Now, you've only been asked about this

18         portion of the letter. Was there an additional page

19         to the letter?

20    A.   There was the front side of this piece of paper.

21    Q.   Okay. Do you remember if that page had any

22         references to money?

23    A.   It did not.

24              MR. McKINNEY:  No additional questions,

25         Your Honor. Thank you.


MARY BETH PERKO, RMR    (412) 350-5414

1          THE COURT:  Mr. White.

2                          - - -

3                    CROSS-EXAMINATION

4    BY MR. WHITE:

5      Q.    Inspector, do you have any training from narcotics

6            investigations?

7      A.    I was the commander of the Allegheny County Police

8            Narcotics Unit.

9      Q.    And drugs are generally wrapped up; is that correct?

10              MR. CHERNOSKY:  I'll just object.  This

11           is outside the scope of my direct

12           examination.

13              MR. WHITE:  Your Honor, I'm referencing

14           where in the letter it says --

15              THE COURT:  I'm going to provide some

16           latitude.  Ask the question.

17     Q.    Drugs are generally wrapped up; correct?  To be

18           sold?

19     A.    It depends on the type.  There are some types of

20           drugs that are wrapped.

21     Q.    And in the sentence on the fourth line it starts,

22           "It's downstair next to the lawnmowers wrapped ready

23           to be tossed."  Do you recall that line?

24     A.    Yes.

25     Q.    He could be referring to drugs; is that correct?

MARY BETH PERKO, RMR    (412) 350-5414

1              MR. CHERNOSKY:  Objection.  Calls for

2         speculation on behalf of the witness.

3              MR. WHITE:  Based on his training and

4         experience.

5              MR. CHERNOSKY:  Objection.  Calls for

6         speculation.

7              THE COURT:  It does call for

8         speculation by definition of the question.

9         I'll sustain the objection.

10    Q.   What's he referring to?

11    A.   Most likely evidence.

12    Q.   Okay.  What type of evidence?

13    A.   Evidence related to the crime in the content of this

14         letter.

15    Q.   And it could be drug dealing crimes?

16              MR. CHERNOSKY:  Objection.

17    A.   No.

18              MR. CHERNOSKY:  Calls for speculation

19         on behalf of the witness.

20              MR. WHITE:  I'll rephrase.

21    Q.   It could be referencing any type of evidence for any

22         type of crime; correct?

23    A.   The sentence before this paragraph he's talking

24         about the Wilkinsburg homicide and the DNA swabbing

25         that was taken from him and his concerns on that.

1    Q.   The sentence before that?

2    A.   This is the second page of the letter.

3    Q.   So you have a first page?  Could I see the first

4         page, then?

5              MR. CHERNOSKY:  Objection.  If

6         Mr. White has it, he can admit it.  I haven't

7         admitted it.  He's stuck to cross-examining

8         him on the one I have admitted.

9              MR. WHITE:  We're playing open the

10        door, Your Honor.  He opened the door.

11        Apparently there's a second page.

12             MR. CHERNOSKY:  There definitely is a

13        second page.

14             MR. McKINNEY:  Your Honor, I believe

15        the Court's order was the testimony would be

16        limited to -- this officer, this inspector

17        can testify as to what's limited to that

18        note, and that's why we haven't shown it to

19        the Court.  We needed to see what it actually

20        said.

21             Now he's gone back to an additional

22        page referencing things we don't have, and we

23        can't confirm what's true.

24             THE COURT:  Mr. Chernosky, the

25        witness's testimony was that there were three

1    handwritten pages, one two-page letter to a

2    female, Brown Sugar, and a one-page letter to

3    Pops.  Is it the case that the one-page

4    letter to Pops is two-sided?

5        MR. CHERNOSKY:  It is the case it is

6    two-sided.  The Commonwealth chose to direct

7    him specifically to the first paragraph of

8    the second page of that letter.  I will

9    gladly admit the first page.

10        THE COURT:  I think out of fairness to

11    both sides, if the two-page letter

12    constitutes the letter, they need to be

13    given.

14        (Pause)

15        MR. McKINNEY:  Your Honor, I would ask

16    the DA stop trying to speak directly to my

17    client.  I don't know what's gotten him so

18    upset, but it's certainly unprofessional.

19        (Pause)

20        MR. CHERNOSKY:  Inspector Palmer, I'm

21    going to show you what I'll mark as

22    Commonwealth's Exhibit 74.

23        MR. WHITE:  Your Honor, I think we're

24    still on cross-examination.

25        THE COURT:  We are.  However, for

MARY BETH PERKO, RMR    (412) 350-5414

1            purposes of authenticating the exhibit, I'm

2            going to let Mr. Chernosky resume direct.  I

3            guess redirect, sir.

4                            - - -

5                    **REDIRECT EXAMINATION**

6    **BY MR. CHERNOSKY:**

7    **Q.**    I'm going to show you what I will mark as

8            Exhibit 74.  Do us a favor.  For the purpose of

9            clarity, will you read the entirety of

10           Commonwealth's Exhibit 74 followed by the entirety

11           of Exhibit 73 and tell us what the entirety of that

12           letter said.

13   **A.**    May I refer to my larger copy?

14   **Q.**    You sure may.

15   **A.**    "Pops, thank you for everything you done for me.

16           Thanks for being there for me when I felt no one

17           else had my back.  You always been there for me, and

18           I seen it from the start.  These two, three sentence

19           just brought tears to my eyes between me and you,

20           because I know the love is here and been genuine.

21                   "Sad to say, you probably done and showed

22           me more than my own father ever had, and I thank and

23           praise you for that.  Thank you for raising a

24           beautiful, smart, and very special caring, loving,

25           and strong daughter, Nelly.  Nelly is one of the

W. Palmer - Redirect by Mr. Chernosky    129

1      best things to ever happen to me besides the boys.

2              "Sorry to put you in the position we was

3      in last week.  Never meant to cramp your space or

4      put y'all in harm's way.  I made a few bad

5      decisions, and one of them was staying that night

6      when I told myself I wasn't going to be there.  Like

7      I told Nelly, I just wanted to see my loved ones go

8      to sleep.  Then I'll be on my way, my merry way.

9      But I got too comfortable, and I know I shouldn't

10     have.  I can only blame myself for the actions and

11     decisions I've made.

12              "Like I told Nelly, I'm down here on a

13     receiving stolen property.  They don't have much but

14     a little speculation and a little opinion and

15     thoughts on what they think happened.  I got mouth

16     swabbed the other day.  My lawyer, Randall McKinney,

17     says it takes four to six weeks before it come back.

18     He said your lawyer inquire him, but it's funny

19     because my ma and them already had him on deck.  He

20     seemed like a standup kind of guy.  But like he told

21     me, don't worry about nothing.  If they had

22     something they would have brung it to light by now.

23     We'll see you in a few weeks, though.

24              "Pops, I need you on some real shit.

25     Round the corner at Bubby house I got something

1       there that I was working on getting rid of.  You

2       don't got to do nothing but open the door and guide

3       my nigga to it.  It's downstair next to the lawn

4       mowers wrapped ready to be toss.

