1

February 5, 2020

Interview of Witness 1

Examination conducted by Randall McKinney, Esq.

2

February 5, 2020

1
2       MR. McKINNEY: ███████ I'm here in the
3       office of Wendy Williams.  As you know, my
4       name is Randall McKinney.  You reached out to
5       me earlier this week with some information.
6       ██Kendall██ can you state your first and last
7       and date of birth.
8              MR. MIKELL: ██Kendall Mikell, 2/25/87██

9              MR. McKINNEY:  Today is February 5,
10      2020.  It is approximately 6:50 p.m.  I guess
11      what I am going to start by doing, and Wendy
12      Williams is on the call, too, what I'm going
13      to start by doing is just asking you why you
14      initially contacted me.  And I do want to let
15      you know and as we discussed, you are being
16      recorded.  But can you just first talk about
17      why you initially contacted me, when you made
18      that contact and we will go from there.
19             MR. MIKELL:  I contacted Thomas'
20      attorney, too because at the time I was
21      working on a complaint that I was putting in
22      against the District Attorney's Office and
23      the County Police for police brutality and
24      police misconduct and prosecution misconduct.
25      And the media saying that the same things

3

1    that occurred with me occurred with others so

2    I just wanted to come forward because I got

3    actual evidence of proving the police

4    misconduct and prosecution misconduct and I

5    wanted to come forward with it.

6          MR. McKINNEY:  Okay now, ▇Kendall▇ at

7    some point in time did you become a potential

8    witness for the Commonwealth in the case

9    against Robert Thomas?

10          ▇MR. MIKE▇ Yes.

11          MR. McKINNEY:  Okay.  Can you talk to

12    me about how that all started and start from

13    the very beginning.

14          ▇MR. MIKE▇ From the beginning, I was

15    housed -- I was working for the Commonwealth

16    and the Feds at one point in time.  And I was

17    done and I was being housed -- coming back

18    from court for one of the cases in the

19    Allegheny County Jail and I was mistakenly

20    put in the county when I was supposed to.  At

21    that time I was stabbed and I was placed in

22    protective holding.  I was in the housing.

23          Thomas came on the block and at that

24    time he just came on and not knowing

25    anything.  But he looked a little distressed.

4

1    We ended up having a conversation and from

2    there, I contacted the Internal Affairs of

3    the jail.  So once I contacted the Internal

4    Affairs at the jail, they immediately got me

5    upstairs on to a different part of the jail.

6    So when I went up to a different part of the

7    jail --

8         MS. WILLIAMS:  Wait.  ██████, this is

9    Wendy.  Was it Sam Pastor that you contacted

10    at the jail or was it somebody else?

11         ██████  At the time he was on

12    vacation because it was a fill in for whoever

13    the main guy is at the jail.

14         MS. WILLIAMS:  Okay.  I'm sorry.  Go

15    ahead.

16         ██████  So after that -- what was I

17    saying?

18         MS. WILLIAMS:  That you contacted

19    Internal Affairs after you had the brief

20    conversation with Robert --

21         ██████  Oh, yeah.  So the Internal

22    Affairs guy asked me to go back down there

23    and talk to Thomas and try to get him close

24    to a cell and he would try to listen in to

25    the conversation and told me to use my hands

1    and to try and talk with as much body

2    language where the camera can pick up what

3    I'm saying non-verbal, but verbally

4    communicating with my body language.  And he

5    also said, I know you just got stabbed and

6    you're not supposed to be here.  I know your

7    situation.  You want to get out this jail.

8    If you do this for me, I'll get you out this

9    jail tomorrow.

10            So he's like, I'll contact the sheriffs

11   myself.  I said okay.  So I went back and I

12   had a conversation with Thomas.  I did

13   exactly what he asked me to do, body language

14   and talked with my hands.  Got him to look at

15   the camera.  On the camera you could see me

16   actually making signals to the camera letting

17   it be known that I'm talking to him on camera

18   and what Thomas is saying.

19            Eventually, the next day I was

20   transported out the jail.  I was transported

21   out.  They transported me back to SCI

22   Houtzdale, the sheriffs.  As I get to SCI

23   Houtzdale, they take everybody's handcuffs

24   off that was transported back with me, but

25   mines.  So I asked the sheriff, why you not

6

1    taking my cuffs off.  He said, you're coming

2    back with me, with us.

3            So they transported me all the way back

4    to Pittsburgh to the County Police.  When I

5    get to the County Police, the sheriffs pull

6    up.  They go in there and have a conversation

7    first and then they come out and get me.  As

8    I'm coming in, there was a detective he

9    introduced himself as Detective Grail of

10   county police station.  I think he was a

11   sergeant at the time, but I'm not 100 percent

12   sure.

13           So he gets to talking to me saying this

14   is a good thing that you're doing this.  We

15   got to get somebody off the street for this.

16   We need a conviction for this.  And if these

17   guys are the guys that did it, there's not

18   way they should be on the street.  Then he

19   tried to convince me that I was doing the

20   right thing even if I was a street person.

21   Because whoever did this crime shouldn't be

22   on the street killing innocent people.

23           MS. WILLIAMS:  Let me ask you a

24   question.  At that point did Detective Grail

25   from the County Police, did he mention Sheron

7

1    Sheldon's name?

2    MR. MIKEL: Not at that time of the

3    conversation, no, but at the end of the

4    conversation, yes.

5    MS. WILLIAMS: So what I'm gathering,

6    but d I don't want to put words in your

7    mouth, he was telling you that these guys

8    were guilty and that you were there to help

9    them get evidence on them or to get them

10   convicted. That they were guilty and they

11   should be off the street. Is that fair?

12   MR. MIKEL: Yes.

13   MS. WILLIAMS: Okay. Go ahead.

14   MR. MIKEL: Yes. So he was like, okay,

15   now. Now when you get in there, once we get

16   in this room that we're about to take you in,

17   once we get in there, we can't talk like this

18   because everything's recorded. He said

19   everything's recorded. Be weary of this

20   room. So he said certain things, he asked me

21   certain questions that I don't remember

22   exactly, but certain questions that he was

23   going to ask me and how they needed me to

24   respond.

25   So you can't say certain things like

8

1      that, they won't hold up in court.  Or

2      certain things like this, they won't hold up

3      in court.

4           MS. WILLIAMS:  Like what type of

5      subject matter was it?  What was he telling

6      you that you couldn't answer a certain way?

7           ~~MR. MIKEL~~  Like why I was involved.

8      Why I was down in the county.  Or don't

9      mention the fact that I was already working

10     with the police.  Or the fact that he didn't

11     want nobody to say that they sent me in there

12     for information if I was ever to be back

13     around him again.  But if I ever was to be

14     around him to gather anything that I could

15     for them.  Whether it was from Thomas or

16     anybody who was involved in the situation

17     that had any knowledge of it to get back to

18     them.

19           And, in fact, he said that he would get

20     me off probation.  But he made it in a way

21     like it wasn't a deal, but it was a deal.  He

22     was like, I'm going to look out for you like.

23     I'm going make sure like, if you look out for

24     us, then I'm going to look out for you like.

25           MS. WILLIAMS:  But your understanding

9

1    was that he was telling you not to say that

2    if you were asked that once you went on

3    camera?

4        ███████ Exactly.

5        MS. WILLIAMS:  Okay.

6        ███████ Like I was understanding.

7    I knew what he was saying.  He knew what he

8    was saying.

