```
 1            IN THE UNITED STATES DISTRICT COURT

 2          FOR THE WESTERN DISTRICT OF PENNSYLVANIA

 3                         - - -

 4   CHERON SHELTON/ROBERT THOMAS,)
                                  )
 5               Plaintiffs,      )
                                  )
 6        vs.                     )No.
                                  )22-CV-196/266
 7   COUNTY OF ALLEGHENY, et. al.,)
                                  )
 8               Defendants.      )

 9                         - - -

10      Deposition of Cmd. Officer Scott Scherer

11            Wednesday, March 20, 2024

12                         - - -

13        The deposition of CMD. OFFICER SCOTT
     SCHERER, called as a witness by the plaintiffs,
14   pursuant to notice and the Federal Rules of Civil
     Procedure pertaining to the taking of
15   depositions, taken before me, the undersigned,
     Philip A. Dawson, Notary Public in and for the
16   Commonwealth of Pennsylvania, at the offices of
     the Allegheny County Solicitor, 300 Fort Pitt
17   Commons, 445 Fort Pitt Boulevard, Pittsburgh,
     Pennsylvania  15219, commencing at 1:00
18   o'clock p.m., the day and date above set forth.

19                         - - -

20            NETWORK DEPOSITION SERVICES
               SUITE 1101, GULF TOWER
21            PITTSBURGH, PENNSYLVANIA
                  866-565-1929
22
                           - - -
23

24

25
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Cmd. Officer Scott Scherer**

2

```
 1    APPEARANCES:

 2         On behalf of the Plaintiff:

 3            Law Offices of Max Petrunya:
              Paul Jubas, Esquire
 4            and Max Petrunya, Esquire
               5 Baynard Road, Unit 917
 5            Philadelphia, Pennsylvania  15213
              maxpetrunyapc@gmail.com
 6
           On behalf of the Defendants:
 7
              Allegheny County Solicitor:
 8            Shelly Rohrer, Esquire
              300 Fort Pitt Commons,
 9             445 Fort Pitt Boulevard
              Pittsburgh, Pennsylvania  15219
10            vscott@alleghenycounty.us

11
    ALSO PRESENT:
12
        Dennis Biondo, Jr., Esquire
13
                      - - -
14

15

16

17

18

19

20

21

22

23

24

25
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Cmd. Officer Scott Scherer**

3

```
 1                    I-N-D-E-X

 2    EXAMINATION BY:                        PAGE:

 3    Mr. Jubas                              4-57

 4    Mr. Petrunya                          57-86

 5    Ms. Rohrer                               86

 6
      EXHIBIT:                             MARKED:
 7
      1 - ACP Form C-7 S. Roberts             19
 8    2 - Magesterial Docket for S. Roberts   20
      3 - ACP Form C-7 S. Rogers              21
 9    4 - ACP Form C-7 for C. Shelton         23
      5 - Criminal Complaint S. Roberts       31
10    6 - Prisoner Detention Form             32
      7 - Follow-Up Form                      37
11    8 - Video Interview                     41

12

13        (Exhibits Retained by Counsel)

14

15

16

17

18

19

20

21

22

23

24

25
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Cmd. Officer Scott Scherer**

4

```
 1              CMD. OFFICER SCOTT SCHERER
 2   called as a witness by the plaintiffs, having
 3   been first duly sworn, as hereinafter certified,
 4   was deposed and said as follows:
 5                      EXAMINATION
 6   BY MR. JUBAS:
 7       Q.  All right, sir.  My name is Attorney
 8   Paul Jubas.  I represent the plaintiffs.  I'm
 9   here with my co-counsel, Attorney Max Petrunya.
10       Could you, please, state and spell you name
11   for the record?
12       A.  Scott Scherer, S-C-H-E-R-E-R.
13       Q.  And you've been doing this for a long
14   time, so I'm sure you know the ground rules for
15   testifying.
16       A.  Yes.
17       Q.  Full answers only.  No uh-huh's, uh-uh's
18   or head nods.  We want to make sure the court
19   reporter can take down every word we say.
20       A.  Okay.
21       Q.  If there's any questions you don't
22   understand, ask me to rephrase it and I'll do
23   that.
24       A.  Okay.
25       Q.  Can we agree if you answer my question
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Cmd. Officer Scott Scherer**

5

1    that you understand my question?

2        A.  Yes.

3        Q.  Okay.  Have you ever given a deposition,

4    before?

5        A.  Yes.

6        Q.  In what matters?

7        A.  It had to do with a man suing a railroad

8    company.

9        Q.  What was your role in that?

10       A.  I was a detective on the case.  The

11   man's son got hurt really bad, got hit by a train

12   crossing the railroad tracks.  They were tying to

13   sue the railroad company.

14       Q.  Did you do anything in preparation for

15   your testimony, today?

16       A.  Just met with the attorneys for an hour

17   ahead of time, like we did, here.

18       Q.  Okay.  Could you tell me about your

19   education?

20       A.  I graduated high school, Hampton, in

21   '88; went to IUP, graduated in '92; joined the

22   military where I got a degree from the Defense

23   Language Institute as a Russian linguist; in

24   '96/'97, got out and joined the County Police --

25   got hired by the County Police.

**NETWORK DEPOSITION SERVICES**
**Transcript of Cmd. Officer Scott Scherer**

6

```
 1        Then, obviously, 25 years of ongoing
 2    education throughout with the County Police.
 3        Q.  I'm sorry.  What years did you start
 4    with County Police?
 5        A.  '97.
 6        Q.  Okay.  What unit were you in?
 7        A.  I started off as a patrol officer at the
 8    airport; I was transferred to the General
 9    Investigations Unit where I was there for a
10    little over a year.
11        Then I was transferred to the Homicide Unit
12    as a Detective for nine years; made Sergeant;
13    went back to uniform; ran a shift for the Uniform
14    District for a little less than two years; was
15    transferred back to the Homicide Unit as a
16    Sergeant where I stayed for another seven years.
17        In spring of 2017, I transferred to the
18    General Investigations Unit, lateral transfer, I
19    was the Sergeant there; and then in 2018, I was
20    promoted to Lieutenant where I ran a Uniform
21    District and that's where I retired in June of
22    '22.
23        Q.  When did you go to the Homicide Unit?
24        A.  As a Detective or a Supervisor?
25        Q.  (Indicating.)
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Cmd. Officer Scott Scherer**

7

```
 1        A.  Let's see -- I think it was around 2000.
 2        Q.  Okay.  And when did you become a
 3   supervisor in the Homicide Unit?
 4        A.  It would've been about -- I'm
 5   guesstimating -- 2011.
 6             MR. BIONDI:  That's an office next door.
 7                         - - -
 8   BY MR. JUBAS:
 9        Q.  Okay.  Could you repeat that?
10        A.  That's okay.  You asked when I became --
11        Q.  When did you become supervisor in
12   Homicide?
13        A.  I believe it was 2011.
14        Q.  Okay.  Is that when you were made
15   Sergeant?
16        A.  No.  I was made Sergeant prior to that.
17   I was a Uniform Sergeant for almost two years.
18        Q.  Okay.  Then, in 2011, you become
19   supervisor for Homicide?
20        A.  Yes.
21        Q.  And is that the role that you were
22   playing for the Allegheny Police on May 9th --
23   I'm sorry -- March 9, 2016?
24        A.  Yes.
25        Q.  That was the night of the Wilkinsburg
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Cmd. Officer Scott Scherer**

8

1    Massacre?

2        A.  (Indicating.)

3            MR. BIONDI:  Could you answer?

4            THE WITNESS:  I'm sorry.  Yes.  Yes.

5                    - - -

6    BY MR. JUBAS:

7        Q.  Could you explain for me your role as

8    supervisor for the unit at this time frame?

9        A.  At that time frame, I was, basically, in

10   charge of handing out the cases as they came in,

11   assigning the cases to the detectives; tried to

12   provide them with guidance; tried to make sure

13   the work was spread out; try to make sure there's

14   continuity between the daylight shift, the

15   afternoon shift, the overnight guys; I would sign

16   off on reports; I was in charge of equipment,

17   vehicles, that kind of stuff.

18       Q.  Okay.  Do you recall, the evening of

19   March 9th when this happened, were you notified

20   right away?

21       A.  Yes.

22       Q.  Okay.  How did you become involved,

23   personally?

24       A.  Man, I can't remember if we had

25   dispatchers or cell phones.  Our dispatch reached

**NETWORK DEPOSITION SERVICES**
**Transcript of Cmd. Officer Scott Scherer**

9

1    out to us.  I wasn't able to respond right away.

2    I'm a single dad with custody of a -- he was an

3    infant, then -- I had to make arrangements.

4         I showed up at the scene, probably,

5    two-and-a-half, three hours into it.

6         Q.  Okay.  How did you make the decision to

7    assign Dolfi and Foley as lead detectives?

8         A.  I didn't.  I did not make the decision.

9         Q.  Okay.  Do you know who did?

10        A.  No.  They were, probably, the on-call

11   detectives.

12        When are you're an on-call detective,

13   you're, normally, the primary detectives.

14        Q.  So if you're the first on call, you

15   don't need somebody to assign you?

16        A.  Correct.

17        Q.  When you did get there, finally, what

18   role did you play to the crime scene?

19        A.  Like I said, I was more like the liaison

20   with the local police officers, making sure the

21   people that needed to be interviewed got where

22   they needed to be; making sure there were enough

23   detectives.

24        Schurman was already there and he had

25   already doled out most of the responsibilities.

1    I, really, didn't have that much to do with it.

2        Q.  What rank did Schurman have at that

3    time?

4        A.  He was the Unit Commander; he was the

5    Lieutenant.

6        Q.  Was that higher than you?

7        A.  Yes.

8        Q.  Okay.  Did Schurman give you any

9    responsibilities that evening?

10       A.  Not that I -- nothing specific that I

11   can recall.

12       Q.  Okay.  Do you recall any leads that were

13   generated on March 9th or March 10th?

14       A.  Man, it was so long ago.  I'm trying to

15   think.  I mean, I don't remember anything,

16   specifically.

17       Q.  Okay.  Do you recall the situation with

18   Detective Adams -- sorry -- Officer Adams, where

19   he claimed to have seen a white Lincoln?

20       A.  I do.

21       Q.  Okay.  Do you recall anything regarding

22   that within the first two days?

23       A.  No.  I became aware of it after the

24   fact.  Detective Miller was a very good friend of

25   mine.  He's deceased.  So I became aware of

**NETWORK DEPOSITION SERVICES**
**Transcript of Cmd. Officer Scott Scherer**

1    things after the fact.

2        But that night, no.

3        Q.  Okay.  So later on, you learned from

4    Detective Miller?

5        A.  Yes.

6        Q.  Okay.  Were you involved in the ensuing

7    days -- say, up to the 12th -- in any briefings

8    for Allegheny County Police on the matter?

9        A.  For the first day or two, I was

10   involved.  The cases kept coming in, so I was

11   more or less assigned to handle the incoming

12   cases with the remainder of the detectives,

13   because there was a lot of manpower being used

14   for the Wilkinsburg case.

15       Q.  Were there any homicide detectives that

16   were not working on the Wilkinsburg Massacre case

17   from the outset?

18       A.  I don't know of any, specifically.  I

19   would say, yes.  You always have someone on

20   vacation or somebody who was on their pass days

21   that were, probably, not involved.

