```
 1            IN THE UNITED STATES DISTRICT
        FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 2                   CIVIL DIVISION

 3
    CHERON SHELTON/
 4  ROBERT THOMAS,

 5       Plaintiffs,
                              No. 22-CV-196/266
 6       - v -

 7  COUNTY OF ALLEGHENY,
    ET AL.,
 8
         Defendants.
 9

10
                    - - -
11
              FRIDAY, NOVEMBER 17, 2023
12
                    - - -
13

14     The deposition of TODD D. DOLFI, called as a
    witness by the Plaintiffs herein, pursuant to
15  notice and the Federal Rules of Civil Procedure
    pertaining to the taking of depositions, taken
16  before me, the undersigned, Sheila Stauffer, RPR, a
    Notary Public in and for the Commonwealth of
17  Pennsylvania, at 300 Fort Pitt Commons, Pittsburgh,
    Pennsylvania, 15219, commencing at 10:00 o'clock
18  a.m., the day and date set forth.

19                  - - -

20           NETWORK DEPOSITION SERVICES
                1101 GULF TOWER
21               707 GRANT STREET
           PITTSBURGH, PENNSYLVANIA 15219.
22
                    - - -
23

24

25
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

2

```
 1    APPEARANCES:

 2           On behalf of the Plaintiffs:
      Max Petrunya, Esq.
 3    Paul Jubas, Esq.
      MAX PETRUNYA, PC
 4    5 Bayard Road, Unit 917
      Pittsburgh, PA  15213
 5    412-720-3497
      maxpetrunyapc@gmail.com
 6
             On behalf of the Defendants:
 7    Dennis Biondo, Jr., Esq.
      Shelley K. Rohrer, Esq.
 8    ALLEGHENY COUNTY LAW DEPARTMENT
      300 Fort Pitt Commons Building
 9    Pittsburgh, PA  15219
      dennis.biondojr@alleghenycounty.us
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

3

```
 1              EXAMINATION INDEX

 2   EXAMINATION BY:                  PAGE

 3   Mr. Jubas                          4

 4   Mr. Petrunya                      97

 5   Mr. Biondo                       123

 6

 7

 8
     CERTIFICATE OF REPORTER          126
 9   CERTIFICATE OF WITNESS           127

10

11
                  EXHIBIT INDEX
12
     DEPOSITION EXHIBIT                MARKED
13
     Exhibit 1   Affidavit of Probable Cause   56
14
     Exhibit 2   Allegheny County housing
15                 history/Shelton              89

16

17

18

19

20

21

22

23

24

25
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

4

```
 1                    PROCEEDINGS
 2          TODD D. DOLFI, having been first duly sworn
 3     to state the truth, the whole truth, and nothing
 4     but the truth, testified as follows:
 5                      -----
 6                    EXAMINATION
 7     BY MR. JUBAS:
 8        Q   Sergeant Dolfi, my name is Paul Jubas, and
 9     this is my co-counsel Max Petrunya.  Sir, I will
10     just ask you a few ground rule questions and then
11     we will move into it.
12          Have you ever given a depo before?
13        A   Yes.
14        Q   And when was that?
15        A   I believe last year.  They have been on car
16     accidents, investigations of car accidents.
17        Q   Like a personal injury?
18        A   Yes.
19        Q   I know you are used to this, but just full
20     answers so that the court reporter can take it
21     down.  No uh-huhs or huh-huhs.
22        A   Sure.
23        Q   Did you do anything to prepare for today?
24        A   Yes.
25        Q   What did you do?
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

```
 1      A   I met with my attorneys, reviewed the
 2   criminal complaint and the prelim and trial
 3   testimony.
 4      Q   How old are you today?
 5      A   I am 40 years old.
 6      Q   How long have you been a police officer?
 7      A   19 years.
 8      Q   And what is your educational background?
 9      A   High school graduate, and I am working at my
10   Bachelor's now.  I have about 99 credits.
11      Q   How many more credits do you have to go?
12      A   120.
13      Q   Nice.  You've been a police officer for 19
14   years.  How long have you been with the Allegheny
15   County Police Department?
16   A   About 17 years.
17      Q   Where were you before that?
18      A   Washington, DC.
19      Q   Working for the DC police?
20      A   Yes.
21      Q   And were you a patrol officer in DC?
22      A   Yes.
23      Q   When you came over to Allegheny County
24   police, what position were you in?
25      A   Patrol officer.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

6

```
 1     Q    What year would that have been?
 2     A    2007.
 3     Q    And from 2007 how long did it take you to
 4  get promoted to whatever it was that you were
 5  promoted to next?
 6     A    The next promotion was to sergeant.  Patrol
 7  officer to detective is a lateral move on our job.
 8  It is not a promotion.
 9     Q    When did you make that lateral move from
10  patrol officer to detective?
11     A    2011.
12     Q    When did you become a homicide detective?
13     A    2013.
14     Q    And when did you become a sergeant?
15     A    2018.
16     Q    So when this case started back in 2016,
17  March of 2016, you weren't yet a sergeant.  You
18  were a homicide detective?
19     A    Correct.
20     Q    Do you remember when in 2013 you became a
21  homicide detective?
22     A    I believe it was October.
23     Q    So less than three years into you being a
24  homicide detective is when you started leading the
25  case on the Wilkinsburg Massacre?
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

7

1     A    I wouldn't say the lead.    But, yes, I was

2    working on the case.

3     Q    Would you say there was an officer that was

4    in charge of the investigation?

5     A    We work all our homicides as a team.

6    Somebody is assigned on paper as what we call the

7    initial detectives.  Just because every case has to

8    be assigned, so Detective Foley and I were the

9    initials on it, but to say I was leading or making

10   all decisions on the case is not true.

11    Q    You guys were the initials.

12    A    Yes.  That's a term our department uses.

13    Q    And this is just for my frame of reference.

14   Were you involved in investigating the Tree of Life

15   shooting?

16    A    I was on scene at the Tree of Life shooting,

17   but I believe -- our supervisors worked out that

18   the FBI was going to be the lead on that case.  So

19   our role was very minimal.

20    Q    Is it a safe to say the Wilkinsburg Massacre

21   case was the biggest case you ever worked on?

22    A    All homicides I consider big, but if you are

23   asking about deceased in one incident, then that is

24   true.

25    Q    And how about from not just the victims but

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

1    as an evidentiary standpoint, the scope and breadth

2    of the evidence, was that comparatively large in

3    terms of the other homicides?

4       A    Yes.

5       Q    In terms of the evidence that was collected,

6    was that the biggest?

7       A    Yes.

8       Q    So does that mean this was a pretty big

9    learning experience for you?

10      A    I mean, all homicides are kind of

11   investigated the same from one body to, you know,

12   10 bodies.  Our investigative process is very

13   similar.  If you are referring to a collection of

14   evidence on scene, I mean, yes, there was a lot of

15   evidence to process that night.

16      Q    So getting a little bit of background here,

17   you became a detective 2011 and then 2013 you

18   become a homicide detective.  2016 is when the

19   massacre happens.  In that five year time span did

20   you guys have the same software, evidence software

21   that you would use?

22      A    Yes, I believe we did.

23      Q    There was no change from the time that

24   you --

25      A    You are referring to what we log evidence

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

1    as?

2        Q    Yes.

3        A    That software is the same.

4        Q    What is that called?

5        A    It is called BEAST.  I don't know what it

6    stands for.  It is called BEAST.

7        Q    So by the time that the Wilkinsburg Massacre

8    occurred you were already very comfortable with

9    BEAST?

10       A    Yes.

11       Q    Generally speaking, with the volume of

12   evidence that you were dealing with, did you guys

13   run into problems with BEAST, with the software at

14   all?

15       A    Not that I am aware of.

16       Q    Is BEAST strictly for or strictly available

17   to the Allegheny County police or is that also

18   available to the District Attorney's office?

19       A    That I don't know.  I know the company can

20   sell their software to other police departments and

21   everything, but if you are asking -- I don't know

22   if the DA's office can sign into BEAST and see the

23   evidence, that I don't know.

24       Q    Do you know is there any sort of program

25   that allows you -- the Allegheny County police and

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

1  District Attorney's office to easily share files,

2  easily share evidence?

3      A    I think at that time we were using MoveIt,

4  like a software program to transfer paperwork and

5  everything like that.

6      Q    What was it called?

7      A    MoveIt.

8      Q    Is this like a cloud software you can upload

9  evidence to?

10      A    I think it is.  I never transferred files on

11  it but --

12      Q    Who is responsible for transferring the

13  files?

14      A    Our secretary would transfer the files.

15      Q    So that means that -- say you would just

16  give the evidence that you collected to the

17  secretary and they would upload it?

18      A    Well, I guess what do you mean by evidence?

19  Are we talking paperwork?

20      Q    Yes.

21      A    Paperwork, right, the papers would be

22  scanned in, and the secretary would send it to the

23  DA's office.

24      Q    And then in terms of physical evidence,

25  maybe pictures, that would be scanned in?

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

11

```
1     A   Or put on disk, and then it would be hand
2  delivered.
3     Q   MoveIt isn't the only way you guys transfer
4  evidence to the DA?
5     A   Correct.
6     Q   It could also be through hand delivery?
7     A   Yes.
8     Q   When this happened back in March of 2016,
9  how old would you have been?
10    A   How many years ago was that?  7 years ago?
11    Q   Early 30s?
12    A   Early 30s.
13    Q   32, 33, something like that?
14    A   Yes.
15    Q   Do you know how old Detective Foley is?
16    A   He is in his 50s.
17    Q   So he is senior to you?
18    A   Yes.
19    Q   Back in 2016, with the detectives that were
20 heavily working this case, were you one of the
21 younger detectives involved?  Like Costa and
22 Fitzgerald, Kinavey.
23    A   I think in 2013 when I transferred into the
24 unit I might have been the youngest person in the
25 unit.  So I would have to say three years later, I
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

1    don't remember any vast changes in the unit in that

2    three year time.  So I can't say I was the youngest

3    but probably one of the youngest in the room.

4        Q    When did you get assigned to be one of the

5    initials?

6        A    The night of.

7        Q    Who made that decision?

8        A    Lieutenant Schurman.

9        Q    So just personally speaking, was that in

10   your early 30s the biggest case to ever come

11   through the city or county?  Was that a shock to

12   the system at all?

13              MR. BIONDO:  Object to form.  Go ahead.

14       A    I don't look at homicides that way.  We work

15   them all the same.  It doesn't really affect me,

16   one body or 10 bodies.

17       Q    Got it.  In your experience as a homicide

18   detective, has the relationship between Allegheny

19   County police and the Allegheny County District

20   Attorney's office remained the same?

21              MR. BIONDO:  Object to form.

22       A    I'm not quite sure I understand.

23       Q    I can make it more specific.  Is it fair to

24   say that the Allegheny County police has a tenuous

25   relationship with the Allegheny County police

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

1    department?

2            MR. BIONDO:  I object to the form.

3    Q    Let me rephrase it.  Is it safe to say that

4    the Allegheny County police has a -- there is

5    tension in their relationship with the Allegheny

6    County District Attorney's office?

7    A    I can't speak for, you know, my department

8    as a whole on that matter.

9    Q    How about in your opinion?

10    A    I mean, at times I am unhappy with their

11    decisions they make but such is life.  I mean --

12    Q    When you became a detective back in 2011,

13    what type of cases were you investigating?

14    A    I was assigned to the general investigations

15    unit which does child sex assaults, adult sex

16    assaults, robbery.  For the most part, every type

17    of case that our department investigates with the

18    exception of death investigations, shootings,

19    suicides, stuff like that.

20    Q    Is the use of informants, cooperating

21    informants, is that consistent across all types of

22    investigations or do you see them more in homicide

23    investigations?

24    A    In my experience, more in homicide than the

25    general investigation section.  Now I have never

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

14

1    been assigned narcotics, vice or anything else like

2    that.  In my personal experience as a police

3    officer, yes, we use them more in homicides than I

4    did in general investigations.

5       Q   So in the two years prior to the Wilkinsburg

6    Massacre where you were a homicide detective, did

7    you develop a lot of experience working with

8    confidential informants in the homicide unit?

9       A   I wouldn't say a vast -- no.

10      Q   Do you have any sort -- are you able to

11   estimate at all a handful of times, less than a

12   handful?

13      A   I think a handful is fair to say.

14      Q   Say five cases approximately?

15      A   I don't want to speculate on an exact number

16   and be locked into an exact number, but to say I

17   used a ton of them personally is not true.

18      Q   But you did have experience using

19   confidential informants in homicide cases prior to

20   the Wilkinsburg Massacre?

21      A   Yes.

22      Q   Prior to the Wilkinsburg Massacre, in any of

23   cases that you worked with confidential informants

24   on, were any of those paid informants?

25          MR. BIONDO:  I will object to the form.

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

```
 1    A    Paid as in what form?

 2    Q    Any form.

 3    A    No.  I wouldn't describe -- we don't have a

 4  fund that we pay informants out of in the homicide

 5  unit.  If you are referring to direct monies.

 6    Q    How about indirect monies?

 7    A    I mean, we have witness relocation programs

 8  that is run through the state Attorney General's

 9  office that provides funding for certain approved

10  expenses.  So that we have used.

11    Q    Is it fair to say that if a witness is not

12  in the Attorney General's witness relocation

13  program that you would not be able to pay these

14  informants out of that fund?

15           MR. BIONDO:  I am going to object to form.

16  Go ahead if you can answer.

17    A    Paid out of which fund?

18    Q    So you had mentioned that there was a fund

19  that the county -- I think the Allegheny County

20  police has for funds that can be directed towards

21  informants that are enlisted within the Attorney

22  General's witness protection program.

23    A    Yes.

24    Q    And is it possible for you guys to use that

25  fund if that witness is not in the Attorney General
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

16

1  witness protection program?

2     A    Not for direct monies, but if someone like

3  needed a hotel room or something, that could be

4  arranged.

5     Q    Are all of these funds from this account,

6  whether a witness in the witness protection program

7  or not, do you have to account for the money that

8  is being taken out or deposited into that account?

9     A    Yes.   In the witness relocation fund, yes.

10    Q    Are there any other funds or bank accounts

11  that the Allegheny County police department has

12  access to pay informants in one way or another

13  besides the witness relocation fund?

14    A    Not that I am aware of.

15    Q    Have you yourself ever had any sort of

16  interactions with the Allegheny County police fund

17  that we are talking about?

18    A    Yes.

19    Q    Is it fair to say, and I'm not talking about

20  any cases after the Wilkinsburg Massacre, just the

21  massacre itself, is it fair to say you used this

22  fund in this case?

23        MR. BIONDO:  I will object to form.  If you

24  can answer, go ahead.

25    A    Referring to the Wilkinsburg case

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

1    specifically, I don't believe I transferred any

2    monies to anybody on this case.

3        Q    Do you know how that money -- where the

4    money comes from that gets deposited into it?

5        A    That fund was started by the District

6    Attorney's office.

7        Q    So is it accurate to say that both the

8    county police and the DA have access to use that

9    fund?

10       A    I don't believe the DA's office has access

11   to it.  They started that account.  They put the

12   initial deposit in.  I don't know how many years

13   ago.  That was before I think I was in the unit,

14   but they started that fund before with an initial

15   deposit amount.

