```
 1              IN THE COURT OF COMMON PLEAS OF
                   ALLEGHENY COUNTY, PA
 2
                         -----
 3
       COMMONWEALTH OF        ) CRIMINAL DIVISION
 4     PENNSYLVANIA           )
                              ) No. 201608963
 5          vs.               )      201608964
                              )
 6     ROBERT THOMAS,         ) TYPE OF PROCEEDING:
       CHERON SHELTON         )  Pretrial Motion
 7                            )
                              ) REPORTED BY:
 8                            )  Michele A. Murawski
                              )  Official Court Reporter
 9                            )
                              ) DATE:  Friday,
10                            )      January 31, 2020
                              )
11                            ) BEFORE:
                              )  Hon. Edward J. Borkowski
12                            )
                              ) COUNSEL OF RECORD:
13                            )   FOR THE COMMONWEALTH:
                              )
14                            )  Lisa Pellegrini,
                              )  Assistant District Attorney
15                            )
                              )  Kevin Chernosky,
16                            )  Deputy District Attorney
                              )
17                            )  COUNSEL OF RECORD:
                              )
18                            )   FOR THE DEFENDANT,
                              )     CHERON SHELTON:
19                            )
                              )  Randall H. McKinney, Esq.
20                            )  Wendy L. Williams, Esq.
                              )
21                            )   FOR THE DEFENDANT,
                              )     ROBERT THOMAS:
22                            )
                              )  Casey D. White, Esq.
23                            )  Michael J. Machen, Esq.

24                         -----

25
```

```
 1              P R O C E E D I N G S

 2                      -----

 3              THE COURT:  Note the presence of

 4    Mike Manko from the District Attorney's Office

 5    of the District Attorney.  I appreciate him

 6    setting up the courtroom.

 7              I'm bringing up Juror No. 18 for

 8    inquiry, if necessary.  Don't let her come in

 9    the door yet.  Both defendants are in their

10    jail garb.  Do you consent to waive their

11    presence while they wait in my chambers?

12              MS. WILLIAMS:  On behalf of

13    Mr. Shelton, we agree to that.

14              MR. WHITE:  On behalf of

15    Mr. Thomas, we also agree to that.

16                      -----

17              (Open court - Juror No. 18

18    present - Defendants are not present.)

19                      -----

20              THE COURT:  Good morning.

21              JUROR NO. 18:  Good morning.

22              THE COURT:  Thank you for coming

23    in.  I don't want you to state your name but I

24    have a couple of questions for you.  During the

25    interviewing process, one way or another, the
```

1    question was asked if you had any physical

2    disabilities or conditions that would prevent

3    you from serving.  Through the questioning

4    process, apparently nothing was raised, at

5    least to what concerned you at the time or the

6    attorneys that was brought to my attention.  In

7    the aftermath of that, I believe you called

8    Mr. Irvin and let him know about a certain

9    physical condition you have and I informed you

10   that I would have to have medical confirmation

11   of that.  I received a letter in that regard.

12   Why didn't you bring this to the attention of

13   the attorneys during the voir dire process?

14             JUROR NO. 18:  Well, when I came

15   in last Friday, I was anticipating a civil case

16   which I thought would only take a few days.  It

17   didn't occur to me that this was going to take

18   much longer.  I'm not supposed to be out in the

19   cold for any extended period of time with my

20   condition.

21             THE COURT:  Okay.  I appreciate

22   your coming in today.  Do any of the attorneys

23   have any questions?

24             MR. McKINNEY:  On behalf of

25   Mr. Shelton, no questions, Your Honor.

```
1                    MR. WHITE:  On behalf of

2     Mr. Thomas, no questions.

3                    THE COURT:  Commonwealth?

4                    MR. CHERNOSKY:  None from the

5     Commonwealth, Your Honor.

6                    THE COURT:  You will be taken

7     downstairs and back to the jury room to await

8     further decision from this courtroom.

9                    JUROR NO. 18:  Okay.

10                    THE COURT:  Thank you, ma'am.  I

11    also note the presence of Dana Halloran,

12    supervisor of jury selection.  Thank you,

13    Ms. Halloran.  You did a great job.

14                    THE CLERK:  Thank you.

15                         -----

16                    (Open court - Juror No. 18 not

17    present.)

18                         -----

19                    THE COURT:  Okay, given her

20    status as an alternate, any objection to

21    excusing her?

22                    MR. MACHEN:  No, Your Honor.

23                    MR. McKINNEY:  No objection, Your

24    Honor.

25                    MR. CHERNOSKY:  None from the
```

1      Commonwealth, Your Honor.

2                  THE COURT:  Inform Ms. Halloran

3      that the juror is excused.  Bring the

4      defendants back in.

5                        -----

6                  (Open court - All parties

7      present.)

8                        -----

9                  THE COURT:  Okay, we have

10     multiple matters to deal with.  There has been

11     a change in status, so to speak, of the

12     evidentiary picture, is that correct,

13     Mr. Chernosky, Ms. Pellegrini?

14                  MR. CHERNOSKY:  Yes, Your Honor.

15                  THE COURT:  What is that change?

16                  MR. CHERNOSKY:  The Commonwealth

17     has voluntarily agreed to proceed with this

18     case without the use of witness number three.

19                  THE COURT:  Okay.  That will,

20     from my perception, although I'll hear

21     argument, otherwise cure or address several of

22     the remaining issues.  With that particular

23     change, anticipating the same I would imagine

24     having been notified of that, there is a

25     petition for writ of habeas corpus filed as to

1    Mr. Thomas.  I note that the original affidavit

2    had two witnesses, what I'll loosely refer to

3    as cooperating witnesses, who have disappeared

4    from the evidentiary landscape and now the

5    third cooperating witness has disappeared.  The

6    affidavit, of course, relies heavily on that.

7    What evidence do you have as to Mr. Thomas and

8    I'll consider this your response to the

9    petition for writ of habeas corpus?

10                MR. CHERNOSKY:  Thank you, Your

11    Honor.  The Commonwealth will note that this is

12    Mr. White's --

13                THE COURT:  You are going to have

14    to slow down and speak up.

