```
 1

 2                 IN THE COURT OF COMMON PLEAS OF
                      ALLEGHENY COUNTY, PA
 3
                            -----
 4
     COMMONWEALTH OF           ) CRIMINAL DIVISION
 5   PENNSYLVANIA              )
                              ) No. 201608964
 6        vs.                  )
                              ) TYPE OF PROCEEDING:
 7   CHERON SHELTON            )  Jury Trial
                              )
 8                            ) REPORTED BY:
                              )  Michele A. Murawski
 9                            )  Official Court Reporter
                              )
10                            ) DATE:  Monday,
                              )         February 3, 2020
11                            ) to
                              )         Wednesday,
12                            )         February 5, 2020
                              )
13                            ) BEFORE:
                              )  Hon. Edward J. Borkowski
14                            )
                              ) COUNSEL OF RECORD
15                            )  FOR THE COMMONWEALTH:
                              )
16                            ) Lisa Pellegrini,
                              ) Assistant District Attorney
17                            )
                              ) Kevin Chernosky,
18                            ) Deputy District Attorney
                              )
19                            ) COUNSEL OF RECORD:
                              )
20                            )  FOR THE DEFENDANT,
                              )    CHERON SHELTON:
21                            )
                              ) Randall H. McKinney, Esq.
22                            ) Wendy L. Williams, Esq.

23                            -----

24
                          VOLUME I
25
```

1                        I N D E X

2
                   Monday, February 3, 2020
3
                                                      PAGE
4
     Jury Instructions
5         by Hon. Edward J. Borkowski..........     7

6    Opening Statements
          by Mr. Chernosky....................     21
7         by Mr. McKinney.....................     26

8    <u>WITNESS</u>

9    Donald Hamlin
        Direct Examination by Ms. Pellegrini...    39
10      Cross-Examination by Mr. McKinney......    53

11   Daniel Ciuffi
        Direct Examination by Ms. Pellegrini...    58
12      Cross-Examination by Mr. McKinney......    66

13   Michael Ferguson
        Direct Examination by Ms. Pellegrini...    70
14
     John Krah
15      Direct Examination by Ms. Pellegrini...    77
        Cross-Examination by Mr. McKinney......    82
16      Redirect-Examination by Ms. Pellegrini.    84
        Recross-Examination by Mr. McKinney....    84
17
     Robert Bourdon
18      Direct Examination by Ms. Pellegrini...    85
        Cross-Examination by Mr. McKinney......    91
19
     Lorenzo Garino
20      Direct Examination by Ms. Pellegrini...    91

21   Terry Morgan
        Direct Examination by Mr. Chernosky....    99
22      Cross-Examination by Mr. McKinney......   104

23   Tonjia Cunningham
        Direct Examination by Ms. Pellegrini...   105
24

25

1                              I N D E X

2

               Monday, February 3, 2020 (cont.)

3

4    WITNESS                                          PAGE

5    Michael Adams
        Direct Examination by Mr. Chernosky...    119
6       Cross-Examination by Mr. McKinney.....    138
        Redirect-Examination by Mr. Chernosky.    165
7       Recross-Examination by Mr. McKinney...    167

8    Todd Dolfi
        Direct Examination by Mr. Chernosky...    169
9

10
                Tuesday, February 4, 2020
11
     Motion...............................    205
12
     Todd Dolfi
13      Direct Examination by Mr. Chernosky...    209
        Cross-Examination by Mr. McKinney.....    231
14      Redirect-Examination by Mr. Chernosky.    241
        Recross-Examination by Mr. McKinney...    242
15
     Thomas Morgan
16      Direct Examination by Mr. Chernosky...    244
        Cross-Examination by Mr. McKinney.....    278
17      Redirect-Examination by Mr. Chernosky.    285
        Recross-Examination by Mr. McKinney...    287
18
     Lamont Powell
19      Direct Examination by Ms. Pellegrini..    289
        Cross-Examination by Mr. McKinney.....    300
20
     David Shelton
21      Direct Examination by Ms. Pellegrini..    305
        Cross-Examination by Mr. McKinney.....    309
22
     Julie Knapp
23      Direct Examination by Ms. Pellegrini..    309
        Cross-Examination by Mr. McKinney.....    316
24
     John Ellis
25      Direct Examination by Ms. Pellegrini..    322

1                          I N D E X

2
                    Tuesday, February 4, 2020 (cont.)
3
     <u>WITNESS</u>                                          <u>PAGE</u>
4
     Carla Lee
5       Direct Examination by Ms. Pellegrini..    330
        Cross-Examination by Mr. McKinney.....    334
6
     Tara Hardy
7       Direct Examination by Ms. Pellegrini..    335
        Cross-Examination by Mr. McKinney.....    342
8
     Justin McEachern
9       Direct Examination by Ms. Pellegrini..    347

10   Jade Burka
        Direct Examination by Mr. Chernosky...    353
11      Cross-Examination by Mr. McKinney.....    358

12   Kevin McCue
        Direct Examination by Mr. Chernosky...    359
13

14
                    Wednesday, February 5, 2020
15
     Kevin McCue
16      Cross-Examination by Mr. McKinney.....    392

17   James Holman
        Direct Examination by Mr. Chernosky...    396
18
     William Best
19      Direct Examination by Mr. Chernosky...    406

20   Leroy Hicks
        Direct Examination by Mr. Chernosky...    431
21      Cross-Examination by Mr. McKinney.....    433

22   Michael Feeney
        Direct Examination by Mr. Chernosky...    433
23

24

25

1                        I N D E X

2

            Wednesday, February 5, 2020 (cont.)
3

4    WITNESS                                          PAGE

5    David Pine
         Direct Examination by Mr. Chernosky...      444
6        Cross-Examination by Mr. McKinney.....      453
         Redirect-Examination by Mr. Chernosky.      457
7
     David Klobucher
8        Direct Examination by Mr. Chernosky...      458
         Cross-Examination by Mr. McKinney.....      464
9
     Dennis Robl
10       Direct Examination by Mr. Chernosky...      465
         Cross-Examination by Mr. McKinney.....      468
11
     Jason Clark
12       Direct Examination by Ms. Pellegrini..      468
         Cross-Examination by Mr. McKinney.....      485
13
     Robert McNeal
14       Direct Examination by Mr. Chernosky...      498
         Cross-Examination by Mr. McKinney.....      501
15
     Robert Barko
16       Direct Examination by Ms. Pellegrini..      507

17   Venerando Costa
         Direct Examination by Mr. Chernosky...      510
18       Cross-Examination by Mr. McKinney.....      531
         Redirect-Examination by Mr. Chernosky.      548
19       Recross-Examination by Mr. McKinney...      553

20   Samuel Pastor
         Direct Examination by Mr. Chernosky...      555
21       Cross-Examination by Mr. McKinney.....      563

22   Robert Barko
         Direct Examination by Ms. Pellegrini..      567
23

24

25

1                        I N D E X

2

          Wednesday, February 5, 2020 (cont.)
3
                                                        PAGE
4
     Juror No. 16 -Interview................     576
5
     Lonnie Jenkins
6        Contempt Hearing...................     579

7
     Reporter's certificate................     582
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S
 2                          -----
 3                    (Monday, February 3, 2020 - Open
 4        court - Jury present.)
 5                          -----
 6                    (Whereupon, the Jurors were
 7        severally and first duly sworn.)
 8                          -----
 9                    THE COURT:  As to those notepads,
10        keep them aside or on the floor.  You are not
11        allowed to take notes yet.
12                    Good morning, members of the jury.
13        You have been selected and sworn to hear the
14        case of the Commonwealth versus Cheron Shelton.
15        Now, during the preliminary matter in the
16        selection process, I told you, and there was
17        inquiry made, as to this being a co-defendant
18        case, that is Robert Thomas.  The case of the
19        Commonwealth versus Robert Thomas is no longer
20        before you.  In that regard, your task becomes
21        narrower.  You are not to draw any adverse or
22        positive inference toward any party, of course
23        including Mr. Shelton or the Commonwealth, from
24        the case of Robert Thomas not being before you.
25        There will be evidence in this matter that
```

Jury Instructions - by Hon. Borkowski

1    refers to Mr. Thomas but that primarily relates
2    to a charge of conspiracy.  You, of course, are
3    allowed to consider that evidence.  But as to
4    the charges of criminal homicide, aggravated
5    assault, all the charges that you are now
6    familiar with, that matter is no longer before
7    you.  Your sole focus is whether or not the
8    Commonwealth can prove their case as to
9    Mr. Cheron Shelton beyond a reasonable doubt.
10   Is there anyone amongst you that does not
11   understand that or could apply that?  Okay.
12           The service that you are about to
13   render as a juror is as important to the
14   administration of justice as those rendered by
15   myself as the trial judge or by the attorneys
16   who try this case on behalf of their respective
17   interests.  You should pay close attention to
18   what is said throughout this trial so that you
19   can faithfully perform your sworn duty as a
20   juror.
21           You are familiar with the parties and
22   the charges by virtue of the voir dire process,
23   but for purposes of a formal record now being
24   made, I will go through that again.
25           Mr. Shelton, will you please stand and

Jury Instructions - by Hon. Borkowski

1    identify yourself?

2                    THE DEFENDANT:  How you doing?

3    Cheron Shelton.

4                    THE COURT:  Thank you.

5    Mr. Shelton is represented by Ms. Wendy

6    Williams and Randall McKinney.

7                    MR. McKINNEY:  Good morning.

8                    THE COURT:  The Commonwealth is

9    represented by Ms. Lisa Pellegrini and

10   Mr. Kevin Chernosky.  There is a third person

11   at the table who you did not know as of yet,

12   Detective Thomas Foley from Allegheny County.

13   He is there to make sure the witnesses are

14   viable and move the case along in plain

15   English.  He is new to you.  He will be in and

16   out of the courtroom during the course of the

17   trial.

18                    I will take a moment and describe to

19   you what will occur so you have a better idea

20   of what to expect.  First, the assistant

21   district attorney will make an opening

22   statement outlining the nature of the case.

23   Who will be opening for the Commonwealth?

24                    MR. CHERNOSKY:  I will, Your

25   Honor.

Jury Instructions - by Hon. Borkowski

1          THE COURT:  Mr. Chernosky will

2     make that opening statement.  Following that

3     opening statement, the defense may make an

4     opening statement or they may reserve that

5     right until the Commonwealth has presented its

6     entire case.  In that regard, it is strictly up

7     to them at that moment whether they choose to

8     open or not.

9          Following the opening statements, the

10    district attorney will present evidence.  They

11    will do so by calling witnesses to the witness

12    stand.  They may offer exhibits, documents, or

13    physical objects as evidence.  Once the DA

14    calls a witness to the witness stand, following

15    the direct examination of that witness, that is

16    the DA's questioning of that witness, the

17    defense has the opportunity to cross-examine

18    that witness to test the truthfulness and

19    accuracy of that testimony.

20         At the close of the Commonwealth's

21    case, the defense may make an opening statement

22    if they have not already done so.  The defense

23    may present evidence on behalf of Mr. Shelton

24    as the Commonwealth did, however it is

25    important at this juncture of the trial that

Jury Instructions - by Hon. Borkowski

1   you have a complete understanding and
2   acceptance that a person accused of a crime has
3   absolutely no obligation whatsoever to offer
4   any evidence on his own behalf.  A person
5   accused of a crime is presumed to be innocent
6   and the burden of proof is entirely upon the
7   Commonwealth to prove him guilty beyond a
8   reasonable doubt.  Therefore, if the defendant
9   does not present a defense or testify,
10  understand that you, as a sworn juror and
11  fact-finder, must not draw any adverse
12  inference whatsoever against the defendant.
13  The reason is simple, anyone accused of a crime
14  is presumed to be innocent.  The sole burden of
15  proof is on the Commonwealth to prove him
16  guilty beyond a reasonable doubt.
17          If, however, the defendant in this
18  case chooses to present a defense and as part
19  of that defense calls witnesses, then, of
20  course, the DA has the same opportunity and
21  right to cross-examine those witnesses to test
22  the truthfulness and accuracy of that testimony
23  as the defense did.
24          After all the evidence is presented,
25  the attorneys for each side will have the

Jury Instructions - by Hon. Borkowski

1    opportunity to make closing argument, I shall

2    then give you my final instructions which

3    includes the rules of law applicable to this

4    case, and you will retire to the jury room to

5    deliberate and reach a verdict.

6         During the course of the trial it is up

7    to the judge to provide you with the law

8    applicable to the case and decide any questions

9    of law that might arise during the course of

10   the trial.  Therefore you must accept and

11   follow my rulings and instructions with regard

12   to matters of law including my opening

13   instructions to you about this case being

14   against Mr. Shelton only.  I am not however the

15   judge of the facts.  It is not for me to decide

16   what are the true facts concerning the charges

17   against this defendant.  You, the jury, are the

18   sole judges of the facts.  It is your

19   responsibility to weigh the evidence, to

20   carefully listen to the evidence, and find the

21   facts from that evidence and to apply the rules

22   of law which I provide to you and therefore

23   decide whether or not the Commonwealth has met

24   its burden of proving this defendant guilty

25   beyond a reasonable doubt.

Jury Instructions - by Hon. Borkowski

1       You have been given notepads in the

2    event that you wish to take notes during the

3    course of this trial.  You are under no

4    obligation to take notes.  It is entirely up to

5    you whether you wish to take notes to help you

6    remember what the witnesses said and to use

7    during your deliberations.  If you do take

8    notes, remember that one of your

9    responsibilities as a juror is to observe the

10   demeanor of the witness on the witness stand to

11   help assess their credibility.  Do not become

12   so involved with note-taking that it interferes

13   with your ability to observe the witness and

14   distracts you from the answers that are given.

15       Your notes may help refresh your

16   recollection of the testimony and should be

17   treated as a supplement to rather than a

18   substitute for your own individual memory.

19   Your notes are only to be used by you as a

20   memory aid and should not take precedence over

21   your independent recollection of what is said.

22       Those of you who do not take notes

23   should not be overly influenced by the notes of

24   other jurors.  It is just as easy to write

25   something down incorrectly as it is to remember

Jury Instructions - by Hon. Borkowski

1    it incorrectly and your fellow jurors' notes

2    are entitled to no greater weight than each

3    juror's independent memory.  You may refer to

4    your notes during deliberations but give no

5    more or less weight to the view of a fellow

6    juror's notes because that juror did or did not

7    take notes.

8         Although you are permitted to use your

9    notes during your deliberations, the only notes

10   that you may use are the notes that you write

11   in the courtroom on the materials distributed

12   by my staff.  Each evening we adjourn, your

13   notes will be collected and secured by the

14   court staff.  Your notes are completely

15   confidential.  Neither myself nor any member of

16   my staff will read your notes now or at any

17   time in the future.  After you reach a verdict,

18   your notes will be destroyed immediately by my

19   staff.

20        In that regard, you cannot take notes

21   during the closing and opening statements.

22   Notes are restricted to the actual testimony.

23   Should your recollection differ from any review

24   of the testimony offered by myself or by the

25   attorneys in their closing arguments,

Jury Instructions - by Hon. Borkowski

1    understand it is your recollection that

2    prevails.  The reason for that is simple, you

3    are the sole judges of the facts and result in

4    this matter.

5         A duty which accompanies the judging of

6    the facts is appraising the credibility of

7    witnesses.  You are the judges of credibility

8    and the weight of all evidence.  Credibility is

9    simply believability.  To assist you in

10   determining credibility, be alert for anything

11   in the witness's words, demeanor, behavior on

12   the witness stand, or for anything else that

13   may help you judge the truthfulness and

14   accuracy and weight of the witness's testimony.

15        You are charged with a duty of keeping

16   an open-mind throughout the entire trial.  You

17   must avoid forming any opinion about the guilt

18   or innocence of a defendant or any other

19   disputed question until you've heard all the

20   evidence, the closing arguments of the

21   attorneys, and the charge of this Court.  In

22   other words, until you begin your

23   deliberations, only then will you have enough

24   information to make an intelligent and unbiased

25   decision in this matter.

Jury Instructions - by Hon. Borkowski

1          You must refrain from discussing the

2     case with anyone including friends, family

3     members, and even your fellow jurors until you

4     are charged with that duty at the very end of

5     this case.

6          During the entire trial, when you are

7     out of the courtroom, during any recess or

8     before or after the end of the court day, do

9     not converse with the attorneys in this case or

10    any parties or witnesses.  Do not permit any

11    person to discuss this case with you or within

12    your hearing.  If anyone attempts to do this,

13    please report it to the Court.  Such

14    incidences, even though they may be innocent,

15    could be misinterpreted and create a serious

16    problem.  If it appears that someone is

17    intentionally trying to approach you, the same

18    responsibility attaches and, rest assured, that

19    I will take swift and appropriate action with

20    law enforcement in that regard.

21          You must not at any time make any

22    independent investigation, visit the scene of

23    the alleged crime, or conduct any experiment of

24    your own.  All the information and the only

25    information that you need will come to you

Jury Instructions - by Hon. Borkowski

1    while you are assembled here as jurors.  You

2    are not to conduct any research activities with

3    regard to this case including the history, the

4    law that might apply, or to any parties

5    involved.  Until this trial is concluded, when

6    you have rendered your verdict, do not read

7    newspaper articles, internet activity which

8    relates to this trial or the parties involved.

9    Avoid any radio or television broadcasts or

10   media or internet activity that might refer to

11   this trial or any parties involved.

12        Understand that you have just taken an

13   oath to decide this case based on the evidence

14   which will be presented to you in the courtroom

15   and in the presence of all concerned parties.

16   We zealously regard that principle of law in

17   our criminal justice system.  As I noted

18   earlier, if anyone tries to contact you with

19   regard to this case, your duty is to report

20   that to me immediately.  Again, I will take

21   swift action and appropriate action to protect

22   the integrity of the proceedings and your role

23   as a juror.

24        Note that the statements of the

25   attorneys, whether it is their opening remarks

Jury Instructions - by Hon. Borkowski

1    or closing arguments, are not actual evidence.

2    Although they are made in good faith with

3    expectations of proving them up in court

4    perhaps, again, they are not actual evidence.

5    They are not binding upon you.  Their

6    arguments, opening or closing remarks, you may

7    give them, of course, due consideration if they

8    are supported by the evidence and if they

9    appeal to your own reason, judgment, and common

10   sense.

11       The admission of evidence in this court

12   is governed by rules of law.  During the trial

13   the attorneys may deem it necessary to raise

14   objections.  Then it becomes my duty to rule on

15   those objections and decide whether certain

16   evidence can be admitted for your

17   consideration.  You must not concern yourself

18   with the objections or the reasons for my

19   rulings on them.  You must not consider

20   testimony or exhibits to which I have sustained

21   an objection or which I have ordered stricken

22   from the record or from your consideration.

23   None of my rulings should be regarded as an

24   indication of my own opinion or what your

25   findings should be or any question that I might

Jury Instructions - by Hon. Borkowski

1    ask of a witness regarded as any indication of
2    my own opinion.  Any opinion that you think I
3    may have about the facts or result in this case
4    is not important.  You, and you alone, are the
5    sole judges of the fact and result.
6            During the course of the trial, the
7    attorneys and I may discuss certain matters
8    outside of your hearing.  We are required to do
9    so by law.  We may do this in one of two ways;
10   if it appears a short discussion, we will do so
11   in front of the bench here, or what we call a
12   sidebar.  That will be in your presence but
13   outside of your hearing.  On those occasions,
14   you may take the opportunity to stand and
15   stretch and talk quietly among yourselves about
16   anything other than this case.  If it appears
17   to be a long discussion, you will be taken back
18   to the jury room until that matter is resolved.
19   Don't concern yourselves, again, with the
20   nature and content of those discussions.  That
21   is why, of course, we hold them outside of your
22   hearing.
23           Now, should any of you have any
24   difficulty seeing or hearing, please raise your
25   hand and bring it to my attention and I will

Jury Instructions - by Hon. Borkowski

1    attempt to correct that.  If you require a

2    recess at any time, again, raise your hand and

3    we will attempt to accommodate you.

4          Understand that the parties have been

5    or will be advised that there are 16 of you in

6    a small room upstairs.  It is an uncomfortable

7    circumstance so I will move this case along,

8    you can rest assured, as expeditiously as

9    possible consistent with the interest of

10   justice but also bearing in mind the close

11   quarters that you endure upstairs.

12         There are certain persons present that

13   I want to introduce.  You know, at least by

14   sight, the court reporter, Ms. Michele

15   Murawski.  She is a very experienced court

16   reporter.  The Court is privileged to have her

17   during the course of this proceeding.  You met

18   Mr. Irvin, my tipstaff, this morning.  I know

19   that you were formally introduced to Pat

20   Perillo, a second tipstaff, who is here for

21   your comfort and convenience and to aid the

22   Court.  Mr. Halloran gave the opening oath.  He

23   has other duties to perform for my calendar, so

24   to speak.  On my far left is Ms. Christy

25   Foreman, she is my law clerk and here to assist

Opening Statement - by Mr. Chernosky

1    in terms of any legal questions that arise

2    during the course of the trial.  Her primary

3    function is to make me look smarter than I

4    actually am.  We appreciate your presence and

5    assistance.

6            With that, Mr. District Attorney.

7            MR. CHERNOSKY:  Thank you, Your

8    Honor.  Mr. McKinney, Ms. Williams, ladies and

9    gentlemen of the jury.  March 9, 2016, was one

10   of those unseasonably warm days that we

11   sometimes get in Western Pennsylvania, not

12   unlike the one we're going to have today in

13   this trial.  It was probably ten degrees

14   warmer.  On those days, Western Pennsylvanians

15   emerge from their hibernation, maybe you wash

16   your car, try to get errands done, or have an

17   impromptu barbecue where one person brings the

18   beer, one person brings the radio, one person

19   brings the burgers.  That is exactly what was

20   happening on March 9, 2016, in Wilkinsburg at

21   1304 Franklin Avenue.

22           Brittany Powell had just moved in with

23   Julie Knapp with her two children.  On that day

24   she was joined by Jerry Shelton, Tina Shelton,

25   Chanetta Powell, Shada Mahone, her neighbors,

Opening Statement - by Mr. Chernosky

1    friends, people stopped over, they came and

2    went.  At that party, they talked, joked, took

3    pictures, and like anybody else these days,

4    they posted those pictures on social media.

5    The conversation probably stopped at some point

6    and revolved around someone's impending

7    pregnancy.  It was weeks away at that time.

8    She was going to have her baby.

9          What they didn't know, what they

10   couldn't know, is that that Facebook post would

11   be an invitation to murder because the

12   defendant was holding a grudge and was aware of

13   the family barbecue.  And because of the

14   Facebook post, he conspired with another

15   individual to execute a plan.  He was holding a

16   grudge because he believed the word on the

17   street that one of the party-goers, Lamont

18   Powell, Chanetta Powell's brother, Brittany's

19   brother, had murdered his friend years ago, his

20   best friend, Calvin Doswell.

21          We will show you how the defendant

22   gathered his weapon, made his way with another

23   individual to Franklin Avenue.  We will show

24   you the calls back and forth, the timing before

25   and after the murders.  We will take you there.

Opening Statement - by Mr. Chernosky

1    The evidence will show that they set up in the

2    shadows, that one of them unleashed a barrage

3    of bullets in the back of the yard, 18

4    consecutive shots, and had the natural effect

5    of making the unsuspecting partygoers run

6    toward their only means of escape, the back

7    porch, where the evidence will show you that

8    Cheron Shelton unleashed an unmerciful

9    hailstorm of bullets, 30, more calculated, more

10   discriminating in their choice, pausing,

11   starting again.  When the smoke cleared, they

12   were gone.  They almost got away.  There were a

13   few things they weren't counting on.

14          They weren't counting on Detective

15   Adams from the Wilkinsburg Police Department

16   who was also enjoying this beautiful day.  He

17   was working but he had his windows down.  He

18   hears the shots.  This is before any 911 call

19   goes out.  This is before he is dispatched to

20   any address.  He is able to ascertain that they

21   are about a street away and slightly behind

22   him.  He calls out on the radio, he drives to

23   that location.  He doesn't have an address yet

24   so he will tell you that he is scanning left to

25   right, right to left, looking for anything

Opening Statement - by Mr. Chernosky

1    that, based on his experience, would take him

2    to a shooting.  He just heard the shots, a man

3    down, someone screaming.  What he sees is

4    Cheron Shelton getting into his mother's car.

5    He will tell you that he pauses, thinking about

6    asking this person if they've seen anything

7    before continuing on.  He gets a very important

8    piece of evidence.  You are going to hear about

9    that.

10          He proceeds on to what you will hear

11   is one of the most chaotic and brutal scenes

12   that he and the EMS and the other officers who

13   responded have ever seen.

14          The defendant wasn't counting on the

15   video from Homewood North which is a housing

16   complex in the Homewood North section of the

17   city and the video captures he and his

18   co-conspirator's comings and goings all night

19   long.  Catches him less than an hour after the

20   shooting and going in the back door and coming

21   out some 20 minutes later, having changed his

22   clothes, one person carrying a garbage bag

23   because, no doubt, you will hear that the shots

24   were so close that he likely had blood on his

25   clothing.

Opening Statement - by Mr. Chernosky

1           Cheron goes away for a while.  He is
2   not counting on people listening to his calls
3   and grabbing his letters.  You will see those
4   letters, you will hear those calls, you will
5   hear about the shots in this case.  Pay
6   attention, pay attention to the tone, pay
7   attention to what he asks for, pay attention to
8   how he signs off and closes the letters.
9           We will take you to the defendant's
10  mother's house, the subject of all those videos
11  of comings and goings days after the murder.
12  We will show you the cache of weapons found in
13  that house to include a bulletproof vest and
14  everything that it would take to make that
15  assault rifle work except the rifle.
16          The defendant arranges for a visit
17  with his father.  We are able to record his
18  side of the visit.  Pay attention to what he
19  does when he thinks nobody is watching.  He
20  opts not to talk but to act things out because
21  he is likely afraid we're listening.
22          This case is going to test you.  It is
23  going to be long, it is going to be arduous.
24  There are going to be technical parts of it.
25  The scene was vast.  The physical exhibits are

Opening Statement - by Mr. McKinney

1    many.  But you will not be alone in this

2    journey.  You will have three things to guide

3    you:  the facts as you and your fellow jurors

4    determine them, the law that the Judge will

5    give you, and the oath that you took as a

6    juror.  If you follow your oath and you pay

7    attention to how the pieces fit together, a

8    picture starts to emerge, a plan hatched and

9    carried out in the darkness brought to light by

10   an investigation of a brazen, vengeful, callus

11   act perpetrated by that defendant.

12            The Commonwealth will be asking you

13   for a verdict, six counts of first degree

14   intentional premeditated murder, one for Jerry,

15   one for Tina, one for Chanetta, one for Shada,

16   and one for the unborn baby.  Thank you.

17            THE COURT:  Mr. McKinney, do you

18   choose to open at this juncture?

19            MR. McKINNEY:  I would, Your

20   Honor.

21            THE COURT:  Proceed.

22            MR. McKINNEY:  May it please the

23   Court, opposing counsel, ladies and gentlemen

24   of the jury.  My name is Randall McKinney.

25   Along with Wendy Williams, we represent Cheron

Opening Statement - by Mr. McKinney

1    Shelton.

2         I want to start by saying that what

3    happened on March 9th of 2016 was an absolute

4    tragedy.  But what is also tragic is that this

5    young man, Cheron Shelton, who played no role

6    in what happened that night is sitting before

7    you as a defendant.  We're here today because

8    the Commonwealth, the Allegheny County DA's

9    Office, says that he is responsible.  The Judge

10   already instructed you in his opening that just

11   because the Commonwealth has made that

12   accusation, it is just a charge.  It is just an

13   allegation.  When we were in jury selection

14   last month, the Judge said to you charges, even

15   when they are numerous, even when they are

16   serious, are just charges.  They are just words

17   on a piece of paper.  We all know that just

18   because someone accuses you of doing something,

19   that certainly doesn't make it so.

20        Do you know what it takes to initiate

21   a criminal complaint to file the charges?  A

22   detective or a police officer writes out a

23   report and they submit what I write I believe

24   to be true, they get a judge to sign off and

25   charges are filed.  That is all it takes.  We

Opening Statement - by Mr. McKinney

1     are at a trial now, words on a piece of paper

2     aren't enough.  Mere allegations don't cut it

3     at this point.  The Commonwealth has to present

4     evidence.  That evidence is going to come in

5     the form of testimony.  Witnesses are going to

6     take that stand and your job is going to be to

7     assess their credibility.  You're going to

8     determine if what they're telling you makes

9     sense and if it is true.  It is an awesome

10    responsibility as a juror because the stakes

11    are so high but also a simple one because what

12    we're asking you to do are things that you do

13    in everyday life, assess credibility.

14            While we're talking about witnesses and

15    your job, I want to talk about the government's

16    star witness, he was mentioned in openings by

17    the Commonwealth, Detective Michael Adams.

18    Detective Michael Adams is going to take that

19    stand and he is going to tell you that he saw

20    Cheron Shelton within a block of the crime

21    scene less than two minutes after the initial

22    shots were fired.  The evidence will show that

23    Detective Adams is lying to you.  It is a bold

24    statement for me to tell you that a member of

25    the law enforcement is going to lie on the

Opening Statement - by Mr. McKinney

1    stand but it is a bold move for a member of the
2    law enforcement to place Mr. Shelton at the
3    scene when he was never there.
4            Now, opening statements are not
5    evidence.  That goes for the Commonwealth as
6    well as the defense.  So, please, don't take my
7    word for it that Detective Adams is not going
8    to be truthful with you, just listen to his
9    testimony.
10           He is going to tell you that on the
11   night of the shooting he was on routine patrol.
12   His windows were down because it was an
13   unseasonably warm day.  At 10:53 p.m., while
14   traveling up Marlboro Avenue, he heard shots.
15   10 to 12 shots he heard himself.  He called
16   into dispatch to let them know that shots were
17   fired.  He went to the vicinity in his cruiser.
18   Ten minutes later they let him know that shots
19   were fired from the 1300 block of Franklin
20   Avenue, one street over.
21           Detective Adams slowly drives his
22   vehicle up Marlboro Avenue because he is
23   scanning the sidewalk, both sides, because he
24   is determining if he can find a victim, a
25   suspect, or a witness.  As he is slowly driving

Opening Statement - by Mr. McKinney

1    up Marlboro, he is looking, his senses are
2    heightened.  He doesn't see anyone.  He makes a
3    left on Princeton Boulevard traveling at about
4    five to eight miles per hour, slowly searching,
5    looking for anyone to start his investigation.
6    He stops his vehicle and looks down Hazel Way,
7    parallel to Franklin Avenue, doesn't see
8    anyone.  He drives Princeton Boulevard and
9    makes a left onto Franklin Avenue, the same
10   street where he was just informed that shots
11   were fired.  He is one block away.  He
12   continues to travel down Franklin Avenue
13   slowly, five to eight miles per hour,
14   searching, looking for anyone.  His testimony
15   is going to be that he saw Cheron Shelton, the
16   only sole on the street at that point in time,
17   less than two minutes after the shots were
18   fired half a block away from the crime scene.
19        What does Detective Adams do?  He's a
20   detective.  His job is to investigate and solve
21   crime.  This is what he did.  He pulled his
22   cruiser next to the car that Cheron Shelton
23   allegedly got into.  He stared at him, five
24   seconds, ten seconds, 20 seconds, 30 seconds.
25   The driver of the car that he was staring at

Opening Statement - by Mr. McKinney

1    never turned on the ignition, purposely looking

2    in the opposite direction as not to make eye

3    contact with the detective.  40 seconds, 50

4    seconds.  There are screams coming from 1304

5    Franklin, half a block away where the crime

6    happened, and this is the only person on the

7    street.  60 seconds.  Staring at the man for 60

8    seconds, the man that he allegedly saw, never

9    questioned him, never detained him, never said,

10   hey, buddy, did you hear those shots?  Not a

11   word.  Now you'll have to ask yourself, does

12   that sound reasonable?

13         Please use your common sense when

14   assessing the credibility of these witnesses.

15   His job is to investigate and solve crimes.

16   Does that sound like an investigation or

17   attempt to solve the crime?  60 seconds.

18   Detective Adams will also tell you that in any

19   other investigation when he arrives on scene,

20   the first thing he does is interview anyone he

21   can find.  But not in this instance.  The

22   evidence will show that he didn't do it in this

23   case because he never saw anybody.

24         Detective Adams then made his way to

25   the crime scene where he saw multiple other

1    officers, three of them part of his own

2    department, additional Wilkinsburg police

3    detectives.  Never said a word to any of them

4    about this guy he saw.

5         But what you're going to hear when he

6    testifies is that Detective Adams, as he was

7    driving away from the vehicle that he saw

8    Cheron Shelton get into, noted the license

9    plate on a piece of paper.  As Detective Adams

10   was driving in the opposite direction, he used

11   his rearview mirror or sideview mirror to look

12   backwards to see the license plate.  When we

13   asked Detective Adams for that paper that he

14   wrote that information down on, it disappeared.

15        Now, this is what you'll have to

16   determine when listening to Detective Adams's

17   testimony.  He is essentially going to be

18   telling you that the driver of the vehicle,

19   less than half a block from a murder scene, was

20   suspicious enough to stop and look at but not

21   suspicious enough to question but suspicious

22   enough to write his license plate down as you

23   head off in the opposite direction.  That is

24   going to be his testimony.

25        Now, in determining whether that is

1    accurate, let me tell you this, the car

2    registered to that license plate belongs to

3    Cheron Shelton's mother and his sister at the

4    address of 1214 Nolan Court.  This was an

5    absolute massacre.  The detectives in this case

6    never paid attention to Nolan Court until three

7    days later so you'll have to ask yourself if

8    they had information about the only possible

9    suspect in this case on March 9th, why would

10   they wait three days?

11            Now, let me tell you what I believe

12   the evidence will show actually.  The incident

13   occurred on March 9th.  Allegheny County Police

14   and Wilkinsburg detectives had no suspects.

15   The next day is March 10th.  The police get

16   calls, anonymous calls, all kinds of tips

17   pointing them in all kinds of different

18   directions.  One of those tips the day after

19   the murders was that it is possible that

20   someone involved may have lived on Hilltop

21   which is in Homewood.  So the next day,

22   March 11th, police pull surveillance video from

23   that area of Homewood and they see what they

24   believe to be suspicious activity on

25   surveillance.  They see Mr. Shelton leaving the

Opening Statement - by Mr. McKinney

 1    back door of his mother's house getting in the
 2    car and driving away 30 minutes before the
 3    homicides.  The next day, which was March 12th,
 4    the detectives sit on the house.  That just
 5    means that they stay outside to see if there is
 6    any action, and they sit on the car, just
 7    making sure that nothing is going to happen,
 8    and if it does, they want to be able to
 9    document it.  So we are now three days after
10    the homicide.  Three days after the homicide
11    they are sitting on the car.  They think it is
12    involved based on surveillance but you can't
13    get into a car or a house unless you have
14    probable cause.  A search warrant is necessary.
15    You can't just barge into anyone's house.
16            So what they do is they call Detective
17    Adams and a conversation occurs.  The evidence
18    will show that it is on March 12th that
19    Detective Adams says, oh, I did see a guy, I
20    did see a car, and the detective sends him a
21    picture of Cheron Shelton on surveillance and
22    the detective says, yes, that's who I saw.  Now
23    they have their search warrant, now they can
24    get in the house and they can get in the car
25    and they do.  You know what they find?  The

Opening Statement - by Mr. McKinney

1    evidence will show they don't find anything.

2    Mr. Chernosky is right, they find weapons, they

3    actually find bullets.  But the evidence will

4    show that when the shooter committed this act,

5    the ammunition that he used or she used, does

6    not match any of the ammunition found in

7    Mr. Shelton's mother's house.  Not a match.

8          The car was searched.  You heard

9    Mr. Chernosky tell you in his opening that

10   whoever committed this act, because it happened

11   at such close range, they would have been

12   covered in blood.  They searched the car.

13   There is not one speck of blood in it.  If

14   their theory is that this man massacred six

15   people and within minutes is sitting in his

16   car, no blood, no evidence?

17          Now, two days later, which was

18   March 14th, so the homicides happened on

19   March 9th.  March 14th Mr. Shelton is not

20   arrested for committing these acts.  He

21   mysteriously is violated on probation.  He is

22   taken to the Allegheny County Jail a couple

23   weeks later on March 25th.  Based on the

24   evidence that I discussed with you already, he

25   was not charged on that evidence but to get him

Opening Statement - by Mr. McKinney

```
 1      in the jail, they try to pile on additional
 2      evidence.  They isolate him.  Put him in the
 3      hole.  23 in his cell a day, one hour of rec
 4      time.  He is isolated.  He is trying to reach
 5      out to family.  It is the worst kept secret
 6      that he is a suspect in this mass murder.  His
 7      mother's house was searched.  His girlfriend's
 8      house was searched.  His mother's car was
 9      searched.  The police took a buccal swab trying
10      to get his DNA.  He is fully aware that he is a
11      suspect so he writes a letter to his sister, a
12      letter that he could never have possibly
13      conceived the Commonwealth would get their
14      hands on.  They find it.  They get it.  Do you
15      know what he is talking about?  The fact that
16      he is a suspect and the fact that he needs
17      money and people on the outside to help him
18      make money so he can afford a lawyer.  There is
19      no confession in that letter.  You will read
20      it.  Read all of it.  Digest it.  You will see
21      and the evidence will show, no crime, no
22      smoking gun.
23              So based on the letter, he is still
24      not charged.  So next up, let's try to record
25      his interactions with his estranged father.  So
```

Opening Statement - by Mr. McKinney

1    the FBI set up a wireless camera during his

2    visit to capture what he may say or do.  One of

3    his father's first visits at the jail, the

4    evidence will show that Cheron Shelton was

5    again trying to talk to his father about

6    finding ways to make money and informing his

7    father that he was a suspect in this case.  So

8    the Allegheny County Police Department captures

9    that surveillance from the video while he is at

10   the Allegheny County Jail.  He still is not

11   charged.

12          Now we're in the first week of April,

13   still no charges.  Second week of April, third

14   week, no charges.  May passes, no charges.  No

15   additional evidence.  Finally, in late June the

16   Commonwealth charges Cheron Shelton with these

17   crimes.  There is no physical evidence tying

18   him to the scene.  In fact, the forensic

19   evidence that the Commonwealth is going to

20   present to you points to someone else.  You

21   see, when they gathered the shell casings from

22   the shooting, they saw a puddle of saliva.

23   They tested it.  They don't just test saliva

24   for no reason.  They tested it because they

25   believed based on its location that it was

Opening Statement - by Mr. McKinney

1    likely the saliva of the killer.  That is their
2    report.  That is what they're going to tell
3    you.  They tested the saliva, not a match.
4    Comes back to some unknown male.  Not Cheron
5    Shelton.
6            I also wanted to now talk to you about
7    what Cheron Shelton was actually doing on the
8    night of the incident that the evidence will
9    show.  On March 8th, the day before the
10   incident occurred, he just got home.  He spent
11   a couple months in jail because he got into a
12   fight with his girlfriend.  His girlfriend and
13   he reunited on March 9th.  They took their two
14   children from their house to Cheron's mother's
15   house at 1214 Nolan Court.  They spent all day
16   together playing with the kids.  Cheron is
17   bouncing back and forth spending time with his
18   family and seeing some of his friends who live
19   around the corner.  Eventually, his girlfriend
20   and the children go back to their place.
21   Cheron stays out.  They have surveillance of
22   him drinking a beer.  They also have
23   surveillance of him hours after the incident in
24   Penn Hills clearly inebriated, drunk, telling
25   the Penn Hills Police Department that he can't

D. Hamlin - Direct by Ms. Pellegrini

 1    find his phone, can't find his friends because

 2    they pulled him over because they believed that

 3    he was acting suspicious just walking around

 4    Penn Hills.  They then tell him he is free to

 5    go.  He heads back to his girlfriend's place.

 6    That's about it.

 7           So the Commonwealth is going to be

 8    asking you to return a verdict of guilty.  They

 9    have to prove to you beyond a reasonable doubt

10    that Cheron Shelton played any role.  As I've

11    outlined the evidence to you the way I expect

12    it to take shape, I submit to you that there is

13    significant reasonable doubt in this case and I

14    ask that you return a verdict of not guilty.

15    Thank you.

16           THE COURT:  Thank you.  Call your

17    first witness.

18           MS. PELLEGRINI:  The Commonwealth

19    calls Donald Hamlin.

20                    -----

21           DONALD HAMLIN,

22    a witness herein, having been first duly sworn,

23    was examined and testified as follows:

24                    -----

25

D. Hamlin - Direct by Ms. Pellegrini

1                        -----

2              DIRECT EXAMINATION

3                        -----

4    BY MS. PELLEGRINI:

5       Q.   Good morning, Officer.  State your full

6    name, spelling your last name for the court

7    reporter.

8       A.   Donald Hamlin, H-A-M-L-I-N.

9       Q.   How are you employed?

10      A.   Police officer with the Borough of

11   Wilkinsburg.

12      Q.   How long a police officer?

13      A.   I've been a police officer for 28 years

14   and the last 24 with Wilkinsburg.

15      Q.   Could you please detail for the jury

16   the various responsibilities and duties that

17   you have for the Wilkinsburg Police Department?

18      A.   Initially, I started off as a

19   patrolman.  I made detective after six years,

20   which I did for approximately seven years as

21   detective and active sergeant on the p.m. shift

22   in Wilkinsburg.

23      Q.   On March 29, 2016, in the evening

24   hours, were you working?

25      A.   Yes, I was.

D. Hamlin - Direct by Ms. Pellegrini

1      Q.  Were you working as an acting sergeant

2  at that time?

3      A.  Not at that time, I was not.

4      Q.  Were you on patrol?

5      A.  Yes.

6      Q.  Could you describe for the jury

7  geographically where Wilkinsburg is located?

8      A.  In the eastern suburbs, Zone 5 area of

9  Pittsburgh, Penn Hills, Forest Hills, we border

10  those jurisdictions.

11      Q.  So on March 9th, where in Wilkinsburg

12  were you patrolling?

13      A.  On that night, I was at Penn Avenue and

14  Center which is basically the business district

15  in Wilkinsburg.  Approximately, almost

16  basically dead center in the middle of

17  Wilkinsburg in the business district.

18      Q.  A few minutes before 11:00, about

19  10:53, did you begin to receive some calls from

20  communications?

21      A.  Actually, the first call I got was from

22  Detective Adams who was working with me in a

23  patrol capacity.  He is a detective but working

24  uniform.  He made notification over the radio

25  that he is hearing -- he is in a location near

D. Hamlin - Direct by Ms. Pellegrini

1    Franklin Avenue and he said he is hearing

2    multiple gunshots coming from the Franklin

3    Avenue, Ardmore Boulevard area.

4        Q.  What did you do then?

5        A.  At the time I proceeded to that

6    location which I was approximately four blocks

7    away.  So it was at night, there was not a lot

8    of traffic, so I got to the area really quick.

9        Q.  When you got to Franklin Avenue, what

10   did you observe?

11       A.  Actually, Penn Avenue.  I went Penn

12   Avenue to Midland Street to Franklin Avenue

13   which when I turned onto Franklin from Midland,

14   I was in the 1300 block for Franklin Avenue.  I

15   could see Detective Adams coming westbound.  I

16   was going eastbound.  He was coming westbound

17   off Princeton Boulevard in his vehicle.  As I

18   hit 1304 Franklin, a female ran out to my car

19   screaming that somebody had been shot on her

20   front porch.

21       Q.  What was her demeanor?

22       A.  Very excited, she was screaming and in

23   a very hurried fashion.

24       Q.  Detective, I'm going to show you what

25   has been marked as Commonwealth Exhibit Nos. 1

D. Hamlin - Direct by Ms. Pellegrini

1    through 9, 9 being a diagram, and ask you if

2    you recognize these photographs.

3                    THE COURT:  While he is looking

4    at those, I want to advise you that they will

5    be displayed.  I told you not to draw any

6    adverse inference toward Mr. Shelton.  They are

7    for background only.  Most of the exhibits

8    introduced at trial, there are some rules

9    restricting certain evidence but most of the

10   evidence will be available for you during your

11   deliberations in the jury room.  So do not

12   think that this is the first and last time that

13   you will see these exhibits.

14        Q.   Detective, do you recognize these

15   photographs, the ones that I just showed you,

16   do you recognize the photographs?

17        A.   Yes, I do.

18        Q.   Do they fairly and accurately depict

19   the scene as you found it at 10:53 on March 9,

20   2016?

21        A.   Yes, they do.

22        Q.   Lastly, the diagram that was prepared,

23   does that fairly and accurately depict the rear

24   of the residence?

25        A.   Yes, it does.

D. Hamlin - Direct by Ms. Pellegrini

1          MS. PELLEGRINI:  I move for the

2     admission of 1 through 9.

3          MR. McKINNEY:  No objection.

4          THE COURT:  They are admitted.

5     Q.  So the lady is hysterical.  What is she

6     telling you?

7     A.  Inially she is saying that somebody is

8     shot on her porch.  When she pointed to the

9     front porch of 1304, I noticed a male on all

10    fours on the front porch.  I exited my vehicle

11    and went over to where he was.  He was bleeding

12    profusely from his chest area.  He had some

13    major gunshot wounds.

14    Q.  I'm going to show you Commonwealth

15    Exhibit No. 1.  If you could look up at the

16    screen, is that the residence at 1304 Franklin

17    Avenue?

18    A.  That's correct.

19    Q.  Now, did you, as you see here, the

20    front porch, is that where you found the first

21    victim?

22    A.  That's correct, that is where I found

23    the male victim on all fours bleeding from his

24    chest.

25    Q.  That victim is Lamont Powell?

D. Hamlin - Direct by Ms. Pellegrini

1          A.   That's correct.

2          Q.   Where is Detective Adams at this point?

3          A.   At this point he was arriving onto the

4     scene as I was walking on the porch.  He was at

5     the bottom of the stairs of the front porch.

6          Q.   The female that was crying

7     hysterically, where is she at this point?

8          A.   She actually came back up on the front

9     porch with me.  She was standing next to me

10    when I was trying to speak with Mr. Powell.

11         Q.   What is Mr. Powell's condition?

12         A.   Very grave.  He was bleeding very

13    heavily from the chest.  He was struggling to

14    breathe and he kept asking for an ambulance.

15         Q.   What did you do then?

16         A.   At that time I was going to call out

17    for an ambulance, and the female that was with

18    me, the one that initially stopped me, began

19    yelling that they were shooting people on her

20    back porch at the house.  The way she was

21    emotional, it sounded like an active shooting

22    going on but I couldn't hear any gunshots.  She

23    insisted that people were being shot on her

24    back porch.

25         Q.   Did you proceed to the rear of the

D. Hamlin - Direct by Ms. Pellegrini

1    residence?

2        A.   Yes.  Myself and Detective Adams

3    proceeded between 1304 and 1306 which is a

4    narrow alley so we were walking between the two

5    homes.

6        Q.   Not an alley, a walkway?

7        A.   Yeah.

8        Q.   Is this the walkway between the two

9    homes?

10       A.   That is correct.  That is between 1304

11   and 1306 Franklin.

12       Q.   Were you armed?

13       A.   Yes, I was.

14       Q.   Was your service weapon out?

15       A.   Absolutely.

16       Q.   Was Adams behind you?

17       A.   Yes.

18       Q.   When you begin to get to the rear of

19   the residence, is this what the female on the

20   porch was talking about?

21       A.   Yes.

22       Q.   When you get to this narrow walkway,

23   what do you see first?

24       A.   The first thing, I initially hear some

25   movement going on on the porch.  As I got to

D. Hamlin - Direct by Ms. Pellegrini

1    the edge of the house where the porch meets the

2    wooden porch with the slats, a dog stuck his

3    face through the slats and began growling and

4    barking at us.

5        Q.   Could you see on to the porch?

6        A.   I could see to the back end of the

7    porch.  I could see a victim there laying

8    facedown.

9        Q.   What did you do next?

10       A.   At that point, I figured we were

11   probably going to have to shoot the dog to get

12   on the porch to help the victim.  A neighbor

13   who walked in the yard behind said that he knew

14   the dog, the dog was friendly, he could get the

15   dog.

16       Q.   Could you show me using the laser

17   pointer where the neighbor was standing when he

18   said that he could get the dog?

19       A.   He was behind this fence where these

20   numbers are but closer to the house.  Basically

21   between 306 and 308 Franklin Avenue but peeking

22   around the corner to where we were.

23       Q.   Okay.  Did the individual then, the

24   neighbor, come around to get the dog?

25       A.   Yes, he then came to the front of the

D. Hamlin - Direct by Ms. Pellegrini

1    house.  Then I asked him to come down and get

2    the dog.  He came through the alley, reached

3    through the railing, and pulled the dog over.

4        Q.  It is a walkway?

5        A.  It is a walkway between the house.

6        Q.  He came and did he just lift the dog

7    over the railing?

8        A.  I asked him if he could grab the dog

9    from over the railing because I didn't want him

10   stepping onto the porch.

11       Q.  After the dog was removed from the

12   porch, did you and Detective Adams then make

13   your way into the rear so that you could

14   observe what was going on in the backyard and

15   the porch?

16       A.  Yes.  After the dog was removed, we

17   continued further back toward the back of the

18   porch where I noticed multiple victims on the

19   back porch and two more victims on the ground

20   laying at the bottom of the stairway of the

21   porch.

22       Q.  Officer, I'm going to show you

23   Commonwealth Exhibit No. 4.  Could you describe

24   what we're seeing in Commonwealth 4?

25       A.  That was the three victims that we

D. Hamlin - Direct by Ms. Pellegrini

1    found on the back porch.

2        Q.   So did you go onto the porch to assess

3    their medical condition?

4        A.   Yes, I did.

5        Q.   We see the first victim here, there is

6    another victim here, there is a female in a

7    green shirt there, correct?

8        A.   That is correct.

9        Q.   Then did you at first notice a fourth

10   victim?

11       A.   No.  I actually noticed before I could

12   get on the porch there were two victims laying

13   on the ground, a male and a female, both

14   struggling to breathe.  I assessed them.  I

15   noticed some movement from the ladies on the

16   porch.  I stepped up onto the porch and I

17   noticed that they had various extreme wounds,

18   head wounds, body wounds.  Then I noticed

19   another victim in the -- basically in the

20   kitchen area right inside the doorway and he

21   sustained a significant head wound.  I could

22   see that he was deceased.

23       Q.   Now, originally, when you arrived, the

24   first female victim in the grey shirt, she

25   wasn't in that position, was she?

D. Hamlin - Direct by Ms. Pellegrini

1    A.  She was basically in that position but

2    she was trying to lift her head.

3    Q.  Commonwealth Exhibit No. 5.  Each of

4    the victims there -- at this point had medics

5    arrived?

6    A.  After I assessed the people on the

7    porch, that is when the first medics arrived.

8    Q.  Did you call out for mass casualties?

9    A.  I notified our dispatch that we had

10   multiple victims and they began sending units

11   and medics from all over.

12   Q.  Commonwealth Exhibit No. 6.  I'm going

13   to try the other laser pointer.  It might be

14   easier for you.  Show us where the additional

15   victims that were still struggling to breathe.

16   A.  There was a male victim, he was right

17   here with his feet facing the stairs laying on

18   his back.  His head was facing the yard.  His

19   feet were facing the stairs.  There was a

20   female directly next to him about this location

21   here.  She had been shot multiple times also it

22   appeared.  She was on her back with her feet

23   facing the stairs and her head facing the yard.

24   Q.  Detective, I'm going to show you

25   Commonwealth Exhibit No. 7.  Is this the rear

D. Hamlin - Direct by Ms. Pellegrini

1    of the residence like from the alleyway behind?

2        A.  Correct, that is Hazel Way.  That is a

3    photo from Hazel Way which is an alley that

4    runs directly behind 1304 Franklin.  That is

5    the fence that stops 1304, the yard.

6        Q.  Now the female victim that was down on

7    the ground, you said she was gasping for

8    breath?

9        A.  Correct.

10        Q.  Her condition appeared to be grave?

11        A.  Very grave.

12        Q.  What did you do in response to that?

13        A.  At that point I figured she may be one

14    of the ones that I could help.  I went back to

15    our unit and grabbed our first aid kit.  I

16    brought it to the back and before I could

17    administer any kind of assistance, the medics

18    had arrived so they were there fairly quickly,

19    too.

20        Q.  Now, at this point, did you call out

21    for Sergeant Ciuffi?

22        A.  At this point, after I checked the

23    ladies on the porch, Sergeant Ciuffi arrived on

24    scene.

25        Q.  Did you, as well as Sergeant Ciuffi,

D. Hamlin - Direct by Ms. Pellegrini

1    begin to secure the scene?

2         A.   Yes, we began taping off, roping off

3    the area around the front and the rear of the

4    other residence.

5         Q.   Do you remember how many hours you were

6    on the scene?

7         A.   From probably 11:00 at night until

8    6:00, 6:30 in the morning.

9         Q.   This call went out eventually as mass

10   casualties.  Were there a number of other

11   agencies that responded?

12        A.   Yeah, there were sheriffs, Pittsburgh

13   Police, Edgewood, Forest Hills.  There were

14   numerous agencies there, numerous ambulance

15   crews also there.

16        Q.   The county police, which you will hear

17   from in a few minutes, responded as well as the

18   Allegheny County Medical Examiners and crime

19   lab?

20        A.   Correct.

21        Q.   As word began to get out what occurred,

22   did there begin to be issues with family and

23   friends responding to Franklin?

24        A.   Yes, there were multiple family members

25   showing up at the scene.  We had to expand the

D. Hamlin - Cross by Mr. McKinney

1    crime scene a little further to keep them away

2    from the scene.

3         Q.  Is it fair to describe people were

4    very, very emotional?

5         A.  Very, it was a very emotional night.

6              MS. PELLEGRINI:  Those are all

7    the questions I have.  I offer for cross.

8              THE COURT:  Any questions?

9              MR. McKINNEY:  Yes, Your Honor.

10   Thank you.

11                    -----

12              CROSS-EXAMINATION

13                    -----

14   BY MR. McKINNEY:

15        Q.  Sergeant Hamlin, how long on the force

16   in Wilkinsburg?

17        A.  25 years.

18        Q.  How long has Detective Adams been on

19   the force?

20        A.  Probably a year more than I have.

21        Q.  Would you say that you were the first

22   law enforcement officer to respond on the scene

23   and walk in the direction of the front porch?

24        A.  Yes.

25        Q.  How long did it take you from the time

D. Hamlin - Cross by Mr. McKinney

1    you got the call to get there?

2        A.   Less than a minute.

3        Q.   When you pulled up, other than the

4    woman who was victimized who was on the front

5    porch, did you see anyone else?

6        A.   No, I did not.

7        Q.   Did you see Detective Adams?

8        A.   I saw him coming down Franklin Avenue

9    towards me.  I was going eastbound on Franklin

10   from Midland.  He was coming westbound from

11   Princeton.

12       Q.   You are coming up, he is coming down

13   the hill?

14       A.   That's correct.

15       Q.   When you saw him, was his car

16   stationary or moving?

17       A.   Initially, he was making the bend but

18   he was going very slow.  That is when I was

19   approached by the lady so I didn't see exactly

20   if he stopped or not but he was going very

21   slowly with his lights on.

22       Q.   When he arrived on scene, were you

23   still at the front of the house or had you

24   already moved to the back?

25       A.   I was on the front porch with the male

D. Hamlin - Cross by Mr. McKinney

1    victim and female who came to the car.

2        Q.   I think you indicated on direct you

3    were on high alert because you thought there

4    may be an active shooter in the back; is that

5    correct?

6        A.   Yes.  We were on the front porch.  The

7    female that stopped me initially was insisting

8    that the shooting was actively going on but I

9    wasn't hearing any gunshot.

10       Q.   You unholstered your firearm and you

11   and Detective Adams headed to the back of

12   house; is that correct?

13       A.   That's correct.

14       Q.   At that point in time, did Detective

15   Adams tell you that he just seen a potential

16   suspect a half a block up the road?

17       A.   He hadn't mentioned that until we were

18   compiling our reports.

19       Q.   So he mentioned that when you guys were

20   compiling your reports; is that what you just

21   said?

22       A.   Yes.

23       Q.   You would agree with me in your report

24   dated March 10, 2016, you make no mention of

25   Detective Adams telling you that he saw a

D. Hamlin - Cross by Mr. McKinney

1    potential suspect in a white car?

2        A.   That's correct.

3        Q.   Would you agree with me -- strike that.

4    Did Detective Adams tell you about any other

5    suspects that he saw on his way to the crime

6    scene?

7        A.   He didn't mention anything until the

8    following day when we were getting ready to do

9    our reports about a suspect, a suspicious male

10   getting into a vehicle.  We were kind of busy

11   that night.

12       Q.   Let me ask you this, as a detective

13   investigating a mass casualty homicide, you

14   would agree with me it would be important if

15   you saw a suspect leaving that same crime

16   scene, to write that information down on a

17   piece of paper or in some way memorialize it;

18   is that accurate?

19       A.   That is accurate.

20       Q.   It is not in your report that Detective

21   Adams told you he saw a black male getting into

22   a white car minutes after the shooting.  That

23   is not in your report; is that accurate?

24       A.    That is accurate.  I didn't see the

25   male, he did.  He was compiling his own report

D. Hamlin - Cross by Mr. McKinney

1  so he would have been documenting in his own

2  supplemental report.

3       Q.  Did he give you a piece of paper or

4  show you a piece of paper where he had written

5  down the license plate of this car that he

6  allegedly saw?

7       A.  No, I didn't see anything that's

8  written down until I saw his report.  Then I

9  saw it in his report.

10      Q.  When you responded on scene, did you

11  also retrieve a bag of heroin?

12      A.  Yes.

13      Q.  Who possessed that bag of heroin that

14  you found?

15      A.  Well, the bag of heroin was given to me

16  by the medic who was treating the first victim

17  I found on the front porch.  When they brought

18  him into the ambulance and were cutting off his

19  clothing, they found, I think, a bundle of

20  heroin on him and she turned it over to me.

21      Q.  That individual that had the bundle of

22  heroin would have been Lamont Powell?

23      A.  Correct.

24      Q.  A bundle of heroin, because I'm sure

25  the jury doesn't know, could you describe what

D. Ciuffi - Direct by Ms. Pellegrini

1    that is?

2        A.   A bundle of heroin is ten stamp bags

3    with a rubber band around them.  They call that

4    a bundle.

5            MR. McKINNEY:  I have no

6    additional questions.  Thank you, Your Honor.

7            THE COURT:  Anything else?

8            MS. PELLEGRINI:  No redirect.

9    Thank you.

10            THE COURT:  Thank you, Officer.

11    Call your next witness.

12            MS. PELLEGRINI:  The Commonwealth

13    calls Sergeant Ciuffi.

14                -----

15            DANIEL A. CIUFFI,

16    a witness herein, having been first duly sworn,

17    was examined and testified as follows:

18                -----

19            DIRECT EXAMINATION

20                -----

21    BY MS. PELLEGRINI:

22        Q.   Sergeant Ciuffi, could you please state

23    your full name, spelling your last name for the

24    court reporter?

25        A.   Daniel Anthony Ciuffi, C-I-U-F-F-I.

D. Ciuffi - Direct by Ms. Pellegrini

1    Q.  Prior to a couple of days ago, how were

2    you employed?

3    A.  I was a Wilkinsburg police officer for

4    24 years.  I retired with a rank of sergeant.

5    Q.  Could you detail for the jury your

6    various duties as a Wilkinsburg police officer?

7    A.  As a Wilkinsburg police officer, we

8    start out as patrol officers then we go through

9    our careers and hopefully get promoted,

10   assigned to investigations.  But mostly towards

11   the end of my career I was a patrol sergeant in

12   charge of the C-squad which is 4:00 to

13   midnight.  My duties were to supervise

14   subordinate officers and do paperwork and

15   anything that a supervisor would do, but mainly

16   what I took on, I still do proactive police

17   work and investigations, also.

18   Q.  So you recently retired.  How are you

19   employed now?

20   A.  A criminal investigator with the

21   Department of Corrections.

22   Q.  Sergeant Ciuffi, I'm going to direct

23   your attention to March 9, 2016, approximately

24   seven minutes to 11:00.  Did you hear the call

25   go out for shots fired, multiple victims, at

D. Ciuffi - Direct by Ms. Pellegrini

1    1304 Franklin Avenue?

2         A.   I did.

3         Q.   Could you tell us what you did next?

4         A.   I was at the station at the time when

5    Officer Adams called in that he heard numerous

6    shots when he was on patrol on Marlboro Avenue

7    which is the 1300 block of Franklin Avenue.  I

8    left the station and started toward that area.

9    As I was getting closer, I heard him and

10   Officer Hamlin report that there were several

11   victims that they located at 1304 Franklin

12   Avenue.

13        I pulled up front and contacted two

14   individuals on the front porch, one was

15   standing over the other one.  The person that

16   was standing over the gentleman laying on the

17   front porch was Tonjia Cunningham and the other

18   individual that was shot, bleeding through his

19   back, was Lamont Powell.

20        Q.   At that point, what did you do next?

21        A.   At that point, I was able to determine

22   it was Mr. Powell who was severely injured but

23   was still conscious and breathing and able to

24   give me his name.  I went into the residence to

25   see if there was anybody inside that was

D. Ciuffi - Direct by Ms. Pellegrini

1    injured or anything.  There wasn't.  However

2    when I went toward the kitchen, I noticed a

3    gentleman lying facedown with what appeared to

4    me multiple gunshot wounds, most significantly

5    to the head, which incapacitated him inside the

6    doorway.  So after I saw that, I peeked out the

7    back door and Officer Hamlin and Officer Adams

8    were back there.  I noticed a few more victims

9    on the back porch with obvious gunshot wounds

10   to the head.

11           I exited the kitchen and went back into

12   the house to contact Ms. Cunningham, she was

13   still on the front porch.  I was trying to get

14   Mr. Powell or her to give me any information

15   regarding what had transpired.  However, the

16   only thing that Ms. Cunningham was able to give

17   me was that she was in the backyard at a party,

18   they were playing music and having a barbecue,

19   and several individuals were outside when she

20   noticed an individual, she noticed a gun being

21   leveled over the fence.  She couldn't -- at

22   that time she was pretty hysterical because she

23   had been hosting a barbecue and it went awry,

24   of course.

25           So I assessed Mr. Powell again.  He

D. Ciuffi - Direct by Ms. Pellegrini

1    wouldn't give me any information.  He just
2    wanted an ambulance for transport.  So I went
3    out front and began to coordinate multiple
4    surrounding departments to help us with crowd
5    control and scene control and called for
6    additional medics to come.  And as they were
7    coming, I was directing them to the rear of the
8    house of what I thought people that were mostly
9    injured, there were four people on the porch
10   and a gentleman in the kitchen laying facedown
11   in the doorway and two other individuals off
12   the back steps on the porch.  We had the medics
13   go back there.
14          Then as I went back in, I directed a
15   medic to Mr. Powell on the front porch and took
16   Ms. Cunningham inside.  When I took
17   Ms. Cunningham inside, I spoke with her a
18   little bit further and was able to determine
19   that she was shot in the right ankle.  So I
20   called for a medic to come in at that point.
21          Q.   Did you then clear the house?
22          A.   When I was talking to Ms. Powell, it
23   dawned on me -- I'm sorry, Ms. Cunningham -- it
24   dawned on me that we hadn't cleared the
25   residence which is one of the first things that

D. Ciuffi - Direct by Ms. Pellegrini

1    you do.  It was so chaotic and so few of us on

2    duty that evening.  So I summoned Officer Adams

3    to the front and we went through and cleared

4    the house to make sure there were no other

5    injured individuals or suspects inside.

6        Q.  Did you determine when you were

7    clearing the house some children hiding

8    upstairs?

9        A.  I did not.  We found out later.  I

10    don't recall that there were any upstairs but I

11    do recall later that we did find out numerous

12    children were in the house.  They were on the

13    couch in the living room.  We did find multiple

14    bullet holes in the back of the couch where

15    they were sitting.  As far as them upstairs, it

16    was a very chaotic evening.  I don't remember

17    exactly if they were upstairs or not.

18        Q.  As your responsibilities as sergeant,

19    did you then notify the Allegheny County Police

20    Department?

21        A.  I did.

22        Q.  Why?

23        A.  Typically when we have an incident of

24    this magnitude, especially if it involves a

25    death or homicide, we call the county.  They

D. Ciuffi - Direct by Ms. Pellegrini

1    are better equipped to investigate such a

2    tedious incident so we call them in for

3    assistance and help them as we can and update

4    them on what we did when we got there and they

5    typically take over the scene and

6    investigation.

7        Q.   We heard from Officer Hamlin that you

8    directed him as well as other members of your

9    department and other departments to secure the

10   scene.  Would that be taping off the area

11   around the home and trying to prevent people

12   from coming into the yard, front yard, into the

13   house?

14       A.   Yes.  Because of the scope of the

15   scene, it was pretty big.  Along the street

16   there were a lot of people out.  We summoned

17   officers from just about every department in

18   the area, Forest Hills, Wilkins Township,

19   Edgewood, Swissvale, we had City of Pittsburgh

20   Police show up, County Housing Authority Police

21   show up.  I'm sure there were a couple of

22   others, Churchill, and other people that I

23   don't remember.  We directed people to certain

24   places and had things taped off and had

25   officers not allow anybody to come in.  If

D. Ciuffi - Direct by Ms. Pellegrini

1    somebody did address them with concerns, they

2    would direct them to me or one of the other

3    investigators and get them to where they needed

4    to be.

5        Q.   Now, you heard from Officer Hamlin.

6    Very quickly --

7            MR. McKINNEY:   Your Honor, there

8    is a sequestration of witnesses for not

9    tainting other testimony.  I object to the

10   leading nature of the question.

11           THE COURT:  Okay, I don't need a

12   narrative.  The objection is overruled in part

13   and sustained in part.  By the same, don't

14   introduce your question with a narrative.

15           MS. PELLEGRINI:  Okay, thank you.

16       Q.   There were a large number of people

17   gathering on the street rather quickly?

18       A.   There were.

19       Q.   Very emotional?

20       A.   Extremely.

21       Q.   Difficult to control?

22       A.   At some points, yes.

23       Q.   Did the media arrive fairly quickly?

24       A.   Yes.

25           MS. PELLEGRINI:  That is all I

D. Ciuffi - Cross by Mr. McKinney

1    have.

2                  THE COURT:  Any questions?

3                  MR. McKINNEY:  Yes, Your Honor.

4                        -----

5                  CROSS-EXAMINATION

6                        -----

7    BY MR. McKINNEY:

8         Q.  Sergeant, with respect to the crime

9    scene -- how long were you on the force?

10        A.  I was on the force for 24 years.

11        Q.  One of the things that you did when you

12   arrived on scene a little later was clear the

13   residence?

14        A.  That's correct.

15        Q.  One of the first things that you did

16   was try to secure the scene?

17        A.  Yes.

18        Q.  Could you describe what you mean by

19   that?

20        A.  By secure the scene?

21        Q.  Yes.

22        A.  Securing the scene basically means not

23   making it available for anybody that isn't law

24   enforcement necessarily, so posting law

25   enforcement officers at various locations to

D. Ciuffi - Cross by Mr. McKinney

1    not allow family members to come in, foot

2    traffic to come in, the media to access

3    sensitive areas.

4        Q.  Did you, yourself, ever see any

5    civilians compromise the crime scene?

6        A.  Not that I'm aware of, no.

7        Q.  You never saw some people who just

8    randomly appeared on the scene in the same

9    vicinity of the shell casings, for example, you

10    never saw that, did you?

11        A.  No, I didn't.

12        Q.  You've been on the force for plus

13    20 years?

14        A.  Yes.

15        Q.  And Sergeant Hamlin as well?

16        A.  Yes.

17        Q.  And Detective Adams?

18        A.  Yes.

19        Q.  In the hierarchy back in March of 2016,

20    were you a superior to Detective Adams or the

21    same level?

22        A.  Yes.  In the police department, in the

23    Wilkinsburg Police Department, detective is not

24    a rank, it is an assignment.

25        Q.  So you were his superior?

D. Ciuffi - Cross by Mr. McKinney

1      A.  Yes.

2      Q.  Did Detective Adams ever tell you on

3  the night of the incident that he saw a suspect

4  or a person getting into a white Lincoln?

5      A.  He expressed concern to me about that.

6  We passed on a license plate to county

7  detectives.

8      Q.  Did you write that in your report?

9      A.  I don't believe I did, no.

10     Q.  Would you like me to refresh your

11  recollection by providing you with your report?

12     A.  No.

13     Q.  You believe you didn't write that in a

14  your report?

15     A.  Right.

16     Q.  Okay.  Other than that one person that

17  Detective Adams allegedly saw, were there any

18  other suspects brought to your attention that

19  were near the scene of the crime around the

20  time that you or other officers responded?

21     A.  No, sir.

22     Q.  So that one person getting into that

23  one car was the only lead in this case on the

24  night of the incident; is that correct?

25     A.  As far as I know, my responsibilities

D. Ciuffi - Cross by Mr. McKinney

1    ended with securing the scene and waiting for

2    county to come on.

3        Q.  Would there be any reason why you would

4    not include that pertinent information in any

5    of your reports?

6        A.  Well, when we go to a scene where it

7    involves multiple officers that do multiple

8    tasks, we try to stick to what we did

9    personally.  We don't try to muddle the report

10   with overlapping information that we were

11   getting secondhand.  It gets confused.  We have

12   the person that witnesses it do it firsthand.

13   That is why I wouldn't have put it into my

14   report.

15       Q.  Who exactly at the Allegheny County

16   Police Department did you pass that information

17   on to the night of the incident?

18       A.  We gave it to the first responding

19   detective.  I'm sorry, I don't recall his name.

20       Q.  So the only suspect in a mass murder

21   where there are six dead bodies, you have a

22   suspect with a license plate and you don't

23   remember who you gave that information to?

24       A.  I don't remember his name.

25              MR. McKINNEY:  No additional

M. Ferguson - Direct by Ms. Pellegrini

1    questions.

2                      THE COURT:  Anything else?

3                      MS. PELLEGRINI:  No additional

4    questions.

5                      THE COURT:  Thank you, Sergeant.

6    Call your next witness.

7                      MS. PELLEGRINI:  Officer

8    Ferguson.

9                          -----

10                   MICHAEL FERGUSON,

11   a witness herein, having been first duly sworn,

12   was examined and testified as follows:

13                          -----

14                   DIRECT EXAMINATION

15                          -----

16   BY MS. PELLEGRINI:

17        Q.  Good morning, sir.

18        A.  Good morning.

19        Q.  State your full name, spelling your

20   last name for the court reporter.

21        A.  Michael Ferguson, F-E-R-G-U-S-O-N.

22        Q.  You are very soft-spoken so keep your

23   voice up.  Speak into the microphone.

24        A.  I can.

25        Q.  How are you employed?

M. Ferguson - Direct by Ms. Pellegrini

1      A.   Employed with Edgewood Borough.

2      Q.   How long a police officer?

3      A.   Just over 15 years.

4      Q.   How long have you been with Edgewood?

5      A.   About 13 years now.

6      Q.   Could you detail for this jury the

7   various assignments that you've had as an

8   officer with Edgewood?

9      A.   Since I've been with Edgewood, it is

10  basically everything.  We're asked to do

11  accident investigations, investigation of

12  anything that the job entails.  The only thing

13  that we ask any outside assistance for is if it

14  is a string of burglaries or homicide or

15  something extremely serious but anything else

16  we do in-house.

17     Q.   You're a relatively small department?

18     A.   Yes, eight full-time officers, five

19  part-time officers.

20     Q.   Geographically, describe where Edgewood

21  is to Wilkinsburg?

22     A.   Edgewood is one square mile.  We have

23  one street that borders Wilkinsburg for the

24  most part.  It is to the south of Edgewood.  So

25  basically from our police station it is a left

M. Ferguson - Direct by Ms. Pellegrini

1    out of Edgewood into Wilkinsburg.

2        Q.  Now, many of the departments

3    surrounding in that eastern suburbs are

4    relatively small, correct?

5        A.  Correct.

6        Q.  Do you often assist each other?

7        A.  All the time.

8        Q.  Did you become aware that there was a

9    call for shots fired and multiple victims at

10   1304 Franklin Avenue?

11       A.  Yes.

12       Q.  What shift were you working?

13       A.  Midnight, 10:30 at night to 6:00 in the

14   morning.

15       Q.  Were you in a marked car?

16       A.  Yes, I was.

17       Q.  Were you in Edgewood at the time?

18       A.  I was.

19       Q.  Approximately, how far away were you?

20       A.  I got my vehicle set up and was pulling

21   out of the police station and that is when I

22   heard the call come over the radio for shots

23   being heard in the area of, I believe it was

24   Marlboro and Ardmore, possibly.  I pulled out

25   of the station and made a left going towards

M. Ferguson - Direct by Ms. Pellegrini

1   Wilkinsburg.  Once I crossed over into

2   Wilkinsburg, I heard Officer Hamlin say that he

3   was on scene on Franklin when dispatch said

4   multiple calls for shots fired on Franklin.

5   Officer Hamlin said that he was at 1304

6   Franklin Avenue and he had a gunshot wound

7   victim at the front of the house.  At that

8   point I already turned onto Rebecca Street

9   heading in that direction so I was probably

10  only four or five blocks away, at best, when he

11  updated that he had multiple victims at that

12  point, multiple people shot, and he requested

13  additional officers to assist him.

14      Q.  So when you arrived at the residence,

15  what did you find?

16      A.   When I pulled up, I initially pulled up

17  on Franklin Avenue in front of the house,

18  Sergeant Ciuffi pulled in front of me.  I got

19  out of the car, I heard screaming.  I got out

20  of the car and asked Sergeant Ciuffi where did

21  he want me to go.  He said go to the rear of

22  the residence and block off the alley.  I got

23  back into my car and went down the side street,

24  I'm not sure of the name, and blocked off the

25  rear of the alley.

M. Ferguson - Direct by Ms. Pellegrini

1    Q.   Did you go into the backyard?

2    A.   Yes, I proceeded to -- after I blocked

3    the alley, I walked down or ran down the alley,

4    the backyard was to my left.  I went through

5    the gate where I entered the backyard.

6    Q.   What did you see?

7    A.   When I entered the backyard, initially

8    it was pretty dark but I believe there were

9    some lights on in the house.  Just light from

10   flashlights and my flashlight.  It was just a

11   lot of screaming and chaos.  I initially ran

12   over or I saw another officer and medic that

13   was now trying to assist a female that had been

14   shot that was laying on the ground.  She looked

15   like she was not doing well, bleeding a lot,

16   obviously in pain.  She was screaming.  I

17   helped that medic get her on the stretcher.

18   After that, my attention got turned because she

19   was out of the way and I wanted to see what

20   else I could do.  I didn't know where anybody

21   else was at that point.  I took care of the

22   chaos and people screaming and officers giving

23   different orders for people to do different

24   things.

25         I turned to my right where I saw the

M. Ferguson - Direct by Ms. Pellegrini

1    back porch and I saw three or four bodies

2    laying on the porch.  As I started over to

3    where they were, I could see there was

4    absolutely nothing that I could do at that

5    point to help them.  It was pretty obvious

6    looking at the people on the porch there was no

7    movement.  There was basically large parts of

8    them missing from the gunfire.

9         At that point Sergeant Ciuffi came

10   around the corner.  I asked him what he needed

11   me to do.  He directed me to the back alley and

12   told me to tape off the alley and locate any

13   type of evidence that I could find but stay in

14   the back alley, secure it, don't let anybody

15   else come into that alley.

16   Q.  I'm going to show you what has been

17   marked as Commonwealth Exhibit No. 8, if you

18   could turn and look at it.  I know it is a

19   little difficult to see, I'm going to give you

20   a laser pointer.  Could you show the jury what

21   evidence you located?

22   A.  All the evidence markers here are the

23   gun shell casings that I was able to locate.

24   Q.  Did you then direct detectives to what

25   you had found?

M. Ferguson - Direct by Ms. Pellegrini

1    A.   Yes.   When the county police arrived on

2    scene, I showed them the casings that I had

3    marked once they got on scene and I showed them

4    what was going on, the evidence that I found.

5    There started to become increasing commotion

6    toward the front of the house.   Officers got on

7    the radio and said they needed another officer

8    to come up to the front of the house.   I asked

9    one of the detectives, I'm not sure who it was,

10   if they needed me at the back because there was

11   a lot of issues at the front and they needed to

12   be able to hold the perimeter.   I asked to go

13   up front.   He relieved me to go up front.

14        When I did, I went through the end of

15   that picket fence.   There was an opening which

16   is where I went through which leads you on the

17   sidewalk in between the two houses, right along

18   the porch where the four victims were.   And

19   that was when I went that way and I was warned

20   pretty quickly there was evidence on the ground

21   that I needed to step over.   And when I went

22   that way, I realized that evidence was a lot of

23   blood and flesh.   So once I got beyond that

24   point, I was able to get to the front of the

25   house and assist the officers, other officers,

J. Krah - Direct by Ms. Pellegrini

1    with trying to hold the perimeter and make sure

2    that no one came beyond that toward the house.

3                    MS. PELLEGRINI:  Thank you,

4    Officer.  I offer for cross.

5                    THE COURT:  Any questions?

6                    MR. McKINNEY:  No questions, Your

7    Honor.

8                    THE COURT:  Thank you, Officer.

9    Call your next witness.

10                        -----

11                    JOHN KRAH,

12    a witness herein, having been first duly sworn,

13    was examined and testified as follows:

14                        -----

15                  DIRECT EXAMINATION

16                        -----

17   BY MS. PELLEGRINI:

18        Q.  Sir, could you please state your full

19    name, spelling your last name for the court

20    reporter?

21        A.  John Krah, K-R-A-H.

22        Q.  How are you employed?

23        A.  Paramedic for Eastern Area Ambulance.

24        Q.  How long a medic?

25        A.  A medic for 30 years.

J. Krah - Direct by Ms. Pellegrini

1      Q.   How long with Eastern Area?

2      A.   Ten.

3      Q.   On March 9, 2016, were you working with

4  Eastern Area?

5      A.   Yes.

6      Q.   What shift were you working?

7      A.   It would have been the 6:00 or 7:00 to

8  11:00 shift.

9      Q.   So a few minutes before 11:00 did a

10  call go out for shots fired, multiple victims?

11     A.   Yes.

12     Q.   Was it 1304 Franklin Avenue?

13     A.   Correct.

14     Q.   What did you do at that point, I mean

15  where were you at that point?

16     A.   We were responding from our station in

17  Turtle Creek.  We started going that way.  We

18  didn't have any information of what the call

19  entailed, just shots fired and just started

20  that way as a preliminary response.

21     Q.   Now, is there a protocol with regard to

22  if there is an active shooter?

23     A.   With regard to medic response, we

24  respond to the area, not to the scene.

25     Q.   Shortly after, did you get an all

J. Krah - Direct by Ms. Pellegrini

1    cleared to respond to the scene?

2        A.  We were getting updates as to victims.

3    As the number grew, we started with additional

4    units and before we arrived on scene, we got

5    all clear, yes.

6        Q.  When you arrived at the residence, what

7    did you do?

8        A.  My unit was the first unit on scene.  I

9    proceeded with our stretcher and equipment.  We

10   had a victim on the front porch who was moving

11   and speaking to an officer.  I put him as lower

12   priority depending on what we found in the

13   backyard.

14       Q.  Let me stop you there.  How do you

15   prioritize a trauma victim?

16       A.  It is a triage process.  We have

17   severe, critical, serious, and walking wounded.

18   Anybody talking or walking is pretty much

19   serious or walking wounded.  We looked for more

20   serious since we were given that there were

21   possibly up to eight victims.

22       Q.  Now, we know that the victim on the

23   porch, Mr. Powell, had a serious wound?

24       A.  Correct.

25       Q.  Did you direct other medics to him?

J. Krah - Direct by Ms. Pellegrini

1      A.   The third unit on scene went directly

2  to him there.

3      Q.   What did you do next?

4      A.   I went into the backyard.  As we were

5  coming down the walkway, there was a female

6  laying in the yard.  She was unconscious but

7  moving, breathing.  I made the corner to assess

8  what else we were dealing with.  On the porch I

9  visualized three females stacked against each

10  other on the porch.

11      Q.   I'm going to show you what has been

12  marked as Commonwealth Exhibit No. 5.  Could

13  you tell us how you went about assessing the

14  victims on the porch?

15      A.   Once we cleared the two people that

16  were in the yard, I cleared the porch, assessed

17  for pulses, breathing, all three females were

18  not breathing.  None of them had pulses.  The

19  first female on the outer edge had a

20  significant head wound with brain matter

21  showing.  Let me use the laser pointer.  Female

22  one was this one, she was struck on the outside

23  with a significant head injury.

24      Q.   Let me stop you.  When you started to

25  say originally, you said the victims were

J. Krah - Direct by Ms. Pellegrini

1    stacked up on each other?

2        A.   Correct.

3        Q.   Could you explain that to me?

4        A.   This female was stacked against these

5    two, all against each other into the corner of

6    the porch on the inside of that doorway, on the

7    outside of that doorway.

8        Q.   Then could you tell me what the

9    assessment was for victim number two?

10       A.   Victim two had a head wound, a leg

11   wound, and I believe a chest wound.  Again, not

12   breathing, no pulses.  Victim three was back in

13   the corner, again a head wound, no body wounds,

14   no pulses, not breathing.  At that point, with

15   the number of victims and severity, no

16   resuscitation could be made.

17       Q.   Did you eventually notice a fourth

18   victim, a male?

19       A.   Yes, he was in that doorway with his

20   feet hanging out like in a kneeling position

21   facedown, also pulseless, not breathing.

22       Q.   Did you then proceed -- at any point in

23   time did anyone indicate that one of the

24   victims was pregnant?

25       A.   Not to me, no.

J. Krah - Cross by Mr. McKinney

1      Q.   Did you then go to the two other living

2  victims that were on the ground?

3      A.   I actually got to the male in the

4  furthest point of the backyard before I went to

5  them because of the severity.  Walking past,

6  they looked like they possibly would be the

7  worst situation so I went to the one moving or

8  breathing.  The one in the yard, my partner

9  took care of him until Paramedic Bourdon got

10  there.  Per triage, the senior person takes

11  over command of a scene so they become triage

12  so the next medic would take my spot.  He took

13  my spot with my partner to care for the male,

14  loaded him on the stretcher, they left the

15  scene with him and took him to the hospital.  I

16  remained on scene.

17           MS. PELLEGRINI:  Thank you,

18  Mr. Krah.  I offer for cross.

19                    -----

20             CROSS-EXAMINATION

21                    -----

22  BY MR. McKINNEY:

23      Q.   Mr. Krah, as part of your job, do you

24  assist in the generation of reports?

25      A.   We have a trip sheet that we write for

J. Krah - Cross by Mr. McKinney

1    every call.

2        Q.  Do you remember writing one for this

3    case?

4        A.  Yes, sir.

5        Q.  Do you remember on the trip sheet

6    writing that a call came in from dispatch

7    reporting that a silver Hyundai sedan just took

8    off from the area of this address at a high

9    rate of speed toward Penn Avenue, do you

10   remember that from the trip sheet?

11       A.  I do not.

12       Q.  If I showed you your trip sheet, would

13   it possibly refresh your recollection?

14       A.  Sure.

15           MR. McKINNEY:  Your Honor, may I

16   approach?

17           THE COURT:  You may.

18       Q.  For the record, it is an Eastern Area

19   trip sheet for?

20       A.  That was a dispatch note.  That wasn't

21   actually given to us.

22       Q.  Is that your report?

23       A.  Yes.

24       Q.  The information that I read to you in

25   my question, is that information contained in

J. Krah - Redirect/Recross

1      that report?

2          A.  Yes.  Yeah, that is downloaded from

3      dispatch.  We don't type that in.

4          Q.  Okay.

5                  MR. McKINNEY:  No additional

6      questions.  Thank you.

7                  THE COURT:  Anything else?

8                  MS. PELLEGRINI:  Yes.

9                      -----

10                 REDIRECT-EXAMINATION

11                     -----

12     BY MS. PELLEGRINI:

13         Q.  Was there lots of information going

14     back and forth over dispatch that evening?

15         A.  Yes.

16                 MS. PELLEGRINI:  Thank you.

17                 MR. McKINNEY:  Your Honor, just a

18     brief recross.

19                 THE COURT:  Go ahead.

20                     -----

21                 RECROSS-EXAMINATION

22                     -----

23     BY MR. McKINNEY:

24         Q.  Mr. Krah, with respect to that

25     information and dispatch that I just read to

R. Bourdon - Direct by Ms. Pellegrini

1    you a couple of questions ago --

2        A.  Yes.

3        Q.  -- did anyone ever follow-up with you

4    with respect to that information --

5        A.  No.

6        Q.  -- during the investigation of this

7    case?

8        A.  No, sir.

9            MR. McKINNEY:  Thank you.

10            THE COURT:  Thank you, sir.  You

11    are excused.  Call your next witness.

12            MS. PELLEGRINI:  Thank you.

13                -----

14            ROBERT BOURDON,

15    a witness herein, having been first duly sworn,

16    was examined and testified as follows:

17                -----

18            DIRECT EXAMINATION

19                -----

20    BY MS. PELLEGRINI:

21        Q.  Good morning.

22        A.  Good morning.

23        Q.  Please state your full name, spelling

24    your last name for of the court reporter.

25        A.  Robert Bourdon, B-O-U-R-D-O-N.

R. Bourdon - Direct by Ms. Pellegrini

1       Q.   How are you employed?

2       A.   I'm a paramedic with the Allegheny

3   Health Network.

4       Q.   What does it mean to be a paramedic

5   with the Allegheny Health Network?

6       A.   I work on the response unit out of

7   Forbes Hospital.  The best way to describe my

8   job is if paramedics go out to help people, I

9   go out to help paramedics.  I'm the back-up for

10  everybody.

11      Q.   So on March 9, 2016, were you

12  monitoring dispatch with regard to calls for

13  shots fired, mass casualties at 1304 Franklin?

14      A.   Yes.

15      Q.   Please tell us what you did.

16      A.   I heard multiple reports coming over

17  the radio for shots fired and multiple victims

18  so I started driving toward the scene before I

19  was even dispatched.  I made it probably, I

20  don't know, a mile before county called me and

21  said are you on the way to this and I told them

22  yes.

23      Q.   Approximately how long did it take you

24  to get to Franklin?

25      A.   Can I look at my notes?

R. Bourdon - Direct by Ms. Pellegrini

1          THE COURT:  Any objection?

2          MR. McKINNEY:  No objection.

3          THE COURT:  You may refer to your

4     notes as needed.

5          THE WITNESS:  Thank you.

6     A.  Six minutes.

7     Q.  When you arrived on Franklin, what did

8     you see?

9     A.  A lot of vehicles parked in the street,

10    a lot of people in the street and on the

11    sidewalk.  Chaos would be the best way to

12    describe it.  People moving everywhere, some

13    running away, some running towards.

14    Q.  Did you go on to the front porch?

15    A.  No.  As I approached the front of the

16    house, one of other EMS crews was coming off

17    the front porch and told me to go around back.

18    Q.  When you went around back, did you

19    encounter Mr. Krah?

20    A.  I did, first.  So I came down a very

21    narrow alley and spotted John in the backyard

22    and asked him what he needed.  He gave me a

23    basic assessment of the scene.  He had one

24    patient that Penn Hills was working on, another

25    patient that still needed attention, and I'll

R. Bourdon - Direct by Ms. Pellegrini

1    never forget him saying, pointing to the porch

2    and saying those are code black.

3        Q.   What does code black mean?

4        A.   On our triage tags it is like a traffic

5    signal, red, yellow, green, and black.   Black

6    means dead.

7        Q.   Did you observe the victims on the

8    porch?

9        A.   I did.

10       Q.   Then where did Mr. Krah direct you to?

11       A.   To a patient that was to my right, his

12   left, in the backyard.

13       Q.   Was that a male?

14       A.   A male, yes.

15       Q.   Did you later learn that that male's

16   name was John Ellis?

17       A.   Yes.

18       Q.   Tell us what you observed in the

19   backyard and your treatment of Mr. Ellis.

20       A.   By the time I got there, some other EMS

21   people put Mr. Ellis on a stretcher.   He had

22   what appeared to be a gunshot wound to the

23   right side of his chest, another one to the

24   right side of his back.   I'm assuming it is the

25   same one through and through.   So I did a rapid

R. Bourdon - Direct by Ms. Pellegrini

1    assessment of his breathing.  I put an item

2    that we call a chest seal that keeps air from

3    going in the wound, one on the front and one on

4    the back.  He was still having trouble

5    breathing.

6        Q.  What was he saying to you?

7        A.  In the backyard, he wasn't saying very

8    much.  In the ambulance, he was saying that he

9    thought he was going to pass out and kept

10   begging me to help him.

11       Q.  So continue to tell us how you treated

12   Mr. Ellis.

13       A.  So the next step in this process is to

14   take a very large needle, insert it into his

15   chest cavity to relieve the air pressure so he

16   can breathe easier.  I did that, listened to

17   his lung sounds, and took him to the ambulance.

18       Q.  Where did you take him?

19       A.  I believe we went to Presby.

20       Q.  Once he arrived -- strike that.  Is the

21   University of Pittsburgh Presbyterian Hospital

22   a level one trauma center?

23       A.  It is.

24       Q.  Did you then turn Mr. Ellis over to the

25   trauma surgeon at Presby?

R. Bourdon - Direct by Ms. Pellegrini

1        A.  Yes.

2        Q.  Did you then -- strike that.  Did you

3    take Mr. Ellis in your vehicle?

4        A.  No.

5        Q.  How did you get to the hospital?

6        A.  In an Eastern Area pre-hospital

7    services ambulance with one of their EMTs

8    driving.

9        Q.  Did you return to the scene?

10       A.  I did.

11       Q.  What is your protocol?

12       A.  I came back to the scene and saw one of

13   the Allegheny County detectives that was there,

14   gave him my business card with my contact

15   information.  On the back of that card I wrote

16   who my patient was and what hospital we went to

17   just because I knew that they were going to

18   need to keep track of where everyone was.

19              MS. PELLEGRINI:  That is all I

20   have.  Thank you.  I offer for cross.

21              THE COURT:  Mr. McKinney.

22              MR. McKINNEY:  Thank you.

23

24

25

R. Bourdon - Cross by Mr. McKinney

```
 1                      -----

 2                 CROSS-EXAMINATION

 3                      -----

 4   BY MR. McKINNEY:

 5       Q.  One question.  You said on direct

 6   examination that there were multiple people

 7   running away from the house when you arrived;

 8   is that correct?

 9       A.  In general terms, yes, there were

10   people moving in every direction.

11                 MR. McKINNEY:  Thank you.  No

12   additional questions.

13                 THE COURT:  Thank you.  You are

14   excused, sir.

15                 THE WITNESS:  Thank you.

16                 THE COURT:  Call your next

17   witness.

18                 MS. PELLEGRINI:  The Commonwealth

19   calls Lorenzo Garino.

20                      -----

21                 LORENZO GARINO,

22   a witness herein, having been first duly sworn,

23   was examined and testified as follows:

24                      -----

25
```

L. Garino - Direct by Ms. Pellegrini

1                              -----

2                    DIRECT EXAMINATION

3                              -----

4    BY MS. PELLEGRINI:

5         Q.   Almost good afternoon.  How are you?

6         A.   I'm all right.

7         Q.   Mr. Garino, could you state your full

8    name, spelling your first and last name for the

9    court reporter?

10        A.   Lorenzo Garino, L-O-R-E-N-Z-O,

11   G-A-R-I-N-O.

12        Q.   How are you employed?

13        A.   I'm a paramedic with the Municipality

14   of Penn Hills.

15        Q.   Do you also work for UPMC?

16        A.   I did briefly, yes.

17        Q.   What did you do for UPMC?

18        A.   I oversaw their EMS operations for the

19   Presbyterian campus.

20        Q.   How long have you been a medic?

21        A.   I believe about eight years now.

22        Q.   On March 9, 2016, where were you

23   working then?

24        A.   I was working the 4:00 p.m. to midnight

25   shift in Penn Hills.

L. Garino - Direct by Ms. Pellegrini

1       Q.   Who was your partner?

2       A.   Michael Norkus.

3       Q.   On that shift, prior to the call that

4  we're going to talk about, were you responding

5  to an unrelated motor vehicle accident?

6       A.   Yes, ma'am.

7       Q.   Do you know where that was?

8       A.   I believe that was on Mt. Carmel Road

9  in Penn Hills.

10       Q.   When you were at that accident scene,

11  did you get radioed from dispatch?

12       A.   We never made it to the scene.  We were

13  close to the border of Penn Hills, Wilkinsburg,

14  and the City of Pittsburgh when we heard radio

15  traffic on the Eastern channel reporting

16  multiple calls for shots fired in Wilkinsburg.

17       Q.   They also called for multiple victims?

18       A.   Yes, ma'am.

19       Q.   Did you then proceed in that direction?

20       A.   We did.

21       Q.   When you hear a shots fired active

22  shooter situation, what is the protocol?

23       A.   The protocol is generally to stay at a

24  location that is close but you give yourself

25  some distance and we wait for police clearance

L. Garino - Direct by Ms. Pellegrini

1    of the scene.

2        Q.  Did you then shortly thereafter receive

3    police clearance?

4        A.  We did.

5        Q.  Did you proceed to the scene?

6        A.  Yes.

7        Q.  When you got to the scene, was John

8    Krah present?

9        A.  Yes, he was.

10       Q.  What did you do then?

11       A.  Immediately upon arriving to the scene,

12   we noticed that a very, very large presence of

13   bystanders or so appeared around the home.  We

14   were then pointed by the bystanders to the back

15   of the residence.  When we got to the back of

16   the residence, we noticed that there were

17   casualties spread throughout the backyard and

18   back porch.  At that time Mr. Krah, who was the

19   incident commander, pointed me in the direction

20   of the patient and that was my assignment.

21       Q.  Do you remember hearing screams about

22   the condition of one of the patients?

23       A.  Yes, ma'am.

24       Q.  What was being screamed?

25       A.  I heard screams, and I couldn't tell

L. Garino - Direct by Ms. Pellegrini

1    from where it was coming from, it was very

2    chaotic, that there was a female, she is

3    pregnant, she is pregnant, she is pregnant,

4    screamed very loudly from multiple people on

5    scene.

6        Q.   Did you then go to the female victim

7    that was in the backyard?

8        A.   Yes, ma'am.

9        Q.   Were you already informed that the

10   patients on the porch, the four patients on the

11   porch, were code black?

12       A.   Yes, ma'am.

13       Q.   What was the condition of the female

14   patient on the ground?

15       A.   She was unresponsive, agonal breathing.

16       Q.   What is agonal breathing?

17       A.   Less than sufficient.  It would be very

18   shallow, very infrequent respirations that are

19   considered very, very critical.

20       Q.   What causes the body to breathe in that

21   manner?

22       A.   In instances of trauma, it could be

23   hemolytic blood or hypoxia which is lack of air

24   and oxygen.

25       Q.   You later learned that this victim's

L. Garino - Direct by Ms. Pellegrini

1    name was Shada Mahone?

2        A.   Yes.

3        Q.   Describe Ms. Mahone's condition?

4        A.   Upon our arrival, she had the agonal

5    respirations.  She was unresponsive.  We used

6    tactile stimulation, a rub of the sternum or

7    pinch of the skin, she was still unresponsive.

8    I believe at one point she had several moans on

9    agonal respirations.  She had a gunshot wound

10   that penetrated to the left anterior shoulder

11   to the best of our knowledge, and a laceration

12   across the chin.

13       Q.   What did you do then?

14       A.   At that point we started immediate

15   care.  We began to ventilate her with a bag

16   valve mask per policy.  We gained intravenous

17   access and intubated her.  An airway was

18   secured on scene.

19       Q.   Did you then rapidly transport her?

20       A.   We did, yes.  So in this situation we

21   determined that she was obviously very

22   critical.  We had brought our stretcher with us

23   which is something that we generally do if we

24   know there is a high acuity patient.

25       Q.   What is that?

L. Garino - Direct by Ms. Pellegrini

1    A.  A high acuity is somebody of a critical

2    nature that requires rapid transportation to

3    the hospital.

4    Q.  What did you do?

5    A.  At that point, after her airway was

6    secured and we had intravenous access, we

7    performed a needle chest decompression which is

8    to relieve pressure in the airway cavity, in

9    layman's term, a collapsed lung which would

10   prevent adequate respiration and oxygenation

11   and cause her mental status to be unresponsive.

12   Q.  Were you still operating under the

13   information that you had that this individual

14   was pregnant?

15   A.  Yes, ma'am.  In a situation like that,

16   we always assume that, you know, the worst

17   until proven otherwise.  Being that it was

18   unreliable information, we went with it to the

19   best of our knowledge.  We assumed that she

20   was.  That did not really change the course of

21   our treatment because of her criticality with

22   the exception of her designation hospital.

23   Q.  Where did you take her?

24   A.  She was transported to UPMC Mercy.

25   Q.  Why Mercy?

L. Garino - Direct by Ms. Pellegrini

1      A.   At that time Mercy was a level one

2   trauma center -- and still is -- and had the

3   capability of a tier three NICU which is the

4   highest level of infant -- if there is any

5   chance of a fetus present, they would have the

6   highest level of care for that fetus and its

7   viability.

8      Q.   You later found out that Ms. Mahone was

9   not the individual that was pregnant?

10     A.   Yes, ma'am.

11     Q.   You turned Ms. Mahone over to the

12   trauma surgeons?

13     A.   Yes, sir.

14     Q.   Did you later find out that she died?

15     A.   Yes.  So she had went into traumatic

16   cardiac arrest prior to our departure from UPMC

17   Mercy.  We continued resuscitative care

18   including CPR and other advanced life support

19   measures that we did through our transport.

20   After we transferred care to the receiving

21   physicians at the hospital, we had not departed

22   from the hospital and found out that she was

23   pronounced dead.

24              MS. PELLEGRINI:  That is all I

25   have.  I offer for cross.

T. Morgan - Direct by Mr. Chernosky

```
 1                    THE COURT:  Cross.

 2                    MR. McKINNEY:  No questions, Your

 3      Honor.

 4                    THE COURT:  You are excused, sir.

 5      At this juncture, we will take our afternoon

 6      recess.  We will resume at 1:45.  Remain seated

 7      and quiet as the jury leaves the room.

 8                          -----

 9                    (Luncheon recess taken.)

10                          -----

11                    (Open court - Jury present.)

12                          -----

13                    THE COURT:  Mr. Chernosky,

14      Ms. Pellegrini.

15                    MR. CHERNOSKY:  The Commonwealth

16      would call Terry Morgan to the stand.

17                          -----

18                     TERRY MORGAN,

19      a witness herein, having been first duly sworn,

20      was examined and testified as follows:

21                          -----

22                  DIRECT EXAMINATION

23                          -----

24      BY MR. CHERNOSKY:

25          Q.  Mr. Morgan, can you state your first
```

T. Morgan - Direct by Mr. Chernosky

1    and last name and spell your name for the court

2    reporter?

3         A.  Terry Morgan, M-O-R-G-A-N.

4         Q.  Mr. Morgan, where did you live in March

5    of 2016?

6         A.  On Midland Street.

7         Q.  Is Midland Street in the Borough of

8    Wilkinsburg?

9         A.  Yes, it is.

10        Q.  On March 9th of 2016, were you home at

11   the time?

12        A.  Yes, I was.

13        Q.  Did you personally hear anything?

14        A.  Yes.

15        Q.  What did you hear, could you describe

16   that for the jury?

17        A.  Rapid gunfire.

18        Q.  Do you know approximately how many

19   shots you heard yourself?

20        A.  It was quite a few but I'm not sure of

21   the total.

22        Q.  How far approximately is your residence

23   from 1304 Franklin?

24        A.  I would say about one hundred yards,

25   not that far.

T. Morgan - Direct by Mr. Chernosky

1      Q.  In March of 2016, did you have a

2  surveillance system on your home?

3      A.  Yes, I did.

4      Q.  How many cameras did it consist of, if

5  you remember?

6      A.  A total of 16.

7      Q.  Did any of those cameras also record

8  audio?

9      A.  Yes.

10      Q.  Which one, if you recall?

11      A.  The one that is in the back, on the

12  side of the house.

13      Q.  Some time after the shooting that

14  occurred on Franklin Street, did you access

15  those videos from your home surveillance

16  system?

17      A.  Yes, I did.

18      Q.  Did you find that your home

19  surveillance system recorded any audio?

20      A.  Yes.

21      Q.  What did you find that it recorded?

22      A.  The rapid gunfire.

23      Q.  I'm going to show you first what I will

24  mark as Commonwealth Exhibit 10.  I ask you if

25  you recognize what is depicted in Commonwealth

T. Morgan - Direct by Mr. Chernosky

1    Exhibit 10?  What is depicted in Commonwealth

2    Exhibit 10?

3        A.   Where I live and approximately where

4    the incident happened.

5                MR. CHERNOSKY:  I move for the

6    admission of Exhibit 10, Your Honor.

7                THE COURT:  It is admitted

8    without objection.

9        Q.  Mr. Morgan, did you have an opportunity

10   to review the surveillance?

11       A.  Yes.

12       Q.  Did you recognize the video that we

13   reviewed?

14       A.  Yes, I did.

15       Q.  I'm sorry, 11, I apologize.  When you

16   reviewed that video, did you recognize it to be

17   accurate video from your surveillance system of

18   March 9, 2016?

19       A.  Yes.

20                MR. CHERNOSKY:  Your Honor, I

21   move for the admission of Commonwealth

22   Exhibit 11.

23                THE COURT:  Any objection?

24                MR. McKINNEY:  No objection.

25                THE COURT:  Admitted without

T. Morgan - Direct by Mr. Chernosky

1    objection.

2                    MR. CHERNOSKY:  I seek to play

3    the relevant portion of Commonwealth Exhibit 11

4    for the jury.

5                    THE COURT:  Does the defense know

6    what you are playing?

7                    MR. CHERNOSKY:  Yes, the

8    timestamp is in a report.

9                    THE COURT:  Any objection?

10                   MR. McKINNEY:  No objection.

11                   THE COURT:  You may do so.

12                   MR. CHERNOSKY:  Thank you, Your

13   Honor.  Your Honor, for purposes of the record,

14   Commonwealth Exhibit 11, I'm accessing a file

15   20160316.  I'm further accessing camera number

16   one on that file.  For purposes of the record

17   I'm starting the timestamp at timestamp

18   22:53:40.

19      Q.  Mr. Morgan, before I start this video,

20   you do recognize the angle depicted on the

21   screen?

22      A.  Yes.

23                   (Audio played for the jury.)

24                   MR. CHERNOSKY:  For purposes of

25   the record, I'm stopping at 22:54:46.  No

T. Morgan - Cross by Mr. McKinney

1    further questions.  I offer for cross.

2                    THE COURT:  Any questions?

3                    MR. McKINNEY:  Briefly.  Thank

4    you, Judge.

5                    -----

6                CROSS-EXAMINATION

7                    -----

8    BY MR. McKINNEY:

9        Q.  Mr. Morgan, how long have you lived on

10   Midland Street?

11       A.  Approximately 16 years.

12       Q.  You said on direct examination that you

13   have 16 surveillance cameras?

14       A.  Yes.

15       Q.  How long have you had those cameras set

16   up at your house?

17       A.  About five years.

18       Q.  Why exactly did you get those cameras

19   set up?

20       A.  For protection, if anything happened,

21   video surveillance.

22       Q.  Would you agree with me that the

23   neighborhood is dangerous enough or enough

24   crime that prompted you to obtain those

25   surveillance cameras?

T. Cunningham - Direct by Ms. Pellegrini

1      A.   I would agree with that.

2                MR. McKINNEY:  I have no

3    additional questions.  Thank you.

4                THE COURT:  Anything else?

5                MR. CHERNOSKY:  No redirect, Your

6    Honor.

7                THE COURT:  Thank you,

8    Mr. Morgan.  You are excused.  Call your next

9    witness.

10               MS. PELLEGRINI:  The Commonwealth

11   calls Tonjia Cunningham.

12                     -----

13                TONJIA CUNNINGHAM,

14   a witness herein, having been first duly sworn,

15   was examined and testified as follows:

16                     -----

17             DIRECT EXAMINATION

18                     -----

19   BY MS. PELLEGRINI:

20      Q.   Ms. Cunningham, could you please state

21   your first and last name and spell your first

22   and last name for the court reporter?

23      A.   Tonjia Stone Cunningham, T-O-N-J-I-A,

24   S-T-O-N-E, C-U-N-N-I-N-G-H-A-M.

25      Q.   Ms. Cunningham, how old are you?

T. Cunningham - Direct by Ms. Pellegrini

1        A.   I'm 45.

2        Q.   What is your occupation?

3        A.   I'm a licensed practical nurse.

4        Q.   In March of 2016, did you live in the

5    Pittsburgh area?

6        A.   Yes, I did.

7        Q.   Without telling us your address, could

8    you tell us the neighborhood?

9        A.   Yes, I lived in --

10       Q.   Is it Wilkinsburg?

11       A.   No, it is considered Pittsburgh.

12       Q.   You are very soft-spoken.  I know

13   you're nervous.

14       A.   I am, very.

15       Q.   Keep your voice up.

16       A.   It is over toward the eastside.

17       Q.   In March of 2016, did you work?

18       A.   I worked at Shadyside Rehab Center.

19       Q.   Did you have a friend by the name of

20   Tina Shelton?

21       A.   Yes, I did.

22       Q.   How did you know Tina?

23       A.   I know her through work.  She was my

24   best friend.

25       Q.   You knew her for a number of years?

T. Cunningham - Direct by Ms. Pellegrini

1      A.  Yes.

2      Q.  On the evening of March 9th, did you

3   and Tina have some plans?

4      A.  Yes, we were going to go to the gym.

5      Q.  Did Tina want to go somewhere on the

6   way to the gym?

7      A.  Yes.

8      Q.  Where did she want to go?

9      A.  She wanted to stop by her cousin's

10  house because they were having a cookout.

11     Q.  Do you know what her cousin's name was?

12     A.  Brittany.

13     Q.  Did you know where Brittany lived?

14     A.  No.

15     Q.  Who drove?

16     A.  I did.

17     Q.  Do you remember ending up at a

18  residence on Franklin Avenue in Wilkinsburg?

19     A.  Yes.

20     Q.  Had you been drinking that evening?

21     A.  No.

22     Q.  Had Tina?

23     A.  No.

24     Q.  Do you remember what time you arrived?

25     A.  We got there a little after 10:00,

T. Cunningham - Direct by Ms. Pellegrini

1   closer to 10:30.

2        Q.  Did you go in through the house or how

3   did you go to the party?

4        A.  We went through the side of the house.

5   We seen her cousin, Lamont, outside standing on

6   the sidewalk.  We followed him to the back.  I

7   parked the car and we followed him to the back.

8        Q.  So when you got there, what was going

9   on?

10       A.  Everyone was laughing, enjoying

11   themselves.  It was nice outside.  It was

12   really warm.  Everybody was laughing, joking,

13   having a good time.

14       Q.  Did you strike up any conversations

15   with Brittany's sister?

16       A.  Tina and I did.  Well, Tina did because

17   I didn't know them.  So Tina introduced me to

18   her family.  They talked about when she was

19   due.  Tina asked her sister, Brittany's sister,

20   Chanetta, when she was due and she told her in

21   May.

22       Q.  Did Chanetta seem excited?

23       A.  Yeah.

24       Q.  Was everyone eating, having fun?

25       A.  Everyone was just really having a good

T. Cunningham - Direct by Ms. Pellegrini

1    time.

2         Q.   Now, did there come a point in time

3    when people started taking pictures?

4         A.   Yes.

5         Q.   And did someone suggest a family photo?

6         A.   Yes, they were trying to take a selfie

7    on the porch.  They couldn't get everyone in

8    the picture so I asked them if they wanted me

9    to take a picture and I did.

10        Q.   I'm going to show you what is up on the

11   screen behind you as Commonwealth Exhibit

12   No. 9, okay.  Could you use this laser pointer

13   and show us where Brittany and Tina and Lamont

14   and Chanetta were and Jerry?

15        A.   Well, Chanetta was here.

16        Q.   I mean when you were all taking the

17   pictures.

18        A.   They were on the stairs here.  They

19   were standing at the top of the steps.

20        Q.   Did you take the pictures and then show

21   them the pictures?

22        A.   I took the picture and gave them the

23   phone.

24        Q.   Do you know whose phone it was?

25        A.   No.

T. Cunningham - Direct by Ms. Pellegrini

1      Q.   When everybody else is looking at the
2   picture, do you see something?
3      A.   Yes.
4      Q.   What do you see?
5      A.   I look to my right and I seen someone
6   looking over the fence with what looked like to
7   me to be a gun.
8      Q.   Was it a handgun or rifle, do you know
9   the difference?
10     A.   It was long, just long.
11     Q.   Could you show us on the diagram where
12  you remember seeing the gun?
13     A.   Right here, in this area.
14     Q.   When you see the long gun, are you able
15  to identify the individual that had the gun?
16     A.   Unfortunately, no.
17     Q.   After you see the gun, what do you say?
18     A.   I asked, I said is that someone
19  standing over there with a gun?  Everyone
20  looked and the person was gone.
21     Q.   Then what happened?
22     A.   Then I heard a shot and I felt
23  something which to me felt like when you are
24  riding a bike and a rock kind of ricochet's off
25  and hits you in the leg, it felt like a sting.

T. Cunningham - Direct by Ms. Pellegrini

1    I continued to hear gunshots so we all ran

2    toward the porch.

3        Q.   I show you what has been marked as

4    Commonwealth Exhibit No. 5.  What happens when

5    the shots begin to ring, when shots begin to

6    fire?

7        A.   I ran, we all began to run.  I ran

8    toward the porch.  I put one foot on the step,

9    I felt a push in the back, the next thing that

10   I knew I was in the corner in the fetal

11   position on the porch.

12       Q.   Could you use the laser pointer and

13   show us where you were on the porch?

14       A.   I was back there on the other side of

15   Tina.

16       Q.   Is Tina in the green shirt?

17       A.   Yes.

18       Q.   Who is next to Tina?

19       A.   Brittany.

20       Q.   Who in the gray shirt?

21       A.   Chanetta.

22       Q.   Chanetta was the one that was pregnant?

23       A.   Yes.

24       Q.   We know there is a man in between the

25   doors, who was that?

T. Cunningham - Direct by Ms. Pellegrini

1      A.  I was introduced to him as Mike but

2  that is Jerry.

3      Q.  Jerry?

4      A.  Yes.

5      Q.  Tell the jury, you're in the corner.

6  How many shots do you hear fired?

7      A.  I couldn't count.  I don't remember.

8  It was a lot.  I just remember being in the

9  corner and telling myself you're going to get

10  shot, it is going to hurt, you'll be okay.  I

11  just kept repeating that to myself as I opened

12  and closed my eyes as pieces of the house and

13  glass were falling on top of me.  I kept

14  telling myself I was going to get shot but it

15  would be okay.

16      Q.  Did you hear one gun or two?

17      A.  I heard two.

18      Q.  Could you describe what you exactly

19  heard?

20      A.  I heard pop, pop, pop, boom, boom, pop,

21  pop, pop, boom, boom.  It just continued until

22  it finally stopped.  It seemed like an

23  eternity.

24      Q.  When the gunshots stopped, what did you

25  do?

T. Cunningham - Direct by Ms. Pellegrini

1     A.   I paused for a moment.  I laid there.
2  I thought to myself should I stay here and
3  pretend to be dead.  I didn't know if the
4  person was reloading or what was going on so I
5  got up.  So when I stood up, I paused because I
6  seen Mike and I knew he was dead.
7     Q.   Why did you know he was dead?
8     A.   Because he wasn't moving at all.  I
9  seen holes in him, the back of his head, his
10  back, towards his butt.  So I tried to get into
11  the kitchen.  Lamont was crawling on the floor
12  towards the living room.  I went to the living
13  room.  He made it to the living room by that
14  time.
15     Q.   Was he injured?
16     A.   Yes, he was bleeding so I knew he had
17  been shot.  I asked him where was the landline
18  phone.  He said there wasn't one.  I asked him
19  if he had a cell phone, he told me no.  He
20  asked me where my phone was at.  I said it is
21  in my car.  He told me that I had to go get it.
22  I told him I couldn't.
23     Q.   Why?
24     A.   I was afraid because I didn't know, I
25  didn't know if the people that did this were

T. Cunningham - Direct by Ms. Pellegrini

1    still out there so I was afraid.  But he told

2    me I had to because I was the only one that

3    could.  So I did.  So I ran to my car.  I

4    called 911.

5        Q.  Did you speak to someone on 911?

6        A.  Yes, I told them that we needed help.

7    I didn't know where we were at.  I didn't know

8    the street.  I just knew that we were in

9    Wilkinsburg.  I told them that there were

10   people shot.  There were people dead.  There

11   were people hurt.  That we needed help.  So I

12   seen a policeman driving down the street and he

13   was driving kind of slow so I ran to him,

14   figuring if they were still out there, that at

15   least the policeman would have a gun and

16   protect me.  I told him and by the time I could

17   get all of my sentences out, the other police

18   started to come.

19       Q.  What did you do then?

20       A.  I ran back to the house.  The police

21   came.  By this time Lamont was on the porch.  I

22   seen the kids so I started taking the kids next

23   door.  I didn't know where I took them.  I

24   didn't know whose house I took them to.  There

25   was a light on so I took them.  I asked, I took

T. Cunningham - Direct by Ms. Pellegrini

1    them all.  I asked them, the one little girl, I
2    don't know who she was, I don't know her name,
3    I asked her if she could be a big girl for me
4    and stay in the house and don't come out unless
5    somebody she knew, the police, came and got
6    her.  She did.  I ran back next door.  There
7    was another little boy standing behind Lamont
8    looking down at him.  I told him to come here.
9    He jumped into my arms.  I took him next door.
10          I came back and I told Lamont he is
11    alive.  I'm like, you're still alive.  He kept
12    saying he was really hurt.  I said you're
13    alive, continue to talk to yourself.  I had to
14    go check on Tina so I sent police and
15    paramedics back and I told them that Tina was
16    still alive.  I knew everyone else was dead but
17    I knew Tina was alive because she was
18    breathing.  She was breathing.  And she had
19    blood on her shirt so I thought she was hurt
20    but I didn't think it was that bad.  I was like
21    she is strong, she can do this.  She is shot in
22    the chest, she will be okay, she can do this.
23    I told the paramedics to help her because she
24    was still breathing.  I told them Chanetta was
25    pregnant, they could help her, they could help

T. Cunningham - Direct by Ms. Pellegrini

1    her baby because I knew she wasn't good.  I

2    wanted -- my focus was Tina because I knew she

3    was alive and she was my friend and I wanted

4    her to live.  Like I said, she was a strong

5    person.  I felt like she could make it.  She

6    was shot in the chest.  She could make it.

7          So the police checked her pulse and her

8    head kind of slumped down and I started

9    screaming and yelling and telling her she

10    better not die on me, she better not die.  Then

11    they told me to go back in the house.  The

12    police kept asking me if I was shot, where was

13    I at.  I told him.  He said are you sure you

14    didn't get hit anywhere?  I told him I didn't

15    think so.  I kept feeling.  I had a pain in my

16    leg and lifted up my pant leg and I was shot.

17          Q.  Did they direct you to medics?

18          A.  Yes.

19          Q.  During this time did you realize that

20    you still had your cell phone in your hand?

21          A.  No.  Actually, I called, like I said, I

22    hung up on, I thought I hung up on the 911

23    operator.  I just wanted help.  I just wanted

24    help.

25          Q.  Did you later find out that that 911

T. Cunningham - Direct by Ms. Pellegrini

1    call never disconnected, the whole time you

2    were still on the phone with the police

3    dispatch?

4         A.  Yes.

5         Q.  Ms. Cunningham, I'm going to show you

6    what I marked as Commonwealth Exhibit 12.  Is

7    this the 911 call that you and I reviewed

8    together?

9         A.  Yes.

10              MS. PELLEGRINI:  I move for the

11    admission of the 911 call and call 13.

12              MR. McKINNEY:  Your Honor, may we

13    approach?

14              (Sidebar discussion held as

15    follows.)

16              MR. McKINNEY:  At this point, I

17    object to relevance.  I'm not sure of the

18    relevance of the 911 call.  I don't understand

19    how it is more probative than prejudicial.  She

20    said she called 911.  She is on the call, she

21    was on the phone.

22              MS. PELLEGRINI:  It is her

23    excited utterances.  It is her excited

24    utterances to what she is telling 911 the whole

25    time.

T. Cunningham - Direct by Ms. Pellegrini

1                    THE COURT:  What number?

2                    MS. PELLEGRINI:  Commonwealth

3       Exhibit 12 but the call is 13.

4                    THE COURT:  Okay.

5                    (Sidebar discussion concluded.)

6                    MS. PELLEGRINI:  Your Honor, at

7       this point we ask to play Ms. Cunningham's 911

8       call.

9                    (Tonjia Cunningham's 911 call

10      played for the jury.)

11                   MS. PELLEGRINI:  Thank you,

12      Ms. Cunningham.  Those are all the questions I

13      have.

14                   THE COURT:  Any questions?

15                   MR. McKINNEY:  No questions, Your

16      Honor.

17                   THE COURT:  Thank you, ma'am.

18      You are excused.

19                   MS. PELLEGRINI:  Is

20      Ms. Cunningham permitted to stay in the

21      courtroom now?

22                   THE COURT:  Yes.

23                   MR. CHERNOSKY:  The Commonwealth

24      would call Detective Mike Adams.

25

M. Adams - Direct by Mr. Chernosky

```
 1                    -----
 2                MICHAEL ADAMS,
 3     a witness herein, having been first duly sworn,
 4     was examined and testified as follows:
 5                    -----
 6              DIRECT EXAMINATION
 7                    -----
 8     BY MR. CHERNOSKY:
 9         Q.   Detective Adams, could you state your
10     first and last name and spell your last name
11     for the court reporter?
12         A.   Michael Adams, A-D-A-M-S.
13         Q.   And how are you currently employed?
14         A.   Employed with the Wilkinsburg Police
15     Department as a detective.
16         Q.   How long have you been employed with
17     the Wilkinsburg Police Department?
18         A.   25, going on my 26th year.
19         Q.   Did you work with any department prior
20     to working with Wilkinsburg?
21         A.   No.
22         Q.   How long have you been employed as a
23     detective with Wilkinsburg?
24         A.   Roughly 17 or 18 years, not
25     consecutively but.
```

M. Adams - Direct by Mr. Chernosky

1        Q.    Were you working in the capacity that

2   you just described on March 9, 2016?

3        A.    Actually, I was an acting sergeant back

4   that evening.

5        Q.    Could you tell the jury what it means

6   to be an acting sergeant?

7        A.    An acting sergeant compared to

8   detective, a detective does investigations of

9   crimes.  An acting sergeant is more of a patrol

10   officer in uniform with responsibilities of

11   running the day-to-day shift so I wear a

12   uniform when I'm acting sergeant.  When I'm

13   detective, I wear plainclothes like I'm dressed

14   today.

15        Q.    During your 25 years with Wilkinsburg,

16   what types of cases do you respond to?

17        A.    Well, as an investigator and officer, I

18   respond to during my investigations, I respond

19   primarily to crimes against children, assault,

20   abuse, neglect, those types of investigations.

21   When I'm not working as a detective, as acting

22   sergeant, I'm on patrol and respond to alarm

23   calls, burglary calls, assaults, domestic

24   violence cases, things like that.

25        Q.    On March 9, 2016, what shift were you

M. Adams - Direct by Mr. Chernosky

 1    working?

 2        A.  I was working the 4:00 to 12:00 shift

 3    as acting sergeant.

 4        Q.  Do you remember March 9, 2016?

 5        A.  Yes, I do.

 6        Q.  Did anything out of the ordinary happen

 7    that day?

 8        A.  Yes.

 9        Q.  Could you tell the jury what you were

10    doing when you were first alerted to something

11    out of the ordinary?

12        A.  Yeah.  While on patrol, typically, you

13    see the officer in uniform in a marked police

14    car.  It was late in my shift, close to maybe

15    10:00 or six minutes to 11:00 or so.  While I

16    was conducting my routine patrol, standard

17    patrol, I usually make a certain patrol pattern

18    when I'm patrolling.  This particular evening,

19    I patrolled an area that I typically do at this

20    time of night called Sherwood.  You have to go

21    through Forest Hills, PA to get to this little

22    section of Wilkinsburg which I normally do.  I

23    patrolled that area, came back, left that area.

24    And as I was approaching back on Ardmore

25    Boulevard, as I was approaching Marlboro

M. Adams - Direct by Mr. Chernosky

1    Avenue, I decided to turn right and go into the

2    neighborhood in Marlboro, in that area.

3         Q.  This particular night, what was the

4    weather like?

5         A.  It was really nice out.  In fact, I had

6    both of my windows, driver's side window and

7    front seat passenger window, down.  It was a

8    very pleasant evening for that time of year, I

9    thought.

10        Q.  What is the first thing that you

11   notice?

12        A.  As I drove up Marlboro Avenue, I was in

13   the 1400 block of Marlboro, I heard like a

14   volley of shots.  A volley, I thought for a

15   minute, this might be firecrackers and

16   fireworks.  I thought, wait a minute, this is

17   not the Fourth of July.  So I stopped my car

18   and stuck my ear out the window a little bit.

19   Then I heard like rhythmic shots.  Like boom,

20   boom, boom, boom, boom, boom, boom.  I thought

21   oh, my goodness, that is not fireworks, that is

22   a gun.  That is serious.

23        Q.  In your line of work over 25 years in

24   Wilkinsburg, do you carry a gun?

25        A.  I do.

M. Adams - Direct by Mr. Chernosky

1    Q.   Have you fired your gun?

2    A.   Yes.

3    Q.   For practice?

4    A.   For training primarily, yeah.

5    Q.   Does the police department require you

6    to qualify with your weapon?

7    A.   Yes, we qualify twice a year with my

8    sidearm which is a pistol but we also use a

9    rifle and a shotgun and other less lethal forms

10   of training such as taser.

11   Q.   Do you know approximately how many

12   shots you heard?

13   A.   Well, initially it was a volley of

14   shots, just like crackling, I mean, like if you

15   poured milk over Rice Crispies, it was a

16   crackling sound.  I was like wait a minute, I

17   don't think that is fireworks.  I stopped the

18   car and just listened.  Then I heard the

19   rhythmic shots which what sounded like we, as

20   officers, are trained at a range, like long

21   guns, like boom, boom, boom, boom, boom.  I

22   counted ten of that type of shot and I knew it

23   wasn't fireworks.

24   Q.   Where were you located physically when

25   you heard the shots?

M. Adams - Direct by Mr. Chernosky

1      A.   I was maybe half-way, not quite

2    half-way, up Marlboro Avenue.  I want to say

3    the 1430, 1432, those addresses, right around

4    that location.

5      Q.   I'm going to show you what I've marked

6    as Commonwealth Exhibit 13 and ask you what is

7    depicted in Commonwealth Exhibit 13?

8      A.   This is an aerial view of the area that

9    I described, Ardmore Boulevard, Franklin

10   Avenue.  There is Dell Way.  This is an overall

11   aerial view of the area that I heard the shots

12   from.

13     Q.   Is the road that you were on, Marlboro,

14   depicted in Commonwealth Exhibit 13?

15     A.   Yes.

16     Q.   Is the area, the general area of 1304

17   Franklin Avenue, depicted in Commonwealth 13?

18     A.   Yes.

19          MR. CHERNOSKY:  I move for the

20   admission of Commonwealth 13, Your Honor.

21          THE COURT:  Admitted without

22   objection.

23     Q.   Detective Adams, could you, on

24   Commonwealth Exhibit 13, which is projected on

25   the screen behind you, could you use that laser

M. Adams - Direct by Mr. Chernosky

1    pointer in front of you and show the jury

2    approximately where you were when you first

3    heard the shots?  So first indicate where

4    Marlboro Avenue is.

5         A.   It will be this street right here.

6         Q.   Does Marlboro sort of curve?

7         A.   Yes.

8         Q.   So in Commonwealth Exhibit 13, where

9    approximately were you when you first heard the

10   shots?

11        A.   Anyway, started up Marlboro and

12   probably about this area right here, about

13   here.

14        Q.   And what did you do after you heard the

15   shots?

16        A.   I continued -- well, first I stopped

17   the car.  I continued driving.  Actually, I

18   stopped and I called, I got on my radio and

19   called, told dispatch that I heard shots fired

20   and proceeded to calls for shots fired.  I gave

21   the location on the radio.  I said it sounded

22   like it was coming from the area of Franklin

23   Avenue, which is over here, and Dell Way, but I

24   wasn't sure so I told dispatch that I'm going

25   to continue up Marlboro, I'm going to head to

M. Adams - Direct by Mr. Chernosky

1    that location.  So I drove up this street.

2    This is a long street here, Marlboro.  I made a

3    left.  This road here is Princeton.  I made a

4    left here.

5        Q.  After you made a left on Princeton,

6    what did you do?

7        A.  So I turned left here and I got to this

8    little alleyway here.  I looked up here, down

9    the alleyway.  It was very dark and basically

10   impassible with a sedan car.  I had a Ford

11   Crown Victoria that I was driving.  I knew that

12   I wouldn't make it down this road.  I didn't

13   want to take any chances.  I would probably get

14   a flat tire.  I couldn't see anything down

15   here.  It was kind of dark.  I went up to this

16   street here which is Franklin.  This is the

17   1400 block.  So I told radio that I turned onto

18   Franklin.

19           Right about when I got here, radio

20   dispatch called me and said that they are also

21   receiving calls of shots fired coming from the

22   same area that I described which was Franklin

23   Avenue, this way.  So I just continued doing

24   what I call the slow crawl, driving down this

25   very slowly, down this road looking left and

M. Adams - Direct by Mr. Chernosky

1    right, looking to see if I saw anybody, anybody

2    laying on the street, unfortunately.

3        Q.   You were looking left and right.  What

4    was the purpose of looking left and right at

5    that point?

6        A.   Well, we often get calls of shots fired

7    and we go to that general location and we try

8    to ascertain if there is anybody hurt or if

9    anybody heard anything.  We ask them.  Usually

10   if we see somebody walking or sitting on the

11   porch, hey, excuse me, did you hear any shots

12   fired over here?  We've had people, yeah,

13   they're doing fireworks over there.  So that is

14   what we normally do.  That is what I was doing

15   as I drove down slowly looking left to right.

16       Q.   At that point did you have an address

17   yet?

18       A.   No.

19       Q.   As you're driving down Franklin Avenue,

20   does anything catch your attention?

21       A.   Yes.

22       Q.   What catches your attention?

23       A.   I saw a gentleman to my left.  I looked

24   left, right.  When I looked left again, I saw a

25   gentleman walk over and sit down in a car.  He

M. Adams - Direct by Mr. Chernosky

1    got into the front seat of a car and just sat

2    there.

3        Q.   What happened after that?

4        A.   Well, I drove my car, I was a little

5    bit further up, I drove down and parked

6    basically side-by-side, window-to-window.  My

7    driver's side window was facing down Franklin

8    Avenue.  The gentleman was parked against the

9    curb and going up Franklin Avenue.

10       Q.   What did you do next?

11       A.   So my windows were down.  I stared in

12   the driver's side window of the car the

13   gentleman was sitting in.  I waited for him to

14   turn his head and look at me because I planned

15   on giving him a signal roll your window down

16   because I wanted to ask you if you heard

17   anything or saw anything.  The gentleman never

18   turned his head.

19       Q.   How long did you sit in the position

20   that you just described?

21       A.   Approximately five to six seconds.  I

22   kept holding the wheel and staring at his

23   window waiting for him to just turn.  I was

24   talking to myself thinking this guy must be

25   going to work or tired.  No movement, just

M. Adams - Direct by Mr. Chernosky

1    stared straight through the windshield of the

2    car.

3        Q.  What did you do after that?

4        A.  Well, I began to creep past his car.  I

5    could hear a voice coming from the bottom of

6    Franklin Avenue, someone yelling.  So I thought

7    I better go investigate that.  As I pulled past

8    his car, I decided to take a look in my

9    sideview mirror of the car and take a mental

10   note of the license plate.  As I did that, this

11   lady, you could hear this voice, down here,

12   down here, officer, down here.  I was like, oh,

13   damn.  I just started down the hill.  That

14   person was at the bottom of Franklin Avenue.

15       Q.  Did you take mental note of the plate?

16       A.  Yes.

17       Q.  Do you know what it was?

18       A.  I do.  When I looked in my mirror,

19   Jiffy Butter Peanut 2200, that is how I

20   recalled it.  And I went on down the road.

21       Q.  When you got on down the road as you

22   say, what is the first thing that you

23   encounter?

24       A.  Well, I could see one of my fellow

25   police officer's cars at the bottom of the

M. Adams - Direct by Mr. Chernosky

```
1    hill, he was coming up the hill.  There was a
2    woman yelling over here, over here, officers.
3    She kind of looked like she flagged him down
4    first.  I pulled in, just seconds after he
5    stopped his car, I pulled and stopped my car
6    and we both actually got out.
7         Q.  When you saw -- Officer Hamlin was it?
8         A.  Yes, Officer Hamlin.
9         Q.  Did he have any lights and sirens
10   activated?
11        A.  I don't remember.
12        Q.  Do you remember if you had any lights
13   or sirens activated?
14        A.  I don't believe.  I may have turned
15   them on as I zoomed down the street but I don't
16   recall if I did or not.
17        Q.  After you exit your vehicle, what do
18   you do?
19        A.  I immediately -- Officer Hamlin gets
20   out first and I get out right behind him.  The
21   woman who is yelling is giving us directions,
22   she is saying over here, over here, he is on
23   the porch.  I'm saying who is on the porch?
24   She is right here, same sentence, around back,
25   they are around back.  My family, she is
```

M. Adams - Direct by Mr. Chernosky

1    pregnant.  They shot my family.  You know, it

2    was just like miniature mayhem.

3          Officer Hamlin addressed the woman and

4    gentleman on the porch.  I started for the rear

5    of the house.  Then immediately Officer Hamlin

6    and I both go to the rear of the house.

7        Q.  At that point do you know how many

8    victims you are dealing with?

9        A.  We didn't know right away, no.

10       Q.  At that point did you know how many

11   perpetrators you were dealing with?

12       A.  No.

13       Q.  Did you draw your weapon?

14       A.  Yes.

15       Q.  Did you know if Officer Hamlin drew his

16   weapon?

17       A.  I don't know.

18       Q.  You go toward the backyard?

19       A.  Yes.

20       Q.  What happens when you get to the

21   backyard?

22       A.  Well, there is a dog on the back porch

23   barking.  It appears to be guarding the people

24   that we could see on the back porch.  Myself

25   and Officer Hamlin were yelling, we got the

M. Adams - Direct by Mr. Chernosky

1    dog, we got the dog.  Then we have a voice of a

2    citizen, I believe to my right, saying I know

3    the dog, I can get the dog for you, I can get

4    the dog.

5         Q.  Did you allow that to happen?

6         A.  Yes.

7         Q.  At this point, did you see the people

8    on the porch?

9         A.  Yes.

10         Q.  Did you have any other victims in the

11    backyard?

12         A.  Yes.  There were several people on the

13    porch.  There were people on the porch, there

14    were two additional victims laying on the lawn

15    at the foot of the porch steps on the lawn

16    level.

17         Q.  Did you call for medics?

18         A.  Yes.

19         Q.  Did they arrive at some point while you

20    were on scene or while you were there?

21         A.  Yes.

22         Q.  How long after you got there if you

23    remember?

24         A.  I really don't know exactly.  It was

25    just a matter of a couple of minutes, a few

M. Adams - Direct by Mr. Chernosky

1   minutes or so.

2       Q.  At some point do you do anything else

3   in the backyard?

4       A.  We -- yeah.  I assessed what was in our

5   immediate surroundings.  We looked around to

6   see if any additional people were laying

7   anywhere else.  We were kind of confined to the

8   two individuals on the lower level backyard.

9   Then we assessed the people that were sitting

10  on the porch also and everyone appeared to be

11  with grave injuries.  We didn't, we were kind

12  of curious about if somebody else may be a

13  shooter so we continued to scan the area and

14  just cover this area, like protect this area.

15      Q.  Did there come a time where you cleared

16  the house?

17      A.  Well, my sergeant, Sergeant Ciuffi,

18  arrived on scene seconds after myself and

19  Officer Hamlin arrived.  Sergeant Ciuffi

20  directed me, because he is not an acting

21  sergeant, he is an actual sergeant, he outranks

22  me, so once he arrives, it becomes his scene.

23  He told me to follow him.  He said, Mike, let's

24  go, we got to clear this house.

25      Q.  What does it mean to clear a house?

M. Adams - Direct by Mr. Chernosky

1      A.  We had to check every crevice of the

2   interior of that house and see if any more

3   victims or a suspect in the house.

4      Q.  Did you clear the house without finding

5   any more victims?

6      A.  Well, we cleared the house.  The woman

7   that was yelling that originally got our

8   attention was actually in the house, like

9   seated on the couch when I walked in.  I don't

10   think she realized but she had been shot in the

11   leg.  She realized it at the same time myself

12   and Officer Ciuffi -- Sergeant Ciuffi --

13   realized it.  She looked down and said I've

14   been shot.  We said you're going to have to

15   exit out of the house while we cleared the

16   house.  That is what we did.  We cleared the

17   entire house and there was nobody else in the

18   house.

19      Q.  After that, did you assist in securing

20   the scene?

21      A.  Yes.

22      Q.  How many hours would you say that you

23   were in that area of 1304 Franklin that night?

24      A.  Several hours.  That happened maybe six

25   minutes to 11:00 p.m.  I was there at least

M. Adams - Direct by Mr. Chernosky

1    until 4:00 a.m., maybe a little bit later.

2       Q.  Prior to leaving that night, did you

3    provide the license plate information that you

4    made note of to a detective?

5       A.  I did.  While I was standing in the

6    backyard keeping that area secure, a detective

7    was standing near me.  The medics were

8    processing things, attending to the victims.  I

9    just said to the detective, hey, I have a

10   license plate, I don't know if it is worth

11   anything but I do have a plate if you would

12   like me to give it to you.  He said sure.  So I

13   provided him the license plate that I remember

14   making a note of.

15      Q.  At that point did you suspect that that

16   person was an actor in the shooting?

17      A.  No.

18      Q.  At that point did you suspect that that

19   person was a witness to the shooting?

20      A.  No.

21      Q.  Could you describe the vehicle that you

22   saw that individual get into?

23      A.  It was a white in color Lincoln

24   Continental.  In fact, the same detective an

25   hour later asked me, Mike, do you remember what

M. Adams - Direct by Mr. Chernosky

1    kind of car it was?  I was like, yeah, it was a
2    white Lincoln.  He just said, okay, thanks.
3        Q.  Did there come a time after you were at
4    the scene that night where you were contacted
5    by the county police?
6        A.  Yes.
7        Q.  Did they ask you if you saw some
8    surveillance would you recognize the person
9    that you saw that night?
10       A.  Yes.
11       Q.  What did you tell them?
12       A.  I said that I would recognize the
13   person.
14       Q.  Now, after this night, did you actually
15   go out of town?
16       A.  Yes.  A couple of nights later, that
17   same weekend, it happened to occur on a
18   Wednesday, Friday I was out of town on
19   vacation, that is when I was contacted by the
20   Allegheny County detective.
21       Q.  So did you eventually, were you
22   eventually provided a photo from some
23   surveillance?
24       A.  Yes.  The detective asked me if I would
25   recognize the person again if I saw him.  I

M. Adams - Direct by Mr. Chernosky

1    said I would.  He sent me a picture, two

2    pictures.  He said tell me, does that look like

3    the same person, the outfit that the person was

4    wearing?  I said that is him.  That is the guy

5    I saw.

6        Q.  Let me show you what I marked as

7    Commonwealth Exhibits 14 and 15 and ask if you

8    recognize what is depicted in Commonwealth

9    Exhibits 14 and 15?

10       A.  Yeah, this is the image that was sent

11   to me by the Allegheny County detective.

12       Q.  Is that the same image that you told

13   him was the person that you say you saw that

14   night?

15       A.  Yes.

16              MR. CHERNOSKY:  Your Honor, I ask

17   for the admission of Commonwealth 14 and 15.

18              MR. McKINNEY:  No objection.

19              THE COURT:  Admitted without

20   objection.

21       Q.  Now, Detective Adams, do you see the

22   individual that you saw on Franklin Avenue that

23   night today?

24       A.  Yes, I do.

25              THE COURT:  One second, put the

M. Adams - Cross by Mr. McKinney

1    lights back on.

2        Q.   Do you see the person that you saw on

3    Franklin Avenue that night today?

4        A.   Yes.

5        Q.   Could you identify the person in the

6    courtroom, what he is wearing?

7        A.   The gentleman to my left in a blue

8    suit, beige shirt and tie.

9              MR. CHERNOSKY:  Your Honor, may

10   the record reflect the identification of the

11   defendant?

12             THE COURT:  It will so reflect.

13             MR. CHERNOSKY:  No further

14   questions.  I offer for cross.

15             MR. McKINNEY:  Thank you.

16                  -----

17             CROSS-EXAMINATION

18                  -----

19   BY MR. McKINNEY:

20       Q.   Detective Adams, you've been in law

21   enforcement with the Wilkinsburg Police

22   Department for about 25 years?

23       A.   Correct, sir.

24       Q.   When you were on routine patrol, I

25   think you said you turned from Ardmore

M. Adams - Cross by Mr. McKinney

1    Boulevard to Marlboro Avenue?

2        A.   Correct.

3        Q.   Were you in a marked police cruiser?

4        A.   Yes, sir.

5        Q.   Equipped with lights and sirens?

6        A.   Yes.

7        Q.   Now, when you make that right onto

8    Marlboro Avenue, it doesn't take long before

9    you start to hear the gunshots; is that

10   correct?

11       A.   That's correct.

12       Q.   You said that your windows were down so

13   you were able to hear pretty much everything,

14   right?

15       A.   Yes, pretty much as I described.

16       Q.   Now, you heard approximately 10 to

17   12 shots initially, correct?

18       A.   Well, initially, I heard like a

19   crackling sound, a volley of the shots, but I

20   thought that is fireworks possibly, and I

21   thought it is not the Fourth of July, is there

22   a holiday?  I'm thinking.  I listened.  I

23   really listened.  I stopped the car and I

24   listened and that's when I heard rhythmic

25   shots.

M. Adams - Cross by Mr. McKinney

1     Q.  When you hear these shots, you would

2  agree with me that you are still in that

3  beginning of Marlboro Avenue before you make

4  your way up the hill?

5     A.  About the 1400 block or so, yes.

6     Q.  According to your report, would you

7  agree with me that you heard the shots at

8  approximately 10:53 p.m.?

9     A.  Yes, that is correct.

10     Q.  You immediately call into dispatch at

11  10:53 to let them know that you heard shots?

12     A.  I let them know that they may get calls

13  because I heard what I think are shots fired.

14     Q.  After you make that call, you then

15  slowly drive up Marlboro Avenue; is that

16  correct?

17     A.  No, I don't slowly.  I don't creep up.

18  I move up Marlboro, no lights or sirens.  I

19  want to get to the area where I think the shots

20  were heard from, that I heard shots from.

21     Q.  Would you agree with me or do you

22  remember testifying at a previous proceeding

23  that you "crept" up Marlboro after you heard

24  the shots?

25     A.  I don't recall testifying that I did.

M. Adams - Cross by Mr. McKinney

1    I may have crept a little bit up and then

2    increased my pace.  I didn't hit my lights or

3    sirens but I went to where I thought the shots

4    were coming from.

5        Q.  I can certainly refresh your

6    recollection if you think that it would be

7    helpful.

8        A.  That is fine if you would like to.

9            MR. McKINNEY:  Your Honor,

10   permission to approach?

11           THE COURT:  You may.

12           MR. McKINNEY:  Your Honor, for

13   purposes of the record, this is the preliminary

14   hearing transcript dated July 29, 2016, Defense

15   Exhibit B.

16       Q.  Detective, you can take a look at page

17   20 and I will ask you a couple questions about

18   it.

19       A.  Okay.

20       Q.  Just take a look at it.  After you're

21   done reading it, I will ask you some questions

22   about it.

23       A.  Okay.

24       Q.  So would you, at least, agree with me

25   that at the preliminary hearing back in 2016

M. Adams - Cross by Mr. McKinney

1    you testified that you crept up Marlboro Avenue

2    after hearing the shots?

3        A.  Well, reading my testimony, yes, I did

4    creep up.  And the shots were still happening

5    which I testified to reading my own words which

6    is accurate as I remember now, yeah.

7        Q.  As you slowly drive up Marlboro Avenue,

8    at least initially, would you agree with me at

9    that point you are processing what you heard?

10       A.  I don't know if I'm processing.  I

11   heard what I heard.  I called it in and I began

12   to go toward that location.

13       Q.  Would you agree with me that you were

14   on high alert?

15       A.  I was on alert.  I knew it wasn't right

16   behind me.  It was a ways over maybe, you know,

17   a football field or so away but I was on alert.

18       Q.  Is it often that you hear crackling

19   shots and then 10 to 12 shots following said

20   crackling shots in that neighborhood?

21       A.  We get a lot of shots-fired calls.

22   Sometimes it is fireworks even when it isn't a

23   holiday so we respond to those areas anyway.

24   We respond just the same.

25       Q.  So are you saying that in the

M. Adams - Cross by Mr. McKinney

1    Wilkinsburg section of Pittsburgh there are

2    oftentimes shots fired?

3        A.   Correct.

4        Q.   Now, after you call into dispatch

5    around 10:35 p.m., you get a radio call from

6    dispatch informing you that the shots-fired

7    call came in from the 1300 block of Franklin

8    Avenue; is that correct?

9        A.   I was told by dispatch that they were

10    receiving -- the way dispatch puts it,

11    receiving some additional calls.  They may have

12    mentioned the 1300 block.  I don't know if they

13    were coming from the 1300 block, the resident

14    was calling from the 1300 block, or someone

15    nearby said it sounded like it was coming from

16    the 1300 block.  I don't think dispatch made

17    that distinction.

18        Q.   If I show you your report, what

19    dispatch told you, would that refresh your

20    recollection?

21        A.   I'm sure it will.

22            MR. McKINNEY:  Your Honor, may I

23    approach?

24            THE COURT:  You may.

25            MR. McKINNEY:  Your Honor, for

M. Adams - Cross by Mr. McKinney

1  the record, Exhibit C, Detective Adams's

2  report.

3      Q.  If you could take a look at it?

4      A.  Okay.

5      Q.  So based on your own report, would you

6  agree with me that dispatch informed you that

7  the shots fired were coming from the 1300 block

8  of Franklin Avenue?

9      A.  That's correct.

10     Q.  So as you're making your way to

11  Franklin Avenue, you know where you're headed

12  in terms of determining what the response is

13  going to be, looking for victims, witnesses,

14  suspects, where you are heading based on your

15  report.

16     A.  That is where I was headed, that's

17  correct.

18     Q.  Now, as you drive up Marlboro Avenue,

19  you make a left on Princeton Boulevard; is that

20  correct?

21     A.  That's correct.

22     Q.  As you travel down Princeton Boulevard,

23  you look down Hazel Way toward your left?

24     A.  That's correct.

25     Q.  You stop your cruiser?

M. Adams - Cross by Mr. McKinney

1         A.   Yes, momentarily stop and peek over to

2    peer down Hazel Way.

3         Q.   As you're peering down Hazel Way, you

4    would agree with me that one of the things that

5    you would be looking for is potential victims?

6         A.   Anything, looking for victims.

7         Q.   Is potential victims one of the things

8    that you are looking for?

9         A.   Yes.

10        Q.   Is a potential witness to any kind of

11   incident something that you may be looking for?

12        A.   Yes, it is.

13        Q.   Is a suspect maybe something that you

14   are looking for?

15        A.   Well, maybe but I don't have any

16   specifics on any suspect at this moment.

17        Q.   That's correct but I'm asking you if

18   you responded to rhythmic shots and you know

19   that they are within less than a tenth of a

20   mile from where you are currently located,

21   would it occur to you that you might want to

22   look for suspects, too?

23        A.   Absolutely.

24        Q.   When you look down Hazel Way, you don't

25   see any suspects?

M. Adams - Cross by Mr. McKinney

1    A.  Pitch black, no lighting in that area.

2  I don't see any suspect or resident or people

3  walking a dog, nothing.

4    Q.  You make your way down Princeton and

5  you make your way down Franklin Avenue?

6    A.  Yes, that is correct.

7    Q.  You're now on the street where shots

8  were fired as you are told by dispatch.  Would

9  you be on higher alert than when you were on

10  Marlboro?

11    A.  When I turn onto Franklin, that is when

12  dispatch informed me that they were receiving

13  additional calls.

14    Q.  So when you get those calls while on

15  Franklin, would you agree that you are on

16  higher alert than on Marlboro?

17    A.  A little higher but I'm basically in

18  the same steady preparedness attitude and

19  motion.

20    Q.  You are driving down Franklin Avenue at

21  a rate of five to eight miles per hour; is that

22  correct?

23    A.  That would be fairly accurate,

24  creeping, slow crawl as I refer to.

25    Q.  Creeping with your slow crawl down

M. Adams - Cross by Mr. McKinney

1    Franklin Avenue looking from the sidewalk on

2    your left to the sidewalk on your right; is

3    that fair?

4        A.  Yes, and the streets in between them,

5    scanning back and forth as I'm driving the car

6    down.

7        Q.  I think we established while you are

8    scanning, you're looking for either suspects,

9    witnesses, or victims?

10       A.  I'm also listening, I'm listening for

11   my dispatcher to give me a description of

12   someone leaving the area, anything.

13       Q.  As you drive down Franklin, you

14   testified to the fact that you saw a black

15   male?

16       A.  I didn't say black or white but I saw a

17   gentleman walking toward -- when I scanned to

18   my left, a gentleman getting into the car.  The

19   cars were parked head to nose or rear, behind

20   each other.  The gentleman just walked, got

21   into a car, he opened the car door and sat

22   down.

23       Q.  You're driving down Franklin Avenue and

24   the individual that you saw came, obviously,

25   from in front of you, so he walked up the

M. Adams - Cross by Mr. McKinney

1    street?

2        A.   I couldn't tell if he walked up the

3    street or came from a resident dwelling that

4    was there.  I looked up and he was getting into

5    a car.  I didn't see him the first time that I

6    looked to my left, right.  I looked again and a

7    gentleman was getting into the car.  It was

8    real quick.

9        Q.   The first time that you see him, he is

10   opening the car door, getting in?

11       A.   No, he was at the rear of the trunk,

12   like coming from a house, walked between the

13   two cars, got into the car like any person

14   would.

15       Q.   This is the first person that you see

16   after you hear the shots and get dispatched

17   reports that they are coming from the 1300

18   block of Franklin?

19       A.   Correct.

20       Q.   Now, you testified on direct

21   examination that generally when you respond to

22   a scene you're looking to interview people to

23   get more information about what happened; is

24   that correct?

25       A.   To ask them if they've seen anything,

M. Adams - Cross by Mr. McKinney

1  heard anything, that sort of thing.  That is my

2  initial reaction.

3      Q.  Now, when you first saw this black

4  male, he was approximately 40 feet away from

5  you; is that correct?

6      A.  40 feet or less but roughly.  Maybe

7  where you're sitting and I'm sitting, close.

8      Q.  You testified before that he was

9  40 feet away from you.  Would you like to

10  review your testimony?

11      A.  No, that would be reasonable.  My car

12  was moving so I'm in motion.

13      Q.  Okay.  You are 40 feet away from this

14  individual.  You would agree with me, at least

15  as you're driving, you see him so he has to be

16  in front of you, he is not behind you?

17      A.  No, he was in front of me, to my left

18  but in front.

19      Q.  You are driving down the street in a

20  marked police cruiser?

21      A.  Correct.

22      Q.  Lights and sirens aren't on but you

23  have lights and sirens on top of your car?

24      A.  Yes.

25      Q.  This individual gets into a car,

M. Adams - Cross by Mr. McKinney

1    according to you, and you continue to drive

2    down Franklin to get closer?

3        A.   I pull right up beside his car, driver

4    to driver, window to driver's side window.

5        Q.   Your face and his face are

6    approximately six to eight feet apart?

7        A.   Yeah, I'm in a car, he is in a car,

8    there is a gap between our two cars.

9        Q.   Your window is down?

10       A.   Yes.

11       Q.   Now, did it ever occur to you at that

12   point that this individual could have been

13   involved in the shooting?

14       A.   Not necessarily.  Not necessarily.  I

15   just looked.  I hadn't received any update from

16   radio as to suspects or victims or anything.  I

17   respond to many shots-fired calls.  I often ask

18   if I see anyone in the area have you seen

19   anything or hear anything.  I was expecting

20   this individual to roll his window down and he

21   just sat there.

22       Q.   Just to confirm, this is within two

23   minutes of the shots being fired, correct?

24       A.   I will say very close to after the time

25   the shots were fired and I called in and heard

M. Adams - Cross by Mr. McKinney

1    shots fired to the time I saw him, yes.

2        Q.   This individual is about five or six

3    houses away from 1304 Franklin?

4        A.   No, he is more houses than that,

5    several more houses away.

6        Q.   How many?

7        A.   I don't know exactly.  The street has

8    some vacant properties, buildings that are torn

9    down, so maybe five to eight houses.  I don't

10   know exactly.

11       Q.   Okay.  You would agree with me that you

12   never question this person?

13       A.   That is correct, I did not.

14       Q.   You never stopped them?

15       A.   No.

16       Q.   You never detained them?

17       A.   No, I never detained them.

18       Q.   You never made eye contact with this

19   person?

20       A.   Well, I looked at him.  His eyes were

21   open and he was staring straight through the

22   windshield of the car.  I was waiting for him

23   to start the car and roll the window down or

24   turn around and look at me.  I looked at him

25   but he, as far as I know, didn't look at me.

M. Adams - Cross by Mr. McKinney

1    Q.   You didn't ask him to roll his window

2    down?

3    A.   Had he turned his head, I would have

4    motioned for him to roll his window down but he

5    never turned.

6    Q.   You testified on direct that you stared

7    at this person for five or six seconds; do you

8    recall saying that?

9    A.   Yes, I do.

10   Q.   Do you remember when I asked you at a

11   previous hearing, that I asked you that

12   question and you testified that you stared at

13   this person for 60 seconds?

14   A.   No.

15   Q.   If I were to show you your prior

16   testimony, would it refresh your recollection?

17   A.   Surely.

18        MR. McKINNEY:  Your Honor,

19   permission to approach?  Your Honor, for the

20   record, this is Defense Exhibit D which is a

21   pretrial motion hearing from July 9, 2018,

22   directing Detective Adams's attention to page

23   40.

24   Q.   Take your time.  Let me know when

25   you're ready and I'll ask you some questions.

M. Adams - Cross by Mr. McKinney

1          A.  Okay.

2          Q.  Thank you, Detective.  So do you

3   remember me asking you how long did you look at

4   this person?  Do you remember responding 60

5   seconds or so?

6          A.  Yes.

7          Q.  Do you remember me asking so are you

8   saying that for 60 seconds your car was stopped

9   and you were facing this individual for

10  approximately a minute, do you remember

11  answering yes?

12         A.  Yes, I do.

13         Q.  Now, finally, do you remember me asking

14  you with respect to that 60 seconds, Detective,

15  are you pretty sure it was about that period of

16  time?  Do you remember responding roughly a few

17  seconds either way or so but I just stared at

18  him?

19         A.  Yes, I remember that.

20         Q.  I essentially asked you three times at

21  a prior proceeding whether it was 60 seconds or

22  not and you said, yes, it was.  Today you're

23  testifying --

24                 MR. CHERNOSKY:  Your Honor --

25                 THE COURT:  Objection sustained.

M. Adams - Cross by Mr. McKinney

1    Ask a question, no narrative necessary.  The
2    information is in front of the jury.

3        Q.   Detective Adams, was it 60 seconds?
4        A.   At this particular moment, it is hard
5    to remember exactly how many seconds it was.
6    It was long enough for me to stare at him and
7    wonder if he was going to roll his window down
8    or not, and I waited and heard a voice and
9    decided to say to myself drive on but let me
10   get the plate before I go.  That is what I did.

11       Q.   Whether it was 60 seconds or less, did
12   you think it was suspicious that this
13   individual not only refused to look in your
14   direction but didn't turn his car on?

15       A.   It was weird.  We've had many
16   shots-fired calls.  People react differently.
17   Some people stay on their porch and the shots
18   fired were three or four doors down, they never
19   moved.  I looked.  I waited.  I stared at him
20   and started thinking this guy is going to work
21   or something on his mind but he wasn't
22   sweating, he wasn't making any weird movements.
23   He just sat there and stared straight ahead.  I
24   was looking at him through my window.  I
25   thought I can't sit here all day with this guy.

M. Adams - Cross by Mr. McKinney

1     I kept on moving.

2         Q.  Is it safe to say that you didn't

3     believe this individual was a suspect in the

4     shooting?

5         A.  That would be safe.  I didn't know.

6         Q.  But you were suspicious enough of him

7     to drive away and look through your sideview

8     mirror to ascertain his license plate?

9         A.  That is how we were trained.  If

10    someone leaves the area, you get something from

11    him before they go just in case you need it.  I

12    said I'm getting the plate.  I was going to

13    call it in but there was more transmission over

14    the radio so I said I'll go down here.

15        Q.  Do you remember in previous proceedings

16    testifying that the individual didn't drive

17    away, in fact, it was you who drove away?

18        A.  Possibly, because as I pulled away,

19    either he started the car, attempted to drive,

20    or I just got the plate and I left.

21        Q.  So with respect to getting the plate,

22    it was 11:00 p.m. at night when you were able

23    to get that information?

24        A.  That's correct.

25        Q.  Now, you drove about a car length ahead

M. Adams - Cross by Mr. McKinney

1    of this individual before you were able to look

2    in your sideview mirror -- or rearview mirror?

3        A.   Sideview.

4        Q.   So at 11:00 at night you were able to

5    look in your sideview mirror and flip and

6    reverse the license plate from the Lincoln

7    Continental?

8        A.   Yeah, I do it all the time.

9        Q.   How were you able to see the license

10   plate of this car when the ignition was never

11   turned on?

12       A.   Well, we try to keep our police cars up

13   to tiptop shape.  The brake lights were bright

14   when I stopped, probably illuminated his plate.

15   I remember my car was facing his plate.  I

16   didn't think about the plate.  It was right

17   there, Jiffy Butter Peanut.

18       Q.   There was no car directly behind this

19   car so you were able to get a full view of the

20   plate?

21       A.   There was enough space so I could see

22   the plate clearly.  I don't remember if there

23   was a car directly behind it but there was

24   enough space for me to see the plate.

25       Q.   You wrote this license plate down on a

M. Adams - Cross by Mr. McKinney

1    piece of paper; is that correct?

2        A.   I jotted it down so I wouldn't forget,

3    yes.

4        Q.   You would agree with me in July of 2016

5    when you were asked where that piece of paper

6    is, you indicated that you have no idea where

7    it was and no idea who you gave it to; is that

8    correct?

9        A.   That's correct.

10       Q.   Even to this day, you've testified that

11   the detective who you provided that information

12   to, you don't know his name?

13       A.   That's correct.

14       Q.   Now since March 9th of 2016, have you

15   made any kind of investigation or done any kind

16   of investigation on your own to figure out who

17   took that piece of paper from you and who you

18   spoke to?

19       A.   No.

20       Q.   Now, you said a couple of days later

21   you were contacted by Allegheny County Police

22   and were provided with a photograph; is that

23   correct?

24       A.   Yes, that's correct.

25       Q.   The Allegheny County Police Department

M. Adams - Cross by Mr. McKinney

```
 1    picked up this case because Wilkinsburg doesn't
 2    generally handle their own homicides; is that
 3    accurate?
 4         A.   That is accurate.
 5         Q.   Now, the photograph that you were
 6    shown, was that provided to you via text
 7    message from a detective?
 8         A.   Yes, it was a picture message.  He just
 9    sent the picture.
10         Q.   He didn't send a message saying this is
11    the guy that committed the Wilkinsburg mass
12    murders, we need you to identify him?
13         A.   No.
14         Q.   Now, you know -- strike that.  The cell
15    phone that would contain the content of that
16    text message, that cell phone was ran over by a
17    car; is that correct?
18         A.   Correct.
19         Q.   So you don't have that cell phone
20    anymore?
21         A.   Two cell phones ago.
22         Q.   Two cell phones ago, okay.  When that
23    cell phone was, unfortunately, run over by a
24    vehicle, did you see it happen?
25         A.   Did I see the car run over it?
```

M. Adams - Cross by Mr. McKinney

1    Q.   Did you see the car run over your

2    phone?

3    A.   No.  I was on a police call, a violent

4    call where I had to make an arrest.  We left

5    the area.  I couldn't find the phone.  I

6    retraced my steps and saw it in the street.

7    Q.   Have you ever authored any reports

8    consistent with what you just said?

9    A.   With my cell phone damage?

10   Q.   Yeah.

11   A.   I don't recall.

12   Q.   As far as you know, is there any other

13   way that you or anyone else would be able to

14   access the content of the text message you

15   received from the Allegheny County Police?

16   A.   No way that I could obtain that

17   information but I'm sure a tech or someone else

18   could perhaps.

19   Q.   Now, when you were provided with the

20   photograph, the photograph that you were sent

21   was accompanied with a message from the

22   detective.  What did that message say?

23   A.   The message, I believe it was separate,

24   it was just, Mike, hey, I want to send you a

25   picture.  Would you be able to recognize the

M. Adams - Cross by Mr. McKinney

1    person if you saw him again, something to that

2    effect.  Then a picture came.  It was this

3    picture.  Right away I recognized this to be

4    the same person I saw in the car.

5                    THE COURT:  When you say this

6    picture, what exhibit are you referring to,

7    just the number?

8                    THE WITNESS:  It is really small.

9                    MR. CHERNOSKY:  It is on the

10   back.

11                   THE WITNESS:  14 and 15.  14 and

12   15.

13        Q.   I'm going to borrow those from you for

14   one second, Detective, and I'll give them back.

15   Detective, when you were sent the photograph,

16   you testified that you recognized the

17   individual from these photos as the person that

18   you saw on Franklin Avenue, correct?

19        A.   Yes.

20        Q.   Now, do you remember physically the

21   description that you provided when you

22   initially described what that person looked

23   like on the night of the incident?

24        A.   Sure, I remember.

25        Q.   What did you say?

M. Adams - Cross by Mr. McKinney

1      A.   What I said, just from memory, he was

2   about 5'10", maybe 175 pounds, 160 to 175

3   pounds.  He was fit.  He looked like in shape,

4   he wasn't overweight, just looked like a fit

5   younger guy.  Real short cropped hair, about my

6   complexion, maybe a little bit darker than me

7   but roughly my complexion.  There was a little

8   bit of facial hair.  He was just very, very

9   calm.  He got in the car and just sat there.

10      Q.   Okay.  Now, in your report, the

11   description that you just gave, you would agree

12   with me there is no mention in your report or

13   what you just said of the suspect on March 9,

14   2016, having a cigarette in his mouth; would

15   you agree with that?

16      A.   He had something on his -- well.

17      Q.   In terms of your report, you never

18   wrote anything in your report about the suspect

19   having a cigarette in his mouth, correct?

20      A.   I don't believe so, no.

21      Q.   When I just asked you to provide the

22   description that you gave on the night of the

23   incident, you didn't say anything about a

24   cigarette in his mouth?

25      A.   Well, I didn't say anything about the

M. Adams - Cross by Mr. McKinney

1    dark shirt that he had on either, I just

2    realized, so I didn't give you everything, no,

3    not the cigarette, I don't believe I wrote that

4    in the report anywhere.

5         Q.   Then three days later you are provided

6    with these photographs.  Would you agree with

7    me that in these photographs the suspect has a

8    cigarette in his mouth; is that accurate?

9         A.   It appears that he has a cigarette in

10   his mouth in the one picture but when the

11   gentleman got in the car, I could see something

12   light.  The shirt that he had on was dark.  I

13   could see a flash of whiteness or something

14   right here so.

15        Q.   Let me just make sure that I could

16   clarify this with you.  In your report that you

17   claim you wrote on the night of the incident,

18   you make no reference to the individual having

19   a cigarette in his mouth at all, correct?

20        A.   That is correct.  I don't believe I

21   did.

22        Q.   Then you are provided with the photo

23   three days later with the suspect having

24   something white coming out of his mouth?

25        A.   Yes, I would agree with that.

M. Adams - Cross by Mr. McKinney

1    Q.  Then three months later when you are

2  testifying at the preliminary hearing, you are

3  asked what does the suspect look like and for

4  the first time you say the suspect may have had

5  a cigarette in his mouth; do you remember that?

6    A.  I don't exactly remember saying that

7  but show it to me.

8    Q.  Would it refresh your recollection?

9    A.  I do remember something white here.

10   Q.  Would it refresh your recollection if I

11 showed you a transcript of the preliminary

12 hearing testimony?

13   A.  No.

14   Q.  It wouldn't help you?

15   A.  I believe you.  If it states that, it

16 is in there.

17   Q.  It is very important so I want you to

18 make sure it is something that you remember

19 saying.

20              THE COURT:  Whether it is

21 important or not is not your decision.  You

22 asked him if it would help him refresh his

23 recollection.  He said no.

24              MR. McKINNEY:  Your Honor,

25 permission to approach not the bench but the

M. Adams - Cross by Mr. McKinney

 1    witness?

 2                    THE COURT:  Pardon me?

 3                    MR. McKINNEY:  Permission to

 4    approach the witness?

 5                    THE COURT:  For what purpose?

 6                    MR. McKINNEY:  Impeachment.

 7                    THE COURT:  Not a proper

 8    impeachment in this circumstance.

 9        Q.   Detective Adams, isn't it true that at

10    the preliminary hearing you testified that the

11    suspect had a cigarette in his mouth?

12        A.   That, I want you to show me if you have

13    it.

14                    MR. McKINNEY:  Thank you.

15                    THE COURT:  It has been overruled

16    by the witness but okay.

17        Q.   Detective Adams, isn't it true that

18    your description of the suspect changed based

19    on the pictures you were provided by the

20    detective?

21        A.   No.

22                    MR. McKINNEY:  Your Honor, no

23    further questions.

24                    MR. CHERNOSKY:  Just briefly on

25    redirect.

M. Adams - Redirect by Mr. Chernosky

1                      -----

2              REDIRECT-EXAMINATION

3                      -----

4    BY MR. CHERNOSKY:

5        Q.   I'm going to show you that same page of

6    your transcript.  Could you read line 6 and

7    lines 6 through 13 out loud?

8        A.   Question:  Do you remember what the

9    individual was wearing?  Answer:  He had a dark

10   top, dark shirt of some sort.  I'm not sure if

11   he had a cigarette or something out of his

12   mouth but I caught something white up in this

13   area just on the one shoulder.  Don't know what

14   color pants he had on but he was thin.  He

15   didn't have a belly or anything like that.  He

16   was, you know, a decently built man.

17       Q.   Let me stop you there for a second.

18   Now, can we ask you just about police

19   procedures, if you wanted to pull that

20   gentleman you saw out of his car right then and

21   get his name and talk to him, could you have

22   done it?

23       A.   I could have.

24       Q.   How?

25       A.   I could have stopped, hit my lights,

M. Adams - Redirect by Mr. Chernosky

1    pounded on his window, say roll your window

2    down, he may have objected and I would have to

3    tell him why, we had a shooting or something to

4    that effect.  However there was no description

5    of a suspect at that moment.  There may not be

6    any suspect because we get shots fired and an

7    area cleared and no suspect.  What I did was

8    not unusual.  I had nothing -- that's the way

9    we describe it in police work -- we had nothing

10   at that moment except a gentleman getting in a

11   car.

12        Q.  Do you get a bonus for solving cases?

13        A.  No.

14        Q.  Now, you took down the license plate

15   information.  You just told the jury about

16   seeing this gentleman.  When you turned that

17   corner in the backyard and saw the victims

18   laying on the porch, were you thinking about

19   the person that you just saw getting in the

20   white car?

21        A.  Not really.

22             MR. CHERNOSKY:  No further

23   questions.

24             MR. McKINNEY:  Briefly, recross,

25   Your Honor.

M. Adams - Recross by Mr. McKinney

1              THE COURT:  All right.

2                    -----

3              RECROSS-EXAMINATION

4                    -----

5    BY MR. McKINNEY:

6        Q.  Detective Adams, when you responded to

7    the house and you see the carnage that is

8    inside, were you privy to any conversations

9    with any of the other detectives there about

10   any possible suspects in this case?

11       A.  No.

12       Q.  So no one in that house investigating

13   this mass murder had any leads; is that

14   correct?

15       A.  I don't know.

16       Q.  As far as you know?

17       A.  As far as I know, no.  I don't know.  I

18   don't know.

19       Q.  So the only information as far as you

20   know that anyone had about any suspects

21   possibly involved was the information that you

22   had and that you provided to the detective,

23   correct?

24       A.  At that moment I believe that would be

25   correct.

M. Adams - Recross by Mr. McKinney

1      Q.  Do you remember what time you gave that

2    information to the detective?  I know the

3    shooting happened at 11:00, what time did you

4    provide it?

5      A.  It was quite a bit later.  Maybe an

6    hour.  I'm not exactly sure.  But while we were

7    still -- while I was still in the rear yard and

8    the county police were on scene, it just dawned

9    on me, I said, hey, I have a plate that may be

10   helpful.  I said would you like to have it?

11     Q.  Did the detective take that information

12   and say thank you, Detective Adams, we're going

13   to follow-up on that immediately?

14     A.  No, I don't remember that.  He just

15   said, yeah, we'll take it, something to that

16   effect.  I said do you want it?  He said, yes,

17   we'll take it, something to that effect.

18            MR. McKINNEY:  No additional

19   questions.

20            THE COURT:  Thank you, Detective

21   Adams.  You are excused.  Call your next

22   witness.

23

24

25

T. Dolfi - Direct by Mr. Chernosky

```
 1                        -----
 2                   TODD DOLFI,
 3      a witness herein, having been first duly sworn,
 4      was examined and testified as follows:
 5                        -----
 6                 DIRECT EXAMINATION
 7                        -----
 8      BY MR. CHERNOSKY:
 9          Q.   Detective Dolfi, state and spell your
10      name for the court reporter.
11          A.   Todd Dolfi, D-O-L-F-I.
12          Q.   I apologize, Sergeant Dolfi.  How are
13      you currently employed?
14          A.   Sergeant with the Allegheny County
15      Police Department.
16          Q.   How long have you been employed with
17      the Allegheny County Police?
18          A.   I've been a police officer for
19      16 years, the past 13 with Allegheny County.
20          Q.   Prior to assuming employment with the
21      Allegheny County Police, where did you work?
22          A.   I worked for the Metropolitan Police
23      Department in Washington, D.C.
24          Q.   You introduced yourself as sergeant,
25      where are you assigned?
```

T. Dolfi - Direct by Mr. Chernosky

1      A.   Currently assigned as sergeant in the
2   general investigations section.
3      Q.   In March of 2013 where were you
4   assigned?
5      A.   2013?
6      Q.   2016, I apologize.
7      A.   2016 I was assigned as detective in the
8   homicide unit.
9      Q.   Were you assigned to investigate a
10   shooting that occurred with multiple victims at
11   1304 Franklin in the Borough of Wilkinsburg?
12      A.   Yes, I was.
13      Q.   How does your department generally get
14   notified when your assistance is needed?
15      A.   Generally speaking, the local
16   municipality will ask for our assistance
17   through the 911 center.
18      Q.   How did you get notified about this
19   particular incident?
20      A.   This incident on this date, detectives
21   from the homicide unit were actually in the
22   Braddock area investigating a previous homicide
23   case when we overheard a call on the radio for
24   Wilkinsburg asking for assistance.
25      Q.   What did you do in response to that

T. Dolfi - Direct by Mr. Chernosky

1   call?

2       A.   My partner and I responded from

3   Braddock to the Wilkinsburg area.

4       Q.   How long did it take from the time that

5   you were notified or became aware that your

6   assistance was needed until you got on scene in

7   Wilkinsburg?

8       A.   I would say approximately ten minutes.

9       Q.   What happens when you get on scene?

10  Who do you meet first?

11      A.   I can't remember exactly who, which

12  police officer I met first.  When we arrived on

13  scene, it was a chaotic scene.  There was lots

14  of police and medics on scene already.  We had

15  to park a block or two away.  We made our way

16  up to the house and eventually met up with the

17  Wilkinsburg police officers.

18      Q.   Could you describe the house that is

19  located at 1304 Franklin?

20      A.   The house I would describe as a

21  two-and-a-half story single family dwelling,

22  front porch.  I would like to say your typical

23  Wilkinsburg house, they are close in proximity

24  together, not spaced far apart between the

25  neighboring houses.

T. Dolfi - Direct by Mr. Chernosky

1      Q.   How many other detectives responded

2  with you at 1304 Franklin?

3      A.   Detective Foley and I came together in

4  the same vehicle.  I believe two other

5  detectives as well in separate cars.

6      Q.   During the course of your time there,

7  did you assume responsibilities for processing

8  the scene?

9      A.   Yes, I did.

10      Q.   Could you tell the jury in general

11  terms what it means to process a scene?

12      A.   Scene processing or crime scene

13  processing, I was assigned with the mobile

14  crime unit basically to document what we had,

15  photographic evidence, collection of evidence

16  is what I was detailed to do.

17      Q.   Generally, how does that process

18  happen?

19      A.   We have a scientist that responds from

20  the Allegheny County Medical Examiner's Office

21  who was trained as well in crime scene

22  processing and photographs.  They work in

23  conjunction with the detective that is

24  processing the scene and collecting evidence

25  and documents it at the scene as we see it.

T. Dolfi - Direct by Mr. Chernosky

1    Q.   When you get on the scene, are there

2    any individual pieces of evidence that have

3    been marked already?

4    A.   I believe there was, yes.

5    Q.   Have you experienced that in the past?

6    A.   Yes, it is common for the local police

7    department, while they are waiting for our

8    arrival, to mark pieces of evidence so they can

9    keep track of it until we get there.

10    Q.   In terms of this particular scene, was

11    it divided at all?  Did you, for processing

12    purposes, divide it?

13    A.   Yes, we did.

14    Q.   Generally speaking, was there an

15    interior scene and an exterior scene?

16    A.   Yes.  This crime scene, that is a good

17    way to describe it, there were items of

18    evidence outside of the house as well as inside

19    of the house.

20    Q.   I show you what I'll mark as

21    Commonwealth Exhibits 16 through 24.  I ask

22    you, first, what is depicted in Commonwealth

23    Exhibit 16?

24    A.   I would describe this as an aerial or

25    bird's eye view of 1304 Franklin from satellite

T. Dolfi - Direct by Mr. Chernosky

1    imagery.

2        Q.  With respect to Commonwealth

3    Exhibits 17 through 24, do those accurately

4    reflect pictures of 1304 Franklin the night you

5    responded?

6        A.  Yes, it does.

7                MR. CHERNOSKY:  I move for the

8    admission of 13 through 24.

9                THE COURT:  Admitted without

10   objection.

11       Q.  With respect to Exhibit 14, what are we

12   looking at here?  I'm sorry, I'm screwing this

13   up.  16 and 17?

14       A.  17?

15       Q.  17 is up on the screen behind you.

16       A.  Yes, that is a picture of the front of

17   1304 Franklin Avenue.

18       Q.  With respect to Commonwealth

19   Exhibit 18?

20       A.  Appears to be a closer picture of the

21   front of 1304 Franklin.

22       Q.  Commonwealth Exhibit 19?

23       A.  That is a picture of the front porch of

24   1304 Franklin.

25       Q.  What is depicted at the bottom of

T. Dolfi - Direct by Mr. Chernosky

1    Exhibit 19?

2         A.   What appears to be some blood.

3         Q.   Commonwealth Exhibit 20?

4         A.   That is a picture looking down the

5    sidewalk that separates 1304 and 1306 Franklin.

6         Q.   Exhibit 21?

7         A.   That is a close-up of the same picture.

8         Q.   22?

9         A.   Also moving down that sidewalk in

10   between 1304 and 1306 towards the backyard.

11        Q.   What are those yellow things with

12   numbers on them that we see there?

13        A.   They are evidence markers.

14        Q.   What is the purpose of evidence

15   markers?

16        A.   To mark and track items of evidence or

17   items of importance.

18        Q.   The two that are the closest in camera

19   view of Commonwealth 21, what are those?

20        A.   Items 24 and 25 that are marked with

21   the yellow?

22        Q.   Yes.

23        A.   They appear to be -- it is hard to tell

24   from this picture what they are marking but

25   they are evidence markers.

T. Dolfi - Direct by Mr. Chernosky

1      Q.   With respect to Commonwealth

2   Exhibit 23?

3      A.   Also a picture almost of the backyard

4   between 1304 and 1306 Franklin Avenue

5   displaying evidence markers.

6      Q.   Commonwealth Exhibit 25 -- sorry, 24?

7      A.   Another picture just about to enter the

8   backyard on the sidewalk in between 1304 and

9   1306 Franklin.

10      Q.   To the top center of Exhibit 24, what

11   is depicted there?

12      A.   The top center of the picture by the

13   gate on the ground, is that what you're

14   referring to?

15      Q.   Yes, the yellow placards that are

16   depicted there?

17      A.   Those are marking spent casings.

18      Q.   Now, during the processing of the

19   scene, would you also make or have the crime

20   lab make a scene diagram?

21      A.   Yes.

22      Q.   Let me show you what I'll mark as

23   Commonwealth Exhibit 25 and Commonwealth

24   Exhibit 26.  I ask you what is depicted in

25   Commonwealth Exhibits 25 and 26?

T. Dolfi - Direct by Mr. Chernosky

1      A.  25 and 26 are diagrams made by the

2  Allegheny County Medical Examiner's Office of

3  the rear of 1304 Franklin Avenue.

4      Q.  Is there a difference between

5  Commonwealth Exhibit 25 and 26?

6      A.  Yes, there is.

7      Q.  What is that difference?

8      A.  Exhibit 25 contains evidence markers

9  listed on the diagram where Item 26 does not.

10             MR. CHERNOSKY:  I move for the

11  admission of Commonwealth Exhibits 25 and 26.

12             THE COURT:  Admitted without

13  objection.

14      Q.  With respect to Commonwealth

15  Exhibit 25 --

16      A.  I believe that is 26.

17      Q.  I'm sorry, 26.  When you are processing

18  the scene, are there deceased individuals still

19  on scene?

20      A.  Yes, there are.

21      Q.  Could you tell the jury the location on

22  Commonwealth's Exhibit 26 of the deceased

23  individuals?

24      A.  Yes.  On Item 26, the deceased victims

25  are labeled.  They are on the back porch and

T. Dolfi - Direct by Mr. Chernosky

1    they are labeled as victim one, victim two,

2    victim three, and victim four.

3        Q.  Is there a key on Commonwealth

4    Exhibit 26 that tells you who the victims are?

5        A.  Correct.

6        Q.  With respect to victim number one,

7    where is that located?

8        A.  Victim one is identified as Chanetta

9    Powell located on the rear porch of 1304

10   Franklin Avenue.

11       Q.  Victim two?

12       A.  Victim two is Brittany Powell on the

13   rear porch of 1304 Franklin Avenue.

14       Q.  With respect to victim three?

15       A.  Victim three is Tina Shelton also on

16   the rear porch of 1304 Franklin.

17       Q.  And victim number four?

18       A.  Victim four is Jerry Shelton also

19   located on the rear porch of 1304 Franklin.

20       Q.  I show you Commonwealth Exhibits 27,

21   28, 29, 30, 31, 32, and 33.  I ask if that

22   fairly and accurately represents the

23   positioning of the victims as you were

24   processing the scene that night?

25       A.  Yes, it does.

T. Dolfi - Direct by Mr. Chernosky

1           MR. CHERNOSKY:  Your Honor, I
2    move for the admission of Commonwealth Exhibits
3    27 through 33.
4           THE COURT:  They are admitted
5    without objection.
6      Q.  Detective, did you find any evidence of
7    shell casings that night at the scene?
8      A.  We did.
9      Q.  Could you tell the jury, at least in
10   general terms, where the primary areas that you
11   found shell casings were?
12     A.  Yes.  There were two areas that we
13   located spent shell casings.  The first of
14   those areas being in the rear yard of 1306
15   Franklin Avenue along the fence line close to
16   1304.  The second location was in the rear
17   alley behind 1304 Franklin.
18     Q.  Was there a division between 1304 and
19   1306?
20     A.  Yes, there was.
21     Q.  Could you describe what that looked
22   like when you came on scene?
23     A.  As you came to the rear, as you came
24   down the sidewalk between 1304 and 1306
25   Franklin, as you got to the backyard, there was

T. Dolfi - Direct by Mr. Chernosky

 1    a chain-link gate that was opened.  To the left

 2    of there, separating 1304 and 1306, was a small

 3    area of chain-link fence that continued by a

 4    taller wooden fence that ran down between the

 5    two yards.

 6         Q.   While you were on scene, did you

 7    observe that wooden fence?

 8         A.   Yes.

 9         Q.   Do you recall if it had any blood on

10    it?

11         A.   I believe it did.

12         Q.   I show you what I'll mark as

13    Commonwealth Exhibits 34, 35, 36, 37, 38, and

14    39.  First, I will ask you with respect to

15    Exhibit 34, what is depicted in that exhibit?

16         A.   Just so I'm clear, there are no numbers

17    on the back of these.

18         Q.   I apologize.  With respect to

19    Commonwealth Exhibits 34 through 39, could you

20    tell us generally what is depicted in those?

21         A.   Yes.  Pictures 34 and 35 appear to be a

22    picture of the wooden fence and chain-link

23    fence looking from 1304 toward 1306.  36

24    through 39 are pictures of the rear alley

25    behind 1304 and 1306.

T. Dolfi - Direct by Mr. Chernosky

1            MR. CHERNOSKY:  I move for the

2    admission of 36 through 39.

3            THE COURT:  Admitted without

4    objection.

5        Q.  With respect to Commonwealth

6    Exhibit 34, could you use the laser pointer and

7    show the jury where the shell casings are?

8        A.  They are in the area marked by the

9    evidence markers on the other side of the

10   fence.

11       Q.  Where is the wooden fence?

12       A.  It begins here.

13       Q.  Commonwealth Exhibit 34, is that also

14   the stockade fence?  Is that the stockade fence

15   from Exhibit 34?

16       A.  Yes, a different angle of photograph.

17       Q.  With respect to photograph 36, could

18   you show the jury where the shell casings are

19   in Exhibit 36?

20       A.  Yes, they are marked in this area with

21   the yellow evidence markers.

22       Q.  With respect to shell casings depicted

23   in this exhibit, the shell casings in an

24   earlier exhibit, are they of different caliber?

25       A.  Yes, they were.

T. Dolfi - Direct by Mr. Chernosky

1       Q.   Could you tell what caliber are here?

2       A.   I believe these are .40-caliber.

3       Q.   Do you recall what caliber were present

4    in the other exhibits?

5       A.   Those were 7.62 by 39.

6       Q.   Exhibit 34, what type of casings were

7    found there?

8       A.   Rifle casings 7.62 by 39.

9       Q.   And with respect to Exhibit 39, is this

10   a closer-up photograph of .40-caliber shell

11   casings?

12      A.   That's correct.

13      Q.   During the processing of the scene, was

14   it brought to your attention and did you direct

15   that a photograph be taken of a boot print in

16   the backyard?

17      A.   Yes.

18      Q.   I show you what I will mark as

19   Commonwealth Exhibit 40.  I ask you what is

20   depicted in Commonwealth Exhibit 40?

21      A.   That is a picture of the boot print,

22   close-up picture.

23           MR. CHERNOSKY:  I move for the

24   admission of Commonwealth Exhibit 40.

25           MR. McKINNEY:  No objection.

T. Dolfi - Direct by Mr. Chernosky

1                    THE COURT:  Admitted without

2       objection.

3            Q.  During your processing of the scene,

4       did the location of the respective shells lead

5       you to believe that shots were fired from

6       different locations?

7            A.  That's correct.

8            Q.  Was one of those locations the backyard

9       of 1306 Franklin Avenue?

10           A.  Yes.

11           Q.  I show you what I'll mark as

12      Commonwealth Exhibits 41 through 46.  I ask you

13      if those photographs depict the rear yard of

14      1306 Franklin Avenue?

15           A.  Yes, they do.

16                   MR. CHERNOSKY:  Your Honor, I

17      move for the admission of 41 through 46.

18                   MR. McKINNEY:  Your Honor, if I

19      could see those briefly?

20                   THE COURT:  Okay.

21                   MR. McKINNEY:  No objection, Your

22      Honor.

23                   THE COURT:  They are admitted

24      without objection.

25           Q.  Directing your attention to

T. Dolfi - Direct by Mr. Chernosky

1    Commonwealth Exhibit 41, what are we looking at

2    here?

3        A.   41 is a picture of the rear of 1306

4    Franklin.

5        Q.   To the left of Commonwealth Exhibit 41,

6    is that the stockade fencing that you referred

7    to earlier?

8        A.   Yes, it is.

9        Q.   With respect to Commonwealth Exhibit

10   42, what is depicted in Commonwealth Exhibit

11   42?

12       A.   This picture is a picture from the rear

13   of 1306 Franklin Avenue looking at 1304

14   Franklin with evidence markers in the center.

15       Q.   Commonwealth Exhibit 43?

16       A.   Also a picture from the rear of 1306

17   Franklin looking towards 1304 Franklin with the

18   evidence markers.

19       Q.   From this exhibit, Commonwealth

20   Exhibit 44, can you see the rear porch of 1304

21   Franklin?

22       A.   Yes, you can.

23       Q.   Could you take the laser pointer and

24   point to us where that is?

25       A.   This is the rear porch of 1304

T. Dolfi - Direct by Mr. Chernosky

1    Franklin.

2        Q.   With respect to Commonwealth Exhibit

3    45, what is a depicted in Commonwealth Exhibit

4    45?

5        A.   That is a close-up photograph of the

6    evidence markers in the rear yard of 1306

7    Franklin Avenue.

8        Q.   46?

9        A.   Again, a close-up photograph of the

10    evidence markers in the rear of 1306 looking

11    toward 1304 Franklin.

12        Q.   I show you what I marked as

13    Commonwealth Exhibits 47 through 52.  Do those

14    exhibits depict other close-ups of the placards

15    that you did in the processing of the backyard

16    of 1304?

17        A.   Yes.

18            MR. CHERNOSKY:  I move to admit

19    Commonwealth Exhibits 47 through 52.

20            THE COURT:  Admitted without

21    objection.

22        Q.   Commonwealth Exhibit 48, what is the

23    placard listed in Commonwealth Exhibit 48?

24        A.   Spent shell casings.

25        Q.   What about Exhibit 49?

T. Dolfi - Direct by Mr. Chernosky

1      A.   That is a photograph of the rear porch

2   of 1304 looking from the rear yard of 1306

3   Franklin Avenue.

4      Q.   Commonwealth Exhibit 50.

5      A.   A closer photograph of the rear porch

6   of 1304 looking from 1306 Franklin.

7      Q.   In Commonwealth Exhibit 50, can you see

8   any ballistic damage or --

9      A.   Yes.

10      Q.   Could you use the laser pointer?

11      A.   Yes, there is ballistic damage located

12   on the railing of the porch and ballistic

13   damage on the rear wall of the porch.

14      Q.   Commonwealth Exhibit 51, do you also

15   see that same damage?

16      A.   Yes, you can.

17      Q.   Commonwealth Exhibit 52.

18      A.   Another photograph, a closer photograph

19   of those previous depictions.

20      Q.   While you were on scene, did you

21   personally observe any blood -- I'm sorry,

22   suspected blood or tissue or bone?

23      A.   Yes.

24      Q.   Where was it located, if you remember?

25      A.   It was in numerous locations throughout

T. Dolfi - Direct by Mr. Chernosky

1    the scene.

2        Q.  I show you what I'll mark as

3    Commonwealth Exhibits 53, 54, 55, and 56.

4                THE COURT:  53 through 56?

5                MR. CHERNOSKY:  Yes, Your Honor.

6                THE COURT:  Admitted without

7    objection.

8        Q.  I ask you if that depicts some of the

9    blood and tissue that you just described

10    observing?

11        A.  Yes, it does.

12        Q.  With respect to Commonwealth Exhibit

13    53, what is depicted in 53?

14        A.  53, there is some suspected tissue and

15    body matter.

16        Q.  54?

17        A.  A close-up picture of the suspected

18    tissue and body matter.

19        Q.  55?

20        A.  Also depicts suspected blood and tissue

21    matter on the wood.

22        Q.  Could you use the laser pointer and

23    point out where that is at?

24        A.  Yes, all these areas.

25        Q.  56?

T. Dolfi - Direct by Mr. Chernosky

1      A.   A close-up of the suspected body

2   matter.

3      Q.   When you said the rear yard of 1306,

4   this is the 7.62 shell casing?

5      A.   That's correct.

6      Q.   I show you what I marked as

7   Commonwealth Exhibit 57.  I ask what is

8   depicted in Commonwealth Exhibit 57?

9      A.   57 is a picture of the 7.62 by 39 spent

10   casings, some of them.

11             THE COURT:  While he is marking

12   those exhibits, explain the difference to the

13   jury between a casing and a bullet.

14             THE WITNESS:  I'm not a firearms

15   expert but a quick explanation of a bullet and

16   a casing is a casing is what is left over or

17   ejected from the weapon after the bullet is

18   fired out the barrel of the weapon.

19      Q.   I show you what I'll mark as

20   Commonwealth Exhibits 58 through 77 directing

21   your attention to the rear of 1304.  Do you

22   know how many total .40-caliber casings were

23   marked in the rear of 1304?

24      A.   I believe there were nine.

25      Q.   I'll ask you generally if this depicts

T. Dolfi - Direct by Mr. Chernosky

1    the area where the .40-caliber casings were

2    recovered?

3        A.  Yes, it does.

4        Q.  Do Commonwealth Exhibits 58 through 77

5    depict both wide angles and close-ups of those

6    .40-caliber casings?

7        A.  Yes, they do.

8                MR. CHERNOSKY:  I move for the

9    admission of Commonwealth's 58 through 77.

10               THE COURT:  Admitted without

11   objection.

12       Q.  With respect to Commonwealth

13   Exhibit 58, generally speaking, Commonwealth

14   Exhibit 58, what is depicted or where are the

15   shell casings?

16       A.  In the rear alley between 1304

17   Franklin.

18       Q.  With respect to Commonwealth

19   Exhibit 58, fair to say they are at the left

20   side of the picture?

21       A.  Correct.

22       Q.  Commonwealth Exhibit 59?

23       A.  Yes, also depicting markings of the

24   .40-caliber casings in the rear of 1304

25   Franklin.

T. Dolfi - Direct by Mr. Chernosky

1     Q.   Did you direct close-ups of the

2     individual shell casings that are denoted at

3     those placards?

4     A.   Yes.

5     Q.   With respect to Commonwealth Exhibit

6     60, is that a close-up?

7     A.   Yes, it is.

8     Q.   61?

9     A.   Correct, a close-up of a spent casing.

10    Q.   62, is this a wide angle depicting some

11    of the shell casings?

12    A.   Correct.

13    Q.   63, is that a close-up?

14    A.   Yes, it is.

15    Q.   64, is that a close-up?

16    A.   Correct.

17    Q.   65, is that a close-up?

18    A.   Yes, it is.

19    Q.   66, is that a close-up?

20    A.   Yes.

21    Q.   70, is that a close-up?  I'm sorry, 67

22    is that a close-up?

23    A.   Correct.

24    Q.   68, is that a close-up?

25    A.   Yes.

T. Dolfi - Direct by Mr. Chernosky

1          Q.   69, is that a wide angle?

2          A.   Yes, it is.

3          Q.   70, is that a close-up containing two?

4          A.   Yes.

5          Q.   71, is that a close-up containing two

6     shells?

7          A.   Yes.

8          Q.   72, is that a close-up?

9          A.   Yes.

10         Q.   73, is that a close-up?

11         A.   Yes.

12         Q.   74, is that also a close-up?

13         A.   Yes.

14         Q.   75, is that a close-up containing two

15    shell casings?

16         A.   Yes, it is.

17         Q.   76, is that a close-up containing two

18    shell casings?

19         A.   Yes.

20         Q.   77, is that also a close-up?

21         A.   Yes, it is.

22         Q.   I show you what I'll mark as

23    Commonwealth Exhibit 78 and ask you if that is

24    a close-up of a shell casing?

25         A.   Yes, it is.

T. Dolfi - Direct by Mr. Chernosky

1    Q.  Directing your attention to what is

2    marked at the scene as placard S, I'll show you

3    what has been marked as Commonwealth Exhibit

4    79.  What is depicted at placard letter S?

5    A.  S depicts, it looks like a hair weave.

6    Q.  Did you direct that that be

7    photographed and collected as evidence?

8    A.  Yes.

9             MR. CHERNOSKY:  I move for the

10   admission of Commonwealth Exhibit 79.

11            THE COURT:  Admitted without

12   objection.

13   Q.  Did the general location of the

14   .40-caliber shell casings lead you to believe

15   that the person using that weapon fired from

16   the rear yard of 1304 in the alley?

17   A.  That is correct.

18   Q.  I show you what I'll mark as

19   Commonwealth Exhibits 80 and 81.  Do these

20   exhibits accurately reflect the vantage point

21   from the rear yard of 1306 to the rear yard of

22   1304 Franklin?

23   A.  Yes, they do.

24            MR. CHERNOSKY:  I move for

25   Commonwealth 80 and 81.

T. Dolfi - Direct by Mr. Chernosky

1          THE COURT:  Admitted without

2    objection.

3          Q.  Moving to the rear yard itself, as you

4    were there, did you observe any signs that

5    there was, for lack of a better word, a party

6    or gathering going on?

7          A.  Yes.

8          Q.  Could you tell the jury generally what

9    the backyard looked like?

10         A.  The backyard looked as depicted by the

11   photograph.  There was a grill in the yard.

12   There was a wooden table that contained

13   alcoholic beverages, chairs, and I believe a

14   radio.

15         Q.  I show you a series of photos that I

16   marked as Commonwealth Exhibit 88 -- I'm sorry,

17   82 through 88.  I will ask you first do these

18   accurately depict the backyard as you viewed it

19   that night?

20         A.  Yes, it does.

21              MR. CHERNOSKY:  I move for the

22   admission of Commonwealth 82 through 88.

23              THE COURT:  Admitted without

24   objection.

25         Q.  First, with respect to Commonwealth's

T. Dolfi - Direct by Mr. Chernosky

1    82 and 83 and 84, are those, generally

2    speaking, the sort of signs of a gathering that

3    you discussed?

4         A.   Yes.

5         Q.   With respect to Commonwealth Exhibit

6    85, what is depicted in Commonwealth Exhibit

7    85?

8         A.   85 depicts the rear of 1304 Franklin.

9    You can see chairs, the grill, the table.

10        Q.   Commonwealth Exhibit 86?

11        A.   Close-up photograph of the grill and

12   wooden table and porch.

13        Q.   87?

14        A.   Looking towards 1306 Franklin, the rear

15   yard of 1304.

16        Q.   88?

17        A.   The photograph of the wooden table and

18   part of the back porch of 1304 Franklin.

19        Q.   Do you recall that night if you were

20   able to recover any bullet or bullet fragments

21   from the scene?

22        A.   Yes, we were.

23        Q.   With respect to the porch and porch

24   railing that we already touched on, did you

25   observe bullet damage to that?

T. Dolfi - Direct by Mr. Chernosky

1      A.  Yes, I did.

2      Q.  I'm going to show you what I marked as

3  Commonwealth Exhibits 89 through 96.  First,

4  with respect to Commonwealth Exhibit 89, what

5  is depicted in Commonwealth Exhibit 89?

6      A.  89 appears to be a projectile.

7      Q.  Then with respect to Commonwealth

8  Exhibits 90 through 96, what is depicted

9  through those exhibits?

10      A.  90 through 96 are pictures of the rear

11  of 1304 Franklin to depict the porch.

12              MR. CHERNOSKY:  I move to admit

13  90 through 96.

14              THE COURT:  They are admitted

15  without objection.

16      Q.  What is depicted in Commonwealth

17  Exhibit 90?

18      A.  That is a table of food and a radio in

19  the rear yard of 1304 Franklin.

20      Q.  And Exhibit 91?

21      A.  That is from the sidewalk between 1306

22  and 1304 looking at the rear porch of 1304

23  Franklin.

24      Q.  Commonwealth Exhibit 92?

25      A.  Also on that sidewalk between 1304 and

T. Dolfi - Direct by Mr. Chernosky

1    1306 looking at the back porch of 1304

2    Franklin.

3        Q.   Did you observe any bullet damage to

4    the handrail at 1304?

5        A.   Yes, I did.

6        Q.   Could you use the laser pointer?

7        A.   Ballistic damage is located in this

8    area.

9        Q.   Commonwealth Exhibit 93, is that a

10   similar picture of that handrail?

11       A.   Correct, it appears to be slightly

12   closer.

13       Q.   Commonwealth Exhibit 94?

14       A.   A picture in the rear door of 1304

15   Franklin.

16       Q.   And Commonwealth Exhibit 95?

17       A.   Looking from the rear porch of 1304

18   Franklin to 1306 Franklin.

19       Q.   Commonwealth Exhibit 96?

20       A.   A picture looking in the rear yard of

21   1306 from 1304.

22       Q.   Now, directing your attention to the

23   interior lower level of the house, do you

24   recall the approximate layout of the house?

25       A.   I do.

T. Dolfi - Direct by Mr. Chernosky

1    Q.  Could you tell the jury approximately

2    how the house was laid out?

3    A.  If you entered 1304 Franklin from the

4    front porch into the front door, you entered

5    into a living room, a small foyer, living room

6    on the right.  As you work your way from the

7    living room to the dining room, as you continue

8    left from the dining room, you enter the

9    kitchen of the residence.  Off of the kitchen

10   was a bathroom and a rear door going to the

11   back porch off the kitchen.

12   Q.  I show you what I'll mark as

13   Commonwealth Exhibit 97 and ask you if this is

14   an accurate diagram of the lower level of 1304

15   Franklin Avenue?

16   A.  Yes, it is.

17            MR. CHERNOSKY:  I move for the

18   admission of Commonwealth Exhibit 96.

19            THE COURT:  Admitted without

20   objection.

21   Q.  Could you tell the jury using the laser

22   pointer where the front of Franklin is, the

23   porch that we've been discussing?

24   A.  The front is right here.  The exterior

25   rear porch is right here.

T. Dolfi - Direct by Mr. Chernosky

1    Q.  During your time on scene, were you

2    able to observe any bullets, bullet fragments,

3    or ballistic damage on the lower level of 1304

4    Franklin?

5    A.  Yes, I was.

6    Q.  I show you what I'll mark as

7    Commonwealth Exhibits 98 through 103.  I ask

8    you if they reflect the lower level of 1304,

9    some of the ballistic damage that you observed?

10    A.  Yes, it does.

11            MR. CHERNOSKY:  Your Honor, I

12    move for the admission of Commonwealth

13    Exhibits 98 through 103.

14            THE COURT:  Admitted without

15    objection.

16    Q.  With respect to Commonwealth

17    Exhibit 98, what are we looking at here?

18    A.  98 appears to be a close-up view of the

19    rear of the door from the porch to the kitchen

20    of 1304 Franklin.

21    Q.  Do you see any bullet damage to that

22    door?

23    A.  Yes.

24    Q.  Could you indicate with the laser

25    pointer where that is?

T. Dolfi - Direct by Mr. Chernosky

1    A.   There appears to be damage here and the
2    rear part of the door appears to be missing.
3    Q.   With respect to Commonwealth
4    Exhibit 98, what room are we looking at here?
5    A.   That is a picture from the front porch
6    into the small foyer or living room of 1304
7    Franklin.
8    Q.   Commonwealth Exhibit 100?
9    A.   A picture of the living room of 1304
10   Franklin.
11   Q.   Commonwealth Exhibit 101?
12   A.   Also a picture of the living room, the
13   carpet area of 1304 Franklin.
14   Q.   Commonwealth Exhibit 102?
15   A.   A picture in the dining room looking
16   toward the living room of 1304 Franklin.
17   Q.   Commonwealth Exhibit 103?
18   A.   That appears to be a picture from the
19   dining room looking into the kitchen depicting
20   ballistic damage on the wall.
21   Q.   Could you point out where the ballistic
22   damage is?
23   A.   Here.
24   Q.   During your processing of the scene, at
25   least the interior level, was victim, Jerry

T. Dolfi - Direct by Mr. Chernosky

1    Shelton, still present on scene?

2        A.   Yes, he was.

3        Q.   Where was he located?

4        A.   He was located basically in the doorway

5    from the back porch into the kitchen of 1304

6    Franklin.

7        Q.   Were you able, during your processing

8    of the scene, the interior scene, to observe

9    both blood and/or tissue in the interior of

10   1304 Franklin?

11       A.   Yes, we were.

12       Q.   I'm going to show you Commonwealth

13   Exhibits 104, 105, 106, and 107.  I ask you if

14   those exhibits depict the blood, tissue, and

15   victim, Jerry Shelton, as he was when you

16   processed the scene?

17       A.   Yes, it does.

18               MR. CHERNOSKY:  I ask to admit

19   104 through 107.

20               THE COURT:  Admitted without

21   objection.

22       Q.   What is depicted in 104?

23       A.   104 is a close-up of suspected blood

24   and tissue matter and some hair in the carpet.

25       Q.   With respect to Commonwealth

T. Dolfi - Direct by Mr. Chernosky

1    Exhibit 105?

2        A.    This is a picture of the kitchen of

3    1304 Franklin Avenue.  You can observe the rear

4    door and bathroom.

5        Q.    In this exhibit, can you see Jerry

6    Shelton?

7        A.    Yes, you can.

8        Q.    Where is he located?

9        A.    Located just on the floor, just inside

10   the rear door of 1304 Franklin.

11       Q.    With respect to Commonwealth's

12   Exhibit 106, is it fair to say that this is a

13   further back view of the same kitchen?

14       A.    Correct.

15       Q.    107, is that a close-up of Jerry

16   Shelton?

17       A.    Yes, it is.

18       Q.    I show you what I'll mark as

19   Commonwealth Exhibits 108 through 115.  I ask

20   if that depicts the bullet damage that you were

21   able to observe in the lower level kitchen area

22   of 1304 Franklin Avenue?

23       A.    Yes.

24             MR. CHERNOSKY:  I move for

25   admission of Commonwealth 108 through 115.

T. Dolfi - Direct by Mr. Chernosky

 1          THE COURT:  Admitted without

 2     objection.

 3          Q.  First, with respect to Commonwealth

 4     Exhibit 108, what is depicted in 108?

 5          A.  That picture is from the kitchen

 6     looking into dining room and looking at the

 7     ballistic damage on the wall.

 8          Q.  109?

 9          A.  Close-up of ballistic damage in the

10     dining room.

11          Q.  110?

12          A.  Picture from the kitchen into the

13     dining room, the ballistic damage in the wall.

14          Q.  111?

15          A.  Picture from the kitchen to the

16     bathroom door, damage on the bathroom door and

17     toilet.

18          Q.  112?

19          A.  Close-up of damage to the bathroom

20     door.

21          Q.  113?

22          A.  Picture of damage to the toilet.

23          Q.  In Commonwealth Exhibit 113, where does

24     the window depicted at the top of 113 look out

25     into?

T. Dolfi - Direct by Mr. Chernosky

1        A.   Into the rear yard of 1304 Franklin.

2        Q.   To the left of Commonwealth

3   Exhibit 113, that wall, what is on the other

4   side of it?

5        A.   This wall behind the toilet is the wall

6   to the rear porch.

7        Q.   With respect to Commonwealth

8   Exhibit 114?

9        A.   Different angle of the toilet and

10  restroom.

11       Q.   With respect to Commonwealth

12  Exhibit 115, what is depicted in -- I'll show

13  you what I will mark as Commonwealth 116.  What

14  is depicted in Commonwealth 116?

15       A.   A picture of the wall between the

16  bathroom and rear porch wall.

17              MR. CHERNOSKY:  I move for the

18  admission of 116.

19              THE COURT:  Admitted without

20  objection.

21       Q.   Based on your observations of the

22  bathroom and exterior wall during the

23  processing of the scene, did you have any

24  suspicion of what caused the damage in that

25  bathroom?

T. Dolfi - Direct by Mr. Chernosky

1        A.   Yes.

2        Q.   What was that?

3        A.   That was projectiles entering the

4    bathroom from the wall separating the rear

5    porch and the bathroom.

6                 MR. CHERNOSKY:  Your Honor, may

7    we approach?

8                 THE COURT:  How much more do you

9    have of this?

10                MR. CHERNOSKY:  The Commonwealth

11   has approximately 80 pictures left.

12                THE COURT:  Remain seated and

13   quiet while the jury leaves the room.  Tomorrow

14   morning report no later than 9:00.  I remind

15   you not to talk with each other, family

16   members, anybody, about the case and certainly

17   avoid any newscasts and media coverage of the

18   matter.  Thank you.

19                        -----

20                (Open court - Jury not present.)

21                        -----

22                THE COURT:  What was the sidebar?

23                MR. CHERNOSKY:  The approach was

24   to ask if we could take a break.

25                MS. PELLEGRINI:  To let you know

Motion

```
 1    how much more pictures we had.
 2                  THE COURT:  All right.
 3                  (Court adjourned for the day.)
 4                        -----
 5                  (Tuesday, February 4, 2020 - Open
 6    court - Jury not present.)
 7                        -----
 8                  THE COURT:  Is there a
 9    preliminary matter?
10                  MS. WILLIAMS:  Yes, Your Honor,
11    there is.  Can we do it at sidebar?
12                  (Sidebar discussion held as
13    follows.)
14                  MS. WILLIAMS:  Your Honor,
15    yesterday in the hearing before starting when
16    the Court dismissed or granted the habeas
17    against Robert Thomas, the Court made a comment
18    that was widely disseminated in the Press which
19    commented on "the evidence with regard to a
20    good circumstantial case against Shelton" which
21    we feel is highly prejudicial.
22                  THE COURT:  I didn't say it
23    against Shelton, I said it against Thomas.  I
24    said there is good circumstantial evidence
25    against Thomas.
```

Motion

1              MS. WILLIAMS:  It is recorded

2     that there is good circumstantial evidence

3     against Shelton.  I do not have the transcript.

4     I want to make a motion that the title of the

5     case under top stories was Judge Drops Case

6     Against Robert Thomas by Paula Reed Ward and

7     supplement the record with a copy of the

8     dissemination.  I do not have a subscription to

9     the Post-Gazette.  It was sent to me twice in

10    the headlines.

11             THE COURT:  Did you read the

12    content of the article?

13             MS. WILLIAMS:  I did.

14             THE COURT:  Did it say the Court

15    said a good circumstantial case against

16    Shelton?

17             MS. WILLIAMS:  Yes, left with

18    good circumstantial evidence against Shelton

19    the judge cited.  It talks about a gag order

20    prohibiting Attorney White remains in effect.

21    We are asking for a continuance and to dismiss

22    this jury again for the reason that after jury

23    selection, allowing Thomas to be dismissed, it

24    makes Mr. Shelton look guilty.  The jury would

25    speculate why didn't he get dismissed but on

Motion

 1    top of the Court's quote saying that it has

 2    been reported, whether the transcript says it

 3    or not, it was reported that the Commonwealth

 4    has good circumstantial evidence against

 5    Shelton.  The quote is devastating to

 6    Mr. Shelton and deprives him of a fair trial

 7    especially when counsel is prohibited against

 8    commenting on why or how Thomas was dismissed

 9    and the jury is not being told that Thomas was

10    dismissed for lack of evidence.  Because this

11    is a capital case and the Court denied the

12    other motions regarding these matters, we're

13    asking the Court to consider this and ask to

14    pick a new jury.  There is high scrutiny that

15    goes along with a death case and death penalty

16    portion of the case for those within reasons,

17    Thomas being dismissed and the jury speculating

18    on that, the quote in the record after while

19    counsel is still gagged.

20         "The Commonwealth has good

21    circumstantial evidence against Shelton," we

22    are asking that the death penalty portion of

23    the case be stricken by the Court and in the

24    event the Court made that quote, we would ask

25    for the Court's recusal because it gives the

Motion

1    impression that the Court has made his mind up

2    or is commenting on the Commonwealth's case as

3    being a good case against Shelton and shows

4    impartiality.

5                  THE COURT:  First of all, I

6    didn't say that they had a good case against

7    Shelton.  I didn't say that they had a good

8    case against Thomas.  I said they had good

9    circumstantial evidence that they relate

10   against Thomas but not enough for the case to

11   continue.  The record will reflect that.  I'm

12   certain of that.  Your motion is denied.

13                  MS. WILLIAMS:  The Court will

14   allow us to supplement the record with a copy

15   of what was actually reported?

16                      -----

17                  (Open court - Jury present.)

18                      -----

19                  THE COURT:  Thank you for

20   appearing in a timely fashion.  Detective

21   Dolfi, come up.

22

23

24

25

T. Dolfi - Direct by Mr. Chernosky

```
 1                    -----
 2                 TODD DOLFI,
 3    a witness herein, having been previously first
 4    duly sworn, was examined and testified as
 5    follows:
 6                    -----
 7             DIRECT EXAMINATION (cont.)
 8                    -----
 9    BY MR. CHERNOSKY:
10       Q.  Detective Dolfi, directing your
11    attention to the rear yard of 1306 Franklin
12    Avenue, let me show you what I'll mark as
13    Commonwealth Exhibits 117 through 139.  I
14    apologize, 117 to 146.  I ask you if those
15    photographs depict various exhibits that were
16    depicted in the rear yard of 1306 Franklin
17    Avenue?
18       A.  Yes, they are.
19             MR. CHERNOSKY:  Your Honor, I
20    move for Commonwealth Exhibits 117 to 146.
21             THE COURT:  Admitted without
22    objection.
23       Q.  First, Commonwealth Exhibit 117, what
24    is depicted in 117?
25       A.  117 depicts one spent shell casing and
```

T. Dolfi - Direct by Mr. Chernosky

1    a small pile of saliva.

2        Q.   Directing your attention to 117 on the

3    screen behind you, could you use that laser

4    pointer and point out the approximate location

5    that you just described on 117?

6        A.   Yes, right here.

7        Q.   And while you were processing the

8    scene, were you with a member of the Allegheny

9    County mobile crime unit?

10       A.   Yes.

11       Q.   Did you request that that saliva be

12   sampled?

13       A.   Yes.

14       Q.   Was that done to your knowledge?

15       A.   Yes, it was.

16       Q.   Now, with respect to Commonwealth

17   Exhibit 118, could you briefly tell the jury

18   what is depicted in Commonwealth's 118?

19       A.   118 is a picture of the rear of 1306

20   Franklin Avenue with evidence markers.

21       Q.   Those evidence markers, do you recall

22   what they are marking?

23       A.   Spent rifle casings.

24       Q.   With respect to Commonwealth Exhibit

25   119, is that a close-up of one of those spent

T. Dolfi - Direct by Mr. Chernosky

1    rifle casings?

2        A.  Yes, it is.

3        Q.  And 120?

4        A.  Yes.

5        Q.  121?

6        A.  Yes.

7        Q.  122?

8        A.  Yes.

9        Q.  123?

10       A.  Yes.

11       Q.  124?

12       A.  Yes.

13       Q.  125, is that a wider angle of multiple

14   rifle cases?

15       A.  Yes, it is.

16       Q.  126, is that a close-up?

17       A.  Yes.

18       Q.  127?

19       A.  Also a close-up.

20       Q.  128?

21       A.  Close-up, appears to be two shell

22   casings in the photograph.

23       Q.  129?

24       A.  Yes.

25       Q.  130?

T. Dolfi - Direct by Mr. Chernosky

1        A.   Yes.

2        Q.   131?

3        A.   Yes.

4        Q.   132?

5        A.   Yes.

6        Q.   133, is that a wider angle of the

7    grouping of several shell casings?

8        A.   Yes, it is.

9        Q.   134?

10       A.   Yes.

11       Q.   135, is that also a close-up?

12       A.   Yes, it is.

13       Q.   136?

14       A.   Also a close up.

15       Q.   137?

16       A.   Yes.

17       Q.   138?

18       A.   Actually, two spent casings in this

19   photograph.

20       Q.   139?

21       A.   Close-up of two.

22       Q.   140?

23       A.   Yes, one spent casing.

24       Q.   141?

25       A.   Also a spent casing.

T. Dolfi - Direct by Mr. Chernosky

1    Q.   142?

2    A.   Spent casing.

3    Q.   143?

4    A.   Spent casing.

5    Q.   144, is that a wider angle?

6    A.   Yes, with two spent casings.

7    Q.   145?

8    A.   Spent casing.

9    Q.   146?

10   A.   Also a spent casing.

11   Q.   Now, as you're processing the scene, at

12   some point does it become necessary that you

13   endeavor to move or remove certain objects for

14   evidence?

15   A.   Yes, we do.

16   Q.   What is the purpose of that?

17   A.   The purpose is to make sure we didn't

18   miss anything.

19   Q.   I show you what I marked as

20   Commonwealth Exhibits 147 through 156 and ask

21   you if those are shell casings that you

22   directed to be photographed at the scene?

23   A.   Yes, it is.

24   Q.   Directing your attention to 148, what

25   is depicted in 148?

T. Dolfi - Direct by Mr. Chernosky

1        A.   I believe that is 147.

2        Q.   Sorry.

3        A.   147 is two evidence markers where spent

4    casings were.

5        Q.   And compared to previous pictures of

6    the same location, is something removed or an

7    item moved to locate those?

8        A.   Yes, there was an item covered, I don't

9    remember exactly what the item was, but covered

10   in plastic, a large item covered in plastic

11   that was moved where we recovered these two.

12       Q.   With respect to Commonwealth

13   Exhibit 148, is that a close-up image of those

14   two shell casings?

15       A.   Yes, it is.

16       Q.   Directing your attention to between the

17   walkway of 1304 Franklin and 1306 Franklin

18   Avenue, did you recover shell casings and

19   bullet fragments at that location?

20       A.   Yes, we did.

21       Q.   In that area, did you observe any

22   evidence of suspected blood or biological

23   material?

24       A.   Yes.

25       Q.   Directing your attention to

T. Dolfi - Direct by Mr. Chernosky

1    Commonwealth Exhibit 139, what is depicted in
2    Commonwealth Exhibit 139 -- sorry, 149?
3        A.   That is the walkway between 1304 and
4    1306 Franklin Avenue depicting evidence
5    markers.
6        Q.   Directing your attention to
7    Commonwealth Exhibit 150, what is depicted in
8    evidence 150?
9        A.   Depicting the walkway between 1304 and
10   1306 Franklin Avenue, evidence markers.
11       Q.   Directing your attention to 151, what
12   is depicted in 151?
13       A.   A close-up of a spent casing on that
14   walkway.
15       Q.   Directing your attention to
16   Commonwealth Exhibit 152, what is depicted in
17   Commonwealth Exhibit 152?
18       A.   Also a spent casing on that walkway.
19       Q.   Directing your attention to
20   Commonwealth Exhibit 153, what is depicted in
21   Commonwealth Exhibit 153?
22       A.   A spent casing collected from the
23   walkway.
24       Q.   Directing your attention to
25   Commonwealth Exhibit 154, what is depicted in

T. Dolfi - Direct by Mr. Chernosky

1    Commonwealth Exhibit 154?

2        A.    Projectile fragments from the walkway

3    between 1304 and 1306.

4        Q.    Directing your attention to

5    Commonwealth Exhibit 155, what is depicted in

6    155?

7        A.    A projectile fragment recovered on the

8    walkway.

9        Q.    Directing your attention to

10   Commonwealth Exhibit 156, what is depicted in

11   Commonwealth Exhibit 156?

12       A.    156 is biological matter on the side of

13   1306 Franklin Avenue.

14       Q.    Directing your attention to

15   Commonwealth Exhibit 157 -- I'm sorry, 156 --

16   what is depicted in Commonwealth Exhibit 156?

17       A.    157?

18       Q.    I apologize, 157.

19       A.    Evidence marker in between 1304 and

20   1306 Franklin Avenue.

21       Q.    With respect to Commonwealth Exhibit

22   158, what is depicted in 158?

23       A.    That evidence marker with a spent

24   projectile fragment recovered on the walkway.

25       Q.    During the course of your processing

T. Dolfi - Direct by Mr. Chernosky

1    the scene that night, at some point were the

2    deceased victims removed by the Medical

3    Examiner's Office?

4        A.  Yes, they were.

5        Q.  After they were removed, did you

6    continue to process and look at the area where

7    they were?

8        A.  Yes, we did.

9        Q.  What is the purpose of doing that?

10       A.  That is completed in case there are any

11   items of evidence that are located where the

12   remains were.

13       Q.  Do you recall if you found any evidence

14   after they were removed?

15       A.  Yes.

16       Q.  I show you what I marked as

17   Commonwealth Exhibits 159 through 168.  I ask

18   you if these pictures depict the rear porch

19   area after the deceased victims were removed?

20       A.  Yes, it does.

21               MR. CHERNOSKY:  Your Honor, I

22   move for the admission of Commonwealth

23   Exhibits 159 through 168.

24               THE COURT:  Admitted without

25   objection.

T. Dolfi - Direct by Mr. Chernosky

1      Q.   First, with respect to Commonwealth

2   Exhibit 159, could you tell us what is depicted

3   in that exhibit?

4      A.   A picture of the rear porch of 1304

5   Franklin Avenue after the remains of the

6   victims had about removed.

7      Q.   Do you see evidence markers or placards

8   in that picture?

9      A.   Yes, there are.

10     Q.   With respect to Commonwealth Exhibit

11  160, what is depicted in Commonwealth

12  Exhibit 160?

13     A.   A close-up picture of a projectile on

14  the steps leading to the rear of 1304 Franklin.

15     Q.   161?

16     A.   161 appears to be a projectile to the

17  bottom of the step to the rear porch of 1304

18  Franklin.

19     Q.   With respect to Commonwealth Exhibit

20  162?

21     A.   Projectile fragments on the steps of

22  1304 Franklin, the rear porch.

23     Q.   And Commonwealth Exhibit 163, what is

24  depicted in that exhibit?

25     A.   Photograph of the rear porch of 1304

T. Dolfi - Direct by Mr. Chernosky

1    Franklin after the remains were removed.

2         Q.   Commonwealth Exhibit 164?

3         A.   164 evidence marker on the rear porch

4    of 1304 Franklin with projectile fragments and

5    biological matter.

6         Q.   Could you use the pointer to point out

7    the projectile fragments?

8         A.   Right here.

9         Q.   Is there a projectile fragment to the

10   right of the placard?

11        A.   Yes, right here.

12        Q.   Directing your attention to

13   Commonwealth Exhibit 165, what is depicted in

14   Commonwealth Exhibit 165?

15        A.   165 is a projectile fragment close up.

16        Q.   Directing your attention to

17   Commonwealth Exhibit 166, what is depicted in

18   Commonwealth Exhibit 166?

19        A.   Cell phone on the rear porch of 1304

20   Franklin Avenue.

21        Q.   Directing your attention to 167, what

22   is depicted in 167?

23        A.   167 appears to be a projectile fragment

24   stuck in the wall of the rear porch of 1304

25   Franklin Avenue.

T. Dolfi - Direct by Mr. Chernosky

1    Q.  Directing your attention to 168, what
2  is depicted in 168?
3    A.  Close-up picture of that projectile
4  fragment stuck in the wall.
5    Q.  You were on scene that night processing
6  the scene, did you notice or observe any
7  apparent personal affects?
8    A.  Yes.
9    Q.  I'm going to show you what I will mark
10  as Commonwealth Exhibits 169 through 174.  I
11  ask you generally if those photographs depict
12  the personal affects that you just described?
13    A.  Yes, they do.
14        MR. CHERNOSKY:  Your Honor, I
15  move for the admission of Commonwealth Exhibits
16  169 through 174.
17        THE COURT:  Admitted without
18  objection.
19    Q.  With respect to Commonwealth
20  Exhibit 169, could you just, in general terms,
21  point out some of the personal affects that you
22  see in that picture?
23    A.  Yes, in this photograph there are items
24  of clothing, shoes, boots, medical waste.
25    Q.  Directing your attention to

T. Dolfi - Direct by Mr. Chernosky

1    Exhibit 170, is that a close-up of the same

2    items?

3        A.   Yes, it is.

4        Q.   Directing your attention to 171, is

5    that similarly a close-up of the personal

6    affects?

7        A.   Yes, clothing items.

8        Q.   With respect to Exhibit 172, what is

9    depicted in 172?

10       A.   Items of clothing on the steps and on

11   the ground below the steps.

12       Q.   With respect to Commonwealth

13   Exhibit 174, what is depicted in Commonwealth

14   Exhibit 174?

15       A.   174 is depicting a purse and bullet

16   strikes in the chair.

17       Q.   When you say bullet strikes in the

18   chair, what do you mean?

19       A.   These are a pair of bullet strikes in

20   this lawn chair.

21       Q.   Those apparent bullet strikes, do they

22   have any aid or any visual aid in seeing them?

23       A.   Yes, the mobile crime unit will mark

24   the bullet strikes with small scales for the

25   purpose of photographing.

T. Dolfi - Direct by Mr. Chernosky

1      Q.   While you were on scene, do you know if

2   that purse that is sitting on the chair in

3   Commonwealth Exhibit 174 was searched?

4      A.   Yes, it was.

5      Q.   I want to direct you to Commonwealth

6   Exhibit 175.   What is depicted in Commonwealth

7   Exhibit 175?

8      A.   175 is a PA ID license update card

9   belonging to Shada Mahone.

10      Q.   Could you tell us the last exhibit

11   number?

12      A.   174.

13      Q.   I show you what I marked as Exhibits

14   175 through 190 and ask you while you were on

15   scene with the mobile crime unit, did you mark

16   various locations of ballistic damage?

17      A.   Yes, we did.

18      Q.   How was that marked?

19      A.   That was marked using the scales

20   described in the previous exhibit.

21      Q.   I ask if Commonwealth Exhibits 175

22   through 190 depict various locations of

23   ballistic damage at the scene?

24      A.   Yes, it does.

25      Q.   I'm directing your attention to

T. Dolfi - Direct by Mr. Chernosky

1    Commonwealth Exhibit 175, what is depicted in

2    175?

3         A.   175 is a picture of a bullet strike.

4         Q.   Are the scales visible around the

5    bullet strike?

6         A.   Yes, they are.

7         Q.   Where is that particular bullet strike?

8         A.   That appears to be on the porch of the

9    support beam of 1304 Franklin.

10        Q.   What is depicted in Exhibit 176?

11        A.   Also a bullet strike in the support

12   beam.

13        Q.   Is that a different bullet strike than

14   depicted in 175?

15        A.   Yes, it is.

16        Q.   With respect to Exhibit 177, what are

17   we looking at?

18        A.   177 is a view of the rear yard of 1306

19   Franklin Avenue to the rear porch of 1304

20   Franklin Avenue depicting bullet strike.

21        Q.   Directing your attention to 178?

22        A.   A picture of the railing of 1304

23   Franklin, the rear porch depicting bullet

24   strikes.

25        Q.   179?

T. Dolfi - Direct by Mr. Chernosky

1      A.   Close-up of bullet strikes on the

2  railing.

3      Q.   180?

4      A.   Picture of the bullet strikes on the

5  railing of 1304 Franklin rear porch.

6      Q.   181?

7      A.   Also a picture of bullet strikes on the

8  railing of the rear porch.

9      Q.   182?

10     A.   Close-up photograph of the rear bullet

11  strikes.

12     Q.   182, is it fair to say that that

13  photograph is taken from an overhead position

14  on the railing?

15     A.   Yes, I believe it is.

16     Q.   183?

17     A.   A different angle photograph of the

18  bullet strikes on the same railing.

19     Q.   184?

20     A.   184 is depicting the bullet strikes on

21  the rear railing and bullet strikes of 1304

22  Franklin Avenue.

23     Q.   185?

24     A.   Picture of the rear wall.

25     Q.   186?

T. Dolfi - Direct by Mr. Chernosky

1    A.  Close-up of the rear wall to the porch.

2    Q.  187?

3    A.  Photograph of a bullet strike in the

4    masonry wall of the house of 1304 Franklin.

5    Q.  Directing your attention to 188.

6    A.  Appears to be a photograph of the rear

7    storm door, the bullet striking 1304 Franklin.

8    Q.  189?

9    A.  Another photograph of the bullet strike

10   in the storm door of 1304 Franklin.

11   Q.  190?

12   A.  A photograph of the railing from a

13   different angle of 1304 Franklin Avenue bullet

14   strikes.

15            MR. CHERNOSKY:  Your Honor, if

16   the Commonwealth didn't already move for the

17   admission of 175 through 190, I would at this

18   point.

19            THE COURT:  Admitted without

20   objection.

21   Q.  Now I show you what I marked as

22   Commonwealth Exhibits 191 through 202 and ask

23   you did you also recover and direct it be

24   photographed, projectiles or bullet fragments

25   in the lower level of the house?

T. Dolfi - Direct by Mr. Chernosky

1    A.  Yes.

2    Q.  I ask you generally does Exhibits 191

3    through 202 depict various projectiles and

4    bullet fragments recovered from the lower level

5    of 1304?

6    A.  Yes, they do.

7         MR. CHERNOSKY:  Your Honor, I

8    move for the admission of Commonwealth

9    Exhibits 191 through 202.

10        THE COURT:  Admitted without

11   objection.

12   Q.  Directing your attention to

13   Commonwealth Exhibit 191, what is that?

14   A.  Fireplace and living room of 1304

15   Franklin Avenue.

16   Q.  Commonwealth Exhibit 192?

17   A.  Another photograph of that depicting

18   the evidence marker marking a projectile

19   fragment in the fireplace.

20   Q.  193?

21   A.  Close-up of that projectile fragment in

22   the fireplace.

23   Q.  Commonwealth Exhibit 194?

24   A.  Evidence marker in the bathroom to 1304

25   Franklin Avenue of a projectile fragment.

T. Dolfi - Direct by Mr. Chernosky

1      Q.   195?

2      A.   Close-up of the projectile fragment in

3   the bathroom.

4      Q.   196?

5      A.   Evidence marker depicting projectile in

6   the kitchen of 1304 Franklin Avenue.

7      Q.   197?

8      A.   Close-up of the previous.

9      Q.   198?

10     A.   198 appears to be a projectile fragment

11   in the dining room of 1304 Franklin Avenue.

12     Q.   199?

13     A.   A close-up photograph of that

14   projectile fragment.

15     Q.   Commonwealth Exhibit 200?

16     A.   200 appears to be marking a bullet

17   strike in the dining room.

18     Q.   Using that laser pointer that is next

19   to you, could you point out the bullet strike,

20   or bullet strikes, in Commonwealth Exhibit 200?

21     A.   One on the couch here and on this

22   furniture item here.

23     Q.   Directing your attention to

24   Commonwealth Exhibit 201.

25     A.   Another photograph of the bullet

T. Dolfi - Direct by Mr. Chernosky

1    strike.

2        Q.  And Commonwealth Exhibit 202?

3        A.  Close-up photograph of the bullet

4    strike on the couch in the living room.

5        Q.  Detective Dolfi, how many homicide

6    crime scenes had you processed in your career?

7        A.  Approximately one hundred.

8        Q.  How many opportunities do you get to

9    process a crime scene?

10       A.  One.

11       Q.  With that in mind, is it your goal to

12   take as much as possible as far as evidence and

13   photographs?

14       A.  Yes, it is.

15       Q.  With respect to this particular crime

16   scene, was it unusual?

17       A.  Yes, it was.

18       Q.  As far as number of exhibits, would you

19   say that it was more than usual or less than

20   usual?

21       A.  This is the most extensive crime scene

22   that I've been on in my career.

23       Q.  Switching gears briefly, during the

24   course of the investigation that you

25   participated in on or after March 9, 2016, did

T. Dolfi - Direct by Mr. Chernosky

1    you have a need to conduct or did you, in fact,

2    conduct what is called a time-distance study

3    between 1214 Nolan Court and 1304 Franklin

4    Avenue?

5        A.  Yes, I did.

6        Q.  What is a time-distance study?

7        A.  It is a fancy term for driving between

8    two points several times taking different ways.

9        Q.  Did you do that?

10       A.  Yes, I did.

11       Q.  What ways did you take and what were

12   the times that resulted in that drive?

13       A.  I traveled three different directions

14   between 1214 Nolan Court and 1304 Franklin

15   Avenue.  Of the three ways, they were between

16   two and four miles of approximate location and

17   between the time of 9 and 11 minutes.  If you

18   would like the exact routes that I took, I

19   would have to refer to my report.

20               MR. CHERNOSKY:  May I approach,

21   Your Honor?

22               THE COURT:  You may.  Show

23   Mr. McKinney.

24       Q.  I'm going to hand you this and ask you

25   if this refreshes your recollection as to the

T. Dolfi - Direct by Mr. Chernosky

1   specific routes you took and to the specific

2   time that each route took?

3       A.  Yes.

4       Q.  Could you tell the jury of the three

5   different ways, what specific route you took on

6   three different occasions and how long?

7       A.  The first route that I took, I started

8   at the intersection of Brushton and Mohler.  I

9   ended at 1304 Franklin Avenue.  For that route,

10  I started on Brushton making a left on

11  Frankstown Road, a right onto Oakwood, a left

12  onto Penn, a right onto Ardmore, and left onto

13  Franklin Avenue.  That was 2.3 miles and the

14  time was 11 minutes and 50 seconds.

15          The second route taken, I started at

16  1304 Franklin Avenue and ended at the

17  intersection of the Brushton and Mohler.  I

18  traveled Franklin Avenue, making a right on

19  Ardmore, a right on Penn, a right on Swissvale,

20  and a left on Montier, a left on Robinson, a

21  left on Frankstown, and a right on Mohler.  The

22  results were 3.9 miles in a time of 9 minutes

23  and 35 seconds.

24          The third route was starting at

25  Brushton and Mohler, starting on Mohler, a

T. Dolfi - Cross by Mr. McKinney

1    right on Wheeler, a left on Frankstown, a right

2    on Robinson, a right on Montier, a left on

3    Penn, a right on Ardmore, and a left on

4    Franklin Avenue, 3.6 miles in a time of 10

5    minutes and 28 seconds.

6                MR. CHERNOSKY:  No further

7    questions, Your Honor.  I offer this witness

8    for cross.

9                MR. McKINNEY:  Thank you, Your

10    Honor.

11                -----

12                CROSS-EXAMINATION

13                -----

14    BY MR. McKINNEY:

15       Q.  Sergeant Dolfi -- you are sergeant now?

16       A.  Yes, sir.

17       Q.  What time did you respond to the crime

18    scene?

19       A.  I don't remember the exact time that I

20    responded.

21       Q.  Are you aware that the shots were fired

22    around 10:53 p.m.

23       A.  Yes.

24       Q.  Did it take you more than an hour to

25    get there or did you get there in ten minutes?

T. Dolfi - Cross by Mr. McKinney

1          A.   After Wilkinsburg called for

2     assistance, I was probably 10 to 15 minutes out

3     from the scene.

4          Q.   How long did you stay on scene?

5          A.   We were there for hours.

6          Q.   Based on your investigation, you have

7     determined that there were two different kinds

8     of shell casings found at the scene, correct?

9          A.   That's correct.

10         Q.   That would be the .40-caliber shell

11    casings to the rear of 1304, correct?

12         A.   Yes, in the alleyway.

13         Q.   Then on the side between 1304 and 1306

14    were the rifle casings, correct?

15         A.   That's correct.

16         Q.   Where was the saliva found?

17         A.   The saliva was located near the rifle

18    casings in the rear yard of 1306 Franklin.

19         Q.   You will agree with me that saliva was

20    tested because it is possible that the shooter

21    could have deposited the saliva in that

22    location, correct?

23         A.   Yes, at the time of that collection, it

24    was collected for DNA testing.

25         Q.   That was sent to the lab?

T. Dolfi - Cross by Mr. McKinney

1        A.   Yes, it was.

2        Q.   Are you aware of the fact that it does

3    not match Mr. Shelton?

4        A.   I'm aware of that.

5        Q.   Now, with respect to the boot

6    impression, where was that?  Was that near the

7    .40-caliber casings or the rifle casings?

8        A.   I believe the boot was actually not

9    close to both.  It was kind of in the middle.

10   The boot print was near the alleyway of the

11   rear yard of 1306 Franklin.

12       Q.   Was that boot impression ever compared

13   to any boot impression of Mr. Shelton?

14       A.   No, it was not.

15       Q.   How about Robert Thomas?

16       A.   No, it was not.

17       Q.   Now, there is that stockade fence that

18   separates 1304 from 1306, right?

19       A.   Yes.

20       Q.   Next to that stockade fence is a

21   chain-link fence, right?

22       A.   Yes.

23       Q.   Next to that chain-link fence we saw

24   blood all over the stockade -- let me rephrase.

25   There was blood on the stockade fence?

T. Dolfi - Cross by Mr. McKinney

1      A.  Yes.

2      Q.  There was actually tissue or bone that

3  went over the stockade fence or through the

4  chain-link fence to the other side where the

5  rifle casings were found?

6      A.  Correct.

7      Q.  So based on your investigation, the

8  individual that was shooting the rifle was

9  standing in a location where you later found

10  blood, tissue, and bone?

11      A.  I don't know the exact location of

12  where the shooter was standing but biological

13  matter of blood, tissue, and bone was found in

14  the yard and the fence.

15      Q.  There was blood, tissue, and bone in

16  close proximity to where the shell casings for

17  the rifle were found?

18      A.  That's correct.

19      Q.  You are aware of the allegation that

20  Mr. Shelton, within two minutes of the

21  shooting, got into a white Lincoln Continental.

22  Are you aware of that allegation?

23      A.  Yes, I am.

24      Q.  Was that white Lincoln Continental

25  tested for blood?

T. Dolfi - Cross by Mr. McKinney

1      A.   I believe the search warrant was served

2   on that Lincoln.  I don't recall the results at

3   this time.

4      Q.   So you are not aware of the fact that

5   there was no blood found in that car at all?

6      A.   I'm not sure.

7      Q.   But the car was tested, you do know

8   that?

9      A.   There was a search warrant for the

10  vehicle.

11     Q.   Now, you said you were on scene for

12  hours, right?

13     A.   Yes, sir.

14     Q.   I believe you said on direct

15  examination this was the most extensive crime

16  seen that you've ever seen?

17     A.   Yes.

18     Q.   Probably more decedents than any scene

19  that you have ever responded to, correct?

20     A.   At a single time, yes.

21     Q.   While you are there processing the

22  scene and looking at this mass murder, do you

23  become aware of any possible suspects?

24     A.   I do not.

25     Q.   So when you're on scene, no one said to

T. Dolfi - Cross by Mr. McKinney

1    you, hey, while I was responding, I saw a black

2    male get into a white Lincoln Continental about

3    a tenth of a mile from where we're standing at

4    this crime scene?  Did anyone ever say that to

5    you?

6         A.   No, they did not.

7         Q.   You are the affiant in this case,

8    correct?

9         A.   That's correct.

10        Q.   So could you tell the jury what that

11   means?

12        A.   The affiant means I'm the individual

13   that signed the criminal complaint and the

14   charging documents against the defendants.

15        Q.   So you essentially filed the charges in

16   this case, correct?

17        A.   That's correct.

18        Q.   And you didn't charge Mr. Shelton with

19   these crimes until June 26th of 2016, correct?

20        A.   I don't recall the exact date but I'll

21   assume that that is correct.

22        Q.   Was it June 2016?  If you are not sure,

23   I could refresh your recollection?

24        A.   June of 2016.

25        Q.   Do you know who Detective Adams is from

T. Dolfi - Cross by Mr. McKinney

1    the Wilkinsburg Police Department?

2        A.  Yes, I do.

3        Q.  Based on your response to my prior

4    question, you would agree with me that he never

5    approached you on the night of the murders and

6    gave you a piece of paper with a license plate

7    on it, correct?

8        A.  No, he did not.

9        Q.  Would you agree with me that part of

10   this investigation was driven by anonymous

11   tips?

12       A.  Every case we have tips.  I wouldn't

13   say this case was driven by anonymous tips.

14       Q.  Well, in the charging document that you

15   authored, would you agree with me that you

16   wrote based upon the knowledge of Officer

17   Adams's observations, who you didn't talk to

18   that night, and the numerous anonymous tips

19   that had been received, Detective McCue

20   obtained surveillance video in the area of

21   Nolan Court before and after the murder, do you

22   remember writing that in your charging

23   document?

24       A.  Yes.

25       Q.  Would you agree with me that at least

T. Dolfi - Cross by Mr. McKinney

1    part of this case based on what you wrote was

2    driven by anonymous sources?

3         A.   Anonymous tips were received in this

4    investigation.

5         Q.   Did you receive those directly or were

6    they given to you by other officers and/or

7    detectives?

8         A.   This case was very extensive.  Our

9    entire unit was working on this so many police

10   and many detectives.

11        Q.   On March 9th, the date that this

12   incident occurred, are you aware of any units,

13   detectives, or uniformed officers being sent to

14   the location of 1214 Nolan Court?

15        A.   On March 9th?

16        Q.   On March 9th?

17        A.   I am not.

18        Q.   How about March 10th?

19        A.   I don't recall if somebody went on the

20   10th.

21        Q.   How about March 11th?

22        A.   I know we went to 1214 Nolan Court but

23   I do not know the exact date at this time.

24        Q.   If I were to provide you with a copy of

25   your charging document, do you think that it

T. Dolfi - Cross by Mr. McKinney

1    might refresh your recollection as to the first

2    time that anyone ever went to 1214 Nolan Court?

3        A.  Yes.

4              MR. McKINNEY:  Your Honor,

5    permission to approach?

6              THE COURT:  You may.

7              MR. McKINNEY:  For the record,

8    this is Defense Exhibit E which is the criminal

9    complaint.

10             THE COURT:  Do you have a page

11   that you could refer him to to refresh his

12   recollection?

13             MR. McKINNEY:  I do, Your Honor.

14             THE COURT:  That is permissible.

15       Q.  Sergeant, have you had an opportunity

16   to review your criminal complaint?

17       A.  Yes.

18       Q.  Based on your criminal complaint, when

19   was the first time that any law enforcement

20   officers ever went to 1214 Nolan Court?

21       A.  On March 12th.

22       Q.  If you had been told on March 9th that

23   a suspect or a potential witness or anyone got

24   into a vehicle less than two minutes after the

25   shots were fired, less than a tenth of a mile

T. Dolfi - Cross by Mr. McKinney

1    away from the crime scene, would you have

2    followed up on that information?

3        A.  If that was my assignment, yes.

4        Q.  Do you know whose assignment that would

5    have been on March 9, 2016?

6        A.  I don't.  My assignment was the crime

7    scene processing which was very extensive and

8    chaotic.  That is what I did for those hours.

9        Q.  You would agree with me that in a case

10   like this, in a case like this, you and the

11   other detectives had briefings every day,

12   correct?

13       A.  That's correct.

14       Q.  So at the briefing on March 10th, with

15   all of the other detectives investigating this

16   case, did anyone ever say to you we have

17   information about a possible suspect who was

18   less than a tenth of a mile from the crime

19   scene, less than two miles from the shooting,

20   did anyone say that to you on March 10th?

21       A.  I did not hear that information.

22       Q.  How about on March 11th, did anyone say

23   that to you?

24       A.  I don't recall the date, whether it was

25   the 11th or the 12th, that I became aware of

T. Dolfi - Redirect by Mr. Chernosky

1    that information.

2                    MR. McKINNEY:  Sergeant, I have

3    no additional questions.  Thank you.

4                    THE COURT:  Anything else,

5    Mr. Chernosky?

6                    MR. CHERNOSKY:  Just briefly on

7    redirect.

8                    -----

9              REDIRECT-EXAMINATION

10                    -----

11   BY MR. CHERNOSKY:

12      Q.  While you were on scene doing the

13   processing, how many other agencies did you

14   personally observe?

15      A.  I mean, there were many.  Again, upon

16   arrival, there were numerous police agencies

17   from the area because with the extent of the

18   crime scene and victims, police agencies and

19   EMS agencies from all over were responding so I

20   mean, I can't tell you exactly who all was

21   there but many.

22      Q.  As Mr. McKinney touched on this, you

23   have how many shifts at the Allegheny County

24   Police?

25      A.  Three.

T. Dolfi - Recross by Mr. McKinney

1        Q.   In a case such as this, how does the
2   investigation go?  Is it just yours because you
3   are the affiant or a collective effort?
4        A.   No, all homicide investigations are a
5   collective effort with our unit.
6               MR. CHERNOSKY:  No further
7   questions.
8               MR. McKINNEY:  Brief recross,
9   Your Honor.
10              THE COURT:  Go ahead.
11                    -----
12              RECROSS-EXAMINATION
13                    -----
14  BY MR. McKINNEY:
15       Q.   Sergeant, maybe I should have asked you
16  this earlier but could you tell the jury what
17  is a briefing?
18       A.   A briefing, in short, we have shift
19  change or after a crime that we're
20  investigating will hold information sharing.
21       Q.   On the night in question, March 9th,
22  how many detectives from the Allegheny County
23  Police Department responded to the scene?
24       A.   On the 9th, I believe eight of us.
25       Q.   And you would agree with me that the

T. Dolfi - Recross by Mr. McKinney

1    purpose of a daily briefing is to keep every

2    single detective associated with this case

3    abreast on any new developments, correct?

4        A.  Correct.

5        Q.  Are these briefings ever memorialized

6    in any way, any reports associated with them or

7    a meeting with all detectives to talk about

8    what is going on in the case verbally?

9        A.  Correct, verbally.

10               MR. McKINNEY:  Thank you.  No

11   further questions.

12               THE COURT:  Call your next

13   witness.

14               MR. CHERNOSKY:  The Commonwealth

15   calls Thomas Morgan.

16               MR. McKINNEY:  Your Honor, I

17   would like this witness to remain on call.  I

18   may call him in my case.

19               THE COURT:  He will be available.

20               MR. CHERNOSKY:  Your Honor,

21   Mr. Morgan is being called for his processing

22   of the physical exhibits at the scene but also

23   for some firearm testing, I would seek to voir

24   dire him on both those subjects.

25               THE COURT:  Is there a

T. Morgan - Direct by Mr. Chernosky

 1    stipulation?

 2                    MR. McKINNEY:  We would stipulate

 3    to his qualifications.

 4                    MR. CHERNOSKY:  Then I would do

 5    it briefly.

 6                    THE COURT:  Okay.

 7                        -----

 8                    THOMAS MORGAN,

 9    a witness herein, having been first duly sworn,

10    was examined and testified as follows:

11                        -----

12                    DIRECT EXAMINATION

13                        -----

14    BY MR. CHERNOSKY:

15        Q.  Mr. Morgan, could you state your first

16    and last name and spell your last name for the

17    court reporter?

18        A.  My name is Thomas Morgan, M-O-R-G-A-N.

19        Q.  How are you currently employed?

20        A.  I'm a scientist at the Allegheny County

21    Medical Examiner's Office, forensic laboratory

22    division with a full-time assignment in the

23    firearm and tool marks section of the

24    laboratory and part-time assignment in the

25    laboratory's mobile crime unit.

T. Morgan - Direct by Mr. Chernosky

1      Q.  Were you working in that capacity that
2  you just described to the jury on March of
3  2016?
4      A.  I was.
5      Q.  How does your office or your department
6  get notified when your services are needed at a
7  crime scene?
8      A.  For the mobile crime unit, which would
9  be the crime scene unit in the laboratory, we
10  pass around a community phone that receives
11  notifications from county dispatch when any
12  agency in Allegheny County requests our service
13  for crime scene processing.
14      Q.  With respect to processing the crime
15  scene, you have experience doing that, how many
16  times have you done that in your career?
17      A.  Processed crime scenes?
18      Q.  Yes.
19      A.  I never kept track.  I've been a
20  primary on the unit since 2007.  We average
21  anywhere between 60 to 90 cases per year.
22  Relative to 2016, it was a nine-year span, so
23  we'll say 300 or so cases give or take.
24      Q.  What is your goal when you're
25  documenting a crime scene?

T. Morgan - Direct by Mr. Chernosky

1     A.   The goals are multiple and relatively

2     simple.  We use photography and sketching and

3     other means to document the crime scene as we

4     see it when we arrive, take detailed notes of

5     the information that was provided, and use the

6     information that was provided to identify

7     objects that are of evidentiary value, at

8     least, to be processed in some area of the

9     crime laboratory.

10    Q.   With respect to firearms testing, could

11    you give the jury an idea of your educational

12    background?

13    A.   I have a Bachelor's degree, or a

14    Bachelor's of Science degree, in chemistry from

15    now what is called the University of Mt. Union.

16    While there, I was an intern at the

17    Canton-Stark County crime laboratory which is

18    in Ohio.  After a short period of time in

19    private industry, I started working at the

20    Allegheny County Medical Examiner's Office in

21    the capacity that I've described previously in

22    June of 2004.

23    Q.   Do you go to trainings relative to the

24    field of firearms and tool marks?

25    A.   Yes.

T. Morgan - Direct by Mr. Chernosky

1    Q.  Are you required to keep up with

2    trainings?

3    A.  Yes, as a stipulation from our

4    accrediting body.

5    Q.  With respect to 1304 Franklin Avenue in

6    Wilkinsburg, were you called out on March 9th?

7                THE COURT:  One second.  Are you

8    requesting that he be treated as an expert?

9                MR. CHERNOSKY:  Yes, Your Honor.

10                THE COURT:  Any objection?

11                MR. McKINNEY:  No, Your Honor.

12                THE COURT:  Ladies and gentlemen,

13    at the end of this case I will give you

14    instructions as to how to consider and evaluate

15    expert testimony including Mr. Morgan.  An

16    expert witness is an expert witness who, by

17    virtue of his or her training, education, and

18    experience, is allowed to testify about matters

19    beyond the matters that can usually be

20    testified to by what might be referred to as a

21    regular witness.  A regular witness can usually

22    only testify about things that he or she

23    observed or heard.  An expert witness, in

24    comparison, may offer opinions and draw

25    conclusions based on his or her training,

T. Morgan - Direct by Mr. Chernosky

1   education, and experience beyond that that may

2   help you decide an issue in a case or explain a

3   body of evidence as in this matter.  As with

4   any witness, you are free to believe all, part,

5   or none of an expert witness's testimony.

6   Mr. Chernosky.

7              MR. CHERNOSKY:  Thank you, Your

8   Honor.

9       Q.  With respect to the crime scene at 1304

10  Franklin Avenue in Wilkinsburg on March 9th,

11  were you called out?

12      A.  Yes, I was.

13      Q.  Do you recall approximately what time

14  you were called?

15      A.  So, approximately, I received the call

16  approximately 11:30 that evening on March 9th.

17      Q.  Then did you proceed to that location?

18      A.  Yes.

19      Q.  When you get on location, what happens?

20  Do you get a briefing?  How does that work?

21      A.  When I get on location, usually the

22  scene is, the scene proper itself, is secured

23  by that time.  I'm pointed out at least a safe

24  spot for me to park and leave my vehicle and

25  other things.  Then I approach whoever is going

T. Morgan - Direct by Mr. Chernosky

1    to be leading the investigation to get a

2    briefing on the details known at the time.

3        Q.  Do you recall who you met with that

4    night?

5        A.  Yes.

6        Q.  Who was that?

7        A.  That would have been a number of

8    detectives from the Allegheny County Police

9    Department to include but not limited to

10   Lieutenant Schurman, Detectives Dolfi and

11   Foley, Miller, and Towne were also there as

12   well as Detective McCool and Sergeant Scherer.

13       Q.  With respect to processing the scene,

14   at some point are you directed to a series of

15   .40-caliber casings?

16       A.  Yes.

17       Q.  Where was that located at?

18       A.  The .40-caliber cartridge casings were

19   located in what was eventually made known to me

20   in an alley called Hazel Way.

21       Q.  With respect to those .40-caliber

22   casings, do you recall how many were present?

23       A.  Yes.

24       Q.  How many?

25       A.  There were 18.

T. Morgan - Direct by Mr. Chernosky

1    Q.  With respect to your duties or your job

2    there for purposes of evidence preservation,

3    are those items of evidence given a

4    designation, a number?

5    A.  Yes.

6    Q.  And in this case, 18 shell casings,

7    what laboratory designation were they given?

8    A.  Do you mean the laboratory item number

9    eventually when they were submitted to the lab?

10   Q.  Yes.

11   A.  The 18 .40-caliber S&W cartridge cases,

12   once they were submitted to the laboratory,

13   were designated Item 3.

14   Q.  What is the purpose of giving them a

15   designation while you're at the scene?

16   A.  While at the scene, the scene is

17   different than the laboratory number I just

18   mentioned.  We typically use lettered placards

19   on scene to both identify the item of evidence,

20   create a cross-reference of a scene item back

21   to a laboratory item, and then also use those

22   for ease of identification and photos to show

23   interrelationships with other evidence.

24   Q.  The .40-caliber casings at the scene,

25   what scene numbers or what scene designations

T. Morgan - Direct by Mr. Chernosky

1   were they given?

2        A.   That, I don't have committed to memory.

3   I believe it was A through O.  I may be

4   incorrect about that.

5        Q.   Would it refresh your recollection if I

6   showed you some documentation?

7        A.   Yes.

8             MR. CHERNOSKY:  May I approach,

9   Your Honor?

10            THE COURT:  Do you have your

11   report with you?

12            THE WITNESS:  I do.

13            THE COURT:  Is there any

14   objection to Criminalist Morgan, Scientist

15   Morgan, referring to his file and his report

16   during the course of his examination?

17            MR. McKINNEY:  No objection.

18            THE COURT:  You may freely do so.

19        A.   I'm sorry, I was incorrect.  Those were

20   -- scene item letters A through R were the

21   scene 18 .40-caliber spent S&W cartridge cases.

22        Q.   I show you what I marked as

23   Commonwealth Exhibit 203.  Would you like some

24   gloves?

25            A.   Sure.

T. Morgan - Direct by Mr. Chernosky

1          Q.   Do you recognize Commonwealth

2     Exhibit 203?

3          A.   I do.

4          Q.   What is Commonwealth Exhibit 203?

5          A.   This is a bag that is currently sealed.

6     It has a barcode label on it that says

7     16LAB02222 No. 3 which is the laboratory case

8     number and the laboratory item number after

9     they were eventually submitted.   There is an

10    item description that says items A through R,

11    18 spent .40-caliber S&W cartridge from Hazel

12    Way and the laboratory case number again for

13    reference is 16LAB02222, Item 3.

14         Q.   Is there any handwriting that you

15    recognize on Commonwealth Exhibit 203?

16         A.   Yes.

17         Q.   Whose is it and where is it located?

18         A.   The handwriting that I recognize is

19    actually from an individual named Jason Clark.

20    That is on the front.   There is additional

21    handwriting that I recognize as my own as well.

22         Q.   On the rear of Commonwealth Exhibit 203

23    where it is sealed, do you recognize any

24    handwriting there?

25         A.   Yes.

T. Morgan - Direct by Mr. Chernosky

1      Q.   What is it that you recognize on the

2   rear?

3      A.   Handwriting of three individuals this

4   time, one from Mr. Clark again over top one of

5   the seals, another set of initials by a

6   gentleman who is known as evidence specialist

7   in the lab named Paul Lumpy (phonetic), and

8   further initials and seals that I recognize as

9   my own handwriting.

10     Q.   We're going to get into that but did

11  you perform some analysis and testing on the

12  items contained in Commonwealth Exhibit 203?

13     A.   After they were submitted and I was

14  functioning in my firearms and tool marks

15  examiner capacity, yes.

16     Q.   So the signature for the sealing of

17  that item, was that after you performed that

18  testing?

19     A.   Yes.

20     Q.   Could you unseal Commonwealth

21  Exhibit 203 and tell us what is contained in

22  it?

23          MR. CHERNOSKY:  Your Honor, at

24  this point I move for the admission of

25  Commonwealth Exhibit 203.

T. Morgan - Direct by Mr. Chernosky

1          THE COURT:  No objection, it will

2     be admitted.

3          A.  Inside of the bag there are what I know

4     from my item description and previous

5     examination of the evidence 18 smaller coin

6     envelopes which will contain the spent

7     cartridge cases individually packaged.

8          Q.  When you gather an item at the crime

9     scene, it goes directly to the crime lab?

10          A.  When we collect them, we take them

11     back, verify that we have everything, and we go

12     through the administrative duties that we need

13     to do to ensure the integrity of the evidence,

14     that they are properly sealed, make decisions

15     where they are going to go in the lab, and make

16     a laboratory submission.

17          Q.  Any request for processing, does that

18     come in with that request or does the agency

19     that is investigating make that request?

20          A.  Ultimately, it is the agency that we

21     are servicing that makes that request.  When we

22     are on scene, it is constantly a discussion

23     back and forth between us as representatives of

24     the laboratory as well as the investigators.

25          Q.  Can I have you open the individual coin

T. Morgan - Direct by Mr. Chernosky

1    envelopes contained in Commonwealth

2    Exhibit 203?

3                    THE COURT:  Mr. Morgan, can you

4    stop?  At this juncture we'll take a morning

5    recess and I'll discuss with the attorneys how

6    we can expedite this, okay.

7                    Remain seated and quiet while the jury

8    leaves the room.

9                             -----

10                   (Open court - Jury not present.)

11                            -----

12                   THE COURT:  What casings are

13   those?

14                   THE WITNESS:  The .40 S&W caliber

15   cartridge cases.

16                   THE COURT:  What about the long

17   gun, the rifle, how many of those?

18                   THE WITNESS:  30 of those.

19                   THE COURT:  Are they similarly

20   sealed in envelopes?

21                   THE WITNESS:  Yes.

22                   THE COURT:  Mr. McKinney and

23   Ms. Williams, can we, during this recess, have

24   him in your presence, if necessary, identify

25   all of those envelopes, cut the tops off so the

T. Morgan - Direct by Mr. Chernosky

1    jury doesn't have to sit there and watch him

2    cut 58 envelopes or whatever it is?

3                    MR. McKINNEY:  No objection, Your

4    Honor.

5                    THE COURT:  Okay, if you can

6    facilitate that.  Thank you.

7                    -----

8                    (Brief recess taken.)

9                    -----

10                   (Open court - Jury not present.)

11                   -----

12                   MS. PELLEGRINI:  Your Honor,

13   before you bring the jury out, I spoke with the

14   deputies.  Do you have an approximate idea of

15   when there would be a lunch recess because the

16   next witness for the Commonwealth is Lamont

17   Powell.  He is currently in custody.  There is

18   a security issue.  The defendant must be in the

19   room before they can bring Lamont Powell from

20   the other side over here.  We are trying to

21   coordinate this or if you could give us a

22   moment to coordinate that.

23                   THE COURT:  How long do you

24   expect Mr. Morgan to be?

25                   MR. CHERNOSKY:  I probably have

T. Morgan - Direct by Mr. Chernosky

1    approximately 20 minutes to a half-hour with

2    Mr. Morgan.

3                    THE COURT:  Do you have any

4    cross?

5                    MR. McKINNEY:  Brief, brief as in

6    a minute, maybe two.

7                    THE COURT:  If we can finish with

8    Mr. Morgan at or about noon, then I'm going to

9    get to Powell.  Here is the thing with Powell,

10   what about the heroin that was found on him?

11                   MS. PELLEGRINI:  He was never

12   charged with it.

13                   THE COURT:  Do you have a

14   non-prosecution agreement with him?

15                   MS. PELLEGRINI:  No.

16                   THE COURT:  Well, you have to.

17                   MS. PELLEGRINI:  Pardon me?

18                   THE COURT:  You don't have to but

19   his attorney, I don't know if Mr. Farrell was

20   aware that heroin was recovered from his

21   pocket, correct?

22                   MR. FARRELL:  This morning I was

23   aware.

24                   THE COURT:  Okay, so are you

25   allowing him to testify without a

T. Morgan - Direct by Mr. Chernosky

1    non-prosecution agreement?

2                      MR. FARRELL:  I would prefer not.

3                      MS. PELLEGRINI:  I'll go prepare

4    one.  It is outside the statute of limitations,

5    Your Honor.

6                      MR. FARRELL:  Although he is on

7    probation at the time which they have not

8    violated him.  I just point that out, Judge.

9                      MS. PELLEGRINI:  He is beyond the

10   two years.

11                     THE COURT:  The cards are on the

12   table.  You play them as you wish.  Bring in

13   the jury.  Mr. McKinney and Mr. Chernosky, I

14   will explain to the jury the process that we

15   took and that the evidence was properly

16   preserved and sealed, et cetera.

17                     MR. CHERNOSKY:  Thank you, Your

18   Honor.

19                         -----

20                     (Open court - Jury present.)

21                         -----

22                     THE COURT:  Members of the jury,

23   the parties have agreed during the recess that

24   rather than Mr. Morgan cutting each envelope

25   open as he goes through each one, those

T. Morgan - Direct by Mr. Chernosky

1    envelopes have been opened.  The parties have

2    agreed that the evidence contained in the

3    envelopes were properly preserved, packaged,

4    and sealed during the course of the

5    investigation and chain of custody.  You saw

6    and heard initially Mr. Morgan describe how the

7    envelope gets processed, someone initials it,

8    it is opened and reclosed and initialed, all of

9    that.  The integrity of that process is not at

10   issue.

11        Mr. Chernosky.

12             MR. CHERNOSKY:  Thank you, Your

13   Honor.

14   Q.  Mr. Morgan, directing your attention to

15   the contents of Commonwealth Exhibit 203, I

16   will show you what has already been laid out in

17   front of you as what I marked as Commonwealth

18   Exhibits 204 through 221.  Do you generally

19   recognize what is contained in those exhibits?

20   A.  Yes.

21   Q.  What is it?

22   A.  Inside of each of these coin envelopes

23   are the spent 18 -- or the 18 spent .40 S&W

24   caliber cartridge cases as we have discussed

25   previously.

T. Morgan - Direct by Mr. Chernosky

1      Q.  Could you, for demonstrative purposes,

2      remove Commonwealth Exhibit 204 from its

3      packaging?

4                MR. CHERNOSKY:  Your Honor, can I

5      walk it across the bar of the court?

6                THE COURT:  Yes.

7      Q.  Generally speaking, the remaining

8      exhibits contained in Commonwealth Exhibits 204

9      through 221 are of a similar nature?

10     A.  Yes.

11               MR. CHERNOSKY:  I move for the

12     admission of Commonwealth Exhibits 204 through

13     221.

14               THE COURT:  Admitted without

15     objection.

16     Q.  Now, I'll direct your attention to

17     Commonwealth Exhibit 222.  What is 222?

18     A.  222 is what was a sealed bag bearing

19     barcode laboratory number 16LAB02222,

20     laboratory Item 6 and further handwritten

21     description of items V through AL, items AO

22     through AZ, and Item 1.  Those designations are

23     the scene item placards that I'm referring to.

24     For the description of the contents are 30

25     spent 7.62 by 39 millimeter caliber cartridge

T. Morgan - Direct by Mr. Chernosky

1    cases which is actually abbreviated.

2        Q.   I direct your attention to Commonwealth

3    Exhibits 223 through 253.  Where are those

4    located in the courtroom currently?

5        A.   They are currently arranged in order on

6    top of the witness stand.

7        Q.   Do you recognize the contents of those

8    exhibits?

9        A.   Yes.

10       Q.   What is contained within 223 through

11   253?

12       A.   In each of these coin envelopes,

13   similarly to the .40 S&W cartridge cases, are

14   contained the 30 spent 7.62 by 39 millimeter

15   caliber cartridge cases.

16       Q.   For demonstrative purposes, could you

17   remove Exhibit 223 from its coin envelope?

18              MR. CHERNOSKY:  May I publish

19   that to the jury, Your Honor?

20              THE COURT:  You may.

21       Q.   In general terms, is what is similar

22   items contained in Commonwealth 223 through

23   253?

24       A.   Yes.

25              MR. CHERNOSKY:  I move for the

T. Morgan - Direct by Mr. Chernosky

1    admission of Commonwealth Exhibits 223 through

2    253.

3              THE COURT:  Admitted without

4    objection.  As I told you earlier, they will be

5    available for you during your deliberations if

6    you choose to examine them during your

7    deliberations.

8        Q.  During your time at the scene, were you

9    directed to or did you process an area of

10   suspected saliva in the area of 1306 Franklin

11   Avenue?

12       A.  Yes.

13       Q.  Do you recall approximately where that

14   was located?

15       A.  Just very generally speaking, it was in

16   the area of where the spent 7.62 by 39

17   millimeter caliber cartridge cases were

18   collected.

19       Q.  What is the process or how is an area

20   of suspected saliva collected by the

21   laboratory?

22       A.  Well, specifically to this particular

23   case, the saliva appeared, or what we believed

24   was saliva on the scene, appeared to be still

25   wet.  So I simply took a cotton swab and

T. Morgan - Direct by Mr. Chernosky

1    swabbed up the wet saliva onto the cotton swab.

2        Q.  Did you also take what is known as a

3    control?

4        A.  Yes, I did.

5        Q.  Generally speaking, what is a control

6    and how is that process done?

7        A.  Just generally speaking, a control is

8    taking up the surface the item was on.  In this

9    case the item was on the ground.  In this case

10   I take water and drip it onto a cotton swab and

11   swab the ground in the immediate vicinity of

12   where the sample was collected.

13       Q.  During your processing of the scene

14   that night, were you directed to any footwear

15   impressions?

16       A.  Yes.

17       Q.  Could you tell the jury what you did

18   with respect to those?

19       A.  There were two suspected footwear

20   impressions.  We photographed them to scale.

21   We also made casts of the footwear impressions

22   that were in question.

23       Q.  How is a cast made?

24       A.  It is essentially a form of plaster or

25   dental stone and depending on the substrate, we

T. Morgan - Direct by Mr. Chernosky

1    may have to set up a frame, as we did in this

2    case.  We prepare the plaster and pour it down

3    on the footwear impression and allow it to dry

4    and harden on scene and collect it for future,

5    if necessary.

6        Q.  What was the purpose of collecting a

7    footwear impression via casting on the night of

8    the incident?

9        A.  Well, at the time, we were unsure as to

10   whether or not there was any relevance to it.

11   It was pointed out to us by some of the first

12   responders.  They could not immediately

13   identify it or did not believe it came from

14   their shoes.  So the location of the footwear

15   impression was in an area that could have been

16   a possible area of egress or ingress to the

17   area where the 7.62 by 39 caliber cartridge

18   cases were found, in the rear of 1306 Franklin

19   I should say.

20       Q.  With respect to the scene at 1304 or

21   1306 Franklin Avenue, did you recover

22   projectile fragments?

23       A.  Yes.

24       Q.  Could you tell the jury what a fragment

25   or a projectile is?

T. Morgan - Direct by Mr. Chernosky

1      A.   A projectile fragment is just a generic

2   term that we apply to the item that we collect

3   on a crime scene that could have at one time

4   been part of an entire bullet or spent bullet

5   fired down the firearm.

6      Q.   Referring to the interior and exterior,

7   did you recover items from the exterior?

8      A.   Yes.

9      Q.   I show you what I marked as

10  Commonwealth Exhibit 254 and ask you what 254

11  is?

12     A.   254 is an envelope bearing a barcode

13  with label laboratory case number 16LAB02222,

14  laboratory Item No. 5.   Further handwriting on

15  the envelope indicates that the scene items

16  contained inside are scene Item U, items 2

17  through 8, 10, and 11, and they were further

18  described as ten projectile fragments.

19     Q.   And contained within that envelope, are

20  there coin envelopes just as in the shell

21  casings that we just discussed?

22     A.   Yes, there are.

23     Q.   I direct your attention to Commonwealth

24  Exhibits 255 through 264.   What are those?

25     A.   These are additional coin envelopes

T. Morgan - Direct by Mr. Chernosky

1    that contain the projectile fragments described

2    on the outer packaging that contains them.

3                MR. CHERNOSKY:  Your Honor, I

4    move for the admission of Commonwealth

5    Exhibits 254 through 264.

6                THE COURT:  Admitted without

7    objection.

8        Q.  Similarly, did you recover projectiles

9    from the interior of 1304 Franklin Avenue?

10       A.  Yes, we did.

11       Q.  I show you what we marked as

12   Commonwealth Exhibit 265.  I ask you what is

13   Commonwealth Exhibit 265?

14       A.  This is another envelope bearing the

15   barcode at the same laboratory case number

16   16LAB02222.  This time laboratory item number

17   No. 16.  The handwriting indicates that these

18   are starting over again with scene items A

19   through E.  There were five spent projectiles

20   from inside 1304 Franklin Avenue.

21       Q.  Then I direct you to what is marked

22   inside of that envelope as Commonwealth

23   Exhibits 266 through 270.  Are those the

24   fragments that you recovered from inside 1304

25   Franklin Avenue?

T. Morgan - Direct by Mr. Chernosky

1    A.   Yes, they are and they are in their own

2    individual sealed coin envelope.

3                MR. CHERNOSKY:  I move to admit

4    266 through 270, Your Honor.

5                THE COURT:  Admitted without

6    objection.

7    Q.   Mr. Morgan, when you process a scene

8    and we see those little yellow placard markers

9    marking evidence, where do they come from?  Do

10   you bring them with you?

11   A.   Yes, we do.

12   Q.   How many did you have to use on this

13   scene?

14   A.   Well, you've heard of most of what

15   we've done.  I can tell you that we typically

16   use letters, just what we prefer.  At the time

17   we had letters A through Z and then another set

18   that was AA through AZ.  I believe on the

19   outside we had to start over with numbers going

20   up to 25, I believe.  Because we had to start

21   over, we started over completely again from the

22   beginning of the alphabet on the inside just to

23   kind of separate things and keep things as

24   least confusing as possible for us.

25                THE COURT:  While they are

T. Morgan - Direct by Mr. Chernosky

1    conferring, explain to the jury in terms of

2    your experience, ultimately when an exhibit,

3    any one of the exhibits, comes into court, how

4    many different letters or numbers they can have

5    based on crime scene processing by the police,

6    your being there, and ultimately in the crime

7    lab.  Do you know what I'm saying?  When the

8    police get there, they give it one designation.

9    When you get there, it gets another

10   designation.  When it gets to the crime lab, it

11   can get another designation, correct?

12               THE WITNESS:  Yes.

13               THE COURT:  Tell the jury how

14   that works.

15               THE WITNESS:  I'm not sure as to

16   what photos or items were shown to you, but

17   typically when I'm called out to a crime scene,

18   the initial first responders are there, in this

19   case, Wilkinsburg Police Department proper.

20   They gather their information and start their

21   search and typically they put out their

22   placards as they see evidence.  It may be a

23   single placard in a generalized area for a

24   number of different items that we prefer to

25   have separate placards on individually.

T. Morgan - Direct by Mr. Chernosky

1    Sometimes some of those departments don't have
2    sequential numbering or they're missing numbers
3    and letters.  So when we get there we
4    photograph it as we see it.  Then we'll often
5    remove their placards and put our own numbers
6    down to kind of create where and what we are
7    identifying each individual item for a placard
8    on scene for photography and cross-reference
9    purposes in as logical of an order as we can
10   possibly come up with as we find the evidence.
11   Those placards, again, are just for scene
12   reference and cross-reference for items that
13   later gets examined in the laboratory to where
14   it was found and recovered on scene.
15          We take all of these like evidence,
16   like the cartridge cases, the projectile items,
17   and according to our submissions policies, we
18   are allowed to put them in single scene package
19   they call it and submit them to the lab as a
20   single item and that becomes the laboratory
21   item number, the number 3, 6, 16 and 5 that
22   I've discussed at that point.
23          THE COURT:  Okay.
24   Q.  Switching gears a little bit, you also
25   described for the jury that your primary

T. Morgan - Direct by Mr. Chernosky

1   assignment is in the firearms and tool marks

2   section of the lab?

3       A.   Yes.

4       Q.   With respect to -- let me take you

5   through the basics.  What happens when a

6   semiautomatic handgun is discharged?

7       A.   When a semiautomatic firearm is

8   discharged, it completes what we call a cycle

9   of a firearm automatically with a single pull

10  of the trigger.  That means when cartridges are

11  loaded into the magazine and the magazine is

12  loaded into the firearm, you first have to

13  typically pull back on the slide of a

14  semiautomatic firearm or an operating handle if

15  it is a rifle and load a cartridge from the

16  magazine into the chamber.  The firearm is now

17  cocked and ready to fire.  All you have to do

18  is pull the trigger.  Once you pull the

19  trigger, the bullet is pushed down the barrel

20  of the firearm by expanding gases and the equal

21  and opposite reaction of that push operates the

22  action in such a way that it grabs ahold of the

23  discharged cartridge case now and automatically

24  extracts it from the chamber and ejects it from

25  the firearm.  There is spring tension typically

T. Morgan - Direct by Mr. Chernosky

1    that is being compressed on that rearward

2    motion of the action.  When that spring tension

3    overcomes the backward force, it closes the

4    action automatically on its own without any

5    manual need for operation, loads a second

6    cartridge into the chamber ready for it to be

7    fired.  For a semiautomatic firearm, all you

8    have to do at that point is let go of the

9    trigger and pull it one more time.  You can

10   keep doing that until you decide to stop or

11   until you run out of ammunition in the

12   magazine.

13        Q.  For lack of a better, the product, what

14   is the term for what goes out of the front of

15   the gun?

16        A.  The part that goes out of the front of

17   the gun is the projectile or bullet which would

18   be the most relevant to this case.

19        Q.  What is the technical term for what is

20   expelled after the bullet is expired?

21        A.  Do you mean ejected from the firearm?

22        Q.  Yes.

23        A.  That would be the spent cartridge case.

24        Q.  Is it possible to compare cartridge

25   cases to one another?

T. Morgan - Direct by Mr. Chernosky

1      A.  Yes.

2      Q.  Could you tell the jury how that is

3   done?

4      A.  A firearms examiner can compare spent

5   cartridge cases to one another using a

6   comparison microscope, which is simply a

7   microscope that has a connecting bridge that

8   allows me to look at two different viewing

9   stages either individually or simultaneously.

10  When we use the comparison microscope we are

11  looking for microscopic markings; in very

12  general and summary terms, markings that have

13  been imparted onto typically and most commonly

14  the primer or head area of the spent cartridge

15  case by the parts inside of the firearm.

16     Q.  Is it possible to compare cartridge

17  casings to a known weapon, a weapon that you

18  would have in evidence?

19     A.  Yes.

20     Q.  Is it possible to compare shell casings

21  to an unknown weapon if you don't have the

22  weapon?

23     A.  By unknown weapon, do you mean

24  cartridge cases from another incident where a

25  firearm has not yet been recovered?

T. Morgan - Direct by Mr. Chernosky

1    Q.   Yes.

2    A.   Yes.

3    Q.   In this particular case, did you

4    examine the .40-caliber casings that we just

5    discussed and compare them to one another?

6    A.   Yes.

7    Q.   And what conclusions did you draw about

8    the .40-caliber casings?

9    A.   That all 18 spent .40 S&W caliber

10   cartridge cases matched each other and were

11   discharged by the same firearm, that is after a

12   microscopic examination.

13   Q.   Did you undertake a similar examination

14   of the 7.62 by 39 shell casings that we

15   discussed here today?

16   A.   Yes.

17   Q.   And what conclusions did you draw about

18   the 7.62 by 39 cartridge casings?

19   A.   After a microscopic examination, that

20   all 30 7.62 by 39 millimeter caliber cartridge

21   cases recovered in this incident match each

22   other and were discharged by the same firearm.

23              THE COURT:  What are the

24   identifying characteristics or markers that

25   allow you to reach that conclusion?

T. Morgan - Direct by Mr. Chernosky

1          THE WITNESS:  Well, there are a
2    number of them during the microscopic
3    examination.  During the discharge process, the
4    cartridge case is pushed backwards into a part
5    of the firearm called the breech face.  During
6    the manufacturing process, there are
7    microscopic abnormalities that are imparted
8    onto that certain breech face that are unique
9    to that specific breech face.  That is just one
10   of the services.
11        There are similar microscopic
12   imperfections say on a firing pin, the part
13   that strikes the primer and causes the rapid
14   burn which burns the gunpowder and causes the
15   bullet to be pushed down the firearm.
16        There are other marks by tools known as
17   an ejector and an extractor that can provide
18   unique marks that we can use for identification
19   as well as some other marks on the chamber
20   itself when the cartridge case actually expands
21   a little bit inside of the chamber and creates
22   an air-tight seal.  So as much as the gas as
23   possible is going to be used to push the bullet
24   down the barrel.  Those are some of what we
25   find that lead us to unique marks that lead us

T. Morgan - Direct by Mr. Chernosky

1    to identification.

2        Q.  Mr. Morgan, is it possible or do you at

3    the laboratory have access to any databases of

4    known shell casings?

5        A.  Yes.

6        Q.  What is that referred to?

7        A.  The database would be referred to as

8    the National Integrated Ballistic Information

9    Network, NIBIN, N-I-B-I-N, for short.

10       Q.  How does that database function?  I

11   mean, how do you get results from that

12   database?

13       A.  Well, it starts with an acquisition of

14   a cartridge case.  We essentially put it into

15   an instrument that takes a photograph and makes

16   a digital map of the surface contours on the

17   primary area on the cartridge case.  That

18   digital map is compared to other exhibits

19   entered into that system with similar class

20   characteristics, meaning 7.62 by 39 millimeter

21   cartridges are compared to 7.62 by 39

22   millimeter cartridge cases and similar for

23   .40 S&W caliber cartridge cases.  That digital

24   map brings us a list of results, kind of like a

25   Google search if you will, for cartridge cases.

T. Morgan - Direct by Mr. Chernosky

 1   We will then review those images which can be

 2   other spent cartridge cases from crime scenes

 3   where a firearm has not been associated yet or

 4   test cartridge cases from a known firearm in

 5   the hopes that we can either link events to

 6   provide further investigative information or,

 7   of course, find the firearm that actually

 8   discharged the cartridge cases in question.

 9       Q.  With respect to the firearms involved

10   in this case, specifically I will start with

11   the .40-caliber, were there any results from

12   NIBIN on that .40-caliber casings?

13       A.  There were results but they were

14   negative for any links statewide.

15       Q.  With respect to the 7.62 by 39 caliber

16   shell casings, were there any NIBIN results for

17   that?

18       A.  There were and there were ultimately

19   two positive correlations.

20       Q.  Do you recall what the positive

21   correlations for those shell casings were?

22       A.  For specificity, I would have to refer

23   to my report for that.

24       Q.  Okay.  Initially, there were what we

25   refer to as high confidence correlations with

T. Morgan - Direct by Mr. Chernosky

1    two different laboratory case numbers, items

2    from two different laboratory case numbers.

3    The first one is 11LAB11661 and 11LAB07952.

4                MR. McKINNEY:  Your Honor,

5    permission to approach briefly.

6                THE COURT:  Okay.

7                (Sidebar discussion held as

8    follows.)

9                MR. McKINNEY:  Your Honor, I

10   believe the Commonwealth is attempting to

11   include hits from these casings on a prior

12   shooting homicide.  I'm not sure how this would

13   be relevant to the case.

14               MR. CHERNOSKY:  That is accurate

15   because on cross-examination Mr. McKinney will

16   try to link them to another homicide to make it

17   seem as if the gun was in the hands of someone

18   else.

19               THE COURT:  Well, it is

20   preemptive.  So you are going to get into that?

21               MR. McKINNEY:  No.

22               MR. CHERNOSKY:  Okay, then I'll

23   stop here with asking the questions.

24               THE COURT:  I will tell the jury

25   to disregard the last part.

T. Morgan - Cross by Mr. McKinney

 1              (Sidebar discussion concluded.)

 2              THE COURT:  Ladies and gentlemen,

 3    as to the last several questions and answers,

 4    you are to disregard that.  Strike it from your

 5    consideration.

 6              MR. CHERNOSKY:  Thank you, Your

 7    Honor.  I have no further questions.  I offer

 8    this witness for cross.

 9              THE COURT:  Mr. McKinney.

10              -----

11              CROSS-EXAMINATION

12              -----

13    BY MR. McKINNEY:

14       Q.  Mr. Morgan, you collected two different

15    kinds of casings from the crime scene?

16       A.   Two different caliber cartridge cases,

17    yes.

18       Q.  .40-caliber was one and the other were

19    rifle casings?

20       A.   7.62 by 39 millimeter caliber cartridge

21    cases, to call them rifle cartridge cases, that

22    would be the type of firearm they would be

23    fired in the overwhelming majority of the time.

24    There are pistols, if you will, that can

25    discharge them.

T. Morgan - Cross by Mr. McKinney

1      Q.   You collected these casings in a manner

2   as best you could to preserve them for future

3   testing?

4      A.   Yes.

5      Q.   Were either one of those types of

6   casings ever submitted for DNA tests?

7      A.   There were no requests for that.

8      Q.   How about fingerprinting?

9      A.   There were no requests for that.

10      Q.   Who would the request come from?

11      A.   Again, that would be discussions that

12   were had with us and the investigating agency

13   itself.

14      Q.   So in this case that would be the

15   Allegheny County Police Department who did not

16   make those requests, correct?

17      A.   Oh, there were requests made regarding

18   the cartridge cases but not for -- especially

19   at the time and at the time at the scene -- but

20   not for DNA or fingerprints.

21      Q.   In the approximate four years that this

22   incident occurred, there has been no additional

23   requests for DNA or fingerprint testing; is

24   that correct?

25      A.   I wouldn't have no knowledge of that

T. Morgan - Cross by Mr. McKinney

1    after my role from the scene is over with.

2        Q.  As far as you know, those requests

3    haven't been made; is that fair to say?

4        A.  As far as I know, that would be fair.

5        Q.  With respect to the boot impression

6    found on scene, were you ever provided with any

7    other boots or shoes either belonging to

8    Mr. Thomas or Mr. Shelton to make a comparison

9    to that boot impression?

10        A.  Well, for specificity to your question,

11    I never collected them.  As far as those

12    comparisons are concerned, I am not -- in my

13    area of expertise, I wouldn't have the

14    expertise via the training and testing and

15    competency testing to compare those in the

16    laboratory anyhow.  But I can say that we were

17    not provided any boots for checking or

18    collected any.

19        Q.  To the best of your knowledge, do you

20    know if your lab or office was provided with

21    the boot or shoe size of either Mr. Shelton or

22    Mr. Thomas?

23        A.  To the best of my knowledge, I do not

24    know that.

25        Q.  Mr. Morgan, as a firearms expert, do

T. Morgan - Cross by Mr. McKinney

1    you know what a headstamp is?

2         A.   Yes.

3         Q.   What is that?

4         A.   The headstamp is, it could be a number

5    of different things.  Typically, they contain

6    the caliber information of the cartridge as

7    well as some sort of mark by the person who at

8    least markets the cartridge case, and I say

9    market because sometimes manufacturers will

10   subcontract some of their work out to another

11   company to make their cartridge cases.

12        Q.   With respect to the 7.62 by 39

13   millimeter casings, was there a headstamp

14   associated with them?

15        A.   Yes.

16        Q.   What was the headstamp?

17        A.   There were three different kinds if my

18   memory serves me correctly.

19        Q.   Could you tell me what kinds?

20        A.   I will refer to my notes to be sure.

21   The 7.62 by 39 millimeter caliber cartridge

22   cases, of the 30, there were 13 of them that

23   had Cyrillic letters of the alphabet which I

24   will call as a Cyrillic N and a K at what would

25   be the 12:00 position and a 1977 which would

T. Morgan - Cross by Mr. McKinney

1   have been found at the 6:00 position if you

2   were looking at the cartridge case in that

3   manner.  There were 15 that had a 9141 which

4   would be at the 12:00 position and a 73 at the

5   6:00 position if you were looking down at the

6   headstamp.  And two that had the letters

7   S-A-D-U at the 12:00 position and 07 at the

8   6:00 position.

9       Q.  With respect to your work on this case,

10  were you ever provided with any other shell

11  casings or ammunition to compare with respect

12  to the ammunition that you found on scene?

13      A.  Yes.

14      Q.  Would that have been ammunition found

15  at 1214 Nolan Court?

16      A.  That would be correct.

17      Q.  I'm going to give you an opportunity to

18  gather that report.

19      A.  Thank you.

20      Q.  Sure.

21      A.  Okay, Mr. McKinney.

22      Q.  With respect to the ammunition that you

23  were asked to review from 1214 Nolan Court,

24  were you asked to review any 7.62 by 39

25  millimeter ammunition?

T. Morgan - Cross by Mr. McKinney

1      A.   Yes, I was.

2      Q.   What was the headstamp on that

3  ammunition?

4      A.   For specificity for the record, this

5  ammunition was submitted to the laboratory

6  under laboratory case number 16LAB02403.  There

7  were two laboratory items that contained them,

8  one which was further itemized after further

9  examination by a different section of the

10  laboratory as laboratory Item 3-A-1.  Those

11  would have been nine 7.62 by 39 millimeter

12  caliber cartridges and laboratory Item 4-A-1

13  which would have been 36 7.62 by 39 millimeter

14  caliber cartridge cases.

15          Referring to the headstamp finally, in

16  laboratory Item 3-A-1, there were two different

17  ones, the first had the headstamp of Wolf,

18  which would have been the 12:00 position and

19  7.62 by 39 at 6:00.  The other three had a

20  symbol that based on my expertise and training

21  in the laboratory I recognized as something

22  from a manufacturer named Barnaul which is a

23  manufacturer of Eastern Europe.  In 4-A-1 of

24  the 7.62 by 39 millimeter caliber cartridges,

25  23 of those also had the Wolf headstamp.  13

T. Morgan - Cross by Mr. McKinney

1    additional had that Barnaul headstamp.  And

2    that is it.  That is the 36, yes.

3        Q.  Thank you, Mr. Morgan.  So the

4    headstamps from the ammunition at 1214 Nolan,

5    none of it matched the headstamps from the

6    casings at the crime scene?

7        A.  Well, no, I wouldn't agree with that.

8    They are all 7.62 by 39 millimeter caliber

9    cartridges.  Regardless of whether if they are

10    made by Wolf, Barnaul, any of the Eastern

11    European manufacturers or Chinese manufacturers

12    which I didn't mention for the other headstamp,

13    they could be loaded into and fired from the

14    same firearm but none of them were the same

15    manufacturer or marker as I referred to.

16        Q.  Maybe I should ask that question a

17    different way.  The manufacturers of the

18    ammunition found at Nolan Court was not the

19    same as the manufacturer for the ammunition

20    that was recovered from the crime scene?

21        A.  That would be correct.

22        Q.  Okay.  With respect to 7.62 by 39

23    millimeter ammunition, as a firearms expert you

24    would agree with me that that ammunition can be

25    found or purchased at any sporting goods store?

T. Morgan - Redirect by Mr. Chernosky

1        A.  Yes.

2        Q.  So it is common with respect to rifles,

3    some handguns can even use it?

4        A.  Yes.

5                MR. McKINNEY:  No additional

6    questions.

7                THE COURT:  Anything else,

8    Mr. Chernosky?

9                MR. CHERNOSKY:  Just briefly.

10                    -----

11              REDIRECT-EXAMINATION

12                    -----

13    BY MR. CHERNOSKY:

14        Q.  Mr. Morgan, is there anything about the

15    physical process of discharging a firearm that

16    in your experience would compromise the ability

17    to get DNA or fingerprints off shell casings?

18        A.  Well, I could go into detail about what

19    happens to the cartridge cases when they are

20    discharged, that might help explain things.

21        Q.  Would you, please?

22        A.  With respect to the discharge itself,

23    when a cartridge or the single unit of

24    ammunition is discharged, it utilizes the

25    burning or fire of the firearm to release a

T. Morgan - Redirect by Mr. Chernosky

1   rapid amount of gas and push it down the

2   cartridge case.  I've already mentioned briefly

3   the cartridge, when it is in the chamber, it is

4   designed to fit tightly so during the

5   discharge, it swells slightly to create a tight

6   fit.  The cartridge case itself during the

7   extraction process is now swelled to create a

8   tight fit.  To make sure all the gas is going

9   to be utilized to push the projectile down the

10  barrel of the firearm, it is now being scraped

11  along that chamber as it is being pulled out of

12  the cartridge case.  That is before it is even

13  ejected and flies through the air and lands on

14  the ground and perhaps bounces around.

15          When the bullet goes down the barrel of

16  the gun, it is designed to grip it tightly.  It

17  has a series of rifling on the inside known as

18  lands and grooves.  Those lands and grooves

19  grip that bullet tightly.  They, in addition to

20  imparting the rifling and microscopic

21  characteristics on the surface so a firearm

22  examiner can use it to make identifications, it

23  grips it tightly so it imparts a rotary motion

24  on the bullet.  So as it is going down the

25  length of the barrel being squeezed in between

T. Morgan - Recross by Mr. McKinney

1    that rifling, that bullet comes out of the
2    barrel rotating on an axis ideally how you
3    would like to throw a football down the field.
4                MR. CHERNOSKY:  Thank you.
5                MR. McKINNEY:  Brief recross,
6    Your Honor?
7                THE COURT:  Okay.
8                      -----
9                RECROSS-EXAMINATION
10                     -----
11   BY MR. McKINNEY:
12       Q.  Mr. Morgan, is it possible to obtain
13   fingerprint evidence from a shell casing?
14       A.  It is possible.
15       Q.  Is it possible to obtain DNA evidence
16   from a shell casing?
17       A.  Well, that depends on who you ask.
18   There have been some techniques that I've been
19   made aware of where they've had some success
20   developing DNA material.
21       Q.  If the Allegheny County District
22   Attorney's Office requested either fingerprint
23   testing or DNA testing, would you have
24   completed that testing?
25       A.  That is not something that I can answer

T. Morgan - Recross by Mr. McKinney

1    for certain sections.  I can only tell you what

2    was given priority on the day of the incident.

3         Q.  If the Allegheny County Police

4    Department would have requested that kind of

5    testing, would it have been completed?

6         A.  With regard to latent fingerprints, I

7    feel comfortable saying yes, but with regards

8    to DNA, you would have to ask the DNA people

9    about that.

10        Q.  From your experience, is it cost

11   prohibitive for your lab to conduct fingerprint

12   and/or DNA testing?

13              MR. CHERNOSKY:  Your Honor, I

14   would object to the relevance.

15              THE COURT:  Objection sustained.

16              MR. McKINNEY:  No additional

17   questions, Your Honor.

18              THE COURT:  Anything else,

19   Mr. Chernosky?

20              MR. CHERNOSKY:  No, Your Honor.

21              THE COURT:  Thank you.  You can

22   package up the exhibits, please.

23              (Sidebar discussion held as

24   follows.)

25              THE COURT:  Powell is next?

L. Powell - Direct by Ms. Pellegrini

1          MR. CHERNOSKY:  Yes, let me

2    confirm.

3          THE COURT:  No, you don't have

4    to.  He is here ready to go.  Is there anything

5    resolved about the prior conviction, no

6    conviction?

7          MR. CHERNOSKY:  The possession?

8          THE COURT:  Yes.

9          MR. CHERNOSKY:  Our position is

10   it is outside the statute of limitations.

11         THE COURT:  But he is allowed to

12   cross-examine?

13         MR. CHERNOSKY:  He is allowed to

14   ask.  His attorney is here.  It expired.

15         THE COURT:  I get that.  Okay,

16   I'm going to bring him in here.

17         (Sidebar discussion concluded.)

18         MS. PELLEGRINI:  The Commonwealth

19   calls Lamont Powell.

20                    -----

21              LAMONT POWELL,

22   a witness herein, having been first duly sworn,

23   was examined and testified as follows:

24                    -----

25

L. Powell - Direct by Ms. Pellegrini

1                          -----

2                  DIRECT EXAMINATION

3                          -----

4    BY MS. PELLEGRINI:

5        Q.  Good morning, Mr. Powell.

6        A.  Good morning.

7        Q.  Would you please state your full name,

8    spelling your first and last name for the court

9    reporter?

10       A.  Lamont Powell, L-A-M-O-N-T,

11   P-O-W-E-L-L.

12       Q.  You don't want to be here, do you?

13       A.  No.

14       Q.  In fact, you failed to appear pursuant

15   to a subpoena?

16       A.  Yes.

17       Q.  In fact, you were arrested on a

18   material witness warrant, right?

19       A.  Yes.

20       Q.  That is why you are in jail clothes?

21       A.  Yes.

22       Q.  You've been held pending your testimony

23   here today?

24       A.  Yes.

25       Q.  You're currently on probation?

L. Powell - Direct by Ms. Pellegrini

1      A.  Yes.

2      Q.  What are you on probation for?

3      A.  Simple assault.

4      Q.  Did that occur before your family was

5   murdered?

6      A.  Yes.

7      Q.  When you were shot the night of March

8   the 9th, the paramedics recovered a bundle of

9   heroin from your clothing?

10     A.  Okay.

11     Q.  Were you ever charged with that?

12     A.  No.

13     Q.  Mr. Powell, how old are you?

14     A.  I'm 28.

15     Q.  Where did you grow up?

16     A.  Homewood Brushton.

17     Q.  Did you live part of your life or all

18  of your life on Hilltop?

19     A.  No, my mom moved around '98.

20     Q.  But you used to spend time on Hilltop?

21     A.  Yes.

22     Q.  And can you tell us who your brothers

23  and sisters are?

24     A.  Michael, Jerry.

25     Q.  Jerry is his real name but you call him

L. Powell - Direct by Ms. Pellegrini

1    Michael?

2         A.  Yes.

3         Q.  And he is deceased?

4         A.  Yes.

5         Q.  Who else?

6         A.  Chanetta Powell.

7         Q.  She died as well?

8         A.  Yes.

9         Q.  Who else?

10        A.  Brittany Powell.

11        Q.  She died?

12        A.  Yes.

13        Q.  Do you have any other siblings?

14        A.  Yes.

15        Q.  Could you tell me their names?

16        A.  Laron Powell and Melloyora Walker.

17        Q.  Does Millie still live in Hilltop?

18        A.  No.

19             THE COURT:  One second.  Did your

20   mom move to or from Hilltop in 1998?

21             THE WITNESS:  From.

22        Q.  You had a lot of friends on Hilltop,

23   right?

24        A.  Yes.

25        Q.  In fact, Brittany and your sisters used

L. Powell - Direct by Ms. Pellegrini

1    to be friendly with a lot of people up there?

2        A.  Yes.

3        Q.  Pretty close-knit community up there,

4    right?

5        A.  Yes.

6        Q.  A few years before your family was

7    killed, did you know an individual by the name

8    of Calvin Doswell also known as Calio?

9        A.  I've heard of him.

10       Q.  He got murdered?

11       A.  I heard.

12              MR. McKINNEY:  Your Honor, I

13   object to the consistent leading questions.

14              THE COURT:  That is sustained.

15       Q.  What were people saying about the

16   murder of Calio?

17              MR. McKINNEY:  Your Honor, that

18   is hearsay.

19              THE COURT:  Objection is

20   overruled.

21       Q.  What were they saying?

22       A.  They said that I had something to do

23   with it.

24       Q.  Did you have anything to do with it?

25       A.  No, ma'am.

L. Powell - Direct by Ms. Pellegrini

1    Q.  As a result of what people were saying,
2    what did you do?
3    A.  I didn't do anything.
4    Q.  Did you go away for a little bit?
5    A.  No.
6    Q.  You didn't go stay with your dad in
7    Washington?
8    A.  I went to college in Washington, that
9    is where I got my degree at.  That is when I
10   went to Washington.
11   Q.  That was after the murder of Calio?
12   A.  I went to school in 2012.
13   Q.  Are you telling us that you didn't
14   leave for a little bit?
15   A.  I didn't leave at all.
16   Q.  Let's talk about March 9th.
17   A.  Okay.
18   Q.  Where was Brittany living, where was
19   Brittany living in March?
20   A.  On Franklin Avenue.
21   Q.  Who was she living with?
22   A.  I'm not sure of the lady's name.
23   Q.  Did Brittany have children?
24   A.  Yes.
25   Q.  Did Chanetta have children?

L. Powell - Direct by Ms. Pellegrini

1          A.  Yes.

2          Q.  Was March 9th a nice day?

3          A.  It was one of the first nice days of

4     that year, yes.

5          Q.  Did you and your sisters decide to have

6     a barbecue?

7          A.  Yes.

8          Q.  Tell me how it came about.

9          A.  Like I said, it was one of the first

10    nice days of that year.  So me and my sister

11    decided to have a cookout.  She asked me to

12    cook the meat.

13         Q.  You go buy party stuff?

14         A.  No, she just bought some food

15    basically.

16         Q.  Was there any beer there?

17         A.  Not that I'm aware of.

18         Q.  How about liquor?

19         A.  Not that I'm aware of.

20         Q.  Were you drinking on that night?

21         A.  I don't remember.

22         Q.  Okay.  Do you remember anybody that

23    came to the party?

24         A.  My cousin came.

25         Q.  Who is your cousin?

L. Powell - Direct by Ms. Pellegrini

 1       A.   Tina Shelton.

 2       Q.   Do you remember her coming with another

 3   lady?

 4       A.   Yes.

 5       Q.   Do you remember the lady's name?

 6       A.   No, I never seen her.

 7       Q.   Do you remember Shada Mahone?

 8       A.   Yes.

 9       Q.   Was she there?

10       A.   Yes.

11       Q.   Was Chanetta having a baby?

12       A.   Yes, she was pregnant.

13       Q.   She was quite far along, right?

14       A.   Yes.

15       Q.   Were any of the kids at the house?

16       A.   Yes.

17       Q.   Do you remember how many children were

18   at the house?

19       A.   I don't remember how many.

20       Q.   Do you remember if any neighbors came?

21       A.   I'm not sure.

22       Q.   Do you remember a lady by the name of

23   Carla?

24       A.   I know her.

25       Q.   Was she at the party?

L. Powell - Direct by Ms. Pellegrini

1        A.  I don't remember seeing her.

2        Q.  What about John Ellis?

3        A.  I don't know him.

4        Q.  Anybody else?

5        A.  Not that I'm aware of.

6        Q.  How about two guys named Ace, were they

7    there?

8        A.  I don't know them.

9        Q.  Do you remember at some point during

10   the party you and your sisters and cousin

11   wanting to take a picture?

12       A.  I think so, yes.

13       Q.  Do you remember being on the steps of

14   the porch and taking a picture?

15       A.  I don't remember.

16       Q.  At some point can you tell us what you

17   remember?

18       A.  I honestly just remember cooking the

19   food, then hearing shots, basically ducking and

20   laying on the ground.

21       Q.  Do you remember what direction the

22   shots were coming from?

23       A.  Absolutely not.

24       Q.  Do you remember hearing more than one

25   type of gun?

L. Powell - Direct by Ms. Pellegrini

1        A.   I don't know.

2        Q.   Where were you shot?

3        A.   Back, hands, neck, and chest I think.

4        Q.   Could you describe your injuries to

5   this jury?

6        A.   Can I describe them?

7        Q.   What happened?  Did you have to have

8   surgery?  Tell us.

9        A.   Yes, I had back surgeries.

10        Q.   Do you remember what kind of internal

11   damage that you had?

12        A.   I really didn't look that much into

13   none of it, do you know what I mean?  I didn't.

14        Q.   You don't remember what medical care

15   you had?

16        A.   Medical care like hospital?

17        Q.   You went to Mercy, right?

18        A.   Right.

19        Q.   In fact, when you went to Mercy, you

20   didn't want to talk to detectives, right?

21        A.   No.

22        Q.   In four years you didn't want to talk

23   to anybody?

24        A.   I didn't want to relive that night,

25   that is it basically.

L. Powell - Direct by Ms. Pellegrini

1      Q.  Even though your sisters were killed

2   and brothers?

3      A.  It is a nightmare.  I take care of my

4   family things in-house.  I didn't want to

5   relive it in the open.

6      Q.  Okay.  So you get shot, right?

7      A.  Right.

8      Q.  The next thing that you remember is

9   that you said that you hit the ground?

10     A.  Yes.

11     Q.  How did you get to the front porch?

12     A.  I ran.

13     Q.  Where were your sisters?

14     A.  I'm not sure.

15     Q.  Did you get in the house first?

16     A.  When I got up, I didn't know nothing

17  around me.  I was just trying to get back in

18  the house.

19     Q.  Do you remember a social media post, I

20  think on Facebook or something, about grilling

21  out that night?

22     A.  Yes.

23     Q.  Do you remember what the post said?

24     A.  It said where the cookout was at, I

25  believe.

L. Powell - Cross by Mr. McKinney

```
 1        Q.  Did you post it?

 2        A.  Yes.

 3        Q.  Do you remember at what point in the

 4   evening you sent that post out?

 5        A.  That was before everything happened.

 6   That was in the morning when I was at home.

 7   That was like the planning of it.

 8        Q.  Do you remember later in the evening

 9   one of your sisters, perhaps Brittany, posting

10   a picture of you by the grill?

11        A.  I don't remember.

12             MS. PELLEGRINI:  That is all I

13   have.

14             THE COURT:  Any questions?

15             MR. McKINNEY:  Yes, Your Honor.

16                  -----

17             CROSS-EXAMINATION

18                  -----

19   BY MR. McKINNEY:

20        Q.  Mr. Powell, how did it feel when you

21   were accused of a murder that you didn't

22   commit?

23        A.  Horrible.

24        Q.  Were you ever charged?

25        A.  No, sir.
```

L. Powell - Cross by Mr. McKinney

1      Q.  Do you know if you were investigated?

2      A.  I don't know.

3      Q.  So when Ms. Pellegrini asked you on

4  direct examination what you had heard, those

5  were just rumors?

6      A.  Yes.

7      Q.  Okay.  Do you remember what years you

8  were in Washington County?

9      A.  I went up there, the first year there

10  was 2012.

11      Q.  So you enrolled in school before this

12  all happened, correct?

13      A.  Yes.

14      Q.  Did you get your degree?

15      A.  Yes.

16      Q.  From what years to what years?

17      A.  From '12 to '15.

18      Q.  Then in 2015 did you move back to

19  Pittsburgh?

20      A.  Yes.

21      Q.  You've lived in Pittsburgh since 2015?

22      A.  Yes.

23      Q.  You said you grew up on Hilltop?

24      A.  Yes.

25      Q.  Back in March of 2016, you still had

L. Powell - Cross by Mr. McKinney

1    family that lived on Hilltop, right?

2        A.   Yes.

3        Q.   And a sister named Millie who lived on

4    Hilltop then?

5        A.   Yes.

6        Q.   And she lived on Nolan Court, right?

7        A.   Yes.

8        Q.   And she lived in the 1200 block of

9    Nolan Court, correct?

10       A.   Yes.

11       Q.   So your sister lived next door to

12   Cheron Shelton's mother; is that correct?

13       A.   I'm not sure.

14       Q.   But your sister's, Millie's, address

15   was 1216 Nolan Street, correct?

16       A.   I'm not sure.

17       Q.   You said that she lived in the 1200

18   block of Nolan Court?

19       A.   Yes, I heard.

20       Q.   You have a brother by the name of Laron

21   Powell?

22       A.   Yes.

23       Q.   Did he grow up on Hilltop, too?

24       A.   Yes.

25       Q.   Did he stay on Nolan Court at any time?

L. Powell - Cross by Mr. McKinney

1       A.   I'm not sure.

2       Q.   Do you know whether your brother and

3  Cheron Shelton had any kind of relationship?

4       A.   No, I don't.

5       Q.   Now, this whole Facebook posting, you

6  posted in the morning a comment that said

7  where's the cookout?

8       A.   Correct.

9       Q.   Was that a post or a post and a

10  picture?

11       A.   I don't remember.

12       Q.   You would agree that the cookout didn't

13  occur until that evening, correct?

14       A.   I believe it was all day.

15       Q.   Where were you when you posted the

16  comment where's the cookout?

17       A.   The north side.

18       Q.   So when you posted that comment, you

19  were not at 1304 Franklin Avenue, correct?

20       A.   No, sir, that is correct.

21       Q.   When you posted that where's the

22  cookout note, you didn't accompany it with any

23  picture of 1304 Franklin Avenue, correct,

24  because you were on the north side?

25       A.   I don't remember.

L. Powell - Cross by Mr. McKinney

1      Q.  Has anyone from the DA's Office
2  provided you with a copy of your Facebook post
3  to review?
4      A.  I was incooperative.  I didn't talk to
5  the DA or anything.
6      Q.  Has anyone from the DA's Office
7  provided you with this alleged picture that was
8  taken at the cookout?
9      A.  I'm not sure.
10              MR. McKINNEY:  No additional
11  questions, Your Honor.  Thank you.
12              THE COURT:  Anything else?
13              MS. PELLEGRINI:  No, thank you.
14              THE COURT:  Thank you.  He is
15  excused.
16              MS. PELLEGRINI:  Your Honor, may
17  Mr. McKinney and I approach?
18              (Sidebar discussion held as
19  follows.)
20              MS. PELLEGRINI:  I'm just
21  formerly requesting that you lift his warrant
22  pursuant --
23              THE COURT:  I did that.
24              MS. PELLEGRINI:  Thank you.
25              THE COURT:  Who is your next

D. Shelton - Direct by Ms. Pellegrini

1    witness?

2                    MS. PELLEGRINI:  David Shelton.

3                    THE COURT:  Is he a victim?

4                    MS. PELLEGRINI:  No, he is a

5    relative.

6                    THE COURT:  Pardon me?

7                    MS. PELLEGRINI:  He is a relative

8    and is going to talk about the Facebook post.

9                    THE COURT:  Okay, let's do that.

10                    (Sidebar discussion concluded.)

11                         -----

12                    DAVID SHELTON,

13    a witness herein, having been first duly sworn,

14    was examined and testified as follows:

15                         -----

16                    DIRECT EXAMINATION

17                         -----

18    BY MS. PELLEGRINI:

19         Q.  Good morning, Mr. Shelton.

20         A.  Good morning.

21         Q.  Mr. Shelton, you are very, very

22    soft-spoken.  Could you do your best to speak

23    into the microphone for me?

24         A.  I got you.

25         Q.  Could you please state your full name

D. Shelton - Direct by Ms. Pellegrini

1    and spell your last name for the court

2    reporter?

3         A.   My name is David Shelton,

4    S-H-E-L-T-O-N.

5         Q.   Mr. Shelton, how old are you?

6         A.   52.

7         Q.   What do you do for a living?

8         A.   I'm a drug and alcohol outreach and

9    family specialist at one job and a behavior

10   tech supervisor at another job.

11        Q.   Can you describe for us what you do for

12   a living, for each job, just briefly?

13        A.   One job I go out, the other job I'm

14   outreach for the drug and alcohol program.

15        Q.   What does that mean?

16        A.   I go out and inform the community about

17   treatment for people that suffer from drug

18   addiction.  I go out and give the resources

19   that we have from our company and let people

20   know that there is a new way to live without

21   the use of drugs and alcohol.  I go out and

22   inform the community.  I go out and perform

23   outpatient treatment presentations for

24   different companies throughout the county.

25   Family specialist, I work with families who

D. Shelton - Direct by Ms. Pellegrini

1    suffer from opioid addiction.

2        Q.   How are you related to Lamont and

3    Brittany and Chanetta and Jerry?

4        A.   I am their uncle.

5        Q.   Is their mom your sister?

6        A.   Yes.

7        Q.   You have the same last name as the

8    defendant.  Are you related to him?

9        A.   No relation.

10       Q.   Mr. Shelton, in March of 2016, on

11   March 9th, did you see a Facebook post that

12   Brittany posted?

13       A.   Yes.

14       Q.   Was it a picture?

15       A.   It was like live.

16       Q.   Like a video?

17       A.   Yeah.

18       Q.   What was it?

19       A.   They were just celebrating a nice night

20   out.  It was a nice day.  They were celebrating

21   with a cookout.

22       Q.   Was that in the evening hours?

23       A.   It was like mid afternoon.

24       Q.   Was that taken at the Franklin Avenue

25   address?

D. Shelton - Cross by Mr. McKinney

1          A.   Yes.

2          Q.   Do you remember, was Lamont in those

3     pictures?

4          A.   He flashed through them on the video.

5          Q.   He was on the video?

6          A.   Yeah, she caught him on the grill here.

7     She caught him on the grill enjoying himself.

8          Q.   Do you still have that post?

9          A.   No, I don't have it.

10              MS. PELLEGRINI:  Thank you,

11    Mr. Shelton.  That is all I have.

12              THE COURT:  Any questions?

13                   -----

14              CROSS-EXAMINATION

15                   -----

16    BY MR. McKINNEY:

17         Q.   Mr. Shelton, whose Facebook page was

18    that on?

19         A.   Brittany's, my niece.

20              MR. McKINNEY:  I have no

21    additional questions.

22              THE COURT:  Thank you,

23    Mr. Shelton.  You are excused.

24              MS. PELLEGRINI:  Your Honor, may

25    he be allowed to remain in the courtroom?

J. Knapp - Direct by Ms. Pellegrini

1          THE COURT:  He may.  Call your

2    next witness.

3          MS. PELLEGRINI:  The Commonwealth

4    calls Julie Knapp.

5                    -----

6                JULIE KNAPP,

7    a witness herein, having been first duly sworn,

8    was examined and testified as follows:

9                    -----

10               DIRECT EXAMINATION

11                    -----

12   BY MS. PELLEGRINI:

13        Q.  Ms. Knapp, could you please state your

14   full name, spelling your last name for the

15   court reporter?

16        A.  Yes, Julie Marie Knapp, K-N-A-P-P.

17        Q.  Julie, without telling us your address,

18   where do you live?

19        A.  Without my address?

20          THE COURT:  Ma'am --

21        Q.  Do you still live on Franklin Avenue?

22        A.  At 1304.

23          THE COURT:  Ask a question.  She

24   does not have to disclose her address.

25        Q.  You still live in the residence where

J. Knapp - Direct by Ms. Pellegrini

1    this occurred?

2        A.   I do, yes.

3        Q.   Do you own that house?

4        A.   It is in my parents' name.  It is my

5    family home.  I grew up there.  It was passed

6    on to me.  I'm working it out on a payment

7    schedule.

8        Q.   How did you know Brittany?

9        A.   Well, having grown up there, I knew my

10   neighbors well.  There was a girl living next

11   door.  Brittany was a dear friend of hers.  I

12   met her the summer before this happened.

13       Q.   What was the next-door neighbor's name?

14       A.   Carla.

15       Q.   Carla and Brittany were friends?

16       A.   Best friends.

17       Q.   And through that were you looking for a

18   tenant?

19       A.   I was.

20       Q.   And did you and Brittany come to an

21   agreement and she moved into the house?

22       A.   I was looking for someone like her, a

23   single mom with a daughter maybe to share the

24   space with because I thought it would be a good

25   place for that sort of thing with a yard and

J. Knapp - Direct by Ms. Pellegrini

1    everything.  I wasn't sure if I would be living

2    there.  I wanted to know that there was family

3    people with children around.

4        Q.  You were actually not living at the

5    house full-time, correct?

6        A.  Not full-time, no.  I had an apartment

7    with my former husband in Squirrel Hill.  When

8    my parents moved, I had to stay on at the house

9    in Wilkinsburg and just there was no one that

10   was going to keep it from getting the pipes

11   worked out, if the house was left empty.

12   Because of my health, it is kind of difficult

13   to be going back and forth so I would stay at

14   one place for a number of days and go back and

15   forth.

16       Q.  When did Brittany move into the house?

17       A.  She moved in in November, I want to

18   say, early November maybe.  It was at the end

19   of the month.  I can't remember.  But it was

20   later on in the fall.

21       Q.  Did you meet her siblings?

22       A.  Later on I did.  She and I got to know

23   each other over the summer a bit.  We just had

24   a rapport.  I got to meet a little bit of her

25   family because I was also giving her daughter

J. Knapp - Direct by Ms. Pellegrini

1    rides to school and helping a little bit with a

2    few things around the house to help her get

3    settled in and develop a routine.

4        Q.  How old was Brittany's daughter?

5        A.  Seven.

6        Q.  Now, on the day of March 9th, how does

7    the idea of a cookout come about?

8        A.  The previous day or so, a day or two,

9    Brittany had some family over.  My former

10   husband had to go to China on family business

11   and actually it is what saved my life, I think,

12   but when he left, I was spending a little more

13   time in the Squirrel Hill apartment because

14   there was something that needed to be fixed

15   there so I went.  So I'm not exactly sure how

16   the idea came about but I know that it was

17   being discussed the day before or the day of.

18   So Brittany and I went through the day and we

19   stopped for food.

20       Q.  Did you buy groceries, hamburgers?

21       A.  I know that we got a lot of the stuff.

22   I think everybody else brought most of what we

23   needed.  Brittany, she had a job interview and

24   I took her to that.  It went very well.  It was

25   just a wonderful day.  On the way back from

J. Knapp - Direct by Ms. Pellegrini

1    that, on the way back from that, we stopped at

2    the Save-A-Lot and grabbed a couple of items.

3         Q.  Do you remember in the afternoon who

4    was at the house?

5         A.  I think Jessica was there, Brittany's

6    mom.

7         Q.  Brittany's mom was there?

8         A.  And.

9         Q.  Was Chanetta there?

10        A.  She was either there or next door

11   because I think she was also spending time with

12   Carla around that time.  I'm not sure.

13        Q.  Were people just sort coming and going

14   throughout the evening?

15        A.  Pretty much, yeah.

16        Q.  What was the mood, backyard barbecue?

17        A.  Everyone was happy.  Brittany had told

18   me that day we feel, she said I feel safe here.

19   She said I feel safe raising my child here.  My

20   family is coming back together again.  We're

21   spending time together.

22        Q.  Ms. Knapp, you need to listen to the

23   questions that I ask you and answer those,

24   okay?

25        A.  I apologize.

J. Knapp - Direct by Ms. Pellegrini

1      Q.  That is okay.  I know that you are

2   upset.

3      A.  I misunderstood you.

4      Q.  So did you ever see anybody at the

5   party with a gun?

6      A.  No.

7      Q.  Did you have a dog?

8      A.  Yes.

9      Q.  What was your dog's name?

10      A.  Tippy.

11      Q.  Was Tippy allowed to be at the Squirrel

12   Hill house with you?

13      A.  She was able to go only if it was to

14   stop by but she needed to stay at the house and

15   she loved the kids so she stayed.

16      Q.  How many kids stayed at the house?

17      A.  Just Tay but she had her cousin sleep

18   over here and there.

19      Q.  Do you remember there being a Facebook

20   post going out about the barbecue?

21      A.  No, I didn't know until the next day.

22   I'm not a Facebook person.

23      Q.  Do you leave the apartment at some

24   point?

25      A.  Yes, that night.

J. Knapp - Direct by Ms. Pellegrini

1    Q.   Yes?

2    A.   Yes.

3    Q.   Why did you leave?

4    A.   I received phone calls from one

5  neighbor after another.

6    Q.   That there had been a shooting at your

7  house?

8    A.   Yes, ma'am.

9    Q.   When you left, do you remember who was

10  at the house?

11    A.   When I left, it was maybe a

12  quarter-after-seven, somewhere in there.

13    Q.   Do you remember who was at the house?

14    A.   I remember Jessica was there, Brittany

15  was there.  There was a lot of people.  There

16  were a lot of people there.

17    Q.   Was Lamont there?

18    A.   Yes, he was.

19    Q.   Do you know in Chanetta was there?

20    A.   She was there.

21    Q.   How about Tina?

22    A.   Yeah -- no.  I can't remember.  She

23  came and then she left and then I guess she

24  came back.

25    Q.   Everyone was happy, having a good time?

J. Knapp - Cross by Mr. McKinney

1        A.   Yes.

2        Q.   When you come back, are the police

3    there?

4        A.   Yes.

5        Q.   The paramedics?

6        A.   Yes.

7        Q.   We heard what happened to Tippy.

8        A.   She took a bullet to the tail.  When I

9    got there, my neighbor gotten to her and I got

10   a slug out of her tail so I had Tippy

11   amputated.

12       Q.   Were there any fights or arguments or

13   disagreements while you were there?

14       A.   Not while I was there, no.

15            MS. PELLEGRINI:  That is all I

16   have for this witness.

17            THE COURT:  Any questions?

18            MR. McKINNEY:  Yes, Your Honor.

19                 -----

20            CROSS-EXAMINATION

21                 -----

22   BY MR. McKINNEY:

23       Q.   Just a couple of questions for you.

24       A.   Yes, sir.

25       Q.   Would you have ever allowed heroin to

J. Knapp - Cross by Mr. McKinney

1    be sold from your house?

2         A.   No.

3         Q.   You said that you saw Lamont at the

4    party?

5         A.   Yes, I did.

6         Q.   Did you know that he had heroin on him?

7         A.   No.

8              MR. McKINNEY:  No additional

9    questions, Your Honor.

10             THE COURT:  Thank you, ma'am.

11   You are excused.

12             MS. PELLEGRINI:  May she be

13   released from her subpoena?

14             THE COURT:  She is excused.

15   We'll take our afternoon recess.  I ask you to

16   be back no later than 1:45.  Now, when you are

17   excused for lunch, do not go on the fifth floor

18   of this building or the fourth floor of this

19   building and go on this third floor, this floor

20   only as necessary to come and go to your room.

21   That is to prevent, sometimes the attorneys are

22   talking with witnesses, or to avoid any

23   incidental contact or the appearance of

24   impropriety or exposure to things that you

25   should not see or hear.  Four and five stay off

J. Knapp - Cross by Mr. McKinney

1    all together.  When you come back to the
2    courthouse, go directly to your room.
3              Remain seated and quiet as the jury
4    leaves the room.
5                        -----
6                   (Luncheon recess taken.)
7                        -----
8              (Open court - Jury not present.)
9                        -----
10             (Sidebar discussion held as
11   follows.)
12                  THE COURT:  What is going on?
13                  MR. CHERNOSKY:  Your Honor, at
14   the afternoon break, I was provided by
15   Detective Miller with a memo again in 2017 to
16   his then lieutenant regarding the license plate
17   number that has been at issue in this trial.
18   It included a copy of the CAD sheet which from
19   my research hasn't been turned over and the
20   Commonwealth didn't have until today.
21   Obviously, it is a discovery violation.
22   Obviously, it is detrimental considering the
23   path that the defense has taken.  We won't
24   introduce that offensively but I don't know
25   where that puts -- conceivably, Mr. McKinney

J. Knapp - Cross by Mr. McKinney

1   could not cross-examine if Mr. Miller ran the

2   plate.  The answer would be yes because the CAD

3   is yes and we would then be able to prove it

4   so.

5              THE COURT:  Okay.

6              MS. WILLIAMS:  That discovery

7   includes a letter to Lieutenant Schurman from

8   Pat Miller and is ten pages of dispatch where

9   the license plate is run twice that evening.

10  Obviously, we haven't had a chance to even read

11  them.

12             THE COURT:  Is Miller testifying

13  this afternoon?

14             MR. CHERNOSKY:  Miller is set to

15  testify.  The only portion that I plan to use

16  Detective Miller for is for whatever is

17  remaining of Rob Thomas's cell phone records.

18  That being said, being at the scene, he could

19  be cross-examined on whether he was at the

20  scene or was provided the number.

21             THE COURT:  Now answer the

22  question.

23             MR. CHERNOSKY:  I don't believe

24  he is set to testify today.

25             THE COURT:  Okay.  All right, so

J. Knapp - Cross by Mr. McKinney

1    we'll discuss it later, at the end of the day

2    or in the morning, all right.

3                    MS. WILLIAMS:  Can I address one

4    other thing?

5                    THE COURT:  What other thing?

6                    MS. WILLIAMS:  I wasn't going to

7    bring it up but now that we're here, as to the

8    software and phone records, we did go back.  To

9    the Commonwealth I e-mailed Alicia Werner and

10   copied all the prosecutors on June 8, 2018,

11   saying that we do not have the Gladiator

12   program and we contacted Gladiator and they

13   would not sell it to us.  We contacted

14   Gladiator, unfortunately it is only for sale to

15   law enforcement, they will only sell it to law

16   enforcement agencies, not to us, what are we

17   supposed to do with discovery we cannot open?

18   What is the purpose of providing it?

19                   THE COURT:  Is that my copy?

20                   MS. WILLIAMS:  Yes, this is all

21   the correspondence about trying to get the

22   software.

23                   THE COURT:  What is the card this

24   afternoon?

25                   MR. CHERNOSKY:  Coming up, a few

J. Knapp - Cross by Mr. McKinney

1    remaining party attendees at the party, a

2    witness on the block, someone to authenticate

3    the video of the Homewood North housing

4    complex, Detective McCue to testify to his

5    observations of the video and compilation of

6    all the film which, full disclosure, is one

7    hour and seven minutes long.

8                    THE COURT:  What is?

9                    MR. CHERNOSKY:  A compilation of

10   all the video clips from Nolan Court.  Instead

11   of doing it the long way, I directed that a

12   compilation be made of these.  He has a few

13   photos to identify of the property at Nolan

14   Court and particularly the road that runs

15   behind it.

16                    THE COURT:  All right.

17                    MR. CHERNOSKY:  I think that will

18   round out the day but we have other people, if

19   necessary.

20                    MS. WILLIAMS:  Do you have a copy

21   for the Judge of the discovery?

22                    MR. CHERNOSKY:  No.

23                    MS. WILLIAMS:  I'll give him my

24   copy and you can get me another copy.

25                    MS. PELLEGRINI:  Mr. Ellis, who

J. Ellis - Direct by Ms. Pellegrini

 1    is wheelchair-bound, is out in the hallway

 2    scanned.

 3                    THE COURT:  He is the first

 4    witness?

 5                    MS. PELLEGRINI:  He is very

 6    soft-spoken because of his injuries.  Maybe the

 7    mic could be brought down.  He is in a

 8    mechanized wheelchair.  He is, healthwise, very

 9    fragile.

10                    (Sidebar discussion concluded.)

11                         -----

12                    (Open court - Jury present.)

13                         -----

14                    THE COURT:  Ms. Pellegrini.

15                    MS. PELLEGRINI:  Thank you.

16                         -----

17                    JOHN PATRICK ELLIS, JR.,

18    a witness herein, having been first duly sworn,

19    was examined and testified as follows:

20                         -----

21                    DIRECT EXAMINATION

22                         -----

23    BY MS. PELLEGRINI:

24         Q.  Good afternoon, Mr. Ellis.

25         A.  Good afternoon.

J. Ellis - Direct by Ms. Pellegrini

1    Q.  Could you please state your full name,

2    spelling your last name for the court reporter?

3    A.  John Patrick Ellis, Jr., E-L-L-I-S.

4    Q.  Okay.

5         MS. PELLEGRINI:  I'm sorry, you

6    need to be sworn.

7    Q.  Mr. Ellis, you have a tendency to talk

8    really fast so if you could slow down a little

9    bit for me.  Mr. Ellis, how old are you?

10   A.  50-years-old.

11   Q.  Back in March of 2016, where were you

12   staying?

13   A.  On Franklin Avenue.

14   Q.  Was it 1306 Franklin Avenue?

15   A.  1306.

16   Q.  Whose house was that?

17   A.  My brother's.

18   Q.  Matthew?

19   A.  Lively, L-I-V-E-S-L-Y.

20   Q.  Did he have a girlfriend?

21   A.  Yes, Carla.

22   Q.  Carla Lee?

23   A.  Carla Lee.

24   Q.  You were staying with them for a while?

25   A.  Yes.

J. Ellis - Direct by Ms. Pellegrini

1    Q.  Did you get to know Brittany Powell?

2    A.  Yes, and her sister Chanetta.

3    Q.  Were they good friends with Carla?

4    A.  Yes.

5    Q.  Would they come over the house?

6    A.  All the time.

7    Q.  Did there come a point when Brittany

8    moved next door?

9    A.  Yes.

10   Q.  With her daughter?

11   A.  Yes, with her daughter.

12   Q.  Did you get to know, did you ever know

13   Brittany's brothers Jerry, who they called

14   Mike, and Lamont?

15   A.  I met Lamont but I didn't know Jerry.

16   Q.  You are quite a bit older than they

17   are, right?

18   A.  Yes, ma'am.

19   Q.  During the course of the fall and early

20   winter, were there different birthday parties

21   and whatnot at the house?

22   A.  Yeah, we had one for Brittany the week

23   before the shooting.

24   Q.  Was that at your brother's house or at

25   the house where Brittany was?

J. Ellis - Direct by Ms. Pellegrini

1      A.  At my brother's house.

2      Q.  Do you remember March 9th of 2016?

3      A.  Yes.

4      Q.  It was a nice day, right?

5      A.  Lovely.

6      Q.  Was everybody kind of excited to be

7   outside?

8      A.  Yes.  It took me a while to get out but

9   I went next door because Carla said Brittany

10   was cooking out.  I said -- I'm greedy -- I

11   wanted a hot dog so I went next door.

12      Q.  Why else did you go?

13      A.  That's all.

14      Q.  There were pretty ladies there, right?

15      A.  Huh?

16      Q.  Pretty ladies there, too?

17      A.  Yeah.

18      Q.  So what time do you think you went over

19   there?

20      A.  I want to say 6:30, 7:00.  I was over

21   there for a while.

22      Q.  Was everybody -- was Lamont, or Monte,

23   grilling?

24      A.  Uh-huh.

25      Q.  There was food?

J. Ellis - Direct by Ms. Pellegrini

1      A.   Yes, he made me a fat cheeseburger, I

2      remember that.   I said, Mont, make me a

3      cheeseburger, little cuz.

4           Q.   Was everybody having a good time?

5      A.   Yes, playing Dominos, Spades, drinking.

6           Q.   What were you drinking?

7      A.   Beer, I drank my first glass of

8      Hennessy.

9           Q.   What is that?

10     A.   Hennessy.

11          Q.   Sorry, I didn't hear you.   Do you

12     remember people taking pictures and things?

13     A.   Not really.

14          Q.   So a little bit before 11:00, do you

15     remember where you were in the yard?

16     A.   I think I was sitting in a chair.   I

17     want to say sitting in the chair on the ground

18     level, not by the steps, I think I was by the

19     fence, by the fence.

20          Q.   What happened?

21     A.   I heard popping noises.   So I said to

22     myself, I said to myself, hey, did I get shot?

23     Then the third one, I felt it.   I got up and

24     started running toward my house.   After I got

25     shot, I heard the loud, it sounded like the

J. Ellis - Direct by Ms. Pellegrini

1    Fourth of July.

2         Q.  Did you hear one gun or two?

3         A.  A couple.  It sounded like a couple.

4         Q.  Do they make different sounds, the

5    guns?

6         A.  Loud.

7         Q.  What did the first one sound like?

8         A.  A regular gunshot, pow.

9         Q.  What did the second gun sound like?

10        A.  Loud.

11        Q.  Like what?

12        A.  Some stuff you have in the Army, loud

13   like an SK or something.  It was loud.

14        Q.  So you get shot.  Do you fall to the

15   ground?

16        A.  I ran to the side going to my house.  I

17   think I fell when I got out through the gate on

18   the side of the house.

19        Q.  If I told you you were found on this

20   side on the ground by the porch steps, do you

21   remember that?

22        A.  See, I don't remember that.

23        Q.  Do you remember the paramedics treating

24   you?

25        A.  Yes.

J. Ellis - Direct by Ms. Pellegrini

1    Q.  Could you identify anybody that was

2    shooting that night?

3    A.  No, I didn't see nobody.  That is why

4    when I got shot, I'm like, damn, did I get

5    shot?  Like I was the first one to get shot.

6    So I looked around.  I was like did I get shot?

7    Then that third one, I felt it.

8    Q.  Did you ever see anybody with a gun

9    that night?

10   A.  No.  I heard them guns, that loud gun,

11   that is all I remember.

12   Q.  John, you got taken to the hospital,

13   right?

14   A.  Yes.

15   Q.  Do you remember which hospital?

16   A.  Presby.

17   Q.  Were you in critical condition?

18   A.  Yes.

19   Q.  As a result of your injuries, did you

20   have to have surgery?

21   A.  Yes.

22   Q.  Can you describe for the jury what

23   injuries you have?

24   A.  I have a spinal cord injury so I might

25   not be able to walk again.

J. Ellis - Direct by Ms. Pellegrini

1      Q.  As a result of that, do you have other

2   health problems?

3      A.  Yeah, I get sick all the time.  I'm in

4   and out of the hospital.  Like for the summer,

5   I bought all these clothes and I'm in Mercy

6   Hospital for the whole summer.  I didn't get to

7   enjoy the summer because I'm in the hospital

8   the whole summer.  I just got out last week

9   from being in the hospital.

10     Q.  Are they concerned that you are going

11  to lose your legs?

12     A.  They said it but now they are saying

13  that my leg is not bad.  They say so much stuff

14  in the hospital.  I told them cut it off.  I

15  ain't worried about what nobody thinks.

16     Q.  They told you that you are probably not

17  going to walk again, right?

18     A.  Right.

19          MS. PELLEGRINI:  Thank you, John.

20          THE COURT:  Any questions?

21          MR. McKINNEY:  No questions, Your

22  Honor.

23          THE COURT:  Thank you.  You are

24  excused, sir.

25          MS. PELLEGRINI:  Does Mr. Ellis

C. Lee - Direct by Ms. Pellegrini

1    have permission to remain in the courtroom?

2                    THE COURT:  Yes.

3                    MS. PELLEGRINI:  Thank you.

4                    THE COURT:  Call your next

5    witness.

6                    MS. PELLEGRINI:  The Commonwealth

7    calls Carla Lee.

8                    -----

9                    CARLA LEE,

10   a witness herein, having been first duly sworn,

11   was examined and testified as follows:

12                    -----

13                    DIRECT EXAMINATION

14                    -----

15   BY MS. PELLEGRINI:

16       Q.  Good afternoon, Ms. Lee.  Could you

17   please state your full name, spelling your last

18   name for the court reporter?

19       A.  Carla Lee, L-E-E.

20       Q.  How old you?

21       A.  36.

22       Q.  Do you still live at the residence of

23   1306 Franklin Avenue?

24       A.  Yes.

25       Q.  Who do you live there with?

C. Lee - Direct by Ms. Pellegrini

1        A.   My husband and my kids.

2        Q.   Who is your husband?

3        A.   Matthew Lively.

4        Q.   Is he John's brother?

5        A.   Yes.

6        Q.   And your kids live with you?

7        A.   Yes.

8        Q.   Who was living with you or staying with

9   you on the night of March 9, 2016?

10       A.   My brother, John Ellis, Nickie

11   Arrington (phonetic).

12       Q.   Would is Nickie?

13       A.   She was a roommate, friend of John

14   Ellis.

15       Q.   Were your kids there then?

16       A.   No.

17       Q.   Were you friends with Brittany Powell?

18       A.   Yes, she was my best friend.

19       Q.   How long had you known Brittany?

20       A.   Since we were 14.

21       Q.   Did you know her sisters?

22       A.   Yes.

23       Q.   Did you know Chanetta?

24       A.   Yes.

25       Q.   Was Chanetta a good friend?

C. Lee - Direct by Ms. Pellegrini

1      A.  Yes.

2      Q.  Was Chanetta excited about her baby?

3      A.  She was, yes.

4      Q.  Now, are you friendly also with Julie

5   Knapp?

6      A.  Yes.

7      Q.  Have you guys socialized before back

8   and forth between the houses?

9      A.  Yes.

10     Q.  So March 9th was nice, right?

11     A.  Yeah, it was a nice day.

12     Q.  Do you know whose idea it was about the

13   barbecue?

14     A.  Brittany's.  It was nice outside so she

15   decided to go to the store and get some meat

16   and cook out.

17     Q.  Who all was invited to the party?

18     A.  Her mom, her cousin, John-John.

19     Q.  John-John is what you call John Ellis?

20     A.  Yeah.  A couple of his friends and

21   myself.

22     Q.  Was Tina also invited, Brittany's

23   cousin?

24     A.  Yes.

25     Q.  Did she come later in the evening?

C. Lee - Direct by Ms. Pellegrini

1        A.  Yes.

2        Q.  Did she bring a friend named Tonjia?

3        A.  I didn't see her.

4        Q.  Were there a lot of people coming and

5   going?

6        A.  Yeah.

7        Q.  What was the mood at the party?

8        A.  It was nice.  We were outside drinking,

9   listening to music, playing cards.

10       Q.  At some point what do you do?

11       A.  I ended up leaving.  I was super drunk

12   so I went in the house.  Me and Nickie went and

13   laid down.

14       Q.  Where in the house did you lay down?

15       A.  Upstairs in my bedroom.

16       Q.  Do you remember at any point in time

17   Brittany posting about the party?

18       A.  She had posted on Instagram.  She said

19   that she was cooking out.  She had a status on

20   Facebook.

21       Q.  I'm sorry, I didn't hear you?

22       A.  She wrote a status on Facebook.

23       Q.  That she was having a cookout?

24       A.  Yes, and posted a picture on Instagram

25   is what she said.

C. Lee - Cross by Mr. McKinney

1      Q.  How do you get awakened?

2      A.  Nickie slapped me in my face.

3      Q.  Were you passed out?

4      A.  Yes.

5      Q.  What did Nickie say?

6      A.  She said wake up, they're shooting next

7  door or they were just shooting next door.

8      Q.  Do you remember about what time you

9  went back to your house?

10     A.  I would say like 10:30, 10:25, 10:30.

11     Q.  Did you ever look out the window and

12  see anybody with a gun or anything?

13     A.  No.  After I woke up, I did look out

14  the window but I just seen people laying on the

15  ground.

16          MS. PELLEGRINI:  That is all I

17  have.  Thank you.

18          THE COURT:  Any questions?

19          MR. McKINNEY:  Briefly, Your

20  Honor.  Thank you.

21              -----

22          CROSS-EXAMINATION

23              -----

24  BY MR. McKINNEY:

25     Q.  Ms. Lee, the picture was posted on

T. Hardy - Direct by Ms. Pellegrini

1    Instagram?

2        A.  Yes, she posted it on video.

3        Q.  And then on Facebook?

4        A.  Yes.

5        Q.  Did you see these posts?

6        A.  Yes, I did, I seen it.  Just she said

7    she was cooking out.

8        Q.  On Facebook she posted that she was

9    cooking out?

10       A.  Yes.

11            MR. McKINNEY:  Thank you.  No

12   more questions.

13            THE COURT:  Thank you, ma'am.

14   You are excused.  Call your next witness.

15            MS. PELLEGRINI:  Tara Hardy.

16                -----

17            TARA HARDY,

18   a witness herein, having been first duly sworn,

19   was examined and testified as follows:

20                -----

21            DIRECT EXAMINATION

22                -----

23   BY MS. PELLEGRINI:

24       Q.  Ms. Hardy, could you please state and

25   spell your full name?

T. Hardy - Direct by Ms. Pellegrini

1          A.  Tara Hardy, T-A-R-A, H-A-R-D-Y.

2          Q.  How old are you?

3          A.  34.

4          Q.  Where do you live?

5          A.  Deary Street.

6          Q.  Where is that?

7          A.  Lincoln-Larimer.

8          Q.  In March of 2016, did you live on

9    Ferris Court?

10         A.  Yes.

11         Q.  Where is Ferris Court?

12         A.  Off of Brushton Avenue.

13         Q.  Is it a housing development?

14         A.  Yes.

15         Q.  What was it called?

16         A.  Homewood North.

17         Q.  Was it also called Hilltop?

18         A.  Yes.

19         Q.  Is that a close-knit community?

20         A.  Yes.

21         Q.  Sort of there is really one way in and

22   one way out around the court?

23              MR. McKINNEY:  Objection,

24   leading, Your Honor.

25              THE COURT:  Sustained.

T. Hardy - Direct by Ms. Pellegrini

1        Q.    Describe what Hilltop looks like.

2        A.    Projects.

3        Q.    But does it sit on top of a hill?

4        A.    Yes, at the top of Brushton Avenue.

5        Q.    How long had you lived up on Ferris

6    Court?

7        A.    For about ten years, maybe more.

8        Q.    Did you know Brittany and Chanetta and

9    Tina?

10        A.    Yes.

11        Q.    And Shada?

12        A.    No, I didn't know her.

13        Q.    Did you know Jerry Shelton, they also

14    called him Mike?

15        A.    Yes.

16        Q.    Did you know Monte, it is Lamont,

17    right?

18        A.    Yes.

19        Q.    And, Millie, his sister, lived up

20    there, right?

21        A.    Yes.

22        Q.    Did everybody sort of socialize

23    together?

24        A.    Yes, pretty much.

25        Q.    And did you know an individual by the

T. Hardy - Direct by Ms. Pellegrini

1      name of Calvin Doswell?

2          A.   Yes.

3          Q.   What did they call Calvin?

4          A.   Calio.

5          Q.   Sometime prior to March 2016 was Calio

6      murdered?

7          A.   Yes.

8          Q.   Was there a rumor who did it?

9          A.   Monte and somebody else named Anthony.

10         Q.   But nobody was arrested, right?

11         A.   No.

12         Q.   For a period of time was Monte not

13     around after that?

14         A.   Correct.

15         Q.   Now, did Brittany still hang around

16     though?

17         A.   Yes.

18         Q.   She and the rest of her family was

19     still welcome there?

20         A.   Yes.

21         Q.   Do you know the defendant, Cheron

22     Shelton?

23         A.   Yes.

24         Q.   Do you know an individual by the name

25     of Rob Thomas?

T. Hardy - Direct by Ms. Pellegrini

1          A.  Yes.

2          Q.  Were they from that Hilltop Homewood

3    North area?

4          A.  Yes.

5          Q.  Prior to March 9th had Cheron been away

6    for a while?

7          A.  No.

8          Q.  He hadn't been in jail?

9          A.  Not that I know of.  I was seeing him.

10         Q.  You hadn't seen him for a while?

11                   MR. McKINNEY:  Your Honor, the

12    question has been asked three times.

13                   THE COURT:  I don't need a

14    narrative.  Do you have an objection?

15                   MR. McKINNEY:  Asked and

16    answered.  I object that the question was asked

17    and answered.

18                   THE COURT:  Ms. Pellegrini, move

19    on.

20                   MS. PELLEGRINI:  Thank you.

21         Q.  Did you see Cheron on March 9th?

22         A.  Yes, I believe so.

23         Q.  Where did you see him?

24         A.  In the community.

25         Q.  Okay.  Was it a nice night on

T. Hardy - Direct by Ms. Pellegrini

1      March 9th?

2          A.   Yes, it was a nice day.

3          Q.   Were people out?

4          A.   Uh-huh.

5          Q.   Do you remember seeing Cheron or Rob

6      Thomas that evening?

7          A.   Yes.

8          Q.   Where did you see them?

9          A.   In the Court.

10         Q.   What Court?

11         A.   Ferris Court.

12         Q.   What were they doing?

13         A.   Just chillin on the steps like they

14     usually do.

15         Q.   Okay.  Describe what they were doing.

16         A.   Sitting on the steps.  That is where

17     all the guys sit.

18         Q.   Were they drinking?

19         A.   I was.  I'm not sure if they were.

20         Q.   Does Cheron have a street name or a

21     nickname?

22         A.   Yes.

23         Q.   What is it?

24         A.   C-Wiz.

25         Q.   C-Wiz?

T. Hardy - Direct by Ms. Pellegrini

1    A.  Uh-huh.

2    Q.  Do you remember about what time you

3  leave that evening?

4    A.  Maybe about 8:00 or 9:00.

5    Q.  If I show you your police report, would

6  it refresh your recollection what time you told

7  the police you left for the bar?

8    A.  Nope.

9    Q.  No, it wouldn't help you?

10    A.  No.

11    Q.  Okay.  What time did you leave?

12    A.  8:00 or 9:00.

13    Q.  Where did you go?

14    A.  Denise and Earl's.

15    Q.  What is that?

16    A.  It is a bar.

17    Q.  Do you see Shelton or Thomas after

18  that?

19    A.  No.

20    Q.  Did you go to the scene of the shooting

21  that night?

22    A.  Yes.

23    Q.  Do you remember if you saw a Facebook

24  post from Brittany that day?

25    A.  I did.

T. Hardy - Cross by Mr. McKinney

1      Q.  What did it say?

2      A.  It was a live video of them grilling

3   out.

4      Q.  Was anyone around when you saw that?

5      A.  Around me?

6      Q.  Uh-huh.

7      A.  My sister.

8      Q.  Did you ever tell anybody else about

9   that?

10     A.  No.

11     Q.  So it wasn't a secret that she was

12   having a barbecue?

13     A.  No, it was on Facebook live.

14          MS. PELLEGRINI:  That is all I

15   have.  Thank you.

16          THE COURT:  Any questions?

17          MR. McKINNEY:  Yes.

18                -----

19            CROSS-EXAMINATION

20                -----

21   BY MR. McKINNEY:

22     Q.  Ma'am, you said that you saw Cheron

23   Shelton that day?

24     A.  Yes, I believe so.

25     Q.  Do you remember what time that was?

T. Hardy - Cross by Mr. McKinney

1          A.   Earlier in the day.

2          Q.   You said that you saw him hanging

3     around on Ferris Court?

4          A.   Yes, I believe so.

5          Q.   With a bunch of other guys?

6          A.   Yes.

7          Q.   Do you remember how many guys you saw?

8          A.   No, they all tend to hang in a gang,

9     like a bunch.

10         Q.   You said you were drinking, right?

11         A.   Yes.  I had my door opened and had the

12    music going loud.

13         Q.   Is Ferris Court off of Nolan Court?

14         A.   Yes, next to it.

15         Q.   Did you see Cheron drinking?

16         A.   I can't recall.

17         Q.   At any point in time did you see him

18    with his children on Nolan Court?

19         A.   No, I didn't go to Nolan Court.

20         Q.   Do you know Millie Walker?

21         A.   Huh?

22         Q.   Do you know a Millie Walker?

23         A.   No.

24         Q.   About how long did you see Cheron on

25    March 9th?

T. Hardy - Cross by Mr. McKinney

1      A.  Like I said, I can't give a time frame.
2   I was in and out back and through my door.  I
3   would go in my house and go back to the door,
4   see what's going on.
5      Q.  On the Facebook post that you saw --
6      A.  Uh-huh.
7      Q.  -- you said it was a Facebook live
8   video?
9      A.  Yes.
10     Q.  About how long was the video?
11     A.  I'm not sure.  About five to seven
12  minutes maybe.  I don't know.
13     Q.  Do you remember who was in the video?
14     A.  Uh-huh.
15     Q.  Who was it?
16     A.  The family.
17     Q.  From the members of the family that you
18  can remember, who did you see?
19     A.  I seen Brittany, I seen Miss Jessica.
20     Q.  The video that you saw, from what you
21  could tell, was it filmed in the backyard or
22  the front?
23     A.  I'm saying the back.
24     Q.  So you would agree with me that the
25  address to the house was not viewable in the

T. Hardy - Cross by Mr. McKinney

1    live video that you saw, correct?

2        A.   Not that I seen.

3             MR. McKINNEY:  One brief moment,

4    Your Honor.

5        Q.   I want to talk to you about on direct

6    examination you were talking about the murder

7    of Calvin Doswell.  What did you know about

8    that?

9        A.   Not much, just from what I heard.

10       Q.   So from what you heard, what do you

11   know based on what you heard?

12       A.   Hearsay, who did it.

13       Q.   So just people in the community?

14       A.   Uh-huh.

15       Q.   Talking about what they believed?

16       A.   Yeah.

17       Q.   You mentioned Lamont and another person

18   named, is it Adam?

19       A.   Anthony.

20       Q.   What is Anthony's last name?

21       A.   I'm not sure.

22       Q.   Are you aware of the fact that Lamont

23   Powell was never charged in the death of Calvin

24   Doswell?

25       A.   Yes.

T. Hardy - Cross by Mr. McKinney

1    Q.  As far as you know, other than rumors

2    in the community, from your knowledge, was

3    there ever any police involvement in viewing

4    Lamont Powell as a suspect in that homicide?

5    A.  I'm not sure.  I don't know nothing

6    about that.

7    Q.  Now, when you talk about people in the

8    community talking about that, did you hear from

9    people that had firsthand information?  Did

10   people tell you why they thought that Lamont

11   Powell was a suspect?  I need you to tell me to

12   the best that you can remember exactly what you

13   heard.

14   A.  It is just that is what the hood was

15   saying.  That is it.  I didn't directly hear it

16   from anyone, that is just what was being said.

17   Q.  No one said to you I was there when it

18   happened?

19   A.  No.

20   Q.  And I saw Lamont?

21   A.  No, nobody said that to me.

22             MR. McKINNEY:  I have no

23   additional questions.  Thank you.

24             THE COURT:  Anything else?

25             MS. PELLEGRINI:  No, thank you.

J. McEachern - Direct by Ms. Pellegrini

1          THE COURT:  Thank you, ma'am.

2    You are excused.  Call your next witness.

3          MS. PELLEGRINI:  The Commonwealth

4    calls Justin McEachern.

5                -----

6              JUSTIN McEACHERN,

7    a witness herein, having been first duly sworn,

8    was examined and testified as follows:

9                -----

10             DIRECT EXAMINATION

11               -----

12   BY MS. PELLEGRINI:

13        Q.   Good afternoon.

14        A.   Good afternoon.

15        Q.   Could you state your full name and

16   spell it for the court reporter?

17        A.   Justin McEachern, M-C-E-A-C-H-E-R-N.

18        Q.   How old are you?

19        A.   40-years-old.

20        Q.   Without telling us your address, what

21   area do you live?

22        A.   Now?

23        Q.   Uh-huh.

24        A.   West End.

25        Q.   Back in March of 2016 where did you

J. McEachern - Direct by Ms. Pellegrini

 1    live?

 2         A.   On Franklin Avenue in Wilkinsburg.

 3         Q.   What was your address?

 4         A.   1281 Franklin.

 5         Q.   So who did you live there with?

 6         A.   Myself and two children and my

 7    significant other.

 8         Q.   What is her name?

 9         A.   Andrea Drzjefski (phonetic).

10         Q.   Was it an apartment or was it a house?

11         A.   It was an apartment building.

12         Q.   I'm going to show you what was

13    previously been marked and admitted as

14    Commonwealth Exhibit No. 16.  On the evening of

15    March 9th of 2016 were you home?

16         A.   I was.

17         Q.   Who was at home with you?

18         A.   My two children and my significant

19    other.

20         Q.   Had you been drinking at all that

21    night?

22         A.   I had not.

23         Q.   Did you have a habit, rules about your

24    house, certain rules?

25         A.   I didn't smoke in the house, I didn't

J. McEachern - Direct by Ms. Pellegrini

1    smoke cigarettes in the house.  I would stand

2    in the hallway or poke my head out the window.

3         Q.  A little bit before 11:00 on March 9,

4    2016, did you hear something?

5         A.  I did.

6         Q.  What did you hear?

7         A.  Gunshots.

8         Q.  Could you describe what you heard to

9    us?

10        A.  Between 30, maybe 40, loud gunshots as

11   I was looking out the window.

12        Q.  Where in your apartment were you?

13        A.  I was in my bedroom.

14        Q.  Where does your bedroom face?

15        A.  I'm not sure the name of the street but

16   it faces a hill that goes up.

17        Q.  If you need to stand up, show us where

18   your apartment was.  Right there?

19        A.  Yes.

20        Q.  Are you pointing to your apartment?

21        A.  Yes.

22        Q.  What was the street number?

23        A.  1281.

24        Q.  Okay.  Where was the window that you

25   were looking out of?

J. McEachern - Direct by Ms. Pellegrini

1     A.  Right there at the corner.

2     Q.  The corner of Midland and Franklin?

3     A.  Correct.

4     Q.  Was the window opened or closed?

5     A.  It was opened.

6     Q.  Were you smoking out the window?

7     A.  I was.

8     Q.  Is that where you were when you heard

9  the shots fired?

10     A.  Correct.

11     Q.  What happens next?

12     A.  I continued to just look out the window

13  in the direction of the gunfire.

14     Q.  Where was the gunfire coming from?

15     A.  I was here, in this general area here.

16     Q.  Up near 1304?

17     A.  Correct.

18     Q.  Do you know if you heard one gun or

19  two?

20     A.  I couldn't tell if it was more than one

21  weapon.

22     Q.  So you hear the gunshots.  What happens

23  next?

24     A.  I just continued to look out the

25  window.  A few minutes later I see someone run

J. McEachern - Direct by Ms. Pellegrini

1      up the street here.

2           Q.  Up what street, is that Midland?

3           A.  Midland.

4           Q.  Could you describe the individual that

5      you see running up the street?

6           A.  He had a dark hooded sweatshirt on over

7      his head.  That is all I could see of him.

8           Q.  Where were his hands?

9           A.  In his pocket.

10          Q.  In the front pocket?

11          A.  Yes.

12          Q.  Could you describe that individual?

13          A.  Between 5'8" and 5'10".  That is all I

14     could describe him.

15          Q.  What about their weight?

16          A.  180.

17          Q.  Could you determine the race of that

18     individual?

19          A.  I could not.

20          Q.  Could you tell if it was male or

21     female?

22          A.  I could not.

23          Q.  When you were looking out the window,

24     where you heard the gunshots coming from, did

25     you see anything?

J. McEachern - Direct by Ms. Pellegrini

1    A.   Just lights, flashes.

2    Q.   Lights or flashes?

3    A.   Flashes.

4    Q.   About from the time you saw that

5    individual to the time you saw the first police

6    officer, do you know how much time elapsed?

7    A.   Three minutes maybe.

8         MS. PELLEGRINI:  Thank you.  That

9    is all I have.

10        MR. McKINNEY:  No questions.

11        THE COURT:  How tall are you?

12        THE WITNESS:  6'1."

13        THE COURT:  How much do you

14   weigh?

15        THE WITNESS:  200 pounds.

16        THE COURT:  So the person that

17   you saw was not as tall as you and weighed

18   less?

19        THE WITNESS:  Correct.

20        THE COURT:  Thank you, sir.  You

21   are excused.  Call your next witness.

22        MR. CHERNOSKY:  The Commonwealth

23   would call Jade Burka.

24

25

J. Burka - Direct by Mr. Chernosky

1                       -----

2                  JADE BURKA,

3    a witness herein, having been first duly sworn,

4    was examined and testified as follows:

5                       -----

6               DIRECT EXAMINATION

7                       -----

8    BY MR. CHERNOSKY:

9        Q.   Mr. Burka, could you state your first

10   and last name and spell your last name for the

11   court reporter?

12       A.   My name is Jade Burka, B-U-R-K-A.

13       Q.   How are you currently employed?

14       A.   I'm an intelligence analyst with the

15   FBI currently.

16       Q.   In March of 2016, how were you

17   employed?

18       A.   I was the public safety coordinator for

19   the City of Pittsburgh Housing Authority.

20       Q.   How long had you held that position as

21   of March of 2016?

22       A.   About two years.

23       Q.   When did you leave for employment with

24   the FBI?

25       A.   February of 2018.

J. Burka - Direct by Mr. Chernosky

1    Q.   Could you tell the jury what some of

2    the job duties associated with your title when

3    you worked at the housing authority was?

4    A.   Sure.  My main job duty was ultimately

5    safety and security of our residents, guests,

6    and assets being our properties.

7    Q.   That was for the City of Pittsburgh

8    Housing Authority?

9    A.   That's correct.

10   Q.   And if you recall, approximately how

11   many properties were managed or overseen by the

12   housing authority at that time?

13   A.   At the time, my recollection is 16 or

14   so properties.

15   Q.   Is Homewood North one of those

16   properties?

17   A.   Yes.

18   Q.   Where is that property?

19   A.   It is in Zone 5, so the east end of

20   Pittsburgh, around that area.

21   Q.   Is Homewood North equipped with video

22   cameras?

23   A.   Yes.

24   Q.   What was the purpose, or what is the

25   purpose, of the video cameras in Homewood

J. Burka - Direct by Mr. Chernosky

1    North?

2        A.   Again, safety and security of our

3    residents, guests, and assets.

4        Q.   How are the cameras accessed?

5        A.   You can access them remotely so my

6    office is just down the road, 200 Ross Street.

7    We had a command center, if you will, so a

8    number of TVs and cameras up on the wall that

9    would feed into the command center there.

10       Q.   At the time that you were working there

11   in 2016, did the housing authority, with

12   respect to its cameras, have a back-up system,

13   or, I guess, memory, that was capable of saving

14   video?

15       A.   Yes, so it would save at the site as

16   well as on servers at the command center on

17   Ross Street.

18       Q.   Do you recall at that time

19   approximately how long a video for a camera

20   would be backed up?

21       A.   About two weeks.

22       Q.   In March of 2016, do you recall getting

23   a request from the county police to have you

24   assist them in viewing video footage from the

25   Homewood North complex?

J. Burka - Direct by Mr. Chernosky

1     A.   Yes.

2     Q.   Do you remember who contacted you?

3     A.   I believe it was Detective McCue that

4     informed me and gave me a call.

5     Q.   Did you grant that request?

6     A.   Yes, I did.

7     Q.   Did you assist Detective McCue in both

8     accessing and viewing video from Homewood North

9     for a given period of time?

10    A.   Yes, I did.

11    Q.   Do you remember what date he was

12    interested in?

13    A.   The date I don't recall but I recall it

14    was involving the incident in Wilkinsburg.

15    Q.   With respect to the access, did that

16    happen at the site or remotely at your office

17    on Ross Street?

18    A.   That happened at the command center on

19    Ross Street.

20    Q.   Could you tell the jury how long

21    yourself and Detective McCue viewed the video

22    from Homewood North?

23    A.   Yeah, it was well over 12 hours that we

24    sat and combed through all the videos and

25    cameras for Homewood North.

J. Burka - Direct by Mr. Chernosky

1      Q.   At the end of that endeavor, did
2   Detective McCue request copies of video for
3   approximately a 48-hour period from March 9th
4   to March 10th -- or March 8th to March 10th --
5   of 2016 from various cameras in Homewood North?
6      A.   Yes, he did.
7      Q.   Did you provide that?
8      A.   Yes.
9      Q.   At the time that you provided that
10   footage, was it accurate?
11      A.   Yes.
12      Q.   Was it authentic footage from the
13   housing authority?
14      A.   Yes, it was.
15      Q.   Did you have an opportunity to review
16   this hard drive with myself prior to your
17   testimony today?
18      A.   Yes, I did.
19      Q.   Do you know what is contained on the
20   hard drive?
21      A.   I do.
22      Q.   What is it?
23      A.   48 hours of footage from every single
24   camera available from Homewood North, I believe
25   they were all working, so 48 hours of footage

J. Burka - Cross by Mr. McKinney

1    available.

2                    MR. CHERNOSKY:  Your Honor, I

3    mark this as Commonwealth Exhibit 271 and move

4    for its admission.

5                    THE COURT:  Any objection?

6                    MR. McKINNEY:  No objection.

7                    THE COURT:  It will be admitted

8    without objection.

9                    MR. CHERNOSKY:  No further

10   questions.  I offer for cross.

11                    -----

12                CROSS-EXAMINATION

13                    -----

14   BY MS. McKINNEY:

15       Q.  When you were first contacted to review

16   surveillance from Homewood North, was there any

17   specific part of it that you were asked to

18   review or was it just the entire portion of the

19   neighborhood?

20       A.  Yes, so in respect to the incident that

21   took place at the time, there was a general

22   time frame, a possible description of a vehicle

23   and a potential flight so it was headed toward

24   Homewood North.  So we started looking for that

25   specific information, found potentially what we

K. McCue - Direct by Mr. Chernosky

1    were looking for and then grabbed the entire

2    48 hours for the sake of the safest possible.

3              MR. McKINNEY:  Thank you.  No

4    additional questions.

5              THE COURT:  Thank you, sir.  You

6    are excused.  Call your next witness.

7              MR. CHERNOSKY:  The Commonwealth

8    would call Detective Kevin McCue.

9                    -----

10                KEVIN McCUE,

11    a witness herein, having been first duly sworn,

12    was examined and testified as follows:

13                    -----

14              DIRECT EXAMINATION

15                    -----

16    BY MR. CHERNOSKY:

17        Q.  Detective McCue, would you state your

18    first and last name and spell your last name

19    for the court reporter?

20        A.  Detective Kevin L. McCue, M-C-C-U-E.

21        Q.  How are you currently employed?

22        A.  Allegheny County Police, currently

23    assigned to the homicide unit.

24        Q.  How long employed with the Allegheny

25    County Police?

K. McCue - Direct by Mr. Chernosky

1        A.   16 years.

2        Q.   How long in the homicide division?

3        A.   Just under six years now.

4        Q.   Did you have any previous employment

5   prior to working for the county police, any

6   prior experience in law enforcement?

7        A.   I did, yes.

8        Q.   Where was that?

9        A.   I worked for the City of Pittsburgh

10   Housing Authority Police Department.

11        Q.   Were you assigned, along with other

12   detectives from your unit, to participate in

13   the investigation into the shooting death that

14   occurred at 1304 Franklin Avenue in the Borough

15   of Wilkinsburg?

16        A.   I was, yes.

17        Q.   As part of your duties, did you make

18   contact with the City of Pittsburgh Housing

19   Authority and request access to their video

20   footage from Homewood North?

21        A.   I did, yes.

22        Q.   Could you explain to the jury what

23   steps you had to take to view the footage and

24   approximately how long you, yourself, spent?

25        A.   I reached out to Joy Pekar, the housing

K. McCue - Direct by Mr. Chernosky

1    authority director for the Pittsburgh Housing
2    Authority, she got me in contact with Jade
3    Burka who reviews their video.  Myself and
4    Mr. Burka, I believe on March 11th, sat down at
5    their command center located at 200 Ross
6    Street.  It is kind of several monitors across
7    the wall.  Myself and Mr. Burka reviewed, I
8    believe that day, about 12 hours of video.
9         Q.  At the time of your review, were you
10    aware of a general description of a vehicle
11    that you were interested in?
12         A.  At that time, yes and no.
13         Q.  Could you explain?
14         A.  There was --
15              MR. McKINNEY:  Your Honor,
16    permission to approach?
17              THE COURT:  Okay, come up.
18              (Sidebar discussion held as
19    follows.)
20              MR. McKINNEY:  Your Honor, I'm
21    just trying to get out in front of an issue
22    before it becomes a problem.  Based on the
23    evidence that was provided to the defense,
24    there is no report that the vehicle in question
25    was the suspect vehicle until March 12, 2016.

K. McCue - Direct by Mr. Chernosky

1    If this detective is going to testify that

2    prior to that he had information on a vehicle,

3    that is inconsistent with the discovery that

4    has been provided.  Now I understand that is

5    due to a Commonwealth oversight that was

6    discussed in chambers, but he should not be

7    permitted to testify to information that wasn't

8    provided to the defense.

9                MR. CHERNOSKY:  I will keep him

10   for potential re-call but I will ask him if he

11   was informed of anonymous tips because that is

12   the reason he was up in Nolan Court.

13               MR. McKINNEY:  That is true.

14               THE COURT:  About that vehicle?

15               MR. CHERNOSKY:  Yeah, that the

16   perpetrators were from Nolan Court and a white

17   vehicle was involved.

18               MR. McKINNEY:  That is inaccurate

19   to the discovery provided to the defense.

20   There is no reference to that vehicle, nothing

21   in my report indicating that it was even a

22   suspect vehicle until March 12th.

23               THE COURT:  What is your response

24   to that?

25               MR. CHERNOSKY:  Your Honor, I can

K. McCue - Direct by Mr. Chernosky

1    dispense the objection by asking what he

2    reviewed on the video.  What came to his

3    attention was one vehicle making suspicious

4    movement.  So I can direct the questions so he

5    answers just those questions.  Essentially, it

6    is the movements of the vehicle and the person

7    grabbing the objects from behind the residence

8    that draws his attention.  He backtracks.  I

9    can get him to describe what he sees.

10              THE COURT:  Okay.  This is a

11   different subject, it is about a vehicle.

12   Where is your source of information about that

13   silver Hyundai speeding away?

14              MR. McKINNEY:  That is from

15   Paramedic Supervisor Krah who indicated that it

16   was in his notes that included a call from

17   dispatch.

18              THE COURT:  Where did he get that

19   information?

20              MR. CHERNOSKY:  Just to be

21   completely clear, his testimony was it was

22   included as an automatic download from

23   dispatch.

24              MR. McKINNEY:  It is in Krah's

25   report.

K. McCue - Direct by Mr. Chernosky

1          THE COURT:  Okay, so dispatch,
2    meaning the entire call log?
3          MR. CHERNOSKY:  I don't know if
4    it is the entire call log, Your Honor.  I could
5    look at his trip sheets.  It was included in
6    his trip sheets because it downloads from
7    dispatch.  Those trip sheets were provided.
8          THE COURT:  When you get a
9    chance, let me see his trip sheets.
10          MR. CHERNOSKY:  Sure.
11          (Sidebar discussion concluded.)
12    Q.  In watching the video from the Homewood
13    North complex, did you notice movement of a
14    white sedan?
15    A.  I did, yes.
16    Q.  Did you notice an individual go behind
17    the area of 1214 Nolan Court in that video?
18    A.  Yes.
19    Q.  From there, did you endeavor to watch
20    the video both backward and forward to try to
21    see if you could determine where that person
22    come from or gone to?
23    A.  Yes.
24    Q.  You said somewhere in your career you
25    were employed with the Allegheny Housing

K. McCue - Direct by Mr. Chernosky

1    Authority.  Did your employment include any

2    either patrol work or work in Homewood North

3    itself?

4         A.  Yes.

5         Q.  I'm going to show you what I'm marking

6    as Commonwealth Exhibits 272 and 273.  I ask

7    you what is depicted in Commonwealth Exhibits

8    272 and 273?

9         A.  Exhibits 272 and 273 is an overhead

10   aerial Google Earth map of the Homewood North

11   housing complex.  273 is a Google Map which

12   that is up in the Homewood community, Nolan

13   Court, Ferris Court, Heart Court, Brushton

14   Avenue or Mohler Street.

15              MR. CHERNOSKY:  Your Honor, I

16   move for the admission of Commonwealth

17   Exhibit 272.

18              MR. McKINNEY:  No objection.

19              MR. CHERNOSKY:  273.

20              THE COURT:  It is admitted

21   without objection.

22        Q.  In Commonwealth Exhibit 273, could you

23   use the laser pointer that is in front of you?

24   You can step down if you have to sort of get

25   the right angle.  Those streets that you just

K. McCue - Direct by Mr. Chernosky

1    named, point them out to the jury on that

2    exhibit.

3        A.   This is Brushton Avenue.  This is

4    Mohler Street.  You have Nolan Court, Ferris

5    Court, and Heart Court.

6        Q.   In watching that video, did you become

7    interested, for lack of a better word, in

8    several camera angles?

9        A.   I did, yes.

10       Q.   Do you recall what those camera angles

11   were called?

12       A.   By housing?

13       Q.   Yes.

14       A.   They were just named as the property of

15   Nolan Court, Ferris Court, or Heart Court.

16       Q.   Given your exposure or experience with

17   Nolan Court, could you describe for the jury

18   the approximate location and angle of various

19   cameras on Nolan Court and various streets?

20       A.   In relation to Nolan Court --

21       Q.   I'll stop you there.  I'm going to show

22   you some exhibits.  I'll show you what I marked

23   as Commonwealth Exhibits 274 through 287 and

24   ask you a general question.  Do those exhibits

25   demonstrate the approximate location and camera

K. McCue - Direct by Mr. Chernosky

1    angles of various cameras as depicted in each

2    individual exhibit?

3        A.  Yes.

4            MR. CHERNOSKY:  Your Honor, I

5    move for the admission of Commonwealth

6    Exhibits 274 through 287.

7            THE COURT:  They are admitted

8    without objection.

9        Q.  First, with respect to Commonwealth

10   Exhibit 274, could you explain what is depicted

11   in Commonwealth Exhibit 274?

12       A.  So this is Mohler Street, this is Nolan

13   Court, this is Ferris Court.

14       Q.  Could you tell the jury the approximate

15   location of 1214 Nolan Court on that exhibit?

16       A.  Right around this area here.

17       Q.  With respect to Commonwealth

18   Exhibit 275, what is depicted in Commonwealth

19   Exhibit 275?

20       A.  The approximate angle of the

21   surveillance camera that will pick up that area

22   and Nolan Court.

23       Q.  With respect to Commonwealth

24   Exhibit 276?

25       A.  This would be the rear of the 1200

K. McCue - Direct by Mr. Chernosky

1    block of Nolan Court and that would depict the

2    angle of surveillance coverage from the rear of

3    Nolan Court.

4        Q.   Commonwealth Exhibit 277?

5        A.   This would catch Mohler Street.  In the

6    rear there is a concrete pad as well as a

7    couple of houses on the 1200 block of Nolan

8    Court.

9        Q.   278?

10       A.   This is further up in the rear of Nolan

11   Court which would depict a back angle which you

12   see the angle of surveillance area coverage for

13   that camera.

14       Q.   And 279?

15       A.   On the corner of one of the structures

16   of Nolan Court and depicts the angles that will

17   be covered.

18       Q.   280?

19       A.   It would be on the front of Nolan Court

20   which would capture this courtyard here as far

21   back as you can see on the angle.

22       Q.   281?

23       A.   From the rear of Nolan Court projecting

24   to the front of Nolan Court to Mohler Street,

25   this is the angle of coverage.

K. McCue - Direct by Mr. Chernosky

1        Q.  282?

2        A.  On this, this would be the rear of

3    Nolan Court, captures some of Ferris Court and

4    off of Mohler Street.

5        Q.  283?

6        A.  This would be the rear of Heart Court

7    which would capture that area in the

8    surveillance.

9        Q.  In Commonwealth Exhibit 283, is it fair

10    to say that the map shifted a little bit?

11    Indicate where Nolan Court is on 283.

12        A.  This is Nolan Court, Ferris, and Heart

13    Court.

14        Q.  On Exhibit 284?

15        A.  Ferris Court, angle of -- I'm sorry,

16    Heart Court, Ferris Court, and Nolan Court.

17        Q.  285?

18        A.  This would be -- depict the angle

19    coverage in Ferris Court itself.

20        Q.  286?

21        A.  This would be towards the rear of

22    Ferris Court depicting the angle of coverage.

23        Q.  287?

24        A.  Again, this is the rear of the front of

25    Ferris Court if you pull into the parking lot

K. McCue - Direct by Mr. Chernosky

1    but depicts the angle back toward Heart Court.

2        Q.   Now, with respect to the video that you

3    viewed from those various cameras, going

4    chronologically, having seen that white sedan

5    that you talked about, did you then go

6    backwards in time?

7        A.   I did, yes.

8        Q.   Chronologically, do you note the

9    arrival of an individual into Nolan Court at

10   approximately 10:21 p.m.?

11       A.   That's correct, yes.

12       Q.   What camera angle are you first able to

13   view that individual on?

14       A.   Referring back to the exhibits, that

15   would be on what is labeled homicide 13, that

16   would catch the front of the vehicle turning

17   off of Mohler or leaving Nolan Court from that

18   angle.

19       Q.   Could you take the jury through a brief

20   narrative of what you observed on the video

21   from 10:21 until approximately 10:31?

22       A.   Around 10:21, an individual is seen

23   leaving 1214 Nolan Court.  That individual gets

24   into a white four-door sedan.  It is seen

25   leaving Nolan Court, making a left on Mohler

K. McCue - Direct by Mr. Chernosky

1    Street, backing up to a concrete pad which is
2    located in the rear of the 1200 block of Nolan
3    Court.  As we further watch the video, that
4    individual is seen going to the back of 1214.
5    That individual recovers --
6              MR. McKINNEY:  Your Honor, at
7    this point I would object to the narrative.
8    The video will speak for itself at the time it
9    is played for the jury.
10              THE COURT:  The objection is
11    sustained in part and overruled in part.  The
12    witness may provide a summary so when you view
13    the video you have a context but it is not his
14    perception of what is on the video, it is what
15    you perceive has occurred on the video.  Let's
16    make it to more general.
17              MR. CHERNOSKY:  Thank you.
18    Q.  In general terms, does an individual
19    retrieve something from behind Nolan Court?
20    A.  Yes.
21    Q.  Did you then go back and try to
22    decipher, if you could, the time period where
23    that item that was retrieved arrived?
24    A.  Yes.
25    Q.  Without telling us what you saw, were

K. McCue - Direct by Mr. Chernosky

1    you able to do that?

2        A.   Yes.

3        Q.   Does that white sedan that you just

4    described exit Nolan Court at some point?

5        A.   Yes.

6        Q.   Directing your attention forward in the

7    evening, did there come a time where you viewed

8    two individuals traverse a fence at the back of

9    the property of Nolan Court?

10       A.   Yes.

11       Q.   Do you know approximately what time

12   that was?

13       A.   Off the top of my head, no.

14       Q.   Do those individuals, did you further

15   watch the video and see where those individuals

16   go?

17       A.   Yes.

18       Q.   Where did they go?

19       A.   Both went into the rear of 1214 Nolan

20   Court.

21       Q.   Did two individuals ever exit Nolan

22   Court?

23       A.   They did later, yes.

24       Q.   Do you know approximately how long

25   later?

K. McCue - Direct by Mr. Chernosky

1     A.  Not off the top of my head, no.

2     Q.  When those individuals exit Nolan

3  Court, are they carrying anything?

4     A.  At the time when they left, there was

5  placed in another vehicle, yes.

6     Q.  In comparison to the clothing of the

7  individuals that went into the rear of Nolan

8  Court, is the clothing they are wearing at the

9  time they exit the same or different?

10     A.  I believe it is different.

11     Q.  What happens next?

12     A.  Two individuals are seen getting in a

13  vehicle and leaving Nolan Court.

14     Q.  Are you able to pick up the car they

15  leave in at any other point on any other

16  cameras?

17     A.  Yes, that vehicle they left in ended

18  up, I believe, on Heart Court.

19     Q.  After some time on Heart Court, does

20  that vehicle depart?

21     A.  Yes.

22     Q.  Does there come a time when that

23  vehicle returns to Nolan Court?

24     A.  Yes.

25     Q.  In returning to Nolan Court, is it

K. McCue - Direct by Mr. Chernosky

1    accompanied at times with another vehicle?

2        A.   Yes.

3        Q.   What vehicle is it accompanying?

4        A.   A white four-door sedan.

5        Q.   Do individuals get out of those cars?

6        A.   Yes.

7        Q.   And what do they do?

8        A.   They run around for a little bit.  They

9    went inside 1214 Nolan Court, seen leaving,

10   heading toward Ferris Court.

11               THE COURT:  When you say "they",

12   how many people?

13               THE WITNESS:  There were two,

14   sir.

15       Q.   What vehicle do they leave in?

16       A.   A dark colored vehicle.

17       Q.   Does there come a time when the vehicle

18   returns to Nolan Court and someone exits that

19   vehicle and enters 1214?

20       A.   Yes.

21       Q.   What time does that occur?

22       A.   I believe that is early in the morning

23   on what would be the 10th, March 10th.

24       Q.   In watching the surveillance, does an

25   individual from 1214 proceed on foot from Nolan

K. McCue - Direct by Mr. Chernosky

1    Court up through Ferris Court and towards Heart

2    Court?

3        A.  Yes.

4        Q.  After that, do two individuals proceed

5    on foot back from Heart Court through Ferris

6    Court and get into a vehicle?

7        A.  Yes.

8        Q.  That vehicle, is that being driven by a

9    third person?

10       A.  Correct.

11       Q.  In preparation for your testimony

12   today -- I show you what I marked as

13   Commonwealth Exhibit 288 -- in preparation for

14   your testimony today, did you compile or have

15   compiled a compilation of the video clips that

16   you testified to?

17       A.  Yes, I did.

18       Q.  Do you recognize what is on

19   Commonwealth Exhibit 288?

20       A.  Yes, it says Trial Final 25-F,

21   Exhibit 288.

22       Q.  Is that a compilation of the video that

23   I just addressed with you?

24       A.  Yes.

25                   MR. CHERNOSKY:  Your Honor, I

K. McCue - Direct by Mr. Chernosky

1    move for the admission to 288.

2                    MR. McKINNEY:  Your Honor, no

3    objection with the argument as long as the

4    entire video is made available for

5    cross-examination.

6                    THE COURT:  So ordered.

7                    MR. CHERNOSKY:  At this point,

8    Your Honor, the Commonwealth would seek to play

9    Exhibit 288 for the jury.

10                   THE COURT:  How long is the

11   video?

12                   MR. CHERNOSKY:  The video is one

13   hour and seven minutes.

14                   THE COURT:  Is there anybody that

15   would prefer to take a break and come back?

16                   THE JURY:  Yes.

17                   THE COURT:  Okay, remain seated

18   and quiet as the jury leaves the room.

19                            -----

20                   (Brief recess taken.)

21                            -----

22                   (Open court - Jury present.)

23                            -----

24                   MR. CHERNOSKY:  Your Honor, may

25   the detective step down from the witness stand

K. McCue - Direct by Mr. Chernosky

1    during the video?

2                    THE COURT:  You may, just keep

3    your voice up.  If any of you in the farther

4    reaches of the jury box can't see as well as

5    you would like and you would like to stand up

6    or get closer to the screen, you can do so.  Go

7    ahead.

8                    MR. CHERNOSKY:  Your Honor, can

9    we get one more set of lights extinguished?

10                          -----

11                    (Video played for the jury.)

12                          -----

13       Q.   Detective McCue, I show you what I

14    marked as Commonwealth Exhibits 289 and 290 and

15    ask you if Commonwealth Exhibits 289 and 290

16    are still frames of a white sedan that appeared

17    earliest in the video montage that we just

18    watched?

19       A.   Yes.

20                    MR. CHERNOSKY:  Your Honor, I

21    move for the admission of 289 and 290.

22                    THE COURT:  Admitted without

23    objection.

24       Q.   I'll show you Commonwealth Exhibits 291

25    through 294 and ask you if those generally

K. McCue - Direct by Mr. Chernosky

1    depict the appearance of that object between

2    Nolan Court?

3         A.   They do, yes.

4              MR. CHERNOSKY:  I move for the

5    admission of Commonwealth Exhibits 291 through

6    294.

7              THE COURT:  Admitted without

8    objection.

9         Q.   Could you use the laser pointer and

10   point out on Exhibit 249 where the item

11   emerges?

12        A.   The reference is the window and grill

13   right here.

14        Q.   292?

15        A.   You can see an object there.

16        Q.   293?

17        A.   The object is there.

18        Q.   294?

19        A.   The object is there.

20        Q.   I show you what I will mark as

21   Commonwealth Exhibits 295, 296, 297, 298, and

22   299, and ask you if those are still frames of

23   the individual retrieving that object?

24        A.   They are, yes.

25             MR. CHERNOSKY:  I move for the

K. McCue - Direct by Mr. Chernosky

1    admission of 295 through 299.

2              THE COURT:  Admitted without

3    objection.

4         Q.  The first is with respect to

5    Commonwealth Exhibits 295, 296, 297, 298, and

6    299.  I show you what I'll mark as Commonwealth

7    Exhibit 300.  I'll ask you if that is a still

8    frame of the Nolan Court video and montage that

9    we just watched after two individuals exit the

10   home?

11        A.  That is, yes.

12             MR. CHERNOSKY:  I move for the

13   admission of Commonwealth Exhibit 300.

14             THE COURT:  Admitted without

15   objection.

16        Q.  I show you Commonwealth Exhibits 301

17   through 306.  I'll ask you if those are still

18   frames from the video we just watched up on

19   Heart Court?

20        A.  They are, yes.

21             MR. CHERNOSKY:  Your Honor, I

22   move for the admission of Commonwealth

23   Exhibits 301 to 306?

24             THE COURT:  Admitted without

25   objection.

K. McCue - Direct by Mr. Chernosky

1      Q.  First 301, with respect to 302, is it

2   fair to say Commonwealth Exhibit 302 is an

3   enlarged version of 301?

4      A.  It is, yes.

5      Q.  Commonwealth Exhibits 303, 304, 305,

6   and 306.  You worked in Nolan Court for some

7   time when you were a housing authority officer?

8      A.  That's correct, yes.

9      Q.  Could you give the jury an idea for the

10   topography of the Nolan Court complex?

11      A.  It is commonly referred to as Hilltop.

12   It is a housing community.  As I stated

13   earlier, it is made up of Nolan Court, Ferris

14   Court, and Heart Court.  You can get there from

15   Brushton Avenue or coming down Mohler Street.

16      Q.  I show you what I'll mark as

17   Commonwealth Exhibits 307 to 313.  First, I'll

18   ask with respect to Commonwealth Exhibit 307,

19   what is depicted in 307?

20      A.  Depicted in 307 is an overhead aerial

21   map from Google Earth.  You can see Mohler

22   Street, you can see Nolan Court, Ferris Court.

23   You really can't see Heart Court though.

24              MR. CHERNOSKY:  I move for the

25   admission of 307.

K. McCue - Direct by Mr. Chernosky

1          THE COURT:  Admitted without

2    objection.

3          Q.  Is there a dirt road that runs behind

4    Nolan Court?

5          A.  There is.

6          Q.  Is that part of the complex?

7          A.  It is not.  It is on the back end.

8          Q.  Commonwealth Exhibit 307 is behind you

9    on the screen.  Could you use the laser pointer

10   and point out that dirt road?

11         A.  This is the dirt road here.

12         Q.  The tree lined area on that dirt road

13   on 307 and Nolan Court, could you point that

14   out?  Generally speaking, what is the

15   topography of that?

16         A.  This is a hillside that leads down to

17   this dirt road as you can see which you get

18   behind Nolan Court there in the video that we

19   just watched two people enter the complex to

20   the rear of Nolan Court.

21         Q.  Could you point out the area where that

22   is?

23         A.  Back here.

24         Q.  Is there a fence in there?

25         A.  There is.  There is a tall fence that

K. McCue - Direct by Mr. Chernosky

1    encompasses the property back there as well.

2        Q.  I direct your attention to Exhibits 308

3    through 313.  Do those exhibits generally

4    depict the area of the dirt road behind Nolan

5    Court, the hillside leading up to Nolan Court,

6    and the fence area that you point out?

7        A.  It does, yes.

8            MR. CHERNOSKY:  If I haven't

9    already introduced.

10           THE COURT:  Admitted without

11   objection.

12       Q.  Could you tell us what 308 is?

13       A.  The dirt road that we were discussing

14   and the dirt road up to the left.

15       Q.  309?

16       A.  Looking up the hillside to the rear of

17   Nolan Court.

18       Q.  Is it fair to say from the vantage

19   point of Commonwealth 309, the photographer

20   will be standing on that dirt road?

21       A.  Yes.

22       Q.  Commonwealth Exhibit 310?

23       A.  The rear of Nolan Court.  The hillside

24   is this way, to my right.

25       Q.  The fence is depicted to the left of

K. McCue - Direct by Mr. Chernosky

1    Commonwealth Exhibit 310.  Where is that?

2        A.   Located on the rear of the building.

3    As it comes toward, it makes a turn and heads

4    back down to Nolan Court.

5        Q.   Commonwealth Exhibit 311, what are we

6    looking at here?

7        A.   The rear of Nolan Court, the fence that

8    I described running back alongside.

9        Q.   Do you know approximately how tall that

10   fence is?

11       A.   I believe it is six foot tall.

12       Q.   Commonwealth Exhibit 311?

13       A.   This would be the courtyard, Nolan

14   Court.  As you can see, the fence line is

15   there.

16       Q.   Commonwealth Exhibit 312?

17       A.   Then this would be looking toward Nolan

18   Court and the fence runs along here.

19       Q.   The fence in Commonwealth Exhibit 312,

20   approximately how tall is it?

21       A.   About six foot as well.

22            MR. CHERNOSKY:  No further

23   questions.  I offer for cross.

24            THE COURT:  How long do you

25   expect to be?

K. McCue - Direct by Mr. Chernosky

1          MR. McKINNEY:  Longer than

2     20 minutes, Your Honor.

3          THE COURT:  Okay, turn the lights

4     on and remain seated and quiet as the jury

5     leaves the room.  See you tomorrow morning at

6     9:00.

7               -----

8          (Open court - Jury not present.)

9               -----

10         THE COURT:  The materials that

11    you gave me regarding the disks on the raw data

12    on the phone activity, the history, as I see

13    it, indicates that on June 1, 2018, there was

14    an e-mail from Ms. Williams to Mr. Chernosky

15    where it is brought up that there is a

16    necessity to purchase a program in order to

17    access that data.  The question is posed why

18    can't you, meaning the Commonwealth, provide a

19    format to access it or provide the software?

20    Ms. Williams receives a response on 06/08/18

21    from Ms. Werner, Alicia Werner, who left the

22    office, forwarded the prior message.  In any

23    event, she goes on to state per Commonwealth

24    discovery letter they do not have, meaning the

25    Commonwealth, does not have Gladiator.  They

K. McCue - Direct by Mr. Chernosky

1    are not purchasing Gladiator owing to the fact

2    that the FBI has it and using it to organize

3    the data and it cannot be turned over in any

4    other format.  Then approximately an hour later

5    Ms. Williams e-mails Ms. Werner, Mr. Chernosky,

6    and Ms. Pellegrini that they searched and

7    contacted Gladiator, meaning the defense, and

8    they will not sell it to the defendants, only

9    to law enforcement, what do we do with this

10   discovery that we cannot open up?  That

11   question is posed.  Did you know that you

12   cannot obtain the system?

13        Now, is there any further communication

14   from the Commonwealth in response to that?

15             MR. CHERNOSKY:  Not to my

16   knowledge, Your Honor, but I'm hesitant to say

17   that for certain without checking my e-mails.

18             THE COURT:  Check that and let me

19   know tomorrow morning.  Anything else today?

20        The other thing, when I granted the

21   habeas as to Thomas yesterday, I contacted both

22   Dr. Wright's office and Ms. Lynn's office to

23   inform them that there was no further work

24   needed on Thomas and to concentrate on

25   Mr. Shelton, that aspect of it.  In light of

K. McCue - Direct by Mr. Chernosky

1  that, there would be no delay in proceeding if,

2  in fact, a verdict was reached consistent with

3  the penalty phase being necessary.

4          MS. PELLEGRINI:  After speaking

5  -- actually, Ms. Williams informed us they have

6  no intention of calling a psychiatrist or

7  psychologist during the penalty phase so

8  Dr. Wright will not be used during the penalty

9  phase.

10         With regard to scheduling, we have a

11  Dr. Dwyer who is the pathologist who performed

12  two of the autopsies.  She is now in Dallas,

13  Texas.  I have arranged for her and I turned

14  over all of her pictures that she selected.  We

15  are moving along much more quickly than any of

16  us anticipated.  I did not anticipate needing

17  her until the end of next week or the beginning

18  of the following week.  There is a possibility

19  that the Commonwealth would finish their case

20  conceivably by the end of this week.  If we

21  finished early on Friday or at some point,

22  would the Court recess and allow me to bring in

23  Dr. Dwyer on the 10th?

24         THE COURT:  Monday?

25         MS. PELLEGRINI:  Monday.

K. McCue - Direct by Mr. Chernosky

1                    THE COURT:  Yes.

2                    MS. PELLEGRINI:  And

3       Mr. Chernosky has a question to another

4       out-of-state witness.

5                    MR. CHERNOSKY:  The Commonwealth

6       is planning on calling a record custodian from

7       T-Mobile regarding phone records.  His flight

8       is for the 12th.

9                    THE COURT:  You are speaking too

10      fast.

11                   MR. CHERNOSKY:  I will see if he

12      is available on Monday the 10th.  If not, the

13      Commonwealth is prepared to admit those records

14      with a record certification pursuant to the

15      rules but I guess I would want a ruling before

16      whether those are coming in before I cancel.

17                   THE COURT:  Is he local?

18                   MR. CHERNOSKY:  He is out of

19      Allentown, Your Honor.

20                   THE COURT:  When is he scheduled

21      to be here?

22                   MR. CHERNOSKY:  The 12th.

23                   THE COURT:  Have you contacted

24      him recently?

25                   MR. CHERNOSKY:  Not since last

K. McCue - Direct by Mr. Chernosky

1    week.

2                 THE COURT:  Try to get ahold of

3    him tonight or tomorrow morning.  I mean, if

4    you're in court, have someone do it.  I'll

5    revisit it.  I'll do my best to accommodate

6    you.

7                 MR. McKINNEY:  Another issue, I

8    recognize there is no jury in the box, it is

9    sensitive so I would rather do it at sidebar.

10                (Sidebar discussion held as

11   follows.)

12                MR. McKINNEY:  Your Honor, I was

13   just provided with a disk which is the edited

14   version of all the surveillance of Nolan Court

15   that we watched.  I was provided with the raw

16   data which is hours and hours.  I'm not

17   degrading Mr. Chernosky, I just received the

18   edited disks and assuming it plays and no

19   issues, I will be prepared for

20   cross-examination.  I want to let the Court

21   know that Ms. Pellegrini wouldn't give me a

22   disk that wouldn't play.  Assuming it plays, I

23   have no issue with discovery matter.

24                THE COURT:  What are you going to

25   play it on?  What are you going to use to open

K. McCue - Direct by Mr. Chernosky

1    it?

2              MR. McKINNEY:  I'm going to open

3    it at my office this evening but if I have

4    questions on cross.

5              THE COURT:  I understand.  What

6    kind of device are you going to open it on?

7              MR. McKINNEY:  My laptop.

8              MR. CHERNOSKY:  It was downloaded

9    to the laptop from a flash drive.

10              MR. McKINNEY:  Every other disk

11    I've been able to open.  I don't believe this

12    is difficult.  With respect to

13    cross-examination of Detective McCue, I would

14    like to be able to ask him if he followed up on

15    the driver of the silver Hyundai that is

16    referenced in the trip sleet.  I'm concerned

17    when I ask him about following up on that

18    vehicle, he may respond no.  I will follow up

19    on the white Lincoln that is at issue in this

20    case but I will have no knowledge what will be

21    his response because that discovery was not

22    provided so I'm hoping that I'm still able to

23    continue with my theory of the case and use

24    proper effective cross-examination without

25    opening the door to some information that I

K. McCue - Direct by Mr. Chernosky

1    didn't have when the case started.

2                    MR. CHERNOSKY:  I can instruct

3    Detective McCue accordingly that he is to

4    answer only questions about that, not volunteer

5    anything with respect to the Lincoln.

6                    THE COURT:  Are we following up

7    on the Lincoln?

8                    MR. CHERNOSKY:  Not any more than

9    what we're aware of going to Nolan Court and

10   watching the video.  Someone, I don't know if

11   it was him, but ran the registration and it was

12   registered to Cheron's mother.

13                   THE COURT:  Okay, work that out.

14                   MR. CHERNOSKY:  The question is

15   about the silver car in the trip sheet.  We are

16   pretty sure there was follow-up on that.  I

17   don't know if it was by Detective McCue.

18                   MR. McKINNEY:  We'll talk about

19   that.

20                   THE COURT:  Okay, thank you.  The

21   dispatch log was not in the case file.

22                   MR. CHERNOSKY:  It is not in the

23   case file.  I have been through the case file.

24   I bet if you flip through it now, it is not in

25   there now.

K. McCue - Direct by Mr. Chernosky

1                    THE COURT:  Okay, thank you.

2                    (Court adjourned for the day.)

3                              -----

4                    (Wednesday, February 5, 2020 -

5          Open court - Jury not present.)

6                              -----

7                    THE COURT:  Mr. Chernosky, can

8          you confirm in your notes that June 6th of 2018

9          was the last communication about the drive

10         test?

11                   MR. CHERNOSKY:  Yes, Your Honor,

12         I confirm there is no further communication

13         from our office on that.

14                   THE COURT:  Okay.

15                             -----

16                   (Open court - Jury present.)

17                             -----

18                   THE COURT:  Detective.

19                             -----

20                   KEVIN McCUE, (cont.)

21         a witness herein, having been previously first

22         duly sworn, was examined and testified as

23         follows:

24                             -----

25                   THE COURT:  Anything else,

K. McCue - Cross by Mr. McKinney

1    Mr. Chernosky?

2                    MR. CHERNOSKY:  No further

3    questions, Your Honor.

4                    THE COURT:  Mr. McKinney.

5                    MR. McKINNEY:  Thank you, Your

6    Honor.

7                            -----

8                    CROSS-EXAMINATION

9                            -----

10   BY MR. McKINNEY:

11       Q.  Detective McCue, I'm going to ask you

12   some questions about the video.

13                   MR. McKINNEY:  For the purposes

14   of the record, Your Honor, this is Commonwealth

15   Exhibit 271 at 10:20:40, camera angle HON-7.

16       Q.  We we're going to play about three or

17   four minutes and then I'm going to ask you a

18   couple questions about it.  Thank you.

19                           -----

20                   (Video played for the jury.)

21                           -----

22       Q.  Detective McCue, the individual that we

23   just saw come down the sidewalk and enter the

24   front portion of a house, is that 1214 Nolan?

25       A.  This is 1214 Nolan right here, yes.

K. McCue - Cross by Mr. McKinney

1    Q.  Did you see that individual coming down

2    the sidewalk?

3    A.  I did, yes.

4            MR. McKINNEY:  Mr. Chernosky, can

5    you continue to play?

6    Q.  Detective, for purposes of the record,

7    it is 10:22:46, is that person beginning to

8    enter 1214 Nolan?

9    A.  That's correct, yes.

10            MR. McKINNEY:  Mr. Chernosky, can

11    you stop?

12    Q.  Detective, that individual has not yet

13    entered 1214 Nolan, correct?

14    A.  That's correct, yes.

15    Q.  Do you see any people next door at 1216

16    Nolan?

17    A.  Right here?

18    Q.  Yes.

19    A.  There is a figure there.  I'm not sure

20    who that is.

21            MR. McKINNEY:  Mr. Chernosky, can

22    you resume play?

23    Q.  Detective, you would agree with me that

24    next door to 1214 where that figure was is 1216

25    Nolan; is that correct?

K. McCue - Cross by Mr. McKinney

1      A.   That would be correct, yes.

2      Q.   And the individual that went into 1214

3   Nolan based on your investigation, do you

4   believe that to be Cheron Shelton?

5      A.   At this time I did not know who it was.

6      Q.   Based on subsequent investigations, do

7   you believe that to be Cheron Shelton?

8      A.   Later on in the investigation, yes.

9      Q.   So are you aware that the resident of

10  1216 Nolan is Lamont Powell's sister?

11     A.   I didn't know that, no.

12     Q.   Further in your investigation, you

13  determined, or you believed, that that is

14  Cheron Shelton going into 1214 Nolan, correct?

15     A.   Correct.

16     Q.   You are aware that he is charged with

17  killing five people?

18     A.   Correct.

19     Q.   Did you ever bother to investigate who

20  he might have been talking to on this video

21  that you had right next door to his house or to

22  his mother's house?

23     A.   I did not, no.

24     Q.   Did you do any investigation over the

25  course of the four years of the pendency of

K. McCue - Cross by Mr. McKinney

1    this case to determine who lived next door to

2    the killer's mom and who he was talking to that

3    night?

4         A.  I did not, no.

5         Q.  Do you know if anyone in your agency

6    has done any investigation to determine who he

7    was talking to or determine who lived at that

8    house?

9         A.  I would not know that.

10        Q.  Are you aware that Lamont, one of the

11   victim's in this case, testified that his

12   sister, Millie Walker, lived at 1216 Nolan

13   Court?

14        A.  I don't know, I was sequestered.

15        Q.  Have you ever spoken to Mr. Powell?

16        A.  No.

17              MR. McKINNEY:  No additional

18   questions, Your Honor.

19              THE COURT:  Anything else,

20   Mr. Chernosky?

21              MR. CHERNOSKY:  No, Your Honor.

22              THE COURT:  Thank you, Detective

23   McCue.

24              MR. CHERNOSKY:  At this point the

25   Commonwealth calls Detective James Holman.

J. Holman - Direct by Mr. Chernosky

```
 1                    -----
 2              JAMES HOLMAN,
 3    a witness herein, having been first duly sworn,
 4    was examined and testified as follows:
 5                    -----
 6              DIRECT EXAMINATION
 7                    -----
 8    BY MR. CHERNOSKY:
 9        Q.   Detective Holman, could you state your
10    first and last name and spell your last name
11    for the court reporter?
12        A.   Detective James Holman, H-O-L-M-A-N.
13        Q.   How are you currently employed?
14        A.   Employed by the Allegheny County Police
15    Department in the video forensic unit.
16        Q.   How long have you been employed with
17    the county police?
18        A.   For 26 years.
19        Q.   Prior to your employment with county
20    police, did you have any law enforcement
21    experience?
22        A.   I did not.
23        Q.   What is your current assignment?
24        A.   Audio and video forensic unit.
25        Q.   How long have you been assigned to the
```

J. Holman - Direct by Mr. Chernosky

1    audio and video forensic unit?

2        A.   For 16 years.

3        Q.   Were you working in that capacity in

4    March of 2016?

5        A.   I was.

6        Q.   During March 9th and the time period

7    that followed, were you asked to analyze a

8    section of video that also contained audio?

9        A.   I was.

10       Q.   Were you informed where that video and

11   audio was obtained from?

12       A.   Yes, I received it from Detective

13   Feeney, he explained that to me.

14       Q.   With respect to the audio and video

15   that you received, what type of requests were

16   you to do?

17       A.   The file was a video file that

18   contained audio retrieved from a home recording

19   system.  I was asked to review specifically the

20   audio portion, or the sound recording, and to

21   count the number of sounds that appeared to be

22   gunshots.

23       Q.   What was generally the purpose of

24   trying to count how many gunshots you heard or

25   was present?

J. Holman - Direct by Mr. Chernosky

1      A.   I frequently receive such requests from

2      the homicide unit to help them process and

3      proceed.  Currently, if the recording contains

4      gunshot, they can pick up the amount of

5      evidence, the pieces of brass, that sort of

6      thing.

7      Q.   Will you let the jury know what steps

8      are involved in comprising an audio/video from

9      that fashion?

10     A.   Yes.  So the video comes to us from the

11     home video recorder, usually exported onto a

12     thumb drive.  They put a thumb drive in the

13     front of the recorder.  We go through the menu

14     system of the digital recorder and select the

15     time period that they want to export.  The

16     video files are transported to me for

17     examination, the files of the audio/video

18     combination file.  When I do an audio analysis

19     as in this case, I separate the audio from the

20     video.  In this case it was as simple as

21     opening it in QuickTime software and using an

22     export option in that software to separate the

23     audio and video.  At that point, I was working

24     with the audio file.  At that point we open the

25     audio file and the digital audio editor in this

J. Holman - Direct by Mr. Chernosky

1    case Adobe editor.

2        Q.   In doing so, in playing only the audio

3    in that software, are you able to get a visual

4    representation of what the sound looks like?

5        A.   That is the primary purpose.  Anyone

6    can listen to it and we can count on our

7    fingers what we are hearing but it is much

8    easier to look at a graphic representation of

9    the sound waves and get a better idea of what

10   composes those sounds.

11       Q.   Did you do that in this case

12   specifically?

13       A.   I did.

14       Q.   I show you what I will mark as

15   Commonwealth Exhibit 314.  I ask if you

16   recognize what is depicted in Commonwealth

17   Exhibit 314?  You previously reviewed 314 with

18   myself?

19       A.   Yes, I have, and I recognize this.

20       Q.   What is contained on 314?

21       A.   The audio file and video audio that was

22   collected.

23            MR. CHERNOSKY:  Your Honor, I

24   move for the admission of Commonwealth

25   Exhibit 314?

J. Holman - Direct by Mr. Chernosky

1          THE COURT:  No objection, it will

2     be admitted.

3          Q.  Detective, I'm going to play that audio

4     for you.

5          MR. McKINNEY:  Mr. Chernosky, can

6     you pause it is for one moment?  Your Honor,

7     permission to approach?

8          THE COURT:  Okay.

9          (Sidebar discussion held as

10    follows.)

11          MR. McKINNEY:  Your Honor, I

12    believe Mr. Chernosky is going to play the

13    shots fired on audio for a second time during

14    this trial.  At this point I would argue that

15    is duplicative.  It is at this point incredibly

16    prejudicial.  They are alarming to hear and I

17    ask that he not be permitted to play them for a

18    second time during the trial.

19          THE COURT:  Objection overruled.

20    First of all, I don't think it is prejudicial.

21    It is necessary to develop this witness's

22    testimony.  Secondly, your theory is your guy

23    wasn't even there so.

24          (Sidebar discussion concluded.)

25          (Audio recording played for the

J. Holman - Direct by Mr. Chernosky

1    jury).

2         Q.   Detective, is that the audio you were

3    able to isolate?

4         A.   It is.

5         Q.   I show you what I will mark as

6    Commonwealth Exhibits 315, 316, 317, and 318.

7    I ask you generally if Commonwealth Exhibits

8    316 through 318 -- I apologize, 319 -- or 318

9    -- represent the graphs that you were able to

10   obtain from that audio?

11        A.   They do.

12             MR. CHERNOSKY:  Your Honor, I

13   move for the admission of Commonwealth Exhibits

14   315 through 318.

15             THE COURT:  Admitted without

16   objection.

17        Q.   First, with respect to Commonwealth

18   Exhibit 315, which is on the screen behind you,

19   could you tell the jury what we're looking at

20   in Commonwealth Exhibit 315?

21        A.   May I stand?

22        Q.   Yes, I apologize.

23        A.   Are we able to show the exhibit that

24   shows frequency and amplitude on the front

25   first?

J. Holman - Direct by Mr. Chernosky

1        Q.   Is that the one?

2        A.   That's it.

3        Q.   So for purposes of the record, you are

4    referring to Commonwealth Exhibit --

5        A.   Exhibit 316.  So as I explained

6    earlier, the digital software Adobe C8, this is

7    what you see on the screen once the audio file

8    is imported into the software and ready for

9    playback.  There are two separate wave forms

10   displayed.  This is the same audio file showing

11   different aspects of the sound recording.  On

12   this line at the left would be the start of the

13   recording.  The right would be the end of the

14   recording.  So this is recording over time.

15   You can see at what point in time the specific

16   sound event takes place.

17           The second wave form is on the bottom.

18   The same thing, they correspond to each other.

19   You see a spike here and a spike there.  This

20   gives us different information about the sound

21   event.  This tells us what frequency composed

22   that particular sound.  What I mean by that is

23   low frequency such as if you were to refer to a

24   marching band, base drums, tubas, that part of

25   the graph, and symbols and flutes would be at

J. Holman - Direct by Mr. Chernosky

1    this higher part of the graph.  So the brighter

2    this particular sound event, the higher the

3    frequency.  So this is a booming sound.  Before

4    I hear it, I know that.

5         What the upper amplitude wave form

6    shows us is a couple of things.  First, it

7    shows there was an event.  It shows relatively

8    how loud that event was.  The taller the spike,

9    the louder the sound.  So the shorter spikes

10   are not as loud relatively to the taller

11   spikes.  They also tell us what points in time.

12   It shows us a rhythm and when an event took

13   place.  That is an explanation of that exhibit.

14        Q.  Directing you back to Commonwealth

15   Exhibit 315, is this both groups of sounds

16   displayed together on the same graph?

17        A.  It is.

18        Q.  In looking at the audio, were you able

19   to give a determination of how many shots were

20   in each grouping?

21        A.  Yes, when I do a gunshot analysis, I do

22   start with the disclaimer that if two loud

23   events take place at the same time, they could

24   be buried one under another.  I've done a

25   number of audio examinations of gunshot

J. Holman - Direct by Mr. Chernosky

1    recordings.  This one is very distinct in that

2    there was very clear separation between these

3    groups.  I did not detect an area in this

4    recording where things seem to have been

5    obliterated.  So I can say the shot count or

6    event count here is fairly accurate with little

7    chance of error.

8        Q.  Directing your attention to 317, what

9    are we looking at here in this graph?

10       A.  The previous graph we showed both sets

11   of shots together.  The point of that was to

12   show, A, the frequency, at what rate did the

13   first set of shots occur and the duration of

14   time between the first set of sounds and the

15   second set of sounds.  This graph shows a

16   closer examination of the frequency components

17   of this particular group of sounds.  You can

18   see when it occurred and you get a better idea

19   of what frequency comprises each one of those.

20   It shows a similarity between each sound event.

21   If you look from the bottom to the top, they

22   are very similar in composition with very few

23   changes.

24       Q.  Directing your attention to

25   Commonwealth Exhibit 318, what is depicted in

J. Holman - Direct by Mr. Chernosky

1    this exhibit?

2        A.    Again, this is a closer examination of

3    the two different groups.  So we see, this

4    being the first group, you can see, for lack of

5    a better word, I'll call this a print, it is

6    kind of like a fingerprint for that particular

7    sound although they can vary relative to the

8    event and microphone.  See how this one has a

9    longer trail on it, it has a more intensity

10   because it is brighter yellow.  These are quite

11   different than those in all aspects.  This

12   frequency section in my determination was that

13   the first set of sound events were a different

14   item creating those events than the second.

15       Q.    Now, directing your attention back to

16   Commonwealth Exhibit 315, how many total events

17   did you count in the first group?

18       A.    I counted 18 in the first.

19       Q.    How many total events did you count in

20   group number two?

21       A.    That was 30 from start to end.

22       Q.    Can you give an idea to the jury how

23   long the sound event was from start to finish?

24       A.    I did not make a note on that.  I

25   couldn't tell you that off the top of my head.

W. Best - Direct by Mr. Chernosky

1    But listening, if you heard it from start to

2    finish, you have an idea of the duration.

3                    MR. CHERNOSKY:  No further

4    questions.  I offer for cross.

5                    MR. McKINNEY:  No questions, Your

6    Honor.

7                    THE COURT:  Thank you.  You are

8    excused.

9                    MR. CHERNOSKY:  The Commonwealth

10   calls Margaret Gramby.  Your Honor, at this

11   point the Commonwealth will call William Best.

12                    -----

13                    WILLIAM BEST,

14   a witness herein, having been first duly sworn,

15   was examined and testified as follows:

16                    -----

17                    DIRECT EXAMINATION

18                    -----

19   BY MR. CHERNOSKY:

20      Q.  Mr. Best, can you state your first and

21   last name and spell your last name for the

22   court reporter?

23      A.  William Best, B-E-S-T.

24      Q.  How are you currently employed?

25      A.  I'm employed at the Allegheny County

W. Best - Direct by Mr. Chernosky

1    Medical Examiner's Office, forensic laboratory

2    division.

3        Q.   How long have you been employed in the

4    capacity that you just described to the jury?

5        A.   Approximately eleven-and-a-half years.

6        Q.   Where is your assignment within the

7    laboratory?

8        A.   I serve a full-time assignment within

9    the firearms and tool marks section of the

10   laboratory.  I also serve an assignment on the

11   mobile crime unit for the laboratory.

12       Q.   Pursuant to your assignment in the

13   mobile crime unit, did you participate in the

14   service of a search warrant at 1214 Nolan Court

15   in the Homewood North housing complex?

16       A.   Yes, I did.

17       Q.   What day did you participate in that

18   search?

19               THE WITNESS:  May I refer to my

20   report, Your Honor?

21               THE COURT:  You may, if there is

22   no objection.

23       A.   That would be Saturday, March 12, 2016.

24       Q.   What agency were you assisting that day

25   with the processing?

W. Best - Direct by Mr. Chernosky

1    A.   The request came through the Allegheny

2    County Police.

3    Q.   Could you describe for the jury in

4    general terms what 1214 Nolan Court looks like?

5    A.   Yes.  1214, to the best of my

6    recollection, was a townhouse style apartment

7    complex.

8    Q.   I show you what I marked as

9    Commonwealth Exhibit 319.  I ask you generally

10   if that appears to be a Google street view of

11   1214 Nolan Court?

12   A.   Yes.

13        MR. CHERNOSKY:  Your Honor, I

14   move for the admission of Commonwealth

15   Exhibit 319.

16        THE COURT:  It will be admitted.

17   If you have a chance, check your numbers.  I

18   have a 319.  We need that cleared up.

19   Q.   Now, when you were processing the scene

20   that day, how does it work generally?  Do the

21   detectives do the searching and you are

22   directed to photograph?

23   A.   That depends.  Sometimes I will simply

24   take photographs, sometimes I will participate

25   and search areas of the residence or vehicle

W. Best - Direct by Mr. Chernosky

1    that is being searched at the time.

2        Q.   During service of the search warrant at

3    1214 Nolan Court, did you photograph various

4    items of evidence and did you recover and mark

5    that evidence?

6        A.   Yes, I did.

7        Q.   Could you give the jury an idea of what

8    you photographed that day?

9        A.   Yes.  The items that I photographed and

10   collected on behalf of the laboratory was a .22

11   long rifle caliber Colt rifle, serial number

12   BP035241, and a magazine containing .22 long

13   rifle caliber cartridges that was located in

14   the red suitcase in the basement of the

15   residence.  Also located in a basement closet

16   was a 7.62 by 39 millimeter caliber magazine

17   containing cartridges, a drum magazine

18   containing 7.62 by 39 millimeter cartridges, a

19   drum magazine containing 12 gauge shot shells,

20   a black bag containing miscellaneous cartridges

21   of ammunition, a scope and other firearm

22   related parts, a white ballistic vest, a

23   plastic bag containing a green leafy substance.

24       Q.   I show you what I will mark as

25   Commonwealth Exhibits 321 through 324 and ask

W. Best - Direct by Mr. Chernosky

1    you if these represent some of the items that

2    you just described to the jury.  Are those

3    items that you just described to the jury?

4         A.  Yes, some of them.

5         Q.  With respect to Commonwealth

6    Exhibit 321, what is depicted in Commonwealth

7    Exhibit 321?

8         A.  That would be a red suitcase.

9              MR. CHERNOSKY:  Your Honor, at

10   this point, I move for the admission of

11   Commonwealth Exhibits 321 through 324.

12             THE COURT:  Admitted without

13   objection.

14        Q.  Then directing your attention to

15   Commonwealth Exhibit 322, what is that a

16   picture of?

17        A.  That is a close-up photograph depicting

18   an item that was located inside of a red

19   suitcase.

20        Q.  Directing your attention to

21   Commonwealth Exhibit 323, what is depicted in

22   Commonwealth Exhibit 323?

23        A.  That is scene Item A which also would

24   be the .22 long rifle caliber Colt rifle,

25   serial number BP035241.

W. Best - Direct by Mr. Chernosky

1        Q.   Then Commonwealth Exhibit 324?

2        A.   Scene Item B, a .22 long rifle magazine

3    containing cartridges and scene Item C, 7.62 by

4    39 caliber magazine containing cartridges.

5        Q.   Let me show you what I will mark as

6    Commonwealth Exhibits 325, 326, 327, and 328.

7    I ask you if those pictures depict other items

8    that you recovered from the house?

9        A.   Yes, they do.

10              MR. CHERNOSKY:  Your Honor, I

11   move for the admission of Commonwealth

12   Exhibits 325 through 328.

13              THE COURT:  Admitted without

14   objection.

15       Q.   Could you tell the jury what is

16   depicted in Commonwealth 325?

17       A.   That is a photograph of the top of a

18   7.62 by 39 millimeter magazine containing 7.62

19   by 39 caliber cartridges.

20       Q.   Commonwealth Exhibit 326?

21       A.   D is a drum magazine containing 7.62 by

22   39 millimeter caliber cartridges.  E would be

23   the drum magazine containing 12 gauge

24   cartridges.  F, a black bag containing

25   miscellaneous cartridges and the scope and

W. Best - Direct by Mr. Chernosky

1    other firearm related parts.

2        Q.   And Commonwealth Exhibit 328, is that a

3    close-up of the drum magazine that you

4    described earlier?

5        A.   Yes.

6        Q.   During the course of your processing of

7    the scene, did you also find items of

8    identification or indicia?

9        A.   Yes, they were photographed but they

10   were not collected by myself for the

11   laboratory.

12       Q.   I show you what I will mark as

13   Commonwealth Exhibits 329, 330, 331, 332, and

14   333.  I'll ask you if those generally represent

15   the items of identification or indicia that you

16   recovered?

17       A.   Yes.

18            MR. CHERNOSKY:  Your Honor, I

19   move for the admission of Commonwealth Exhibits

20   329 through 333.

21            THE COURT:  Admitted without

22   objection.

23       Q.   With respect to Commonwealth

24   Exhibit 329, what is depicted in Commonwealth

25   Exhibit 329?

W. Best - Direct by Mr. Chernosky

1      A.   A Pennsylvania identification card with

2      the name of Cheron Lamont Shelton with the

3      address of 7167 Ross Garden Road on it.

4      Q.   Commonwealth Exhibit 330, is that the

5      same item with an evidence marker with it?

6      A.   Yes.

7      Q.   Commonwealth Exhibit 331, what is

8      Commonwealth Exhibit 331?

9      A.   A white envelope with an address to

10     DeAndre Smith at 1214 Nolan Court with other

11     information handwritten on it.

12     Q.   Can you read the writing that is on the

13     right side of that exhibit?

14     A.   Yes, that would be Cheron new number

15     with the number 412-689-2889.

16     Q.   Are you able to read the handwriting

17     that is on the left side of that exhibit?

18     A.   I can't quite make out what is spelled

19     above the numbers.  It appears possibly to be

20     Oklahoma with a number 580-857-0782.

21     Q.   Commonwealth Exhibit 331, the same

22     piece of evidence with an evidence marker with

23     it?

24     A.   Yes.

25     Q.   What is depicted in Commonwealth

W. Best - Direct by Mr. Chernosky

1    Exhibit 332?

2        A.  It appears to be an envelope addressed

3    to Cheron Shelton with the address of 1214

4    Nolan Court.

5        Q.  Could you give the jury an idea of the

6    general layout of 1214 Nolan Court?

7        A.  I don't quite recall the exact layout.

8    I recall there being a basement area with

9    closets where many of those items were

10   recovered that were located.

11       Q.  Is it your recollection that that was

12   on the lower level of the house?

13       A.  Yes.

14            MS. PELLEGRINI:  Mr. Chernosky,

15   excuse me, Your Honor.

16            (Discussion off the record.)

17            MR. CHERNOSKY:  Your Honor, may I

18   have a five-minute recess to open the evidence

19   packages?

20            THE COURT:  Okay.  Remain seated

21   and quiet as the jury leaves the room.

22                 -----

23            (Brief recess taken.)

24                 -----

25

W. Best - Direct by Mr. Chernosky

```
 1                      -----
 2              (Open court - Jury not present.)
 3                      -----
 4              MR. McKINNEY:  Your Honor, if we
 5       could approach before the jury comes out?
 6                  (Sidebar discussion held as
 7       follows.)
 8              MR. McKINNEY:  Your Honor, I, as
 9       the Court knows, filed a motion in limine with
10       respect to all of this evidence found at 1214
11       Nolan Court and argument that it was more
12       prejudicial than probative.  I understand that
13       the Court denied the motion and the evidence is
14       coming in, but the demonstrative .22-caliber
15       rifle, that is in no way related to this case.
16       That would certainly be more prejudicial than
17       probative.
18              MR. CHERNOSKY:  The only
19       fingerprints, and that is Mr. Shelton's
20       fingerprints, is on the rifle to the entire
21       cache of weapons.
22              MR. McKINNEY:  Just in brief
23       response, that his fingerprint was found on the
24       gun, it is not a problem, just showing a rifle
25       that has nothing to do with this mass killing.
```

W. Best - Direct by Mr. Chernosky

1              THE COURT:  Did he pull the

2    print?

3              MR. CHERNOSKY:  No.  That is Tom

4    Morgan to testify to that.

5              THE COURT:  I may let you show

6    the weapon where the print was found with that

7    witness.

8              MR. CHERNOSKY:  Okay.

9              THE COURT:  When are you calling

10   Brittany Shelton?

11             MR. CHERNOSKY:  Right now, in the

12   event that they deny that they talked to the

13   police or deny their statements, I need to

14   admit the statement through the detective so I

15   don't have to do the authentication through

16   them.  That is coming up later today.

17             THE COURT:  I'm going to have to

18   get an attorney for her probably, right?  I

19   better get one for her.

20             MR. McKINNEY:  Better safe than

21   sorry.

22             MR. CHERNOSKY:  I don't think any

23   of our questioning --

24             THE COURT:  I'll do it in case it

25   should arise and won't slow things down.  Okay.

W. Best - Direct by Mr. Chernosky

1           (Sidebar discussion concluded.)

2                     -----

3           (Open court - Jury present.)

4                     -----

5      Q.   Mr. Best, I show you what I will mark

6  as Commonwealth's Exhibit 33 and ask if you

7  recognize -- or, I'm sorry, 334 -- and ask if

8  you recognize what is contained in Commonwealth

9  Exhibit 334?

10     A.   Yes, I do.

11     Q.   What is that?

12     A.   It is a 7.62 by 39 millimeter caliber

13 magazine and 7.62 by 39 caliber cartridges.

14     Q.   Is that the same one that you recovered

15 from 1214 Nolan Court?

16     A.   Yes.

17     Q.   I show you what I marked as

18 Commonwealth Exhibit 335.  I ask if you

19 recognize what Commonwealth Exhibit 335 is?

20     A.   Yes, I do.

21     Q.   What is 335?

22     A.   That is a 7.62 by 39 caliber drum

23 magazine and several 7.62 by 39 millimeter

24 caliber cartridges.

25     Q.   Do you know or could you explain the

W. Best - Direct by Mr. Chernosky

1    differences between the first magazine that the

2    Commonwealth gave you at 334 and the magazine

3    that was presented at 335?

4        A.   Yes.   This is a magazine that is

5    designed to typically hold approximately 30

6    cartridges of ammunition.   The cartridges are

7    placed in the bottom and they go down toward

8    the bottom of the magazine.   The drum magazine

9    here is designed to typically hold 50 to 75

10   cartridges of ammunition and the cartridges are

11   loaded into the top.   There is a spring inside

12   and they wind inside kind of like a snail.

13       Q.   Thank you.  I will show you what I will

14   mark as Commonwealth Exhibit 336.  I ask if you

15   recognize what Commonwealth Exhibit 336 is?

16       A.   Yes, I do.

17       Q.   What is 336?

18       A.   A drum magazine containing 12 gauge

19   cartridges.

20       Q.   Similar in function, does it work as

21   you just described for the 7.62 magazine?

22       A.   Yes, but it doesn't hold as many

23   cartridges as the 7.62 because the 12 gauge

24   cartridges are significantly larger than the

25   7.62 cartridge.

W. Best - Direct by Mr. Chernosky

1      Q.   I show you what I marked as

2   Commonwealth Exhibit 337 and ask you what

3   Commonwealth Exhibit 337 is?

4      A.   It appears to be a white Point Blank

5   brand body armor ballistic vest.

6      Q.   Was that recovered from 1214 Nolan

7   Court?

8      A.   Yes.

9      Q.   I will mark Commonwealth's Exhibit 338.

10  Did you review what is marked as Commonwealth

11  Exhibit 338?

12     A.   Yes.

13     Q.   Was that the .22-caliber rifle that you

14  recovered from 1214 Nolan Court?

15     A.   Yes, it was.

16     Q.   Relative to your assignment in the

17  mobile crime unit, did you also participate in

18  the processing of a white Lincoln Continental?

19     A.   Yes, I did.

20     Q.   Do you recall what day you processed

21  that?

22     A.   Processing was conducted on a white

23  Continental on two occasions, the first being

24  Sunday, March 13, 2016, the second being

25  Monday, May 9, 2016.

W. Best - Direct by Mr. Chernosky

1        Q.   I show you what I will mark as

2   Commonwealth Exhibits 339 through 342.  I ask

3   you generally are those photographs

4   representative of the way the vehicle looked

5   during your processing on March 13th of 2016?

6        A.   Yes, they do.

7             MR. CHERNOSKY:  I move for the

8   admission of Commonwealth exhibits -- I

9   apologize, Mr. Best, could you tell me the

10  first number?

11            THE WITNESS:  339.

12            MR. CHERNOSKY:  339 through 342.

13            THE COURT:  Admitted without

14  objection.

15       Q.   First, with respect to Commonwealth's

16  Exhibit 339, could you just tell the jury what

17  that is?

18       A.   So prior to taking any scene

19  photographs at a scene that the mobile crime

20  unit responds to, we fill out a photo

21  coversheet card.  It has the date, the

22  flashcard number that we use, the address that

23  the scene is or where the processing is being

24  conducted, that municipality, the agency, an

25  agency incident number if available at the

W. Best - Direct by Mr. Chernosky

1    time, who the photographer is, and which camera

2    we used.

3        Q.  Is the purpose for that more for your

4    purposes to know what set of pictures you are

5    about to get into if you were to start looking

6    at pictures?

7        A.  Correct.

8        Q.  I show you Commonwealth Exhibit 340.

9    Could you tell us what is depicted in

10   Commonwealth Exhibit 340?

11       A.  Photographs of the back of a white

12   Lincoln Continental JBP-2200.

13       Q.  I show you Commonwealth Exhibit 341.

14   What is depicted in Commonwealth Exhibit 341?

15       A.  The passenger's side of a white Lincoln

16   Continental.

17       Q.  342?

18       A.  Driver's side of a white Lincoln

19   Continental.

20       Q.  During the processing of the Lincoln

21   Continental, do you recall if you were able to

22   recover a registration card?

23       A.  Yes.

24       Q.  I show you what I will mark as

25   Commonwealth Exhibit 343.  I ask you what is

W. Best - Direct by Mr. Chernosky

1    depicted in Commonwealth Exhibit 343?

2        A.   It is a photograph of a registration

3    card that was located inside of the white

4    Lincoln Continental.

5        Q.   You might be straining your eyes but

6    could you read who the registration belongs to?

7        A.   Brittany D. Shelton.

8                MR. CHERNOSKY:  Your Honor, I

9    move for the admission of Commonwealth

10   Exhibit 343.

11               THE COURT:  Admitted without

12   objection.

13       Q.   You testified that you also

14   participated in a processing of the white

15   Lincoln Continental at a later date.  I'm going

16   to show you what I will mark as Commonwealth

17   Exhibits 344, 345, 346, and 347.  I'll ask if

18   these are representative of pictures from the

19   processing on May 9th?

20       A.   Yes, they were.

21               MR. CHERNOSKY:  I move for the

22   admission of Commonwealth Exhibits 344 through

23   347.

24               THE COURT:  Admitted without

25   objection.

W. Best - Direct by Mr. Chernosky

1    Q.  Again, 344 is that placard?

2    A.  Yes.

3    Q.  What is depicted in Commonwealth

4    Exhibit 345?

5    A.  It would be a photograph of the front

6    passenger's side floorboard area of the white

7    Lincoln Continental.

8    Q.  Could you give the jury an idea of what

9    processing you did on this later date?

10   A.  Yes.  We were requested to examine the

11   interior of the Lincoln Continental for the

12   presence of any red-brown staining.  We were

13   asked to chemically stain the interior of the

14   Lincoln Continental for any latent red-brown

15   staining that may have been present.

16   Q.  What procedure did you go through to do

17   that testing?

18   A.  First, we did a visual exam to see if

19   any red-brown staining could be seen.  For the

20   chemical processing, we used a reactant known

21   as Luminol which reacts with red-brown staining

22   and presents a luminescent presumptive presence

23   for blood.

24   Q.  Were there any results from your

25   Luminol test?

W. Best - Direct by Mr. Chernosky

1          A.   Yes, there were.

2          Q.   Where?

3          A.   The front passenger floorboard area and

4     the front passenger floor mat.

5          Q.   Directing your attention to

6     Commonwealth Exhibit 345, what is depicted in

7     Commonwealth Exhibit 345?

8          A.   That would be two items that were

9     marked on the front passenger floorboard.

10    There was one area of visual red-brown staining

11    that was observed and also we collected in the

12    area after the staining what was known as a

13    substrate control.  So you have the stain and

14    then an area directly next to it for the

15    substrate control.

16         Q.   Directing your attention to

17    Commonwealth Exhibit 346, what is depicted in

18    Commonwealth Exhibit 346?

19         A.   The front passenger floor mat.  Then

20    there is an area that is outlined that would

21    have been the area that fluoresced when treated

22    with the Luminol reagent.

23         Q.   Then with respect to Commonwealth

24    Exhibit 347, what is depicted in Commonwealth

25    Exhibit 347?

W. Best - Direct by Mr. Chernosky

1    A.   The front passenger floorboard area,

2    another area that was outlined that luminesced

3    when treated with the Luminol.

4    Q.   Now, after your processing on that

5    date, those areas that you described as a

6    sampling, did you forward those to a different

7    division of the laboratory for further

8    processing?

9    A.   Yes, the samples that were collected

10   were submitted to the laboratory with an

11   assignment to the laboratory's forensic biology

12   section.

13   Q.   Do you work in the forensic biology

14   section at all?

15   A.   I do not.

16   Q.   Pursuant to your duties at the mobile

17   crime lab, were you also requested to

18   photograph a golden colored Buick LaCrosse?

19   A.   Yes, I was.

20   Q.   I show you what I will mark as

21   Commonwealth Exhibits 348, 349, 350, 351, 352,

22   and 353.  I apologize, 348 through 354.

23        MR. McKINNEY:  Your Honor,

24   permission to approach?

25        THE COURT:  Okay.

W. Best - Direct by Mr. Chernosky

 1                 (Sidebar discussion held as

 2      follows.)

 3                 MR. McKINNEY:  Sorry, Your Honor.

 4      Your Honor, there is not -- in reference to the

 5      exhibits, I recognize that I am not perfect in

 6      this and there is a possibility that I could

 7      have missed a William Best report with respect

 8      to Luminol and exposure on the front

 9      floorboard, I don't have that in my discovery.

10                 MR. CHERNOSKY:  I'll check his

11      MCU reports but, ultimately, they determine

12      whether there is red-brown staining of

13      evidentiary interest and turn it over to

14      serology.  I've never seen anything about the

15      Luminol either, to be honest.

16                 MR. McKINNEY:  Maybe we should

17      double-check the report.  Maybe it doesn't

18      exist, maybe it does, I don't have it.

19                 THE COURT:  How much more direct?

20                 MR. CHERNOSKY:  These four or

21      five more pictures, whatever is left.

22                 THE COURT:  Finish with that and

23      then we'll recess.  Maybe I'll take a luncheon

24      recess or extend the recess and you can sort

25      that out with him if available.

W. Best - Direct by Mr. Chernosky

 1          (Sidebar discussion concluded.)

 2      Q.  I show you what I'll mark as

 3  Commonwealth Exhibits 348 through 354.  I ask

 4  you generally if those picture are reflective

 5  of the processing of a tan, in color, Buick

 6  LaCrosse?

 7      A.  Yes, they do.

 8              MR. CHERNOSKY:  I move for the

 9  admission of Commonwealth Exhibits 348 through

10  354.

11              THE COURT:  Admitted without

12  objection.

13      Q.  Directing your attention to

14  Commonwealth Exhibit 349, what is depicted in

15  Commonwealth Exhibit 349?

16      A.  The passenger side of a gold Buick

17  LaCrosse.

18      Q.  350?

19      A.  Photograph of the hood and front driver

20  side of a gold Buick LaCrosse, similarly dark

21  black colored hood.

22      Q.  351?

23      A.  The front of a Buick LaCrosse.

24      Q.  352?

25      A.  The rear of the Buick LaCrosse showing

W. Best - Direct by Mr. Chernosky

 1    license plate JLR-8174.

 2        Q.  Did you similarly get a registration

 3    card in this instance?

 4        A.  Yes.

 5        Q.  On Commonwealth Exhibit 353, could you

 6    read who the registration is to?

 7        A.  To Channel Falls.

 8        Q.  Commonwealth 352 is a closer-up view of

 9    that registration card?

10        A.  Yes.

11                MR. CHERNOSKY:  No further

12    questions.  I offer for cross.

13                THE COURT:  Come up.

14                (Sidebar discussion held as

15    follows.)

16                THE COURT:  Who is your next

17    witness?

18                MR. CHERNOSKY:  I have to

19    double-check.  We may go into a video witness

20    that is five or ten minutes.  Then Detective

21    Feeney for angles on the video for maybe six or

22    seven minutes.

23                THE COURT:  Are any of those

24    witnesses Ms. Pellegrini's witnesses?

25                MR. CHERNOSKY:  No.

W. Best - Direct by Mr. Chernosky

1              THE COURT:  It is really too

2      early for me to break.  What we'll do is we'll

3      bring him back here this afternoon.  Over the

4      lunch hour you two can sort that out, okay?

5              MR. McKINNEY:  Okay.

6              THE COURT:  Mr. Best, come on up.

7      The Court notes the presence of William Best.

8      Mr. Best, there is some uncertainty as to what

9      was contained in the courtroom lab reports or

10     not retained in the courtroom lab reports so

11     your cross-examination will occur sometime this

12     afternoon after the lunch break.  We'll notify

13     you of that.  You will have to be available on

14     the break to discuss this matter with the

15     attorneys about what you did or did not do.

16             THE WITNESS:  Sure, whatever you

17     need.

18             THE COURT:  Thank you.

19             (Sidebar discussion concluded.)

20             THE COURT:  As to the

21     cross-examination of this witness by

22     Mr. McKinney, we'll reserve that more likely

23     than not to this afternoon.  There is a matter

24     that I have to discuss with the attorneys about

25     his testimony, so to speak.  You are not to

W. Best - Direct by Mr. Chernosky

1    draw any adverse inference to that.  Sometimes

2    these things occur during the course of the

3    trial.  Mr. McKinney will have that opportunity

4    once that matter is settled.  You are excused

5    until such time, sir.

6              THE WITNESS:  Thank you.

7              THE COURT:  Call your next

8    witness.

9              MR. CHERNOSKY:  Your Honor, may

10   we approach?

11             THE COURT:  Come up.

12             (Sidebar discussion held as

13   follows.)

14             MR. CHERNOSKY:  I apologize, Your

15   Honor.  The next witness was to be Margaret

16   Gramby who lives at the residence.  She is hard

17   of hearing.  Her boyfriend, who is here, can

18   testify and will authenticate the video.  That

19   being said, his name was never read to the jury

20   as a substituted witness.  It will be about

21   five minutes of testimony.  I don't anticipate

22   any problems.

23             THE COURT:  What is his name?

24             MR. CHERNOSKY:  Leroy Hicks.

25             THE COURT:  Leroy Hicks?

L. Hicks - Direct by Mr. Chernosky

1                    MR. CHERNOSKY:  Hicks.

2                    THE COURT:  Is he here?

3                    MR. CHERNOSKY:  He is here.

4                    THE COURT:  Leroy Hicks?

5                    MR. CHERNOSKY:  Yes.

6                    THE COURT:  Where is Gramby at?

7                    MR. CHERNOSKY:  She is out in the

8        hallway.  They are both available.  If you want

9        to call her and force that testimony, fine.  If

10       not, we'll get away with Hicks.

11                   (Sidebar discussion concluded.)

12                   THE COURT:  Does anybody

13       recognize the name Leroy Hicks?  His name is

14       not on the witness list.  If you recognize him

15       when he comes into the courtroom, raise your

16       hand, okay?  Get Mr. Hicks, please.

17                        -----

18                   LEROY HICKS,

19       a witness herein, having been first duly sworn,

20       was examined and testified as follows:

21                        -----

22                   DIRECT EXAMINATION

23                        -----

24       BY MR. CHERNOSKY:

25            Q.  Mr. Hicks, could you state your first

L. Hicks - Direct by Mr. Chernosky

1    and last name and spell your last name for the

2    court reporter?

3        A.   Leroy Hicks, H-I-C-K-S.

4        Q.   In March of the 2016 did you live in

5    the Borough of Wilkinsburg?

6        A.   Yes.

7        Q.   At that time did you have a

8    surveillance system on the house that you lived

9    in?

10        A.   Yes.

11        Q.   Could you tell the Court and the jury

12    approximately how far in number of houses you

13    lived from the shooting scene at 1304 Franklin

14    Avenue?

15        A.   Three or four across the street.

16        Q.   Directing your attention to the days

17    that followed March 9th of 2016, did you

18    provide your camera system to the Wilkinsburg

19    Police Department?

20        A.   Yes.

21        Q.   At that time, did you know if there was

22    anything on your camera that was of value?

23        A.   No.

24        Q.   Do you remember who you turned it over

25    to?

L. Hicks - Cross by Mr. McKinney

1          A.   Lieutenant Michelle Krempaski.

2                    MR. CHERNOSKY:  No further

3     questions of this witness.

4                    THE COURT:  Any questions?

5                         -----

6                    CROSS-EXAMINATION

7                         -----

8     BY MR. McKINNEY:

9          Q.  Mr. Hicks, if you are coming up

10    Franklin from Ardmore, is your house on the

11    left or right?

12         A.   Right.

13                   MR. McKINNEY:  Okay, no

14    additional questions.

15                   MS. PELLEGRINI:  May he be

16    excused?

17                   THE COURT:  He may.  Call your

18    next witness.

19                   MR. CHERNOSKY:  The Commonwealth

20    calls Detective Mike Feeney.

21                        -----

22                   MICHAEL FEENEY,

23    a witness herein, having been first duly sworn,

24    was examined and testified as follows:

25                        -----

M. Feeney - Direct by Mr. Chernosky

```
 1                    -----

 2              DIRECT EXAMINATION

 3                    -----

 4   BY MR. CHERNOSKY:

 5        Q.   Detective Feeney, could you state your

 6   first and last name and spell your last name

 7   for the court reporter?

 8        A.   My name is Mike Feeney, F-E-E-N-E-Y.

 9        Q.   How are you currently employed?

10        A.   I'm a detective for the Allegheny

11   County Police currently assigned to your

12   technical services unit.

13        Q.   How long have you been an Allegheny

14   County Police detective?

15        A.   This is my 17th year.

16        Q.   Did you have any previous law

17   enforcement experience prior to that?

18        A.   No, I did not.

19        Q.   Directing your attention to the month

20   of March of 2016, were you working for the

21   county police?

22        A.   I was.

23        Q.   Where were you assigned at that time?

24        A.   At that time I was assigned to the

25   homicide section.
```

M. Feeney - Direct by Mr. Chernosky

1    Q.  Did you receive a request to process

2    video footage from a DVR from the Wilkinsburg

3    Police Department?

4    A.  Yes, it was a Lorex four channel DVR

5    unit.  When I say DVR, the old-time digital

6    records like the old-time video cassette

7    recorder.

8    Q.  Where did you physically process that

9    piece of equipment?

10    A.  At our headquarters building in our

11    audio/video lab where we have output to view

12    these devices, put them on a TV, for example,

13    and see the screen.

14    Q.  Where did you obtain that digital

15    recording from?

16    A.  I met with Lieutenant Krempaski from

17    the Wilkinsburg Police and she provided it to

18    me.

19    Q.  Could you give the jury a brief

20    overview of how the process works and in

21    obtaining a video?

22    A.  Part of my job including the time that

23    I was assigned to the homicide unit, I've been

24    processing digital video since 2009.  When we

25    first began, a lot of stores and people with

M. Feeney - Direct by Mr. Chernosky

1    video systems in their house had video cassette

2    based systems.  Slowly over the years the

3    transition changed.  It is almost all digital.

4    I haven't seen a VCR tape in a long time.

5           A digital video system is a box that

6    you put in your house or business and it

7    receives camera feeds via a wireless connection

8    or a hard wire connect to that.  It is part of

9    my job to be able to extract those images from

10   the system.  A lot of homeowners and businesses

11   don't really know how to take the information

12   off that device.  So when you see it on the

13   news, for example, or in a courtroom

14   presentation, that is usually somebody like me

15   who collected it if the business owner doesn't

16   know how.

17          In modern days, we use a thumb drive

18   for it.  That is what I did in this case.  I

19   used the menu settings of the device, the

20   Lorex, and hook it up to my USB.  After I copy

21   a certain amount of time frame on the night in

22   question, this one, March 9th, I copy the

23   digital files to a disk.  The disk gets entered

24   into evidence.  The main DVR unit is entered

25   into evidence as well so I collected it.  So it

M. Feeney - Direct by Mr. Chernosky

1    still resides with us to this day.

2        Q.   In preparation for your testimony

3    today, have you -- I'm going to show you what

4    I'll mark as Commonwealth Exhibit 355 -- have

5    you reviewed Commonwealth Exhibit 355 prior to

6    today?

7        A.   I have.

8        Q.   What is contained on Commonwealth

9    Exhibit 355?

10       A.   So this is a disk, a DVD disk.  It

11   contains the digital files that I extracted

12   from the Lorex DVR from 1282 Franklin.

13                MR. CHERNOSKY:  I move for the

14   admission of Commonwealth Exhibit 355.

15                THE COURT:  Admitted without

16   objection.

17       Q.   Did you, in discussing the video from

18   that address, did you ascertain how many

19   channels were on the exterior of the house?

20       A.   I did.  There were two views of

21   interest on the exterior.  The remaining two

22   views on the four-channel system were on the

23   interior of the residence and were of no value

24   to us.

25       Q.   In watching the video, were you able to

M. Feeney - Direct by Mr. Chernosky

1    ascertain the proximate location and the

2    proximate coverage angle of the two cameras?

3         A.   Yes.   There is a camera that is a

4    positioned on the front porch up in the corner

5    of the front porch looking out toward the door

6    of the residence, the main door of the

7    residence.   It is hooked up in the field of

8    view of the camera in protecting the

9    homeowner's property and captures the door but

10   it also captures a view of the street on

11   Franklin Avenue, or street, I think it is

12   avenue.

13        Q.   I show you what I'll mark as

14   Commonwealth Exhibits 356, 357, and 358.

15   First, I'll ask you a general question.   The

16   356, 357, and 358 overview satellite images

17   where the video was taken from and crime scene

18   location of 1304 Franklin Avenue.

19        A.   I'm sorry, did you ask me a question?

20        Q.   Generally, are those overhead maps of

21   both the area where the video was taken from

22   and the area of 1304 Franklin Avenue?

23        A.   Yes, they are, each one.   The second

24   camera, I never described the location.

25        Q.   I apologize.

M. Feeney - Direct by Mr. Chernosky

1    A.   That is all right.   The remaining
2    camera was on the side of the house that
3    captured a view toward the alley which is
4    behind Franklin, Franklin Avenue, and the
5    residence and the alley is Hazel Way.   The road
6    that intersects all of those two together is
7    Midland.   That is where the other camera was
8    positioned, on the side of the house.   The two
9    exterior are right there.
10            MR. CHERNOSKY:   I move for the
11   admission of Commonwealth Exhibits 356 through
12   358.
13            THE COURT:   Admitted without
14   objection.
15   Q.   Could you tell the jury what we're
16   looking at in Commonwealth Exhibit 356?
17   A.   So the main road here is Ardmore
18   Boulevard or Route 8.   That is the main drag
19   coming into town.   The street where the
20   highlighter is is Franklin Avenue.   This street
21   is Midland and the aforementioned alleyway is
22   Hazel Way.   That runs underneath these trees in
23   this particular view.
24   Q.   Directing your attention to 357, what
25   is depicted in Commonwealth Exhibit 357?

M. Feeney - Direct by Mr. Chernosky

1    A.   This 357, where the cone was added,

2    that is channel four, the channel of the video

3    that I exported and an approximate view that

4    the camera would see from the mounting location

5    in the corner of the porch as I mentioned to

6    you.

7    Q.   Commonwealth Exhibit 358, what is

8    depicted in 358?

9    A.   The same thing, channel one view,

10   approximate cone pointing to the area where the

11   camera lens would pick up information from.

12   Q.   With respect to Commonwealth's

13   Exhibits 356 and 357, the cone we're referring

14   to, is that an approximate coverage angle?

15   A.   Yes, it is.

16   Q.   Did you personally view the video from

17   1282 Franklin Avenue?

18   A.   Yes, I have.

19   Q.   Did there come a time when you observed

20   a white, in color, sedan driving past channel

21   four on that video?

22   A.   Yes, there was.  That would be in the

23   direction of Route 8, what they call Route 8 or

24   Franklin Avenue.

25   Q.   I will play you an excerpt from

M. Feeney - Direct by Mr. Chernosky

1    Commonwealth Exhibit 355.  For purposes of the

2    record, I'm accessing file name CH4,

3    20160309-223635-225354-101000000000.  For

4    purposes of the record, I will start the

5    timestamp at 10:41.  For purposes of the record

6    I stopped the timestamp at 10:41:40.

7         Detective Feeney, is that the white

8    vehicle that you described you observed driving

9    past 1282 Franklin Avenue?

10   A.  Yes.

11   Q.  I show you what I will mark as

12   Commonwealth Exhibits 359, 360, 361, 362, 363,

13   and 364.  I ask you if Commonwealth Exhibits

14   359 through 364 are still frames from that same

15   video?

16   A.  Yes, 359 and 364 are still images from

17   this video.

18        MR. CHERNOSKY:  Your Honor, I

19   move for the admission of Commonwealth

20   Exhibits 359 through 364.

21        THE COURT:  Admitted without

22   objection.

23   Q.  First, Commonwealth Exhibits 359, 360,

24   361, 362, 363, and 364.  Did you also watch the

25   video contained at channel one on that camera

M. Feeney - Direct by Mr. Chernosky

1    system?

2        A.  Yes, I did.

3        Q.  Generally speaking, do you see some

4    movement on that street prior to the shootings?

5        A.  Yes, I do.  You see movement in and

6    around a truck and a vehicle approach that area

7    which seems to be movement consistent toward

8    Hazel Alley.

9        Q.  Then, afterwards, if you watch that

10   video, were you able to see both movement after

11   the shooting and then, at least, one first

12   responder arriving on scene?

13       A.  Yes.  In fact, in both views you see

14   the first responder coming into view

15   particularly, but in the channel one view,

16   there are additional figures moving in the

17   video.  It is not clear enough to tell who it

18   may be but you can see the movements of people

19   in there.

20           MR. CHERNOSKY:  For purposes of

21   the record, I'm accessing file name

22   CH1-20160309-223301-224927-101000000000, all

23   those same zeros.

24       Q.  For purposes of the record, I'm

25   starting the video at timestamp 10:44:28.

M. Feeney - Direct by Mr. Chernosky

1                    (Video played for the jury.)

2         Q.  For purposes of the record, I'm

3     stopping that recording at 10:45:33.  For

4     purposes of the record, I'm accessing file name

5     CH01-20160309-224927-230554-101000000000.  For

6     purposes of the record I'm starting that video

7     at timestamp 10:53:01.

8                    (Video played for the jury.)

9         Q.  For purposes of the record, I'll stop

10    that at timestamp 11:00:31.  I show you what I

11    will mark as Commonwealth Exhibits 365, 366,

12    367, 368, and 369 and I ask you if those

13    exhibits are still photos of channel one

14    relative to the earlier timestamp of 10:44?

15        A.  Yes, they are.

16                    MR. CHERNOSKY:  Your Honor, I

17    move for admission of Commonwealth Exhibits 365

18    through 369.

19                    THE COURT:  They are admitted

20    without objection.

21                    MR. CHERNOSKY:  No further

22    questions of this witness.  I offer for cross.

23                    THE COURT:  Any questions?

24                    MR. McKINNEY:  No questions, Your

25    Honor.

D. Pine - Direct by Mr. Chernosky

1          THE COURT:  Thank you.  You may

2    step down.  Call your next witness.

3          MR. CHERNOSKY:  The Commonwealth

4    calls Officer David Pine.

5                    -----

6               DAVID PINE,

7    a witness herein, having been first duly sworn,

8    was examined and testified as follows:

9                    -----

10              DIRECT EXAMINATION

11                   -----

12   BY MR. CHERNOSKY:

13      Q.  Officer Pine, could you state your

14   first and last name and spell your last name

15   for the court reporter?

16      A.  David Pine, P-I-N-E.

17      Q.  How are you employed?

18      A.  With the Municipality of Penn Hills.

19      Q.  How long have you been employed with

20   Penn Hills?

21      A.  Almost 19 years.

22      Q.  What is your title or your rank?

23      A.  Patrol officer.

24      Q.  Could you tell the jury a little bit

25   about what a patrol officer does?

D. Pine - Direct by Mr. Chernosky

1    A.   Well, I patrol the midnight shift.

2    I've been there for 19 years.  I answer any

3    calls that are dispatched to us throughout the

4    night.

5    Q.   Were you working in that capacity on

6    March 9th, going into the 10th, of 2016?

7    A.   Yes, sir.

8    Q.   At some point that evening, did you

9    receive a call to 3017 Hebron Drive in your

10   jurisdiction?

11   A.   I did.

12   Q.   Where were you when you got the call?

13   A.   I was on Robinson Boulevard about three

14   or four minutes away from that location toward

15   the city.

16   Q.   Approximately how long did it take you

17   to get to that location?

18   A.   About three minutes.

19   Q.   What was the nature of the call?

20   A.   We were called for a prowler, an

21   anonymous caller didn't want to be identified.

22   A neighbor called about a prowler walking

23   around a vacant house I think it was.

24   Q.   What did you do in response to getting

25   that call?

D. Pine - Direct by Mr. Chernosky

1        A.   Responded from my location.  Came down

2   Hebron Road to that location.  Myself and a

3   couple other officers arrived at about the same

4   time.

5        Q.   Anything about three officers

6   responding to the same call on the midnight

7   shift?

8        A.   No, two of us were dispatched and the

9   third showed up voluntarily which usually does

10   happen at that time.

11        Q.   Could you explain to the jury what

12   Hebron Drive is like?

13        A.   It is residential.  A road that bends,

14   a quarter of a mile.  It is all residential.

15   Maybe 20, 30 houses.

16        Q.   I'm going to show you what I will mark

17   as Commonwealth Exhibits 370, 371, and 372.

18   I'll ask you with respect to those exhibits

19   whether they are overhead maps that, at least,

20   in some part indicate where 3020 Hebron Drive

21   is?

22        A.   Yes.

23             MR. CHERNOSKY:  Your Honor, I

24   move for the admission of Commonwealth Exhibits

25   370 through 372.

D. Pine - Direct by Mr. Chernosky

1              THE COURT:  Admitted without

2     objection.

3         Q.  First, with respect to Commonwealth

4     Exhibit 370, which is on the screen behind you,

5     could you use that laser pointer and point out

6     the location of 3020 Hebron Drive?

7         A.  Right there, and Frankstown Road is

8     just above it, we came down that road.

9         Q.  With respect to Commonwealth

10    Exhibit 371, is that a closer-up image of the

11    street Hebron Drive?

12        A.  Yes, right here.

13        Q.  Then 372 is closer still?

14        A.  Yes.

15        Q.  Could you tell the jury what you

16    encountered when you got onto Hebron Drive?

17        A.  When we approached just about that

18    house, we witnessed a black male standing in

19    the roadway.  When I was coming down the hill,

20    he was on the left side but he was in the

21    roadway.

22        Q.  What did you do?

23        A.  We basically -- I said -- we all got

24    there at the same time, exited our vehicles and

25    approached him.

D. Pine - Direct by Mr. Chernosky

1    Q.  Did you inquire what he was doing

2    there?

3    A.  We did.

4    Q.  What was his response?

5    A.  He had made some reference to being in

6    the area earlier and losing his phone in the

7    grass and he was back there looking for it and

8    had found it just before we arrived.

9    Q.  When you observed him, was he able to

10   -- did he show you his cell phone?

11   A.  He was on his cell phone.  It looked

12   like he was either texting or talking on it,

13   I'm not sure, but he had it in his hands, yes.

14   Q.  When you encounter an experience like

15   this, do you ask for identification, to try to

16   identify them?

17   A.  Yes, we do.  We asked him.

18   Q.  Did you do this on this occasion?

19   A.  I did.  He said that he did not have

20   any.

21   Q.  What is the, I guess, typical protocol

22   when someone doesn't have identification?

23   A.  Basically you want to get their name

24   and date of birth and I can check him on the

25   computer in my patrol car.

D. Pine - Direct by Mr. Chernosky

1      Q.  Could you tell the jury how that works?

2      A.  I get a first and last name, date of

3  birth.  At that time I just go back to the

4  police car, we can punch in that information

5  and get license information back and photos.

6  In that case, I did.

7      Q.  In this particular incident, you did

8  that?

9      A.  Yes.

10     Q.  What name was provided to you?

11     A.  Mr. Shelton, Cheron Shelton.

12     Q.  Did you, at that point, in general

13 terms, when someone doesn't have an ID, are you

14 trying to make a visual identification through

15 the computer?

16     A.  Yes, hoping to get a picture of him in

17 that case and I did get one.

18     Q.  Did you confirm that night the photo

19 that you saw in your cruiser was the person

20 that was there?

21     A.  Yes.

22     Q.  What was Mr. Shelton's demeanor when

23 you were interacting with him?

24     A.  Very calm, very polite, very talkative.

25 Did not show any signs of intoxication or

D. Pine - Direct by Mr. Chernosky

1    anything like that.

2        Q.   What kind of clothing was he wearing if

3    you remember?

4        A.   I remember dark clothing but beyond

5    that, I really can't say.

6        Q.   How long did you talk with Mr. Shelton

7    that night?

8        A.   We interacted with him for a few

9    minutes.  The other two officers stayed with

10   him while I went to my patrol car and checked

11   the information so maybe a total of five or

12   eight minutes.

13       Q.   Did there come a time that you informed

14   Mr. Shelton that he was free to go?

15       A.   Yes.

16       Q.   How long did you interact with

17   Mr. Shelton that night

18       A.   Maybe a total of five minutes.

19       Q.   When you told him he was free to go,

20   how did he leave?  Did he get in a car?

21       A.   No, he walked down Hebron from where we

22   came.  Crab Hollow is the top or bottom, he

23   went to the bottom.  I'm not sure where he went

24   after that.

25       Q.   Down toward your location of Crab

D. Pine - Direct by Mr. Chernosky

1    Hollow, is that also residential?

2        A.  Yes.

3        Q.  What car were you operating that night?

4        A.  I think it was No. 35.

5        Q.  At the time, were the Penn Hills Police

6    Department vehicles equipped with dashboard

7    cameras?

8        A.  Yes.

9        Q.  I'm going to show you what I will mark

10   as --

11           MR. CHERNOSKY:  Your Honor, if I

12   may have a moment?  I apologize.

13       Q.  I'm going to show you what I will mark

14   as Commonwealth Exhibit 373.  Prior to

15   testifying today, have you had an opportunity

16   to review your dash cam?

17       A.  I did.

18       Q.  Does this exhibit contain the dash cam

19   from your vehicle?

20       A.  Yes.

21           MR. CHERNOSKY:  Your Honor, I

22   move for the admission of Commonwealth

23   Exhibit 373.

24           THE COURT:  Admitted without

25   objection.

D. Pine - Direct by Mr. Chernosky

1    Q.  For purposes of the record, I'm

2    starting that dash cam footage from 2:21:35.

3              (Video played for the jury.)

4    Q.  For purposes of the record, I stopped

5    that recording at 02:27:04.  Officer, is that

6    the interaction that you had with Cheron

7    Shelton that night?

8    A.  Yes, sir.

9    Q.  As he walked away, did you notice him

10   having any problems walking?

11   A.  No.

12   Q.  Any stumbling?

13   A.  No.

14   Q.  As you talked to him, did you notice

15   any slurred speech or odor of alcohol?

16   A.  No.

17   Q.  Do you recognize the person that you

18   interacted with on March 10, 2016, in the

19   courtroom today?

20   A.  Yes, sir.

21   Q.  Where is he at and what is he wearing?

22   A.  Blue suit at the end of the table.

23              MR. CHERNOSKY:  Your Honor, can

24   the record reflect identification?

25              THE COURT:  It will so reflect.

D. Pine - Cross by Mr. McKinney

1      Q.   During the course of your employment

2   with Penn Hills, have you had an opportunity to

3   be in a professional capacity around

4   intoxicated people?

5      A.   Yes, sir.

6      Q.   How many DUI arrests have you made?

7      A.   Over 100, 200.

8      Q.   Did you have any feelings or thoughts

9   about Mr. Shelton being intoxicated?

10      A.   No, I had no worries about that.

11           MR. CHERNOSKY:  No further

12   questions for this witness.

13           THE COURT:  Mr. McKinney.

14           MR. McKINNEY:  Thank you, Your

15   Honor.

16                -----

17           CROSS-EXAMINATION

18                -----

19   BY MR. McKINNEY:

20      Q.   Patrolman Pine, the call came in at

21   02:17 and you responded three minutes later?

22      A.   I got there about three minutes later,

23   yes.

24      Q.   When you got there, it was you and two

25   other cruisers?

D. Pine - Cross by Mr. McKinney

1        A.   Correct.

2        Q.   There were three officers total?

3        A.   Right.

4        Q.   You all converged at the same time?

5        A.   Yeah.  It just happened that way.

6        Q.   When you got there, did Mr. Shelton try

7   to flee?

8        A.   No.

9        Q.   You said that he was cooperative and

10   calm?

11        A.   Yes.

12        Q.   He answered all your questions?

13        A.   Yes.

14        Q.   You were with him for about five

15   minutes?

16        A.   Approximately.

17        Q.   He told you that he had been drinking

18   with a friend?

19        A.   I recall him saying earlier in the

20   evening, that is why he lost his phone in the

21   grass.

22        Q.   So he told you that he had consumed

23   alcohol?

24        A.   Yes, he did.

25        Q.   Did you perform a breathalyzer?

D. Pine - Cross by Mr. McKinney

1    A.  No, I didn't.

2    Q.  Did you ask him to consent to a blood

3  draw to determine if there was any alcohol in

4  his system?

5    A.  No.

6    Q.  This was in the early morning hours you

7  got a call for a suspicious person.  Did you do

8  a pat-down or detain him?

9    A.  I personally did not.  Another officer

10 did.

11   Q.  What officer was that?

12   A.  I believe Officer Klobucher.

13   Q.  You were there when that happened?

14   A.  I think I was getting out of my car at

15 the same time.  You can see it on the video.

16   Q.  To your knowledge, were any weapons

17 found on Mr. Shelton's person?

18   A.  No.

19   Q.  Do you know what was found, what he had

20 in his pockets?

21   A.  No, I don't know.

22   Q.  You don't know if he had car keys in

23 his pockets or not?

24   A.  No.

25   Q.  You didn't see him get into a vehicle

D. Pine - Cross by Mr. McKinney

1    at the end of your interaction with him,

2    correct?

3         A.   Right.

4         Q.   You've been a patrolman for a couple

5    decades?

6         A.   Yep.

7         Q.   Anything about your interaction with

8    Mr. Shelton that led you to believe that he had

9    been involved in a crime?

10        A.   No.

11        Q.   Did you have any reason to follow him

12   after he ended his interactions with you?

13        A.   No.

14        Q.   When you said you saw him walk away --

15        A.   Yes.

16        Q.   -- did any of the officers follow him

17   at that point?

18        A.   No.

19        Q.   He was alone, right?

20        A.   As far as I know.  He was alone when we

21   talked to him, yes.

22        Q.   When you approached, he was standing in

23   the middle of the street?

24        A.   He was standing on the left side,

25   almost on the curb area, but in the street,

D. Pine - Redirect by Mr. Chernosky

1    yes.

2                    MR. McKINNEY:  No additional

3    questions, Your Honor.

4                    THE COURT:  Anything else?

5                    MR. CHERNOSKY:  Just briefly.  I

6    neglected to show the officer three still

7    frames from his interactions.

8                    THE COURT:  Okay.

9                         -----

10                   REDIRECT-EXAMINATION

11                        -----

12   BY MR. CHERNOSKY:

13       Q.   I show what you I marked as

14   Commonwealth Exhibits 374 through 376.  I ask

15   you if those represent still images from your

16   dash cam?

17       A.   Yes, sir.

18                   MR. CHERNOSKY:  Your Honor, I

19   move for the admission of Commonwealth

20   Exhibits 374 through 376.

21                   THE COURT:  Admitted without

22   objection.

23       Q.   Officer, is it possible to arrest

24   someone for being drunk in public?

25       A.   Yes.

D. Klobucher - Direct by Mr. Chernosky

1          Q.  In your experience, what are the signs

2    of being intoxicated or under the influence?

3          A.  Slurred speech, stumbling.

4          Q.  You did not arrest Mr. Shelton for

5    public drunkenness?

6          A.  Correct.

7                    MR. CHERNOSKY:  No further

8    questions.

9                    THE COURT:  You may step down.

10   Thank you, Officer.  Call your next witness.

11                   MR. CHERNOSKY:  The Commonwealth

12   will call Officer David Klobucher.

13                        -----

14                   DAVID KLOBUCHER,

15   a witness herein, having been first duly sworn,

16   was examined and testified as follows:

17                        -----

18                   DIRECT EXAMINATION

19                        -----

20   BY MR. CHERNOSKY:

21         Q.  Officer Klobucher, could you state your

22   first and last name and spell your last name

23   for the court reporter?

24         A.  David Klobucher, K-L-O-B-U-C-H-E-R.

25         Q.  How are you employed?

D. Klobucher - Direct by Mr. Chernosky

1      A.   As a police officer with the Penn Hills
2   Police Department.
3      Q.   How long have you been a police officer
4   with the Penn Hills Police Department?
5      A.   I've been a police officer for 25 years
6   total, 21 years with the Penn Hills Police
7   Department.
8      Q.   Prior to Penn Hills, where did you
9   work?
10      A.   I worked for Wilkins Township and the
11   City Housing Authority.
12      Q.   Do you have any special assignment
13   within the Penn Hills Police Department at this
14   time?
15      A.   Yes, I'm a canine officer.
16      Q.   Were you employed by Penn Hills on
17   March 9th, going into the 10th, of 2016?
18      A.   Yes, I was.
19      Q.   What was your shift that day, if you
20   recall?
21      A.   Midnight shift, 11:00 p.m. to 7:00 a.m.
22      Q.   During your shift, did you receive a
23   call to the area of Hebron Drive for a
24   suspicious male?
25      A.   Yes.

D. Klobucher - Direct by Mr. Chernosky

1    Q.  What did you do in response to that
2    call?
3    A.  We responded for a suspicious male.  We
4    located the male.  I exited my vehicle.  I saw
5    him standing on the side of the roadway talking
6    on his cell phone.  I asked him if I could pat
7    him down to see if he had any weapons on him.
8    He was cooperative.  He allowed me to.  He did
9    not have any weapons.  We asked for
10    identification.  He could not provide any but
11    he did give us his name and date of birth.
12    Officer Pine, the officer that I was with, was
13    able to check his name and date of birth
14    through our computer system.  It shows a
15    picture so we were able to match a picture with
16    who we were dealing with and he was released.
17    Q.  How long did you interact with that
18    person that night?
19    A.  Seven minutes, eight minutes.
20    Q.  Did you observe at the time that you
21    interacted with him any signs of intoxication?
22    A.  No, I did not.
23    Q.  Did you smell any odor of alcohol
24    coming from his person?
25    A.  No, I did not.

D. Klobucher - Direct by Mr. Chernosky

1      Q.   During your interactions with him, was

2  he staggering or swaying at all?

3      A.   No.

4      Q.   Ultimately, after the seven to eight

5  minutes that you described interacting with

6  him, was it determined that he was free to go?

7      A.   He was free to go.  Once we identified

8  him and determined that he was not wanted or

9  didn't have any warrants, he was free to go.

10     Q.   How did he choose to leave the scene?

11     A.   He walked drown Hebron Drive toward

12 Crab Hollow Road.

13     Q.   During that walk, approximately how far

14 was it?

15     A.   I would say about 50 yards.

16     Q.   Did you observe any unsteadiness in his

17 gait or how he was walking?

18     A.   No, I did not.

19     Q.   Did you observe him to trip or stumble

20 at all?

21     A.   No.

22     Q.   That particular night, what type of

23 vehicle were you operating?

24     A.   I was in a canine truck, a Ford F150.

25 My canine partner is in the back.

D. Klobucher - Direct by Mr. Chernosky

1      Q.  A fully marked police car, vehicle?

2      A.  Yes, a fully marked police vehicle with

3      lights, decals.

4      Q.  Was your vehicle equipped with a dash

5      cam?

6      A.  Yes.

7      Q.  Prior to your testimony today, have you

8      had an opportunity to review that dash cam?

9      A.  Yes.

10     Q.  I show you what has already been marked

11     as Commonwealth Exhibit 373.

12            MR. CHERNOSKY:  For purposes of

13     the record, Your Honor, I'm starting that dash

14     cam from Car 44 at timestamp 02:36:46.  I

15     apologize, Your Honor, the video restarted.

16            (Video played for the jury.)

17     Q.  For purposes of the record, I'm

18     stopping the recording at timestamp 02:38:51.

19     I show you what I'm marking as 378 and 377.  I

20     ask if these are still frame images from your

21     dash cam from that night?

22     A.  Yes, they are.

23            MR. CHERNOSKY:  I move for the

24     admission of the Commonwealth Exhibits 377 and

25     378.

D. Klobucher - Direct by Mr. Chernosky

1          THE COURT:  Admitted without

2    objection.

3          Q.  During the course of your career, how

4    many times have you had an opportunity to make

5    an arrest for DUI or public drunkenness?

6          A.  I don't have an exact number but I

7    would say well over 500.

8          Q.  In your personal life, have you had an

9    opportunity to be around intoxicated people

10   much?

11         A.  Yes, I have.

12         Q.  Did you smell any alcohol coming from

13   Mr. Shelton's person?

14         A.  No, I did not.

15         Q.  Did you notice any other signs of

16   intoxication?

17         A.  No.

18         Q.  Do you recognize the person that you

19   interacted with that night in the courtroom

20   today?

21         A.  Yes, I do.

22         Q.  Where is he seated and what is he

23   wearing?

24         A.  He is seated at this table wearing a

25   blue suit and an orange shirt.

D. Klobucher - Cross by Mr. McKinney

1          MR. CHERNOSKY:  I offer for

2     cross.

3                    -----

4                 CROSS-EXAMINATION

5                    -----

6     BY MR. McKINNEY:

7          Q.  You patted down Mr. Shelton that

8     evening?

9          A.  Yes, I did.

10          Q.  Were there any weapons on his person?

11          A.  No, there were not.

12          Q.  What did he have in his pocket?

13          A.  I didn't go into his pocket.  I patted

14     down his outer garment for weapons.

15          Q.  When you patted him down afterwards,

16     did you note any blood on your hands?

17          A.  No, I did not.

18          Q.  He was completely cooperative with you?

19          A.  Yes, he was.

20          Q.  He didn't try to flee when you got

21     there with the other two cruisers?

22          A.  No, he did not.

23          MR. McKINNEY:  No additional

24     questions.

25          THE COURT:  Thank you.  You are

D. Robl - Direct by Mr. Chernosky

1    excused.  Who is your next witness?

2              MR. CHERNOSKY:  The Commonwealth

3    would call Officer Robl.

4                    -----

5              DENNIS ROBL,

6    a witness herein, having been first duly sworn,

7    was examined and testified as follows:

8                    -----

9              DIRECT EXAMINATION

10                   -----

11   BY MR. CHERNOSKY:

12       Q.  Officer Roble, could you state your

13   first and last name and spell your last name

14   for the court reporter?

15       A.  Dennis Robl, R-O-B-L.

16       Q.  How are you employed?

17       A.  Employed by the Municipality of Penn

18   Hills as a police officer.

19       Q.  How long employed in Penn Hills?

20       A.  Since July of 2013.

21       Q.  Prior to working with Penn Hills, did

22   you have employment with any other law

23   enforcement agency?

24       A.  I did.  I worked for the City of

25   Pittsburgh Police since September of 2005.

D. Robl - Direct by Mr. Chernosky

1      Q.   Any employment prior to that?

2      A.   No, sir.

3      Q.   Were you working on March 9th leading

4   into March 10, 2016?

5      A.   I was.

6      Q.   What was your shift that day?

7      A.   I worked the midnight to 8:00 a.m.

8   shift.

9      Q.   At some point did you receive a call

10   for a suspicious man in the area of 3020 Hebron

11   Drive?

12      A.   Officers Klobucher and Pine received a

13   call.  I was close by so I decided to go.

14      Q.   How long did it take you to get there?

15      A.   Less than a minute.

16      Q.   When you arrived on scene, what

17   happened next?

18      A.   Hebron Drive is sort of a horseshoe

19   shaped street with two entries and two exits.

20   I assumed that Officers Pine and Klobucher went

21   to the top so I went to the bottom.

22      Q.   Did you encounter a male in that

23   location?

24      A.   I did.

25      Q.   Could you tell the jury what your

D. Robl - Direct by Mr. Chernosky

1    interactions was with that person?

2         A.   I pulled in from the bottom of Hebron.

3    Officers Pine and Klobucher pulled in from the

4    top almost simultaneously.  Officer Klobucher

5    approached the male first and Officer Pine and

6    as I approached I observed their interactions.

7         Q.   Did you, yourself, search the male?

8         A.   No.

9         Q.   How close were you to him?

10        A.   Less than five feet.

11        Q.   Did you observe any signs of

12   intoxication on him?

13        A.   I didn't.

14        Q.   During the course of your career, how

15   many arrests for DUI or public toxication have

16   you made?

17        A.   Well over 100.

18        Q.   How long would you say that you

19   interacted with that person that night?

20        A.   Maybe five minutes.

21        Q.   Do you see the individual that you saw

22   that night in the courtroom that day?

23        A.   I do.

24        Q.   Where is he located and what is he

25   wearing?

D. Robl - Cross by Mr. McKinney

1      A.  He is wearing a blue suit with an

2   orange shirt at the end of the table.

3                MR. CHERNOSKY:  May the record

4   reflect identification?

5                THE COURT:  Yes.

6                -----

7                CROSS-EXAMINATION

8                -----

9   BY MR. McKINNEY:

10     Q.  Officer, did you see a white Lincoln

11  Continental on the scene when you responded?

12     A.  No.

13                MR. McKINNEY:  Thank you.  No

14  additional questions.

15                THE COURT:  Call your next

16  witness.

17                MS. PELLEGRINI:  The Commonwealth

18  calls Jason Clark.

19                -----

20                JASON CLARK,

21  a witness herein, having been first duly sworn,

22  was examined and testified as follows:

23                -----

24

25

J. Clark - Direct by Ms. Pellegrini

1                         -----

2                  DIRECT EXAMINATION

3                         -----

4    BY MS. PELLEGRINI:

5        Q.  Good afternoon, Mr. Clark.  Could you

6    please state your full name, spelling your last

7    name for the court reporter?

8        A.  Jason Clark, C-L-A-R-K.

9        Q.  How are you employed?

10       A.  At the Allegheny County Office of

11   Medical Examiner forensic laboratory.

12       Q.  What is your position in the forensic

13   laboratory?

14       A.  I'm a scientist in the latent print

15   section.

16       Q.  Could you please detail for this jury

17   your educational background and training?

18       A.  I received a Bachelor's degree in

19   biochemistry from Duquesne University.  I also

20   have a Master's degree in forensic science and

21   law also from Duquesne University.  I've had

22   numerous trainings over the years by providers

23   such as the Pennsylvania State Police, TriTech

24   Forensics, Ron Smith & Associates, as well as

25   California University of Pennsylvania.  I'm

J. Clark - Direct by Ms. Pellegrini

1    currently recognized by the International

2    Association for Identification as a certified

3    latent print examiner.

4        Q.  How long have you been with the -- we

5    call it the crime lab -- how long have you been

6    with the crime lab?

7        A.  A little over 11 years now, I believe.

8        Q.  Have you testified as an expert before?

9        A.  I have.

10       Q.  Have you testified as an expert in the

11   field of latent fingerprint examination?

12       A.  I have.

13               MS. PELLEGRINI:  I offer the

14   witness for cross on his expertise.

15               THE COURT:  Any questions?

16               MR. McKINNEY:  No questions.

17               THE COURT:  The witness will be

18   accepted as an expert in his field.  I will

19   give you a preliminary instruction as it

20   applies to expert witnesses and any subsequent

21   witness.

22       Q.  Mr. Clark, did I ask you to prepare a

23   PowerPoint presentation to aid the jury in your

24   testimony here today?

25       A.  You did.

J. Clark - Direct by Ms. Pellegrini

1    Q.  I'm going to show you what I marked as
2    Commonwealth Exhibits 379 to 406.  Are these
3    the slides that you prepared in anticipation of
4    your testimony here today?
5    A.  Yes, they are.
6              MS. PELLEGRINI:  Your Honor, I
7    move for the admission of 379 to 406.
8              THE COURT:  They will be admitted
9    without objection.
10             MS. PELLEGRINI:  May the witness
11   step down if it is easier for him to testify?
12             THE COURT:  He may.
13             THE WITNESS:  Thank you, Your
14   Honor.
15   Q.  Mr. Clark, this is the first slide, it
16   is just an introductory that this is the
17   process of latent print examination.  The next
18   slide, 380, could you describe for us what
19   fingerprints are?  I think everybody has heard
20   about it but can you actually describe the
21   technical terms and what we look at with the
22   swirls and things on your fingerprint.
23   A.  Yes.  So friction ridge skin is the
24   skin that is present on the palm side of your
25   hand as well as the bottom or sole side of your

J. Clark - Direct by Ms. Pellegrini

1    foot.  So the friction ridge skin is comprised

2    of two main components.  We have the raised

3    area -- which you can advance the slide -- this

4    is the ridge.  We have the area in between the

5    ridges which is known as the furrows.  Along

6    the tops of the ridges are tiny openings which

7    are pores.  Those pores secrete residue that

8    are perspiration.  That perspiration coats the

9    ridges so when an object is touched, an outline

10   of the friction ridge skin may get deposited

11   onto an object and leave latent print residue.

12   So the term latent print is just a transferred

13   impression of friction ridge skin that may not

14   readily be visible.  It is also a generic term

15   for any unintentionally deposited friction

16   ridge detail transferred from friction ridge

17   skin to an object.

18        Q.  Mr. Clark, slow down.

19        A.  So known prints are prints that are

20   intentionally recorded.  So we typically do

21   this with ink.  We can use electronic methods

22   but it is physically capturing someone's

23   friction ridge skin onto some sort of a medium

24   and using contrasting colors that could be

25   utilized.

J. Clark - Direct by Ms. Pellegrini

1          So ACE-V is a method that we use when
2     we start analyzing or trying to compare latent
3     prints.  ACE-V is an acronym that stands for
4     analysis, comparison, evaluation, and
5     verification.  The analysis is where we take
6     the qualitative and quantitative assessment of
7     three levels of detail to determine whether a
8     particular impression is suitable for a
9     comparison.  Level one detail is the ridge
10    flow.  It is the overall, it is the
11    orientation, it is the overall impression or
12    the overall information from the impression so
13    if it is a fingerprint, we're going to try to
14    determine whether we can determine its pattern
15    type.  We are going to try to orient it in the
16    proper orientation to use to compare it, and if
17    able to, distinguish if it is a fingerprint or
18    palm print based on the characteristics that we
19    observe.
20         Level two detail is when we start
21    looking at the individual ridges themselves.
22    There are three characteristics.  There are
23    bifurcations, there are ridge endings, and
24    there are ridge dots.  So a bifurcation is
25    where a ridge goes along and abruptly splits

J. Clark - Direct by Ms. Pellegrini

1    into two ridges.  A ridge ending goes on and

2    abruptly stops or ends.  A ridge dot is a

3    single ridge unit that may or may not have a

4    pore.

5        So this is just a known impression

6    where I'm going to point out some of those

7    second level features that I just mentioned.

8    So if we follow this ridge right here, which is

9    black, at this point it splits and bifurcates

10   into two ridges.  If we follow this ridge down,

11   it ends and is known as a ridge ending.  Here

12   we have a ridge dot, that is just a single

13   ridge unit.  If you look in this particular

14   impression, there are various other ending

15   ridges and bifurcations that I have not pointed

16   out.

17       Level three detail is we look even

18   closer at the friction ridges.  So we've coined

19   the term or use the term poroscopy and

20   edgeoscopy.  So poroscopy is the position,

21   size, and frequency of pores present on the

22   friction ridge.  Edgeoscopy is the contour or

23   shape of the ridges.  So poroscopy is looking

24   at the location of the pores along the ridge.

25   If you look, this one is above the center line,

J. Clark - Direct by Ms. Pellegrini

1    where these two are below and looking at the

2    individual arrangement as we go through, in

3    addition to the shape, where this one looks

4    like a jellybean and this is circular, that

5    goes into our assessment as well.

6          Edgeoscopy, as I mentioned before, is

7    the contour or side of the ridges.  So I

8    pointed out various features.  Here we have

9    like an upside down U if you will.  There is

10   another one here where this may be a pore that

11   was along the side of the ridge as well as this

12   particular ridge has an abrupt stop here.  It

13   is almost straight up and down.  Here we have

14   almost like a Q-Tip along the contour.  That

15   would be information that we also would utilize

16   if they were present in the impression.

17          So at the end of the analysis when we

18   look at our three levels of details, we come to

19   a conclusion.  So if friction ridge, if it is a

20   friction ridge impression and does not contain

21   enough sufficient quality and quantity of

22   characteristics, we determine that to be of no

23   value and the ACE-V process stops.  If

24   sufficient quality and quantity of

25   characteristics are present, we determine that

J. Clark - Direct by Ms. Pellegrini

1    impression to be of value for comparison

2    purposes and we move on with the C of the ACE-V

3    method.

4         So the C is the observation of two or

5    more impressions that determine similarities,

6    dissimilarities, or discrepancies.  We take all

7    our data that we've gathered during our

8    analysis of our unknown latent print and we

9    start to compare it to our set of known prints

10   to see if we can see similarities,

11   dissimilarities, or discrepancies.

12        The E, or the evaluation, is

13   essentially the continuation of the comparison

14   where we take all that data that we gathered

15   during our analysis and our comparison to come

16   to a conclusion.  The conclusions that we

17   utilize are identification, meaning that our

18   latent print and known print came from the same

19   source.  We have exclusion meaning that our

20   latent print and our known print came from

21   different sources.  Or we have inconclusive, we

22   may not have enough information to decide

23   whether conclusive, yes or no, if you will.

24        So the V, verification, is when another

25   analyst does an analysis comparison evaluation

J. Clark - Direct by Ms. Pellegrini

1    of the impression to form their own conclusion.

2             So in this particular case I was given

3    Item 1, which was a sealed box containing one

4    Colt Model M4 .22 long caliber rifle with

5    serial number BP035241 with a fabric sling with

6    it.

7        Q.  Could you stop there?  I'm going to

8    show you what has been previously marked as

9    Commonwealth Exhibit No. 338.

10            MS. PELLEGRINI:  Your Honor, the

11   deputy verified that it is made safe for court.

12       Q.  Could you describe what Exhibit 338 is?

13       A.  It is a Colt M4 carbine .22 long rifle

14   with serial number BP035241.

15       Q.  What is this on top?

16       A.  Some sort of sight.

17       Q.  Could you tell us if you developed any

18   friction ridge detail on that particular item?

19       A.  I did.

20       Q.  Could you tell us where you did?

21       A.  So this is my adhesive scale where a

22   print was developed.  So Item 1 was processed

23   when I first received it.  I did a visual

24   examination.

25            THE WITNESS:  Your Honor, may I

J. Clark - Direct by Ms. Pellegrini

1    refer to my notes?

2                    THE COURT:  You may.  Any

3    objection?

4                    MR. McKINNEY:  No objection.

5        Q.  Just to catch you up here, Mr. Clark,

6    on the screen right now is Commonwealth

7    Exhibit 396.  Your findings are found at

8    laboratory case number 16LAB02403, correct?

9        A.  That is correct.

10       Q.  Tell us what Item 1-C is.

11       A.  Item 1-C was a digital image of

12   friction received that was developed.  Where I

13   had pointed out on the firearm an area of

14   friction ridge detail developed, I took a

15   photograph and that is what 1-C became.

16       Q.  Commonwealth Exhibit 397?

17       A.  So this is the digital image.  So we

18   designate our digital image by the lab case

19   number minus the LAB and then the particular

20   image in this case so this would be one so that

21   is why it is point one.  The scale that you

22   just saw is over here.  It is on the magazine.

23       Q.  I'm going to back you up.  Could you

24   describe the actual process for identifying the

25   print, like what you physically do to look for

J. Clark - Direct by Ms. Pellegrini

1    a print on, for instance, that rifle?

2        A.   For this particular rifle, after I

3    received it, I did a visual examination where I

4    did not see anything.  After that, I did

5    cyanoacrylate or superglue fuming.

6        Q.   Describe in detail what that is.

7        A.   Superglue fuming is where we take an

8    object and we stick in into a chamber that

9    encloses.  We then add humidity to get it to

10   about 80 percent humidity which is the optimal

11   humidity for cyanoacrylate.  After that we

12   stick glue into a coffee cup warmer and then

13   that glue gets heated and the vapor from the

14   glue sticks or attaches to the friction ridge

15   detail that may be on an object.

16           After that I did another examination

17   and I was able to see friction ridge detail.

18   After that we stain the superglue fumed print

19   with a red dye stain which is similar to

20   staining an Easter egg and then we use an

21   alternate light source.  White light can be

22   broken down into individual wavelengths and

23   that is what this alternate light source does.

24   So for the particular dye stain that I used,

25   which is Rhodamine 6G, I need 495 nanometers of

J. Clark - Direct by Ms. Pellegrini

1    light which is like a bluish light.  So I used

2    495 nanometers of light which is the orange and

3    blue.

4            So after I finished the Rhodamine and

5    using an alternate light source to visualize, I

6    saw this particular impression and then used a

7    digital camera to capture it.

8        Q.  Commonwealth Exhibit No. 398?

9        A.  So, as I mentioned, the superglue

10   adheres to the friction ridge detail or

11   friction ridge impression.  So the superglue,

12   then we stain the superglue.  So in this

13   particular example what we see here is green is

14   the ridges, then the black areas are the

15   furrows.

16       Q.  398?

17       A.  So in this image, all I did was rotated

18   it like to try to get to the proper

19   orientation.  Then I color inverted, what was

20   black before is white, what was green is

21   purple.  I found this to be easier to see for

22   my particular eyes which is why I did it.

23       Q.  Commonwealth Exhibit No. 399?

24       A.  So what I did was the analysis of the

25   ACE-V method.  I looked at the ridge flow as

J. Clark - Direct by Ms. Pellegrini

1  well as the pattern type which I determined to

2  be a loop or a whorl.  I have it orientated

3  into what I thought was the proper orientation.

4  I then started looking for level two.

5      Q.  Let me stop you there.  Why did you say

6  proper orientation?  What do you mean by that?

7      A.  We typically compare prints in the up

8  direction where the finger tip would be on the

9  top and the base of the finger would be on the

10  bottom.  This is what I felt was the proper

11  orientation.  I then looked for second level

12  features, bifurcations, ridge dots, and ridge

13  endings as well as level three detail, pores

14  and edges.

15      Q.  Commonwealth Exhibit 400?

16      A.  So this is just a bigger image of the

17  digital image that I took.  So I started

18  pointing out features that I saw.  So I'm

19  looking at the white here.  This appears to be

20  an ending ridge.  So we have another feature

21  right here where could be a bifurcation that

22  opens up to the left right where the red arrow

23  is.  If we follow this ridge here, at this

24  point it stops or ends, a ridge ending.  Here

25  if we follow this ridge up, it appears as

J. Clark - Direct by Ms. Pellegrini

1    though it ends or bifurcates.  If we follow

2    this ridge up here, it appears to end right

3    around there.

4            Here we have another feature where we

5    have three ridges here and only two down here

6    so I believe this to be a feature as well.

7    This appears as a bifurcation, if we follow

8    this ridge right here, it splits or bifurcates

9    into two.  And here appears to be another

10   bifurcation where it splits and bifurcates into

11   a second ridge.  These are not all the

12   features -- oh, we have another ending ridge

13   right here.  So if we follow this ridge right

14   here, it ends in between this ridge and this

15   ridge.

16           So these aren't all the features that I

17   found but these are examples of the features

18   that I did see in this particular impression.

19       Q.  Okay.  You then were asked to make a

20   comparison to several individuals, correct?

21       A.  That's correct.

22       Q.  Commonwealth Exhibit No. 401, were you

23   asked to compare the latent print to the

24   defendant, Cheron Shelton, an individual by the

25   name of Justin Gomez, an individual by the name

J. Clark - Direct by Ms. Pellegrini

1    of Dontay Reed, and an individual by the name

2    of Brittany Shelton?

3        A.   That is correct.

4        Q.   You were given those fingerprint cards

5    for those individuals?

6        A.   Yes, I was able to obtain them.

7        Q.   Commonwealth Exhibit No. 402?

8        A.   So we have in our lab access to our

9    AFIS machine.  AFIS is an acronym for Automated

10   Fingerprint Identification System.  It is an

11   instrument that can be used to perform searches

12   of the Pennsylvania State database of known

13   fingerprints and palm prints.  It also contains

14   known prints of individuals in the State of

15   Pennsylvania and an individual fingerprint and

16   palm print exemplars can be obtained through

17   AFIS by using that state identification or SID

18   number.

19       Q.   Next photo, 403.

20       A.   So the known fingerprint exemplars for

21   the individuals previously listed were

22   obtained.

23       Q.   404?

24       A.   So this is what we would call temp

25   print cards or known fingerprint exemplars for

J. Clark - Direct by Ms. Pellegrini

1    Cheron Shelton with the associated SID number.

2        Q.   Commonwealth Exhibit 405?

3        A.   So the image on the left is, again, the

4    latent impression that I had gone through and

5    done my analysis and determined to be of value.

6    After the known prints were obtained, I started

7    comparing the latent print with all the

8    features I observed during the analysis with

9    the known print of the individuals.  So on the

10   left is the latent print which was developed on

11   the frame of the firearm.  On the right is the

12   No. 6, left thumb, of Cheron Shelton.  The

13   features that are labeled 1 through 15

14   correspond from the left to the right with

15   features that I found in agreement between the

16   two impressions.  So at the end of my analysis,

17   I came to a conclusion of identification.  I

18   then submitted the case for review or

19   verification.  My verifier also agreed to my

20   identification.

21       Q.   So it is your opinion that the

22   defendant left the latent print on this rifle?

23       A.   That is correct.

24       Q.   Do you hold your opinions based upon

25   your training and experience in your field of

J. Clark - Cross by Mr. McKinney

1    expertise?

2        A.  I do.

3            MS. PELLEGRINI:  I offer for

4    cross.

5            THE COURT:  Mr. McKinney.

6            MR. McKINNEY:  Thank you.

7                -----

8            CROSS-EXAMINATION

9                -----

10   BY MR. McKINNEY:

11       Q.  Mr. Clark, are you aware that that

12   rifle that Ms. Pellegrini just showed the jury

13   isn't even alleged to have been involved in the

14   Wilkinsburg shootings?

15       A.  Yes, I believe it is a different

16   caliber.

17       Q.  Those other individuals that you were

18   asked to compare fingerprints to, when were you

19   given those names?

20       A.  I believe when the case was submitted

21   but I'm not entirely sure.

22       Q.  If you review your report, would that

23   refresh your recollection?

24       A.  It may.  I'm not sure when those names

25   were submitted to the case.

J. Clark - Cross by Mr. McKinney

1      Q.   What were those names again?

2      A.   Cheron Lamont Shelton, Justin Gomez,

3   Dontay Ramont Reed, and Brittany Shelton.

4      Q.   Who asked you to investigate those

5   prints?

6      A.   They were submitted -- the evidence was

7   submitted by Bill Best as a result of working

8   with Allegheny County homicide.

9              MR. McKINNEY:  Thank you,

10   Mr. Clark.

11              THE COURT:  Anything else?

12              MS. PELLEGRINI:  No.

13              THE COURT:  Thank you.  You're

14   excused, sir.

15              THE WITNESS:  Thank you, Your

16   Honor.

17              THE COURT:  We'll take your

18   luncheon recess.  We'll resume court at 1:45.

19   Make certain again, I told you to stay off

20   floors three, four, and five.  Do not follow

21   any media accounts should you get on your

22   devices and certainly do not talk about the

23   case or discuss the case with each other or

24   anyone.  Thank you.

25              Remain seated and quiet as the jury

J. Clark - Cross by Mr. McKinney

1    leaves the room.

2                        -----

3                    (Open court - Jury not present.)

4                        -----

5                    THE COURT:  Resolve the matter

6    with Mr. Best over the lunch hour.

7                    MR. CHERNOSKY:  Yes.

8                    THE COURT:  Do you have any idea

9    when you are calling Ms. Shelton?  Can we put

10   her on for tomorrow morning?

11                   MR. CHERNOSKY:  Yes, Your Honor,

12   I can do that.

13                   THE COURT:  Thank you.

14                       -----

15                   (Luncheon recess taken.)

16                       -----

17                   (Open court - Jury not present.)

18                       -----

19                   MR. McKINNEY:  Your Honor, with

20   respect to the issue that you asked us to

21   address with Mr. Best --

22                   THE COURT:  Stand down there and

23   talk to me.

24                   MR. McKINNEY:  We're going to be

25   discussing sensitive information.

J. Clark - Cross by Mr. McKinney

1              THE COURT:  Do you think it is

2      necessary that we do this at sidebar?

3              MR. McKINNEY:  Yes.

4              (Sidebar discussion held as

5      follows.)

6              MS. PELLEGRINI:  Judge, with

7      regard to Brittany Shelton, I don't know how

8      you pronounce her first name, Desdrene Smith

9      and Tara Smith, the paramour of Rob Thomas,

10     they are all subpoenaed as Commonwealth

11     witnesses.  I understand you appointed a lawyer

12     and will deal with those witnesses tomorrow.

13     They have given the officers an extremely

14     difficult time.  We let them go on Monday to

15     return, it was a big hassle.  I don't want to

16     get in the middle of this with regard to them.

17     They are going to have attorneys but I think

18     the Court needs to explain to them that they

19     have to be back in the morning.

20              THE COURT:  Where are they at?

21              MS. PELLEGRINI:  In the hallway.

22              MR. McKINNEY:  I wasn't there for

23     the conference.  I've had lengthy conversations

24     with these potential Commonwealth witnesses.  I

25     did talk to them in the hallway.  I didn't get

J. Clark - Cross by Mr. McKinney

1    any indication that they're going to be

2    uncooperative.  I believe Ms. Pellegrini has

3    her perception but they are here and willing to

4    be called and testify when necessary.  I think

5    one of them had childcare issues.  I think she

6    was worried about when she was going to pick up

7    here children.  I don't think they are trying

8    not to abide by her subpoena.

9              THE COURT:  Who is the third one?

10             MR. McKINNEY:  D-E-S-D-R-E-N-E,

11   last name Smith.

12             THE COURT:  Are they in the

13   hallway now?

14             MS. PELLEGRINI:  Yeah.  Just so

15   you know, Tara Gomez is like I'm on house

16   arrest, I can't come.  I said who is your PO,

17   we'll get you a window.

18             THE COURT:  What is she going to

19   testify to?

20             MS. PELLEGRINI:  Phone numbers

21   with Rob Thomas and some other matters.  I

22   just, again, they were giving the sheriffs a

23   hard time.  It was brought to my attention.  I

24   don't want to get in the middle or anyone to

25   get in trouble.  It is a distraction.

J. Clark - Cross by Mr. McKinney

1                MR. McKINNEY:  With all the

2      press --

3                THE COURT:  Are you calling them

4      in the morning?

5                MS. PELLEGRINI:  Yeah, that is

6      fine.

7                MR. McKINNEY:  With all the press

8      that is associated with this case, given the

9      fact that I don't believe these witnesses are

10     going to be uncooperative, I would rather the

11     Court not reprimand for something they may or

12     may not have done on the record.

13               THE COURT:  I'm not going to do

14     that.  I'm going to have the sheriffs talk to

15     them.

16               MS. PELLEGRINI:  Okay, that is

17     fine.

18               THE COURT:  Deputy, we have three

19     witnesses, they are out here in the hall.  They

20     are under subpoena.  Just tell them, if you

21     would be kind enough, that the Court is letting

22     them go for the day but they are to be here

23     tomorrow morning otherwise one of your

24     associates will be out to get them.

25               DEPUTY SHERIFF:  Yes, sir.

J. Clark - Cross by Mr. McKinney

1              MS. PELLEGRINI:  Just so you

2    know, they've shown up late every day.  So you

3    need to explain to them 9:00 is 9:00.

4              MR. McKINNEY:  Your Honor, I know

5    Mr. Chernosky is not back yet.  Based on what I

6    think is a major discovery violation, I think

7    that we need Mr. Chernosky to return and we

8    need to address it before we continue.

9              THE COURT:  Okay.

10             MS. PELLEGRINI:  Okay.

11             THE COURT:  Get Chernosky down

12   here.

13             (Sidebar discussion concluded.)

14             THE COURT:  As to Mr. Best --

15             MR. McKINNEY:  Your Honor, given

16   the sensitive nature of this information, I

17   would prefer to address this issue in chambers.

18             THE COURT:  Okay, we'll do it at

19   sidebar.

20             (Sidebar discussion held as

21   follows.)

22             THE COURT:  Okay.

23             MR. McKINNEY:  Your Honor, with

24   respect to witness Best, I'm attempting to

25   create a record so if the Court will bear with

J. Clark - Cross by Mr. McKinney

1    me, I won't be that long.

2         As the Court knows from my opening and

3    questions that I've posed, there are two issues

4    for the defense in this case.  One, that

5    Detective Michael Adams never saw my client on

6    the night of the shooting.  I opened on that

7    and asked a lot of cross-examination based on

8    that theory.  Yesterday, as the Court knows,

9    the Commonwealth presented the defense with a

10   report indicating that the suspect vehicle's

11   license plate was ran at or near the time of

12   the incident which would go to show that it was

13   more likely than not that Detective Adams did

14   see the suspect vehicle.  That information was

15   not provided prior to opening.  The Court, I

16   believe, rightfully is going to exclude that

17   information.  Today the Commonwealth, on direct

18   of Scientist William Best, elicited testimony

19   that there was a Luminol test done on the

20   suspect vehicle, driver's seat floorboard,

21   front passenger seat floorboard, and that those

22   results came up positive for blood.  Your

23   Honor, that would be a second theory that the

24   defense argued that if Mr. Shelton allegedly

25   committed this act and was getting inside the

J. Clark - Cross by Mr. McKinney

 1    suspect vehicle less than two minutes after the
 2    accident, blood would have been found inside
 3    the vehicle.  Your Honor, I opened on that
 4    issue, I cross-examined several witnesses on
 5    that issue based on the fact that I did not
 6    have any discovery to the contrary.
 7            Your Honor, in talking to Mr. Chernosky
 8    over the lunch hour, he provided me with a
 9    report which would be 16LAB02403, report No. 5.
10    Your Honor, the bate stamp numbers on the
11    document are 6499, 6500, and 6501.  Your Honor,
12    I'm just reviewing this now.  Apparently,
13    Mr. Chernosky can chime in, William Best
14    indicates, it would be on page 4, that there
15    was the presence of Luminol in the suspect
16    vehicle.  Your Honor, what I did have prior to
17    today is another lab report.  16LAB, report
18    No. 9.  Your Honor, in this report the bates
19    number would be 1100, all the way up to 1110.
20    Your Honor, these are the results of lab
21    testing indicating that there was some swabbing
22    done of the Lincoln Continental that indicates
23    that there was some possible bloodstaining of a
24    towel in a car unrelated, possible
25    bloodstaining on a car in another vehicle, and

J. Clark - Cross by Mr. McKinney

1    there was DNA results from the testing of the
2    Lincoln Continental that came back inconclusive
3    to many samples and they can't determine if any
4    of the DNA matched any of the victims in this
5    case.
6         Your Honor, I was provided with a
7    receipt that I allegedly signed referencing the
8    discovery that indicates that I did not
9    receive.  Looking at the letter from
10   Mr. Chernosky dated June 19, 2017, it indicates
11   that bates number 6375 to 6800 were disclosed
12   on June 19, 2017.  I'm looking at the receipt
13   for that information.  Your Honor, I do have my
14   signature on a receipt with that date.  There
15   is a notation on the receipt that says detailed
16   in letter dated 06/19/17.  I have not had an
17   opportunity to go back to my office to review
18   if I have this document in my file.  I was just
19   provided it by the Commonwealth less than five
20   minutes ago.
21        Your Honor, given the way that
22   discovery has been handled in this case, I am
23   confident in saying that I did not have this
24   information, and if I did, I would have never
25   opened and cross-examined the way I did in this

J. Clark - Cross by Mr. McKinney

 1    case.  So I would like an opportunity to go

 2    back to my office because this is just being

 3    put on me now and determine -- I can tell you

 4    I've contacted Attorney Casey White who has not

 5    had an opportunity to go through his whole file

 6    because he is no longer apart of this case but

 7    from what he informed me he never had this

 8    document.  I've spoken to my co-counsel, Wendy

 9    Williams, and her staff is going through her

10    file now.  She never had this document and I

11    never have.

12         I think what the Court should know is

13    that everything else related to this testing is

14    bates stamped with numbers in the thousands.

15    This is a bate stamp with a number in the six

16    thousands.  I have never seen this document

17    before.  Had I been provided it, there was no

18    way I would have ever chosen the strategy that

19    I have chosen for this case.  So I'm asking for

20    an opportunity to confirm whether I received

21    this because, obviously, this is a major issue.

22              THE COURT:  Mr. Chernosky.

23              MR. CHERNOSKY:  Your Honor, in

24    response to Mr. McKinney making a record, I

25    would just indicate that over the lunch hour,

J. Clark - Cross by Mr. McKinney

1    which is the time we were given, I was able to

2    discover and produce both the receipt for those

3    bate stamped numbers and the letter that

4    indicates which bate stamped numbers are being

5    turned over.  The lab report in question is

6    bate stamped 6459 through 6502.  That is

7    indicated on June 19th that I myself signed.

8    The receipt has my initials and says detailed

9    in letter of 06/19/17.  I have a similar

10   receipt from Ms. Williams and Mr. White.

11           To answer Mr. McKinney as to why some

12   of the lab numbers are bate stamped in the

13   thousands and some in the six thousands, as

14   discovery progressed in this case, the

15   Commonwealth turned over a bunch in a hurried

16   disorganized manner.  This indicates our

17   intention to turn over every lab that we had.

18   As of the date of this letter, it is in

19   consecutive order and bate stamped in that

20   range.  We could, if Your Honor wishes, produce

21   where they start and where they end.  You will

22   see rather quickly that they go from one, I

23   believe we had twenty-some odd labs in this

24   case, but I would have to check.  It was an

25   organizational tactic to produce them all again

J. Clark - Cross by Mr. McKinney

1    at a later bate stamp number.

2                THE COURT:  I'll give you an

3    opportunity to check your file.  It will be

4    overnight.  We'll get to Best tomorrow.  Is

5    that Agent Burke available?

6                MR. CHERNOSKY:  As a preliminary

7    matter, I had to make contact with the

8    representative of T-Mobile to authenticate the

9    records.  I do have a certification from

10   T-Mobile that makes it admissible but it was my

11   intent to have T-Mobile before Agent Burke

12   testified.

13               THE COURT:  Before I give you a

14   ruling, see if he is available.

15               MR. CHERNOSKY:  Yes, I can do

16   that.

17               THE COURT:  I'll give you

18   overnight to check your files.  I mean, I don't

19   know how, it is not likely that it slipped your

20   mind, but we'll see.

21               MR. McKINNEY:  Okay.

22               THE COURT:  Have someone call

23   Best.  He is not standing in the hallway?

24               MR. CHERNOSKY:  He is in the

25   hallway.

R. McNeal - Direct by Mr. Chernosky

1          THE COURT:  Have him come back

2    tomorrow morning.

3              (Sidebar discussion concluded.)

4          MS. PELLEGRINI:  Judge, there is

5    a witness that we are going to call, his name

6    is Robert Barko.  He works for 911.  He is the

7    records custodian.  His name was not read

8    earlier.

9                  -----

10              (Open court - Jury present.)

11                  -----

12          MR. CHERNOSKY:  The Commonwealth

13    calls Robert McNeal.

14                  -----

15              ROBERT McNEAL,

16    a witness herein, having been first duly sworn,

17    was examined and testified as follows:

18                  -----

19              DIRECT EXAMINATION

20                  -----

21    BY MR. CHERNOSKY:

22       Q.  Could you state your name and spell

23    your last name for the court reporter?

24       A.  Robert McNeal, M-C-N-E-A-L.

25       Q.  Directing your attention back to March

R. McNeal - Direct by Mr. Chernosky

```
 1      of 2016, did you know Cheron Shelton and Robert
 2      Thomas?
 3           A.   Yes.
 4           Q.   Did you have an opportunity to or did
 5      you call Robert Thomas on a regular basis?
 6           A.   Somewhat regular, yeah.
 7           Q.   Did you ever provide rides for Robert
 8      Thomas?
 9           A.   Yeah.
10           Q.   What type of rides?
11           A.   Taking him to his mom's house,
12      girlfriend's house, to his house.
13           Q.   Is that commonly referred to as
14      jitneying?
15           A.   Yeah.
16           Q.   Could you tell the jury, is jitney like
17      an informal taxi?
18           A.   Yeah.  Get paid for it.
19           Q.   Back in 2016, did you have the same
20      cell phone number that you do now?
21           A.   No.
22           Q.   Do you remember what your cell phone
23      number was in 2016?
24           A.   No.
25           Q.   If I approach and show you something,
```

R. McNeal - Direct by Mr. Chernosky

1    would that refresh your recollection?

2         A.   I don't remember the number, sir.

3         Q.   I'm going to show you this and ask you

4    just to read the second full paragraph.

5                   MR. McKINNEY:   Your Honor,

6    objection.   The witness did not indicate that

7    he needed his recollection refreshed.

8                   THE COURT:   The objection is

9    overruled.   Did you highlight it?

10        Q.   Read the second full paragraph to

11   yourself.

12        A.   Yeah.

13        Q.   Does that refresh your recollection as

14   to what your phone number was in 2016?

15        A.   No.

16        Q.   Do you recall that the Wilkinsburg

17   homicides happened March 9th?

18        A.   Vaguely, yeah.

19        Q.   Where were you living at the time?

20        A.   McKeesport or my aunt's house.

21        Q.   At that point in time did you have an

22   opportunity to visit Homewood North or Hilltop?

23        A.   Yes.

24        Q.   Did you sometimes provide jitney rides

25   from Hilltop?

R. McNeal - Cross by Mr. McKinney

1          A.  Yeah.  I used to live up there, too.

2          Q.  Do you remember being interviewed by a

3     Detective Miller?

4          A.  I don't know his name.  Homicide came

5     to my aunt's house to see me.

6          Q.  Do you remember talking to them about

7     phone calls that you made on March 9, 2016?

8          A.  I don't know the dates and all that.

9     They had a list of phone calls and whatever.

10          Q.  Did you recognize your number at that

11     time?

12          A.  Yeah, at that time, yeah.

13          Q.  Did you admit that the phone calls they

14     were showing you you had made?

15          A.  Yeah.

16               MR. CHERNOSKY:  No further

17     questions.  I offer for cross.

18               THE COURT:  Any questions?

19                    -----

20               CROSS-EXAMINATION

21                    -----

22     BY MR. McKINNEY:

23          Q.  Sir, when was the last time you

24     remember speaking to Mr. Thomas?

25          A.  I didn't even talk to him.  It has been

R. McNeal - Cross by Mr. McKinney

1    a long time ago.  I don't know.

2        Q.  You said you don't remember what your

3    phone number was back in March of 2016?

4        A.  Nope.

5        Q.  At some point you said you gave an

6    interview to some detectives back then?

7        A.  Yeah, it was two homicide cops came to

8    my aunt's house.  Then they came to my hospital

9    room a couple times since then.  That is why

10   I'm here.

11       Q.  How many times have they come to speak

12   with you in total if you can remember?

13       A.  Four times all together.

14       Q.  The most recent was when?

15       A.  Say maybe two-and-a-half months ago.  I

16   think that was the last.  I just got out of the

17   hospital not too long ago, a couple weeks ago.

18   But before that, it was two months before that.

19   So that was the last time they came to the

20   hospital.  They came to the home looking for

21   me.  I wasn't there that day.

22       Q.  Did they ever show you your phone

23   records?

24       A.  The first time when they came to see

25   me.

R. McNeal - Cross by Mr. McKinney

 1     Q.  When they showed you your phone
 2  records, what did they say?  How did the
 3  conversation start?
 4     A.  They said that they had my number in
 5  Rob's phone and I called him the night of and
 6  the day of the shooting but I didn't talk to
 7  Rob.  He never -- I had a bad signal.  I didn't
 8  talk to him or I left a message or tried to,
 9  and vice versa, he tried to call me back and
10  couldn't get through.
11     Q.  Did they take your phone, the
12  detectives?
13     A.  No.
14     Q.  Did they look at your phone back then?
15     A.  No.  I had a different number, sir.
16     Q.  No, we're talking about back in March
17  of -- when they first interviewed you?
18     A.  Okay.
19     Q.  When they first interviewed you, they
20  showed you your phone records and said you had
21  communication what Rob Thomas?
22     A.  Yes.
23     Q.  And were they homicide detectives?
24     A.  Yes.
25     Q.  Did they tell you they were homicide

R. McNeal - Cross by Mr. McKinney

1    detectives?

2         A.  Yes.

3         Q.  Did they tell you that they were

4    investigating the Wilkinsburg shootings?

5         A.  Yes.

6         Q.  You know what the allegations were, you

7    know what happened based on what you read in

8    the news?

9         A.  Yes.

10        Q.  Was that March or April that they

11   interviewed you?

12        A.  No.

13        Q.  It has been a while ago?

14        A.  Yeah, a while ago.  I've been through a

15   lot since then.

16        Q.  Did they tell you that they believed

17   that Rob Thomas was a suspect in the shootings?

18        A.  Yes.

19        Q.  What else did they tell you about Rob

20   Thomas?

21        A.  They asked me a whole bunch of

22   questions, the age difference, how I knew him

23   and everything from the neighborhood and we're

24   out there, you know.  They are good guys.  They

25   are my friends.

R. McNeal - Cross by Mr. McKinney

1    Q.  Rob Thomas was a good guy, a friend of
2  yours?
3    A.  Yeah.
4    Q.  Did the detectives tell you that they
5  thought Rob Thomas was a suspect in the
6  shootings?
7    A.  Yes.
8    Q.  How did you feel about that?
9         MR. CHERNOSKY:  Objection, Your
10  Honor, relevance.
11         MR. McKINNEY:  You don't have to
12  answer.
13    Q.  When two homicide detectives came to
14  you telling you that your friend, Rob Thomas,
15  was a suspect in a mass murder, how did that
16  make you feel?
17         MR. CHERNOSKY:  Objection, Your
18  Honor, relevance.
19         THE COURT:  Objection sustained.
20    Q.  How long did they talk to you that
21  first time?
22    A.  About a half-hour.  My mom and my aunt
23  was present.
24    Q.  How long between the first time they
25  spoke to you and the second time they spoke to

R. McNeal - Cross by Mr. McKinney

1    you from what you could remember, a year, six

2    months?

3        A.  Years.

4        Q.  So they talked to you once, waited a

5    few years, and talked to you again?

6        A.  Yeah, they found me in the nursing

7    home.

8        Q.  That was the second time.  Then two

9    times after that they found you and spoke to

10   you again?

11       A.  Correct.

12       Q.  When was the most recent time that you

13   spoke to them?

14       A.  I would say about three months ago,

15   maybe four, sir.  I'm not sure.  Maybe four

16   months.

17       Q.  Okay.

18       A.  They been calling me.

19       Q.  They've been calling you?

20       A.  Yeah.

21       Q.  Calling you a lot?

22       A.  Well, they wanted me to come here and

23   tell me what I told them the day when they

24   interviewed me.  They asked me did I think they

25   did it?  I said I don't think so.

R. Barko - Direct by Ms. Pellegrini

1       Q.   Now, do you remember what Rob Thomas's

2    phone number was way back in March?

3       A.   No, sir.  I don't remember nobody's

4    phone number.  I just put them in my phone.

5       Q.   Do you remember what your phone number

6    was back in March?

7       A.   I don't know.  I've had a couple phones

8    since March.

9       Q.   March of 2016?

10      A.   Right.  No, no, no, sir.

11            MR. McKINNEY:  Those are all the

12   questions I have.  Thank you.

13            THE COURT:  Anything else?

14            MR. CHERNOSKY:  No further

15   questions, Your Honor.

16            THE COURT:  Thank you, sir.  You

17   are excused.  Call your next witness.

18            MS. PELLEGRINI:  Your Honor, may

19   Mr. Manko have a moment?

20                 -----

21            ROBERT BARKO,

22   a witness herein, having been first duly sworn,

23   was examined and testified as follows:

24                 -----

25

R. Barko - Direct by Ms. Pellegrini

1                          -----

2                   DIRECT EXAMINATION

3                          -----

4    BY MS. PELLEGRINI:

5        Q.   Good afternoon, sir.  Could you please

6    state your full name and spell your last name

7    for the court reporter?

8        A.   My name is Robert Barko, B-A-R-K-O.

9        Q.   How are you employed?

10       A.   I'm employed at the Allegheny County

11   Emergency Services Department for 911.

12       Q.   Could you keep your voice up, sir?

13       A.   Sorry.

14       Q.   Sir, did we ask you to review a call

15   that was placed to 911 on 03/10/16 at 2:18 in

16   the morning?

17       A.   Yes.

18       Q.   Is your job to be the records custodian

19   of 911 calls?

20       A.   Correct.

21       Q.   Could you tell the jury what that

22   means?

23       A.   All the 911 calls that come into the

24   center are retained on a report.  I get various

25   subpoenas and requests from multiple agencies

R. Barko - Direct by Ms. Pellegrini

1    and departments requesting those audiotapes.

2    I'm responsible for downloading and processing

3    the request and delivering them as well.

4        Q.  And are they maintained in the regular

5    course of business?

6        A.  Yes.

7        Q.  And they are a business record?

8        A.  Yes.

9        Q.  I show you what I marked as

10   Commonwealth Exhibit 407.  Is this a CD of the

11   911 call placed on March 10, 2019, at

12   2:15 p.m.?

13       A.  Yes.

14                MS. PELLEGRINI:  I move for the

15   admission of 407.

16                THE COURT:  Admitted without

17   objection.

18       Q.  Was that patched through because it was

19   Hebron Drive that was in the Penn Hills area?

20       A.  Yes.

21                MS. PELLEGRINI:  Move to play

22   407, please.  Your Honor, there appears to be a

23   problem with this.  May I have a moment to

24   notify Mr. Manko?

25                THE COURT:  Step down, sir.  Call

V. Costa - Direct by Mr. Chernosky

1    another witness.  You will be re-called later

2    this afternoon.  Call your next witness.

3              MR. CHERNOSKY:  The Commonwealth

4    would call Detective Venerando Costa.

5                      -----

6              VENERANDO COSTA,

7    a witness herein, having been first duly sworn,

8    was examined and testified as follows:

9                      -----

10                 DIRECT EXAMINATION

11                     -----

12   BY MR. CHERNOSKY:

13        Q.  Detective Costa, could you state your

14   first and last name and spell your name for the

15   court reporter?

16        A.  Venerando Costa, V-E-N-E-R-A-N-D-O,

17   C-O-S-T-A.

18        Q.  How are you currently employed?

19        A.  With the Allegheny County Police

20   Department.

21        Q.  How long have you been employed with

22   the Allegheny County Police Department?

23        A.  Twenty-some years.

24        Q.  Prior to being employed with the

25   Allegheny County Police Department, did you

V. Costa - Direct by Mr. Chernosky

1    have any law enforcement experience?

2         A.   No.

3         Q.   What section are you currently assigned

4    to?

5         A.   The homicide unit.

6         Q.   What is your current rank?

7         A.   Lieutenant.

8         Q.   Directing your attention to March of

9    2016, how were you employed at that point?

10        A.   As a detective with the homicide unit.

11        Q.   Were you assigned, along with other

12   detectives, to investigate the deaths that

13   occurred at 1304 Franklin Avenue in the Borough

14   of Wilkinsburg?

15        A.   I was.

16        Q.   Pursuant to that assignment, did you

17   participate in the service of a search warrant

18   on a gold Chevrolet Impala?

19        A.   I did.

20        Q.   Could you tell the jury where that

21   search occurred?

22        A.   I believe it occurred at the Allegheny

23   County crime lab.

24        Q.   Do you recall who that vehicle was

25   registered to?

512

V. Costa - Direct by Mr. Chernosky

1      A.  I do not, not at this time.

2      Q.  Could you tell the jury what, if

3  anything, you found during your search of that

4  Impala?

5      A.  Underneath the driver's seat we found

6  two cell phones, one was a Samsung cell phone,

7  one was a Nextel cell phone that was

8  inoperable.  In the trunk of the car we found a

9  blue pillowcase that had blood on it and a

10  multi-colored towel with red-brown stain

11  consistent with blood.

12     Q.  Do you recall what day you participated

13  in the search of that vehicle?

14     A.  I believe it was March 22nd.

15     Q.  I show you what I will mark as

16  Commonwealth Exhibits 408, 409, 410, 411, and

17  412.  I'll ask if these are photos from the day

18  that you searched that vehicle?

19     A.  Yes.

20          MR. CHERNOSKY:  Your Honor, I

21  move for the admission of Commonwealth

22  Exhibits 408 through 412.

23          THE COURT:  Admitted without

24  objection.

25     Q.  With respect to Commonwealth

V. Costa - Direct by Mr. Chernosky

1    Exhibit 408, do you recognize what 408 is?

2        A.    That is what the crime lab uses at the

3    beginning of their photographs, the date, the

4    address, the location.  So that is 40 North

5    Lexington.  There are two garages, we use the

6    crime lab or our garage.  At the time it was

7    400 North Lexington.  That is our garage.

8        Q.    When you say our garage --

9        A.    I'm sorry, the Allegheny County Police

10   garage.

11       Q.    And 409?

12       A.    That is a gold Impala.

13       Q.    Is that, for purposes of the record, a

14   view of the passenger side and part of the

15   hood?

16       A.    Correct.

17       Q.    412 -- sorry, 410?

18       A.    The driver's side of the gold Impala.

19       Q.    411?

20       A.    The rear of the gold Impala.

21       Q.    412?

22       A.    That is the registration card.  That is

23   registered to Ashley Michelle Smith at 1214

24   Nolan Court.

25       Q.    I show you what I will mark as

514

V. Costa - Direct by Mr. Chernosky

1    Commonwealth Exhibits 413, 414, 415, and 416.

2    Now, I ask you if those are generally

3    indicative of the items that you described

4    finding in the trunk?

5        A.  Yes, they are.

6            MR. CHERNOSKY:  Your Honor, I

7    move for the admission of Commonwealth

8    Exhibits 413 through 416.

9            THE COURT:  Admitted without

10   objection.

11       Q.  Commonwealth Exhibit 413, is that a

12   picture of the car with its trunk open?

13       A.  Yes, it is.

14       Q.  Commonwealth Exhibit 414, what is

15   depicted in 414?

16       A.  The blue pillowcase with the red-brown

17   staining.

18       Q.  Commonwealth Exhibit 415?

19       A.  The multi-colored towel with red-brown

20   staining.

21       Q.  And Commonwealth Exhibit 416?

22       A.  That is the pillowcase with red-brown

23   staining.

24       Q.  I show you what I marked as

25   Commonwealth Exhibits 417, 418, 419, and 420.

V. Costa - Direct by Mr. Chernosky

1    I ask if these are indicative of the items that

2    you also described as finding in the trunk?

3        A.  Yes.

4              MR. CHERNOSKY:  Your Honor, I

5    move for admission of Commonwealth Exhibits 417

6    through 420.

7              THE COURT:  Admitted without

8    objection.

9        Q.  With respect to Commonwealth

10   Exhibit 417, what are we looking at?

11       A.  The trunk with a tire and white stuff

12   in the tire.

13       Q.  Commonwealth Exhibit 418?

14       A.  That is a close-up of the tire with the

15   white covering inside of the tire.

16       Q.  Commonwealth Exhibit 419?

17       A.  Again, that is pulled out kind of a

18   pillow type case with red-brown staining on it.

19       Q.  Commonwealth Exhibit 420?

20       A.  That is a piece of cloth with a blue

21   and purplish design.

22       Q.  Now, the purpose of processing the

23   vehicle is to see if there is any evidence; is

24   that correct?

25       A.  That's correct.

516

V. Costa - Direct by Mr. Chernosky

1    Q.   Those items, were they submitted to the

2    Allegheny County crime lab?

3    A.   They were.

4    Q.   For further testing?

5    A.   They were submitted to the Allegheny

6    County crime lab for further testing.

7    Q.   Later in this investigation were you

8    detailed to listen to recorded phone calls of

9    the defendant Cheron Shelton?

10   A.   I was.

11   Q.   Did you listen to phone calls for a

12   period of time around March 28th of 2016?

13   A.   I did.

14   Q.   Did you listen to a phone call between

15   the defendant and someone who answered to the

16   name of Brittany?

17   A.   I did.

18   Q.   Do you recall the day of that telephone

19   call?

20   A.   The date of the call or the day I

21   listened to it?

22   Q.   The date of the call?

23   A.   I believe it was March 28th or 29th.

24   Q.   Generally speaking, what was the nature

25   of the conversation between the two?

V. Costa - Direct by Mr. Chernosky

1      A.  Mr. Shelton stated that he was going to
2  write a kite -- a kite is a jail term for a
3  letter -- laying it all out, that he was going
4  to send it out I believe Thursday when he gets
5  his commissary time.
6      Q.  Based on that phone call, did you
7  author search warrants in this case?
8      A.  I did.  So based on the phone call, I
9  authored a search warrant requesting Cheron
10  Shelton's mail from the Allegheny County Jail.
11      Q.  Did you serve that search warrant?
12      A.  I did.
13      Q.  How many letters did you receive; do
14  you recall?
15      A.  One envelope with two separate letters
16  inside.
17      Q.  Who were those letters addressed to?
18      A.  One was addressed to Brown Sugar and
19  one was addressed to Pops.  At the time we felt
20  that Pops was Adrien, Brown Sugar was Channel
21  Falls.
22      Q.  During the course of your
23  investigation, did you become aware of Channel
24  Falls's relationship to the defendant Cheron
25  Shelton?

V. Costa - Direct by Mr. Chernosky

1       A.   Yes.

2       Q.   What is her relationship to him?

3       A.   Girlfriend.  I believe the mother of

4  his child or children.

5       Q.   During the course of your

6  investigation, did you become aware of Adrien

7  Falls's relationship to the defendant?

8       A.   I did.  He is the father of Channel

9  Falls.

10      Q.   Prior to testifying today, did you

11  review or have you reviewed the jail call that

12  you referenced from the 28th?

13      A.   I have not.

14      Q.   During the course of your

15  investigation, did you receive or did you get a

16  copy of the jail call from March 28th?

17      A.   I did.

18      Q.   I'm going to show you what I'll mark as

19  Commonwealth Exhibit 421.  I ask you if this

20  contains that call to your knowledge?

21      A.   To my knowledge, yes.

22           MR. CHERNOSKY:  Your Honor, I

23  move for the admission of Commonwealth Exhibit

24  421.

25           THE COURT:  It will be admitted

V. Costa - Direct by Mr. Chernosky

1    without objection.

2              MR. CHERNOSKY:  Your Honor,

3    Ms. Pellegrini is going to get Mr. Manko.  I'll

4    continue questioning on another exhibit.

5              THE COURT:  All right.

6         Q.  Detective, I'm going to show you what

7    I'll mark as Commonwealth Exhibits 422, 423,

8    424, 425, 426, 427, 428, and 429.  I ask you if

9    you recognize the items depicted in these

10   photographs?

11        A.  This is the letters that I recovered

12   from the Allegheny County Jail.

13        Q.  With respect to Commonwealth

14   Exhibit 422, what is depicted in 422?

15        A.  422 is the front of the envelope.  It

16   is addressed to a Pat Annie Taylor at

17   6914 Hartman Lane, Pittsburgh, PA 15206 with

18   Cheron Shelton and his Department of

19   Corrections number.

20        Q.  And 423, what is depicted in

21   Commonwealth Exhibit 423?

22        A.  423 is the back of the envelope.

23        Q.  Commonwealth Exhibit 424, 425, and 426?

24        A.  So 424 is going to be the first page of

25   the letter addressed to Pops.  425 is the

V. Costa - Direct by Mr. Chernosky

1    second page of the letter addressed to Pops.

2    It is a two-page letter.  426 is the front page

3    of the letter addressed to My Brown Sugar.

4        Q.  With respect to Commonwealth

5    Exhibits 424 and 425, could you read for the

6    jury the content of the letter?

7        A.  The entire letter?

8        Q.  Yes.

9        A.  Pops, thank you for everything you've

10    done for me.  Thanks for being there for me

11    when I felt no one else had my back.  You

12    always been there for me and I say from the

13    start those two to three sentences brought

14    tears to my eyes.  Between me and you -- these

15    are photocopies so they're hard to read --

16    between me and you LOL because I know the love

17    is here and been genuine.  Sad to say, you

18    probably done and showed me more than my own

19    father ever had.  I thank and praise you for

20    that.

21        Thank you for raising a beautiful

22    smart, very special, caring, loving, and strong

23    daughter.  Nelly is one of the best things that

24    has ever happened to me beside the boys.  Sorry

25    to put you in the position we was in last week.

V. Costa - Direct by Mr. Chernosky

1    Never meant to cramp your space and put you in

2    harm's way.  I made a few bad decisions, one of

3    them was staying there that night when I told

4    myself not be there.  Like I told Nelly, I just

5    wanted to see my loved ones go to sleep and

6    then I'd be on my merry way but I got too

7    comfortable and I know I shouldn't have.  I can

8    only blame myself for the actions and decisions

9    I made.

10           Like I told Nelly, I'm down here on a

11    receiving stolen property.  They don't have

12    much but little speculation and a little

13    opinion and thoughts on what they think

14    happened.  I got mouth swabbed the other day.

15    My lawyer, Randall McKinney, said it takes four

16    to six weeks before it comes back.  He said

17    your lawyer acquired him because it's funny

18    because my maw and them had him on deck.  He

19    seemed like a stand-up kind of guy.  Like he

20    told me don't worry about nothing.  If they had

21    something, they would have brung it to light by

22    now.  We will see in a few weeks though.

23           Pops, I need you on some real shit.

24    Around the corner at Bubby's house I got

25    something there that I was working on getting

V. Costa - Direct by Mr. Chernosky

1    rid of.  You don't got to do nothing but open

2    the door and guide my nigga to it.  It's

3    downstairs next to the lawnmower wrapped and

4    ready to be tossed.  Call 513-6784 and

5    underneath it says his or 651-5029 and

6    underneath that is says girl, and ask for

7    house.  Don't say much but you all got to sit

8    and talk and explain what I need him to do.  He

9    is a good dude.  He will take care of it.  Also

10   he owe me a few dollars, damn near a stack.  As

11   about it.  Tell him to carry on with Paul Wall

12   for me.  Let him know it is crunch time and I

13   need him.  And if you feel up to it, tell him

14   anytime he has a few dollars from Paul Wall,

15   give it to you.  I trust you with the money.

16   It is anywhere from a stack to $1,300.  He says

17   even if it is $800 I need.  When it is all said

18   and done, about every week, maybe

19   week-and-a-half, he won't give you any lip

20   because he can't tell all this came straight

21   from me.

22          One more thing, it may sound stupid,

23   but help out with the boys.  Show them how to

24   be a man.  Cheeks already want to do what Pap

25   Pap do LOL and I'm proud of that.  It made me

V. Costa - Direct by Mr. Chernosky

1    step up and show him that daddy can do

2    something positive as well.

3         Once again, sorry for the inconvenience

4    and endangering you all.  Also, thanks for

5    everything.  Burn this when done reading LOL.

6    Love you with all my heart, Cheron.

7         Q.  With respect to Commonwealth

8    Exhibits 426, 427, and 428, is that the

9    entirety of the letter to Brown Sugar?

10        A.  429?

11        Q.  Sorry, 429.  How many pages is that

12   letter total?

13        A.  Four pages.

14        Q.  Could you read to the jury the content

15   of that letter?

16        A.  My Brown Sugar:  Sorry.  Then three

17   unhappy faces.  Can't start the letter off

18   better than saying your Baby Cakes is sorry.  I

19   let you down when only you believe in me and

20   the boys.  I tended on doing what was right for

21   you all, just made some bad decisions that day.

22   Forgive me for my stupid actions, forgive me

23   for my selfishness.  When all reality I can

24   only blame me, myself and I, for being in here.

25   I done wrong by you.  You should have been done

V. Costa - Direct by Mr. Chernosky

1    right by.  You brought the tears out of me

2    yesterday.  Can frankly say you're the only one

3    that can do that.  And I realized that a long

4    time ago when we have been arguing moments, I

5    can honestly say you are my queen, my trophy,

6    my everything in this world.  It is sad to say

7    I might have took you for granted a few times.

8    In the margin it says the other letter is for

9    Pops.

10            I always valued you and put you on a

11   high pedestal, any and everybody, but I may

12   have took granted the love you showered me day

13   in and day out.  My love for you, Suga, is

14   real.  Can't be no duplicate.  No imitation to

15   it.  I'm sorry to say if I hadn't showered you

16   with it, but I genuinely love you for who you

17   are.  The Lord made a genuine, beautiful,

18   caring, loving woman in my eyes.  You can't get

19   any better than you.  You were meant to be the

20   lady you are today, strong, beautiful, and

21   vibrant.  Don't ever fold under any situation

22   or circumstance.  Keep that head up and that

23   beautiful smile showing no matter the odds

24   against you, no matter who stands in your way.

25   Knock them down, Suga.  The way you carry

V. Costa - Direct by Mr. Chernosky

1    yourself, I love it.  You have good morals and

2    great intentions.  Until I get back out there

3    with you, I need you to install that into our

4    sons.  I couldn't and wouldn't ask for a better

5    lady/wife/mother than you.

6        Thank you for everything, Suga.  You

7    always played a big part in my life and still

8    do, no matter what the outcome may be.  I

9    always loved you even at the worst of times

10   that we may have.  I found lots of pleasure

11   being around you.  Even if you put a little

12   damp on my day, you always found a way to

13   brighten it up.  No matter what the situation

14   was, when I put a smile on your face, it made

15   my day.  Your smiles always put a spell on me,

16   I swear.

17       I did wrong to -- it's hard to read --

18   ABY.  I know where I went wrong at.  I went

19   wrong at putting the streets at the same level

20   or a little above my family when all really I

21   was doing a lot thinking before school saying

22   if I give the streets 12 to 14 years, I could

23   give the real world the same amount and prosper

24   in life.  That is why I called that morning and

25   I seen how much of a smile I put on your face

V. Costa - Direct by Mr. Chernosky

1    and given the chance again to prove to you and

2    the boys I can be a better man and father to

3    you all, I'll make you all life so much happy

4    and better.  Trust and believe me.  I love

5    every single moment we share in this life.  You

6    and the kids are the best thing to ever happen

7    to me but it all started from Channel Falls.

8    You are who I prayed for.  Before I met you and

9    the Lord answered my prayers.  Sorry if you

10   feel if I wasted a few of your life but I found

11   life in me when I met you.  I thank you for

12   that.  You made me the nurturing man I am

13   today.  You taught me how to be a man in this

14   world, not my mom or dad, you did.

15          Suga, sorry if my head was up my ass in

16   the streets.  I should have paid more attention

17   to you and your needs.  Promise when and if

18   given a chance at the plate again, I'm going to

19   hit a home run out of the park and we'll be

20   celebrating a victory that is worth it.  You

21   are everything in the world to me, you and

22   those little handsome guys we have.  I ache so

23   much in our future together.  We have a great

24   family and life.  Couldn't ask for anything

25   different.  So thank you again.  Even without

V. Costa - Direct by Mr. Chernosky

1    you, none of it will be possible.

2          Not to change the subject but let me

3    put you up to speed with things.  They have me

4    down here on R and S and P.  Receiving stolen

5    property on the gun they found at my ma house.

6    They are fishing for something more.  If they

7    had a strong enough case, they would have

8    charged me but there is no statute of

9    limitations to that charge they're asking for.

10   They came and mouth swabbed me the other day.

11   My lawyer, Randall H. McKinney, said it takes

12   four to six weeks to come back.  They tried to

13   place me at the scene with that.  I really

14   doubt it.  That will be the golden key for them

15   but my mouthpiece says they can't identify me

16   at the scene but in the area up the street

17   supposedly.  Even that isn't a conviction.

18   Also have footage of me where by not Julie and

19   the big one with me supposedly coming from my

20   ma.  It looks like I'm holding, carrying

21   something, but who knows what that can be.  The

22   fact that they have me coming up through the

23   back in the wee hours of the late night going

24   to my mom but all of that isn't enough to put a

25   stamp on anything.  So, once again, they can't

V. Costa - Direct by Mr. Chernosky

1    charge me for anything.  Like I said before,

2    they are fishing for anything.

3         I'm sorry if the news tried to make you

4    out to be a bad person.  Don't let it get to

5    you.  Keep your head held high.  You fuck

6    around and sue for defamation of character and

7    me as well for trying to make me into this bad

8    person that I am not.

9         Once again, don't let it get to you.

10   My lawyer is supposedly highly recommended for

11   things like this.  He showed me several case

12   and he beat me.  He even said your dad lawyer

13   recommended him.  I was shocked about that.

14   One and really doubt believe him when he said

15   that.  Look him up and tell me what you think

16   of the guy.  When I first met him, can't say I

17   liked him because he bad-mouthed Milt Raif LOL

18   but he nipped it in the bud quick after two to

19   three lines and said he isn't here for that

20   even though I know how Milt Raif get down.  I

21   laughed real hard in the back of my head.  But

22   he seemed authentic to me.  He made it clear

23   that he is here for me no matter what is

24   brought to the table.  I believe he is asking

25   for 15 G if it goes that way.  I need to say

V. Costa - Direct by Mr. Chernosky

1    that he seems cool and honor for him to be on a

2    high profile case so he is more than eager to

3    jump on it.  He could be on some pro bono shit,

4    free shit if you ask me, but if things go as

5    planned, it won't be necessary.  LOL can't

6    spell or say that word.  You will be laughing

7    like fuck if you see my face trying to spell

8    it.  You always try to point out my flaw when

9    it come to my word of choice or grammar but be

10   mad when I catch you in yours LOL.

11           I love you, Brown Sugar.  You mean the

12   world to me and I want you to know it.  You and

13   the kids, I love you all with all my heart,

14   with all my breath in me.  Take care and be

15   strong.  Don't let this get the best of you.  I

16   pray to you all everyday and I hope you all

17   pray for me.  Love Your Baby Cakes.

18       Q.  After you seized those two letters, did

19   you send them to the Allegheny County crime lab

20   for further testing?

21       A.  I believe so.

22           MR. CHERNOSKY:  Your Honor, can I

23   have five minutes to address the audio issue?

24           THE COURT:  Who is going to

25   address it?

V. Costa - Direct by Mr. Chernosky

1          MR. CHERNOSKY:  Mr. Manko.

2          THE COURT:  He was here and left.

3    Why did he leave?

4          MR. CHERNOSKY:  He told me it was

5    okay.  It doesn't appear to be playing.

6          MS. PELLEGRINI:  I sent for him

7    again.

8          THE COURT:  What are we doing?

9          MR. CHERNOSKY:  Waiting for

10   Mr. Manko.

11         THE COURT:  He was here and left.

12         MR. CHERNOSKY:  Yes.  So the

13   Commonwealth will play it at a different point.

14         THE COURT:  So we're ready to go?

15         MR. CHERNOSKY:  Yes, Your Honor.

16   Your Honor, at this point, I would move for the

17   admission of Commonwealth Exhibits 423 through

18   429 if they haven't already been admitted.

19         THE COURT:  Admitted without

20   objection.

21    Q.  I show you what I'll mark as

22   Commonwealth Exhibits 430 and 431.  I ask if

23   you recognize what is contained in Commonwealth

24   Exhibits 430 and 431?

25    A.  I believe these are the letters we

V. Costa - Cross by Mr. McKinney

1    seized from the Allegheny County Jail that

2    Cheron Shelton wrote.

3              THE COURT:  Please keep your

4    voice up and into the microphone.

5        A.  These are the letters that we seized

6    from Allegheny County Jail that Cheron wrote.

7        Q.  Are those the original letters?

8        A.  These are the original letters, yes.

9              MR. CHERNOSKY:  I move for

10   admission of 430 and 431.

11             THE COURT:  They will be admitted

12   without objection.

13             MR. CHERNOSKY:  Your Honor, while

14   reserving the right to play this jail call, I

15   will offer this witness for cross.

16             -----

17             CROSS-EXAMINATION

18             -----

19   BY MR. McKINNEY:

20       Q.  Detective, do you know when Cheron

21   Shelton was lodged in the Allegheny County Jail

22   prior to you obtaining a search warrant for his

23   letter?

24       A.  Not right now I don't know the date.

25       Q.  If I were to provide you with a copy of

V. Costa - Cross by Mr. McKinney

1    the bench warrant for the probation violation,

2    is it possible that that could refresh your

3    recollection?

4        A.  Yes.

5              MR. McKINNEY:  Your Honor,

6    permission to approach?

7              THE COURT:  You may.

8              MR. McKINNEY:  Your Honor, for

9    purposes of the record --

10             THE COURT:  Show it to the DA,

11   please.

12       Q.  Detective Costa, take an opportunity to

13   look at this entire document.  I'm going to ask

14   you a couple questions.  See if it refreshes

15   your recollection.

16       A.  I don't know if this will refresh my

17   recollection but.

18       Q.  Okay, no problem.  You would agree with

19   me that obviously he was in the jail when you

20   got a search warrant to seize the letters?

21       A.  Yes.

22       Q.  Now, why would you need a search

23   warrant to get those letters?  Is it possible

24   for you to just go down to the jail and open

25   inmates' mail?

V. Costa - Cross by Mr. McKinney

1          A.   I know that usually when we conduct

2     homicide investigations we do get what I want

3     to say is more likely apply for a search

4     warrant than just going down and grabbing

5     somebody's mail.

6          Q.   Are there often other times when you go

7     down and grab people's mail without a search

8     warrant?

9          A.   No.  As I sit here, not that I'm aware

10    of.

11         Q.   How often have you obtained search

12    warrants for inmates' letters?

13         A.   That was probably for me, personally,

14    that was the first case that I can recall.

15         Q.   How long have you been on the job?

16         A.   I was a patrol officer in multiple

17    units, I was in homicide 2010.

18         Q.   So you applied for the search warrant

19    on March 28th; is that correct?

20         A.   No, I believe it was April 1st.

21         Q.   April 1st, okay.  Prior to April 1st

22    are you aware of the fact that Mr. Shelton's

23    mother's house was searched on March 12th of

24    2016?

25         A.   I don't remember the date but if that

V. Costa - Cross by Mr. McKinney

1    was 1214 Nolan Court, yes.

2         Q.  Are you also aware that on March 12th

3    or around that time Channel Falls's house on

4    Ross Garden was searched prior to the 28th?

5         A.  I do not recall that.

6         Q.  If I were to show you a copy of the

7    search warrant, would that refresh your

8    recollection?

9         A.  Yes, it would.

10              MR. McKINNEY:  One moment, Your

11   Honor.

12              THE COURT:  Any time you need.

13        Q.  Detective, for purposes of

14   identification -- Detective Costa, for purposes

15   of the record, I'm going to show you the search

16   warrant for the jail letter and other searches.

17   Take an opportunity to look at that.  That is

18   Defense Exhibit F for purposes of

19   identification.

20              THE COURT:  Is this his warrant?

21              MR. McKINNEY:  Yes, it is, Your

22   Honor.

23              THE COURT:  Okay.

24        A.  I don't believe this one has the Rose

25   address.

V. Costa - Cross by Mr. McKinney

1      Q.   Ross Garden?

2      A.   Ross Garden, I do not.  I do not

3    remember that one specifically.

4      Q.   Did you know that prior to Mr. Shelton

5    sending that letter that his sister, both

6    Brittany Shelton and Ashley Smith and his

7    mother Desdrene Smith, had been questioned by

8    the police; did you know that?

9      A.   I believe, yes.

10     Q.   So when you overheard the phone call

11   which prompted the application for the search

12   warrant, did you also know that Mr. Shelton had

13   been asked to provide a buccal swab for his

14   DNA?

15     A.   Yes.

16               THE COURT:  One second.  One of

17   the jurors appropriately indicated that the

18   juror could not hear during some of the

19   testimony because of the audio disruption.

20   Could be accidently.  I usually do not do this

21   but we are going to have to ask Ms. Murawski to

22   go back ten minutes and read those questions.

23   It is my practice, because you are allowed to

24   take notes, not to rehash testimony, but under

25   the circumstances, I will allow it in this

V. Costa - Cross by Mr. McKinney

1    instance.

2                    (Whereupon, cross-examination was

3    read back to the jury.)

4                    THE COURT:  Does that cure that?

5                    THE JUROR:  Yes, sir.  Thank you.

6        Q.  Detective, I'm now going to show you

7    what I'm marking as Defense Exhibit G.  Could

8    you take an opportunity to review it?  I guess

9    I should ask you a question first but I'll wait

10   for you to review it.

11       A.  Okay.

12       Q.  So were you aware that prior to the

13   seizure of the letter that Cheron wrote from

14   the Allegheny County Jail on March 28th,

15   Channel Falls's home at 7167 Ross Garden Road

16   had been searched?

17       A.  According to that search warrant.

18       Q.  Now, when Mr. Shelton was at the

19   Allegheny County Jail, are you aware of the

20   fact that he was in isolation from the time he

21   was lodged until the time he had his letter

22   seized by you?

23       A.  No.

24       Q.  Okay.  Now, with respect to the letter

25   addressed to Pops, do you have that letter in

V. Costa - Cross by Mr. McKinney

1    front of you?

2        A.   Not anymore.

3        Q.   I'm going to show you what I'm marking

4    for identification purposes as Defense Exhibit

5    H.  Does that look familiar to you?

6        A.  Yes, it does.

7        Q.   When you were reviewing that letter and

8    you were reading it to the jury, you would

9    agree with me that there was reference to

10   finances; is that correct?

11       A.  Yes.

12       Q.   Can you tell the jury what a stack is?

13       A.   A stack of money.

14       Q.   Have you ever worked in narcotics?

15       A.   I did interdiction years ago but that

16   is a different type of narcotics.

17       Q.   Do you know a stack or have you ever

18   heard of a stack referenced as $1,000?

19       A.   Yes, it is $1,000.

20       Q.   All right.  Now, there is a reference

21   to $1,300 and shortly thereafter, I can give

22   you this copy, shortly thereafter maybe every

23   week, week-and-a-half.  Would you agree with me

24   that it appears from the language of this

25   letter that that is referencing some kind of

V. Costa - Cross by Mr. McKinney

1     continual operation to make money?

2          A.   It appears, yes, that he is receiving

3     money from somebody else.

4          Q.   So from the content this letter, it

5     appears to you, based on your experience, that

6     he is obviously at the jail so it would be

7     difficult for him to make money?

8                    THE COURT:  Ask a question.

9     Don't introduce the question or --

10                   MR. McKINNEY:  Fair enough.

11                   THE COURT:  -- make a narrative.

12         Q.   Based upon your experience and from how

13    you answered my recent question, would you

14    agree with me that it certainly would be

15    possible that the content of the letter with

16    respect to weekly or every other week business

17    could be referencing his attempt to make money

18    on the outside?

19         A.   Yes.

20         Q.   Based on your experience and

21    expertise -- not that you are an expert so I

22    don't want to put those qualifications on

23    you -- based on your experience, would you

24    agree when he is referencing guiding someone to

25    something, that could be in reference to his

V. Costa - Cross by Mr. McKinney

1   attempt to make money?

2       A.  No.  In my opinion, I think that is two

3   separate issues.

4       Q.  Okay.  When he references he has a few

5   dollars from Paul Wall, do you have any idea

6   what that may mean?

7       A.  I can only speculate.  If you would

8   like me to speculate, I could speculate.

9       Q.  Yes, give me your opinion what that

10  means?

11              MR. CHERNOSKY:  I object.  That

12  calls for speculation.

13              THE COURT:  The objection is

14  sustained.

15      Q.  As a result of obtaining this letter,

16  you would agree with me that you authored about

17  seven or eight additional search warrants as a

18  result of obtaining this information; is that

19  correct?

20      A.  The letter?

21      Q.  Yes.

22      A.  I believe the search warrants were

23  before the letter.  I would have to go look.  I

24  know I authored a lot of search warrants.

25      Q.  I have them.

V. Costa - Cross by Mr. McKinney

1        A.   Oh, the search of the different
2   residences, yes.  I don't know the exact
3   amount, but as a result of the letter, we
4   authored other search warrants.
5        Q.   Right.  So as a result of receiving the
6   letter, you authored several other search
7   warrants; is that correct?
8        A.   If that is what the record shows, yes.
9        Q.   Okay.  Now, would you agree with me
10   that the purpose of authoring those search
11   warrants to search those additional residences
12   was an attempt to try to find some kind of
13   evidence that would potentially link
14   Mr. Shelton to the Wilkinsburg shootings?
15        A.   Yes.
16        Q.   You would agree with me that those
17   residences that search warrants were applied
18   for and search warrants were issued and search
19   warrants were executed, correct?
20        A.   Correct.
21        Q.   And all of those residences, houses,
22   apartments, whatever they may be, were all
23   searched as a result of those search warrants?
24        A.   Correct.
25        Q.   During the searches of all of those

V. Costa - Cross by Mr. McKinney

1    residences, did you or anyone else in the

2    Allegheny County Police Department ever find

3    any evidence tying Mr. Shelton to the

4    Wilkinsburg shootings?

5        A.  No, I don't believe so, no.

6        Q.  In the course of this entire

7    investigation, have you or any of your

8    colleagues in the Allegheny County Police

9    Department ever found any weapons associated

10   with the Wilkinsburg shootings?

11       A.  No.

12              MR. McKINNEY:  One brief moment,

13   Your Honor.

14              THE COURT:  Whatever time you

15   need.

16       Q.  Do you know how many houses were

17   searched in response to the letter that you

18   seized when you were looking for weapons or

19   evidence tying Mr. Shelton to the crime?

20       A.  No.

21       Q.  If I were to show you a report authored

22   by you, is it possible that that might refresh

23   your recollection?

24       A.  Yes.

25              MR. McKINNEY:  Your Honor, I'm

V. Costa - Cross by Mr. McKinney

1    marking for identification purposes Defense

2    Exhibit I.  Your Honor, this is a report

3    authored by Detective Costa with respect to

4    executing search warrants.

5                    THE COURT:  Are you finished

6    reading the document?

7                    THE WITNESS:  Yes, I have.

8    Q.  Does that refresh your recollection?

9    A.  Yes.

10   Q.  How many --

11   A.  Three.

12   Q.  What is the address?

13   A.  147 Tayburn Drive, 7107 Monticello, and

14   317 Collins Avenue.

15   Q.  You would agree with me that there were

16   additional residences searched other than just

17   those three?

18   A.  Yes.

19   Q.  With respect to the letter written by

20   Mr. Shelton to Channel Falls, are you aware of

21   the fact that Mr. Shelton was arrested at a

22   home where Ms. Falls was present?

23   A.  Yes.

24   Q.  Are you aware that Ms. Falls's father,

25   Adrien, was also present at that home?

V. Costa - Cross by Mr. McKinney

1          A.   Yes.

2          Q.   Are you aware that as a result of

3     Mr. Shelton being arrested at that location

4     both of those individuals, Channel Falls and

5     Adrien Falls, were charged?

6                    MR. CHERNOSKY:  Objection to

7     relevance.

8                    THE COURT:  Sustained.

9                    MR. McKINNEY:  May I respond to

10    the objection?

11                   THE COURT:  Come up.

12                   (Sidebar discussion held as

13    follows.

14                   MR. McKINNEY:  Your Honor, part

15    of the letter has Mr. Shelton apologizing to

16    Channel Falls for putting her in the situation.

17    I think the Commonwealth is going to make the

18    implication that the situation is involvement

19    in this crime.  I think it is relevant because

20    we think the situation is being charged with a

21    felony for hindering an apprehension.  That is

22    consistent with I wanted to see my loved ones

23    one more time, I'm sorry that I got you caught

24    up in this.  She was charged as a result of his

25    conduct.

544

V. Costa - Cross by Mr. McKinney

1              THE COURT:  Was she charged?

2              MR. CHERNOSKY:  She was charged

3     with hindering as was her father.

4              THE COURT:  Okay, I will allow

5     it.

6              (Sidebar discussion concluded.)

7         Q.  Detective, are you aware of the fact

8     that Channel Falls and Adrien Falls were both

9     charged with felony hindering apprehension due

10    to the fact that Cheron Shelton was arrested at

11    the --

12        A.  I was not present when the arrest of

13    Cheron Shelton occurred but just remembering

14    the case from 2016, I believe that something

15    like that occurred.

16        Q.  Okay.  Detective, I want to direct your

17    attention to Commonwealth Exhibit 412.

18              MS. PELLEGRINI:  412.

19              MR. McKINNEY:  Your Honor,

20    permission to approach?

21              THE COURT:  You may.

22        Q.  Detective, with respect to Commonwealth

23    Exhibit 412 that you testified to recently, you

24    would agree with me that is a registration card

25    for Ashley Smith for her vehicle?

V. Costa - Cross by Mr. McKinney

1        A.   Yes.

2        Q.   And that address on her registration is

3   1214 Nolan Court?

4        A.   Yes, it is.

5        Q.   Do you know based on your investigation

6   how many other individuals have cars registered

7   to 1214 Nolan Court?

8        A.   I do not.  I only had my part.  I was

9   assigned a specific task to complete in an

10  investigation.  I do not know how many people

11  had cars registered to that address.

12       Q.   Do you know how many people lived at

13  that address back in March of 2016?

14       A.   No.

15       Q.   Just a few more questions, Detective.

16  In addition to the search warrants that I've

17  asked you about that you issued or applied for

18  after the receipt of the letter, was one of

19  those searches that was conducted a search of

20  Hebron Drive and Curtis Street and Crab Hollow

21  Road?

22       A.   That I authored a search warrant?  I

23  know that I did a lot of them.

24       Q.   Would it refresh your recollection if I

25  provided you with your report?

V. Costa - Cross by Mr. McKinney

1          A.   It would.

2                   MR. McKINNEY:  I'm approaching

3     the witness with Defense Exhibit J.

4          Q.   Could you take a moment and review

5     Defense Exhibit J?

6                   MR. McKINNEY:  Your Honor, for

7     the record, it is a report of searches by

8     Detective Costa.

9          Q.   Let me know if that refreshes your

10    recollection.

11         A.   It does, yes, it does.

12         Q.   So based on your recollection being

13    refreshed, what area was searched?

14         A.   Hebron Drive, Curtis Street, and Crab

15    Hollow Road.

16         Q.   Are you aware that Mr. Shelton had an

17    encounter with the Penn Hills Police in the

18    early morning hours after the Wilkinsburg

19    shootings on Hebron Drive?

20         A.   Yes.

21         Q.   Did you conduct a search of that area?

22         A.   Yes.

23         Q.   Did you find any weapons?

24         A.   No.

25         Q.   Detective, did you also conduct a

V. Costa - Cross by Mr. McKinney

1    search of 325 North St. Clair Street?

2        A.   Yes.

3        Q.   Any weapons found there?

4        A.   No.

5        Q.   Any evidence at all tying Mr. Shelton

6    to the Wilkinsburg shootings?

7        A.   No.

8        Q.   Detective, prior to listening to the

9    phone call, which was the impetus for the

10   application of these search warrants of the

11   letter, how many other phone calls had you

12   listened to prior to that call?

13       A.   I believe I listened to three calls.

14       Q.   Any of those three phone calls that you

15   listened to, did you find or hear any evidence

16   that would lead you to believe that Mr. Shelton

17   had any involvement in the Wilkinsburg

18   shootings?

19       A.   Just the one that led me to the letter.

20       Q.   So the other three phone calls?

21       A.   I think it is three in total so the

22   other two if my recollection serves me

23   correctly.

24       Q.   Okay.

25            MR. McKINNEY:  Your Honor, thank

V. Costa - Redirect by Mr. Chernosky

1  you.  No additional questions.

2                THE COURT:  Mr. Chernosky.

3                MR. CHERNOSKY:  Briefly, Your

4  Honor.

5                      -----

6                REDIRECT-EXAMINATION

7                      -----

8  BY MR. CHERNOSKY:

9      Q.  I'm going to show you what has been

10  previously marked as Commonwealth Exhibit 425.

11  That is the second page of the letter addressed

12  to Pops.  Could you read the first sentence at

13  the top of that letter again?

14     A.  Pops, I need you on some real shit

15  around the corner at --

16     Q.  I'm sorry, continue to the end.

17     A.  Around the corner at Bubby's house.  I

18  got something there that I was working on

19  getting rid of.

20     Q.  Did you know what around the corner at

21  Bubby's house means?

22     A.  No.

23     Q.  So is it fair to say that that had no

24  significance to you?

25     A.  No.

V. Costa - Redirect by Mr. Chernosky

1      Q.   There is no address provided in that

2    letter?

3      A.   There is not.  I believe that is why we

4    tried to get as many search warrants as we did

5    to try to locate around the corner at Bubby's

6    house.

7      Q.   What date did you serve that search

8    warrant?

9      A.   I believe it was April 1st.

10      Q.   So nearly three weeks after the

11    Wilkinsburg murders?

12      A.   Correct.

13      Q.   With respect to the searches that

14    Mr. McKinney drew your attention to, did you do

15    those all the same day that you got the letter?

16      A.   I believe I did most, a lot that day.

17    I would have to see the search warrant when I

18    actually got it done.

19              MR. McKINNEY:  Your Honor, one

20    moment, I need to provide the Commonwealth with

21    an exhibit.

22              THE COURT:  Do you remember what

23    day you obtained the letter?

24              THE WITNESS:  April 1st.

25      Q.   With respect to the search of the area

V. Costa - Redirect by Mr. Chernosky

1    around Hebron Drive, do you remember what day

2    that search was conducted?

3        A.  That was April 8th.

4        Q.  With respect to -- so the search of

5    that area was nearly a month after the murders?

6        A.  That's correct.

7                MR. CHERNOSKY:  Your Honor, at

8    this point I'm told that the audio is working.

9                THE COURT:  Okay, let's try it.

10   For the purposes of the record, what are we

11   referring to?

12               MR. CHERNOSKY:  Commonwealth

13   Exhibit 421, Your Honor.

14               THE COURT:  Okay.

15               (Cheron Shelton jail phone call

16   played for the jury.)

17               MR. CHERNOSKY:  I apologize, Your

18   Honor.  That is the wrong date or the wrong

19   time.

20               (Cheron Shelton jail phone call

21   played for the jury.)

22               MR. McKINNEY:  Could you stop it?

23   Your Honor, I have an objection.

24               THE COURT:  What is the

25   objection?

V. Costa - Redirect by Mr. Chernosky

1          MR. McKINNEY:  Your Honor, I
2    don't believe that that recording is a
3    recording of my client.
4          THE COURT:  Come up.
5          (Sidebar discussion held as
6    follows.)
7          THE COURT:  This isn't new
8    information.  This isn't new information.  You
9    had access to all of this so.  You're saying it
10   is not Cheron Shelton?
11         MR. McKINNEY:  I would hope the
12   Commonwealth would authenticate it before they
13   play the tape.  It isn't authenticated as his
14   person or voice.
15         THE COURT:  That is different
16   than what you said.  You said something that is
17   not my client.  That it a different objection.
18         MR. CHERNOSKY:  Your Honor, the
19   Commonwealth is of the position this was
20   authenticated as the call he listened to as
21   Cheron Shelton was identified on the phone.
22         THE COURT:  I thought the
23   beginning of the call it said Cheron.
24         MR. McKINNEY:  The automated
25   message said this is Cheron but that doesn't --

V. Costa - Redirect by Mr. Chernosky

1    Your Honor knows how the jail works.  Just

2    because someone uses someone's PIN doesn't mean

3    he is talking on the phone.  It is

4    introductory.

5              MR. CHERNOSKY:  Sam Pastor is

6    waiting in the hall to authenticate the

7    visitation.  He can authenticate the record.

8              MR. McKINNEY:  We would need

9    that.  I'm arguing for further authentication,

10   Your Honor.

11             THE COURT:  This has been on the

12   horizon.  This has been on the horizon for

13   months.  I'm going to allow him to play it.  It

14   is just too late, too late in the process for

15   this to come up and disrupt the proceedings

16   again.

17             MR. McKINNEY:  I understand the

18   Court's position.  I'm merely asking that there

19   hasn't been any authentication from any

20   Commonwealth witness that this phone call was

21   made by Cheron Shelton other than the playing

22   of his name at the beginning of this call.  I

23   am asking for additional authentication before

24   the call is played.  The Commonwealth has

25   witnesses to do that but the detective has no

V. Costa - Recross by Mr. McKinney

1    way to authenticate the call or how the jail

2    works or how PIN numbers are provided.  This

3    witness can't provide any information.

4              MR. CHERNOSKY:  This witness

5    provided information to authenticate the call.

6              THE COURT:  Which witness?

7              MR. CHERNOSKY:  This one, he made

8    requests to listen to calls provided by the

9    jail.  He listened to a phone call between him

10   and a person named Brit which he believes based

11   on his knowledge of the investigation was his

12   sister Brittany Shelton.

13             THE COURT:  I'll allow it.  You

14   can cross on it.

15             MR. McKINNEY:  Okay.

16             (Sidebar discussion concluded.)

17             (Cheron Shelton jail phone call

18   continued to be played for the jury.)

19             MR. CHERNOSKY:  No further

20   questions.  I offer for cross.

21                  -----

22             RECROSS-EXAMINATION

23                  -----

24   BY MR. McKINNEY:

25        Q.  Detective, a few more residences that

554

V. Costa - Recross by Mr. McKinney

1    were searched that I didn't get to ask you

2    about.  Do you remember authoring a search

3    warrant for 147 Hebron Drive?

4         A.  Yes.

5         Q.  Also 7107 Monticello Street?

6         A.  Yes.

7         Q.  And 317 Collins Avenue?

8         A.  Yes.

9         Q.  Now, that phone call that we just

10   listened to, was that the phone call that

11   prompted the search warrant for the letter?

12        A.  I believe so.

13        Q.  Was there ever a letter -- strike that.

14   That was a phone call between Cheron Shelton

15   and his sister Brittany?

16        A.  Yes.

17        Q.  Did you ever seize a letter that was

18   directed to Brittany?

19        A.  No, I believe we did a search for that

20   specific letter mentioned in the call and a

21   search warrant for any additional letters and

22   we never recovered any additional letters.  It

23   stopped.

24        Q.  You will agree with me in listening to

25   that phone call, a lot of references to dollars

S. Pastor - Direct by Mr. Chernosky

1    and money and bucks; is that fair to say?

2        A.  Yes.

3            MR. McKINNEY:  No additional

4    questions, Your Honor.

5            THE COURT:  Anything else?

6            MR. CHERNOSKY:  No, Your Honor.

7            THE COURT:  Thank you, Detective.

8    Does anybody need a break?

9            THE JURY:  No.

10           THE COURT:  Call your next

11   witness.

12           MR. CHERNOSKY:  The Commonwealth

13   would call Sam Pastor.

14               -----

15           SAMUEL PASTOR,

16   a witness herein, having been first duly sworn,

17   was examined and testified as follows:

18               -----

19           DIRECT EXAMINATION

20               -----

21   BY MR. CHERNOSKY:

22       Q.  Good afternoon.  Could you state your

23   first and last name and spell your last name

24   for the record?

25       A.  Yes.  My name is Samuel Pastor,

S. Pastor - Direct by Mr. Chernosky

1    P-A-S-T-O-R.

2        Q.    And how are you currently employed?

3        A.    I am an investigator for the Allegheny

4    County Jail Internal Affairs Department.

5        Q.    How long have you been employed in that

6    capacity that you just described?

7        A.    I've been at the jail for 25 years, in

8    that capacity for the past 12.

9        Q.    Could you give the jury an idea what

10   some of your job duties are at the Allegheny

11   County Jail?

12       A.    Absolutely.  We investigate any and all

13   crimes that take place within the jail.  We do

14   internal investigation on any wrongdoing of any

15   misconduct of the employees and sole

16   responsibility to provide any video and audio

17   communications from the jail to outside law

18   enforcement and legal counsel.

19       Q.    Does the Allegheny County Jail have a

20   phone system for use by the inmates?

21       A.    Yes.

22       Q.    Could you explain to the jury how that

23   phone system works?

24       A.    There are phone banks located within a

25   jail on each and every housing unit including

S. Pastor - Direct by Mr. Chernosky

1      our in-take area, our disciplinary housing

2      area.  Each inmate, whenever they first come

3      into the jail, is given a designated DOC or PIN

4      number.  That DOC number is what designates the

5      inmate.  That same thing doubles as their PIN

6      number.

7          Q.  Is there a voice confirmation required

8      when using a phone?

9          A.  There is.

10         Q.  How does that work?

11         A.  When they first register their phone,

12     basically whenever they first come into the

13     jail, when they register their name, it will

14     ask them to repeat it three times.

15         Q.  If it is a voice other than the one

16     when they come into the jail, what happens?

17         A.  It will kick it back.  But we have had

18     instances where other individuals have been on

19     a phone and it was not the caller.

20         Q.  Now, could you explain to the jury how

21     face-to-face visitation is accomplished?

22         A.  Yes.  Basically, the civilian who is

23     coming to make the visit prearranges the visit.

24     They come to our main visiting area.  From the

25     main visiting area, they are taken up to

S. Pastor - Direct by Mr. Chernosky

1    whatever housing location the inmate is at.

2    Basically they are supposed to utilize a phone

3    system even though it is not the same phone

4    system that they are calling out but means of

5    communication between two separate walls or

6    plexiglass that separates the individual and

7    the civilian.

8        Q.   At the start of the face-to-face, are

9    you similarly supposed to enter their PIN?

10       A.   They are.

11       Q.   Are the telephone calls that leave the

12   jail recorded?

13       A.   They are.

14       Q.   And is the face-to-face interview

15   recorded?

16       A.   Yes.

17       Q.   When an inmate enters the jail, are

18   they informed that the calls are recorded and

19   monitored?

20       A.   Yes, they are.

21       Q.   I'm going to show you what I will mark

22   as Commonwealth Exhibits 432, 433, 434, 435,

23   and 436.  I'll ask if these pictures depict

24   visitation, face-to-face visitation in the

25   jail?

S. Pastor - Direct by Mr. Chernosky

1      A.  It does.

2      Q.  Is there any way for you to tell based

3  on those pictures what floor that visitation is

4  on?

5      A.  Looking at the insides of the actual

6  room that you have depicted on 432 and then on

7  433, to me, with my knowledge of being there

8  that many years, it is displaying the RHU and

9  the DHU area which is 8-E.

10          MR. CHERNOSKY:  Your Honor, I

11  move for the admission of Commonwealth

12  Exhibits 432 through 436.

13          THE COURT:  Admitted without

14  objection.

15      Q.  What is 432?

16      A.  It is the outside that looks like the

17  civilian area and it is listed as visiting room

18  number one.

19      Q.  When you refer to the civilian area,

20  could you give the jury an idea why you refer

21  to it as the civilian area?  When the visits

22  are conducted, is it fair to say that civilians

23  are brought in through a different entrance?

24      A.  They are.  That exact area, of course,

25  the inmate is in disciplinary housing or

S. Pastor - Direct by Mr. Chernosky

1    restrictive housing so the officer would

2    basically bring the inmate in and lock him into

3    the room.  This is just a free-standing door.

4         Q.  Directing your attention to

5    Commonwealth Exhibit 433, what is depicted in

6    433?

7         A.  It is the inside of what looks like the

8    same visiting booth.  No civilians inside AE.

9         Q.  Could you point out the phone the

10   visitor would have to use to speak to the

11   inmate?

12        A.  Right there.  That is on the civilian

13   side.

14        Q.  Where would the person being visited be

15   in this picture?

16        A.  On the other side in between this gate.

17   There is plexiglass and another small cubical

18   area where the individual would be placed.

19        Q.  Directing your attention to

20   Commonwealth Exhibit 433, is that just a better

21   lit picture of that same area?

22        A.  Yes.

23        Q.  Commonwealth Exhibit 434, tell the jury

24   what we're looking at.

25        A.  That looks like the inside of where the

S. Pastor - Direct by Mr. Chernosky

1    inmate would be placed.

2        Q.   Now, directing your attention back to

3    Commonwealth Exhibit 433, how much space

4    between the fenced in area and the glass that

5    we see in 433?

6        A.   I don't know the exact figure but I

7    would say approximately three foot.

8        Q.   In front of the chair that is present

9    in Commonwealth Exhibit 433, is there also

10   visible a stool or another seating area that is

11   not in use?

12       A.   Yes.

13       Q.   What is that?

14       A.   The original visiting areas before, we

15   were basically able to see that the inmate and

16   civilians were trying to bring in contraband.

17   That is the actual brick wall to introduce

18   contraband into jail.

19       Q.   In your experience in the Allegheny

20   County Jail, is it possible to communicate, to

21   be heard through that glass without using the

22   phone?

23       A.   Yes, sir.

24       Q.   Directing your attention to

25   Commonwealth Exhibit 435, what is depicted in

S. Pastor - Direct by Mr. Chernosky

1    Commonwealth Exhibit 435?

2         A.   It looks like a photo from the inmate's

3    side of the visiting room.  It looks like

4    facing the civilian side.

5         Q.   In April of 2016, do you recall if you

6    were contacted by the Allegheny County Police

7    and requested to let them have access to the

8    face-to-face visitation room?

9         A.   Yes, I do.

10        Q.   If you could describe for the jury your

11   understanding of what was the stated purpose of

12   the Allegheny County Police gaining access to

13   that room?

14        A.   It was to place another camera within

15   the visiting booth facing the inmate this way.

16   In case they did not communicate through the

17   inmate phone that is recorded, it would at

18   least show communication between the inmate and

19   civilian.

20        Q.   Did you provide that assistance and

21   access?

22        A.   I did.

23             MR. CHERNOSKY:  No further

24   questions.  I offer for cross.

25

S. Pastor - Cross by Mr. McKinney

1                         -----

2              CROSS-EXAMINATION

3                         -----

4    BY MR. McKINNEY:

5         Q.   Good afternoon, Investigator Pastor.

6    Could you explain what RHU or DHU means?

7         A.   Restrictive housing or disciplinary

8    housing.  Disciplinary housing is for someone

9    who doesn't follow the rules or regulations of

10   the jail, they go to RHU.  DHU is an inmate

11   that is high profile.  It is AC, administrative

12   custody.  They are placed in there to provide

13   safety for that individual or safety for

14   employees at the jail or other inmates.

15        Q.   What pod is RHU and DHU?

16        A.   8-E.

17        Q.   How is that different in terms of

18   movement for inmates than any other pod?

19        A.   They are limited.  You are locked down

20   23 hours out of 24.  When you do come out of

21   your cell area, you are handcuffed, shackled,

22   and tethered.

23        Q.   You said high profile inmates are kept

24   in RHU.

25        A.   Yes.

S. Pastor - Cross by Mr. McKinney

1      Q.  Would a high profile inmate be in DHU

2      or in their cell 23 hours a day?

3      A.  Yes.

4      Q.  If they had that choice and elected not

5      to be in DHU, would the jail honor that?

6      A.  Yeah, it would go through the

7      classification department and verify with the

8      inmate that he does not need those safety

9      precautions, check with him to see if there is

10     anyone else in the jail that he would need

11     separation against.

12     Q.  Are you aware of the fact that

13     Mr. Shelton, on numerous occasions, asked to be

14     removed from DHU and put in general population?

15     A.  I am not.

16     Q.  Would you have access to that

17     information?

18     A.  Only if he specifically wrote to the

19     Internal Affairs.  I'm going back on my

20     recollection.  I don't believe he wrote

21     specifically me.  He might have wrote other

22     individuals in our office.

23     Q.  Okay.  Would you agree with me that

24     based on what you know he certainly didn't

25     volunteer to be in his cell 23 hours of a day

S. Pastor - Cross by Mr. McKinney

1    with one hour of rec?  Would you agree with

2    that?

3         A.   I would agree with that.

4         Q.   Are you aware of the fact that a small

5    wireless camera was placed in a visiting area

6    to capture a visit between Mr. Shelton and his

7    father?

8         A.   Yes.

9         Q.   Was Mr. Shelton on 8-E when that visit

10   occurred?

11        A.   He was.

12        Q.   How many visiting rooms are there on

13   8-E?

14        A.   Two.

15        Q.   On other pods, how many visiting rooms

16   are there?

17        A.   Anywhere between five and six.

18        Q.   The signs that you were shown that

19   essentially let civilians know that the visits

20   are being monitored, are there similar signs

21   like that on the inmate's side?

22        A.   Both sides, yes, sir.

23        Q.   Okay.  What exactly does the sign say?

24        A.   I would have to refer to it if you

25   don't mind?

S. Pastor - Cross by Mr. McKinney

1      Q.  Sure.

2      A.  These visits are subject to monitoring

3   and recording.

4      Q.  All right.  So the sign doesn't

5   necessarily say audio recorded or video

6   recorded, just monitoring and recording?

7      A.  Yes, sir.

8      Q.  It does not specify?

9      A.  It does not specify.

10     Q.  Do you know when those signs were put

11   up?

12     A.  I would say sometime in 2016.  I do not

13   know the exact date.

14             MR. McKINNEY:  No additional

15   questions.  Thank you.

16             MR. CHERNOSKY:  No questions,

17   Your Honor.

18             THE COURT:  Who is your next

19   witness?

20             MR. CHERNOSKY:  Detective Patrick

21   Kinavey.

22             THE COURT:  Does anyone need a

23   break?  At least start with Detective Kinavey.

24             MS. PELLEGRINI:  Your Honor, at

25   this point can we play the 911 tape?

R. Barko - Direct by Ms. Pellegrini

1                          -----

2                   ROBERT BARKO,

3     a witness herein, having been previously first

4     duly sworn, was examined and testified as

5     follows:

6                          -----

7               DIRECT EXAMINATION

8                          -----

9     BY MS. PELLEGRINI:

10        Q.  Mr. Barko, to continue your testimony,

11    you identified, and we marked and identified

12    Commonwealth Exhibit 407, the 911 call from the

13    early morning hours of March 10th of 2016,

14    correct?

15        A.  Correct.

16              MS. PELLEGRINI:  I ask to play

17    the tape.

18              THE COURT:  Proceed.

19              (911 tape played for the jury.)

20        Q.  Then the caller hung up?

21        A.  I believe so, yes.

22              MS. PELLEGRINI:  Thank you.  That

23    is all I have.

24              MR. McKINNEY:  No questions, Your

25    Honor.

Motion

1           THE COURT:  Okay, you're excused,

2      sir.  Bring in Kinavey.

3                      -----

4           <u>PATRICK KINAVEY</u>,

5      a witness herein, having been first duly sworn,

6      was examined and testified as follows:

7                      -----

8           MR. CHERNOSKY:  Your Honor, for

9      the purpose of the Court's schedule, once I

10      mark this exhibit, it is about an hour long.

11           THE COURT:  All right, have a

12      seat.  Ladies and gentlemen of the jury, you've

13      been working diligently under rather gruelling

14      circumstances so we'll recess for today.  I

15      want to remind you to not tune into the media,

16      get on the internet, pay attention to any

17      broadcasts or internet activity, media accounts

18      of this case or the parties associated with it.

19      You've been told that repeatedly but it does

20      bear repeating in any event.  Do not discuss

21      the case with anyone including your fellow

22      jurors, family members, anybody at all.

23           As I noted, you've been working, what

24      I'll loosely refer to, under gruelling

25      conditions that includes the quarters that you

Motion

1    have upstairs in the jury room.  I understand

2    that they are very tight.  I do my best to

3    minimize the breaks and the amount of time that

4    you spend up there.  If there is anything

5    further we can do to add to your comfort, or

6    your discomfort, please let Mr. Irvin or

7    Mr. Perillo know.

8          I appreciate your extended courtesy and

9    respect to each other as you go about your

10   business as a sworn juror in this regard.

11   Again, I'm moving the case along as best I

12   possibly can.

13         Remain seated and quiet while the jury

14   leaves the room.  One other thing, if you want

15   to bring in a bottled water or something to

16   drink while you are here, most trials I don't

17   allow it but if that will help, bring your own

18   bottled water, okay.

19                     -----

20         (Open court - Jury not present.)

21                     -----

22         THE COURT:  There are a couple

23   outstanding matters that I want to address.

24   That is first, filed on behalf of Mr. Shelton,

25   the jury media coverage we discussed at

Motion

 1    sidebar, it refers to Monday's proceeding

 2    wherein I granted the habeas motion as to

 3    Mr. Thomas.  Ms. Williams, I'll incorporate the

 4    argument that you made at sidebar in that

 5    regard and you had leave to attach the article

 6    written by Paula Reed Ward of the Post-Gazette

 7    wherein this goes to paragraphs 7, 8, and 9.

 8    The context was the discussion of the motion

 9    filed on behalf of Mr. Thomas.  I'm quoting

10    from the article post, internet post, however

11    you choose to describe it, as it now unfolds

12    with the manner in which the Post-Gazette

13    publishes that the witness was the third such

14    person from the jail prosecutors attempted to

15    use, now they will use none.  It goes on to

16    quote me:  They are treacherous waters, we know

17    that from experience, Judge Borkowski said of

18    the jailhouse witnesses.  This is what the

19    article stated:  The Commonwealth is left with

20    some good circumstantial evidence, it ends the

21    quote.  Then it goes on to state against

22    Shelton, the Judge continued.  I checked the

23    actual record.  That is not what I said.  What

24    I said was what I told you at sidebar.  So

25    actually in terms of the analysis and the

Motion

1    motion, it doesn't make much of a difference

2    because it is what was printed and what the

3    jury was exposed to.  But I think it is covered

4    by the repeated admonitions that I made to the

5    jury not to follow the case in the media.  That

6    motion is denied.  You've made a record in that

7    regard.

8              There is a motion to bar introduction

9    of autopsy photographs.  That speaks for

10   itself.  Have you had an opportunity to review

11   the motion?

12             MS. PELLEGRINI:  I did, Your

13   Honor.  I have given defense counsel the

14   numbers of the pictures.  In the morning I will

15   have actual pictures because I am anticipating

16   Dr. Ennis and Dr. Xu testifying in the

17   afternoon.  We can argue at a break or

18   something in the morning.  I will be making

19   some of those photographs black and white.

20   Thank you.

21             THE COURT:  Have those available

22   to the Court, also.

23             MS. PELLEGRINI:  Certainly.

24             THE COURT:  So I can preview

25   them.

Motion

1                MS. PELLEGRINI:  I will have that

2        for you first thing in the morning.

3                THE COURT:  As to the proposed

4        testimony of Agent Burke, the Court has looked

5        at that, and I'm indicating yesterday we

6        discussed this briefly, the communications that

7        occurred here regarding the discovery of the

8        calls between Shelton and Thomas and there are

9        some related other information to other persons

10       outside of those two but this was in 2018 in

11       June.  I've gone over this at sidebar, I

12       believe, as to the exact dates and times, but

13       the conversations, discussions between the

14       parties started on 06/01/18 with Ms. Williams

15       bringing it to the attention of the DA's Office

16       about the difficulty with the information that

17       was provided, that is the form in which the

18       information was provided.  It further continued

19       on 06/08/18 with Ms. Williams contacting.

20       Ms. Werner who was then on the case along with

21       Mr. Chernosky and Ms. Pellegrini.

22                On 06/08/18, Ms. Werner replied:  As

23       per our discovery letter, we do not have the

24       Gladiator program and do not plan on purchasing

25       it due to the fact that the FBI has those

Motion

1    resources and are using them to organize the
2    data.  We were directly given the raw data in
3    the format that it has been turned over to you
4    and it cannot be turned over in any other
5    format unfortunately by virtue of its nature.
6    We turned it over in the same format as we
7    currently have it in our possession.  There was
8    a further communication from Ms. Williams that
9    they searched and contacted Gladiator and
10   Gladiator indicated they do not sell or
11   disclose the format to private parties.  So I
12   asked Mr. Chernosky from his recollection and
13   he did take the time to search his records.
14   That was the last communication regarding that
15   piece or body of evidence, do you agree with
16   that, until last week or when jury selection
17   was going on or the week before and the
18   Commonwealth notified you that they were going
19   to call Burke and gave you a copy of the
20   PowerPoint presentation, correct?
21                  MS. WILLIAMS:  I believe so.
22   There may have been a few follow-up phone calls
23   but I don't think it was any substantive after
24   that.
25                  THE COURT:  So in that regard,

Motion

1    the Court looked close at the matter.  The

2    first finding that I will make is that this

3    historical cell site analysis and the pinging

4    that they refer to has now pretty much become

5    routine in this courthouse.  So this type of

6    evidence is not unexpected.  I refer you to the

7    Rules of Criminal Procedure 573, and that would

8    be the comment.  I will go over it again:

9    However these provisions are not intended to

10   require a prepared report in every case.  The

11   judge should determine on a case-by-case basis

12   whether a report should be prepared.  For

13   example, a prepared report ordinarily would not

14   be necessary when the expert is known to the

15   parties and testifies about the same subject on

16   a regular basis.  On the other hand, a report

17   might be necessary if the expert is not known

18   to the parties or is going to testify about a

19   knew and controversial technique.

20          As to the techniques, I'll refer you to

21   Commonwealth versus Nevels, N-E-V-E-L-S, 202,

22   A2nd, 229.  The court there, the Superior

23   Court, clearly stated that this type of

24   evidence is not novel and it is not subject to

25   the Frye test.  The Court, in fact, discusses

Motion

1    phone records, this type of evidence that was

2    at issue in that case from the FBI's Cellular

3    Analysis Survey Team, CAST, which is the same

4    unit that Agent Burke serves with.

5         The Court, again, it is not the exact

6    issue, in terms of whether it was subject to

7    the Frye test, but it does discuss the members

8    of the CAST team and this specific type and

9    body of evidence that is at issue here.

10        The Court notes that the defense was

11   clearly on notice, that this type of evidence

12   both in terms of the drive test and its

13   possible use by a person from the FBI in 2018.

14   There are provisions in the Pennsylvania Rules

15   of Criminal Procedure that, in fact, allow, if

16   not direct, the defense give you the

17   opportunity to request the Commonwealth prepare

18   an expert report.  In this instance, for two

19   years and 18 months chose not to clarify the

20   matter despite knowledge that there was a

21   potential witness on the horizon and this body

22   of evidence was on the horizon.  Failing to

23   avail yourself to bring that to the Court's

24   attention, to ask for an expert of your own, in

25   that regard, the Court will deny the motion to

Juror Interview

1    exclude it.

2         The Court will limit the evidence if

3    Burke is available to that portion of his

4    report that was prepared at the direction of

5    the Court more recently to what I'll refer to

6    as the first 13 slides of a 22-page submission.

7    As of now, that labeled pattern analysis

8    starting with page 14, continuing through 18,

9    and labeled contact analysis, page 21, will be

10   excluded.  I will hear further argument on that

11   tomorrow when you've had the opportunity to

12   review the cases, the case, from either side if

13   you deem it necessary.

14        Anything else today?  Okay, remain

15   seated and quiet while the defendant leaves the

16   room.

17                    -----

18             (In chambers - Interview of Juror

19   No. 16.)

20                    -----

21             THE COURT:  I have an indication

22   that as you sat there, there was a guy sitting

23   right next to you.

24             JUROR NO. 16:  Yes.

25             THE COURT:  He made some remarks?

Juror Interview

1              JUROR NO. 16:  He was talking
2    kind of low.  One thing that I did hear him say
3    was ain't this some BS.
4              THE COURT:  Bullshit?
5              JUROR NO. 16:  He actually used
6    the word bullshit.  I glanced over
7    uncomfortable because he was staring at me and
8    I'm like, oh, my God he keeps talking to me.  I
9    tried ignoring him from that point on but I
10   still heard him talking.  I wished he would
11   move.  There were five empty seats.  He chose
12   to sit right there.  I was really
13   uncomfortable.
14             MS. WILLIAMS:  Long day for you.
15             JUROR NO. 16:  Oh, my God.
16             THE COURT:  I'm going to deal
17   with him.  Do you think that will have any
18   impact on your ability to serve?
19             JUROR NO. 16:  No.  It was the
20   first time that he's done that but it was
21   really annoying and uncomfortable.
22             THE COURT:  All right.
23             MR. CHERNOSKY:  Can I ask if
24   you've seen that individual other than today
25   when some sort --

Juror Interview

1              JUROR NO. 16:  I was just about
2    to say I've seen him maybe I think yesterday.
3    I was getting on the elevator.  I don't know if
4    he was flirting or whatnot but I kind of left
5    because I recognized him so I went a different
6    way but I remember him.  I recall him very
7    well.
8              THE COURT:  Okay.
9              JUROR NO. 16:  So it was odd that
10   he sat there.  Like he was leaning the whole
11   time.  He just kept talking and talking.
12             THE COURT:  Yesterday and today?
13             JUROR NO. 16:  No, just today he
14   did that.
15             THE COURT:  Okay, anything else
16   he said besides ain't this some bullshit?
17             JUROR NO. 16:  Nothing that I
18   made out but he was talking.
19             THE COURT:  All right, thank you.
20                      -----
21             (In chambers - Juror No. 16 is
22   not present.)
23                      -----
24             THE COURT:  Anything on that?
25             MR. CHERNOSKY:  Do we have any

L. Jenkins - Contempt Hearing

1    indication, was he in the front row or closest

2    row?

3                    THE COURT:  I know who it is.

4                    MS. WILLIAMS:  I didn't see.

5                    THE COURT:  We all know who it is

6    by context and the sheriff's deputies, I know

7    it is the guy on the far right.  I saw him all

8    afternoon.  I wasn't focused on him.

9                    MR. CHERNOSKY:  I haven't looked

10   at anybody in the gallery today.  I don't know

11   if it is capacity, if it is an option to clear

12   another row on that side.

13                   THE COURT:  He is going down the

14   county.

15                        -----

16                   (Open court - Jury not present.)

17                        -----

18                   THE COURT:  Do you have

19   identification on your, sir?

20                   DEPUTY SHERIFF:  Do you have any

21   ID on you?

22                   MR. JENKINS:  What is going on?

23                   DEPUTY SHERIFF:  Just listen and

24   follow instructions.

25                   THE COURT:  Sir, you're being

L. Jenkins - Contempt Hearing

1    detained for your conduct during the course of

2    these proceedings and potentially being charged

3    with obstruction for what has been reported as

4    your attempt to influence a juror.

5             MR. JENKINS:  Me?  Charged with

6    what?

7             THE COURT:  Okay.  Sergeant,

8    Lieutenant Kearney, that juror will have to be

9    interviewed.  I don't know if you know exactly

10   what is going on.  The allegations seem

11   credible to me that this individual is making

12   remarks to one of the alternates seated,

13   positioned himself in close proximity to her so

14   she will have to be interviewed by one of your

15   investigators to see if any charges are

16   warranted.  Right now he is being held in

17   contempt based on credible evidence, okay?

18             LIEUTENANT KEARNEY:  Yes, sir.

19             THE COURT:  The other thing we

20   have to consider regarding this juror is she is

21   going to be interviewed and identify this guy.

22   That is a different sort of pressure on her.

23   She is an alternate so give that some thought

24   over night if we want to excuse her given all

25   the circumstances.

L. Jenkins - Contempt Hearing

1                    (Court adjourned for the day.)

2

3                         -----

4

5

6

7                    PROCEED TO VOLUME II

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4                    <u>REPORTER'S CERTIFICATION</u>

5

6          I, Michele A. Murawski, Official Court

7     Reporter for the Court of Common Pleas of

8     Allegheny County, Pennsylvania, do hereby

9     certify that the proceedings and evidence are

10    contained fully and accurately in the

11    stenographic notes taken by me on the hearing

12    of the within cause and that this is a correct

13    transcript of the same.

14

15

16

17

18                    _____
                      Michele A. Murawski
19                    Official Court Reporter
                      Registered Professional Reporter
20

21

22

23

24

25