# In The Matter Of:

## *CHERON SHELTON/ROBERT THOMAS v.*
## *COUNTY OF ALLEGHENY, et al.*

---

## *ANDREW SCHURMAN*
### *April 9, 2024*

---

## *AA COURT REPORTERS*
### *428 Boulevard of the Allies, Suite 300*
### *Pittsburgh, PA 15219*
### *412.288.5370*
### *anthony@aacourtreporters.com*

Original File SCHURMAN-040924.txt
**Min-U-Script® with Word Index**

CHERON SHELTON/ROBERT THOMAS v.
COUNTY OF ALLEGHENY, et al.

ANDREW SCHURMAN
April 9, 2024

---

AA COURT REPORTERS 412-288-5370                                    Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
 2        FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 3
 4    CHERON SHELTON/ROBERT          )
 5    THOMAS,                        )
 6                                   )
 7            Plaintiffs,            )
 8                                   )
 9        vs.                        )   No. 22-CV-196/266
10                                   )
11    COUNTY OF ALLEGHENY, et al.,   )
12                                   )
13            Defendants.            )
14    _____       )
15
16
17           DEPOSITION OF ANDREW SCHURMAN
18             TUESDAY, APRIL 9, 2024
19                  10:00 A.M.
20             PITTSBURGH, PENNSYLVANIA
21
22
23
24    REPORTED BY:  ANTHONY JUDE CORDOVA, CSR 12943
25        JOB NO. SCHURMAN-040924
```

---

AA COURT REPORTERS 412-288-5370                                    Page 3

```
 1                    - - - -
 2                  APPEARANCES
 3
 4    FOR THE PLAINTIFFS:
 5    Max Petrunya, Esq.
 6    Paul Jubas, Esq.
 7    MAX PETRUNYA, P.C.
 8    5 Bayard Road, Unit 917
 9    Pittsburgh, PA  15213
10    412.720.3497
11    mpetrunya@gmail.com
12    pjubasesq@gmail.com
13
14
15    FOR THE DEFENDANTS:
16    Dennis Biondo, Jr., Esq.
17    Shelley Rohrer, Esq.
18    ALLEGHENY COUNTY LAW DEPARTMENT
19    445 Fort Pitt Boulevard, Suite 300
20    Pittsburgh, PA  15219
21    412.350.1120
22    dennis.biondojr@alleghenycounty.us
23    srohrer@alleghenycounty.us
24
25
```

---

AA COURT REPORTERS 412-288-5370                                    Page 2

```
 1            BE IT REMEMBERED THAT, on April 9, 2024,
 2    commencing at the hour of 10:00 a.m. of the said day, at
 3    Allegheny County Law Department, 445 Fort Pitt
 4    Boulevard, Pittsburgh, Pennsylvania, before me, ANTHONY
 5    JUDE CORDOVA, CSR 12943, a Certified Shorthand Reporter
 6    and Notary Public, appeared Andrew Schurman, produced as
 7    a witness in the above-titled court and cause, who,
 8    being by me first duly sworn, was examined in said
 9    cause.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

