```
 1          IN THE UNITED STATES DISTRICT COURT

 2          FOR THE WESTERN DISTRICT OF PENNSYLVANIA

 3                         - - -

 4   CHERON SHELTON/ROBERT THOMAS,)
                                  )
 5              Plaintiffs,       )
                                  )
 6        vs.                     )No.
                                  )2:22-cv-196/266
 7   COUNTY OF ALLEGHENY, et al., )
                                  )
 8              Defendants.       )

 9                         - - -

10          Deposition of PATRICK KINAVEY

11             Friday, April 12, 2024

12                         - - -

13       The deposition of PATRICK KINAVEY, called as a
     witness by the plaintiffs, pursuant to notice and the
14   Federal Rules of Civil Procedure pertaining to the
     taking of depositions, taken before me, the
15   undersigned, Lance E. Hannaford, Notary Public in and
     for the Commonwealth of Pennsylvania, at the offices
16   of County of Allegheny Law Department, 300 Fort Pitt
     Commons, Pittsburgh, Pennsylvania  15219, commencing
17   at 1:10 o'clock p.m., the day and date above set
     forth.

18                         - - -

19
            NETWORK DEPOSITION SERVICES
20           SUITE 1101, GULF TOWER
            PITTSBURGH, PENNSYLVANIA
21              866-565-1929

22                         - - -

23

24

25
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

2

```
 1    APPEARANCES:

 2         On behalf of the Plaintiffs:

 3             Law Offices of Max Petrunya:
               Max Petrunya, Esquire
 4             Paul Jubas, Esquire
               5 Bayard Road, Suite 917
 5             Pittsburgh, Pennsylvania  15213
               maxpetrunyapc@gmail.com
 6
           On behalf of the Defendants:
 7
               County of Allegheny Law Department:
 8             Dennis Biondo, Jr., Esquire
               Shelley Rorher, Esquire
 9             300 Fort Pitt Commons
               Pittsburgh, Pennsylvania  15219
10             dennis.biondojr@alleghenycounty.us

11
                              -  -  -
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

3

```
 1                      I-N-D-E-X

 2    EXAMINATION BY:                      PAGE:

 3    Mr. Jubas                           4, 175
      Mr. Petrunya                         113
 4

 5    EXHIBIT:                            MARKED:

 6    Exhibit 1 - DA2932 through 36         49

 7                       _ _ _

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

4

```
 1                PATRICK KINAVEY
 2    called as a witness by the plaintiffs, having been
 3    first duly sworn, as hereinafter certified, was
 4    deposed and said as follows:
 5                    EXAMINATION
 6    BY MR. JUBAS:
 7        Q    Mr. Kinavey, I appreciate you being here
 8    with us today.  My name is Attorney Paul Jubas.  I am
 9    here with my co-counsel, Max Petrunya.  We represent
10    the plaintiffs in this matter Cheron Shelton and
11    Robert Thomas.  A few groundrules.  I am sure you have
12    been through this a million times.
13              Our court reporter is taking down
14    everything we are saying.  So make sure you speak
15    slowly, and articulate everything.  No uh-huhs or
16    uh-uhs and head nods.  We need full answers.
17              Can we agree that if you have answered my
18    question, that means you have understood my question?
19        A    Yes.
20        Q    So how old are you today?
21        A    51.
22        Q    Have you ever given a deposition before?
23        A    Only in civil matters related to vehicular
24    crashes we have investigated.
25        Q    You have never been deposed as a defendant?
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

5

1       A       No -- well, I was never deposed as a

2    defendant.  No.

3       Q       What did you do to prepare for your

4    testimony today?

5       A       I reviewed documents pertinent to the

6    investigation that I drafted regarding the case

7    against Cheron Shelton and Robert Thomas.

8       Q       Did you speak with anybody to prepare for

9    today?

10      A       Yes.  I spoke with the county attorneys.

11   We had I guess a pretrial conference on Wednesday.

12      Q       You don't have to tell me about the

13   contents of the discussions.  But is that what you are

14   referring to when you say a conference?

15      A       Yes.  Pretrial.  I would call it a pretrial

16   conference.

17      Q       Predeposition conference?

18      A       Predeposition conference.

19      Q       Did you meet or speak with anybody else in

20   preparation for today?

21      A       In preparation?  No.

22      Q       Are you saying that you did not speak with

23   Detective McCue in preparation for today?

24      A       Not in preparation.  I have spoke with him

25   about things we did in the investigation, yes.

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

6

1      Q      Did you help prepare him for his
2    deposition?
3      A      I don't know that I would help prepare him.
4    If you are asking if I sat down with him, I told him
5    in regard to Kendall Mikell information, because I
6    believe that is what I was being involved in regarding
7    the Cheron Shelton and Robert Thomas matter.
8      Q      Specifically what did you discuss with him
9    about Kendall Mikell?
10     A      There was a homicide we investigated in I
11   believe it occurred in 2013.  It may have been early
12   2014.  Kendall Mikell was initially interviewed by
13   Detective McCue under the grounds of a federal
14   proffer.  Where his attorney came forward with
15   information regarding that case.
16            My involvement with Kendall Mikell after
17   that was that I accompanied the chief trial deputy in
18   regards to I think it was Dan Fitzsimmons and Attorney
19   Lisa Carey maybe.  I am not 100% sure.  Regarding a
20   pretrial conference with Kendall Mikell.
21     Q      Were those the case that McCue dealt with
22   Mikell on and the case you handled, are they the same
23   cases?
24     A      They are.
25     Q      Which case is that?

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

7

1       A       It was the case against Rayshawn -- I refer
2   to them as victims.  The victim case in ours, the
3   victim was Susan Sidney.  The suspects in that case
4   were Rayshawn Walker and Henry Proctor.
5       Q       Did Kendall testify in that case?
6       A       He did not.
7       Q       Do you know why he didn't testify in that
8   case?
9       A       The District Attorney's Office chose not to
10  use him.
11      Q       Do you know why?
12      A       Because the information he provided was
13  being provided by an eyewitness to the case that was
14  already testifying.
15      Q       How about your education?
16      A       I graduated high school.  I attended two
17  years of community college at CCAC Boyce.  I received
18  an associate's degree in criminal justice.
19              I then attended the police academy.  After
20  I got out of the police academy I completed my
21  bachelor's degree in human resources from Geneva
22  College.
23              Then I attended online courses towards my
24  master's degree for Bureau of Corrections and Criminal
25  Justice from University of Cincinnati.

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

8

```
 1      Q      When did you get that degree?

 2      A      The human resources degree?

 3      Q      Yes.

 4      A      I think I completed it in 2004.  I'm not

 5  100% sure.

 6      Q      When did your career in law enforcement

 7  begin?

 8      A      1993.

 9      Q      Who was that with?

10      A      So I graduated the academy in 1993.  I

11  worked for the borough of Whitaker from 1993 until --

12  it was September of 1993 to January 1994.

13             I was then hired by the borough of

14  Homestead in 1994, where I worked both capacity

15  uniformed officers in 1994 to 1995, I served both with

16  municipalities of borough of Homestead and Whitaker as

17  uniformed police officer.

18      Q      How about after '95?

19      A      I was hired by City of Pittsburgh police

20  department January of 1995.  I served in that

21  capacity, in uniformed capacity approximately two

22  years, assigned to Hazelwood section of the City of

23  Pittsburgh under the community oriented policing

24  program, where I was assigned to the weed and seed

25  task force.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

1              In 1997 I was detailed as a detective

2    within the narcotics and vice unit with the City of

3    Pittsburgh, where I served as a task force officer

4    with the Drug Enforcement Administration until 2006.

5        Q    You were TFO in narcotics with Pennsylvania

6    -- Pittsburgh police from '97 to '04 did you say?

7        A    Yes.  From '97 to 2006.  I left City of

8    Pittsburgh in 2006.  I was assigned as a TFO for that

9    time.

10       Q    Where did you go in 2006?

11       A    I was hired by Allegheny County police

12   department where I served in the uniform capacity

13   assigned to district 2, which was the South Park

14   region of Allegheny County, in a uniform capacity

15   until January of 2008.  So two years.

16       Q    And then what happens in '08?

17       A    In January 2008 until June 2008, I was

18   requested to participate as a detective within the

19   general investigations unit specifically being a

20   county executive.  They call it the executive detail.

21   I was a detective that was on executive detail with

22   county executive Dan Onorato for six months.

23              In June of 2008 I was assigned to homicide

24   unit.

25       Q    Have you been in homicide since then?

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

10

```
 1        A      I have.

 2        Q      Have you received any promotions?

 3        A      I have not.

 4        Q      Getting to March 2016, who was your

 5   partner?

 6        A      It would have been James Grill.

 7        Q      How long were you partners with James

 8   Grill?

 9        A      About two months.  I believe he came into

10   the unit in January 2016, I believe.

11        Q      So you were partners with him from January

12   until about March?

13        A      No.  I am still partners with him today.

14        Q      When Grill became your partner in 2016, did

15   you have considerably more experience than him in

16   homicide?

17        A      In homicide, but not as a detective.  I

18   knew Jimmy working in the City of Pittsburgh.  He was

19   in major crimes, I believe he was a burglary

20   detective.  I knew he had investigative experience.

21   Not related to homicides.

22               But at the time, obviously, I went in in

23   June '08.  He came in in June 2016.  So approximately

24   I had eight years in homicide at that point.

25        Q      What kind of differences are there between
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

1    investigating narcotics cases or major crime cases and

2    homicide cases?

3        A    I think what I would call differences, what

4    I notice is a lot of times in narcotics whether you

5    have a confidential informant, the confidential

6    informant may remain confidential.  Whereas, in

7    homicides they do not remain confidential.  Everything

8    is pretty much an open book.  Everything is placed on

9    the table.

10            When you are interviewing a witness that

11    somebody wants to identify as a confidential

12    informant, it is obviously put up first and foremost

13    that person -- it's going to be made public that

14    person is providing information.

15        Q    Do witnesses ever ask you to keep them

16    anonymous?

17        A    In homicide investigations?

18        Q    Yes.

19        A    I mean, if they ask to not be -- if they

20    say "I don't want my name out there," you have to

21    explain we are going to document the information, the

22    information will be placed out there.

23            Whether it is turned over for discovery,

24    the individual person who provided the information is

25    going to be documented.

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

```
 1              I can't go to interview somebody in a

 2    homicide investigation as an anonymous source that is

 3    not identifiable.

 4         Q    Why not?

 5         A    Because if they are providing -- if we are

 6    interviewing them, they are providing information as

 7    relates to the crime itself.  They are going to be

 8    either an ear witness or eyewitness or some sort of

 9    witness to the crime we are investigating.

10         Q    If you are a lead detective on a case, is

11    it fair to say you would not include anonymous tips in

12    your affidavit of probable cause, if you don't plan on

13    identifying the witness?

14         A    No.  I think anonymous tips are different

15    than interviewing a witness.  Anonymous tips might

16    come in via email.  They might come in via tip line.

17    They may provide information that may be corroborated

18    by other means.

19              So anonymous tips, per se, wouldn't fall

20    under that category of not being identified.

21         Q    Have you received training throughout your

22    career as a police officer?

23         A    I have.

24         Q    Basics like conducting investigation,

25    writing reports?  Interviewing witnesses?
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

13

```
 1      A     Yes.  Early on in my narcotics experience I
 2   attended several narcotics related classes.  I was
 3   dubbed an instructor with Top Gun.
 4           I have participated in interview classes.
 5   But I think more valuable lesson than anything is just
 6   years on the job, learning from people that have done
 7   the job for more time than I have.
 8      Q     When you were -- you said you were a Top
 9   Gun instructor, was that in narcotics context?
10      A     Yes, sir.
11      Q     Were you ever an instructor during your
12   tenure with Allegheny County police?
13      A     No.
14      Q     You would agree with me you do help to
15   mentor younger officers, your partner?
16      A     Through experiences, just being in the unit
17   that long, a lot of younger detectives that come in
18   the unit that may not have done -- or worked a case
19   that is maybe something I worked similarly previously
20   in my career, I can guide them in the way they may
21   want to proceed on that case.  It is possible.
22      Q     Did you ever receive any training
23   throughout your career as a police officer on dealing
24   with jailhouse witnesses?
25      A     No.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

14

```
 1        Q      Have you ever helped to mentor or
 2   informally instruct other police officers like your
 3   partner, James Grill, on the use of jailhouse
 4   witnesses?
 5        A      No.
 6        Q      You have never provided mentorship or
 7   helped explain to younger detectives how to handle a
 8   jailhouse witness?
 9        A      Just because they are in jail doesn't mean
10   that they are handled any differently than any other
11   witness.  They are just incars rated.
12             You still let them provide the information
13   they are willing to provide or the information they
14   have.  Just because they are jailhouse, I don't dub
15   them any different -- just because they are
16   incarcerated doesn't mean they are any different than
17   a witness off the street.
18        Q      If a supervisor that gave a deposition in
19   this case said that he doesn't think jailhouse
20   witnesses should have been used in this case, do you
21   disagree with his characterization of jailhouse
22   witnesses?
23             MR. BIONDO:  Object to form.  Go ahead.
24        A      I don't think that -- I think of a
25   jailhouse witness -- if somebody is incarcerated,
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

15

1    whether it is SCI or Allegheny County jail, the state

2    correction institution, if they are reaching out to

3    provide information, I think you have to go, you have

4    to document and interview that person.  Whether it is

5    used or not, that is a whole other thing.

6          That becomes a determination on the case as

7    a totality.  If I am answering your question

8    correctly, if that is what you are asking.

9       Q    Have you ever throughout your career, have

10    you ever been taught by more senior detectives how to

11    hide evidence?

12       A    Hide evidence?

13       Q    Yes.

14       A    No.

15       Q    Have you ever hidden evidence in a case?

16       A    No.

17       Q    Have you ever been involved in a case where

18    other detectives have hidden evidence?

19       A    No.

20       Q    This might be obvious.  Why wouldn't you

21    hide evidence in a criminal case, in a criminal

22    investigation?

23       A    Because one, it is inappropriate.  It is

24    illegal.  You wouldn't hide evidence, per se, in any

25    kind of investigation.

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

16

```
 1              If I am understanding your characterization
 2   of hiding evidence, I would say no.  I was never
 3   involved in anything like that.
 4       Q     You have never been involved with
 5   discussions with other homicide detectives about
 6   hiding evidence?
 7       A     No.
 8       Q     Are you aware of any evidence in this case
 9   that was not turned over to the defense pretrial?
10       A     I am not.
11       Q     Were you ever instructed by more senior
12   detectives throughout your police career with regards
13   to fabricating information in an affidavit of probable
14   cause?
15       A     No.
16       Q     Have you ever been on a case where another
17   detective has fabricated information in an affidavit
18   of probable cause?
19       A     No.
20       Q     If you are working on an investigation, and
21   you are made aware during that investigation that
22   misrepresentations are being made in affidavits of
23   probable cause, what steps do you take?
24       A     That would have to be corrected with the
25   District Attorney's Office immediately I would say.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

17

```
1        Q     So you would -- what steps would you take?

2   Would you go straight to the DA?  Would you speak with

3   a supervisor first?

4        A     All of our affidavits of probable cause,

5   whether they are search warrants or criminal

6   complaints have to be approved by the District

7   Attorney's Office involving homicide cases.

8              If there is a certain District Attorney

9   involved in a case that I notice a misrepresentation

10  on in an affidavit drafted by another detective,

11  hypothetically if it was my case, I'm not saying this

12  case, generally, I would notify the District Attorney,

13  who either has that case assigned to him or her, or I

14  would notify the deputy District Attorney in charge of

15  the homicide unit.

16       Q     What happens then, to the extent you know?

17       A     I think if it is true misrepresentation,

18  then it would be corrected.  I haven't had that

19  happen.  I wouldn't know the steps.  I would think it

20  would be documented at that point.

21       Q     Getting to your work on this particular

22  investigation, you said that you reviewed a number of

23  documents that you drafted?

24       A     Yes.

25       Q     Could you just walk me through the
```

**Johnstown - Erie - Pittsburgh - Greensburg**
**866-565-1929**

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

18

1    documents you are referring to?

2        A    Well, I interviewed some Penn Hills

3    officers in the following days, I wasn't one of the

4    detectives that was assigned to the investigation.

5            We kind of picked up the following day or

6    two to help out.  I think my involvement in the case

7    started actually the next morning.  One of the -- some

8    of the documents I reviewed were interviews that were

9    conducted, I think evidence collection, maybe body

10   worn cameras or in-car cameras from Penn Hills police

11   department.

12           I believe I may have interviewed two of the

13   officers involved in the I guess field contact stop of

14   Cheron Shelton in the early morning hours of I believe

15   it was the next day of the homicide, like a few hours,

16   maybe four or five hours after the murders.

17       Q    Were you involved in any briefings that

18   took place among a group of Allegheny County

19   detectives in the early days of the investigation?

20       A    Yes.  The night of the murder, I think we

21   had -- I'm not sure how many detectives working.  I

22   believe we had six at the time.  When we arrived -- I

23   can say when I arrived the next morning, we were

24   briefed at 8:00 a.m. as normal on things that needed

25   done on the case.

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

```
 1        Q     You said that night approximately six

 2   detectives were working.  The next morning, when you

 3   went into this briefing, about how many detectives

 4   were there?

 5        A     I don't know that.  I know how many

 6   detectives were on our squad.  I don't know how many

 7   detectives were off or maybe in court or were off that

 8   day.  I would say at least a handful.

 9        Q     Do you guys have briefings every morning?

10        A     No.

11        Q     When do you have briefings?

12        A     It is typically we have briefings -- early

13   on I think with the 8:00 to 4:00 shift, the lieutenant

14   would try to have briefings.  As long as there was --

15   if something happened the night before, obviously the

16   briefings were more important, because there was

17   something more pressing you had to go out on.  Maybe

18   they needed a neighborhood canvas, something of that

19   nature.  They need you to do a daylight scene search.

20             If there was nothing that happened in the

21   days that preceded, the morning briefing may consist

22   of who has court today, who is available if any

23   details come in.  That might be your morning briefing.

24   That is about it.

25        Q     So is it fair to say there is no real rhyme
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

20

1    or reason for when a briefing might happen, it is kind

2    of at the discretion of the supervisors when you guys

3    need updates?

4        A     Yes.  If anything pertinent or anything

5    happens that is significant in the previous days,

6    maybe a Monday, you might have a briefing every Monday

7    morning.  You might have to go over things that

8    happened over the weekend.

9             You may not have a briefing on Wednesday

10   because nothing happened Monday and Tuesday, and you

11   already briefed on everything over the weekend.  And

12   nothing has changed in the court of investigation.

13   Again, just if something happened over the weekend,

14   you might not have a briefing on Wednesday, because

15   there was nothing to brief.

16       Q     Were there more briefings throughout the

17   early days of the Wilkinsburg massacre investigation

18   compared to other times?

19       A     I would say it was no more -- it wasn't out

20   of the ordinary.  It wasn't like everybody had to be

21   there at 8:00, we were going to have this huge

22   briefing.

23             I would say if something was happening

24   every day -- I think we did have briefings in the days

25   after the Wilkinsburg six.  We had briefings -- as

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

21

1    long as the investigation was fluid, I would say we

2    still had briefings.

3              At that time, our scheduling, you had six

4    detectives, you had four detectives on 4:00 to 12:00.

5    And two detectives 8:00 to 4:00.  So if things were

6    done overnight by detectives from those shifts, you

7    definitely would hold the briefing the next morning to

8    let everybody know so nobody is duplicating work.

9        Q    When you say that, you are referring to a

10   time period where the investigation that was I think

11   flowing or fluid, could you give me a time frame to

12   bookend that, approximately?  Was it three days?  Was

13   it two weeks?

14       A    I would think we held briefings -- just

15   because we had -- obviously, this was a mass casualty

16   loss of life.  It wasn't like we weren't getting other

17   cases as they came in.

18             We were still investigating other murders.

19   We still had suicides.  We still had overdoses.

20   Aggravated assaults that we investigate.

21             I would say probably we held briefings in

22   the weeks after the Wilkinsburg six pretty regularly.

23       Q    In a case like Wilkinsburg 6, there is a

24   lot of ground to cover.  Correct?

25       A    I mean, the most significant thing about

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

22

1    the case was the loss of life.  It was still homicide.

2            The investigation didn't move any

3    differently than any other homicide that we would

4    investigate.

5        Q    When Allegheny County homicide detectives

6    are having briefings, is the supervisor briefing

7    everybody on the most updated information?  Or are the

8    detectives that are bringing the information in, are

9    they standing up and explaining what is happening?

10       A    You are talking in general?  Or back then?

11       Q    Back then.

12       A    I believe the way the information was

13   conveyed, if anything was done on the 4:00 to 12:00,

14   it was conveyed to the sergeant lieutenant.  The

15   sergeant lieutenant held the briefing.

16           If they were provided an email overnight,

17   "We did A, B, and C."  They would come in the next day

18   and brief you, this is what was done, this is what

19   still needs done.

20       Q    You recall Cheron Shelton and Robert Thomas

21   were charged for this, right?

22       A    Yes.

23       Q    Do you recall the names of any other

24   suspects?

25       A    There were none.

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

23

```
 1        Q      Ryan Gomez, not a suspect?

 2        A      I don't believe he was listed as a suspect.

 3        Q      How about Dontay Reed?

 4        A      Not a suspect.

 5        Q      How about Shaquan Roberts?

 6        A      Not a suspect.

 7        Q      Do you remember hearing the name Ryan Gomez

 8   in the investigation?

 9        A      I do.

10        Q      How about Dontay Reed?

11        A      I do.

12        Q      How about Shaquan Roberts?

13        A      I do not.

14        Q      Just to be thorough, I think I know the

15   answer, do you recall ever hearing during a briefing

16   Shaquan Roberts' name?

17        A      No.

18        Q      Did you -- when you are working on a

19   homicide case, are you having independent discussions

20   with various other detectives working the case

21   whenever you get the opportunity to?

22        A      Discussing how the case is moving?

23        Q      Yes.  When you are talking about this case

24   in particular, you have a number of different officers

25   working on various different parts of the case.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

24

1    Right?

2       A    Yes.

3       Q    It is impossible for one officer to know

4    what everybody else is doing all the time.  Right?