5               "Call 513-6784" -- it says "his number"

6       underneath that -- "or 651-5092" -- "the girl

7       number" under that number.  "Ask for Houze.  Don't

8       say much, but y'all got to sit and talk.  Then

9       explain what I need him to do.  He is a good dude.

10      He'll take care of it.

11              "Also, he owed me a few dollars, damn near

12      a stack.  Ask about it, and tell him to carry on

13      with Paul Wall for me.  Let him know it's crunch

14      time and I needs him.  And if you feel up to it,

15      tell him only one time he -- anytime he has a few

16      dollars from Paul Wall, give to you.

17              "I trust you with the money, and it's

18      anywhere from a stack to $1,300 when it's all said

19      and done, about every week, maybe week and a half.

20      He won't give you any lip because he can tell all

21      this came straight from me.

22              "One more thing.  It may sound stupid, but

23      help out with the boys and show them how to be a

24      man.  Cheat's already want to do what Pop Pop do,

25      LOL, and I'm proud of that.  It made me step up and

1      show him Daddy can do something positive as well.

2              "Once again, sorry for the inconvenience

3      and endangering y'all.  Also, thanks for everything.

4      Burn this when you're done reading, LOL.  Love y'all

5      with all my heart.  Cheron."

6              MR. CHERNOSKY:  I don't have any other

7          questions on that.

8                      - - -

9              CROSS-EXAMINATION (Continued)

10    BY MR. WHITE:

11    Q.   Back to my question, I believe I asked you,

12         Inspector, I was referencing the sentence "It's

13         downstair next to the lawn mowers wrapped and ready

14         to be toss."

15              I'm referencing that sentence on the

16         second page.  What is he referring to?

17    A.   Again, it's something he wants to get rid of.

18    Q.   And I believe you also said he references the

19         Wilkinsburg homicides on Page 1?

20    A.   His mouth was swabbed on search warrants for the

21         Wilkinsburg homicide.

22    Q.   But he was charged with -- You're talking about

23         Cheron Shelton; is that correct?

24    A.   Yes.

25    Q.   And a search warrant was served on Mr. Shelton's

MARY BETH PERKO, RMR    (412) 350-5414

1          house where there were weapons found; is that

2          correct?

3    A.    That's my understanding.  I'm not in Homicide.

4    Q.    And those weapons were tested for DNA; is that

5          correct?

6                MR. CHERNOSKY:  Just object.  We're now

7             way outside the scope of direct examination.

8                THE COURT:  I'll sustain.

9    Q.    When was this letter sent?  I know this was the

10         beginning part of your direct.

11   A.    I believe on March 31.

12   Q.    And that was after detectives issued a search

13         warrant for purportedly Cheron Shelton's home on

14         Ross Garden Road; is that correct?

15   A.    I'm not sure of the dates all the search warrants

16         were served.

17   Q.    A search warrant was served on Mr. Shelton's address

18         at Ross Garden Road on March 12, 2016.

19                MR. CHERNOSKY:  I'll just object.  This

20             is outside the scope of his direct

21             examination.

22                THE COURT:  Sustained.

23                MR. WHITE:  I have nothing further,

24             Your Honor.

25                THE COURT:  Mr. McKinney, you're

1      entitled to recross if you have any.

2              MR. McKINNEY:  I have no questions,

3      Your Honor.

4              MR. CHERNOSKY:  No redirect, Your

5      Honor.

6              THE COURT:  Thank you, Inspector.  You

7      may step down.

8              MR. CHERNOSKY:  Your Honor, the

9      Commonwealth will recall Detective Feeney.

10             Your Honor, to the extent that I

11     haven't moved to admit Exhibits 73 and 74, I

12     think Your Honor would be insisting on it.  I

13     would move for the admission of

14     Commonwealth's Exhibits 73 and 74.

15             THE COURT:  Mr. McKinney, any

16     objection?

17             MR. McKINNEY:  No objection.

18             THE COURT:  Mr. White, any objection?

19             MR. WHITE:  No objection.

20             THE COURT:  73 and 74 are admitted.

21                        - - -

22

23

24

25

1                          <u>DETECTIVE FEENEY</u>

2              a witness herein, having been first duly sworn, was

3              examined and testified as follows:

4                              <u>EXAMINATION</u>

5      <u>BY MR. CHERNOSKY</u>:

6          Q.   Detective Feeney, are you aware of an envelope and

7               letter seized from the Allegheny County Jail in

8               connection with the investigation of this case?

9          A.   Yes, I am.

10         Q.   And to your knowledge, was that envelope sent to the

11              Allegheny County Jail for processing?

12         A.   Yes, it was.

13         Q.   Or was it subjected to testing for comparison to the

14              DNA of Cheron Shelton?

15         A.   It was.  Allegheny County Crime Lab

16              No. 16-Lab-02222, a cutting of the flap of the

17              letter, DNA was extracted from that, possible saliva

18              that was contained therein, and it was the

19              conclusion at Lab. No. 14 of scientist Elizabeth

20              Lisbon that the DNA matched that of the reference

21              sample obtained from Cheron Shelton.

22         Q.   Will Ms. Lisbon be available for trial, to the best

23              of your knowledge?

24         A.   She will.

25                   MR. CHERNOSKY:  No further questions.


                   MARY BETH PERKO, RMR    (412) 350-5414

1          MR. McKINNEY:  No questions, Your

2     Honor.

3          MR. WHITE:  No questions.

4          THE COURT:  Thank you, Detective

5     Feeney.  You may step down once more.

6          THE WITNESS:  Thank you, Judge.

7          MR. CHERNOSKY:  Commonwealth would Call

8     Detective Michael Caruso.

9          THE COURT:  Go ahead, Mr. Chernosky.

10                     - - -

11              **DETECTIVE MICHAEL CARUSO**

12     a witness herein, having been first duly sworn, was

13     examined and testified as follows:

14                **DIRECT EXAMINATION**

15     BY MR. CHERNOSKY:

16     Q.   Detective Caruso, how are you currently employed?

17     A.   Allegheny County Police Homicide Section.

18     Q.   How long have you been with the Allegheny County

19          Police?

20     A.   16 full years in January.

21     Q.   And how long in Homicide?

22     A.   Almost seven years.

23     Q.   Did you participate in the investigation into

24          multiple deaths that occurred at 1304 Franklin

25          Avenue in Wilkinsburg?

          **MARY BETH PERKO, RMR    (412) 350-5414**

1     A.    Yes, I did.

2     Q.    During the course of that investigation did you have

3           an opportunity to serve a search warrant at

4           1214 Nolan Court in the City of Pittsburgh?

5     A.    Yes, I did.

6     Q.    What day was that?

7     A.    It was March 12, 2016.

8     Q.    Could you tell the Court what you obtained during

9           the course of that search warrant.

10    A.    Myself along with several detectives of the Homicide

11          Section responded to 1214 Nolan Court.  We executed

12          a search warrant, several detectives at the rear of

13          the building.  Several detectives went through the

14          front.  I searched the bottom area of that

15          residence.