9        MS. WILLIAMS:  What were you on

10    probation for at that time?

11        ███████ At that time I was on

12    federal probation for I got caught in an

13    indictment with conspiracy to possess a

14    firearm and drug trafficking.  And I was also

15    on state parole for conviction in 2005 for

16    aggravated assault and a robbery and another

17    aggravated assault.

18        MS. WILLIAMS:  Were you on county

19    probation at all?

20        ███████ Not at the time.

21        MS. WILLIAMS:  Who was your probation

22    officers?

23        ███████ At the time I had for

24    parole I had Daryl Reed and for federal I had

25    -- what was her name --

1          MS. WILLIAMS:  It's a female?

2          ███████  I can't even think of my

3    federal PO's name.  It was a white lady.

4          MS. WILLIAMS:  A white lady.

5          ███████  Downtown.  She's tall,

6    pretty.  I forget it.  Alexander.  Stacy

7    Alexander.

8          MS. WILLIAMS:  Okay.  Great.  Thank

9    you.  Do you know if the County Police or the

10   D.A.s or anybody ever contacted either one of

11   your federal or state supervisor agents?

12         ███████:  I got the text messages

13   from the detective saying that he contacted

14   my probation officer saying that he had an

15   approval that I could work for him and build

16   up my credibility for you all for the

17   Wilkinsburg case, but when I talked to my

18   probation officer he said that he didn't give

19   him no approval.  So I don't know if he

20   really did talk to him, but he texted me and

21   told me that he did.

22         MS. WILLIAMS:  Okay.  Go ahead.  So

23   he's telling you outside once we get inside

24   this room we can't talk about certain things.

25   That's where we left off.

1  ████MR. MIKEL████:  So I go in there and I have

2  the interview.  I don't really remember

3  exactly what I said in the interview.  After

4  the interview was gone afterwards they gave

5  me a phone call and told me to be weary.

6  Don't even say nothing on the phone.  Make

7  sure you don't say nothing on the phone

8  because they are still recorded.  So I get

9  the phone call and as I'm leaving out --

10  MS. WILLIAMS:  Wait.  Wait a minute.

11  ████████who do you call?  Do you remember

12  who you called?

13  ████MR. MIKEL████ I called my baby's mom.

14  MS. WILLIAMS:  Okay.  And did she think

15  you were at Houtzdale or did she know you

16  were somewhere in Pittsburgh?

17  ████MR. MIKEL████ She didn't know anything at

18  all.

19  MS. WILLIAMS:  I just lost you.  Can

20  you hear me?

21  ████MR. MIKEL████ Yeah, I can hear you.

22  MS. WILLIAMS:  I'm sorry.  I lost you

23  for a minute.  So she didn't know anything.

24  You just talked and chatted with her and

25  that's it?

1    ████████ She was just wondering why

2    I wasn't calling collect.  Where you at.  Why

3    ain't you calling collect.

4         MS. WILLIAMS:  Yeah.

5         ████████ So after we leave out the

6    room, Detective Grail shook my hand and

7    everything and I hear ████████ (sic)

8    interviewing in the next room.  Now, I know

9    it's him because this like my friend and I

10   have been knowing him a long time.  And I was

11   like, you all got ████████ over there.  And

12   he's like yeah.  I said, man, you all ain't

13   like, me trying to act like I'm cool.  You

14   all know his statement ain't going to hold up

15   because Shelton ain't saying none that stuff

16   to him.  He ain't even had a conversation

17   with him.  He is just doing this because I

18   told him what I was doing.  So he's trying to

19   get involved.  And he was like, yeah, well,

20   let them figure that out.

21        MS. WILLIAMS:  Meaning us, the defense

22   attorneys or the defendants; is that your

23   understanding of what he meant?

24        ████████ Yes.

25        MS. WILLIAMS:  So were there any other



MARY SPAGNOLO, OFFICIAL COURT REPORTER

1   detectives in the room?

2        MR. MIKEL:  There was a few detectives.

3   I just don't remember all their names.

4   Everybody who is on the tape.  There was two

5   that was on tape of the interview.  Them two

6   was the detectives I dealt with a lot.  And

7   Detective Grail supervised everything.  But I

8   don't remember their names.  I just know from

9   their interview that's the two detectives.

10       MS. WILLIAMS:  Right.  And then there

11  were know D.A.s there though?

12       MR. MIKEL:  No, not at this time.  I

13  remember meeting with them a little later.

14       MS. WILLIAMS:  What month do you think

15  this was?  When did you leave the county

16  after you got stabbed?

17       MR. MIKEL:  I can't even tell you

18  exactly.

19       MS. WILLIAMS:  We have the video of the

20  interview so that's okay.

21       MR. MIKEL:  It was the beginning of

22  summertime.  Eyster can probably give you all

23  that because he got everything documented.

24       MS. WILLIAMS:  Who has everything

25  documented?

14

1          ████████ Chris Eyster.

2          MS. WILLIAMS:  So that's the other

3     thing I was going to ask you.  Just from one

4     or two things you said we thought maybe

5     Rabner was your lawyer, but you are saying it

6     was Chris Eyster?

7          ████████ Yeah.  During the whole

8     situation, this whole process I was pro se at

9     times, but Chris Eyster was my attorney

10    through it all.

11         MS. WILLIAMS:  Would they offer to get

12    your lawyer when you went down to talk to

13    them or --

14         ████████  No.  And that's the point

15    because I'm like, where is my lawyer because

16    my lawyer was assigned to this case and

17    everything.  And they said they called

18    somebody.  They said we made a phone call to

19    somebody, but we can't get in contact with

20    somebody.  They ain't got in contact with

21    nobody.  So they went and did the interview

22    without him.  But I definitely mentioned I

23    wanted my lawyer.  Where is my lawyer.  You

24    know.

25         MS. WILLIAMS:  All right.  At what

1   point did Shelton enter the statement and

2   enter what you were telling them that Thomas

3   said to you?  How did that come about?

4        ████████ Say that again.

5        MS. WILLIAMS:  At what point did Sheron

6   Shelton enter the statement and how did it

7   come about, how did Shelton come into Thomas'

8   statement?  Like when you were saying what

9   Thomas said, how did it go from you know

10  they --

11       ████████  At this time it really

12  didn't.  At this time other than the fact

13  that I told him that ███████ didn't talk to

14  him about that.  That that was bull shit what

15  ███████ was doing.

16       MS. WILLIAMS:  Right.

17       ████████  Other than that it didn't

18  come up until I got arrested again by

19  McKeesport Police.  And I told them that I

20  couldn't be housed in the county because of

21  my situation.

22       MS. WILLIAMS:  Right.  Sure.

23       ████████ And then they contacted the

24  county police.  And at that time they got in

25  contact with me and told me, well, we can't

1    make this charge go away because once they

2    file the charge, it's filed.  But we can help

3    you out during the situation.  So they

4    arranged -- I don't know how they did it or

5    anything, but they arranged for me to be

6    placed from the beginning.  As soon as I got

7    down the county I went through intake and I

8    was placed directly -- I didn't go to a pod.

9    I was sent directly to the hole right next to

10    Shelton.  My cell was directly next to him.

11    I don't know how they did it, but they

12    arranged for me to go next to him and wanted

13    me to have a conversation with him regarding

14    his case and gather anything that I could.

15        MS. WILLIAMS:  Let me ask you a

16    question.  What month do you think that was,

17    the month and year?  When did you get

18    arrested by McKeesport?