22       Our theory was always that everybody is --

23   you know, everybody and anybody can help out, but

24   it didn't always work out that way.

25       No, I don't remember anybody, specifically,

```
 1   who was not involved.
 2        Q.  Okay.  Now, these -- the briefings that
 3   took place in the first few days after the
 4   incident, were those briefings any different than
 5   any usual briefings that occurred?
 6        A.  Not that I recall.
 7        Q.  Standard?
 8        A.  (Indicating.)
 9            MR. BIONDI:  Is that a yes?
10            THE WITNESS:  Yes.
11            MR. BIONDI:  Okay.
12                       - - -
13   BY MR. JUBAS:
14        Q.  Do you recall when these briefings would
15   take place?
16        A.  No.  It would vary.
17        Q.  Would there be a briefing for the day
18   shift and the night shift?
19        A.  Not always official.  A lot of times it
20   was just detectives passing on information.  The
21   detectives who were leaving passing it on to the
22   detectives who were coming on.
23        Q.  Are there any forms or documents that
24   are kept by Allegheny County Police that would
25   allow us to see which detectives were working on
```

1    the case from the outset?

2        A.  I'm not sure I understand the question.

3        Q.  Are there any documents that are kept by

4    Allegheny County Police that detail which

5    detectives and when they started working on the

6    case?

7        A.  Oh, yeah.  I mean, if you look at the

8    initial report from the case file, it will tell

9    you who was there, who responded.

10       Q.  Okay.  How about attendance at

11   briefings; is there any way see who was there?

12       A.  No.  It would, normally, be, just,

13   whoever was working.

14       Q.  Okay.  And how about individual

15   officer's schedules for the time; did those

16   exist?

17       A.  Yes.

18       Q.  Okay.  Do you know what -- specifically,

19   what forms those are called or how that

20   information is kept?

21       A.  No.  We had -- I know I kept, just, a

22   spreadsheet of who was on daylight.

23       I think -- I can't remember.  It changed a

24   few times.  For example, at one time you had an

25   eight-week rotation; you did six weeks of

**NETWORK DEPOSITION SERVICES**
**Transcript of Cmd. Officer Scott Scherer**

14

1   daylight; the sixth week of day light you were on

2   call, overnight; then you did two weeks of 4:00

3   to 12:00.  That's just an example.

4       I know that changed several times depending

5   on the number of detectives that we had.

6       But there was no -- I don't believe there

7   was any official form or anything that showed who

8   was on duty.

9           MR. JUBAS:  Okay.  I'm not -- I'm not

10  going to submit this as an exhibit; I'm just

11  going to show you this particular form.

12          Take your time to check out that form.

13          THE WITNESS:  Mm-hmm.

14          MS. ROHRER:  May I ask, this has a

15  number at the bottom, 00002; is that from

16  something we produced?

17          MR. PETRUNYA:  That was from what we

18  produced from the initial criminal case file, the

19  blue Bates labelling at the bottom.  So that

20  would be on the Dropbox we provided.

21          MS. ROHRER:  Okay.  Thank you.

22          MR. PETRUNYA:  Yes, ma'am.

23                  - - -

24  BY MR. JUBAS:

25      Q.  Okay.  Can you -- so I am indicating a

**NETWORK DEPOSITION SERVICES**
**Transcript of Cmd. Officer Scott Scherer**

15

1    CRR Number; could you explain what a CRR Number

2    is? (Indicating.)

3        A.   Yeah.  When a case is generated or a

4    call is generated throughout the County Police

5    Department, it is assigned a number.

6        So if a police officer at the airport makes

7    a traffic stop, it's assigned a CCR Number.

8        The last number is the year.  The, "-16,"

9    obviously.  So, yeah, any kind of case that's

10   initiated gets assigned a CCR Number.

11       Q.   Okay.  As a supervisor, have you ever

12   signed off on documents like that?

13       A.   Yes.  That's my signature, right there

14   (indicating.)

15       Q.   Okay.  And this is ACP Form C-7?

16       A.   Correct.  This would be -- this would

17   have -- yeah, it's the preliminary hearing.

18       Q.   Okay.  So I'm trying to understand the

19   life cycle of these particular forms.  So if you

20   sign off on it, how does this form get to you?

21       A.   The detectives type them up, put them in

22   my box -- literally, a document box outside my

23   office -- and I would -- you know, there's -- I

24   can't -- too numerous to count.

25       And then I would review them for spelling

16

1  and grammar and sign off on them; then they would

2  be handed off to the secretary who would put them

3  in the case file.

4      Actually, they would, normally, go to the

5  unit commander, as well.

6      Q.  Okay.  So these are not sent to you

7  electronically by the officers that printed out,

8  first?

9      A.  Back then, they were not.

10     Q.  Okay.  In 2016?

11     A.  Right.

12     Q.  Okay.  So are you saying, now, they are

13 handled electronically?

14     A.  I, honestly, have no idea.

15     Q.  Okay.  Could you tell me what -- for a

16 case type -- could you tell me what VCSDD/CA

17 would indicate for a case type?

18     A.  What is it?

19     Q.  VCSDD/CA.

20     A.  Can I see it?

21     Q.  (Indicating.)

22     A.  Oh, yeah.  That's a drug case.

23     Q.  Okay.

24     A.  That's a Violation of the Drug and --

25 something, something -- Act.  That's --

```
 1        Q.  Violation of the Controlled

 2   Substances --

 3        A.  Yeah.  Something like that.

 4        Q.  Okay.

 5        A.  I was never a narc.

 6        Q.  Okay.  Were you involved early on with

 7   any discussions about the evidence that was being

 8   generated within the first, say, week?

 9            MR. BIONDI:  Object to form.  Go ahead

10   if you can answer.

11            THE WITNESS:  Yeah.  Can you clarify

12   that?

13                        - - -

14   BY MR. JUBAS:

15        Q.  Generally, within the first week, were

16   you involved in any discussions about the

17   evidence that was being developed?

18        A.  Yeah.  I was present for some of the

19   discussions.

20        Q.  Okay.

21        A.  I don't remember anything, specifically,

22   but I'm sure I was part of the them as the

23   supervisor.

24        Q.  Okay.  Do you recall when charges were

25   filed against Shelton and Thomas?
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Cmd. Officer Scott Scherer**

18

```
 1        A.  I do not.

 2        Q.  If I said June 23, 2016, does that sound

 3   familiar?

 4        A.  Honestly, I couldn't tell you.

 5        Q.  Okay.

 6        A.  It was so long ago.

 7        Q.  Okay.

 8        A.  I was -- again, after the second or

 9   third day, I was guiding the rest of the cases

10   that were coming in.  So I was only peripherally

11   involved.

12        So you'll see my signature on reports for

13   spelling and grammar and that kind of stuff, but

14   as far as decisions that were made, I was not

15   part of it.

16        Q.  Do you recall that the motive theory

17   developed by the County Police was that one of

18   the victims in the massacre -- Lamont Powell --

19   killed Calvin Doswell from the hilltop, and that

20   somebody from the hilltop wanted to retaliate

21   against Doswell?

22        A.  Yes, I do recall hearing that.

23        Q.  Okay.  Do you recall where that

24   information came from?

25        A.  I don't.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Cmd. Officer Scott Scherer**

19

```
 1        Q.  Do you recall ever hearing from any of
 2   the detectives about an individual named Saquon
 3   Roberts that was interviewed?
 4        A.  I don't.
 5        Q.  Okay.
 6                      - - -
 7        (WHEREUPON, a discussion was held off
 8   the record.)
 9                      - - -
10        MS. ROHRER:  Do you want -- Let's take a
11   couple minutes.
12        MR. BIONDI:  Yeah.  We'll take a break.
13        MR. PETRUNYA:  Okay.
14                      - - -
15        (WHEREUPON, a recess was taken).
16                      - - -
17        MR. JUBAS:  Okay.  I'm going to show the
18   witness another ACP Form C-7, same type of form,
19   and I believe in one -- yeah, this one is dated
20   4/14/16, and it's pertaining to Saquon Roberts.
21        MR. BIONDI:  Okay.
22        MR. JUBAS:  Okay.  And I'm going to mark
23   this -- would it be Exhibit 1?
24        MR. BIONDI:  Yeah.
25        MR. PETRUNYA:  Yes.
```

```
 1                    - - -

 2            (WHEREUPON, Deposition Exhibit No. 1 was

 3    marked for identification.)

 4                    - - -

 5            MR. JUBAS:  If I can just put a marker

 6    on that one.

 7            MR. PETRUNYA:  What's Bates number is

 8    that; 410?

 9            MR. JUBAS:  Yeah.  It's Bates No.

10    AC-410.

11                    - - -

12    BY MR. JUBAS:

13        Q.  Okay.  Can you review that name?

14        A.  Yes.

15        Q.  What does that say?

16        A.  Saquon Roberts.

17        Q.  Okay.  And can you review the date of

18    the trial hearing?

19        A.  Yes.  April 14, 2016.

20        Q.  Okay.  So I'm next going to show you

21    what I'm going to mark as Exhibit 2.

22                    - - -

23            (WHEREUPON, Deposition Exhibit No. 2 was

24    marked for identification.)

25                    - - -
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Cmd. Officer Scott Scherer**

```
 1   BY MR. JUBAS:

 2        Q.  This is the first page of a magisterial

 3   docket for Saquon Roberts for that case.

 4        A.  Okay.

 5        Q.  Okay.  I want to draw your attention to

 6   the block labeled, "Calendar Events."

 7        And do you see a date that corresponds to

 8   the ACP Form C-7, labeled as Exhibit 1?

 9        A.  I see a Preliminary Arraignment -- No.

10   That's March 16th -- what are you talking about;

11   April 16th -- I don't -- April 14th -- oh, okay.

12   My fault.

13        Yeah.  So the date of the hearing was April

14   14th, and, yeah, this says Preliminary Hearing,

15   April 14th.

16        Q.  Okay.  And I believe I pulled this,

17   myself.  I don't think it's Bates numbered.

18        I'm, next, going to show you another ACP

19   Form C-7.  I'll mark this as Exhibit 3.

20                      - - -

21          (WHEREUPON, Deposition Exhibit No. 3 was

22   marked for identification.)

23                      - - -

24   BY MR. JUBAS:

25        Q.  And this is the one I, initially, showed
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Cmd. Officer Scott Scherer**

22

1    Bates labeled, 004, okay.  So showing you that,

2    marking it as an exhibit, this time.

3        A.  Okay.

4        Q.  Okay.  On Exhibit 3, can we confirm that

5    there is a different CCR number than --

6    (Indicating.)

7        A.  Yes, there is.

8        Q.  -- than Exhibit 1.  Okay.

9        And -- okay.  Do you have any idea whether

10   these are the same individuals?

11       A.  I don't.  It's -- I mean, I assume not.

12   It's Saquon Roberts and Saquon Rogers.

13       Q.  Okay.  Did you sign off on this?

14       A.  I did.  I signed off as Acting

15   Lieutenant, that day.

16       Q.  Okay.  If this is the same person, do

17   you have any idea why you would not have caught

18   the spelling of his name?

19       A.  No.  I mean, it's a first name.  I

20   wouldn't have thought twice about it.  One is

21   Roberts and one is Rogers.

22       Q.  Okay.

23       A.  It's two different cases, two different

24   dates.