16       Q    And then subsequent to that you guys took

17   over maintenance of the fund?

18       A    I guess maintenance would be a fair word to

19   say when someone is accepted into the AG's program,

20   whatever funds were used get reimbursed from the

21   state Attorney General.

22       Q    Are there written policies about the use of

23   this fund?

24       A    I don't believe so.

25       Q    Do you guys receive training on the use of

1   this fund?

2       A    No.

3       Q    Is there any supervision of the use of this

4   fund?

5       A    Yes.

6       Q    Who supervises it?

7       A    The unit commander.

8       Q    In this case, who was the unit commander?

9       A    Lieutenant Schurman.

10      Q    Could you just give me a -- could you walk

11  me through what you would do hypothetically?  Not

12  specifically.  Just hypothetically if you had to

13  use this fund and you had to report it or were

14  being supervised by Lieutenant Schurman?  Could you

15  walk me through this process.

16      A    Yes.  It is a little vague.  I mean, you are

17  saying I have -- could you ask it a little more

18  specifically.

19      Q    Let's say you have a witness that's been

20  accepted by the AG's protection program, and you

21  guys are going to deposit some funds and then

22  transfer some funds to get to a witness relocated.

23  Can you walk me through the process?  And we can

24  break it down to make -- I know that's kind of a

25  vague question.

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

19

```
 1      A   If there was a witness that is accepted into
 2   the relocation program, it is up to them, the
 3   witness themself to find a place that they want to
 4   be relocated to.  When they locate a place, some of
 5   the -- like the AG's office, they are pretty
 6   specific with what they will reimburse on.  For
 7   instance, like first month's rent, last month's
 8   rent and security deposit, and they would provide a
 9   moving truck if need be or plane tickets depending
10   on where someone is going.
11          So there is a packet that is filled out on
12   their acceptance that the state has to sign off on,
13   and, you know, depending on what it would cost, we
14   get receipts, document everything, signatures and
15   then send it to the state.
16      Q   Are you guys trained on the use of
17   confidential informants?
18      A   What do you mean by use?
19      Q   Just, you know, correct me if I am wrong,
20   you use confidential informants in homicide cases?
21      A   Sometimes.
22      Q   In those cases you have to go through the
23   process of working with the informant, correct?
24      A   Fair.
25      Q   And do you receive training on how to work
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

20

1   with these informants?

2       A    I don't think there is specific informant

3   training.

4       Q    So it is fair to say that you yourself have

5   never been trained on how to properly use an

6   informant?

7       A    Is there such a training?  I don't know.

8       Q    Have you ever gone through a class?

9       A    I have not.

10      Q    Did you receive any training when you became

11  a homicide detective?

12      A    Yes.

13      Q    What kind of training?

14      A    There was interview, interrogation classes,

15  some crime scene processing classes, stuff like

16  that.

17      Q    Do you guys -- do you have to do like yearly

18  updates or things like that?

19      A    The state mandates yearly updates, yes.

20      Q    Is there within BEAST, is there a -- is that

21  where you guys would store the documentation

22  pertaining to working with these informants?

23      A    No.  BEAST is more of physical evidence

24  storage.  Like that's where items collected at the

25  crime scene get logged into.

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

21

1      Q    And police reports?

2      A    No, they are not stored in BEAST.

3      Q    Where are your police reports stored?

4      A    In the report management system.

5      Q    That is MoveIt?

6      A    No.

7              MR. PETRUNYA:  MoveIt is transfer.

8      Q    What is this one?

9      A    The report management system that we were

10   using in 2016 is not the one that we have now, and

11   I cannot remember the name of the one used in 2016.

12     Q    So the report management system is where you

13   would put police reports?

14     A    Yes.

15     Q    And supplementals and stuff like that?

16     A    Yes.

17     Q    Is the report management system where you

18   guys would store the paper trail regarding working

19   with informants?

20     A    Yes, I believe so, yes.

21     Q    Would you agree that it would be best

22   practices to upload any of the paper trail or

23   investigations as you are going into this report

24   management system?

25     A    I can't -- I don't know.

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

22

```
 1      Q    What do you think?  Would that make it
 2   easier to stay organized in a case?
 3              MR. BIONDO:  I object to form.  If you can
 4   answer.
 5      A    I mean, there is other -- I mean, we have
 6   other electronic storage methods.
 7      Q    Is there a preferred electronic storage
 8   method for the paper trail related to informants?
 9              MR. BIONDO:  I will object to the form.
10      A    I don't know if I would use the word
11   preferred.  RMS is preferred.  That's where the
12   paper goes.
13      Q    That would be the ideal place?
14      A    Or into a file.
15      Q    A physical file.
16      A    Correct.
17      Q    So you said that you and Foley were the
18   initials on this case?
19      A    Yes.
20      Q    Did you guys both write the affidavit of
21   probable cause for the charges or was that mainly
22   you, mainly Foley?
23      A    I think it was a collaborative effort.
24      Q    So you prepared the affidavit of probable
25   cause and then you talked to the District
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

23

```
 1    Attorney's office about it?
 2       A   Yes.
 3       Q   Which DA did you deal with?
 4       A   Kevin Chernosky.
 5       Q   Was he your main point man in the DA's
 6    office for this?
 7       A   Yes.
 8       Q   Would that be the case from the very get-go?
 9       A   From the very get-go of this case?
10       Q   Yes.
11       A   From what I remember Kevin Chernosky is who
12    we were dealing with the most.
13       Q   Were there any other DA's besides Kevin
14    Chernosky that you were working closely with in
15    this investigation?
16       A   Yes.
17       Q   Who were they?
18       A   Alicia Werner and Lisa Pellegrini.
19       Q   And I believe that Kevin Chernosky was a
20    deputy district attorney at the time?
21       A   I can't remember when he got promoted to
22    deputy.
23       Q   Do you know if Alicia Werner was a deputy at
24    that time?
25       A   I don't believe so.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

24

1    Q   Were you aware of whether Kevin, Alicia or

2  Lisa outranked the other?

3    A   My understanding of the DA's office is that

4  a deputy district attorney is higher than an ADA.

5  I wouldn't know the answer who outranks who in the

6  DA's office.

7    Q   Do you know what -- so there is assistant

8  district attorney, there is deputy district

9  attorney and then there is special district

10  attorney, special assistant district attorney.  Do

11  you know anything about that designation?

12    A   I do not.

13    Q   In your experience with the Allegheny County

14  police department as a detective, were you engaged

15  in many investigations involving grand juries?

16    A   No.

17    Q   Do you have any idea how many prior to this

18  case that you worked on that involved a grand jury?

19    A   Maybe one or two.

20    Q   What was your experience in that?  What was

21  your role?

22    A   I have testified in front of a grand jury

23  here in Pennsylvania before, but that's about it.

24    Q   Were you at all involved in any of the grand

25  juries with regard to any of the witnesses that

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

25

1    were involved in this case?

2        A    No.

3        Q    Is it accurate to say that this case did not

4    originate with the grand jury?

5            MR. BIONDO:  Object to form.  If you can

6    answer, go ahead.

7        A    I don't think this case was in the grand

8    jury.

9        Q    Were you ever provided by the District

10   Attorney's office with any grand jury documents

11   pertaining to this case?

12       A    No.

13       Q    So you never received any sort of grand jury

14   documents pertaining to the witnesses that were

15   involved in this case?

16       A    No, not that I recall.

17       Q    We will start getting into more of the

18   specifics of the actual investigation.  When did

19   you arrive on scene?

20       A    I think Detective Foley and I were the first

21   county detectives on scene.

22       Q    Would that have been on March 9, the night

23   of the shooting?

24       A    Yes.

25       Q    Were there any district attorneys on scene

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

26

1    before you guys got there?

2       A    No, not that I am aware of.

3       Q    Did any district attorneys arrive on scene

4    subsequent to you guys showing up?

5       A    That night, not that I remember.

6       Q    When did Kevin Chernosky become your point

7    of contact from the DA's office in this case?

8       A    I would say that night.

9       Q    Do you recall how that happened, how you

10   became aware of that, that he was your point of

11   contact?

12      A    No.  I mean, we deal regularly with the

13   District Attorney's office on all homicide cases

14   and usually go to the deputy.

15      Q    So you generally will -- you just assume you

16   are going to be working with Kevin Chernosky on

17   homicide cases?

18      A    At that time, yes.

19      Q    Did you have any meetings or phone calls

20   with Kevin Chernosky about the case early on?

21      A    Me one-on-one with Kevin Chernosky or -- I

22   don't recall.  I am sure we spoke at some point in

23   time about the case, but I couldn't give you a

24   specific date or time.

25      Q    So do you recall -- do you recall a specific

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

```
 1   date or time when you did have a meeting with Kevin

 2   or Lisa?

 3       A   I don't.

 4       Q   But there probably was one?  Do you think

 5   there was one at some point in time?

 6       A   I am sure at some point we discussed the

 7   case with them.

 8       Q   What was your role when you first arrived at

 9   the scene on March 9?

10       A   When I first arrived at the scene we were

11   trying to get a scope of what we had.  So just

12   being observant to see what we were dealing with

13   and updating my supervisor.

14       Q   Do you recall what types of evidence that

15   you guys were collecting at that point early on?

16       A   I mean, there is ballistic evidence, body

17   matter.  I mean, like we talked about in the

18   beginning, I mean, the scope of the scene was vast.

19   So, I mean, there was a lot of evidence.

20       Q   Do you recall having conversations with

21   Wilkinsburg officer Michael Adams the night of

22   March 9?

23       A   I do not.

24       Q   Did you have any discussions with him prior

25   to him making the, we will call it identification
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

28

```
 1    of Cheron Shelton?
 2        A    I mean, to tell you I didn't speak to him in
 3    any form that night, I can't remember.  So I don't
 4    want to speculate about that.  I don't recall of
 5    any -- I guess the word to use would be like
 6    substantial conversation with Sergeant Adams that I
 7    had that night.
 8        Q    Would it be fair to say that Sergeant Adams
 9    observation of the black male and the white
10    Lincoln -- was that the only lead that you guys had
11    connecting to somebody specifically?
12        A    That early on, that night, yes.
13        Q    So I believe that he makes the
14    identification on March 12; does that sound about
15    right?
16        A    I don't want to speculate on the date, but I
17    know it was a few days after.
18        Q    Prior to him making that identification,
19    were there any other leads coming in pointing to
20    any other suspects?
21        A    I mean, on a case like that we were getting
22    tips, you know, throughout.
23        Q    So just tips, nothing beyond tips?
24        A    Yes, from what I recall.
25        Q    Did you yourself meet with any tipsters
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

```
 1   about any knowledge they may have --
 2       A   Yes.
 3       Q   -- prior to the identification?
 4       A   Prior to the -- that I don't recall.
 5       Q   Do you recall meeting with tipsters?
 6       A   Yes.  Throughout the investigation I spoke
 7   to some, yes.
 8       Q   Do you recall how many tipsters identified
 9   Cheron Shelton and Rob Thomas as being involved?
10       A   I don't recall an exact number.
11       Q   Did any tipsters identify Rob Thomas or
12   Cheron Shelton?
13       A   I can't remember if they were identified by
14   name or not.
15       Q   Do you think -- is it accurate to say that
16   the tips that you were receiving, some of the tips
17   that you were receiving were saying Hill Top?
18       A   Yes.
19       Q   So you weren't getting information from
20   tipsters that it was specific people from Hill Top,
21   you were getting information it was someone from
22   Hill Top.
23           MR. BIONDO:  Object to form.
24       A   From what I recall, I don't remember exactly
25   if anybody said specific names.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

```
 1      Q   Do you recall what date you guys started
 2   applying for search warrants?
 3      A   Not exactly.
 4      Q   Just one moment.  Do you remember what your
 5   first search warrant was for?
 6      A   I believe it was a search warrant on Nolan
 7   Court.
 8      Q   That was because you guys traced the JBP2200
 9   from the white Lincoln to Nolan Court.
10            MR. BIONDO:  I object to form.  When you say
11   you guys --
12      Q   Allegheny County police.
13      A   I don't remember the license plate
14   specifically, but the search warrant on that
15   address, yes, was because of a vehicle that was
16   identified.
17      Q   Did you guys collect any evidence --
18            MR. BIONDO:  I am sorry, can we --
19      Q   Did your unit, your department, collect any
20   evidence at 1214 Nolan Court?
21      A   Yes.
22      Q   What type of evidence did you get from 1214
23   Nolan Court?
24      A   I don't remember exactly what was taken from
25   there, but I believe there was firearms.
```

1    Q    Is it safe to say that those firearms were

2    not used in the Wilkinsburg Massacre?

3    A    From what I recall from lab testing that

4    came back, I don't believe they were, no.

5    Q    In your experience with dealing with

6    evidence, did those weapons connect Cheron Shelton

7    to the Wilkinsburg Massacre?

8    A    I think the lab reports and those weapons

9    that were collected, they were not used in that

10   shooting.

11   Q    So would you agree that those firearms were

12   not connected to Wilkinsburg Massacre?

13   A    Correct.

14   Q    In fact, he was charged separately for the

15   firearm, correct?