15                MR. CHERNOSKY:  We'll note this

16    is Mr. White's third writ of habeas corpus.  He

17    filed a similar filing after the Commonwealth

18    decided not to use previously identified

19    witnesses number one and two.  Those were

20    denied as well.  At the time of the preliminary

21    hearing, which Mr. White attached to his

22    motion, the magisterial district judge who

23    heard the case, in fact, said that he held the

24    case for court without consideration of the

25    confidential witness -- or, I'm sorry, the

1    informant that the Commonwealth was using at

2    that time.

3           With respect to the Court's question

4    directly posed to the Commonwealth, the

5    Commonwealth's case against Mr. Thomas is the

6    phone number associated with Mr. Shelton,

7    calling the phone number that the Commonwealth

8    will associate with Mr. Thomas.  The

9    Commonwealth will associate that phone number

10   with Mr. Thomas via content from processing of

11   Brittany Shelton's phone.  The testimony by a

12   person who regularly called Mr. Shelton -- or,

13   I'm sorry, Mr. Thomas -- at that time period on

14   that number via Mr. Thomas's statement wherein

15   he details a phone number that he repeatedly

16   called for jitney services that does appear in

17   the phone records for that cell phone number.

18   With the use of that cell phone number, the

19   Commonwealth anticipates that it will place

20   Mr. Thomas geographically in the location or in

21   the approximate location of the crime scene at

22   the appropriate time for the crime.

23           THE COURT:  Okay.  Well, there is

24   probably some dispute as to that.  When you say

25   place him in the approximate location, what are

1    you referring to?

2              MR. CHERNOSKY:  I'm referring to

3    Mr. Thomas's cell phone, utilizing a tower that

4    is adjacent to the crime scene, Your Honor.

5              THE COURT:  Where is the tower at

6    in relation to Franklin?

7              MR. CHERNOSKY:  Visually

8    depicted, within a mile.  I don't have the

9    exact.

10              THE COURT:  What else?

11              MR. CHERNOSKY:  After that, Your

12    Honor, the Commonwealth, it is detailed in the

13    affidavit, obtained video from Nolan Court

14    approximately at 11:45 after the shooting.  Two

15    individuals almost simultaneously are behind

16    the back fence at Nolan Court, both dressed in

17    winter coats with hoods, the hoods are up.

18    Both individuals traverse different paths but

19    enter the rear of Nolan Court.  They enter

20    Nolan Court for approximately 20 minutes and

21    exit the front door.  The person -- sorry --

22    one of the individuals places a large garbage

23    bag in the back of a tan sedan.  That tan sedan

24    is then followed within the camera up to Heart

25    Court where the two individuals exit, exit the

1    vehicle, and are visible at that point in time.

2         Mr. Thomas is interviewed April 5,

3    2016 -- or April 6th, I apologize -- in

4    connection with this crime and confronted about

5    both the video and the phone number that he had

6    at the time.  He identifies that he was, in

7    fact, the person that jumped the fence with

8    Mr. Shelton and entered that house.  He

9    tactically admits the phone number was his and

10   provides, as I said earlier, the phone number

11   for a jitney service that he was using earlier

12   that day found in his phone.

13        Search of 1214 Nolan Court reveals a

14   cache of weapons to include one .22-caliber

15   long rifle, various pieces of ammunition to

16   include 7.62 by 39 bullets, 7.62 by 39

17   magazines, one other magazine.  That is

18   essentially the case against Mr. Thomas, Your

19   Honor.

20             THE COURT:  Now, the ammunition

21   found on Nolan Court, the residence of Nolan

22   Court, is the same type of ammunition that was

23   used or retrieved from the scene?

24             MR. CHERNOSKY:  It is the same

25   caliber, not the same headstamp.

1              THE COURT:  It is what?

2              MR. CHERNOSKY:  It is the same

3      caliber, it is not the same headstamp.

4              THE COURT:  Okay.  Any response

5      other than what's in your --

6              MR. CHERNOSKY:  I apologize, Your

7      Honor.  I did fail to state the actual timeline

8      of the calls between the two phones.

9              THE COURT:  Okay.  Well, I'm

10     pretty much familiar with it but for purposes

11     of the record, I'll allow you to do that.

12             MR. CHERNOSKY:  I apologize.  I

13     can just sketch it.  There were approximately

14     30 phone calls over the course of the night

15     leading up to the time of the murders.  There

16     is a four-minute phone call between those two

17     phones at 10:46 p.m.  The first 911 call is

18     about 10:53 p.m.  At the actual time of the

19     shooting, there is no communication between

20     those two numbers and several minutes after the

21     shooting there is a series of missed calls,

22     completed calls, text messages leading up to

23     11:44, just prior to two individuals jumping

24     over the fence at Nolan Court.

25             THE COURT:  Mr. White.

1                    MR. WHITE:  Thank you, Your

2     Honor.  To start at the end of Mr. Chernosky's

3     recitation of what he perceives the facts to

4     be, the ammunition found at 1214 Nolan Court is

5     not A, Mr. Thomas's residence nor ever was his

6     residence.  Two, the ammunition that he is

7     referring to does not match the ammunition they

8     perceive that Mr. Thomas used, does not match

9     that weapon that they perceive Mr. Thomas used.

10    The ammunition found at 1214 Nolan Court points

11    to the ammunition they believe Mr. Shelton

12    used.  I don't know why that was brought up in

13    the recitation of the facts because that has

14    nothing to do with Mr. Thomas.

15                    As far as the April 6th interview that

16    my client, Mr. Thomas, had with Detective

17    Hitchings, in a previous filing -- I could grab

18    it.  I didn't know the Commonwealth would make

19    this argument -- they conceded to the fact that

20    my client did not admit that the phone number

21    was his phone number.  They finally conceded

22    that the phone number was talked about however

23    my client adamantly denies that that is, in

24    fact, his phone number.

25                    As far as the phone number is

1    concerned, I believe the Commonwealth is going

2    to have a very difficult time establishing a

3    foundation that the phone number in question

4    is, in fact, my client's phone number.  I also

5    think that they are going to have a difficult

6    time establishing the other phone number in

7    question is, in fact, Cheron's phone number.

8         More importantly, the telephone

9    communications between those two phone numbers,

10   there is no substance to those telephone

11   conversations, there are no recordings, there

12   is no text exchanges, no copies of text

13   exchanges.  On top of that, they refer to these

14   phone calls and texts messages throughout the

15   time period in question but they are remiss to

16   tell you that there are 18 other telephone

17   numbers that are contacted by the phone that

18   they believe Cheron Shelton was using.  Many of

19   those phones were contacted on a number of

20   different occasions throughout the evening

21   hours.  Again, there is no substance to the

22   text messages or phone calls that were made by

23   that phone number.