AA COURT REPORTERS 412-288-5370                                    Page 4

```
 1    INDEX:
 2    Examination by Mr. Jubas                        5
 3    Examination by Mr. Petrunya                   120
 4
 5
 6    EXHIBITS:
 7    EX 1  Affidavit                                44
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

AA COURT REPORTERS 412-288-5370                    Page 5

1              - - - -
2              ANDREW SCHURMAN,
3          Being by me first duly sworn,
4        Was examined and testified as follows:
5              - - - -
6              EXAMINATION
7              - - - -
8  BY MR. JUBAS:
9  Q.    Good morning, sir. My name is Attorney Paul
10 Jubas. I represent the plaintiffs in this matter with
11 my cocounsel Max Petrunya and I just wanted to go over a
12 few ground rules at the beginning here. If you answer
13 my question, is it fair to assume that you've understood
14 my question?
15 A.    Yes.
16 Q.    Okay. And I'm sure you've done this before.
17 You know the rules. So that our court reporter can take
18 down everything, make sure you answer in full sentences,
19 no uh-huhs or huh-uhs or head nodding.
20 A.    It got you. Yes.
21 Q.    Alright. Have you ever given a deposition?
22 A.    Civil deposition? Yes.
23 Q.    And what was the context?
24 A.    There was a suit filed against the municipality
25 of Monroeville involving one of their officers in a

AA COURT REPORTERS 412-288-5370                    Page 6

1  motor vehicle collision resulting in a death. So, I was
2  deposed for that.
3  Q.    And did you have anything to do with the
4  incident?
5  A.    No. No. We were the investigating agency.
6  Q.    Was that the only one?
7  A.    Yes.
8  Q.    And what did you do to prepare for today's
9  deposition?
10 A.    I met with Dennis and Shelley last week to have
11 an understanding -- I've never been through a civil
12 proceeding, so, to help me with the understanding of
13 what to expect, the topic matter.
14 Q.    Did you review any documentation?
15 A.    No.
16 Q.    No videos or anything?
17 A.    No.
18 Q.    Okay. So, how about we start with you telling
19 me your age.
20 A.    55.
21 Q.    Okay. And what's your date of birth?
22 A.    January 8, 1969.
23 Q.    And can you give me an idea of your educational
24 background, please?
25 A.    So, I went to high school at Central Catholic

AA COURT REPORTERS 412-288-5370                    Page 7

1  and college at University of Pittsburgh where I
2  graduated.
3  Q.    And when did you graduate?
4  A.    1991.
5  Q.    Okay.
6  A.    Or -- '91.
7  Q.    What did you do after you graduated from Pitt?
8  A.    I worked for the Allegheny County Treatment
9  Alternative. It was first of its kind like halfway
10 house where they did onsite drug rehab. So, I did that
11 and then I got hired by the county police in '93.
12 Q.    Okay. And what was your role when you got hired
13 in '93 at county police?
14 A.    I was a patrol officer.
15 Q.    How long were you a patrol officer?
16 A.    Seven years.
17 Q.    Where did you go after that?
18 A.    I was transferred voluntarily at my request to
19 the detective division.
20 Q.    Would that have been about year 2000?
21 A.    2000.
22 Q.    And what unit were you in as a detective?
23 A.    I started in the general investigations unit.
24 Q.    Is that standard?
25 A.    Yes.

AA COURT REPORTERS 412-288-5370                    Page 8

1  Q.    How long did you stay in general investigations?
2  A.    One year.
3  Q.    What was the next move?
4  A.    Homicide. Homicide, violent crimes unit.
5  Q.    Was it -- was that the same unit or is that two
6  different units?
7  A.    The homicide unit is also the violent crimes
8  unit. The homicide, violent crime, they investigated
9  all manner of death.
10 Q.    Is that still the same way?
11 A.    Uh-huh. As far as I know. I've been retired
12 four years, so, unless there's been major changes that
13 I'm not aware of.
14 Q.    So, how long were you a homicide detective for?
15 A.    A little over four years.
16 Q.    Till about 2004?
17 A.    2005.
18 Q.    And what happened then?
19 A.    I was promoted to sergeant and I stayed within
20 the homicide unit.
21 Q.    Okay. Were there any subsequent promotions?
22 A.    Yes. In 2010, I was -- I want to say it was
23 '10, I was promoted to lieutenant within the homicide
24 unit.
25 Q.    Were there any promotions after that?

CHERON SHELTON/ROBERT THOMAS v.
COUNTY OF ALLEGHENY, et al.

ANDREW SCHURMAN
April 9, 2024

1  A.     Yes.  In 2019, I was promoted to inspector.
2  Q.     Okay.  What was the next move?
3  A.     Retirement.
4  Q.     And when was that?
5  A.     March of 2020.
6  Q.     Why did you retire?
7  A.     The -- we're eligible at age 50.  County police
8  are eligible to retire at age 50, and at the time, I had
9  two college-age kids.  So, it was financially beneficial
10 to start another career.  So --
11 Q.     Cashed in on the pension?
12 A.     Yes.
13 Q.     Do you recall when in March 2020?
14 A.     The exact date?
15 Q.     Yes.
16 A.     13th.
17 Q.     March 13th.  So, about just under a month after
18 Cheron Shelton was acquitted in the Wilkinsburg massacre
19 trial; correct?  If it was February 14th?
20 A.     Yeah.  Yeah.  I'll take your word for that.  I
21 don't remember the exact date.
22 Q.     Were you present for that trial?
23 A.     Yes.  Parts of it.
24 Q.     Parts of it?
25 A.     Yes.

1  Q.     What were your thoughts on it?
2  A.     So, the -- any trial, there are a number of
3  things that need to be worked out and I know -- I think
4  it was okay.
5  Q.     Did you feel that it was an accurate reflection
6  of the investigation?
7  A.     No.
8  Q.     Explain it.
9  A.     There were parts of the investigation and
10 witnesses that were not permitted to be used or that
11 were not permitted to be given to a jury.  So, I don't
12 think it was an accurate representation of the
13 investigation.
14 Q.     Okay.  And are you referencing the CAD sheet
15 with regards to one of the pieces of evidence?
16 A.     No.
17 Q.     What are you referring to?
18 A.     Witness information.
19 Q.     Are you talking about from the jailhouse
20 witnesses?
21 A.     Yes.
22 Q.     Okay.  Did you ever teach any courses or
23 certifications or trainings while you worked for
24 Allegheny County Police?
25 A.     No.

1  Q.     Did you supervise any instructors or teachers
2  teaching other homicide detectives?
3  A.     Expound on that.
4  Q.     Do Allegheny County Police homicide detectives
5  receiving training?
6  A.     Yes.
7  Q.     Okay.  And do they receive training on how to
8  conduct investigations?
9  A.     Yes.
10 Q.     Okay.  And do other officers within the county
11 police department, are they the instructors?  Do you
12 guys get outside instructors?
13 A.     Both.  So, when an officer or detective is
14 selected to be transferred to the homicide unit, they've
15 already been through a number of training offerings,
16 some required, some voluntary.  The most basic is the
17 Police Academy.  So, every officer goes through that
18 when they're hired.
19        Most detectives -- most homicide unit detectives
20 come from other units where they are provided training
21 within that unit as to the basic mechanisms of an
22 investigation and then some outside offerings, interview
23 courses, crime scene investigation.  Once they get to
24 the homicide unit, they are then partnered with a senior
25 partner or a senior detective for on-the-job training

1  and that detective who's been there a while then imparts
2  their knowledge onto the new detective.
3  Q.     Okay.
4  A.     And then once in that unit, then they get,
5  again, outside offerings from different venues for
6  further training whether it's blood spatter analysis,
7  ballistics.  So, there's ongoing training, and then, of
8  course, the MPOETC-required training that every sworn
9  officer in the Commonwealth has to attend, continuing
10 education.
11 Q.     Understood.  When it comes to the use of
12 jailhouse witnesses, is that something that Allegheny
13 County Police trains on?
14 A.     No formal training.
15 Q.     Only on-the-job training?
16 A.     Experience.  Yes.
17 Q.     Okay.  Or informal training or advice from more
18 experienced detectives?
19 A.     That's fair.  Yes.
20 Q.     Would you say that's probably the main way that
21 they -- that homicide detectives get experience?
22 A.     Yes.
23 Q.     Okay.
24 A.     In dealing with that particular aspect.
25 Q.     Okay.  And how about cellphone evidence?  Has

AA COURT REPORTERS 412-288-5370 — Page 13

1  cellphone evidence changed a lot throughout the course
2  of your career?
3  A.    Exponentially.
4  Q.    Could you expound on that how -- what
5  investigations were like prior to cellphones and how
6  that's changed?
7  A.    When I started in police work, there were no
8  cellphones. So, as the cellphone evolved, so did the
9  technology and the means to investigate. To give you an
10  example, in 2000, we were taking a phone and literally
11  writing down the numbers from the call log. As
12  technology evolved, software and devices became
13  available to download that data for investigating
14  agencies. Now I'm sure it's even more advanced software
15  that will analyze the data that's downloaded.
16  Q.    Is that software you were referring to
17  Cellebrite software?
18  A.    I don't think that's the exact name, but you're
19  on the right path.
20  Q.    What do you think it is?
21  A.    I can't remember the name, but you're on the
22  right path. I just don't remember the name.
23  Q.    Okay. And but this cellphone software --
24  A.    Yes.
25  Q.    -- you said that you're able to navigate it by

AA COURT REPORTERS 412-288-5370 — Page 14

1  dates and various terms; right?
2  A.    You could search -- yeah. Depending on the
3  software, you could search by different parameters.
4  Q.    And would you agree that one of the more
5  valuable aspects of the software, it allows you to
6  create extraction reports which is basically reports
7  pertaining to the cellphone that you're able to whittle
8  down based off of whatever terminology you want to use?
9  A.    Yes.
10       MR. BIONDO: Object to form. But he said yes.
11  BY MR. JUBAS:
12  Q.    Okay. Would you agree with me that cellphone
13  evidence is extremely valuable for police these days?
14  A.    Yes.
15       MR. BIONDO: I'll object to form. Go ahead.
16  A.    Yes.
17  BY MR. JUBAS:
18  Q.    And this might seem obvious, but I just want to
19  make sure that we pin the record down here. When it
20  comes to cellphone evidence, you would agree with me
21  that one of the reasons that it's so valuable is that
22  people use their cellphones so often; right?
23  A.    Yes.
24  Q.    Would you agree with the statement that when it
25  comes to other forms of evidence, cellphone downloads

AA COURT REPORTERS 412-288-5370 — Page 15

1  provide an unparalleled insight into somebody's personal
2  life?
3       MR. BIONDO: Object to form. You can answer.
4  Go ahead.
5  A.    I don't know if I'd say unparalleled. Video
6  evidence is up there, as well.
7  BY MR. JUBAS:
8  Q.    Okay. But just with regards to somebody's
9  everyday movements and communications?
10  A.    Yes.
11  Q.    Okay. Now, so that's one form of cellphone
12  evidence. Another form that was actually derived in
13  this case is cell data from carriers.
14  A.    Uh-huh.
15       MR. BIONDO: Yes?
16  A.    Yes. I'm sorry.
17  BY MR. JUBAS:
18  Q.    And do you recall the cell data reports that
19  were generated in this case?
20  A.    I don't.
21  Q.    Okay. So, there were two cell data reports both
22  pertaining to each of the suspect's phone numbers. Did
23  you ever take a look at those?
24  A.    I did not.
25  Q.    Okay. So, I'm not going to mark this as

AA COURT REPORTERS 412-288-5370 — Page 16

1  evidence. I'm just going to show you one of the reports
2  of cellphone data connected to phone number
3  412-378-3461. This is one of the suspect's phone
4  numbers. Go ahead and take a look at that and I'll ask
5  you a few questions to see if it rings your bells about
6  anything regarding cell data reports.
7  A.    Okay.
8  Q.    So, are you aware or do you recall that these --
9  A.    Okay. If I touch this --
10  Q.    Sure. Sure. These types of cell data reports
11  don't contain content for communications?
12  A.    It does not appear this one does.
13  Q.    Okay.
14  A.    There are instances, I believe, where some cell
15  carriers will give you text message content. The one
16  I'm looking at does not, that I can tell.
17  Q.    Is this the first time that you have looked at
18  one of the cell data reports for one of the suspect
19  phone numbers?
20       MR. BIONDO: I'll object to form. You mean in
21  this case?
22       MR. JUBAS: Yes.
23  A.    I don't recall.
24  BY MR. JUBAS:
25  Q.    You don't recall whether you've seen one?

CHERON SHELTON/ROBERT THOMAS v.
COUNTY OF ALLEGHENY, et al.

ANDREW SCHURMAN
April 9, 2024

1  A.    In this case, no.
2  Q.    Okay.  So, if you're in an investigation and you
3  have a cell data report like you just saw or a cellphone
4  download, which would you choose?
5  A.    I'm not sure I understand.
6  Q.    Okay.  So, we spoke about cellphone downloads;
7  right?
8  A.    Yes.
9  Q.    And we discussed the fact that you can search
10 through somebody's entire call log.  You can see the
11 contents of their text messages; correct?
12 A.    Uh-huh.  Yes.
13 Q.    And you can see the pictures in their phones,
14 the videos in their phones?
15 A.    Yes.
16 Q.    You can hear if they have voicemails in their
17 phones; correct?
18 A.    Yes.
19 Q.    Okay.  So, would you agree with me that there is
20 a lot of additional evidence in a cellphone download
21 than in a data report similar to what you just saw?
22 A.    Yes.
23 Q.    Okay.  So, with that being said, if you could
24 choose or you could identify which would be more
25 evidentially valuable, would it be the cellphone report

1  or the data report?
2       MR. BIONDO: I'll object to the form.  But go
3  ahead and answer, if you can.
4  A.    So, I don't know that we would be forced to
5  choose because we could get them both.
6  BY MR. JUBAS:
7  Q.    Okay.  And so if you would have them both, that
8  would allow you to cross-reference things; right?
9  A.    Yes.
10 Q.    Okay.  But when it comes to just the evidentiary
11 value, which one would allow you to get more insight
12 into the investigation?
13      MR. BIONDO: I'll object again.  But go ahead
14 and answer, if you can.
15 A.    So, that's a twofold so -- and to the person,
16 like you spoke, you can glean more from the cellphone
17 download itself to the location.  You're getting more
18 from the tower or the data.
19 BY MR. JUBAS:
20 Q.    Okay.
21 A.    Because that's going to include your tower data
22 that puts your location, whereas you don't always get
23 that with the -- so, they're both equally important for
24 different reasons.
25 Q.    Okay.  Did you ever recall hearing testimony at

1  trial that the location information from the data report
2  pertaining to Cheron Shelton could have placed him on
3  his couch on the night of the homicides?
4  A.    I don't recall.
5  Q.    Are you aware that cell data or cell tower
6  evidence isn't the most reliable?
7       MR. BIONDO: I'll object to form.  But go ahead.
8  A.    I'm not aware of that.
9  BY MR. JUBAS:
10 Q.    Would it surprise you to learn that whoever
11 testified regarding the cell tower location said that
12 Cheron Shelton may have been on his couch pertaining to
13 that data?
14 A.    I don't recall the testimony that was provided.
15 Q.    Okay.  So, for the Wilkinsburg massacre
16 investigation, what was your classification at that
17 point?
18 A.    My title?
19 Q.    Yes.
20 A.    I was a lieutenant.
21 Q.    Lieutenant.  Okay.  And what's your
22 responsibility -- what was your responsibility specific
23 to the Wilkinsburg massacre investigation?
24 A.    So, lieutenants within the county police
25 department are commanders.  In my case, I was a unit

1  commander.  I had oversight of the homicide unit,
2  collision reconstruction, the cellphone unit.  So, that
3  was my primary function was oversight.  As a lieutenant,
4  I did not become involved in the cases.  There's
5  300 cases a year, over 300, so, on average, at the time,
6  300 cases a year that went through the homicide unit.
7  Those all had to be managed.  So, my primary role was to
8  manage the supervisors of the respective units to make
9  sure everything is getting done as it should.
10 Q.    Okay.  Do you ever see evidence?  I'm sorry.
11 I'll withdraw the question.
12      Throughout the Wilkinsburg massacre
13 investigation, did you ever see evidence?
14 A.    Yes.
15 Q.    Did you see a lot of the evidence, just bits and
16 pieces?
17 A.    Bits and pieces is a fair assessment.
18 Q.    Okay.  Is it fair to say that you did not review
19 all of the evidence prior to the criminal complaints
20 being filed?
21 A.    That's correct.
22 Q.    Okay.  Can you give me an idea of whether you
23 reviewed -- what portion, percentage of the evidence did
24 you review --
25 A.    I --

CHERON SHELTON/ROBERT THOMAS v.
COUNTY OF ALLEGHENY, et al.

ANDREW SCHURMAN
April 9, 2024

1 Q.     Let me finish.  At the time that -- prior to and
2 including the date June 23rd, 2016 that the criminal
3 complaint was filed?
4          MR. BIONDO: I'll object to form.  Go ahead and
5 answer, if you can.
6 A.     I couldn't give you a number percentage on what
7 I had seen at that point.  I don't recall.
8 BY MR. JUBAS:
9 Q.     Okay.  Were you aware of the witnesses that were
10 involved in the case?
11 A.     For the most part, yes.
12 Q.     Okay.  Now, you had mentioned that you managed
13 the supervisors of a number of units.  How many units
14 did you supervise?
15          MR. BIONDO: I'll object to form.  But go ahead
16 and answer, if you can.
17 A.     Three.
18 BY MR. JUBAS:
19 Q.     And which were those?
20 A.     The homicide unit or violent crime unit,
21 collision reconstruction and technical services which is
22 the cellphone unit.
23 Q.     Did collision reconstruction have much influence
24 on the Wilkinsburg massacre investigation?
25 A.     No.

1 Q.     So, when it comes to the supervisors of units
2 that you were managing, would it be safe to say that it
3 was just the homicide unit and the cellphone unit?
4 A.     Uh-huh.  Yes.
5 Q.     Did you see all the cellphone evidence in this
6 case?
7 A.     No.
8 Q.     What cellphone evidence did you see in this
9 case?
10 A.     I don't recall.
11 Q.     Just generally speaking, when homicide
12 detectives are investigating a case, are there ever
13 times where they should no longer look into alternate
14 suspects?
15          MR. BIONDO: I'll object to form.  But go ahead
16 and answer, if you can.
17 A.     Can you rephrase that?
18 BY MR. JUBAS:
19 Q.     Yeah.  At what point in any given investigation
20 would you rule out -- would you tell homicide detectives
21 you don't have to look for alternate suspects?
22          MR. BIONDO: And I'll object again.  But go
23 ahead and answer, if you can.
24 A.     I don't think that would ever be said.  I think
25 there gets to a point in a case where you develop enough

1 possible cause to move forward with a criminal
2 complaint.
3 BY MR. JUBAS:
4 Q.     Okay.  Were you made aware of any alternate
5 suspects in this case?
6 A.     Yes.
7 Q.     Do you recall who they were?
8 A.     I don't recall their names.
9 Q.     How about the circumstances that led to them
10 being alternate suspects?
11 A.     Again, I don't recall the details.
12 Q.     Do you recall what allowed homicide detectives
13 to rule them out?
14 A.     I don't recall the details.
15 Q.     Do you recall the evidence against the two
16 suspects that were charged?
17 A.     I don't.  Not all of it.
18 Q.     Generally, do you?
19 A.     Generally.
20 Q.     Okay.  Do you recall the evidence against Robert
21 Thomas?
22 A.     Again, not all of it.
23 Q.     What do you recall?
24 A.     So, there was video, I believe, of him jumping
25 the fence with Cheron Shelton.  I believe that's post

1 shooting.  There was cellphone evidence prior to and
2 then post shooting that linked the two and then
3 informant information after they were incarcerated.
4 Q.     When you say informant, is that the jailhouse
5 witnesses that we were discussing previously?
6 A.     Correct.
7 Q.     Okay.  Now, in your experience in Allegheny
8 County Police Department, did you ever have any
9 interactions with either of the first two jailhouse
10 witnesses that were used in this case?
11 A.     No.
12 Q.     Had you ever heard from other members of the
13 county police that either of them were being used as
14 jailhouse witnesses on other cases?
15 A.     I don't recall.
16 Q.     Is that something you would have wanted to know?
17 A.     So, in the homicide unit, we didn't use
18 confidential informants.  That was something that
19 narcotics units routinely do and they're allowed to do
20 that in their affidavits in the homicide unit.  All the
21 witnesses providing information to be contained in an
22 affidavit have to be identified and readily available.
23 So, had someone provided information in the past, that
24 was something that had to be weighed by the district
25 attorney's office.  We gather the information, present

AA COURT REPORTERS  412-288-5370    Page 25

1  it. They weigh it yes or no to move forward with it.
2  Q.    Okay. Do you recall learning about the
3  information that was provided by these jailhouse
4  witnesses?
5  A.    Regarding their shootings, the shootings --
6  Q.    Yes.
7  A.    Yes.
8  Q.    Walk me through how you discussed these
9  jailhouse witnesses with the homicide detectives on the
10  case.
11  A.    I don't recall the conversations.
12      MR. JUBAS: Okay. I'm not going to submit this
13  as an exhibit. I just wanted him to take look at that.
14  Q.    Okay. Do you recall going on -- going along
15  with homicide detectives when they went to pick up
16  Dontay Reed?
17  A.    I don't recall.
18  Q.    Do you know if you were there?
19  A.    I don't recall.
20  Q.    Do you recall whether you were involved on the
21  ground with homicide detectives at all during the
22  investigation?
23  A.    I was.
24  Q.    So, tell me about those instances.
25  A.    I couldn't tell you specific dates, times,

AA COURT REPORTERS  412-288-5370    Page 26

1  locations of what I did.
2  Q.    Were there any other -- what other supervisors
3  were on the case with you?
4  A.    Scott Scherer was the sergeant in the homicide
5  unit at the time.
6  Q.    And what role would he have played?
7  A.    So, he's a case manager.
8  Q.    So, he managed the Wilkinsburg massacre
9  investigation?
10  A.    And the 299 other investigations that happened
11  throughout the course of that year.
12  Q.    Okay. Did you pull him, Scott Scherer, off of
13  the case?
14  A.    No.
15  Q.    So, if he testified that you did pull him off
16  the case early on, is that accurate or false?
17  A.    Is that what he said? Did he testify to that?
18  Okay. So, the other cases need to be managed. When the
19  phone rings, that's another case that needs to be
20  initiated. So, someone has to manage that. So, to use
21  the term pulled him off, if that's how he testified,
22  would not be an accurate description. He still needed
23  to maintain the supervisory role for all the other cases
24  that continued to come in.
25  Q.    Okay. So, if he testified that he was taken off

AA COURT REPORTERS  412-288-5370    Page 27

1  the case by you because he was receiving media attention
2  and you wanted it all for yourself, would that be
3  inaccurate?
4      MR. BIONDO: And I'll object to form. But go
5  ahead and answer, if you can.
6  A.    That would be very inaccurate.
7  BY MR. JUBAS:
8  Q.    Explain.
9  A.    I'm not aware of that at all.
10  Q.    So, you never told him that he needed to get off
11  the case?
12  A.    I never told him that any media attention had
13  anything to do with any decisions.
14  Q.    Did you deal with the district attorney's office
15  at all throughout this investigation?
16  A.    Yes.
17  Q.    Who in the district attorney's office?
18  A.    Kevin Chernosky and Lisa Pellegrini.
19  Q.    How about during the investigation?
20  A.    I didn't deal with them so much as the
21  detectives dealt with the attorneys.
22  Q.    Okay. Did you ever deal with the head district
23  attorney, Stephen Zappala?
24  A.    In regards to this case?
25  Q.    Yes.

AA COURT REPORTERS  412-288-5370    Page 28

1  A.    I don't recall. I don't recall.
2  Q.    Do you think that the detectives in this case
3  believed that the shooters came from Hilltop?
4  A.    At what stage?
5  Q.    At the point that they filed the criminal
6  complaints against --
7  A.    Yes.
8  Q.    Okay. Do you think that they believed their
9  cellphone theory?
10      MR. BIONDO: I'll object to the form. But go
11  ahead and answer, if you can.
12  A.    What's the cellphone theory?
13  BY MR. JUBAS:
14  Q.    That the two suspect phone numbers belonged to
15  Cheron Shelton and Robert Thomas respectively and that
16  those numbers were used to conspire to execute the
17  Wilkinsburg massacre.
18  A.    Yes.
19  Q.    Okay. So, you believe that -- you're saying
20  that it's your testimony that they -- the Allegheny
21  County Police believed the suspect phone theory;
22  correct?
23      MR. BIONDO: Object to the form again. But go
24  ahead and answer, if you can.
25  A.    Yes.

CHERON SHELTON/ROBERT THOMAS v.
COUNTY OF ALLEGHENY, et al.

ANDREW SCHURMAN
April 9, 2024

AA COURT REPORTERS  412-288-5370                    Page 29

1  BY MR. JUBAS:
2  Q.    Okay.  Have you ever seen detectives or police
3  officers fabricate evidence?
4  A.    Never.
5  Q.    Have you ever become aware that it has happened
6  before?
7  A.    Never with the county police.
8  Q.    Outside of the county police?
9  A.    I'm not aware of any factual case within
10  Allegheny County where evidence was ever manufactured.
11  Q.    How about outside of the county?
12  A.    I can speak to --
13  Q.    You know --
14  A.    -- only what I've seen on TV.  So --
15  Q.    So, are you saying that you're not aware of a
16  single instance where police have fabricated evidence?
17  A.    I've watched TV shows where the allegations are
18  made, but nothing that I've dealt with in my career.
19  Q.    Okay.  If -- do the homicide detectives have to
20  provide a list of the evidence for you for your review?
21  A.    No.
22  Q.    Okay.  Do they have discussions with you about
23  the evidence?
24  A.    Yes.
25  Q.    Okay.  Prior to the criminal complaint being

AA COURT REPORTERS  412-288-5370                    Page 30

1  filed, did you have discussions with the detectives
2  about the evidence that they believed gave them probable
3  cause?
4  A.    I don't recall.
5  Q.    Okay.  Do you think you probably would have?
6  A.    It's a possibility.
7  Q.    How concerned were you about the evidence that