5            MR. BIONDO:  Object to form.  Go ahead.

6       A    I would say -- I don't think that is

7    exactly correct.  There are initial detectives that

8    are assigned to the investigation.

9            Whatever another detective does, everything

10   should get reported back to them.  Like during the

11   course of the investigation.

12      Q    That is the value of having the lead

13   detective is your point man?

14      A    Or lead detectives.  Normally it's a team.

15      Q    In this case it was Dolfi and Foley?

16      A    They were assigned the case.

17      Q    Rather than speaking to individual

18   detectives working on various pieces of the

19   investigation, you would speak with Dolfi and Foley?

20      A    You don't talk to other detectives in the

21   unit about things.

22           I would say -- I think what you are asking,

23   if I did something on the case, I would let Foley and

24   Dolfi know and document with what it is I did.  Let

25   them know A, B and C.

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

25

```
 1              I would talk to other detectives as well.
 2   But not necessarily --
 3       Q     Would it be basically maybe to just talk
 4   about the case?
 5       A     Yes.  How it is going.  Maybe there was
 6   something that was done I wasn't aware of.  Maybe I
 7   was in court in the morning, I missed the morning
 8   briefing, or something of that nature.  You would
 9   discuss the case.  We work in a group atmosphere like
10   a team setting.
11              But again, not all detectives were working
12   on that case at all times.
13       Q     Is it fair to say working under this type
14   of arrangement, that you are not reviewing the other
15   evidence that is being gathered by other detectives on
16   a case?
17       A     Me personally?  No.
18       Q     Unless you are a lead detective?
19       A     I would say that is fair.
20       Q     So do you believe that Cheron Shelton and
21   Robert Thomas perpetrated the Wilkinsburg massacre?
22       A     I do.
23       Q     Is it accurate to say the only evidence
24   that you actually reviewed was the evidence that you
25   yourself were involved in collecting?
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

26

```
 1              MR. BIONDO:  Object to form.  Go ahead and

 2        answer, if you can.

 3        A      You are talking about evidence that I

 4   collected?

 5        Q      Yes.  Did you review any other evidence,

 6   besides the evidence you collected on the case?

 7        A      So the affidavit of probable cause?

 8        Q      Cell phone downloads.

 9        A      I did not review those.

10        Q      How about affidavits of probable cause from

11   Detective Miller?

12        A      I did not.

13        Q      What evidence did you review besides the

14   stuff you brought in?

15        A      Just the affidavit of -- the criminal

16   complaint.

17        Q      Is it fair to say that your belief that

18   Cheron Shelton and Robert Thomas were the perpetrators

19   of the Wilkinsburg massacre is based off of your

20   review of the criminal complaint?

21              MR. BIONDO:  Objection to form.  Go ahead

22        and answer, if you can.

23        A      No.

24        Q      What else?

25        A      The information as the case progressed.  I
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

27

1    would say that I knew -- information that I knew as

2    the case moved along regarding Cheron Shelton.  And

3    then information received during briefings and so

4    forth from other detectives regarding the information

5    they received in regards to Robert Thomas.

6              I knew information as it pertained to

7    Cheron Shelton early, probably within a week or two

8    afterwards.

9              Having that information, I think

10   circumstantially, yes, Cheron Shelton 100%.

11             Then you take in the totality of everything

12   else investigated, I mean I might not partake in

13   searches.  I wasn't up at Hill Top, things of that

14   nature.

15             But I was -- I knew about the video from

16   Nolan Court from Housing Authority.

17             That is what stems my belief Cheron Shelton

18   and Robert Thomas committed the crime.

19        Q    You were talking about information you had

20   coming in from other detectives that is leading you to

21   believe this?

22        A    Yes.  Like I said, that we would brief as a

23   team.

24        Q    Would you agree with me that your belief

25   that Robert Thomas and Cheron Shelton perpetrated this

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

28

1    massacre is based not on your review of the evidence

2    brought in by detectives, but what they were telling

3    you?

4              MR. BIONDO:  I object to form.  Go ahead

5         and answer, if you can.

6         A    You are saying evidence that they brought,

7    that I didn't review for today.  But that doesn't

8    mean I didn't review reports and things back then.

9              Like, we weren't able to go through reports

10   in our report management system back then and go over

11   things that occurred.  Just for my understanding for

12   the deposition today was just for things that I

13   participated in.

14        Q    Right.

15        A    That is why I reviewed the things that I

16   participated in.

17        Q    You said you believed 100% based off the

18   circumstantial evidence that you learned about, that

19   Cheron Shelton was involved in this, right?

20        A    That was my belief.

21        Q    So 100%?

22        A    Cheron Shelton?

23        Q    Yes.

24        A    Yes.

25        Q    How about Rob Thomas?

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

29

```
 1      A     I would say given the circumstantial case,

 2   I would say Robert Thomas was the co-conspirator in

 3   the case, yes.  My belief.

 4      Q     This is based off the evidence you know

 5   about?

 6      A     The evidence I'm aware of.  Yes.

 7      Q     You said there were no other suspects,

 8   right?

 9      A     There were none.

10      Q     If you were to find out there was a

11   suspect, another suspect that was interviewed on March

12   15th, his name is Shaquan Roberts.  I know you said

13   you weren't aware of him.  You never had any

14   conversations with Detective Hoffman about Shaquan

15   Roberts?

16           MR. BIONDO:  Object to form.  Go ahead and

17        answer, if you can.

18      A     No.  I did not.

19      Q     Did Detective Hitchings ever tell you

20   Shaquan Roberts was from Hill Top, and that he was

21   with four other individuals from Hill Top on the night

22   of the massacre?

23      A     I do not know that information, no.

24      Q     Did you know that Shaquan Roberts -- I will

25   withdraw the question.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

30

```
 1              It's your belief and Allegheny County
 2    police position that Rob Thomas and Cheron Shelton
 3    conspired to commit the Wilkinsburg massacre on
 4    suspect phones.  Do you recall that?
 5              MR. BIONDO:  Object to form.  Go ahead and
 6         answer, if you can.
 7         A    I don't know that they conspired on the
 8    phones, if it was ever proven they conspired on the
 9    phones.  I know the phones were linked.  Information
10    was linked between Cheron Shelton and Robert Thomas.
11    Yes.
12         Q    But you are aware there were suspect phone
13    numbers attributed to Cheron Shelton and Robert
14    Thomas.  Right?
15         A    For Cheron Shelton, yes.  The suspect phone
16    number with Cheron Shelton running off those phone
17    records led to Robert Thomas.  Yes.
18         Q    The suspect phone attributed to Rob Thomas
19    was -- those were the two phones your department
20    theorized were in communication with each other both
21    before the massacre and after the massacre.  Right?
22         A    My understanding.  Yes.
23         Q    I'm not going to submit this as an exhibit.
24    I am just going to show this to you, ask you to read
25    it.  Take your time and read it to yourself.
```

31

```
 1      A      Okay.

 2      Q      That is a followup report.  Right?

 3      A      Yes.

 4      Q      What is this followup report indicating?

 5      A      A request for subscriber information was

 6   requested by Detective Hoffman from numbers related to

 7   Cheron Shelton's cellular telephone under a specific

 8   cell phone number of 412-897-0447.

 9      Q      What is the date that Detective Hoffman

10   took this investigative step?

11      A      It is documented as Saturday, April 2nd.

12      Q      Is that the same date the report was

13   drafted?

14      A      2016.

15      A      Yes.

16      Q      Why would Detective Hoffman be interested

17   in the phone numbers associated with Cheron Shelton's

18   suspect phone number?

19             MR. BIONDO:  Object to form.  You can

20         answer.

21      A      Maybe Detective Hoffman had information

22   that he received in regards to Cheron Shelton's phone

23   number and was tasked to get subscriber information on

24   those numbers.

25      Q      I will represent to you that on March 22nd,
```

```
 1   Allegheny County police did receive the cell data

 2   report for that 0447 number.

 3                  I think we skipped that step.

 4        A       You are saying March 22nd --

 5        Q       They get a report.

 6        A       April 2nd, additional subscriber

 7   information is on those numbers.

 8        Q       They are asking for the 31 numbers he was

 9   in contact with.

10        A       Okay.

11        Q       Why, as an investigator, would that

12   information be important?

13        A       To see who he is contacting with,

14   subscriber information for those specific numbers.

15        Q       Why is that important?

16        A       To see who they are in communication with

17   around the time of the crimes.

18        Q       What might that indicate?

19        A       The co-conspirator.

20        Q       Might find out who a co-conspirator is.  Is

21   it possible -- I will withdraw the question.

22                  Is it fair to say as a detective that you

23   don't want to jump to any conclusions?

24        A       Sure.

25        Q       It could be fatal to a case, right?
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

33

1       A       Could be.

2       Q       So you never really know, until you

3    definitively prove it, you never really know what a

4    thing might be.  Right?

5               MR. BIONDO:  Object to form.  Go ahead and

6       answer.

7       A       What a thing might be?  I don't understand.

8       Q       You don't -- when you are investigating a

9    case, you don't want to jump to conclusions, because

10   you don't know what it is this is going to be, right,

11   whatever it is you are investigating?

12              MR. BIONDO:  Object to form.  Answer, if

13      you can.

14      A       If I understand you correctly, which I am

15   not sure I do, if you are asking if Detective Hoffman

16   jumped to conclusions on who the subscribers were --

17      Q       I'm not.

18      A       Then I don't understand.

19      Q       I am asking generally, as a homicide

20   detective, do you make a habit of jumping to

21   conclusions?

22      A       No.

23      Q       You don't jump to conclusions, because that

24   could tarnish a case?

25      A       Correct.

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

34

1      Q      You want to keep an open mind as you are

2   investigating a case, because you don't want to twist

3   the facts, according to your preconceived theory.

4   Correct?

5      A      Correct.  You want corroboration.

6      Q      You want to take the case where the

7   evidence leads you?

8      A      Correct.

9      Q      Allegheny County police -- would you agree

10  Allegheny County police didn't want to jump to any

11  conclusions with regard to who was in contact with

12  Cheron Shelton's phone?

13     A      Hence the request for subscriber

14  information.  They wanted to know who the subscribers

15  were to the phone.

16     Q      As of April 2nd, do you think that Cheron

17  Shelton was definitively 100% proved to be the

18  murderer -- one of the murderers in the Wilkinsburg

19  massacre?

20          MR. BIONDO:  Object to form.  Go ahead and

21      answer.

22     A      So he was the main suspect, yes.

23     Q      But not proven yet?

24     A      Correct.

25     Q      Since the county police had not yet

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

35

1    definitively proven Cheron Shelton was the

2    perpetrator, is it fair to say this investigation into

3    the numbers that he was in contact with could have

4    also been in line with keeping an open mind, a search

5    for exculpatory evidence, is it possible he was in

6    contact with people that were not involved in the

7    massacre?

8         A    I think that is probably pretty likely.

9         Q    As of this date, Allegheny County police

10   are still keeping an open mind with regards to their

11   investigation of Cheron Shelton and the phone numbers

12   he is in contact with.  You agree?

13        A    Yes.  He is asking for subscriber for 31

14   different phone numbers.

15        Q    Bearing in mind -- I will show you this.

16   Do you recall me telling you that Allegheny County

17   police received Cheron Shelton's cell data report on

18   March 22nd?

19        A    I recall you telling me that.

20        Q    I will pull that up for you.

21             I won't mark this as evidence.  I will show

22   you -- this is one of the records pertaining to the

23   cell report.  This is Cheron Shelton's cell data.

24             MR. BIONDO:  I object just because I don't

25        know if we established he has seen this or knows

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

36

```
 1          what it is.  If he can answer, he can answer.
 2     Q     I am just drawing your attention to the
 3  top.  I want him to feel comfortable with the dates.
 4          Do you see the application -- the request
 5  for information was made on March 15th?
 6     A     March 22nd.  But the request was -- it was
 7  provided on the 22nd.  Court order dated March 15th.
 8     Q     So they requested the information from
 9  T-Mobile on the 15th.  The report was received on the
10  22nd?
11     A     That is what it looks like.  Yes.
12     Q     I wanted to show you that for purposes of
13  having you comfortable with the timeline.
14          I will represent to you that this report
15  that was received by Allegheny County police for
16  Cheron Shelton's phone number on March 22nd, this is
17  where the second suspect phone number was derived, the
18  3461 number that Allegheny County police attributed to
19  Rob Thomas.
20     A     Okay.
21     Q     Is it fair to say that as of March 22nd,
22  Allegheny County police were in possession of not only
23  Cheron Shelton's phone number, but also the suspect
24  phone number connected to Rob Thomas?
25          MR. BIONDO:  Object to form.  Go ahead and
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

37

```
 1        answer, if you can.
 2        A      If it is Rob Thomas' number on the
 3   subscriber -- on the call detail records.  I don't
 4   know it is identified as Rob Thomas' phone number.
 5        Q      I am just referring to the presence of the
 6   suspect phone number.  I'm not saying it said Rob
 7   Thomas, just that this suspect phone number was found
 8   in this report?
 9        A      The suspect phone number for Rob Thomas.
10               MR. BIONDO:  I object.
11        A      I don't know that.
12        Q      That is fine.  We will go through this.
13               Are you aware that Cheron Shelton's cell
14   data report is where the suspect phone theory came
15   from?
16        A      Yes.
17        Q      And is it fair to say that is where they
18   found the other suspect phone number?
19               I know it wasn't connected to Rob Thomas.
20   But that is where they found it, right?
21        A      From Cheron Shelton's call detail records.
22        Q      Yes.
23        A      Yes.
24        Q      Later it was connected to Robert Thomas?
25        A      Yes.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

```
 1        Q      We are getting there.

 2               So as of March 22nd we have Cheron

 3   Shelton's phone number and Allegheny County police has

 4   a seconds suspect's phone number.  Right?

 5        A      I don't know they had a second suspect

 6   number on the 22nd, per se.  If you want me to speak

 7   in generalities, on April 2nd, on the document you

 8   presented me, there is 31 phone numbers they are

 9   requesting subscriber information from.  From CDR, my

10   understanding is there is 31 different numbers on

11   there they are requesting subscriber information on.

12        Q      Do you recall whether a document was

13   generated that had all the cell phone numbers in this

14   case for cross-reference?

15        A      I believe there was probably like a cell

16   link data form generated.  But not that I have ever

17   reviewed.

18        Q      I know you haven't reviewed it.  Just

19   generally, to your knowledge, how would such a

20   document help you, help Allegheny County police in an

21   investigation?

22        A      If you have a target number, if you have a

23   main suspect, and you have that number, you can branch

24   off that number during the times and dates that you

25   know are true dates and times.  Say the initial call
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

39

```
 1   for shots fired, different things of that nature,
 2   first officers on scene, and kind of expand around
 3   that regarding the investigation to kind of focus on
 4   specific numbers and dates and times.
 5            Obviously, they did that in this case.  So
 6   you can have your main number at the top, and kind of
 7   branch off from there.
 8       Q    Is it fair to say, as of receiving Cheron
 9   Shelton's cell phone report on March 22nd, Allegheny
10   County police had the capacity to compare the phone
11   numbers he was in contact with with the other cell
12   phone information they had already developed in the
13   case, whether from consent, or whether they got a
14   search warrant for a cell phone?
15            MR. BIONDO:  Object to form.  Go ahead.
16       A    In 2016, I don't know that we had the same
17   capabilities we have now.  Like if there was a link
18   system that took a call frequency, if that is what you
19   are asking.
20            If we had one suspect target number, that
21   is what we would key on.  If you had a number, again
22   like I spoke of, you knew the certainty of the 911
23   call.  And that is what you want to branch before and
24   after, and focus your investigation and branch off
25   from there.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

40

```
 1        Q     On March 22nd -- I will withdraw the
 2    question.
 3              Can we agree modern cell phone data, cell
 4    phone evidence is an extremely effective form of
 5    evidence?
 6              MR. BIONDO:  Object to form.  Go ahead and
 7        answer.
 8        A     Could be, yes.
 9        Q     That is because we use our cell phones for
10    everything.  So it gives you a unique window into a
11    person's personal life?
12        A     Yes.  I would say so.
13        Q     Relative to other forms of evidence.
14        A     Correct.
15        Q     As of March 22nd, would it have been
16    possible to compare the phone numbers that were in
17    contact with Cheron Shelton with the other phone
18    evidence that you have received in the case?
19              MR. BIONDO:  Object to form.  Go ahead and
20        answer.
21        A     I don't know that, if we had those
22    capabilities eight years ago or not.
23              If you are saying to dump all the phone
24    numbers in a program, I don't know if we had those
25    capabilities.
```

**Johnstown - Erie - Pittsburgh - Greensburg**
**866-565-1929**

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

41

1      Q      I'm not saying that.  I am saying by any

2    means.

3             It could be by hand.  It could be the old

4    fashioned way with a detective sitting there saying

5    now we are going through this phone number.  Now we

6    are going through this phone number.  That could have

7    been done to cross-reference the numbers in

8    communication with Cheron Shelton with the cell phones

9    that were already obtained in the case?

10     A      If there were other cell data records

11   received at that point.

12     Q      We have the cell data report.  Are you

13   familiar the cell data report, at least these ones in

14   the case don't have text message content, no

15   voicemails, no pictures?

16     A      That's correct.

17     Q      It is just the basic information of

18   incoming, outgoing, and we can tell if it is a text or

19   call, right?

20     A      Correct.

21     Q      The cell phone downloads themselves, would

22   you agree those are a superior form of evidence to

23   just a cell data report?  Generally speaking.

24     A      I would say generally.

25             If you download a cell phone, generally --

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

42

1    I shouldn't say it is always the case.  But sometimes

2    it is.  Because if the phone has been changed or

3    server has been changed, you might have better luck

4    getting more information from a call detail records in

5    the cell phone company than you would the individual

6    device itself.  Speaking in generalities.

7              You could gain some valuable information

8    from CDRs such as cell tower information, which was

9    key -- there is a lot of things we used at that time

10   were cell tower information.

11        Q    Did you ever work with Matt Rosenberg in

12   this case?

13        A    I did not.  Not in this case.

14        Q    Have you had any conversations with Matt

15   Rosenberg about this case, generally, at all?

16        A    I believe in generalities, the only

17   information I think I talked to Matt Rosenberg in

18   regards to this case was about the Cellebrite

19   information that you were trying to access.

20        Q    When was this?

21        A    Yesterday.  That is only because we are in

22   a homicide trial.

23        Q    How did that come up?

24        A    Well, he is a witness in our homicide case.

25   So that information, he just explained you guys

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

43

```
 1    weren't able to open I think the cell data without
 2    Cellebrite.  If you are asking -- to be open, that is
 3    the only conversation I had with him in regards to
 4    this case.
 5         Q    Did he relate any specific names to you?
 6         A    Regarding this case?
 7         Q    Regarding what you guys were discussing
 8    yesterday?
 9         A    No names.
10         Q    Did he provide you any details about
11    information he was providing in this case?
12         A    No.
13         Q    Did he ask you for any advice about the
14    information he is providing in this case?
15         A    No.
16         Q    Did he express any concerns about the
17    information he provided in this case?
18         A    No.  None.
19         Q    Did he ask you any questions about other
20    detectives and the information he provided in this
21    case?
22         A    Not at all.
23         Q    When it comes to -- withdraw the question.
24              What is the name of the case that you were
25    speaking with Matt Rosenberg with regards to this
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

44

```
 1    other case?  What was the case called?

 2         A      This case.

 3         Q      So you were both involved in a case

 4    yesterday?

 5         A      We are currently in trial.

 6         Q      What is the name of that case?

 7         A      The defendant in that case?

 8         Q      Yes.

 9         A      Kareef Easington.

10         Q      How do you spell that?

11         A      K-A-R-E-E-F, E-A-S-I-N-G-T-O-N.

12         Q      Is it fair to say Mr. Rosenberg was

13    involved in the cell phone investigation of Kareef

14    Easington?

15         A      He was.

16         Q      Are you saying you provided no advice or

17    insight to Mr. Rosenberg with regards to the stuff he

18    was speaking with you about?

19         A      No.

20         Q      Are you aware of any other Allegheny County

21    police detectives that gave Mr. Rosenberg information

22    or advice pertaining to this case, or the subpoena

23    that you received?

24         A      I know nothing about that at all.

25         Q      When you are working with Mr. Rosenberg, do
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

45

1    you tell him what cell phone information you need from

2    him?

3        A       Previously -- I would think years ago we

4    would have to specifically ask for certain things.

5    Now that cell phones, I think they are a full dump.

6    Whenever you get a consent, it is basically you are

7    dumping the whole phone.

8               If there is something specific to the

9    investigation that you are looking for, you can

10   request that.  Yes.  That doesn't negate the fact he

11   might not -- he is still not going to download the

12   entire device, if that makes sense.

13       Q       You are saying no matter what, he is going

14   to download the entire device?

15       A       I think if he has the capabilities.  I

16   don't know if he would do it unless he was asked.

17       Q       Are you saying that -- I will withdraw

18   that.

19              When Matt Rosenberg receives a cell phone,

20   to your understanding, does he get a download for the

21   entire cell phone?

22       A       I think it is case specific.  It is upon

23   request of the case and entails what you are

24   specifically looking for.  I would say case by case

25   basis.

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

46

1      Q      I think I understand what you are saying.

2   Correct me, if I am wrong.  Rosenberg gets the cell

3   phone, uploads it into the Cellebrite reader software.

4   And then provides an extraction report to detectives

5   based on the parameters that they requested?

6            MR. BIONDO:  Object to form.  Answer, if

7        you can.

8      A      I didn't understand that.

9      Q      Do you know when Rosenberg receives a cell

10  phone, that he uploads it into the Cellebrite software

11  reader?

12           MR. BIONDO:  Object to form.  Answer, if

13       you can.

14     A      I'm not sure of the -- I'm not familiar

15  with dumping cell phones.  I don't know if it goes in

16  the Cellebrite system, or how he opens the phone,

17  whether by brute force, or by software.  I don't know

18  the actual steps he takes.  I just know Cellebrite is

19  one of the softwares that he uses.

20     Q      And an Allegheny County detective can go to

21  Rosenberg and say, "Matt, I need reports for these

22  parameters."  And he will provide a report according

23  to those parameters?

24           MR. BIONDO:  Object to form.  Answer, if

25       you can.