16    Q.    During the course of that search warrant, what items

17          were recovered?

18    A.    There was a .22 caliber long rifle recovered.  There

19          was four magazines that contained .22 caliber

20          ammunition, 7.62 by 39 ammunition, and there was a

21          drum with 12 gauge shotgun shells in it as well.

22    Q.    Did you find any clips for any guns?

23    A.    That's magazines.  Magazines is the same thing as a

24          clip.

25    Q.    Did you find any magazines for a 7.62?

1    A.   Yes.  Found a malignant with 7.62 by 39 and one drum

2          magazine.

3    Q.   Did you find any indicia for Cheron Shelton in that

4          residence?

5    A.   Yes, we did.  We observed a driver's license with

6          Cheron Shelton's name on it.

7    Q.   Any other indicia at that residence?

8    A.   There was a piece of mail located upstairs with his

9          name on it.

10   Q.   Other than the guns and the indicia you just made

11         reference to, did you find any body armor in that

12         residence?

13   A.   Yes, we did.  We found a bulletproof vest, white in

14         color.  It was found inside a closet.

15   Q.   To your knowledge, were the various items collected

16         and sent to the crime lab for processing?

17   A.   Yes, they were.

18   Q.   And with regard to the .22 caliber rifle, was it

19         processed for fingerprints to the best of your

20         knowledge?

21   A.   Yes, it was.

22   Q.   And with what result?  With what result?

23   A.   A fingerprint that was found on the rifle was Cheron

24         Shelton's fingerprint.

25   Q.   During the course of your investigation, did you

1          become aware that an individual from the Allegheny
2          County Jail wished to speak with you regarding
3          information on these shootings?
4     A.   Yes, we did.
5     Q.   And what day did you become aware of that?
6     A.   April 7.
7     Q.   And what steps did you take after that date to speak
8          with this individual?
9     A.   Myself and Detective McCool, M-c-C-o-o-l, obtained a
10         court order to retrieve this individual from
11         Allegheny County Jail to bring him back to Allegheny
12         County Homicide Section to interview him.
13    Q.   Does the Allegheny County Homicide Section have
14         interview rooms?
15    A.   Yes, they do.
16    Q.   Are they capable of recording interviews?
17    A.   Yes.
18    Q.   Is that, in fact, protocol that you record these
19         during --
20    A.   Yes, both audio and video recording.
21    Q.   Was that done in this case?
22    A.   Yes.
23    Q.   Will that interview that you're referring to be
24         available for trial?
25    A.   Yes, it is.

1    Q.    Is the individual that you went to speak to that

2          particular day, April 7, named Freddie Collins?

3    A.    Yes.

4    Q.    What did Mr. Collins tell you he had been told by

5          Cheron Shelton about the Wilkinsburg --

6              MR. McKINNEY:  Your Honor, I would

7          object to hearsay.  I would note the

8          Pennsylvania Supreme Court decision of

9          Commonwealth v Verbonitz, 581 A. 2d, 172,

10         it's a 1990 case, Pennsylvania Supreme Court.

11             A careful reading of that case shows

12         that the due process rationale was a holding

13         in a plurality opinion where the Pennsylvania

14         Supreme Court ruled that hearsay evidence

15         cannot be admissible in a preliminary hearing

16         unless it's corroborated by other evidence.

17             The reasons for that decision, Your

18         Honor, were fundamental fairness, reliability

19         concerns, and the fact that due process

20         requires that hearsay must be corroborated by

21         other evidence to sustain any adjudication.

22             I would ask that this Court consider

23         that Pennsylvania Supreme Court decision.  I

24         understand that Ricker is a Pennsylvania

25         Superior Court decision, but I'm asking Your

1    Honor not allow this witness to testify to

2    this hearsay evidence against my client.

3         THE COURT:  Mr. Chernosky?

4         MR. CHERNOSKY:  Your Honor, the

5    Commonwealth has submitted and will argue

6    consistent with the memo that's submitted,

7    Commonwealth versus Ricker allows for the

8    holding of a case at a prima facie level with

9    the use of hearsay almost in its entirety.

10         The Commonwealth has not presented a

11    case up until this point that requires you to

12    rely solely on hearsay, and we will ask that

13    you allow this.

14         With regard to Mr. McKinney's point

15    regarding corroboration, it is my belief that

16    the testimony of Detective Caruso can provide

17    at least some corroborating details as to

18    placement at the time that he received this

19    information, et cetera, so I believe we can

20    at least meet that.  The Commonwealth under

21    Commonwealth versus Ricker is arguing that

22    this hearsay is allowable for today.

23         MR. WHITE:  Your Honor, may I?

24         THE COURT:  You may.

25         MR. WHITE:  Your Honor, the

1    Commonwealth submitted a memorandum just

2    before trial planning for this issue to arise

3    for the preliminary hearing, and they go

4    through Ricker.  However, I have the entire

5    opinion of Ricker in front of me, and I can

6    show Your Honor, but I'm sure you've read it

7    in its entirety.

8        In the Commonwealth's memorandum they

9    fail to mention Pennsylvania Rule of Criminal

10   Procedure Rule 542 (c).  They mention every

11   other subsection in this memorandum except

12   for subsection (c), which reads out of the

13   opinion of Ricker, "A defendant at a

14   preliminary hearing is entitled to counsel,

15   to cross-examine witnesses, inspect physical

16   evidence, call noncharacter witnesses, and

17   present his own evidence."

18       They're going to testify to what

19   Freddie Collins, Fredrick Collins told this

20   detective.  Frederick Collins is available to

21   testify.  He's being housed.  He's

22   incarcerated at this point in time.  He's

23   here to testify.

24       Those gentlemen are incarcerated

25   because of what Freddie Collins said to these

1        detectives, Your Honor.  Where's the right to

2        confront Mr. Collins about what my client

3        purportedly said to him?

4                Further, this detective's going to

5        testify that my client made a statement

6        against interest or an admission to Freddie

7        Collins.  An admission or a statement against

8        interest is an exception to the hearsay rule,

9        but Freddie Collins has to testify to that.

10               This detective's going to testify to

11       what Freddie Collins -- or what my client

12       purportedly told Freddie Collins.  So, again,

13       they're jumping over the hearsay.  This is

14       hearsay within hearsay or hearsay on hearsay,

15       Your Honor.  This is double hearsay.

16               THE COURT:  Exclusion from hearsay

17       included within hearsay testimony.  As I

18       explained to counsel prior to the beginning

19       of the proceeding, the Ricker case, while

20       it's the law of the land, I have some grave

21       reservations about.

22               I'm going to conditionally permit this

23       witness to testify and then will hear

24       argument at the end.  And, of course, you'll

25       have a chance to cross-examine.