19        MR. MIKEL:  That was 2017.  It was

20    right before Thanksgiving 2017.

21        MS. WILLIAMS:  Did they file charges

22    against you?

23        MR. MIKEL:  Yeah.  I went to court.

24    They filed the charges because they said, the

25    county police said they couldn't stop the

1      McKeesport Police from not filing.  That that

2      wasn't their jurisdiction.  They are separate

3      and they can do what they want.

4          MS. WILLIAMS:  Right.

5          MR. MIKEL:  They said they got to file

6      it, but we can help you down the line if you

7      help us.

8          MS. WILLIAMS:  Did they tell you that

9      they wanted you to go talk to Shelton and try

10     and get info from him, that the target was

11     Shelton?

12         MR. MIKEL:  Yeah.  They arranged for me

13     to be right next to him in the cell and

14     everything.  So once I got in the cell, I

15     ended up talking to Shelton on regular stuff.

16     And I really ain't had no conversation with

17     him because once I got to talking to him I

18     didn't want to do it.  I couldn't go through

19     with it.  And he just kept saying he was

20     innocent and I said, man, I'm not doing this.

21     So I didn't even engage in the conversation

22     other than regular conversation with him.

23        MS. WILLIAMS:  Right.

24         MR. MIKEL:  So at that time I went and

25     got an attorney.  I went and got an attorney

18

1   other than Chris Eyster.  I went and got

2   Michael DeRiso.

3       MS. WILLIAMS:  Okay.

4       MR. MIKEL:  So I got Michael DeRiso and

5   I went and I told him everything.  He told me

6   don't talk to them no more.  Don't say

7   nothing else to them.  So we went and we

8   fought the charges.  He got everything

9   dismissed down to a summary offense.  I just

10  had to pay a fine.

11      MS. WILLIAMS:  You're just talking

12  about the McKeesport case at this time?

13      MR. MIKEL:  That was the McKeesport

14  case at the time.  So at that time I was

15  released, but I was ordered by Judge Conti in

16  federal court not to be in McKeesport.  So

17  they sent me, arranged for me to go to West

18  Virginia into a halfway house and to be out

19  in West Virginia.

20      MS. WILLIAMS:  Wait.  When you say they

21  arranged, do you mean the feds, like your PO

22  legitimately?

23      MR. MIKEL:  Yeah.  My probation officer

24  in the federal court.  So eventually I came

25  back and I end up catching a case down there,

1    domestic.  It got dismissed.  I violated and

2    got off of federal paper.  So I was done once

3    I did my probation time.

4          So I came home recently, just recently

5    on my last release.  And as I was parked in

6    Crawford Village in a rental car.  As I'm

7    parked a silver Impala pulls up on me and

8    pulls in front of me.  And they just sitting

9    here.  And I'm like, who the hell is this.

10   And then they hit the lights.  So I'm like,

11   oh, this is the police.  Three people get

12   out.  Three people get out and they had their

13   little detective police SWAT vests on and

14   everything.

15         So they walk up to my car and they are

16   like, what is you doing here.  I'm like, sir,

17   I'm just here waiting at the store.  And he's

18   like, you're parked illegally.  And he opened

19   my car door and pulled me out the car.  And

20   I'm like, what are you doing.  I'm not

21   consenting to this.  I'm just sitting here at

22   the store.  So they put me in cuffs and I'm

23   like, why you put me in handcuffs and

24   everybody is witness.  I'm like, sir, why you

25   put me in cuffs.  And he's like, you got

1    anything in the car, anything in the car.  So

2    I'm like, no, there's nothing in the car.

3          So he searched the car.  He found what

4    looked like a bag, like a small baggie like

5    the size of a dime of cocaine.  And I'm like,

6    man, that's not mine.  Maybe somebody because

7    I jitney somebody dropped it in there.  Let

8    me make a phone call because I let my brother

9    use my car.  So he said, no.  This is what

10    we're here for.  And I got the text messages,

11    too.  We're out here for guns and dope.  You

12    can work with us and make this go away.

13          MS. WILLIAMS:  Did they know who you

14    were or what your prior history was?  Did it

15    seem like they were there on purpose?

16          MR. MIKEL:  I was sitting there and I

17    just got a text from Mark Steele from

18    McKeesport police.  And next thing you know

19    they pull on me.  Because I told Mark Steele

20    I was out.  He asked me something and I said

21    I'm out Crawford.  And I got those text

22    messages, too.  And then they pull up on me.

23          So I wouldn't say that he sent them.  I

24    don't know if they were there on purpose

25    because I honestly wasn't doing anything but

21

1   parked at the store.  And they just pulled up

2   on me like that.

3        MS. WILLIAMS:  Right.  I want to go

4   back when you were at West Virginia and

5   stuff.  You had told Randall that they sent

6   you money.

7        ███ ██████  Yes.

8        MS. WILLIAMS:  When did you first meet

9   with somebody from the Allegheny County

10  D.A.'s office about our case?

11       ███ ██████  When I got released from

12  that whole situation when I got released from

13  Houtzdale, so I got released from Houtzdale

14  and Chris Eyster called me like a month after

15  being released and told me that I had a

16  warrant out for my arrest.  So I'm like, for

17  what.  How do I got a warrant.  What did I

18  do.  He said you didn't show for what's his

19  name's trial.  I forget his name.  Michael

20  such and such trial.  For Samuel Mitchell's

21  trial.  You didn't show.  I said I didn't

22  even know.  How I getting a warrant for my

23  arrest.  I didn't know nothing.  No one

24  contacted me.  You didn't contact me.  I

25  didn't know anything.

22

1        MS. WILLIAMS:  Yeah.  You would have to

2    have a subpoena.

3        MR. MIKEL:  Yeah.  He was like, just

4    come down.  Some people want to talk to you

5    any way.  So just come downtown tomorrow and

6    we will get the warrant dismissed and you

7    will have a sit down with some people who

8    want to talk to you.  So I'm like, man, you

9    sure I ain't going to go to jail.  He's like,

10    yeah, they assured me you're not going to go

11    to jail.  I talked to him.  They just want to

12    talk to you.  You are not going to go to

13    jail.

14        So I'm like, all right, man.  So the

15    next day, I go down to the courthouse.  I go

16    in front of the judge and they really didn't

17    say much.  I think it was Judge Todd.  He

18    really ain't say much.  He was like, he's

19    here.  Okay.  The court hearing starts on

20    such and such day.  So after that hearing

21    with Judge Todd to get the warrant dismissed.

22    My lawyer wouldn't talk to me.  He was like,

23    you're about to talk to the prosecutor.

24    She's the top dog.  And she's like, she's a

25    pit bull.  So just be respectful and listen

1    to what she got to say.  She got a lot of

2    power.

3         MS. WILLIAMS:  This is Eyster talking?

4         MR. MIKEL:  This is Eyster talking.

5         MS. WILLIAMS:  And the trial you are

6    saying it was Samuel Mitchell?

7         MR. MIKEL:  Yeah.  It was Samuel

8    Mitchell for his trial.

9         MS. WILLIAMS:  Go ahead.

10         MR. MIKEL:  When I went to talk to her,

11    she just straight came off at me like I was

12    the criminal like.  Like this whole demanding

13    thing.  Like we need to start working on your

14    testimony.  We need to get you prepared.