25       Q.  Okay.  So -- and is this the one that

**NETWORK DEPOSITION SERVICES**
**Transcript of Cmd. Officer Scott Scherer**

23

```
 1   says Rogers? (Indicating.)

 2       A.  Yes, that's the one that says Rogers.

 3           MR. BIONDI:  Which one are you

 4   indicating, there?

 5           MR. JUBAS:  This is Exhibit 3.

 6           MR. BIONDI:  Okay.

 7                       - - -

 8   BY MR. JUBAS:

 9       Q.  What is -- on Exhibit 3, what is the CCR

10   Number?

11       A.  4404-16.

12       Q.  Do you happen to recall what case that

13   is?

14       A.  I do not.

15       Q.  Okay.  I'm going to be marking another

16   ACP Form C-7 as Exhibit 4.

17       A.  Okay.

18                       - - -

19           (WHEREUPON, Deposition Exhibit No. 4 was

20   marked for identification.)

21                       - - -

22   BY MR. JUBAS:

23       Q.  Okay.  And can you confirm for me that

24   Exhibit 4 is the same type of form, except this

25   one is for Cheron Shelton?
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Cmd. Officer Scott Scherer**

24

```
 1      A.  Correct.

 2      Q.  Okay.  And can you identify the charges?

 3      A.  Five counts, Criminal Homicide; one

 4  count, Homicide of unborn child; six counts,

 5  Aggravated Assault; and six counts of Recklessly

 6  Endangering Another Person.

 7      Q.  Can you identify which CCR number is on

 8  Exhibit 4?

 9      A.  Yes.  4406-16.

10      Q.  And is that the same CCR number seen on

11  Exhibit 3?

12      A.  Correct.  It is.

13      Q.  Okay.  So could you explain why you

14  would see these same CCR numbers?

15      A.  I mean, there could be several reasons.

16      If we're in the process of working on one

17  case, and then you come across someone with an

18  illegal gun or drugs or something like that, they

19  could be arrested, and since you were

20  investigating the original case, it would be --

21  the same CCR number would be tied to that case.

22      Q.  Okay.  So --

23      A.  Possibly.

24      Q.  Right.  Okay.  So if Saquon Roberts was

25  arrested and questioned by Allegheny County
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Cmd. Officer Scott Scherer**

25

1   Police -- questioned about the Wilkinsburg

2   Massacre and his knowledge on it -- would that

3   make sense as to why his form is labeled under

4   CCR --

5       A.  Roberts or Rogers?  You said Roberts.

6   Roberts is a different one.

7       That's Rogers (indicating.)

8       The one you're pointing at.

9       Q.  Okay.  So if that's a misspelling --

10  that's what I'll represent to you that --

11          MS. ROHRER:  And is this is on

12  Exhibit 3?

13          MR. JUBAS:  Yes.

14          MS. ROHRER:  Okay.

15                  - - -

16  BY MR. JUBAS:

17      Q.  So if this is supposed to be Saquon

18  Roberts, could we agree that he had some sort of

19  involvement in the Wilkinsburg Massacre

20  investigation, because of that CCR number?

21          MS. ROHRER:  Objection as to form.  You

22  can answer, if you can.

23          THE WITNESS:  I mean, yeah.  I would

24  think it would be related being that's the same

25  CCR number.  But if there's a misspelling in the

26

1    name, there could be one in the CCR, as well.  I

2    don't know.

3                          - - -

4    BY MR. JUBAS:

5        Q.  Okay.

6        A.  I can't explain it.

7        Q.  Okay.  One moment.

8        One moment.

9        Do you recall -- you said you don't recall

10   ever hearing anything about Saquon Roberts as a

11   witness?

12       A.  Roberts?

13       Q.  Yes.

14       A.  Honestly, I don't recall either one of

15   those names.

16       Q.  Okay.

17       A.  But these would not be the same, because

18   in this one, it says the case was postponed.

19            MS. ROHRER:  And this one, you're

20   looking at --

21            THE WITNESS:  In Exhibit 3, it says it

22   was postponed and he was transferred to the

23   Allegheny County Jail on No. 3.

24            On No. 1, the hearing is on the 14th,

25   which is two days later; which anybody that knows

1    our court system knows that would never happen.

2                        - - -

3    BY MR. JUBAS:

4        Q.  So, hypothetically, if Saquon Roberts

5    and Saquon Rogers are the same person, can we

6    agree that there are some inconsistencies with

7    regards to these forms?

8            MS. ROHRER:  Objection as to form.  Go

9    ahead.

10           THE WITNESS:  I think it's a stretch to

11   say they are the same person.  One is in the

12   Indiana County Jail, and one is at Court.

13                       - - -

14   BY MR. JUBAS:

15       Q.  Okay.

16       A.  But it's possible.

17       Q.  Okay.  Let me see this (indicating.)

18   Okay.  One moment.

19       We had spoken about the Calvin-Doswell-

20   motive theory; you recall that, right?

21       A.  Yes.

22       Q.  Okay.  Do you recall ever being informed

23   of evidence that was developed by detectives --

24   Allegheny County detectives that indicated that

25   someone with knowledge -- Mr. Roberts -- of both

**NETWORK DEPOSITION SERVICES**
**Transcript of Cmd. Officer Scott Scherer**

28

```
 1   Cheron Shelton and Lamont Powell had come forward
 2   with a statement?
 3       A.  I don't understand.  What's the
 4   question?
 5       Q.  Were you ever told that somebody with
 6   information about Lamont Powell and Cheron
 7   Shelton had come forward with a statement?
 8       A.  Honestly, I do not recall.  It was so
 9   long ago.
10       Q.  Okay.  I think what -- we're going to
11   take five minutes, real quick, and I think we're
12   going to queue up the video.
13                     - - -
14           (WHEREUPON, a recess was taken.)
15                     - - -
16   BY MR. LANG:
17       Q.  Before we continue questioning, prior to
18   the last time we went off the record, is there
19   anything you want to tell us about the District
20   Attorney?
21       A.  No.  No.  I went to the scene, escorted
22   him to the scene -- I guess it was, either, a day
23   or two after the actual incident -- and then
24   after that, I had very little involvement with
25   the case.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Cmd. Officer Scott Scherer**

29

1      Q.   What was -- so you -- did you escort him

2   with anybody else?

3      A.   Oh, yeah.   I, actually, met him, there.

4   I can't remember if there was any other

5   detectives from our department.

6      I know he was with his people, his

7   politician.   I remember Dennis -- City

8   Homicide -- I can't remember his name -- I know

9   he was there.

10      Basically, I walked him through the scene;

11   here's where we found shell casings; here's where

12   we found the victims, that kind of thing.

13      And he used it as a -- you know, I think it

14   was even on national news.

15      Q.   Okay.   When was that -- what date?

16      A.   It was either one or, maybe, two days

17   after the actual shooting.

18      Q.   Okay.

19      MR. JUBAS:   I'm just going the show him

20   this document to ask a question.   I'm not going

21   the mark it as an exhibit, at this point.

22                    - - -

23      (WHEREUPON, a discussion was held off

24   the record.)

25                    - - -

**NETWORK DEPOSITION SERVICES**
**Transcript of Cmd. Officer Scott Scherer**

```
 1    BY MR. JUBAS:
 2         Q.  Do you see the box with the CR Number?
 3         A.  Yes.
 4         Q.  What's the difference between the CR
 5    Number and a CCR Number?
 6         A.  A CCR Number is an in-house,
 7    County-Police-assigned number; a CR Number -- I
 8    have no idea.
 9         Q.  Okay.  All right.  One moment.
10         Okay.  And can I get that back?  I'm not
11    going to put that into evidence, yet.
12         I'm going to do the same thing with this
13    form.  I'm not going to put this into evidence,
14    yet.  I'm just going to ask you questions about
15    the boxes (indicating.)
16         A.  Okay.
17         Q.  Okay.  And can you look at the CCR
18    Number?
19         A.  Yeah.
20         Q.  So, can you agree that instead of a CCR
21    Number, there's a CR Number?
22         A.  That is what it says.  I've never seen
23    that, before.
24         Q.  So --
25         A.  Yes.  It says CR No. 000886-16.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Cmd. Officer Scott Scherer**

31

```
1        Q.  What should be in the CCR Number -- I

2   guess what I'm asking is what is the CR Number?

3        A.  I don't know.  I only know what the CCR

4   Number is, and that's the case-generated number

5   within the Police Department.

6        So in here, should be the CCR Number

7   (indicating.)

8        Now, -- yeah I don't know.

9        Q.  Okay.  So, now, I am going to mark this.

10  I'm marking AC-443, this is Exhibit 4.

11        MR. BIONDI:  This is Five, I think.

12        MR. JUBAS:  I'm sorry.  Five.

13                   - - -

14        (WHEREUPON, Deposition Exhibit No. 5 was

15  marked for identification.)

16                   - - -

17  BY MR. JUBAS:

18        Q.  And you had just looked at this, the

19  front page of the Criminal Complaint for Saquon

20  Roberts.  I ask you, again, to look at the CR

21  Number.

22        A.  Okay.

23        Q.  Okay.  Do those match?

24        A.  Yes.

25        Q.  Okay.  So with knowing where this CR
```

32

```
 1   Number comes from, why would it have been put

 2   on -- I'm going to have to mark that.  I'm going

 3   to mark this as Exhibit 6, now.

 4           MR. BIONDI:  Can I just ask you to

 5   explain which one you're pointing to when you're

 6   pointing to it?

 7           MR. JUBAS:  Yeah.  So this is a Prisoner

 8   Detention Form that is signed by, then, Sergeant

 9   Scherer.

10           MR. BIONDI:  And that was Six; does that

11   have a Number on it?

12           MR. JUBAS:  Yes.  AC-451.

13           MR. BIONDI:  Thank you.

14                   - - -

15           (WHEREUPON, Deposition Exhibit No. 6 was

16   marked for identification.)

17                   - - -

18   BY MR. JUBAS:

19      Q.  Okay.  Now, comparing Exhibit 5 with

20   Exhibit 6, I'm looking at the CR Numbers common

21   on both of those.

22      Could you try to give me some insight into

23   why these forms are written like that?

24      A.  The only possibility that I can think of

25   was that another agency made the arrest.
```

1          That's why it's not a CCR Number, which

2    would be the Allegheny County Police.

3          Q.  Okay.

4          I think this is the remainder of --

5          A.  Do you have the rest of this Compliant?

6          Q.  I'm going to hand you the remainder of

7    Exhibit 5.  And Exhibit 5 is numbered AC-443

8    through AC-447.

9              MS. ROHRER:  So is that going to be part

10   of the entire exhibit, now?

11             MR. JUBAS:  Yes.

12             MR. BIONDI:  So that's, now, a five-page

13   exhibit, correct?

14             MR. JUBAS:  Yes.

15                      - - -

16   BY MR. JUBAS:

17        Q.  So go ahead and take a look at that.

18   Make sure that is what it is.

19        A.  Okay.

20        Q.  Okay.  Now, at -- I believe that's --

21   are you looking at AC-4477 at the bottom?

22        A.  Yes.

23        Q.  Okay.  Could you read into the record

24   the second paragraph?