16   A    I believe he was.

17   Q    We will get more specific at some point.  We

18   will go through each of the warrants, but I am

19   still just moving through the investigation.  So do

20   you remember when you specifically received

21   information about an individual named Calvin

22   Doswell?

23   A    Not specifically, no.

24   Q    Was it early on in the investigation?

25   A    Yes.

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

```
 1      Q    Were you the officer or detective that
 2  handled that aspect of the investigation?
 3      A    No.
 4      Q    Do you recall who that was?
 5      A    I don't know.
 6      Q    Do you recall having discussions about
 7  Calvin Doswell?
 8      A    Yes.
 9      Q    Could you inform me about what your
10  impression was of the Calvin Doswell situation?
11      A    I just knew that that was a homicide that
12  the city was investigating.
13      Q    You received information that Cheron Shelton
14  was close to Mr. Doswell?
15      A    Yes.
16      Q    And so are you saying that you had no
17  conversations with the Pittsburgh police officer
18  that was in charge of the Doswell investigation?
19      A    Right.  I don't think I spoke to any city
20  detective about that.
21      Q    And is it correct to say that your theory
22  was that Cheron Shelton committed this massacre in
23  retaliation against Lamont Powell for his allegedly
24  perpetrating the Doswell matter?
25      A    I don't think it was my theory.  Motive
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

33

```
 1    isn't needed for a homicide charge.
 2        Q   Why would you put that in your affidavit of
 3    probable case if that's not part of the theory?
 4        A   It is not mine.  I didn't come up with that
 5    theory but that was one aspect we were looking at
 6    as a possible motive to this.
 7        Q   So you and Foley are the initials.  What
 8    kind of discussions are you having about the
 9    Doswell situation?
10        A   I mean, we discussed that the city had a
11    murder, that they reached out to us and said, hey,
12    your victim in this Wilkinsburg shooting has been
13    linked to the Calvin Doswell murder.
14        Q   Do you recall how he was linked?
15        A   I don't know.  They developed in their
16    investigation some type of information that had him
17    as a someone they were looking at.
18        Q   Lamont Powell was never charged for that
19    murder, was he?
20        A   I don't believe he was.
21        Q   Did your department give any resources to
22    investigating the Calvin Doswell murder?
23        A   No.
24        Q   Do you think that it would have -- scratch
25    that.  Do you agree that closing the Doswell murder
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

34

```
1    could have helped your case if Lamont Powell was

2    charged?

3        A    No, I don't see how that would help our

4    case.

5        Q    So you don't think that if Lamont Powell was

6    charged with Doswell's murder that would make him

7    look more like a suspect in that murder?

8        A    I'm not sure I understand.  Are you talking

9    about before?  After?  I am a little confused.

10       Q    You would agree that in your affidavit of

11   probably cause you attribute a motive of

12   retaliation to Mr. Shelton for Lamont Powell

13   allegedly killing Calvin Doswell.

14       A    Yes, I mentioned that.

15       Q    And Mr. Powell was not charged for that

16   murder?

17       A    Correct, Mr. Powell was not charged.

18       Q    So would you agree with me that if he was

19   charged that would have improved your case?

20       A    I don't know if it would have improved the

21   case.

22       Q    What about a conviction?

23       A    I still don't know if -- it might have moved

24   a little bit more towards motive, but I don't know

25   that that would have improved what we had in this
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

```
 1    investigation.
 2       Q    What information -- what type of information
 3    did you guys receive from the city that pointed the
 4    finger at Lamont Powell for the Calvin Doswell
 5    murder?
 6       A    I don't remember personally any specifics
 7    into that.  I do know that the city had reached out
 8    to somebody in our unit saying when they heard
 9    Lamont Powell was a victim in our shooting, that
10    they were looking at him as a possible suspect in
11    the Doswell murder.
12       Q    Were you surprised based off of what you
13    knew at the time about Lamont Powell, were you
14    surprised to hear that he was potentially involved
15    in the murder?
16       A    No.  I don't find that surprising, no.
17       Q    And I believe Mr. Powell's nickname is
18    Murder?
19       A    I don't know.
20       Q    Did you guys investigate Lamont Powell for
21    any other murder?
22            MR. BIONDO:  I object to "you guys."
23       Q    Your department.
24       A    I don't know if the county police did or
25    not.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

1    Q    Did you theorize that Lamont Powell was the
2    prime target in this incident?
3    A    Yes.  That was a theory that we were
4    discussing.
5    Q    As a homicide detective, would you agree
6    that it would be important to investigate who had
7    motive to kill the prime target?
8    A    That is something that we look into,
9    although in a vast majority of our homicides that
10   we charge, we never get a motive.
11   Q    But in this one you did, correct?
12   A    Yes.  In this one we believe we had a
13   motive.
14   Q    Is it accurate to say that you never
15   investigated Lamont Powell for any of the other
16   potential murders that is he was involved in?
17             MR. BIONDO:  I object to form.  If you can
18   answer that, go ahead.
19   A    I don't believe that the county police
20   investigated Lamont Powell as a suspect in any
21   homicide.
22   Q    When this massacre initially happened would
23   you agree that it was sensational?
24             MR. BIONDO:  I will object to form.  You can
25   answer if you can.

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

```
 1      A   What are you implying?

 2      Q   In a general sense, big news, a lot of

 3   attention?

 4      A   Yes, that's fair.

 5      Q   Are you aware of any additional funding

 6   being made available either to the police

 7   department or the District Attorney's office from

 8   state or federal funds as a result of it being such

 9   a large investigation?

10      A   Not that I am aware of.

11              MR. JUBAS:  We will take a five minute

12   break.

13      (There was a recess in the proceedings.)

14   BY MR. JUBAS:

15      Q   So getting into the scene itself, was it six

16   individuals that were dead on scene?

17      A   I remember -- I believe there was four

18   individuals dead on scene.

19      Q   Did two subsequently die or one?  John Ellis

20   subsequently died.

21      A   Yes, years after.

22              MR. PETRUNYA:  It was five.

23      Q   So five initially and years later John Ellis

24   died.

25      A   Yes.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

38

1    Q   And Lamont Powell obviously was not killed?

2    A   Correct.

3    Q   And the theory was that they were -- the

4   victims were essentially funneled from the back

5   yard towards the back door, the porch door,

6   correct, by the initial shots?

7    A   That's what it appeared, yes.

8    Q   And a gunman with -- what type of firearm

9   was it?

10    A   A rifle.

11    Q   A gunman with a rifle was lying in wait

12   right next to the back porch, correct?

13    A   That's what it appeared, yes.

14    Q   And do you recall about how far away that

15   distance would have been between the gunman and the

16   porch?

17    A   I mean, we are in Wilkinsburg so the houses,

18   you know, older style houses are close together.  I

19   don't want to put a -- I don't recall an exact -- I

20   don't want to estimate an exact distance, but it

21   was fairly close.  I am sure you are familiar with

22   those style houses, they are close together.

23    Q   Does your department, homicide detectives,

24   do you guys carry a service weapon?

25    A   Yes.

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

39

1    Q    Do you receive training on that weapon?

2    A    Yes.

3    Q    How frequently are you trained on that

4    weapon?

5    A    Usually twice a year.

6    Q    Are there any instances where the homicide

7    department would use rifles?

8    A    The homicide unit specifically or our

9    department?

10    Q    Your unit, whoever you work with in the

11    homicide unit.

12    A    Some officers are qualified to carry rifles.

13    Q    Are you qualified to carry a rifle?

14    A    No.

15    Q    What are the qualifications to carry a

16    rifle?

17    A    You have to obtain the rifle and obtain the

18    necessary training classes for it and then keep

19    up-to-date your yearly training.

20    Q    Is it more difficult to use a rifle than

21    your service weapon?

22    A    I wouldn't say that.

23    Q    What is the reason for, I guess, additional

24    barriers to your unit being able to carry rifles?

25    A    Probably comes down to money that the

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

40

```
 1   department doesn't want to buy all officers --
 2   there are specs and standards.  You have to buy
 3   your own.
 4        Q   Have you ever fired a rifle before?
 5        A   Yes.
 6        Q   Have you ever fired the type of rifle that
 7   was fired in this case?
 8        A   That I don't know.
 9        Q   Is it easy to fire a rifle?
10        A   I am sure it is different for everybody.
11        Q   Would you agree with me whoever was wielding
12   the rifle in this instance on March 9 was
13   proficient with the use of that rifle?
14        A   They got results.
15        Q   Would you agree with me that if not all,
16   nearly all of the victims received head shots?
17        A   I don't remember.
18        Q   If that is the case and if they did receive
19   head shots on top of being riddled with bullets,
20   would you agree with me this individual is a good
21   shot?
22        A   Again, they got the results they were
23   looking for.
24        Q   So are you saying that you are not sure
25   whether four or five head shots is not indicative
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

1    of an individual being a good shot?

2        A    I think you have to look at how many shots

3    they fired, but yes.

4        Q    How many shots were fired?

5        A    I don't remember how many rifle casings we

6    collected.

7        Q    Are you saying that you did not put that

8    much weight on the fact that these individuals, say

9    four or five individuals received head shots?

10       A    I did not, no.

11       Q    Do you think that somebody that is drunk

12    could have achieved that level of accuracy?

13       A    I would say it would be easier with the

14    rifle as opposed to a handgun, but I don't know

15    exactly -- I am sure everybody handles alcohol

16    different.  I don't know.

17       Q    Since Lamont Powell, he survived, what was

18    it that led you guys to believe that he was the

19    target?

20       A    I feel the information from the city.

21       Q    You didn't receive any documentation about

22    that.  It was just hearsay, correct?

23       A    I think the city provided us some of their

24    reports.

25       Q    They provided reports, but you would agree

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

1    they didn't provide any reports specific to Lamont

2    Powell.

3        A    Not that I remember.

4        Q    The only information you guys relied on

5    regarding Lamont as target was hearsay?

6        A    Sure.

7        Q    Is there a preference within the homicide

8    unit with regards to how to obtain cell phone

9    information?  I can ask that more specifically.

10   Are there various ways to obtain cell phone

11   information?  Are you able to get search warrants?

12   Are there any other ways beyond getting a search

13   warrant that you can get access to cell phone

14   information?

15       A    Yes.

16       Q    Explain those for me?

17       A    You could get a court order.  You could get

18   the physical device and download it.

19       Q    Could you explain to me what the difference

20   is between a search warrant and a court order?

21       A    A court order comes and is signed by the

22   judge and gets sent off, you know.  I don't have a

23   lot of experience with court orders.  In my time in

24   the homicide unit, since they changed it, you have

25   to type a search warrant.  Court orders are no

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

43

1    longer used.  So I don't really know.

2        Q    What was the protocol for court orders in

3    2016 when this incident occurred?

4        A    I think in 2016 I think you could still get

5    a court order for cell phones.

6        Q    Would it be accurate to say that it would be

7    easier to get a court order than a search warrant?

8        A    I don't know.  Again, my experience with

9    court orders is not that -- for cell phone stuff is

10   not vast.

11       Q    You were obviously not one of the detectives

12   that applied for any court orders.

13       A    I think I just did search warrants.  I don't

14   recall my name for any court orders.

15       Q    How did your unit decide who would apply for

16   the court orders?

17       A    I think it would be timing on who is doing

18   what tasks.

19       Q    So availability and who was specifically

20   with that person --

21       A    Correct.

22       Q    -- that is being investigated?

23       A    Maybe person or just available and has

24   knowledge of what was going on at the time.

25       Q    Now when you guys, your unit was

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

44

1  investigating this early on and your unit began

2  applying for court orders, was your unit having

3  meetings about the individual court orders that

4  were being applied for?

5      A   I don't know about the individual court

6  orders, that I don't remember.

7      Q   Would the detectives that were applying for

8  the court orders, would they have come to you to

9  discuss this?  Would you have gone to Lieutenant

10  Schurman to discuss it or would they have made this

11  decision on their own?

12      A   Probably not come to me.  They probably

13  would have discussed with the unit supervisors and

14  the DA's office.

15      Q   Who would the unit supervisors have been?

16      A   At the time it was Lieutenant Schurman and

17  Sergeant Scherer.

18      Q   Are you aware whether the detectives

19  themselves would have approached the supervisors to

20  ask if they could get a court order or whether they

21  would have been approached by the supervisors to

22  get a court order?

23      A   I'm not sure.

24      Q   And you mentioned that they also would have

25  dealt with the DA's office?

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

45

```
 1      A    Yes.

 2      Q    Are you aware of whether the district

 3   attorney at all was either suggesting or telling

 4   anybody in your unit to apply for court orders?

 5      A    I don't remember if they would have

 6   specifically said or said, you know, apply for

 7   this, but it definitely could have been like, oh,

 8   you don't need a search order for that, get a court

 9   order.  That's a possibility.

10      Q    Are you aware of whether the District

11   Attorney's office has its own investigative arm?

12      A    They do.

13      Q    Would we consider them detectives?

14      A    That's their title I believe.

15      Q    Did you work with any of those detectives on

16   the initial investigation prior to the charges?

17      A    No, not that I recall.

18      Q    And did you work with any of the detectives

19   subsequent to the charges?

20      A    Not that I recall.

21      Q    So the contact you were having with the

22   District Attorney's office was strictly with the

23   District Attorney's themselves?

24      A    Yes.  With lawyers, with attorneys.

25      Q    Just generally speaking, it wasn't until the
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

46

```
 1    third week of June that you charged our clients,
 2    correct?
 3        A    That sounds about right.
 4        Q    And it was in early April where your unit
 5    had spoken with two confidential informants,
 6    correct?
 7        A    I don't remember the month, but that sounds
 8    appropriate, around that time period.
 9        Q    And there was approximately a two month gap
10    between you dealing with these informants and
11    charging our clients, correct?
12        A    Yes, that's fair.
13        Q    In that two months was there any additional
14    evidence that you developed that you put in the
15    affidavit of probable cause?
16        A    I don't remember.
17        Q    Is it possible that there was no additional
18    evidence developed?
19        A    I would say that's possible, yes, in that
20    time frame.
21        Q    In early April when your unit dealt with
22    those two informants, did you after developing that
23    evidence, did you have probable cause to charge
24    them in early April?
25        A    In my opinion, yes.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

47

```
 1      Q    Why didn't you?
 2      A    I don't have an answer for that.  I mean, we
 3   can't just file homicide charges whenever we want
 4   as the police.  Everything that we do has to be
 5   reviewed and approved by the DA's office before
 6   anything is filed.
 7      Q    Is it accurate to say you attempted to file
 8   the charges?
 9      A    I don't think I would phrase it that way.  I
10   think it is fair to say that we updated the
11   District Attorney's office along the way of what we
12   have.
13      Q    Do you have any discretion in charging?
14      A    No.  Not for homicide charges and aggravated
15   assault charges.  If a patrolman has a theft, he
16   can charge a theft without DA approval.  If that
17   makes sense to you.
18      Q    Do you make suggestions to the District
19   Attorney's office to say that we believe we have
20   probable cause?
21           MR. BIONDO:  I am going to object to the
22   form.  Are we talking about him specifically or the
23   officers within his unit?
24      Q    Him specifically.
25      A    I am sure at some point in time during my
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

48

1   career, yes, I have given my opinion on whether I

2   think we should charge or not.

3      Q   Do you recall when you started typing up the

4   criminal complaint?

5      A   No.

6      Q   Did you type up the criminal complaint when

7   it was decided they would be charged?

8      A   I don't remember, I am sorry, when exactly

9   it was written.

10     Q   Within the software that you use for

11  evidence, would the drafts of your affidavit be

12  included within that software or is that separate?

13     A   In the evidence -- we file -- no, I don't

14  think the drafts are.  I am a little confused.

15     Q   Would you agree with me that in a case like

16  this where there are a lot of affidavits of

17  probable cause that you guys are not, your unit is

18  not just individually typing up every single one.

19  Would you agree that you're taking chunks, copying

20  and pasting?

21     A   Yes, chunks are taken from other

22  investigative reports.

23     Q   How does that work?  Do you just have a

24  paper document that you are looking at from a prior

25  affidavit and then you are copying it or do you

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

49

```
 1   have Word documents that you are able to copy and
 2   paste from?
 3       A   Yes.  There is Word documents or where the
 4   reports are formed in.  Allegheny County is the
 5   ASAP programs to type the criminal complaint.
 6       Q   Is that what you used then?
 7       A   That complaint was filed using the ASAP
 8   program.
 9       Q   All of the affidavits of probable cause in
10   this case were typed using the ASAP program?
11       A   For criminal complaints, yes.
12       Q   What about search warrants?
13       A   No, they are on the state search warrant
14   template.
15       Q   Is there any way for you to copy and paste
16   from the state's search warrant templates?
17       A   Yes.
18       Q   Do you recall which officer interviewed the
19   two cooperating witnesses?
20       A   I remember one of the two.
21       Q   Who was that?
22       A   Foley and Grill.
23       Q   And you were not involved in interviewing
24   either of them?
25       A   No.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

50

1    Q    Was there a discussion between you and Foley

2    about whether these informants provided probable

3    cause?

4    A    I don't remember.

5    Q    But you personally, it is your belief that

6    after you developed the witnesses, those two

7    confidential informants in April, that you had

8    probable cause to charge our clients?