24        All we have are cell phone records that

25   indicate two numbers communicated with each

1    other in the light most favorable to the
2    Commonwealth.  And let's not forget about all
3    the other phone numbers that that same phone
4    number communicated with throughout the course
5    of the evening.
6            As far as the rest of my argument, I
7    think it is very brief because I don't have
8    much to talk about what evidence will be
9    presented at trial.
10           The cell phone tower, as far as the
11    cell phone tower, you denied the Commonwealth
12    in part, I'm assuming until today, to allow the
13    cell phone "expert" to testify.  The cell phone
14    tower, if you're looking at a map, 376 runs
15    diagonal.  I guess that would be northeast to
16    southwest if you're looking at a map.  My
17    geography might be off.  The cell phone tower
18    is far away, on the other side of 376.  Kind of
19    near WTAE, in that general area.  So the cell
20    phone tower encompasses a large area, a very
21    large area.  I think it is, at least, a mile.
22    The exact denomination, which should be in an
23    expert report, is close to 2.5 miles of a
24    radius but we don't have any reports to
25    establish how far the radius extends.

1          Back to the cell phone expert, this FBI

2     agent, we received a narrative report from this

3     FBI agent dated January 29, 2020.  We received

4     it yesterday, January 30, 2020.  Quite frankly,

5     I don't understand what it says because I'm not

6     an expert in cell phone tower tracking or cell

7     phones for that matter.  I would need an expert

8     to review this or rebut what they are trying to

9     present today.  They give us this on the eve of

10    trial.

11          THE COURT:  Give that to

12    Mr. Irvin.  Make a copy of that.

13          MR. WHITE:  The date that they

14    did this PowerPoint presentation, you will see

15    the second word, it says on June 13, 2018 --

16          THE COURT:  I heard that the

17    first 20 times in the last one, okay.

18          MR. WHITE:  Sorry.  As far as the

19    Nolan Court issue, again, Mr. Chernosky's view

20    that he admitted to jumping over the fence and

21    walking on Nolan Court, I'm not going to argue

22    that point right now and certainly not

23    stipulate that it was Robert Thomas, but he is

24    remiss to mention that 20 to 25 other people

25    are walking down Nolan Court and walking in and

1    out of the houses on Nolan Court and jumping

2    over the fence on Nolan Court throughout the

3    course of the evening.

4         So, again, as far as any direct

5    evidence that my client was at the scene of the

6    crime, there is no DNA.  The DNA that was found

7    at Nolan Court was tested against my client's

8    DNA and every other person that was in Nolan

9    Court that evening and excludes Mr. Thomas as a

10   contributor of that saliva which was found in

11   the rear where they believe he was at on Nolan

12   Court.  I have marked this Defense Exhibit B, a

13   report from the Allegheny County Crime Lab,

14   report No. 5 LAB0222.  There are no

15   eyewitnesses.  There is no physical evidence.

16   The boot print that was argued about last week

17   or earlier this week or last week, again, it

18   doesn't fit.  There is no evidence, Your Honor.

19   I don't know how else to say it.

20             THE COURT:  Okay, anything to

21   rebut anything?

22             MR. CHERNOSKY:  No, Your Honor.

23             THE COURT:  Okay, as to other

24   matters, there is a motion to dismiss jury

25   panel filed by Mr. Machen and Mr. White.  That

 1    concern, the witness number three guarantees

 2    that a potential voir dire question, that is

 3    rendered moot by virtue of the current

 4    evidentiary posture.

 5         As to the FBI agent and his proposed

 6    testimony, I now have in front of me a

 7    four-page document.  Mr. Chernosky, is this the

 8    narrative that I requested you have the agent

 9    compile and provide to the defense?

10              MR. CHERNOSKY:  Yes, Your Honor.

11              THE COURT:  Okay.  I'll hear

12    argument on this circumstance.  Are you

13    objecting to the FBI -- is anyone objecting to

14    the FBI agent's testimony?

15              MR. WHITE:  Yes, Your Honor.

16              THE COURT:  On what basis?

17              MR. WHITE:  The basis that under

18    the Rules of Discovery we were not provided

19    this expert report in a timely fashion.  Two,

20    we object on the relevance of it because that

21    drive test was done on January 13th of 2018.

22    These crimes were committed two years earlier.

23    The limited knowledge I have about drive

24    testing -- and Mr. McKinney can elaborate more

25    for you -- they test where the cell phone can

 1    be generally.  I have no knowledge how cell

 2    phone towers work because I'm not an expert but

 3    if I were to call a person A or person B that

 4    would ping off the cell phone towers, there are

 5    different locations that the cell phone could

 6    be used in the vicinity or the radius of a

 7    particular tower.  However my point is that

 8    this isn't relevant because it is not an

 9    accurate depiction of the weather patterns,

10    topography, any of the physical factors that

11    were involved or similar back in March of 2016.

12    So I think it is irrelevant for those purposes

13    but Mr. McKinney was going to argue that point,

14    too.

15              THE COURT:  Mr. McKinney.

16              MR. McKINNEY:  Thank you, Your

17    Honor.  We are objecting as well.  As has been

18    a pattern in this case, this is an eve-of-trial

19    disclosure of incredibly important information.

20    In this instance, it is very technical.  In

21    order to properly prepare for trial where the

22    government is seeking to execute our clients,

23    we would appreciate the opportunity to have

24    more than three business days to review this

25    critical piece of information.  So much like

1    everything that is associated with witness

2    three, I understand the government is no longer

3    calling that witness, I'm not going to go over

4    that now, but this is another instance where

5    they are giving us something only because you

6    forced them to and it is one day or two days

7    before trial.  There is no way that we would

8    be, as a defense, able to procure our own

9    expert to evaluate this technical information.

10              THE COURT:  Mr. Chernosky, I

11    understand that your position is, in part,

12    based on the fact, it is undisputed from what I

13    can tell, that the raw data and the report of

14    the drive -- what is it called, a drive test?

15              MR. CHERNOSKY:  A drive test,

16    Your Honor.

17              THE COURT:  The drive test was

18    provided well in advance of trial.  That is not

19    what I want you to address.  I want you to

20    address what, in this report, goes beyond what

21    was provided, if anything?