8  they wanted to bring into the case?
9         MR. BIONDO: I'll object to the form.  Go ahead
10  and answer, if you can.
11  A.    I wasn't concerned.
12  BY MR. JUBAS:
13  Q.    So, are you saying that it wasn't your job to
14  review the evidence or see if the case was legitimate?
15         MR. BIONDO: I'll object to the form again.  But
16  go ahead and answer, if you can.
17  A.    Correct.
18  BY MR. JUBAS:
19  Q.    Okay.  Would you have preferred if they told you
20  about all the evidence?
21  A.    No.
22  Q.    And why don't you want to know about the
23  evidence?
24         MR. BIONDO: I'll object to the form.  But go
25  ahead and answer, if you can.

AA COURT REPORTERS  412-288-5370                    Page 31

1  A.    So, routinely during an investigation, the
2  supervisor may or may not be directly involved with the
3  evidence that's developed.  Ultimately, the evidence is
4  compiled and taken to the district attorney's office.
5  Currently, the district attorney's office has to sign
6  off on any search warrants before they're presented to a
7  judge and any arrest warrants.
8         So, all that evidence has to be compiled,
9  brought forth to the district attorney's office.  They
10  have to say yes or no, you've met the threshold or
11  you've not, go back and find more, do more
12  investigation.  So, my role is supervisory.  I don't get
13  down into the nuts and bolts of it.  They might want to
14  bounce ideas off of me.  That's great.  But my approval
15  is not required for them to go to the DA's office and
16  present a case.
17  BY MR. JUBAS:
18  Q.    Okay.  You had mentioned that you were
19  overseeing the cellphone unit?
20  A.    Technical services.
21  Q.    Technical services in this case?
22  A.    Yes.
23  Q.    Okay.  Do you recall any sort of interactions
24  you had with the technical services unit in this case?
25  A.    I don't.

AA COURT REPORTERS  412-288-5370                    Page 32

1  Q.    Okay.  Do you recall whether the technical
2  services unit was handling the cellphone evidence in
3  this case?
4  A.    I don't.
5  Q.    Okay.  Would you assume that they were?
6  A.    Yes.  That's a fair assumption.
7  Q.    Who was in this -- the technical services unit
8  that would have handled this stuff?
9  A.    Matt Rosenberg was the cellphone expert.
10  Q.    And was there -- to your knowledge, was there a
11  single document created by Mr. Rosenberg or somebody
12  else for the cellphone evidence in this case?
13  A.    An all-inclusive single document?
14  Q.    I'm asking if you know of any documents that
15  somebody would have created pertaining to cellphone
16  evidence.
17  A.    I could speak in generalities to that, but
18  specific to the case, I don't recall, but he would
19  produce reports from his work.
20  Q.    Okay.  And do you know if he would create
21  compilations so that you could easily cross-reference
22  cellphone evidence in the case?
23  A.    If asked, yes, that is one of the capabilities
24  he had --
25  Q.    Okay.

CHERON SHELTON/ROBERT THOMAS v.
COUNTY OF ALLEGHENY, et al.

ANDREW SCHURMAN
April 9, 2024

1  A.    -- I believe at the time. Again, that software
2  evolves. That technology evolves daily. I don't
3  remember where we were at in 2016 with that.
4  Q.    So, you don't know if he created one in this
5  case?
6  A.    I don't.
7  Q.    Okay.
8  A.    Or I don't recall.
9  Q.    Okay. Would anybody else in the county police
10 department have access to the cellphone evidence
11 themselves or did they have to go through Rosenberg?
12 A.    The detectives would have access.
13 Q.    So, Rosenberg is not the only one with access?
14 A.    Correct.
15 Q.    Are you saying that the detectives also had the
16 ability to create reports?
17 A.    Yes.
18 Q.    Okay.
19 A.    Specific to cellphone data -- well, yeah. It's
20 fair to say they could create reports.
21 Q.    Okay. Do you think -- getting back to the topic
22 of motive, do you recall what the motive theory was in
23 this case?
24 A.    If my memory's accurate, I believe one of the
25 people on the porch that night was accused of killing --

1  was it Doswell maybe?
2  Q.    Yeah.
3  A.    And this was a retaliation for that.
4  Q.    And just to be thorough, I think earlier, you
5  testified that it's your belief that the county
6  detectives believed this theory?
7  A.    Yes.
8  Q.    I'm not going to enter this into evidence. I
9  just wanted to show that to you. Okay. So, this says
10 that on Saturday the 2nd of April, this detective sent
11 out requests for subscribers' information, phone numbers
12 which made calls to and/or received calls from Cheron
13 Shelton's cellular number 412-897-0447; is that
14 accurate?
15 A.    That's what the report says. Yes.
16 Q.    It says next that 31 phone numbers were
17 retrieved from the phone records requested from T-Mobile
18 via court order; right?
19 A.    Yes.
20 Q.    Why would homicide detectives want evidence for
21 these other 31 numbers?
22 A.    I don't know why that -- at the time that was
23 done. I can't speak to the detail to that.
24 Q.    So, is it -- I'll represent to you that the
25 phone number 0447, that is the suspect phone number

1  theorized to have been used by Cheron Shelton. So, does
2  that give you any insight as to why detectives would
3  want phone numbers that that number is communicating?
4  A.    Speaking in generalities, yes, they may hold
5  investigative leads.
6  Q.    Elaborate on that. Why is that?
7  A.    The people that Cheron Shelton spoke to or
8  texted before, during or after the crime would be
9  pertinent.
10 Q.    Okay. Why is that pertinent? I know it's
11 obvious, but state the obvious, please.
12 A.    Working on the theory that there's two people
13 involved, he's either communicating with his
14 coconspirator before, during or after.
15 Q.    Did you ever hear from any county detectives
16 that they were of the belief that there might be
17 additional suspects that they never tracked down?
18 A.    I don't recall that.
19 Q.    Would that surprise you?
20 A.    Yes.
21 Q.    Why is that?
22 A.    In any case, when the investigation is
23 initiated, we don't know who's committed the crime. So,
24 we have to narrow down and eliminate potential suspects.
25 So, in this case, I'm sure that we've eliminated a

1  number of suspects.
2  Q.    You're sure that they did?
3  A.    Yes.
4  Q.    What makes you sure that they did?
5  A.    I think you referenced at the beginning.
6  Q.    Remind me.
7  A.    The people that we eliminated.
8  Q.    Elaborate on that, please.
9  A.    As suspects.
10 Q.    And how were they eliminated?
11 A.    Through investigation.
12 Q.    Do you recall how?
13 A.    I don't.
14 Q.    Okay. So, are you assuming they were
15 eliminated?
16 A.    No. I remember there was -- I think they were
17 brothers who were eliminated but I don't --
18 Q.    The Gomez brothers?
19 A.    That sounds right. Yeah.
20 Q.    Alright. Now, so, am I right to say that these
21 31 other numbers were important to the investigation?
22       MR. BIONDO: I'll object to the form. But go
23 ahead and answer, if you can.
24 A.    Yes.
25 BY MR. JUBAS:

AA COURT REPORTERS 412-288-5370                                    Page 37

1 Q.    Okay. Because that would allow you to see what
2    a suspect phone number was up to; correct?
3 A.    Correct.
4 Q.    It would allow you to see who they were
5    contacting; right?
6 A.    Yes.
7 Q.    At what times they were targeting these people,
8    right?
9 A.    Yes.
10 Q.   In fact, that played a major role in county
11   detectives developing the other suspect phone number?
12        MR. BIONDO: Object to the form.
13   BY MR. JUBAS:
14 Q.   Do you recall that?
15        MR. BIONDO: Object to the form.
16 A.   I don't recall that.
17   BY MR. JUBAS:
18 Q.   So, I'll represent to you that that's how they
19   got the other suspect phone number. Does that surprise
20   you that they got it from the cellphone data?
21 A.   No.
22 Q.   Because they were able to see who else Cheron
23   Shelton was in contact with; right?
24 A.   Correct.
25 Q.   Do you recall that county police theorized that

AA COURT REPORTERS 412-288-5370                                    Page 38

1    the two suspect phone numbers were in contact
2    immediately before the homicides and subsequent to the
3    homicides?
4 A.    Did you say would it surprise me?
5 Q.    Were you aware?
6 A.    Yes.
7 Q.    And so just to clarify that, you were aware that
8    the two suspect phone numbers were in contact with each
9    other prior to the homicide and subsequent to the
10   homicide; correct?
11 A.   Yes.
12 Q.   Do you recall if detectives ever learned about
13   the whereabouts of the murder weapons?
14 A.   Unless they've learned of them since I retired,
15   we had not discovered them.
16 Q.   Okay. And did -- prior to your retirement, did
17   the detectives ever find any of the clothes that were
18   worn by the assailants?
19 A.   I don't recall.
20 Q.   I'll represent to you that they haven't.
21 A.   Okay.
22 Q.   At least to our knowledge. So, when you're
23   looking at this cellphone evidence, would you agree that
24   communications leading up to the massacre have
25   investigative value?

AA COURT REPORTERS 412-288-5370                                    Page 39

1 A.    Yes.
2 Q.    Would you agree that that could potentially lead
3    us in the direction of people that conspired to commit
4    the Wilkinsburg massacre?
5 A.    Yes.
6 Q.    Okay. So, we want to take a close look at that
7    evidence; right?
8        MR. BIONDO: I'll object to the form. But go
9    ahead and answer, if you can.
10 A.   Yes.
11   BY MR. JUBAS:
12 Q.   And with regards to cellphones, phone numbers
13   that were in touch with the suspect phone numbers after
14   the massacre, would you agree that that could be good
15   evidence of potentially trying to get rid of evidence?
16 A.   Yes.
17 Q.   Okay. So, you would agree with me that it is
18   critical to investigate cellphone numbers that are in
19   touch both prior and after the Wilkinsburg massacre with
20   our two suspect phone numbers?
21        MR. BIONDO: I'll object to the form. But go
22   ahead and answer, if you can.
23 A.   I would say it's critical to investigate all
24   aspects of the case.
25   BY MR. JUBAS:

AA COURT REPORTERS 412-288-5370                                    Page 40

1 Q.    But that's critical, as well; correct?
2 A.    That's a very important piece. Yes.
3 Q.    Okay. You had mentioned that a lot of training
4    and learning comes experientially; right?
5 A.    Yes.
6 Q.    And there's also actual trainings. Would
7    Allegheny County homicide detectives ever be trained to
8    hide evidence?
9 A.    No.
10 Q.   Do you think -- did you instruct Allegheny
11   County homicide detectives in this case to hide
12   evidence?
13 A.   No.
14 Q.   If you found out that they hid evidence, what
15   would you have done prior to your retirement?
16 A.   There would have been an internal investigation.
17 Q.   Walk me through an internal investigation.
18 A.   So, there would have to be an allegation or
19   assertion. It would be handled through our internal
20   affairs, and if it was founded, then it would be turned
21   over to the district attorney's office.
22 Q.   For potential criminal investigation?
23 A.   Both. Yes. Both as it pertains to this
24   investigation and criminal prosecution.
25 Q.   So, you're saying that you never became aware

CHERON SHELTON/ROBERT THOMAS v.
COUNTY OF ALLEGHENY, et al.

ANDREW SCHURMAN
April 9, 2024

---

AA COURT REPORTERS  412-288-5370                    Page 41

1 that evidence was hidden in this case?
2 A.    Correct.
3 Q.    And you're also saying that homicide detectives
4 are not trained to do that?
5 A.    Correct.
6 Q.    Based off of what you know about the case,
7 getting back to those phone numbers that were in contact
8 with the suspect phone numbers, based off of what you
9 know, are you able to identify any phone numbers that
10 should not have been investigated in this case?
11         MR. BIONDO: I'll object to the form. But go
12 ahead and answer, if you can.
13 A.    Can you rephrase that?
14 BY MR. JUBAS:
15 Q.    Do you think that every single one of the phone
16 numbers in touch with the suspect phone numbers in this
17 case should have been thoroughly investigated?
18 A.    I can't speak to that without having read --
19 Q.    I'll ask you this question.  If there was a
20 phone number in touch with one of the suspect phone
21 numbers immediately before the Wilkinsburg massacre as
22 well as numerous times after the Wilkinsburg massacre,
23 do you think that that evidence should have been
24 thoroughly investigated?
25 A.    Yes.

---

AA COURT REPORTERS  412-288-5370                    Page 42

1 Q.    Okay.  Now, what if that phone number also
2 belonged to one of the Hilltop guys?  Do you think that
3 that provides additional reasons that that evidence
4 should be investigated?
5 A.    I don't know the specifics.  Speaking in
6 generalities, yes.
7 Q.    So, generally speaking, if you learned that
8 another Hilltop boy that was friends with Cheron Shelton
9 was in contact with the suspect phone numbers before the
10 massacre and after the massacre, you would assume that
11 it was thoroughly investigated; right?
12         MR. BIONDO: I'll object to the form. But go
13 ahead and answer, if you can.
14 A.    Yes.
15 BY MR. JUBAS:
16 Q.    Because that could quite possibly mean that this
17 was one of the conspirators, doesn't it?
18 A.    Yes.
19 Q.    And this could quite possibly mean that this
20 conspirator may have helped them get rid of evidence,
21 wouldn't it?
22 A.    Working on your theory, yes.
23 Q.    It's possible; right?
24 A.    Yes.
25 Q.    This is the type of thing that you would need to

---

AA COURT REPORTERS  412-288-5370                    Page 43

1 rule out of an investigation?
2 A.    Yes.
3 Q.    Okay.  And especially if you -- if the county
4 police believed that the killers came from Hilltop,
5 there's no -- could you think of any reason that they
6 wouldn't investigate that?
7 A.    I can't.
8 Q.    Okay.  Would there be any reason for
9 investigators to hide evidence that another person may
10 have been involved?
11 A.    No.
12 Q.    Is there any reason that investigators would
13 hide evidence about somebody that helped to get rid of
14 the evidence?
15 A.    No.
16 Q.    Okay.  So, fair to say that under these
17 circumstances, that type of person should be thoroughly
18 investigated; right?
19 A.    Yes.
20 Q.    And also fair to say that under no circumstances
21 should Allegheny County Police detectives hide that
22 evidence; right?
23 A.    Correct.
24         MR. JUBAS: Okay.  Can we take a few minutes?
25         MR. BIONDO: Yes.

---

AA COURT REPORTERS  412-288-5370                    Page 44

1         (There was a pause in the proceedings.)
2 BY MR. JUBAS:
3 Q.    What is your designation now?
4 A.    I'm the director of public safety for
5 Children's Hospital of Pittsburgh.
6 Q.    So, I can call you Director Sherman?
7 A.    Or Andy.  That's fine.
8 Q.    Andy, you can call me Paul.
9         MR. PETRUNYA: I'm still going by Mr. Petrunya.
10         (Exhibit 1 was marked for identification.)
11 BY MR. JUBAS:
12 Q.    I'm going to mark this Exhibit 1 and I will
13 first give this to counsel for review, and I'm going to
14 be specifically drawing your attention to the three
15 paragraphs I starred.  That's going to be on Bates No.
16 DA-2935. I'm going to be drawing your attention to the
17 fourth page.
18 A.    I read those paragraphs.
19 Q.    Okay.  Were you able to see that this is a
20 search warrant affidavit for a cellphone connected to
21 Robert Thomas?
22 A.    Yes.
23 Q.    Okay.  And you see that this was filed on
24 April 8, 2016?
25 A.    Yes.

---

CHERON SHELTON/ROBERT THOMAS v.
COUNTY OF ALLEGHENY, et al.

ANDREW SCHURMAN
April 9, 2024

1 Q.    Okay. And you may not recall. I just wanted to
2 represent that Mr. Thomas was interviewed a few days
3 prior to this. Do you recall that?
4 A.    I don't.
5 Q.    Well, he was and he had a cellphone on him and
6 that is what this is a search warrant for.
7 A.    Okay.
8 Q.    So, now drawing your attention to those three
9 paragraphs on DA-2935, I'm going to show you at the
10 bottom right here. Do you see where it says further?
11 A.    Okay.
12 Q.    Could you start reading from there?
13 A.    Further, the record showed frequent contact
14 between Cheron Shelton and a number identified as
15 412-378-3461 to include prior to and after the
16 homicides, period. There was a break on communication
17 between the Cheron Shelton and the unknown number
18 between the timeframe of 9:50 PM and 11:19 PM on
19 3/9/2016.
20 Q.    Could you continue reading the next paragraph?
21 A.    Sure. Further review of the cellphone records
22 showed contacts with the phone numbers that your affiant
23 was not able to identify, period. It was your affiant's
24 experience has -- I'm sorry. It has been your affiant's
25 experience that persons involved in criminal incidents

1 often will communicate with one another prior to, during
2 and after the commission of criminal acts. It has
3 further been your affiant's experience that persons
4 involved in the criminal -- involved in criminal
5 incidents will often destroy or discard cellphones in an
6 attempt to conceal their involvement in said criminal
7 incidents. Upon his interview, Robert Thomas was asked
8 about phone number 412-378-3461, period. The number was
9 found in several witness contact information as, quote,
10 Millhouze spelled with a Z and in Cheron Shelton's
11 cellphone records.
12 Q.    So, that last sentence that you read, that
13 number was found in several witness contact information
14 as Millhouze; correct?
15 A.    Yes.
16 Q.    What does that mean to you?
17 A.    That there was other phones that were examined
18 and that phone number was found in either the contacts
19 or the call logs listed as Millhouze.
20 Q.    So, what I'm going to do is -- I'm not going to
21 submit these as evidence necessarily right now. I just
22 want to show you the extraction reports that were
23 provided to defense pertaining to the cellphones with
24 this number in it. Okay. Do you understand that?
25 A.    Sure.

1        MR. JUBAS: And, Dennis, I'm happy if you guys
2 want to check it out beforehand. I'm going to show him
3 the extraction reports.
4        MR. BIONDO: Okay.
5        MR. JUBAS: Okay. Dennis, so, I'm first going
6 to hand you -- this is a copy of Ashley Smith's
7 extraction report, and that's one of Cheron Shelton's
8 sisters.
9 BY MR. JUBAS:
10 Q.    While they're doing that, do you know the
11 difference between an extraction report and a cellphone
12 download?
13 A.    I don't.
14 Q.    Okay. So, I'll represent to you that a
15 cellphone download is a software program that allows you
16 to create extraction reports.
17 A.    My understanding of a cellphone download would
18 be taking the actual physical cellphone and downloading
19 the data. That creates a download. So, it -- maybe
20 it's the same. Maybe extraction equals download in this
21 case.
22 Q.    So, the extraction reports are derived from the
23 cellphone download. So, are you aware that you can --
24 like we had discussed earlier, you're able to winnow
25 down what you want to find in a cellphone download and

1 create reports based off of the terms that you're
2 looking for or the dates?
3 A.    Yes.
4 Q.    Okay. So, what I'm showing you is not a
5 cellphone download. It is an extraction report that
6 came from a cellphone download. Does that make sense?
7 A.    Yes. Okay. I follow you now.
8 Q.    Okay.
9        MR. BIONDO: So, I'm going to object to this
10 line of questioning. He has stated that he hasn't
11 reviewed these before and you just had to explain to
12 him, you know, where you were going with the difference
13 between extraction reports and cellphone downloads.
14 You're free to ask the questions, but I object to the
15 line of questioning and ask for a continuing objection
16 on the entire line of questioning related to all the
17 extraction reports that you're going to show him.
18        MR. JUBAS: Certainly. Certainly.
19 BY MR. JUBAS:
20 Q.    Okay. So, we'll start out. What I'm going to
21 do here is, now, this is a PDF --
22 A.    Do you have the ability to put it up there?
23        MR. BIONDO: No.
24 BY MR. JUBAS:
25 Q.    I'm going to hand this to you.

CHERON SHELTON/ROBERT THOMAS v.
COUNTY OF ALLEGHENY, et al.

ANDREW SCHURMAN
April 9, 2024

1  A.    Okay.
2  Q.    So, what I'm going to do is I'm going to search
3  certain terms and you'll be able to see what comes up --
4  A.    Okay.
5  Q.    -- as a result of my search. So, we'll start
6  with Millhouse because that is what -- from what you
7  just read; correct?
8  A.    Yes.
9  Q.    So, that name, Millhouse, was being attributed
10  to one of the suspect phones; correct?
11  A.    Yes.
12  Q.    Okay. So, I'm going to type in Millhouse into
13  the search -- and that's M-I-L-L-H-O-U-S-E -- and I'm
14  also going to zoom in here for you. Could you please
15  read the number associated with Millhouse in Ashley
16  Smith's phone?
17  A.    This is a PDF. Is it okay if I scroll?
18  Q.    Yes. It's highlighted.
19  A.    476 is the line that's highlighted. I just want
20  to see the top. Oh, my God. That's a long one. So,
21  this is a -- you said a download or an extraction?
22  Q.    An extraction from the download.
23  A.    It looks more like a download. Download is more
24  all-inclusive of the data. I see text messages --
25  Q.    Well, here --

1  A.    -- and contacts.
2  Q.    We'll do this, then, to make sure that we're on
3  the same page. I will show you page 1 and please check
4  out the top.
5  A.    Oh. Okay.
6  Q.    So, we can agree that this is an extraction
7  report, not a cellphone download; right?
8  A.    I think it's semantics but -- I think those
9  words are kind of synonymous.
10  Q.    Can we agree that this is an extraction report?
11  A.    Absolutely we can agree the title of that PDF
12  says extraction report. I just don't want to misspeak,
13  Paul. Do you know what I mean?
14  Q.    I appreciate that. So, getting back to what we
15  were reading previously, and that's cell 476, I believe.
16  A.    Cell 476. Yes.
17  Q.    And what number is associated with Millhouse?
18  A.    So, cell 476 has Millhouse spelled with an S.
19  This document, the search warrant, had Millhouze spelled
20  with a Z.
21  Q.    And what was the phone number that was
22  associated with Millhouse in the search warrant?
23  A.    The search warrant, it was 412-378-3461.
24  Q.    Can we agree that Ashley Smith's phone is not
25  reflective of the contact information placed in the

1  search warrant?
2  A.    Ashley Smith's phone extraction has Millhouse
3  spelled with an S, and 412-295-1769 is the phone number
4  associated with that.
5  Q.    Okay. And can we agree that, referring back to
6  that paragraph you read, that Millhouse is not saved in
7  Ashley Smith's phone under the 3461 number? Can we
8  agree on that?
9  A.    I can't because I can't see this entire report
10  and what I see here is cell 470 -- oh, that's a touch
11  screen. I'm sorry. It didn't change. What I see in
12  476 is name, colon, Millhouse, source recently
13  contacted, then two cells over, the 1769 phone number.
14  So, I don't know the source of the name.
15  Q.    Okay.
16  A.    Like so I can't look at the entire extraction
17  report and say that nickname came from something entered
18  by Ashley Smith.
19  Q.    Okay. What I'm next going to do is I'm going to
20  type in 412-378-3461 and that is -- that is the number
21  referenced in that search warrant connected to
22  Millhouse; correct?
23  A.    Correct.
24  Q.    Okay. So, I'm now going to show you the results
25  of that search, and do you see the highlighted portion

1  there?
2  A.    I do.
3  Q.    Do you see that number with a name or a contact
4  associated with it?
5  A.    I do not.
6  Q.    Okay.
7  A.    But the other ones above and below it do not
8  have names associated with it, either.
9  Q.    Okay. Is there anything -- I want to make sure
10  that you feel comfortable before moving forward. Is
11  there -- can we agree that whatever is being referenced
12  regarding the suspect phone number and Millhouse, can we
13  agree that was not found in Ashley Smith's
14  cellphone?
15  A.    No, because I haven't seen that entire
16  extraction report.
17  Q.    So, that was my next question.
18  A.    I could tell you that the number is different
19  than what's associated with the name Millhouze spelled
20  with a Z associated in the affidavit as opposed to what
21  you showed me in that extraction report.
22  Q.    Okay. So, just to clean that up, the cellphone
23  and the contact name associated with the search warrant
24  do not match the cellphone number and contact name in
25  Ashley Smith's cellphone?

AA COURT REPORTERS 412-288-5370                                Page 53

1 A.     From what you showed me, the limited portion of
2  that extraction report you showed me.
3 Q.     Okay. Now, if -- I'll represent to you that at
4  no point in this cellphone download is the 3461 number
5  saved as Millhouse. Okay? So, with that being said, if
6  that is the case, would you agree that the information
7  regarding 3461 and Millhouse saved as a contact does not
8  match Ashley Smith's cellphone?
9 A.     Taking it at your word, yes.
10 Q.    So, I'm going to next move to Brittany Shelton's
11  cellphone.
12 A.    Okay.
13       MR. BIONDO: And, again, same objection. He
14  hasn't seen these before. This isn't part of the
15  investigation which he really was involved with.
16       MR. JUBAS: That's not correct. He's involved
17  with cellphones.
18       MR. BIONDO: But he hasn't viewed any of these
19  documents that you're showing him here today.
20       MR. JUBAS: He was overseeing the cellphone
21  unit.
22 BY MR. JUBAS:
23 Q.    Okay. One moment.
24 A.    So, oversight and hands-on are very different.
25 Q.    I realize that. I'm just trying to get your

AA COURT REPORTERS 412-288-5370                                Page 54

1  insight with regards to the person that was overseeing
2  the cellphones.
3 A.     Having oversight didn't make me an AV wizard,
4  either.
5 Q.     Well, it sounds like you know enough about this
6  stuff to navigate it.
7 A.     I can navigate my own iPhone.
8 Q.     Brittany Shelton's download -- well, extraction
9  report. I'm going to do the same thing. I'm going to
10  type in 412-378-3461 which is that suspect phone number;
11  right?
12 A.    Yes.
13 Q.    So -- do you mind if I come over there?
14 A.    No. Not at all.
15 Q.    Alright, Andy. Up close and personal now. So,
16  would you agree that that -- the search term is
17  412-378-3461?
18 A.    Yes.
19 Q.    And would you agree that this is the first
20  result that showed up?
21 A.    I don't know if that's the first, but it is
22  what's on the screen.
23 Q.    Well, that's number 1; right?
24 A.    Oh. Okay. I got you.
25 Q.    And that is cell 3626?