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

47

```
 1      A    Yes.

 2      Q    Is that what you do with him?

 3      A    Again, it is case specific.  I may just

 4   ask -- depending what the case is, I may ask for

 5   different things.

 6      Q    Have you ever asked for a report from

 7   Rosenberg and told him to keep certain contacts out of

 8   the report?

 9      A    No.

10      Q    Have you ever asked for a report from

11   Rosenberg and told him keep certain text messages on

12   certain dates out of a report?

13      A    No.  I don't know if that is even possible.

14      Q    It is?

15      A    Are you sure?

16      Q    Yes.

17           What happens is when you have a Cellebrite

18   cell phone download, you have the entire contents of

19   the phone.

20           Then using the software, you can create

21   extraction reports, which winnows down the corpus of

22   evidence to specifically what you are looking for with

23   time, dates, contacts, and whatnot.

24      A    That doesn't mean you are actually --

25   because the phone is downloaded, according to your
```

48

1    example.  So the whole phone is downloaded.  You are

2    just focusing on a specific number.  It doesn't mean

3    something has been purposely left out.

4        Q    Not on the cell phone download, but on the

5    extraction report, you can exclude a lot of stuff.

6              MR. BIONDO:  I object.  You are testifying

7        at this point.  Ask a question.

8        Q    Do we have an understanding that you can

9    extract reports from cell phone downloads that limits

10   the information in the report compared to the entire

11   cell phone download?

12       A    No.  I think if you download the cell

13   phone, that is the evidence.  Whether you are focusing

14   on a specific number or specific time, that is

15   different than not having evidence at all.

16       Q    Right.

17             So in a report, in an extraction report, do

18   you realize that you can get a report from a cell

19   phone download that only includes a part of the cell

20   phone download rather than the entire thing.  Do you

21   realize that?

22       A    I understand what you are saying.  If you

23   are saying only a portion is taken out of the cell

24   phone, maybe only a conversation that occurred, like

25   three text messages back and forth, for example, and

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

49

```
 1   just document that, and leave the whole rest of the
 2   cell phone out.  It doesn't mean the whole rest of the
 3   cell phone isn't part of evidence.
 4        Q     Correct.  We are in agreement.
 5              I think we are on the same page now.
 6              Just because it is not in a report, an
 7   extraction report, doesn't mean Allegheny County
 8   police doesn't have the evidence.  It just means you
 9   guys got an extraction report with part of that
10   evidence.  Does that make sense?
11        A     No.  It doesn't.
12              MR. BIONDO:  Could we take a couple
13        minutes?
14              MR. PETRUNYA:  Sure.
15              (Recess taken.)
16        Q     I will show you a document here I marked
17   Exhibit 1.
18              (Thereupon, Exhibit No. 1 was marked for
19        identification.)
20        Q     On the first page you see this is dated
21   April 8th, 2016?
22              MR. BIONDO:  DA2932 is the Bates number.
23        Q     Do you see the date?
24        A     April 8th, 2016.
25        Q     Turn to the next page.  That is Bates
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

50

```
 1    DA2933.  Can you read this portion, the retrieval on

 2    the cell phone?

 3        A     Read it?

 4        Q     Yes.

 5        A     Okay.

 6        Q     Could you read it out loud?

 7        A     The retrieval of the cell phone number of

 8    Robert Thomas.

 9        Q     Is it fair to say as of this date,

10    Allegheny County police is trying to get to the bottom

11    of Rob Thomas' cell phone information?

12              MR. BIONDO:  Object to form.  Go ahead and

13        answer, if you can.

14        A     According to the warrant.

15        Q     I'm going to ask you to turn a few pages to

16    DA2935.  Are there three paragraphs starred?

17              MR. BIONDO:  No.  Not on this one.  This is

18        April 5th.

19        Q     I will mark these.  Marking the three

20    paragraphs.

21              So can you read the bottom of the first

22    marked paragraph, and the sentence starts with -- on

23    the far right, "Further, the record showed frequent

24    contact."  Can you read that into the record, please?

25        A     "Further, the record showed frequent
```

51

```
 1    contact between Cheron Shelton, and the number

 2    identified as 412-378-3461 to include prior to and

 3    after the homicides."

 4         Q    Can you read the full next paragraph?

 5         A    Need me to finish that paragraph?

 6         Q    Yes, please.

 7         A    "There was a break on communication between

 8    Cheron Shelton and the unknown number between the time

 9    frame of 9:50 p.m. and 11:19 p.m. on 3-9-2016."

10         Q    Please read the next paragraph.

11         A    "Further review of the cell phone record

12    showed contacts with phone numbers that your affiant

13    has not been able to identify.  It has been" -- the

14    whole paragraph?

15         Q    Yes.

16         A    "It has been your affiant's experience that

17    persons involved in criminal incidents often will

18    communicate with one another prior to, during and

19    after the commission of criminal acts.  It has further

20    been your affiant's experience that persons involved

21    in the criminal incidents will often destroy or

22    discard cell phones in an attempt to conceal their

23    involvement in said criminal incidents.  Upon his

24    interview, Robert Thomas was asked about the phone

25    number 412-378-3461.  The number was found in several
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

52

```
 1    witness contact information as Millhouze, and in
 2    Cheron Shelton's phone records."
 3         Q     Thank you.
 4               Do you see who this was authored by?
 5         A     I do.
 6         Q     Who was it?
 7         A     Detective Patrick Miller.
 8         Q     Did you have any conversations with
 9    Detective Miller about the affidavits of probable
10    cause he was filing in this case?
11         A     I did not.
12         Q     Did anybody else?  Any other detectives
13    express any concerns to you regarding the affidavits
14    of probable cause that Detective Miller was filing in
15    this case?
16         A     They did not.
17         Q     Are you saying that you had no reason to
18    look over Miller's shoulder to make sure what he was
19    saying was accurate?
20         A     That's correct.
21         Q     What I'm going to show you next is an
22    excerpt from Detective Miller's preliminary hearing
23    transcript.  From his testimony in the preliminary
24    hearing transcript.
25               I'm going to -- I'm drawing your attention
```

53

```
1    to page 97.  This is Detective Miller's direct

2    testimony.  He is being questioned by ADA Chernosky.

3    I will ask you to start reading this into the record

4    starting with line 6, going down to line 24.

5         A     You want me to read it?

6         Q     Please read it into the record.

7         A     "How is it you developed Robert Thomas'

8    cell phone during the time of the murders?"

9               "Through a phone download of Brittany

10   Shelton's phone."  That was the answer.

11              Line 10, question, "Was that conducted by

12   the county police?"

13              Line 11, answer, "Yes, it was."

14              Line 12, question, "What do cell download

15   records reveal with regard to Robert Thomas?"

16              Line 14, answer, "Well, first, it revealed

17   a contact in her contact log as Millhouze,

18   M-I-L-L-H-O-U-Z-E, with that associated phone number."

19   That is line 16.

20        Q     Keep going to 24.

21        A     Sorry.  Question, 17, "What was the

22   associated phone number?"

23              18, answer, "412-378-3461."

24              Line 19, question, "What else did the

25   download of pretty Shelton's phone reveal?"
```

```
 1              Line 21, answer, "Text message received on
 2    February 1st of this year from Millhouze, same
 3    number -- same 378 number in the text.  Body of the
 4    text it said, 'Hey, it's Rob.  I need you to call
 5    me.'"
 6              25, question --
 7        Q    That's it.  Just keep that over there.  I
 8    will come closer and walk you through the cell phone
 9    download.
10              MR. BIONDO:  I will put this on the record.
11         I object to the entire line of questioning
12         related to the cell phone record.  This wasn't
13         part of his investigation.  This has been gone
14         through the last two depositions by two other
15         witnesses.  It is repetitive at this point.
16         Detective Kinavey has not said he has seen these
17         downloads.  They are irrelevant to the probable
18         cause for Rob Thomas and Cheron Shelton.
19              MR. JUBAS:  We would counter with the fact
20         it is not irrelevant to the probable cause
21         determination, because --
22              MR. BIONDO:  I'm not asking him -- I'm not
23         telling him not to answer.  I am just putting my
24         objection on the record.
25              MR. JUBAS:  I will just respond.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

```
 1              MR. BIONDO:  I don't think you have to.  Go
 2       ahead and ask questions is I think your role
 3       here.
 4              Are you marking these as exhibits?
 5              MR. JUBAS:  No.
 6              MR. BIONDO:  Have they been marked in any
 7       of the depositions as exhibits?
 8              MR. JUBAS:  No.  Just reading it in and
 9       asking him about his input.
10       Q    Are you able to see this?
11       A    Yes.  That is better.
12       Q    I am showing you an extraction report.
13  This is the extraction report provided by Allegheny
14  County police to Shelton and Thomas in the underlying
15  criminal matter.
16              Do you see that this case number belongs to
17  Brittany Shelton?
18       A    I see that.
19       Q    Do you see it says -- below Brittany
20  Shelton, it says consent to search?
21       A    I do.
22       Q    Does that tell you that this is from
23  Brittany Shelton's cell phone, and she gave consent to
24  search?
25       A    That would be my understanding.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

56

```
 1      Q     Based off the affidavit you read, as well
 2  as the preliminary hearing testimony you just read, is
 3  it an accurate statement to say that Allegheny County
 4  police's theory connecting Rob Thomas to the suspect
 5  phone number is based off of cell phone information
 6  that was collected from Brittany Shelton's cell phone?
 7            MR. BIONDO:  Object to form.  Answer, if
 8      you can.
 9      A     Solely on cell phone?
10      Q     Just based off the testimony you read as
11  well as the affidavit that you read.
12      A     That Rob Thomas is linked to the homicide
13  as a co-conspirator just on that information?
14      Q     What I am asking is do you recall that the
15  transcript you just read, and the affidavit you just
16  read was linking the suspect cell phone number to Rob
17  Thomas through Brittany Shelton's cell phone?
18      A     As Millhouze, yes.
19      Q     I am going to conduct a search.  Have you
20  ever done that?  Have you ever searched an extraction
21  report?
22      A     I have not.
23      Q     What I'm going to do, I will type in the
24  suspect phone number.  That is 412-378-3461.  What
25  this will do, this will give us all of the input for
```

1    that particular number.

2         A     Is it specific to having hyphens or

3    parentheses around the area code?

4         Q     It is just the number.  Do you see this is

5    on page 136?  This is cell 3626.  Do you see the

6    suspect phone number?

7         A     I see highlighted outgoing number.  Yes.

8         Q     Do you see a contact or a name associated

9    with this phone number?

10        A     I do not.

11        Q     The cell above and below are two different

12    telephone numbers.  Correct?

13        A     They are.

14        Q     Those two different telephone numbers,

15    would you agree with me they do have contacts or names

16    associated with them?

17        A     They do.

18        Q     Moving to the next one.  This is from the

19    same report.  Different type of input.  Do you see the

20    suspect phone number highlighted?

21        A     I do.

22        Q     Do you see a name associated with it?

23        A     I do not.

24        Q     Page 820 for the next two inputs.

25              Do you see the suspect phone number

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

1    highlighted?

2        A    I do.

3        Q    Do you see names associated with that

4    contact?

5        A    I do not.

6        Q    How about over here, I am directing your

7    attention further to the right in cell 7038.

8        A    I see text data.

9        Q    What does the text say?

10       A    "Hey, it Rob, need you to call me."

11       Q    Besides Rob, do you see any names

12   associated with this number in this input?

13       A    I do not.

14       Q    Moving to page 824.  We see a string of

15   seven communications involving the suspect phone

16   number.  Is that accurate?

17       A    Seven, correct.

18       Q    Do you see any names or contacts associated

19   with the suspect phone number in these seven

20   communications?

21       A    I do not.

22       Q    Now, in the two cells, one above and below

23   these contacts, do you see different telephone

24   numbers?

25       A    I do.

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

59

```
 1      Q     With those numbers, do you see names or
 2   contacts associated with them?
 3      A     Yes.  In red.
 4      Q     Page 825 and 826.  Between these pages, do
 5   you agree there are eight communications between
 6   Brittany Shelton and the suspect phone number?
 7      A     Yes.
 8      Q     Do you see names associated with the
 9   suspect phone number?
10      A     I do not.
11      Q     Do you see cells above these communications
12   with different phone numbers?
13      A     Above it, yes.
14      Q     Do you see that number is associated with a
15   name or contact?
16      A     In red.  Yes.
17      Q     Page 1225.  It seems like we are looping at
18   this point.  But for the sake of being thorough we
19   will go through it.
20            Do you see three highlighted communications
21   between Brittany Shelton and the suspect phone number?
22      A     I do.
23      Q     Do you see any names associated with that
24   contact?
25      A     In that text box, you have highlighted, I
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

1    do not.

2        Q    We will go to the next one, again we are

3    looping here, we are at page 1244.  Do you see search

4    communications between Brittany Shelton and the

5    suspect phone number?

6        A    I do.

7        Q    Do you see any names or contacts associated

8    with that phone number?

9        A    I do not.

10        Q    Do you see a different phone number above

11    and below these communications?

12        A    I do.  But it is not in red.

13        Q    Is there a name or a contact associated

14    with those numbers?

15        A    Yes.  Again, different from the other ones.

16    Not in red.

17        Q    We are taken to pages 1246 and 1247.

18            Do you see eight highlighted communications

19    between Brittany Shelton and the suspect phone number?

20        A    I do.

21        Q    Do you see any names or contacts associated

22    with that phone number?

23        A    I do not.

24        Q    Do you see other text -- other phone

25    numbers above and below the suspect phone number

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

61

```
 1    communications?

 2         A    Yes.

 3         Q    Some of them, are there names or contacts

 4    associated with that phone number?

 5         A    There are some that are not.

 6         Q    Final inputs here.  Looking at page 2788.

 7    Do you see some input with the suspect phone number?

 8         A    Yes.

 9         Q    Do you see a name or contact associated

10    with that phone number?

11         A    I do not.

12         Q    Finally, looking at page 2828.  Do you see

13    the suspect phone number?

14         A    I do.

15         Q    Is there a name or a contact associated

16    with suspect phone number?

17         A    There is not.

18         Q    Drawing your attention back to Detective

19    Miller's preliminary hearing testimony.  You would

20    agree with me that Detective Miller testified

21    Millhouze associated with 412-378-3461 is how they

22    developed this contact number with Robert Thomas?

23              MR. BIONDO:  Object to form.  Go ahead and

24         answer, if you can.

25         A    Just by the transcript, that is what it
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

62

```
 1   sounds like.
 2        Q     His testimony is Millhouze, 412-378-3461, I
 3   got that from Brittany Shelton's cell phone?
 4        A     That is what the transcript appears to
 5   state.
 6        Q     I am showing you Exhibit 1.  Can you
 7   confirm Pat Miller is putting in his affidavit the
 8   suspect phone number 3461 was found in several witness
 9   contact information as Millhouze with a Z?
10        A     That is what it says.
11        Q     After reviewing Brittany Shelton's cell
12   phone extraction report, is it fair to say this is
13   inaccurate, the statements that were made by Detective
14   Miller?
15        A     I would say that in the cell phone
16   extraction you showed me of that number, if that is
17   what he was referencing, then no, Millhouze did not
18   appear in the cell phone extraction.
19        Q     What I will do, rather than going through
20   all of them, I will represent to you, your counsel can
21   surely correct me if I am mistaken, I will represent
22   to you the other cell phone downloads provided by
23   Allegheny County police and turned over to the
24   defense, none of them had the suspect phone number
25   3461 in their contacts saved as Millhouze.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

```
 1              That being said, is it fair to say the
 2    representation that Detective Miller made in his April
 3    8th affidavit of probable cause that several witness
 4    contact information has Millhouze saved according to
 5    3461, is it safe to say this affidavit also includes
 6    inaccuracies?
 7        A    If that is what you are representing.  I
 8    don't know what the other cell phone extractions --
 9        Q    Rather than taking you through all of them,
10    I will represent to you 3461 is not saved in any of
11    them as Millhouze.
12              MR. PETRUNYA:  Take him through them.
13              MR. JUBAS:  We can do that.
14        Q    Do you understand?
15        A    I understand what you are saying.
16        Q    If 3461 is not saved in Millhouze in any of
17    the other cell phone downloads, is it fair to say it's
18    a misrepresentation in the April 8th affidavit?
19        A    I would say yes.
20        Q    What is your responsibility -- I know this
21    is a hypothetical.  Had you become aware on April 9th
22    of this misrepresentation, what is your duty as a
23    police officer?
24        A    I think if I learned that somebody
25    misrepresented something in a legal document, it would
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

64

1    have to almost immediately be corrected.  Like I said

2    early on, it would have to be brought to the attention

3    of the prosecuting attorney at that point.  Because

4    again, they approve our affidavits of probable cause.

5        Q    Would the answer be the same with regards

6    to Detective Miller's preliminary hearing testimony?

7        A    I mean, I would think at the preliminary

8    hearing the District Attorney is present for that.  At

9    that point I would think -- if I am following you

10   correctly --

11       Q    What if the District Attorney doesn't know

12   about it?

13       A    If I became aware -- if you are asking

14   hypotheticals, like I testified before, if I became

15   aware there were inaccuracies in a legal document,

16   whether it be an affidavit of probable cause or a

17   criminal complaint that was already filed, then yes,

18   my action would be to notify the District Attorney's

19   Office.

20       Q    Is it fair to say if you knew about these

21   misrepresentations in early April, that Detective

22   Miller never would have had the opportunity to provide

23   this testimony?

24            MR. BIONDO:  Object to form.

25       Q    At the preliminary hearing.

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

65

```
 1              MR. BIONDO:  Object to form.  Answer, if

 2      you can.

 3      A      If you are asking, if we knew it was

 4  inaccurate, and it was corrected, that he wouldn't

 5  have testified to it?  Is that your question?

 6      Q      Yes.

 7      A      Yes.

 8      Q      So it would have been a different

 9  presentation a Allegheny County police at the

10  preliminary hearing, had you known about these

11  misrepresentations?

12      A      I would say so.  Yes.

13      Q      What would have been --

14      A      In that context of Detective Miller's

15  testimony of the number.

16      Q      What would have been presented would have

17  been the truth.  Correct?

18      A      I think what would have been presented is

19  whatever was extracted from that phone, whether it was

20  a number that was associated with Rob Thomas, but not

21  that it was characterized under Brittany Shelton's

22  phone as in the testimony, as in Millhouze.

23      Q      It would have to -- he would have to have

24  testified about where the number actually came from?

25      A      I would say so.  Yes.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

66

```
 1      Q     And you are representing to us today that
 2  you never heard of Shaquan Roberts?
 3      A     I do not know Shaquan Roberts.
 4      Q     So are you also saying you don't know who
 5  he was with, who Shaquan Roberts claims to have been
 6  with on the night of the massacre?
 7      A     I can speak that I do not know.
 8      Q     You said you were confident that Cheron
 9  Shelton and Rob Thomas perpetrated the Wilkinsburg
10  massacre.  Right?
11      A     I was, yes.
12      Q     That was based off of the idea that you
13  took your fellow detectives' words at face value
14  pertaining to the credibility of their investigation?
15      A     And information, yes, they were deriving
16  from the investigation.  Yes.
17      Q     Without seeing anything yet about the truth
18  of where this investigation came from, are you still
19  confident Cheron Shelton and Robert Thomas perpetrated
20  the Wilkinsburg massacre?
21            MR. BIONDO:  Object to form.  Answer, if
22      you can.
23      A     Yes.
24      Q     You are saying this without knowing about
25  Shaquan Roberts, right?
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

67

```
 1        A      Yes.

 2        Q      Do these misrepresentations you have seen

 3   from Detective Miller, do these cause you to question

 4   Detective Miller's investigation?

 5        A      I think, based on what you showed me, the

 6   misrepresentation of Detective Miller was probably an

 7   error, clerical error of some sort on where he

 8   actually obtained the information.

 9        Q      What makes you think that?

10        A      A hunch.  I don't think Detective Miller --

11   knowing Detective Miller as long as I have, that he

12   would fabricate something.

13        Q      Is it possible that somebody else could

14   have fabricated something, and Miller made

15   representations made based off that fabrication?

16        A      I don't believe so.

17        Q      You are thinking this was a complete

18   mistake?

19        A      That would be my theory.

20        Q      I am going to show you where this phone

21   number came from.

22               I'm going to come back over there and do

23   this same song and dance.

24               I am showing you --

25               MR. BIONDO:  For the record, I object to
```