1           Mr. Chernosky, please proceed.

2           MR. CHERNOSKY:  Thank you, Your Honor.

3    Q.    What did Mr. Collins tell you with regard to what

4          the defendant Cheron Shelton said about the

5          Wilkinsburg killings?

6    A.    Well, he said that on March 26, 2016, there was an

7          individual placed in Cell 121, began conversing with

8          that individual.  He learned that that individual

9          was indeed Cheron, a/k/a C-Wiz.

10   Q.    Were you able to confirm both Mr. Collins' placement

11         and Mr. Shelton's placement with regard to housing

12         at the Allegheny County Jail at the time this

13         alleged statement was made?

14   A.    Yes, I was.

15   Q.    And were they, in fact, housed in cells next door to

16         one another?

17   A.    Yes.

18   Q.    What did Mr. Collins tell you that Mr. Shelton told

19         him about the killings?

20   A.    Cheron stated to Mr. Collins they received a phone

21         call from an individual who saw one of the victims

22         on Facebook at a cookout in Wilkinsburg, so him and

23         another individual went over there, basically

24         ambushed them.  Cheron told Mr. Collins that the

25         individual who he went over there with who he

1        referred to as "his man" shot everyone with a

2        handgun and was chasing everyone from the back of

3        the yard to the front, back of the yard going into

4        the back door, and that Cheron said that he was

5        using a K or a chopper and was chopping them down.

6    Q.  That term "chopper," are you familiar with what that

7        is slang, what that term is used for?

8    A.  An AK-47.  Also, K is an AK-47.

9    Q.  What did Mr. Collins tell you that Mr. Thomas told

10       him regarding the shooting?

11   A.  He said he spoke with Mr. Rob Thomas on April 6,

12       which was the day before this interview.

13   Q.  Was that on the same pod that he was on before?

14   A.  It was on the same pod.

15   Q.  Were you able to confirm whether Rob Thomas was on

16       the same pod with Frederick Collins at the time this

17       alleged statement was made?

18   A.  Yes.

19   Q.  Was Mr. Shelton on that same pod at the same time?

20   A.  No.  I believe Mr. Shelton had already been moved at

21       that time.  I believe Mr. Thomas was moved on that

22       pod on April 6.

23   Q.  What did Mr. Collins tell you that Mr. Thomas told

24       him about the shootings?

25   A.  Mr. Thomas told Mr. Collins that they had received a

1          phone call from an individual who saw Murder, one of

2          the victims, on Facebook at a cookout in

3          Wilkinsburg.

4     Q.   Did you learn during the course of your

5          investigation that that was a nickname for one of

6          the victims in the case?

7     A.   Yes, it was, for Lamont Powell.

8     Q.   Continue.

9     A.   Mr. Thomas told Mr. Collins that they went over

10         there, waited inside a garage, that they were in

11         there for a minute, which means for a while.  At one

12         point Rob urinated either inside or outside the

13         garage.  Rob also told Mr. Collins that he had seen

14         Murder at the back of the yard and that he'd gone

15         out with his handgun and shot at them and that

16         Cheron had gone around him and was chopping people

17         down with the chopper, picking people off.

18    Q.   To your knowledge, at the time Mr. Collins came

19         forward, had you been out to the scene at 1304?

20    A.   Yes.

21    Q.   Is it accurate to say that there is a garage in the

22         back alley of that location?

23    A.   Yes.

24    Q.   At the time Mr. Collins came forward to you, was

25         that at all a significant piece of investigation?

MARY BETH PERKO, RMR    (412) 350-5414

M. Caruso - Cross by Mr. McKinney    **146**

1    A.    No, I don't think at that time.

2                    MR. CHERNOSKY:  No further questions.

3            I'll offer for cross.

4                    THE COURT:  Mr. McKinney?

5                    MR. McKINNEY:  Your Honor, I would

6            briefly just -- I know the Court allowed this

7            testimony conditionally.  Based on the

8            Commonwealth's position that there was

9            corroboration, the fact that this inmate

10           happened to be in a cell that was on the same

11           pod as my client I don't think is true

12           corroboration.

13               I was expecting video surveillance

14           where there was a conversation being had and

15           we were made privy to the content.

16                   THE COURT:  We'll get to argument.  Do

17           you have questions for this witness?

18                   MR. McKINNEY:  I do, Your Honor.

19                   THE COURT:  Please ask them.

20                           - - -

21                   <u>CROSS-EXAMINATION</u>

22   <u>BY MR. McKINNEY</u>:

23    Q.    When Mr. Collins and my client allegedly had this

24          conversation, what cell was Mr. Collins housed in?

25    A.    I believe 124.


                MARY BETH PERKO, RMR    (412) 350-5414

1    Q.   On what pod?

2    A.   Pod D, Level 7.

3    Q.   And what cell was Mr. Shelton housed in?

4    A.   121.

5    Q.   Now, are you aware of the fact that every single pod

6         in the Allegheny County Jail is monitored by video

7         surveillance?

8    A.   I would think so, yes.

9    Q.   After learning this information, this alleged

10        conversation, did you take it upon yourself to

11        review that video surveillance to determine whether

12        or not Mr. Shelton and Mr. Collins actually ever

13        spoke?

14   A.   No, I didn't.

15   Q.   Where did Mr. Collins tell you that this

16        conversation took place?

17   A.   He said that it was about three or four o'clock in

18        the morning and he wasn't sleeping.  He heard the

19        door slam shut to Cell 121.  He knew that that was

20        the only cell that was empty.  All the other cells

21        were full, so he knew it was Cell 121, and that they

22        were speaking through the door.

23   Q.   Okay.  So what date was this again?

24   A.   March 26.

25   Q.   March 26 at three or four o'clock; correct?

MARY BETH PERKO, RMR   (412) 350-5414

1    A.    That's what he said, yes.

2    Q.    And he said, just to clarify, that Mr. Shelton was

3          in the cell and Mr. Collins walked over and was

4          talking through the door?

5    A.    Mr. Collins was in his cell and Mr. Shelton was in

6          his cell.

7    Q.    Are Cells 124 and 121 next to each other?

8    A.    I'm not sure.

9    Q.    You haven't made any efforts to investigate as to

10         how close these cells actually are to each other?

11   A.    No.

12   Q.    You would agree with me that it's likely -- You've

13         been to the Allegheny County Jail before; right?

14   A.    Yes.

15   Q.    And you would agree with me that next to Cell 121 is

16         Cell 122; correct?

17   A.    I'm not sure what cells are next to 121.

18   Q.    Did you make any attempts -- Because you did not

19         attempt to review surveillance video in the jail to

20         determine if this conversation ever took place, did

21         you make any other attempts to corroborate

22         Mr. Collins' story?

23   A.    No, I didn't.

24   Q.    So essentially you're just taking him at his word?

25   A.    Yes.  The video surveillance would only show cell

1          doors being closed, so it wouldn't show the two

2          having the conversation.

3    Q.    Right.  And it's your testimony here today -- Strike

4          that.

5                So this conversation took place allegedly

6          on March 26 and then -- Strike that.