15    There are going to be some questions I need

16    to ask you.  I need to make sure you answer

17    the right questions.  As you know there is

18    six homicides so we can't mess this up.  We

19    can't fuck this up.  We won't mess this up.

20    And this and this and that.

21         And I'm like, hold on, hold on, hold

22    on.  Before I even started that interview, if

23    you watch that interview, I said I wasn't

24    agreeing on being no mother fucken witness

25    and testifying.  I just contacted them and

1    told them.  I wasn't agreeing to this shit.

2    I'm not going to be no witness on this case.

3    I will not.

4         So at that time she is going to say,

5    yes, you will.  You can't tell me what you

6    want to do.  She said by law, there is laws

7    around the fact that you cannot testify.  If

8    I want you to get on the stand and testify,

9    you will be on that stand and testify.  And I

10    will --

11        MS. WILLIAMS:  Was Chris Eyster there

12    for that?

13       MR. MIKEL:  Yes.  It was Chris Eyster

14    and the detectives.

15        MS. WILLIAMS:  And Detective Grail and

16    who else, do you know?

17       MR. MIKEL:  It was the two detectives

18    that was in the interview.

19        MS. WILLIAMS:  And what did Chris say

20    when he started talking like that?

21       MR. MIKEL:  He didn't saying anything.

22    It was me.  Because Chris, he understands

23    that I don't really -- you know, I stand up

24    for myself.  I have been pro se in federal

25    court so he already knows I can handle myself

25

1    in the situation.  So he sits back and lets

2    me talk.

3         MS. WILLIAMS:  Okay.

4         ███████:  I'm like, I'm not agreeing

5    to testify.  This case is too crazy.  I'm not

6    getting involved on that level.  I said, I'm

7    already in danger out here.  I'm already got

8    money on my head from the mistakes you all

9    made and everything else.  I said, I'm not

10   doing it.  And he said, hold on.  Can we talk

11   to your lawyer.  Let me sit and talk to your

12   lawyer for a second.  I said all right.

13        ·So I leave out the room.  When Chris

14   come back out, he said, listen, you got to do

15   what this lady wants you to do.  And say what

16   this lady wants you to say or she's going to

17   send you to jail.  I'm like, how is she going

18   send me to jail, Chris.  I didn't do shit.

19   And he said they got you on probation for the

20   next seven years.  After your parole, that's

21   county probation.  She's county.  She's the

22   head of all of that shit.  She's county.  So

23   she said she can violate you and send you and

24   make that seven years into a sentence if you

25   don't do what she wants you to do.

1         MS. WILLIAMS:  What did they want you

2   to testify to at that point?  What did she

3   want you to testify to at that point?

4       MR. MIKELL:  At that time she didn't

5   tell me.  At that time she was about to go in

6   there and tell me what she wanted me to do

7   tell me what she wants me to say.  But at

8   this time we are battling.  It was a battle

9   right now.  Because now I'm mad.  Because I'm

10   like, okay, if you want somebody to

11   cooperate, there are different ways to

12   approach them.  You don't try and bully them

13   into this shit.  So I'm mad.  So now she lost

14   me now.  Like the whole office like lost me

15   and they don't even know it.

16         MS. WILLIAMS:  Right.

17       MR. MIKELL:  So I'm like, all right.  So

18   now I'm looking at you like an enemy because

19   you're coming at me like an enemy.  Like

20   you're just flat out trying to bully me into

21   testifying about some bull shit.

22       So at that time I'm like, all right.

23   I'm going to talk to her.  So he's like, just

24   do what she needs to do.  And I'm like, yeah,

25   I got it.  And so I went back in there and we

1    sit down.  And the detective is standing up

2    and me and Chris sit down.  And she's sitting

3    down.  She's like, okay.  So you decide what

4    you want to do.  I said, man, over my dead

5    body will I allow you to bully me into

6    testifying for some shit.  I don't give a

7    fuck what you got to do.  Make your move.

8    Make your move.  And she's like, okay, okay.

9    Now you're talking my fucken language.  And

10   she's like, she looked over to the detectives

11   and said, don't let him out this room.  Don't

12   let him out this room.  Stand at the door and

13   don't let him out this room.

14         So she got up and she went somewhere.

15   And she came back with a subpoena.  So she

16   handed me a subpoena and she said, now you

17   been subpoenaed.  She said, I told you I can

18   make you do what the fuck I want you to do.

19   Well, she didn't cuss.  I told you I can make

20   you do what I want you to do.  I didn't want

21   to go this route, but it doesn't matter.  And

22   she walked out.

23         So I'm like, okay.  All right.  So now

24   I'm mad all the way to the point where like

25   all right.  You all want me to testify and

28

1    cooperate and do all this when you want to
2    come at me like this. All right. So when it
3    was time to come down for the Sam Mitchell
4    trial like a week later, she came there to
5    supervise me. So my attorney came to me and
6    said, Lisa's here. She want to supervise you
7    and see how you handle yourself on the stand
8    before they get to coaching you. She's like,
9    she wants to see you. This is a mock run for
10   the big trial you can look at it. She wants
11   to see how you handle yourself.
12        So honestly right then and there I
13   said, okay. So when I went to the Sam
14   Mitchell trial, I went in there rebellious
15   and I didn't give them the testimony they
16   wanted.
17        MS. WILLIAMS: Right.
18        MR. MIKEL: Because of the situation.
19   And he ended up getting found not guilty
20   because of it. So now they're mad. So now
21   they're mad at me. So I don't care because
22   now it's like me against you all because of
23   my attitude. But I'm not on you're my enemy.
24   I'm just on like, I'm just going to expose
25   the truth. You know.

29

1    MS. WILLIAMS:  Right.

2    ▇▇▇ MIKEL▇  So I leave it alone and I'm

3    going to federal court and during the process

4    I mention it all to the Judge.  I'm putting

5    it down, documenting it all.  Documenting it.

6    So when I get pulled over by the county

7    police, they didn't know who I was at the

8    time so I explained to them, I can't be

9    there.  I can't work for you all.  I was a

10    witness on and I mentioned this case, on such

11    and such a case.  I'm all on google about

12    that case right now.  You all can google me.

13    And she what case.

14         So he said, what case.  Who's the

15    prosecutor.  He started asking questions.  I

16    don't know what questions.  But now he got an

17    interest about the case.  And he's like, hold

18    on.  Let me make some phone calls.  So he

19    walks away.  He got on his cell phone and he

20    walks away.  He made a phone call.  I don't

21    know who he called.  I don't know who he

22    called.  So he comes back and he says,

23    listen, people in our office want me to

24    charge you right now.  He said, people in my

25    office, the prosecutor's office want you

30

1    charged right you.

2        MS. WILLIAMS: Wait. Wait. Is this

3    the stop in Crawford Village or is this a

4    different stop?

5        MR. MIKEL: This is the stop in

6    Crawford Village. So he said, people in my

7    office want you charged right now. But I'm

8    going to pull a little string and keep you

9    out here. I'm a man of my word. You give us

10    some stuff and we can all work together. He

11    said get back to me. He said, I got a year

12    to file these charges. And I'm like, all

13    right. So he gave me his card.

14        At that time he gets in the car and

15    pulls off. At that time I had a little bit

16    of weed, but they just threw the weed down

17    and let me go.

18        MS. WILLIAMS: Yeah.

19        MR. MIKEL: So at that time I'm sitting

20    in my car and I send him a text message. So

21    I text and I said, do I get a lawyer about

22    the search and probable cause purposes and

23    video footage from the store of the stop.