25        A.  Yes.  "Tuesday, March 15, 2016, at,

**NETWORK DEPOSITION SERVICES**
**Transcript of Cmd. Officer Scott Scherer**

1  approximately, 13:30 hours.

2      "Detective Hitchings of the Allegheny County

3  Homicide Section, along with the Allegheny County

4  Sheriff's Deputies Feeney and Beniggio went to

5  1244 Nolan Court in the City of Pittsburgh to

6  search for an  individual who was possibly wanted

7  for probation violations and questioning in a

8  recent homicide.

9       "Upon arrival, detectives and deputies

10  spoke with Gina Lewis who stated the individual

11  they were looking for was not present; and she

12  allowed them access to her residence.

13      "While detectives and deputies cleared the

14  residence for other individuals, they encountered

15  an individual named Saquon Roberts, date of

16  birth: 11/30/94, in rear bedroom.

17      "For officer safety, deputies and detectives

18  were going to conduct a pat down for weapons,

19  asked the individual if he had anything in his

20  person that could harm others, or harm officers,

21  to which he responded, "I have some weed in my

22  pockets." Deputies and detectives recovered 17

23  individual baggies that contained marijuana in

24  Roberts right-front pocket."

25      Q.  I'm sorry.  Can you read the paragraph

**NETWORK DEPOSITION SERVICES**
**Transcript of Cmd. Officer Scott Scherer**

35

1   below that, as well?

2       A.   "Saquon Roberts was transported to the

3   Allegheny County Police Headquarters to be

4   interviewed.  Prior to the interview, your

5   affiant read verbatim ACP Form R-12, A-20 Waiver

6   form and communicated that he understood his

7   rights and agreed to speak with your affiant and

8   Detective Hoffman."

9       Q.   Again, still on that page, that's

10  AC-447, could you read off the top-right box;

11  it's labeled as, "Complaint Incident Number?"

12      A.   CR-000776-16.

13      Q.   Now, drawing your attention back to

14  Exhibit 6, is that a matching CR Number?

15      A.   It is.

16      Q.   Okay.  So are you -- do you -- do you

17  see that Saquon Roberts was brought in on March

18  15th, by Allegheny County Police and was,

19  ultimately, charged for this drug case?

20      A.   Yes.

21      Q.   Okay.  Now, before we go any further,

22  does this give you any insight with regards to

23  why that CR Number was placed there?

24      A.   That is, probably, related to the

25  Sheriff's investigation.

36

```
 1        Q.   The Sheriff's investigation?

 2        A.   Yes.

 3        Q.   Okay.   Could you elaborate on that?

 4        A.   Yeah.   It said he was wanted for

 5   probation violations and questioning.

 6        Q.   Well, it says that --

 7        A.   So I'm sure our guys went with him.

 8        Q.   Well, there was an individual -- they

 9   weren't looking for Saquon Roberts on that --

10        A.   Right.

11        Q.   -- they were looking for somebody else?

12        A.   Correct.

13        Q.   Okay.   So it's not the other individual

14   whose CR Number -- you would agree that this is

15   Saquon Roberts CR Number?

16           MR. BIONDI:   I'll object to the form.

17   But if you can answer, go ahead.

18           THE WITNESS:   I don't know if I can

19   answer, but they went with the Sheriff's

20   Department because of probation violations.   They

21   came across this other kid, so he would, likely,

22   be arrested under the Sheriff's number, not the

23   County Police number.

24           I could be wrong.   That's the only thing

25   I can think of.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Cmd. Officer Scott Scherer**

37

1       Q.  Okay.  Okay.  So -- all right.  Let me

2   see, here.

3           One moment, please.  Okay.

4           MR. JUBAS:  So I don't have this one

5   printed out.  I just have to show it to him on my

6   computer.

7           I can show you guys, first.  This is

8   what you produced to us in the Saquon Roberts

9   disclosure.

10          MR. BIONDI:  Okay.

11          MR. PETRUNYA:  What's the Bates Number

12  on that document?

13          MS. ROHRER:  That is AC-000420.

14          MR. PETRUNYA:  Okay.  Thank you.

15          MR. JUBAS:  Okay.  Can I get that back?

16          Okay.  So this is marked as Exhibit 7

17  and this is a Follow-Up Report.

18                  - - -

19          (WHEREUPON, Deposition Exhibit No. 7 was

20  marked for identification.)

21                  - - -

22  BY MR. JUBAS:

23      Q.  Did you have a chance to read this whole

24  report?  Would you like to read it?

25      A.  I would like to see it, again.  I

1    skimmed it.

2         Q.  Sure.  Before I hand this to you, what

3    Badge Number are you?

4         A.  At the time, I was 638.

5         Q.  Okay.  Go ahead and take your time to

6    review that.

7                       - - -

8         (WHEREUPON, a discussion was held off

9    the record.)

10                      - - -

11   BY MR. JUBAS:

12        Q.  Were you able to review Exhibit 7?

13        A.  Yes.

14        Q.  After reviewing that, can you confirm

15   that Allegheny County detectives were not looking

16   for Mr. Roberts, they were looking for Mr. Reed?

17        A.  Yeah, it doesn't appear so according to

18   the verbiage.  But, Like I said, I didn't even

19   sign off on that one.  I haven't even seen that

20   one, before.

21        Q.  And just to --

22        A.  But, yeah.  It says they were looking

23   for somebody else when they came across him.

24        Q.  Okay.  Did you happen to notice -- I can

25   let you review this, again.  I'm going to make it

**NETWORK DEPOSITION SERVICES**
**Transcript of Cmd. Officer Scott Scherer**

39

```
1   bigger -- Not because of age, but for my own

2   good, as well -- did you recall reading anything

3   in this Follow-Up Report about what Mr. Roberts

4   said in his interview?

5        A.  Just that he had weed in his pockets.

6        Q.  Okay.

7        A.  Or, no.  That wasn't during the

8   interview.

9        Q.  Please, feel free to read over that

10  (indicating.)

11       A.  I don't see anything about an interview.

12       Q.  Okay.  So if Mr. Roberts did provide

13  information in his interview pertinent to the

14  investigation, pertinent to the victims Lamont

15  Powell and Cheron Shelton, should that

16  information be included in a report somewhere?

17            MS. ROHRER:  Objection as to form.  You

18  can answer if you can.

19            THE WITNESS:  It should, definitely, be

20  in some form, in a report in a case file.

21                      - - -

22  BY MR. JUBAS:

23       Q.  Specifically, with regard to what

24  Mr. Roberts was telling them pertinent to this

25  matter, right?
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Cmd. Officer Scott Scherer**

40

```
 1      A.  Yes.  Yes.

 2      Q.  Okay.  Okay.  One moment.

 3      Okay.  So we're going to start up the video.

 4  Is it possible to try that?  (Indicating.)

 5          MS. ROHRER:  I really don't think it

 6  works.

 7          MR. BIONDI:  I think it's going to take

 8  more time to try to make it work than it's worth.

 9          MS. ROHRER:  Is this the Saquon

10  Roberts --

11          MR. JUBAS:  Yeah.

12          MS. ROHRER:  I'm going to object to the

13  Saquon Roberts interview as our witness, today,

14  said that he didn't know anything about Saquon

15  Roberts; I don't believe he's going to have seen

16  this video, before; I just want to put than on

17  the record.

18          MR. JUBAS:  Sure.  And we're, basically,

19  just putting it on the record with regards to his

20  insight as a supervisor regarding paperwork and

21  whatnot.

22          MS. ROHRER:  And I would also note, it

23  is extremely difficult to hear.  It's very quiet.

24  I just want to make sure it's understood that he

25  hasn't had the opportunity to put on head phones
```

```
 1   and listen to it, carefully, and reflect upon it.

 2   Thank you.

 3           MR. JUBAS:  Okay.  Great.  So we'll play

 4   this.  Hopefully, it's loud enough for you.

 5                       - - -

 6           (WHEREUPON, a discussion was held off

 7   the record.)

 8                       - - -

 9           MR. JUBAS:  Okay.  This is -- I'm going

10   to play the video for Mr. Scherer and we're going

11   to mark this as Exhibit 8.

12                       - - -

13           (WHEREUPON, Deposition Exhibit No. 8 was

14   marked for identification.)

15                       - - -

16           MR. JUBAS:  Okay.  And I'm going to

17   start the video at, approximately, 3:59.

18           MR. BIONDI:  I believe these times are

19   correct.

20           MR. JUBAS:  Yes.  Into -- yeah, not

21   hours of the day.

22           MR. BIONDI:  Correct.

23           MR. JUBAS:  Dealing with the technology

24   is a pain.

25           Okay.  So we'll play this for a little
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Cmd. Officer Scott Scherer**

```
 1   bit.  Let me know if you're able to hear this.
 2              THE WITNESS:  Is it just audio or video?
 3              MR. JUBAS:  Both.
 4                      - - -
 5              (WHEREUPON, the video exhibit was
 6   played.)
 7                      - - -
 8   BY MR. JUBAS:
 9       Q.  For an example, right there, did you
10   hear what Detective Hoffman said, there?
11       A.  That was, actually, Carusso speaking,
12   right there, but I couldn't hear -- I couldn't
13   understand what he was saying.
14       Q.  Okay.  So the individual in the top-left
15   is Carusso?
16       A.  No.  Carusso is the bald guy.  That's
17   Mike Hoffman, there.
18       Q.  Okay.
19                      - - -
20              (WHEREUPON, the video exhibit was
21   resumed.)
22                      - - -
23   BY MR. JUBAS:
24       Q.  Are you able to hear that okay?
25       A.  Yeah.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Cmd. Officer Scott Scherer**

43

```
 1        Q.  So what did you hear?

 2        A.  Something about -- he said everyone is

 3   saying the Hilltop people did it.

 4        Q.  Okay.

 5                      - - -

 6        (WHEREUPON, the video exhibit was

 7   resumed.)

 8                      - - -

 9   BY MR. JUBAS:

10        Q.  Did you hear that?

11        A.  Most of it, yeah.

12        Q.  Did he indicate that he was with Lamont

13   Powell a lot?

14        A.  Yeah.  He said he used to be with Lamont

15   Powell a lot, nicknamed Murder.

16        Q.  And did you hear him, also, indicate

17   that Lamont told him he had a lot of enemies?

18        A.  I didn't catch that part, but --

19        Q.  Okay.  We'll rewind just a little bit.

20                      - - -

21        (WHEREUPON, the video exhibit was

22   resumed.)

23                      - - -

24   BY MR. JUBAS:

25        Q.  Did you hear it that time?
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Cmd. Officer Scott Scherer**

44

1        A.  Honestly, it sounded like a mumble.

2        Q.  So you did not hear him say that Lamont

3    Powell had a lot of enemies?

4        A.  No.  I believe that's what he said.  I,

5    honestly, can't hear it that clearly.

6        Q.  If he said that Lamont had a lot of

7    enemies, is that relevant to this investigation?

8        MS. ROHRER:  Objection as to form.

9    Answer if you can.

10        THE WITNESS:  I would think it would be.

11                    - - -

12    BY MR. JUBAS:

13        Q.  Why is that?

14        A.  If you're trying to find out who's

15    responsible for a murder, and somebody has a lot

16    of enemies and that person is being blamed for

17    it, you would want to find out the details of

18    what he's referring to.

19        Q.  Would you agree with me that is the type

20    of information that should be included in a

21    police report pertaining to this interview?

22        MS. ROHRER:  Objection to form.  Answer

23    if you can.

24        THE WITNESS:  I mean, we always taught

25    the detectives they don't have to include every

**NETWORK DEPOSITION SERVICES**
**Transcript of Cmd. Officer Scott Scherer**

45