9    A    Again, I don't remember if we obtained more

10   evidence from April until June.  So I guess I don't

11   know if it is fair to say exactly that right after

12   we talked to them that I was, oh, yes we have a PC.

13   I would have to look.  I don't remember what else.

14   Q    Was there any frustration within the

15   homicide department that charges were not being

16   filed after early April when these informants were

17   interviewed?

18   A    I don't think so.  I don't think.

19   Q    What were the circumstances of the charging

20   decision in June?

21        MR. BIONDO:  I will object to form.  If you

22   can answer it, go ahead.

23   A    Are you able to rephrase?

24   Q    You were one of the initials on the case.

25   As an initial in the biggest case of your career

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

51

1    was that a -- do you remember when the charging

2    decision was made?

3        A    I think it was around that June time period

4    that the complaint was filed.

5        Q    Do you recall how that charging decision was

6    made?

7        A    I don't.

8        Q    Do you recall how you heard that a charging

9    decision was made?

10       A    I can't remember if I heard from the DA's

11   office directly or the supervisors.

12       Q    So you were in the dark about charging in

13   this case?

14            MR. BIONDO:  I will object to form.  Go

15   ahead, you can answer it.

16       A    I don't want to say totally in the dark, but

17   those charging decisions were not mine.

18       Q    Did you have discussions with your

19   supervisors about probable cause prior to charging?

20       A    Yes.

21       Q    Could you inform me what specific supervisor

22   you discussed this with?

23       A    I don't remember.  My supervisors were

24   Lieutenant Schurman and Sergeant Scherer.  I am

25   sure I spoke to them about the case.  If you are

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

```
 1    looking for an exact date and time, I don't
 2    remember.
 3        Q   The two informants, Kendall Mikell and
 4    Freddie Collins was Witness 2, did they provide the
 5    homicide unit with any evidence besides their
 6    statements?
 7        A   I don't believe so.
 8        Q   Generally speaking, when you are dealing
 9    with an informant would it help to prove their
10    credibility if they were able to provide you other
11    forms of evidence beyond the statement?
12        A   Yes.
13        Q   Because that would allow you to corroborate
14    what they said, correct?
15        A   Correct.
16        Q   In absence of that, would you agree with me
17    it would be a best practice to investigate what
18    they are saying in order to corroborate what they
19    are saying.
20        A   Yes.  We would want to look into what they
21    are saying?
22        Q   Would it be correct to say that you would
23    also want to investigate them to determine their
24    veracity or to say it another way to determine
25    whether they are telling the truth?
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

53

```
 1      A   Yes, we are seeking the truth.  That's what
 2  we want to look at.
 3      Q   So you would investigate them to try to
 4  corroborate their statements, correct?
 5      A   Yes, we would want to look how they obtained
 6  this information.
 7      Q   I am not sure at what point you did the
 8  drive test.  Do you recall when you did that?
 9      A   I don't recall the date on that.  I remember
10  authoring a report.  If you are referring to time
11  and distance studies?  I remember authoring a
12  report for that.  But I can't tell you the date and
13  time now.
14      Q   Okay.  Was that you and Foley?
15      A   I don't remember.
16      Q   Is it fair to say that the reason that you
17  did that time and distance study was because it was
18  your theory that Cheron Shelton drove from Nolan
19  Court to the crime scene shortly before it
20  occurred?
21      A   I can't remember if it was Nolan Court to
22  the crime scene or the crime scene back to Nolan
23  Court that we were looking at, but those were the
24  two locations that we were looking at, yes.
25      Q   Are you saying that you don't recall whether
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

54

```
 1   it was your theory that Cheron Shelton drove from
 2   Nolan Court to the crime scene?
 3      A   Right.  I don't know if he made any more
 4   stops is what I am saying.
 5      Q   Do you recall about what the time and
 6   distance was?
 7      A   No, I don't.  I am sorry.
 8      Q   If I said about 10 minutes, would that sound
 9   accurate, from Nolan Court to Franklin Street?
10      A   I don't want to speculate on the number.  I
11   know it is documented in my report.
12      Q   We will get into the specifics.  That's no
13   problem.
14          Do you recall whether -- did you believe
15   that Cheron Shelton was there at the scene around
16   Franklin Avenue for hours?
17      A   I don't remember that.
18      Q   Do you recall whether any of the evidence
19   that your unit had developed throughout this
20   investigation was in contradiction with the
21   information that was provided by the confidential
22   informants?
23      A   I don't remember giving a specific.
24      Q   We will get into the specifics.  I was
25   trying to generally get your feel for the case.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

55

```
 1     A   Sure.
 2     Q   Generally speaking, if confidential
 3  informants are providing contradictory information
 4  relative to your investigation, does that weigh in
 5  on whether you would use them?
 6     A   I am sure that's something that we would
 7  look at, yes.
 8     Q   Why is that?
 9     A   Because, again, we are seeking the truth.  I
10  mean, that's why we are doing this.  We want to
11  find the truth, what happened.
12     Q   Would it be accurate to say that if a
13  confidential informant's information is
14  contradicted by the police investigation that would
15  shed a negative light on the credibility of the
16  informant?
17     A   Sure.
18     Q   And as an initial in an homicide
19  investigation that would weigh in on your decision
20  with regards to how you are going to use that
21  informant, correct?
22     A   Yes.  I wouldn't put it all on the initial
23  but as a unit, yes.
24         MR. JUBAS:  Do you guys have a preference
25  for a time as to when we take a lunch break?
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

```
 1              MR. BIONDO:  I don't.

 2              MR. PETRUNYA:  I would say -- let's go off

 3   record.

 4      (There was a recess in the proceedings.)

 5      (Exhibit 1 was marked for identification.)

 6   BY MR. JUBAS:

 7      Q   Sergeant Dolfi, I am going to hand you what

 8   I will mark as Exhibit 1, and this is your

 9   affidavit of probable cause charging the homicide

10   and this is the Cheron Shelton complaint.

11   Sergeant, as I am sure you are aware, just because

12   of the nature of the case, you did bounce around

13   here and there, so we will just take it step-by-step

14   and take it as it comes.

15          Is it correct that you were the affiant

16   officer for the criminal complaint against Cheron

17   Shelton?

18      A   Yes.

19      Q   Did you say that you and Detective Foley

20   teamed up to write this?

21      A   I think the whole unit did.  Everybody

22   helped out.

23      Q   So this exhibit is Bates numbered 185

24   through 197.  Sergeant Dolfi, I want to direct your

25   attention to the second page that's Bates No. 186.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

```
 1    We have No. 5, and it has the heading of "why
 2    affiant believes the source of information."  Now,
 3    obviously there isn't just one source of
 4    information in this case.  So is it fair to say
 5    that we are talking about sources of information?
 6        A    Yes.
 7        Q    And there is an X next to "source is
 8    presumed reliable."  Is that indicative that
 9    sources you cite within this document are reliable,
10    that you presume them to be reliable?
11        A    Yes.
12        Q    And then there is also an X by "affiant
13    and/or other police officers corroborated details
14    of the information"; is that correct?
15        A    Yes.
16        Q    That would indicate either you or other
17    officers that you were working with corroborated
18    the details that are provided in this document.
19        A    Yes.
20        Q    All right.  So moving on, I'm not going to
21    pay much attention to page 3 of 13.  So just
22    briefly talking about on page 4 of 13, Officer
23    Adams.  Is it accurate to say that Officer Adams
24    claimed to have observed a white Lincoln with an
25    individual in it that would eventually be connected
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

58

1    to Cheron Shelton?

2        A    I believe he viewed him on foot at first and

3    then getting into the white Lincoln, yes.

4        Q    So that is a source of where the license

5    plate for the white Lincoln came from?

6        A    Yes.

7        Q    He was in -- Officer Adams was in his patrol

8    car when he was making this observation?

9        A    Yes.

10       Q    And Officer Adams did not have a dash cam on

11   his patrol car; is that accurate?

12       A    I don't believe that he did.

13       Q    So the only evidence that you were able to

14   prove regarding this license plate was Officer

15   Adams statement that he signed?

16       A    Correct.

17       Q    Moving down, we are at the fourth paragraph,

18   and it says "during the course of the

19   investigation, detectives received numerous

20   anonymous tips."  Were you receiving anonymous tips

21   exclusively that this shooting originated in the

22   Hill Top or were there other -- was there other

23   information as well coming in from anonymous tips?

24       A    I think there was other information, but I

25   don't think it would be accurate to say that every

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

59

1    tip that came in said Hill Top.

2        Q    Do you recall when the tips started coming

3    in pointing towards Hill Top?

4        A    It was soon after.  I can't put an exact

5    time, the time frame on it, but it was early into

6    the investigation.

7        Q    Did you say that the Pittsburgh police

8    reached out to the Allegheny County police homicide

9    department to inform them about Doswell?

10       A    At some point, yes.

11       Q    That wasn't an inquiry that started with you

12   guys reaching out the Pittsburgh police, they came

13   to you?

14       A    Yes.

15       Q    Based off of the observation of Officer

16   Adams, and the anonymous tips you guys were getting

17   referring to the -- that Allegheny County police

18   was getting with regards to the Hill Top

19   involvement, that is what led Officer -- I believe

20   it was Detective McCue to look at the Nolan Court

21   video?

22       A    Yes.

23       Q    Could you walk me through it?  I know it is

24   in the affidavit, but could you walk me through

25   that from your perspective, how that portion of the

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

60

```
 1    investigation was developing with Detective McCue?

 2       A    Is there anything specific?

 3       Q    Just generally.  How did you become aware of

 4    the fruits of Detective McCue's investigation of

 5    the Nolan Court video?

 6       A    I believe through discussion with him that

 7    he located video.

 8       Q    Was this happening just randomly through

 9    discussion, or did you guys have a daily briefing

10    where everybody would talk about --

11       A    There were briefings done on the case.  Now

12    when this incident happened, I was on the p.m.

13    shift so working 4:00 p.m. to midnight.  So, you

14    know, whatever briefings -- the bulk of the unit

15    works daylight, but there were briefings held

16    throughout on the case with information sharing.

17       Q    Were these briefings isolated to the

18    Allegheny County homicide unit or were other

19    departments involved in the briefings as well?

20       A    I would have to say both at some point in

21    time.

22       Q    Were there more resources, more

23    investigative resources including officers

24    available from other units and departments in this

25    case?
```

```
 1            MR. BIONDO:  I object to the form.  You mean
 2  within Allegheny County?
 3     Q   Including the Feds, say the ATF.  Were your
 4  briefings larger than usual when you were dealing
 5  with this case?
 6     A   Not normally, no.
 7     Q   Do you recall if Officer Robert Shaw who
 8  provided the Doswell information, was he present at
 9  any of the briefings?
10     A   Not that I remember.
11     Q   Do you recall what time the shooting took
12  place?
13     A   I don't recall exactly.  If you would like
14  me to look at the criminal complaint.
15     Q   Page 3 of 13, third paragraph, it says
16  approximately 10:54 p.m.
17     A   Correct, that would be accurate.
18     Q   And there is a number of ways to prove that
19  it occurred at 10:54 p.m., correct?
20     A   Correct.
21     Q   I want to draw your attention -- getting
22  back to page 4 of 13, I will draw your attention to
23  paragraph 5, and about midway down it says that
24  "the vehicle matches the description of the vehicle
25  that Officer Adams observed the night of the
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

1    murders in the vicinity of the murders," correct?

2        A    Correct.

3        Q    And the vehicle that we are talking about is

4    the white Lincoln that Cheron Shelton was connected

5    to?

6        A    Yes.

7        Q    And that vehicle, looking at that same

8    paragraph, "that vehicle remained in the parking

9    lot until approximately 10:28 p.m.," correct?

10        A    Yes.

11        Q    Just drawing your attention to two

12    paragraphs down it says "through several time and

13    distance studies" -- you were involved in those,

14    correct?

15        A    Yes.

16        Q    And the results of the time and distance

17    study is that Nolan Court where the vehicle came

18    from at approximately 10:30 was 3 miles and 10

19    minutes from the crime scene, correct?

20        A    Yes.

21        Q    So I think there was -- just to tie up some

22    loose ends about what we discussed previously, it

23    is accurate to say your theory was that Cheron

24    Shelton drove the white Lincoln around 10:30 p.m.

25    from Nolan Court to the crime scene, correct?

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

63

```
 1     A   Correct.

 2     Q   Which at 10:30-ish would make that about 20

 3   minutes essentially before the shooting occurred.

 4     A   Yes.  Approximately, yes.

 5     Q   In your opinion, did that time and distance

 6   study, did that give the assailant enough time if

 7   they were coming from Nolan Court 20 minutes prior,

 8   did that give them enough time to get there and

 9   execute this shooting?

10     A   Yes.

11     Q   This evidence was used to collect or rather

12   to obtain a search warrant for 1214 Nolan Court,

13   correct?

14     A   We did obtain a search warrant for Nolan

15   Court.

16     Q   That would have been -- was that March 10?

17   Well, regardless, whose residence was 1214 Nolan

18   Court?

19     A   If I recall, Cheron Shelton and his mother

20   and sister I believe.

21     Q   I think that the Ross Garden Court is where

22   Cheron lived and then his mother and sister lived

23   at 1214 Nolan Court.

24     A   I don't remember.

25     Q   We will tie it all up.  Were you involved in
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

64

1    the execution of the search warrant at 1214 Nolan

2    Court?

3        A    Eventually.

4        Q    Could you explain what you mean by that?

5        A    I authored the search warrant, and then

6    after getting it approved by the DA's office, I had

7    to take it to the judge to get signed.  Once it was

8    signed and approved by the judge, I believe they

9    executed the warrant.  So I showed up afterwards.

10       Q    Was it Kevin Chernosky that signed off on it

11   for the DA's office?

12       A    I don't remember.

13       Q    Do you recall what your unit confiscated

14   from 1214 Nolan Court?

15       A    As we talked about earlier, I think firearms

16   were taken.  I can't remember what -- if there was

17   anything else.

18       Q    And ultimately a thumbprint connecting Mr.

19   Shelton to one of the firearms at 1214 Nolan Court

20   was obtained?

21       A    Yes.  From what I remember, yes.

22       Q    That was enough for you guys to get a

23   probation violation on him?

24            MR. BIONDO:  I will object to form.  If you

25   can answer, go ahead.

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

1    A    I remember -- I do think he was violated

2    because of that, and I don't remember if there was

3    any other charges.

4    Q    But we have established though that what was

5    found at 1214 Nolan Court did not connect him to

6    the Wilkinsburg Massacre, correct?

7    A    Correct, as I said earlier.

8    Q    I want to jump to page 5 of 13 and about

9    halfway down, five paragraphs, we have your mention

10    of Lamont Powell being a suspect in the Doswell

11    murder, correct?

12    A    Yes.

13    Q    And, again, that was based on the hearsay

14    statement of Officer Richard Shaw I think it was?

15    A    I don't remember which city detective

16    reached out to us, but it came from a city police

17    detective.

18    Q    Do you recall the circumstances under which

19    detectives on March 12 showed Officer Adams the

20    still image?

21    A    I do not.

22    Q    So you don't recall if it was in a briefing

23    or whether somebody reached out to him outside?