22              MR. CHERNOSKY:  To the extent

23    that the original report did not provide the

24    slides that we discussed earlier this week that

25    were turned over during jury selection, this

1   goes beyond that and describes the slides, Your

2   Honor.  So, essentially, it describes the

3   visual depiction of each and every one of those

4   slides, one being represented that was

5   contained in a combination of the raw data, the

6   drive test reports, and the cell phone records

7   which were all provided years ago, Your Honor.

8               THE COURT:  The first two pages

9   of the narrative are what I'll refer to as

10  general information about cell phones, devices,

11  and towers, not case specific in terms of this

12  case, this particular case.  It is background.

13  On page 3, it starts to discuss the individual

14  slides.  Let me direct your attention to slide

15  eight, the paragraph regarding slide eight.  It

16  has a couple in what I'll refer to a more

17  general sense.  Here is the sentence, for

18  example, I'm quoting, "for example, on March 9,

19  2016, at 10:19 p.m., both phones would have

20  been located somewhere within any of the purple

21  shaded areas which collectively represent the

22  coverage area of the specified cell tower and

23  sector."  Are you suggesting to the Court that

24  by virtue of the raw data and the drive test

25  report that was given to the defense, that they

1    were or should have been aware of such an

2    observation or conclusion was reached?

3                    MR. CHERNOSKY:  Yes, Your Honor.

4    That, in combination with the cell phone

5    records that were provided because that is what

6    you use to form a basis of the slides, so the

7    cell phone records were provided in every

8    instance, the raw data, the program that would

9    have been needed to view the raw data and/or

10    the ability to make arrangements to have the

11    raw data viewed with the FBI and the drive

12    test, a combination of all of those were

13    provided and contained within this report.

14                    THE COURT:  In fact, the report

15    progresses in a similar fashion to slide nine,

16    it is a more general introductory sentence and

17    then a conclusion.  For example, when the agent

18    is saying "for example", do you expect to

19    elicit that "for example" as a conclusion

20    during the testimony of the witness?

21                    MR. CHERNOSKY:  I expect the

22    witness, as far as the slides go, to testify

23    that given the records and the tower drive test

24    that he did, so the tower drive test is an

25    actual picture of the sector as opposed to a

```
 1    generic pie piece which is what you get if you
 2    don't do the drive test, so you don't know what
 3    the sector looks like.  So using the
 4    specialized equipment, he did the drive test
 5    and those are what the individual sectors look
 6    like on a map so it's a better idea of what is
 7    already included in the cell phone records.
 8    The tower and sector are already included in
 9    the cell phone records.  This is a better idea
10    of what each sector looks like.
11                   THE COURT:  Anything else on
12    that?
13                   MR. McKINNEY:  Yes, Your Honor.
14    If I'm hearing Mr. Chernosky correctly, it
15    sounds like he's saying that had we been able
16    to coordinate with the FBI and accessed their
17    specialized equipment, that we would have been
18    able to ascertain this information.
19    Additionally, we just got this report
20    yesterday, or two days ago, and the PowerPoint
21    presentation during jury selection when we were
22    spending eight hours a day selecting jurors and
23    that was only two weeks ago.  So there would
24    have been no time based on the late disclosure
25    of this information to properly prepare a
```

1    defense.

2                    THE COURT:  How many pages or how

3    long is the drive test report?

4                    MR. CHERNOSKY:  The drive test

5    report is one page.  The raw data was contained

6    on the disk.  I don't know how large the disk

7    was.

8                    THE COURT:  The raw data that you

9    are referring to, is that on a disk?

10                   MR. CHERNOSKY:  The raw data was

11   on a disk but the instructions that the defense

12   would have needed to use it was included in the

13   correspondence about that raw data.

14                   THE COURT:  Make me a copy of the

15   correspondence and the disk.

16                   MR. WHITE:  Your Honor, it is a

17   one-page report that I handed to your

18   assistant.  It was raw data and we were told to

19   buy or use a special program that the Allegheny

20   County District Attorney's Office did not have

21   access to at that point.  We were requested to

22   buy a specialized program to review this raw

23   data at that time.  It is not in the report.

24   It is numbers for a mathematician to figure out

25   so it would be nothing to me.  The raw data, we

1    can never open it because we don't have the

2    program and neither does the Commonwealth.

3                    MR. CHERNOSKY:  So --

4                    MR. WHITE:  It is the FBI.

5                    MR. CHERNOSKY:  To Mr. White's

6    point, we offered a description of the program

7    if they wanted to pursue that avenue on their

8    own and the assistance of the FBI if they

9    wanted to use their program.  None of the

10   defense took us up on that option.

11                    THE COURT:  When did you make

12   that offer?

13                    MR. CHERNOSKY:  In the

14   correspondence that we turned over the raw data

15   and drive test.

16                    THE COURT:  In 2018?

17                    MR. WHITE:  2018.

18                    MR. McKINNEY:  My only response

19   to that, Your Honor, is had we had this

20   PowerPoint presentation in 2018 and this new

21   report that we received two days ago back in

22   June of 2018, we would have known that we had

23   to rebut this actual evidence, that we would

24   have to try to coordinate with the FBI or get

25   the specialized software that was inaccessible

1    at the time.

2                    THE COURT:  Anything else on that

3    issue?

4                    MR. CHERNOSKY:  Nothing on that

5    issue, Your Honor.

6                    THE COURT:  Have you addressed

7    the autopsy and scene photographs?

8                    MS. PELLEGRINI:  Your Honor, if I

9    may.  Yesterday, we provided a list of scene

10   photos to each of the defense counsel with

11   descriptions and today I am providing a list of

12   the scene photos regarding the victim Tina

13   Shelton.  Those are the numbers on the

14   thumbnails.

15                    THE COURT:  One second.  I'm not

16   going to stand here and be a witness to the

17   discovery process.

18                    MS. PELLEGRINI:  Jerry Shelton, I

19   have Chanetta Powell, I have Brittany Powell.

20   The only one I do not have is Shada Mahone

21   which I can have by Monday.  Dr. Xu

22   inadvertently did not send me those numbers.

23   These witnesses will be the last Commonwealth

24   witnesses so this would give the defense time

25   to review these on their own.  They've had

1    these disks for years.

2                    THE COURT:  I understand that.

3    You have the capability of providing a list or

4    a package as to what I asked for yesterday or

5    the day before?