AA COURT REPORTERS 412-288-5370                                Page 55

1 A.     Yes.
2 Q.     And this is would be on page 136?
3 A.     Yes.
4 Q.     Now, this is Brittany Shelton's cellphone.
5  That's the sister of Cheron Shelton.
6 A.     Okay.
7 Q.     This was obtained consensually from her. Is
8  there -- referring to cell 3626, is there a name or a
9  contact name associated with that name?
10 A.    It does not appear.
11 Q.    We're going to do -- go through -- okay. Now,
12  this is cell 154 on page 391; correct?
13 A.    Yes.
14 Q.    Okay. And do you see that number again?
15 A.    Yes.
16 Q.    And do you see a name associated with that
17  number?
18 A.    No name, but in this portion of the report, it
19  does not appear there's names associated.
20 Q.    So, we'll move to the next one. So, this is
21  page 820 and this is cells 7038 and 7039. Do you see
22  the number there?
23 A.    Yes.
24 Q.    Okay. And is it saved -- is there any
25  information saying what it is saved as?

AA COURT REPORTERS 412-288-5370                                Page 56

1 A.     No.
2 Q.     But you would agree with me that there is a text
3  message from that number? Right?
4 A.     Yes.
5 Q.     Okay.
6 A.     There's data there. I'm not sure.
7 Q.     What does it say?
8 A.     Hay it Rob need you to call me. H-A-Y it Rob
9  need you to call me.
10 Q.    And just to clarify, you didn't see anything
11  regarding Millhouse?
12 A.    Correct.
13 Q.    Associated with this number?
14 A.    Correct.
15 Q.    The next one is on page 824 and we're referring
16  to cells 7133 through 7139 and is that phone number
17  represented here again?
18 A.    Yes.
19 Q.    Do you see a contact name or Millhouse
20  associated with that phone number?
21 A.    No.
22 Q.    Okay. We're going to continue. Okay. So, now
23  that takes us to page 825. We're looking at cells 7169
24  through 7175. Again, do you see that phone number?
25 A.    Yes.

1 Q.   And this is the suspect phone number; right?
2 A.   Yes.
3 Q.   Do you see any names or contacts associated with
4 this number?
5 A.   No.
6 Q.   Okay. So, fair to say that Millhouse was not in
7 any of these cells?
8 A.   Yes.
9 Q.   Okay. Moving on. Okay. Now we are at
10 page 826, cell 7176. Do you see that number?
11 A.   Yes.
12 Q.   Same number we've been looking at?
13 A.   Yes.
14 Q.   And do you see a contact name associated with
15 it?
16 A.   No.
17 Q.   Do you see Millhouse associated with it?
18 A.   No.
19 Q.   Okay. Now we're at page 12 -- 1225 and we're
20 looking at cells 15383 through 15385, and do you see
21 that suspect phone number?
22 A.   Yes.
23 Q.   Okay. And it looks like we're walking --
24 cycling back through reports. You would agree with me
25 there's no contact or Millhouse associated with this

1 number?
2 A.   Not stored, but it looks like the sender said
3 hay it's rob need you to call me.
4 Q.   Hay it rob need you to call me. Is that the one
5 that you read earlier?
6 A.   Yes.
7 Q.   So, we're starting to cycle through.
8 A.   Yeah.
9 Q.   Keep going. Want to be thorough here. Now,
10 this takes us to page 1244 and we're looking at cells
11 16197 through 16203, and, again, does this show us the
12 3461 suspect phone number?
13 A.   Yes.
14 Q.   Do you see any contacts saved associated with
15 it?
16 A.   No.
17 Q.   Do you see Millhouse associated with it?
18 A.   No.
19 Q.   Okay. And now this takes us to 1246, page 1246,
20 and we're looking at cells 16300 through 16307. Does
21 this show us again the 3461 suspect number?
22 A.   Yes.
23 Q.   Do you see any contacts that it's saved under?
24 A.   No.
25 Q.   Do you see Millhouse associated with it?

1 A.   No. Again, I would agree it looks like we're
2 cycling just based on the text messages that it's the
3 same data over and over.
4 Q.   I just want to be thorough and show you that
5 we're going through the whole thing.
6 A.   Got you.
7 Q.   Okay. And next page is 1247 and we're looking
8 at cells 16308 through 16309. Is that the suspect phone
9 number?
10 A.   Yes.
11 Q.   Do you see a contact or Millhouse associated
12 with it?
13 A.   No.
14 Q.   Okay. And then this takes us back the whole way
15 through. So, Andy, did you see anything in Brittany
16 Shelton's cellphone report indicating the 3461 number
17 associated with Millhouse?
18 A.   No.
19 Q.   So, would you agree with me that Ashley Smith
20 cellphone report that we just reviewed also does not
21 show the 3461 number associated with Millhouse?
22 A.   That's the one we just reviewed?
23 Q.   That one was Brittany Shelton. Before that --
24 A.   Associated with the nickname Millhouse but that
25 were the name Rob. Is Rob Thomas synonymous with

1 Millhouse? Is that his nickname?
2 Q.   We don't know that.
3 A.   Oh.
4 Q.   Okay.
5 A.   So, then, Millhouse is not associated with that,
6 to answer your question directly.
7 Q.   And also Ashley Smith the ones --
8 A.   Correct.
9 Q.   -- that were download also, that 3461 number is
10 not associated with Millhouse; right?
11 A.   Correct.
12 Q.   Okay. We're getting there. Now I'm going to
13 show you one of the Channel Falls cellphone downloads.
14 There's two.
15 A.   Okay.
16 Q.   We're going to do the exact same thing.
17 A.   Channel Falls is?
18 Q.   Cheron Shelton's girlfriend.
19 A.   Girlfriend.
20      MR. JUBAS: So, Dennis, this is one of the
21 cellphone downloads pertaining to Channel Falls.
22 BY MR. JUBAS:
23 Q.   Prior to showing you anything, do you recall
24 that Cheron Shelton's sisters Ashley Smith and Brittany
25 Shelton were interviewed?

1 A.    I don't recall.
2        MR. BIONDO: And same objection with this
3 report. It's not something he's looked at before and he
4 did not investigate this.
5 BY MR. JUBAS:
6 Q.    So, I am showing you what I'm doing is I just
7 typed in 412-378-3461 to search through this report.
8 Would you agree with me that that's the suspect's phone
9 number?
10 A.    Yes.
11 Q.    So, we're going to do -- hit enter and it says
12 that Adobe Acrobat has finished searching the document,
13 no matches were found.  Do you agree with that?
14 A.    Yes.
15 Q.    So, is it fair to say that the suspect phone
16 number is not found in the cellphone report -- one of
17 the cellphone reports connected to Channel Falls?
18        MR. BIONDO: Object to form.  If you can answer,
19 go ahead.
20 A.    Yes.
21 BY MR. JUBAS:
22 Q.    Okay.  We're getting there, Andy.  Now, there
23 was a second extraction report for Channel Falls.
24 Handing that to your counsel right now for them to
25 review.  Thank you.  Okay.  So, what I'm doing now is

1 this is the second Channel Falls extraction report.  I'm
2 going to do what we were doing previously and I'm going
3 to search for the suspect cellphone number and that's
4 412-378-3461.  I hit search.  Does that match the
5 suspect phone number, the search that I conducted there?
6 A.    Yes.
7 Q.    Okay.  And were any results found in Channel
8 Falls' second cellphone extraction report?
9 A.    No.
10 Q.    So, we've seen four cellphone extraction reports
11 so far and you saw the suspect phone saved as Millhouse
12 in none of them; right?
13 A.    Correct.
14 Q.    Two more.  Okay.  So, I am showing you a -- one
15 -- there's two cellphones extraction reports associated
16 with Dontay Reed.  He was one of the suspects.  So,
17 here's the first one I'm handing to your counsel to
18 review.  I'm going to do the same search.  That's
19 412-378-3461 and that is one of our suspect phone
20 numbers; right?
21 A.    Yes.
22 Q.    Okay.  And I hit enter to conduct the search,
23 and can you please read the results?
24 A.    And how do we know this is associated with
25 Dontay Reed?

1 Q.    The first page of the extraction report.
2 A.    It's probably under this.  Okay.  Yes.
3 Q.    And what does that search provide?
4 A.    Zero results.
5 Q.    Zero results.  Okay.  We've got one more
6 connected to Dontay Reed.  I'm handing this to counsel
7 to look at.  I'm going to type in 412-738-3461 [sic]
8 into the search bar and hit enter, and can you please
9 tell me what the results are of that search inquiry?
10 A.    No matches were found.
11 Q.    So, that brings us up to six extraction reports
12 pertaining to cellphones that were obtained in this case
13 and you would agree with me that not a single one of
14 them had the suspect phone number saved as Millhouse;
15 right?
16 A.    Correct.
17 Q.    Actually, you know what?  I think there might be
18 two more.  We want to be thorough here.  So, I am
19 showing you the final -- finally the final cellphone
20 report -- extraction report that was available in this
21 case to the defendants.
22        MR. BIONDO: I don't know what this is.  I don't
23 know -- I don't know what that is.
24        MR. JUBAS: It's a -- one of the extraction
25 reports that was provided in this case.

1        MR. BIONDO: Whose is it?  Do you know whose it
2 is?
3        MR. JUBAS: It just says Kyocera.  I think it
4 might be one of Shelton's phones.
5        MR. BIONDO: You can show it to him.
6 BY MR. JUBAS:
7 Q.    I'm going to enter the same search criteria and
8 hit search.  Can you please tell me what the results of
9 that search were?
10 A.    No matches were found.
11 Q.    Okay.  So, we have gone through seven extraction
12 reports pertaining to cellphone reports that were
13 provided to the defense in the underlying criminal
14 matter and you would agree with me that not a single one
15 of them had this suspect's cellphone number saved as
16 Millhouse; right?
17 A.    Correct.
18 Q.    So, now I am going to show you an excerpt from
19 the preliminary hearing.  I'm going to hand this to
20 counsel to verify.  Okay.  So, I am going to hand you
21 the computer and I'm showing you page 97 of the
22 preliminary hearing transcript, and this is Allegheny
23 County Police Detective Miller's direct testimony.
24 A.    Okay.
25 Q.    So, please, go ahead and review that page.

AA COURT REPORTERS 412-288-5370                    Page 65

1 A.    Just that page?
2 Q.    Yes. Okay. So, Andy, if you wouldn't mind, if
3 you could read line 6 Through 24?
4 A.    Starting with line 6: How is it you developed
5 Robert Thomas's cellphone during the time of the
6 murders?
7       Answer: Through a download of Brittany
8 Shelton's phone.
9       Question: Was that conducted by the county
10 police?
11      Answer: Yes, it was.
12      Question: What do the cell download records
13 reveal with regard to Robert Thomas?
14      Answer: Well, first, it was revealed a contact
15 in her contact log as Millhouze, M-I-L-L-H-O-U-Z-E, with
16 that associated number.
17      What was the associated number?
18      412-378-3461.
19      Question: What else did the download of
20 Brittany Shelton's phone reveal?
21      A text message received on February 1st of this
22 year from Millhouse, same 378 number. In the text --
23 body of the text, it says hey it's Rob I need you to
24 call me.
25      That was the last question.

AA COURT REPORTERS 412-288-5370                    Page 66

1       MR. BIONDO: It just cuts off.
2 BY MR. JUBAS:
3 Q.    That's fine. So, we just reviewed Brittany
4 Shelton's cellphone extraction report; correct?
5 A.    We reviewed a PDF you showed me. Yes.
6 Q.    And I'm representing to you that that's what was
7 made available to the defense.
8 A.    Yes.
9 Q.    Okay. So, would you agree with me that based
10 off of the cellphone evidence that you and I reviewed
11 together, that what Detective Miller testified to at the
12 preliminary hearing was inaccurate?
13      MR. BIONDO: I'll object to the form. But go
14 ahead and answer, if you can.
15 A.    Let me ask you a question. Did you search
16 Brittany's as Millhouse?
17 BY MR. JUBAS:
18 Q.    We searched the number. We could go back
19 through, if you'd like.
20 A.    No. Because one of them you searched as
21 Millhouse. Was that Brittany's?
22 Q.    I'll tell you what we can do.
23 A.    Because he spells it with a Z there.
24 Q.    We can go through the number search with
25 Brittany to see if it was saved so we'll be able to see

AA COURT REPORTERS 412-288-5370                    Page 67

1 the contacts associated with that number.
2 A.    I'm not following.
3 Q.    Let's just -- we'll take our time. Okay. So,
4 this is Brittany Shelton.
5 A.    Okay.
6 Q.    So, we'll do the search. Do it the easy way.
7 412-378-3461. That's the suspect's cellphone number;
8 right?
9 A.    Yes.
10 Q.    Hit enter. Okay. So, this is the first.
11 A.    Right. So, we did this. Can you search
12 Millhouze with a Z and see if we get any results out of
13 it?
14 Q.    Yes. Did I spell that right?
15 A.    It looks like it. Yes.
16 Q.    So, that's spelled M-I-L-L-H-O-U-Z-E --
17 A.    Yes.
18 Q.    -- correct? And hit search and what are the
19 results of that?
20 A.    No matches were found.
21 Q.    Okay. So, can we agree that Brittany Shelton's
22 cellphone did not contain the suspect phone number saved
23 as Millhouse?
24      MR. BIONDO: I'll object to the form. But go
25 ahead and answer, if you can.

AA COURT REPORTERS 412-288-5370                    Page 68

1 A.    This document does not.
2 BY MR. JUBAS:
3 Q.    Okay. Is it fair to say that Detective Miller
4 did not get Millhouse associated with the suspect phone
5 number from Brittany Shelton's cellphone download?
6 A.    From this document, correct.
7 Q.    Okay. So, based off of your review of this
8 document, would you agree with me that the preliminary
9 hearing testimony from Patrick Miller was inaccurate?
10 A.    Solely based on that document, correct.
11 Q.    Okay. So, you also reviewed with me six other
12 cellphone extraction reports; right?
13 A.    Correct.
14 Q.    Now, I'm going to represent to you -- and please
15 correct me if I'm wrong -- you guys may know more than I
16 do -- that those were the only cellphone download
17 extraction reports that were provided to the defense.
18 A.    I don't know.
19 Q.    I'm representing that to you.
20 A.    Okay.
21 Q.    Any idea where that evidence came from that he
22 was referring to?
23 A.    I don't recall.
24 Q.    Is that -- if they did have a phone -- when I
25 say they, I mean Allegheny County homicide detectives.

CHERON SHELTON/ROBERT THOMAS v.
COUNTY OF ALLEGHENY, et al.

ANDREW SCHURMAN
April 9, 2024

1  If they did have a phone with the suspect phone number
2  saved as Millhouze with a Z, should they have turned
3  that over?
4  A.    I would suspect that would be yes.
5  Q.    Okay.  Would you ever advise one of the
6  Allegheny County homicide detectives to not turn over a
7  cellphone with this particular evidence?
8  A.    No.
9  Q.    Especially if they're going to testify about it,
10  right?
11  A.    Correct.
12  Q.    Did they ever tell you that -- did any of the
13  Allegheny County homicide detectives ever tell you that
14  they were going to make misrepresentations when it came
15  to cellphone evidence?
16  A.    No.
17  Q.    Is this the first time that you're learning
18  about it?
19          MR. BIONDO: Object to form.  Go ahead and
20  answer, if you can.
21  A.    Yes.
22  BY MR. JUBAS:
23  Q.    Had you known back then in 2016 that Allegheny
24  County Police were making misrepresentations with
25  regards to cellphone evidence, what would you have done?

1          MR. BIONDO: Object to form.  But go ahead and
2  answer, if you can.
3  A.    So, this -- that's a hypothetical question.
4  Number one, I did not know that, I was not inclined to
5  know that, but had I known that, I would have stopped
6  it, but I don't know that to be factual.
7  BY MR. JUBAS:
8  Q.    What would you have done to stop it?
9  A.    So, you're asking had someone presented me -- a
10  detective presented me with the fact that they were
11  going to misrepresent themselves in our department under
12  you oath?  Is that the question?
13  Q.    Yes.
14  A.    I would have said don't do it, can't do it.
15  Q.    Is that it?  That's all you would have said?
16  A.    Yes.
17  Q.    Okay.  Now, what if you found out subsequent to
18  their providing that testimony?  What would you have
19  done?
20  A.    I did not.
21  Q.    Hypothetically, what would you have done?
22  A.    So, the hypothetical questions, are they
23  relevant?  Because there's a lot of ways you can go with
24  a hypothetical question.  Right?
25  Q.    Well, I was never a lieutenant overseeing a

1  homicide investigation.  That's why I'm asking you the
2  question.
3  A.    There's a lot of variables involved with your
4  question.
5  Q.    Like what?
6  A.    You tell me.  Tell me exactly.  You just asked a
7  hypothetical question.
8  Q.    Okay.
9  A.    Give me specifics.
10  Q.    I'm going to show you a cellphone download --
11  actually, no.  Yes.  Yes, I am.  Yes, I am.  I'm going
12  to show you another report that was turned over to a
13  few weeks ago by Detective Hitchings.  Did you ever hear
14  the name Shaquan Roberts in this investigation?
15  A.    I don't recall.
16  Q.    So, I am now going to hand my computer over to
17  your counsel to check out this extraction report.
18          (There was a pause in the proceedings.)
19          MR. BIONDO: Same objection again as with all
20  the other extraction reports.  He did not work on these
21  extraction reports.  This is the first time he's seen
22  any of these.  I object to the line of questioning.
23          MR. JUBAS: Sure.  Just to mention that we keep
24  this in order, we're only asking him with regards to
25  what his impression as the supervising lieutenant that

1  was also in charge of managing the cellphone --
2          MR. BIONDO: Understood.  He still hasn't seen
3  the reports.
4          MR. JUBAS: That's what this is for.
5  BY MR. JUBAS:
6  Q.    So, could you identify -- now, I'm going to
7  represent to you that this is the extraction report
8  belonging to Shaquan Roberts, and drawing your attention
9  to case name, can you tell me what the case name is
10  there?
11  A.    Shaquan Roberts.
12  Q.    And that's S-H-A-Q-U-A-N, R-O-B-E-R-T-S; right?
13  A.    Correct.
14  Q.    And what is the case name?
15  A.    Wilkinsburg shooting.
16  Q.    So, I'm going to do the same search on this
17  412-378-3461 and we're going to hit enter, and can you
18  please -- we're looking at page 6 and cell 100.  Can you
19  please read what that says?
20  A.    Cell 100, 412 -- I'm sorry -- outgoing to
21  412-378-3461.  Below that, the word Millhouze spelled
22  with a Z.
23  Q.    Now, does that match the suspect phone number
24  with Millhouze?
25  A.    Yes.

CHERON SHELTON/ROBERT THOMAS v.
COUNTY OF ALLEGHENY, et al.

ANDREW SCHURMAN
April 9, 2024

1  Q.    Okay. So, based off of this evidence, is it
2  fair to say that the suspect phone number being
3  412-378-3461 associated with Millhouze came from Shaquan
4  Roberts' cellphone?
5         MR. BIONDO: I'll object to the form. But go
6  ahead and answer, if you can.
7  A.    I don't know where it came from or I can't
8  recall where it came from. In that extraction report
9  you're showing me, the two are directly linked.
10  BY MR. JUBAS:
11  Q.    Okay. So, you said you're not sure if it came
12  from Shaquan Roberts?
13  A.    I don't recall the original source or if that is
14  the original source.
15  Q.    Is it possible that this is the original source?
16  A.    Yes.
17  Q.    Okay.
18  A.    For my memory purposes.
19  Q.    I'll represent to you that this was obtained on
20  March 15, 2016 in the early days of the investigation.
21  A.    Okay.
22  Q.    And I'll also represent to you that Brittany
23  Shelton's and Ashley Smith's were obtained in the early
24  days of the investigation. Based on that knowledge, do
25  you think it's possible that Allegheny County detectives

1  obtained the contact information associated with
2  Millhouze and the suspect number from Shaquan Roberts?
3  A.    It's possible.
4  Q.    Okay. Would you advise Allegheny County Police
5  detectives in a homicide investigation to hide the
6  Shaquan Roberts evidence?
7  A.    No.
8  Q.    Would you advise them to misrepresent where they
9  got particular cellphone evidence or theories from?
10  A.    No.
11  Q.    Is today the first day that you are learning
12  about a witness named Shaquan Roberts?
13  A.    I don't recall when or if I heard about Shaquan
14  Roberts in 2016.
15  Q.    Had you known about the details of the
16  cellphones, would you have had more to say about Shaquan
17  Roberts?
18  A.    No.
19  Q.    Would you have allowed Allegheny County
20  detectives to misrepresent where they got cellphone
21  evidence from?
22  A.    No.
23         MR. BIONDO: Object to form. You could answer.
24  A.    No.
25  BY MR. JUBAS:

1  Q.    So, now that we got a little bit more context
2  here, getting back to your question about what you would
3  have done, so, if you learned about misrepresentations
4  being made on the record by county detectives about
5  cellphone evidence, what would you have done in this
6  circumstance?
7  A.    Again, that's hypothetical. Had I been told
8  there was a misrepresentation, there would have been an
9  investigation and that would have been turned over to
10  the district attorney's office.
11  Q.    Would you have wanted to look into this
12  evidence?
13         MR. BIONDO: I'll object to the form just
14  because I don't understand it. But go ahead and answer,
15  if you can.
16  BY MR. JUBAS:
17  Q.    I can rephrase.
18  A.    Yeah. Rephrase that, please.
19  Q.    Okay. So, hypothetically, getting back to our
20  hypothetical, you just found out that representations
21  are being made by county detectives regarding cellphone
22  evidence.
23  A.    Yes.
24  Q.    Okay. Would you -- prior to alerting for an
25  investigation, would you yourself wanted to look into

1  the details of this evidence?
2         MR. BIONDO: I'll object again. But go ahead,
3  if you can answer.
4  A.    In regards to an internal investigation or as it
5  pertains to the criminal investigation?
6  BY MR. JUBAS:
7  Q.    As it pertains to the criminal -- the
8  Wilkinsburg massacre investigation.
9  A.    So, hypothetically, had I been made aware that
10  someone -- a detective misrepresented themselves on the
11  stand, that would have been brought to the DA's office
12  and I might not have personally evaluated the evidence
13  but other detectives would have.
14  Q.    Okay.
15  A.    In collaboration with the DA's office.
16  Q.    So, upon learning that misrepresentations were
17  being made by Allegheny County detectives, somebody
18  would have looked into this evidence; right?
19  A.    Correct.
20  Q.    Okay.
21         MR. BIONDO: Are you moving on or -- we want to
22  take a couple minutes. If you want to keep going, it's
23  okay. But if we're going on to the next subject --
24         MR. JUBAS: We can take a break.
25         (There was a pause in the proceedings.)

CHERON SHELTON/ROBERT THOMAS v.
COUNTY OF ALLEGHENY, et al.

ANDREW SCHURMAN
April 9, 2024

1  BY MR. JUBAS:
2  Q.   So, picking up where we left off, Andy, we were
3  talking about what happens after you learn that a
4  detective has misrepresented himself on the record;
5  right?
6  A.   Correct.
7  Q.   Okay. If you become aware of that in a criminal
8  case after a preliminary hearing, do you have the duty
9  to disclose that to the defense?
10 A.   First step would be the district attorney's
11 office. I think they would then disclose.
12 Q.   Okay. And I'm going to draw your attention back
13 to Exhibit 1, and this was a search warrant for the
14 retrieval of cellphone numbers associated with Robert
15 Thomas; right?
16 A.   Yes.
17 Q.   Okay. Now, drawing your attention to page
18 DA-2935, okay, and we are looking back at those
19 paragraphs initially and showing you -- directing your
20 attention to that top paragraph a few sentences down
21 where it says further.
22 A.   Okay.
23 Q.   Could you read that again, please?
24 A.   Further, the records -- further, the records
25 showed frequent contact between Cheron Shelton and a

1  number identified as 412-378-3461 to include prior to
2  and after the homicides.
3  Q.   Okay. And, again, is it reasonable to assume
4  that Allegheny County Police are trying to get this
5  information because they think that conspiring and
6  potentially hiding evidence may have occurred between
7  these cellphones?
8  A.   Yes.
9  Q.   Okay. Now, drawing your attention to the
10 paragraph below that, the bottom of that paragraph where
11 it says upon his interview Robert Thomas.
12 A.   Okay.
13 Q.   Could you read that, please?
14 A.   Upon his interview, Robert Thomas was asked
15 about the phone number 412-378-3461.
16 Q.   Can you continue reading?
17 A.   That number was found in several witness contact
18 information as Millhouze and in Cheron Shelton's
19 cellphone records.
20 Q.   And that's spelled M-I-L-L-H-O-U-Z-E; correct?
21 A.   Yes.
22 Q.   And after reviewing the cellphone evidence in
23 this case, you would agree with me that the only source
24 that you saw came from Shaquan Roberts' cellphone;
25 right?

1  A.   Today, yes.
2  Q.   So, is it fair to say that this affidavit is --
3  also includes a misrepresentation pertaining to --
4  A.   That's not fair to say.
5  Q.   So, could you please point me in the direction
6  of the other cellphones that included that contact?
7  A.   I don't recall or know what was included in
8  2016.
9  Q.   Just based off of the evidence that you reviewed
10 today?
11 A.   What we had today was the seven records you
12 showed me, only the one had Millhouze.
13 Q.   And that was Shaquan Roberts?
14 A.   Shaquan Roberts. Correct.
15 Q.   Okay. So, based off of that knowledge alone, is
16 it fair to say that a misrepresentation was made in this
17 affidavit?
18      MR. BIONDO: I'll object to the form. But if
19 you can answer, go ahead.
20 A.   Yeah. So, I think in a silo today, this is not
21 accurate, but in context in 2016, we don't know that
22 wasn't accurate.
23 BY MR. JUBAS:
24 Q.   So, are you saying that there may have been
25 additional cellphones that contained this contact

1  attributed to Millhouze?
2  A.   There could have been.
3  Q.   Why wouldn't they turn that over?
4  A.   I don't know.
5  Q.   Is that a problem?
6  A.   I don't know.
7  Q.   So, let me ask you. I'll ask you this question.
8  Hold on one second. So, as the lieutenant overseeing
9  the investigation, would you turn a blind eye to this
10 evidence if you learned about these misrepresentations?
11 A.   I would not.
12 Q.   What would you do specifically regarding this
13 search warrant affidavit?
14 A.   So, there have to be some factfinding done. If
15 it was brought to my attention that an affidavit
16 contained a misrepresentation, we have to, number one,
17 determine whether it was intentional or accidental and
18 then our findings would lead us to the next level.
19 Q.   Okay. Would you tell the district attorney's
20 office about this?
21 A.   Yes.
22 Q.   Based off of what you know?
23 A.   Yes.
24 Q.   Why would you care about misrepresentations
25 being made in affidavits and testimony?

CHERON SHELTON/ROBERT THOMAS v.
COUNTY OF ALLEGHENY, et al.

ANDREW SCHURMAN
April 9, 2024

1  A.    So, I think it's illegal to misrepresent facts