**Johnstown - Erie - Pittsburgh - Greensburg**
**866-565-1929**

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

68

```
 1        any questions you are asking about this
 2        extraction report.  He said he hasn't seen it.
 3        He doesn't know who Shaquan Roberts was.  He
 4        wasn't involved in that part of the
 5        investigation.  What he thinks of this report
 6        doesn't have bearing on the outcome of the case.
 7        Q      Do you see an extraction start and end date
 8   time?
 9        A      3-16-2016, 9:37 a.m.
10        Q      Do you recall that I showed you the Cheron
11   Shelton cell phone report that indicated Allegheny
12   County received it on March 22nd?
13        A      Yes.
14        Q      You would agree with me Allegheny County
15   police obtained a cell phone from Shaquan Roberts six
16   days prior?
17        A      Is that the date and time -- you said you
18   can extract certain things.  Is that the date and time
19   they are extracting from the phone?  Or is that the
20   actual date and time it was hooked up to the machine?
21        Q      Do you see they said --
22        A      Shaquan Roberts.
23        Q      Obtained by consent to search?
24        A      Yes.
25        Q      I will represent to you Mr. Roberts was
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

69

1    interviewed by Allegheny County detectives Hopkin and

2    Caruso on March 15th, 2016.

3        A    Okay.

4        Q    The cell phone report, would you agree

5    becomes available on six days before Cheron Shelton's

6    cell data report is obtained?

7        A    Okay.

8        Q    You agree with me it would have been

9    possible for Allegheny County detectives to

10   cross-reference what was found in Shaquan Roberts'

11   phone with Cheron Shelton's phone as of March 22nd,

12   2016, not necessarily that it happened at that time.

13       A    It is possible.

14       Q    Allegheny County police had the capacity to

15   cross-reference these two cell phones.  Right?

16       A    Correct.

17       Q    You would agree with me 412-378-3461, the

18   suspect phone number attributed to Rob Thomas, that

19   was found in a cell data report received by Allegheny

20   County police on March 22nd pertaining to Cheron

21   Shelton?

22       A    Yes.

23       Q    You would agree with me as of March 22nd,

24   Allegheny County police has Shaquan Roberts' cell

25   phone.  The cell data report for Cheron Shelton.  As

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

70

1    well as the target phone number, 3461?

2         A    Cheron Shelton is in Shaquan Roberts' is

3    what you are saying?

4         Q    Yes.

5         A    And the 3461 number as well.

6         Q    Was in Cheron Shelton's cell report.

7         A    Correct.

8         Q    As of March 22nd, Allegheny County police

9    has the ability to cross-reference their cell phone

10   data and see if there are any connections with Shaquan

11   Roberts' cell phone.  Right?

12        A    Yes.

13             MR. BIONDO:  I object.  Just to clarify,

14        you have the two phones, and one phone number,

15        you don't have the phone for the suspect phone

16        number.

17             MR. JUBAS:  Correct.

18             MR. BIONDO:  The way you phrased it made it

19        sound like there were three phones.  I want to

20        clarify.

21        Q    Just to clarify for the record, no phones

22   were ever found connected to the suspect phone

23   numbers.  All we have is cell data report for -- we

24   are still on March 22nd.  We have the cell data report

25   for Cheron Shelton which contains other suspect

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

71

1    number, 3461, right?

2         A      From Cheron's cell.

3         Q      We have Shaquan Roberts' cell phone

4    download?

5         A      Correct.

6         Q      I will conduct the search Allegheny County

7    police had the capacity to conduct as early as March

8    22nd.  I am searching the suspect phone number,

9    412-378-3461.  Does that look accurate?

10        A      Yes.

11        Q      I am hitting search.  This takes us to page

12   6 at cell 100.

13              Do you see the suspect phone number

14   highlighted?

15        A      I do.

16        Q      Do you see a contact or name associated

17   with that number?

18        A      I do.

19        Q      What is it?

20        A      Millhouze, M-I-L-L-H-O-U-Z-E.

21        Q      Since Millhouze saved to 3461 is not in any

22   of the other cell phone downloads, is it fair to say

23   that Shaquan Roberts' cell phone is the source for

24   this contact information?

25              MR. BIONDO:  Object to form.  Go ahead.  If

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

72

1       you can answer.

2       A      It is in Shaquan Roberts' phone as

3    Millhouze, yes.

4       Q      You didn't see it in Brittany Shelton's?

5       A      The number was in there.  Not as Millhouze.

6       Q      Not the contact?

7       A      Correct.

8       Q      I represented to you, and opposing counsel

9    hasn't corrected me, the other cell reports did not

10   have this phone number saved as Millhouze?

11      A      As Millhouze.

12      Q      So only Shaquan Roberts' cell phone had the

13   suspect phone number saved as Millhouze.  Correct?

14      A      Yes.

15      Q      Is it safe to say that one way or another,

16   we aren't going to speculate how, one way or another

17   the suspect phone number and the contact associated

18   with Millhouze came from Shaquan Roberts' cell phone?

19             MR. BIONDO:  Object to form, go ahead and

20       answer, if you can.

21      A      I don't know -- I am assuming that it came

22   from there.  I don't know if it came from other

23   avenues, maybe other interviews conducted.

24      Q      I will represent to you --

25      A      You could say you showed the document you

1    showed me the extraction report did represent that

2    number was associated with Millhouze from Shaquan

3    Roberts' phone.

4        Q    The suspect phone number being associated

5    with Millhouze, that was what Detective Miller was

6    representing in his affidavit and in his preliminary

7    hearing testimony.  Correct?

8        A    Yes.

9        Q    But he was misrepresenting where it came

10   from?

11           MR. BIONDO:  Object to form.  Go ahead.

12       Answer, if you can.

13       A    The transcript, I believe the testimony was

14   that it was Brittany Shelton's phone.

15       Q    That is inaccurate.  Correct?

16       A    Yes.

17       Q    The affidavit of probable cause that you

18   reviewed was also inaccurate.  Correct?

19       A    That's correct.

20       Q    Given that you have now seen a number of

21   misrepresentations, do you have cause to doubt the

22   cell phone portion of this investigation?

23           MR. BIONDO:  Object to form.  Go ahead and

24       answer, if you can.

25       A    Not necessarily just because of the

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

74

1  misrepresentation of the name, the person that is

2  associated with the number.

3          I don't know that in and of itself would

4  change my characterization of my belief.

5      Q    Do you think this could potentially be

6  cured by just speaking with the DA's office and having

7  the truth put into the affidavit or in the testimony?

8      A    I think it could be cured by the fact just

9  documenting where it came from.  It came from a

10  consent download from Shaquan Roberts.  And it was

11  listed in there and not Brittany Shelton's phone.

12     Q    Does that strike you as odd that Detective

13  Miller would put misrepresentations in affidavits and

14  sworn testimony when he had this evidence legally?

15          MR. BIONDO:  Object to form.  Answer, if

16      you can.

17     A    I would believe it was probably a mistake

18  on his part.  Obviously, it is incorrect, it is

19  inaccurate.

20     Q    I am not asking you to be a fortune teller.

21  Do you have any reason to believe that Detective

22  Miller knew about Shaquan Roberts?

23     A    I don't know.  I am assuming maybe he did.

24  I don't know.  If that is where the name Millhouze

25  came from, if that is where that was derived from.

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

75

```
 1    And then it was followed up and corroborated possibly
 2    by other information.
 3         Q      What would that mean?
 4         A      If you have somebody associated with a
 5    name, whether it is a nickname or something, maybe it
 6    is corroborated through other interviews with other
 7    people that reference that person as such, as
 8    Millhouze or whatever.
 9         Q      You never learned about Shaquan Roberts in
10    this case, right?
11         A      I did not.  No.
12         Q      You never learned about the four
13    individuals that Shaquan Roberts claimed to be with on
14    the night of the massacre.  Right?
15         A      No.
16         Q      You never learned that all those
17    individuals, those five individuals were from Hill
18    Top.  Right?
19         A      I did not know who they are.
20         Q      Did you ever learn that Shaquan Roberts was
21    in contact with one of the suspect phone numbers in
22    the hours leading up to the massacre, and in the days
23    following the massacre?
24         A      Are you asking if I knew that?
25         Q      Yes.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

76

```
1        A      I did not.

2        Q      Would you assume that they were

3   investigated?

4        A      I wouldn't assume anything.

5        Q      Would you hope they were investigated?

6        A      I would think if information was provided

7   to investigators, that they would follow up with it.

8        Q      If investigators did not follow up with

9   it -- I will withdraw the question.

10               Based off of what you know about Shaquan

11  Roberts right now, and we will listen to his

12  interview, so you can feel comfortable with it, just

13  based off what you know about Shaquan Roberts right

14  now, would you rule him out as a suspect based off of

15  what you know?

16       A      Right now the only thing I know is you have

17  a phone that was consented to, I don't know in what

18  context he presented the consent to search --

19       Q      He was seen in Hill Top.

20       A      And he voluntarily provided his phone and

21  gave that information regarding a cell phone dump?

22       Q      Yes.  Gave consent.

23       A      So he is a cooperating individual.

24       Q      Absolutely.  On March 15th, gave a full

25  interview.
```

**Johnstown - Erie - Pittsburgh - Greensburg**
**866-565-1929**

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

77

```
 1      A      So how did detectives come in contact with
 2   him?
 3      Q      While investigating the Wilkinsburg
 4   massacre.  This was on March 15th.  I believe they
 5   were canvassing the scene looking for Dontay Reed.
 6   They found Mr. Roberts in one of the Nolan Court
 7   residences.
 8           Just based off the few attributes you know,
 9   from Hill Top, knew Cheron Shelton, friends with
10   Calvin Doswell.  He was with four other Hill Top
11   members, people from Hill Top that night.  And he was
12   in contact with one of the suspect phone numbers
13   leading up to the massacre and in the days following
14   the massacre.
15           So based off these details, can you rule
16   him out as a suspect?
17           MR. BIONDO:  Object to form.  Go ahead and
18        answer.
19      A      Can I rule him out?
20      Q      Yes.
21      A      Without speaking with him, and taking
22   everything else into consideration, I would say based
23   on what you just represented, and he is a cooperating
24   individual and came in and voluntarily gave a phone
25   download, I don't know that he would be characterized
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

78

1    as a suspect at that point.  Just based on what you

2    told me.

3           Obviously, he was not seen at the scene

4    immediately afterwards.

5        Q    How do you know that?

6        A    He wasn't identified at the scene.

7        Q    Was Cheron Shelton?

8        A    He was.

9        Q    Was Robert Thomas?

10       A    I don't believe Robert Thomas was.

11       Q    How does that make him different from

12   Robert Thomas?

13       A    Because Robert Thomas puts himself with

14   Cheron Shelton later on.

15       Q    So if an individual did not put themselves

16   with Cheron Shelton, then they are not a suspect?

17       A    I would say at the preliminary stages,

18   maybe not.

19       Q    So you would have --

20       A    It would be a cooperating witness at this

21   point.

22       Q    Based off of this line of reasoning, fair

23   to say your testimony is he doesn't need to be

24   investigated?

25       A    I am not going to say that.

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

```
 1        Q      Do you think he should be investigated?

 2        A      I think he should be interviewed.

 3        Q      Fair to say that a productive first step

 4   after getting this cell phone information from Cheron

 5   Shelton on March 22nd, would have been first

 6   cross-referencing with Shaquan Roberts' phone, right?

 7   Which obviously was done, because that is where they

 8   got the contact name Millhouze.  Right?

 9        A      From Shaquan Roberts' phone.  Correct.

10        Q      We established that.

11               The next step, correct me if I am wrong,

12   would be reinterview him?

13               MR. BIONDO:  Object to form.  Answer, if

14        you can.

15        A      Reinterview him?  I don't know -- did they

16   ever break the interview of him?

17               If they interviewed him, and he consented

18   to his phone dump, you are saying they release him,

19   give him his phone back, then they find that it

20   matches Millhouze, would they go back and interview

21   him?

22        Q      Yes.

23        A      Did they not ask him who Millhouze was or

24   that number at that time?

25        Q      Let me ask the question.  Is that what the
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

80

1    next steps would have been?

2         A      If they would have identified the number, I

3    think they would have asked who that number is

4    attributed to.

5         Q      Would that have been a good next step after

6    seeing Cheron Shelton's number was in contact with

7    suspect phone number, who was in contact with Shaquan

8    Roberts?

9         A      And Shaquan Roberts is able to identify the

10   phone number communicating with Cheron Shelton.

11        Q      That would be important, right?

12        A      I would say yes.

13        Q      That would give us potential insight into

14   who 3461 was on March 22nd.  Right?

15        A      Yes.  You would be able to identify that

16   person, presumably.

17        Q      So Shaquan Roberts and his cell phone

18   represents a huge break in the case.  Right?

19               MR. BIONDO:  Objection to form.

20        A      I don't think it is any more break than

21   Brittany Shelton.  She had that number in her phone,

22   just not identified as Millhouze.  But she knew -- I

23   would think conceivably she would know who that person

24   was.  If you are asking me.

25        Q      She wasn't asked about that number during

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

81

```
 1   her first interview or her second interview.  Are you

 2   saying it would have been a good idea for detectives

 3   to follow up with her subsequently to ask her about

 4   the phone number?

 5        A    To identify who is using that number.

 6        Q    If that was not done, was that just a

 7   missed opportunity to corroborate some evidence?

 8        A    Maybe it was done, was it done in another

 9   avenue by a different interview?

10        Q    You are assuming?

11        A    I am asking.

12        Q    No, it wasn't.

13        A    I don't know.

14        Q    If that question was never posed to

15   Brittany Shelton, was that a missed opportunity by

16   investigators?

17             MR. BIONDO:  Objection, form.  Answer, if

18        you can.

19        A    If they had that information, and whether

20   they asked her, they didn't ask her who the user of

21   that number was.

22        Q    If you were working with Grill on a

23   situation like this, Grill walked up to you and said

24   "Hey, I have this cell phone download, and I have

25   these potential witnesses, haven't yet talked to them
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

82

```
 1    about the suspect phone number, is it all right if I
 2    just don't talk to them?"
 3                 What would you say?
 4                 MR. BIONDO:  Objection.  Form.  Answer, if
 5         you can.
 6         A      I think that would be inappropriate.
 7         Q      It would be appropriate to follow up on,
 8    right?
 9         A      Yes.
10         Q      If it was not followed up on, would you
11    agree with me that is inappropriate?
12         A      I would say that information should be
13    followed up on, yes.
14         Q      Because this is quite possibly crucial
15    evidence that could lead us to identifying
16    definitively not only the identity of 3461, but also
17    specific movements prior to the massacre, and
18    potentially even getting rid of evidence after the
19    massacre, right?
20                 MR. BIONDO:  Objection to form.  Answer, if
21         you can.
22         Q      Potentially.
23         A      Potentially.
24         Q      We don't know until we investigate.
25    Correct?
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

83

```
1        A      Correct.

2        Q      If that wasn't done, if Shaquan Roberts was

3    not reinterviewed, and if four other Hill Top

4    witnesses that he said he was with that night are not

5    interviewed, and Shaquan Roberts is never asked about

6    the communications with 3461 before and after the

7    massacre, that is a pretty big gap in the

8    investigation, wouldn't you agree?

9              MR. BIONDO:  Objection to form.  Answer, if

10         you can.

11       A      I wouldn't know that the other four

12   individuals in Hill Top are cooperative.

13       Q      Which is why you would investigate it.

14   Isn't it?

15       A      I don't know that -- we get much

16   cooperation in a lot of murder cases we investigate,

17   to be honest with you.  It would sound to me Shaquan

18   Roberts who comes in -- whether he comes in

19   voluntarily or not, he at least to a minimum consents

20   to a download of his phone.  I would say he is a

21   cooperating witness at that point.  Regardless whether

22   he is from Hill Top or whatever.

23       Q      The fact he is from Hill Top, and he is

24   friends with Calvin Doswell, these things make you

25   investigate him.  Right?  Investigate what he is
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

84

1   saying?

2       A      If he is assisting on the investigation,

3   yes.

4       Q      What if Detective Hoffman told Shaquan

5   Roberts he didn't believe what he was telling him in

6   his interview?

7       A      Then he didn't believe him.

8       Q      That would provide even more reason to

9   investigate Shaquan Roberts closely, if one of the

10  Allegheny County police detectives thinks he is

11  withholding information during their initial

12  interview?

13          MR. BIONDO:  Objection to form.  Answer, if

14      you can.

15      A      Depending what he doesn't believe in the

16  information he is providing.

17      Q      It doesn't matter, right?  No matter what,

18  he should follow up with him, right?

19      A      I mean, just to speak in generalities --

20  you are saying Detective Hoffman said he didn't

21  believe Shaquan Roberts was telling him the truth.

22          Is that in what context?  Whether he

23  committed the murder, or knew who committed the

24  murder, or talked to a person?

25      Q      It was in the context he believed --

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

1    Detective Hoffman believed Shaquan Roberts was

2    withholding information about Cheron Shelton.

3              MR. BIONDO:  Objection to form.  Answer, if

4        you can.

5        A    Okay.

6        Q    Let's say hypothetically you learn about

7    Shaquan Roberts on March 22nd or March 23rd, when this

8    cross-referencing is available to Allegheny County

9    police.

10             You find out Detective Hoffman believed

11   that he was withholding information about Cheron

12   Shelton's involvement in the Wilkinsburg massacre.

13   Based off of everything you know about Shaquan

14   Roberts, would you investigate him?

15       A    I don't know based on that characterization

16   if that would be a full court press.  We still have

17   the information we are operating on, that the two

18   individuals that are seen at Hill Top, that we know

19   Cheron Shelton is identified as being on Franklin

20   immediately after shots are fired.

21             And Rob Thomas and Cheron Shelton are in

22   Hill Top together in at least the hour after the

23   murder.  That the context in which Shaquan Roberts is

24   talking about, I think Detective Hoffman believed he

25   might have been an ear witness is what it sounds like

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

86

```
 1    to me.  He didn't believe --

 2         Q     Are you speculating?

 3         A     You asked me hypothetically.  I am asking.

 4    I am assuming.  Maybe he thought he was a witness,

 5    like an ear witness, and just didn't want to tell him.

 6         Q     If you were coaching a younger detective,

 7    would you say "This is a good way to do it"?  If you

 8    think he might just have heard something, don't follow

 9    up on it?

10               MR. BIONDO:  Object to form.

11         Q     Is that the advice you would give?

12         A     No.  You are taking it totally out of

13    context.

14               You are telling me what Detective Hoffman

15    didn't believe with Shaquan Roberts.  I am telling you

16    potentially, I don't know this to be true, maybe

17    Detective Hoffman just believed Shaquan Roberts might

18    have been an ear witness and had information he wasn't

19    providing.  And that happens a lot.

20               That doesn't mean you don't follow up.  He

21    did consent to his phone.

22         Q     Just to clarify, you follow up on it.

23    Right?  That is basic police work?

24         A     Yes.  You follow up on it.  You will

25    document Shaquan Roberts and the information he
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

87

```
 1   provided.
 2       Q    I will show you Detective Hoffman's report,
 3   it's a followup report pertaining to Shaquan Roberts.
 4   Go ahead and review that.  You don't need to read it
 5   in the record.
 6            Have you had the chance to read that?
 7       A    Yes.
 8       Q    Can you read the activity date and time of
 9   that report?
10       A    July 9th, 2018.
11       Q    Can you read just the first sentence?  Can
12   you read the date of the interview?
13       A    Tuesday, March 15th, 2016.
14       Q    How much of a time gap is there between
15   Hoffman filing this report and the interview itself?
16       A    About 28 months.
17       Q    Is that standard procedure, standard police
18   protocol, to wait more than two years to file reports
19   about interviews you conducted?
20       A    No.  I would say no.
21       Q    What would be the better practice?
22       A    If applicable, we do them as soon as we
23   can, when you get downtime to document the reports.
24       Q    You would agree there is no excuse as to
25   why more than two years would pass?
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

88

```
 1        A       I don't know why he documented it then as
 2   opposed to -- when he documented as opposed to not in
 3   March.  I don't know.
 4        Q       You read the report.  Right?
 5        A       I did.
 6        Q       Did you see any mention of what Shaquan
 7   Roberts -- what evidence he provided about the
 8   Wilkinsburg massacre?
 9        A       No.  Just that he consented to a download
10   of his phone.  And they collected evidence from that.
11        Q       We are going to get into the interview.
12   Since Shaquan Roberts did actually provide information
13   on Lamont Powell and Cheron Shelton, and from his cell
14   phone we learned he was in contact with one of the
15   suspect phone numbers at very important points
16   relative to this investigation, does it strike you as
17   inappropriate Detective Hoffman did not include any of
18   that information in his report?
19             MR. BIONDO:  Objection to form.  Answer, if
20        you can.
21        A       I would think there would be a separate
22   interview report done.
23        Q       If this is the only one, is that
24   inappropriate?
25        A       I would say probably.  If the interview is
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

89

1    audio and video recorded, that would be the most

2    accurate form of the interview that would be provided.

3        Q      You saw Shaquan Roberts' cell phone

4    extraction report.  It referenced the Wilkinsburg

5    shooting.  Right?

6        A      You mean the front page, Wilkinsburg

7    shooting, yes.

8        Q      You also see yourself, and I am

9    representing, he was interviewed with regard to the

10   Wilkinsburg massacre?

11       A      Yes.

12       Q      That being the case, it is important that

13   not just Detective Hoffman, any detective working on

14   this particular part of the investigation would

15   document it timely in a report.  Right?

16       A      You would think so.

17       Q      It is inappropriate that it didn't happen.

18   Correct?

19              MR. BIONDO:  Objection to form.  Answer, if

20       you can.

21       A      Again, to say it is inappropriate, I don't

22   know why he documented it the way he did.

23       Q      If you were teaching a younger detective,

24   would you use this as an example how to do good police

25   work?

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

```
 1      A      I would say it would need to be documented

 2   sooner.

 3      Q      And include the details pertinent to the

 4   Wilkinsburg massacre investigation, right?

 5      A      Well, enter the contents of the interview.

 6             MR. BIONDO:  Are you doing the video?

 7             MR. JUBAS:  Yes.

 8             MR. BIONDO:  Let's take a break.

 9             (Recess taken.)

10      Q      Back on the record with Detective Kinavey.

11   Detective Kinavey, just to briefly touch on the part

12   of the investigation we have been discussing, we spoke

13   about Detective Miller's misrepresentations and

14   affidavits and preliminary hearing testimony.  Right?

15             MR. BIONDO:  Objection to form.  Answer, if

16      you can.

17      A      We did discuss his preliminary hearing

18   transcript, the affidavit --

19      Q      And there are misrepresentations in both,

20   right?

21      A      There are.  Yes.

22      Q      We also discussed what we would describe as

23   aspects of the handling of Shaquan Roberts by

24   Detective Hoffman that we would say are inappropriate?

25             MR. BIONDO:  Objection to form.  Go ahead
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

91

```
 1      and answer.
 2      A     I don't know what you mean by
 3  inappropriate.  But -- I wouldn't characterize it as
 4  inappropriate.
 5      Q     Is filing a report more than two years
 6  after you take the interview, is that appropriate?
 7      A     No.
 8      Q     We would say that is inappropriate?
 9      A     Yes.  The filing of the documentation.
10      Q     As well as the fact he left all details
11  pertaining to the Wilkinsburg massacre that he
12  provided out of the report.  That is also
13  inappropriate?
14      A     Yes.
15      Q     We have identified we will call them
16  inappropriate conduct or inappropriate actions
17  regarding Shaquan Roberts with Detective Miller and
18  Detective Hoffman.  Right?
19            MR. BIONDO:  Objection to form.  Go ahead
20      and answer.
21      A     Yes.  Obviously we just discussed that.
22      Q     I will show you Shaquan Roberts' interview
23  now.
24            MR. BIONDO:  Without knowing questions, I
25      will object.  This is the first time he saw it.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

92

1          This was not part of his investigation.  He has

2          had no role in anything that has to do with

3          Shaquan Roberts.

4                  MR. PETRUNYA:  Noted.

5                  MR. JUBAS:  Trying to hurry.

6                  MR. BIONDO:  It's not the hurrying part.

7          Q    Before diving into this, I want to clarify

8     one thing.  I will represent to you on the record, one

9     of the district attorneys confirmed they never heard

10    about Shaquan Roberts.  So information regarding

11    Shaquan Roberts was never turned over to the district

12    attorney's office.