7                My client, do you know whether or not my

8          client knew Frederick Collins prior to the day of

9          this conversation?  For example, did he know him

10         from being in the community outside of the Allegheny

11         County Jail?

12   A.    Frederick Collins had indicated that he knew Cheron,

13         a/k/a C-Wiz.  He wasn't sure of his last name, but

14         he knew him from Hilltop and that the two of them

15         would smoke weed and sell drugs together.  So he

16         knew Cheron from the Hilltop.

17   Q.    Did you do any investigation to determine whether

18         the two had ever been arrested together, been

19         co-conspirators in a drug case to determine whether

20         that was actually true?

21   A.    No.  Like I said, the only thing he had indicated

22         was that they smoked weed together and sold drugs

23         together.  No, I didn't look to see if they were

24         arrested together.

25   Q.    And it's your testimony that this individual who

1        didn't even know Mr. Shelton's last name, that this

2        individual was the sounding board for Mr. Shelton to

3        confess to killing all these people in Wilkinsburg?

4        That's your testimony today?

5   **A.**   Yes.

6   **Q.**   And is it also your testimony that the next day

7        Mr. Thomas made a full confession to Mr. Collins

8        while housed at the Allegheny County Jail?

9   **A.**   Well, it wasn't the next day.  It was April 6.  The

10       next day would be March 27.

11   **Q.**   I'm sorry.  I didn't mean to be disingenuous.

12       Approximately a week and a half later this young man

13       seated to my left made a full confession to

14       Frederick Collins as well; correct?

15   **A.**   Yes.

16   **Q.**   Did you do any kind of investigative work to

17       determine or corroborate whether that actually

18       happened during surveillance video?

19   **A.**   I believe, not myself, other detectives did.  But

20       I'm not sure what the results are of that.

21          MR. McKINNEY:  Your Honor, I have no

22         additional questions on cross.

23          THE COURT:  Mr. White?

24             - - -

25

1                           <u>CROSS-EXAMINATION</u>

2      <u>BY MR. WHITE</u>:

3      **Q.**   After Freddie Collins gave you the statement about

4            Mr. Shelton, did you place him back in the Allegheny

5            County Jail?

6      **A.**   Yes.  After the interview was completed, we drove

7            him back down.

8      **Q.**   Was he specifically placed to be in the same pod as

9            Mr. Thomas?

10     **A.**   I'm not sure which pod he was actually placed.  We

11           just turned him back over to the jail officials.

12     **Q.**   But did you instruct the jail officials to place

13           Freddie Collins in the same pod as my client, Robert

14           Thomas?

15     **A.**   I didn't instruct them.  We just turned him over to

16           the jail officials.

17     **Q.**   Did other members of the Allegheny County Police

18           Department, District Attorney's Office, Wilkinsburg

19           Police Department, to your knowledge, instruct the

20           Allegheny County Jail to place Freddie Collins in

21           the same pod as Robert Thomas?

22     **A.**   I can't answer.  I'm not sure.  I don't know.

23     **Q.**   You don't know?

24     **A.**   I don't know.

25     **Q.**   It could be true?

1   A.   It could be true, could or couldn't.

2   Q.   But you don't know?

3   A.   I don't know.

4   Q.   Was Freddie Collins at that time after he was placed

5        in the same pod as Robert Thomas working as an agent

6        for the government?

7   A.   I don't understand the question.

8   Q.   Was he a confidential informant at that time?

9   A.   No, not to my knowledge.

10  Q.   Were you waiting for him to report back to you after

11       he talks to Robert Thomas?

12  A.   No.

13  Q.   But based on --

14  A.   If you're asking if we gave him instructions to get

15       information, I didn't.  I didn't do that.

16  Q.   But based on the affidavit of probable cause that

17       you reviewed, correct, Mr. Collins calls on at least

18       two separate occasions immediately after he speaks

19       to Robert Thomas on that pod; is that correct?

20  A.   I'm not sure.

21  Q.   Does he call investigators after, immediately after

22       he speaks to Robert Thomas?

23  A.   I'm not sure.

24  Q.   How many times have you interviewed Freddie Collins?

25  A.   Just once.

M. Caruso - Cross by Mr. White     **153**

1   Q.   How many times have you attempted to interview

2        Freddie Collins?

3   A.   I've only interviewed him once.

4   Q.   How many times have you attempted to interview

5        Freddie Collins?

6   A.   Once.

7   Q.   It's your testimony here today he was never ordered

8        to be brought over here for a second subsequent

9        interview?

10  A.   I don't know about that.

11  Q.   You don't know if that's true?

12  A.   I don't know if that's true.  We were ordered to

13       conduct an interview of him on April 7.

14  Q.   Were you planning on doing a second interview?

15  A.   No.

16  Q.   So it's your testimony here today under oath that

17       Mr. Collins was never court ordered to be brought

18       over to the Allegheny County Courthouse to be

19       interviewed for a second time?

20  A.   Not by me.

21  Q.   To your knowledge?

22  A.   To my knowledge.  I was only instructed to interview

23       Mr. Collins on the one occasion.

24  Q.   To your knowledge, was Mr. Collins ever attempted to

25       be brought over here for a second interview?

MARY BETH PERKO, RMR   (412) 350-5414

1    A.    I said I don't know.

2    Q.    Mr. Collins is still incarcerated; is that correct?

3    A.    I believe so.

4    Q.    Did you try and bring him over here today to testify

5          against these two guys?

6    A.    That's not my call.

7                    MR. CHERNOSKY:  I'll just object, Your

8          Honor.  It's outside the scope of his direct

9          examination.

10                   THE COURT:  I think you've gotten what

11         you're after a couple of times now.  I'll

12         sustain the objection.

13                   MR. WHITE:  I have no further questions

14         for Detective Caruso.

15                   THE COURT:  Any redirect?

16                   MR. CHERNOSKY:  No redirect, Your

17         Honor.

18                   THE COURT:  Thank you.  You may step

19         down, Detective.

20                   MR. CHERNOSKY:  With that, the

21         Commonwealth rests, Your Honor.

22                   THE COURT:  We will proceed to

23         argument.

24                   MR. McKINNEY:  One moment, Your Honor,

25         briefly.

MARY BETH PERKO, RMR    (412) 350-5414

1    THE COURT:  Absolutely.  In fact, we'll

2    take a short four-minute recess, and then

3    we'll come back and hear argument.

4          (Short recess taken.)

5    THE COURT:  Mr. McKinney.

6    MR. McKINNEY:  Thank you, Your Honor.

7          Your Honor, even at this level the

8    government is woefully shy of proving a prima

9    facie case.  Just to briefly recap the

10    evidence -- Your Honor's been here just the

11    like the rest of us, so I'm not going to beat

12    a dead horse, but I want to highlight some

13    points.

14          Your Honor, Sergeant Adams testified

15    that he saw a black male get into this white

16    Lincoln.  I know credibility is not at issue

17    so I won't talk about the fact that he was

18    able to identify the license plate while

19    backwards five, six seconds, but I will say

20    when he looked at the individual in that car,

21    that individual's head was turned in the

22    opposite direction, and there was no

23    testimony Sergeant Adams identified that

24    individual as being Cheron Shelton.