24    And he replied back in the text, lawyers

25    muddy the water. That quote is in the text.

1    But I got the text.  Lawyers muddy the water.

2    This can go away as fast as you can work.

3    I'm a man of my word.  That's why you are not

4    in jail.  We need guns and dope, whatever it

5    takes.  Something like that.

6        MS. WILLIAMS:  Yeah.

7        MR. MIKEL:  So I'm like okay.  So at

8    that time --

9        MS. WILLIAMS:  Wait.  What was his

10    name?

11        MR. MIKEL:  Whatever that is the name

12    in that text.  Diornesta (sic) or something

13    like that.  I just took the name off his card

14    and looked in my phone.

15        MS. WILLIAMS:  Okay.

16        MR. MIKEL:  So at that time after that

17    text I end up contacting my probation officer

18    because you have to contact your probation

19    officer after a stop or anything.  So my

20    probation officer replied, like you ain't

21    been charged and I'm like, no, they didn't

22    charge me.  He would look into it.  So I told

23    my probation officer, yeah, they want me to

24    work for them.  And he said, yeah, you know

25    that's not going to happen.  We don't allow

1    that to happen while you're on probation.

2         MS. WILLIAMS:  Right.

3         MR. MIKEL:  So I'm like, yeah, that's

4    what I thought.  That's what I don't

5    understand.  So he said yeah.  So I end up

6    leaving the probation officer.  And

7    eventually I text them or they text me and I

8    asked them did they talk to my probation

9    officer.  So I got the text message.  He

10   said, yeah, man, everything is a go with your

11   probation officer.  Can you meet up with us

12   around such and such a time behind the school

13   around Cornell.  I'm like, all right.  I'll

14   meet up with you all.

15        So I met up with them and I did tell

16   him, he was like, our office is pissed off

17   about your last performance at trial.  Lisa

18   wants you in jail.  But she feel like you can

19   be better used if out.  So what can you get

20   us.  He asked me, what can you get us.  What

21   kind of cases can you get us.  And I'm like,

22   man, honestly I really ain't in the streets.

23   I ain't in the streets no more so I really

24   don't know.

25        So this is the county detectives.  He

33

1   had the McKeesport detective there, too.  A

2   Mark Steele and Sommers.  Mark Steele and

3   Sommers.  And an ATF agent named Ryan.  So he

4   said, listen, this is ATF.  He introduced me

5   to Ryan.  He said, they are done with our

6   office.  You are blowing it with our office.

7   But we are trying to go around the law and

8   still be able to work with you.  He said, our

9   office needs your credibility to be built up

10  because they are not sure if they want to use

11  you right now for that Wilkinsburg case or

12  not.  So we got to build your credibility

13  back up because you already fucked us before.

14       Now, I told them I talked to you and I

15  ran to you and there's a dozen people that I

16  feel I can work with us and be straight up

17  enough with us.  And he said I talked to the

18  detectives that was involved with Lisa and

19  they said you got a raw deal.  She handled

20  you wrong.  She done everything wrong and

21  she's down there trying to bully you.  And

22  that's why you rebelled against you.  He

23  said, I'm not trying to bully you.  You work

24  with me and there is benefit from this.

25       I got the text messages of regards to

1     this conversation.  He said you can benefit

2     from this.  You can work and you can make a

3     lot of money and get off probation.  Relocate

4     and move.  You can do whatever we need you

5     to, but we need to work on your credibility

6     and we need to move now.  We need to work

7     now.  We don't got time.  So what can you

8     give us.

9          So I'm like, I really don't know.  He

10    said at this time do you know death row.

11    You're from Crawford.  You know death row.

12    This is what Mark Steele mentioned.  So I'm

13    like, yeah, I know death row.  He said, so

14    can you help us.  Can you get around him or

15    get any drugs around him, anything.

16         MS. WILLIAMS:  Is that just one of the

17    bigger players in McKeesport?

18         MR. MIKEL:  Not any more.  At one point

19    he was a street person and then he --

20         MS. WILLIAMS:  You just went silent for

21    a minute.  You're phone just got all muffled.

22    I missed maybe the last 40 seconds.  Kendall

23         MR. McKINNEY:  Kendall wait.

24         MS. WILLIAMS:  Kendall you must have

25    your microphone covered.  I can't hear you.

1          MR. MIKEL:  Can you hear me now?

2          MS. WILLIAMS:  Yeah.  I can hear you

3    perfectly.  So they want death row and you

4    are telling them death row is not in the game

5    anymore.

6          MR. MIKEL:  Yeah, exactly.  So they

7    just keep asking me questions regarding him.

8    And they are, in order for you to build up

9    your credibility, you got to give us

10    something major like.  We need stuff off

11    these streets.  And he said, there's a lot of

12    money that was poured during this task force.

13    There's a lot of people out here right now.

14    And she said, we got county out here.  We got

15    state down here.  We got the feds down here.

16    We got a lot of people out here right now.

17    And we need results.

18          And at the same time we need to build

19    your credibility up.  So there is no way you

20    can get around row or anything.  And I'm

21    like, no.  He's not that type of person.  So

22    at that time he said, the ATF agent was like

23    all right, what about guns and stuff.  And

24    I'm like, before I dealt with this guy back

25    in the day.  And he used to sell guns.  I

36

don't know if he still do.  I can see.  And

he's like, yeah, see what's up.  See if any

other player, we don't need no petty drugs.

We need major stuff.  We need you to build up

your credibility.  We need you to be on the

other end of this major stuff.  And I'm like,

all right.

          So, at that time I reached out to the

guy that I told him about.  He's a tattoo

guy.

          MS. WILLIAMS:  Kendall, I have to let

Randall take over right now on that part.

Okay?

          MR. MIKEL:  All right.

          MS. WILLIAMS:  I have to go to the

ladies room.  He is going to take over for a

couple of minutes.  And then I want to ask

you about the money and stuff and the Walmart

transfers.  But Randall is going to take over

this part.

          MR. McKINNEY:  Kendall, continue you.

          MR. MIKEL:  What was I saying?

          MR. McKINNEY:  You were talking about

they are asking if you could provide them

with any big scores in terms of guns and

1    drugs or any big time people.

2        ██████████  Okay.  At that time I

3    reached out to the guy that I told them

4    about.  And I asked the guy, yo, you still

5    remember who I am and everything.  You still

6    involved in anything.  He said, yeah.  So I

7    went back to the county police.  I contacted

8    them and said, okay, this guy is still

9    involved and stuff.

10        So they said, okay, we need to do

11    something on wire.  We need you to wear a

12    wire.  We need you to wear a wire.  And I'm

13    like, man, I'm not going to try and wear no

14    wire.  I don't know this guy.  And he's like

15    we can always charge you.  And I said, all

16    right.  So they give me a phone.  It was no

17    wire.  It was a phone they give me.  So this

18    time they bring in reenforcements, county

19    detectives, McKeesport police, ATF and they

20    said I'm going to be okay.  They give me

21    1,500 and told to go in there and come out

22    with guns and drugs.  They will be listening

23    in if anything happens.  They gave me a code

24    name for them to come in and said if they

25    come in, they told me just to get down.

38

1        So I go in there and I purchase an AR

2    firearm.  So I come out.  Meet them back out

3    behind the school.  They took the firearm.