```
 1    little bit and piece, as long as they provide the
 2    actual video, which they did, so that people can
 3    listen to it.
 4                         - - -
 5    BY MR. JUBAS:
 6        Q.  Okay.  If they didn't provide this
 7    video, would you view that as problematic?
 8            MS. ROHRER:  Objection as to form.
 9    Answer if you can.
10            THE WITNESS:  Yeah, I don't know what
11    context it was in.  He's clearly friends with
12    them, and he got hemmed up for a little bit of
13    weed.  So it would depend on a lot of
14    circumstances.
15                         - - -
16    BY MR. JUBAS:
17        Q.  Okay.  But you did indicate to me this
18    information should have been turned over to the
19    District Attorney's office and, certainly,
20    defense counsel, right?
21            MS. ROHRER:  Objection as to form, but
22    go ahead and answer if you can.
23            THE WITNESS:  Yeah, I mean, it should
24    be.
25            MR. JUBAS:  Okay.  One moment.  Just
```

 1    looking for what time frames.

 2              THE WITNESS:  What was the date of the

 3    interview, again?

 4              MR. JUBAS:  3/15.

 5              MR. PETRUNYA:  2017.

 6              MR. JUBAS:  Okay.  And I'm, now, going

 7    to play from 4 minutes and 12 seconds.  I'm sorry

 8    4:00 p.m. -- 4:12 p.m. and 40 seconds.

 9         Hopefully, you can hear this.

10                        - - -

11              (WHEREUPON, the video exhibit was

12    resumed.)

13                        - - -

14    BY MR. JUBAS:

15         Q.  Did you hear that?

16         A.  Yeah.

17         Q.  Okay.  Did you hear him say that, "I

18    can't tell you who his best friend is; he has a

19    lot of family up there, and everybody loves

20    Calvin?"

21         A.  Yeah.

22         Q.  Do you recall that the Allegheny County

23    Police motive theory with Mr. Shelton was that

24    Mr. Shelton was Calvin Doswell's best friend?

25         A.  I do recall them being -- yeah.  Yes, I

**NETWORK DEPOSITION SERVICES**
**Transcript of Cmd. Officer Scott Scherer**

47

1    recall that.

2         Q.  Okay.  Okay.  And would you agree with

3    me that what Mr. Roberts stated, here, was that

4    there were a lot of people that were very close

5    with Mr. Doswell?

6         A.  Yeah.  He said -- is that the Calio that

7    he's talking about?

8         Q.  Yes.

9         A.  Yes.  He said people up on the hilltop,

10   yes -- were --

11        Q.  Okay.  Same question as before; should

12   that information have been included in the case

13   file --

14            MS. ROHRER:  Objection to form.

15            MR. JUBAS:  -- for the underlying

16   Wilkinsburg Massacre case file?

17            MS. ROHRER:  Objection to form.  Answer

18   if you can.

19            THE WITNESS:  I can't answer that.  I

20   mean, I don't see any supreme relevance; this is

21   one of his boys from up on Hilltop, of course

22   he's going to stick up for him, you know.

23            I didn't hear anything that would help

24   or hurt the case in either direction.  So every

25   conversation, if it gets stuffed into the case

48

```
 1    file, the case file would be a foot thick.
 2            But, I mean, I had little to do with the
 3    case, except for the first several days signing
 4    off on some documents.  When you keep talking
 5    about the County's motive theory and stuff, I
 6    wasn't involved in any of that.
 7        Q.  Okay.  One moment.
 8        Okay.  We're just going to go off the record
 9    real quick.
10                    - - -
11            (WHEREUPON, a discussion was held off
12    the record.)
13                    - - -
14    BY MR. JUBAS:
15        Q.  Okay.  We're ready to go back on the
16    record.
17        And, I'm sorry, what is your -- what is it
18    that you do right now?
19        A.  I'm a security director at the Westin
20    Hotel.
21        Q.  Okay.  What's your title?
22        A.  Director of Security.
23        Q.  I wanted to know if I should call you
24    Mr. Director.
25        A.  Loss-prevention manager.  I don't know.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Cmd. Officer Scott Scherer**

49

1    They gave me three different titles; as long as

2    they get the numbers right on the paycheck.  I'm

3    good.

4        Q.  Is Mr. Scherer okay?

5        A.  Yeah, that's fine.

6        Q.  So Mr. Scherer, in your experience in

7    Allegheny County Homicide Unit, did you have --

8    ever, throughout your career -- have any reason

9    to work with witness protection funds?

10       A.  Yes.

11       Q.  Okay.  How many -- and just with regards

12   to homicide, I'm talking -- how many different

13   funds have you worked with?

14       A.  Just one.

15       Q.  Okay.  Do you happen to -- can you tell

16   me what that account is called?

17       A.  Just -- I can't remember what it was

18   called.  It was, basically, for people who were

19   involved with cases that felt threatened, felt

20   they needed to move, that kind of thing.

21       So it was through the District Attorney's

22   Office, and they had to have two supervisors be

23   available with the funds.

24       So Lieutenant Schurman and myself were both

25   on there, in case one of us was on vacation and

50

1    wasn't able to retrieve the money.

2        Q.  Can you give me an approximate date when

3    you started working with that fund?

4        A.  I couldn't begin to tell you.

5        Q.  Well, 2000s, 2010, time frame?

6        A.  It would've been when I was a

7    Supervisor.  I never used it as a Detective.  It

8    would have been when I was a Supervisor.  We

9    didn't use it, frequently.

10       I would guess -- I can't even guess.  I was

11   a Sergeant in Homicide from about 2010, until the

12   spring of 2017.  So in that period, I used it a

13   handful of times.

14       Q.  Okay.  Are you familiar with a different

15   homicide fund in Allegheny County Police?

16       A.  Yes.  I'm aware that, at one point, the

17   District Attorney's funds -- they were having

18   trouble providing funds, or --

19       I don't know what the whole logistics of it

20   were.  I wasn't involved with the conversation.

21       But then, the Attorney General's Office

22   offered to assist us, as well.

23       They had stepped up their role with the

24   local law enforcement at that time, and that was

25   their olive branch, I guess you would say.

**NETWORK DEPOSITION SERVICES**
**Transcript of Cmd. Officer Scott Scherer**

51

```
 1        Q.  Okay.  I realize you weren't involved,
 2   but to your understanding, did they help to open
 3   it open, the account?
 4        A.  I, honestly, don't know how that works.
 5   I know it wasn't there, and one day it was.
 6        Like I said, I never used it.
 7        Q.  Okay.  Were you one of the supervisors
 8   for that account?
 9        A.  No.
10        Q.  Okay.  So is Schurman the right person
11   to talk to about that account?
12        A.  I believe so.
13        Q.  And just a few follow-up questions on
14   that to tie up the loose ends.
15        You said that -- could you explain what you
16   said earlier, I think, about your name was made
17   available in case Schurman wasn't available?
18        A.  Yeah.  So if he was on vacation for a
19   week, then I would be the Acting Lieutenant, and
20   so -- you mean, pertaining to the funds?
21        Q.  (Indicating.)
22        A.  So both of us had access to the account,
23   in case one of us wasn't available.
24        Q.  Okay.  Were there ever any times where
25   you had to access the accounts because he
```

1    wasn't -- Schurman wasn't available?

2         A.  Not that I recall.

3         Q.  To your recollection, you never had to

4    use the accounts or supervise?

5         A.  No.  I used accounts, but he would be

6    there, but it would fall on me.  He would put

7    that responsibility on me.

8         Q.  So explain to me how you would use the

9    account.

10        A.  As far as I can remember, the case would

11   come to fruition, and if we had a witness that

12   seemed like a key witness that was in genuine

13   fear for their lives they would speak to the

14   District Attorney's Office, and we would request

15   through them -- if they approved it -- they would

16   have a breakdown of what it was for, like

17   specifically, this was $600 for rent and $300 for

18   sustenance, or something like that.  I'm just

19   making up numbers just to make an example.

20             And then I would get the paperwork and

21   Then I would go and withdraw, you know, $900,

22   usually, in a money order, or something like

23   that, and then give it to the detectives to hand

24   it over.

25             They would have paperwork, you know, it

53

```
 1    would be signed off on and returned and put in
 2    the case file, from what I recall.
 3         Q.  And these are government funds, right?
 4         A.  Yes.
 5         Q.  So would it be fair to say that every
 6    time you used this account, you conducted a full
 7    accounting of where that money went?
 8         A.  No.
 9         MS. ROHRER:  Objection as to form.  You
10    can answer that if you can.
11         THE WITNESS:  No.
12                     - - -
13    BY MR. JUBAS:
14         Q.  But are you saying that you guys didn't
15    have to provide an accounting of what was being
16    done with that money?
17         A.  We -- from what I recall we provide an
18    accounting of what it was, specifically, for.
19    Once it was turned over to them, we had no
20    control over what it was used for.
21         Q.  Okay.  Now, prior to and including
22    turning the money over to a witness, did you have
23    to document that, any of those steps?
24         A.  No, not that I recall.  I mean, some
25    times I -- because -- sometimes it would be
```

1    denied, you know.  It was all -- I guess, there

2    was criteria that they used -- how important the

3    witness was, how legitimate a threat it was, that

4    kind of stuff -- that they would use to assess.

5         But I had no parts of that aspect of it.

6         Q.  When you say they were making this

7    assessment, are you talking about the Attorney

8    General's Office or the District Attorney's

9    Office?

10        A.  Again, I had no involvement with the

11    Attorney General's Office.  When I dealt with the

12    District Attorney's office, then, yes.

13        Q.  Okay.  Do you know if the District

14    Attorney any kept more detailed accounting

15    records?

16        A.  I do not.

17        Q.  Okay.  What kind of records did the

18    Allegheny County Police keep with regards to this

19    account?

20        A.  I don't recall, specifically.  I know

21    there was -- I -- you know, I don't know the

22    answer to that.

23        Q.  Was there a logbook?

24        A.  No.

25        Q.  Okay.

1        A.   Not that I recall.

2        Q.   Okay.  Throughout your career with the

3   Allegheny County Police, had you ever worked with

4   jailhouse informants?

5        A.   No.  Me, no.

6        Q.   Okay.  So you would just --

7        A.   I take that back.  We have in -- I had,

8   in the past, as a detective.  If somebody would

9   get hemmed up on a case, they would reach out and

10  say, you know, I have information.  I wouldn't

11  call them -- I'm trying to guess, they -- it's

12  never really -- we never had a term for them, you

13  know -- but, yeah.

14       Q.   Did you ever as a -- within the

15  Allegheny County Police, did you ever receive

16  training on how to deal with jailhouse informants

17  or cooperating witnesses?

18       A.   No.  No.  It was on-the-job training.

19  We would go to a supervisor or go to a senior

20  detective that had done it before, and, you know,

21  try to find out how they did it and how it should

22  be done.

23       Q.   Okay.  So practical experience?

24       A.   I would say, yes.

25       Q.   Okay.  How would you -- would you agree

1    with the statement that working with cooperating

2    witnesses or jailhouse informants could be risky

3    business?