24    A    I don't remember Officer Adams being in our

25    office for anything like that, but I do not know.

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

66

```
1      Q   So under that paragraph, the affidavit is
2   discussing what was collected from 1214 Nolan
3   Court, correct?
4      A   Yes.
5      Q   If none of this evidence connected Mr.
6   Shelton to the Wilkinsburg Massacre why did you
7   place this in the charging document?
8      A   I don't remember.  I think just showing, you
9   know, we executed a documented search warrant, and
10  we were putting in there what was recovered, the
11  fruits of that search warrants were.
12     Q   Understood.  But you would agree with me
13  that didn't contribute to probable cause to arrest
14  him for the massacre?
15     A   No.  I think as we discussed, his weapons
16  were tested by the lab and found not to be.
17     Q   But you did find some indicia of residency
18  connected to Mr. Shelton, correct?
19     A   I don't remember.
20     Q   On next page, 6 of 13, based off of the
21  evidence that your unit collected, you obtained a
22  search warrant for 7167 Ross Garden Road in
23  Pittsburgh, correct?
24     A   Yes.
25     Q   And that search warrant was applied for by
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

1    yourself and Detective Hitchings, correct?

2      A    Yes.

3      Q    And at 7167 Ross Garden Road when that

4    search warrant was executed, you confiscated three

5    pieces of evidence.  Is it fair to say none of the

6    evidence that you confiscated from 7167 Ross Garden

7    Road connected Mr. Shelton to the Wilkinsburg

8    Massacre?

9      A    Not that I am aware of, no.

10     Q    Going down to the next paragraph, we have on

11   March 25 Cheron Shelton being apprehended at 6914

12   Hartmans Lane in Pittsburgh, correct?

13     A    Yes.

14     Q    Was that the home of his girl friend Channel

15   Falls to your recollection?

16     A    I don't remember if that was her address or

17   her father's address.

18     Q    And did you search that location or did your

19   unit search that location?

20     A    The unit was there.  I don't know if -- I

21   don't remember if there was a search done of that

22   house.

23     Q    But fair to say that no evidence connecting

24   Mr. Shelton to the Wilkinsburg Massacre was

25   collected from the location that he was arrested

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

68

1    in?

2        A    Not that I recall.

3        Q    Under that paragraph, we are still on page 6

4    of 13, it says that "Cheron Shelton was placed in

5    the Allegheny County jail on the above-listed

6    charges."  Were you involved with transporting him

7    to the Allegheny County jail?

8        A    I don't think I was.  I don't remember

9    transporting him.

10       Q    Do you know who handcuffed him and took him

11   in?

12       A    I don't know.

13       Q    Would it have been somebody from your unit?

14       A    It might have been from the sheriff's office

15   based on what was -- based on the paragraph above

16   with the fugitive task force.

17       Q    I am assuming you've made numerous homicide

18   arrests, correct?

19       A    Yes.

20       Q    Have you ever been responsible for

21   transporting somebody that you just arrested to the

22   Allegheny County jail?

23       A    Yes.

24       Q    Walk me through that process.

25       A    I mean, upon arrest, they are searched,

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

69

1    handcuff secured, and put in a police vehicle, and

2    they are transported to the Allegheny County jail.

3    When we arrive at the jail, we are buzzed into the

4    sally port, and we go into the sally port, secure

5    your weapons, and you take the prisoner in to

6    intake.

7        Q    And what happens when you get the prisoner

8    into intake?

9        A    At that point in time the jail staff

10   conducts their search of the prisoner, and the

11   prisoner meets with the nurse and mental health

12   doctors there, and it is deemed whether they are

13   accepted into the jail or not.  And once they are

14   accepted into the jail, we leave, and that's it.

15       Q    Are you aware of what happens once they are

16   accepted into the jail?

17       A    No.

18       Q    Generally speaking, when you arrest an

19   individual, do you have to take them straight to

20   the jail or can you also take them to say

21   headquarters to interrogate them?

22       A    Yes.  There are times that they are not

23   transported directly to the county jail.

24       Q    Procedurally for you, does that look any

25   different?  Do you have to fill out forms or

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

```
 1   anything like that?
 2       A   If they are brought back to headquarters and
 3   placed in a room, we would audio and video record
 4   the room and document that.
 5       Q   Does the Allegheny County police department
 6   have any investigators or detectives that work in
 7   the Allegheny County jail?
 8       A   Yes.
 9       Q   Who would those be?
10       A   Right this second?
11       Q   At the time.
12       A   At the time I believe Inspector Palmer was
13   assigned to the jail, and I don't remember the
14   other detective.
15       Q   Passaro?
16       A   That sounds right.
17       Q   Did you have contact upon arresting either
18   Mr. Shelton or Mr. Thomas with either Inspector
19   Palmer or Detective Passaro?
20       A   I don't remember having direct contact with
21   them, no.
22       Q   How about at any point in the investigation,
23   do you recall having direct contact with either of
24   them?
25       A   I can't say that I didn't speak to either
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

71

```
 1    one of them at all.  I don't remember anything of
 2    substance that I personally spoke to them about.
 3        Q    Are they the point of contact for the
 4    Allegheny County police department when it comes to
 5    cooperating informants within the Allegheny County
 6    jail?
 7        A    To what end?
 8        Q    Generally.
 9        A    As far as -- I don't know if that's
10    totally -- I mean, they work there.  They are
11    assigned there.  If we want to come down and speak
12    with somebody, we might arrange that through them
13    since they are there.
14        Q    Do they have an investigative capacity?
15        A    Yes.
16        Q    So in this case, the confidential informants
17    came from Allegheny County jail.
18        A    Yes.
19        Q    Do you recall who made first contact with
20    either Passaro or Inspector Palmer?
21        A    No, I do not.
22        Q    Do you recall whether they made first
23    contact with your unit?
24        A    They could have.  I don't know to be
25    certain.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

1     Q   I realize that this was a while ago, and so

2   I understand if you don't recall.  Do you recall

3   whether Inspector Palmer was on vacation at any

4   point early on in the investigation?

5     A   I can't, I am sorry.

6     Q   Is Palmer employed exclusively through the

7   police or is he also employed by the jail?

8     A   No, through the Allegheny County police.

9     Q   If he was on vacation would he have had to

10  have applied for that vacation through the police

11  department.

12          MR. BIONDO:  I am going to object to form.

13  Go ahead if you can answer.

14    A   I'm not -- the inspector position is a

15  command level position.  I'm not sure how they do

16  their vacation.  That rank is a command level

17  position.

18    Q   But would you assume that he would have to

19  account for the vacation with the Allegheny County

20  police?

21    A   Allegheny County police is his employer, but

22  I don't want to speculate.  I don't know how the

23  command level -- he is not in a bargaining unit

24  like myself where our vacations are by contract, do

25  you know what I mean.  I'm not certain how the

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

73

```
 1    command officers do it.

 2        Q    How are you notified if any informant in the

 3    Allegheny County jail wants to cooperate on a case?

 4        A    Usually from our detectives assigned at the

 5    jail.

 6        Q    Are you ever notified by the informants

 7    themselves they want to cooperate in a case?

 8        A    I mean, I can't say it has never happened.

 9    I mean --

10        Q    Have you ever received a phone call from an

11    inmate at the Allegheny County jail?

12        A    I have not.

13        Q    Do you know if that is possible for an

14    inmate at the Allegheny County jail to contact

15    somebody at the Allegheny County police department?

16        A    Yes.  If they had their phone number and

17    money on their account, they can dial out.

18        Q    Do you know if there is a pin number that

19    can be dialed from an inmate's phone at the

20    Allegheny County jail that will give them a line to

21    the Allegheny County police department?

22        A    I don't know about that, no.

23        Q    Did you know that in this case one of the

24    cooperating informants Freddie Collins was able to

25    use a pin number to inform somebody that he had
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

74

```
 1   information on Cheron Shelton?
 2              MR. BIONDO:  I will object to form.  If you
 3   can answer.
 4      A    I don't know how Freddie Collins first
 5   reached out.
 6      Q    Are you aware of Pod 7D in the Allegheny
 7   County jail being a quote-unquote snitch pod?
 8      A    No.
 9      Q    Would you agree with me that both of your
10   confidential informants came from Pod 7D?
11      A    I don't remember what pod they were on.
12      Q    We will get some documentation to refresh
13   your recollection.
14              Just real quick.  I want to draw your
15   attention to page 8 of 13.
16      A    Yes.
17      Q    And we are going to look at the third from
18   the bottom, do you see where it discusses Pod 7D?
19      A    Yes.
20      Q    So you can take some time to review this,
21   but would you now agree with me both of these
22   confidential informants came from Pod 7D?
23      A    Witness 1 did based on the affidavit.  I
24   would have to go to the next page if that's okay to
25   look at Witness 2.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

```
 1      Q    Please do.
 2            MR. PETRUNYA:  I think 12 is where it
 3   mentions it.
 4      A    I see where it says pod.  I am looking for
 5   the pod number on page 12.  I see the word pod.
 6            MR. PETRUNYA:  Just off the record.
 7      (An off-the-record discussion was held.)
 8      Q    Eventually you guys arrest Robert Thomas,
 9   correct?
10      A    Yes.
11      Q    And Robert Thomas gives a statement,
12   correct?
13      A    Robert Thomas was interviewed, yes.
14      Q    Do you recall who interviewed Robert Thomas?
15      A    I believe Detective Hitchings interviewed
16   Rob Thomas.
17      Q    So Detective Hitchings interviewed Robert
18   Thomas.  Do you remember that it was Detective Pat
19   Miller that filled out the application for an order
20   disclosing the phone number you guys believed was
21   connected to Rob Thomas?
22      A    I know Pat Miller did some court orders.  I
23   can't remember specifically if he did that one
24   right now.
25      Q    Do you recall that the Allegheny County
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

76

1    District Attorney's office conceded that Detective

2    Pat Miller included a false statement in that

3    affidavit of probable cause?

4              MR. BIONDO:  I will object to form.  Go

5    ahead.

6    A    I remember a suppression hearing that took

7    place, but I don't know if I was in there or not to

8    see if they conceded or what the DA's office

9    conceded.

10   Q    Was that something that you had investigated

11   as this was happening?  Did you investigate the

12   accuracy of what Detective Pat Miller was putting

13   in this affidavit of probable cause?

14             MR. BIONDO:  I will object.  When you say

15   you, are you using --

16   Q    Him as the affiant for the criminal

17   complaint and also as the initial, one of the

18   initials.

19   A    I don't remember looking into --

20   Q    Would you have been looking, so to speak

21   looking over Detective Miller's shoulder to see

22   whether everything he was putting in his affidavit

23   was accurate?

24   A    No.

25   Q    So is it accurate to say that any of the

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

1    information that you got from Detective Miller

2    regarding what Hitchings said with regards to the

3    Robert Thomas interview, you take him at his word?

4        A    Yes.

5        Q    Along with any other police officer you are

6    working with?

7        A    Yes.

8        Q    Were there any previous instances in your

9    experience working with the Allegheny County police

10   department where Detective Patrick Miller had

11   fabricated evidence that you are aware of?

12       A    Not that I am aware of.

13       Q    If you were aware that he had fabricated

14   evidence previously would that impact your decision

15   whether you were going to believe what he puts in

16   his affidavit?

17       A    Yes.

18       Q    What would you do in that circumstance?

19       A    Well, I would want to double check all of

20   his work.  My name is on this.  If I didn't believe

21   his charging document to be true, I would not have

22   put my name to it.

23       Q    I want to draw your attention -- and we are

24   on page 7 of 13.  I want draw your attention to the

25   fourth paragraph down where it says that detectives

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

```
 1    applied for court order for cell phone records

 2    belonging to the 0447 number.  Would you agree that

 3    was the number that you guys believed belonged to

 4    Cheron Shelton?

 5        A    I don't remember specifically that number.

 6        Q    Would it refresh your recollection to read

 7    that paragraph?

 8        A    Yes.

 9        Q    Please do.

10        A    Yes.

11        Q    Now is it safe to assume that the same --

12    your demeanor remained the same for the detectives

13    that were applying for this court order, that you

14    would not have been looking over their shoulders?

15        A    Correct.

16        Q    And so what Detective Towne placed in his

17    affidavit of probable cause you did not double

18    check to make sure it was true?

19        A    Correct.

20        Q    If Detective Towne put a lie in his

21    affidavit of probable cause, would it be fair to

22    say that that was not a lie that you detected

23    because you weren't looking for one?

24        A    Correct.

25        Q    So specifically in the second sentence
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

1     within that fourth paragraph, "it was learned from

2     Channel Falls, Cheron Shelton's girl friend that

3     she purchased this phone for Shelton after his

4     release from prison or March 8, 2017."

5          You yourself did not develop this

6     information?

7     A     I don't think I interviewed Channel Falls

8     from my recollection.

9     Q     So it would have come from the detective

10    that interviewed her.

11    A     Yes.

12    Q     And would you agree with me that if she did

13    not state that she bought this specific phone,

14    connected the phone number for him, that this would

15    be inaccurate?

16          MR. BIONDO:  I will object to form.

17    A     Can you rephrase that one more time or

18    restate it.

19    Q     If Channel Falls never said in the interview

20    that she purchased this phone for Cheron Shelton,

21    would you have agree with me that that would be a

22    false statement in your criminal complaint?

23          MR. BIONDO:  I object to the form again.

24    A     It would be an inaccuracy then.

25    (There was a recess in the proceedings.)

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

80

1    BY MR. JUBAS:

2        Q    So we are still on page 7 of 13 of your

3    affidavit of probable cause.  I want to take a look

4    at paragraph 5.  You would agree with me that your

5    unit was able to obtain cell phone information that

6    you believe was connected to Mr. Shelton and Mr.

7    Thomas, correct?

8        A    Yes.

9        Q    Would you agree with me that your unit never

10   actually came into physical possession of these

11   phones?

12       A    I don't remember.  I don't believe so.

13       Q    Do you recall if you just had information

14   pertaining to when calls and texts were made as

15   opposed to the actual text and calls?

16       A    Yes, I don't remember having the physical

17   device.

18       Q    And then moving to page 8 of 13, I want to

19   draw your attention to the fourth paragraph down

20   and this is the point in your affidavit where you

21   begin discussing the information received from the

22   confidential informants, correct?

23       A    Yes.

24       Q    So the informants gave interviews on April

25   7, 2016, correct?

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

81

```
 1      A    Witness 1 was -- yes.  I have to check on
 2   the other.
 3      Q    Do you recall that Rob Thomas was arrested
 4   and incarcerated just previous to these informants
 5   giving their statements?
 6      A    I know he was arrested.  I can't remember
 7   what date he was arrested on.
 8      Q    I am going to just rewind here for a second.
 9   Going back to page 7, I want to draw your attention
10   to the second paragraph from the bottom discussing
11   Robert Shelton and a prescheduled visitation with
12   Cheron Shelton.
13      A    Yes.
14      Q    Do you recall what type of evidence that
15   your unit obtained from this visit?
16      A    I believe we have video evidence.
17      Q    Is it accurate to say it was just video, not
18   audio?
19      A    Correct.  I don't recall any audio of this
20   visitation.
21      Q    Essentially what is recorded in this video,
22   would you agree that it was Mr. Shelton making
23   various gestures?
24      A    Yes, I remember that.
25      Q    Do you consider the gestures and the video
```

**Johnstown - Erie - Pittsburgh - Greensburg**
**866-565-1929**

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

1    obtained, do you consider that evidence to directly

2    link him to the Wilkinsburg shooting?

3        A    I think that it plays into the scope of

4    everything, yes.

5        Q    Would you consider that circumstantial

6    evidence?

7        A    Yes.

8        Q    Not direct evidence.  It doesn't itself put

9    him at the scene of the crime pulling a trigger?

10        A    Right.  Nothing there says, yes, I was

11    there.

12        Q    Same with any of his jail letters that were

13    confiscated, none of those put him at the scene

14    pulling a trigger, correct?

15        A    Not that I recall.

16        Q    So now getting over to page 8, we are about

17    to get into the informants.  Prior to that, can you

18    agree with me that thus far, everything that we

19    have gone through and everything in your criminal

20    complaint, none of that directly connects Mr.

21    Shelton to the shooting; would you agree with that?

22              MR. BIONDO:  I will object to form.  Go

23    ahead.

24        A    No, I don't think I would agree with it.

25        Q    Could you point to the evidence that

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

```
 1   directly connected him to the shooting?
 2       A   I mean, circumstantially there is a police
 3   officer that reports a license plate and sees a
 4   male matching the description, and cell phone
 5   calls.  If you are asking me is there something
 6   that puts him with a gun in his hand, direct
 7   evidence wise, no.
 8       Q   Okay.  Now getting into these informants,
 9   were you involved in interviewing either of these
10   informants?
11       A   I don't believe I was.
12       Q   Prior to filling out this criminal
13   complaint, did you review the video of the
14   interviews of these informants?
15       A   I am sure I looked at them at some point in
16   time.  I don't remember.
17       Q   Do you recall whether there was any effort
18   made by your unit to investigate either of these
19   confidential informants to corroborate what they
20   were saying?
21       A   I believe there was, yes.
22       Q   Could you educate me on those efforts?
23       A   I don't remember exactly what was done.
24       Q   Is that an assumption?  Are you assuming
25   that efforts were taken to corroborate their
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

1    statements?