6                    MS. PELLEGRINI:  They've been

7    given the scene photos and today they are

8    provided --

9                    THE COURT:  I'm sorry, have your

10   assistant do that compilation presently.  He

11   can do that.  In other words, here's victim

12   one, here's victim two, here's victim three,

13   I'm not going to sit here while you go through

14   that.

15                   MS. PELLEGRINI:  That is fine.

16                   THE COURT:  Have him do that so

17   there are two packets for each.

18                   MS. PELLEGRINI:  That is fine,

19   Your Honor.  With regard to that, these have

20   been available for quite some time.  They had

21   indicated to me that they would be making

22   arrangements to come by our office this

23   morning.  I never heard from defense counsel.

24   We have been anticipating them to come view the

25   physical photographs.  That did not occur.

```
 1                    THE COURT:  What about the
 2    criminal history of the witness?
 3                    MS. PELLEGRINI:  That was
 4    provided to all of defense counsel yesterday as
 5    well as the CVs of all of the witnesses with
 6    the exception of Dr. Dwyer which I will have.
 7    She is located in Dallas.  I will have her's.
 8    She is a professional witness, Your Honor.
 9                    THE COURT:  As to this issue or
10    issues that surround the more recent criminal
11    activity of Mr. Shelton from the jail, he has
12    been charged but there has been no
13    adjudication; is that correct?
14                    MR. CHERNOSKY:  That is accurate,
15    Your Honor.
16                    THE COURT:  I don't see that as
17    an issue for any reason.  There will be no
18    reference to that for any purpose, guilt or
19    penalty phase, unless somehow the defense
20    brings that into play.
21                    MS. PELLEGRINI:  Thank you, Your
22    Honor.
23                    THE COURT:  Insofar as that, that
24    part of the defense motion is granted.  Is
25    there anything else outstanding, Mr. Chernosky?
```

1           MR. CHERNOSKY:  Just briefly,

2    Your Honor.  I wanted to address in

3    Ms. Williams's filing this morning, I

4    understand that most of the remedies she was

5    asking for are really moot in that filing.  I

6    do want to address the second half of it where

7    she alleges a pattern of misconduct on behalf

8    of Ms. Pellegrini.  She did cite the Freedom

9    Bey case and cited it with the proposition that

10   Ms. Pellegrini has a history of misconduct.  In

11   doing so though, she misrepresented the facts

12   to the Court.  That case, in fact, was sent

13   back on PCRA grounds and argued that jeopardy

14   should attach because of prosecutorial

15   misconduct.  The Superior Court however in

16   reviewing that case found in every instance

17   that no misconduct occurred.  So if Your Honor

18   hasn't read that case, I would ask that you do

19   read it and consider at least admonishing

20   Ms. Williams for misquoting that case.

21           THE COURT:  Ms. Williams.

22           MS. WILLIAMS:  First of all, on

23   the motion regarding Grand Jury evidence and

24   the additional discovery and conflict hearing,

25   Your Honor, we had agreed at the last hearing

1    that I would get the phone calls if the

2    Commonwealth or -- I'm not sure if I'm going to

3    open the door because I still don't have the

4    discovery from the Grand Jury.  We are still

5    requesting that.

6                    THE COURT:  On what case?

7                    MS. WILLIAMS:  On the second

8    Grand Jury case involving the drugs at the

9    Allegheny County Jail.

10                    THE COURT:  You're not entitled

11    to them.  I'm excluding all evidence relating

12    to that unless you bring it up.

13                    MS. WILLIAMS:  Your Honor, with

14    regard to our motion for a hearing to

15    disqualify counsel for conflicts with a capital

16    defendant, it is my position as with the first

17    motion to disqualify the Allegheny County

18    District Attorney's Office for extraordinary

19    relief, that we cannot whitewash what happened

20    with the prosecutorial misconduct and the Brady

21    violations by allowing the Commonwealth to just

22    say, okay, we're not going to use witness

23    three.  That is like a shoplifter getting into

24    their car at a store while they are being

25    arrested and offering to pay for the items that

1    they stole.  So gross and obvious flagrant

2    violations of Brady occurred in this case at

3    the Commonwealth's knowledge, acquiescence in

4    violation of their right to a fair trial.

5            We got yesterday, that I haven't had

6    time to look at, an immunity agreement signed

7    by witness three and Mr. Machen that should

8    have, obviously, been raised when the

9    Commonwealth was saying that lawyers at this

10    table had a conflict with these capital

11    defendants.  That is a huge Brady violation.

12    We cannot trust the Commonwealth in this case

13    to be the gatekeepers of their own Brady

14    material and give these guys a fair trial.

15    That includes Ms. Pellegrini.  The motion was

16    filed by all of us and agreed to by all of us

17    and the Court was given the decision of Freedom

18    Bey.  The pattern of conduct in this case alone

19    is enough.

20            We have the recording of witness three

21    that was not Grand Jury material that was the

22    confession in the Baby Marcus killing where all

23    of us got the recording on December 19th except

24    for Mr. White because the Commonwealth

25    convinced Judge Rangos that he couldn't

1   possibly get the discovery for his own client

2   because he had a conflict that I don't even

3   understand because we never had a hearing on

4   it.  Now, if he is not allowed to have

5   exculpatory information for his own client,

6   then that is obviously a conflict that can't be

7   cured by saying we're not going to call witness

8   three.

9          Mr. Machen gets called to the Grand

10  Jury after Attorney Rachel Santoriella is

11  determined to have a conflict with a witness in

12  the Grand Jury jail drug case.  She is a

13  potential Commonwealth witness and was a

14  defense witness in this case.  Rachel

15  Santoriella shows up to represent her.  She is

16  the defendant's, Shelton's, sister.  They tell

17  Rachel Santoriella you can't represent her

18  because she is Shelton's sister and Randall

19  McKinney represents Shelton in this present

20  death case.  Mike Machen is called to the Grand

21  Jury.  No one tells him the same day that he

22  shows up, the Commonwealth does not tell him

23  this is Shelton's sister and Shelton is the

24  target of the Grand Jury.  They allow him to go

25  into the Grand Jury after disqualifying Rachel

1    Santoriella to represent Shelton's sister who

2    is a witness in this case for the Commonwealth

3    and the defense while he is sitting as a

4    defense attorney with Shelton.  Those are

5    conflicts that cannot be whitewashed away

6    without a full hearing.  It is all discovery

7    that the Commonwealth had.