2  and circumstances.
3  Q.    Okay.
4  A.    Am I correct in that?
5  Q.    I'm just asking your impression.
6  A.    There's a criminal -- criminal penalty
7  associated with misrepresenting facts in evidence.
8  Q.    But based off of this evidence, you're saying
9  you're not quite sure whether it was intentional?
10  A.    Correct.
11  Q.    Okay.  We have a misrepresentation here, a few,
12  but we don't know the context of them; right?
13  A.    As we sit here today with the seven records you
14  have and this affidavit, yes.
15  Q.    Okay.  Okay.  So, you're saying that had you
16  known about these misrepresentations, you would not have
17  covered them up?
18  A.    I would not have covered up anything.
19  Q.    You would have not kept quiet had you known
20  about these?
21  A.    Correct.
22  Q.    Okay.
23  A.    Wait a minute.  Not kept quiet?  I would have
24  said something.  Yes.
25  Q.    Now, based off of what we've seen in the Shaquan

1  Roberts cellphone report, we saw that he was in touch
2  with one of the suspect phone numbers, did we not?
3  A.    Is that Rob Thomas's?
4  Q.    The 3461 number.
5  A.    Millhouze.  In Shaquan Roberts' is the
6  Millhouze.
7  Q.    So, to clean that up, we did see that Shaquan
8  Roberts was in touch with one of the suspect phone
9  numbers in the Wilkinsburg massacre?
10  A.    Correct.
11  Q.    Okay.  So, what I'll do next is I'm pulling up
12  the cell data report that was obtained for suspect's
13  phone number 3461.  So, I am showing this to counsel.
14        MR. BIONDO:  Okay.  Same objection as with the
15  cell extraction reports.  These are not documents he's
16  familiar with, these are not something that he worked on
17  during the investigation and I object to him being asked
18  questions about them today.
19  BY MR. JUBAS:
20  Q.    Okay.  Andy, I'll come back over here so we can
21  do this same song and dance.  Alright.  So, this is a
22  cell data report, not a cellphone download, not an
23  extraction report.  This is just the cell data that was
24  obtained from the carrier T-Mobile.
25  A.    Got you.

1  Q.    It looks like it was provided on 4/29/2016.
2  A.    Yes.
3  Q.    So, what we're going to do is we are going to --
4  actually, no.  Okay.  So, the phone number associated
5  with Shaquan Roberts, I can show you in other sources if
6  -- if that would make you feel better, but it's
7  412-926-9750.  Do you see that there?
8  A.    Yes.
9  Q.    So, we are going to search that number in the
10  Rob Thomas -- the 3461 cell data report.  926-9750.
11  Okay.  So, I'm going to hit find all and we have a
12  number of contacts here between the two.  Would you
13  agree with that?
14  A.    Yes.
15  Q.    Okay.  So, now this is drawing your attention to
16  the cell data report attributed to 3461 suspect
17  cellphone number?
18  A.    Okay.
19  Q.    And we just searched Shaquan Roberts' phone
20  number and this is the first that comes up.  Do you see
21  Shaquan Roberts' number there?
22  A.    Yes.
23  Q.    Okay.  And do you know how to tell the
24  difference between UTC and Eastern Time?  Subtract five?
25  A.    Minus five.  Well, it depends.  Daylight or

1  Eastern Time?
2  Q.    Eastern.
3        MR. BIONDO:  Off the record.
4        (There was a pause in the proceedings.)
5  BY MR. JUBAS:
6  Q.    So, this -- so, the first one we're looking at,
7  cell 16, that's 3816 and the time is, say, 12:33:41 UTC?
8  A.    Yes.
9  Q.    So, we would subtract either four or five to get
10  Eastern Time?
11  A.    Right.
12  Q.    So, we are just going to keep going through
13  this.  About similar timeframe for the second one;
14  right?
15  A.    Yes.
16  Q.    Okay.  So, we're going to skip forward about ten
17  spaces.  Would you agree that was about ten?
18  A.    Give or take, sure.
19  Q.    Okay.  So, getting to cell 744, and would you
20  agree with me that this says March 10, 2016 and it's
21  12:55:37 AM UTC?
22  A.    Yes.
23  Q.    Which we would subtract to either about 7 or
24  8 PM on March 9th?
25  A.    Yes.

CHERON SHELTON/ROBERT THOMAS v.
COUNTY OF ALLEGHENY, et al.

ANDREW SCHURMAN
April 9, 2024

AA COURT REPORTERS 412-288-5370                                Page 85

1 Q.    So, is it fair to say that the suspect phone
2 number was in touch with Shaquan Roberts in the hours
3 leading up to the Wilkinsburg massacre?
4 A.    Yes.
5 Q.    Okay. Keep going. So, we are at 744. Now
6 looking at 754, and is it accurate to say that cell 54
7 represents a contact on March 10, 2016 at 1:54:51 AM
8 UTC?
9 A.    Yes.
10 Q.    So, if that's approximately 2 AM, that would put
11 us at about 9 PM?
12 A.    Yes.
13 Q.    On March 9, 2016?
14 A.    Yes.
15 Q.    In the lead-up to the Wilkinsburg massacre,
16 correct?
17 A.    Yes.
18 Q.    Okay.
19 A.    What time was the shooting?
20 Q.    Late -- like 10:53, 54 timeframe.
21 A.    Got you.
22 Q.    Okay. So, we are next going to cell 778, and
23 would you agree with me that this contact between the
24 two phones occurred on March 10, 2016 at 3:28:55 AM UTC?
25 A.    Yes.

AA COURT REPORTERS 412-288-5370                                Page 86

1 Q.    Okay. And that would put us at approximately
2 10:30-ish PM?
3 A.    Depending four or five.
4 Q.    On March 9th?
5 A.    Yeah. Four or five, generally.
6 Q.    Right. So, if it is five, would you agree with
7 me that this is right before the massacre takes place?
8 A.    3:30 --
9 Q.    3:28:55 minus five?
10 A.    Yeah. 10:30.
11 Q.    So, right before?
12 A.    Yes. Minus five.
13 Q.    Is this -- would this have been significant to
14 the investigation, this evidence?
15 A.    Yes.
16 Q.    Okay. And what we're going to do here is we
17 won't go into quite that level of detail, but we're
18 going to start -- we're going to go with cell 860 and
19 another contact on March 10th, and that is 10:55 PM UTC,
20 I believe. 22:55.
21 A.    Yes.
22 Q.    So, that makes it later in the day on
23 March 10th --
24 A.    The day after.
25 Q.    -- that these phones are contacting; right?

AA COURT REPORTERS 412-288-5370                                Page 87

1 A.    Correct.
2 Q.    864. So, this is a subsequent communication not
3 very long after the communication we just looked at;
4 right?
5 A.    Yes.
6 Q.    So, and that is 864, and without getting into
7 the other ones, is it fair to say that after cell 864,
8 that there were numerous contacts between the suspect
9 phone number and Shaquan Roberts' cellphone?
10 A.    Yes.
11       MR. BIONDO: 864 is the 10:55 UTC?
12       MR. JUBAS: Yes.
13 BY MR. JUBAS:
14 Q.    Okay. And what I'm going to do is I am going to
15 scroll to the end of this cell data report attributed to
16 the suspect phone number, and when does it end? Could
17 you tell me what the last one is?
18 A.    The last record, March 28th of 2016.
19 Q.    Okay. So, based on your review of the contact
20 between Shaquan Roberts and the -- one of the suspect
21 phone numbers, is it fair to say that suspect phone
22 number was in contact with Mr. Roberts immediately
23 before the Wilkinsburg massacre a number of times and a
24 number of times subsequent to the Wilkinsburg massacre?
25 A.    Yes.

AA COURT REPORTERS 412-288-5370                                Page 88

1 Q.    Okay. Now, we're going to get a little bit more
2 in detail with this, but I'm going to represent to you
3 that Mr. Roberts, Shaquan Roberts, is from Hilltop. Now
4 that you know that he is from Hilltop and that -- would
5 that add any evidentiary value to the case?
6 A.    Circumstantial, yes.
7 Q.    How so?
8 A.    His relevant -- or proximity to Cheron Shelton.
9 Q.    Okay. So, fair to say that this individual
10 Shaquan Roberts should have been investigated as a
11 suspect?
12 A.    I can't say he wasn't.
13 Q.    So, are you saying that he should be ruled out
14 as a subject?
15 A.    I can't say anything because I don't remember.
16 Q.    Should he have been investigated as a suspect?
17 A.    In the hypothesis we're working in right now,
18 yes.
19 Q.    Why?
20 A.    The cellphone records connect him to a suspect
21 phone.
22 Q.    And he's from Hilltop; right?
23 A.    Correct.
24 Q.    That would be the type of evidence that an
25 Allegheny County Police detective working on the

CHERON SHELTON/ROBERT THOMAS v.
COUNTY OF ALLEGHENY, et al.

ANDREW SCHURMAN
April 9, 2024

1   Wilkinsburg massacre should be keyed on; correct?
2       MR. BIONDO: Object to form. But go ahead and
3   answer, if you can.
4   A.   Yes.
5   BY MR. JUBAS:
6   Q.   Okay. And the reason being we want to find out
7   whether Shaquan Roberts was involved in conspiring to
8   commit the Wilkinsburg massacre; correct?
9   A.   Correct.
10  Q.   Because the two suspect phone numbers, we
11  believe that their communication -- I shouldn't say
12  we -- the Allegheny County Police believe that the
13  communications between these two numbers leading up to
14  the Wilkinsburg massacre was being conducted because
15  they were conspiring to commit it; right?
16  A.   Correct.
17  Q.   Okay. That was the theory that Allegheny County
18  Police operated off of when it comes to the cellphones?
19  A.   Again, I can't speak to that factually in 2016.
20  Q.   I'm just asking you if that is why -- if that
21  was the suspect phone theory basically, that that phone
22  number attributed to Cheron Shelton and the phone number
23  attributed to Rob Thomas were communicating and
24  conspiring to pull off the Wilkinsburg massacre; right?
25  A.   Yes.

1   Q.   And we have -- I know that this is the first
2   time seeing it, but now you would agree with me that a
3   third individual was involved in the investigation from
4   Hilltop that was in contact with one of the suspect
5   phone numbers; right?
6       MR. BIONDO: I'll object to the form. But go
7   ahead and answer, if you can.
8   A.   I would agree with you. Yes.
9   BY MR. JUBAS:
10  Q.   And the fact that this individual was from
11  Hilltop should have keyed investigators to look closely
12  at Shaquan Roberts; right?
13      MR. BIONDO: Object to form. Go ahead and
14  answer, if you can.
15  A.   Did they?
16  BY MR. JUBAS:
17  Q.   I'm asking you.
18  A.   I don't recall.
19  Q.   Should they have?
20  A.   Yes.
21  Q.   Okay. And you would agree with me that there
22  was subsequent communications between Mr. Roberts and
23  one of the suspect phone numbers after the Wilkinsburg
24  massacre?
25      MR. BIONDO: Object to form. But, yeah, go

1   ahead.
2   A.   One more time. I'm sorry.
3   BY MR. JUBAS:
4   Q.   Would you agree with me based off of our review
5   of the cell data for the suspect phone number that
6   Shaquan Roberts was in contact with that suspect phone
7   subsequent to the Wilkinsburg massacre?
8   A.   Yes.
9   Q.   So, knowing that he is from Hilltop, would you
10  agree with me that Allegheny County detectives should
11  have investigated him as potentially helping to get rid
12  of evidence?
13  A.   Yes.
14  Q.   Okay. And the firearms were never located;
15  right?
16  A.   Correct.
17  Q.   And the clothes that the perpetrators were
18  wearing that day were never found to our knowledge;
19  right?
20  A.   To the best of my recollection and again since
21  2020 when I retired.
22  Q.   And no additional suspects were ever identified
23  that were connected to Rob Thomas and Cheron Shelton;
24  right?
25  A.   Correct.

1   Q.   But based off of the evidence that you just
2   looked at, you would agree with me that there was
3   another suspect in Shaquan Roberts that should have been
4   investigated; correct?
5       MR. BIONDO: Object to form. But go ahead and
6   answer, if you can.
7   A.   Working off your operational theory as we sit
8   here today, yes.
9   BY MR. JUBAS:
10  Q.   Okay. Because it's possible that Shaquan
11  Roberts may have been involved with conspiring to commit
12  the Wilkinsburg massacre before it and in destroying
13  evidence or getting rid of evidence afterwards, you need
14  to investigate that; right?
15      MR. BIONDO: I'll object to the form. But go
16  ahead and answer, if you can.
17  A.   Yes.
18  BY MR. JUBAS:
19  Q.   Okay. So, what we're going to do is we are
20  going -- not going to watch the whole thing, but we are
21  going to watch parts of the Shaquan Roberts interview,
22  and that you -- you are the very first person that I get
23  to use my USB speaker for because these interviews are
24  notoriously difficult to hear.
25      MR. BIONDO: I'll just put on the record I'll

AA COURT REPORTERS 412-288-5370                                      Page 93

1  object to this, as well. It hasn't been established --
2  or he testified he has never seen this interview before
3  and this is not something he's familiar with as being
4  part of the investigation.
5        MR. JUBAS: Okay.
6  BY MR. JUBAS:
7  Q.    Before we get going, getting back to our
8  hypotheticals, had you become aware that there was a
9  third suspect that was not disclosed to defense in this
10 case, what would you have done, if anything?
11 A.    Again, this is a hypothetical and the question,
12 if I understand it correctly, is there was a third
13 suspect that was not disclosed to the defense, what's
14 the reason that suspect wasn't disclosed.
15 Q.    So, are you saying that that's something that
16 should be investigated?
17 A.    Yes.
18 Q.    Okay.
19 A.    I think we established that, though. Right?
20 Q.    Well, that was with regards to cellphone
21 evidence. We hadn't yet established that there was
22 actually a viable suspect.
23 A.    Okay.
24 Q.    So, I'm just asking you with regards to there
25 being a third suspect.

AA COURT REPORTERS 412-288-5370                                      Page 94

1  A.    Yes.
2  Q.    Okay. And what would --
3  A.    Again, this isn't a hypothetical. This is as we
4  sit here on April 9, 2024 looking at a microcosm of the
5  evidence from a 2016 case that had much more evidence
6  and investigative leads.
7  Q.    To define this microcosm appropriately, this
8  would be the evidence that was provided to the defense.
9  A.    Okay.
10       MR. BIONDO: A portion of the evidence that was
11 provided.
12 A.    And who provides that? The district attorney's
13 office, correct?
14 BY MR. JUBAS:
15 Q.    Well, I'll represent to you that the district
16 attorney's -- one of the -- Kevin Chernosky during his
17 deposition represented on the record that he had no
18 knowledge of Shaquan Roberts.
19 A.    Okay.
20 Q.    And if he had no knowledge of Shaquan Roberts,
21 what would that indicate to you?
22 A.    That we didn't give the DA's office Shaquan
23 Roberts.
24 Q.    What would you talk -- could you talk to the
25 district attorney about that?

AA COURT REPORTERS 412-288-5370                                      Page 95

1  A.    Yes.
2  Q.    What would you say?
3  A.    Well --
4  Q.    Subsequent to finding out what we've been
5  discussing.
6  A.    Yes. So, if Shaquan Roberts had been
7  investigated and ruled out, right, the discussion would
8  be here's the information removing him from
9  participating in the crime.
10 Q.    And if Shaquan Roberts were not ruled out?
11 A.    If he was ruled in, he'd be getting charged.
12 Q.    Would you be surprised to learn that he was not
13 ruled out?
14       MR. BIONDO: Object to the form. But go ahead.
15 A.    I wouldn't.
16 BY MR. JUBAS:
17 Q.    Why?
18 A.    It's been eight years; right? Eight years and I
19 don't have a recollection.
20       MR. JUBAS: If he was -- actually, you know
21 what? We are just going to start playing this.
22       MR. PETRUNYA: Let's take a two-minute break.
23       (There was a pause in the proceedings.)
24 BY MR. JUBAS:
25 Q.    Andy, a few questions here. If Shaquan Roberts

AA COURT REPORTERS 412-288-5370                                      Page 96

1  was interviewed and provided information pertaining to
2  suspects in the Wilkinsburg massacre investigation,
3  should that information have been documented?
4  A.    Yes.
5  Q.    Would you ever advise a detective not to
6  document information like that?
7  A.    No.
8  Q.    Should that -- if Mr. Roberts provided
9  information pertaining to the Wilkinsburg massacre and
10 one of the suspects, should that information have been
11 included in the case file which is turned in to the
12 district attorney's office?
13 A.    Yes.
14 Q.    Is it possible for the district attorney's
15 office to disclose evidence to the defense that they
16 don't know about, that the district attorney doesn't
17 know about?
18 A.    No.
19 Q.    Okay. Is it a Constitutional obligation to turn
20 evidence pertaining to an investigation over to the
21 defense?
22       MR. BIONDO: Object to form. It calls for a
23 legal conclusion. But if you can answer, go ahead.
24 A.    I don't know if it's Constitutional. Rules of
25 criminal procedure, maybe.

CHERON SHELTON/ROBERT THOMAS v.
COUNTY OF ALLEGHENY, et al.

ANDREW SCHURMAN
April 9, 2024

1  BY MR. JUBAS:
2  Q.    Have you heard Brady?
3  A.    Yes.
4  Q.    Okay.
5  A.    Is that the Constitutional --
6  Q.    Well, it's --
7  A.    Either way, we should be, yes. It's fair to say
8  we should be.
9        MR. BIONDO: Fair enough.
10       MR. PETRUNYA: That works for us.
11  BY MR. JUBAS:
12  Q.    Okay. So, what I'm going to do is this -- this
13  is a little disappointing.
14  A.    Oh, no.
15  Q.    I'm just going to represent to you -- counsel
16  can correct me if he believes I'm wrong -- Shaquan
17  Roberts says that after midnight on March 9th going into
18  March 10, 2016, he and three other individuals from
19  Hilltop went to IHOP in Homestead.
20  A.    Okay.
21  Q.    Okay? So, these three individuals, four
22  including Shaquan, all from Hilltop, would you agree
23  with me that each of these three individuals should have
24  been investigated by Allegheny County Police in this
25  matter?

1  A.    One more time.
2  Q.    So --
3  A.    So I got you right, Shaquan and three other
4  people go --
5  Q.    All from Hilltop.
6  A.    All from Hilltop go to --
7  Q.    IHOP.
8  A.    -- IHOP post shooting?
9  Q.    Yeah. In the hours following the shooting.
10  A.    Okay.
11  Q.    And also -- correct me if I'm wrong -- we also
12  know that Shaquan Roberts in this timeframe leading up
13  to the Wilkinsburg massacre was in contact with one of
14  the suspect phone numbers a number of times; right?
15  A.    Yes.
16  Q.    So, would you agree with me that as part of the
17  investigation into Shaquan Roberts, these other three
18  individuals from Hilltop should also have been
19  investigated?
20       MR. BIONDO: I'll object to the form. If you
21  can answer, go ahead.
22  A.    No. Not knowing the context now of your
23  question, just working off what we have, you have
24  Millhouze texts Shaquan Roberts. So, in theory, they're
25  not sitting next to each other. Right? Because why

1  would you be calling and texting if you're sitting at
2  IHOP.
3  BY MR. JUBAS:
4  Q.    That's a great point.
5  A.    So, would that remove Shaquan from -- or his
6  three -- we don't know who his three friends are.
7  Q.    We don't know who -- well, no, no. He gave us
8  names, and just to give you some more context with
9  Shaquan Roberts, he was on probation at the time --
10  A.    Okay.
11  Q.    -- and provided a full interview to detectives
12  and also gave detectives consent to search his phone.
13  So, he was very forthcoming and he provided the names
14  that he was aware of who were the three individuals from
15  Hilltop that he was with that night.
16  A.    Got you. Okay.
17  Q.    There's a lot that we don't know about these
18  individuals; right?
19  A.    Right.
20  Q.    There's a lot that we don't know about Shaquan
21  Roberts; right?
22  A.    Yes.
23  Q.    And that is why we should investigate them;
24  right?
25  A.    Sure.

1  Q.    Okay. Could Shaquan -- could the people with
2  Shaquan Roberts have been involved with conspiring to
3  commit the Wilkinsburg massacre?
4        MR. BIONDO: I'll object to the form. But go
5  ahead and answer.
6  A.    In the context in which you framed it today,
7  yes.
8  BY MR. JUBAS:
9  Q.    Okay. Because we know that he was in contact
10  with one of the suspect phone numbers leading up to and
11  in the days afterwards; right?
12  A.    Yes.
13  Q.    So, the Allegheny County Police Department has
14  to rule him out as a suspect?
15  A.    Yes.
16       MR. BIONDO: I'll object to the form. Who has
17  to rule who out?
18  BY MR. JUBAS:
19  Q.    Shaquan Roberts.
20  A.    Yes.
21  Q.    Okay. And sitting here today, we don't know if
22  he was ever ruled out; right?
23  A.    I have no recollection of that, but based on
24  what you said, he gave a full, cooperative interview.
25  Q.    Do we still need to follow up on that interview?

CHERON SHELTON/ROBERT THOMAS v.
COUNTY OF ALLEGHENY, et al.

ANDREW SCHURMAN
April 9, 2024

1 A.    Did they? I don't recall.
2 Q.    Should they have?
3 A.    Yes.
4 Q.    And should they have investigated the three
5 people that he claimed to have been with that night?
6       MR. BIONDO: Go ahead. I'll object to the form,
7 but go ahead.
8 A.    In the framework in which you posed the
9 question, yes, but there might have been other
10 information available to the investigators at the time
11 that did not -- that maybe mitigated the need to go find
12 those other people.
13 BY MR. JUBAS:
14 Q.    And you're speculating about that; right?
15 A.    That's all I can do because I don't have a
16 recollection.
17 Q.    For the purposes of the record, that was a
18 speculation; correct?
19 A.    Correct.
20 Q.    Because we don't at our disposal have any
21 reports connected to Shaquan Roberts; right?
22 A.    Correct.
23 Q.    And we don't have any reports connected to the
24 individuals that Shaquan Roberts claimed to have been
25 with that night, do we?

1 A.    Correct.
2 Q.    And just to -- not to beat a dead horse, but it
3 would have been critical to investigate Shaquan Roberts'
4 story and the people that he claimed to have been with
5 that night; right?
6       MR. BIONDO: Object to form. But go ahead and
7 answer, if you can.
8 A.    Yes.
9 BY MR. JUBAS:
10 Q.    Okay. One moment. Do you recall me showing you
11 the cell data report for the 3461 suspect phone number
12 where we saw a lot of communication --
13 A.    From T-Mobile?
14 Q.    Yes. We saw a lot of communications between the
15 3461 suspect number and Shaquan Roberts; right?
16 A.    Yes.
17 Q.    Okay. So, I want to show you what we are --
18 okay. Coming back over.
19       MR. JUBAS: And, Dennis, I'm going to show him
20 again. This is the Shaquan Roberts extraction report.
21       MR. BIONDO: And, again, same objections.
22       MR. JUBAS: Yes.
23 BY MR. JUBAS:
24 Q.    Okay. So, we're going to do the same thing we
25 did with the cell data. We are going to search for

1 suspect phone number. So, we hit search. Okay. So, is
2 it accurate to say that Shaquan was in touch with the
3 suspect phone number on March 14th, 2016?
4 A.    Yes.
5 Q.    So, I'm going to write these down to make sure
6 that we keep this straight. So, we have -- page 6, we
7 have a contact on 3/14 between the two numbers; right?
8 A.    Yes.
9 Q.    Okay. Next. And we have another one on
10 3/14/16; right?
11 A.    Yes.
12 Q.    Okay. Next. And we have a third on 3/14/16?
13 A.    Yes.
14       MR. BIONDO: What are the times for those?
15       MR. JUBAS: That's -- I can give you the times.
16 We're trying to get through. Yeah. Yeah.
17 A.    So, that's a four-second -- is that a phone
18 call? What is that?
19 BY MR. JUBAS:
20 Q.    That appears to be a --
21 A.    A text message? A phone call?
22 Q.    That appears to be an outgoing phone call. So,
23 this is the third one that puts us for three on
24 March 14th; right?
25 A.    Okay.

1 Q.    And going to the next one, that's 3/13/16.
2 A.    Okay.
3       MR. BIONDO: Is that a yes on 3/13/16? You have
4 to ask a question to --
5 BY MR. JUBAS:
6 Q.    So, we're looking at two more on 3/13/16 right
7 there; right?
8 A.    Yes.
9 Q.    At cell 292 and 294?
10 A.    Yes.
11 Q.    And then cell 308 gives us another one on
12 3/13/16; right?
13       MR. BIONDO: You have to answer out loud.
14 A.    Yes.
15 BY MR. JUBAS:
16 Q.    And cell 354 --
17 A.    Yes.
18 Q.    -- gives us another contact at 3/12/16 and that
19 would be approximately three days after the massacre;
20 right?
21 A.    Yes.
22 Q.    And then cell 390 gives us another contact at
23 3/12/16; right?
24 A.    Yes.
25 Q.    And then cell 478 gives us a contact on 3/11;

AA COURT REPORTERS 412-288-5370                                    Page 105

1  correct?
2  A.    Yes.
3  Q.    And then 482 gives us a contact also on 3/11; is
4  that correct?
5  A.    Yes.
6  Q.    Okay.
7  A.    So, what do you make of the four-second calls?
8  They're not even four seconds. They're four-tenths of a
9  second.
10 Q.    Well, let me ask you this question. Is what
11 you're doing, is that what should have been done in an
12 investigation?
13 A.    I'm sure they did it, but I'm asking you what do
14 you make of that? Like the point --
15        MR. BIONDO: Again, I'm going to object to this.
16 This is the whole point of this. He doesn't have the
17 knowledge --
18        MR. JUBAS: He doesn't need to. He's just
19 identifying dates.
20        MR. BIONDO: He's identifying dates. That's
21 right. He's identifying dates.
22 A.    So, you're going to ask me to draw a conclusion
23 from this, though.
24     BY MR. JUBAS:
25 Q.    No, I'm not.

AA COURT REPORTERS 412-288-5370                                    Page 106

1  A.    Oh. Okay. If we're just identifying dates,
2  then we're good.
3  Q.    That's all we're doing is identifying dates for
4  contacts.
5  A.    Got you.
6  Q.    The last one was 482. Now we're going to 490,
7  and that gives us a contact on 3/11/16; right?
8  A.    Yes.
9  Q.    Okay. And then the next search, it seems to
10 have taken us out of that part of the analytics.
11 There's no dates connected with this part of the search?
12 A.    Correct. I don't know what that is.
13        MR. BIONDO: I'm going to object again. Again,
14 he's not an expert in reading these. This doesn't give
15 us the analytics. Maybe somebody could show you where
16 there are dates on here.
17        MR. JUBAS: He's just identifying the dates
18 associated with this --
19        MR. BIONDO: That you can see, what you're
20 showing him. You haven't printed it out as a document.
21 You're showing him on a computer. There may be
22 something on here where someone can identify a date.
23        MR. JUBAS: Dennis, are you saying that the
24 dates that he's identified thus far pertaining to these
25 questions is incorrect?

AA COURT REPORTERS 412-288-5370                                    Page 107

1        MR. BIONDO: No. I'm saying the stuff you're
2  showing him now, there might be a place that can
3  identify a date. It might correspond with one of those
4  other ones. We don't know that. He is not an expert in
5  reading this report. He didn't generate this report.
6  He oversees the divisions. This isn't his creation and
7  you're asking him questions showing this for the first