13         A    Okay.

14         Q    I will start playing Shaquan Roberts'

15    interview at 3:21:19.

16                  I'm going to hit play at 3:20 p.m.  I'm

17    going to hand you that.  Hopefully this is sufficient.

18                  (Video played.)

19         Q    Can you hear that okay?

20         A    It's a little tough.

21         Q    3:25:18, I am pausing it.

22                  Did you hear him say his street name is

23    ReeRee?

24         A    Yes.

25         Q    Throughout your experience on the

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

1  Wilkinsburg massacre investigation and prosecution,

2  did you ever hear the street name ReeRee?

3      A    I did not.

4           (Video played.)

5      Q    3:25:58 p.m. I am pausing it.  Did you hear

6  him say he was on probation?

7      A    I did.

8      Q    When individuals are on probation, is it

9  typical some of the conditions of their probation is

10  that if they are asked, that they have to cooperate

11  with law enforcement?

12     A    That could be parameters of your probation.

13  Or parole.

14     Q    Is that a normal one you see?

15     A    Not anymore.  We used to a lot.

16     Q    Back then it would have been something you

17  would have seen?

18     A    2016, maybe.

19     Q    Pushing play at 3:25:58.

20          (Video played.)

21     Q    Did you hear the question:  Were you up

22  there on Wednesday in Ferris Court?  And he says yes?

23     A    I did.

24     Q    Are you familiar with the Hill Top

25  neighborhood?

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

94

```
 1      A     I know where Nolan Court is.  I don't know
 2  all the courts, all the streets, how they branch off.
 3      Q     Do you know Nolan, Muller and Ferris Court
 4  are part of Hill Top?
 5      A     If you represent that, yes.
 6      Q     That is the information we got from McCue,
 7  who was previously involved with investigating Hill
 8  Top.
 9      A     Okay.
10            (Video played.)
11      Q     Pausing at 3:29:40 p.m.  Did you hear
12  Shaquan Roberts confirm that three or four guys he was
13  with the night of the massacre were also from Hill
14  Top?
15      A     Yes.  They are from up there.  I think from
16  what I could hear, it sounds like he gave street
17  names.
18      Q     One of the detectives confirmed he is
19  talking about Hill Top?
20      A     Correct.
21            (Video played.)
22      Q     Pausing at 3:30:32 p.m.  Did you hear him
23  confirm he was with these individuals from Hill Top at
24  1:00 a.m. on Wednesday night going to Thursday?
25      A     Yes.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

95

```
 1        Q      The time frame we are speaking about,
 2  Wednesday night would have been the evening of the
 3  massacre.  Right?
 4        A      I believe so.  Yes.
 5        Q      He stated at 1:00 a.m., he and these four
 6  other individuals from Hill Top were at IHOP.
 7  Correct?
 8        A      That is what he says.
 9        Q      And that would be approximately two hours
10  after the Wilkinsburg massacre.  Correct?
11        A      Yes.  Approximately.
12        Q      Did you hear him say what he was doing
13  during the time frame of the Wilkinsburg massacre?
14        A      I didn't.
15        Q      As of right now, just where we are, that is
16  an open question.  Right?
17        A      I haven't heard him say what he was doing.
18  Unless he alluded to it being -- and I just missed it.
19        Q      No.  You are right.  I am pressing play at
20  3:30:32.
21               (Video played.)
22        Q      Pausing at 3:32:19 p.m.  Did you hear him
23  say the driver he was with was also from Hill Top?
24        A      A girl?
25        Q      Yes.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

96

```
 1      A     Yes.

 2            (Video played.)

 3      Q     Pausing at 3:34:45 p.m.  Thus far have you

 4   heard anything that would lead you to rule Mr. Roberts

 5   out as a suspect?

 6      A     Other than he is pretty forthcoming in

 7   information.

 8            Like, he is providing information they can

 9   corroborate.

10      Q     So that, in your opinion, gives you

11   information that you can rule him out as a suspect?

12      A     No.  He is providing information on where

13   he is at, who he is with.

14      Q     He is giving information that can be

15   followed up on?

16      A     Correct.

17      Q     I will show one more short part.  3:59:51.

18            (Video played.)

19      Q     Pausing at 4:00:15 p.m.  Did you hear him

20   beginning to provide information on Lamont Powell?

21      A     Yes.

22      Q     That is ostensibly the reason for the

23   Wilkinsburg massacre, right?

24      A     Arguably, yes.

25      Q     Shaquan Roberts actually provides
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

97

1    information here in this interview that he used to be

2    close with Lamont Powell, right?

3        A      Yes.  He said he used to hang out with him.

4        Q      In fact, he knows Lamont's nickname is

5    murder, right?

6        A      Correct.

7        Q      Just that right there, you would agree this

8    is pertinent information pertaining to the Wilkinsburg

9    massacre?  Not going to get into the details.  At

10   least he is providing information?

11       A      It is information.  Yes.

12       Q      And also, you would agree with me this is

13   of interest, because he is claiming to have a personal

14   connection to Lamont Powell, one of the main players

15   in this case.  Right?

16              MR. BIONDO:  Object to form.  Answer, if

17        you can.

18       A      He does know Lamont Powell, who is a victim

19   of the shooting.

20              (Video played.)

21       Q      I paused it at 4:00:38 p.m.  Did you hear

22   him say he was down, he was in jail when Calvin got

23   killed?

24       A      Yes.

25       Q      Do you recall that Cheron Shelton was also

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

98

```
 1    in jail when Calvin Doswell got killed?

 2         A     I don't know that.

 3         Q     Pushing play.

 4               (Video played.)

 5         Q     Pausing at 4:00:54 p.m., did you hear him

 6    say Lamont Powell told him he has a lot of enemies?

 7         A     I couldn't hear that, to be honest with

 8    you.

 9               MR. BIONDO:  For clarification, the time is

10         4:54.  You are saying minutes and seconds.

11         Q     4:00:54.

12               (Video played.)

13         Q     Pausing at 4:01:04 p.m.  Did you hear him

14    reference Whiz?

15         A     Yes.

16         Q     Do you know who C Whiz is?

17         A     I do not.

18         Q     I will represent to you C Whiz is Cheron

19    Shelton's street name.

20         A     Okay.

21               (Video played.)

22         Q     I am pausing at 4:02:05.  Did you hear

23    Shaquan provide his code to detectives for his cell

24    phone?

25         A     Yes.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

```
 1      Q     Is it fair to say these two detectives had
 2   the code to access Shaquan Roberts' cell phone?
 3      A     Yes.
 4            (Video played.)
 5      A     Who does he say he is talking to?
 6      Q     People in Hill Top.
 7      A     He is talking to somebody on Facebook, they
 8   caught him on Facebook.
 9      Q     He was talking about Dontay Reed who was
10   involved in the investigation early on?
11      A     That is who he is talking to in regards to
12   knowing what went on?
13      Q     I'm not sure if that is clear.  He is
14   talking with Hill Top.  I am not saying that is not.
15   I just wasn't sure that is specifically who.
16            (Video played.)
17      Q     Pausing at 4:03:20.  Did you hear him say
18   he heard Braddock people did it and Wilkinsburg people
19   did it?
20      A     Yes.
21      Q     Now, that is -- whether credible or not,
22   that is evidence pertinent to the investigation.
23   Right?
24            MR. BIONDO:  Object to form.  Go ahead.
25      A     I mean, it is information.  He is not
```

1   giving specifics.

2      Q    Is that information that you could put in a

3   report?

4      A    It is documented with the audio video.  You

5   can put it in a report.

6      Q    Did you ever see any Shaquan Roberts

7   evidence in the case file for this homicide?

8      A    I did not.

9      Q    I will represent to you Detective

10  Hitchings, who provided us with this information, told

11  us that he went to the Wilkinsburg case file to pull

12  this Shaquan Roberts evidence, but it wasn't in there.

13       If this report -- this interview wasn't in

14  the Wilkinsburg file, and the cell phone download

15  isn't in the Wilkinsburg file, and the report isn't in

16  the Wilkinsburg file, any information pertaining to

17  Shaquan Roberts, if it is all missing out of the

18  Wilkinsburg file, is there any way for either

19  Allegheny County police or the District Attorney's

20  Office, or the defense, to know about Shaquan Roberts?

21       MR. BIONDO:  Objection.  Form.  Go ahead

22     and answer, if you can.

23      A    Not if they are not aware of it.

24      Q    And not if it is not in the case file.

25  Right?

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

```
 1      A      Right.

 2             (Video played.)

 3      Q      Pausing at 4:04:35, did you hear him trying

 4  to explain to detectives how he is not quite sure why

 5  people would assume that Hill Top is going to be

 6  retaliated against for the Wilkinsburg massacre?

 7      A      Yes.  I think he is definitely referencing

 8  Calvin about the retaliation in Hill Top.

 9      Q      Is he saying that it doesn't have to be

10  Hill Top, it could come from somewhere else,

11  paraphrasing?  Is that the impression you are getting?

12      A      Yes.  I think he is trying to talk Hill Top

13  out of it.

14      Q      That is what I was getting at.  Thank you.

15             (Video played.)

16      Q      So I am pausing at 4:04:59.  Did he

17  elaborate a little more on what he was saying and how

18  he doesn't think people should just suspect Hill Top?

19      A      Yes.  He is making reference to somebody

20  specifically.  Because he is saying -- because he has

21  done a lot, too.

22      Q      Lamont Powell.

23      A      Yes.  If that is who he is speaking about.

24      Q      He is basically saying, paraphrasing again,

25  Lamont Powell has a lot of enemies, there is no reason
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

1    Hill Top should be worried about retaliation?

2        A     I think he is saying Lamont Powell did a

3    lot of stuff.  Not that he has a lot of enemies.  He

4    has done a lot of stuff is what it sounds like.

5        Q     And the source could come from somewhere

6    besides Hill Top?

7        A     Yes.  He is pretty forthcoming.

8        Q     This was evidence, right, that a witness

9    was providing pertaining to the Wilkinsburg massacre.

10   Would you agree?

11            MR. BIONDO:  Object to form.  Answer, if

12       you can.

13       A     You are asking if Shaquan Roberts is a

14   witness?

15       Q     Is providing evidence pertaining to the

16   Wilkinsburg massacre?

17       A     Information, yes.  I would say so.

18       Q     He is providing information relative to the

19   motive theory in particular right now.  Right?

20       A     Some background information.  Yes.

21       Q     That is relevant to the investigation.

22   Right?

23       A     Yes.

24       Q     And whether it is credible or not, would

25   you agree with me this is evidence that would tend to

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

103

1    contradict Allegheny County police's theory it was

2    Calvin Doswell?

3              MR. BIONDO:  Object to form.  Go ahead.

4        A    Calvin Doswell?

5        Q    Yes.  Would you agree he is providing

6    information contradictory to Allegheny County police's

7    theory that this was a massacre that occurred in

8    retaliation for killing Calvin Doswell?

9        A    I don't know that he is saying that

10   definitively.  I think he is trying to talk them out

11   of Hill Top being involved.

12       Q    Right.  That is what I am saying.

13       A    He makes reference that he is in jail at

14   the time when Doswell was killed.

15       Q    But he is saying in his communications with

16   other Hill Top members currently, that they are

17   basically saying there is no reason for us to worry

18   more than anybody else, because this guy has so many

19   enemies.  Right?

20       A    Yes.  He kind of alludes I am sure Lamont

21   Powell has done his stuff, too.

22       Q    Right.

23            (Video played.)

24       Q    I am pausing at 4:06:27.  Did you hear what

25   Hoffman just said about Shaquan Roberts?

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

104

```
 1          MR. BIONDO:  Objection.  Form.  I don't
 2     understand.
 3     Q     Did you hear him tell Shaquan Roberts that
 4     you are right in the middle of the guys that could be
 5     involved in this?
 6     A     He did.  Meaning Hill Top is what it
 7     sounded like he paraphrased.  You are up in Hill Top.
 8          (Video played.)
 9     Q     Pausing at 4:06:43 p.m.  Did you just hear
10     Mr. Roberts saying "I am not denying somebody up there
11     at Hill Top probably did it"?
12     A     Yes.
13          (Video played.)
14     Q     Pausing at 4:07 p.m.  Did you hear him ask
15     about Whiz?
16     A     I couldn't hear it.
17     Q     I will represent to you they are currently
18     asking him about Whiz.
19          (Video played.)
20     Q     Pressing pause at 4:07:20.  Did you hear
21     that Shaquan Roberts was at least trying to get in
22     contact with Cheron Shelton?
23          MR. BIONDO:  Objection to form.
24     A     I think it sounds like he said he tried
25     reaching out to him.  But he hasn't talked to him.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

```
 1              (Video played.)
 2      Q      I will fast forward to 4:10:55 -- 4:10:22.
 3              (Video played.)
 4      Q      Did you hear that?
 5      A      No.
 6      Q      We will rewind.  Make sure we hear what
 7   Detective Hoffman is saying.
 8              (Video played.)
 9      Q      Did you hear Detective Hoffman say, "You
10   don't remember me, do you?"
11      A      Yes.
12      Q      Does that indicate he knew Shaquan Roberts
13   previously?
14      A      That is what it sounds like.
15      Q      Pushing play at 4:11 p.m.
16              (Video played.)
17      Q      Pressing play at 4:10:49 p.m.
18              (Video played.)
19      Q      Pausing at 4:11:26 p.m.  Did you hear
20   Detective Hoffman tell Shaquan Roberts he also knows
21   Dontay Reed and Whiz?
22      A      He did say that.
23      Q      Detective Hoffman previously knew Shaquan
24   Roberts, Dontay Reed and Cheron Shelton.  Right?
25      A      That's correct.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

106

1      Q      Does that make Detective Hoffman, just

2   based off the information you know here, an important

3   piece of the investigative puzzle here, somebody who

4   knows all of these individuals?

5            MR. BIONDO:  Objection to form.  Go ahead

6      and answer.

7      A      I think that he knows them.  He was in jail

8   for three years.  I know Mike came from the city, too.

9   I don't know how long ago that he is referencing that

10  he knew these guys.  Maybe when they were younger.

11  Just because he knows them or has dealt with them when

12  they were younger, I don't --

13     Q      Could provide information, right?  Could?

14     A      Information from years ago that probably

15  wouldn't be helpful in a case like this.

16     Q      Probably?

17     A      I mean, if we are going back ten years that

18  he has been gone from City of Pittsburgh, I would say

19  I don't know --

20     Q      From 2016?

21     A      From 2016.

22     Q      Detective Hoffman left Pittsburgh in 2006

23  and started working for --

24     A      No.  He didn't come with me.  I'm not sure

25  when he got hired.  He didn't come into the unit until

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

```
 1    I think 2015.  He was probably hired -- I don't know

 2    when he was hired.  I know he was in the city, that he

 3    worked in Homewood.

 4         Q     That might be it.

 5               I am pressing play at 4:18:28 p.m.

 6               (Video played.)

 7         Q     Pausing.  Did you hear Detective Hoffman

 8    tell Shaquan Roberts he thinks he is holding back on

 9    us?

10         A     I did.

11         Q     Does that mean that Detective Hoffman

12    believes Shaquan Roberts is withholding information

13    from him?

14               MR. BIONDO:  Object to form.  Go ahead and

15         answer.

16         A     That is what it sounds like.

17         Q     Pressing play.

18               (Video played.)

19         Q     Pressing pause at 4:18:56.  Did it just

20    sound like Detective Hoffman offered Shaquan Roberts

21    the possibility of allowing him to go home without

22    charges, if he cooperates against Cheron Shelton?

23         A     That is what he is insinuating.

24         Q     Pressing play.

25               (Video played.)
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

```
 1      Q      Pausing at 4:19:35.  Just a few more parts.
 2             Pressing play at 4:21:57.
 3             (Video played.)
 4      Q      So pausing at 4:24:36 p.m.  Did you hear
 5   Hoffman again saying he thinks Shaquan Roberts is
 6   holding back?
 7      A      I do.
 8      Q      Would you agree with the statement that
 9   police are similar to gangs?
10             MR. BIONDO:  Objection to form.
11      A      No.
12      Q      You disagree with that?
13      A      Similar to gangs?
14      Q      Yes.
15      A      Yes.  I disagree.
16      Q      Why would you disagree?
17      A      I don't believe the two are linked
18   together.
19             (Video played.)
20      Q      Pausing at 4:45 p.m.  Did you hear
21   Detective Hoffman say police and gangs are very
22   similar?
23             MR. BIONDO:  Objection to form.
24      A      He said that.
25      Q      Do you disagree with that?
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

```
 1      A     Yes.  I don't agree with that.
 2      Q     Are you surprised to hear him talk like
 3  that?
 4      A     Everybody has their own technique.
 5  Apparently that is Detective Hoffman's.
 6      Q     Gangs are criminals.  Right?
 7      A     Correct.
 8      Q     You would agree with me Detective Hoffman's
 9  actions in this case surrounding Shaquan Roberts are
10  inappropriate.  Right?
11            MR. BIONDO:  Objection to form.
12      Q     The ones we have gone over.
13            MR. BIONDO:  Objection to form.
14      A     The authoring of the report 28 months
15  later.  But you can see what he is trying to do.
16      Q     What is he trying to do?
17      A     He believes Shaquan Roberts is a witness.
18  I can see that.
19      Q     Because he keeps telling him "I think you
20  are withholding information," right?
21      A     He believes Shaquan Roberts knows the
22  people that are responsible from Hill Top that did the
23  murders told Shaquan Roberts.  That is what Detective
24  Hoffman is trying to extract.
25      Q     You would agree this interview took place
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

110

1    on March 15th?

2        A    I do.

3        Q    And that is seven days before Allegheny

4    County police receive Cheron Shelton's cell phone data

5    report.  Right?

6        A    The 22nd.  Correct.

7        Q    So on the 22nd we know Shaquan Roberts'

8    cell phone is able to be cross-referenced by Allegheny

9    County police linking him to one of the suspect phone

10   numbers.  Right?

11           MR. BIONDO:  Object to form.  Answer, if

12       you can.

13       A    Robert Thomas' phone.  Yes.

14       Q    We know Detective Hoffman believes that

15   Shaquan Roberts is a witness.  Right?

16       A    We don't know that.  I am just telling you

17   that from the way he is interviewing him.

18       Q    It appears as though.

19       A    Correct.

20       Q    Have you identified any reasons that this

21   evidence pertaining to Shaquan Roberts should have

22   been kept out of the Wilkinsburg massacre homicide

23   file?

24       A    I can't answer that.

25       Q    Are you able to rule out the possibility

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

111

1    that Detective Hoffman, who sees police and gangs as

2    similar, didn't do something underhanded, when it

3    comes to Shaquan Roberts and this evidence?

4          MR. BIONDO:  Objection to form.  Answer, if

5       you can.

6    A    Are you insinuating Detective Hoffman did

7    underhandedly?

8    Q    I am asking if you can rule out the

9    possibility he did something inappropriate when it

10   came to this evidence?

11         MR. BIONDO:  Object to form.  Go ahead and

12      answer.

13   A    If the interview and the reports didn't

14   make itself to the Wilkinsburg 6 case, I can't speak

15   to why.  Whether they made a decision to file it in

16   another case, I can't speak to that.

17   Q    Would that be inappropriate?

18   A    I don't know inappropriate.  I think it

19   should have made its way there.  I don't know if there

20   was a reason why, like it was accidental, or they made

21   a case with Shaquan and never cross-referenced the

22   case.  I don't know.

23   Q    You also know that in April, that a contact

24   from Shaquan Roberts' phone was placed by Detective

25   Miller in sworn affidavits as well as in his

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

112

1    preliminary hearing testimony in July 2016.  Right?

2         A    For Millhouze.

3         Q    Right.

4         A    Correct.

5         Q    It came from Shaquan Roberts' cell phone.

6    Right?

7         A    If you are representing all of the other

8    cell phone data dumps and everything that didn't

9    represent Millhouze, I would say Millhouze came from

10   Shaquan Roberts' cell phone.

11        Q    It is fair to say, based on your knowledge

12   that you have been provided with thus far, and your

13   familiarity with the case, that the only Shaquan

14   Roberts evidence that ever made it into the

15   Wilkinsburg massacre investigation was the single cell

16   phone contact identified as Millhouze?

17             MR. BIONDO:  Object to form.  Go ahead and

18        answer, if you can.

19        A    That is what was represented.

20             Yes.

21        Q    I think that might be it from me.  Let me

22   verify.