25          Detective McCue testified that when he

Closing Argument - by Mr. McKinney    **156**

1    watched the video, he while watching the

2    video could not identify the individual in

3    the Nolan Court property as being Cheron

4    Shelton.

5            He also testified that he saw a long,

6    slender object.  The Court has seen the

7    photos.  The Court obviously would be able to

8    review the exhibits.  It is unclear to me how

9    Detective McCue saw a long, slender object.

10   Upon cross-examination his testimony was he

11   had no idea what was under that I call it a

12   jacket.  Who knows what it was.  But it's

13   certainly not abundantly clear that it's a

14   firearm.

15           Detective Feeney testified that when he

16   reviewed surveillance from Franklin, he saw

17   there was a white car with similar markings

18   as the white Lincoln.  Detective Miller

19   testified that there were 37 communications

20   taking place either text message or phone

21   call purportedly between my client and

22   Mr. Thomas.

23           Your Honor, my argument would be that

24   these people had to be together at some point

25   to commit this act.  Communicating 37

1    times -- I believe Mr. White brought up a

2    great question on cross-examination.  One of

3    those times these individuals were in the

4    same house.

5            It just doesn't make any sense.  You're

6    not going to sit next to someone and call or

7    text them.  And I would also add, Your Honor,

8    the testimony was that the phone that's

9    purportedly possessed by my client, Cheron

10   Shelton, Chanel Falls, his girlfriend at the

11   time, allegedly made a statement she

12   purchased the phone for him.

13           Upon cross-examination we learned that

14   the phone was purchased under a fictitious

15   name.  And I would make the argument, Your

16   Honor, if a girlfriend's buying a phone for

17   her boyfriend, why would you use a fake name?

18   It just doesn't make any sense.

19           So I'm not sure who that phone belongs

20   to.  It's never been recovered.  I would make

21   the argument that it is not attributable to

22   my client.

23           Inspector Palmer testified.  He read

24   the letter.  Your Honor's obviously read it

25   as well or at least heard it.  There's no

1    incriminating statement in that letter.

2    There's no reference to the Wilkinsburg case.

3        I think it's public record I believe

4    that my client had been named a person of

5    interest at some point, so maybe he was

6    concerned about that, like anyone would be,

7    but he's not making any statements saying he

8    was involved.

9        He said a buccal swab was performed on

10    him while he was at the Allegheny County

11    Jail.  He also talks about money and talks

12    about having a lawyer.  I think it's

13    plausible to make the argument he wanted

14    money to be provided, money that was owed to

15    be paid to his family so he could hire a

16    lawyer for his case that was already pending

17    and had nothing to do with the Wilkinsburg

18    mass shooting.

19        Then we have Detective Michael Caruso

20    who the Court allowed his testimony in

21    conditionally.  I don't believe there's been

22    proper corroboration.  The Court has already

23    heard my legal argument as to why that

24    testimony should be inadmissible.

25        And, in addition to that, it's

MARY BETH PERKO, RMR    (412) 350-5414

1    incredible.  We're led to believe that Cheron
2    Shelton was able to talk through -- I think
3    it's possible to argue that Cells 121 and 124
4    are not next to one another, so I would make
5    the argument that Cheron Shelton allegedly
6    made a full confession to Mr. Collins through
7    three jail cells.

8        And as the Court knows, there was no
9    corroboration, no video surveillance, no
10   corrections officer to confirm any of this.

11       So, Your Honor, I don't want to beat a
12   dead horse.  I understand the seriousness of
13   this case, but it's also serious for these
14   two young men.  And the government, even at
15   this level, Your Honor, has to prove it's
16   more likely than not that these defendants
17   committed this act.

18       And I would submit to you this case is
19   circumstantial, which I understand is also
20   evidence, but it's a weak circumstantial
21   case, even if the Court does consider
22   Mr. Caruso's testimony, which I submit is
23   inadmissible based on the current state of
24   the law, so I would ask that Your Honor
25   dismiss all charges as they relate to

Closing Argument - by Mr. White    **160**

1    Mr. Shelton.

2    THE COURT:  Thank you.  Mr. White?

3    MR. WHITE:  Your Honor, thank you.

4    I obviously echo Mr. McKinney's

5    sentiments.  I'll be brief, not only for the

6    sake of not beating a dead horse but the fact

7    there is very little evidence to argue that's

8    been presented against my client.

9    I drew a line down the middle of a

10    page, plusses and minuses of the evidence

11    against my client.  And the first number of

12    witnesses -- Sergeant Adams, he never sees my

13    client or purportedly my client at the scene

14    of the crime.

15    The medic testifies he never sees my

16    client at the scene of the crime.  Detective

17    Dolfi processes the scene, picks up cell

18    casings that allegedly, based on the

19    Commonwealth's theory, my client shot and

20    picked up those shell casings, .40 caliber

21    shell casings, but could not place them on my

22    client.

23    I asked Detective Dolfi point blank,

24    did he do a DNA test on the shell casings.

25    It was objected to by the Commonwealth.  I

MARY BETH PERKO, RMR    (412) 350-5414

1    think we can assume the answer to that.

2         Detective McCue then testified as to

3    the cell phone and the cell phone

4    conversations purportedly my client had with

5    Mr. Shelton.  First thing, none of those cell

6    phone conversations were recorded.  None of

7    the text messages were reported.  So we don't

8    have any idea if, in fact, these two

9    individuals were talking to each other.

10         And if, in fact, they were talking to

11    each other, we don't know what they're

12    talking about.  Okay?  None of those

13    conversations have been dictated, and we have

14    no idea what's said between the two of them.

15         The letter that we had to pull from the

16    Commonwealth talks about a letter being sent

17    by Mr. Shelton and inculpates my client.  It

18    references a phone number, Your Honor, his

19    number, 513-6784.  And I understand under

20    Bruton this letter cannot be held against my

21    client, but, quite frankly, this letter helps

22    my client because they're saying 513-6784 is

23    my client's number.

24         Well, the number that Detective McCue

25    says is my client's number is 412-378-3461.

Closing Argument - by Mr. White    **162**

1    So what number is my client's, Your Honor?

2    We have no idea.  We have absolutely no idea

3    what phone my client allegedly had at the

4    time of this horrible crime.

5    Your Honor, there was testimony that my

6    client purportedly IDed himself during some

7    sort of investigation by some officer who was

8    not here to testify, that he said that was

9    him on the video screen.

10    Let's not forget all the testimony

11    prior to that officer's testimony doesn't

12    have anything to do with my client.  There's

13    been zero evidence what my client was doing

14    prior to the homicides and during the

15    homicides.

16    The only evidence conceivably to be

17    held against my client is that he purportedly

18    IDs himself in the video after the homicides

19    jumping over a fence and walking into the

20    back of the residence on Nolan Court.  That

21    is the only evidence they have against my

22    client.

23    They have zero physical -- They don't

24    have any DNA.  They don't have any

25    ballistics.  They don't have any eye

MARY BETH PERKO, RMR    (412) 350-5414

1    witnesses.  They do not have enough evidence

2    even at this level, Your Honor, even at this

3    level to hold the charges against my client.