4    They are all happy, happy, happy go lucky and

5    happy.  So at that time during the

6    conversation, the guy mentions that he was

7    very involved in biker gangs and all this

8        So they say, he's bigger than we

9    thought.  We need to do more research.  So

10   eventually I went on another controlled buy

11   because they are like, now we got to get you

12   signed up.  Hurry up get you signed up as an

13   informant legally.  That's what he told me.

14   Legally.  And I got the test messages them

15   saying they going to hurry up get me signed

16   with the agency.

17        So they wanted to get around, the

18   county police wanted to get around the fact

19   that I couldn't be used in the Commonwealth

20   so they brought me an ATF agent to use me on

21   the government level where they will use me

22   as an informant.  So I went on another sale

23   with them.  So at this time I purchase and AR

24   and drugs.

25        So during the time, I come out, the

39

1    drugs they tell me end up being fake.  So now

2    they are mad and they are accusing me saying,

3    you're going to mother fuck your name up.

4    You're going to mess your credibility up.

5    You are going to make us look bad.  We can't

6    have this.  We need you to go back in there

7    and get him on admitting something about the

8    drugs.  You need to go back in there and

9    confront him.

10          And I'm not trying to go back in there.

11    I'm not trying to go confront this man

12    without being armed.  You all want me to go

13    in there when this man just admitted to you

14    all that he is a biker gang and they don't

15    care about nobody who talks to police.  And

16    they just admitted.  I heard him say it.  And

17    you all want me to go back in and confront

18    this man.  No, I don't want to.

19          So they threatened me like, well, you

20    are going in there and this and this and

21    that.  Or you are going to jail.  And we'll

22    make it hard for you in jail.  We will put

23    you on the block with the same people that

24    you're telling on.  We'll put you right on

25    the same block with Shelton if we have to.

40

1          MR. McKINNEY:  Let me stop you.  Who do

2     you remember said that?  Do you remember who

3     exactly that was?

4          MR. MIKEL:  I don't remember his name,

5     but I can describe him.  He was part of the

6     Task Force.  He's Diornesta's (sic) partner.

7     He's part of the Task Force.  He's an older

8     guy.  There's three of them.  He says he's

9     been on the force for 21 years.  He did a

10    lot.  He was on the SWAT team before.  I

11    don't know his name, but I can describe him

12    down to the T.

13         MR. McKINNEY:  Hold on.

14         MR. MIKEL:  Because we was arguing back

15    and forth.  Like really had a stand off to

16    the point where he was like, forget this guy.

17    We don't need him.  Tell Lisa fuck him.  Tell

18    Lisa fuck him.  Tell Lisa I said fuck him.

19    And he walked off.

20         MR. McKINNEY:  Let me ask you this.

21    With respect to the case against Robert

22    Thomas and Sheron Shelton, were you ever

23    provided any compensation for your

24    involvement in either of those cases?

25         MR. MIKEL:  Yes.  I was placed in an

1    extended hotel and at that time I was given

2    $300. They said it was for my groceries.

3    And for me to contact them every so often

4    every two weeks for more money to get by. So

5    eventually they end up giving me money to get

6    my own apartment and everything. Security

7    deposit and the first three months rent. And

8    they gave me the money and bolt.

9        MR. McKINNEY: Hold on. Hold on.

10    Every once in a while I am going to check in

11    with you. And these questions may sound

12    repetitive, but it's just important for me to

13    know when you say they, are you referring to

14    someone different than you just referred to

15    before or another agent or another officer?

16    Like try to remember who it was that gave you

17    the money, handed you the money.

18    ██████████ Yeah. It was different

19    detectives every time. It was a different

20    detective. But it was always Detective Grail

21    that I contacted. So I would contact him.

22    Have a conversation with him and he would be

23    like, okay, I will have somebody get with

24    you. And different detectives would call me

25    and meet me either at the hotel or the mall.

42

1    I got pictures in my other phone in the

2    police station of me taking pictures of me

3    meeting in the mall and text messages and

4    everything.  But it's evidence in the police

5    station.

6        MR. McKINNEY:  Let me ask this.  In

7    terms of total amounts, how much money do you

8    think you were provided with respect to the

9    case against Robert Thomas and Sheron

10   Shelton?

11       ██MR. MIKE█:  I can't come up with a

12   total amount because it was different

13   occasions that I received money.  Like one in

14   West Virginia I was wired to Walmart 2,700.

15   I was given money for groceries.  I was given

16   coffee money, a hundred dollars here and

17   there if I needed something from detectives.

18   If I need anything.  So during the process I

19   was given different money.  Sometimes I

20   signed for it.

21       MR. McKINNEY:  Let me ask you this.

22   When you got the $2,700 Walmart to Walmart,

23   in order to obtain that money you have to

24   give a name so which name did they give you

25   when they sent the money?

1    MR. MIKEL   I really don't remember.  I

2    really don't remember.  But the halfway house

3    got it documented because I was in the

4    halfway house at the time.  And the director

5    of the halfway house is kept by a former cop.

6    So when they contacted me, I went to them and

7    I tell them, I got this money at Walmart.  I

8    need to go pick it up.  He's like, how much.

9    I said, 2,700 and he's like, what.  Where you

10   getting 2,700 from.  And I explained that the

11   county detectives about to send it to me.

12   And he is like, for what.  I said they are

13   just helping me out.  He said, have them call

14   me.  I'm not doing that.

15        So I contacted the detective with my

16   cell phone right then and there.  Ad I said.

17   The director of the halfway house is not

18   allowing me to go pick up the money until

19   they talk to you all.  So they get on the

20   phone and they talk.  They had a conversation

21   and they laughed and talked and he ended up

22   approving me to go out and pick up the money.

23   I had to put it in the computer.  I had to

24   log it the date and time and amount of money

25   I was picked up and why in the computer.  And

1    they approved it and then they let me go pick

2    up the money.  I caught the bus and I went to

3    Walmart.  I don't really remember the name.

4    I just decided to go pick up $2,700.

5        MS. WILLIAMS:  I'm back.  It was in

6    your name?

7        MR. MIKEL:  Yeah.  They sent it to me.

8        MS. WILLIAMS:  What was your

9    understanding of what the money was for?  How

10   did the number of 2,700 come out and what was

11   your understanding of what you had to do for

12   the money?

13       MR. MIKEL:  Because at the time I was

14   about to get out the halfway house.  I was

15   just about to get released.  And I was

16   supposed to be saving money and getting me an

17   apartment.  Like you work and you are

18   supposed to put money up and everything.  But

19   I was not managing my money properly.  Like

20   my daughter came down for Christmas and I

21   spent a lot of money.

22       So I contacted them.  I said, I need

23   money.  I'm about to get out this halfway

24   house.  I messed up my money.  And they are

25   like, how much you need.  I don't know if we

45

1    are going to be able to get it approved from

2    the District Attorney's office because we

3    already gave you so much.  But let me see

4    what I can do and I will call you back.

5         So eventually he ended up contacting me

6    back.  I can't give you money on the record.

7    So I can send you some money, but I can't

8    give you money on the record.  But listen, I

9    am going to take care of you.  I said, we

10   already told you we got you.  And I said go

11   and see how much you need for rent, for a

12   couple months rent and add it all up.  Find a

13   place and let us know that you are really

14   getting an apartment and lease and everything

15   and we will send you the money.

16        I was like okay.  So I let it go for a

17   couple of days and then I just threw out a

18   number.  Like everything came to around

19   2,700.  And they are like, all right.