4            MR. BIONDI:  Object to form, but go

5    ahead and answer if you can.

6            THE WITNESS:  Not necessarily.

7                    - - -

8    BY MR. JUBAS:

9        Q.  Okay.  Would you agree that --

10       A.  Well, I take that back.  If they are in

11   jail, they are clearly trying to get out of jail.

12   So yeah, you, definitely, would have to be

13   careful.

14       Q.  Okay.  Elaborate on that; why would you

15   have to be careful; who would you have to be on

16   the look out for?

17       A.  Truthfulness.  I mean, plain and simple,

18   you know.  People would -- a lot of times

19   prisoners would say, "Oh, I heard a

20   conversation," when they actually overheard

21   third-party conversations.

22       So you have to go and check the tapes, make

23   sure they were where they said they were, with

24   who they said they were with, and that kind of

25   stuff, so yeah.  I mean, you had to, obviously,

**NETWORK DEPOSITION SERVICES**
**Transcript of Cmd. Officer Scott Scherer**

57

1    be cautious.

2         Q.  Okay.  So is it fair to say, if you're

3    working with a jailhouse informant, that's -- as

4    an officer, there's an a bit of a heightened

5    responsibility to verify what they are saying?

6         A.  You know, I'll be honest with you, I

7    never liked using jailhouse information because

8    of that reason.

9         Q.  Could you explain why?

10        A.  Just because they'll -- a lot of those

11   guys will say anything to get free, you know, or

12   get a lesser sentence.  So, yeah, you would have

13   to be cautious.

14        Q.  Okay.  Do you happen to recall,

15   generally, when probable cause was developed by

16   the Allegheny County Police in this case?

17        A.  No.

18        Q.  Okay.  Well, I'm going to hand it off to

19   my co-counsel, here, for any follow-up questions.

20                     - - -

21                  EXAMINATION

22   BY MR. PETRUNYA:

23        Q.  Okay.  Mr. Scherer, thank you for your

24   time, again.

25        A.  No problem.

```
 1        Q.  So I want to follow up a little bit on,
 2   first of all, your chronology as far as the time
 3   you were in the Homicide department, and then I
 4   want to, kind of, go back through some of the
 5   questions that Mr. Jubas asked related to the
 6   account information.
 7        So the last time you actually worked in the
 8   Homicide Department in any capacity, would've
 9   been at some point in the spring of 2017, you
10   believe?
11        A.  Yes.
12        Q.  Okay.  And do you recall -- so we know
13   the Wilkinsburg Massacre occurred on March 9,
14   2016, correct?
15        A.  Correct.
16        Q.  And I know you didn't sign off on the
17   Criminal Complaint; but we'll represent the
18   Criminal Complaint was filed on June 23, 2016.
19        A.  Okay.
20        Q.  Does that sound about --
21        A.  Yes.
22        Q.  -- correct with your recollection?
23        A.  Mm-hmm.
24            MS. ROHRER:  Is that a yes?
25            THE WITNESS:  Yes.
```

```
 1                    - - -
 2  BY MR. PETRUNYA:
 3      Q.  Okay.  What was the -- what was going on
 4  in the Homicide Department throughout that
 5  two-and-a-half-month period that you recall,
 6  related to the Wilkinsburg Massacre and filing
 7  charges; were you all getting pressure from the
 8  District Attorney's Office or from any Commanders
 9  or Supervisors to make this case, or make a solve
10  on it?
11          MS. ROHRER:  Objection as to form.  You
12  can answer if you can.
13          THE WITNESS:  I don't know if I can
14  answer that.  Like I said, I had little
15  involvement after the first several days.
16          Again, I was running the other -- you
17  know, the other cases that were coming in.
18          And it's Homicide, we average 400 cases
19  a year; every case in important.  So, you know,
20  we put more pressure on ourselves than we would
21  ever succumb to outside pressure.
22          But as far as what was going on, you
23  know, yeah, it got a lot more media coverage and
24  that kind of stuff, but -- you know, I don't
25  recall any kind of extenuating circumstances or
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Cmd. Officer Scott Scherer**

1   any differences than normal, business as usual.

2       Q.  Do you remember conversations you may

3   have had with District Attorney Zapala when you

4   were accompanying him on either the site visit

5   or -- were you up there when he went to hilltop,

6   the project?

7       A.  I was not.

8       Q.  Okay.  Do you recall any specific

9   conversations you may have had with District

10  Attorney Zapala throughout this investigation,

11  period?

12      A.  The only conversation I had with

13  Mr. Zapala was that the day that I took him out

14  there to the scene.

15      And my conversation consisted of, this is

16  where we found the cases, this is where this

17  victim was found, you know, just, generally,

18  pointing out what we had found at the crime scene

19  throughout the case, and that was it.

20      Q.  Did you have an understanding from being

21  at the crime scene on March 9, 2016, that the

22  case, itself, involved, at least, two shooters?

23      A.  Yes.

24      Q.  Okay.  And was that based upon the fact

25  that two different types of casings were found?

1      A.  Two different types of casings, two

2  different directions.

3      Q.  Now, when you are acting as a sergeant

4  in the Homicide Department, overseeing cases and

5  investigations, are you providing any guidance or

6  are you acting as a sounding board to detectives

7  as they are going through, looking at evidence,

8  analyzing claims, and, kind of, putting together

9  PC for the cases?

10     A.  Both, normally, yes.  As far as advice,

11  from my experience; and also guidance, if they

12  request it.

13     Q.  So were you aware of the fact that the

14  casings, the head stamps on the bullets that were

15  discovered from the AK actually hit on the ATF

16  database being linked to another crime?

17     A.  Now, that you say that, I vaguely

18  remember something to that effect.  I don't

19  recall any of the specifics of it.

20     Q.  As a sergeant, at the time, if you

21  would've had that information and you were being

22  asked by your detectives about following up on

23  that, would you have recommended that the

24  detectives or the department, Allegheny County as

25  a whole, speak to any of the individuals tied to

62

```
 1    the prior case involving that gun?
 2            MS. ROHRER:  Objection as to form.  You
 3    can answer if you can.
 4            THE WITNESS:  I don't know if I can
 5    answer it.  I think you guys are
 6    misunderstanding.
 7            Once Schurman took over, you know, I was
 8    running the other cases.  I had little to do with
 9    any of that.
10            So, I mean, if it was my case, a
11    different case, it's a hypothetical question,
12    then, I think, you know, I would definitely
13    encourage my guys to go follow up on it.
14                    - - -
15    BY MR. PETRUNYA:
16       Q.  Yeah.  And I guess, you know, part of my
17    question is I'm not trying to say, specifically,
18    in the Wilkinsburg Massacre, what you did or
19    didn't do; what I'm asking is as someone that is
20    a sergeant in the Homicide Department, you're
21    also, acting as a liaison for your detectives,
22    but you're also helping to provide that
23    on-the-job training for them as they're getting
24    their feet wet in investigations, correct?
25       A.  Correct.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Cmd. Officer Scott Scherer**

63

1        Q.  So part of your role is to, almost,

2    serve as a mentor to younger detectives as

3    they're going through their investigations to let

4    them know what best practices might be or how

5    they can run down evidence, correct?

6        A.  Right.

7        Q.  Okay.  Do you have any knowledge

8    sitting, here, today, whether the case head

9    stamps in this case were ever followed up on by

10    the detectives?

11        A.  I don't.

12        Q.  Would it surprise you, given your

13    experience in the Homicide Department -- your

14    friends that worked there and the people that you

15    worked with -- would it surprise you to know that

16    that wasn't done?

17        A.  Nothing -- there was no phone calls, no

18    follow-up, whatsoever?

19        Q.  Not that I've seen in the case file.  So

20    if there didn't exist a follow-up related to that

21    case, would that surprise you?

22        A.  I mean, no.  I mean, yeah.  Yeah.  I --

23    if I'm handling a case, I'm steering the case,

24    we're following up on it.  We don't all do the

25    same, you know.

**NETWORK DEPOSITION SERVICES**
**Transcript of Cmd. Officer Scott Scherer**

64

1       Different supervisors, different opinions on

2   things.

3       Q.   Okay.  And by that same logic, then, I

4   guess, if your detectives are developing a motive

5   about an actor related to the case, related to

6   information from a different case, would you want

7   your detectives to follow up on the underlying

8   criminal case that provides that motive?

9       A.   I would have to know the details.  If it

10  was a case that was already done, solved, and

11  somebody was convicted for it, then it would be

12  irrelevant.  We, absolutely, got it in somebody

13  else's hands.

14       But they would, at least, have to look into

15  it far enough to know that, you know.

16       So I don't know the details, so I can't

17  accurately, you know -- answer that.

18       Q.   So one question that I have, we had

19  talked a little bit about this Calvin Doswell

20  murder being one of the links to Lamont Powell

21  and the reason why he might have been the target;

22  do you recall us talking about that?

23       A.   Yes.

24       Q.   So if there was information that the

25  detectives in Allegheny County had received that

**NETWORK DEPOSITION SERVICES**
**Transcript of Cmd. Officer Scott Scherer**

65

1    the gun used in the Calvin Doswell case -- even

2    though that case wasn't solved or an arrest

3    wasn't made by the City of Pittsburgh -- if there

4    was information that the detectives had that,

5    that gun was linked to another crime or another

6    individual, would you expect your detectives --

7    or would you want them -- to follow up on that

8    information, as well?

9         A.  Yes.

10             MR. BIONDI:  I'll object to form.

11    That's fine.

12                     - - -

13    BY MR. PETRUNYA:

14         Q.  Do you know sitting, here, today,

15    whether there was any follow-up done into the

16    Doswell murder and the link of the weapon --

17         A.  I do not.

18         Q.  -- to Calvin Doswell?

19         A.  I don't.

20         Q.  Would it surprise you if that

21    information is not in the case file or wasn't

22    followed up?

23             MS. ROHRER:  Objection as to form.  You

24    can answer if you can.

25             THE WITNESS:  No, I can't.

**NETWORK DEPOSITION SERVICES**
**Transcript of Cmd. Officer Scott Scherer**

66

```
 1                      - - -

 2    BY MR. PETRUNYA:

 3        Q.  Would you agree with me that when you're

 4    obtaining an individual's cell phone, one of the

 5    easiest ways to identify that individual's cell

 6    phone would be having that number in someone

 7    else's contact list from a cell phone download?

 8        A.  I'm not sure what you're asking.

 9        Q.  If you ask an individual what their cell

10    phone number is and they can't recall it, but you

11    have that individual's name and number in someone

12    else's cell phone that you've downloaded, would

13    you agree with me that that's one of the easier

14    ways to identify that person's number?

15        A.  It would be a method, yeah.

16        Q.  And if that evidence is at the disposal

17    of the detectives, you would anticipate that

18    being used in Affidavits of Probable Cause for

19    search warrants, correct?

20        A.  Not necessarily.  You know I was always

21    taught, sometimes, too much is, you know over

22    board; and with an Affidavit, you need the four

23    corners, and, then, the rest comes out in trial.

24        It should be somewhere in the case file,

25    though.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Cmd. Officer Scott Scherer**

67

```
 1        Q.  Certainly, it's not enough in an

 2   Affidavit of Probable Cause to make up a number

 3   and say that a person gave it to them?