2    A    Yes.

3    Q    Have you personally ever worked with Kendall

4    Mikell who is referred to as Witness No. 1 on any

5    other cases?

6    A    No, not that I am aware of.

7    Q    Do you recall if Detective Foley was working

8    with him on any other cases?

9    A    I don't know.

10   Q    Do you recall any discussions prior to

11   filing this affidavit of probable cause for the

12   criminal complaint, were there any discussions had

13   among your unit about him cooperating in other

14   cases?

15   A    I don't remember.

16   Q    Were you aware at that time that he was

17   cooperating on other cases?

18   A    I was not.

19   Q    Would that have been something that you

20   would have preferred to know prior to filing an

21   affidavit of probable cause for a criminal

22   complaint?

23   A    I mean, probably, yes.

24   Q    Because that would have been able to give

25   you some insight into his credibility, correct?

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

85

```
 1      A   It depends on all the more information we
 2   know the better prepared you are.  So, yes, I would
 3   have liked to have known it, but I don't think it
 4   directly affects what he says here.
 5      Q   Subsequently you became aware that he was
 6   cooperating on other cases?
 7      A   Correct.  Yes.
 8      Q   Do you recall how you learned about this?
 9      A   I believe I learned it from the DA's office.
10      Q   Can you give me the context for how they
11   alerted you to this?
12      A   I don't remember the conversation, I am
13   sorry.
14      Q   Do you recall who from the DA's office
15   discussed this with your unit?
16      A   No.
17      Q   Did it become an issue that your unit had to
18   discuss amongst you?
19      A   No, I don't think it became an issue.
20      Q   Did your unit have any sort of discussions
21   when Mr. Mikell was labeled an agent of the state
22   by the Pennsylvania Superior Court?
23      A   I remember hearing that, yes.
24      Q   What impact does that have on using him on
25   any of your investigations?
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

86

```
 1    A   I think it does have an impact.  I believe
 2   at that point in time you cannot use them.
 3    Q   So when the Superior Court identifies a
 4   confidential informant as a agent of the state then
 5   you can't use them anymore; is that what you are
 6   saying.
 7          MR. BIONDO:  I will object to form.  I think
 8   that calls for a legal conclusion.
 9    A   It is my understanding of it, but I'm not --
10    Q   Did your unit continue to use Mr. Mikell as
11   a confidential informant after he was labeled an
12   agent of the state?
13    A   Not that I am aware of, no.
14    Q   Do you know if that was the District
15   Attorney's choice to continue to use him after he
16   was labeled an agent of the state?
17    A   I don't know whose choice it was.  I don't
18   remember when he was labeled as such.
19    Q   Do you remember that Freddie Collins,
20   Witness No. 2, was dropped before Kendall Mikell,
21   Witness No. 1.
22          MR. BIONDO:  I object to form.
23    A   Dropped as in what sense?
24    Q   Dropped from the case.
25    A   I don't remember which one came first.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

```
 1     Q   Do you recall whether you had reviewed
 2  specifically the Frederick Collins interview?
 3     A   I don't remember specifically.
 4             MR. JUBAS:  Let's take five.  We will go off
 5  the record.  I want to put a few documents together.
 6     (There was a recess in the proceedings.)
 7  BY MR. JUBAS:
 8     Q   Sergeant Dolfi, did you have an opportunity
 9  to read through pages 8 through 13 of the criminal
10  complaint?
11     A   Yes.
12     Q   And you would agree with me that what you
13  just reviewed was essentially the confidential
14  informant portion of the affidavit of probable
15  cause?
16     A   Yes.
17     Q   We discussed working with informants
18  previously.  You would agree with me that if you
19  put an informant statement in your affidavit of
20  probable cause it is because you found them
21  credible, correct?
22     A   Yes.
23     Q   Did you say that you investigated the
24  statements that were made by these informants to
25  corroborate their credibility?
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

88

```
 1    A   No.
 2    Q   You did not investigate.  You yourself did
 3  not investigate.
 4    A   Correct.
 5    Q   Do you know whether anybody in your unit
 6  investigated either of the confidential informants
 7  to determine their credibility?
 8    A   I believe we looked into their credibility
 9  of these statements.
10    Q   So we will get into some of those.  So I
11  want to first get into the statements that were
12  made by Witness No. 2, and that's Freddie Collins.
13  Is it accurate that Freddie Collins provided
14  statements against both Mr. Shelton and Mr. Thomas?
15    A   I believe he did, yes.
16    Q   That's opposed to Kendall Mikell who only
17  provided a statement against Robert Thomas.
18    A   From my recollection, yes.
19    Q   And when I say that he provided a statement,
20  would you agree with me that he claimed to have
21  received confessions from both of them?
22         MR. BIONDO:  I will object to the form.  If
23  you can answer, go ahead.
24    A   I don't remember him having or saying
25  confessions from Rob Thomas, but I believe he said
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

89

1    from Cheron Shelton that he did.

2    Q   Do you recall the circumstances under which

3    Mr. Collins came into contact with Cheron Shelton?

4    A   I believe they came into contact in the same

5    pod at the jail.

6    (Exhibit 2 was marked for identification.)

7    Q   So I am going to show the witness what I

8    have marked as Exhibit 2.  This is an Allegheny

9    County jail housing history for Cheron Shelton.

10   Sergeant Dolfi, I want to draw your attention to

11   the second page, and it should be highlighted.  Is

12   there a portion highlighted?

13   A   There is.

14   Q   And this indicates that on March 26, 2016

15   Cheron Shelton was on Pod 7D from 12:05 to 5:37

16   a.m.; is that correct?

17   A   Yes.  It is highlighted as March 26, 2016

18   Level 7, Pod D.

19   Q   So you would agree with me this is the time

20   that he would have interacted with Mr. Collins,

21   correct?

22   A   If Mr. Collins was on that pod, then yes.

23   Q   And that's 12:05 a.m. to 5:37 a.m., correct?

24   A   That's what is listed on the document, yes.

25   Q   Do you recall Mr. Collins saying that they

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

90

```
 1   had conversation through cell doors?

 2      A   I don't recall.

 3      Q   If they have this conversation through cell

 4   doors, did you or your unit take any steps to

 5   investigate the nature of the cells to see whether

 6   this was a credible statement that was being made?

 7      A   I'm not sure.

 8      Q   You would agree with me that Mr. Collins had

 9   a five hour window to have this interaction with

10   Mr. Shelton, correct?

11      A   According to these documents, that's what it

12   looked like, yes.

13      Q   We can play the interview.  However, would

14   you find it credible -- did you find it credible

15   for Mr. Collins to say that he had a conversation

16   with Mr. Shelton through the cell doors that no

17   other inmates heard?

18      A   I find it credible that they had a

19   conversation through the cell doors because I know

20   people can talk through toilets in the jail.  It

21   has been through doors.  But to say that nobody

22   else heard the conversation, I don't think I could

23   say that's accurate.

24      Q   So are you saying that other people did hear

25   it?
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

```
 1      A   I don't know if anybody else heard it.  I
 2   can't tell you that it is not out of the realm of
 3   possibility that somebody else heard the
 4   conversation.
 5      Q   Would that be something that your unit would
 6   have investigated?
 7      A   I'm not sure.
 8      Q   Do you think that it is credible that Mr.
 9   Shelton would have been incarcerated on March 26 in
10   this pod and would have just started singing and
11   confessing to pulling the trigger for this crime?
12      A   It is possible.
13      Q   Drawing your attention back to the drive
14   test.
15      A   Yes.
16      Q   We established that it is your theory that
17   Cheron Shelton drove about 20 minutes prior from
18   Hill Top -- or from Nolan Court to the crime scene,
19   correct?
20      A   Yes.
21      Q   That's the theory?
22      A   Yes.
23      Q   And the drive test, time distance test said
24   it was approximately 10 minutes, 3 miles away,
25   correct?
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

```
 1      A   Yes.  From what I remember, yes.
 2      Q   I want to draw your attention to page 12 of
 3   13 of the criminal complaint, and we are looking at
 4   paragraph 4.  It says Witness No. 2 said "Rob told
 5   him they waited there for a long time and
 6   eventually Rob saw a murder in the backyard."
 7      A   Yes.
 8      Q   Do you think that that contradicts your
 9   drive test study?
10      A   Yes.
11      Q   And if Witness No. 3, Gregory Parker, also
12   indicated that they were -- that Rob told them they
13   were waiting there for hours, that would also
14   contradict your theory, correct?
15      A   If they were waiting there for hours, yes.
16   I am just trying to recall.  I don't believe we
17   have Rob Thomas leaving Hill Top on video.  I
18   believe it was just Cheron.
19      Q   Their story is that Rob told them they were
20   waiting there for hours?
21      A   Yes.
22      Q   I believe that's contradictory?
23      A   Yes.
24      Q   Do you recall that the cell phone evidence
25   that you had collected that you believe was
```

**Johnstown - Erie - Pittsburgh - Greensburg**
**866-565-1929**

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

93

```
 1    connected to the two defendants, Mr. Shelton and

 2    Mr. Thomas, do you recall that that evidence was

 3    indicating they were making phone calls, text

 4    messages around that time?

 5        A    I remember there being some back and forth

 6    between them.

 7        Q    I want to draw your attention to page 7,

 8    five paragraphs down.  So it says "at approximately

 9    10:46 p.m. there was a 4 minute and 33 second call

10    from Shelton to Thomas," correct?

11        A    What times again?

12        Q    I am sorry.  At approximately 10:46 p.m.

13        A    Yes.

14        Q    And this call ended minutes prior to the

15    shooting, correct?

16        A    Yes.

17        Q    So according to -- if Mr. Mikell's statement

18    is credible, that would indicate that they were

19    making a phone call to each other while they were

20    waiting in the garage for hours, correct?

21        A    It is a possibility.

22        Q    Do you think that sounds credible?

23        A    Well, again, like I said, I don't think we

24    have Rob on -- Rob Thomas on video.  I think we

25    have Cheron on video leaving Nolan Court at the
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

94

1   times that we discussed.

2      Q   And you would agree Mr. Mikell says that

3   they waited --

4      A   Yes, that's what he says, yes.

5      Q   You would agree with me that Mr. Shelton is

6   not able to be in two places at once.

7      A   Correct.

8      Q   It was one or the other.

9      A   Correct.

10     Q   Would you agree with me it is not credible

11  they would be making a phone call to each other

12  while waiting in a garage together?

13     A   Maybe they would, I don't know.  I can't say

14  they weren't.

15     Q   Did you prior to today realize that these

16  informants were providing contradictory information

17  compared to the evidence that you had collected?

18     A   I can say that upon reviewing their

19  statements, I mean if every single part of their

20  statement was 100 percent accurate, no, I don't

21  know that.  That's a statement that they provided.

22     Q   I believe that you at the beginning of this

23  affidavit of probable cause, you had actually

24  checked that you were presuming that these

25  witnesses were credible, correct?

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

95

1      A    Yes.

2      Q    Would you still check that box knowing that

3    they were providing contradictory information?

4      A    Yes.  I found the bulk of their statement

5    credible.

6      Q    When you say the bulk, what about their

7    statement do you find credible?

8      A    I think they provided corroborating

9    information for the evidence that we have.

10     Q    Except for the evidence that contradicts

11   what you had, right?

12     A    I'm not going to say there is not some

13   contradictory evidence, but the box doesn't check

14   line by line on what has been corroborated.  It is

15   a blanket box that you check in the creation of the

16   criminal complaint.

17     Q    Are you saying that despite these

18   contradictions, you have probable cause --

19     A    Yes.

20     Q    -- to charge them with these crimes?

21     A    Yes.

22     Q    I want to jump back to Mr. Mikell real

23   quick.  You mentioned that you don't believe he

24   could be used once he was identified as an agent of

25   the state.

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

1          MR. BIONDO:  I am objecting to form again.

2    You can answer.

3      A    I don't think he could be used on new cases.

4    Again, I'm not sure precisely what the law says on

5    that.

6      Q    Would you agree that if he was identified as

7    an agent of the state prior to you charging him in

8    this case, you charging our clients in this case,

9    that he should not have been used?

10          MR. BIONDO:  I will object to the form

11    again.

12      A    If he was labeled as an agent of the state

13    prior to this criminal complaint being filed, then

14    if I was the final decision-maker, I probably would

15    not want to use him, no.

16      Q    Who was the final decision-maker?

17      A    We work in conjunction with the District

18    Attorney's office who approves the criminal

19    complaint before it goes to the magistrate for

20    signature.

21      Q    Was that Kevin Chernosky?

22      A    I believe it was.

23          MR. JUBAS:  Could we get a couple minutes to

24    discuss things.

25          MR. BIONDO:  Yes.

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

```
 1       (There was a recess in the proceedings.)

 2                       -----

 3                     EXAMINATION

 4  BY MR. PETRUNYA:

 5    Q   So Officer Dolfi, ultimately you were

 6  reviewing the final version of this complaint and

 7  signing your name up on it, correct?

 8    A   Yes.

 9    Q   Who was directing you to say that this

10  criminal complaint itself is in final form?  Is

11  that a decision you are making or is someone

12  telling you this is final form?