8         Just like the recording, all of us got

9    a recording of witness three.  Every single one

10   us had our recordings erased.  It is like

11   Watergate.  It is too much of a coincidence.

12   All of us have a recording of witness three's

13   confession.  Every single piece of discovery

14   that we received from the Commonwealth,

15   December 19th, none of the important evidence

16   was on there.

17        We're asking for the case to be

18   dismissed because of the prosecutorial

19   misconduct.  At the very least we're asking

20   that this District Attorney's Office cannot be

21   trusted.  There are other issues out there like

22   Officer Adams's phone issue.  He wrote

23   something down on a piece of paper, that has

24   been lost.  They cannot be the gatekeepers of

25   this important Brady materials when they have

1    shown that they are not trustworthy to turn

2    over or make those decisions in a timely

3    manner.  That includes Ms. Pellegrini in this

4    case.

5         She saw the video of Agent Carman prior

6    to it ever being seen by us or given to us on

7    the 19th.  She saw it years ago where Randall

8    McKinney leaves the room and Agent Carman goes

9    in and talks about guarantees and putting

10   witness three back out on the street knowing

11   that he killed a 15-month-old and has other

12   victims out there but still represented to this

13   Court on the record and to us that no

14   guarantees had been made.  There is no way that

15   they can be trusted on the whole.  This is a

16   death penalty case as Brady was a death penalty

17   case.  Those obligations apply to both phases.

18        Now we're asking you to seriously

19   consider the misconduct and, A, dismiss the

20   case against both defendants; B, dismiss it as

21   a death penalty case.  They should not be

22   rewarded or allowed to whitewash the conduct

23   that they've shown as far as the violations go.

24   They should not be allowed to continue

25   prosecuting and specifically Ms. Pellegrini.

1          There is no cure for the conflicts that
2     have occurred.  As I stated in my motion, I
3     have consulted with the Atlantic Center for
4     Capital Representation and other legal
5     scholars.  Their basic thing is remove yourself
6     from this case and look down on the conflicts
7     and say can sitting defense attorneys in a
8     capital case represent Commonwealth witnesses
9     at the same time that they are trying to take
10    their client's life?  It doesn't matter what
11    the circumstances are, there is no cure and the
12    answer is no.
13          Because of the Commonwealth's Brady
14    violations, the Court was not apprised.  If the
15    Court had had the immunity agreement signed by
16    witness three and Attorney Machen that we got
17    yesterday at the time you were deciding this
18    conflict motion eight months ago, I think your
19    decision would have been different.  If the
20    Court had seen the video with Attorney McKinney
21    representing witness three at the time you made
22    your decision on the conflict motion, I think
23    your decision would have been different.  We
24    didn't have all of that because they didn't
25    give it to us.

1          The other thing is the defendants have

2     never been apprised of that.  Who is going to

3     talk to Mr. Thomas about the conflicts?

4     Mr. Machen and Mr. White?  There is no way to

5     fix this and there is no way to fix what has

6     gone on in this case.

7          With respect to releasing the jury, it

8     is my position, at least on behalf of my

9     client, that all the publicity.  Number two, I

10    did raise in my motion on the Grand Jury as far

11    as the drugs in the jail, the timing by the

12    Commonwealth when this was from August of 2018

13    to the present to wait until right before jury

14    selection to ambush us with this and put

15    Mr. Shelton on television as being in a

16    conspiracy with Attorney Gettleman and

17    arresting him, the timing is prejudicial.  The

18    Commonwealth, we're suggesting, waited to make

19    that charge.

20         With respect to releasing the jury and

21    request to releasing this jury that we picked,

22    I am renewing that request.  There is no way to

23    cure what has gone on with witness three and

24    the publicity that has been gotten.  It is not

25    about asking questions, it is about these

1      jurors seeing headlines that the Court is

2      considering excluding the witness, excluding

3      important testimony that the witness has to

4      give.  It gives the impression, it is like

5      telling them confessions have been suppressed.

6      I think the only way to cure that is to release

7      this jury and pick a new one.  If the Court is

8      not inclined to do that, and I can probably

9      already tell that you are not because of the

10     hearing with the 18th juror today, I state that

11     you, at the very least, individually have to

12     voir dire every juror on the media coverage on

13     witness three and the statements that were not

14     going to be allowed and whatever coverage is

15     going to come out today with the Commonwealth

16     voluntarily stating that they're withdrawing

17     him.

18              THE COURT:  They were told as

19     parting instructions once selected not to read

20     about the case, avoid any media contact, and

21     Mr. Irvin told that individually to each one.

22              MS. WILLIAMS:  I don't doubt

23     that, Your Honor, in a perfect world but jurors

24     are not perfect.  That reminder to counsel and

25     the defendants and people in the courtroom is

1    not enough to assure that my client is going to

2    get a fair trial when somebody is trying to

3    take his life.

4              THE COURT:  Well, from my

5    perception, if an empaneled juror, which they

6    are, made it through a questioning process with

7    six attorneys, that they are solid citizens as

8    exist in this country.  They can be trusted to

9    follow the Court's instructions.  Even if, for

10   example, even if I were to grant the writ as to

11   Mr. Thomas, we're proceeding to trial against

12   Mr. Shelton so.

13             MR. McKINNEY:  Your Honor, if the

14   Court is inclined to grant the habeas --

15             THE COURT:  I'm not inclined to

16   do anything.  I haven't read enough to be

17   inclined one way or the other.  If that

18   contingency should arise, be prepared for that.

19             MS. WILLIAMS:  Even the testimony

20   that was given to the Court and given to us,

21   sworn testimony by Agent Carman where he

22   testified that there was a meeting between

23   himself, Attorney Pellegrini, and a lawyer on

24   speaker phone and then Ms. Pellegrini said and

25   then we went out to visit the witness again and

1    met with the witness again, that indicates

2    there were two meetings in 2019 with witness

3    three that were never memorialized.  Again, we

4    receive an Eleventh Hour report from Agent

5    Carman after his testimony that memorializes a

6    meeting with witness three at a different time,

7    not the time frame that he testified under oath

8    with Ms. Pellegrini asking the questions and at

9    one point directing the answer and didn't we go

10   meet with the witness again.  The sworn

11   testimony from Friday from the Commonwealth

12   doesn't match up to the report that we got

13   yesterday from Agent Carman.