8  time when he doesn't have a base of knowledge.
9        MR. JUBAS: Are you saying only the people that
10 created these reports are able --
11        MR. BIONDO: I'm saying that's the appropriate
12 persons to ask the questions to. I'm allowing him to
13 answer questions. I just want to put this on the
14 record.
15     BY MR. JUBAS:
16 Q.    Okay. So, back to identifying dates associated
17 with this report, do you see any dates with regards
18 to --
19        MR. BIONDO: On the screen that he's showing
20 you.
21     BY MR. JUBAS:
22 Q.    -- page 19?
23 A.    I do not.
24 Q.    Okay. And now we're at page 108 and we see a
25 date. We see cell 810 and the date of 3/11 associated

AA COURT REPORTERS 412-288-5370                                    Page 108

1  with the suspect phone number; right?
2  A.    We do. It's not a duplicate?
3  Q.    It might be. I'm just asking about the dates
4  that you see here.
5  A.    Okay. Yes. Yes.
6  Q.    Okay. These very well may be duplicates. I
7  just want to go through and identify each of the dates
8  that are associated with this.
9  A.    Got you.
10 Q.    Okay. And then on page 109, we have cell 828
11 and the date associated with cell 828 is 3/11; correct?
12 A.    Correct. Hold on one second.
13 Q.    Go ahead.
14 A.    Without knowing what your question's going to
15 be, I think what we're getting into is duplicate data.
16 You have an outgoing and an incoming.
17 Q.    I think you're right.
18 A.    So, those are going to be double, without
19 knowing the question.
20 Q.    Right. All we're trying to do here is identify
21 the dates that are in this report.
22 A.    Okay.
23 Q.    So, the next one is cell 834, call at 3/11.
24 Would you agree with that?
25 A.    Yes.

1  Q.      Okay. And then we have on page 117 at cell
2  1174, we have a call at 3/12. Would you agree with
3  that?
4  A.      Yes. Again, I think we're just going in
5  reverse.
6  Q.      Right. All we're concerned about is the dates.
7  A.      Okay.
8  Q.      So, that is 3/12/16. Okay. And now we have
9  page 119, cell 1289, and would you agree with there is
10 another March 12th date here associated with the contact
11 between those numbers?
12 A.      Yes.
13 Q.      Okay. And then we get to page 122, cell 1417,
14 and we have a call on 3/13/16; correct?
15 A.      Yes.
16 Q.      Okay. And then to the next one.
17 A.      I think that might be a text.
18 Q.      It says call log.
19 A.      But, see, these look like texts to me. So, I
20 think we're in the text portion.
21 Q.      Could be a text. Could be a call.
22 A.      Communication of some form.
23 Q.      Yeah. Happened on 3/14.
24 A.      Yes. See? That says message. There we go.
25 These do say call and that says message.

1  Q.      I think we're looking at like a history. So, at
2  123, cell 1477, another call or contact on 3/13 between
3  these two numbers; right?
4  A.      Yes.
5  Q.      Okay. Moving to 124 at cell 1486, we have
6  another contact between these two numbers at 3/13;
7  right?
8  A.      Yes.
9  Q.      Okay.
10 A.      I think you started over. It jumped back to 1.
11 Q.      Okay.
12 A.      Yeah.
13 Q.      Okay. So, we started over?
14 A.      I think so. I was going by the counter there.
15 It skipped back to 1 out of 27.
16 Q.      Okay. Now, after going through this report --
17 and this is Shaquan Roberts' report -- did you see any
18 contacts on March 9, 2016?
19 A.      Between the number listed as Millhouze and
20 Shaquan Roberts?
21 Q.      Yes.
22 A.      No.
23 Q.      So, just to clarify that, after going through
24 Shaquan Roberts' cellphone download -- or extraction
25 report, there was no documented contact between the

1  suspect phone number and Mr. Roberts on March 9, 2016;
2  correct?
3  A.      Correct.
4  Q.      Okay.
5  A.      So, let me qualify that. You said between Mr.
6  Roberts and -- between the number listed and the number
7  you have associated with Millhouze.
8  Q.      Correct.
9  A.      I can't say that they didn't talk on March 9th.
10 Q.      Well, no. In fact, you saw -- in 3461 cell
11 data, we saw that there were numerous contacts between
12 those two numbers on March 9, 2016, did we not? We can
13 go through it to refresh your recollection.
14 A.      No. That's alright. So, we see it in the
15 Millhouze phone records.
16 Q.      In the cell data records pertaining to --
17 A.      T-Mobile.
18 Q.      T-Mobile. Do you recall seeing those contacts
19 on March 9th?
20 A.      But it's not representative on Shaquan Roberts.
21 Q.      In the extraction report that we were provided.
22 A.      Okay.
23 Q.      So, would you agree with me that there is a
24 discrepancy there?
25 A.      Yes.

1  Q.      Okay. So, would you agree with me that whoever
2  provided the Shaquan Roberts cellphone report got rid of
3  the contacts on March 9th?
4          MR. BIONDO: Object to form.
5  A.      No.
6  BY MR. JUBAS:
7  Q.      What do you think happened?
8  A.      I can't explain it, but you asked me if I
9  thought someone got rid of it. No, I don't think.
10 Q.      Do you think that it could have been an error?
11 A.      I'd have to see that report. When does the
12 report start?
13 Q.      Which report?
14 A.      The one that you're alleging is missing data.
15 What was the date of that report? Does that capture the
16 night?
17 Q.      So, I'm going to show you now page 24 of the
18 Shaquan Roberts cellphone data.
19          MR. PETRUNYA: What Bates number? Is that Bates
20 numbered?
21          MR. JUBAS: No.
22 BY MR. JUBAS:
23 Q.      And would you look at some of the dates
24 associated with those?
25 A.      I see 9th. Okay.

1 Q.    So, is it fair to say that this report includes
2 data from March 9th and March 10th?
3 A.    Let's see. SongFlip on March 9th. Facebook
4 Messenger on March 9th.
5 Q.    Is it fair to say that there are -- there's
6 input, there's information pertaining --
7 A.    Yes. Can I scroll?
8 Q.    Yeah. Before we go anywhere, I want to make
9 sure that we pin this down. In this report, did you see
10 input and information pertaining to March 9th and
11 March 10th?
12 A.    Yes.
13 Q.    Okay.
14 A.    Again, I've never seen this before, first time
15 looking at it and I don't know how to read it. So, what
16 I ask of you is look for text messages or cellphones on
17 the 8th. Those -- what you showed me were dates
18 associated with --
19 Q.    That number.
20 A.    -- FlipSong or something. No.
21 Q.    Oh. No. I was talking about the previous one.
22 So, you're talking about what?
23 A.    Here. Look. Those dates are associated --
24 again, I don't know how to read this, but this is what's
25 associated to those dates.

1 Q.    Okay.
2 A.    If you can scroll through the call log and have
3 dates of messages or calls prior to the 8th because we
4 have stuff after the -- or the 9th. Right? Then we
5 know it's missing the 9th.
6 Q.    So, what you're saying is that you -- would you
7 agree -- I'll withdraw that question.
8       Would you agree with me that you and I went
9 through each of the instances where the suspect number
10 3461 was in the report?
11 A.    Yes. But we don't know that the report is
12 all-inclusive. I haven't seen the 9th. That's what I'm
13 asking to see, some data from the 9th.
14 Q.    But if it doesn't exist in this report, it's
15 because it wasn't included in the report; correct?
16 A.    Or it didn't happen.
17 Q.    So, are you saying --
18 A.    I don't know a logical answer.
19 Q.    Wait a second. Wait. Wait. Wait. Let me
20 finish.
21 A.    What I'm asking is the date the report begins.
22 Q.    So, are you saying that it's possible that the
23 cell data report that I just showed you pertaining to
24 suspect number 3461 might be inaccurate?
25 A.    That's the T-Mobile?

1 Q.    Yes.
2 A.    I don't know.
3 Q.    Well, that was what you just insinuated;
4 correct?
5 A.    No.
6       MR. BIONDO: Object to form. Yeah. Go ahead.
7 BY MR. JUBAS:
8 Q.    Okay. So, you have no reason to think that it's
9 inaccurate?
10 A.    Correct.
11 Q.    Okay.
12 A.    I'd like to see more of that report.
13 Q.    Which report?
14 A.    Is that that -- is that the --
15       MR. BIONDO: Shaquan Roberts.
16 A.    Shaquan Roberts extraction.
17 BY MR. JUBAS:
18 Q.    And specifically what would you like to see?
19 A.    Messages or calls dated prior to the 9th. That
20 should be; right? In there?
21 Q.    It should be; right?
22 A.    Yes.
23       MR. BIONDO: Object to form.
24 BY MR. JUBAS:
25 Q.    And if they are not in there, what might that

1 indicate?
2 A.    Are they or are they not?
3 Q.    They're not.
4 A.    Okay. Can I see that?
5 Q.    Yes. You're going to see --
6       MR. BIONDO: Can we clarify what we're looking
7 for?
8       MR. JUBAS: So, what initially I was looking for
9 and I walked the -- Mr. Schurman through each of the
10 contacts between the two numbers and we were able to see
11 -- correct me if I'm wrong -- that there were no
12 contacts on March 9th.
13       MR. BIONDO: I'm going to object to that and I
14 don't know now if you want me to put this on the record.
15 We can go off the record. I think you guys are talking
16 past one another.
17       MR. JUBAS: No. I think we're getting close.
18       MR. BIONDO: Keep it on the record? I think
19 what he's saying is he would like to see other calls or
20 texts from the 9th and the 10th.
21       MR. JUBAS: And that's where we're going.
22       MR. BIONDO: Okay.
23 A.    My question was could there have been another
24 mechanism of communication other than the Millhouze
25 phone number.

CHERON SHELTON/ROBERT THOMAS v.
COUNTY OF ALLEGHENY, et al.

ANDREW SCHURMAN
April 9, 2024

AA COURT REPORTERS 412-288-5370                Page 117

1   BY MR. JUBAS:
2   Q.    And that would have been an important part of
3   the investigation; correct?
4   A.    Yes.
5   Q.    Okay. So, I have found -- okay. So, we have a
6   number of communications -- and this is on page 25 and
7   26 -- including dates March 10th and March 9th. You can
8   verify that. Do you see input information in there
9   pertaining to March 9th and March 10th?
10  A.    But it doesn't look like what we saw before, but
11  I see data.
12  Q.    Do you see a contact and a phone number?
13  A.    No. That's -- this does not look -- this one
14  has one. What's the --
15  Q.    Which cell number is that that you're referring
16  to?
17  A.    So, cell -- oh. Cell 21. Not the number. The
18  cell. Cell 21. I'm sorry. Yes.
19  Q.    And does cell 21 have a phone number besides
20  Shaquan Roberts?
21  A.    Looks like from 770-873-0785 to Shaquan Roberts,
22  412-926-9750?
23  Q.    Yes.
24  A.    Okay. Yes.
25  Q.    And is there a contact name associated with

AA COURT REPORTERS 412-288-5370                Page 118

1   that?
2   A.    Does not appear.
3   Q.    But we do have a date associated with that?
4   A.    Yes. Looks like -- yes, yes.
5   Q.    And what is the date?
6   A.    The 10th.
7   Q.    Now, drawing your attention to page -- the
8   following page that's 26, and it will be cell 24, do you
9   see a phone number associated with that cell?
10  A.    Yes.
11  Q.    And is there a contact saved to that phone
12  number?
13  A.    No.
14  Q.    Okay.
15  A.    Oh. Is the red the contact, we think?
16  Q.    Yes. Seems like it.
17  A.    Okay.
18  Q.    Okay. And is there a date associated with that?
19  A.    Yes. The 9th.
20  Q.    Okay. So, based off of what you've reviewed, it
21  does seem like there's some information in here
22  pertaining to March 9th and March 10th; correct?
23  A.    Yes.
24  Q.    And after reviewing all the contacts between
25  Shaquan Roberts and the suspect phone number, you would

AA COURT REPORTERS 412-288-5370                Page 119

1   agree with me that there are no contacts between these
2   two numbers on the 9th or the 10th?
3   A.    Yes.
4   Q.    So, now with that established, can we say that
5   somebody -- whoever took this extraction report out
6   removed the Shaquan Roberts communications with the
7   suspect's cellphone number on March 9th and March 10th?
8         MR. BIONDO: I'll object to the form. But go
9   ahead and answer, if you can.
10  A.    No.
11  BY MR. JUBAS:
12  Q.    It doesn't indicate that to you?
13  A.    No.
14  Q.    Do you know where they might have gone?
15  A.    I couldn't answer that.
16  Q.    Could it have been an error in the cellphone
17  download?
18  A.    Software.
19  Q.    Software?
20  A.    Software.
21  Q.    Could have been?
22  A.    Could have been.
23  Q.    Could it have been an error from the cell data
24  reports?
25  A.    Yes.

AA COURT REPORTERS 412-288-5370                Page 120

1   Q.    That there was a March 9, 2016 communication
2   between Shaquan Roberts and the suspect's cellphone?
3   A.    Yes.
4   Q.    Okay. So, and you saw a number of contacts
5   between Shaquan Roberts and the suspect phone number
6   leading up to the Wilkinsburg massacre; correct?
7   A.    Yes.
8   Q.    Okay. And you saw a bunch of contacts between
9   the two phones afterwards; right?
10  A.    Yes.
11  Q.    And now you're saying that the cell data report
12  may be unreliable?
13        MR. BIONDO: I'll object to the form. But go
14  ahead and answer, if you can.
15  A.    I'm not drawing that conclusion.
16  BY MR. JUBAS:
17  Q.    It's worth investigating; right?
18  A.    Yes.
19        (There was a pause in the proceedings.)
20        MR. JUBAS: I'm done.
21        - - - -
22             EXAMINATION
23        - - - -
24  BY MR. PETRUNYA:
25  Q.    Lieutenant Sherman, the Wilkinsburg massacre

CHERON SHELTON/ROBERT THOMAS v.
COUNTY OF ALLEGHENY, et al.

ANDREW SCHURMAN
April 9, 2024

AA COURT REPORTERS 412-288-5370                                Page 121

1  happened eight years ago; correct?
2  A.    Yes.
3  Q.    March 9th, 2016, to be exact?
4  A.    Yes.
5  Q.    We're sitting here on April 9th of 2024;
6  correct?
7  A.    Yes.
8  Q.    And we just spent approximately two hours on the
9  record talking about cellphone data information for a
10  person by the name of Shaquan Roberts?
11  A.    Three hours, but two with the cellphone.  Yes.
12       MR. BIONDO: I'm going to object to form. I'm
13  sorry.
14       MR. PETRUNYA: What's the form?
15       MR. BIONDO: It wasn't just Shaquan Roberts. It
16  was cellphone information generally.
17  BY MR. PETRUNYA:
18  Q.    It's clear from the line of questioning that Mr.
19  Roberts may have had information related to the
20  Wilkinsburg massacre; correct?
21  A.    So, you're working off of Paul's theory; right?
22  Or are you asking a separate question?
23  Q.    Is today the first time you learned about
24  Shaquan Roberts and any questioning or involvement he
25  may have had related to the Wilkinsburg massacre?

AA COURT REPORTERS 412-288-5370                                Page 122

1  A.    I don't recall 2016. So, as we sit here today,
2  yes.
3  Q.    Okay. We established that the DA's office is
4  provided with the criminal file from your office when
5  the investigation is completed; correct?
6  A.    Correct.
7  Q.    And the DA can only have knowledge about
8  evidence which is presented to them by your office once
9  the compilation of the file is created; correct?
10  A.    Yes.
11  Q.    Okay. By that same logic, would you agree with
12  me, then, that a defense lawyer that is defending a
13  person that's accused of a crime would only have
14  knowledge of the investigation conducted based upon the
15  information provided in the criminal file?
16  A.    Yes.
17  Q.    And we don't know, we can't go back into 2016
18  which your memory is, but based upon what you're
19  learning today and Paul's theory is that Shaquan Roberts
20  may have had information related to the Wilkinsburg
21  massacre; correct?
22  A.    Yes.
23  Q.    Okay. If you believe that he did have
24  information related to the Wilkinsburg massacre that
25  should have been investigated, does it strike you as

AA COURT REPORTERS 412-288-5370                                Page 123

1  problematic that Shaquan Roberts' identity and
2  information was only disclosed to civil lawyers in March
3  of 2024?
4  A.    So, again, we're working off the theory.
5  Q.    Uh-huh.
6  A.    I don't want to speak to a theory. I can't
7  recall exactly what transpired in 2016.
8  Q.    Okay.
9  A.    So, working off of the theory to the question,
10  yes.
11  Q.    It is a problem?
12  A.    Yes.
13  Q.    And why is it a problem?
14  A.    For all the reasons you stated.
15  Q.    If one of your detectives had indicated that in
16  this year of 2024 when he was preparing for his
17  deposition he had gone to the Wilkinsburg massacre file
18  looking for this information and it wasn't there, would
19  you consider that to be problematic?
20  A.    Yes.
21  Q.    And is that because this is information which
22  should have been investigated and turned over as part of
23  the underlying criminal investigation?
24  A.    Yes.
25  Q.    Okay. Now, I want to go back a little bit to

AA COURT REPORTERS 412-288-5370                                Page 124

1  2016. March 9th of 2016, you would agree with me that
2  you were the lieutenant of the homicide division;
3  correct?
4  A.    Correct.
5  Q.    And approximately how many years at this point
6  had you been a lieutenant in the homicide division in
7  2016?
8  A.    Six.
9  Q.    Six years?
10  A.    Give or take.
11  Q.    You were involved in some capacity in law
12  enforcement dating back to the 1990s; correct?
13  A.    Yes.
14  Q.    Okay. Now, did you have any role or did you
15  play any part in assisting with the investigation for
16  the synagogue shooting that occurred in 2018 in
17  Squirrel Hill?
18  A.    Yes.
19  Q.    Did you do any investigation or were you just
20  boots on the ground helping to coordinate for the people
21  that were there?
22  A.    The latter. Boots on the ground helping.
23  Q.    We can agree the Wilkinsburg massacre, March 9th
24  of 2016, involved of the loss of life for six
25  individuals; correct?

CHERON SHELTON/ROBERT THOMAS v.
COUNTY OF ALLEGHENY, et al.

ANDREW SCHURMAN
April 9, 2024

1  A.    Yes.
2  Q.    And the charges sought by the district
3  attorney's office for Cheron Shelton and Robert Thomas
4  were death penalty charges; correct?
5  A.    I believe so. I don't have a direct
6  recollection.
7  Q.    First-degree murder, death penalty is the most
8  severe charge that can be brought against a person;
9  correct?
10  A.    Yes.
11  Q.    Is it fair to say that given the local, national
12  and international attention this case got on March 9th
13  of 2016, it was the biggest or most sensationalized case
14  you had had come through your office during your time as
15  lieutenant?
16        MR. BIONDO: I'll object to the form. Go ahead
17  and answer, if you can.
18  A.    No. It's not fair to say that.
19  BY MR. PETRUNYA:
20  Q.    Up to this point, March 9 of 2016, have there
21  been more covered or greater loss of life cases that
22  your office investigated?
23  A.    So, officer-involved shootings get a lot of
24  publicity.
25  Q.    Sure.

1  A.    The George Sodini, LA Fitness in Collier
2  Township, Robert Taylor, Wilkinsburg, Baumhammers. So,
3  no.
4  Q.    Alright. This is a pretty big case for the
5  office?
6        MR. BIONDO: I'll object to the form. But go
7  ahead and answer.
8  A.    Yes.
9  BY MR. PETRUNYA:
10  Q.    Okay. From the outset of the investigation, you
11  would agree with me that there were federal agencies
12  involved in assisting with the investigation which would
13  be ATF and FBI?
14  A.    Yes.
15  Q.    And do you also recall that -- I believe it was
16  ATF offered a $20,000 reward for information related to
17  anyone coming forward to identify suspects for who
18  perpetrated the crime?
19  A.    I don't remember the dollar value, but yes.
20  Q.    Okay. Is it fair to say that throughout your
21  investigation -- so, we'll say March 9, 2016 up until
22  June 23rd, 2016 when charges were filed -- there were
23  multiple resources available or avenues that your
24  detectives could have used or reached out to to assist
25  with their investigation?

1  A.    Yes.
2  Q.    Okay. That includes speaking to members of the
3  City of Pittsburgh Police Department?
4  A.    Yes.
5  Q.    That includes working with or obtaining
6  information from members of the ATF or FBI?
7  A.    Yes.
8  Q.    Okay. And as the lieutenant, were you aware of
9  or were there any restrictions in place to your
10  detectives while they were investigating this case about
11  resources they could or could not use in their
12  investigation?
13  A.    No.
14  Q.    And the expectation was that the investigation
15  conducted by your officers would be thorough and
16  complete; correct?
17  A.    Yes.
18  Q.    And that would mean to investigate all possible
19  suspects or leads related to this crime?
20  A.    Yes.
21  Q.    And as part of being a homicide detective, you
22  would agree with me that it is very important,
23  especially with a case of this magnitude, but any case
24  involving loss of life, to be thorough in your
25  investigation related to alternative suspects and leads;

1  correct?
2  A.    Yes.
3  Q.    Your expectation as the lieutenant, even though
4  you're not involved in the day-to-day of the
5  investigation, is that your officers, your detectives
6  are following up on these leads and these alternative
7  suspects?
8  A.    Yes.
9  Q.    Okay. And, again, there was never any
10  discussion either directed by you or discussion that
11  you're aware of saying that FBI resources, City of
12  Pittsburgh resources could not be asked for or followed
13  up by your detectives; correct?
14  A.    Correct.
15  Q.    In fact, would you agree with me that a
16  responsible detective throughout this investigation
17  would utilize those resources as part of their
18  investigation to do a thorough and complete
19  investigation?
20  A.    Yes.
21  Q.    Okay. Now, what do you recall your involvement
22  with the Wilkinsburg massacre being at the point that
23  the decision was made for criminal charges to be filed
24  against Robert Thomas and Cheron Shelton? And if you
25  need me to clarify that question, I can.

1 A.     Please.
2 Q.     Okay. So, obviously, you're the lieutenant of
3 the homicide department, but we've also talked about
4 other responsibilities you had. You're not involved
5 intimately in the day-to-day investigations. I get
6 that. Do you recall a point or can you tell us a point,
7 if at all, where you became involved in reviewing the
8 affidavit of probable cause for the criminal complaint
9 or, you know, the real meat of the investigation about
10 identifying who the suspects were and how they were
11 going to be arrested?
12 A.     I don't have a direct recollection of the how --
13 Q.     Okay.
14 A.     -- it was going to happen. I could tell you
15 from a procedural standpoint how it unfolds in the
16 respect that the detectives take all the information to
17 the DA's office. Ultimately, they decide what, if any,
18 charges are applicable. So, my review of the affidavit
19 if I read it -- I don't recall -- wouldn't have meant
20 anything to the criminal case. Ultimately, it's -- it
21 would have been Kevin Chernosky and Lisa Pellegrini
22 saying yes or no.
23 Q.     So, when the affidavit of probable cause is
24 being put together, you're relying on your detectives to
25 include the information that they gather as part of the

1 investigation in the affidavit of probable cause?
2 A.     Yes.
3 Q.     Now, did you review the affidavit of probable
4 cause in preparation for today's deposition?
5 A.     Yes.
6 Q.     And do you recall seeing your name appearing in
7 the affidavit of probable cause?
8 A.     I do.
9 Q.     Okay. I believe -- and I'm paraphrasing here --
10 but I believe the affidavit of probable cause relates to
11 how you had mentioned something to Robert Thomas about
12 him taking his last breath of free air.
13 A.     Yes.
14 Q.     Is that something you said to him?
15 A.     Yes.
16 Q.     Why did you say that to Robert Thomas?
17 A.     Because I firmly believed he and Cheron Shelton
18 were solely responsible for the killing of those people.
19 Q.     And so this statement would have been made by
20 you as of April 6th of -- April 5, 2016?
21 A.     I don't know.
22 Q.     This would have been before Robert Thomas went
23 into prison; correct?
24 A.     I don't know. I don't recall.
25 Q.     If you would have interacted with Robert Thomas

1 at any point between the time that he was arrested and
2 the time that charges were filed against him for the
3 Wilkinsburg massacre, would that have been documented?
4 Would you have written a report on that?
5 A.     I would not have interacted with him.
6 Q.     You would not have interacted with him?
7 A.     No.
8 Q.     So, well, let me make sure I understand this,
9 though, temporally. It is accurate that you had an
10 interaction with him at some point; correct?
11 A.     I believe they passed me in the hall on the way
12 out.
13 Q.     Okay. And so you had mentioned something to him
14 about his last free breath being taken?
15 A.     Yes.
16 Q.     Do you recall if charges had been filed against
17 him when you made that comment?
18 A.     I don't.
19 Q.     Is that something you would normally say to an
20 individual when they're being arrested?
21 A.     Not normally.
22 Q.     Why did you feel it was appropriate to say to
23 him in this case?
24 A.     I don't recall.
25 Q.     If you had said this to Mr. Thomas before

1 charges were formally filed against him, would that
2 comment have been made based upon the fact that you
3 believed there was enough evidence to provide probable
4 cause against him at that time?
5 A.     I don't know that. I don't know. I can't tell
6 you why I said that.
7 Q.     Do you regret saying that?
8 A.     No.
9 Q.     If one of the confidential jailhouse witnesses
10 had relayed the fact that Mr. Thomas had said that you
11 said that to him, does that help refresh your
12 recollection temporally of when you would have had that
13 interaction with him?
14 A.     Generally -- no, because I don't know when the
15 interactions with the jailhouse informants were.
16 Q.     The affidavit of probable cause in this case was
17 filed on June 23rd of 2016. Does that date sound about
18 right?
19 A.     Okay.
20 Q.     It's on the papers.
21 A.     Yeah. Yeah.
22 Q.     And that would have been within about three
23 months after the Wilkinsburg massacre occurred; correct?
24 A.     Yes.
25 Q.     Do you know why charges were filed in June of

CHERON SHELTON/ROBERT THOMAS v.
COUNTY OF ALLEGHENY, et al.

ANDREW SCHURMAN
April 9, 2024

AA COURT REPORTERS 412-288-5370                              Page 133

1   2016 as opposed to before that?
2  A.    I don't recall.
3  Q.    Do you believe that there was probable cause to
4   charge Cheron Shelton and Robert Thomas with the
5   Wilkinsburg massacre before the jailhouse witnesses came
6   forward with the allegations of the statements that were
7   made by Mr. Thomas and Mr. Shelton?
8  A.    I don't recall all the information, but from