23             I appreciate your time.

24             That is it for me.

25        A    Okay.

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

113

```
 1                    EXAMINATION
 2   BY MR. PETRUNYA:
 3       Q     My co-counsel asked whether actions were
 4   appropriate or inappropriate.  But let's use a
 5   different phrase.  Would withholding evidence
 6   from a criminal file be considered illegal?
 7       A     Withholding evidence from a criminal file?
 8             MR. BIONDO:  I will object.  Go ahead.
 9       A     So I think it goes to intention, if that is
10   what we are speaking of.  If something wasn't intended
11   to be -- like it was intended to make its way to the
12   file and it never did, then I would say no, it is not
13   illegal.  I would say it is probably some sort of
14   error.
15             If you are telling me -- if you are asking
16   me hypothetically if intentionally somebody left
17   evidence out of a file, I would say yes.
18       Q     One thing you talked about at the beginning
19   was the difference between investigating narcotics and
20   homicide.  I think you used the phrase in homicide
21   cases everything is placed on the table.  Did you say
22   that?
23       A     Yes.
24       Q     You would agree with me there are rules of
25   criminal procedure for investigations and turning over
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

114

1    evidence, right?

2        A    I can agree.

3        Q    Those rules of criminal procedure are

4    grounded in the rights that everyone shares from the

5    United States Constitution, right?

6            MR. BIONDO:  Objection to form.  Answer, if

7        you can.

8        A    Yes.

9        Q    You would agree with me if someone does not

10   know about a piece of evidence, or it is not in a

11   file, they don't know to investigate it?

12       A    If the existence of it is not known, then

13   yes, you are accurate.

14       Q    So having heard the interview with Shaquan

15   Roberts in this case, do you agree there is

16   information he is providing recorded relative to the

17   Wilkinsburg massacre?

18       A    Relative to the investigation, yes.

19       Q    Would this be considered, in your mind, a

20   card that should be placed on the table?

21           MR. BIONDO:  Object to form.  Go ahead.

22       A    Shaquan Roberts, like I said, just

23   listening to the interview and not listening to the

24   entire thing obviously, seemed to be forthcoming.  I

25   would say yes, that information is definitely

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

1    valuable.  He is providing information on people for

2    Hill Top, up at Hill Top.

3         Q     Is it also a requirement based upon your

4    understanding of the rules of criminal procedure and

5    how investigations are supposed to take place, this

6    evidence has to be disclosed and turned over so people

7    accused of crimes have the opportunity to investigate

8    this evidence?

9             MR. BIONDO:  Object to form.  Go ahead.

10        A     Yes.

11        Q     Do you agree with me, I think you used this

12   before, investigations and trials is a search for

13   truth.  Right?

14        A     Yes.

15        Q     And you worked in law enforcement how long?

16        A     31 years.

17        Q     From your demeanor, is it fair to say you

18   are proud of the work you do?

19        A     I am.

20        Q     Do you think law enforcement serves an

21   important function in the judicial system?

22        A     I do.

23        Q     Would you agree with me any actions of law

24   enforcement that undermine the sanctity of that

25   process serve to sow distrust with the public and law

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

116

1    enforcement?

2              MR. BIONDO:  Object to form.  Go ahead.

3       A    Yes.  I agree with that statement.

4       Q    You agree with me in conducting

5    investigations and procuring evidence, you want to be

6    thorough.  Correct?

7       A    Correct.

8       Q    When a murder takes place, you agree with

9    me as a detective there is no time frame or statute of

10   limitations that you have to press charges against

11   someone.  Correct?

12      A    If a case isn't solved.  Obviously there is

13   no statute of limitations on homicide.  So the case

14   remains active.

15      Q    The goal is make sure you investigate leads

16   and obtain all the information as part of the

17   investigation?

18      A    Correct.

19      Q    It's important in the search for the truth.

20   Correct?

21      A    It is.

22      Q    It is also important to maintain the

23   public's trust in law enforcement in the process of

24   investigation, correct?

25      A    It is.

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

117

```
 1       Q     Is this the first time you have been
 2  deposed in a cases where individuals in civil court
 3  are claiming malicious prosecution?
 4       A     Yes.
 5       Q     Is this the first time, also, you have
 6  given a deposition in a case where an alleged
 7  conspiracy of an individual's civil rights has taken
 8  place?
 9       A     Yes.
10       Q     Are you aware of the fact you were named as
11  a defendant in this case, when the complaint was
12  originally filed?
13       A     Was I aware?  You are asking if I was aware
14  if I was named?
15       Q     Yes.
16       A     I believe I was served notice.  Yes.
17       Q     You are aware, as you sit here today, you
18  are no longer a named defendant in the case.  Correct?
19       A     To my understanding.
20       Q     When you received notice about the lawsuit,
21  what was your understanding of why you would have been
22  named in this case?
23       A     Initially, I believe I wasn't exactly sure.
24  Then I believe I was informed it was over the Kendall
25  Mikell witness relocation.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

118

```
 1        Q     Who have you talked to throughout the time
 2   that this litigation has been going on about this
 3   process, if anyone?
 4        A     About this?
 5        Q     Sure.
 6        A     I haven't talked to anybody about it.
 7        Q     You haven't talked to any of the other
 8   detectives involved in the Wilkinsburg massacre about
 9   the investigation?
10        A     I mean, the days they had their
11   depositions, or just knowing they were being deposed
12   that day.  That was it.  Everybody had their own -- I
13   think given the six people that were named, six or
14   eight named originally, you kind of knew what their
15   functions were within the investigation.
16        Q     Today is April 12th, 2024.  Correct?
17        A     Yes.
18        Q     Wilkinsburg massacre took place March 9th,
19   2016.  Correct?
20        A     That's correct.
21        Q     If I indicated to you that March of 2024
22   was the first time anyone sitting on this side of the
23   table ever learned of the identity of Shaquan Roberts,
24   or the evidence that he provided in this case, would
25   you agree that's a problem?
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

```
 1              MR. BIONDO:  Objection to form.  Go ahead
 2      and answer.
 3      A     Yes.
 4      Q     Why?
 5      A     I mean, as far as information that Shaquan
 6      Roberts provided regarding the Millhouze phone number,
 7      I would say that his statements to Detective Hoffman
 8      and Detective Caruso at the time should have been
 9      turned over for discovery, even if Shaquan Roberts was
10      called as a witness in the case.
11      Q     I think you talked about -- my co-counsel
12      was asking about confidential witnesses, you said they
13      are treated as witnesses, we take their information.
14      Right.
15      A     Correct.
16      Q     You take the information, assess
17      credibility, you determine if you want to use it in
18      the case.  Right?
19      A     Well, I don't determine if I am going to
20      use it in a case.  I document it and submit it.  It is
21      up to the district -- like I said, in a homicide, if a
22      witness comes forward, and a witness wants to provide
23      me information, that witness has the understanding to
24      know they are going to be -- their name will be put in
25      this homicide file, if it is solved, or if it is
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

1    already solved.

2            If it is never solved, it will be

3    documented, and it may never be turned over for

4    discovery, because the case never gets solved.

5        Q    In a situation where a case -- at least you

6    think you solved it, and probable cause is -- and

7    charges are filed, you want to turn that evidence over

8    to the DA's office, correct?

9        A    Yes.

10       Q    It doesn't platfert person is in jail or

11   not in jail, if they offer information related to the

12   investigation, that should go in the file.  Right?

13       A    Correct.

14       Q    We had the chance to talk to Detective

15   McCue yesterday.  I want to make sure the process that

16   you all were going through in 2016 is accurate.

17           When you perform a task on a case, you

18   would then -- or ideally generate a report about that

19   task.  Correct?

20       A    I think it depends on the task.

21           If you are told to go out and do

22   surveillance, if you are going out to do an interview,

23   you will document the interview of that person.  Yes.

24       Q    What about if you are following up on a

25   lead that you have about either a suspect or

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

121

1    information about a motive?

2        A    I would think the information, if you talk

3    to somebody that corroborates that information, it

4    should be documented.

5        Q    If you do a task that is worthy of

6    documenting, you type up the report, you print it out.

7    Correct?

8        A    Correct.

9        Q    You then put that report, print it out on a

10   folder or receptacle that is reviewed by the

11   supervisor.  Correct?

12       A    It goes into the sergeant's bin.

13       Q    After the sergeant reviews that and signs

14   off, it is given to the secretary for filing.

15   Correct?

16       A    That's correct.

17       Q    The secretary has no discretion about where

18   something gets filed.  Correct?

19       A    What do you mean she has no discretion?

20       Q    If there is an identifier with a piece of

21   evidence associated with an open case, when that

22   document hits the secretary's desk for filing, the

23   secretary is to put that in the corresponding file.

24   Correct?

25       A    Yes.  It goes with whatever case number,

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

1    victim's name that would go under.

2        Q    The trust is that when that information is

3    put in the sergeant's bin, given to the secretary, if

4    you did it, it's going to be in the file?

5        A    Should be.  Yes.

6        Q    So if you had to pull a file or document

7    from a case you worked on three, four, five years ago,

8    you would start by going to that case file to find

9    that information.  Right?

10       A    Yes.

11       Q    If that information was not in the case

12   file, what would you do?

13       A    If I knew where the information came from?

14       Q    Yes.

15       A    I'm not sure I understand your question.

16            If you are saying I went to a specific file

17   looking for something that wasn't there?

18       Q    Yes.

19       A    So we have a report management system.

20   Then you would just look in that area to see if the

21   report is there, or if it is not.

22       Q    Let me ask it this way.

23            You have interviewed a witness in a case

24   two, three, four, five years ago.  You have written a

25   report.  You know there is an interview that was

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

```
 1    conducted.

 2         A    Okay.

 3         Q    So you generated the report.  It's gone in

 4    the bin.  It was in the file.  You are now looking for

 5    that evidence.

 6         A    Okay.

 7         Q    You go to the file where you believe the

 8    evidence should exist.  You don't find it.

 9         A    Okay.

10         Q    What do you do?

11         A    When you say the evidence, you mean a copy

12    of the report?

13         Q    The evidence that you know you did, that

14    should be in that file.

15         A    If I did an interview report, I authored

16    it, I handed it in, I am assuming that it made its way

17    to the case file.  I have no reason to believe it

18    didn't.

19         Q    Correct.

20         A    I go there and it is not there?

21         Q    Correct.

22         A    I assume if it's a case that has been

23    charged, turned over for discovery, I would think I

24    would notify the DA.

25              If you are asking me if it is a case not
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

124

1    solved, I would print out another report and make sure

2    it's in the file, because there hasn't been any

3    arrests.  I know you are saying hypothetically if

4    there is an arrest in the case.

5        Q    What if there was an arrest, one person was

6    dismissed, one was acquitted, you noticed evidence was

7    not in the file that should be there.  What would you

8    do?

9        A    Turn it over to the District Attorney's

10   Office.

11       Q    But what if the District Attorney's Office

12   doesn't have a case they are working on, meaning

13   charges were dismissed, and someone was acquitted?

14       A    If charges are dismissed, that means the

15   case is still active.  Just because someone is

16   acquitted doesn't mean the case isn't still active or

17   open.

18       Q    So then are you telling me that if you

19   notice a piece of evidence wasn't in the file, but the

20   case was still active, you would make a copy and add

21   it to the file or back in?

22       A    I would say that could be a working theory.

23   Yes.

24       Q    Is there a process that you have -- would

25   you start by questioning why the evidence wasn't in

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

1　the file?

2　　　A　　Would I?

3　　　Q　　Are there policies you have at Allegheny

4　County, if this happens?

5　　　A　　There is supervisors that are in charge of

6　our unit.  But obviously our supervisors have changed

7　from 2016 until now.  I think the course of action, if

8　we are discussing the Shaquan Roberts' interview, it

9　should have been in the Cheron Shelton or the

10　Wilkinsburg 6 case file.

11　　　Q　　What I am saying, sitting here today, you

12　Detective Kinavey, if you went to the file and noticed

13　a piece of evidence you believe should have been in

14　there and wasn't in there, what do you do with that?

15　Do you report that to a supervisor, and make sure that

16　evidence gets added to the file so we can figure out

17　why it wasn't in there?

18　　　A　　If it hasn't already been done, I would say

19　yes.

20　　　Q　　If you know a case has already been

21　charged, but that evidence wasn't in the initial

22　criminal file, do you report it to the supervisor so

23　that error is noted?

24　　　A　　If it has already been charged, it goes to

25　the District Attorney's Office.

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

126

1      Q      What if the District Attorney's Office
2    doesn't have it?
3      A      You provide them with it.
4      Q      What if it's an active file the District
5    Attorney is not working on?
6      A      If it's an open homicide case, it would
7    still be an active case, just like our cases would
8    still be active.
9      Q      Is there a mechanism you have in place for
10   reporting, so you can understand why a piece of
11   evidence was not put in the file and didn't make its
12   way over to the DA's office?
13           MR. BIONDO:  I will object.  I don't
14       understand what you are asking.
15     Q      Let me get to the point.
16           This Shaquan Roberts evidence should have
17   been in the Wilkinsburg massacre file, correct?
18     A      It should have been.
19     Q      The cell phone report for Shaquan Roberts
20   has as the identifying case Wilkinsburg shooting,
21   correct?
22     A      On the face sheet of the extraction report.
23   Yes.
24     Q      What that tells you is the corresponding
25   file for that should be the Wilkinsburg massacre or

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

```
 1   Wilkinsburg six as you call it?

 2        A     It should have made it into the Wilkinsburg

 3   file.  Yes.

 4        Q     What I am asking you, at Allegheny County,

 5   either you can specifically answer this or someone

 6   can, what mechanism is in place to right the wrong

 7   that this evidence was not in the case file and was

 8   not turned over to the District Attorney's Office in

 9   2016 when charges were brought?

10              MR. BIONDO:  Objection to form.  Answer, if

11        you can.

12        A     Other than the report managing system and

13   the immediate supervisors.  I don't know how else to

14   answer.

15        Q     So you can't go back and uncharge Robert

16   Thomas and Cheron Shelton for the Wilkinsburg

17   massacre.  Right?

18        A     Uncharge them?

19        Q     Sure.

20        A     No.  They were charged.

21        Q     You would agree, though, evidence not being

22   turned over to people that are criminal defendants in

23   a matter runs afoul of the rules of criminal

24   procedure.  Correct?

25              MR. BIONDO:  Objection to form.  Go ahead
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

1        and answer.

2        A     I think obviously if it is exculpatory.

3    But as far as you are talking about specifically the

4    Shaquan Roberts stuff being turned over.

5            Are you asking me if it should be -- should

6    have been documented?

7        Q     I am trying to figure out what mechanism

8    Allegheny County has, if any, to make something that

9    we can admit should have been in a file right eight

10   years later.

11           MR. BIONDO:  Objection to form.  Answer, if

12       you can.

13       A     If you are asking -- I think the only way

14   you can right it is if you are saying how do you find

15   out it doesn't go in there.  The checks and balances

16   in place are the report is completed, it goes to the

17   sergeant who approves it, who goes to the district

18   commander, that assigns it to the secretary, that

19   makes its way into the file.

20           Those are the ramifications of our unit.

21   Those are how the paperwork and reporting process is

22   completed.

23       Q     If Detective Hitchings went to Wilkinsburg

24   massacre file in March 2024 looking for an interview

25   and report that was not in there, which should have

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

1    been, is there procedure in place for Hitchings, or

2    whoever in your department realizes this, to either

3    put that back in the file or provide notice to someone

4    at Allegheny County?

5          A      Put what back in the file?

6          Q      The evidence which should be in the file.

7          A      What I am saying, you are saying he goes to

8    the Wilkinsburg file, it is not there, Shaquan Roberts

9    is not there.

10         Q      Sitting here today, do you have any

11   understanding how we obtained information about

12   Shaquan Roberts?

13         A      Just from what you told me, from Detective

14   Hitchings.

15         Q      If I told you Detective Hitchings found the

16   Shaquan Roberts interview, cell report, and that

17   written report Mr. Jubas showed you in a miscellaneous

18   folder, you would agree with me that is not the

19   Wilkinsburg massacre folder.  Right?

20         A      If it's in a miscellaneous folder, like a

21   miscellaneous file folder?

22         Q      Yes.

23         A      Then it's not the Wilkinsburg folder.  If

24   you are representing that is what Detective Hitchings

25   told you.  I would agree with that.

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

```
 1        Q      That is what he told us.

 2               Again, what I am saying, in Allegheny

 3   County, when you recognize evidence which should have

 4   been in the file is not there, what are the rules,

 5   policies, process that you have to either ensure that

 6   evidence makes its way in the file, or to identify

 7   that evidence wasn't in there but should have been?

 8        A      I think you just take the reports and

 9   cross-reference them into the pertinent case file.

10        Q      Does it change whether charges had already

11   been filed in a case or not?

12        A      I would say no.

13        Q      If a case is still active, you can still go

14   back and put that evidence in?

15        A      Correct.

16        Q      There is absolutely nothing that would stop

17   detectives from taking that evidence, which is not in

18   the file, but put back in, and following up on that.

19   Correct?

20        A      Are we talking about the Shaquan Roberts --

21        Q      Sure.

22        A      It could be cross-referenced and put into

23   the Wilkinsburg file.

24        Q      Is the Wilkinsburg massacre file still

25   active?
```

**Johnstown - Erie - Pittsburgh - Greensburg**
**866-565-1929**

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

1      A      It is considered unsolved.  Because there

2   is a co-conspirator that hasn't been identified.

3   There was somebody that was charged.  Charges were

4   dismissed.  Robert Thomas.

5      Q      We started this by asking you if you

6   believed there was probable cause for Cheron and

7   Robert to be arrested for the Wilkinsburg massacre,

8   correct?

9      A      Yes.

10      Q      You indicated it was still your belief that

11   yes, they should have been charged?

12      A      I do.

13      Q      There was a witness that alleges to have

14   interacted with Robert Thomas at Allegheny County jail

15   by the name of Kendall Mikell.  Correct?

16      A      Correct.

17      Q      You knew Kendall Mikell prior to him

18   providing information in the Wilkinsburg massacre.

19   Right?

20      A      Well, I wouldn't say I knew him.  We

21   conducted an interview with him at the Allegheny

22   County jail in 2014.

23      Q      So you were aware that he had been a

24   cooperating witness or provided information on another

25   case prior to him coming in to provide information on

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

132

1    the Wilkinsburg massacre?

2        A    I mean, I had a documented interview with

3    him.  Yes.

4        Q    Were you aware of the fact your partner at

5    the time was one of the participants in the interview

6    of Kendall Mikell?

7        A    Yes.  Detective Grill and Foley interviewed

8    Kendall Mikell.

9        Q    Is there any reason you didn't participate

10   in the interview?

11       A    I was probably busy doing something else.

12       Q    When do you remember learning Kendall

13   Mikell was not going to be used as a witness in the

14   Wilkinsburg massacre?

15       A    It was probably somewhere around the time

16   that we provided him assistance in West Virginia, once

17   he was released from federal custody.

18       Q    Are you referring to the 1,700 dollars that

19   you Western Union'd to him at Walmart in West

20   Virginia?

21       A    Yes.  I think it was 1,740 was for two

22   months rent and security deposit.

23       Q    How did you get that information about the

24   money?

25       A    What do you mean how did I get information

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

133

1    about the money?

2        Q    How did you know what figure to send to

3    Kendall Mikell by Western Union?

4        A    He provided me what the rent would be.

5        Q    How did he provide it to you?

6        A    Over the phone.

7        Q    Was there a requirement for you to get some

8    type of documented reporting or documentation of this

9    amount?

10       A    No.

11       Q    Under your policies and procedures or

12   rules, there was no requirement for you to have a

13   conversation with his landlord, or document any

14   receipts to show that money was going to what he said

15   it was going to?

16       A    In fact, I would never talk to the

17   landlord.  That would undermine the precept of being

18   in witness relocation.  If someone is claiming they

19   are in jeopardy, I would never as a detective go talk

20   to the landlord and let the landlord know we are

21   putting somebody into his complex or their apartment.

22   We stay out of -- it's not a witness protection.  It's

23   a witness relocation.

24            It provides witnesses with assistance, if

25   they need to be relocated from a danger area.  To give

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

1    them opportunity to live, if possible.

2        Q    What was the danger Kendall was

3    experiencing at the time this money was provided to

4    him?

5        A    He had reached out to his federal parole

6    officer and expressed his life was in danger, because

7    he was a witness in the Wilkinsburg six case, and if

8    he came back to Allegheny County in general, that he

9    would likely not survive.

10            I think he was on state parole at the time.

11   Federal probation reached out to us to try and make

12   sure, because he said he was a cooperator in that

13   case.

14       Q    When you have a cooperating witness working

15   with you in any type of investigation, do you take

16   threats levied against them seriously?

17       A    If they provide true evidence like a

18   Facebook threat or something like that, I would say

19   yes.

20       Q    What evidence do you recall Kendall

21   providing you in this case that corroborated the idea

22   his life was in jeopardy, if he came back to Allegheny

23   County?

24       A    Basically he told us people were looking to

25   kill him, because he was cooperating in the

```
 1   investigation.
 2        Q     What people exactly?
 3        A     He wouldn't speak specifics.  He didn't
 4   want to name anybody.  He just said "If I come back to
 5   Allegheny County, I will be killed."
 6        Q     Did he say it was people from Hill Top?
 7        A     I don't think he made reference to anybody
 8   specific from Hill Top.  But in that area, because he
 9   was cooperating against Cheron Shelton and Rob Thomas.
10   They were initially from that area.  Anybody from the
11   Homewood area I think was his concern.  At least at
12   the time.
13        Q     He was in West Virginia at the time you
14   wired the money to him.  Right?
15        A     He was released from a correctional
16   facility, federal correctional facility in West
17   Virginia, I believe.  I think he stayed in a halfway
18   house.  I think he was being released from a halfway
19   house.  That is when he reached out to federal
20   probation, because he couldn't come back to Allegheny
21   County for fear of retaliation.
22        Q     Did you have any issues obtaining these
23   funds for Mr. Mikell?
24        A     Did I have any issues?
25        Q     Sure.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

136

```
 1      A     I had to request the same channel I go

 2   through when we request any kind of money in witness

 3   relocation.

 4             This specifically, because Kendall Mikell

 5   had been arrested, while he was previously put in with

 6   the Pennsylvania State Attorney General's office, he

 7   was removed from their -- any kind of funding for

 8   their witness relocation.

 9             That was extended.  I explained that to

10   Mr. Chernosky.  And explained to Mr. Chernosky the

11   situation that Kendall Mikell being released and felt

12   threatened coming back and felt his life was in

13   danger.

14             So I asked him to authorize the payment for

15   rent so he could stay in West Virginia and be safe

16   down there.

17      Q     Was it your understanding, at the time you

18   provided these funds to Mr. Mikell, he was going to be

19   testifying as a witness in the Wilkinsburg massacre?

20      A     I don't know.  At that point I think deputy

21   District Attorney Chernosky hadn't made a decision on

22   whether he was going to use Kendall Mikell as a

23   witness.