4        All this pomp and circumstance that we

5    have here today, the media -- we moved this

6    hearing up to the big courthouse.  We bring

7    you in and have a hearing in front of you.

8    All of this is a red herring.  All of this,

9    all this action is a red herring.

10        The focus of this hearing should be on

11    my client, Mr. Thomas, and the weight of the

12    evidence being held against him.  There is

13    not enough evidence at all to link him to any

14    of the homicides, to any of the actions

15    committed that night.  And for that matter,

16    Your Honor, all these charges should be

17    dismissed.

18        THE COURT:  Thank you.  Mr. Chernosky?

19        MR. CHERNOSKY:  Thank you, Your Honor.

20    I'll try to be as brief as possible.

21        Sergeant Adams catches the best piece

22    of evidence in the case, that license plate.

23    This license plate comes back to Nolan Court.

24    The person he sees coming to that car fits

25    the physical description of Cheron Shelton.

1          If you recall, he does testify,

2    Sergeant Adams, that later he's shown a still

3    image from video obtained by the County

4    Police and that he identifies that person on

5    the video as the same person he saw at the

6    car that night.

7          The entire point of the stills from the

8    video is to show you the movements that

9    night.  Essentially the Commonwealth's case

10   is that that car is of interest, so we start

11   watching its movements once we're aware of it

12   on the night of the murder.

13         And curiously enough, at about

14   10:28 p.m. that car moves to the rear parking

15   area of 1214 Nolan Court where it had

16   previously been parked for some eight to ten

17   hours.  The person moving that is a tall,

18   slender individual who fits Cheron Shelton's

19   description.

20         That person gets out of the car,

21   retrieves an object covered by a jacket.

22   It's been described by the officers as long

23   and slender, but it's covered by some

24   clothing.

25         I submit to you you'll be able to

1    compare Commonwealth's Exhibits 33 and 34 and

2    35, that sequence, and you would be able to

3    tell that that's a jacket in that picture.

4    In fact, it's a jacket with a fur-lined hood,

5    the same jacket that Rob Thomas or a similar

6    jacket that Robert Thomas identities himself

7    wearing when he comes back later that

8    evening.

9        You need to compare the time stamps on

10    the video of that car leaving with the

11    evidence that you've heard about the phone

12    numbers associated with Cheron Shelton and

13    the phone numbers associated with Rob Thomas.

14        There's a phone communication at 10:31

15    exactly when that car pulls off of camera.

16    That time stamp when the car leaves is 10:30

17    and some seconds.  At 10:31 is the first

18    text.  There's a text back a few minutes

19    later.  All of that is leading up to the

20    crime.

21        We then showed you a time stamp 10

22    minutes later.  The time and distance studies

23    tell us that is about how long it takes to

24    get from the Nolan Court area to the Franklin

25    Avenue area.

1          A characteristically similar car -- and

2     I don't need to remind you.  You've seen the

3     pictures.  The characteristically similar

4     thing is the black piece of molding in the

5     center of the car entering Franklin Avenue at

6     10:41, approximately 10 minutes later.

7          There is then a phone contact at 10:46

8     that lasts approximately four minutes.  It

9     takes you right up to three to four minutes

10    before the shooting.  And, most importantly,

11    there is absolutely no contact between those

12    numbers during the time of the shooting.

13         We know the 911 call is 10:53, so I

14    would submit to Your Honor the shooting is

15    slightly before then and slightly after then,

16    but that is the time period that's relevant,

17    and there's absolutely no phone

18    communication.  Then it starts up again, and

19    it takes us the whole way until we have those

20    individuals back in the Nolan Court area.

21         The individual that I would remind you

22    Detective Miller was able to testify after

23    some prodding from the defense that was

24    identified as Rob Thomas by Rob Thomas.

25         Let me just tell you this.  It's

1    something that shouldn't be lost.

2        The people on that video at 11:45 are

3    moving suspiciously.  They're wearing heavy

4    clothing.  Let me remind you why this family

5    was in the position to get slaughtered that

6    night.  They were in a position to get

7    slaughtered because they were having a

8    barbecue because it was the nicest day that

9    had happened this year.  They were having a

10   barbecue because it was nice out for March.

11   That's why Adams had his windows down.  It's

12   an unseasonably nice day.

13       This person returns at 11:45 at night

14   wearing -- Robert Thomas identified

15   himself -- wearing a heavy hooded jacket with

16   the hood up.  I can describe their movements

17   as suspicious because you heard from

18   Detective McCue that they essentially arrive

19   together over that fence and then they

20   separate before going into the very address

21   where that object was retrieved two hours

22   earlier.

23       I don't know how to say it except that

24   all of this movement, all of this fits the

25   exact timeline of the murders, and that car

1    is on that street by virtue of Detective

2    Adams, by virtue of the video from the

3    private residence.

4        Your Honor, I submit at a prima facie

5    level the Commonwealth has presented more

6    than enough evidence to meet its case, but if

7    you want to turn to one damning piece of

8    evidence, it's the letter that Cheron Shelton

9    sends to his co-defendant.  He sends a letter

10   directed to Pops asking him to get in contact

11   with Houze, and I'm --

12       THE COURT:  Pops is not his

13   co-defendant.

14       MR. CHERNOSKY:  I'm sorry.  Sorry.  He

15   sends it seeking someone to reach out to his

16   co-defendant Houze.  We know that that's his

17   nickname because he acknowledges it.  The

18   letter contains information about getting rid

19   of something.  Now, right, it's speculation,

20   but I think that we can fairly speculate that

21   it's evidence of some sort.

22       The real problem or the real reason

23   that he reaches out and the real reason he

24   reaches out to Houze is, one, because he

25   trusts him.  But, two, it requires the least

1      amount of explaining.  I don't have to

2      explain to this person how serious this is.

3      They'll just know.  All you got to do is lead

4      him to it.  That is the import of that

5      letter.

6            And if you ever have to consider how

7      damning that letter is, it is signed off with

8      "Burn after reading."  He doesn't want

9      anybody to see it because that's how

10     sensitive this stuff that's contained in that

11     letter is.

12           Your Honor, the Commonwealth is

13     entitled to the light most favorable to the

14     Commonwealth and all inferences drawn

15     therefrom, and I submit that the Commonwealth

16     has sustained its burden in this case.

17           THE COURT:  Mr. Chernosky, the search

18     that the Commonwealth did at Nolan Court --

19           MR. CHERNOSKY:  Yes?

20           THE COURT:  -- was that after the

21     letter was intercepted?