20        MS. WILLIAMS:  Did you have to send

21   them a copy of a lease or any kind of

22   documentation or anything?

23        ██MR. MIKE?██  He didn't even mention it.

24   He was like all right.  Let me figure out how

25   to send it to you without it being on

MARY SPAGNOLO, OFFICIAL COURT REPORTER

46

1   record.

2       MS. WILLIAMS:  What was your

3   understanding of where the cash or money was

4   coming from if there wasn't going to be a

5   record of it?

6       MR. MIKEL  I just thought the money

7   was coming from the District Attorney's

8   office or their office.  But they just wasn't

9   going to have me sign for it like they

10  usually do.

11      MS. WILLIAMS:  Right.  I get it.  I

12  have another question.  What was your

13  understanding of what you had to do for it?

14  What were you doing in return?  Like what was

15  your obligation regarding our case or coming

16  back as a witness?

17      MR. MIKEL  I just knew that they

18  wanted to be smooth things out and be cool

19  with me because they wanted to use me for

20  that case.

21      MS. WILLIAMS:  Right.

22      MR. MIKEL  I knew this so I ain't just

23  going to sit back.  I knew they wanted to be

24  cool with me so anytime I would call, they

25  always came through.

1        MS. WILLIAMS:  Right.  And did you let

2   them know that you would give them the

3   testimony they wanted in return for the

4   money?  Like it was an understanding that

5   they knew if they came through, you would

6   keep coming through?

7        MR. MIKEL:  No.  Because one time

8   during the Shelton preliminary hearing on

9   that day I talked with Lisa.  She was like,

10   we started off last time bad.  I want to make

11   amends to all that situation.  She said, we

12   didn't bring you up today.  So I kept my

13   word.  I am going to keep you out of this as

14   much as I can.  She said no one knows

15   anything.  She said we had a trial today.  We

16   had a court hearing today and no one knows

17   anything.  You are not going to be brung up.

18        She's like, what do you want.  I got

19   county money.  I got state money.  I got

20   federal money.  I got unlimited funds for

21   this case.  What do you want.

22        So when she said that, I was still mad

23   so I responded back with, I don't want

24   nothing to do with this case.  So now when

25   they sending me the money, I'm thinking like,

1    all right.  This is what I want now.  So

2    every time I called I needed them to come

3    through and they did.

4         MS. WILLIAMS:  I understand.  When you

5    are saying Lisa, do you know her last name?

6         MR. MIKEL:  Lisa Pellegrini or however

7    you pronounce her crazy name.

8         MS. WILLIAMS:  And the date of the

9    preliminary hearing when she said, nobody

10   knows about you and I didn't bring you up

11   today, did you meet with her in person or did

12   you talk to her on the phone?

13        MR. MIKEL:  This was in person.  It was

14   me, her and my lawyer and one of the

15   detectives.

16        MS. WILLIAMS:  A different detective,

17   not Detective Grail?

18        MR. MIKEL:  Yeah.  It was a different

19   detective.  This is right out in the hallway.

20   So I don't know how far back, but this right

21   in the hallway of the courthouse.

22        MS. WILLIAMS:  The Allegheny County

23   Courthouse or down at City Court?

24        MR. MIKEL:  This was down at the

25   Allegheny County Courthouse, the big

49

courthouse.

MS. WILLIAMS:  And when you say your lawyer, are you talking about Chris Eyster?

MR. MIKEL  Yeah.

MS. WILLIAMS:  And how did you come to be at the Allegheny County Courthouse on the same day as Shelton's prelim?

MR. MIKEL  Because she brought me there and forced me in the room.

MS. WILLIAMS:  So that was the same time.  Okay.  All right.  And from the day of the prelim to when you got the 2,700 at the halfway house, did you ever talk to Lisa in-between there or was it always just the Allegheny County Police?

MR. MIKEL  I called her a couple of times.  I called her one time and she got mad at me and hung up.  Like, Kendall, I cannot talk to you directly.  You can only talk to me through the detectives or through your lawyer.  She hung up on me.

MS. WILLIAMS:  Did you call the D.A.'s office or did you call her cell?

MR. MIKEL  I called the D.A.'s office and called her office.

50

1     MS. WILLIAMS:  Why did you call her
2  that day?
3          MR. MIKEL:  Because at that time I
4  wanted to talk to her about relocation and
5  like, what is you all doing.  I need to know
6  what you doing with me.  I wanted to ask her
7  questions.
8          MS. WILLIAMS:  Yeah, sure.
9          MR. MIKEL:  I just wanted to ask her
10  questions what was going on.  Like I haven't
11  heard anything.  I don't know nothing.  I was
12  in limbo.
13          MS. WILLIAMS:  At some point did they
14  talk to you about your statement as far as
15  Thomas and talk about the actual homicide and
16  bringing Shelton into it?  At some point did
17  it go from like, okay, he just told me this
18  one little thing.  You got to include the
19  homicide, you got to include Shelton in what
20  you guys talked about?  Because from what
21  Randall said there was something like that
22  going on, but I don't want to put words in
23  your mouth.
24          MR. MIKEL:  I'm not sure what you're
25  saying.  Say that again.

51

1          MS. WILLIAMS:  Wait.  Randal is going

2     to ask you.

3          MR McKINNEY:  Earlier when we were

4     talking, I believe it was yesterday, you were

5     saying that you got involved initially when

6     you said that Robert Thomas told you that he

7     urinated near the scene.  That's all he said.

8     And then your story about what Robert Thomas

9     told you kind of expanded.  And I guess

10    Wendy's question is, what caused that story

11    to expand from Robert Thomas just telling you

12    he urinated near the scene so that he told

13    you much more, allegedly much more about what

14    happened?

15          MR. MIKEL:  You are asking me how did

16    the conversation get to more?

17          MR. MCKINNEY:  How did your story

18    change from Robert Thomas told me he urinated

19    to Robert Thomas told me he admitted to doing

20    this with Sheron Shelton?

21          MR. MIKEL:  I don't understand what you

22    are asking.  But I just told him.  I went in

23    there and told him, they asked me to go in.

24    He had asked me to go in and get him to talk

25    and I went in there and I talked to him.

52

1          MR. MCKINNEY:  I guess what I'm really

2      trying to ask you is, I'm going to be direct.

3      And I just want your honest answer.  I don't

4      want to pull any information out of you that

5      is not true.  Did anyone at one point ask you

6      to give them information that Robert Thomas

7      told you that wasn't what Robert Thomas told

8      you?

9          MR. MIKEL:  Oh, yeah.  There was times

10     that Shelton was stopped or something by the

11     police.  I'm not sure because I didn't get

12     this form Shelton.  I got this from the

13     county police and the prosecutor.  But there

14     was a time I guess when they were stopped.

15     And they almost might have discovered

16     something.  The conversation from the video.

17     But they wanted me to like engage in a phone

18     conversation insinuating the gun was in that

19     area.  And it was Thomas and Shelton

20     together.  Shelton was in the car with Thomas

21     because I'm telling them what Thomas told me

22     that they were going to meet down there.

23         MR. McKINNEY:  Are you saying they were

24     feeding you information?

25         MR. MIKEL:  Yes.  They was feeding me

53

1    information on that occasion, yeah.  But they

2    wanted me to throw Thomas in the car, too

3    when Thomas admitted he got stopped and it

4    was something they were almost discovered

5    something.  And they wanted Shelton to be

6    there, too.  Because they were trying to --

7    he told me they were trying to -- I forget

8    the word he used, but it was like a grid.