 4            MR. BIONDI:  Objection to form.  You can

 5   answer.

 6            THE WITNESS:  Yeah, could you re-ask the

 7   question?  I'm not sure I understand it.

 8                       - - -

 9   BY MR. PETRUNYA:

10        Q.  Sure.  By that same logic, though,

11   sticking to the four corners, it's not

12   permissible -- or a detective shouldn't just say

13   that someone in an interview gave me this number

14   when that information wasn't provided?

15        A.  If it wasn't provided and they put it in

16   an Affidavit?

17        Q.  Yes.

18        A.  They would have to put how they obtained

19   that number.  They should have to explain how

20   they obtained the number.

21        Q.  If there was another source of them

22   obtaining that number, which you could argue was

23   an easier source of getting to that number, you

24   would expect that to appear in the Affidavit of

25   Probable Cause?
```

```
 1            MR. BIONDI:  I'll object to the form.
 2      But if you can answer, go ahead.
 3            THE WITNESS:  I don't know if I can
 4      answer that.  It would all depend on the
 5      relevance of the phone number, how it actually
 6      was obtained, there's a lot of variables, there.
 7            It's not a simple, black and white, yes
 8      or no question.
 9                        - - -
10      BY MR. PETRUNYA:
11         Q.  What was the last day you recall doing
12      any work on the Wilkinsburg Massacre case?
13            MR. BIONDI:  I'll object to form.  He --
14      go ahead and answer if you can.
15            THE WITNESS:  So other than signing off
16      on a couple of reports, I know at one point
17      Schurman wasn't available and there was a search
18      warrant conducted where I went along as a
19      supervisor.  I really had nothing to do with it.
20            So within several days after the actual
21      shooting occurred, I had very limited involvement
22      with the case.
23                        - - -
24      BY MR. PETRUNYA:
25         Q.  Was the -- so I have you down,
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Cmd. Officer Scott Scherer**

69

1    basically, for we'll say four instances where

2    you're cited in here.  3/12, you would have been

3    present at the search of 1214 Nolan Court, do you

4    recall that?

5        A.  I do.

6        Q.  Okay.  And do you, also, recall that the

7    evidence that was obtained at that search

8    warrant -- none of that evidence directly linked

9    Cheron Shelton to the Wilkinsburg Massacre?

10       A.  I don't directly recall that, but, now,

11   that you say that, I think you're correct.

12       Q.  So it sounds accurate based upon your

13   understanding?

14       A.  Yeah, it sounds accurate.

15       Q.  Okay.  So March 12, 2016, 6:02 p.m., do

16   you recall, specifically, being present as that

17   search warrant was executed?

18       A.  And that was up at Nolan Court?

19       Q.  Correct.

20       A.  I do.

21       Q.  Okay.  Can you tell me about that?

22       A.  Basically, I didn't have much to do with

23   the search, more with the crowd.  I'm not sure if

24   you're familiar with Hilltop, there's one way in

25   and one way out.

**NETWORK DEPOSITION SERVICES**
**Transcript of Cmd. Officer Scott Scherer**

70

1       They do not like police, and it was very

2   hostile.  So I was more concerned with my guys

3   being safe and us all getting our asses out of

4   there without getting hurt.

5       Q.  So you would agree with me, though, that

6   people from the neighborhood at Hilltop, itself,

7   were present when the search was being conducted,

8   not, necessarily, in the house, but they knew you

9   were there?

10      A.  Yeah there were a lot of people out.

11  Yeah.  Yeah.

12      Q.  Okay.  So the idea that the police were

13  up there looking for something, probably, related

14  to the Wilkinsburg Massacre wouldn't be

15  unreasonable to think that the people on Hilltop,

16  kind of, knew what was going on at that time?

17      A.  Hilltop was known for all the drug

18  activity.  So, you know what you mean, I can't

19  presume to say that.  I don't know -- you know,

20  if those folks, you know, tied it into the

21  Wilkinsburg thing or not.

22      Q.  Okay.  But there were people there that

23  would've known the police were there doing the

24  search?

25      A.  Oh, yeah.  They knew before we even got

1    there.

2        Q.  Okay.  How is that possible?

3        A.  They have kids at the bottom of both

4    hills, and they see guys in suits and ties coming

5    up the hill; they are immediately on the phone.

6    Yeah.

7        Q.  So Hilltop, itself, then, the access to

8    Hilltop, it's contained, correct?

9        A.  It is.

10       Q.  If you don't live in the Hilltop area,

11   is it better for you to try to go through the

12   front of Hilltop or to jump a fence to go in the

13   back?

14           MS. ROHRER:  Objection as to form.

15           THE WITNESS:  If you don't --

16                   - - -

17   BY MR. PETRUNYA:

18       Q.  If you don't live in Hilltop.

19       A.  If you don't live there, you should go

20   around Hilltop, to be honest with you.

21       I mean, it depends on what your purpose is

22   for going up.

23       Q.  Unless you're invited in from someone

24   that's in there?

25       A.  Yes.

**NETWORK DEPOSITION SERVICES**
**Transcript of Cmd. Officer Scott Scherer**

72

```
 1        Q.  Let's take five minutes, real quick I
 2   just want to talk to my co-counsel.
 3                    - - -
 4           (WHEREUPON a recess was taken.)
 5                    - - -
 6   BY MR. PETRUNYA:
 7        Q.  Okay.  Back on the record.  Sergeant
 8   Scherer -- I guess, sergeant, at the time --
 9   Mr. Scherer, Mr. Westin, if you want,
10   Mr. Director --
11        A.  Mr. Civilian.  I like Mr. Civilian.
12        Q.  That's good.  Well, that's another hotel
13   I can't stay at, now.
14        But you also conducted the search on March
15   13th of 27167 Ross Garden Road?
16           MR. BIONDI:  I'm going to object to
17   form.  Go ahead, you can answer.
18           THE WITNESS:  I don't recall that one.
19                    - - -
20   BY MR. PETRUNYA:
21        Q.  Okay.
22        A.  Who's house was it?
23        Q.  I'm going to show you 1471.  I'm not
24   going to enter it into evidence but if you take a
25   look, you'll see your name appears, there.
```

1        That would be the house that is linked to

2    Shanell Falls who was Cheron Shelton's

3    girlfriend, at the time.

4        A.  Okay.

5        Q.  So you were present when the search was

6    conducted of that house?

7        A.  Yeah.  I don't think I actually went in

8    the house.  I think I was outside.

9        Q.  Okay.

10       A.  You said this was the house of Shanell?.

11       Q.  Shanell Falls.

12       A.  Yeah.  I vaguely remember being there.

13       Q.  Okay.  And then I think on the 14th, the

14    next day, you were actually present with Hoffman

15    and Carusso, Towns and Hitchings when a K-9 was

16    brought out to the area around Franklin and Hazel

17    Way to see if they could find any weapons or

18    items of criminality.

19       A.  If that's what's in the report, I'll

20    take your word for it.

21       Q.  I'll show it to you.

22       A.  Okay.

23       Q.  So you were present for, basically,

24    three searches that were conducted on consecutive

25    days, the 12th, 13th, and 14th?

**NETWORK DEPOSITION SERVICES**
**Transcript of Cmd. Officer Scott Scherer**

74

```
 1        A.  Correct.

 2        Q.  All right.  You might not, necessarily,

 3   recall going into the residences, right?

 4        A.  I know that Shanell's I did not go in.

 5   This one, this is a K-9 search.  This is

 6   exterior.  So I do remember being there, you

 7   know, walking the allies, vaguely.

 8        Q.  And this search yielded no direct

 9   evidence linking anyone to the Wilkinsburg

10   Massacre, correct?

11        A.  It's not listed on here, but I do not

12   recall.

13        Q.  Okay.  And then I think at some point on

14   March 29, 2016, this might have been the search

15   you conducted when Schurman was out; but do you

16   recall this Penn Hills K-9 search taking place?

17        A.  I don't remember this one.

18        Q.  Okay.

19        A.  Yeah I -- I mean, honestly, I don't

20   remember.

21        Q.  I'm just going back and looking through

22   my notes, real quick, with your work history.

23        So you were actually a detective in Homicide

24   for nine years, you said, from 2000, until 2009?

25        A.  Correct.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Cmd. Officer Scott Scherer**

75

1      Q.  Okay.  And so I know you had, basically,
2  talked about, you know, not having worked with
3  jailhouse witnesses or informal witnesses; at any
4  point did you have occasion in any of your cases
5  to work with a man by the name of Frederick
6  Collins or Kendall Michael?
7      A.  No.  I mean, I remember Freddie Collins.
8  I remember the name.  I never worked with him
9  that I -- no.  I don't recall.
10     Q.  How do you remember Frederick Collins?
11     A.  Freddie was -- can I speak frankly?
12     Q.  Please.  You're under oath.
13     A.  He was kind of a nut, that I remember.
14 Freddie was always trying to reach out trying to
15 give information.  So I would not have used him.
16     Q.  And when you say he was always reaching
17 out trying to give information, are you saying
18 that before 2016, or before 2017, you recall
19 Freddie reaching out?
20     A.  I just recall hearing stories from -- I
21 can't even name specific detectives.  I just
22 remember his name, and I remember hearing his
23 name at the courthouse.
24     Q.  Okay.  This bank account that we had
25 talked about for witness protection funds, do you

**NETWORK DEPOSITION SERVICES**
**Transcript of Cmd. Officer Scott Scherer**

76

1    recall this being a PNC account?

2         A.  Yes.

3         Q.  Okay.

4         A.  I do.  Because I used to use the PNC

5    right in Wilkinsburg by our office.

6         Q.  Okay.  And so at the time you were

7    working in Homicide as a sergeant, was it only

8    you and Schurman that had access to the account?

9         A.  I know the detectives didn't, but as far

10   as the higher ups, I don't know.

11        Q.  When you were working there up until

12   2017, was there a sign-out sheet that you had

13   access to, like, a debit card for that account?

14        A.  Oh, no.  No.  The only ones that would

15   take money out was me and Schurman.

16        Q.  Do you know if at any point after you

17   left in 2017, that policy might have changed?

18        A.  I don't.

19        Q.  When you were working in homicide up

20   until 2017, were there ever occasions where you

21   would take money out of the account and use it to

22   purchase gift cards that were given to detectives

23   to give to witnesses?

24        A.  No.

25        Q.  Okay.  Were there any policies and

77

```
 1    procedures in place, written or otherwise, for
 2    this account and its use?
 3         A.  I don't know the answer to that.  I
 4    don't recall.  I don't think there was at the
 5    time.
 6         Q.  What training did you receive on this
 7    account?
 8         A.  Just on the job.
 9         Q.  So up until 2017, then, if money was to
10    be taken out of the that PNC Bank account, you're
11    telling me that it was only you and Schurman that
12    could do it?
13         A.  Mm-hmm.
14         Q.  Is that a yes?
15         A.  Yes.
16         Q.  Okay.
17         A.  And you had to have the proper
18    paperwork.
19         Q.  Okay.  Did that account, that PNC
20    account, predate your time coming to work as a
21    Sergeant in Homicide, if you recall?
22         A.  I don't recall.  I don't -- yeah, I -- I
23    mean, if it was there, we didn't use it; I don't
24    know.  I don't know how long we had it, to be
25    honest with you.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Cmd. Officer Scott Scherer**

1     Q.   How would you know how much money was in

2   that account at any time or if you needed to know

3   that?