13    A   So I will prepare the final document per se,

14  and then it is sent to the DA's office for review.

15    Q   How is it sent?

16    A   It might have been sent by email.  I can't

17  remember.  Or they might have been at our office.

18  I don't remember.

19    Q   Would the email that -- if you had emailed

20  it to the District Attorney's office, would that

21  email have originated from a county email address

22  that you have as a detective?

23    A   If I was the one that sent it to them, then

24  yes.

25    Q   And how would you have sent a draft of this
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

98

1    complaint to the District Attorney's office?

2        A    It would either be by ASAP or by email.

3        Q    And then when you send it off to the

4    District Attorney's office, do you then get

5    correspondence back from them regarding edits,

6    changes or finalized version before you sign it and

7    make it official?

8        A    Yes.

9        Q    Do you recall in this case how you got that

10   final version to the District Attorney's office?

11       A    I do not.

12       Q    Is there a way that you would be able to go

13   through the documents and information you have to

14   determine how that happened?

15       A    I don't know if there would be away to tell

16   whether it was done by email or through ASAP.

17       Q    But in your mind, okay, and I want to make

18   sure we have this concrete because this is very

19   important for us to get this information.  So there

20   is three ways that this version of the criminal

21   complaint could have gotten to the DA for review

22   before it was finalized.  You indicated it was

23   either in person, through ASAP or a Word version

24   that may have been emailed to the DA's office.

25       A    That my recollection.

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

```
 1     Q   Sitting here today you have no recollection
 2  as to you how it was exactly reviewed by the
 3  District Attorney's office?
 4     A   Or how got it to them?
 5     Q   Yes.
 6     A   That was 7 years ago, 8 years ago, I don't
 7  remember how it was sent.
 8     Q   You do recall someone from the DA's office
 9  reviewed this criminal complaint before you signed
10  off on it and made it final?
11     A   Yes.
12     Q   Sitting here today do you recall whom from
13  the District Attorney's office would have reviewed
14  this criminal complaint before you finalized it?
15     A   I believe we were dealing with Kevin
16  Chernosky for this case.  I don't know if anybody
17  else looked at it.
18     Q   Do you rely on the District Attorney's
19  office reviewing your criminal complaint and
20  pointing out contradictions to you to be edited and
21  changed before they are made final?
22     A   Yes.
23     Q   If you sign off on a complaint and finalized
24  it, is it fair to say that all of the information
25  that was contained in there was relevant to the
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

1    probable cause for the case?

2    A    Yes.

3    Q    So you wouldn't include information in there

4    if it wasn't relevant to the probable cause

5    determination?

6         MR. BIONDO:  I will object to form, but you

7    can answer if you can.

8    A    Can you say it again.

9    Q    You wouldn't include information in the

10   criminal complaint that wasn't relevant to the

11   probable cause determination for the charges,

12   correct?

13   A    You may.

14   Q    Why?

15   A    If we feel it is beneficial to our case to

16   put it in the charging document then we would.

17   Q    So does including contradictory information

18   in the affidavit of probable cause, is that

19   beneficial to your criminal case?

20   A    If the statements are the information where

21   we came from, is from a statement, and that's what

22   they said, yes, it is being transparent about what

23   they said.

24   Q    Is it your responsibility as a detective to

25   weigh the credibility of the information that is

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

```
 1   being provided and determine if that provides

 2   enough probable cause to bring charges against

 3   someone?

 4              MR. BIONDO:  I am going to object to form.

 5   If you can answer, go ahead.

 6      A    One more time please.

 7      Q    Sure.  Is it part of your job as a detective

 8   to weigh the evidence that you have in your

 9   possession, including contradictions and determine

10   if the evidence provides you with a probable cause

11   to bring charges?

12      A    Yes.

13      Q    And so we have identified some

14   contradictions between the information you received

15   from confidential informants and the physical

16   evidence that you had, correct?

17      A    Yes.

18      Q    How did you take that contradictory

19   information into account when determining whether

20   there was probable cause against Robert Thomas and

21   Cheron Shelton?

22      A    Because we look at the statement on the

23   whole, the whole information that was provided to

24   you, and through looking at it as a whole, we

25   determine the information to be credible.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

1    Q   You said earlier in the deposition as of

2    April 7, 2016, following the statements from these

3    confidential informants you believe there was

4    probable cause to charge Robert Thomas and Cheron

5    Shelton, correct?

6              MR. BIONDO:  Object to form.  Go ahead and

7    answer if you can.

8    A   I think I said, yes, that we did.  I

9    couldn't remember what information was learned

10   between then and the charging but, yes, I believe

11   that's what I said.

12   Q   And this criminal complaint was not actually

13   filed and signed off on until June 23, 2016.

14   A   Correct.

15   Q   If one of the witnesses information

16   contained within this statement had been someone

17   that was designated as an agent of the state, would

18   you rely on the District Attorney's office to bring

19   that to your attention when you are signing off on

20   the final affidavit?

21   A   Yes, if they were aware of it, I think that

22   would be information I would like to know.

23   Q   Would your supervisor also have to be aware

24   of that as well in reviewing it?

25   A   I would assume so, yes.

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

1    Q    And so April 7, 2016 was the day that the

2    interviews were conducted for both Kendall Mikell

3    and Frederick Collins, correct?

4    A    Yes.

5    Q    And the first seven pages of the complaint,

6    before we get to the confidential informant

7    portion, when you talked to my co-counsel, you

8    agreed with me you provided no direct evidence that

9    either had Robert Thomas or Cheron Shelton as the

10   shooters at the scene of the crime that day,

11   correct?

12   A    Correct.  I don't recall anything that puts

13   a gun in their hand.

14   Q    You would agree with me that at no point

15   between March 9, 2016 to June 23, 2016 or even up

16   to today, have any of the weapons that were used in

17   the Wilkinsburg Massacre been recovered?

18   A    Not to my knowledge.

19   Q    You would agree with me that no articles of

20   clothing containing any of the DNA of any of the

21   victims of the Wilkinsburg Massacre have been

22   recovered, correct?

23        MR. BIONDO:  I object to form.  You can go

24   ahead.

25   A    I don't believe so.  Not to my knowledge.

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

1     Q    You would agree with me that one of the

2   foundations for your office investigating Cheron

3   Shelton was the fact that Officer Adams had

4   identified him as someone who was in the area

5   shortly after the shooting, correct?

6     A    Yes.

7     Q    Mr. Shelton was an individual who was

8   spotted according to Officer Adams as getting into

9   the white Lincoln car that your office got a search

10  warrant to search, correct?

11    A    Yes.

12    Q    And Cheron Shelton is, under your theory in

13  the criminal complaint and also throughout the

14  prosecution, alleged to have been the individual

15  that was holding the AK-47 at close range of the

16  victims, correct?

17    A    Yes.

18    Q    You would agree with me that the white

19  Lincoln that Cheron Shelton was seen getting into

20  shortly after the shooting itself took place had no

21  DNA associated with any of the victims of the

22  Wilkinsburg Massacre, correct?

23    A    Yes.

24    Q    You would agree with me that directly in

25  front of the area where the alleged shooter with

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

105

1    the AK-47 was standing, there was blood and bone

2    fragments from the victims of the shooting at the

3    Wilkinsburg Massacre?

4        A    Yes.

5        Q    You would agree with me there was also a

6    pool of saliva that was found right next to the

7    location where the shooter with the AK-47 was

8    during the Wilkinsburg Massacre, correct?

9        A    Yes.

10       Q    You would agree with me that Cheron Shelton

11   and Robert Thomas' saliva was tested against that

12   evidence, correct?

13       A    Correct.

14       Q    You would agree that saliva evidence was not

15   a match to Cheron Shelton, Robert Thomas or any of

16   the victims of the Wilkinsburg Massacre.

17       A    Yes.

18       Q    So that would be something we consider to be

19   exculpatory evidence possibly related to the

20   suspects Robert Thomas and Cheron Shelton?

21           MR. BIONDI:  Object to form.

22       A    Possibly.

23       Q    I am just using colloquial terms here, but

24   that would exclude them based upon the fact that

25   that evidence doesn't match up.

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

```
 1      A   That would exclude them from depositing the
 2   pile of saliva.
 3      Q   There was also a boot print that was cast
 4   from the scene?
 5      A   There was a cast that was taken.  I can't
 6   remember it was boot, shoe or what.  But there was
 7   a cast that was taken.
 8      Q   And neither Cheron Shelton nor Robert
 9   Thomas' feet were tested against that cast, correct?
10      A   I don't recall.
11      Q   So you would agree with me then that between
12   March 9, 2016 up to the time that the charges were
13   filed on June 23, 2016, there was no physical
14   evidence, DNA evidence recovered that indicated
15   that either Robert Thomas or Cheron Shelton were at
16   the scene of that crime or fired those weapons?
17      A   Correct.  There was no DNA evidence saying
18   that.
19      Q   You would agree with me that the only
20   evidence that you obtained related to the fact that
21   either one of them or both pulled the triggers is
22   information from confidential witnesses that was
23   obtained in the Allegheny County jail?
24          MR. BIONDO:  Object to form.  You can
25   answer.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

```
 1     A   As far as -- I mean, there was other
 2   circumstantial evidence obtained, but if you are
 3   referring to direct their statements those two had
 4   the weapons, is that what you are referring to?
 5     Q   Yes.
 6     A   Then yes.
 7     Q   The investigation of the Wilkinsburg
 8   Massacre is still open to this day, correct?
 9     A   So open in what ways?
10     Q   I don't know.  Your counsel provided us with
11   discovery responses saying that the investigation
12   was still open.  So is it still open?
13     A   Yes.
14     Q   Is the police department actively
15   investigating any suspects for the Wilkinsburg
16   Massacre?
17     A   If we get information to look into, then
18   yes, we do so.
19     Q   As part of your investigation in this case
20   would you agree it is important to investigate the
21   individuals who were at the barbecue and also the
22   motives that individuals may have had for
23   perpetrating the shooting?
24     A   To a point, yes.
25     Q   Are you aware of information that came from
```

**Johnstown - Erie - Pittsburgh - Greensburg**
**866-565-1929**

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

```
 1    the FBI to the Allegheny County homicide department
 2    about Lamont Powell having executed drug dealers
 3    and stealing $90,000 cash and 10 bricks of heroin
 4    from them several weeks before the Wilkinsburg
 5    Massacre?
 6       A    No, I don't recall that.
 7       Q    If that information was contained within the
 8    investigative file that was turned over to the
 9    criminal defense lawyers in this case for the
10    prosecution, does that mean that information was
11    obtained by your department?
12       A    Yes.
13       Q    So as the individual who signed the
14    affidavit in this case, you have no knowledge of
15    any wrongdoing of Lamont Powell that could have
16    provided motivation for someone to have committed
17    this crime?
18            MR. BIONDI:  Object to form.
19       A    I heard information that he was a suspect
20    into certain crimes such as that, but I don't have
21    any firsthand knowledge whether he committed those
22    crimes.  Was he charged with any of those crimes, I
23    don't know.
24       Q    Did you assist with the recent discovery
25    responses that were turned over in this case?
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

```
 1    A    Yes.
 2    Q    And to your knowledge no investigation was
 3  conducted into Lamont Powell following the
 4  Wilkinsburg Massacre?
 5    A    I don't believe -- no, I don't believe our
 6  department investigated Lamont Powell.
 7    Q    The purpose of videotaping Cheron Shelton's
 8  visit with his dad was also to obtain a warrant to
 9  follow Cheron's dad and see if his dad led you to
10  any indicia of evidence associated with the
11  Wilkinsburg Massacre, correct?
12    A    I remember the videotaping of their
13  interaction, but I'm not sure what the -- I can't
14  remember if the purpose was to follow or get
15  warrants for his father-in-law.
16    Q    No evidence came from following Cheron's
17  father or following that meeting?
18         MR. BIONDI:  Again, I will object to the
19  form of that.  If you can answer, go ahead.
20    A    I don't remember being part of following
21  anybody.  I remember the video being taken and
22  seeing that.
23    Q    Sure.  But Cheron's father, if he was
24  followed, didn't lead your office to any evidence
25  associated with the Wilkinsburg Massacre?
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

```
 1     A    Not that I recall, no.
 2     Q    So there was a two month gap between the
 3   time that the confidential informants provided the
 4   evidence in this case to the time that charges were
 5   filed.  We have agreed to that, correct?
 6     A    Yes.
 7     Q    Were you under any pressure or scrutiny from
 8   anyone in the homicide department, from the
 9   District Attorney's office or anyone in the county
10   to press charges, make an arrest or begin a
11   prosecution of the Wilkinsburg Massacre?
12     A    No.
13     Q    Sitting here today, do you have any
14   recollection as to why there was a gap between
15   April 7, 2016 when the witness statements were
16   taken and June 23, 2016 when charges were filed?
17     A    No.  I think we were just continuing the
18   investigation and to gain evidence and obviously
19   with a case of this magnitude, we want to make sure
20   we have everything ready to go and not rush into
21   something.
22     Q    Would that also include investigating
23   alternative suspects and information brought to the
24   attention of your department related to individuals
25   that may have motive to commit this crime?
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

1     A    Possibly.

2     Q    What was your involvement with the Allegheny

3   County District Attorney's office once charges were

4   filed as of June 23, 2016 throughout the

5   prosecution of this case?

6     A    It is kind of broad.  I mean --

7     Q    Well, my question is this.  Once the charges

8   were filed, it becomes a criminal case and the DA's

9   office is handling it, correct?

10    A    Yes.

11    Q    Are you brought in and consulted by the

12  District Attorney's office when the need arises

13  throughout the investigation of the prosecution?

14    A    Yes.

15    Q    Did anyone from the District Attorney's

16  office consult with you before determinations were

17  made related to the use of Witness 1 or Witness 2

18  in the underlying prosecution?

19    A    I can't remember if I was consulted on the

20  use of those witnesses or not.

21    Q    Is that something that the District

22  Attorney's office does with your department

23  whenever they are prosecuting homicide cases?

24    A    Preparing for trials.  We have pretrials,

25  meetings with the attorneys.

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

```
 1      Q    But I guess my question is, did you have any
 2  say or responsibility for the determination to not
 3  use Witness 1 or Witness 2 as the prosecution was
 4  going on?
 5      A    Not that I recall.
 6      Q    Do you recall how you learned that Witness 1
 7  or 2 were no longer part of the case?
 8      A    I do not.
 9      Q    Do you have any recollection of how Witness
10  3 entered the landscape of the Wilkinsburg Massacre
11  prosecution?
12      A    Yes.
13      Q    Explain how that happened.
14      A    We were contacted by City of Pittsburgh
15  detectives.
16      Q    Who is "we"?
17      A    I can't remember.  I can't remember if it
18  was me or Foley or somebody else from our office.
19  That the City of Pittsburgh police had reached out
20  and said they had somebody who has information on
21  the Wilkinsburg case.
22      Q    And you were one of the individuals that
23  took the statement of Gregory Parker on February --
24  I think it was February 15 of 2018.
25      A    I don't remember the exact date, but I did
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

113

```
 1    take a statement from Gregory Parker.