14           Because of the Eleventh Hour production

15   of all of these things, I haven't even had a

16   chance to go get that and look at it because

17   I'm trying to cover the issues that are coming

18   up daily and hourly.  We've gotten disks,

19   reports, phone reports, all based on things

20   that we should have gotten in 2018, 2017.  I

21   mean, we got the disk.

22           Imagine this, if you weren't the judge

23   on this case, we got the disk of witness three

24   with the full recording so we could finally

25   listen to it, we got it on Wednesday at 4:00.

1    We got the immunity agreement signed by

2    Mr. Machen yesterday.  We got the phone report

3    yesterday.  We got the PowerPoint which we're

4    looking at going we're not sure what this means

5    but this is a problem but there is no report

6    with it during jury selection.  It is a pattern

7    as is providing us recordings that aren't there

8    and hoping that we don't dig down and get them.

9         I'm asking you to seriously consider my

10   arguments and ask you if you're going to deny

11   any of those points, for permission to take an

12   interlocutory appeal.

13                THE COURT:  Anything else?

14                MR. McKINNEY:  Yes, Your Honor.

15   As we prepare for opening statements on Monday,

16   if the Court is inclined to deny our motions, I

17   ask that the Commonwealth be precluded from

18   referencing their cell phone tower expert as

19   the Court has not ruled on the admissibility of

20   that witness.

21                THE COURT:  I will entertain

22   argument in that regard when I make some final

23   decisions of a couple issues in front of me.

24   We'll reconvene at 3:00.  2:00.

25                MR. McKINNEY:  We would like the

```
 1    Court to also consider postponing the case due
 2    to the late discovery so we can effectively
 3    prepare for trial.
 4              THE COURT:  Okay, I'll see you at
 5    2:00.
 6                      -----
 7              (Brief recess taken.)
 8                      -----
 9              THE COURT:  I have in front of me
10    a transcript, I imagine it purports to be -- is
11    this an interview of Robert Thomas?
12              MR. WHITE:  Your Honor, there was
13    a hearing in front of Judge Cashman back on
14    December 18, 2017, wherein an interview between
15    Mr. Thomas and Detective Hitchings was
16    transcribed by the court reporter in front of
17    Judge Cashman in Judge Cashman's chambers.  I
18    indicated, along with a copy that I gave to the
19    district attorney, the relevant parts to my
20    argument is pages 3 through 50.
21              THE COURT:  In context of the
22    habeas motion?
23              MR. WHITE:  Yes, regarding his
24    admission or lack thereof of an admission.
25              THE COURT:  Anything else on
```

1     that?

2                    MR. CHERNOSKY:  With respect to

3     that, Your Honor, the Commonwealth directs you

4     to page 17, line 9.  The Commonwealth's

5     position during that motion is Mr. Thomas

6     neither admitting nor denying that that was his

7     phone number.

8                    THE COURT:  What was Judge

9     Cashman doing at the time procedurally?

10                    MR. WHITE:  That was a motion to

11     suppress, I believe, Your Honor.

12                    MR. CHERNOSKY:  Yes, Your Honor.

13                    THE COURT:  Okay.  As to what I

14     perceive as the remaining matters, the motion

15     for extraordinary relief and to disqualify the

16     Allegheny County District Attorney's Office

17     based on prosecutorial misconduct, the Court

18     recognizes here certainly that there were

19     shortcomings in the protocol or investigative

20     process and the communication process that

21     unfolded here.  Certainly that should not occur

22     in any case and in a case of this magnitude it

23     should not occur.  Nonetheless, the Court also

24     recognizes that in a case of this magnitude

25     there are a volume of information and number of

 1    witnesses who have to be interviewed,

 2    processed, and information from the

 3    investigative agency to the DA's Office and

 4    forwarded to the defense, also, again, always

 5    presents a challenge.  Although you have the

 6    shortcomings, the Court finds there is no

 7    intentional misconduct or anything close to

 8    amounting to prosecutorial misconduct that

 9    warrants a dismissal.  That motion is denied

10    similar to the motion to disqualify the

11    District Attorney's Office.

12            As to the habeas, the Court, I'm not

13    prepared to make a decision on that presently.

14    I have to review all the materials in fairness

15    to Mr. Shelton and in fairness to the

16    Commonwealth.  I will do that over the weekend

17    and have a ruling for you on Monday morning.

18    Without giving any indication of how I will

19    rule, if Mr. Shelton receives a favorable

20    ruling, unless you can show me a case from the

21    Pennsylvania Supreme Court or Supreme Court of

22    the United States or the Third Circuit, we will

23    be proceeding to trial against Mr. Shelton.

24    Did I say -- Mr. Thomas, as to the habeas for

25    Mr. Thomas, I have to review that in fairness

1    to all parties.  As to Mr. Shelton, we will be

2    proceeding as in regards to that.

3              As to the FBI expert, so to speak, I

4    will take that under advisement although I'll

5    open to this, is it accurate to say as has been

6    represented your disk is phone numbers?

7              MR. CHERNOSKY:  Your Honor, it is

8    all raw data.  You would not be able to view it

9    without the program that we told them about.

10             THE COURT:  Who has seen -- have

11   you seen the raw data?

12             MR. CHERNOSKY:  We have a disk of

13   the raw data.  I definitely opened it at one

14   time.

15             THE COURT:  So the answer is no?

16             MR. CHERNOSKY:  No.

17             THE COURT:  Have you seen the raw

18   data?

19             MR. WHITE:  No, Your Honor.

20             MR. McKINNEY:  It can't be

21   deciphered or opened.

22             THE COURT:  I understand.  I read

23   the communication that you have to buy the

24   program to do that, but what explanation do you

25   have in terms of preparation and notice that

1    you did not give that PowerPoint which amounts

2    to the opening report, of opening any content

3    to the defense, last week?

4              MR. CHERNOSKY:  Yes, Your Honor.

5    That PowerPoint was completed in advance of a

6    meeting with the FBI and what their actual

7    results of the drive test and their analysis of

8    it.  We didn't know nor were we certain that we

9    were going to use it at trial.

10              THE COURT:  What?

11              MR. CHERNOSKY:  We had it for

12    that period of time but we didn't know that we

13    were going to use it at trial.  The other

14    option would have been to give the cell phone

15    records that we were provided to an expert or

16    even a detective in our office that had that

17    familiarity and have them plot that geographic

18    on a map because the latitude and longitude

19    were included for the cell towers in the

20    original cell phone records that were provided.