9   what I remember, there was a circumstantial case against
10  them.
11 Q.    Against both of them?
12 A.    Implicating both of them.  Yes.
13 Q.    Okay.  Now, you would agree with me that the
14  best possible evidence you could get in any type of
15  investigation would be direct evidence; correct?
16 A.    Yes.
17 Q.    And that would be locating an actual murder
18  weapon or putting someone at the scene; correct?
19 A.    Correct.
20 Q.    And you would agree with me that for both Mr.
21  Thomas and Mr. Shelton, murder weapons were never
22  located; correct?
23 A.    Correct.  Up to the 20th -- or the -- March of
24  '20 when I retired.  Beyond that, I don't know.
25 Q.    You haven't seen anything reported that murder

AA COURT REPORTERS 412-288-5370                              Page 134

1   weapons have been --
2  A.    Correct.
3  Q.    And you would agree with me that the first
4   location in this investigation where Robert Thomas
5   appears is with Mr. Shelton hopping a fence at Nolan
6   Court later in the evening; correct?
7  A.    I don't recall all the information.
8  Q.    Okay.  Now, Officer Adams allegedly saw Mr.
9   Shelton enter the white Lincoln shortly after the
10  Wilkinsburg massacre; correct?
11 A.    Yes.
12 Q.    Okay.  And you're also aware of the fact that
13  your detectives pulled video from the Hilltop area also
14  known as Homewood North showing various movements that
15  Mr. Shelton was making and various vehicles he was
16  operating before and after the massacre; correct?
17 A.    Yes.
18 Q.    And you would agree with me that actual evidence
19  seeing an individual at a certain time would be the
20  clearest evidence to show where that person is located
21  at that time; correct?
22 A.    Yes.
23 Q.    Okay.  And when you're evaluating information
24  that is provided by individuals claiming to have
25  information associated with a crime, you want to

AA COURT REPORTERS 412-288-5370                              Page 135

1   evaluate the veracity of their statements based upon the
2   evidence in your possession; correct?
3  A.    Yes.
4  Q.    And you would agree with me that Mr. Shelton
5   cannot be two places at once; correct?
6  A.    Yes.
7  Q.    Okay.  So, do you recall video evidence being
8   pulled from Hilltop showing Mr. Shelton leaving in a
9   white Lincoln at approximately 10:30 PM?
10 A.    I don't know the times.
11 Q.    Okay.  But you do recall video showing him
12  driving a white Lincoln?
13 A.    Are we referring on the video where he leaves
14  the address -- I forget the name of the street.
15 Q.    Nolan Court.
16 A.    Yeah.  Goes out, gets the car, brings it back up
17  to the parking lot and goes and retrieves what we
18  believe is a long gun covered by a hoodie.
19 Q.    Yes.
20 A.    I don't know the time of that, but yes.
21 Q.    And you would agree with me that your detectives
22  also conducted drive tests to see how long it would take
23  Mr. Shelton to drive from Nolan Court down to Franklin
24  Avenue; correct?
25 A.    Yes.

AA COURT REPORTERS 412-288-5370                              Page 136

1  Q.    And those time/distance studies put it at
2   approximately 10 to 11 minutes; correct?
3  A.    I don't recall.
4  Q.    But if it's documented in the report, you have
5   no reason to dispute that?
6  A.    Correct.
7  Q.    Okay.  And one of the things that Paul had gone
8   over with you that we had talked about for the
9   preliminary hearing was the cellphone communications
10  that were associated between the suspects in the
11  Wilkinsburg massacre; correct?
12 A.    Correct.
13 Q.    And one of the things that you had talked about
14  was if you were in the same location or in the same
15  room, you wouldn't be talking or texting with each
16  other; correct?
17 A.    Correct.
18 Q.    So, if the confidential witnesses provided
19  information indicating that Cheron Shelton and Robert
20  Thomas waited for at least a half an hour in a garage
21  behind Franklin Avenue to perpetrate the Wilkinsburg
22  massacre yet we had cellphone evidence showing that they
23  were talking to one another during this time and
24  evidence that Mr. Shelton was in a vehicle less than
25  20 minutes before the massacre happened, wouldn't that

CHERON SHELTON/ROBERT THOMAS v.
COUNTY OF ALLEGHENY, et al.

ANDREW SCHURMAN
April 9, 2024

1  be contradictory information to the story being told by
2  the witnesses?
3      MR. BIONDO: I'm going to object to the form.
4  But go ahead and answer, if you can.
5  A.   So, if I understand -- give me your timeframes
6  again.
7  BY MR. PETRUNYA:
8  Q.   Okay. So, the confidential witnesses had
9  indicated that Mr. Shelton and Mr. Thomas waited for at
10  least a half an hour in a garage behind Franklin Avenue
11  to perpetrate the Wilkinsburg massacre, and if your
12  detectives had evidence showing that Mr. Shelton was in
13  a vehicle traveling within less than 30 minutes in that
14  time and there was allegedly cellphone communication
15  between those two at a time when they were potentially
16  in the same garage together, wouldn't that be
17  contradictory to the information being provided by the
18  witnesses?
19      MR. BIONDO: Object to form.
20  A.   Yes.
21  BY MR. PETRUNYA:
22  Q.   And is that some type of evidence you would
23  expect your detectives to review for its accuracy?
24  A.   Which evidence? The video and the timestamps on
25  the cellphone communication or the witnesses --

1  Q.   How about all of it together?
2  A.   Yes.
3  Q.   You would want it to be a cogent story that
4  makes sense based on the evidence?
5  A.   Yes.
6  Q.   And if that contradictory evidence would appear
7  in the criminal complaint, you would want that to be
8  investigated by your detectives; correct?
9  A.   So, you're talking about a witness recounting a
10  story told to them?
11  Q.   Correct.
12  A.   There's a -- the term I'm looking for -- a
13  margin of error built into a person's recollection. If
14  I tell you a set of facts and circumstances and you wait
15  and you have to retell it to Paul, you might get one of
16  the times wrong. That's not an uncommon occurrence in
17  witness accounts, versions of events. We can show all
18  five of us in this room the same event and we'll get
19  five different versions of that event.
20  Q.   So, you would agree with me, then, that knowing
21  that, anytime you're talking to a witness who is
22  relaying information to you second or thirdhand, you
23  want to make sure that you vet that information and also
24  look at how it compares to the direct evidence you have?
25  A.   Yes.

1  Q.   Okay. And would that level of review of that
2  evidence also take into account the circumstances by
3  which the individuals obtaining that information are
4  providing that to detectives?
5      MR. BIONDO: I'm going to object to form just
6  because I don't understand. If you can answer, go
7  ahead.
8  A.   Yeah. I didn't -- rephrase that.
9  BY MR. PETRUNYA:
10  Q.   So, what I'm saying is when you are reviewing
11  the evidence provided by individuals related to second
12  or thirdhand stories, do you also have to take into
13  account the circumstances by which that individual is
14  providing you with the evidence? For instance, they're
15  an individual that's incarcerated and is looking to get
16  something in return for providing this information.
17  A.   That's one factor. Yes.
18  Q.   And there's multiple factors that go into
19  assessing an individual's credibility; correct?
20  A.   Credibility and the circumstances in which the
21  -- because there's extraneous -- ambient sound can
22  influence what the person heard.
23  Q.   Or even access to whether that person would be
24  in a position to have that communication with them,
25  correct?

1  A.   I don't know that that impacts the account
2  that's being provided to us.
3  Q.   Well, if an individual is not in a position to
4  interact with another individual, doesn't that go to the
5  credibility of the story that's being relayed by that
6  person?
7  A.   I don't think I'm following. So, if you don't
8  have access to someone, there's never a story.
9  Q.   Okay. Right. So, if that person can't see that
10  individual or is not in a circumstance to be able to
11  hear what that individual is saying, that assessment
12  goes into the credibility of the story that that
13  person's telling you.
14  A.   But they never tell us a story because they
15  never have access -- oh, I follow you. Yes.
16  Q.   Right.
17  A.   So, if they never were housed with them, how
18  could they possibly have that version of events.
19  Q.   Correct.
20  A.   I follow you.
21  Q.   Got you. Have you ever heard of the term in
22  investigation -- it's called tunnel vision?
23  A.   Yes.
24  Q.   And can we agree that that is more or less a
25  term of art but a situation where investigators focus on

CHERON SHELTON/ROBERT THOMAS v.
COUNTY OF ALLEGHENY, et al.

ANDREW SCHURMAN
April 9, 2024

1  one story or one suspect and will possibly bend evidence
2  or look in ways that will make it fit that story?
3        MR. BIONDO: Object to form. But go ahead and
4  answer, if you can.
5  A.    So, I've heard the term tunnel vision as it
6  applies to officer-involved shootings. When we
7  interview officers who have been involved in a critical
8  incident, they have a tendency to block out everything
9  that's going on around them and focus on the bad thing
10  that's happening in front of them. I've never heard it
11  as pertaining to a detective solely focusing on a single
12  theory. I'm sure there's a term for it and maybe that's
13  commonly used, but I've just never heard it relayed that
14  way.
15  BY MR. PETRUNYA:
16  Q.    Your expectation of your detectives is not to
17  focus on a single theory, but review all possible
18  avenues?
19  A.    Correct. Yes.
20  Q.    So, you had talked earlier about some ballistics
21  training and information -- or ballistics training that
22  detectives would undergo as part of their continuing
23  education?
24  A.    Yes.
25  Q.    And ballistics evidence can provide valuable

1  insight into suspects or even take you down a chain of
2  looking at individuals or speaking to individuals who
3  may provide you with information about crimes; correct?
4  A.    Yes.
5  Q.    Okay. Are you aware that the shell casings
6  found tied to the AK-47 in this matter had two hits in
7  addition to the Wilkinsburg massacre case in the ATF,
8  FBI ballistics database?
9  A.    I don't recall.
10  Q.    Do you have any reason to doubt that evidence
11  coming back or would it help if I showed you that
12  evidence?
13  A.    I have no reason to doubt it.
14  Q.    Okay. If that evidence came back indicating
15  that the head stamps on the AK-47 found at the scene of
16  the Wilkinsburg massacre were identical to the head
17  stamps found in another crime, would you expect your
18  detectives to investigate that other individual or speak
19  to anyone involved in that crime to get leads on where
20  that weapon might be or who was tied to that?
21        MR. BIONDO: Object to form. But go ahead and
22  answer, if you can.
23  A.    So, the head stamp. That's the marking?
24  BY MR. PETRUNYA:
25  Q.    Yes.

1  A.    Not the mark that the firearm leaves on the
2  weapon but --
3  Q.    The head stamp. There's a database where it's
4  collected after a crime is committed and the hits come
5  back based upon the match of the head stamp from the gun
6  itself to the actual ballistics when it's fired.
7  A.    So, that's markings left on the weapon -- I'm
8  sorry -- left on the casing by the weapon?
9  Q.    Correct.
10  A.    The head stamp is the actual numbers like
11  9-millimeter or 7.62 that the manufacturer puts on.
12  Q.    Okay.
13  A.    So, are you referring to the head stamp or the
14  actual --
15  Q.    I'm going --
16  A.    The only reason I say that is it's pertinent to
17  your question because Winchester might make -- I don't
18  know -- 10,000 rounds distributed locally of 7.62.
19  We're not going to chase down every head stamp of 7.62.
20  Now, firing pin impressions or extractor marks on a
21  casing that match another scene, that's what they should
22  be tracking down.
23  Q.    So, I'm going -- I'm not going to enter this in
24  evidence.
25  A.    I didn't mean to belabor that, but that's an

1  important differentiation.
2  Q.    I want to talk about all this with you. So, I
3  want to show you what's been Bates labeled as 1046, and
4  this is a portion of a lab report that was provided to
5  your detectives in this case. I'll come around. If I
6  scroll down, so this is -- so, you'll see this is 30
7  spent 7.62 39-millimeter caliber cartridge cases, MCU
8  items V, AL, AO, AZ. Okay?
9  A.    Uh-huh.
10        MR. BIONDO: Yes?
11  BY MR. PETRUNYA:
12  Q.    Is that a yes?
13  A.    Yes.
14  Q.    And you would agree with me that this
15  spreadsheet that appears down here is a listing of cases
16  that are on file in the lab tied to these casings;
17  correct?
18  A.    Correct.
19  Q.    And you would agree with me that this Jerry
20  Michael Shelton homicide 3/9/16, that's the Wilkinsburg
21  massacre; right?
22  A.    Yes.
23  Q.    But there are two other crimes that are listed
24  that predate this from December 31st, 2011 and
25  September 3rd, 2011; correct?

AA COURT REPORTERS 412-288-5370                    Page 145

1  A.    Yes.
2  Q.    And Donald Russell, that would be the case name
3  associated with the victim; correct?
4  A.    Correct.
5  Q.    Okay. Now, do you know if your detectives ever
6  interviewed or followed up with anyone involved in the
7  Donald Russell case to see if they could get any idea
8  where this AK murder weapon was located?
9  A.    I don't recall.
10 Q.    Would you expect them to have done that as part
11 of their investigation?
12 A.    Yes.
13 Q.    If that was not done by the detectives, would
14 that not be a sound investigation in your mind?
15        MR. BIONDO: Object to form. But go ahead and
16 answer.
17 A.    Yes.
18    BY MR. PETRUNYA:
19 Q.    Is that information which may lead to
20 alternative suspects that should have been investigated?
21 A.    It's an investigative lead that can lead any
22 number of ways and, yes, it should be investigated.
23 Q.    And if that lead would have led to locating a
24 firearm or someone connected to the firearm that was
25 used in this case, that's one that should be followed;

AA COURT REPORTERS 412-288-5370                    Page 146

1  correct?
2  A.    Yes.
3  Q.    Now, you had indicated that you weren't really
4  involved in the investigation; correct?
5  A.    Correct.
6  Q.    Okay. Do you recall that Robert Thomas was
7  arrested for a 2013 guns and drugs case that was filed
8  against him?
9  A.    Yes.
10 Q.    Was it you that told the detectives to re-file
11 that case?
12 A.    I don't have a direct recollection.
13 Q.    Okay. Do you recall how that 2013 case got
14 brought up in the context of arresting Robert Thomas?
15 A.    I don't recall.
16 Q.    Would you agree with me that the 2013 arrest --
17 the 2013 case that was re-filed against Robert Thomas
18 was the reason that he was taken to Allegheny County
19 Jail on April 6th of 2016?
20 A.    Yes.
21 Q.    And can we agree that if Mr. Thomas was never
22 placed in Allegheny County Jail on April 6th of 2016, he
23 wouldn't have interacted with the confidential witnesses
24 that came forward with alleged information about the
25 Wilkinsburg massacre; correct?

AA COURT REPORTERS 412-288-5370                    Page 147

1  A.    Correct.
2  Q.    Now, working in homicide, the Wilkinsburg
3  massacre was not the first time your office had worked
4  with witnesses who were in jail to obtain information
5  about other crimes; correct?
6  A.    Correct.
7  Q.    So, there's a process that goes into witnesses
8  coming forward with information; correct?
9  A.    Correct.
10 Q.    And part of your job as a detective is to do an
11 initial determination on any tips or information to see
12 if it's a lead you want to track down; correct?
13 A.    Yes.
14 Q.    And we can agree that if someone's incarcerated,
15 you can't just go and pick them up like you would call a
16 taxi or an Uber? There's a process associated with
17 getting them out?
18 A.    Yes.
19 Q.    And that includes making a request from the jail
20 and actually getting resources to have the individual
21 taken from jail and transported to the homicide
22 department for questioning?
23 A.    Yes.
24 Q.    Now, the jail has inspectors onsite and private
25 rooms where detectives can go and interview individuals

AA COURT REPORTERS 412-288-5370                    Page 148

1  that say that they have information; correct?
2  A.    Inspectors onsite being county police?
3  Q.    Yes.
4  A.    Yes.
5  Q.    And also there's private rooms where they can
6  have meetings with people that say that they have
7  information; correct?
8  A.    I don't know.
9  Q.    You don't know if the jail has private rooms to
10 speak to people?
11 A.    Yes. I don't know.
12 Q.    Okay. The jail has phones; correct?
13 A.    Yes.
14 Q.    And those phones can be used to speak with
15 inmates; correct?
16 A.    Yes.
17 Q.    The inspectors at the jail have their own
18 offices; correct?
19 A.    Correct.
20 Q.    And those offices can be used to talk to
21 individuals that are incarcerated; correct?
22 A.    Yes. Well, I don't know that. I don't know
23 what the jail permits and doesn't permit as far as
24 prisoner movement. So, I can't say that.
25 Q.    Okay. Do you know how long had elapsed between

1 the time Mr. Thomas was placed in jail and the time the
2 witnesses came forward with information associated with
3 the Wilkinsburg massacre?
4 A.     I don't recall.
5 Q.     If a jailhouse witness reached out to a
6 detective indicating they may have information related
7 to a claim, would you expect your detectives to follow
8 up on the veracity of that information or immediately
9 call to have that person brought out of jail to the
10 station for questioning?
11 A.     Are you speaking in general terms?
12 Q.     Yes, I am.
13 A.     So, normally, if someone were to reach out from
14 jail, we would try and have one of the jail internal
15 inspector and detective do -- have one of them do the
16 initial factfinding.
17 Q.     So, they would do the initial factfinding and
18 turn that over to your office to determine if you want
19 to take a statement from this person?
20 A.     Yes.
21 Q.     And the reason why that's important is because
22 you don't want to waste resources or time following down
23 leads from unreliable sources; correct?
24 A.     That's one part. The second part is it's very
25 conspicuous to remove an inmate from jail.

1 Q.     What about two inmates?
2 A.     It's conspicuous.
3 Q.     Do you know why it was that within less than
4 24 hours of Robert Thomas being incarcerated in
5 Allegheny County Jail, two witnesses were taken from the
6 jail and interviewed at Allegheny County headquarters?
7      MR. BIONDO: Object to form. But go ahead and
8 answer, if you can.
9 A.     I don't know.
10 BY MR. PETRUNYA:
11 Q.     Were you aware that one of the confidential
12 witnesses in this case had been utilized by your office
13 in other investigations?
14 A.     No.
15 Q.     You were not aware of that?
16 A.     At the time.
17 Q.     If you were aware of that at the time, what
18 would have been your instructions related to the
19 information this individual was providing?
20 A.     My instructions to?
21 Q.     The detectives.
22 A.     So, we still conduct the interview, but it's up
23 to the district attorney's office because that person's
24 a witness for us. That's not an agent of the state.
25 That person is a witness, wants to provide information.

1 We take the information and provide it to the DA's
2 office. Ultimately, they have to make the
3 determination.
4 Q.     Would the DA rely on your detectives to inform
5 them if they had spoke to this person in another case or
6 used them on another case?
7 A.     Yes.
8 Q.     And you would anticipate your detectives
9 informing the district attorney of that; correct?
10 A.     Yes, if indeed they were aware. There's other
11 mechanisms for the DA's office, I would imagine, to
12 learn if someone's been a witness for them in the past.
13 Q.     Well, is that something that you also instruct
14 your detectives on how to figure out? Like --
15      MR. BIONDO: I'm going to object to the form.
16 But go ahead, if you can answer.
17 A.     No.
18 BY MR. PETRUNYA:
19 Q.     Okay. Do you recall seeing information received
20 from the FBI to your detectives in this matter related
21 to an incident that involved Lamont Powell several
22 months before this where he was alleged to have robbed
23 two drug dealers and robbed them of close to $100,000 in
24 cash?
25 A.     I don't recall.

1 Q.     Is that something that should have been
2 investigated by your department if they received that
3 information?
4 A.     Yes.
5 Q.     Do you know sitting here today whether that was
6 investigated?
7 A.     I don't recall.
8 Q.     If a lead like that from the FBI was
9 investigated by your office, is that something that
10 should have been documented?
11 A.     Yes.
12 Q.     Should that appear in the criminal file?
13 A.     Yes.
14 Q.     And why is it important that that appears in the
15 criminal file?
16 A.     I believe that would go toward motive.
17 Q.     Right. And motive in this case -- one of the
18 reasons for motive in this case was because Cheron
19 Shelton wanted to get retribution against Lamont Powell
20 for the of murder of Calvin Doswell?
21 A.     Yes.
22 Q.     Did you ever look at the Calvin Doswell file in
23 this matter?
24 A.     I personally did not.
25 Q.     If I told you that Lamont Powell's name does not

AA COURT REPORTERS 412-288-5370                    Page 153

1  appear in that file, would that be the first time you're
2  learning of this?
3  A.    I don't recall.
4  Q.    Okay. Would it surprise you if I told you
5  Lamont Powell's name does not appear in that file?
6  A.    No. It would not.
7  Q.    Why is that?
8  A.    Having spent almost 20 years in the homicide
9  unit and investigating hundreds of murders, often times,
10 murders go unsolved and the killers are never known to
11 law enforcement.
12 Q.    I don't want to say it's okay, but if there's
13 not enough evidence to arrest someone for a crime, then,
14 sometimes you just have to let it lie; correct?
15 A.    Correct.
16 Q.    And that's not necessarily a knock on the
17 homicide department's abilities. That's just whether
18 there's enough evidence to prove that someone did that;
19 correct?
20 A.    Correct.
21        MR. BIONDO: Two minutes here. Two or
22 three minutes.
23        (There was a pause in the proceedings.)
24 BY MR. PETRUNYA:
25 Q.    Before you left in 2020, did you have any

AA COURT REPORTERS 412-288-5370                    Page 154

1  discussions with anyone at the homicide department about
2  the charges in the Wilkinsburg massacre itself and what
3  may have gone wrong with it?
4  A.    No.
5  Q.    Is that just because that's not what you do in
6  the homicide department or was no one supposed to talk
7  about it?
8  A.    It was never talked about. I'm not sure how to
9  answer that question. It wasn't taboo to talk about it
10 by any means, but it just wasn't talked about. Lots of
11 things have happened since then.
12 Q.    Did you have any involvement in or an
13 understanding of the grand juries that were being
14 commissioned by the district attorney's office related
15 to 2015, 2016, 2017 homicides?
16 A.    I'm not sure I understand that. Were they
17 county police homicides?
18 Q.    It was pretty much all over the city and the
19 county.
20 A.    I don't recall specifics.
21 Q.    Do you recall a witness by the name of Gregory
22 Parker who was sought to be utilized at some point in
23 the Wilkinsburg massacre?
24 A.    I do not.
25 Q.    Okay. Do you remember the pretrial hearings

AA COURT REPORTERS 412-288-5370                    Page 155

1  where Mr. Parker and his testimony came up?
2  A.    I do not.
3  Q.    Do you know of Mr. Parker's involvement in the
4  Wilkinsburg massacre or any other cases?
5  A.    I do not.
6  Q.    Do you know how Mr. Parker's name or the
7  information he could provide came to the attention of
8  your detectives related to the Wilkinsburg massacre?
9  A.    I don't recall.
10 Q.    Now, there is -- the attorney general operates a
11 witness protection program for individuals that
12 cooperate in homicides and drug cases; correct?
13 A.    Yes.
14 Q.    And in order to be accepted into the attorney
15 general's witness relocation program, an application
16 needs to be provided and the attorney general actually
17 has to accept that individual; correct?
18 A.    Yes.
19 Q.    And once that individual's accepted into the
20 attorney general's office, the attorney general controls
21 and dictates the distribution of funds for that
22 individual; correct?
23 A.    Yes.
24 Q.    I think one of your detectives had said once a
25 person's in the witness protection program, that's it,

AA COURT REPORTERS 412-288-5370                    Page 156

1  we wash our hands of it, it's up to the AG; correct?
2  A.    No.
3  Q.    What type of involvement do you have with these
4  witnesses, then, once they're accepted into the attorney
5  general program?
6  A.    So, the attorney general's program is only a
7  funding source. So, the onus is on the detective to
8  manage the funds for the witness.
9  Q.    And where do those funds come from?
10 A.    In the beginning, I'm sure it's tax dollars, but
11 it comes from the attorney general. So, when an
12 individual is enrolled into the program, the attorney
13 general will say okay, there's an ask, what do you need,
14 we need to move them, we need subsistence, moving van,
15 whatever the case may be.
16        That's articulated in advance. They say okay,
17 we're going to allot $300 a month in rent for two months
18 to get them on their feet, money for food, moving van.
19 We ask for that in advance. That's what's allocated.
20 Now the onus is on the detective, okay, we got to find
21 them somewhere to move that's within the parameters of
22 the area that's set forth, how much money we have
23 available for the rent.
24 Q.    Okay. So, you're relying on the authorization
25 of the attorney general's office related to those funds

CHERON SHELTON/ROBERT THOMAS v.
COUNTY OF ALLEGHENY, et al.

ANDREW SCHURMAN
April 9, 2024

1   to dictate what is -- what the detectives are capable of
2   providing as a resource to those witnesses?
3   A.      Yes.
4   Q.      Okay.  Where does that physical money, the
5   actual money that the detectives are providing to these
6   individuals, where does that come from?
7   A.      The attorney general will send a check.
8   Q.      Where does that check go?
9   A.      Into the county police fund and they can dole it
10  out from there.  Everything has to be receipted and
11  covered with a report --
12  Q.      And is that fund --
13  A.      -- and sent back to the attorney general's