24      Q     To your knowledge he was possibly a witness

25   that needed protected still?
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

137

```
 1      A     He was a witness no matter what.  There was

 2   documentation of his interviews and information he

 3   provided.  Whether they chose to use him or not, he

 4   was still a witness.  He still is afforded the right

 5   if he is a witness, and he feels threatened and says

 6   his life is in danger, we have to take course of

 7   action to at least give him assistance to relocation.

 8      Q     Did you read, or were you kept abreast of

 9   the fact that Mr. Mikell spoke to reporters in

10   Pittsburgh right before the Wilkinsburg massacre

11   trial?

12      A     I think he gave an interview, on camera

13   interview.

14      Q     Did you have thoughts or feelings about the

15   information he provided in that interview, or the fact

16   he was talking to reporters?

17      A     I mean, that the point I don't think I

18   watched the interview.  But I didn't have a thought on

19   it either way.

20      Q     Did you review any of the information

21   Mr. Mikell provided relative to the Wilkinsburg

22   massacre in this case?

23      A     No.

24      Q     Did you review the criminal complaint?

25      A     I did.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

138

1      Q     You reviewed the criminal complaint in

2    preparation for today's deposition as well?

3      A     I never reviewed his interview.  The

4    affidavit of probable cause, I know I think he was

5    witness No. 1, I believe.  I'm not sure.

6      Q     Do you know who witness No. 2 was?

7      A     I don't.  It might have been -- I don't.  I

8    think it was Freddy Collins.  But I'm not 100% sure.

9      Q     You know Freddy?

10     A     I know who he is.

11     Q     How do you know him?

12     A     Just from this case.  His being a witness

13   at some point.

14     Q     Did you know Mr. Collins to be someone that

15   frequently called Allegheny County to offer

16   information on other cases as well?

17     A     I don't remember if he was or he wasn't.

18     Q     Is that something you, as a detective,

19   would take into account when you are evaluating the

20   information the person provides to you?

21     A     Like if they are constantly providing

22   information?

23     Q     Yes.

24     A     I mean, I would say yes, if they are

25   constantly providing information.

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

139

```
 1      Q     Or constantly looking for opportunities to
 2  get a lighter sentence, or get out of prison?
 3      A     Yes.  Regardless of whether -- what
 4  angle -- what the angle is, if they are providing
 5  information, you still have to document it.  You still
 6  have to provide it.  You can't pick and choose.  If
 7  you bring him in, and you talk to him, and he gives
 8  you information, you have to document it.
 9      Q     Now, did you talk to your partner Grill
10  before he went in to interview Kendall?
11      A     I didn't even know they were interviewing
12  him.
13      Q     Is it that you -- is that something your
14  department would be briefed on, as far as the day
15  these people are coming in?
16      A     What do you mean we would have been briefed
17  on?
18      Q     For instance, if the detectives know
19  witnesses are coming in to provide information related
20  to the Wilkinsburg massacre, is that something you
21  would go over in your daily briefings?
22      A     I would think if it is scheduled.  But I
23  don't know that Kendall Mikell was scheduled.
24      Q     What about Freddy Collins, do you know
25  about that?
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

```
 1       A      No.

 2       Q      When you say something is scheduled, how

 3   does that work?

 4       A      If I am scheduling to interview somebody

 5   that is in custody, I have to get a court order to get

 6   them out.  You would know it is scheduled at 2:00

 7   o'clock, we will get him out of jail at 2:00 o'clock

 8   and bring him to headquarters, and we will interview

 9   him at 2:00 o'clock.

10       Q      Did you have any involvement in the

11   Wilkinsburg massacre trial?

12       A      In the trial?  Yes, I did testify.

13       Q      What did you testify about?

14       A      I think it was in regards to the camera

15   that was placed in the interview room with Cheron

16   Shelton.

17       Q      Was that at the actual trial?  Or was that

18   a pretrial?

19       A      I think -- when I say testified, I think I

20   introduced the video.  That was it.  If I remember

21   correctly.

22       Q      If I told you that you did not testify in

23   the Wilkinsburg massacre trial, do you have any reason

24   to dispute that?

25       A      Cheron Shelton?
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

```
 1      Q     Yes.

 2      A     I mean, I did think I testified about --

 3   maybe it was we went through a pretrial conference.  I

 4   thought we introduced the video we collected with his

 5   father.

 6      Q     Did you have any involvement with a lip

 7   reader that was hired or provided by the FBI to try to

 8   read or decipher what Cheron is saying to his dad?

 9      A     There was nobody provided by the FBI.

10   Lieutenant Sherman scheduled a lip reader I think from

11   the school of the deaf.  There was another detective

12   filming.  The lip reader was just going to watch what

13   we recorded from the jail.

14            He asked me to sit in.

15      Q     There was cooperation assistance offered to

16   your department related to the Wilkinsburg massacre

17   from City of Pittsburgh and the FBI and ATF throughout

18   the investigation.  Correct?

19      A     Yes.

20            MR. BIONDO:  Object to form.  Go ahead.

21      A     Yes.  Whether we requested it or they

22   offered it.  There was I think ATF provided intel

23   analysts.

24      Q     That is a valuable resource you can use

25   especially when dealing with homicide and ballistics,
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

142

1    right?

2         A    Yes.

3         Q    Part of your responsibility investigating

4    cases is to follow leads, and follow where the

5    evidence leads you, correct?

6         A    Correct.

7         Q    Do you know if all of the possible leads

8    for the Wilkinsburg massacre were followed up or

9    investigated by your department?

10        A    I would say it was my understanding they

11   were, yes.

12        Q    Were you aware of the fact the FBI provided

13   information to Detective Dolfi that the Wilkinsburg

14   massacre may have been retaliation against Lamont

15   Powell for a double homicide he committed several

16   months before where he robbed a drug dealer of 95,000

17   dollars cash and stole two bricks of heroin?  Two drug

18   dealers.

19             MR. BIONDO:  Object to form.  Go ahead.

20        A    I don't know that the FBI provided that

21   information.

22        Q    If there was an FBI memo in the criminal

23   file indicated that information was provided to

24   Officer Dolfi, would you expect that information to be

25   followed up on?

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

143

```
 1      A      And it was that Lamont Powell was targeted

 2   because of -- I'm sorry, for what?

 3      Q      That a couple months before the Wilkinsburg

 4   massacre Lamont Powell perpetrated a double homicide

 5   against drug dealers where he stole two bricks of

 6   heroin and 95,000 dollars cash from them.

 7      A      I would think that would be followed up on.

 8      Q      Is that a lead you would want to follow up

 9   a document?

10      A      If possible, if you have the pertinent

11   information, where the double homicide happened.  You

12   know who the investigators are.

13      Q      If it happened in City of Pittsburgh, would

14   you reach out to Pittsburgh to ask if there was a

15   double homicide, or would you look at a database to

16   see if there had been a double homicide a couple

17   months before?

18      A      The database, we don't share database with

19   City of Pittsburgh.  But you can -- you would call

20   over and talk to somebody in homicide with the city.

21      Q      Could you also just Google it to see if

22   there was a double homicide?

23      A      Yes.  You could do that.

24      Q      Would that be good practice?

25      A      It could be.  If it is reported on and you
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

144

1    know the exact time frame.  If you Google something

2    that isn't within the time frame, you don't know what

3    you will get to pop up.

4         Q    Let me ask this.  It is April 2024.

5    Correct?

6         A    Uh-huh.  Yes.

7         Q    Is today the first day you are learning the

8    FBI provided information about a possible double

9    homicide that Lamont Powell was involved in months

10   before the Wilkinsburg massacre?

11        A    I don't know that I am just learning that.

12   I don't know that I was told that eight years ago and

13   I just don't remember that I was told that.  But I

14   don't remember investigating anything regarding that.

15        Q    Okay.  So if that information was provided

16   to Allegheny County, you would agree with me that is a

17   lead that should be investigated?

18        A    I think it should be looked into.

19        Q    What about if that same information was

20   provided by another witness who had come forward in

21   the Wilkinsburg massacre voluntarily?

22        A    The person would be interviewed and

23   followed up on.

24        Q    One of the pieces of evidence or pieces of

25   information that Allegheny County used to develop its

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

1    motive theory in this case was this idea that Lamont

2    Powell was being targeted for retribution for the

3    Calvin Doswell case.  Correct?

4         A    I think that was the early on motive.  Yes.

5         Q    Do you have any reason to believe that

6    motive changed before criminal charges were filed

7    against Cheron Shelton and Robert Thomas?

8         A    I don't.

9         Q    If that was in the affidavit of probable

10   cause, does that tell you that is one of the pieces of

11   evidence that provide a motive?

12        A    Regarding Calvin Doswell?

13        Q    Yes.

14        A    Yes.

15        Q    So the Doswell murder occurred in 2013.

16   Right?

17        A    Yes.  I believe it was a couple years

18   before the Wilkinsburg case.

19        Q    So did you investigate at all, personally

20   in the Wilkinsburg massacre, Calvin Doswell's killing?

21        A    I did not.

22        Q    Would it be commonplace in the practice of

23   detectives at Allegheny County to talk to the

24   detectives where that murder happened and request file

25   information?

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

1     A     Yes.  I think they did in the Doswell case.
2  I think they talked to one of the city detectives that
3  provided information.
4     Q     Do you know if the city provided the
5  investigation file?
6     A     I don't know that.
7     Q     If I told you the city did provide the
8  investigation file, do you have any reason to doubt
9  that?
10    A     If they did.  I don't know.
11    Q     Would it surprise you to learn, in all of
12  the documents related to Calvin Doswell in the
13  criminal investigation file for the Wilkinsburg
14  massacre, Lamont Powell's name does not appear once?
15    A     I don't know how to answer that.  I don't
16  know.
17    Q     If I am telling you it doesn't appear
18  there, would it surprise you based upon how the
19  Doswell murder was used in charging Robert Thomas and
20  Cheron Shelton?
21    A     That Lamont Powell doesn't show up in the
22  Calvin Doswell homicide case at all?
23    Q     Correct.
24    A     Well, the information I think was provided
25  by detective from the city.  Yes.

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

```
 1      A     So I don't know why it wouldn't be in the

 2   file.

 3      Q     If it is not, it would surprise you?

 4            MR. BIONDO:  Object to form.  Answer, if

 5      you can.

 6      A     I don't know why it wouldn't be in their

 7   file.  It has to come from somewhere.

 8      Q     If it isn't the actual file, it has to come

 9   from another source.  Right?

10      A     If there is a city detective that says

11   Lamont Powell was involved with Calvin Doswell murder,

12   and it's an unsolved murder, I don't know if they just

13   didn't have -- they had other information like family

14   members telling them it was Lamont Powell, so that was

15   their suspect, I don't know.  I don't know how to

16   answer.

17      Q     You are involved in a homicide trial going

18   on right now.  Correct?

19      A     I am.

20      Q     And in reading the Trib Live article, are

21   you the lead detective on that case?

22      A     I am not.

23      Q     Have you been present in the courtroom for

24   the trial?

25      A     No.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

```
 1      Q      Were you present when the defense attorney
 2   for --
 3             MR. BIONDO:  I don't know if he is allowed
 4      to hear what you are going to ask.  I am sure he
 5      is being sequestered.  That is the only --
 6      Q      Are you sequestered in that case?
 7      A      Yes.
 8      Q      Then you wouldn't have been present for
 9   opening statement?
10      A      I was not.
11      Q      Okay.  I won't ask the question.
12             MR. BIONDO:  Thank you.
13      Q      I'm glad we caught that.
14             Have you ever heard of reference to a term
15   or phrase called tunnel vision in investigations?
16      A      I am familiar with it.
17      Q      Is it important to avoid tunnel vision
18   investigating homicides?
19      A      I think so, yes.
20      Q      It is important to avoid tunnel vision,
21   because if you have tunnel vision, sometimes you will
22   bend the evidence to fit the narrative you are trying
23   to tell.  Right?
24      A      No.  I don't agree.
25      Q      Why is it important to avoid tunnel vision?
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

149

1        A     Just because if you are staying on one

2    arrow -- you want to be able to branch out, and if you

3    are correct, it will bring you back to where it is.

4    There is no need to bend or anything like that.

5              The information that you get, that you

6    obtain during your investigation, will bring you back

7    to where you initially start anyway.

8        Q     In order to get to that point, you have to

9    investigate leads and sources you obtain through an

10   investigation.  Right?

11       A     Correct.

12       Q     Is it possible that a former City of

13   Pittsburgh homicide detective provided your department

14   with the theory that Lamont Powell committed the

15   Calvin Doswell murder?

16       A     I don't know that.

17       Q     Detective Hoffman was working for City of

18   Pittsburgh up until 2014.  Right?

19       A     I don't know when he was hired.  He retired

20   as a sergeant with the city.  I don't think he was a

21   detective when he retired in the city.  He might have

22   come over -- I'm not sure when he got hired.

23       Q     If he was in the City of Pittsburgh in

24   2013, it is possible he may have investigated the

25   Doswell murder.  Right?

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

```
 1      A      I don't think he was in homicide at the
 2  time.
 3      Q      What if he was?
 4      A      Then yes.  He could have been.
 5      Q      Did you have any conversations with anyone
 6  in your department or anyone at the homicide office
 7  about what happened in this investigation that led to
 8  one dismissal and one acquit signal?
 9      A      I don't think we ever had conversation
10  about that.
11      Q      Why not?
12      A      Regarding the trial?
13      Q      Regarding what happened with the
14  investigation and the outcome.
15      A      We discussed why I believe -- it was a
16  decision made by the District Attorney's Office to
17  withdraw I believe on Robert -- I think they had a
18  habeas hearing, and the judge dismissed against Rob
19  Thomas.
20      Q      That's right.
21      A      But that was at the point where I believe
22  Mr. Chernosky wasn't going to use some of the
23  witnesses.  I mean, as far as a jury trial goes,
24  regardless, you could present the best case in front
25  of a jury, and the outcome -- like, I could believe
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

 1   what the outcome is going to be.  But 12 people might

 2   see it different.

 3        Q    Do you think the jury got it wrong with

 4   Cheron Shelton?

 5        A    I do.

 6        Q    Why?

 7        A    Given the information, I believe Cheron

 8   Shelton was responsible.

 9        Q    Do you feel, or have you heard or had

10   conversation with anyone that you weren't getting

11   appropriate assistance from the community in the

12   claims, or in providing evidence?

13             MR. BIONDO:  Object to form.  Go ahead and

14        answer, if you can.

15        A    No.  I had no discussions with anybody

16   about that.

17        Q    Have you ever found it to be a barrier to

18   investigating cases when people from the community

19   don't come forward or stay mum on something?

20        A    It happens, yes.

21        Q    Those would be situations where people

22   don't consent to speaking to investigators.  Right?

23        A    They don't want to get involved, because

24   they live there.

25        Q    They don't want to provide their cell phone

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

152

1  information, right?

2      A    They don't want to provide their names.

3      Q    They don't want to consent to searches of

4  their property.  Right?

5      A    I would say.

6      Q    Shaquan Roberts spoke to police and

7  consented to his cell phone being downloaded.  Right?

8      A    Correct.

9      Q    Are you aware that Ryan Gomez also came in

10  voluntarily to be interviewed by detectives related to

11  the Wilkinsburg massacre?

12      A    I don't remember if he came in voluntarily

13  or not.  Are you representing that?

14      Q    Sure.

15      A    Okay.  I don't remember him coming in

16  voluntarily.

17      Q    My co-counsel, he wound up showing you a

18  couple cell phone downloads from individuals

19  associated with the case.  Do you recall hearing from

20  anyone in your department, or anyone you interacted

21  with, that people were reluctant to come in to talk to

22  people or provide their cell phones?

23      A    I know that I don't think we had a lot of

24  cooperation right upfront at the beginning of the

25  investigation.

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

153

```
 1              Other than I think we received some
 2  cooperation from the neighborhood, the immediate area.
 3  From Franklin, from where the shooting happened.  To
 4  say that, I can't speak to that.
 5       Q    Well, one of the pieces of evidence that
 6  was obtained was from a Wilkinsburg police officer,
 7  Officer Adams.  Do you recall that?
 8       A    Yes.
 9       Q    Officer Adams saw Cheron walk calmly to a
10  white Lincoln and enter it shortly after the
11  Wilkinsburg homicide; is that correct?
12              MR. BIONDO:  Object to form.
13       A    Yes.
14       Q    You know that white Lincoln was searched?
15       A    Yes.
16       Q    You know that white Lincoln didn't yield
17  DNA evidence connecting him to the Wilkinsburg
18  massacre.  Right?
19       A    No usable DNA evidence, that's correct.
20       Q    So no evidence that could be used against
21  him to implicate him.  Right?
22       A    Yes.  That is my understanding.
23       Q    There is levels of the types of evidence
24  that you obtain in certain cases that you are
25  investigating.  Right?
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

154

```
 1        A       Levels of evidence?
 2        Q       More reliable as opposed to less reliable.
 3    Right?
 4        A       It depends on the type of evidence, whether
 5    it is a fingerprint, a ballistic or DNA.  Right.
 6        Q       Or eyewitness testimony?
 7        A       Okay.
 8        Q       Video evidence?
 9        A       Right.
10        Q       And then secondary evidence, thirdhand
11    evidence, that can be a little less reliable than
12    direct evidence you actually see.  Right?
13        A       Yes.
14        Q       You come up with an idea or theory of what
15    happened, and you take the evidence that you have, and
16    you try to piece it together.  Right?
17        A       I think your theory kind of comes from
18    where the evidence leads you.
19        Q       Part of the analysis that individuals may
20    have been responsible for perpetrating a crime is
21    looking at the totality of the circumstances involved
22    in the evidence that you are obtaining.  Right?
23        A       That's fair.
24        Q       If you have evidence or a lead on direct
25    evidence that you chase down or lead you to somewhere
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

1   else, your expectation would be it would be followed

2   up.  Right?

3        A     Yes.  I would think there would be no

4   reason not to.

5        Q     You are familiar with how ballistics

6   evidence works or is obtained in relation to

7   homicides?

8        A     I am.

9        Q     And you are familiar with the fact there is

10  a database that is maintained federally which can show

11  matches or hits that come up with ballistics that are

12  recovered.  Right?

13       A     Correct.

14       Q     Are you aware of the fact that the

15  ballistics evidence that was found at the scene of the

16  Wilkinsburg massacre from the AK47 was -- actually hit

17  on two other cases that were in the database?

18       A     Okay.

19       Q     Were you aware of that?

20       A     I don't know if I was or I wasn't.

21       Q     If that information was provided to

22  detectives at Allegheny County by the crime lab, is

23  that evidence you would expect to be followed up on?

24       A     I think it would depend when the hits were.

25  Are you talking about a NIBIN hit?

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

```
 1      Q     Yes.
 2      A     It would depends when those hits are in
 3  relation to the crime.
 4      Q     What about two years before?
 5      A     I would say you could probaly obtain the
 6  police reports.  But the gun has probably passed hands
 7  at that point.
 8      Q     What about if there was conviction of
 9  someone that used that weapon in another crime, could
10  you talk to that person?
11      A     You probably could.
12      Q     Would you?
13      A     If they are arrested for the gun, I
14  wouldn't understand -- if they are arrested two years
15  before, how would they -- two years before the
16  incident, and they were arrested with the weapon, and
17  it is a NIBIN hit, that means the weapon is in
18  possession of the lab.  How would it make it out for
19  the '16 case?
20      Q     I have no clue.  In order to figure that
21  out, you need to follow up on that?
22      A     You need to pull the reports at a minimum.
23      Q     You pull the reports and maybe talk to
24  witnesses in that case or the defendant, right?
25      A     You talk to the defendants.  If they are
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

157

1    charged, they are represented.

2        Q    You would reach out to their lawyer?

3        A    Yes.

4        Q    That is a lead you could follow.  Right?

5        A    It is possible.

6        Q    What about, if you get information about

7    another crime that serves as the motive for the crime

8    you are investigating, and there is NIBIN hit evidence

9    in there, could you talk to the other detectives that

10   investigated, or could you run that down yourself?

11       A    If you are investigating another crime, the

12   crime you are investigating touches on another

13   detective's crime, you will both get the NIBIN

14   reports.  They both link.

15       Q    So are you aware of the fact there was a

16   NIBIN hit associated with the weapon used to murder

17   Calvin Doswell in the Calvin Doswell filed provided to

18   Allegheny County?

19            MR. BIONDO:  Objection to form.  Go ahead

20       and answer.

21       A    I did not know that.

22       Q    Do you know if that was followed up on?

23       A    I don't know.

24       Q    Is that something that should have been

25   followed up on, if that evidence exists?

1      A      I mean, if there is a NIBIN hit, I would

2    think they at least obtained the police reports.

3      Q      What if they didn't?

4      A      It goes to three years before.  Obviously

5    if Calvin Doswell, if there is a NIBIN hit in that, I

6    don't know in reference to the NIBIN hit you are

7    talking about from the AK47 or from the 40 caliber.  I

8    don't know.

9      Q      But if that exists in the document that we

10   laid eyes on as part of the criminal investigation?

11     A      The spent cartridge casings at the murder

12   scene?

13     Q      Yes.

14     A      The 762s, and the 40 calibers?

15     Q      The 762s had two NIBIN hits.  That should

16   have been investigated.  Right?

17     A      In relation -- the 762s had two NIBIN hits.

18   Like I said, it depends on the relation.  Not saying

19   you wouldn't investigate them.  You at least obtain

20   the police reports on the context in which the other

21   casings were collected.

22     Q      By that same logic, if you are using an

23   unsolved murder from City of Pittsburgh, that is

24   serving as the motive for this Wilkinsburg massacre,

25   and there is NIBIN hits, that would be something you

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

1    want to follow up on as well to be thorough?

2         A    I would think that you would definitely

3    follow up on that.

4         Q    If neither of that was followed up on,

5    would that call into question the thoroughness of the

6    investigation that Allegheny County did into Cheron

7    Shelton and Robert Thomas?

8              MR. BIONDO:  Objection to form.  Go ahead

9         and answer.

10        A    I don't believe so.

11        Q    Why not?

12        A    Just because you didn't investigate a NIBIN

13   hit doesn't mean you haven't investigated the case

14   fully in other ways.

15             If somebody doesn't go out and obtain

16   reports from cartridge cases, that doesn't mean there

17   wasn't a complete investigation done in other ways.

18        Q    As someone who mentors younger detectives,

19   you agree it is a better practice to follow those

20   leads.  Correct?

21        A    Yes.

22        Q    That would help -- if someone questioned

23   the thoroughness of your investigation, that would

24   help you be able to respond to those questions.

25   Right?

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

160

```
 1      A      If you are ever questioned about the
 2   thoroughness of the investigation.  It may not further
 3   the investigation itself.  But in this situation, if
 4   anybody questioned the thoroughness of the
 5   investigation, yes.
 6      Q      Is it common in homicide cases where the
 7   defendants are challenging their involvement,
 8   sometimes the thoroughness of an investigation is
 9   questioned?
10      A      Probably, yes.
11      Q      In order to get out ahead of those
12   potential issues at detectives, it is best practice to
13   follow these leads?
14      A      That's fair.  Yes.
15      Q      There is no limitation in the mind of the
16   detectives putting these stories together on the
17   length of time that elapsed between the incident that
18   gave motive for the Wilkinsburg massacre and when the
19   massacre occurred.  Is there?
20          MR. BIONDO:  Objection to form.  If you can
21       answer, go ahead.
22      A      I don't understand what you are saying.
23      Q      Calvin Doswell was murdered in 2013.
24   Right?
25      A      Okay.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

```
 1       Q      The Wilkinsburg massacre happened three
 2  years later in 2016?
 3       A      Correct.
 4       Q      So using that as a motive theory, there was
 5  no concern that it was three years in the past, and
 6  maybe too much time elapsed for anyone to get revenge
 7  against Lamont Powell?
 8       A      No.  I don't know that was taken into
 9  consideration.
10       Q      That is a factor.  Correct?
11       A      The length of time -- when I speak of
12  length of time, I talk about investigation into NIBIN
13  reports, NIBIN hits.  If you have a case from 2020,
14  and a NIBIN hits from 2015 for maybe somebody has a
15  criminal mischief, something of that nature.
16       Q      Right.  But what I am saying, there is no
17  limitation in the length of time between hits, leads,
18  whatever, when you are trying to do a thorough
19  investigation.  Right?
20       A      Yes.
21              In this case, there would be no limitations
22  on investigating any information that came up about
23  Calvin Doswell.
24       Q      Up until this point in 2016, was this the
25  largest loss of life homicide you had ever
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

1    investigated?

2        A    I would say this was the single most.  Yes.

3        Q    Was this the most sensational covered

4    homicide your department had been involved in?

5             MR. BIONDO:  Objection to form.  Go ahead.

6        A    We have had other pretty significant cases.

7        Q    It is always important to try to get the

8    right people.  Correct?

9        A    Correct.

10       Q    You don't want to taint the information you

11   are obtaining from sources, either witnesses, other

12   officers, other departments, right?  You want it to be

13   clean and factual.  Correct?

14       A    Yes.  That is fair.

15       Q    Is it uncommon to arrest individuals for

16   other cases to put them in prison where that I may be

17   around people that have been cooperating witnesses

18   previously?

19            MR. BIONDO:  Objection to form.  Go ahead

20       and answer.

21       A    Is it uncommon?

22       Q    Yes.

23       A    That doesn't happen.

24       Q    If it happened for both Cheron Shelton and

25   Robert Thomas, would that have been a unique

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

163

1    circumstance in 2016?

2             MR. BIONDO:  Objection to form.

3        A    A unique circumstance?

4        Q    Yes.

5        A    Are you saying planting somebody with

6    Cheron Shelton and Robert Thomas?

7        Q    I am not saying planting.  I am saying

8    having Cheron Shelton and Robert Thomas arrested for

9    unrelated crimes before they were charged in the

10   Wilkinsburg massacre.

11       A    No.  I don't even understand your question.

12            MR. BIONDO:  I don't either.

13       Q    Wilkinsburg massacre occurred March 9th,

14   2016.  Correct?

15       A    Correct.

16       Q    The criminal complaint was filed in this

17   case June 23rd, 2016.  Right?

18       A    For the homicides.

19       Q    Correct.

20       A    Yes.

21       Q    Cheron Shelton was arrested March 25th,

22   2016.

23       A    On unrelated charges.

24       Q    On a probation violation.

25       A    Unrelated charges.

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

```
 1        Q     It's not the Wilkinsburg massacre.  Right?