22           MR. CHERNOSKY:  The search was done

23     days after the murder before the letter was

24     intercepted.  It was March 12, I believe,

25     Your Honor.

**MARY BETH PERKO, RMR   (412) 350-5414**

1          THE COURT:  After the letter was
2     intercepted, did anyone think to go back?
3          MR. CHERNOSKY:  To go back to the
4     house?  It is not of record, Your Honor, but
5     efforts were made after the letter was
6     intercepted to go to every address they had
7     an arguable connection to the description in
8     the letter.
9          THE COURT:  Anything further?  I
10    interrupted you.  I'm sorry.
11         MR. CHERNOSKY:  Sorry.  Speaking of the
12    search warrant, and I would just say this.
13    The search warrant at 1214 Nolan Court is
14    done in short order, five days after the
15    murder.  It reveals several things, and it
16    reveals several things that aren't there.
17         Notably there's 7.62 ammunition.
18    Notably there's 7.62 clips as well as other
19    guns.
20         I didn't introduce the fact that
21    Cheron's fingerprint was on the gun to
22    associate him with the gun so much as to
23    associate him with all of the items at the
24    house.  Same thing for the driver's license.
25    Same thing for the letter.  He is associated

1   with that house both circumstantially and
2   directly.
3        The Commonwealth would submit that the
4   one thing missing from this cache of weapons
5   and ammo that they're able to find is a gun
6   capable of firing a 7.62, and the
7   Commonwealth would submit that that's because
8   that gun was used and then disposed of.
9        THE COURT:  Do you have any argument as
10  to Mr. White?
11       MR. CHERNOSKY:  I'm sorry?
12       THE COURT:  Do you have any argument as
13  to Mr. White's argument?
14       MR. CHERNOSKY:  Are you talking about
15  Mr. White's client specifically?
16       THE COURT:  He made the argument.  He
17  made it on behalf of his client, Mr. Thomas.
18       MR. CHERNOSKY:  Yeah.  Mr. White's
19  client is tied to this by the phone
20  communications, Your Honor, by the number
21  we've associated with him, and I've had the
22  detective detail it for you, but it's a phone
23  number that's programmed into his phone.
24       And the phone number that's programmed
25  into his phone or programmed into other

1    people's phone as Millhouze has a text that

2    says, "It's Rob. Give me a call back." Then

3    Mr. Thomas acknowledges he goes by the name

4    Millhouze.

5         So he is loosely associated with that

6    phone number, and they're in contact pursuant

7    to the time frame that I've laid out that

8    night, and then he identifies himself,

9    returns to Nolan Court with Mr. Shelton on

10   video.

11        THE COURT: Okay. We're going to take

12   a 15-minute recess. We'll be back at 20

13   minutes till 6:00. Court's in recess.

14        (Short recess taken.)

15        THE COURT: Court is back in session.

16   Mr. Chernosky, anything final in conclusion?

17        MR. CHERNOSKY: Nothing additional from

18   the Commonwealth.

19        THE COURT: Thank you.

20        MR. McKINNEY: No, Your Honor.

21        MR. WHITE: No, Your Honor.

22        THE COURT: First, one open matter was

23   the testimony of Detective Caruso in part

24   relating to the alleged statements by the

25   defendants. I'm going to disregard that

MARY BETH PERKO, RMR    (412) 350-5414

1          testimony as inadmissible hearsay testimony

2          without reaching to the credibility or

3          incredibility of that testimony.

4             Second, I would note that in these

5          cases, no one piece of evidence or

6          circumstantial evidence is particularly of

7          enormous weight.

8             In each case, the defendants are

9          charged with five counts of violation of

10         Section 2501 (a), criminal homicide as to

11         Jerry Shelton, Brittany Powell, Tina Shelton,

12         Chanetta Powell, and Shada Mahone, one count

13         of violation of Section 2603 (a), criminal

14         homicide of an unborn child as to the unborn

15         male child of Chanetta Powell, one count of

16         criminal conspiracy to commit the crime of

17         homicide, three counts of aggravated assault

18         as to Lamont Powell, John Ellis, and Tanjia

19         Cunningham, three counts of aggravated

20         assault 2702 (a)(4) -- the first three were

21         2702 (a)(1) -- as to Lamont Powell, John

22         Ellis, and Tanjia Cunningham, six counts of

23         recklessly endangering another person as to

24         Lamont Powell, John Ellis, Tanjia Cunningham

25         and three minor children identified in the

1    complaint as John Doe 1, John Doe 2, and Jane

2    Doe.

3        Although no one piece of evidence I

4    find of enormous weight, taken together I

5    think they compel some conclusions, and at

6    this stage the burden of proof is more likely

7    than not a crime was committed and more

8    likely than not the defendants committed the

9    crime.

10        As to Mr. Shelton, the testimony of

11    Sergeant Adams as to the vehicle at the

12    scene, Sergeant Adams' subsequent

13    identification, the fact that there is a long

14    object taken from the rear of the Nolan Court

15    residence, which the Court is able to discern

16    in passing there certainly is a long object

17    that would be consistent with a firearm,

18    significantly finding 7.62 millimeter

19    ammunition at the residence and significantly

20    the intercepted letter which, taken in

21    context, I believe indicates a consciousness

22    of guilt.

23        As to Cheron Shelton, this Court finds

24    that the Commonwealth has established a prima

25    facie case with respect to each of the

1    charges alleged in the complaint, and the

2    case is held for court.

3    As to Mr. Thomas, that is a much more

4    difficult case from the Court's perspective.

5    I am, though, satisfied that the Commonwealth

6    has established a convincing link between

7    Mr. Thomas and the phone that communicated

8    with Mr. Shelton on the night of these

9    remarkably callous killings, and in passing I

10   would note that a higher disregard for the

11   value of any life than those persons

12   possessed with these killings I cannot

13   imagine.

14   In addition, as to Mr. Thomas, his

15   admission that he was at the Nolan Court

16   residence after the killings, accordingly I

17   think those compel more likely than not,

18   although perhaps not a great deal beyond that

19   level of proof, more likely than not

20   Mr. Thomas committed these crimes.

21   Accordingly, Mr. Thomas is also held for

22   court on all charges.

23   I will remand both defendants to the

24   custody of the Allegheny County Jail.  That

25   concludes this proceeding.

MARY BETH PERKO, RMR    (412) 350-5414

1                        MR. CHERNOSKY:  Thank you, Your Honor.

2                        MR. McKINNEY:  Thank you, Your Honor.

3                        MR. WHITE:  Thank you, Your Honor.

4                                  - - -

5                   (Whereupon, the proceedings were concluded.)

6                                  - - -

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2    COMMONWEALTH OF PENNSYLVANIA    )

3    COUNTY OF ALLEGHENY                    )

4

5                    ### CERTIFICATE OF REPORTER

6

7            I, Mary Beth Perko, RMR, do hereby certify that the
     evidence and proceedings are contained fully and accurately in
8    the machine shorthand notes taken by me at the hearing of the
     within cause, and that the same were transcribed under my
9    supervision and direction, and that this is a correct
     transcript of the same.

10

11

12

13

14

15                                    _____

16                                    Official Court Reporter
                                      Court of Common Pleas

17

18

19            The foregoing record of the proceedings upon the
     hearing of the above cause is hereby approved and directed to
20   be filed.

21

22

23                                    _____

24

25

                    MARY BETH PERKO, RMR (412) 350-5414