9    Put together a grid of events.

10        And then he told me how they had him on

11   camera jumping a fence.  And they said, we

12   got him at this time jumping a fence.  And we

13   got him at this time doing something.  So we

14   need him at this time doing something.  So we

15   need to relate this time so we need Shelton

16   to be in the car so this makes sense.

17        MS. WILLIAMS:  And who was there when

18   that was being said?

19        MR. MIKEL:  That was -- let me think

20   and make sure.  I think that was Lisa.  That

21   was Lisa and the detectives and my lawyer.

22        MS. WILLIAMS:  And that's Chris Eyster?

23        MR. MIKEL:  Yeah.

24        MS. WILLIAMS:  Did you agree to say

25   that or did you tell them you couldn't say

54

1    that or how did that meeting end?

2        MR. MIKEL: I just said okay. All

3    right. I didn't agree. I just said okay.

4        MS. WILLIAMS: Yeah, I get it. No one

5    is judging you at all. Give us a timeframe

6    on that if you can. Do you have any idea

7    what month or when that meeting would have

8    been?

9        MR. MIKEL: This is all around the time

10   the Sam Mitchell case. Around Shelton's

11   preliminary case. This was all around all

12   that time. Because after that I rebelled and

13   stopped communicating with them.

14       MS. WILLIAMS: Were they still trying

15   to get in touch with you or did they talk

16   about you owing them because they had given

17   you so much money? And how did you end up in

18   Texas?

19       MR. MIKEL: So once I did this with the

20   county police and then tried to build up my

21   credibility and everything, they ended up

22   raiding the tattoo guy. I was riding on the

23   street and I seen the raid. So I contacted

24   the county police and I said you didn't tell

25   me nothing. You all said you were going to

55

1    tell me everything.  To make sure I'm safe

2    and that --

3         MR. McKINNEY:  Wendy left the room so

4    it's just you and me.  Keep going.

5         

6

7

8

9

10   And I was already in a hurry and I sped off.

11   I'm in danger.  I don't need that.  After you

12   all said you were going to look out for me.

13   And they don't reply back.

14        So at that time the next day or the day

15   after I went down to the county detective's

16   office to put a complaint in.  And then I

17   went to the prosecutor's office to put a

18   complaint in.  And then I went to the

19   Attorney General's office to put a compliant

20   in.  And then I walked into Judge Cashman's

21   chambers and explained everything to his

22   clerk.  And she put me on probation and told

23   me go ahead I can get out of here.

24        At that time I contacted the ATF

25   supervisor and told him about everything.

1    And that agent end up calling my phone.  The

2    ATF agent called my phone and he was mad.  He

3    was mad about everything.  And he was like,

4    you owe us money.  You owe us money.  All

5    that money we feel like you got over on us.

6    And he's cussing at me and stuff.  This is

7    tough.

8         But he ended up meeting me and putting

9    me in a extended stay hotel and he gave me

10    $1,000.  And I ended up driving down here.

11    And he told me he was giving me four more

12    thousand when I get here.  So when I get down

13    here, I end up contacting him again.  And now

14    he is not answering so I contacted the ATF

15    agent and asking them where's my money.  And

16    he is like, I don't know what you're talking

17    about.

18         So I got a text message from him saying

19    he is not going to talk about it over the

20    phone.  He said he didn't even know nothing

21    about anything.  And for me to send him all

22    the text messages and everything.  What the

23    conversation is and everything.  So I sent

24    him all the conversations and text messages

25    and I called him back and he said, I'm going

1    to talk to everyone if they promised you

2    money, I'm going to send you money.  I'm

3    going to send you something.  But I never

4    heard back from him.

5         MR. McKINNEY:  When was that if you can

6    remember?

7         MR. MIKEL:  When was what?

8         MR. McKINNEY:  The most recent

9    conversation you just referenced.

10         MR. MIKEL:  I don't know.  It's on the

11    text message.  I think that was July.  I

12    ain't 100 percent sure because I got so many

13    different text messages.  But that text

14    message was in July.  It's on the text

15    messages.

16         MR. McKINNEY:  With respect to your

17    relationship with county detectives and the

18    Allegheny County District Attorney's office,

19    what is the status of that relationship now?

20    Or how did things end up, whether good or

21    bad, how did it end up?

22         MR. MIKEL:  I just feel like they are

23    mad because I didn't do the things they

24    wanted me to do because they only care about

25    having a conviction in this case.  And they

1      they are just doing anything in their power

2      to do that.  And they don't handle things

3      proper like they should have.  So I feel like

4      they are mad that I didn't sit down and take

5      their threats and sit down and do exactly

6      what they wanted me to do and the way they

7      wanted me to do it.

8          I think they mad that I rebelled and

9      because the detectives told me they wanted to

10     use you, but they're scared because they

11     don't know what you are going to say when you

12     get on the stand.  So my relationship with

13     them, didn't everything turn out the way it

14     did with me that I wasn't the witness that

15     they thought that they had.

16         MR. McKINNEY:  And that conversation

17     where the detectives said they wanted to use

18     you but they are concerned about what you may

19     say, do you remember how long ago that was or

20     when that occurred?

21         MR. MIKEL:  That was a conversation he

22     was text messaging.  Whenever the text

23     message say when he wanted to meet behind the

24     school.  They wanted to talk about things and

25     then the text messages around the same time

1    that I talked to our office.  And they want

2    you to cooperate and we are trying to get

3    around that.  Meet us at such and such.  So

4    we can talk about how to get around that.  So

5    those two text messages were around that

6    time.

7         MR. McKINNEY:  Do you still have those

8    text messages or are they on the other phone?

9         MR. MIKEL:  I got those text messages.

10        MR. McKINNEY:  Did anyone ever say to

11   you that they didn't want you I guess I

12   should say to let anyone know that you are

13   being paid for this case?

14        MR. MIKEL:  Yeah.  They don't want like

15   -- we can't just keep sending you money.  It

16   may look bad for the defense for the case.

17   We can't keep pushing you money.  So that's

18   why they came up with the other way of doing

19   the Walmart to Walmart where I didn't have to

20   sign for it.

21        MR. McKINNEY:  Okay,          I

22   appreciate your time.  We have been talking

23   for about an hour now.  You have been doing

24   most of the talking so I'm sure you are

25   tired.  I hope you get to go to work.  I'll

60

1    be in touch.  I will keep you updated on

2    where things go.  But I appreciate your time

3    and we will talk to you soon.

4            MR. MIKEL:  Okay.

5            MR. McKINNEY:  Take care.

6            (Hearing concludes.)

7                    * * * * *

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

61

1  COMMONWEALTH OF PENNSYLVANIA)

2  COUNTY OF ALLEGHENY        )

3

4

5

6              CERTIFICATE OF REPORTER

7

8      *I, Mary Spagnolo, an Official Court Reporter, do hereby*

9  *certify that the evidence and proceedings are contained fully*

10 *and accurately in the audiotape recording transcribed by me of*

11 *the hearing of the within cause, and that the same were*

12 *transcribed under my supervision and direction, and that this*

13 *is a correct transcript of the same.*

14

15

16

17

18

19                                 _____
20                                 Mary Spagnolo
                                   Official Court Reporter
21

22

23

24

25