4     A.   Because they would -- whenever we made a

5   withdraw, I would ask for a receipt, a ledger.

6     Q.   Well, I guess is there a way -- or did

7   you have access to check to see what the balance

8   or the ledger of that account was, prior to

9   making a withdraw?

10    A.   Yeah.  It was just a PNC ATM card.  So

11   you could do an account balance.

12    I never did, but --

13    Q.   If you could just let me finish my

14   question, real quick so I can get this out for

15   the record.

16    A.   Mm-hmm.

17    Q.   So a detective approaches you and says

18   he needs $1,700 for a witness because this is

19   first and last month's rent and security deposit,

20   how would you know whether that account had

21   sufficient funds for you to withdraw that amount

22   before you went; would you rely on the DA to give

23   you that information with the approval process;

24   would you have access to see what the balance

25   was; how did that work?

**NETWORK DEPOSITION SERVICES**
**Transcript of Cmd. Officer Scott Scherer**

79

1          A.   I had access to the balance; and

2      whenever it would get below a certain level, we

3      would contact the District Attorney's Office and

4      say we're running low.

5          Sometimes, they would give us more money;

6      sometimes, they would say you have to wait.

7          But, yeah, it was, basically, a PNC ATM

8      card.  You go do an account balance.

9          Q.   And --

10         A.   It wasn't hard to keep track of.  We did

11     not use it, frequently.

12         Q.   What was the threshold, if you recall,

13     of funds in that account that would trigger the

14     correspondence to the District Attorney saying

15     you needed more funds?

16         A.   There wasn't one.  Like they might put

17     $10,000 in, and when it got down to $2,000 we

18     would mention it; and if they got around to it,

19     they would get around to it.

20         Q.   And do you know where the money was

21     coming from that they were putting in the

22     account?

23         A.   I do not.

24         Q.   At the time you were sergeant in the

25     Homicide Department, was the Wilkinsburg Massacre

80

1    the biggest case that your office was responsible

2    for handling?

3           MS. ROHRER:  Objection as to form.  Go

4    ahead and answer if you can.

5           THE WITNESS:  No.  I wouldn't say that.

6    I mean, it got a lot of publicity.  It was, you

7    know -- but I was on a lot of cases.

8           I mean I was in Homicide for 16 years.

9    There were a lot of high-profile cases.  So, you

10   know, I wouldn't call it -- any time there's a

11   death involved, it's a big deal.

12                         - - -

13   BY MR. PETRUNYA:

14      Q.  Sure.  Now, I don't, necessarily, need

15   specifics from you, here, but the Wilkinsburg

16   Massacre occurs March 9, 2016, charges were filed

17   June 23, 2016, we talked about that.

18      Do you recall, approximately, within that --

19   we'll call it three-month window --

20   three-and-a-half-month window -- how many murder

21   cases your office would've picked up within that

22   time?

23      A.  I don't.

24      Q.  Okay.  At the time that the Wilkinsburg

25   Massacre occurred, up until the time that the

1    charges were filed, do you recall anything,

2    specifically, about the detectives and the

3    homicide numbers; were there a lot of homicides;

4    were there a lot of active cases, or more than

5    normal; did you feel like you had enough manpower

6    to be able to handle the investigations?

7            MS. ROHRER:  Objection as to form.  Go

8    ahead and answer if you can.

9            THE WITNESS:  I don't recall it being

10   any different than, you know, business as usual,

11   as far as manpower and stuff.

12            I mean, those first couple days are

13   always man-power intensive, because when you're

14   developing fresh information, you need more

15   bodies to go in the different directions.

16            But after that, yeah -- I would say

17   business as usual.

18                    - - -

19   BY MR. PETRUNYA:

20       Q.  How many detectives do you recall, round

21   about, working for the department in 2016?

22       A.  I don't know.  I, actually, just told

23   them that.  I said we would go from anywhere from

24   16 or 18 detectives up to, at one point, we had

25   30.  I don't remember how many we had back then.

**NETWORK DEPOSITION SERVICES**
**Transcript of Cmd. Officer Scott Scherer**

82

```
 1      Q.  Okay.  Earlier in the deposition, there
 2   was a point where you had looked like you wanted
 3   to share some information about the District
 4   Attorney and his possible involvement related to
 5   this case.
 6      A.  Oh, no.  It wasn't -- can I speak
 7   Frankly?
 8           MR. BIONDI:  Yeah.
 9           THE WITNESS:  No.  It had nothing to do
10   with his involvement with the case.
11           It was just I was going to point out --
12   because you kept asking me questions about how --
13   what happened several days later after that
14   second or third day.
15           I had -- you know, after I took -- what
16   happened was, I took the District Attorney out
17   there to Wilkinsburg and it was on national news.
18   And some people within my department were not
19   happy about that.
20           And so that's why they were, like, "Go
21   handle the rest of the cases."
22           So I don't really have that much to do
23   with this case.
24                        - - -
25   BY MR. PETRUNYA:
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Cmd. Officer Scott Scherer**

1      Q.  Why were they not happy that you had

2   taken the District Attorney out to Wilkinsburg?

3      Seriously.  I'm curious about this.  I think

4   it's an important point.

5      A.  Some people have big egos and like to be

6   on TV.

7      Q.  Did you get the sense from interacting

8   with District Attorney Zapala in this matter that

9   he wanted to see this case solved and wanted to

10  get attention for this?

11     A.  I mean, he's a politician.  Any time

12  they can get a little bit of camera time, they

13  do.

14     So, you know, but no more than usual.  I

15  mean, he was cool as a cucumber that day that I

16  was out there with him.

17     Q.  Did you follow the progress of this case

18  even after you left the Homicide Department or

19  stayed in touch with anyone from the department?

20     A.  Well, yeah.  I mean, I was right across

21  the hall in General Investigations, but I wasn't

22  really following up on it.

23     You know, I would hear them saying, "Hey we

24  had a hearing," or whatever, and, you know, how

25  to go.  But that was the extent of it.

```
 1        I was revamping the Child Line systems.  So
 2   I had enough work to do without being in their
 3   business.
 4        Q.  Were you surprised by the outcome of the
 5   case -- of the Wilkinsburg Massacre with
 6   Mr. Thomas being dismissed on the eve of trial
 7   and Mr. Shelton being acquitted?
 8        A.  I really didn't even hear any of the
 9   specifics of it.  I don't think I was around when
10   it actually went down.  But the thought doesn't
11   surprise me.
12        Q.  Why doesn't it surprise you?
13        A.  There were -- you know, from what I was
14   understanding, you know, from overhearing it --
15   guys talk and there wasn't a whole lot of
16   cooperation, and --
17        Q.  Cooperation from whom?
18        A.  From the witnesses, specifically.  What
19   was the guy's name that was at the actual target?
20        Q.  Lamont?
21        A.  Yeah, Lamont.  He was, like, "I got shot
22   in the leg; go F yourselves; we're not talking to
23   you."  You know, I don't have nothing to do with
24   this, you know.
25        Tons of people off the record would tell us
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Cmd. Officer Scott Scherer**

85

1  exactly what happened, you know.  But you can't

2  force them to go on the record.  You can't force

3  them to cooperate.  There's nothing you can do.

4      Q.  And so you aren't surprised by the fact

5  that one person was dismissed and one was

6  acquitted?

7      A.  No.

8      Q.  Did anyone in your Department express

9  any apprehension or concern about the charges

10  being brought against Robert Thomas and Cheron

11  Shelton at the time that the charges were filed?

12      MS. ROHRER:  Objection as to form, but

13  go ahead.

14      THE WITNESS:  Yeah, no.  Not that I

15  recall.  Again, I had very little to do with it.

16                  - - -

17  BY MR. PETRUNYA:

18      Q.  You had said that someone, kind of, said

19  after you had accompanied the District Attorney

20  to Wilkinsburg, they, kind of, took you off the

21  case; who was that specifically?

22      A.  They didn't take me off the case.  I

23  mean, I was still involved, but they,

24  basically -- the jealousy for me being on the

25  national news, it was, like, you know, "I got

**NETWORK DEPOSITION SERVICES**
**Transcript of Cmd. Officer Scott Scherer**

86

```
 1    this from here," so --

 2         Q.  Who was that, exactly?

 3         A.  It was the Lieutenant.

 4         Q.  Lieutenant Schurman?

 5         A.  Mm-hmm.

 6         Q.  Is that a yes?

 7         A.  Yes.

 8         Q.  Okay.  We're going to take just five

 9    minutes to make sure we don't have any more

10    questions.  And then I think we're, probably,

11    done.

12                    - - -

13         (WHEREUPON a recess was taken.)

14                    - - -

15         MR. PETRUNYA:  Okay.  For the record, we

16    have no further questions.  Thank you so much for

17    your time and also for the questions.  And if you

18    get calls about me, please don't respond.

19         THE WITNESS:  No problem.

20                    - - -

21                   EXAMINATION

22    BY MS. ROHRER:

23         Q.  Do you think that Cheron Shelton and

24    Robert Thomas committed the Wilkinsburg Massacre?

25         A.  Yes.
```

87

```
 1            MS. ROHRER:  I don't have any more

 2    questions.

 3            You can -- you have the option to read

 4    the transcript and to look it over to make sure

 5    that there were no mistyped words or things that

 6    were, maybe, taken down wrong.  But you can't

 7    change your answer.

 8            Or you can trust what the court reporter

 9    is typing, here, today.  Sometimes, we advise

10    someone to read; in your case, I'll leave it up

11    to you.  Do you want to read or waive?

12            THE WITNESS:  I'll waive.

13            MS. ROHRER:  Okay.  That's fine.

14            THE COURT REPORTER:  Would the attorneys

15    like a copy of the transcript?

16            MS. ROHRER:  We'll take one.

17            MR. JUBAS:  One for us as well.

18                      - - -

19            (WHEREUPON, the deposition was concluded

20    at 2:52 p.m.)

21                      - - -

22

23

24

25
```

```
 1
 2                      CERTIFICATE
 3   COMMONWEALTH OF PENNSYLVANIA, )
                                    )  SS:
 4   COUNTY OF ALLEGHENY.           )
 5        I, Philip A. Dawson, do hereby certify that
     before me, a Notary Public in and for the
 6   Commonwealth aforesaid, personally appeared SCOTT
     SCHERER who then was by me first duly cautioned
 7   and sworn to testify the truth, the whole truth,
     and nothing but the truth in the taking of his
 8   oral deposition in the cause aforesaid; that the
     testimony then given by him as above set forth
 9   was by me reduced to stenotypy in the presence of
     said witness, and afterwards transcribed by means
10   of computer-aided transcription.
11        I do further certify that this deposition
     was taken at the time and place in the foregoing
12   caption specified, and was completed without
     adjournment.
13
          I do further certify that I am not a
14   relative, counsel or attorney of either party, or
     otherwise interested in the event of this action.
15
          IN WITNESS WHEREOF, I have hereunto set my
16   hand and affixed my seal of office at Pittsburgh,
     Pennsylvania, on this 23rd day of April, 2024.
17
18
19   _____
          Philip A. Dawson, Notary Public
20        My commission expires June 28, 2027
21
                         -  -  -
22
23
24
25
```