 2        Q    That was just an audio recording?

 3        A    Yes.  That was just an audio recording.

 4        Q    Why was that just an audio recording?

 5        A    The location of the interview, there was no

 6    video capabilities there.

 7        Q    Was that Greentree grand jury office?

 8        A    No.

 9        Q    Where was it?

10        A    Dormont.

11        Q    What was Dormont?

12        A    The District Attorney's office has an office

13    in Dormont.

14        Q    Was the purpose of that statement that you

15    took from Gregory Parker on February 15, 2018 for

16    investigative purposes related to the information

17    you could provide to the Wilkinsburg Massacre case?

18        A    Yes.  Again, I'm not sure on the date, but,

19    yes, we interviewed Gregory Parker in reference to

20    information on the Wilkinsburg case.

21        Q    Again, the purpose of that was for

22    investigative purposes, correct?

23        A    Yes.

24        Q    When interviews are being taken for

25    investigative purposes, is the District Attorney
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

1    allowed to sit in on those interviews and

2    participate?

3        A    I'm not sure.

4        Q    If the District Attorney was participating

5    in that interview, would that be for investigative

6    purposes?

7        A    I'm not sure in the rules of criminal

8    procedures if attorneys are allowed to sit in on

9    interviews.  Is that what you are asking?

10       Q    Have you had occasion where you develop

11   confidential witnesses in cases where the District

12   Attorney has been involved in the interviews in

13   middle of the prosecution?

14       A    I don't remember one other than this case

15   that I have been involved in.

16       Q    This was the first time that in the middle a

17   criminal prosecution a new confidential witness was

18   brought to the attention of the investigators?

19       A    I can't say that.

20       Q    I am saying in your experience, in your

21   history.

22       A    I don't know.  I don't remember all my

23   cases, if someone was brought up in the middle or

24   not.

25       Q    Did you have a consultation with the

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

1    District Attorney's office following your interview

2    with Gregory Parker to determine if the information

3    he was providing was correct?

4        A    I am sure we spoke about it, yes.

5        Q    Are you aware that on three separate

6    occasions in that 16 minute interview with Gregory

7    Parker he references the fact that he was told that

8    Cheron and Rob waited in that garage for hours

9    before perpetrating the Wilkinsburg Massacre?

10       A    I would have to review the interview.

11       Q    If that's what the interviews says, do you

12   have any reason to dispute that?

13       A    No.

14       Q    So if that information was being provided,

15   and we have already determined that that

16   information contradicts evidence which you had,

17   does that go into an assessment of the credibility

18   of the witness who is providing that information,

19   AKA Gregory Parker?

20       A    To a point, yes.

21       Q    Do you recall bringing it to the attention

22   of the District Attorney or anyone in your

23   department that Gregory Parker was providing

24   information which had contradictions relative to

25   the evidence in your possession?

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

116

     1      A   I don't remember.

     2      Q   Can we agree that if neither Cheron Shelton

     3   or Rob Thomas were placed in Allegheny County jail

     4   on March 26, 2016 or April 6, 2016, that your

     5   office would not have had probable cause to charge

     6   them in the Wilkinsburg Massacre case?

     7           MR. BIONDO:  Objection to form.

     8      A   No, I don't think we can say that.

     9      Q   Well, explain to me how you can say

    10   something different than that.

    11      A   I believe on all of this information

    12   obtained through video, cell phones, Officer Adams

    13   statement, the license plate, you know, that we can

    14   put our actors at that location.  Although it's

    15   circumstantial.

    16      Q   So I just want to make sure I understand

    17   this correctly for my own purposes.  In a homicide

    18   case where five individuals and an unborn baby were

    19   executed on March 9, 2016, there would have been

    20   enough probable cause to arrest Cheron Shelton and

    21   Robert Thomas based upon the fact that Mr. Shelton

    22   was seen getting into a vehicle several minutes

    23   after the shooting around the area, and he had cell

    24   phone communication with his best friend, Rob

    25   Thomas on March 9, 2016?

**Johnstown - Erie - Pittsburgh - Greensburg**
**866-565-1929**

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

117

```
 1              MR. BIONDO:  I will object to form.  If you
 2    can answer, go ahead.
 3    A    And I think all of the other actions taken
 4    on stuff that we have on video.
 5    Q    What do you have on video?
 6    A    We have the two of them at Nolan Court
 7    jumping the fence.  Everything else that is cited
 8    in the criminal complaint and other information
 9    that we have learned talking to people that were
10    interviewed, I believe there was probable cause.
11    Q    Right.  But you've told me that the purpose
12    of the affidavit that you are filing here is to put
13    the evidence that you have in your possession to
14    support the probable cause against the defendants,
15    correct?
16    A    Correct.
17    Q    You are putting in that affidavit of
18    probable cause the evidence that you believe
19    supports the claims that you are bringing in this
20    case which were death penalty claims against both
21    Cheron Shelton and Robert Thomas.
22    A    I don't make the determination on what cases
23    are death penalty cases, but the criminal homicide
24    charges, yes.
25    Q    You do know this was a case that involved
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

```
 1   the death penalty sentences for both Rob Thomas and

 2   Cheron Shelton?

 3      A   Yes.

 4      Q   We have gone through this criminal

 5   complaint, and earlier we talked about the first

 6   seven pages of that complaint being related to

 7   evidence that your office had prior to both Cheron

 8   and Rob going into jail, correct?

 9      A   Yes.

10      Q   And so what you are telling me is that even

11   if they hadn't gone to jail, both Rob and Cheron,

12   that that was enough probable cause to bring

13   homicide death penalty charges against Robert

14   Thomas and Cheron Shelton for the Wilkinsburg

15   Massacre on March 9, 2016?

16           MR. BIONDI:  Object to form.  You can answer

17   if you can.

18      A   I don't make the determination what is death

19   penalty and what is not.  I believe that the

20   evidence that we had, there was probable cause for

21   the arrest of Cheron Shelton in this case.  Without

22   the information provided by informants used in the

23   affidavit, the probable cause against Robert Thomas

24   is much weaker of a case and may not have been

25   filed.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

119

```
 1      Q   You are saying that without the confidential

 2   informants, there is a possibility that there was

 3   no probable cause against Robert Thomas?

 4           MR. BIONDI:  I will object to form.

 5      A   Not no probable cause, but I believe it is a

 6   much weaker of a case, and it may not have rose to

 7   the level of probable cause without the information

 8   provided by the informants.

 9      Q   So if the determination was made that

10   Witness 1 and 2 were no longer going to be used by

11   the prosecution as of the summer of July 2018, and

12   no other confidential witnesses provided

13   information, would you agree with me then that the

14   probable cause against Robert Thomas goes back to

15   what you just talked about without the confidential

16   witnesses dating back to 2016?

17      A   Yes.  That is not my decision to make on who

18   is using what information, but, yes, I think it is

19   a weaker case against Robert Thomas as opposed to

20   Cheron Shelton without the use of the informants.

21      Q   I'm not asking for what decisions you make

22   or don't make.  I am asking for the probable cause

23   element that specifically related to both Robert

24   Thomas and Cheron Shelton.

25      A   Sure.
```

**Johnstown - Erie - Pittsburgh - Greensburg**
**866-565-1929**

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

120

1    Q    I believe you provided that.  If there was

2    information that indicated that the -- either

3    Thomas or Shelton were not in proximity or even

4    located within the jail to come into contact with

5    the confidential informants, you would agree with

6    me then that it would question the credibility of

7    information provided by those informants, correct?

8    A    Some of it, yes.

9    Q    You had indicated earlier that the Attorney

10   General's office has a witness protection program

11   in place that provides funds for individuals who

12   are involved in providing information to be

13   provided with funds for relocation, correct?

14   A    Yes.

15   Q    And I think your testimony was that you can

16   only provide funds to individuals for relocation if

17   they are accepted into the witness protection

18   program; is that accurate?

19   A    No.

20   Q    Okay.

21   A    In order to get reimbursed from the Attorney

22   General's office they have to be accepted into the

23   program.

24   Q    Well, reimbursed from what?

25   A    We talked about earlier the other fund that

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

1    the District Attorney's office set up.

2        Q    Are there policies and procedures associated

3    with that fund and when monies can be withdrawn

4    from that fund?

5        A    I don't believe so.

6        Q    Are there policies and procedures or

7    instructions about how that money can be used?

8        A    I don't know if there is a written policy on

9    that or not.  Not that I am aware.

10       Q    Are you required to provide receipts and

11   documentation any time you withdraw money from that

12   fund and the purpose it is used for?

13       A    Yes.

14       Q    If receipts are not provided with the

15   withdrawal of that money or those funds, what

16   happens?  Are you subject to discipline?  Does that

17   get docked from your pay?

18       A    Obviously they are going to look into why

19   you took money out of that account, but I don't

20   believe that's ever happened before so I don't know

21   what -- there would be an investigation as to why

22   you took money out of that account.

23       Q    Do you have personal access to that account?

24       A    Now, yes.  Not then.

25       Q    What allowed you access to that account?

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

122

```
1     A    What do you mean?

2     Q    You said then.  I am assuming you mean back

3  in 2016.

4     A    Yes.

5     Q    When you were investigating the Wilkinsburg

6  Massacre.

7     A    Yes.

8     Q    What is it that happened that allowed you

9  access to that account?

10    A    Now I am assigned as a sergeant of the

11  homicide unit.

12    Q    So it is only the sergeants that have access

13  to that money?

14    A    There is a debit card that's used to take

15  money or an account number from a bank, and there

16  is only certain authorized signers on it.  The

17  supervisors of the unit maintain the card and are

18  the authorized signers for that fund.

19    Q    And what are the requirements for you to be

20  able to access that fund?  Do you have a

21  corresponding investigation going on in order to

22  withdraw money from that fund?

23    A    Yes.

24    Q    So there has to be an ongoing case that an

25  individual is withdrawing that money for, correct?
```

```
 1     A    Yes.  It would have to be associated with a
 2  case.
 3             MR. PETRUNYA:  Could we take two or three
 4  minutes real quick.
 5     (There was a recess in the proceedings.)
 6             MR. PETRUNYA:  Sergeant, thank for your time
 7  this afternoon and your patience with my co-counsel and
 8  myself.  I do not have any further question.  Your
 9  counsel may have questions.  I can't promise I'm not
10  going to have follow-up questions after that occurs.
11  However, for the time being I am done.
12                      -----
13                   EXAMINATION
14  BY MR. BIONDO:
15     Q    So with regard to a probation violation, do
16  you have any say on what constitutes a probation
17  violation?
18     A    No.
19     Q    You have no say in determining whether
20  somebody stays incarcerated because they violated
21  probation; is that accurate?
22     A    Accurate.
23     Q    The Lamont Powell investigations, were any
24  of those conducted out of your office?
25     A    No.
```

124

```
 1      Q    Do you know what office they were conducted
 2  out of?
 3      A    I know one was the City of Pittsburgh.
 4      Q    So homicide is within the City of
 5  Pittsburgh.  Does Allegheny County police
 6  investigate homicides within the City of
 7  Pittsburgh?
 8      A    No.
 9      Q    Let's go back to Exhibit 1 on page 5.  Can
10  you read the last sentence, just read that out loud
11  for us.
12      A    "In addition to the above items, various
13  pieces of indicia of residency were discovered
14  throughout the house to include a piece of mail
15  addressed to Cheron Shelton bearing the address
16  1214 Nolan Court."
17      Q    Would you consider indicia of residence a
18  part of a probable cause to arrest Cheron Shelton
19  in this matter?
20      A    Yes.
21           MR. BIONDO:  That's all I have.
22           MR. PETRUNYA:  I don't think we have
23  anything further.  Are you guys going to read?
24           MR. BIONDO:  So you have the option to
25  either read the deposition transcript or trust what the
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

125

```
 1   court reporter has taken down today.  In this instance,

 2   because of the nature of the case, I would advise you to

 3   read.

 4              THE WITNESS:  Okay.

 5              THE REPORTER:  Is everyone getting copies?

 6              MR. PETRUNYA:  Yes.

 7              MR. BIONDI:  Yes.

 8   (Thereupon, at 2:35 p.m., the deposition was concluded.

 9   Signature was not waived.)

10                    -----

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1   COMMONWEALTH OF PENNSYLVANIA:
                          SS.
 2   COUNTY OF ALLEGHENY:

 3        I, SHEILA STAUFFER, RPR, Notary Public in
     and for the County of Allegheny, Commonwealth of
 4   Pennsylvania, hereby certify that the said witness
     was by me first duly sworn to testify to the truth,
 5   the whole truth, and nothing but the truth and that
     the within deposition was recorded in stenotype and
 6   reduced to typewriting by me.

 7        I FURTHER CERTIFY that the reading and
     signing of the said deposition were NOT waived by
 8   the said witness and the said deposition
     constitutes a true record of the testimony given by
 9   said witness.

10        I FURTHER CERTIFY that the deposition was
     taken before me at the place specified in the
11   caption And was concluded the same day.

12        I FURTHER CERTIFY that I am not a relative
     or employee or attorney or counsel of any of the
13   parties or a relative or employee of such attorney
     or counsel, or financially interested directly or
14   indirectly in this action.

15        IN WITNESS WHEREOF, I have set my hand and
     affixed my seal of office this 14th day of
16   December 2023.

17

18

19

20                       Sheila Stauffer, RPR
                         Notary Public
21

22                       Commission expires 10/17/27

23

24

25
```

```
 1                    ERRATA SHEET

 2        I, TODD D. DOLFI, have read the foregoing pages
      of my deposition given on November 17, 2023, and to
 3    make the following, if any, amendments, additions,
      deletions or corrections:
 4
          Page/Line          Should Read     Reason for Change
 5

 6

 7

 8

 9

10

11

12

13        In all other respects, the transcript is
      true and correct.
14

15    _____
      TODD D. DOLFI
16

17    Subscribed and sworn to before me this _____ day of
      _____, 2023.
18

19

20

21    _____

22

23    Notary Public

24

25
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Todd D Dolfi**

128

```
 1              NETWORK DEPOSITION SERVICES
                     The Gulf Tower
 2              707 Grant Street, Suite 1101
                Pittsburgh, Pennsylvania  15219
 3                    412-281-7908

 4      December 14, 2023

 5      TO: Dennis Biondo, Jr., Esq.
            Allegheny County Solicitor
 6          300 Fort Pitt Commons Building
            Pittsburgh, PA  15219
 7
        RE:  DEPOSITION OF TODD D. DOLFI
 8
        NOTICE OF NON-WAIVER OF SIGNATURE
 9
        Please have the deponent read his
10      deposition transcript.  All corrections are to
        be noted on the preceding Errata Sheet.
11
        Upon completion of the above, the deponent must
12      affix his signature on the Errata Sheet,
        and it is to then be notarized.
13
        Please forward the signed original of the
14      Errata Sheet to ATTORNEY PETRUNYA for
        attachment to the original transcript, which is
15      in his possession, copying all other
        counsel and myself.
16
        As per the rules, if the witness does not sign
17      the signature page within 30 days after receipt
        of the transcript, signature is deemed waived.
18

19
20      Sheila Stauffer, RPR
        Court Reporter
21

22

23

24

25
```

**Johnstown - Erie - Pittsburgh - Greensburg**
**866-565-1929**