21    We toyed around with both ideas, essentially

22    settling on calling the FBI.

23              THE COURT:  What is the

24    difference between what Burke would do than

25    what a detective with your office such as

1    someone from the county like Lyle Graber who

2    would come in and say here is the cell phone

3    tower, what is the difference?

4              MR. CHERNOSKY:  Agent Burke had

5    the benefit of the raw data and the drive test.

6    I keep using the generic term pie piece, which

7    is as it sounds, it is a triangle and within

8    that triangle is what the actual coverage looks

9    like.  That was the purpose of doing the drive

10   test.  Instead of saying it generally looks

11   like this, it actually looks like the slides

12   that are depicted as the slides that were

13   provided.

14             THE COURT:  Make me another copy

15   of that slide show or PowerPoint before we

16   leave the building, please.  Anything else?

17             MR. McKINNEY:  Your Honor --

18             THE COURT:  Except when he copies

19   that, it is not color coded.

20             MR. WHITE:  You can have that

21   copy, Judge.

22             THE COURT:  Anything else?

23             MR. McKINNEY:  Your Honor, again,

24   in preparation for openings, strategically, I

25   ask again the Commonwealth, until you make a

```
1    final ruling on the cell tower expert, they be
2    precluded from mentioning that in the opening.
3                THE COURT:  I'm not going to
4    entirely exclude reference to cell phone
5    contact between Mr. Shelton and Mr. Thomas
6    because even without expert testimony, if they
7    can circumstantially or directly establish this
8    phone is Mr. Shelton's phone, this phone is
9    Mr. Thomas's phone, and the phone calls back
10   and forth and there is a blank period when the
11   homicides occur, well, that is not expert
12   testimony.  That is what I'm referring to as
13   regular testimony and reasonable inferences can
14   be drawn from that and argued.  I don't see any
15   basis to object to that once the
16   identification, so to speak, as to the phones
17   and the actors is put into play, but the rest
18   of it, I'll tell you now, not to talk about
19   that in your opening.
20                MR. McKINNEY:  Okay.
21                MS. WILLIAMS:  Your Honor, with
22   respect to our motion barring the death penalty
23   with Mr. Shelton with regard to the reasons
24   described --
25                THE COURT:  For what?
```

1          MS. WILLIAMS:  For barring the

2    death penalty because of the shortcomings that

3    you described we raised in our motions, we are

4    asking the Court because of the Brady

5    violations and the other violations, to bar

6    this as a death case because of the higher

7    scrutiny that should have been used.

8          THE COURT:  I characterized it as

9    shortcomings, not violations, and I'm not

10   finding any.

11         MS. WILLIAMS:  With respect to

12   the conflicts and other issues raised, are you

13   denying our request for the hearing on the

14   conflicts of the other defense counsel?

15         THE COURT:  Yes.

16         MS. WILLIAMS:  With respect to

17   our request for a postponement --

18         THE COURT:  Well, today's

19   request, your present request, relates to

20   Mr. Machen and Mr. Thomas, correct?

21         MS. WILLIAMS:  No, the motion is

22   for all three lawyers, and Mr. White's conflict

23   was never fully explored.  The Commonwealth was

24   more intent on getting Mr. White off the case

25   but those reasons were never made clear to us

1    or the defendants.  The request is for all

2    three and for a hearing on that because I was

3    never privy to why exactly they wanted

4    Mr. White off.

5              THE COURT:  That request is

6    denied.

7              MS. WILLIAMS:  Okay.

8              THE COURT:  What else?

9              MS. WILLIAMS:  The motion for a

10   postponement to give us time to go through the

11   discovery that we haven't even looked at or

12   picked up yet that we just got this week.

13             THE COURT:  What hasn't been

14   picked up yet?

15             MS. WILLIAMS:  I've gotten

16   e-mails or other lawyers gotten e-mails about

17   discovery that I haven't had a chance to go get

18   because of preparing these motions.

19             MS. PELLEGRINI:  Your Honor, that

20   was the curriculum vitae of the lab witnesses,

21   the document that I referred to having to do

22   with the scene photos and the numbers and

23   descriptions as well as criminal histories of

24   the civilian witnesses and of that one

25   detective.  That was all.

1        MS. WILLIAMS:  It was also the

2    interviews of witness three.  We also didn't

3    get the e-mails that Agent Carman sent to the

4    DOC on witness three's behalf.  We're still

5    asking for those because in our position that

6    still supports prosecutorial misconduct.  I

7    know they're not using the witness anymore but,

8    for us, that is still an issue.

9        THE COURT:  All right.  I'll see

10   you on Monday morning at 9:00.

11        MS. PELLEGRINI:  Thank you, Your

12   Honor.

13        MS. WILLIAMS:  Are we proceeding

14   with 17 jurors?

15        THE COURT:  Yes.  Come on up

16   here.

17        (Sidebar discussion held as

18   follows.)

19        THE COURT:  On the jurors, we

20   selected 18.  That was on the possible premise

21   that we would lose one or two during the week

22   of downtime.  The reason I so easily excused 18

23   is because I was set to excuse 17 and 18 on

24   Monday morning anyhow because I would like to

25   keep them but there is no room for them in the

```
1    courtroom but especially in the jury room.  So
2    once all 16 are here and ready to go, then I
3    will excuse 17, also.  In fact, I may tell 17
4    to stay home, not to talk to anyone, and then
5    once everybody is here, we're ready to go,
6    we'll make a phone call and that juror will be
7    off.  Any objection to that?
8                   MR. McKINNEY:  No.
9                   MS. WILLIAMS:  No.
10                  MR. WHITE:  No, Your Honor.
11                  MR. CHERNOSKY:  No objection,
12   Your Honor.
13
14                        -----
15
16
17
18
19
20
21
22
23
24
25
```

1

2

3

4                    <u>REPORTER'S CERTIFICATION</u>

5

6           I, Michele A. Murawski, Official Court

7    Reporter for the Court of Common Pleas of

8    Allegheny County, Pennsylvania, do hereby

9    certify that the proceedings and evidence are

10   contained fully and accurately in the

11   stenographic notes taken by me on the hearing

12   of the within cause and that this is a correct

13   transcript of the same.

14

15

16

17

18           _____
             Michele A. Murawski
19           Official Court Reporter
             Registered Professional Reporter
20

21

22

23

24

25