14  office.
15  Q.      Is that fund known as the Allegheny County
16  Witness Protection Program Fund?
17  A.      Correct.
18  Q.      Is that a PNC Bank fund?
19  A.      Yes.
20  Q.      Okay.  And six years as the lieutenant in
21  homicide.  2020.  Backdate.  That puts you at 2013,
22  2014?
23  A.      No.  No.  '10 to '16.  I'm sorry.  I was a
24  lieutenant for -- yeah.  '10 to '20.
25  Q.      Ten years.

1   A.      10 to '19.
2   Q.      '10 to '19?
3   A.      '10 to 19.  Sorry.  Yes.  '10 to '19.
4   Q.      Okay.
5   A.      Promoted in '19.  Retired in '20.
6   Q.      So, there was a fund that Allegheny County had
7   called Allegheny County Fund Homicide that was closed in
8   March of 2018.  Do you remember that?
9   A.      Are you referring to the PNC account?
10  Q.      No.  I'm not referring to the PNC account.  I'm
11  referring to another account.
12  A.      I don't recall when that was closed.
13  Q.      But you know there was an account that was
14  closed and moved over to narcotics?
15  A.      There was -- yes.  I was aware there was a
16  homicide -- internal county police homicide fund that
17  was transferred to -- maybe it -- I don't know what
18  happened to it.  We didn't use it.
19  Q.      Who is Louis Blauth?  Do you know him?
20  A.      He is a county police officer.
21  Q.      And I have a memo from him from September 26th
22  of 2019 indicating that funds were removed from the
23  homicide fund and the account was closed as of
24  March 22nd, 2018.  Does that sound about right?
25  A.      Okay.

1   Q.      This PNC checking account, though, was already
2   in place prior to the closure of the homicide fund;
3   correct?
4   A.      Yes.
5   Q.      How long was this PNC checking account in place?
6   Do you know?
7   A.      I'm going to guess.
8   Q.      That's fine.
9   A.      2006 or 7, roughly.
10  Q.      Okay.  And who started this account?
11  A.      The -- so, there was a need -- the attorney
12  general's office has the witness protection fund.  An
13  individual has to be enrolled in that, so that means
14  sitting down, going through a packet of paper like this,
15  submitting it to the AG's office, waiting a week for
16  approval, whatever the case is, but there's a lag time.
17  Whether it's an hour or a week, there's a lag time.
18       So, in the short term, we had no way to provide
19  for someone who was willing to cooperate with us in the
20  middle of the night.  So, when there's a murder and a
21  significant other needs relocated, we had no funding
22  available to do that.  So, we petitioned the DA's
23  office.  So, the city had a witness protection/dignitary
24  protection.  It's funded by city council, their budget.
25  We didn't have that available.

1        So, we petitioned the district attorney's
2   office, said hey, we need some source of funding so in
3   the middle of the night, we can provide for the
4   witnesses who are going to be your witnesses, the people
5   who are cooperating with us who will ultimately be your
6   witnesses.  So, they created the witness protection
7   account -- I forget what title was -- at PNC Bank for us
8   with debit cards, credit card -- I forget what it was --
9   but a card associated so in the middle of night, we
10  could relocate someone, then get them enrolled in the
11  attorney general's program.  So, that account started --
12  and don't nail me down to the dates -- 2006, 2007.
13  Q.      Was that account still in operation when you
14  left in 2020?
15  A.      Yes.
16  Q.      And that account is different than the account
17  called Confidential Fund, dash, Homicide which was
18  closed in 2018?
19  A.      Yes.
20  Q.      Now, why was this account created and -- when a
21  confidential fund for homicide existed?
22  A.      I don't know what that confidential fund was set
23  up to do.  I never used it.  I don't know if there was
24  funds in there.  We used the witness protection fund or
25  account to provide for our people.

CHERON SHELTON/ROBERT THOMAS v.
COUNTY OF ALLEGHENY, et al.

ANDREW SCHURMAN
April 9, 2024

1 Q.    And the people that could be provided for in
2 that account had to be accepted into the attorney
3 general program or have an acceptance pending?
4 A.    Yes. Or if someone needed relocated
5 immediately, domestic violence situation, they don't
6 have a family member locally, we can set them up in a
7 hotel so they can make arrangements to go to whatever
8 state they're going to to remove them from a situation.
9 So, it was available as a resource.
10 Q.    What about if the person's already relocated or
11 in a different state at the time when a request is made
12 for the funds?  Does -- do your detectives have access
13 to that money then?
14 A.    So --
15         MR. BIONDO: I'll object to the form. But go
16 ahead and answer, if you can.
17 A.    So, if we relocate someone -- I'm going to use
18 hypotheticals.
19 BY MR. PETRUNYA:
20 Q.    Sure. Please do.
21 A.    If we move someone from McKeesport to
22 Morgantown, we now have to pay the landlord in
23 Morgantown. Is that what you're -- so, we move them.
24 We have to pay their landlord. So, we pay directly to
25 the landlord.

1 Q.    Pay directly to the landlord?
2 A.    Yes.
3 Q.    The monies would not go directly to the witness?
4 A.    That was our ideal situation. If we could pay
5 the landlord direct, we would do that because there was
6 only allotted so much money.
7 Q.    And was there a documentation required
8 associated with the transmission of these funds to
9 witnesses?
10 A.    Yes.
11 Q.    What is that documentation requirement exactly?
12 A.    Receipts, then a report from the detective.
13 Q.    Receipts being to show that the money that was
14 being provided to that person was actually going to the
15 intention of what it was provided for?
16 A.    Yes.
17 Q.    And that was a requirement in your department?
18 A.    Yes.
19 Q.    Written policy or verbal policy?
20 A.    Verbal. I don't know that it exists in --
21 Q.    There is a law that requires any government
22 official to not misappropriate government funds;
23 correct?
24 A.    I don't know.
25 Q.    If I told you that that was codified in the

1 criminal code, do you have any reason to doubt that?
2 A.    I don't doubt it.
3 Q.    Did you ever have occasion to investigate any of
4 your detectives while you were working as the lieutenant
5 for misappropriating those government funds?
6 A.    No.
7 Q.    Are you aware of the fact that $1,700 in cash
8 was wired to Kendall Mikkell in April of 2018 related to
9 the Wilkinsburg homicide?
10 A.    I don't recall that.
11 Q.    Would that have been something you needed to get
12 approval for?
13 A.    From?
14         MR. BIONDO: Object to form.
15 BY MR. PETRUNYA:
16 Q.    From you. Would your detectives have needed
17 approval from you to access the money, to get that fund?
18 A.    How was it wired?
19 Q.    Western Union.
20 A.    So, that would be cash.
21 Q.    Yeah.
22 A.    So, yes.
23 Q.    They would have needed approval?
24 A.    Yes.
25 Q.    And how would that approval have been given?

1 A.    Well, me or the sergeant.
2 Q.    And that would have been Scherer?
3 A.    Yes. There was two of us that had -- what do
4 they call it -- signature authority on that account.
5 Q.    Signature authority?
6 A.    Whatever the -- it's an approval process for
7 PNC Bank.
8 Q.    Was there a debit card associated with this
9 account?
10 A.    Yes.
11 Q.    And how would someone get access to that debit
12 card?
13 A.    They would come to me or Scherer and say hey, I
14 need to withdraw X amount, go with them, withdraw it,
15 here's the receipt, the ATM receipt. I need a receipt
16 what you're doing with it and a report.
17 Q.    Do you know if -- so if -- if your detectives
18 are wiring money to someone by Western Union, do you
19 expect them to get a receipt from the person receiving
20 that money to show that the money's going for what they
21 say it's going towards?
22 A.    You try.
23 Q.    If there's a direct source to send that money
24 to, like a landlord or someone that is -- where they're
25 staying, is that where that money should be directed?

AA COURT REPORTERS  412-288-5370                          Page 165

1  A.    Ideally.
2  Q.    Do you know why $1,700 was Western Union-ed to
3  Kendall Mikkell in 2018?
4  A.    I don't recall.
5  Q.    Where was the money in that account coming from
6  during your time as lieutenant?
7  A.    So, the DA's office put $5,000 in the account
8  when they created it and then as -- we would use it for
9  a witness enrolled with the AG's. If we use 200, the
10  first 200 from the AG's office would be backfill for
11  that and then the rest of the money would go in and be
12  allocated out for the witness. So, in theory, it stayed
13  flush with the reimbursement from the attorney general's
14  office.
15  Q.    What if the attorney general's office didn't
16  reimburse it?
17  A.    Then the DA's office -- we'd have to ask the
18  DA's office is it appropriate to use this money for X
19  reason.
20  Q.    So, in order to get to that point, though, you
21  would have had to go through the attorney general
22  process, be denied and then go to the DA's office for
23  approval?
24  A.    No. There might be instances where someone
25  wasn't being enrolled in the witness -- in the attorney

AA COURT REPORTERS  412-288-5370                          Page 166

1  general's program. It was just, like I said, the one
2  night, let's get someone out of the danger zone for one
3  night so they can get to where they need to go, then
4  they wouldn't be enrolled.
5  Q.    Would you receive the statements for this bank
6  account?
7  A.    No. They went to the district attorney's
8  office.
9  Q.    Did you have access or could you request to
10  review those statements at any point?
11  A.    We used to reconcile -- I believe Walt Szymanski
12  was the first person to -- he was one of the financial
13  people at the DA's office.
14  Q.    So, what was the procedure for doing these
15  reconciliations, then? Did you -- I mean, was this a
16  monthly thing? Was this bimonthly?
17  A.    Quarterly is the best way I can describe it.
18  Our reconciliations at the police department level were
19  each case. Those happen contemporaneously with the
20  case. So, every dollar that we got had to be accounted
21  for and they were covered with a receipt and a report.
22  Q.    And that report would be added to the case files
23  associated with it?
24  A.    There's a separate file for justifying the case.
25  Q.    Which is maintained at the Allegheny County

AA COURT REPORTERS  412-288-5370                          Page 167

1  homicide department?
2  A.    Correct.
3  Q.    Physical file? Digital file? Both?
4  A.    Physical. Again, I left in '20. I don't know
5  what it looks like now.
6  Q.    Let's put you back in the driver's seat as
7  lieutenant, though, 2020. I call you up and I say
8  Lieutenant Schurman, I need the reportings for the
9  reconciliations that you submitted in March, April, May
10  of 2016. You could direct me where that file exists?
11  A.    It was done by person. So, if it's John Doe,
12  say give me the file on John Doe, because the attorney
13  general's office would occasionally do that, we need to
14  reconcile, we'd pull the file, here's everything.
15  Q.    So, if -- this is partially hypothetical, but I
16  want you to imagine you're Lieutenant again. If I tell
17  you that Frederick Collins, Gregory Parker and Kendall
18  Mikkell were cooperating witnesses in this case and I
19  called you up in 2016, 2017, 2018 or 2020 and said can
20  you produce to me all receipts you have associated with
21  payments made to these individuals, you would have that
22  information?
23  A.    Yes.
24  Q.    You being a county employee.
25  A.    The current lieutenant should have those.

AA COURT REPORTERS  412-288-5370                          Page 168

1  Q.    Was there a policy associated with document
2  retention there or when that would get --
3  A.    I don't know.
4         MR. PETRUNYA: Okay. Let's take a five-minute
5  break and then we'll come back.
6         (There was a pause in the proceedings.)
7  BY MR. PETRUNYA:
8  Q.    Lieutenant Schurman, we had subpoenaed the
9  county for information associated with witness accounts
10  and bank accounts for witness payments and we received a
11  policy titled Confidential Fund Homicide, a written
12  policy.
13  A.    Okay.
14  Q.    Were you aware of the fact this policy existed
15  and was revised June of 2016?
16  A.    I don't recall.
17  Q.    Do you have any reason to doubt this policy
18  existing, though, if it was turned over and the county
19  represented this was the policy on it?
20  A.    I have no reason to doubt that. You said -- was
21  that for the confidential fund?
22  Q.    Confidential Fund Homicide.
23  A.    So, that's the fund that was disbanded or
24  whatever in 2018.
25  Q.    Do you know why it is that there weren't written

AA COURT REPORTERS 412-288-5370     Page 169

1  policies and procedures in place for this other fund
2  that you were obtaining -- that your detectives were
3  obtaining funds from?
4  A.    I don't. There were policies as it pertains to
5  the AG. They have their rules governing how we use the
6  money. But how our internal recordkeeping -- I don't
7  believe there was a policy.
8  Q.    But okay. So, what you're saying is the rules
9  for your fund would have been based on the rules for the
10 AG's fund?
11         MR. BIONDO: Object to the form. But go ahead
12 and answer, if you can.
13 A.    So, the overarching rule book for the AG's
14 played a part, but our internal recordkeeping, I don't
15 believe there was a policy as to how that should look.
16 BY MR. PETRUNYA:
17 Q.    Was there a -- was there a sign-out sheet
18 associated with the debit card linked to this PNC
19 checking account?
20 A.    I don't recall that.
21 Q.    If a detective said at the time that there was a
22 sign-out sheet, does that not comport with your
23 recollection of the policies at the time?
24 A.    Again, I don't believe we had a formal policy.
25 Q.    Okay.

AA COURT REPORTERS 412-288-5370     Page 170

1  A.    But if that's the case, if someone testified to
2  that, certainly.
3  Q.    When a witness is being used in an underlying
4  case by your office and your office has information
5  about that witness's use in a prior case, do you have
6  files that track with the witness itself or is
7  everything case-specific?
8  A.    Case-specific.
9  Q.    But the payment receipts and records that we
10 talked about for these witnesses are witness-specific;
11 correct?
12 A.    Correct.
13 Q.    And before we took a break, you had indicated
14 that the lieutenant should have access to files for each
15 witness that's been paid through that PNC account;
16 correct?
17 A.    Yes.
18 Q.    Now, we talked about your office providing a
19 criminal file to the district attorney's office once
20 charges are filed; correct?
21 A.    Yes.
22 Q.    So, when charges are filed in a case and a
23 witness that has an existing file with Allegheny County
24 is used, is it expected that that information is put
25 into and incorporated into the file?

AA COURT REPORTERS 412-288-5370     Page 171

1         MR. BIONDO: I'll object to the form. But go
2  ahead and answer, if you can.
3  BY MR. PETRUNYA:
4  Q.    Do you understand my question?
5  A.    So, if a witness has been enrolled in witness
6  protection.
7  Q.    Yes.
8  A.    How does the DA's office become aware of that?
9  Q.    Yes.
10 A.    Is that the crux of what you're asking?
11 Q.    Yeah.
12 A.    So, there is not a document that goes with the
13 criminal case that I can recall saying this witness A,
14 John Doe, is enrolled in the witness protection.
15 Q.    Okay.
16 A.    That is conveyed to the DA at the time of, but
17 they would know that if there is a criminal complaint
18 filed. So, I guess we're putting the cart before the
19 horse there. So, in order for us to get a -- we had to
20 sign off on the attorney general, anyway, if I remember
21 correctly. So, that packet where we would have to
22 enroll somebody needed a DA's signature. So, they would
23 know it then.
24 Q.    Let me ask it this way, then. Let's say a
25 witness comes forward with information previously

AA COURT REPORTERS 412-288-5370     Page 172

1  enrolled in the witness protection program but not
2  currently for the case we're investigating. Charges are
3  filed. Your office is compiling the information to send
4  to the district attorney's office pursuant to the
5  obligations associated with turning over information.
6  A.    Okay.
7  Q.    If that witness has their own independent file
8  for prior cases they were working on, do you then also
9  as part of your process copy that and put that into the
10 criminal case file that you send over to the DA's
11 office?
12 A.    No.
13 Q.    Why not?
14 A.    That would be a prior instance and their
15 biographical information would be contained in that and
16 we wouldn't want it to get turned over in discovery to
17 someone who would want to do harm or have this person
18 not testify.
19 Q.    Don't you have to turn over any exculpatory
20 evidence as part of your investigation to the district
21 attorney's office?
22 A.    If the witness -- in prosecution, they should
23 know that. Right?
24 Q.    I don't know. I'm asking you.
25 A.    I don't know, either.

CHERON SHELTON/ROBERT THOMAS v.
COUNTY OF ALLEGHENY, et al.

ANDREW SCHURMAN
April 9, 2024

1  Q.     So, there's no formal policy about what needs to
2  be turned over from those witnesses or not?
3  A.     I don't believe there is as far as the witness
4  protection piece goes.
5  Q.     One of the pieces of evidence your office used
6  to investigate Cheron Shelton in this case was Officer
7  Adams' representations that he saw Mr. Shelton get into
8  a white Lincoln shortly after the Wilkinsburg massacre;
9  correct?
10 A.     Yes.
11 Q.     And are you aware of the fact that that white
12 Lincoln that Mr. Shelton was seen getting into at the
13 time did not contain any DNA evidence connecting him to
14 the scene of the victims?
15 A.     I don't recall.
16 Q.     Is that lack of DNA evidence in the vehicle
17 itself that he was seen getting into shortly after the
18 shooting something that you would want your detectives
19 to take into account when determining if he is a suspect
20 in this case?
21 A.     So, that's a very broad question. So, DNA is
22 usually a transfer of something. Right? Whether it's
23 skin, blood, something. The absence of that would not
24 in and of itself rise to a level of whatever you want to
25 describe it as, but it's part of the bigger picture.

1  Q.     Okay. And if Officer Adams had identified Mr.
2  Shelton getting into this vehicle in the same clothes
3  that he was seen entering the vehicle before the
4  Wilkinsburg massacre without any alteration in the
5  clothing, blood, bone, DNA that was then in the car,
6  that would be a piece of evidence you would want to take
7  into account to determine if he is a suspect in this
8  case?
9  A.     Yes.
10 Q.     Is that a yes?
11 A.     Yes.
12 Q.     From the inception of the investigation, meaning
13 March 9, 2016 -- and I think I remember watching an
14 interview with you on WTAE to this effect -- but was it
15 always the theory that this case was perpetrated by at
16 least two individuals?
17 A.     Yes.
18 Q.     And is that because there were two different
19 types of casings that were found at the scene?
20 A.     In two different locations.
21 Q.     So, you would agree with me, then, in order for
22 the Wilkinsburg massacre to have been perpetrated under
23 your theory, you would have to have two individuals at
24 least that would be complicit; correct?
25 A.     Yes.

1  Q.     And if you didn't have both of those individuals
2  either communicating about it or together at some point
3  in that location, that would weigh against your theory
4  about the identity of those individuals?
5        MR. BIONDO: Object to the form. Go ahead and
6  answer.
7  A.     One more time.
8  BY MR. PETRUNYA:
9  Q.     Sure. If you don't have these two individuals
10 together or you have evidence to the contrary that
11 they're at different locations or couldn't have been
12 together, then the theory that they acted in concert
13 with one another to perpetrate the Wilkinsburg massacre
14 goes against your theory that it was two people working
15 together at the time?
16        MR. BIONDO: Object to the form. But go ahead
17 and answer, if you can.
18 A.     Our working theory was two people because there
19 was two sets of casings in two different locations and,
20 I believe, ballistic damage to the house consistent with
21 those two different calibers. So, your question is
22 Cheron Shelton and Rob Thomas, we can't connect them,
23 that goes counter --
24 BY MR. PETRUNYA:
25 Q.     Well, if you lose one, you possibly lose the

1  other; is that accurate?
2        MR. BIONDO: Again, I'll object to the form.
3  A.     No. You could still have one without the other.
4  BY MR. PETRUNYA:
5  Q.     Okay. But in order to -- but you still had to
6  have two people to perpetrate the Wilkinsburg massacre.
7  A.     Yes.
8  Q.     So, it could have been one of them; right? It
9  could have been both of them, but it also could have
10 been two completely different people or them and someone
11 else completely different?
12 A.     Yes.
13        MR. BIONDO: Object to form.
14 BY MR. PETRUNYA:
15 Q.     So, you have to investigate the different leads,
16 though, to figure out who is where at the time and can
17 you actually put them together for this story?
18 A.     Correct.
19 Q.     Were you receiving any pressure from the
20 district attorney's office or anyone for your detectives
21 to solve this case?
22 A.     No.
23 Q.     Were you putting pressure on any of your
24 detectives to solve or make an arrest in this case?
25 A.     No.

CHERON SHELTON/ROBERT THOMAS v.
COUNTY OF ALLEGHENY, et al.

ANDREW SCHURMAN
April 9, 2024

---

AA COURT REPORTERS 412-288-5370                Page 177

1  Q.    Is it accurate when your detectives are telling
2      you that they haven't slept or they couldn't leave the
3      station because you were forcing them to work overtime?
4          MR. BIONDO: Object to the form. Answer if you
5      can.
6  A.    I'm an ogre running a salt mine? I hope they
7      didn't tell you that. No. I would never ever tell
8      someone they couldn't leave or deprive them of sleep.
9  BY MR. PETRUNYA:
10 Q.    Is it important for the integrity of the trust
11     that the public has in law enforcement that a thorough
12     and complete investigation is conducted?
13 A.    Yes.
14 Q.    Does cutting corners or conducting a sloppy
15     investigation undermine the trust that the community has
16     in law enforcement?
17 A.    Yes. Absolutely.
18 Q.    Is it more important to conduct a thorough
19     investigation on the front end to make sure that you
20     arrest the right people before charges are filed against
21     them?
22 A.    Yes.
23 Q.    And is there any restriction on the amount of
24     time you can take in an investigation to pin down the
25     correct individuals that may have perpetrated a crime?

---

AA COURT REPORTERS 412-288-5370                Page 178

1  A.    No restrictions.
2  Q.    Do you encourage or was your department
3      encouraged to utilize the resources at their disposal
4      and follow the leads available to make sure they got the
5      right people?
6  A.    Yes.
7          MR. PETRUNYA: I don't think I have anything
8      further. It's been a pleasure speaking to you today.
9          MR. BIONDO: I'm not going to ask you anything.
10     You have the option to either read or waive the
11     transcript. We're going to ask you to read it, to take
12     a look at it. You can't change your answers, but if you
13     want to clarify anything, you have the opportunity to do
14     that.
15         (The deposition ended at 2:30 p.m.)
16
17
18
19
20
21
22
23
24
25

---

AA COURT REPORTERS 412-288-5370                Page 179

1              CERTIFICATE OF REPORTER
2
3      I, ANTHONY JUDE CORDOVA, a Certified Shorthand
4  Reporter and E-Notary Public, hereby certify that the
5  witness in the foregoing deposition was by me duly sworn
6  to tell the truth in the within-entitled cause;
7      That said deposition was taken down in shorthand by
8  me, a disinterested person, at the time and place
9  therein stated, that review was not waived, and that the
10 testimony of the said witness was thereafter reduced to
11 typewriting, by computer, under my direction and
12 supervision;
13     I further certify that I am not of counsel or
14 attorney for either or any of the parties to the said
15 deposition, nor in any way interested in the event of
16 this cause, and that I am not related to any of the
17 parties thereto.
18
19 DATE:  April 19, 2024
20
21 /s/ Anthony Jude Cordova
22 Anthony Jude Cordova, CSR 12943
23 Certificate Attached
24
25

---

AA COURT REPORTERS 412-288-5370                Page 180

1      UNITED STATES DISTRICT COURT      )    ERRATA SHEET
2      WESTERN DISTRICT OF PA            )
3
4  SHELTON V. COUNTY
5  I, Andrew Schurman, have read the foregoing pages of my
6  deposition given on April 9, 2024 and wish to make the
7  following, if any, amendments, additions, deletions or
8  corrections:
9
10     PAGE NO.      LINE NO.      REASON FOR CHANGE
11
12
13
14
15
16
17
18
19
20 The transcript is correct in all other respects.
21
22
23              _____
23              Andrew Schurman
24 Subscribed and sworn before me this ___ day, _____,
25 2024.
              _____

---

CHERON SHELTON/ROBERT THOMAS v.
COUNTY OF ALLEGHENY, et al.

ANDREW SCHURMAN
April 9, 2024

| AA COURT REPORTERS 412-288-5370 | Page 181 |
| --- | --- |

```
 1                    AA COURT REPORTERS
            428 BOULEVARD OF THE ALLIES, SUITE 300
 2               PITTSBURGH, PENNSYLVANIA  15219
                        412.288.5370
 3

 4    April 19, 2024

 5    TO:  Dennis Biondo, Jr., Esq.

 6    Re:  SHELTON V. COUNTY

 7    Dear Counsel:

 8    Please find enclosed your copy of the deposition of
      Andrew Schurman taken in the above-titled matter on
 9    April 9, 2024.  Please have the witness make any changes
      and/or corrections that are deemed necessary on the
10    enclosed errata sheet.

11    After making any changes and/or corrections, have the
      witness sign the errata sheet on the signature line and
12    then have it Notarized.

13    Retain a copy of the errata sheet for attachment to your
      copy of the transcript, and send the original errata
14    sheet to Max Petrunya, Esq., and also copies to all
      other counsel, if applicable.  Also, send a copy to me.
15
      Thank you for your cooperation in this matter.
16
      Sincerely yours,
17

18    Anthony Cordova, CSR 12943
      Court Reporter, Notary Public
19
      Cc:  Max Petrunya, Esq.
20         Paul Jubas, Esq.
           Shelley Rohrer, Esq.
21

22

23

24

25
```