 2        A     Correct.

 3        Q     Rob Thomas was arrested April 5th, 2016 for

 4   a 2013 case in Wilkinsburg that was re-filed against

 5   him.  Are you aware of that?

 6        A     I was aware of that.  Yes.

 7        Q     One of the things that is important, when

 8   you are doing this investigation, is not to taint any

 9   of the information, or have it come in such a way that

10   people are unduly influenced by the background they

11   have or prior information that they have.  Right?

12        A     You are talking about witnesses you

13   interview?

14        Q     Absolutely.

15        A     Yes.

16        Q     So you would agree with me that

17   understanding the charges that an individual has

18   brought in to jail for can possibly taint the

19   information that a person is providing to law

20   enforcement?

21        MR. BIONDO:  Objection to form.  Go ahead

22        and answer, if you can.

23        A     I can't answer that.  I don't understand.

24   I don't understand your question.

25        Q     Let's go back to the question I asked about
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

165

```
 1    individuals being arrested on different charges and

 2    placed in jail.  Is that an uncommon occurrence?

 3        A    Individuals arrested on other charges and

 4    being placed in jail?

 5        Q    Correct.  That are suspects in another

 6    case.

 7             MR. BIONDO:  Object to form.  Go ahead.

 8        A    It happens.  Not in every case.  But it

 9    does happen.

10        Q    When those individuals are in jail, there

11    is the potential that they may interact with other

12    witnesses, and then they may provide information which

13    is helpful in your investigation.  Right?

14             MR. BIONDO:  Object to form.  Go ahead.

15        A    It does happen.  Yes.

16        Q    In order to try and ensure that the

17    information that these witnesses are providing to you

18    from the person that is the suspect, you want to make

19    sure they are not tainted by understanding what crime

20    they are being investigated for.  Right?

21             MR. BIONDO:  Objection to form.  Go ahead

22        and answer, if you can.

23        A    If a witness comes forward with

24    information -- I don't think I understand the form of

25    your question.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

```
 1              I think -- if a witness is in jail, there
 2     is somebody in jail that is going to be a witness, and
 3     they reach out, we don't tell them what case to reach
 4     out on.  They provide us information on the person
 5     they are speaking of.  Whether it is he or she.
 6        Q     Do you take into account, when interviewing
 7     witnesses, their understanding before talking to that
 8     witness of what crimes they are suspected of?
 9              MR. BIONDO:  Objection to form.  I don't
10        think I understand.  Go ahead.
11        A     The witness's crimes?
12        Q     Yes.
13        A     Because you are in jail.
14        Q     If you are in jail, the person you are
15     providing information about, allegedly confessed to
16     you, do you take into account whether the witness
17     providing this information to you has an understanding
18     of the severity of the crime that the person that is
19     giving the information to them is allegedly accused
20     of?
21        A     Does that make a difference?
22        Q     Absolutely.
23        A     Is that what you are asking me?
24        Q     Yes.  I am.
25        A     I still -- if you are saying because it is
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

167

1    the Wilkinsburg case, and there were six people

2    killed, do they understand the severity of that?

3        Q    Yes.  Do they understand that -- if they

4    understand these individuals that are sharing a cell

5    with them are under investigation for a severe crime,

6    do you take that into account when you are reviewing

7    the information they are providing to you, or their

8    motive for providing that information?

9            MR. BIONDO:  Objection to form.  Answer, if

10       you can.

11       A    I wouldn't take it into consideration.  We

12   would document whatever the person tells us.

13       Q    You take what they tell you.  Then you

14   compare that to the evidence that you have in your

15   possession to see if what they are telling you is

16   credible.  Right?

17       A    So the information they provide us would be

18   documented and submitted to the District Attorney's

19   Office.  Yes.

20           Just because it may not coincide with the

21   investigation, that doesn't mean we don't document it.

22   Because maybe it will go against what we are doing in

23   the investigation.

24       Q    Sure.

25       A    But we still document it.  We don't take

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

1   into level the credibility.  Every witness is

2   essentially the same.  You bring them in.  You don't

3   want to taint them.  You want to take whatever

4   information they provide you.

5       Q     When you are assessing the reliability of

6   the information that the witnesses are providing, are

7   you comparing the information the witnesses are

8   providing to the evidence -- I'm not saying don't

9   document it.

10          I am saying when you are putting together

11  to figure out if you have probable cause for

12  something, you are taking into account contradictions

13  of the evidence the witness provides versus evidence

14  you already have in your possession?

15      A     I would say that I would take into account

16  whatever the witness -- the information that the

17  witness provides.  Because it would be the

18  understanding that the information that the witness is

19  providing is being obtained from the person that is

20  providing it.

21          It is information maybe we don't have.  I

22  am not speaking specifically about this case.  But

23  information that maybe we didn't have initially.  And

24  they provide additional information that can or cannot

25  be corroborated.  That doesn't mean we don't document

1    it.

2        Q        Sure.

3                But you would agree with me that before an

4    affidavit of probable cause is filed, you as a police

5    officer have a whole section of why I believe the

6    source of information, correct?

7        A        On the affidavit of probable cause?

8        Q        Yes.

9        A        Okay.

10       Q        This document.  Right?

11       A        Yes.

12       Q        This has check boxes for you to figure out,

13   or to put why you believe the source of the

14   information is credible.  Right?

15       A        Correct.

16       Q        I'm not saying what you document in your

17   reports is part of your investigation.  I am saying

18   what you document in your affidavit of probable cause,

19   whether that is consistent with the evidence you have

20   in your possession.  Right?

21       A        I am not following you on whether the

22   witness provided -- are you saying the witness

23   provided information that is credible or not credible,

24   and we check the box?

25                I'm not sure is that -- are you saying the

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

1   witness isn't credible, and that box that says witness

2   of a crime, or witness presumed to be credible from

3   law enforcement or something like that?

4        Q    Would you include contradictory information

5   in an affidavit of probable cause?

6             MR. BIONDO:  Objection to form.  Go ahead

7        and answer, if you can.

8        A    Contradictory information in an affidavit

9   of probable cause?

10       Q    Yes.

11       A    I would document whatever the witness tells

12  you.

13       Q    Right.  In the report.  I am saying in your

14  affidavit of probable cause to charge someone, would

15  you put evidence that is contradictory to evidence

16  that you already have?

17       A    If it is corroborated in the report, in

18  theory the affiant would gain that information from

19  the report.

20       Q    So you reviewed the criminal complaint in

21  this matter, correct?

22       A    I did.  I read the body of it.

23       Q    You agree with me Cheron Shelton cannot be

24  in two places at once.  Right?

25       A    I don't understand that question.

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

1      Q      Any human being cannot be in two places at

2   once?

3      A      You said Cheron Shelton.  No human being

4   can be in two places at once.

5      Q      Which would also mean Cheron Shelton can't

6   be in two places at once.  Right?

7      A      I don't agree with that statement.

8      Q      How could he be in two places at once?

9      A      How would he be?

10          MR. BIONDO:  He cannot.

11     Q      He cannot be in two places at once.

12   Correct?

13     A      Correct.

14          MR. BIONDO:  He thought you said can.

15     Q      I did not say can.

16          He cannot be in two places at once?

17     A      He cannot be.

18     Q      If you had evidence in your possession,

19   video evidence showing Cheron Shelton's location at a

20   specific time, and that evidence was contradicted by

21   information given by a witness, would you include that

22   in your affidavit of probable cause?

23          MR. BIONDO:  Objection to form.  Go ahead

24      and answer.

25     A      I have to weigh the two.  Who is providing

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

172

```
 1   the information?

 2        Q     A jailhouse witness.

 3        A     A jailhouse witness.

 4              I would lay more credibility into the video

 5   or the police officer.

 6        Q     Right.  Would you include that

 7   contradictory evidence in your affidavit of probable

 8   cause for the criminal complaint?

 9        A     I would document however the witness -- we

10   are going to use the witness, I would include whatever

11   information the witness provided.

12        Q     Even if it contradicts direct evidence that

13   you have in your possession?

14        A     I mean, if it is contradictory to direct

15   evidence in our possession, it would be turned over to

16   the District Attorney's Office.  I don't know what

17   witness --

18        Q     You are aware drive tests were conducted in

19   this matter?

20        A     I believe so.  Yes.  From Franklin to Hill

21   Top.

22        Q     Right.  That was a time distance study

23   conducted to see how long it would take Cheron Shelton

24   to drive from Nolan Court down to Franklin Avenue

25   where he allegedly parked his vehicle, got out and
```

173

1    perpetrated the Wilkinsburg massacre.  Right?

2        A    Yes.

3        Q    Cheron Shelton is seen on video in Hill Top

4    approximately 10:30 p.m.  Is that accurate?

5        A    If you say so.

6        Q    If that is what the video says, you would

7    believe your own eyes, right?

8        A    If that is what the video says.

9        Q    Your detectives conducted a time distance

10   study that showed it would take between nine to 11

11   minutes to drive from Hill Top down to Franklin

12   Avenue.  Right?

13           MR. BIONDO:  Objection to form.  Answer, if

14       you can.

15       A    Nine to 11 minutes, that sounds about

16   accurate.

17       Q    So that would be 10:41, 42, if he leaves

18   Hill Top at 10:30?

19       A    Okay.

20       Q    Parks the car.  Heads to the location to

21   get suited up.  Right?

22       A    Okay.

23       Q    Do you believe that two people that are in

24   the same location at the same time would talk to each

25   other on a cell phone?

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

174

```
 1      A      In the same location at the same time?
 2      Q      Yes.
 3      A      I would say if they are in close proximity
 4   to one another, I would say yes.
 5      Q      What about if they are in the same room?
 6      A      It doesn't necessarily mean they are not
 7   still communicating.  Like a text message.  Something
 8   like that.
 9      Q      Would they talk on the phone to each other,
10   if they were in the same room?
11      A      I would think that wouldn't be normal.
12      Q      If your lieutenant indicated that doesn't
13   sound credible, would you agree with that, Lieutenant
14   Sherman?
15      A      That wouldn't be normal.  No.  Texting
16   somebody in the same room isn't out of the realm --
17      Q      It's not.  But what if you believed you had
18   evidence indicating the two individuals you believe
19   committed the crime talked to each other on the phone
20   in the same room for approximately four and a half
21   minutes?
22      A      I don't think they would talk to one
23   another on the phone for four and a half minutes.
24      Q      Right.  They wouldn't.  By that same logic,
25   if you had witnesses come forward and tell you the two
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

```
1    people that perpetrated the Wilkinsburg massacre
2    waited a long time behind where the shooting took
3    place, half an hour or longer, that would contradict
4    the direct evidence you have in your possession,
5    wouldn't it?
6              MR. BIONDO:  Objection to form.  Go ahead
7         and answer, if you can.
8         A    I don't want to say it would contradict it.
9    I don't know how long they were sitting back there.
10             MR. PETRUNYA:  Let's take a break.
11             (Recess taken.)
12                       EXAMINATION
13   BY MR. JUBAS:
14        Q    So we discussed the fact that Detective
15   Miller's representations and affidavits and at the
16   preliminary hearing pertaining to the suspect phone
17   number being found in Brittany Shelton's cell phone,
18   those were inaccurate.  Right?
19        A    Yes.
20        Q    We established that evidence was actually
21   discovered in Shaquan Roberts' cell phone.  Right?
22        A    Yes.
23        Q    Would you agree with me if you learned
24   about this in say midApril, after the warrants -- or
25   the affidavits were filled out, you would have
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

1    reported it to the District Attorney's office and have

2    them corrected.  Correct?

3        A    Correct.

4        Q    That means that at the preliminary hearing

5    Detective Miller never would have testified that he

6    found this evidence in Brittany Shelton's cell phone.

7    Right?

8            MR. BIONDO:  Objection to form.  Go ahead

9        and answer.

10       A    If it was corrected.  Yes.

11       Q    At the preliminary hearing, and in any

12   affidavits of probable cause filed in this case, it

13   would only have referenced that number with the

14   contact coming from Shaquan Roberts, right?

15           MR. BIONDO:  Objection to form.  If you can

16       answer.

17       A    Correct.

18       Q    Is it fair to say that based off the

19   preliminary hearing testimony, that the only way you

20   guys are -- Allegheny County is getting a prima facie

21   case on Rob Thomas is if this information is

22   corrected.  Right?

23           MR. BIONDO:  Objection.  Form.

24       A    No.  I don't think it matters where the

25   information comes from.  It is just misrepresented

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

```
 1   where it came from.
 2       Q     So it has to be accurately represented.
 3   Right?
 4       A     Right.  You are saying prima facie case.
 5   Regardless, if he testified it came from Brittany
 6   Shelton's phone, or Shaquan Roberts' phone, it would
 7   still be Millhouze with that name.
 8       Q     Right.  But it wouldn't say Brittany
 9   Shelton.  Right?
10       A     Correct.
11       Q     It would say Shaquan Roberts?
12       A     Yes.
13       Q     So it wouldn't be a prima facie case unless
14   it said Shaquan Roberts.  Right?
15             MR. BIONDO:  Objection to form.
16       A     Yes.  I mean -- yes.
17       Q     So with that being said --
18             MR. BIONDO:  Go ahead.  Let's go.  Let's
19       hear it.  This is what I am talking about.  You
20       can't go back and forth.  Go ahead.  Go ahead.
21       Let's go.
22       Q     So if this was the setting here, and
23   Shaquan Roberts is placed in this case in the
24   affidavits and the preliminary hearing the way it
25   should have been, would you also make sure that he and
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

```
 1   other individuals that he was with and the cell phone
 2   was fully investigated?
 3            MR. BIONDO:  Objection to form.
 4       A    I would say that if Shaquan Roberts was
 5   being used as a witness, yes.
 6       Q    Even if he wasn't used as a witness, should
 7   all these things still be investigated?
 8            MR. BIONDO:  Objection to form.
 9       A    I would think he would be used as a
10   witness.  He is providing the Millhouze with Rob
11   Thomas.  So he is providing the number.  He would be a
12   witness.
13       Q    Because he is a witness, because he is
14   providing important information, he would be fully
15   investigated along with the leads he has?
16       A    Yes.  The information that he provided.
17       Q    So it is fair to say that the way you
18   properly get probable cause to charge Rob Thomas to
19   have a prima facie case against him would be with
20   Shaquan Roberts' involvement and him fully
21   investigated?
22            MR. BIONDO:  Objection to form.
23       A    I wouldn't say that's the only way.
24       Q    If in the preliminary hearing Chernosky
25   says that Rob Thomas is loosely connected to the case
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

1    through cell phone evidence, would you agree then?

2              MR. BIONDO:  Object to form.  Go ahead.

3        A    I don't know that -- the number is what the

4    number is.  Whether it was identified by Brittany

5    Shelton or by Shaquan Roberts.  I don't know it

6    changes the course of the investigation on who

7    provided the number.

8        Q    Do you know what type of evidence is in

9    Shaquan Roberts' cell phone?

10       A    I do not.

11       Q    Because it hasn't been investigated.

12   Right?

13       A    Just the information that you provided me

14   today from the Cellebrite.

15       Q    If you bring him in the case as a witness,

16   and you have all of this information connected to him,

17   you are going to investigate it.  Right?

18             MR. BIONDO:  Objection.  Go ahead.

19       A    We are going to produce it.

20       Q    You are going to investigate it.  Right?

21             MR. BIONDO:  Object to form.

22       A    When you say investigate it, as a suspect?

23   If you watch that interview, Shaquan Roberts seems to

24   me like -- obviously, Cheron Shelton, and then you

25   have Rob Thomas.  Then you are saying Shaquan Roberts.

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

1          So Roberts has a connection with Robert

2    Thomas, because he has the name Millhouze in his

3    phone.

4          Q    You are going to, for that reason, you are

5    going to investigate?

6          A    We would investigate.

7          Q    So is it safe to say any prima facie case

8    involving Rob Thomas would include Shaquan Roberts,

9    and you would investigate it?

10              MR. BIONDO:  Objection to form.  Asked and

11         answered.  I instruct the witness not to answer.

12         I instruct him not to answer.  Do you have

13         another question?

14         Q    That's it.

15              (Thereupon, at 5:51 p.m. the deposition was

16         concluded.)

17                        – – –

18

19

20

21

22

23

24

25

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

181

```
 1                    ERRATA SHEET

 2      I, Patrick Kinavey, have read the foregoing 180
     pages of my deposition given on April 12, 2024, and
 3   wish to make the following, if any amendments,
     additions, deletions or corrections:
 4
     Page/Line          Should Read          Reason for Change
 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18      In all other respects, the transcript is true and
     correct.
19
                       _____
20                     Patrick Kinavey

21   Subscribed and sworn to before me this _____ day of

22   _____, 2024.

23   _____

24   Notary Public

25                       _ _ _
```

```
 1                    CERTIFICATE

 2  COMMONWEALTH OF PENNSYLVANIA, )
                                  )  SS:
 3  COUNTY OF ALLEGHENY.          )

 4       I, Lance E. Hannaford, do hereby certify that
    before me, a Notary Public in and for the Commonwealth
 5  aforesaid, personally appeared PATRICK KINAVEY, who
    then was by me first duly cautioned and sworn to
 6  testify the truth, the whole truth, and nothing but
    the truth in the taking of his oral deposition in the
 7  cause aforesaid; that the testimony then given by him
    as above set forth was by me reduced to stenotypy in
 8  the presence of said witness, and afterwards
    transcribed by means of computer-aided transcription.
 9
         I do further certify that this deposition was
10  taken at the time and place in the foregoing caption
    specified, and was completed without adjournment.
11
         I do further certify that I am not a relative,
12  counsel or attorney of either party, or otherwise
    interested in the event of this action.
13
         IN WITNESS WHEREOF, I have hereunto set my hand
14  and affixed my seal of office at Pittsburgh,
    Pennsylvania, on this 19th day of APRIL, 2024.
15

16

17  _____
    Lance E. Hannaford, Notary Public
18  My commission expires October 19, 2026

19                     - - -

20

21

22

23

24

25
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Patrick Kinavey**

183

```
 1    April 19, 2024

 2    TO:  Dennis Biondo, Jr., Esquire
           County of Allegheny Law Department:
 3         300 Fort Pitt Commons
           Pittsburgh, Pennsylvania  15219
 4
             RE:  DEPOSITION OF PATRICK KINAVEY
 5
             NOTICE OF NON-WAIVER OF SIGNATURE
 6
          Please have the deponent read his deposition
 7    transcript.  All corrections are to be noted on the
      preceding Errata Sheet.
 8
          Upon completion of the above, the deponent must
 9    affix his signature on the Errata Sheet, and it is to
      then be notarized.
10
          Please forward the signed original of the Errata
11    Sheet to Mr. Max Petrunya, Esquire, for attachment to
      the original transcript, which is in his possession.
12    Send a copy of same to me.

13        Please return the completed Errata Sheet within
      thirty (30) days of receipt hereof.
14

15
      Lance Hannaford,
16    Court Reporter

17                        _ _ _

18

19

20

21

22

23

24

25
```