**In The Matter Of:**

*CHERON S HELTON/ROBERT THOMAS v.*
*COUNTY OF ALLEGHENY, et al.*

---

*KEVIN CHERNOSKY*
*March 15, 2024*
*CONFIDENTIAL  ATTORNEYS' EYES ONLY*

---

*AA COURT REPORTERS*
*428 Boulevard of the Allies, Suite 300*
*Pittsburgh, PA  15219*
*412.288.5370*
*anthony@aacourtreporters.com*

Original File CHERNOSKY-031524.txt
Min-U-Script® with Word Index

CHERON S HELTON/ROBERT THOMAS, CONFIDENTIAL ATTORNEYS' EYES ONLY    KEVIN CHERNOSKY
COUNTY OF ALLEGHENY, et al.    March 15, 2024

---

AA COURT REPORTERS  412-288-5370                                      Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
 2         FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 3
 4    CHERON SHELTON/ROBERT        )
 5    THOMAS,                      )
 6                                 )
 7              Plaintiffs,        )
 8                                 )
 9         vs.                     )  No. 22-CV-196/266
10                                 )
11    COUNTY OF ALLEGHENY, et al., )
12                                 )
13              Defendants.        )
14    _____     )
15
16          *** C O N F I D E N T I A L ***
17    *** A T T O R N E Y S'  E Y E S  O N L Y ***
18
19         DEPOSITION OF KEVIN CHERNOSKY
20            FRIDAY, MARCH 15, 2024
21                 10:00 A.M.
22            PITTSBURGH, PENNSYLVANIA
23
24    REPORTED BY:  ANTHONY JUDE CORDOVA, CSR 12943
25        JOB NO. CHERNOSKY-031524
```

---

AA COURT REPORTERS  412-288-5370                                      Page 2

```
 1           BE IT REMEMBERED THAT, on March 15, 2024,
 2  commencing at the hour of 10:00 a.m. of the said day, at
 3  Allegheny County Law Department, 445 Fort Pitt
 4  Boulevard, Pittsburgh, Pennsylvania, before me, ANTHONY
 5  JUDE CORDOVA, CSR 12943, a Certified Shorthand Reporter
 6  and Notary Public, appeared Kevin Chernosky, produced as
 7  a witness in the above-titled court and cause, who,
 8  being by me first duly sworn, was examined in said
 9  cause.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

AA COURT REPORTERS  412-288-5370                                      Page 3

```
 1                    - - - -
 2                  APPEARANCES
 3
 4    FOR THE PLAINTIFFS:
 5    Max Petrunya, Esq.
 6    Paul Jubas, Esq.
 7    MAX PETRUNYA, P.C.
 8    5 Bayard Road, Unit 917
 9    Pittsburgh, PA  15213
10    412.720.3497
11    mpetrunya@gmail.com
12    pjubasesq@gmail.com
13
14
15    FOR THE DEFENDANTS:
16    Dennis Biondo, Jr., Esq.
17    Shelley Rohrer, Esq.
18    ALLEGHENY COUNTY LAW DEPARTMENT
19    445 Fort Pitt Boulevard, Suite 300
20    Pittsburgh, PA  15219
21    412.350.1120
22    dennis.biondojr@alleghenycounty.us
23    srohrer@alleghenycounty.us
24
25    APPEARANCES CONTINUED:
```

---

AA COURT REPORTERS  412-288-5370                                      Page 4

```
 1    FOR THE WITNESS:
 2    Joseph G. Heminger, Esq.
 3    BRUCKER & PORTER
 4    180 Fort Couch Road, Suite 410
 5    Pittsburgh, PA  15241
 6    412.881.6620
 7    jbheminger@aol.com
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

Case 2:22-cv-00196-CB    Document 83-27    Filed 07/01/24    Page 3 of 60

CHERON S HELTON/ROBERT THOMAS    CONFIDENTIAL ATTORNEYS' EYES ONLY    KEVIN CHERNOSKY
COUNTY OF ALLEGHENY, et al.    March 15, 2024

AA COURT REPORTERS 412-288-5370 — Page 5

```
1   INDEX:
2   Examination by Mr. Jubas                           6
3   Examination by Mr. Petrunya                       77
4   Re-Examination by Mr. Jubas                      130
5   Examination by Ms. Rohrer                        137
6   Re-Examination by Mr. Petrunya                   146
7   Re-Examination by Mr. Jubas                      149
8   Re-Examination by Ms. Rohrer                     152
9   Re-Examination by Mr. Jubas                      153
10
11  EXHIBITS:
12  EX 1  Transcript, 2.15.18                         51
13  EX 2  Broman email, 8.30.18                       54
14  EX 3  Response to Motion to Suppress             138
15
16
17
18
19
20
21
22
23
24
25
```

AA COURT REPORTERS 412-288-5370 — Page 6

```
1                    - - - -
2              PROCEEDINGS
3                    - - - -
4       MR. HEMINGER: This is Joe Heminger on behalf of
5   the Kevin Chernosky.  Pursuant to a stipulation agreed
6   to by the attorneys in accordance with the order entered
7   by the Court at document number 47 on August 16, 2023,
8   the parties stipulate and agree that this deposition
9   will be treating as highly confidential, attorneys' eyes
10  only as defined in that order so that it will be treated
11  as a highly confidential document to be used under seal
12  unless the parties agree otherwise.  Is that okay with
13  everyone?
14       MR. BIONDO: Yes.
15       MR. JUBAS: Yes.
16                   - - - -
17           KEVIN CHERNOSKY,
18       Being by me first duly sworn,
19       Was examined and testified as follows:
20                   - - - -
21           EXAMINATION
22                   - - - -
23  BY MR. JUBAS:
24  Q.   This is Attorney Paul Jubas, P-A-U-L, J-U-B-A-S.
25  I'm here on behalf of the plaintiffs Robert Thomas and
```

AA COURT REPORTERS 412-288-5370 — Page 7

```
1   Cheron Shelton and I'm joined here with my cocounsel Max
2   Petrunya and we are here today for the deposition of
3   Kevin Chernosky, and Mr. Chernosky could you introduce
4   yourself and spell your name for the record, please?
5   A.   Kevin Chernosky.  First name is traditional
6   spelling.  Last name is C-H-E-R-N-O-S-K-Y.
7   Q.   So, Mr. Chernosky, have you ever given a
8   deposition before?
9   A.   Once about 15 years ago.
10  Q.   And what was that in regards to?
11  A.   A civil lawsuit against a local police officer.
12  I forget what jurisdiction.  I think McKees Rocks.
13  Q.   What was your involvement in that case?
14  A.   I was the prosecutor on the case at the time the
15  charges were dismissed.
16  Q.   Not a defendant?
17  A.   No.
18  Q.   Okay.  So, you know the ground rules.  Is it
19  fair to say that if you answer a question, you've
20  understood the question?
21  A.   Yes.  I'll clarify if I don't understand.
22  Q.   Okay.  And, then, if you need to take a break,
23  just let us know.  We can accommodate that.  Also, you
24  know the rules; no head nods, uh-huhs, huh-uhs, full
25  answers?
```

AA COURT REPORTERS 412-288-5370 — Page 8

```
1   A.   Sure.  Try to correct me if I do that.
2   Q.   What did you do today to prepare?
3   A.   As soon as I learned you wanted to depose me, I
4   called the DA office to see if they'd be providing
5   counsel.  Once I was told they would, had a brief phone
6   conference with Mr. Heminger and Mr. -- sorry --
7   Brucker, I let them know my availability each time you
8   emailed asking about my availability, I read the
9   affidavit of probable cause three days ago, and I had a
10  deposition prep session with Mr. Heminger yesterday --
11  or two days ago.  Sorry.
12  Q.   Great.  And is it correct that you're no longer
13  employed by the district attorney's office?
14  A.   Yes.
15  Q.   And where are you employed now?
16  A.   Private defense attorney at Shrager Defense
17  Attorneys.
18  Q.   Welcome back to the good guys.  So, getting to
19  the date of the incident -- that's March 9, 2016 -- what
20  was your role in the district attorney's office?
21  A.   I was an assistant district attorney assigned to
22  the homicide unit.  So, I was a line prosecutor.  We
23  also took -- jeez, we would -- there's a local rule that
24  requires approval of all homicide charges and search
25  warrants.  We do that on an on-call capacity in the
```

AA COURT REPORTERS  412-288-5370                                    Page 9

1  after hours. So, I don't think I got a call that night.
2  I would have got a call first thing in the morning.
3  Q.    Okay. So, you were an assistant at that time.
4  Who was the deputy of the homicide department?
5  A.    Law Claus.
6  Q.    How do you spell that?
7  A.    C-L-A-U-S. Lawrence, but everybody calls him
8  Law.
9  Q.    And is he still there?
10 A.    No. He retired in -- jeez -- 2000 and -- I want
11 to say '18.
12 Q.    And who took his spot as deputy?
13 A.    They broke up the homicide unit into two
14 deputies, Stephie Ramaley -- R-A-M-A-L-E-Y -- and
15 myself. I don't know that they -- I think Stephie got
16 it when he retired. I didn't get my deputy spot until
17 another deputy retired.
18 Q.    So, were there two deputies in the homicide
19 unit?
20 A.    At the time of this incident?
21 Q.    Yes.
22 A.    No. Mr. Claus was the deputy supervising
23 homicide and investigations.
24 Q.    And then Stephie is brought on when he retired
25 in 2018?

AA COURT REPORTERS  412-288-5370                                   Page 10

1  A.    I believe so. I believe she was officially made
2  the deputy of homicide in that time.
3  Q.    And you became deputy when?
4  A.    Somewhere around 2018 with the retirement of
5  Diane Berman. There's a weird rule where you have to
6  wait out someone's retirement and benefits before they
7  actually give you the position.
8  Q.    Do you remember when in 2018?
9  A.    No. Sorry.
10 Q.    That's okay. And you said after whose
11 retirement?
12 A.    Diane Berman, B-E-R-M-A-N. She was not a deputy
13 of homicide at the time she retired. She was an
14 investigations deputy.
15 Q.    Okay. So, the homicide unit being broke into
16 two units, could you explain that?
17 A.    So, as a practical matter, there are two primary
18 agencies that file homicide charges, the City of
19 Pittsburgh Police and county police. Also, the
20 State Police have jurisdiction over any highways or
21 traffic fatalities on the highways and any jurisdiction
22 that has expanded its police force. Currently, Rankin
23 is an example of that. They don't have a police force.
24 The State Police are responsible for them. So, any
25 murders that are occur in Rankin are State Police

AA COURT REPORTERS  412-288-5370                                   Page 11

1  jurisdiction.
2      Because of the number of search warrants,
3  charging decisions, police-involved shooting reviews, it
4  started to work more practical if we had one deputy who
5  was the liaison with the City of Pittsburgh Police and
6  one deputy who was the liaison with the county police.
7  So, that's the decision for two deputies and why they
8  broke it up that way.
9  Q.    Is it fair to say that you were the liaison for
10 the county police?
11 A.    Yes.
12 Q.    And Stephie was the liaison for the city?
13 A.    Yep.
14 Q.    And as deputy in 2018 when you and Stephie were
15 deputies, who did you each report to?
16 A.    Command structure, there were only three people
17 ahead of us or higher than us, Ms. Spangler, Mr. Petula
18 who was the chief trial deputy, though I don't -- he's
19 currently the chief trial deputy. It may have been --
20 jeez -- Dan Fitzsimmons for a period of time -- I don't
21 remember when he retired -- and then Mr. Zappala. Those
22 are the only three above homicide deputy. Actually, I
23 would say all the deputies are on the same level, but
24 those are the only people that I could be considered as
25 reporting to.

AA COURT REPORTERS  412-288-5370                                   Page 12

1  Q.    Okay. Did you report to any of those superiors
2  throughout your work on this case?
3  A.    Yes.
4  Q.    Which ones?
5  A.    I would say all of them at various times
6  depending on what we were talking about and to include,
7  at the time that this was approved, Law Claus. He was
8  actually my supervisor. I wasn't a deputy at the time
9  that this occurred.
10 Q.    Okay. So, on March 9th, Law Claus was the
11 deputy?
12 A.    Uh-huh.
13 Q.    Along those lines, what was the process for
14 getting charges approved for a case like this?
15 A.    There was a local rule that requires approval of
16 search warrants and arrest warrants in homicide cases.
17 So, they essentially have to provide you with an
18 affidavit of probable cause that you'll review and we
19 make a decision on whether we believe it sufficiently
20 states probable cause, and we'll check it for
21 typographical errors, too, and then we tell them --
22 there's a computer system that they put the charges up
23 on that requires you to -- you can adjust the grading of
24 the charges, et cetera. It's call ASAP. It does stand
25 for something, but I don't know what it stands for or at

CHERON S HELTON/ROBERT THOMAS CONFIDENTIAL ATTORNEYS' EYES ONLY    KEVIN CHERNOSKY
COUNTY OF ALLEGHENY, et al.    March 15, 2024

AA COURT REPORTERS 412-288-5370    Page 13

1 least don't recall, and you basically have to click an
2 approval button that makes the charges go live. You
3 have to give probable cause, gets generated from there.
4 Q.    And is ASAP a program that the county police had
5 access to, as well?
6 A.    Yes. You have to have credentials to log in on
7 both sides. So, they submit for approval, you can see
8 it on your side and then -- they can't approve. You
9 have to approve.
10 Q.    And were you responsible for authorizing all the
11 search warrants?
12 A.    I don't recall whether I was responsible for all
13 of them. I would have seen various search warrants
14 during this case. Couldn't tell you which ones I
15 approved and which ones I didn't approve.
16 Q.    When it came to the ones that you did or did not
17 approve, was that your decision alone or was Claus
18 Law -- or Law, Lawrence Claus involved in that, as well?
19 A.    So, I don't have any specific recollection of
20 which ones I approved. I can -- I don't want to talk
21 generally about it, but I would have briefed him on
22 facts at various points. I don't know that he would
23 have weighed in on the approval of individual search
24 warrants.
25 Q.    Okay. Do you know who from the district

AA COURT REPORTERS 412-288-5370    Page 14

1 attorney's office got involved in this case first?
2 A.    No.
3 Q.    So, you got involved on the 10th?
4 A.    I believe it was the morning of the 10th. Yes.
5 Q.    Okay. Besides Claus, who else in the district
6 attorney's office were you conferring with?
7 A.    Homicide takes a team approach. I would have
8 talked to just about everybody at some point. Lisa
9 Pellegrini was with me on the case for various points.
10 I would have talked to Stephie Ramaley, Law Claus.
11 At the time, there were other assistants
12 including myself. I don't remember what the actual
13 structure was in '16, but Bill Petula was in the
14 homicide section. I believe a DA by the name of Chelsea
15 Pratt was in the homicide section. Eventually, there
16 was a DA by the name of Alicia Werner was a member of
17 the homicide section. W-E-R-N-E-R. Sorry.
18 Q.    None of those DA's outranked you; right?
19 A.    At the time of this, we were all assistant DA's
20 at the time this happened. So, if you want to talk
21 about ranking, they were all of my same title.
22 Q.    Okay. Were you assigned to this right away?
23 A.    I believe so. Yeah.
24 Q.    And would that have been Claus assigning you?
25 A.    I probably got an on-call briefing. When a

AA COURT REPORTERS 412-288-5370    Page 15

1 crime -- when a murder happens overnight, sometimes Mr.
2 Zappala asks for details about it. So, we would have
3 sought out some details about this one.
4 Q.    Okay. Just generally speaking, before we start
5 moving into the details, when this occurred around the
6 2016 timeframe, was Spangler, Petula and Fitzsimmons,
7 were those your --
8 A.    Petula was, I believe at the time, an assistant
9 DA with me, I believe that Fitzsimmons was the chief
10 trial deputy, and Ms. Spangler was the first assistant.
11 Q.    So, Fitzsimmons and Spangler would have
12 outranked you, to so speak?
13 A.    Yes.
14 Q.    Were either of them, at the outset, making any
15 calls?
16 A.    No.
17 Q.    Okay. So, is it fair to say that the only real
18 decision made initially by the district attorney's
19 office was essentially by you?
20 MR. HEMINGER: Object to the form of the
21 question.
22 A.    When you say decision -- when you say decision,
23 it wasn't an active decision. It would have been me in
24 the on-call capacity getting a briefing that morning
25 because I was on call that month.

AA COURT REPORTERS 412-288-5370    Page 16

1 BY MR. JUBAS:
2 Q.    Got it.
3 A.    So, the decision to put me on call, yes. But a
4 decision to actively assign that to me, no.
5 Q.    When -- is it fair to say that this was the
6 biggest case that you had ever handled?
7 A.    No.
8 Q.    What was the biggest case?
9 A.    It was the biggest loss of life I've ever
10 handled. I did a poisoning of doctor with cyanide that
11 got a lot of attention. That was a pretty big case.
12 Q.    Do you remember if you submitted more evidence
13 in that case?
14 A.    Yes.
15 Q.    Okay. About how much more? Do you remember?
16 A.    I don't know. I think we ended that case with
17 200 and some odd exhibits and over a hundred witnesses.
18 So, it was a different type of case.
19 Q.    How long did that case take?
20 A.    Three weeks.
21 Q.    Okay. So, are you -- as a homicide prosecutor
22 in the district attorney's office, are you provided with
23 any training when it comes to dealing with a case as
24 it's starting into investigation?
25 A.    Yes. I mean -- sorry -- they -- regular CLE

AA COURT REPORTERS  412-288-5370                    Page 17

1   trainings, you start specializing in homicide
2   presentations, both statewide trainings and I know they
3   sent me out to capital training in California at one
4   point. There's your progress through the office that is
5   training for approval of charges. So, you start in the
6   screening division which is essentially paperwork. You
7   then move to area prosecution which is the preliminary
8   hearings. Then you go back to general trial which is a
9   little bit of everything and then specialize in a unit.
10        In my case, I went to child abuse and sex
11  assault and then to homicide, so, if you want to
12  consider that training. You learn how to approve
13  charges, because once you get to a specialized unit,
14  generally, there's a local rule you have to approve the
15  charges and search warrants before they're actually
16  signed.
17  Q.    Were you involved in the early days of the
18  investigation with any of the daily briefings that
19  occurred with the Allegheny County Police homicide unit?
20  A.    No. Ordinarily, I don't participate in
21  briefings. They happen onsite at the county police
22  headquarters. I would then probably get a briefing as
23  to any progress in the case after that one-on-one with
24  either a sergeant or a lieutenant, sometimes an
25  individual detective.

AA COURT REPORTERS  412-288-5370                    Page 18

1  Q.    Okay. Were you -- besides the warrants that you
2  were signing off on or assessing, were you being updated
3  about the developments of the case?
4  A.    Yes.
5  Q.    Who were you receiving those updates from?
6  A.    Oh, jeez. I don't know if he was a sergeant at
7  the time. Todd Dolfi, Fernando Costa and -- you're
8  going to have to give me a second on the --
9  Q.    Foley?
10  A.    No. Well, I mean, in an individual detective
11  capacity, every once in a while, but the briefings
12  primarily came from the command staff; Dolfi, Costa and
13  -- sorry --
14  Q.    Schurman.
15  A.    Schurman. Sorry. Thank you.
16  Q.    Now, as you're getting these updates or they're
17  submitting warrants, are you assessing the evidence at
18  all?
19  A.    Well, specifically in the case of a search
20  warrant, because we're actually going to either go into
21  a car or a house, yes, I'm assessing whether it states
22  sufficient probable cause to enter the premises or enter
23  the car.
24  Q.    With regards to a lot of the warrants, the
25  information was the evidence was gathered out of

AA COURT REPORTERS  412-288-5370                    Page 19

1   interviews; correct?
2  A.    Yes.
3  Q.    And when you would sign off on a warrant or just
4   assess a warrant generally, were you ever reviewing
5   these interviews?
6  A.    No. I don't believe I would have listened to an
7   interview.
8  Q.    Would you have basically just reviewed reports?
9  A.    Reports and/or the draft version of whatever
10  search warrant they were doing.
11  Q.    Okay. So, is it possible that you were
12  reviewing only the affidavit of probable cause and no
13  accompanying evidence?
14        MR. HEMINGER: I would object at this point.
15  He's getting into the work product as you did your
16  mental impressions when you came to the conclusions on
17  the case. So, I would object as getting into work
18  product. So, I would instruct you not to answer that.
19  If you could rephrase the question or move on to another
20  subject, whatever you prefer.
21        BY MR. JUBAS:
22  Q.    Sure. Do you recall which warrant you
23  authorized first?
24  A.    No.
25  Q.    Do you recall any of the warrants that you

AA COURT REPORTERS  412-288-5370                    Page 20

1   authorized?
2  A.    No. Well, sorry. I know we went into 1214
3   Nolan Court. That was the -- Mr. Shelton's mother's
4   residence and where the white vehicle was registered. I
5   know at some point, we went into an address on Ross
6   Garden Road. I don't remember whose address that was.
7   I think it was Mr. Shelton's girlfriend's. I know we
8   searched and seized that white car and the gold car, but
9   I don't remember what order any of those came in.
10  Q.    Do you recall whether any evidence linking
11  either of the defendants at that time was found in those
12  search warrants connecting them to the massacre?
13  A.    Yes. The 1214 Nolan Court had a drum magazine
14  for a 762 rifle. When you say connecting, I guess I'm
15  saying circumstantially connecting. I know there was a
16  bulletproof vest in one of the houses. Off the top of
17  my head, I can't recall anything else but --
18  Q.    Okay.
19  A.    Sorry. Mr. Shelton's new phone number was found
20  in front of 1214 Nolan Court on a piece of paper.
21  Q.    Is it fair to say that when it comes to those
22  items that you just listed, that in your new role as a
23  defense attorney, you would have a different view of
24  their relevance?
25        MR. BIONDO: Object to form.

AA COURT REPORTERS 412-288-5370                                Page 21

1        MR. HEMINGER: That's also getting into the
2   mental impressions, again, work product on this
3   particular case. I'm going to instruct him not to
4   answer that.
5   BY MR. JUBAS:
6   Q.    Okay. So, do you recall when the first
7   identification was made of Mr. Shelton?
8   A.    No. I don't recall what the first
9   identification was.
10  Q.    Okay. Do you recall if it was the video of the
11  individual running behind 1213 Nolan Court and grabbing
12  an object?
13  A.    I remember that there was an identification of
14  that. I don't remember whether that was the first
15  identification.
16  Q.    Okay. Do you recall on March 18th a news
17  article indicating that -- indicating a quote from
18  District Attorney Zappala saying that the DA's office
19  was cautiously optimistic that an identification was
20  made?
21       MR. HEMINGER: Object to the question. You can
22  answer.
23  A.    I don't remember that specific news article.
24  BY MR. JUBAS:
25  Q.    Does that jive with your -- or help to stir any

AA COURT REPORTERS 412-288-5370                                Page 22

1   recollection for you?
2   A.    No.
3   Q.    One moment. Do you recall -- do you have a
4   general recollection of the interviews and the witnesses
5   that were dealt with?
6   A.    Oh, jeez. Yes. Generally, there were a ton of
7   interviews in this case. I mean with people that --
8   there were a ton of interviews in this case.
9   Q.    Do you recall an individual by the name of
10  Shaquan Roberts?
11  A.    No.
12  Q.    His nickname was ReeRee.
13  A.    No.
14  Q.    Do you recall dealing with issues pertaining to
15  what was believed by the Commonwealth to be Rob Thomas's
16  phone number?
17  A.    What do you mean, dealing with issues?
18  Q.    Do you just recall there were issues?
19  A.    I recall there was much litigation over Rob
20  Thomas's phone number.
21  Q.    Do you recall making a statement on the
22  record -- I think it was in a response, I think -- that
23  certain statements in an application regarding Rob
24  Thomas's number were not factually accurate?
25  A.    Could you be more specific with the question?

AA COURT REPORTERS 412-288-5370                                Page 23

1   Q.    It was with regards to a statement Patrick
2   Miller made in the application.
3   A.    I know I'm not allowed to ask you questions. I
4   think you're mistaken about that. I think you're
5   referring to one of Cheron Shelton's numbers.
6        MR. HEMINGER: I'll object to the question. If
7   you could rephrase it or --
8   BY MR. JUBAS:
9   Q.    I guess basically what I'm trying to get to was
10  do you recall that there were issues pertaining to the
11  truthfulness of the applications for Rob Thomas's
12  number?
13  A.    I recall litigating an entire suppression motion
14  on that particular issue.
15  Q.    Do you recall Shaquan Roberts coming up with
16  regards to any of the litigation surrounding Rob
17  Thomas's phone number?
18  A.    No.
19       MR. JUBAS: Can we take five minutes real quick?
20       (There was a pause in the proceedings.)
21  BY MR. JUBAS:
22  Q.    We're back on the record. Do you recall that
23  the criminal complaints in this case were filed the
24  third week of June 2016?
25  A.    I don't recall the specific week, but that's

AA COURT REPORTERS 412-288-5370                                Page 24

1   generally my recollection, that it was sometime in June.
2   Q.    Okay. With regards to the decision to okay the
3   charges, was that your decision alone? Did you have
4   supervisors involved in that, as well?
5   A.    That was not my decision alone. No.
6   Q.    Was that your decision?
7   A.    To file the charges, yes, along with everybody
8   else in my office. Not everybody else. Sorry. Along
9   with my supervisors. Yes.
10  Q.    Okay. Which supervisors specifically?
11  A.    Law Claus.
12  Q.    Is it fair to say that the affidavit of probable
13  cause or the criminal complaint was uploaded into ASAP
14  for this charging decision?
15  A.    Yes. Though, in this particular case, that's
16  not how I read it the first time. So, if I could
17  explain?
18  Q.    Please, do.
19  A.    They have running affidavits. It's basically a
20  Word document so that on a case like this, nobody has to
21  reinvent the wheel when they file a search warrant. You
22  can excise whatever you want from it and add to it, but
23  we have a running affidavit so that the facts that are
24  generally known to them appear in one place that they
25  can sort of use.

CHERON S HELTON/ROBERT THOMAS    CONFIDENTIAL  ATTORNEYS' EYES ONLY    KEVIN CHERNOSKY
COUNTY OF ALLEGHENY, et al.                                            March 15, 2024

1    So, I did see multiple versions of what became
2  the affidavit of probable cause for the charging in the
3  form of the affidavits of probable cause for the various
4  search warrants. In the lead-up to actually placing it
5  on ASAP, my recollection is that a version -- a Word
6  version of that was circulated to me via email that I
7  would have read it, looked for typos, generally made
8  sure it was cohesive before saying it's good to put it
9  up on ASAP, and, also, ASAP's kind of a clunky system.
10 It's more difficult to read something on ASAP than it is
11 to read in a Word document.
12 Q.    Okay. So, your initial review of this
13 particular affidavit of probable cause wasn't to okay
14 the charges? It was to okay to put it into ASAP?
15      MR. BIONDO: I'm going to object to the form.
16      MR. HEMINGER: Same.
17      MR. BIONDO: If you can answer.
18 A.    Yes. My initial review was via a Word document
19 via email.
20 BY MR. JUBAS:
21 Q.    Okay. And that was just to make necessary
22 edits?
23 A.    Yep.
24 Q.    Okay. And once it was uploaded into ASAP, then
25 you and Claus had the discussion about it?

1      MR. HEMINGER: I object to any work product.
2  Anything that went on to come to the conclusion is work
3  product and I would ask you not to answer that.
4      MR. JUBAS: Well, we're not asking necessarily
5  for the work product. We're asking specifically
6  whether --
7      MR. HEMINGER: Work Law Claus --
8      MR. JUBAS: What the function was of Claus in
9  this review of the ASAP document.
10      MR. HEMINGER: I would consider that both work
11 product and the deliberative product -- deliberative
12 process privileges. If you wanted to just ask a generic
13 question without who was involved, that's one thing, but
14 what the process was, I have to object.
15 BY MR. JUBAS:
16 Q.    Okay. So, the act of you reviewing them prior
17 -- reviewing the affidavits prior to uploading into
18 ASAP, is that something that you did with each warrant?
19 A.    Sorry. Do you mean a search warrant or each
20 arrest warrant that I've ever done?
21 Q.    The search warrant in this case.
22 A.    No. ASAP is not involved in search warrants.
23 Q.    Okay. And are you review -- is a criminal
24 complaint uploaded to ASAP or just an affidavit?
25 A.    So, ASAP is a computer system that let's them

1  generate the complaint. So, they can pick charges, pick
2  gradings, fill in certain things like victim name to
3  auto-correct in the format that you may be used to
4  seeing it when your client gets a printed affidavit of
5  probable cause. So, it's used to assemble that document
6  that is the finished product.
7      So, there's various things. There's also some
8  aspect of it that I'm not extremely familiar with, just
9  has biographical information. I assume that goes into
10 some state database somewhere where it's tracked, but
11 it's things like names and dates of birth of different
12 witnesses or the defendants themselves.
13 Q.    Was the June affidavit that made its way into
14 ASAP, was that the first affidavit of probable cause the
15 county police attempted to get onto ASAP for review?
16 A.    Yes. When it was approved, it was the -- it is
17 the first time they submitted it specifically for that
18 purpose. However, as I said previously, the version
19 that ultimately became the charging document existed in
20 the format of all the ones I saw for -- not all -- not
21 identical. I'm not testifying that it's identical, but
22 in some format in all of the affidavits of probable
23 cause for the search warrants. Yeah.
24 Q.    And I think I know the answer to this. I just
25 want to be thorough. Does that mean that in May and

1  April of 2016, the Allegheny County Police did not try
2  to get charges approved?
3      MR. BIONDO: I'll object to form. If you can
4  answer, go ahead.
5  A.    That does not mean that they didn't try to get
6  charges approved. From the night that a crime happens,
7  there's always a question looming in the air about if
8  and when we can charge. That's the whole reason that
9  we -- whole reason that we weigh in on the search and
10 arrest warrants is because that discussion needs to be
11 had with us because we will be prosecuting the case
12 ultimately if it is charged.
13      So, to answer your question, this was an effort
14 in building the case. The county police were
15 investigating it. As they submitted probable cause,
16 there was always a question of where do you think we
17 should go next, what do you think we should be doing
18 with this case.
19 BY MR. JUBAS:
20 Q.    And those questions specifically, were those
21 directed to you?
22 A.    They were directed to me and other members of
23 the homicide unit.
24 Q.    Okay. Did you provide any advice regarding
25 those questions?

AA COURT REPORTERS  412-288-5370                    Page 29

1  A.    Yes.  Generally, yes.
2  Q.    Do you recall what you said with regards to
3  that?
4        MR. HEMINGER: I would object. That would have
5  to get into him acting in his attorney capacity in
6  preparing the litigation, the work product. So, I would
7  ask him not to answer that.
8  BY MR. JUBAS:
9  Q.    How about instances -- not necessarily what your
10 impressions were, but instances where you provided
11 insight?
12 A.    As long as we both understand that an incident
13 that I give you would not be the only example, when we
14 intercepted Mr. Shelton's jail mail, we realized that he
15 wanted an in-person visit with his father.  We all --
16 sorry.  Without getting into deliberations, there was a
17 discussion about whether to place a recording device in
18 the face-to-face interview room and how that should best
19 be accomplished.
20 Q.    How about just with regards to the existence or
21 nonexistence of probable cause for charges?
22 A.    You mean -- sorry.  Can --
23        MR. BIONDO: I'll object to form.
24 BY MR. JUBAS:
25 Q.    So, basically what I'm asking is specifically

AA COURT REPORTERS  412-288-5370                    Page 30

1  instances where you provided insight to the county
2  police with regards to the charging decision.
3        MR. HEMINGER: I think I have to object to that.
4  That would be work product, deliberative process, and I
5  think he'd be acting in his capacity as attorney, so,
6  his mental impressions.
7        MR. JUBAS: It's not with regards to the mental
8  impressions.  Just incidences where he would have had
9  conversations.
10       MR. HEMINGER: If you can remember, okay.
11 A.    Can I restate your question, not reform it?  You
12 mean do I have a specific incident where I talked to the
13 county police about the existence or nonexistence of
14 probable cause?
15 BY MR. JUBAS:
16 Q.    For charges.
17 A.    I have at least one recollection of that.  That
18 would be when Mr. Shelton was first identified,
19 obviously, they were excited that they believed they
20 identified him.  I, at that time, obviously, wasn't
21 going to move forward with the case just because they
22 identified one of the suspects.
23 Q.    Without getting into the content of the
24 discussions or your deliberations, do you recall if any
25 discussions were had with the homicide unit and you with

AA COURT REPORTERS  412-288-5370                    Page 31

1  regards to a charging decision subsequent to the April
2  statements by Kendall and Collins?
3  A.    When you say homicide unit -- I'm sorry to ask
4  you a question -- you mean the homicide unit at the
5  county police or the homicide unit in the DA's office?
6  Q.    Well, I guess my question -- that changes it.
7  First, yes, with regards to the county police.
8  A.    Did we -- sorry.  Is your question did I have a
9  discussion about the existence of probable cause after
10 the statements of the informants?
11 Q.    Probable cause with regards to charging.
12 A.    Yes.
13 Q.    Were there any of the similar discussions that
14 we've just been discussing between April 6th with those
15 witnesses and the -- I think it was June 23rd when the
16 charges were actually filed?
17 A.    Yeah.  Well, I want to be clear.  It's an
18 ongoing discussion.  They always are discussing probable
19 cause to do search warrant and there's always an
20 underlying discussion about whether we have enough to
21 arrest.  That's -- in any investigation, that is always
22 a question that is looming below the surface.
23       So, it's not like we sit down every day and say
24 today do we have probable cause.  It's sort of they're
25 continuing to investigate.  They bring me information

AA COURT REPORTERS  412-288-5370                    Page 32

1  sometimes in the form of a search warrant.  I learn
2  something new because now it has triggered a search
3  warrant or I'll go out there and ask to be briefed, but
4  there's an ongoing discussion about whether we have
5  sufficient probable cause to charge.
6  Q.    Do you -- after the April witnesses were
7  developed by the county homicide detectives, did you
8  yourself make any efforts like you said, like to go out
9  and ask or to be briefed?
10       MR. BIONDO: I'll object.  I'm sorry.  I don't
11 think I understand the question.
12       MR. JUBAS: So, yeah.  I'm just asking if after
13 April when they spoke with the witnesses, whether Mr.
14 Chernosky himself reached out and asked to be briefed on
15 the developments.
16       MR. BIONDO: Okay.
17 A.    I don't have a specific recollection, but I am
18 certain that I did.
19 BY MR. JUBAS:
20 Q.    Okay.  After the April witnesses came forth --
21 and that's early April -- was any additional evidence
22 provided to you from the homicide unit with regards to
23 this case or with regards to a charging decision?
24       MR. BIONDO: I'll object to form.  But if you
25 can answer, go ahead.

AA COURT REPORTERS  412-288-5370                                         Page 33

1 A.    Yes. So, aside from their investigative
2 efforts, there is the processing of physical evidence.
3 So, they would have been constantly getting evidence
4 back from the crime lab that, as it came back, they
5 would have updated me about. So, processing of the
6 vehicles or -- I don't have a specific recollection. I
7 know we got a fingerprint at one point on one of the
8 weapons in the house. So, as that came back, they would
9 present that to me and ask me if that -- well, not ask
10 me. I should say they would have a discussion whether
11 that adds to the picture or not.
12 BY MR. JUBAS:
13 Q.    Okay. When it comes to the statement that Rob
14 Thomas made -- and that would have been early April, as
15 well -- were you made aware of any of his movements or
16 transfers within Allegheny County Jail?
17          MR. BIONDO: I'll object to form.
18          MR. HEMINGER: Object to form.
19          MR. BIONDO: Just what statement?
20          MR. HEMINGER: Yeah.
21          MR. JUBAS: I'm sorry?
22          MR. BIONDO: I don't know what statement we're
23 talking about.
24          MR. JUBAS: The Rob Thomas statement.
25          MR. BIONDO: His interview by county police

---

AA COURT REPORTERS  412-288-5370                                         Page 34

1 detectives?
2          MR. JUBAS: Yes.
3          MR. BIONDO: Okay.
4 A.    I was made aware of that interview. I was not
5 made aware of any housing at the Allegheny County Jail
6 for Mr. Thomas.
7 BY MR. JUBAS:
8 Q.    Okay. Were you preemptively made aware of
9 either Kendall Mikkell or Freddy Collins' involvement
10 prior to their interviews?
11 A.    So, my recollection is that, at least with
12 regard to Mr. Mikkell, he reached out through prison
13 authorities, and I believe I was informed that they
14 intended to interview him, but that would have been the
15 extent of it.
16 Q.    Did you provide any insight with regards to Mr.
17 Mikkell at that time?
18 A.    No.
19 Q.    So, this was just you getting the information?
20 A.    Uh-huh.
21          MR. BIONDO: Yes?
22 A.    Yes. Sorry.
23 BY MR. JUBAS:
24 Q.    And no recollection concerning Mr. Collins?
25 A.    No specific recollection with regard to Mr.

---

AA COURT REPORTERS  412-288-5370                                         Page 35

1 Collins. No.
2 Q.    Okay. Do you recall when Freddy Collins started
3 becoming a problem for the prosecution?
4 A.    I don't remember month or year. I remember he
5 had an outburst at a court proceeding where he made
6 threats, and it was apparent from that day forward, he
7 was never going to be a witness for the Commonwealth.
8 Q.    Same question for Kendall Mikkell?
9 A.    So, there was a ruling -- I don't remember month
10 or year -- that Mr. Mikkell was declared an agent of the
11 state in a separate proceeding. That was probably a
12 year and a half into the case, but I don't recall
13 specifically when. We then started assessing whether we
14 -- we then had a discussion that it was a separate
15 proceeding and we could put on separate evidence if they
16 challenge that and that it was possible that he could
17 not be declared an agent of the state in this case. We
18 geared up and made a witness list to prepare for that
19 hearing and then decided we were not going to use him.
20 Q.    Okay.
21 A.    So, we canceled that motion -- or canceled the
22 proceedings for that motion.
23 Q.    Do you recall when the decision was made --
24 strike that.
25          Was the decision to drop Collins and Mikkell,

---

AA COURT REPORTERS  412-288-5370                                         Page 36

1 was that a district attorney decision or a county police
2 decision?
3 A.    It was a district attorney decision.
4 Q.    Okay. Do you recall when the decision to drop
5 Kendall Mikkell was made?
6 A.    I can only give you a general time period. I
7 don't recall the specific date.
8 Q.    What's the general time period?
9 A.    The general time period is after the ruling
10 on -- I believe the case was Rodney Howard. I could be
11 wrong about that name. After the ruling and before the
12 motion was scheduled to actually argue that, we had got
13 to the point of making a witness list to actually have
14 that hearing and decided we were not going to use him.
15 Q.    Okay. Was that your decision or was that a
16 deliberative process in the district attorney's office?
17          MR. HEMINGER: I would object just that that
18 would have been deliberative process on its face, I
19 would think.
20 A.    I'll answer. It was a deliberative process.
21 BY MR. JUBAS:
22 Q.    Okay. Can you tell me who was involved in the
23 deliberative process?
24          MR. HEMINGER: That would be part of his
25 deliberative process itself, and anything internally

---

AA COURT REPORTERS  412-288-5370    Page 37

1  about how a decision is made like that I believe is
2  covered by the privilege.  I believe it's a very broad
3  privilege.  I'm going to instruct him not to answer
4  that.
5       MR. PETRUNYA: Is it possible he could answer
6  that and then if we have to argue about the privilege
7  you're asserting -- I mean, this has been deemed
8  confidential.
9       MR. HEMINGER: I do understand that.  The
10  problem here it's a privilege that is recognized in many
11  cases like this.  I would refer you to the El cases on
12  Lexus where we had this same exact argument in the case
13  and I briefed it fully with the Judge, and the steps,
14  who was involved in an internal district attorney
15  decision as to whether to do or not do something is a
16  very broad deliberative process privilege in my
17  understanding and I can't allow it to be waived without
18  the Court compelling it.
19       MR. JUBAS: Would you mind emailing us to the
20  extent it's not cumbersome?
21       MR. HEMINGER: Sure.  Of course.
22       (There was a discussion off the record.)
23  A.     At the time that that decision was made, we had
24  three attorneys trying the case; myself, Alicia Werner
25  and Lisa Pellegrini.  They were all in on the decision.

AA COURT REPORTERS  412-288-5370    Page 38

1  Law Claus was the head of homicide.  He was in on the
2  decision.  Mr. Zappala did not sit in on, to my
3  recollection, any meeting about it but would have
4  weighed in on our thoughts on the decision and Ms.
5  Spangler would have weighed in on her thoughts.
6  BY MR. JUBAS:
7  Q.     Okay.  Out of you, Ms. Pellegrini and Ms.
8  Werner, did -- were the three of you on the same level
9  that -- did any of the three outrank the other?
10  A.     No. Nobody's opinion was given any more weight.
11  It was a discussion about where the case stood and our
12  prosecution without the witnesses.
13  Q.     Okay.  Generally speaking, are you aware -- were
14  you aware throughout the pendency of the criminal matter
15  of any payments that were made of any kind by anybody to
16  Mr. Mikkell, Kendall Mikkell?
17  A.     Yes.  I can tell you by the time the trial
18  rolled around -- and I had forgotten about the payment
19  but I now have a recollection of it.  After we decided
20  Mr. Mikkell was not going to be a witness anymore, I
21  believe Detective Kinavey approached me and said Mr.
22  Mikkell is relocating to West Virginia and would like
23  money to have, I believe, first month's and last month's
24  rent, security deposit.  I don't know what the figure
25  was.

AA COURT REPORTERS  412-288-5370    Page 39

1       At first, I pushed back and said he's no longer
2  a witness for us and then I reconsidered because of the
3  dangerous nature of this offense and the fact that his
4  name had been out in public since the preliminary
5  hearing.  I believed it was safer, if he was going to
6  permanently relocate, that we assist him with that.
7  Q.     Are you aware of, in 2018, any discussions
8  anyone in the district attorney's office was having with
9  Mr. Mikkell?
10  A.     Sorry. I don't have any specific recollections
11  of anybody else from the district attorney's office
12  having discussions with Mr. Mikkell in 2018.
13  Q.     Besides who?
14  A.     I don't have any specific recollection of any
15  conversation.
16  Q.     Okay.
17  A.     It would have been at some point witness prep.
18  I don't remember what year that was.  I know I talked to
19  him before the preliminary hearing because we still had
20  not made a decision on whether we were going to call him
21  at the time.  We ultimately did not call him as a
22  witness, but that would have been in 2016 or '17. So, I
23  don't have any specific recollection of a 2018
24  conversation with Mr. Mikkell.
25  Q.     Did you become aware of a complaint filed with

AA COURT REPORTERS  412-288-5370    Page 40

1  the district attorney's office by Mr. Mikkell?
2  A.     No.
3  Q.     Okay.
4  A.     If you can specify the year?
5  Q.     I believe it would have been 2020.
6  A.     You're talking during the trial?
7  Q.     I think so.
8  A.     I'm aware that Mr. Mikkell talked to the defense
9  counsel prior to the trial and then went to the media
10  during the trial, the day before it started.
11  Q.     Okay.
12  A.     I don't know if that fits your definition of
13  complaint.
14  Q.     Do you know if he filed one?
15  A.     No.
16  Q.     Is there a mechanism to file a complaint with
17  the district attorney's office?
18  A.     I don't know.
19  Q.     Are you aware, prior to 2018, of any payments
20  that were made by anybody to Kendall Mikkell?
21  A.     I don't have any specific recollection of any
22  payments made to Kendall Mikkell prior to 2018.
23  Q.     Do you recall not the content of the
24  discussions, but do you recall prior to 2018 any
25  discussions in the Allegheny County District Attorney's

AA COURT REPORTERS  412-288-5370                    Page 41

1  Office about payments being made to Mr. Mikkell?
2  A.    I don't recall because I don't recall the date
3  and time of the discussion with mister -- Detective
4  Kinavey. I can't tell you whether that was 2018 or
5  subsequent. It's my belief that it was subsequent. So,
6  that may qualify. I don't --
7  Q.    How about any 2016 payments?
8  A.    No.
9  Q.    Okay. When it comes to any payments that were
10  made to Mr. Mikkell -- and that includes benefits -- are
11  you saying that the only one that you have awareness of
12  occurred in 2018 pursuant to the conversation with
13  Kinavey?
14  A.    I'm not saying that. It would not surprise me
15  if Mr. Mikkell received payments as a consequence of him
16  being a witness in this case. There is a fund run
17  through the attorney general's office and a fund that
18  the district attorney's office runs for that purpose.
19  Ordinarily, it's as a direct result of the danger
20  they're placed in by being a witness. So, it includes
21  funds for a hotel room, possible relocation, but in this
22  specific case, I don't know dates, times or amounts that
23  Mr. Mikkell was paid.
24      (There was a pause in the proceedings.)
25  BY MR. JUBAS:

AA COURT REPORTERS  412-288-5370                    Page 42

1  Q.    Going back on the record, I don't have them
2  printed out yet, I just have them opened up here. I'll
3  just ask you to look through these documents. There's
4  five documents. This is from an email received this
5  morning. So, yeah. It was received this morning at
6  8:59 AM from Joseph Heminger and it included an
7  attachment with five pages, and these documents were
8  responsive to a -- a subpoena that was sent to Mr.
9  Heminger in this case.
10      MR. HEMINGER: And if I may say on the record,
11  the source of the documents were that they were sent to
12  me yesterday with the -- saying these may be responsive
13  to the subpoena. After some more looking around, you
14  know, that they did, so that's when I immediately sent
15  them to you this morning. That's their pedigree or
16  background.
17      MR. JUBAS: Who sent them to you?
18      MR. HEMINGER: They would have been sent from
19  the office to Mr. Brucker who then sent them to me. I'm
20  not sure exactly who sent them from the office.
21      MR. JUBAS: So, this is straight from the email?
22      MR. HEMINGER: Right.
23      MR. JUBAS: Go ahead and take your time, review
24  those. We can go off the record until he's done
25  reviewing them.

AA COURT REPORTERS  412-288-5370                    Page 43

1      MR. HEMINGER: When these documents were sent to
2  me, it was because they appeared to have the account
3  number that was referenced in the subpoena. That's all
4  that's known about them at this time. I just wanted to
5  get that on the record.
6  BY MR. JUBAS:
7  Q.    Mr. Chernosky, were you able to review those
8  documents?
9  A.    Yes.
10  Q.    And did you happen to notice the account number
11  for that?
12  A.    I did not.
13  Q.    Okay. Is it your belief that these documents
14  refer to the district attorney's fund that you were just
15  referencing?
16  A.    Yes. Contextually. I've never seen the account
17  number, didn't know what bank it was at.
18  Q.    Have you ever had any dealings with this bank
19  account?
20  A.    Generally.
21  Q.    Can you give me an idea of what types of
22  dealings?
23  A.    So, as I was saying, I don't know who runs it, I
24  don't know who authorizes it. I know that if we need it
25  for a case and a detective approaches me, they'll

AA COURT REPORTERS  412-288-5370                    Page 44

1  explain the need for it and for that particular account
2  and then make a request for the funds.
3  Q.    Did you have any involvement with this account
4  in this case?
5  A.    Not -- well, sorry. Not to my knowledge, but
6  the payment that we just discussed with Mr. Mikkell
7  after he was no longer a witness likely came from that
8  account.
9  Q.    Are you familiar with an Allegheny County Police
10  homicide account that was closed in 2018 that was not
11  used to make any payments in this case? Are you
12  familiar with it?
13  A.    I'm not.
14  Q.    Are there any other accounts used, to your
15  knowledge, by either the district attorney's office or
16  the county police besides this account with regards to
17  making payment to witnesses?
18      MR. BIONDO: Object to form.
19      MR. HEMINGER: Object to form. Yeah. He
20  testified he doesn't really know much about the
21  accounts, just about the payment itself.
22      MR. JUBAS: I'm just asking with regards to
23  whether he knows.
24      MR. BIONDO: Object to form still.
25  A.    There is another fund that the county police and

Case 2:22-cv-00196-CB    Document 83-27    Filed 07/01/24    Page 13 of 60

CHERON S HELTON/ROBERT THOMAS, et al.    CONFIDENTIAL ATTORNEYS' EYES ONLY    KEVIN CHERNOSKY
COUNTY OF ALLEGHENY, et al.                                                    March 15, 2024

AA COURT REPORTERS 412-288-5370                    Page 45

1  the state police have access to. It's administered by
2  the attorney general's office. I don't know how it
3  works. I do know that that one required a district
4  attorney to sign off that someone is in fact a witness
5  of the case and is in need of protection. So, I don't
6  know.
7  BY MR. JUBAS:
8  Q.    So, this was the other of the two funds that you
9  had referenced earlier?
10 A.    Yes.
11 Q.    Okay.
12 A.    And I don't think it's limited to homicide
13 cases. I think it's any case where witness protection
14 is needed.
15 Q.    Did the district attorney's office ever receive
16 any training on how to administer, deal with that fund?
17 A.    Me in particular, no, and I couldn't speak to
18 whether any other members. They did at the time and I
19 believe they still do have an entire forfeiture
20 department that deals with that.
21 Q.    You beat me to it.
22 A.    Sorry.
23 Q.    To the best of your knowledge, can you explain
24 how drug forfeiture is used to fund the account?
25        MR. HEMINGER: Object to form of the question.

AA COURT REPORTERS 412-288-5370                    Page 46

1  Go ahead, if you can answer.
2  A.    In a rudimentary way, if any money is seized by
3  a drug arrest, it will be forfeited, the funds will go
4  into account and my understanding is that they can be
5  used for law enforcement purposes, but that's my
6  base-level understanding of how the forfeiture works.
7  BY MR. JUBAS:
8  Q.    Okay. Do you know who in the district
9  attorney's office at the time throughout the pendency of
10 the criminal matter, who would have been involved with
11 the asset forfeiture aspect of this account?
12 A.    There's an attorney by the name of Angela Kelly
13 who is in the forfeiture department. Her name appeared
14 on one of those emails that you showed me. At the time,
15 one of the people who ran the budget generally was Amy
16 O'Neil whose signature appears on one of those documents
17 that you showed me. There are other members of the
18 forfeiture department, but I couldn't be specific as to
19 who they were in 2018 or '16.
20 Q.    Okay. Do you have -- I realize that you don't
21 know a lot of details. I'm just trying to see what you
22 do know. Do you know how old the DA fund that we're
23 discussing is?
24 A.    No.
25 Q.    Do you know how old the forfeiture unit is?

AA COURT REPORTERS 412-288-5370                    Page 47

1  A.    It's been there as long as I was a DA which was
2  16 years.
3  Q.    Were you aware of, throughout the pendency of
4  the criminal matter, any payments or benefits that were
5  made to Gregory Parker?
6  A.    Yes. Would you like me to --
7  Q.    Please elaborate.
8  A.    I don't have any specific recollection of
9  payments, though, it wouldn't surprise me if payments
10 were made to Gregory Parker. I do know that because he
11 was -- his status was incarcerated at the time he was a
12 witness, we did have to move him to another facility. I
13 can get specific, if you want.
14 Q.    Please do.
15 A.    We had to pay for his housing at that facility
16 out of pocket and we had to provide accounting to
17 defense counsel as to what was paid on his behalf. I
18 don't recall specific amounts, but it was 20 or $30,000
19 to house him in Erie County Jail.
20 Q.    Do you recall when you provided that information
21 to defense counsel?
22 A.    I don't recall specific month and year. I
23 recall we were scheduled for a motion on his -- I
24 believe filed by defense counsel on his ability -- or
25 our ability to use him in the case.

AA COURT REPORTERS 412-288-5370                    Page 48

1  Q.    Do you recall if that would have been early
2  2020?
3  A.    That generally fits my recollection, but I don't
4  recall the date.
5  Q.    Okay. Was there a specific district attorney
6  that helped to facilitate Gregory Parker's involvement
7  from the Grand Jury cases into the Wilkinsburg massacre
8  case?
9        MR. HEMINGER: Object to form of the question.
10       MR. BIONDO: Yeah. Same objection.
11 A.    No. Gregory Parker volunteered that information
12 while getting transported to a Grand Jury proceeding. I
13 was out of town and I got a call that he had come
14 forward as a witness and just instructed someone to have
15 him interviewed.
16 BY MR. JUBAS:
17 Q.    I think you said that Alicia Werner was one of
18 the attorneys in this case?
19 A.    Uh-huh.
20 Q.    Was she involved in the Grand Jury, as well, to
21 your knowledge, involving Mr. Parker?
22       MR. HEMINGER: I think I have to object to any
23 questions involving the Grand Jury. Under state law, I
24 don't think we can get into any Grand Jury matters.
25       MR. PETRUNYA: I'm going to put on the record

AA COURT REPORTERS 412-288-5370                                      Page 49

1  that the underlying criminal matter, there was an order
2  entered that any specific reference to the Grand Jury
3  and Mr. Parker was deemed to be admissible and turned
4  over to defense counsel. So, to the extent that Gregory
5  Parker in the Grand Jury discusses anything with this
6  case, that would be discoverable, and if you allege that
7  it's still privileged, put that on the record, he can
8  testify, and I guess we can deal with that issue down
9  the line, if we have to.
10         MR. HEMINGER: Based on your representation as
11  an Officer of the Court that you're sure that it is
12  something that can be testified about from Judge Rangos
13  would put an objection on the record as a general
14  proposition that you can't get into any kind of
15  testimony or evidence regarding that. Do you have any
16  thoughts on that, Dennis?
17         MR. BIONDO: Max is looking at it right now.
18         MR. JUBAS: We could also represent that -- we
19  can represent that in the hearings we're referencing
20  which were pretrial hearings prior to the February 2020
21  trial, a number of documents were produced by the
22  Commonwealth pertaining to specifically the Grand Jury
23  transcript with regards to Mr. Parker and that was ruled
24  to be discoverable.
25         MR. HEMINGER: Okay.

AA COURT REPORTERS 412-288-5370                                      Page 50

1         MR. JUBAS: Obviously, still it's Grand Jury, so
2  we're not going to get into the nitty-gritty of the
3  topics, but with regards to promises or benefits
4  received by Parker.
5         MR. HEMINGER: Alright. Since we're all
6  Officers of the Court, based on those representations,
7  I'll just make what other alternative objections may be
8  appropriate. Are you alright with that?
9         MR. BIONDO: I'm okay with that. I actually
10  think the question that was specifically asked would not
11  be covered. You're right.
12         MR. PETRUNYA: I'm just going to put on the
13  record that I'm looking at an order from Judge Rangos
14  that's signed October 10th of 2018 that relates to the
15  divulgence of the Grand Jury material related to the
16  Wilkinsburg massacre investigation.
17         MR. JUBAS: One moment, please.
18         MR. PETRUNYA: For the record, the order from
19  Judge Rangos specific to these transcripts was entered
20  December 17, 2019 and specifically discusses the
21  divulgence of Gregory Parker Grand Jury testimony from
22  2/15/18 to 3/29/18, all reports therefrom or promises
23  made and any other materials and that's signed by Judge
24  Rangos, and then, actually, there's a verification
25  signed by Mr. Chernosky from December 17th of 2019, as

AA COURT REPORTERS 412-288-5370                                      Page 51

1  well.
2         MR. JUBAS: So, I am going to be showing Mr.
3  Chernosky transcript on my laptop and we're going to
4  mark this as Plaintiff's Exhibit 1.
5         (Exhibit 1 was marked for identification.)
6         MR. HEMINGER: And also, just for the record,
7  this would also be covered by attorneys' eyes only
8  confidentiality we've all stipulated to at the beginning
9  of this deposition.
10  BY MR. JUBAS:
11  Q.   So, Mr. Chernosky, I'm going to show you first
12  page 1 of this transcript, and it is dated February 15,
13  2018. I think you just took a look at this, but, again,
14  if you could confirm that that's what I'm showing you?
15  A.   Yep.
16  Q.   And do you see a portion in that caption that
17  names district attorneys?
18  A.   Yes.
19  Q.   Are any of those district attorneys named, were
20  any of them involved with the Wilkinsburg massacre
21  prosecution?
22  A.   No.
23  Q.   Okay. I'm showing you -- this is from the same
24  transcript. Both dates were combined. So, this is
25  page 85 of the same transcript, and showing that to Mr.

AA COURT REPORTERS 412-288-5370                                      Page 52

1  Chernosky, were any of those district attorneys listed
2  in the caption involved in the Wilkinsburg massacre
3  prosecution?
4  A.   No.
5         MR. JUBAS: Without getting into -- well,
6  actually, we're -- let's go off the record again.
7         (There was a pause in the proceedings.)
8  A.   When you say involved in the prosecution, you
9  mean the actual presentation of the case?
10  BY MR. JUBAS:
11  Q.   No. Just generally.
12  A.   So, Ms. Walker was the head of the
13  investigations unit at that time. If you wanted a court
14  order for cell phone location information, you had to go
15  through her. I do believe we did. I do believe we did
16  two or more of those in this case. So, she would have
17  been involved in that aspect of it but not involved in
18  the presentation of the trial. Sorry.
19         MR. JUBAS: Okay. Do you recall -- actually,
20  we'll go off the record.
21         (There was a pause in the proceedings.)
22         MR. JUBAS: So, I just showed Mr. Chernosky an
23  email from Russ Broman of the DA's office dated
24  August 30, 2018 at 8:34 AM regarding subject Parker.
25  BY MR. JUBAS:

CHERON S HELTON/ROBERT THOMAS et al.
COUNTY OF ALLEGHENY, et al.
CONFIDENTIAL ATTORNEYS' EYES ONLY
KEVIN CHERNOSKY
March 15, 2024

AA COURT REPORTERS  412-288-5370    Page 53

1 Q.    Mr. Chernosky, do you recognize that email?
2 A.    Until you showed it to me, no.  That has
3 refreshed my recollection.  I don't see my DA's email
4 address on there, but that appears to be an email to me
5 from Mr. Broman.
6 Q.    Do you have any idea why it might not have shown
7 up as your DA's email address?
8 A.    It's auto-completed as my name, but it just
9 doesn't fill it out with the subsequent kchernosky@da --
10 or alleghenycountyda.us.  I believe it's my email.  It
11 just doesn't have the address there and it actually
12 looks like it printed and scanned from my email because
13 that's my name at the top.
14        MR. JUBAS: And he was indicating towards the
15 top of the email.
16 A.    Yep.
17 Q.    You would agree with me that Russ Broman in this
18 email represented that -- quoting -- I promised him
19 nothing but will bring his cooperation to the Court's
20 attention, which if I go first probably in January or
21 February, he should present a good appearance to
22 Borkowski.
23 A.    Uh-huh.  Yes.  Sorry.
24 Q.    So, with regards to the representation from Mr.
25 Broman that Broman promised him nothing, did that at the

AA COURT REPORTERS  412-288-5370    Page 54

1 time -- and this is August 30, 2018 -- did that jive
2 with your understanding of what promises, if any, Parker
3 was receiving?
4 A.    Yes.
5 Q.    Did you subsequently learn that Russ Broman's
6 representation in 2018 was not accurate?
7        MR. HEMINGER: Object to form of the question.
8 You can answer.
9 A.    I did not subsequently learn that.  I, to this
10 day, couldn't tell you what Mr. Parker ultimately got in
11 the case.
12        MR. JUBAS: Okay.  So, go off the record again.
13        (There was a pause in the proceedings.)
14        MR. JUBAS: I'm going to mark that email from
15 Russ Broman dated August 30, 2018 as Plaintiff's
16 Exhibit 2.
17        MR. HEMINGER: I would add for the record that
18 would also be covered by the attorneys' eyes only
19 confidential stipulation entered earlier today.
20        (Exhibit 2 was marked for identification.)
21 BY MR. JUBAS:
22 Q.    Is it fair to say that you never personally
23 reviewed the Grand Jury transcripts referred to as
24 Plaintiff's Exhibit 1?
25 A.    I don't think I could fairly say that.  They

AA COURT REPORTERS  412-288-5370    Page 55

1 were kept for me for a long time until I was authorized
2 by court order to look at them.  I couldn't tell you how
3 many times I've looked at them, but I know I've looked
4 at them at least once.
5 Q.    Do you recall when that was about?
6 A.    Likely in the lead-up to our decision on whether
7 or not to use Mr. Parker, but I couldn't tell you
8 specifically.
9        MR. JUBAS: So, going off the record again.
10        (There was a pause in the proceedings.)
11 BY MR. JUBAS:
12 Q.    So, Mr. Chernosky, I just showed you Plaintiff's
13 Exhibit 1 and that was page 6 from the March 29, 2018
14 portion of the transcript; is that accurate?
15 A.    Is it accurate that you just showed me that?
16 Q.    Yes.
17 A.    Yeah.
18 Q.    And did you have an opportunity to review that?
19 A.    Yes.
20 Q.    Did you see the part -- and this is a quote from
21 Mr. Ball with regards to what you just read.  We have
22 also given you -- meaning Gregory Parker -- a grant of
23 immunity as far as it concerns a Marcus White Junior
24 homicide and the homicide of Dayjon Parker.  Did you
25 review that?

AA COURT REPORTERS  412-288-5370    Page 56

1 A.    I read those words.  Yes.
2 Q.    And that would indicate that the district
3 attorney's office provided Gregory Parker with immunity
4 for two homicides; correct?
5        MR. HEMINGER: Object to form of the question.
6 You can answer.
7 A.    It doesn't necessarily mean that.  Can I
8 explain?
9 BY MR. JUBAS:
10 Q.    Please do.
11 A.    There are two types of immunity that we offer.
12 There's blanket immunity for the crime, we will never
13 prosecute you for it, and there's use immunity meaning
14 what you testify to here won't be used against you.  I
15 can't tell from those words which immunity grant was
16 given in that case.
17 Q.    And are you saying that typically, in most
18 Grand Jury circumstances, that would be identified?
19        MR. HEMINGER: Object to form.  You can answer.
20 A.    I can't say what's typical.  If you're having a
21 problem with someone hesitating to testify, you can
22 generally grant them immunity for anything they actually
23 say and that cures the issue, meaning we won't use your
24 testimony to prosecute you.
25        (There was a pause in the proceedings.)

1   BY MR. JUBAS:
2   Q.    So, Mr. Chernosky, just a little housekeeping,
3   recap. We were discussing the two forms of immunity.
4   Could you explain those again?
5   A.    Yes. Blanket immunity which says we'll never
6   prosecute for the crime -- sorry -- I'm paraphrasing --
7   and then there's use immunity which is anything you say
8   in this particular proceeding we won't use against you.
9   Q.    Which -- I guess from a defendant's point of
10  view, which is the more desirable immunity to get?
11  A.    Being told you'll never be prosecuted at all.
12  Q.    And that's the blanket immunity?
13  A.    Uh-huh.
14        MR. BIONDO: Is that a yes?
15  A.    Yes. Sorry.
16  BY MR. JUBAS:
17  Q.    Would you consider both of those forms of
18  immunity as benefits or promises?
19  A.    No. The first -- sorry. The use immunity I
20  consider a tool to get someone to testify. You say
21  okay, you have a problem telling us what you're going to
22  say, we won't prosecute you for anything you say.
23  Q.    Okay. And I think you said you are not sure
24  which immunity he received; correct?
25  A.    I can't tell from the phrasing that you showed

1   me what one it was.
2   Q.    Okay. Do you know who we would talk to in order
3   to determine which form of immunity Parker was given?
4   A.    Mr. Ball who was conducting the questioning
5   might know. Mr. Broman is since deceased. He might
6   know, but he's no longer with us. Those are the two off
7   the top of my head.
8   Q.    Okay. So, if Parker received blanket immunity
9   for the two homicides discussed on page 6 of Plaintiff's
10  Exhibit 1, would you consider that to be a benefit or a
11  promise?
12  A.    Yes.
13  Q.    Okay. If that is the case, would that make the
14  email in 2018 from Russ Broman which is Plaintiff's
15  Exhibit 2, would that make representations in that email
16  false?
17  A.    Can I -- sorry.
18  Q.    I could show you the email.
19  A.    If you don't mind. Sorry.
20        MR. JUBAS: Showing Mr. Chernosky Plaintiff's
21  Exhibit 2.
22  A.    Sorry. My answer to your question is not
23  necessarily. He said I promised him nothing, but if he
24  means he's been promised nothing for the entire case,
25  then that would make it inaccurate.

1   BY MR. JUBAS:
2   Q.    Okay.
3   A.    I just want to clarify. That's if he was given
4   blanket immunity from prosecution on both of those
5   homicides.
6   Q.    Got it. Do you know why this was turned over in
7   early 2020?
8   A.    I believe that we reached out to anybody who had
9   connection with Parker just as a matter of turning it
10  over to the defense in anticipation of calling him as a
11  witness whether he was offered anything.
12  Q.    Okay. And this is an August 30th -- referring
13  to Plaintiff's Exhibit 2, this is an August 30th, 2018
14  email. Do you know -- do you recall if Broman sent you
15  this or if this came about as a result of your own
16  searches through your email?
17  A.    Is your question -- and I apologize for asking
18  you a question. Is your question do I recall whether
19  Broman sent me that email or --
20  Q.    I'm asking -- so, when you were trying to get
21  evidence pursuant to the Court's order to turn over
22  regarding Parker promises, did you get that because
23  Broman sent it to you in 2020 or did you get it because
24  you printed it off your email in 2020?
25  A.    I would have -- I printed it, to my

1   recollection, off of my email in 2020 in the lead-up to
2   calling Mr. Parker or anticipating calling Mr. Parker as
3   a witness.
4   Q.    Okay. Now, specifically with regards to
5   promises made to Mr. Parker, did Russ Broman make any
6   representations to you in 2020?
7   A.    I don't have a specific recollection of whether
8   he told me anything in 2020.
9   Q.    Okay. With regards to any of the evidence
10  pertaining to Parker that was turned over to the defense
11  in early 2020, did any of that, to your recollection,
12  surprise you that you didn't know about?
13        MR. HEMINGER: Object to form of the question.
14  Go ahead.
15  A.    I don't remember anything surprising, anything
16  that I didn't previously know about or wasn't aware of.
17  BY MR. JUBAS:
18  Q.    Okay. So -- and refresh my recollection. With
19  regards to Plaintiff's Exhibit 1, the Grand Jury
20  transcript, was that something that you had reviewed
21  prior to 2020?
22  A.    Yes. Prior to 2020. I can't tell you when.
23  There was a time at which I wasn't authorized to see
24  those materials. You have to get an order to be
25  actually permitted to see those. So, I don't know how

CHERON S HELTON/ROBERT THOMAS, CONFIDENTIAL ATTORNEYS' EYES ONLY    KEVIN CHERNOSKY
COUNTY OF ALLEGHENY, et al.                                          March 15, 2024

AA COURT REPORTERS 412-288-5370                                   Page 61

1  long that time lasted, but at some point, I was
2  permitted to see them. I did review them and I was
3  aware of the testimony.
4  Q.    Okay. Can you tell me why information
5  pertaining to the immunity for Parker, why that
6  information wasn't turned over to the defense prior to
7  2020?
8  A.    I can't tell you why.
9  Q.    Okay. Do you believe that it should have been?
10        MR. HEMINGER: Object to the form of the
11 question.
12 A.    Sorry. I don't -- how should I say this? I
13 don't know what type of immunity we're talking about.
14 Right? I don't have a recollection today what it was or
15 how it was come about in that proceeding that we just
16 read. So, I don't believe that it should. If it was
17 just a use immunity, meaning please testify today, I
18 know you're afraid that we'll prosecute for what you
19 say, or if it was blanket immunity, those would result
20 in two different opinions.
21        If it was blanket immunity, the defense should
22 hear about it because they would want to cross-examine
23 him on the fact that he can't be prosecuted for,
24 apparently, two homicides. If it was use immunity, I
25 wouldn't necessarily think it had to be turned over

AA COURT REPORTERS 412-288-5370                                   Page 62

1  because that's a tool that basically aids us in getting
2  someone to testify.
3  BY MR. JUBAS:
4  Q.    Given the fact that you learned about this
5  sometime prior to 2020, in retrospect, do you think you
6  would have had a duty to inquire as to whether which
7  form of immunity it was?
8        MR. HEMINGER: Object to the form of the
9  question.
10        MR. BIONDO: Same objection.
11 A.    So, that's a hard question to answer. I don't
12 remember if I knew at one point and just don't know now.
13 I don't know if I had discussions about the type of
14 immunity he was granted. It seems to me it was likely
15 not blanket immunity, but I don't have a specific
16 recollection.
17 BY MR. JUBAS:
18 Q.    If -- and this is hypothetical, but does the
19 fact that Parker gave statements outside of Grand Jury
20 pertaining to the Marcus White Junior homicide, is that
21 at all indicative of whether it would have been blanket
22 or use immunity?
23        MR. HEMINGER: Object to the form of the
24 question. You can answer.
25 A.    Sorry. That could be indicative that it was

AA COURT REPORTERS 412-288-5370                                   Page 63

1  blanket if he gave statements and wasn't prosecuted. My
2  recollection is that at some point, he was charged with
3  it but -- and I apologize -- that particular case had a
4  pretty tortured history. I think it was filed at one
5  point and then dismissed at a preliminary hearing or
6  maybe withdrawn at a preliminary hearing and then
7  proceeded to Grand Jury after that.
8  BY MR. JUBAS:
9  Q.    So, that was the vigil shooting.
10 A.    Okay.
11 Q.    And you had referenced Parker, I believe, being
12 charged on the Marcus White Junior homicide?
13 A.    I had some recollection that he was. I don't
14 know if that's true or not.
15 Q.    Okay. So, I'll represent to you that he was
16 charged and that was subsequent to the end of the
17 Wilkinsburg massacre case as well as the dropping of the
18 vigil shooting case. So, if he was granted blanket
19 immunity, would it be a fair statement to say that he
20 would only receive that immunity if he followed through
21 with testifying in the cases that he was receiving the
22 deal for?
23        MR. HEMINGER: Object to the form of the
24 question. You can answer if you understand it.
25 A.    Yes. Except that there could be an argument

AA COURT REPORTERS 412-288-5370                                   Page 64

1  that any statement he gave wasn't voluntary because he
2  thought he was getting a benefit that he didn't get.
3  So, to answer your original question, yes, if -- sorry.
4  If someone doesn't follow through on their end, we don't
5  have any obligation to hold up our end. So, if the deal
6  was for blanket immunity and he did not in fact testify,
7  then we don't have any obligation to follow through with
8  that.
9  BY MR. JUBAS:
10 Q.    Because there would be no bargain?
11 A.    Yeah.
12 Q.    Okay. Could you just generally give me your
13 impression of Rob Thomas being let out of the case in, I
14 think, late January 2020?
15        MR. HEMINGER: I object to that question. Go
16 ahead and answer.
17        MR. BIONDO: Yeah.
18        MR. HEMINGER: Can you be more specific? I'm
19 sorry.
20        MR. JUBAS: Not with regards to any deliberative
21 process. Just generally.
22        MR. HEMINGER: Or work product or mental
23 impressions about the case or anything like that.
24        MR. JUBAS: Just his impression with regards to
25 the dismissal.

| AA COURT REPORTERS  412-288-5370 | Page 65 |
| --- | --- |

1   A.    We fought feverishly at every stage to -- I
2   shouldn't say fought feverishly.
3   BY MR. JUBAS:
4   Q.    Zealously?
5   A.    Argued zealously to keep him in the case and
6   I'll summarize that in a second. Rob Thomas was, in the
7   Judge's opinion, habeas motioned out of the case because
8   there was no informant that had a statement from Rob
9   Thomas. It was my opinion and part of our decision in
10  abandoning informants that we still had a case against
11  Rob Thomas because of the cell phone connections which
12  was his initial number and the location data showing he
13  and Cheron had different locations coming together or
14  phones we believed were his and phones we believed were
15  Cheron's and then going toward the crime scene and the
16  fact that both of them switched phones afterwards.
17      We considered it evidence against Rob Thomas
18  that Cheron reached out to his father to get a hold of
19  Rob in trying to get away -- sorry -- trying to get rid
20  of the murder weapon in our opinion. There was a
21  jailhouse letter that we intercepted and part of our
22  theory and part of our argument was that you don't have
23  to explain to your coconspirator what exactly you need
24  him to do with one of the murder weapons.
25      So, I don't know if you have the transcript from

| AA COURT REPORTERS  412-288-5370 | Page 66 |
| --- | --- |

1   that proceeding, but that was my argument because,
2   essentially, Judge Borkowski called upon us to say what
3   do you still have against Mr. Thomas, and I explained it
4   was his phone connections, the video evidence, the fact
5   that when he was interviewed, he had admitted to jumping
6   the fence at Nolan Court and going back to the back of
7   Cheron's house. So, circumstantially, in our minds, the
8   case starts from Cheron's house where he collects what
9   we believe was the murder weapon, goes to his car,
10  drives to the scene on Franklin Avenue and it ends back
11  there.
12      If you remember correctly -- or if I remember
13  correctly, this was a barbecue because it was like a
14  70-degree day. Both suspects that come over that fence
15  have winter coats on with the hoods up at the time they
16  come back, and Rob Thomas identified himself as one of
17  the two people that jumped the fence and went into the
18  back of Nolan Court. So, our case was circumstantial
19  against both defendants, quite frankly, but
20  circumstantial against Mr. Thomas. In Judge Borkowski's
21  opinion, he didn't think we had a case past the prima
22  facie level without the informants. I disagreed.
23  Q.    Did you -- just to try to parse that a little
24  bit.
25  A.    Sure.

| AA COURT REPORTERS  412-288-5370 | Page 67 |
| --- | --- |

1   Q.    Did you see any direct evidence connecting Rob
2   Thomas to the crime scene?
3   A.    When you say direct evidence, there are no
4   fingerprints or DNA or anything like that. It was a
5   circumstantial case against both defendants, but the
6   direct evidence was the admission that we claim was made
7   to the informants but --
8   Q.    Did you have any concerns as it related to the
9   informants regarding their credibility?
10  A.    No. Well, when we got the ruling on Kendall
11  Mikkell that he was an agent of the state, that's
12  obviously not ideal. Informants, in general, are
13  problematic, but my first step in most cases and this
14  case was to confirm their access to the defendants, to
15  have the detectives on my behalf look at their housing
16  records and make sure that they had access and then
17  definitely with regard to Mr. Mikkell, but I believe
18  with regard to Mr. Collins, I had them pull the video
19  from the jail that showed the individuals talking to one
20  another on the date that they said they were talking to
21  each other. So, I had no problems with proving that he
22  had access and that they did, in fact, have a
23  conversation.
24  Q.    Alright. One moment. Do you recall that Judge
25  Cashman recused himself? It was on May 15, 2018.

| AA COURT REPORTERS  412-288-5370 | Page 68 |
| --- | --- |

1   A.    I recall him recusing himself. I don't recall
2   the date.
3   Q.    Without getting into how this affected your
4   decisionmaking process, can you just give me your
5   impression of that recusal?
6   A.    Absolutely not unusual. He signed most of the
7   search warrants.
8   Q.    Could you explain?
9   A.    When the search warrants start getting
10  challenged, he would then be called upon to review his
11  own decision of probable cause. Just to avoid the look
12  of impropriety.
13  Q.    Are most search warrants -- or are search
14  warrants commonly applied for through the Court of
15  Common Pleas?
16  A.    We do a mix of both. I believe there are
17  certain ones we have to go through Common Pleas for, I
18  think cell phone warrants or anything requesting
19  location data, but it's probably an even mix. I would
20  say most homicide warrants, though, go through judges at
21  the Court of Common Pleas.
22  Q.    And do you recall --
23  A.    Sorry. Especially under seal, and I believe
24  almost all of the Wilkinsburg search warrants were under
25  seal. So, you are required to go to a Common Pleas

Case 2:22-cv-00196-CB    Document 83-27    Filed 07/01/24    Page 19 of 60

CHERON S HELTON/ROBERT THOMAS CONFIDENTIAL ATTORNEYS' EYES ONLY    KEVIN CHERNOSKY
COUNTY OF ALLEGHENY, et al.    March 15, 2024

1  Court judge.
2  Q.    Do you recall what it was that was the impetus
3  for this like in terms of timing for his recusal?
4  A.    I believe we were approaching the first
5  suppression motion on one of the search warrants.
6  Q.    So, he didn't make any of the rulings with
7  regards to the motions?
8  A.    I think that, yes, it's my recollection that he
9  had not ruled yet on at least the search warrants and
10 recused himself because of that.
11 Q.    Okay. Do you recall that the underlying motive
12 theory for the Commonwealth was that a Calvin Doswell
13 was killed by Lamont Powell who was one of the victims
14 of the massacre in 2016?
15        MR. HEMINGER: Object to the form of the
16 question. You can answer.
17 A.    I recall that was one of the -- that was one of
18 the motives we believed caused the shooting.
19 BY MR. JUBAS:
20 Q.    Were there others?
21 A.    Not that I recall.
22 Q.    Okay. Do you recall how that information was
23 developed by investigators?
24 A.    I don't remember. I'm sorry. When you say
25 developed, do you mean what they gathered afterwards or

1  how it first came to their attention?
2  Q.    How it first came to their attention.
3  A.    I don't recall.
4  Q.    Does it sound familiar that detectives were
5  receiving tips?
6  A.    Yes. Well, sorry. They were receiving tips
7  with regard to this entire case. Alright. I believe
8  one of those tips might have been about Mr. Doswell, but
9  I don't have a specific recollection of that.
10 Q.    Did you ever receive information indicating,
11 during this investigation, that this Doswell information
12 originated from the county police?
13 A.    I don't have a specific recollection of that.
14 Q.    Okay. Do you have a recollection of whether any
15 of the witnesses were close with Lamont Powell, Cheron
16 Shelton and Calvin Doswell?
17        MR. BIONDO: I'll object to form. You can
18 answer.
19        MR. HEMINGER: Object to the form.
20 A.    Can I ask you to specify? What do you mean by
21 witnesses? Do you mean any of the confidential
22 informants we've been discussing or any of the witnesses
23 in the case?
24 BY MR. JUBAS:
25 Q.    Witnesses in the case generally.

1  A.    That's a very broad question, but there were
2  multiple witnesses in the case who were close with
3  Lamont Powell, and I don't know about Calvin Doswell,
4  and I say that because there was a next-door neighbor.
5  There was -- I mean -- when you look at all the
6  witnesses that were interviewed, there were a lot that
7  were close to those people. So, it's hard for me to
8  answer because there are so many witnesses that are
9  implicated by your question.
10 Q.    Do you recall whether there were any witnesses
11 that knew Lamont Powell and knew Cheron Shelton that
12 were saying that they don't believe that it was Cheron
13 Shelton?
14        MR. BIONDO: I'll object to the form. But go
15 ahead and answer.
16 A.    I don't recall any specific witnesses. No.
17 BY MR. JUBAS:
18 Q.    Okay. If a witness was interviewed by Allegheny
19 County Police in this matter and the interviewee
20 indicated as much, that he knew both of the individuals,
21 Lamont and Cheron, and he rules out -- the witness rules
22 out Cheron Shelton as the perpetrator, would you
23 consider that exculpatory evidence that should be turned
24 over to the defense?
25        MR. BIONDO: Object to the form.

1        MR. HEMINGER: Object to the form.
2  A.    If an interview like that exists, I would
3  consider that exculpatory generally.
4  BY MR. JUBAS:
5  Q.    And the same goes for -- the same question
6  applies for a witness that indicates that his personal
7  knowledge of Lamont Powell indicates that Mr. Powell has
8  a lot of enemies?
9        MR. HEMINGER: I object again. It calls for
10 opinion. You can answer.
11 BY MR. JUBAS:
12 Q.    If that witness provided that statement, would
13 that be considered exculpatory?
14        MR. BIONDO: Object to the form.
15        MR. HEMINGER: Object to the form.
16 A.    I would consider -- if a witness said that
17 Lamont Powell had a lot of enemies, that that would be
18 something the defense would be interested in. I would
19 consider that exculpatory, albeit, mildly.
20 BY MR. JUBAS:
21 Q.    Okay. Do you recall generally or specifically
22 any incidences throughout the investigation where you
23 dealt specifically with a Detective Hoffman?
24 A.    I know Detective Hoffman. I'm certain I dealt
25 with him on this case. I don't have any specific

CHERON S HELTON/ROBERT THOMAS CONFIDENTIAL ATTORNEYS' EYES ONLY
COUNTY OF ALLEGHENY, et al.

KEVIN CHERNOSKY
March 15, 2024

AA COURT REPORTERS 412-288-5370                                          Page 73

1  recollection of dealing with Detective Hoffman.
2  Q.    Okay. One moment, please. When a Court opinion
3  from the Superior Court is designated as
4  non-precedential, does that mean that a ruling judge is
5  not allowed to consider that opinion?
6         MR. HEMINGER: Object to the question. You can
7  answer.
8  A.    My understanding is that it's persuasive
9  argument only, but it's not precedent. So, it doesn't
10 control.
11 BY MR. JUBAS:
12 Q.    It's not binding precedent, but you would agree
13 that it is something that can be considered by a judge?
14 A.    Yes. Sorry. It's my understanding it shouldn't
15 be cited to in a motion or attached or -- but you can
16 point it out, give the judge a copy, but you certainly
17 shouldn't cite to it.
18 Q.    Could you elaborate on that?
19 A.    I just mean you shouldn't -- if you were
20 required to brief, you shouldn't cite to that as an
21 authority in any capacity. It's not precedential. It's
22 persuasive.
23 Q.    Would you cite it and specify that?
24 A.    I probably wouldn't cite it. I probably would
25 tell the judge about it and give him a copy if he wanted

AA COURT REPORTERS 412-288-5370                                          Page 74

1  to read it.
2  Q.    Do you remember specifically when the decision
3  to -- that the Commonwealth was going to use Gregory
4  Parker in this prosecution was made?
5  A.    No. I believe it was after Mr. Mikkell was out
6  of the case. I know I got the call in March of '16
7  because I was in New Orleans. So, I know that's when he
8  came forward. Only time I went down to Mardi Gras.
9  Q.    How was Mardi Gras?
10 A.    It was fine. It was hugely inconvenient. I was
11 out of town so I let someone else handle it. So, it
12 would have been post March of '16. It would have been
13 March of '17. Sorry.
14 Q.    Okay. Do you recall whether the decision to use
15 him was made after he gave statements on the case?
16 A.    Oh, yeah. Certainly. Sorry. We can't even
17 assess whether we want to use someone unless they've
18 given a statement and it told us what we want to know.
19 Q.    I'll represent that he made statements on the
20 case in February and March --
21 A.    Okay.
22 Q.    -- of 2018.
23 A.    Okay. '18. Sorry.
24 Q.    So, sometime after that, the decision was made?
25 A.    Yes.

AA COURT REPORTERS 412-288-5370                                          Page 75

1  Q.    Okay. And you think it was made after the
2  decision to drop Mikkell was made?
3  A.    Right. I think we -- my recollection is that we
4  had the information, came forward, had statements, and
5  at the same time, we were deciding whether Mikkell would
6  be a part of the case and that we made the decision to
7  use Gregory after we decided that Mr. Mikkell wasn't in
8  the case.
9  Q.    Okay. What was your impression of Neil Carmen's
10 testimony which led to dropping Gregory Parker?
11        MR. HEMINGER: I would object to that question.
12 You're asking for his mental impressions in connection
13 with litigation he was an attorney in. I'd instruct you
14 not to answer.
15 BY MR. JUBAS:
16 Q.    Do you generally recall the videos that were
17 taken from Hilltop surveillance of what you believe to
18 be Mr. Shelton around 1214 Nolan Court?
19 A.    Yes.
20 Q.    Do you recall the videos of him -- and I think
21 it was about the 10:20 PM timeframe -- getting out of a
22 car and entering 1214?
23        MR. HEMINGER: Object to the form of the
24 question. You can answer.
25 A.    Generally, I recall that that occurred. I

AA COURT REPORTERS 412-288-5370                                          Page 76

1  couldn't tell you the time period. Just to be clear,
2  they pulled up two or three days worth of footage from
3  there. I remember it was extremely large as far as the
4  data sent.
5  BY MR. JUBAS:
6  Q.    Okay.
7  A.    I remember that he gets to the house at some
8  point, enters through the front door. I believe he then
9  leaves and moves that white Lincoln from the front to
10 the back of the house. I don't know how long any of
11 that transpired.
12 Q.    Okay. So, and you recall that there was video
13 from the rear of 1214 where an object was placed
14 outside?
15 A.    Yes.
16 Q.    Okay. Now, prior to that, do you recall
17 representing that the video of Mr. Shelton -- allegedly
18 Mr. Shelton entering 1214, do you recall representing
19 that he had a gun on him at that time.
20        MR. HEMINGER: Object to the form. You can
21 answer, if you can.
22 A.    If I could clarify, you mean representing in a
23 proceeding?
24 BY MR. JUBAS:
25 Q.    Yes.

AA COURT REPORTERS 412-288-5370                    Page 77

1  A.   No.
2  Q.   Okay.
3  A.   I don't recall that.
4  Q.   Do you recall any homicide detectives ever
5  representing to you that that is what was happening;
6  that Mr. Shelton had a firearm in his pants and that he
7  was hobbling to 1214?
8       MR. BIONDO: I'll object to the form.  Go ahead.
9  A.   I recall vaguely some discussion about that
10 particularly in light of the face-to-face recording in
11 the interview room and some of the actions he makes on
12 that and whether that's substantiated by Nolan Court
13 video.  I don't recall having that similar belief, but I
14 vaguely recall discussions about whether that was
15 occurring.
16 BY MR. JUBAS:
17 Q.   So, if you didn't make that observation or that
18 representation at trial, is it fair to say it's because
19 you didn't believe that it was that way?
20 A.   Sure.  If I didn't say that at trial, it wasn't
21 something I thought was important to argue or that I
22 thought could be substantiated or that I thought was
23 even important.
24      MR. JUBAS: Okay.  I think we can take five real
25 quick, see if we can expedite this.

AA COURT REPORTERS 412-288-5370                    Page 78

1       (There was a pause in the proceedings.)
2                    - - - -
3              EXAMINATION
4                    - - - -
5  BY MR. PETRUNYA:
6  Q.   So, Mr. Chernosky, I apologize for jumping
7  around, but I want to touch on a couple things we talked
8  about initially about how the homicide unit operates.
9  So, in 2016 when the crime first happened and then the
10 charges were filed June 23rd, 2016, how many attorneys
11 were part of your homicide unit at the DA's office?
12 A.   One supervisor and five attorneys, if I recall
13 correctly.
14 Q.   So, in total, then, excluding Mr. Zappala, we're
15 talking about six people?
16 A.   I believe.
17 Q.   Okay.
18 A.   For a while, Ms. Ramaley had a half-and-half
19 role where she did homicide and investigations cases.  I
20 don't know what that time period was, but five, maybe
21 six attorneys.
22 Q.   And your assignment on this case came from just
23 kind of how you were up in the rotation, as we call it?
24 A.   Uh-huh.
25 Q.   Is that a yes?

AA COURT REPORTERS 412-288-5370                    Page 79

1  A.   Yes.  Sorry.
2  Q.   I think we've had similar testimony from the
3  detectives, but you would agree with me -- I think you
4  said that collectively, the homicide unit at the DA's
5  office works together in reviewing cases and helping
6  each other?
7  A.   Yes.
8  Q.   Okay.  Now, this ASAP system that we talked
9  about.
10 A.   Yes.
11 Q.   So, in this case specifically, you remember the
12 charges going live, as we'll say, after having reviewed
13 numerous Word documents for search warrants and probable
14 cause; correct?
15 A.   Yes.
16 Q.   And I don't want you to you speculate, but is it
17 possible that at the time between March 9, 2016 and
18 June 23rd of 2016, that you and the other five people in
19 the homicide department had reviewed, at various points,
20 this Word document before it was uploaded?
21      MR. BIONDO: Object to the form of the question.
22 You can answer, if you can.
23 A.   Yes.  I would hesitate to say all five, but yes.
24 BY MR. PETRUNYA:
25 Q.   I mean, the point is you're having conversations

AA COURT REPORTERS 412-288-5370                    Page 80

1  collectively amongst the homicide department?
2  A.   Yes.
3  Q.   In 2016, how long had you worked at the homicide
4  department at the DA's office?
5  A.   Two, two and a half years.
6  Q.   So, you would have been going back to -- so,
7  2016 -- let's say 2013, you might have started?
8  A.   Yes.
9  Q.   And there were -- I wrote down some of the names
10 of the people that were working with you at the time,
11 but I guess, in general, when we're talking about -- I
12 think it was Ramaley, Pellegrini.  Were you the most
13 junior or rookie attorney in the homicide department in
14 2016?
15 A.   No.
16 Q.   Did some of the attorneys in the department
17 predate your work in the department?
18 A.   Yes.
19 Q.   Who had worked there longer than you had at that
20 time?
21 A.   Lisa Pellegrini had been there for 20 plus
22 years.  Ms. Ramaley worked for the office, left for a
23 while and came back.  So, I would consider her more
24 senior than me.
25 Q.   Okay.

CHERON S HELTON/ROBERT THOMAS  CONFIDENTIAL ATTORNEYS' EYES ONLY          KEVIN CHERNOSKY
COUNTY OF ALLEGHENY, et al.                                                March 15, 2024

AA COURT REPORTERS  412-288-5370                    Page 81

1  A.    When I first started in homicide -- though, I
2  don't know if it was the case in 2016 -- a DA by the
3  name of Rob Schupansky was there. He had more seniority
4  than me. I think he was gone not from the office
5  entirely. I think he was a supervisor of our general
6  trial division in 2016. My recollection is Bill Petula
7  was there. He was one year less senior than I was.
8  When Alicia Werner came over on the case, which would
9  have been midway through the Wilkinsburg case, she was
10  the least senior at that time. She had only been in one
11  other unit. So, I was probably middle of the road as
12  far as seniority goes of the homicide unit.
13  Q.    We're saying 2016?
14  A.    Yes.
15  Q.    And 2013 is when you started?
16  A.    Yes. 2013 is when I started in the homicide
17  unit. I was in the office since 2007.
18  Q.    Do you recall, at any point during your time
19  working in the homicide unit, of being involved in or a
20  case Commonwealth versus Samuel Mitchell?
21  A.    I know the caption.
22  Q.    Okay.
23  A.    I never touched that case.
24  Q.    Okay. Would that have been handled by other
25  people in the homicide department?

AA COURT REPORTERS  412-288-5370                    Page 82

1  A.    Yes.
2  Q.    What about Commonwealth versus Rodney Howard
3  Junior which, I think, was a 2014 case? Do you recall
4  that one?
5  A.    I know the case. I never handled that case.
6  Q.    But someone in your homicide department would
7  have worked on it?
8  A.    Yes.
9  Q.    What about Commonwealth versus Henry Little
10  Foster, also a 2014 case?
11  A.    I know the name as you just said it. I didn't
12  work on the case, but it was in the homicide unit.
13  Q.    Commonwealth versus Jordan Johnson, 2015. Was
14  that a homicide case?
15  A.    I don't recall that case at all.
16  Q.    Commonwealth versus Destiny Walker, 2015. Was
17  that a homicide case?
18  A.    The name sounds familiar. I have no
19  recollection of whether that was a homicide case.
20  Q.    And then we already talked about Rodney Howard
21  Junior from 2014. So, my question is we talked about
22  people being designated agents of the state and we
23  talked about non-precedential decisions from the
24  Superior Court. Is it fair to say, though, that before
25  those decisions are issued by the Court, or written,

AA COURT REPORTERS  412-288-5370                    Page 83

1  your office would generally have an understanding of
2  witnesses that are being challenged in other criminal
3  cases that you're working on?
4          MR. HEMINGER: Object to the form of the
5  question. You can answer.
6  A.    Yes. Generally, those would be handled by our
7  appeals division for the most part. So, they would
8  inform us, right, as to the progress of any motions in
9  the higher court, but whether they would say -- because
10  the appeals division doesn't have the ability to tell us
11  this is what's happening, don't do anything with this.
12  They would just tell us about the decision and we would
13  either decide as a unit or discuss further with the
14  office how we're supposed to proceed.
15  BY MR. PETRUNYA:
16  Q.    I guess it goes without saying, but to get to
17  the appeals division, you would have to go through the
18  underlying trial court level; correct?
19  A.    Yes.
20  Q.    So, it's fair to say, then, that the homicide
21  department would generally have an understanding, at
22  least at the trial level, of which witnesses were
23  potentially being challenged for their involvement in
24  other cases?
25  A.    I would say yes. Not a comprehensive like list,

AA COURT REPORTERS  412-288-5370                    Page 84

1  but more a -- at the time that someone challenges that,
2  we might be informed if -- there's no requirement to
3  tell us until the decision comes down there are or are
4  not an agent of the state.
5  Q.    But you might have knowledge of these witnesses
6  being used in other cases and their challenges?
7          MR. HEMINGER: Object to the form of the
8  question. You can answer.
9  A.    We might have knowledge of it. Yes.
10  BY MR. PETRUNYA:
11  Q.    And do you know if the -- as far as like
12  policies are concerned, whether it's formal or informal,
13  are the detectives relying on you to provide that
14  information to them when they're utilizing informant
15  witnesses when the affidavits of probable cause are
16  being written?
17          MR. HEMINGER: Object to the form of the
18  question. You can answer if you understand it.
19  A.    Are they relying on us to tell them we don't
20  want to use the witness?
21  BY MR. PETRUNYA:
22  Q.    That or just in general of, hey, I see you're
23  using this person in this case, we have him on another
24  case and they were unreliable just in general when
25  you're looking at these affidavits?

AA COURT REPORTERS 412-288-5370    Page 85

1  A.    Generally, yes. Not in every circumstance. I
2  can tell you that the more cases that anybody testifies
3  on, the less you want to use them because just at a
4  certain point, you've used them too much, and I can tell
5  you that, obviously, before you decide whether you're
6  going to use somebody, they have to be interviewed.
7       I would never tell any detective not to
8  interview someone who's been used before because you
9  want the information even if you don't use them as a
10  witness, and at a certain point, to do that, you have to
11  get -- not every witness. Some witnesses are
12  incarcerated at the time. We have to approve the court
13  orders to get witnesses out to talk to them in the
14  interview room.
15       So, if we see a name pop up too many times, just
16  say go ahead and talk to them if you want, but we're not
17  using them for this case because they've been
18  interviewed on this case and this case and this case.
19  Q.    Do you recall that being communicated to the
20  detectives at any point before Frederick Collins and
21  Kendall Mikkell came forward?
22  A.    I don't recall ever having a conversation on the
23  informants on this case where I said we may or may not
24  use them. I was open to taking information from
25  anybody.

AA COURT REPORTERS 412-288-5370    Page 86

1  Q.    So, the process of reviewing the affidavit of
2  probable cause in this case, you would agree with me
3  that the Wilkinsburg massacre occurred on March 9th of
4  2016; correct?
5  A.    Yes.
6  Q.    The formal criminal complaint charges and the
7  arrests of Cheron Shelton and Robert Thomas were not
8  made until June 23rd, 2016; correct?
9  A.    Until you said that, I had no specific
10  recollection. I know it was June of 2016.
11  Q.    And I think you referenced earlier that there's
12  conversations that you're having with the detectives
13  along the way as they're developing suspects or even
14  arresting individuals that they may believe are
15  suspects; correct?
16  A.    Yes.
17  Q.    And June -- I'm sorry. March 24, 2016 was when
18  Cheron Shelton was arrested. Do you recall that?
19  A.    I recall he was arrested near the end of March.
20  I believe it was a probation violation.
21  Q.    And do you recall whether you authorized those
22  or reviewed that criminal complaint for the probation
23  violation?
24  A.    They don't file criminal complaints for
25  probation violations. So, that's a decision of the

AA COURT REPORTERS 412-288-5370    Page 87

1  individual judge that's supervising him.
2  Q.    And so is that decision being made by the
3  detectives to bring that probation violation up or --
4       MR. BIONDO: I'll object to the form. If you
5  can answer, go ahead.
6  A.    No. Sometimes that's a tool they can use, but
7  no.
8  BY MR. PETRUNYA:
9  Q.    Were you aware of the fact that Mr. Shelton was
10  being arrested at the time that it was happening?
11  A.    I don't specifically recall if I knew the day he
12  was getting arrested he was getting arrested. No.
13  Q.    Were you aware at any point during the time at
14  the end of March of where he was being placed in the
15  jail when he was arrested?
16  A.    No.
17  Q.    And do you recall at any point any of the
18  detectives as of March 24, 2016 requesting to file
19  charges against Cheron Shelton for the Wilkinsburg
20  massacre as of that day?
21  A.    I don't recall. No.
22  Q.    Do you recall whether there was probable cause
23  as of March 24, 2016 to file charges against Cheron
24  Shelton?
25       MR. HEMINGER: Object to the form of the

AA COURT REPORTERS 412-288-5370    Page 88

1  question. You can answer.
2  A.    In hindsight, the circumstantial case could have
3  been filed that day, but we didn't.
4  BY MR. PETRUNYA:
5  Q.    Okay. You would agree with me that -- and I
6  think this was actually put in pleadings that you
7  signed, but none of the firearms from this murder were
8  ever located; correct?
9  A.    Yes.
10  Q.    And one of the things as the detectives are
11  going through the investigative process, you have
12  circumstantial evidence but you also have direct
13  evidence that's being sent to the lab and being
14  reviewed; correct?
15  A.    Yes.
16  Q.    And one of the things that we've talked about
17  with these detectives is this idea -- the City of
18  Pittsburgh has its own homicide investigation
19  department; correct?
20  A.    Yes.
21  Q.    And so those officers, they have their own
22  jurisdiction over murders that happen in the city?
23  A.    Yes.
24  Q.    But those murders are still overseen and the
25  charges are still overseen by the district attorney's

CHERON S HELTON/ROBERT THOMAS CONFIDENTIAL ATTORNEYS' EYES ONLY          KEVIN CHERNOSKY
COUNTY OF ALLEGHENY, et al.                                               March 15, 2024

AA COURT REPORTERS 412-288-5370                                          Page 89

1    office; correct?
2  A.    Yes. The same for approval of search warrants
3    and arrest warrants applies to the City of Pittsburgh.
4  Q.    Do you recall at any point having conversations
5    with any of the detectives about having access to or
6    speaking to individuals in other murder cases to see if
7    they could locate the murder weapons in this matter?
8  A.    I have one specific recollection as it revolves
9    around locating a murder weapon. Very close to the
10   start of trial, a defense attorney reached out to us who
11   had a client who was also facing a murder charge who
12   said that they could locate the weapon or believed they
13   could ultimately. They didn't tell me the ID, or if
14   they did tell me the identification, I did not know who
15   it was. They went as far as requesting that he could
16   help to locate it himself and that was an absolute deal
17   breaker as far as I was concerned.
18 Q.    In your experience when you're dealing with
19   homicide cases, is it something that you would
20   anticipate or something you would hope of the detectives
21   to go and review or talk to other individuals tied to
22   weapons that may have hits in the database for weapons
23   used in other cases?
24 A.    So --
25         MR. HEMINGER: Object to the form. You can

AA COURT REPORTERS 412-288-5370                                          Page 90

1    answer if you understand it.
2  A.    I'm going to have to break that down a little
3    bit. We were always looking for the two weapons
4    involved in this case. It would have been my desire to
5    find them and find a connection to them. If I recall
6    correctly, the 762 was used in another homicide many
7    years before, so it was always my desire to find those
8    weapons.
9         It was also my recollection that the detectives
10   worked tirelessly to find those weapons. My
11   recollection is they found multiple discarded weapons on
12   the hillside behind Nolan Court. We checked those.
13   Those were not the weapons.
14        Tips rolled in. There was a small cache one of
15   which was a 762 found in an abandoned garage, if I
16   remember correctly, by a Wilkinsburg police officer.
17   Those were checked. Those were not the weapons. So, in
18   my recollection, they made efforts to try to locate the
19   weapons. I believe your specific question was would I
20   have had a desire that they talk to someone who's
21   incarcerated about locating these weapons?
22   BY MR. PETRUNYA:
23 Q.    Yes.
24 A.    To the extent that it would have turned up the
25   weapons, I would have always been interested in that as

AA COURT REPORTERS 412-288-5370                                          Page 91

1    part of the investigation.
2  Q.    Sitting here today, were you aware of the fact
3    that the head stamps on the bullets from the AK-47 were
4    come back as positive hit from the crime lab on
5    March 15th of 2016 for the Donald Russell homicide in
6    2011?
7  A.    Yeah. That's the circumstance I was just
8    referring to that the AK-47 was used in another murder.
9  Q.    If the detectives in the case had interviewed
10   anyone associated with the Donald Russell homicide to
11   try to locate the murder weapon, is that something that
12   should have been documented in the file and put in as
13   part of the exculpatory evidence?
14        MR. HEMINGER: Object to the form of the
15   question. You can answer.
16        MR. BIONDO: Same objection.
17 A.    Sorry. To answer your question, if they did any
18   research or investigation to that, I would have expected
19   a report on it.
20   BY MR. PETRUNYA:
21 Q.    Did you ever ask the detectives that were
22   assigned it this case if they ever interviewed anyone or
23   did any investigation of that?
24 A.    I don't recall.
25 Q.    Sitting here today, do you have any knowledge

AA COURT REPORTERS 412-288-5370                                          Page 92

1    that that investigation occurred?
2  A.    No.
3  Q.    After Cheron Shelton was arrested, a DNA sample
4    was taken from Mr. Shelton; correct?
5  A.    Yes. I don't know when.
6  Q.    And that DNA sample was done with a mouth swab?
7  A.    Yes.
8  Q.    And you would agree with me that that DNA sample
9    came back excluding him from the saliva that was found
10   next to where the suspected AK shooter was located?
11 A.    Yes.
12 Q.    You would agree with me based on the casings
13   that were found at the scene, too, it was always the
14   theory at least two individuals were working together to
15   perpetrate this crime?
16 A.    Yes.
17 Q.    And do you generally have an understanding of
18   when there was enough probable cause to charge -- I know
19   we talked about circumstantially, you believe there was
20   enough probable cause to charge Cheron Shelton after the
21   search warrants in Nolan Court and he was arrested. Do
22   you have that same understanding for Rob Thomas?
23        MR. HEMINGER: Object to the form of the
24   question. You can answer if you can.
25 A.    Yes. Except I couldn't tell you a specific date

CHERON S HELTON/ROBERT THOMAS  CONFIDENTIAL ATTORNEYS' EYES ONLY                    KEVIN CHERNOSKY
COUNTY OF ALLEGHENY, et al.                                                          March 15, 2024

1   after Rob Thomas was interviewed and identified himself
2   as jumping over the fence on the back of Nolan Court and
3   I don't recall what day that interview was, I believe
4   under the same circumstantial theory with Mr. Shelton,
5   once we had a solid connection of him putting himself to
6   what we believed was the return after the murders, I
7   believe we could have charged that day.
8          I have to be honest with you.  I wasn't in a
9   rush to charge the case on anybody's timeline but my own
10  so -- and I wanted to feel comfortable with the
11  prosecution and comfortable with where we stood from an
12  evidence standpoint, hence, why we waited for a lot of
13  the stuff from the crime lab to be worked.
14         So, I guess, to answer your question, based on
15  the circumstantial nature of the case, you always want
16  it to be better, but in our theory of the timeline, once
17  Rob Thomas identifies himself as coming back after the
18  murder, in connection with everything else, we would
19  have had enough probable cause to charge him then.
20  BY MR. PETRUNYA:
21  Q.     Does that mean that at the time that Rob gave
22  his statement, then there were no other suspects that
23  anyone was looking into that you're aware of?
24  A.     That's not what that means.
25  Q.     I was just clarifying that for the record.  Did

1   you review or did you see at any point through your
2   analysis the FBI memo and the ATF memo that came in
3   about alternative suspects related to the -- this case
4   and specifically related to Lamont Powell having
5   murdered two drug dealers a couple months before?
6          MR. HEMINGER: Object to the form of the
7   question.  If you understand, you can answer.
8   A.     Thank you.  My recollection is -- my
9   recollection -- and I could be confused about this -- is
10  that the case that was referred to connected to Lamont
11  Powell was the Calvin Doswell case.  I don't recall as I
12  sit here today any other murder that Mr. Powell was
13  allegedly connected to.
14  BY MR. PETRUNYA:
15  Q.     So, you don't have any independent recollection
16  of an FBI memo discussing him being in possession of
17  drugs and cash stolen from two drug dealers from a
18  murder that happened months before the Wilkinsburg
19  massacre?
20  A.     I don't have any recollection of that.
21  Q.     Do you have any recollection if that was
22  investigated by the detectives?
23  A.     No.
24  Q.     Okay.  And if that was investigated by the
25  detectives, then you would anticipate those

1   investigations and the interviews that were conducted
2   appearing in their files?
3   A.     Yes.
4   Q.     Now, I think you had said the decision to not
5   use Frederick Collins came after there was an outburst
6   in court that he had?
7   A.     Yes.
8   Q.     Okay.  Do you recall reviewing any information
9   related to the statement that Mr. Shelton allegedly gave
10  to Mr. Collins and its veracity?
11  A.     Do you mean -- I apologize for asking you a
12  question.  Do you mean do I have any recollection of
13  reviewing it other than in the affidavit of probable
14  cause?
15  Q.     Correct.
16  A.     Prior to charging?
17  Q.     Correct.
18  A.     I don't have any recollection of reviewing the
19  statements either written or even recorded prior to
20  seeing it in the affidavit of probable cause.
21  Q.     Did you know that Collins and Mikkell were
22  talking to detectives before the affidavit of probable
23  cause hit your desk?
24  A.     Yes.
25  Q.     When did you learn about that?

1   A.     It would have been at or about the time they
2   came forward, I would have been informed that they had a
3   potential witness from the jail.
4   Q.     And so do you recall why charges weren't brought
5   in April of 2016 after these individuals had spoke to
6   detectives?
7          MR. HEMINGER: I would object to that.  You're
8   asking for the deliberative process as to why or why not
9   they did a prosecution.  So, I would ask you not to
10  answer that.  Or you could try and rephrase it
11  differently.
12  BY MR. PETRUNYA:
13  Q.     Was there any evidence that came back from the
14  crime lab between April 6, 2016 and June 23rd, 2016 that
15  directly connected Cheron Shelton or Robert Thomas to
16  the Wilkinsburg massacre?
17  A.     No.
18  Q.     Okay.  So, the circumstantial claims against Rob
19  Thomas and Cheron Shelton were all related back to the
20  witness statements and the information you already
21  obtained?
22  A.     Yes.
23  Q.     My cocounsel had asked you about a Shaquan
24  Roberts who you had no recollection of seeing his name
25  or reviewing a statement from him; correct?

1 A.    Yes.
2 Q.    And you would agree with me that if an interview
3   does not appear in the underlying criminal file that is
4   provided to you from the detectives, then the defense
5   lawyers would not know about that information that's not
6   in there; correct?
7 A.    Yes. I would agree if it's not -- my file and
8   my discovery comes from the police file. So, if it's
9   not in the police file, I can't turn it over to the
10  defense.
11 Q.   And so your understanding from the affidavit of
12  probable cause and the evidence that you obtained in
13  this case is that none of it came from Mr. Roberts based
14  upon the fact that you had no idea of any statement that
15  he gave or information he provided to the Wilkinsburg
16  massacre?
17        MR. HEMINGER: Object to the form. You can
18  answer.
19 A.    Thank you. I'm telling you I don't remember Mr.
20  Roberts ever being in the case. It doesn't mean it's
21  not true. I don't recall that name or what information,
22  if any, he had.
23 BY MR. PETRUNYA:
24 Q.   No. That's fine. So, if you're not going to
25  use a witness at trial, in general, how is that

1   communicated to the defendants?
2 A.    It's communicated to the defendants through
3   their counsel. We either tell them in person or email
4   that we're not using that witness. Actually, I
5   shouldn't say that generally because there would be
6   circumstances where we don't tell them until -- I mean,
7   we're not under any obligation until we call our first
8   witness or give our witness list. So, we don't always
9   inform them that we're not calling someone.
10        In this particular case, because there was so
11  much pretrial litigation and discussion about it, when
12  we were set for motions and decided we weren't going to
13  call Kendall Mikkell, for example, we actually relayed
14  that, I believe, in an email to defense counsel we were
15  no longer calling him and that the motion that was
16  scheduled for that would need to be canceled.
17 Q.   Do you recall what date that email was sent?
18 A.    No.
19 Q.   Now, I know from reviewing hearing transcripts
20  that on August 8, 2018, the Commonwealth indicated on
21  the record before Judge Borkowski that Mikkell was no
22  longer going to be used as a witness.
23 A.    Yes.
24 Q.   Do you have any independent recollection of a
25  letter formally about Kendall Mikkell being sent or do

1   you just believe that might have been done?
2 A.    Just have a belief that's how we would have done
3   it in this case.
4 Q.    Are you aware of the fact that a letter
5   regarding Mr. Collins was sent to defense counsel?
6 A.    I don't recall.
7 Q.    Is it possible that your recollection of this
8   formal communication relates to the Collins letter and
9   not the Mikkell letter?
10 A.    It is entirely possible. Sorry.
11 Q.   So, unless and until we have some document from
12  the Commonwealth indicating that Kendall Mikkell is no
13  longer being called or it's said on the record, we don't
14  know when that decision was exactly made?
15        MR. HEMINGER: Object to the form of the
16  question. If you can answer.
17 A.    As I'm talking to you today, I don't have any
18  independent recollection of when that decision was made
19  and I don't recall and I haven't seen any documentation
20  as to when that decision was made, but I know it was
21  made before trial and my recollection is it was made
22  before the scheduled motion on whether he was again
23  going to be declared an agent of the state.
24 BY MR. PETRUNYA:
25 Q.   So, was this a motion that was filed by the

1   defendant or was that an affirmative motion that the
2   district attorney's office was planning on filing to
3   challenge the agent of the state issue? Because I
4   couldn't really understand --
5 A.    It's my recollection that they motioned to
6   disqualify a witness as agent of the state and they were
7   prepared to argue that. We were prepared to call
8   witnesses to the contrary. I know we had made at least
9   a witness list and began making arrangements for one of
10  the US attorneys who had worked with him who was now
11  living out of state to actually come back under subpoena
12  and that is when we made the decision to abandon him as
13  a witness before we actually put in the time and effort
14  to have a hearing.
15 Q.   Now, when the Commonwealth is working with
16  confidential informant witnesses and you get word either
17  from detectives or from individuals in the department
18  itself that an individual may be facing threats or may
19  have been threatened, is there a policy or mechanism in
20  place that those are investigated?
21 A.    They're always informed to call their local
22  police. They don't always take them up on it. If
23  there's a credible threat against them, I don't know
24  that the detectives investigate them. Yeah. I don't
25  know the detectives investigate the threats.

AA COURT REPORTERS 412-288-5370                                          Page 101

1 Q.      I mean, is that something that needs to be
2 investigated or should be investigated?
3 A.      Well, if it rises to the level of intimidation
4 of a witness, we'll have either the locals or some other
5 agency investigate the actual intimidation charges. If
6 it's just the general allegation they feel threatened or
7 feel like their life is in danger because of what they
8 said, we wouldn't investigate that or I wouldn't know
9 where to start investigating that.
10 Q.     Is that a prerequisite to a witness being able
11 to be provided with relocation funds or getting accepted
12 into the attorney general program?
13 A.     When you say --
14        MR. BIONDO: Object to the form.
15        MR. HEMINGER: Object to the form, as well.
16 A.     When you say that, you mean is the investigation
17 a prerequisite?
18 BY MR. PETRUNYA:
19 Q.     No. Just the witness saying that they feel in
20 fear for their life.
21 A.     Yes. They have to express a desire to actually
22 be relocated.
23 Q.     So, is there the requirement of an investigation
24 component to that on the back end when the witness says
25 that or is it just more whether you believe the person

---

AA COURT REPORTERS 412-288-5370                                          Page 102

1 or not?
2        MR. BIONDO: I'll object to the form.
3        MR. HEMINGER: Object to the form. If you know.
4 A.      There's no requirement that it be investigated
5 or even substantiated. If they're in fear, we'll do our
6 best to relocate them.
7 BY MR. PETRUNYA:
8 Q.      And as far as relocation funds are concerned,
9 are you aware of any documentation policy that is
10 required because it's governmental money that's being
11 distributed?
12 A.     I'm not aware as I sit here of a policy. It
13 would surprise me if there wasn't a policy, but I don't
14 know what it is or who writes it.
15 Q.     Why would it you surprise you if there wasn't?
16 A.     Because you want to keep track of funds, I
17 assume.
18 Q.     So, when you say keeping track of the funds,
19 would that necessarily include confirming that the
20 monies that are being given are going to the purposes
21 that they're being asked for which would be rent and
22 movement?
23 A.     No. I --
24        MR. HEMINGER: Object to the form of the
25 question. You can answer.

---

AA COURT REPORTERS 412-288-5370                                          Page 103

1 A.      No. I meant the balance of the funds and the
2 fact that nobody is internally making claims for people
3 who aren't witnesses. Like tracking the fact that the
4 funds are going to a case and a documented case number
5 is what I meant.
6 BY MR. PETRUNYA:
7 Q.      But I guess your answer doesn't touch on having
8 actual confirmation that the money's being spent for the
9 reason it's being requested.
10 A.     Yes. So, that would surprise me if that was
11 part of the policy.
12 Q.     Why would it surprise you if that was part of
13 the policy?
14 A.     If I can be frank, we have as many people turn
15 us down on relocation as take us up on it and then
16 sometimes the people who said they were in fear will
17 come back here. So, it's not really a rational bunch of
18 people we're dealing with. It would surprise me if you
19 then put upon them the requirement that they document
20 where they're spending the money and provide it back to
21 you.
22 Q.     Well, it's possible for individuals that are
23 providing the money to reach out to the entity that's
24 receiving it; correct?
25 A.     It's possible. Yes.

---

AA COURT REPORTERS 412-288-5370                                          Page 104

1 Q.      And so I guess, overall, if a witness had worked
2 with detectives before or had received benefits from the
3 witness relocation fund before, it's fair to say through
4 common sense that they would understand what they need
5 to say to obtain that money; correct?
6        MR. BIONDO: Objection to form.
7        MR. HEMINGER: Object to the form.
8        MR. BIONDO: If you can, answer.
9 A.      It's fair to say that they would know how the
10 process works. So, if that includes knowing what to
11 say, yes.
12 BY MR. PETRUNYA:
13 Q.     And is the funding that's provided in the case,
14 is it tied specifically to a witness or tied
15 specifically to a case?
16 A.     I don't know how they document the monies that
17 are spent on these cases.
18 Q.     Do you have any responsibility, you specifically
19 or the district attorney's office, for approving those
20 monies when they're distributed?
21        MR. BIONDO: I'll object to the form. Go ahead.
22        MR. HEMINGER: Object to the form.
23 A.     For the attorney general's funds, we're required
24 to sign approval that they are in fact a witness on the
25 case. I believe that does come with a case number. I

---

CHERON S HELTON/ROBERT THOMAS, et al.    CONFIDENTIAL ATTORNEYS' EYES ONLY    KEVIN CHERNOSKY
COUNTY OF ALLEGHENY, et al.                                                    March 15, 2024

AA COURT REPORTERS 412-288-5370    Page 105

1  could be wrong about that. For the district attorney's
2  office, I don't recall ever having signed a form. We'll
3  get a request from an individual detective or
4  investigator, we'll talk about it, and then I would say
5  okay, well, go talk to whoever in the office -- I don't
6  know if it was Ms. O'Neil or Ms. Kelly -- and if they
7  have any questions, have them reach out to me.
8  BY MR. PETRUNYA:
9  Q.    And with regards to Mr. Mikkell and money that
10 was provided to him in April of 2018, do you recall
11 having a conversation with Detective Kinavey before the
12 money was distributed to him?
13 A.    Yes.
14 Q.    And did Detective Kinavey relay to you that Mr.
15 Mikkell's life was threatened or he felt unsafe based
16 upon the fact that he was cooperating in this case?
17 A.    My recollection is Detective Kinavey asked for
18 funds to relocate Mr. Mikkell and to set him up in
19 West Virginia. Initially, I didn't like the idea
20 because he was no longer a witness in the case and my
21 honest question was why pay him any money when he's no
22 longer going to be used in the case, and then I decided
23 that because he was going to relocate out of the area
24 and it was dangerous for him to come back just because
25 of the seriousness of the case, that we could spend the

AA COURT REPORTERS 412-288-5370    Page 106

1  money on him.
2  Q.    Did you have a sense that if the confidential
3  informants did not testify in this case, that the
4  motions to dismiss filed by Cheron, Robert and/or both
5  might be granted by the Court?
6  A.    I can tell you that at the time Rob Thomas's
7  motion was granted, I had no idea that that was going to
8  be the result. I expected it to be held for court.
9  Q.    Okay. Do you know where Kendall Mikkell was
10 located at the time that the request was made for money
11 to be transferred to him?
12 A.    No.
13 Q.    Do you know if he was in West Virginia at the
14 time that the money was sent to him?
15 A.    No.
16 Q.    When the money was provided to Kendall Mikkell
17 in April of 2018, do you recall if Gregory Parker was in
18 the landscape of the case or had provided any
19 information in the case?
20      MR. BIONDO: Object to the form.
21      MR. HEMINGER: Object to the form.
22 A.    So, if I could break that down, I don't have any
23 specific recollection of when Kendall Mikkell was
24 provided the money that we've just been talking about.
25 So, if you tell me it's April of '18, I will accept

AA COURT REPORTERS 412-288-5370    Page 107

1  that, and I don't have any recollection of whether Mr.
2  Parker was in the case yet or not.
3      MR. PETRUNYA: Okay. Let's take five minutes.
4  Then we'll come back.
5      (There was a pause in the proceedings.)
6  BY MR. PETRUNYA:
7  Q.    Mr. Chernosky, you would agree with me that
8  criminal defendants can file motions to dismiss their
9  claims for lack of evidence at any point in the
10 underlying proceedings; correct?
11 A.    Yes.
12 Q.    And that would include at any point when they
13 get notification that evidence may not be used against
14 them or that witnesses may not be testifying against
15 them; correct?
16 A.    Yes. I'll agree.
17 Q.    And so if an individual is dismissed -- if a
18 motion to dismiss is granted, that means that the
19 individual is no longer being accused of the crime and
20 they would be released from jail if they're being housed
21 in jail; correct?
22      MR. HEMINGER: Object to the form. You can
23 answer, if you can.
24      MR. BIONDO: Yeah. I'll object to the form, as
25 well. Go ahead.

AA COURT REPORTERS 412-288-5370    Page 108

1  A.    Sorry. Can you repeat the question? I
2  apologize.
3  BY MR. PETRUNYA:
4  Q.    Sure. In a situation where an individual is
5  incarcerated pending trial and a motion to dismiss is
6  granted, assuming there's not any other claims that are
7  out there against them, once that motion to dismiss is
8  granted, they would be removed from prison or set free?
9      MR. BIONDO: Object to the form.
10 A.    Yes, with the caveat that in my experience, it
11 takes the jail a day or two to process someone out.
12 BY MR. PETRUNYA:
13 Q.    It's not like that second, they're released from
14 prison like they show on Law and Order and everything.
15 A.    Yeah.
16 Q.    Is there an obligation within the district
17 attorney's office to notify criminal defendants once
18 they recognize or determine that they're not going to
19 use a piece of evidence or a witness?
20      MR. HEMINGER: Object as to form. You can
21 answer.
22 A.    My understanding is that there's no affirmative
23 obligation to inform the defendant or the defense
24 counsel that we've decided not to use a particular piece
25 of evidence.

CHERON S HELTON/ROBERT THOMAS, CONFIDENTIAL ATTORNEYS' EYES ONLY        KEVIN CHERNOSKY
COUNTY OF ALLEGHENY, et al.                                              March 15, 2024

1  BY MR. PETRUNYA:
2  Q.    Okay.  And you would agree with me that both Mr.
3  Shelton and Mr. Thomas were charged with capital cases
4  or death penalty cases; correct?
5  A.    Yes.
6  Q.    And from your experience, you would agree with
7  me that that adds a certain level of severity to the
8  charges, but it also, we can agree, adds an extra level
9  of costs and lawyering that's required within the
10 Commonwealth of Pennsylvania for death penalty cases;
11 correct?
12       MR. BIONDO: Object to the form.
13       MR. HEMINGER: Same objection.
14 A.    The death penalty just by its very nature
15 becomes more expensive.  There's an extra penalty phase
16 counsel and to select a death-qualified jury takes
17 longer.
18 BY MR. PETRUNYA:
19 Q.    Whose decision was it exactly -- and I'm not
20 asking for specific names.  I'm asking for, really,
21 offices, either detectives or DA's office.  Who makes
22 the determination on filing these cases as capital
23 cases?
24 A.    That's 100 percent the decision of the elected
25 district attorney.  The way it works in Allegheny County

1  is there is a panel, a death penalty review committee
2  who -- a particular ADA or deputy DA assigned to the
3  case writes up a memo.  That memo is inclusive of the
4  facts and circumstances, the criminal history of the
5  individual defendant, the family's wishes to the extent
6  that you can get them.
7        We invite defense counsel to submit a mitigation
8  at that point.  Even though it's early, they can argue
9  mitigation.  That's all assembled in a memo that is sent
10 to a three-person committee to review.  The committee is
11 made up of Rebecca Spangler at the time of this, Ron
12 Wabby from the appeals division and Chief Trial Deputy
13 Dan Fitzsimmons at the time of this.
14       They all review the materials and talk to the
15 individual DA whose case it is and then they make a
16 recommendation which is only a recommendation.  It then
17 goes to the desk of Mr. Zappala to approve or disapprove
18 the recommendation.  By statute, he's the only one that
19 can actually approve it.
20 Q.    And in this case, the lead attorney on this
21 case, were you the one that prepared that memo?
22 A.    I believe so.
23 Q.    And would that memo appear -- is that part of
24 the district attorney's underlying file?
25 A.    It's not discovery.  It's internal only.  I

1  don't think we provide it to defense counsel.  It might
2  be in the file, but I don't believe we provide it to
3  defense counsel.
4  Q.    In this case, though, that kind of process
5  happened?
6  A.    Yes.  That process has -- happens in every case
7  that's a homicide whether -- no matter who files it.
8  Q.    Okay.  When an individual is charged with a
9  capital case -- and I'm speaking in general -- then
10 we'll talk about the specifics here -- are there certain
11 requirements related to their housing as trial is
12 pending when they're housed in the jail?
13       MR. BIONDO: Object to the form.  Go ahead.
14 A.    Not to my knowledge.
15 BY MR. PETRUNYA:
16 Q.    And who, if you now --
17 A.    If I may correct?
18 Q.    Sure.
19 A.    It's my understanding that the jail has floors
20 that are segregated based on seriousness of the charges
21 generally.  So, most homicide defendants are on the
22 upper 7th and 8th floors.  So, a capital defendant being
23 a homicide defendant would be on the upper floors as far
24 as security goes, and that's not to say they would stay
25 there.  They're subject to disciplinary housing if

1  something goes on in the prison.  So, being a capital
2  defendant doesn't put you, in my understanding, at any
3  different housing situation than being a regular
4  homicide defendant.
5  Q.    But, I mean, clearly, your life is in the
6  balance when those charges are brought against you?
7  A.    I agree with your premise generally.  My answer
8  is still it doesn't change their housing.
9  Q.    Okay.  Are you familiar with the Allegheny
10 County Jail and its different pods, that it has
11 different levels?
12 A.    Generally.
13 Q.    And is there an understanding that you have of
14 pod 7-D or who's housed there?
15 A.    No.
16 Q.    Do you have any understanding of why Cheron
17 Shelton was taken to pod 7-D for approximately six hours
18 on March 24th into the 25th on -- of 2016?
19       MR. BIONDO: Objection as to the form.  You can
20 answer.
21       MR. HEMINGER: Object to the form.
22 A.    Thank you.  I have no specific knowledge that
23 that happened and I have no knowledge of the reasons why
24 if it did happen.
25 BY MR. PETRUNYA:

CHERON S HELTON/ROBERT THOMAS CONFIDENTIAL ATTORNEYS' EYES ONLY          KEVIN CHERNOSKY
COUNTY OF ALLEGHENY, et al.                                              March 15, 2024

AA COURT REPORTERS 412-288-5370                                      Page 113

1 Q.     Well, I mean, you would have to have some
2  knowledge that he was there, though, because you had
3  said at some point, you reviewed the housing assignments
4  to confirm that he would have had conversations with the
5  witnesses; correct?
6        MR. HEMINGER: Objection as to form.
7 A.     So, to answer your question, yes, I would have
8  looked at it.  I don't recall what pod he was on, 7-A,
9  7-B.  You could tell me it was 5 at this point.  I don't
10 know what pod he was on.
11 BY MR. PETRUNYA:
12 Q.     That's fine.  I'm going to ask the same question
13 for Robert Thomas, too.  Do you have any understanding,
14 recollection of why Mr. Thomas was taken to pod 7-D on
15 April 6th of 2016 when he was arrested?
16 A.     I have no idea.
17 Q.     You've reviewed jail calls?
18 A.     Generally in my career or for this case?
19 Q.     Both.
20 A.     Yes.
21 Q.     And you have an understanding of the jail phone
22 system and the dial-out system; correct?
23 A.     Yes.
24 Q.     And we can agree that each inmate is assigned
25 their own recognition so their calls can be tracked;

AA COURT REPORTERS 412-288-5370                                      Page 114

1  correct?
2 A.     Yes.
3 Q.     And that doesn't mean that everyone's above
4  board in making those calls, but, generally, when you
5  look at the call logs, you want to be able to track the
6  individual who is making the call to their actual
7  account?
8        MR. BIONDO: I'll object to form.  But go ahead
9  and answer.
10 A.     Yes.
11 BY MR. PETRUNYA:
12 Q.     And the reason for that is because when an
13 individual calls out, one, there's a charge, but, two,
14 the person on the other end of the call has to actually
15 accept the call and pick it up; correct?
16 A.     Yes.
17 Q.     Do you recall reviewing the jail calls in this
18 case?
19 A.     So, for each defendant, I know I would have
20 listened to individual calls of theirs, but I don't have
21 any independent recollection of the content of any
22 calls.
23 Q.     Do you recall reviewing the jail call logs from
24 April 6, 2016 of pod 7-D which were turned over to
25 defense counsel?

AA COURT REPORTERS 412-288-5370                                      Page 115

1 A.     I recall we had those jail calls and I would
2  have listened to them at some point, but I don't
3  remember what was on them.
4 Q.     And do you recall the last call of the night on
5  pod 7-D on April 6, 2016 being made by Frederick Collins
6  that was direct to voicemail saying he had information
7  about the Wilkinsburg massacre?
8        MR. HEMINGER: Objection as to form.
9 A.     No.  I don't recall that specifically.
10 BY MR. PETRUNYA:
11 Q.     At any point during the prosecution of this case
12 or the investigation, do you recall asking anyone how
13 Mr. Collins obtained the PIN to bypass the call-out
14 system and leave a voicemail?
15       MR. HEMINGER: I'll object to the form.
16 A.     So, the answer to your question generally is no,
17 I'm not aware that he did bypass any PIN.
18 BY MR. PETRUNYA:
19 Q.     If I'm representing to you that that did happen,
20 do you have any knowledge or understanding of how that
21 could have occurred?
22       MR. HEMINGER: Objection as to form.
23 A.     No.
24 BY MR. PETRUNYA:
25 Q.     Do you recall questioning anyone or running any

AA COURT REPORTERS 412-288-5370                                      Page 116

1  traces for the number which Mr. Collins left a voicemail
2  for?
3 A.     No.
4 Q.     Do you know of anyone, from your understanding
5  of the jail system, whom we should talk to to get that
6  information?
7 A.     Not off the top of my head.  There was a
8  gentleman by the name of Sam Pastor that worked there
9  that we used to get information.  I think it was his job
10 to provide, in response to subpoenas, jail calls, but I
11 don't know that he still works there.
12 Q.     That's fine.  We actually have his deposition
13 set up on Monday, actually.  So --
14       MR. BIONDO: He's in April.
15       MR. PETRUNYA: Oh.  Pastor.  I'm sorry.
16 Correct.  Palmer.
17 BY MR. PETRUNYA:
18 Q.     Okay.  So, earlier in your deposition, you had
19 talked about getting realtime updates on the case
20 from -- I think you said Dolfi, Costa and Schurman.
21 A.     Yes.  That's my recollection.
22 Q.     Okay.  Schurman at the time was one of the
23 administrators for the homicide detectives; correct?
24 A.     Yes.
25 Q.     Can you explain to me what his role was in

CHERON S HELTON/ROBERT THOMAS    CONFIDENTIAL ATTORNEYS' EYES ONLY    KEVIN CHERNOSKY
COUNTY OF ALLEGHENY, et al.    March 15, 2024

AA COURT REPORTERS  412-288-5370                          Page 117

1  communicating information to you or dealing with your
2  office in this investigation?
3      MR. HEMINGER: Objection as to form.  If you can
4  answer.
5  A.    Yeah. So, he was the lieutenant at the time.
6  And I apologize. I believe now Sergeant Dolfi, I think,
7  was just a detective at the time.
8  BY MR. PETRUNYA:
9  Q.    Yes. He was.
10 A.    And Costa was in fact a lieutenant. I think
11 that's the structure. However -- sorry -- Schurman is
12 not under any obligation to inform us of anything, but,
13 ultimately, you're going to need search warrants
14 approved or things of that nature and there's generally
15 a collaborative effort for them communicating with us so
16 that we can both inform the public and make decisions as
17 far as charges and approval of search warrants.
18      So, my understanding was there were a lot of
19 detectives working on this, that they themselves
20 regularly had briefings -- I don't know how
21 frequently -- whether it was every morning or every
22 other morning -- and that he would reach out generally
23 to inform me of progress in the case, and then if we got
24 to a point where a decision had to be made in a timely
25 fashion, the example I give of that is when we seized

AA COURT REPORTERS  412-288-5370                          Page 118

1  the jail mail, had to make a decision what we would do
2  if the in-person meeting started, he would inform me as
3  quickly as possible because that decision in the
4  approval of the search warrants that would allow for
5  that have to happen quickly.
6      We knew the in-person meeting was going to
7  happen in a few days, so we had to start on that right
8  away if we were going to do it at all. So, to answer
9  your question, he briefed me regularly. I can't tell
10 you how frequently. I know he was the one who briefed
11 me that morning, but it was a very hectic situation
12 because we were still actually investigating the crime
13 scene at the time he updated me.
14 Q.    I guess my question in general, though, is when
15 you're talking about updating you and briefing you, is
16 this via email, phone, is it a combination?
17 A.    Normally, it's via phone. Occasionally, it's me
18 going out there in person. I don't have a specific
19 recollection of if I did or how many times I did go out
20 to the county police headquarters in person, and then
21 every once in a while, it would be maybe a small update
22 by email if there was something I was waiting to hear
23 back about. So, if I said, well, okay, well, that
24 sounds good, get me more information on this, sometimes
25 email.

AA COURT REPORTERS  412-288-5370                          Page 119

1  Q.    Did you go out to any of the scenes in this
2  case?
3  A.    Not the night of. I was out at the actual
4  shooting scene within a week or so, and at some point, I
5  know I accompanied Mr. Zappala to Hilltop. It was a
6  huge operation to get him there, meaning it just took a
7  lot of officers and detectives and walked around the
8  scene. I don't recall going to any other scene-related
9  visits for this case.
10 Q.    When did that visit to Hilltop take place, if
11 you recall generally? And by generally, I mean if you
12 can't remember a specific date, can you tell us as it
13 relates to the 3/9/16 date of the actual incident?
14 A.    It was before the charges were filed because
15 someone at Hilltop made a comment to us about making an
16 arrest in the case. So, the arrests had not yet been
17 made.
18 Q.    What was the purpose of this visit with Mr.
19 Zappala and you to Hilltop?
20 A.    So, in general terms?
21 Q.    Sure.
22 A.    He sometimes likes to see a scene so then we can
23 talk about it. Right? That he has an informed decision
24 of the areas that we're talking about. So, for
25 instance, the video that ultimately was an exhibit in

AA COURT REPORTERS  412-288-5370                          Page 120

1  this case from behind 1214, he wanted to know how it
2  relates to the rest of Hilltop when we're talking about
3  the fences and everything else.
4  Q.    Did that visit occur before or after Robert
5  Thomas was arrested on April 6, 2016, if you remember?
6  A.    I don't have a specific recollection of what day
7  it occurred. So, all I can say is it was between the
8  March crime date and the filing of the charges.
9  Q.    On June 23rd?
10 A.    Uh-huh.
11      MR. BIONDO: Yes?
12 BY MR. PETRUNYA:
13 Q.    Yes?
14 A.    Yes. Sorry.
15 Q.    Do you recall what happened to Robert Thomas's
16 shoes in this matter?
17 A.    I know they were seized from the interview room.
18 I believe that they were placed into evidence, but I
19 don't have any specific recollection after that. We
20 would have sent them to the crime lab, but I don't know
21 specifically that we did.
22 Q.    Now, you had talked earlier about wanting to
23 find the murder weapon in this case because I think we
24 can agree it makes any prosecution of the murder easier;
25 correct?

AA COURT REPORTERS  412-288-5370                    Page 121

1  A.    Yes.
2  Q.    And one of the things we've talked about is this
3  theory or one theory that Calvin Doswell's murder was
4  retribution for -- or at least the Wilkinsburg massacre
5  was retribution for Calvin Doswell's murder; correct?
6  A.    Yes.
7  Q.    Do you recall seeing any documents in your
8  review of the underlying file that the gun that was used
9  to murder Calvin Doswell actually appeared in another
10 criminal case in the City of Pittsburgh?
11 A.    I don't have any specific recollection that the
12 Calvin Doswell murder weapon turned up in any other
13 case. It could be that I knew it but I don't have any
14 recollection right now.
15 Q.    And so if you don't have any recollection of
16 that, I'm guessing -- did you ever talk to any of the
17 detectives about following up on that appearance of the
18 gun in that case and trying to pin down, you know, who
19 got it, how they obtained it, any of that information?
20 A.    I don't recall any specific conversation with
21 detectives about that.
22 Q.    When you were working at the district attorney's
23 office, did you ever have any conversations with anyone
24 from the City of Pittsburgh about the Doswell murder and
25 filing charges or not filing charges?

AA COURT REPORTERS  412-288-5370                    Page 122

1         MR. BIONDO: Object to the form. Go ahead and
2  answer.
3  A.    I know that the county police obtained the
4  Calvin Doswell file which would mean copies of all the
5  papers or however they obtained it. I know I looked at
6  it and I know it was one of the more thin homicide files
7  I've ever seen. So, it wasn't very well investigated to
8  begin with.
9  BY MR. PETRUNYA:
10 Q.    And do you know where this concept that Lamont
11 Powell committed the Calvin Doswell murder came from in
12 that file?
13 A.    No.
14 Q.    Did you remember seeing his name anywhere in the
15 Calvin Doswell file?
16 A.    Not -- I don't have any recollection of seeing
17 his name in the Calvin Doswell murder file.
18 Q.    Who was the first person that you remember
19 bringing up the Calvin Doswell murder to you when you
20 were reviewing this case?
21        MR. BIONDO: Objection to the form. Calvin
22 Doswell murder in this case?
23 BY MR. PETRUNYA:
24 Q.    In this case. I mean the Wilkinsburg massacre.
25 A.    As it relates to this investigation?

AA COURT REPORTERS  412-288-5370                    Page 123

1  Q.    Yes.
2  A.    I honestly don't recall.
3  Q.    You had indicated that -- I think you had used
4  the term earlier that there was much litigation over
5  Robert Thomas's phone number in this case?
6  A.    Yes. And just to add to that, over both phone
7  numbers we had -- by both -- each defendant, in my
8  recollection, had two phone numbers that we were
9  interested in. So, we did a lot of litigation about
10 both Cheron Shelton's phone number and, I believe, Rob
11 Thomas's phone number.
12 Q.    And sitting here today, do you recall reviewing
13 any evidence which showed a direct statement related to
14 Rob Thomas's phone number at the time of 3/9/16 and
15 where that was obtained?
16 A.    3/9 of '16?
17 Q.    Well, I guess the phone number that he was using
18 on the day of the incident.
19 A.    Yes. I don't want to the misspeak. It was my
20 recollection that he provided that number at the time of
21 his interview, but that may have been what we were
22 calling the second number. So, I don't have a specific
23 recollection as to how that number got attributed to Rob
24 Thomas.
25 Q.    If his first number was directly attributed to

AA COURT REPORTERS  412-288-5370                    Page 124

1  him by a witness that was asked about it, that's
2  information that would or should appear in the
3  underlying criminal file; correct?
4         MR. HEMINGER: Object to the form.
5  A.    It could appear -- sorry. It could appear in
6  the underlying form if a witness said specifically that
7  is his number. We also processed a lot of cell phones
8  related to this and they'll do sometimes a link analysis
9  where they just look for numbers attributed to people in
10 other people's phones. It could have come from that. I
11 don't have a recollection of where it came from.
12 BY MR. PETRUNYA:
13 Q.    And so one other thing that was conducted in
14 this case, there was a drive test conducted by the
15 detectives in this matter to time the time you could
16 leave Nolan Court to get down to Franklin Avenue; is
17 that correct?
18 A.    I remember that. They call that a time/distance
19 study.
20 Q.    And you would agree with me that the concept
21 behind that time/distance study was to see how long,
22 approximately, it would take Cheron Shelton to drive
23 from Nolan Court down to Franklin Avenue, the site of
24 the murder?
25 A.    I agree that that was the purpose for conducting

CHERON S HELTON/ROBERT THOMAS, et al.
COUNTY OF ALLEGHENY, et al.
CONFIDENTIAL ATTORNEYS' EYES ONLY
KEVIN CHERNOSKY
March 15, 2024

AA COURT REPORTERS 412-288-5370                                Page 125

1  the test and for writing the report relative to the
2  test.
3  Q.    And when you're reviewing affidavits of probable
4  cause, you would agree with me that you're looking
5  for -- determining if there's inconsistencies in the
6  information that's being provided which would contradict
7  itself; correct?
8        MR. BIONDO: Object to the form.
9        MR. HEMINGER: Object to the form.
10 A.    I would agree generally. I want the whole thing
11 to be cohesive and to support the charges that we're
12 ultimately bringing. So, yes, generally.
13 BY MR. PETRUNYA:
14 Q.    Now, you don't actually go in and type any of
15 the affidavit; correct? You just simply review what
16 comes from the officers?
17 A.    If -- not entirely. I would say that if
18 something was -- so, without being rude, some of the
19 education level of the detectives and some of the way
20 they write sometimes makes you always correct, let's
21 say, the plural form of something. It's just their
22 style.
23        Rather than sending it back and say take all
24 this out, sometimes I'll just erase the S off of a
25 plural word. Occasionally, there will be a sentence

AA COURT REPORTERS 412-288-5370                                Page 126

1  that is worded a little odd, then I'll just reword the
2  sentence rather than taking it back and say one you
3  think of another way to write it. So, it is true that
4  the bulk of the affidavit comes to me as is and I review
5  it, but I'm not foreclosed from making a correction to
6  some of the way something's written.
7  Q.    Do you recall how many drafts of this affidavit
8  you reviewed or were reviewed amongst the homicide
9  detectives before charges were finalized and uploaded to
10 the ASAP system?
11        MR. BIONDO: I'll object to the form.
12        MR. HEMINGER: When you say drafts, do you mean
13 including the draft of the affidavits of probable cause
14 or search warrants?
15        MR. PETRUNYA: Sure.
16        MR. HEMINGER: Okay.
17 A.    I want to say probably well over 20 if we're
18 including those. When it comes to drafts of the
19 charging document, it would have been passed back and
20 forth a few times. So, maybe three or four.
21 BY MR. PETRUNYA:
22 Q.    And did you review -- you reviewed the criminal
23 complaint in preparation for today's deposition?
24 A.    Yes. I read it three days ago.
25 Q.    And did you come across any inconsistencies in

AA COURT REPORTERS 412-288-5370                                Page 127

1  the statements that were given by the confidential
2  informants and the direct evidence that the detectives
3  had at their disposal?
4        MR. HEMINGER: Objection as to form. You can
5  answer.
6  A.    Thank you. No obvious inconsistencies. I know
7  -- no. No obvious inconsistencies that I remember.
8  BY MR. PETRUNYA:
9  Q.    So, one of the issues in this matter as I'll
10 represent is this idea of where the actors would have
11 hid out before the shooting; correct?
12 A.    I agree that there is a portion of the affidavit
13 that's dedicated to that. Yes.
14 Q.    And would you agree with me that the witnesses
15 portray the actors as having waited for a long time in a
16 garage behind the barbecue before they started shooting?
17        MR. BIONDO: Object to the form.
18        MR. HEMINGER: Object to the form. Same.
19 A.    Sorry. I would agree that, as stated in the
20 affidavit of probable cause, that is what's relayed by
21 at least one of the confidential informants. I don't
22 know that they both say that.
23 BY MR. PETRUNYA:
24 Q.    And you would agree with me that there is direct
25 evidence that the detectives were able to pull showing

AA COURT REPORTERS 412-288-5370                                Page 128

1  Cheron Shelton at Hilltop at approximately 10:30?
2  A.    Yes. I agree with that.
3  Q.    And so we can agree that Mr. Shelton could not
4  be in two places at one time; correct?
5  A.    Yes.
6  Q.    And so is that an example -- one witness had
7  come forward and said that Mr. Shelton was in an area
8  where he wasn't. Is that an example of an inconsistency
9  that you would question a detective about?
10 A.    No. I might ask about the -- we might talk
11 about it, but there's two possible explanations for that
12 statement, one, this witness is not being truthful when
13 they're relying -- or relaying the information, two,
14 that the individual actually said it but they either
15 were lying when they said it or were incorrect when they
16 said it. So, I kind of take a words and all approach to
17 informants. They're going to be cross-examined about it
18 anyway. Let's put the inconsistencies in there as well
19 as the consistencies.
20 Q.    When the search warrants were originally applied
21 for in this matter, they were put under seal given the
22 gravity of the case and the nature of the case; correct?
23 A.    Yes.
24 Q.    And there was a lot of media attention and
25 publicity about the case; correct?

AA COURT REPORTERS 412-288-5370     Page 129

1 A.    Yes.
2 Q.    Would you agree with me that at some point
3 during the pendency of the litigation, the information
4 about the criminal complaint itself and the allegations
5 against Mr. Thomas and Mr. Shelton were -- became public
6 knowledge or were covered by the media?
7 A.    I would agree that the media covered them. I
8 don't know when in the scheme of whether it was after
9 filing. Obviously, the case got a lot of attention and
10 there were a lot of stories about it. To be honest with
11 you, I don't remember as I sit here today having any --
12 because it would make me angry if details of the
13 investigation got out -- having any anger about the
14 coverage relaying stuff about the case that I didn't
15 think should be out there.
16 Q.    But at some point during the pendency of the
17 actual litigation after the charges were filed, there
18 was publicity about the allegations being raised against
19 Mr. Thomas and Mr. Shelton?
20 A.    Yes.
21 Q.    Do you recall having any conversations with Mr.
22 Parker or any of the detectives that were taking his
23 statement to determine if Mr. Parker had reviewed or had
24 access to this information before he came forward to
25 give a statement about Mr. Shelton and Mr. Thomas's

AA COURT REPORTERS 412-288-5370     Page 130

1 involvement in this case?
2     MR. HEMINGER: Objection as to form.
3 A.    I don't recall having a specific conversation
4 about the detectives as to whether they should rule in
5 or rule out Mr. Parker's access to coverage on the case.
6 BY MR. PETRUNYA:
7 Q.    Was that something that you personally
8 questioned when Mr. Parker came forward?
9 A.    No.
10     MR. PETRUNYA: I don't think I have anything
11 further at the moment. I think we're five minutes away
12 from a break, so we'll take our break, come back at 2,
13 2:15-ish and then I'm pretty much done.
14     MR. JUBAS: We might have a few followup.
15     MR. BIONDO: We're going to be very short at
16 this point.
17     (There was a pause in the proceedings.)
18     - - - -
19     RE-EXAMINATION
20     - - - -
21 BY MR. JUBAS:
22 Q.    So, just a few followup questions and then we'll
23 be done, Mr. Chernosky. What I'll do as I'm asking
24 these questions, I'm going to show you some transcripts.
25 I can show you beforehand. I guess I just want to do a

AA COURT REPORTERS 412-288-5370     Page 131

1 little housekeeping here to make sure that this is tidy.
2 Do you recall that the -- do you recall that payments
3 were made to Kendall Mikkell on April 8th of 2018?
4 A.    I don't recall the specific dates. The only
5 payment that I have affirmative knowledge to is the one
6 I described when Detective Kinavey asked me for the
7 relocation funds. I'm aware that payments were probably
8 made to him before that to relocate him, but I don't
9 know any specifics about it.
10 Q.    Okay. One moment, then. So, I'm going to show
11 you -- I don't think we need to mark this as an exhibit.
12 I'm just going to show you. It is Allegheny County
13 Police Form 20 and it's dated April 6, 2018 from
14 Detective Kinavey detailing a $1,762 payment to Kendall
15 Mikkell.
16 A.    Okay.
17 Q.    So, is that the payment you're referring to?
18 A.    Yes. That appears to be the payment I'm
19 referring to.
20 Q.    Okay. And did you testify earlier that this
21 payment was made after the decision was made to drop
22 Mikkell from the prosecution?
23 A.    Yes.
24 Q.    Do you recall how long the delay was between
25 dropping Freddy Collins from the case and notifying the

AA COURT REPORTERS 412-288-5370     Page 132

1 defense that he was going to be dropped?
2 A.    I don't recall. I remember it was readily
3 apparent based on his actions that he wasn't going to be
4 a witness for us. So, we would have talked about it
5 relatively quickly when we informed the defense.
6 Q.    What would you view your obligation as being
7 with regards to informing the defense that you were
8 dropping Collins?
9 A.    So, I guess that's a hard question to answer.
10 If I decided I wasn't going to admit a particular piece
11 of evidence, I wouldn't tell them that it was my
12 decision not to admit a particular piece of evidence. I
13 don't know -- I don't know that I had a firm obligation
14 to tell them on this date I intend not to call this
15 person as a witness. So, I guess that leaves room for
16 you to change your mind. It was apparent we were never
17 going to call him. He was a liability, so I didn't
18 believe at the time we made that decision that I had an
19 affirmative obligation to tell them that day we weren't
20 using him as a witness.
21 Q.    Did you feel the same way with regards to
22 Kendall Mikkell?
23 A.    Yeah.
24 Q.    Okay.
25 A.    The only reason I felt any more obligation with

AA COURT REPORTERS 412-288-5370    Page 133

1  Kendall Mikkell is I believe we were scheduled for
2  proceedings to litigate that very issue.  So, the whole
3  point in telling was so that we can dispense with
4  actually preparing and doing a motion.
5  Q.  Okay.  Do you recall when you actually informed
6  the defense that you would not be calling Kendall
7  Mikkell?
8  A.  No.
9  Q.  So, I'm going to represent to you that it was
10  August 9, 2018 that the -- or actually, rather, August 8,
11  2018 that the Commonwealth made that notification
12  to defense --
13  A.  Okay.
14  Q.  -- in an email.  So, I'm going to show you a
15  transcript from August 9, 2018.  Here is caption page of
16  the transcript.
17  A.  Okay.
18  Q.  And then I'm going to turn to page 16.  Okay.
19  And if you could review that paragraph on page 16,
20  second paragraph?
21  A.  Do you mind if I see who's talking?
22  Q.  Sure.
23  A.  Okay.
24  Q.  Okay.  So, does -- after reviewing page 16, does
25  it appear as though the Commonwealth notified defense

AA COURT REPORTERS 412-288-5370    Page 134

1  counsel on October 8, 2018 that they would not be using
2  Kendall Mikkell?
3  A.  It appears from Mr. White's --
4  MR. HEMINGER: Object to the form of the
5  question.
6  A.  It appears from Mr. White's stated version of
7  events that notification was made the day before.
8  BY MR. JUBAS:
9  Q.  Okay.  So, it's your position that you didn't
10  have an affirmative duty to alert them to evidence that
11  you wouldn't be using?
12  MR. HEMINGER: Objection to the form of the
13  question.
14  A.  It's my belief that -- how should I say this?
15  It's my belief that I don't have an affirmative duty
16  other than turning over the evidence to tell them I've
17  made a decision that my presentation of the case will be
18  different than they think it's going to be.  I don't
19  have to tell them how I'm going to present the case.
20  BY MR. JUBAS:
21  Q.  Okay.  Does the Commonwealth have a duty to not
22  make false representations with regards to this witness?
23  MR. HEMINGER: Objection to the form.
24  MR. BIONDO: Object to the form.
25  A.  Sorry.  I'm going to interpret your question as

AA COURT REPORTERS 412-288-5370    Page 135

1  do I have a duty to not present false evidence meaning
2  like if I know that's something's doctored and not
3  accurate?
4  BY MR. JUBAS:
5  Q.  I'm asking so you would agree with me that in
6  April of 2018, the Commonwealth definitively made the
7  decision that they would not be using Kendall Mikkell?
8  A.  Uh-huh.  Yes.  Sorry.
9  Q.  Okay.  And you would agree with me that it
10  wasn't until August 8, 2018 that the Commonwealth
11  finally notified the defense that the Commonwealth
12  wouldn't be using Kendall Mikkell?
13  A.  Okay.
14  Q.  So, there's four months between there; correct?
15  A.  Yep.
16  Q.  And in that four months, would the Commonwealth
17  have had the duty to not misrepresent whether they were
18  going to be using Kendall Mikkell?
19  MR. HEMINGER: Object to the form of the
20  question.
21  MR. BIONDO: Yeah.  Same objection.
22  A.  That's fine.  I disagree with your premise that
23  it's a misrepresentation to them in August that we're
24  not using the witness.
25  BY MR. JUBAS:

AA COURT REPORTERS 412-288-5370    Page 136

1  Q.  So, if -- if the Commonwealth was representing
2  in the meantime between April and August that the
3  Commonwealth was still making a decision or that the
4  Commonwealth was going to use him, would you have an
5  affirmative responsibility to not say that?
6  MR. BIONDO: Object to the form.
7  MR. HEMINGER: Objection to the form.
8  A.  No.  I don't believe I would have an affirmative
9  duty to not say that.  How should I say this?  With
10  respect to the decision as far as using Kendall Mikkell
11  or not using Kendall Mikkell, the ruling that he was an
12  agent of the state was problematic for us.  That's when
13  we started reviewing whether we were going to use him or
14  not.
15  But in the lead-up to that motion, we still had
16  a witness list and we're inquiring about how to get
17  subpoenas to witnesses to proceed on that motion.  So,
18  the day we affirmatively said we're not using him is the
19  day we decided not to use him.  However, it appeared as
20  if we weren't going to use him in the lead-up to that
21  hearing and that's why I pushed back with Detective
22  Kinavey about whether we should pay another dime for
23  Kendall Mikkell to be relocated anywhere.
24  BY MR. JUBAS:
25  Q.  So, is it fair to say that the door wasn't

AA COURT REPORTERS  412-288-5370                    Page 137

1   closed in April on --
2   A.    I wouldn't say the door wasn't closed, but he
3   was problematic from the date that ruling came down.
4   Q.    So, I am going to show --
5   A.    If I can just elaborate a little bit, had
6   Kendall Mikkell come back with some other corroborative
7   evidence -- I can't imagine what it would be -- a
8   recording -- we probably would have thrown him back into
9   the case, something where you didn't have to just
10  believe him.
11  Q.    Okay. So, I'm going to show you another
12  transcript. This one is June 11th of 2018.
13  A.    Okay.
14  Q.    And we're going to jump to page 11. So, I'm
15  going to show you page 11 and I would direct you to the
16  paragraph where Ms. Werner is speaking.
17  A.    Okay.
18  Q.    And you would agree with me that this is from
19  Ms. Werner and affirmative representation that the
20  Commonwealth will be using Kendall Mikkell; correct?
21  A.    Yes.
22        MR. JUBAS: One moment, please. Okay. That
23  does it.
24              - - - -
25              EXAMINATION

AA COURT REPORTERS  412-288-5370                    Page 138

1              - - - -
2   BY MS. ROHRER:
3   Q.    Good afternoon, Mr. Chernosky. My name is
4   Shelley Rohrer. I represent the defendants. There are
5   four named police officers from Allegheny County Police
6   Department. I am representing them today. Now, Mr.
7   Chernosky, you had mentioned that there was -- there was
8   a lot of litigation surrounding the phone numbers of Mr.
9   Shelton and Mr. Thomast; correct?
10  A.    Yes.
11  Q.    Were you present for the hearing -- a hearing
12  where Detective Patrick Miller testified about the
13  search warrant that he authored pertaining to the phone
14  number related to -- the phone numbers that you have
15  referenced here today?
16  A.    Yes.
17  Q.    Now, you also drafted a response to a defense
18  motion to suppress evidence obtained from a telephone
19  number ending in 3461. Do you recall that?
20  A.    I recall the pleading. I couldn't tell you the
21  content of it. My signature's on it.
22        MS. ROHRER: We're going to mark this as
23  Exhibit 3. We'll just keep going with the numbering
24  from before.
25        (Exhibit 3 was marked for identification.)

AA COURT REPORTERS  412-288-5370                    Page 139

1   BY MS. ROHRER:
2   Q.    I've identified Chernosky Exhibit 3. Take a
3   look at that and let me know if you recognize that.
4   A.    I recognize the pleading. I haven't read the
5   content. That is my signature on the last page.
6   Q.    I'm going to represent to you that this was a
7   response that you did file to a motion to suppress
8   evidence related to the telephone number ending in 3461
9   that was determined to be associated with Mr. Robert
10  Thomas. I want to direct you to page 4 of 10. We'll go
11  to paragraph 10. It says: In response to defendant's
12  argument that defendant did not confirm in his
13  interview -- and the defendant in this one is Robert
14  Thomas -- defendant did not confirm in his interview
15  that number 412-378-3461 was in fact his own, the
16  Commonwealth concedes. Do you see that?
17  A.    Yes.
18  Q.    And would that, then, be you representing as the
19  prosecutor in this criminal case that you concede that
20  Mr. Thomas did not specifically say that was his number?
21  A.    Yes.
22  Q.    And then in paragraph 11, it says: The author
23  of this affidavit, Detective Patrick Miller, is prepared
24  to and would testify that the statement based upon
25  information received was not a deliberate or intentional

AA COURT REPORTERS  412-288-5370                    Page 140

1   falsehood for the purposes of deceiving in order to
2   obtain probable cause for the Court order. Do you see
3   that there?
4   A.    Yes.
5   Q.    Now, did Detective Patrick Miller so testify, to
6   your knowledge?
7   A.    Yes. How should I say this? I don't remember
8   whether we litigated this with the Cheron Shelton
9   suppression motion.
10  Q.    Okay.
11  A.    Or whether they were both the same day or
12  whether we argued them separately. But in preparation
13  for the motion, I would have talked to Detective Patrick
14  Miller and made this representation after talking to
15  him.
16  Q.    Now, based on your work on this case and your
17  conversations with Detective Miller and other detectives
18  on this case, do you believe that this was not a
19  deliberate or intentional falsehood?
20        MS. ROHRER: Object to the form of the question.
21  A.    Yes. I believe that it was not deliberate.
22  BY MS. ROHRER:
23  Q.    Now, you do say in paragraph 13 that -- now
24  we're talking about contacts between two telephone
25  numbers. It says in paragraph 12: Defendant argues

CHERON S HELTON/ROBERT THOMAS CONFIDENTIAL ATTORNEYS' EYES ONLY      KEVIN CHERNOSKY
COUNTY OF ALLEGHENY, et al.                                           March 15, 2024

AA COURT REPORTERS  412-288-5370                                     Page 141

1   that the following statement the last contact between
2   the two telephones seized at 9:50 PM on March 9, 2016
3   and resumed again at 11:19 PM on March 9, 2016 contained
4   within the affidavit was also fabricated. Do you see
5   that paragraph?
6   A.      Yes.
7   Q.      And then your response in paragraph 13: The
8   Commonwealth argues that although the statement was
9   clearly inaccurate as evident by the preliminary hearing
10  testimony of Detective Patrick Miller, the purpose for
11  this statement is immaterial and unnecessary for
12  purposes of probable cause. Do you see that?
13  A.      Yes.
14  Q.      Now, do you on this day still agree with what
15  you have represented in this response?
16  A.      Yes.
17  Q.      Thank you very much. I think we're done with
18  that exhibit for now. I want to move on to Kendall
19  Mikkell being an agent of the state and using -- and the
20  decision to use him in this trial. Not this trial. I
21  apologize. The criminal prosecution of Mr. Shelton and
22  Mr. Thomas. When someone is designated as an agent of a
23  state -- of the state, do you know whether that is
24  case-specific or is that just general? Are you aware?
25  A.      I'm aware. It's case-specific.

AA COURT REPORTERS  412-288-5370                                     Page 142

1   Q.      Now, if someone is designated as an agent of the
2   state on a specific case, can they be potentially used
3   on a separate case as a witness?
4   A.      Yes.
5   Q.      If someone is deemed an agent of the state, do
6   you know whether that goes to admissibility or
7   credibility?
8   A.      Credibility.
9   Q.      Does them being an agent of the state make them
10  not credible?
11  A.      No.
12  Q.      Okay. What does it indicate?
13  A.      It indicates in the particular case that they're
14  declared an agent of the state that they were
15  intentionally attempting to get information to better
16  their circumstances so that they are no different in
17  that capacity than the officers themselves in obtaining
18  the information.
19  Q.      Now, Mr. Chernosky, as a prosecutor in the
20  criminal matter, did you -- the information that was
21  actually provided by Mr. Mikkell as put forward in
22  reports and interviews, did you have any kind of opinion
23  as to the credibility of Mr. Mikkell's testimony?
24          MR. PETRUNYA: Object to the form.
25          MR. HEMINGER: Yeah. I would object to I think

AA COURT REPORTERS  412-288-5370                                     Page 143

1   we're going too much into your thought process as an
2   attorney. I don't want to put you in that spot. I
3   think that's work product. I have to object to that.
4           BY MS. ROHRER:
5   Q.      We also discussed -- or you testified during
6   your deposition that there was a lot of sealed
7   documentation related to the criminal prosecution; is
8   that accurate?
9   A.      Yes.
10  Q.      Was there any documentation related to the
11  criminal investigation, let's say, leading up to
12  April 6th of 2016 that would have been made available to
13  the public?
14  A.      Information directly from the case?
15  Q.      Yes.
16  A.      No.
17  Q.      Was --
18  A.      Sorry.
19  Q.      Go ahead.
20  A.      There's a duty to inform the public, so, the
21  basic facts and circumstances about the time of the
22  occurrence and probably the fact that we believe there
23  were two shooters that were out there.
24  Q.      Would the district attorney's office have any
25  say over what, let's say, the media was giving out to

AA COURT REPORTERS  412-288-5370                                     Page 144

1   the public?
2   A.      No.
3           MR. PETRUNYA: Object to the form.
4   A.      I'm sorry.
5           BY MS. ROHRER:
6   Q.      Do you know when the information contained in
7   sealed search warrants, for example, would have been
8   unsealed and made available to people outside of the
9   district attorney's office?
10  A.      They're sealed for an initial period of 60 days
11  with the possibility of extending it 30 days. So, as to
12  each one, 60 days from when it was filed and potential
13  for an additional 30. There were so many in this case
14  that we made a spreadsheet to track them and we
15  intentionally resealed every one at the point prior to
16  the 60-day mark. So, all of them were sealed for
17  60 days after they were filed. I can't tell you how
18  many of them were and the dates that each one of them
19  became publicly available.
20  Q.      As of April 7th of 2016, who would have had
21  access to the search warrants involved in the criminal
22  matter?
23  A.      The detectives in the original case filed would
24  have had their original with the sealing order on top.
25  I believe that we kept a copy of the sealed ones or we

CHERON S HELTON/ROBERT THOMAS CONFIDENTIAL ATTORNEYS' EYES ONLY                KEVIN CHERNOSKY
COUNTY OF ALLEGHENY, et al.                                                    March 15, 2024

AA COURT REPORTERS 412-288-5370                                    Page 145

1   may have just kept the miscellaneous docket cover sheet.
2   The actual sealed warrant goes in an envelope that is
3   taped shut with the order on top of the envelope and is
4   filed in the Clerk of Courts. It's literally sealed.
5   Q.    Do the defense counsel for these defendants, do
6   they have access to those documents?
7        MR. PETRUNYA: I'm going to object to the form
8   of the question. Also, just clarification for this.
9   So, when you're saying defense counsel for these
10  defendants, if the charges aren't filed yet for the
11  Wilkinsburg massacre case, then can you clarify what
12  you're referring to?
13       MS. ROHRER: That's a great point there, Max.
14  BY MS. ROHRER:
15  Q.    Would Mr. Shelton or Mr. Thomas have had access
16  to any of those documents, let's say, the end of April
17  of 2016?
18  A.    No with one exception. If anything was served
19  on property that they got back, the cover sheet is left.
20  So, if I've seized your car but eventually it's returned
21  to you -- and I don't recall if that happened -- you
22  would get the initial sealing order that just says that
23  a search warrant and the cover sheet for the search
24  warrant which says what they're searching but you
25  wouldn't get the body. They're required to leave that

AA COURT REPORTERS 412-288-5370                                    Page 146

1   as a part of the rule. So, it normally gets left in the
2   car or with the phone or however they do that to serve
3   it. So, I don't have any specific recollection that
4   that occurred, but if a car was seized and then
5   returned, the cover sheet for the search warrant should
6   have been with the car.
7   Q.    Would Kendall Mikkell have been given
8   documentation related to this case anytime from the
9   incident date of March 9, 2016 through the end of
10  April 2016?
11       MR. PETRUNYA: I'm going to object to the form
12  and I would ask that it be limited to whether he has
13  knowledge of Mr. Mikkell --
14  A.    To my knowledge, Mr. Mikkell was not given any
15  search warrants or case materials.
16  BY MS. ROHRER:
17  Q.    And to your knowledge, was Mr. Frederick Collins
18  given any of the materials related to the investigation
19  of the Wilkinsburg massacre during that same period,
20  March 9, 2016 through the end of April 2016?
21  A.    To my knowledge, he was not given any search
22  warrants or reports or case materials.
23       MR. BIONDO: Give us two minutes.
24       MR. PETRUNYA: I have a couple followups after
25  that.

AA COURT REPORTERS 412-288-5370                                    Page 147

1        (There was a pause in the proceedings.)
2        MS. ROHRER: I don't have any more questions for
3   you, Mr. Chernosky. Thank you.
4             - - - -
5             RE-EXAMINATION
6             - - - -
7   BY MR. PETRUNYA:
8   Q.    Mr. Chernosky, when you were being asked
9   questions, just as a followup, when we say that the
10  search warrants themselves weren't available to the
11  public, you would agree me, though, that when you're
12  actually serving the warrants, the individuals that are
13  serving the warrants are going to these locations and
14  they're dressed as law enforcement identifying
15  themselves as such; correct?
16  A.    Yes.
17  Q.    When you're serving the warrants, you're
18  actually serving them on people to let them know we're
19  possessing your car, we're going into your house;
20  correct?
21  A.    When you say -- you're interacting with people
22  for the purpose of the service of the search warrant.
23  Q.    Yes.
24  A.    When it's sealed, they're only required to leave
25  the cover page and the first page of the search warrant,

AA COURT REPORTERS 412-288-5370                                    Page 148

1   so, the sealing order, the first page. So, yes, that
2   would be served on individuals.
3   Q.    And one of the places where the search warrant
4   was served in this case was a location known as Hilltop;
5   correct?
6   A.    Yes.
7   Q.    And that is a segment of row houses where
8   there's a number of individuals who the police officers
9   had received tips about that may have been involved in
10  the Wilkinsburg massacre; correct?
11  A.    Yes.
12  Q.    Additionally, if police are asking questions of
13  individuals that are brought in for other cases, that
14  might be a situation where information about the case
15  itself is divulged when they're asking questions to
16  people; correct?
17       MR. BIONDO: Objection to the form.
18       MR. HEMINGER: Objection.
19  A.    I would say yes in the general sense. Wider
20  sense of the word, if you ask someone a question that
21  suggests a certain -- did you see anything on this
22  street, I guess that suggests that something happened on
23  that street but --
24  BY MR. PETRUNYA:
25  Q.    Or identification of a vehicle, correct?

CHERON S HELTON/ROBERT THOMAS, et al.   CONFIDENTIAL ATTORNEYS' EYES ONLY   KEVIN CHERNOSKY
COUNTY OF ALLEGHENY, et al.   March 15, 2024

1  A.    Yes.
2  Q.    Or the names of individuals, correct?
3  A.    Yes.
4  Q.    So, just so we can clarify, there's possible
5  ways that people from the neighborhood or area could
6  learn about who some of the suspects were in a case like
7  this?
8          MR. HEMINGER: I'll object to the form.
9  A.    Yes. In the way that anything is possible.
10          MR. PETRUNYA: Okay.
11             - - - -
12          RE-EXAMINATION
13             - - - -
14  BY MR. JUBAS:
15  Q.    Okay. I wanted to ask you a question about what
16  was labeled as Chernosky 3, and, again, directing your
17  attention to paragraphs 10 and 11, did you say -- when
18  Ms. Rohrer was questioning you, did you say that there
19  was -- that he did provide an explanation to you?
20  A.    I would have spoken to him. So, my
21  representation that he's prepared to testify that this
22  was not an intentional omission would have been directly
23  from discussing that with Detective Miller.
24  Q.    Do you recall the context of that? Was he going
25  to say that it was an accidental misrepresentation?

1  A.    I don't recall the context at this point. I do
2  vaguely recall the interview and he confronts him with
3  the number and they just keep talking. He doesn't say
4  yes or no, it's his number.
5  Q.    Detective Miller --
6  A.    In fact -- I'm sorry. I don't even think it's
7  him. I think it's Detective --
8  Q.    Hitchings?
9  A.    -- Hitchings that confronts him and Miller was
10  writing the search warrant about the video.
11  Q.    Is it or was it your opinion ever that maybe
12  Detective Miller just misspoke?
13  A.    About the number?
14  Q.    Yes.
15  A.    Yeah. It's my -- how should I say this? It's
16  my understanding that he was of the belief that Rob
17  Thomas did say that was his number. Whether that was
18  relayed to him by another detective and he didn't
19  actually watch the interview or not, I don't know.
20  Q.    So, is it accurate to say that Detective Miller
21  never informed you that they received that phone number
22  from a legal means, legal meaning not illegal?
23  A.    A legal means?
24  Q.    Yes.
25          MR. BIONDO: I'll object to the form.

1          MR. HEMINGER: Object to the form.
2  A.    Is it accurate to say that Detective Miller
3  never told me that they got it through a legal means?
4  BY MR. JUBAS:
5  Q.    Yes.
6          MR. BIONDO: I'll object to the form.
7  A.    Sorry. I just wanted to repeat it. It is
8  accurate to say that he never told me there was another
9  source of information. The way it was relayed to me in
10  the search warrants is the way it was understood to be
11  that he acknowledged that it was his number.
12  BY MR. JUBAS:
13  Q.    So, just to pin this down, is it accurate to say
14  that Detective Miller or any other homicide detectives
15  never informed you or the prosecution, to your
16  knowledge, that they received this number from Shaquan
17  Roberts on March 15, 2016?
18  A.    I don't recall them ever telling me that they
19  received a number from Shaquan Roberts.
20  Q.    And then you also had discussed with Ms.
21  Rohrer -- you were discussing the difference between
22  admissibility and credibility when it came to agents of
23  the state.
24  A.    Yes.
25  Q.    And you had said that that impacts credibility;

1  correct?
2  A.    Yes.
3  Q.    Would you agree with me that it's possible that
4  if an individual is designated as an agent of the state,
5  that they would be required to provide Miranda warnings?
6  A.    I disagree with that. I understand, I guess,
7  your theory behind it, but I disagree that they would be
8  required. I agree that if you wanted to overcome a
9  designation in a particular case that someone was an
10  agent of the state, that if they provided Miranda
11  warnings, the statement would be usable, but I disagree
12  that they should be required to do that.
13          MR. JUBAS: Okay. That's does it. Nothing
14  further.
15             - - - -
16          RE-EXAMINATION
17             - - - -
18  BY MS. ROHRER:
19  Q.    Okay. So, you had mentioned that you were not
20  aware of any -- of obtaining Mr. Thomas's phone number
21  from Shaquan Roberts as a possible source. Were there
22  other sources where Mr. Thomas's phone number was
23  confirmed to be 3461 -- ending in 3461?
24  A.    My recollection is that we were asked for and
25  given permission to download Brittany Shelton's phone

CHERON S HELTON/ROBERT THOMAS CONFIDENTIAL ATTORNEYS' EYES ONLY          KEVIN CHERNOSKY
COUNTY OF ALLEGHENY, et al.                                               March 15, 2024

---

AA COURT REPORTERS  412-288-5370                                    Page 153

1    and that that phone number was in there.  Not under
2    Robert Thomas.  It might have been under Rob or --
3    sorry.  I believe there was a responsive text message in
4    her phone where whoever's using the phone says it's Rob,
5    call me back, but it doesn't say Rob Thomas or anything
6    like that.  I believe we surmised that that must be
7    another source of his number.
8         MS. ROHRER: I don't have any more.
9         MR. BIONDO: One more.
10   BY MS. ROHRER:
11   Q.   To your knowledge, did Detective Miller do
12   anything illegal or improper to obtain this phone
13   number, the evidence related to this phone number?
14   A.   No.  Well, I have no recollection of that.  If I
15   did, we would have had a discussion about it.
16   Q.   Do you recall having a discussion about it?
17   A.   No.
18        MS. ROHRER: No more questions.
19                    - - - -
20                RE-EXAMINATION
21                    - - - -
22   BY MR. JUBAS:
23   Q.   If you had known that the Allegheny County
24   Police interviewed an individual named Shaquan Roberts
25   and provided information pertaining to Lamont Powell,

---

AA COURT REPORTERS  412-288-5370                                    Page 154

1    Cheron Shelton and Robert Thomas's phone number on
2    March 15, 2016, would you have wanted to know about
3    that?
4    A.   Yes.
5    Q.   Would you have had discussions with the
6    detectives about that?
7    A.   Yes.
8         MR. JUBAS: Nothing further.
9         MR. HEMINGER: We would like to read.
10        (The deposition ended at 2:57 p.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

AA COURT REPORTERS  412-288-5370                                    Page 155

1                CERTIFICATE OF REPORTER
2
3        I, ANTHONY JUDE CORDOVA, a Certified Shorthand
4    Reporter and E-Notary Public, hereby certify that the
5    witness in the foregoing deposition was by me duly sworn
6    to tell the truth in the within-entitled cause;
7        That said deposition was taken down in shorthand by
8    me, a disinterested person, at the time and place
9    therein stated, that review was not waived, and that the
10   testimony of the said witness was thereafter reduced to
11   typewriting, by computer, under my direction and
12   supervision;
13       I further certify that I am not of counsel or
14   attorney for either or any of the parties to the said
15   deposition, nor in any way interested in the event of
16   this cause, and that I am not related to any of the
17   parties thereto.
18
19   DATE:  April 4, 2024
20
21   /s/ Anthony Jude Cordova
22   Anthony Jude Cordova, CSR 12943
23   Certificate Attached
24
25

---

AA COURT REPORTERS  412-288-5370                                    Page 156

1        UNITED STATES DISTRICT COURT        )    ERRATA SHEET
2        WESTERN DISTRICT OF PA              )
3
4    SHELTON V. COUNTY
5    I, Kevin Chernosky, have read the foregoing pages of my
6    deposition given on March 15, 2024 and wish to make the
7    following, if any, amendments, additions, deletions or
8    corrections:
9
10       PAGE NO.      LINE NO.       REASON FOR CHANGE
11
12
13
14
15
16
17
18
19
20   The transcript is correct in all other respects.
21
22
23                          _____
                            Kevin Chernosky
24   Subscribed and sworn before me this ___ day, _____,
                                                     2024.
25                          _____

---

CHERON S HELTON/ROBERT THOMAS **CONFIDENTIAL ATTORNEYS' EYES ONLY**    KEVIN CHERNOSKY
COUNTY OF ALLEGHENY, et al.                                              March 15, 2024

| AA COURT REPORTERS  412-288-5370 | Page 157 |
|---|---|

```
 1                    AA COURT REPORTERS
              428 BOULEVARD OF THE ALLIES, SUITE 300
 2                PITTSBURGH, PENNSYLVANIA  15219
                         412.288.5370
 3

 4   April 4, 2024

 5   TO:  Joseph G. Heminger, Esq.

 6   Re:  SHELTON V. COUNTY

 7   Dear Counsel:

 8   Please find enclosed your copy of the deposition of
     Kevin Chernosky taken in the above-titled matter on
 9   March 15, 2024.  Please have the witness make any
     changes and|or corrections that are deemed necessary on
10   the enclosed errata sheet.

11   After making any changes and|or corrections, have the
     witness sign the errata sheet on the signature line and
12   then have it Notarized.

13   Retain a copy of the errata sheet for attachment to your
     copy of the transcript, and send the original errata
14   sheet to Max Petrunya, Esq., and also copies to all
     other counsel, if applicable.  Also, send a copy to me.
15
     Thank you for your cooperation in this matter.
16
     Sincerely yours,
17

18   Anthony Cordova, CSR 12943
     Court Reporter, Notary Public
19
     Cc:  Max Petrunya, Esq.
20        Paul Jubas, Esq.
          Shelley Rohrer, Esq.
21        Dennis Biondo, Jr., Esq.

22

23

24

25
```

CHERON S HELTON/ROBERT THOMAS, CONFIDENTIAL  ATTORNEYS' EYES ONLY
COUNTY OF ALLEGHENY, et al.

KEVIN CHERNOSKY
March 15, 2024

**$**

**$1,762 (1)**
131:14
**$30,000 (1)**
47:18

**A**

**abandon (1)**
100:12
**abandoned (1)**
90:15
**abandoning (1)**
65:10
**ability (3)**
47:24,25;83:10
**able (7)**
43:7;101:10;114:5;
127:25
**above (2)**
11:22;114:3
**absolute (1)**
89:16
**Absolutely (1)**
68:6
**abuse (1)**
17:10
**accept (2)**
106:25;114:15
**accepted (1)**
101:11
**access (11)**
13:5;45:1;67:14,16,
22;89:5;129:24;130:5;
144:21;145:6,15
**accidental (1)**
149:25
**accommodate (1)**
7:23
**accompanied (1)**
119:5
**accompanying (1)**
19:13
**accomplished (1)**
29:19
**accordance (1)**
6:6
**account (13)**
43:2,10,16,19;44:1,3,
8,10,16;45:24;46:4,11;
114:7
**accounting (1)**
47:16
**accounts (2)**
44:14,21
**accurate (10)**
22:24;54:6;55:14,15;
135:3;143:8;150:20;
151:2,8,13
**accused (1)**
107:19

**acknowledged (1)**
151:11
**across (1)**
126:25
**act (1)**
26:16
**acting (2)**
29:5;30:5
**actions (2)**
77:11;132:3
**active (1)**
15:23
**actively (1)**
16:4
**actors (2)**
127:10,15
**actual (9)**
14:12;52:9;101:5;
103:8;114:6;119:3,13;
129:17;145:2
**actually (37)**
10:7;11:22;12:8;
17:15;18:20;25:4;
31:16;36:12,13;50:9,
24;52:6,19;53:11;
56:22;60:25;88:6;98:4,
13;100:11,13;101:21;
110:19;114:14;116:12,
13;118:12;121:9;
125:14;128:14;133:4,
5,10;142:21;147:12,
18;150:19
**ADA (1)**
110:2
**add (3)**
24:22;54:17;123:6
**additional (2)**
32:21;144:13
**Additionally (1)**
148:12
**address (5)**
20:5,6;53:4,7,11
**adds (3)**
33:11;109:7,8
**adjust (1)**
12:23
**administer (1)**
45:16
**administered (1)**
45:1
**administrators (1)**
116:23
**admissibility (2)**
142:6;151:22
**admissible (1)**
49:3
**admission (1)**
67:6
**admit (2)**
132:10,12
**admitted (1)**
66:5
**advice (1)**

**28:24**
**affected (1)**
68:3
**affidavit (23)**
8:9;12:18;19:12;
24:12,23;25:2,13;
26:24;27:4,13,14;86:1;
95:13,20,22;97:11;
125:15;126:4,7;
127:12,20;139:23;
141:4
**affidavits (8)**
24:19;25:3;26:17;
27:22;84:15,25;125:3;
126:13
**affirmative (9)**
100:1;108:22;131:5;
132:19;134:10,15;
136:5,8;137:19
**affirmatively (1)**
136:18
**afraid (1)**
61:18
**afternoon (1)**
138:3
**afterwards (2)**
65:16;69:25
**again (10)**
21:2;51:13;52:6;
54:12;55:9;57:4;72:9;
99:22;141:3;149:16
**against (19)**
7:11;56:14;57:8;
65:10,17;66:3,19,20;
67:5;87:19,23;96:18;
100:23;107:13,14;
108:7;112:6;129:5,18
**agencies (1)**
10:18
**agency (1)**
101:5
**agent (16)**
35:10,17;67:11;84:4;
99:23;100:3,6;136:12;
141:19,22;142:1,5,9,
14;152:4,10
**agents (2)**
82:22;151:22
**ago (4)**
7:9;8:9,11;126:24
**agree (38)**
6:8,12;53:17;73:12;
79:3;86:2;88:5;92:8,
12;97:2,7;107:7,16;
109:2,6,8;112:7;
113:24;120:24;124:20,
25;125:4,10;127:12,14,
19,24;128:2,3;129:2,7;
135:5,9;137:18;
141:14;147:11;152:3,8
**agreed (1)**
6:5
**ahead (17)**

**11:17;28:4;32:25;**
42:23;46:1;60:14;
64:16;71:15;77:8;
85:16;87:5;104:21;
107:25;111:13;114:8;
122:1;143:19
**aids (1)**
62:1
**air (1)**
28:7
**AK (1)**
92:10
**AK-47 (2)**
91:3,8
**albeit (1)**
72:19
**alert (1)**
134:10
**Alicia (4)**
14:16;37:24;48:17;
81:8
**allegation (1)**
101:6
**allegations (2)**
129:4,18
**allege (1)**
49:6
**allegedly (3)**
76:17;94:13;95:9
**Allegheny (12)**
17:19;28:1;33:16;
34:5;40:25;44:9;71:18;
109:25;112:9;131:12;
138:5;153:23
**alleghenycountydaus (1)**
53:10
**allow (2)**
37:17;118:4
**allowed (2)**
23:3;73:5
**almost (1)**
68:24
**alone (3)**
13:17;24:3,5
**Along (4)**
12:13;24:7,8;86:13
**Alright (4)**
50:5,8;67:24;70:7
**alternative (2)**
50:7;94:3
**although (1)**
141:8
**always (14)**
28:7,16;31:18,19,21;
90:3,7,25;92:13;93:15;
98:8;100:21,22;125:20
**amongst (2)**
80:1;126:8
**amounts (2)**
41:22;47:18
**Amy (1)**
46:15
**analysis (2)**

**94:2;124:8**
**and/or (2)**
19:9;106:4
**Angela (1)**
46:12
**anger (1)**
129:13
**angry (1)**
129:12
**anticipate (2)**
89:20;94:25
**anticipating (1)**
60:2
**anticipation (1)**
59:10
**anymore (1)**
38:20
**apologize (7)**
59:17;63:3;78:6;
95:11;108:2;117:6;
141:21
**apparent (3)**
35:6;132:3,16
**apparently (1)**
61:24
**appeals (4)**
83:7,10,17;110:12
**appear (7)**
24:24;97:3;110:23;
124:2,5,5;133:25
**appearance (2)**
53:21;121:17
**appeared (4)**
43:2;46:13;121:9;
136:19
**appearing (1)**
95:2
**appears (5)**
46:16;53:4;131:18;
134:3,6
**application (2)**
22:23;23:2
**applications (1)**
23:11
**applied (2)**
68:14;128:20
**applies (2)**
72:6;89:3
**approach (2)**
14:7;128:16
**approached (1)**
38:21
**approaches (1)**
43:25
**approaching (1)**
69:4
**appropriate (1)**
50:8
**approval (10)**
8:24;12:15;13:2,7,
23;17:5;89:2;104:24;
117:17;118:4
**approve (9)**

13:8,9,15,17;17:12,
14;85:12;110:17,19
**approved (8)**
12:7,14;13:15,20;
27:16;28:2,6;117:14
**approving (1)**
104:19
**approximately (3)**
112:17;124:22;128:1
**April (28)**
28:1;31:1,14;32:6,
13,20,21;33:14;96:5,
14;105:10;106:17,25;
113:15;114:24;115:5;
116:14;120:5;131:3,
13;135:6;136:2;137:1;
143:12;144:20;145:16;
146:10,20
**area (4)**
17:7;105:23;128:7;
149:5
**areas (1)**
119:24
**argue (5)**
36:12;37:6;77:21;
100:7;110:8
**Argued (2)**
65:5;140:12
**argues (2)**
140:25;141:8
**argument (6)**
37:12;63:25;65:22;
66:1;73:9;139:12
**around (8)**
10:4;15:5;38:18;
42:13;75:18;78:7;89:9;
119:7
**arrangements (1)**
100:9
**arrest (7)**
12:16;26:20;28:10;
31:21;46:3;89:3;
119:16
**arrested (10)**
86:18,19;87:10,12,
12,15;92:3,21;113:15;
120:5
**arresting (1)**
86:14
**arrests (2)**
86:7;119:16
**article (2)**
21:17,23
**ASAP (17)**
12:24;13:4;24:13;
25:5,9,10,14,24;26:9,
18,22,24,25;27:14,15;
79:8;126:10
**ASAP's (1)**
25:9
**aside (1)**
33:1
**aspect (3)**

27:8;46:11;52:17
**assault (1)**
17:11
**assemble (1)**
27:5
**assembled (1)**
110:9
**asserting (1)**
37:7
**assess (2)**
19:4;74:17
**assessing (4)**
18:2,17,21;35:13
**asset (1)**
46:11
**assign (1)**
16:4
**assigned (5)**
8:21;14:22;91:22;
110:2;113:24
**assigning (1)**
14:24
**assignment (1)**
78:22
**assignments (1)**
113:3
**assist (1)**
39:6
**assistant (5)**
8:21;9:3;14:19;15:8,
10
**assistants (1)**
14:11
**associated (2)**
91:10;139:9
**assume (2)**
27:9;102:17
**assuming (1)**
108:6
**ATF (1)**
94:2
**attached (1)**
73:15
**attachment (1)**
42:7
**attempted (1)**
27:15
**attempting (1)**
142:15
**attention (7)**
16:11;53:20;70:1,2;
128:24;129:9;149:17
**Attorney (23)**
6:24;8:16,21;20:23;
21:18;29:5;30:5;36:1,
3;37:14;41:17;45:2,4;
46:12;48:5;75:13;
80:13;89:10;101:12;
104:23;109:25;110:20;
143:2
**attorneys (12)**
6:6;8:17;37:24;
48:18;51:17,19;52:1;

78:10,12,21;80:16;
100:10
**attorneys' (3)**
6:9;51:7;54:18
**attorney's (27)**
8:13,20;14:1,6;
15:18;16:22;36:16;
39:8,11;40:1,17,25;
41:18;43:14;44:15;
45:15;46:9;56:3;88:25;
100:2;104:19;105:1;
108:17;110:24;121:22;
143:24;144:9
**attributed (3)**
123:23,25;124:9
**August (13)**
6:7;52:24;54:1,15;
59:12,13;98:20;
133:10,10,15;135:10,
23;136:2
**author (1)**
139:22
**authored (1)**
138:13
**authorities (1)**
34:13
**authority (1)**
73:21
**authorized (5)**
19:23;20:1;55:1;
60:23;86:21
**authorizes (1)**
43:24
**authorizing (1)**
13:10
**auto-completed (1)**
53:8
**auto-correct (1)**
27:3
**availability (2)**
8:7,8
**available (4)**
143:12;144:8,19;
147:10
**Avenue (3)**
66:10;124:16,23
**avoid (1)**
68:11
**aware (25)**
33:15;34:4,5,8;
38:13,14;39:7,25;40:8,
19;47:3;60:16;61:3;
87:9,13;91:2;93:23;
99:4;102:9,12;115:17;
131:7;141:24,25;
152:20
**awareness (1)**
41:11
**away (4)**
14:22;65:19;118:8;
130:11

| | |
|---|---|
| **B** | |

**back (38)**
8:18;17:8;23:22;
33:4,4,8;39:1;42:1;
66:6,6,10,16,18;76:10;
80:6,23;91:4;92:9;
93:2,17;96:13,19;
100:11;101:24;103:17,
20;105:24;107:4;
118:23;125:23;126:2,
19;130:12;136:21;
137:6,8;145:19;153:5
**background (1)**
42:16
**balance (2)**
103:1;112:6
**Ball (2)**
55:21;58:4
**bank (2)**
43:17,18
**barbecue (2)**
66:13;127:16
**bargain (1)**
64:10
**Based (10)**
49:10;50:6;92:12;
93:14;97:13;105:15;
111:20;132:3;139:24;
140:16
**base-level (1)**
46:6
**basic (1)**
143:21
**basically (6)**
13:1;19:8;23:9;
24:19;29:25;62:1
**beat (1)**
45:21
**became (5)**
10:3;25:1;27:19;
129:5;144:19
**become (1)**
39:25
**becomes (1)**
109:15
**becoming (1)**
35:3
**beforehand (1)**
130:25
**began (1)**
100:9
**begin (1)**
122:8
**beginning (1)**
51:8
**behalf (4)**
6:4,25;47:17;67:15
**behind (6)**
21:11;90:12;120:1;
124:21;127:16;152:7
**belief (7)**

41:5;43:13;77:13;
99:2;134:14,15;150:16
**below (1)**
31:22
**benefit (2)**
58:10;64:2
**benefits (6)**
10:6;41:10;47:4;
50:3;57:18;104:2
**Berman (2)**
10:5,12
**B-E-R-M-A-N (1)**
10:12
**Besides (4)**
14:5;18:1;39:13;
44:16
**best (3)**
29:18;45:23;102:6
**better (2)**
93:16;142:15
**big (1)**
16:11
**biggest (3)**
16:6,8,9
**Bill (2)**
14:13;81:6
**binding (1)**
73:12
**biographical (1)**
27:9
**BIONDO (59)**
6:14;20:25;25:15,17;
28:3;29:23;32:10,16,
24;33:17,19,22,25;
34:3,21;44:18,24;
48:10;49:17;50:9;
57:14;62:10;64:17;
70:17;71:14,25;72:14;
77:8;79:21;87:4;91:16;
101:14;102:2;104:6,8,
21;106:20;107:24;
108:9;109:12;111:13;
112:19;114:8;116:14;
120:11;122:1,21;
125:8;126:11;127:17;
130:15;134:24;135:21;
136:6;146:23;148:17;
150:25;151:6;153:9
**birth (1)**
27:11
**bit (4)**
17:9;66:24;90:3;
137:5
**blanket (12)**
56:12;57:5,12;58:8;
59:4;61:19,21;62:15,
21;63:1,18;64:6
**board (1)**
114:4
**body (1)**
145:25
**Borkowski (3)**
53:22;66:2;98:21

CHERON S HELTON/ROBERT THOMAS, CONFIDENTIAL  ATTORNEYS' EYES ONLY                    KEVIN CHERNOSKY
COUNTY OF ALLEGHENY, et al.                                                                                    March 15, 2024

**Borkowski's (1)**
66:20
**both (22)**
13:7;17:2;26:10;
29:12;51:24;57:17;
59:4;65:16;66:14,19;
67:5;68:16;71:20;
106:4;109:2;113:19;
117:16;123:6,7,10;
127:22;140:11
**break (5)**
7:22;90:2;106:22;
130:12,12
**breaker (1)**
89:17
**brief (2)**
8:5;73:20
**briefed (7)**
13:21;32:3,9,14;
37:13;118:9,10
**briefing (4)**
14:25;15:24;17:22;
118:15
**briefings (4)**
17:18,21;18:11;
117:20
**bring (3)**
31:25;53:19;87:3
**bringing (2)**
122:19;125:12
**Brittany (1)**
152:25
**broad (3)**
37:2,16;71:1
**broke (3)**
9:13;10:15;11:8
**Broman (12)**
52:23;53:5,17,25,25;
54:15;58:5,14;59:14,
19,23;60:5
**Broman's (1)**
54:5
**brought (4)**
9:24;96:4;112:6;
148:13
**BRUCKER (3)**
4:3;8:7;42:19
**budget (1)**
46:15
**building (1)**
28:14
**bulk (1)**
126:4
**bulletproof (1)**
20:16
**bullets (1)**
91:3
**bunch (1)**
103:17
**button (1)**
13:2
**bypass (2)**
115:13,17

## C

**cache (1)**
90:14
**California (1)**
17:3
**call (24)**
9:1,2;12:24;15:25;
16:3;39:20,21;48:13;
74:6;78:23;98:7,13;
100:7,21;114:5,6,14,
15,23;115:4;124:18;
132:14,17;153:5
**called (4)**
8:4;66:2;68:10;
99:13
**calling (7)**
59:10;60:2,2;98:9,
15;123:22;133:6
**call-out (1)**
115:13
**calls (12)**
9:7;15:15;72:9;
113:17,25;114:4,13,17,
20,22;115:1;116:10
**Calvin (14)**
69:12;70:16;71:3;
94:11;121:3,5,9,12;
122:4,11,15,17,19,21
**came (29)**
13:16;18:12;19:16;
20:9;32:20;33:4,8;
44:7;59:15;70:1,2;
74:8;75:4;78:22;80:23;
81:8;85:21;92:9;94:2;
95:5;96:2,13;97:13;
122:11;124:11;129:24;
130:8;137:3;151:22
**can (103)**
7:23;12:23;13:7,20;
21:21;23:19;24:22,25;
25:17;27:1;28:3,8;
29:22;30:10,11;32:25;
36:6,22;38:17;40:4;
42:24;43:21;45:23;
46:1,4;47:13;48:24;
49:7,8,12,19;54:8;56:6,
7,19,21;58:17;61:4;
62:24;63:24;64:18;
68:4;69:16;70:17,20;
72:10;73:6,13,15;
75:24;76:20,21;77:24,
25;79:22,22;83:5;84:8,
18;85:2,4;87:5,6;88:1;
89:25;91:15;92:24,24;
94:7;97:17;99:16;
102:25;103:14;104:8;
106:6;107:8,22,23;
108:1,20;109:8;110:6,
8,19;112:19;113:24,
25;116:25;117:3,16;
119:12,22;120:7,24;

126:2;127:4;128:3;
130:25;133:3;137:5;
142:2;145:11;149:4
**canceled (3)**
35:21,21;98:16
**capacity (7)**
8:25;15:24;18:11;
29:5;30:5;73:21;
142:17
**capital (6)**
17:3;109:3,22;111:9,
22;112:1
**caption (4)**
51:16;52:2;81:21;
133:15
**car (11)**
18:21,23;20:8,8;
66:9;75:22;145:20;
146:2,4,6;147:19
**career (1)**
113:18
**Carmen's (1)**
75:9
**case (183)**
7:13,14;12:2,14;
13:14;14:1,9;16:6,8,11,
13,16,18,19,23;17:10,
23;18:3,19;19:17;21:3;
22:7,8;23:23;24:15,20;
26:21;28:11,14,18;
30:21;32:23;35:12,17;
36:10;37:12,24;38:11;
41:16,22;42:9;43:25;
44:4,11;45:5,13;47:25;
48:8,18;49:6;52:9,16;
54:11;56:16;58:13,24;
63:3,17,18;64:13,23;
65:5,7,10;66:8,18,21;
67:5,14;70:7,23,25;
71:2;72:25;74:6,15,20;
75:6,8;78:22;79:11;
81:2,8,9,20,23;82:3,5,
5,10,12,14,15,17,19;
84:23,24;85:17,18,18,
18,23;86:2;88:2;90:4;
91:9,22;93:9,15;94:3,
10,11;97:13,20;98:10;
99:3;103:4,4;104:13,
15,25,25;105:16,20,22,
25;106:3,18,19;107:2;
110:3,15,20,21;111:4,
6,9;113:18;114:18;
115:11;116:19;117:23;
119:2,9,16;120:1,23;
121:10,13,18;122:20,
22,24;123:5;124:14;
128:22,22,25;129:9,14;
130:1,5;131:25;
134:17,19;137:9;
139:19;140:16,18;
142:2,3,13;143:14;
144:13,23;145:11;
146:8,15,22;148:4,14;

149:6;152:9
**cases (23)**
12:16;37:11,11;
45:13;48:7;63:21;
67:13;78:19;79:5;83:3,
24;84:6;85:2;89:6,19,
23;104:17;109:3,4,10,
22,23;148:13
**case-specific (2)**
141:24,25
**cash (1)**
94:17
**Cashman (1)**
67:25
**casings (1)**
92:12
**cause (38)**
8:9;12:18,20;13:3;
18:22;19:12;24:13;
25:2,3,13;27:5,14,23;
28:15;29:21;30:14;
31:9,11,19,24;32:5;
68:11;79:14;84:15;
86:2;87:22;92:18,20;
93:19;95:14,20,23;
97:12;125:4;126:13;
127:20;140:2;141:12
**caused (1)**
69:18
**cautiously (1)**
21:19
**caveat (1)**
108:10
**cell (4)**
52:14;65:11;68:18;
124:7
**certain (10)**
22:23;27:2;32:18;
68:17;72:24;85:4,10;
109:7;111:10;148:21
**certainly (2)**
73:16;74:16
**cetera (1)**
12:24
**challenge (2)**
35:16;100:3
**challenged (3)**
68:10;83:2,23
**challenges (2)**
84:1,6
**change (2)**
112:8;132:16
**changes (1)**
31:6
**charge (8)**
28:8;32:5;89:11;
92:18,20;93:9,19;
114:13
**charged (7)**
28:12;63:2,12,16;
93:7;109:3;111:8
**charges (39)**
7:15;8:24;10:18;

12:14,22,24;13:2;17:5,
13,15;24:3,7;25:14;
27:1;28:2,6;29:21;
30:16;31:16;78:10;
79:12;86:6;87:19,23;
88:25;96:4;101:5;
109:8;111:20;112:6;
117:17;119:14;120:8;
121:25,25;125:11;
126:9;129:17;145:10
**charging (10)**
11:3;24:14;25:2;
27:19;30:2;31:1,11;
32:23;95:16;126:19
**check (1)**
12:20
**checked (2)**
90:12,17
**Chelsea (1)**
14:14
**Chernosky (27)**
6:5;17:7;33,5,3,7;
32:14;43:7;50:25;51:3,
11;52:1,22;53:1;55:12;
57:2;58:20;78:6;107:7;
130:23;138:3,7;139:2;
142:19;147:3,8;149:16
**C-H-E-R-N-O-S-K-Y (1)**
7:6
**Cheron (24)**
7:1;23:5;65:13,18;
70:15;71:11,12,21,22;
86:7,18;87:19,23;92:3,
20;96:15,19;106:4;
112:16;123:10;124:22;
128:1;140:8;154:1
**Cheron's (3)**
65:15;66:7,8
**chief (4)**
11:18,19;15:9;
110:12
**child (1)**
17:10
**circulated (1)**
25:6
**circumstance (2)**
85:1;91:7
**circumstances (5)**
56:18;98:6;110:4;
142:16;143:21
**circumstantial (8)**
66:18,20;67:5;88:2,
12;93:4,15;96:18
**circumstantially (3)**
20:15;66:7;92:19
**cite (4)**
73:17,20,23,24
**cited (1)**
73:15
**City (8)**
10:18;11:5,12;88:17,
22;89:3;121:10,24
**civil (1)**

Case 2:22-cv-00196-CB     Document 83-27     Filed 07/01/24     Page 45 of 60

CHERON S HELTON/ROBERT THOMAS,          CONFIDENTIAL  ATTORNEYS' EYES ONLY          KEVIN CHERNOSKY
COUNTY OF ALLEGHENY, et al.                                                          March 15, 2024

7:11
claim (1)
  67:6
claims (4)
  96:18;103:2;107:9;
  108:6
clarification (1)
  145:8
clarify (5)
  7:21;59:3;76:22;
  145:11;149:4
clarifying (1)
  93:25
Claus (14)
  9:5,22;12:7,10;
  13:17,18;14:5,10,24;
  24:11;25:25;26:7,8;
  38:1
C-L-A-U-S (1)
  9:7
CLE (1)
  16:25
clear (2)
  31:17;76:1
clearly (2)
  112:5;141:9
Clerk (1)
  145:4
click (1)
  13:1
client (2)
  27:4;89:11
close (4)
  70:15;71:2,7;89:9
closed (3)
  44:10;137:1,2
clunky (1)
  25:9
coats (1)
  66:15
coconspirator (1)
  65:23
cocounsel (2)
  7:1;96:23
cohesive (2)
  25:8;125:11
collaborative (1)
  117:15
collectively (2)
  79:4;80:1
collects (1)
  66:8
Collins (18)
  31:2;34:24;35:1,2,
  25;67:18;85:20;95:5,
  10,21;99:5,8;115:5,13;
  116:1;131:25;132:8;
  146:17
Collins' (1)
  34:9
combination (1)
  118:16
combined (1)

51:24
comfortable (2)
  93:10,11
coming (3)
  23:15;65:13;93:17
Command (2)
  11:16;18:12
comment (1)
  119:15
committed (1)
  122:11
committee (3)
  110:1,10,10
Common (5)
  68:15,17,21,25;
  104:4
commonly (1)
  68:14
Commonwealth (27)
  22:15;35:7;49:22;
  69:12;74:3;81:20;82:2,
  9,13,16;98:20;99:12;
  100:15;109:10;133:11,
  25;134:21;135:6,10,11,
  16;136:1,3,4;137:20;
  139:16;141:8
communicated (3)
  85:19;98:1,2
communicating (2)
  117:1,15
communication (1)
  99:8
compelling (1)
  37:18
complaint (10)
  24:13;26:24;27:1;
  39:25;40:13,16;86:6,
  22;126:23;129:4
complaints (2)
  23:23;86:24
component (1)
  101:24
comprehensive (1)
  83:25
computer (2)
  12:22;26:25
concede (1)
  139:19
concedes (1)
  139:16
concept (2)
  122:10;124:20
concerned (3)
  84:12;89:17;102:8
concerning (1)
  34:24
concerns (2)
  55:23;67:8
conclusion (1)
  26:2
conclusions (1)
  19:16
conducted (3)

95:1;124:13,14
conducting (2)
  58:4;124:25
conference (1)
  8:6
conferring (1)
  14:6
confidential (9)
  6:9,11;37:8;54:19;
  70:21;100:16;106:2;
  127:1,21
confidentiality (1)
  51:8
confirm (5)
  51:14;67:14;113:4;
  139:12,14
confirmation (1)
  103:8
confirmed (1)
  152:23
confirming (1)
  102:19
confronts (2)
  150:2,9
confused (1)
  94:9
connected (3)
  94:10,13;96:15
connecting (4)
  20:12,14,15;67:1
connection (5)
  59:9;75:12;90:5;
  93:5,18
connections (2)
  65:11;66:4
consequence (1)
  41:15
consider (11)
  17:12;26:10;57:17,
  20;58:10;71:23;72:3,
  16,19;73:5;80:23
considered (4)
  11:24;65:17;72:13;
  73:13
consistencies (1)
  128:19
constantly (1)
  33:3
contact (1)
  141:1
contacts (1)
  140:24
contained (2)
  141:3;144:6
content (5)
  30:23;40:23;114:21;
  138:21;139:5
context (2)
  149:24;150:1
Contextually (1)
  43:16
continuing (1)
  31:25

contradict (1)
  125:6
contrary (1)
  100:8
control (1)
  73:10
conversation (8)
  39:15,24;41:12;
  67:23;85:22;105:11;
  121:20;130:3
conversations (8)
  30:9;79:25;86:12;
  89:4;113:4;121:23;
  129:21;140:17
cooperating (1)
  105:16
cooperation (1)
  53:19
copies (1)
  122:4
copy (3)
  73:16,25;144:25
correction (1)
  126:5
correctly (5)
  66:12,13;78:13;90:6,
  16
corroborative (1)
  137:6
Costa (4)
  18:7,12;116:20;
  117:10
costs (1)
  109:9
Couch (1)
  4:4
counsel (18)
  8:5;40:9;47:17,21,
  24;49:4;98:3,14;99:5;
  108:24;109:16;110:7;
  111:1,3;114:25;134:1;
  145:5,9
county (32)
  10:19;11:6,10;13:4;
  17:19,21;27:15;28:1,
  14;30:1,13;31:5,7;
  32:7;33:16,25;34:5;
  36:1;40:25;44:9,16,25;
  47:19;70:12;71:19;
  109:25;112:10;118:20;
  122:3;131:12;138:5;
  153:23
couple (3)
  78:7;94:5;146:24
course (1)
  37:21
Court (34)
  6:7;20:3,13,20;
  21:11;35:5;37:18;
  49:11;50:6;52:13;55:2;
  66:6,18;68:14,21;69:1;
  73:2,3;75:18;77:12;
  82:24,25;83:9,18;

85:12;90:12;92:21;
  93:2;95:6;106:5,8;
  124:16,23;140:2
Courts (1)
  145:4
Court's (2)
  53:19;59:21
cover (5)
  145:1,19,23;146:5;
  147:25
coverage (2)
  129:14;130:5
covered (6)
  37:2;50:11;51:7;
  54:18;129:6,7
credentials (1)
  13:6
credibility (6)
  67:9;142:7,8,23;
  151:22,25
credible (2)
  100:23;142:10
crime (16)
  15:1;28:6;33:4;
  56:12;57:6;65:15;67:2;
  78:9;91:4;92:15;93:13;
  96:14;107:19;118:12;
  120:8,20
criminal (25)
  23:23;24:13;26:23;
  38:14;46:10;47:4;49:1;
  83:2;86:6,22,24;97:3;
  107:8;108:17;110:4;
  121:10;124:3;126:22;
  129:4;139:19;141:21;
  142:20;143:7,11;
  144:21
cross-examine (1)
  61:22
cross-examined (1)
  128:17
cumbersome (1)
  37:20
cures (1)
  56:23
Currently (2)
  10:22;11:19
cyanide (1)
  16:10

_____

D

DA (9)
  8:4;14:14,16;15:9;
  46:22;47:1;81:2;110:2,
  15
daily (1)
  17:18
Dan (2)
  11:20;110:13
danger (2)
  41:19;101:7
dangerous (2)

CHERON S HELTON/ROBERT THOMAS CONFIDENTIAL ATTORNEYS' EYES ONLY  KEVIN CHERNOSKY
COUNTY OF ALLEGHENY, et al.  March 15, 2024

39:3;105:24

**DA's (11)**
14:18,19;21:18;31:5;
52:23;53:3,7;78:11;
79:4;80:4;109:21

**data (3)**
65:12;68:19;76:4

**database (2)**
27:10;89:22

**date (14)**
8:19;36:7;41:2;48:4;
67:20;68:2;92:25;
98:17;119:12,13;
120:8;132:14;137:3;
146:9

**dated (4)**
51:12;52:23;54:15;
131:13

**dates (5)**
27:11;41:22;51:24;
131:4;144:18

**day (19)**
31:23;35:6;40:10;
54:10;66:14;87:11,20;
88:3;93:3,7;108:11;
120:6;123:18;132:19;
134:7;136:18,19;
140:11;141:14

**Dayjon (1)**
55:24

**days (10)**
8:9,11;17:17;76:2;
118:7;126:24;144:10,
11,12,17

**deal (5)**
45:16;49:8;63:22;
64:5;89:16

**dealers (2)**
94:5,17

**dealing (7)**
16:23;22:14,17;73:1;
89:18;103:18;117:1

**dealings (2)**
43:18,22

**deals (1)**
45:20

**dealt (3)**
22:5;72:23,24

**death (4)**
109:4,10,14;110:1

**death-qualified (1)**
109:16

**deceased (1)**
58:5

**deceiving (1)**
140:1

**December (2)**
50:20,25

**decide (2)**
83:13;85:5

**decided (9)**
35:19;36:14;38:19;
75:7;98:12;105:22;

108:24;132:10;136:19

**deciding (1)**
75:5

**decision (62)**
11:7;12:19;13:17;
15:18,22,22,23;16:3,4;
24:2,3,5,6,14;30:2;
31:1;32:23;35:23,25;
36:1,2,3,4,15;37:1,15,
23,25;38:2,4;39:20;
55:6;65:9;68:11;74:2,
14,24;75:2,6;83:12;
84:3;86:25;87:2;95:4;
99:14,18,20;100:12;
109:19,24;117:24;
118:1,3;119:23;
131:21;132:12,18;
134:17;135:7;136:3,
10;141:20

**decisionmaking (1)**
68:4

**decisions (4)**
11:3;82:23,25;
117:16

**declared (4)**
35:10,17;99:23;
142:14

**dedicated (1)**
127:13

**deemed (3)**
37:7;49:3;142:5

**defendant (14)**
7:16;100:1;108:23;
110:5;111:22,23;
112:2,4;114:19;123:7;
139:12,13,14;140:25

**defendants (13)**
20:11;27:12;66:19;
67:5,14;98:1,2;107:8;
108:17;111:21;138:4;
145:5,10

**defendant's (2)**
57:9;139:11

**Defense (34)**
8:16,16;20:23;40:8;
47:17,21,24;49:4;
59:10;60:10;61:6,21;
71:24;72:18;89:10;
97:4,10;98:14;99:5;
108:23;110:7;111:1,3;
114:25;132:1,5,7;
133:6,12,25;135:11;
138:17;145:5,9

**defined (1)**
6:10

**definitely (1)**
67:17

**definition (1)**
40:12

**definitively (1)**
135:6

**delay (1)**
131:24

**deliberate (3)**
139:25;140:19,21

**deliberations (2)**
29:16;30:24

**deliberative (11)**
26:11,11;30:4;36:16,
18,20,23,25;37:16;
64:20;96:8

**Dennis (1)**
49:16

**department (16)**
9:4;45:20;46:13,18;
79:19;80:1,4,13,16,17;
81:25;82:6;83:21;
88:19;100:17;138:6

**depending (1)**
12:6

**depose (1)**
8:3

**deposit (1)**
38:24

**deposition (10)**
6:8;7:2,8;8:10;51:9;
116:12,18;126:23;
143:6;154:10

**deputies (5)**
9:14,18;11:7,15,23

**deputy (20)**
9:4,12,16,17,22;10:2,
3,12,14;11:4,6,14,18,
19,22;12:8,11;15:10;
110:2,12

**described (1)**
131:6

**designated (5)**
73:3;82:22;141:22;
142:1;152:4

**designation (1)**
152:9

**desirable (1)**
57:10

**desire (4)**
90:4,7,20;101:21

**desk (2)**
95:23;110:17

**Destiny (1)**
82:16

**detailing (1)**
131:14

**details (5)**
15:2,3,5;46:21;
129:12

**detective (33)**
17:25;18:10;38:21;
41:3;43:25;72:23,24;
73:1;85:7;105:3,11,14,
17;117:7;128:9;131:6,
14;136:21;138:12;
139:23;140:5,13,17;
141:10;149:23;150:5,
7,12,18,20;151:2,14;
153:11

**detectives (44)**

32:7;34:1;67:15;
70:4;77:4;79:3;84:13;
85:20;86:12;87:3,18;
88:10,17;89:5,20;90:9;
91:9,21;94:22,25;
95:22;96:6;97:4;
100:17,24,25;104:2;
109:21;116:23;117:19;
119:7;121:17,21;
124:15;125:19;126:9;
127:2,25;129:22;
130:4;140:17;144:23;
151:14;154:6

**determination (1)**
109:22

**determine (3)**
58:3;108:18;129:23

**determined (1)**
139:9

**determining (1)**
125:5

**developed (3)**
32:7;69:23,25

**developing (1)**
86:13

**developments (2)**
18:3;32:15

**device (1)**
29:17

**dial-out (1)**
113:22

**Diane (2)**
10:5,12

**difference (1)**
151:21

**different (10)**
16:18;20:23;27:11;
61:20;65:13;112:3,10,
11;134:18;142:16

**differently (1)**
96:11

**difficult (1)**
25:10

**dime (1)**
136:22

**direct (11)**
41:19;67:1,3,6;
88:12;115:6;123:13;
127:2,24;137:15;
139:10

**directed (2)**
28:21,22

**directing (1)**
149:16

**directly (4)**
96:15;123:25;
143:14;149:22

**disagree (4)**
135:22;152:6,7,11

**disagreed (1)**
66:22

**disapprove (1)**
110:17

**discarded (1)**
90:11

**disciplinary (1)**
111:25

**discoverable (2)**
49:6,24

**discovery (2)**
97:8;110:25

**discuss (1)**
83:13

**discussed (4)**
44:6;58:9;143:5;
151:20

**discusses (2)**
49:5;50:20

**discussing (8)**
31:14,18;46:23;57:3;
70:22;94:16;149:23;
151:21

**discussion (16)**
25:25;28:10;29:17;
31:9,18,20;32:4;33:10;
35:14;37:22;38:11;
41:3;77:9;98:11;
153:15,16

**discussions (10)**
30:24,25;31:13;39:7,
12;40:24,25;62:13;
77:14;154:5

**dismiss (5)**
106:4;107:8,18;
108:5,7

**dismissal (1)**
64:25

**dismissed (3)**
7:15;63:5;107:17

**dispense (1)**
133:3

**disposal (1)**
127:3

**disqualify (1)**
100:6

**distributed (3)**
102:11;104:20;
105:12

**district (38)**
8:13,20,21;13:25;
14:5;15:18;16:22;
21:18;36:1,3,16;37:14;
39:8,11;40:1,17,25;
41:18;43:14;44:15;
45:3,15;46:8;48:5;
51:17,19;52:1;56:2;
88:25;100:2;104:19;
105:1;108:16;109:25;
110:24;121:22;143:24;
144:9

**division (6)**
17:6;81:6;83:7,10,
17;110:12

**divulged (1)**
148:15

**divulgence (2)**

Case 2:22-cv-00196-CB    Document 83-27    Filed 07/01/24    Page 47 of 60

CHERON S HELTON/ROBERT THOMAS    CONFIDENTIAL  ATTORNEYS' EYES ONLY    KEVIN CHERNOSKY
COUNTY OF ALLEGHENY, et al.                                           March 15, 2024

50:15,21
**DNA (4)**
67:4;92:3,6,8
**docket (1)**
145:1
**doctor (1)**
16:10
**doctored (1)**
135:2
**document (13)**
6:7,11;24:20;25:11,
18;26:9;27:5,19;79:20;
99:11;103:19;104:16;
126:19
**documentation (5)**
99:19;102:9;143:7,
10;146:8
**documented (2)**
91:12;103:4
**documents (13)**
42:3,4,7,11;43:1,8,
13;46:16;49:21;79:13;
121:7;145:6,16
**Dolfi (4)**
18:7,12;116:20;
117:6
**Donald (2)**
91:5,10
**done (8)**
26:20;42:24;92:6;
99:1,2;130:13,23;
141:17
**door (3)**
76:8;136:25;137:2
**Doswell (15)**
69:12;70:8,11,16;
71:3;94:11;121:9,12,
24;122:4,11,15,17,19,
22
**Doswell's (2)**
121:3,5
**down (13)**
31:23;49:8;74:8;
80:9;84:3;90:2;103:15;
106:22;121:18;124:16,
23;137:3;151:13
**download (1)**
152:25
**draft (2)**
19:9;126:13
**drafted (1)**
138:17
**drafts (3)**
126:7,12,18
**dressed (1)**
147:14
**drive (2)**
124:14,22
**drives (1)**
66:10
**drop (4)**
35:25;36:4;75:2;
131:21

**dropped (1)**
132:1
**dropping (4)**
63:17;75:10;131:25;
132:8
**drug (4)**
45:24;46:3;94:5,17
**drugs (1)**
94:17
**drum (1)**
20:13
**duly (1)**
6:18
**during (11)**
13:14;40:6,10;70:11;
81:18;87:13;115:11;
129:3,16;143:5;146:19
**duty (8)**
62:6;134:10,15,21;
135:1,17;136:9;143:20

### E

**earlier (7)**
45:9;54:19;86:11;
116:18;120:22;123:4;
131:20
**early (7)**
17:17;32:21;33:14;
48:1;59:7;60:11;110:8
**easier (1)**
120:24
**edits (1)**
25:22
**education (1)**
125:19
**effort (3)**
28:13;100:13;117:15
**efforts (3)**
32:8;33:2;90:18
**either (13)**
15:14;17:24;18:20;
20:11;34:9;44:15;
83:13;95:19;98:3;
100:16;101:4;109:21;
128:14
**El (1)**
37:11
**elaborate (3)**
47:7;73:18;137:5
**elected (1)**
109:24
**else (8)**
14:5;20:17;24:8,8;
39:11;74:11;93:18;
120:3
**email (29)**
25:6,19;42:4,21;
52:23;53:1,3,4,7,10,12,
15,18;54:14;58:14,15,
18;59:14,16,19,24;
60:1;98:3,14,17;
118:16,22,25;133:14

**emailed (1)**
8:8
**emailing (1)**
37:19
**emails (1)**
46:14
**employed (2)**
8:13,15
**end (10)**
63:16;64:4,5;86:19;
87:14;101:24;114:14;
145:16;146:9,20
**ended (2)**
16:16;154:10
**ending (3)**
138:19;139:8;152:23
**ends (1)**
66:10
**enemies (2)**
72:8,17
**enforcement (2)**
46:5;147:14
**enough (4)**
31:20;92:18,20;
93:19
**enter (2)**
18:22,22
**entered (4)**
6:6;49:2;50:19;
54:19
**entering (2)**
75:22;76:18
**enters (1)**
76:8
**entire (4)**
23:13;45:19;58:24;
70:7
**entirely (3)**
81:5;99:10;125:17
**entity (1)**
103:23
**envelope (2)**
145:2,3
**erase (1)**
125:24
**Erie (1)**
47:19
**errors (1)**
12:21
**Especially (1)**
68:23
**Esq (1)**
4:2
**essentially (4)**
12:17;15:19;17:6;
66:2
**et (1)**
12:24
**even (9)**
68:19;74:16;77:23;
85:9;86:13;95:19;
102:5;110:8;150:6
**events (1)**

134:7
**Eventually (2)**
14:15;145:20
**everybody (4)**
9:7;14:8;24:7,8
**everyone (1)**
6:13
**everyone's (1)**
114:3
**evidence (41)**
16:12;18:17,25;
19:13;20:10;32:21;
33:2,3;35:15;49:15;
59:21;60:9;65:17;66:4;
67:1,3,6;71:23;88:12,
13;91:13;93:12;96:13;
97:12;107:9,13;
108:19,25;120:18;
123:13;127:2,25;
132:11,12;134:10,16;
135:1;137:7;138:18;
139:8;153:13
**evident (1)**
141:9
**exact (1)**
37:12
**exactly (4)**
42:20;65:23;99:14;
109:19
**EXAMINATION (3)**
6:21;78:3;137:25
**examined (1)**
6:19
**example (7)**
10:23;29:13;98:13;
117:25;128:6,8;144:7
**Except (2)**
63:25;92:25
**exception (1)**
145:18
**excise (1)**
24:22
**excited (1)**
30:19
**excluding (2)**
78:14;92:9
**exculpatory (5)**
71:23;72:3,13,19;
91:13
**Exhibit (17)**
51:4,5;54:16,20,24;
55:13;58:10,15,21;
59:13;60:19;119:25;
131:11;138:23,25;
139:2;141:18
**exhibits (1)**
16:17
**existed (1)**
27:19
**existence (3)**
29:20;30:13;31:9
**exists (1)**
72:2

**expanded (1)**
10:22
**expected (2)**
91:18;106:8
**expedite (1)**
77:25
**expensive (1)**
109:15
**experience (3)**
89:18;108:10;109:6
**explain (9)**
10:16;24:17;44:1;
45:23;56:8;57:4;65:23;
68:8;116:25
**explained (1)**
66:3
**explanation (1)**
149:19
**explanations (1)**
128:11
**express (1)**
101:21
**extending (1)**
144:11
**extent (5)**
34:15;37:20;49:4;
90:24;110:5
**extra (2)**
109:8,15
**extremely (2)**
27:8;76:3
**eyes (3)**
6:9;51:7;54:18

### F

**fabricated (1)**
141:4
**face (1)**
36:18
**face-to-face (2)**
29:18;77:10
**facie (1)**
66:22
**facilitate (1)**
48:6
**facility (2)**
47:12,15
**facing (2)**
89:11;100:18
**fact (21)**
39:3;45:4;61:23;
62:4,19;64:6;65:16;
66:4;67:22;87:9;91:2;
97:14;99:4;103:2,3;
104:24;105:16;117:10;
139:15;143:22;150:6
**facts (4)**
13:22;24:23;110:4;
143:21
**factually (1)**
22:24
**fair (14)**

CHERON S HELTON/ROBERT THOMAS CONFIDENTIAL ATTORNEYS' EYES ONLY
COUNTY OF ALLEGHENY, et al.

KEVIN CHERNOSKY
March 15, 2024

7:19;11:9;15:17;
16:5;20:21;24:12;
54:22;63:19;77:18;
82:24;83:20;104:3,9;
136:25
fairly (1)
54:25
false (3)
58:16;134:22;135:1
falsehood (2)
140:1,19
familiar (6)
27:8;44:9,12;70:4;
82:18;112:9
family's (1)
110:5
far (10)
55:23;76:3;81:12;
84:11;89:15,17;102:8;
111:23;117:17;136:10
fashion (1)
117:25
fatalities (1)
10:21
father (2)
29:15;65:18
FBI (2)
94:2,16
fear (3)
101:20;102:5;103:16
February (4)
49:20;51:12;53:21;
74:20
feel (5)
93:10;101:6,7,19;
132:21
felt (2)
105:15;132:25
fence (4)
66:6,14,17;93:2
fences (1)
120:3
Fernando (1)
18:7
feverishly (2)
65:1,2
few (4)
118:7;126:20;
130:14,22
figure (1)
38:24
file (22)
10:18;24:7,21;40:16;
86:24;87:18,23;91:12;
97:3,7,8,9;107:8;
110:24;111:2;121:8;
122:4,12,15,17;124:3;
139:7
filed (17)
23:23;31:16;39:25;
40:14;47:24;63:4;
78:10;88:3;99:25;
106:4;119:14;129:17;

144:12,17,23;145:4,10
files (3)
95:2;111:7;122:6
filing (6)
100:2;109:22;120:8;
121:25,25;129:9
fill (2)
27:2;53:9
finalized (1)
126:9
finally (1)
135:11
find (5)
90:5,5,7,10;120:23
fine (5)
74:10;97:24;113:12;
116:12;135:22
fingerprint (1)
33:7
fingerprints (1)
67:4
finished (1)
27:6
firearm (1)
77:6
firearms (1)
88:7
firm (1)
132:13
first (30)
6:18;7:5;9:2;14:1;
15:10;19:23;21:6,8,14;
24:16;27:14,17;30:18;
31:7;38:23;39:1;51:11;
53:20;57:19;67:13;
69:4;70:1,2;78:9;81:1;
98:7;122:18;123:25;
147:25;148:1
fits (2)
40:12;48:3
Fitzsimmons (5)
11:20;15:6,9,11;
110:13
five (10)
23:19;42:4,7;77:24;
78:12,20;79:18,23;
107:3;130:11
floors (3)
111:19,22,23
Foley (1)
18:9
follow (2)
64:4,7
followed (1)
63:20
following (2)
121:17;141:1
follows (1)
6:19
followup (3)
130:14,22;147:9
followups (1)
146:24

footage (1)
76:2
force (2)
10:22,23
foreclosed (1)
126:5
forfeited (1)
46:3
forfeiture (7)
45:19,24;46:6,11,13,
18,25
forget (1)
7:12
forgotten (1)
38:18
form (104)
15:20;20:25;25:3,15;
28:3;29:23;32:1,24;
33:17,18;44:18,19,24;
45:25;48:9;54:7;56:5,
19;58:3;60:13;61:10;
62:7,8,23;63:23;69:15;
70:17,19;71:14,25;
72:1,14,15;75:23;
76:20;77:8;79:21;83:4;
84:7,17;87:4,25;89:25;
91:14;92:23;94:6;
97:17;99:15;101:14,
15;102:2,3,24;104:6,7,
21,22;105:2;106:20,
21;107:22,24;108:9,
20;109:12;111:13;
112:19,21;113:6;
114:8;115:8,15,22;
117:3;122:1,21;124:4,
6;125:8,9,21;126:11;
127:4,17,18;130:2;
131:13;134:4,12,23,24;
135:19;136:6,7;
140:20;142:24;144:3;
145:7;146:11;148:17;
149:8;150:25;151:1,6
formal (3)
84:12;86:6;99:8
formally (1)
98:25
format (3)
27:3,20,22
forms (2)
57:3,17
Fort (1)
4:4
forth (2)
32:20;126:20
forward (11)
30:21;35:6;48:14;
74:8;75:4;85:21;96:2;
128:7;129:24;130:8;
142:21
Foster (1)
82:10
fought (2)
65:1,2

found (6)
20:11,19;90:11,15;
92:9,13
four (4)
126:20;135:14,16;
138:5
frank (1)
103:14
Franklin (3)
66:10;124:16,23
frankly (1)
66:19
Freddy (3)
34:9;35:2;131:25
Frederick (4)
85:20;95:5;115:5;
146:17
free (1)
108:8
frequently (2)
117:21;118:10
front (3)
20:20;76:8,9
full (1)
7:24
fully (1)
37:13
function (1)
26:8
fund (8)
41:16,17;43:14;
44:25;45:16,24;46:22;
104:3
funding (1)
104:13
funds (13)
41:21;44:2;45:8;
46:3;101:11;102:8,16,
18;103:1,4;104:23;
105:18;131:7
further (4)
83:13;130:11;
152:14;154:8

| G |
| --- |

garage (2)
90:15;127:16
Garden (1)
20:6
gathered (2)
18:25;69:25
gave (7)
62:19;63:1;64:1;
74:15;93:21;95:9;
97:15
geared (1)
35:18
general (19)
17:8;22:4;36:6,8,9;
49:13;67:12;80:11;
81:5;84:22,24;97:25;
101:6,12;111:9;

118:14;119:20;141:24;
148:19
generally (40)
13:21;15:4;17:14;
19:4;22:6;24:1,24;
25:7;29:1;38:13;43:20;
46:15;48:3;52:11;
56:22;64:12,21;70:25;
72:3,21;75:16,25;83:1,
6,21;85:1;92:17;98:5;
111:21;112:7,12;
113:18;114:4;115:16;
117:14,22;119:11,11;
125:10,12
general's (3)
41:17;45:2;104:23
generate (1)
27:1
generated (1)
13:3
generic (1)
26:12
gentleman (1)
116:8
gets (4)
13:3;27:4;76:7;
146:1
girlfriend's (1)
20:7
given (16)
7:7;38:10;55:22;
56:16;58:3;59:3;62:4;
74:18;102:20;127:1;
128:21;146:7,14,18,21;
152:25
giving (1)
143:25
goes (10)
27:9;66:9;72:5;
81:12;83:16;110:17;
111:24;112:1;142:6;
145:2
gold (1)
20:8
good (5)
8:18;25:8;53:21;
118:24;138:3
governmental (1)
102:10
grabbing (1)
21:11
grading (1)
12:23
gradings (1)
27:2
Grand (16)
48:7,12,20,23,24;
49:2,5,22;50:1,15,21;
54:23;56:18;60:19;
62:19;63:7
grant (3)
55:22;56:15,22
granted (7)

Case 2:22-cv-00196-CB    Document 83-27    Filed 07/01/24    Page 49 of 60

CHERON S HELTON/ROBERT THOMAS, CONFIDENTIAL  ATTORNEYS' EYES ONLY                              KEVIN CHERNOSKY
COUNTY OF ALLEGHENY, et al.                                                                     March 15, 2024

62:14;63:18;106:5,7;
107:18;108:6,8
**Gras (2)**
74:8,9
**gravity (1)**
128:22
**Great (2)**
8:12;145:13
**Gregory (12)**
47:5,10;48:6,11;
49:4;50:21;55:22;56:3;
74:3;75:7,10;106:17
**ground (1)**
7:18
**guess (17)**
20:14;23:9;31:6;
49:8;57:9;80:11;83:16;
93:14;103:7;104:1;
118:14;123:17;130:25;
132:9,15;148:22;152:6
**guessing (1)**
121:16
**gun (3)**
76:19;121:8,18
**guys (1)**
8:18

## H

**habeas (1)**
65:7
**half (2)**
35:12;80:5
**half-and-half (1)**
78:18
**handle (1)**
74:11
**handled (5)**
16:6,10;81:24;82:5;
83:6
**happen (7)**
17:21;43:10;88:22;
112:24;115:19;118:5,7
**happened (8)**
14:20;78:9;94:18;
111:5;112:23;120:15;
145:21;148:22
**happening (3)**
77:5;83:11;87:10
**happens (3)**
15:1;28:6;111:6
**hard (3)**
62:11;71:7;132:9
**head (7)**
7:24;20:17;38:1;
52:12;58:7;91:3;116:3
**headquarters (2)**
17:22;118:20
**hear (2)**
61:22;118:22
**hearing (12)**
35:19;36:14;39:5,19;
63:5,6;98:19;100:14;

136:21;138:11,11;
141:9
**hearings (1)**
17:8;49:19,20
**hectic (1)**
118:11
**held (1)**
106:8
**help (2)**
21:25;89:16
**helped (1)**
48:6
**helping (1)**
79:5
**Heminger (101)**
4:2;6:4,4;8:6,10;
15:20;19:14;21:1,21;
23:6;25:16;26:1,1;10;
29:4;30:3,10;33:18,20;
36:17,24;37:9,21;42:6,
9,10,18,22;43:1;44:19;
45:25;48:9,22;49:10,
25;50:5;51:6;54:7,17;
56:5,19;60:13;61:10;
62:8,23;63:23;64:15,
18,22;69:15;70:19;
72:1,9,15;73:6;75:11,
23;76:20;83:4;84:7,17;
87:25;89:25;91:14;
92:23;94:6;96:7;97:17;
99:15;101:15;102:3,
24;104:7,22;106:21;
107:22;108:20;109:13;
112:21;113:6;115:8,
15,22;117:3;124:4;
125:9;126:12,16;
127:4,18;130:2;134:4,
12,23;135:19;136:7;
142:25;148:18;149:8;
151:1;154:9
**hence (1)**
93:12
**Henry (1)**
82:9
**hesitate (1)**
79:23
**hesitating (1)**
56:21
**hey (1)**
84:22
**hid (1)**
127:11
**higher (2)**
11:17;83:9
**highly (2)**
6:9,11
**highways (2)**
10:20,21
**hillside (1)**
90:12
**Hilltop (8)**
75:17;119:5,10,15,
19;120:2;128:1;148:4

**himself (9)**
32:14;66:16;67:25;
68:1;69:10;89:16;93:1,
5,17
**hindsight (1)**
88:2
**history (2)**
63:4;110:4
**hit (2)**
91:4;95:23
**Hitchings (2)**
150:8,9
**hits (1)**
89:22
**hobbling (1)**
77:7
**Hoffman (3)**
72:23,24;73:1
**hold (2)**
64:5;65:18
**homicide (68)**
8:22,24;9:4,13,18,
23;10:2,13,15,18;
11:22;12:16;14:7,14,
15,17;16:21;17:1,11,
19;28:23;30:25;31:3,4,
5;32:7,22;38:1;44:10;
45:12;55:24,24;62:20;
63:12;68:20;77:4;78:8,
11,19;79:4,19;80:1,3,
13;81:1,12,16,19,25;
82:6,12,14,17,19;
83:20;88:18;89:19;
90:6;91:5,10;111:7,21,
23;112:4;116:23;
122:6;126:8;151:14
**homicides (4)**
56:4;58:9;59:5;
61:24
**honest (3)**
93:8;105:21;129:10
**honestly (1)**
123:2
**hoods (1)**
66:15
**hope (1)**
89:20
**hotel (1)**
41:21
**hours (2)**
9:1;112:17
**house (8)**
18:21;33:8;47:19;
66:7,8;76:7,10;147:19
**housed (3)**
107:20;111:12;
112:14
**housekeeping (2)**
57:2;131:1
**houses (2)**
20:16;148:7
**housing (8)**
34:5;47:15;67:15;

111:11,25;112:3,8;
113:3
**Howard (3)**
36:10;82:2,20
**huge (1)**
119:6
**hugely (1)**
74:10
**huh-uhs (1)**
7:24
**hundred (1)**
16:17
**hypothetical (1)**
62:18

## I

**ID (1)**
89:13
**idea (8)**
43:21;53:6;88:17;
97:14;105:19;106:7;
113:16;127:10
**ideal (1)**
67:12
**identical (2)**
27:21,21
**identification (10)**
21:7,9,13,15,19;
51:5;54:20;89:14;
138:25;148:25
**identified (7)**
30:18,20,22;56:18;
66:16;93:1;139:2
**identifies (1)**
93:17
**identifying (1)**
147:14
**illegal (2)**
150:22;153:12
**imagine (1)**
137:7
**immaterial (1)**
141:11
**immediately (1)**
42:14
**immunity (31)**
55:23;56:3,11,12,13,
15,22;57:3,5,7,10,12,
18,19,24;58:3,8;59:4;
61:5,13,17,19,21,24;
62:7,14,15,22;63:19,
20;64:6
**impacts (1)**
151:25
**impetus (1)**
69:2
**implicated (1)**
71:9
**important (2)**
77:21,23
**impression (4)**
64:13,24;68:5;75:9

**impressions (7)**
19:16;21:2;29:10;
30:6,8;64:23;75:12
**improper (1)**
153:12
**impropriety (1)**
68:12
**inaccurate (2)**
58:25;141:9
**incarcerated (4)**
47:11;85:12;90:21;
108:5
**incidences (2)**
30:8;72:22
**incident (7)**
8:19;9:20;29:12;
30:12;119:13;123:18;
146:9
**include (3)**
12:6;102:19;107:12
**included (1)**
42:6
**includes (3)**
41:10,20;104:10
**including (3)**
14:12;126:13,18
**inclusive (1)**
110:3
**inconsistencies (5)**
125:5;126:25;127:6,
7;128:18
**inconsistency (1)**
128:8
**inconvenient (1)**
74:10
**incorrect (1)**
128:15
**independent (4)**
94:15;98:24;99:18;
114:21
**indicate (2)**
56:2;142:12
**indicated (3)**
71:20;98:20;123:3
**indicates (3)**
72:6,7;142:13
**indicating (5)**
21:17,17;53:14;
70:10;99:12
**indicative (2)**
62:21,25
**individual (20)**
13:23;17:25;18:10;
21:11;22:9;87:1;
100:18;105:3;107:17,
19;108:4;110:5,15;
111:8;114:6,13,20;
128:14;152:4;153:24
**individuals (14)**
67:19;71:20;86:14;
89:6,21;92:14;96:5;
100:17;103:22;147:12;
148:2,8,13;149:2

Case 2:22-cv-00196-CB    Document 83-27    Filed 07/01/24    Page 50 of 60

CHERON S HELTON/ROBERT THOMAS
COUNTY OF ALLEGHENY, et al.
CONFIDENTIAL  ATTORNEYS' EYES ONLY

KEVIN CHERNOSKY
March 15, 2024

**inform (8)**
83:8;98:9;108:23;
117:12,16,23;118:2;
143:20
**informal (1)**
84:12
**informant (3)**
65:8;84:14;100:16
**informants (12)**
31:10;65:10;66:22;
67:7,9,12;70:22;85:23;
106:3;127:2,21;128:17
**information (42)**
18:25;27:9;31:25;
34:19;47:20;48:11;
52:14;61:4,6;69:22;
70:10,11;75:4;84:14;
85:9,24;95:8;96:20;
97:5,15,21;106:19;
115:6;116:6,9;117:1;
118:24;121:19;124:2;
125:6;128:13;129:3,
24;139:25;142:15,18,
20;143:14;144:6;
148:14;151:9;153:25
**informed (9)**
34:13;84:2;96:2;
100:21;119:23;132:5;
133:5;150:21;151:15
**informing (1)**
132:7
**initial (5)**
25:12,18;65:12;
144:10;145:22
**initially (3)**
15:18;78:8;105:19
**inmate (1)**
113:24
**in-person (3)**
29:15;118:2,6
**inquire (1)**
62:6
**inquiring (1)**
136:16
**insight (3)**
29:11;30:1;34:16
**instance (1)**
119:25
**instances (3)**
29:9,10;30:1
**instruct (4)**
19:18;21:3;37:3;
75:13
**instructed (1)**
48:14
**intend (1)**
132:14
**intended (1)**
34:14
**intentional (3)**
139:25;140:19;
149:22
**intentionally (2)**

142:15;144:15
**interacting (1)**
147:21
**intercepted (2)**
29:14;65:21
**interested (3)**
72:18;90:25;123:9
**internal (2)**
37:14;110:25
**internally (2)**
36:25;103:2
**interpret (1)**
134:25
**interview (17)**
19:7;29:18;33:25;
34:4,14;72:2;77:11;
85:8,14;93:3;97:2;
120:17;123:21;139:13,
14;150:2,19
**interviewed (10)**
48:15;66:5;71:6,18;
85:6,18;91:9,22;93:1;
153:24
**interviewee (1)**
71:19
**interviews (8)**
19:1,5;22:4,7,8;
34:10;95:1;142:22
**intimidation (2)**
101:3,5
**into (35)**
9:13;10:15;15:5;
16:24;18:20;19:15,17;
20:2,5;21:1;24:13;
25:14,24;26:17;27:9,
13;29:5,16;30:23;
35:12;46:4;48:7,24;
49:14;50:2;52:5;66:17;
68:3;93:23;101:12;
112:18;120:18;137:8;
143:1;147:19
**introduce (1)**
7:3
**investigate (5)**
31:25;100:24,25;
101:5,8
**investigated (7)**
94:22,24;100:20;
101:2,2;102:4;122:7
**investigating (3)**
28:15;101:9;118:12
**investigation (19)**
16:24;17:18;31:21;
50:16;70:11;72:22;
88:18;91:1,18,23;92:1;
101:16,23;115:12;
117:2;122:25;129:13;
143:11;146:18
**investigations (5)**
9:23;10:14;52:13;
78:19;95:1
**investigative (2)**
33:1;88:11

**investigator (1)**
105:4
**investigators (1)**
69:23
**invite (1)**
110:7
**involved (20)**
13:18;14:1,3;17:17;
24:4;26:13,23;36:22;
37:14;46:10;48:20;
51:20;52:2,8,17,17;
81:19;90:4;144:21;
148:9
**involvement (6)**
7:13;34:9;44:3;48:6;
83:23;130:1
**involving (2)**
48:21,23
**issue (5)**
23:14;49:8;56:23;
100:3;133:2
**issued (1)**
82:25
**issues (5)**
22:14,17,18;23:10;
127:9
**items (1)**
20:22

**J**

**jail (21)**
29:14;33:16;34:5;
47:19;67:19;87:15;
96:3;107:20,21;
108:11;111:12,19;
112:10;113:17,21;
114:17,23;115:1;
116:5,10;118:1
**jailhouse (1)**
65:21
**January (2)**
53:20;64:14
**jbheminger@aolcom (1)**
4:7
**jeez (5)**
8:23;9:10;11:20;
18:6;22:6
**jive (2)**
21:25;54:1
**job (1)**
116:9
**Joe (1)**
6:4
**Johnson (1)**
82:13
**joined (1)**
7:1
**Jordan (1)**
82:13
**Joseph (2)**
4:2;42:6
**JUBAS (94)**

6:15,23,24;16:1;
19:21;21:5,24;23:8,19,
21;25:20;26:4,8,15;
28:19;29:8,24;30:7,15;
32:12,19;33:12,21,24;
34:2,7,23;36:21;37:19;
38:6;41:25;42:17,21,
23;43:6;44:22;45:7;
46:7;48:16;49:18;50:1,
17;51:2,10;52:5,10,19,
22,25;53:14;54:12,14,
21;55:9,11;56:9;57:1,
16;58:20;59:1;60:17;
62:3,17;63:8;64:9,20,
24;65:3;69:19;70:24;
71:17;72:4,11,20;
73:11;75:15;76:5,24;
77:16,24;130:14,21;
134:8;20;135:4,25;
136:24;137:22;149:14;
151:4,12;152:13;
153:22;154:8
**J-U-B-A-S (1)**
6:24
**Judge (14)**
37:13;50:13,19,23;
66:2,20;67:24;69:1;
73:4,13,16,25;87:1;
98:21
**judges (1)**
68:20
**Judge's (1)**
65:7
**jump (1)**
137:14
**jumped (1)**
66:17
**jumping (2)**
66:5;78:6;93:2
**June (12)**
23:24;24:1;27:13;
31:15;78:10;79:18;
86:8,10,17;96:14;
120:9;137:12
**Junior (6)**
55:23;62:20;63:12;
80:13;82:3,21
**jurisdiction (5)**
7:12;10:20,21;11:1;
88:22
**Jury (17)**
48:7,12,20,23,24;
49:2,5,22;50:1,15,21;
54:23;56:18;60:19;
62:19;63:7;109:16

**K**

**kchernosky@da (1)**
53:9
**keep (4)**
65:5;102:16;138:23;
150:3

**keeping (1)**
102:18
**Kelly (2)**
46:12;105:6
**Kendall (31)**
31:2;34:9;35:8;36:5;
38:16;40:20,22;67:10;
85:21;98:13,25;99:12;
106:9,16,23;131:3,14;
132:22;133:1,6;134:2;
135:7,12,18;136:10,11,
23;137:6,20;141:18;
146:7
**kept (3)**
55:1;144:25;145:1
**Kevin (4)**
6:5,17;7:3,5
**killed (1)**
69:13
**Kinavey (9)**
38:21;41:4,13;
105:11,14,17;131:6,14;
136:22
**kind (7)**
25:9;38:15;49:14;
78:23;111:4;128:16;
142:22
**knew (7)**
62:12;71:11,11,20;
87:11;118:6;121:13
**knowing (1)**
104:10
**knowledge (22)**
44:5,15;45:23;48:21;
72:7;84:5,9;91:25;
111:14;112:22,23;
113:2;115:20;129:6;
131:5;140:6;146:13,
14,17,21;151:16;
153:11
**known (4)**
24:24;43:4;148:4;
153:23
**knows (1)**
44:23

**L**

**lab (6)**
33:4;88:13;91:4;
93:13;96:14;120:20
**labeled (1)**
149:16
**lack (1)**
107:9
**Lamont (11)**
69:13;70:15;71:3,11,
21;72:7,17;94:4,10;
122:10;153:25
**landscape (1)**
106:18
**laptop (1)**
51:3

CHERON S HELTON/ROBERT THOMAS CONFIDENTIAL  ATTORNEYS' EYES ONLY    KEVIN CHERNOSKY
COUNTY OF ALLEGHENY, et al.                                                March 15, 2024

large (1)
   76:3
Last (5)
   7:6;38:23;115:4;
   139:5;141:1
lasted (1)
   61:1
late (1)
   64:14
Law (14)
   9:5,8;12:7,10;13:18,
   18;14:10;24:11;26:7;
   38:1;46:5;48:23;
   108:14;147:14
Lawrence (2)
   9:7;13:18
lawsuit (1)
   7:11
lawyering (1)
   109:9
lawyers (1)
   97:5
lead (1)
   110:20
leading (1)
   143:11
lead-up (5)
   25:4;55:6;60:1;
   136:15,20
learn (6)
   17:12;32:1;54:5,9;
   95:25;149:6
learned (2)
   8:3;62:4
least (11)
   13:1;30:17;34:11;
   55:4;69:9;81:10;83:22;
   92:14;100:8;121:4;
   127:21
leave (4)
   115:14;124:16;
   145:25;147:24
leaves (2)
   76:9;132:15
led (1)
   75:10
left (4)
   80:22;116:1;145:19;
   146:1
legal (4)
   150:22,22,23;151:3
less (2)
   81:7;85:3
letter (5)
   65:21;98:25;99:4,8,9
level (9)
   11:23;38:8;66:22;
   83:18,22;101:3;109:7,
   8;125:19
levels (1)
   112:11
Lexus (1)
   37:12

liability (1)
   132:17
liaison (1)
   11:5,6,9,12
lieutenant (3)
   17:24;117:5,10
life (5)
   16:9;101:7,20;
   105:15;112:5
light (1)
   77:10
likely (3)
   44:7;55:6;62:14
likes (1)
   119:22
limited (2)
   45:12;146:12
Lincoln (1)
   76:9
line (2)
   8:22;49:9
lines (1)
   12:13
link (1)
   124:8
linking (1)
   20:10
Lisa (3)
   14:8;37:25;80:21
list (6)
   35:18;36:13;83:25;
   98:8;100:9;136:16
listed (2)
   20:22;52:1
listened (3)
   19:6;114:20;115:2
literally (1)
   145:4
litigate (1)
   133:2
litigated (1)
   140:8
litigating (1)
   23:13
litigation (10)
   22:19;23:16;29:6;
   75:13;98:11;123:4,9;
   129:3,17;138:8
little (8)
   17:9;57:2;66:23;
   82:9;90:2;126:1;131:1;
   137:5
live (2)
   13:2;79:12
living (1)
   100:11
local (5)
   7:11;8:23;12:15;
   17:14;100:21
locals (1)
   101:4
locate (5)
   89:7,12,16;90:18;

91:11
located (3)
   88:8;92:10;106:10
locating (2)
   89:9;90:21
location (4)
   52:14;65:12;68:19;
   148:4
locations (2)
   65:13;147:13
log (1)
   13:6
logs (2)
   114:5,23
long (10)
   16:19;29:12;47:1;
   55:1;61:1;76:10;80:3;
   124:21;127:15;131:24
longer (12)
   8:12;39:1;44:7;58:6;
   80:19;98:15,22;99:13;
   105:20,22;107:19;
   109:17
look (9)
   42:3;51:13;55:2;
   67:15;68:11;71:5;
   114:5;124:9;139:3
looked (5)
   25:7;55:3,3;113:8;
   122:5
looking (7)
   42:13;49:17;50:13;
   84:25;90:3;93:23;
   125:4
looks (1)
   53:12
looming (2)
   28:7;31:22
loss (1)
   16:9
lot (16)
   16:11;18:24;46:21;
   71:6;72:8,17;93:12;
   117:18;119:7;123:9;
   124:7;128:24;129:9,
   10;138:8;143:6
lying (1)
   128:15

                M

magazine (1)
   20:13
mail (2)
   29:14;118:1
makes (5)
   13:2;77:11;109:21;
   120:24;125:20
making (11)
   15:14;22:21;36:13;
   44:17;100:9;103:2;
   114:4,6;119:15;126:5;
   136:3

many (11)
   37:10;55:3;71:8;
   78:10;85:15;90:6;
   103:14;118:19;126:7;
   144:13,18
March (24)
   8:19;12:10;21:16;
   55:13;74:6,12,13,20;
   79:17;86:3,17,19;
   87:14,18,23;91:5;
   112:18;120:8;141:2,3;
   146:9,20;151:17;154:2
Marcus (3)
   55:23;62:20;63:12
Mardi (2)
   74:8,9
mark (5)
   51:4;54:14;131:11;
   138:22;144:16
marked (3)
   51:5;54:20;138:25
massacre (18)
   20:12;48:7;50:16;
   51:20;52:2;63:17;
   69:14;86:3;87:20;
   94:19;96:16;97:16;
   115:7;121:4;122:24;
   145:11;146:19;148:10
material (1)
   50:15
materials (6)
   50:23;60:24;110:14;
   146:15,18,22
matter (15)
   10:17;38:14;46:10;
   47:4;49:1;59:9;71:19;
   89:7;111:7;120:16;
   124:15;127:9;128:21;
   142:20;144:22
matters (1)
   48:24
Max (3)
   7:1;49:17;145:13
may (20)
   11:19;27:3,25;41:6;
   42:10,12;50:7;67:25;
   85:23,23;86:14;89:22;
   100:18,18;107:13,14;
   111:17;123:21;145:1;
   148:9
maybe (5)
   63:6;78:20;118:21;
   126:20;150:11
McKees (1)
   7:12
mean (35)
   16:25;18:10;22:7,17;
   26:19;27:25;28:5;
   29:22;30:12;31:4;37:7;
   52:9;56:7;69:25;70:20,
   21;71:5;73:4,19;76:22;
   79:25;93:21;95:11,12;
   97:20;98:6;101:1,16;

112:5;113:1;114:3;
   119:11;122:4,24;
   126:12
meaning (7)
   55:22;56:13,23;
   61:17;119:6;135:1;
   150:22
means (6)
   58:24;93:24;107:18;
   150:22,23;151:3
meant (2)
   103:1,5
meantime (1)
   136:2
mechanism (2)
   40:16;100:19
media (5)
   40:9;128:24;129:6,7;
   143:25
meeting (3)
   38:3;118:2,6
member (1)
   14:16
members (3)
   28:22;45:18;46:17
memo (8)
   94:2,2,16;110:3,3,9,
   21,23
mental (6)
   19:16;21:2;30:6,7;
   64:22;75:12
mentioned (2)
   138:7;152:19
message (1)
   153:3
middle (1)
   81:11
midway (1)
   81:9
might (16)
   53:6;58:5,5;70:8;
   80:7;84:2,5,9;99:1;
   106:5;111:1;128:10,
   10;130:14;148:14;
   153:2
Mikkeil (61)
   34:9,12,17;35:8,10,
   25;36:5;38:16,16,20,
   22;39:9,12,24;40:1,8,
   20,22;41:1,10,15,23;
   44:6;67:11,17;74:5;
   75:2,5,7;85:21;95:21;
   98:13,21,25;99:9,12;
   105:9,18;106:9,16,23;
   131:3,15,22;132:22;
   133:1,7;134:2;135:7,
   12,18;136:10,11,23;
   137:6,20;141:19;
   142:21;146:7,13,14
Mikkeil's (2)
   105:15;142:23
mildly (1)
   72:19

Case 2:22-cv-00196-CB    Document 83-27    Filed 07/01/24    Page 52 of 60

CHERON S HELTON/ROBERT THOMAS, CONFIDENTIAL  ATTORNEYS' EYES ONLY          KEVIN CHERNOSKY
COUNTY OF ALLEGHENY, et al.                                                  March 15, 2024

**Miller (15)**
23:2;138:12;139:23;
140:5,14,17;141:10;
149:23;150:5,9,12,20;
151:2,14;153:11
**mind (4)**
37:19;58:19;132:16;
133:21
**minds (1)**
66:7
**minutes (4)**
23:19;107:3;130:11;
146:23
**Miranda (2)**
152:5,10
**miscellaneous (1)**
145:1
**misrepresent (1)**
135:17
**misrepresentation (2)**
135:23;149:25
**misspeak (1)**
123:19
**misspoke (1)**
150:12
**mistaken (1)**
23:4
**mister (1)**
41:3
**Mitchell (1)**
81:20
**mitigation (2)**
110:7,9
**mix (2)**
68:16,19
**moment (7)**
22:3;50:17;67:24;
73:2;130:11;131:10;
137:22
**Monday (1)**
116:13
**money (14)**
38:23;46:2;102:10;
103:20,23;104:5;
105:9,12,21;106:1,10,
14,16,24
**money's (1)**
103:8
**monies (3)**
102:20;104:16,20
**month (4)**
15:25;35:4,9;47:22
**months (4)**
94:5,18;135:14,16
**month's (2)**
38:23,23
**more (23)**
11:4;16:12,15;22:25;
25:10;38:10;42:13;
52:16;57:10;64:18;
80:23;81:3;84:1;85:2;
101:25;109:15;118:24;
122:6;132:25;147:2;

153:8,9,18
**morning (9)**
9:2;14:4;15:24;42:5,
5,15;117:21,22;118:11
**most (8)**
56:17;67:13;68:6,13,
20;80:12;83:7;111:21
**mother's (1)**
20:3
**motion (22)**
23:13;35:21,22;
36:12;47:23;69:5;
73:15;98:15;99:22,25;
100:1;106:7;107:18;
108:5,7;133:4;136:15,
17;138:18;139:7;
140:9,13
**motioned (2)**
65:7;100:5
**motions (5)**
69:7;83:8;98:12;
106:4;107:8
**motive (1)**
69:11
**motives (1)**
69:18
**mouth (1)**
92:6
**move (5)**
17:7;19:19;30:21;
47:12;141:18
**movement (1)**
102:22
**movements (1)**
33:15
**moves (1)**
76:9
**moving (1)**
15:5
**much (10)**
16:15;22:19;44:20;
71:20;85:4;98:11;
123:4;130:13;141:17;
143:1
**multiple (3)**
25:1;71:2;90:11
**murder (26)**
15:1;65:20,24;66:9;
88:7;89:6,7,9,11;91:8,
11;93:18;94:12,18;
120:23,24;121:3,5,9,
12,24;122:11,17,19,22;
124:24
**murdered (1)**
94:5
**murders (4)**
10:25;88:22,24;93:6
**must (1)**
153:6
**myself (3)**
9:15;14:12;37:24

## N

**name (23)**
7:4,5,6;14:14,16;
22:9;27:2;36:11;39:4;
46:12,13;53:8,13;81:3;
82:11,18;85:15;96:24;
97:21;116:8;122:14,
17;138:3
**named (3)**
51:19;138:5;153:24
**names (5)**
27:11;51:17;80:9;
109:20;149:2
**nature (5)**
39:3;93:15;109:14;
117:14;128:22
**near (1)**
86:19
**necessarily (6)**
26:4;29:9;56:7;
58:23;61:25;102:19
**necessary (1)**
25:21
**need (9)**
7:22;43:24;44:1;
45:5;65:23;98:16;
104:4;117:13;131:11
**needed (1)**
45:14
**needs (2)**
28:10;101:1
**neighbor (1)**
71:4
**neighborhood (1)**
149:5
**Neil (1)**
75:9
**new (4)**
20:19,22;32:2;74:7
**news (2)**
21:16,23
**next (2)**
28:17;92:10
**next-door (1)**
71:4
**nickname (1)**
22:12
**night (4)**
9:1;28:6;115:4;
119:3
**nitty-gritty (1)**
50:2
**nobody (2)**
24:20;103:2
**Nobody's (1)**
38:10
**nods (1)**
7:24
**Nolan (13)**
20:3,13,20;21:11;
66:6,18;75:18;77:12;

90:12;92:21;93:2;
124:16,23
**None (3)**
14:18;88:7;97:13
**nonexistence (2)**
29:21;30:13
**non-precedential (2)**
73:4;82:23
**Normally (2)**
118:17;146:1
**notice (1)**
43:10
**notification (3)**
107:13;133:11;134:7
**notified (2)**
133:25;135:11
**notify (1)**
108:17
**notifying (1)**
131:25
**number (47)**
6:7;11:2;20:19;
22:16,20,24;23:12,17;
43:3,10,17;49:21;
65:12;103:4;104:25;
116:1;123:5,10,11,14,
17,20,22,23,25;124:7;
138:14,19;139:8,15,20;
148:8;150:3,4,13,17,
21;151:11,16,19;
152:20,22;153:1,7,13,
13;154:1
**numbering (1)**
138:23
**numbers (7)**
23:5;123:7,8;124:9;
138:8,14;140:25
**numerous (1)**
79:13

## O

**Object (103)**
15:20;19:14,17;
20:25;21:12,21;23:6;
25:15;26:1,14;28:3;
29:4,23;30:3;32:10,24;
33:17,18;36:17;44:18,
19,24;45:25;48:9,22;
54:7;56:5,19;60:13;
61:10;62:8,23;63:23;
64:15;69:15;70:17,19;
71:14,25;72:1,9,14,15;
73:6;75:11,23;76:13,
20;77:8;79:21;83:4;
84:7,17;87:4,25;89:25;
91:14;92:23;94:6;96:7;
97:17;99:15;101:14,
15;102:2,3,24;104:7,
21,22;106:20,21;
107:22,24;108:9,20;
109:12;111:13;112:21;
114:8;115:15;122:1;

124:4;125:8,9;126:11;
127:17,18;134:4,24;
135:19;136:6;140:20;
142:24,25;143:3;
144:3;145:7;146:11;
149:8;150:25;151:1,6
**objection (20)**
48:10;49:13;62:10;
91:16;104:6;109:13;
112:19;113:6;115:8,
22;117:3;122:21;
127:4;130:2;134:12,
23;135:21;136:7;
148:17,18
**objections (1)**
50:7
**obligation (10)**
64:5,7;98:7;108:16,
23;117:12;132:6,13,19,
25
**observation (1)**
77:17
**obtain (3)**
104:5;140:2;153:12
**obtained (8)**
96:21;97:12;115:13;
121:19;122:3,5;
123:15;138:18
**obtaining (2)**
142:17;152:20
**obvious (2)**
127:6,7
**obviously (6)**
30:19,20;50:1;67:12;
85:5;129:9
**Occasionally (2)**
118:17;125:25
**occur (2)**
10:25;120:4
**occurred (10)**
12:9;15:5;17:19;
41:12;75:25;86:3;92:1;
115:21;120:7;146:4
**occurrence (1)**
143:22
**occurring (1)**
77:15
**October (2)**
50:14;134:1
**odd (2)**
16:17;126:1
**off (15)**
18:2;19:3;20:16;
37:22;42:24;45:4;52:6,
20;54:12;55:9;58:6;
59:24;60:1;116:7;
125:24
**offense (1)**
39:3
**offer (1)**
56:11
**offered (1)**
59:11

Case 2:22-cv-00196-CB    Document 83-27    Filed 07/01/24    Page 53 of 60

CHERON S HELTON/ROBERT THOMAS **CONFIDENTIAL  ATTORNEYS' EYES ONLY**    KEVIN CHERNOSKY
COUNTY OF ALLEGHENY, et al.                                                    March 15, 2024

**office (46)**
8:4,13,20;14:1,6;
15:19;16:22;17:4;
21:18;24:8;31:5;36:16;
39:8,11;40:1,17;41:1,
17,18;42:19,20;44:15;
45:2,15;46:9;52:23;
56:3;78:11;79:5;80:4,
22;81:4,17;83:1,14;
89:1;100:2;104:19;
105:2,5;108:17;
109:21;117:2;121:23;
143:24;144:9

**officer (3)**
7:11;49:11;90:16

**Officers (7)**
50:6;88:21;119:7;
125:16;138:5;142:17;
148:8

**offices (1)**
109:21

**officially (1)**
10:1

**old (2)**
46:22,25

**omission (1)**
149:22

**on-call (3)**
8:25;14:25;15:24

**Once (11)**
7:9;8:5;17:13;18:11;
25:24;55:4;93:5,16;
108:7,17;118:21

**one (68)**
11:4,6;15:3;17:3;
20:16;22:3;23:5;24:24;
26:13;30:17,22;33:7,7;
40:14;41:11;45:3;
46:14,15,16;48:17;
50:17;58:1;62:12;63:4;
65:24;66:16;67:19,24;
69:5,13,17,17;70:8;
73:2;78:12;81:7,10;
82:4;88:10,16;89:8;
90:14;100:9;110:18,
21;114:13;116:22;
118:10;121:2,3;122:6;
124:13;127:9,21;
128:4,6,12;131:5,10;
137:12,22;139:13;
144:12,15,18;145:18;
148:3;153:9

**O'Neil (2)**
46:16;105:6

**one-on-one (1)**
17:23

**ones (8)**
12:4;13:14,15,16,20;
27:20;68:17;144:25

**ongoing (2)**
31:18;32:4

**only (21)**
6:10;11:16,22,24;

15:17;19:12;29:13;
36:6;41:11;51:7;54:18;
63:20;73:9;74:8;81:10;
110:16,18,25;131:4;
132:25;147:24

**onsite (1)**
17:21

**onto (1)**
27:15

**open (1)**
85:24

**opened (1)**
42:2

**operates (1)**
78:8

**operation (1)**
119:6

**opinion (10)**
38:10;65:7,9,20;
66:21;72:10;73:2,5;
142:22;150:11

**opinions (1)**
61:20

**opportunity (1)**
55:18

**optimistic (1)**
21:19

**order (18)**
6:6,10;20:9;49:1;
50:13,18;52:14;55:2;
58:2;59:21;60:24;
108:14;140:1,2;
144:24;145:3,22;148:1

**orders (1)**
85:13

**Ordinarily (2)**
17:20;41:19

**original (3)**
64:3;144:23,24

**originally (1)**
128:20

**originated (1)**
70:12

**Orleans (1)**
74:7

**others (1)**
69:20

**otherwise (1)**
6:12

**out (45)**
10:6;15:3;17:3;
18:25;32:3,8,14;34:12;
38:7;39:4;42:2;47:16;
48:13;53:9;59:8;64:13;
65:7,18;71:21,22;
73:16;74:5,11;75:21;
85:13;89:10;100:11;
103:23;105:7,23;
108:7,11;114:13;
117:22;118:18,19;
119:1,3;125:24;
127:11;129:13,15;
130:5;143:23,25

**outburst (2)**
35:5;95:5

**outrank (1)**
38:9

**outranked (2)**
14:18;15:12

**outset (1)**
15:14

**outside (3)**
62:19;76:14;144:8

**over (22)**
10:20;16:17;22:19;
49:4;59:6,10,21;60:10;
61:6,25;66:14;71:24;
81:8;88:22;93:2;97:9;
114:24;123:4,6;
126:17;134:16;143:25

**overall (1)**
104:1

**overcome (1)**
152:8

**overnight (1)**
15:1

**overseen (2)**
88:24,25

**own (7)**
59:15;68:11;88:18,
21;93:9;113:25;139:15

---

**P**

**PA (1)**
4:5

**page (15)**
51:12,25;55:13;58:9;
133:15,18,19,24;
137:14,15;139:5,10;
147:25,25;148:1

**pages (1)**
42:7

**paid (2)**
41:23;47:17

**Palmer (1)**
116:16

**panel (1)**
110:1

**pants (1)**
77:6

**paper (1)**
20:20

**papers (1)**
122:5

**paperwork (1)**
17:6

**paragraph (9)**
133:19,20;137:16;
139:11,22;140:23,25;
141:5,7

**paragraphs (1)**
149:17

**paraphrasing (1)**
57:6

**Parker (34)**

47:5,10;48:11,21;
49:3,5,23;50:4,21;
52:24;54:2,10;55:7,22,
24;56:3;58:3,8;59:9,
22;60:2,2,5,10;61:5;
62:19;63:11;74:4;
75:10;106:17;107:2;
129:22,23;130:8

**Parker's (2)**
48:6;130:5

**parse (1)**
66:23

**part (14)**
36:24;55:20;65:9,21,
22;75:6;78:11;83:7;
91:1,13;103:11,12;
110:23;146:1

**participate (1)**
17:20

**particular (15)**
21:3;23:14;24:15;
25:13;44:1;45:17;57:8;
63:3;98:10;108:24;
110:2;132:10,12;
142:13;152:9

**particularly (1)**
77:10

**parties (2)**
6:8,12

**passed (1)**
126:19

**past (1)**
66:21

**Pastor (2)**
116:8,15

**Patrick (6)**
23:1;138:12;139:23;
140:5,13;141:10

**Paul (1)**
6:24

**P-A-U-L (1)**
6:24

**pause (11)**
23:20;41:24;52:7,21;
54:13;55:10;56:25;
78:1;107:5;130:17;
147:1

**pay (3)**
47:15;105:21;136:22

**payment (9)**
38:18;44:6,17,21;
131:5,14,17,18,21

**payments (13)**
38:15;40:19,22;41:1,
7,9,15;44:11;47:4,9,9;
131:2,7

**pedigree (1)**
42:15

**Pellegrini (5)**
14:9;37:25;38:7;
80:12,21

**penalty (5)**
109:4,10,14,15;

110:1

**pendency (5)**
38:14;46:9;47:3;
129:3,16

**pending (2)**
108:5;111:12

**Pennsylvania (1)**
109:10

**people (21)**
11:16,24;22:7;46:15;
66:17;71:7;78:15;
79:18;80:10;81:25;
82:22;103:2,14,16,18;
124:9;144:8;147:18,
21;148:16;149:5

**people's (1)**
124:10

**percent (1)**
109:24

**period (8)**
11:20;36:6,8,9;76:1;
78:20;144:10;146:19

**permanently (1)**
39:6

**permission (1)**
152:25

**permitted (2)**
60:25;61:2

**perpetrate (1)**
92:15

**perpetrator (1)**
71:22

**person (8)**
84:23;98:3;101:25;
114:14;118:18,20;
122:18;132:15

**personal (1)**
72:6

**personally (2)**
54:22;130:7

**persuasive (2)**
73:8,22

**pertaining (8)**
22:14;23:10;49:22;
60:10;61:5;62:20;
138:13;153:25

**Petrunya (59)**
7:2;37:5;48:25;
50:12,18;78:5;79:24;
83:15;84:10,21;87:8;
88:4;90:22;91:20;
93:20;94:14;96:12;
97:23;99:24;101:18;
102:7;103:6;104:12;
105:8;107:3,6;108:3,
12;109:1,18;111:15;
112:25;113:11;114:11;
115:10,18,24;116:15,
17;117:8;120:12;
122:9,23;124:12;
125:13;126:15,21;
127:8,23;130:6,10;
142:24;144:3;145:7;

CHERON S HELTON/ROBERT THOMAS CONFIDENTIAL ATTORNEYS' EYES ONLY                    KEVIN CHERNOSKY
COUNTY OF ALLEGHENY, et al.                                                         March 15, 2024

146:11,24;147:7;
148:24;149:10
Petula (5)
  11:17;14:13;15:6,8;
  81:6
phase (1)
  109:15
phone (33)
  8:5;20:19;22:16,20;
  23:17;52:14;65:11;
  66:4;68:18;113:21;
  118:16,17;123:5,6,8,
  10,11,14,17;138:8,13,
  14;146:2;150:21;
  152:20,22,25;153:1,4,
  4,12,13;154:1
phones (5)
  65:14,14,16;124:7,
  10
phrasing (1)
  57:25
physical (1)
  33:2
pick (3)
  27:1,1;114:15
picture (1)
  33:11
piece (5)
  20:20;108:19,24;
  132:10,12
PIN (4)
  115:13,17;121:18;
  151:13
Pittsburgh (7)
  4:5;10:19;11:5;
  88:18;89:3;121:10,24
place (4)
  24:24;29:17;100:20;
  119:10
placed (4)
  41:20;76:13;87:14;
  120:18
places (2)
  128:4;148:3
placing (1)
  25:4
plaintiffs (1)
  6:25
Plaintiff's (9)
  51:4;54:15,24;55:12;
  58:9,14,20;59:13;
  60:19
planning (1)
  100:2
pleading (2)
  138:20;139:4
pleadings (1)
  88:6
Pleas (4)
  68:15,17,21,25
please (9)
  7:4;24:18;47:7,14;
  50:17;56:10;61:17;

73:2;137:22
plural (2)
  125:21,25
plus (1)
  80:21
PM (4)
  75:21;141:2,3;
  154:10
pocket (1)
  47:16
pod (7)
  112:14,17;113:8,10,
  14;114:24;115:5
pods (1)
  112:10
point (39)
  14:8;17:4;19:14;
  20:5;33:7;36:13;39:17;
  57:9;61:1;62:12;63:2,
  5;73:16;76:8;79:25;
  81:18;85:4,10,20;
  87:13,17;89:4;94:1;
  107:9,12;110:8;113:3,
  9;115:2,11;117:24;
  119:4;129:2,16;
  130:16;133:3;144:15;
  145:13;150:1
points (3)
  13:22;14:9;79:19
poisoning (1)
  16:10
police (41)
  7:11;10:19,19,20,22,
  23,24,25;11:5,6,10;
  13:4;17:19,21;27:15;
  28:1,14;30:2,13;31:5,
  7;33:25;36:1;44:9,16,
  25;45:1;70:12;71:19;
  90:16;97:8,9;100:22;
  118:20;122:3;131:13;
  138:5,5;148:8,12;
  153:24
police-involved (1)
  11:3
policies (1)
  84:12
policy (6)
  100:19;102:9,12,13;
  103:11,13
pop (1)
  85:15
PORTER (1)
  4:3
portion (3)
  51:16;55:14;127:12
portray (1)
  127:15
position (2)
  10:7;134:9
positive (1)
  91:4
possessing (1)
  147:19

possession (1)
  94:16
possibility (1)
  144:11
possible (15)
  19:11;35:16;37:5;
  41:21;79:17;99:7,10;
  103:22,25;118:3;
  128:11;149:4,9;152:3,
  21
post (1)
  74:12
potential (2)
  96:3;144:12
potentially (2)
  83:23;142:2
Powell (12)
  69:13;70:15;71:3,11;
  72:7,7,17;94:4,11,12;
  122:11;153:25
practical (2)
  10:17;11:4
Pratt (1)
  14:15
precedent (2)
  73:9,12
precedential (1)
  73:21
predate (1)
  80:17
preemptively (1)
  34:8
prefer (1)
  19:20
preliminary (6)
  17:7;39:4,19;63:5,6;
  141:9
premise (2)
  112:7;135:22
premises (1)
  18:22
prep (2)
  8:10;39:17
preparation (2)
  126:23;140:12
prepare (2)
  8:2;35:18
prepared (5)
  100:7,7;110:21;
  139:23;149:21
preparing (2)
  29:6;133:4
prerequisite (2)
  101:10,17
present (5)
  33:9;53:21;134:19;
  135:1;138:11
presentation (3)
  52:9,18;134:17
presentations (1)
  17:2
pretrial (2)
  49:20;98:11

pretty (3)
  16:11;63:4;130:13
previously (2)
  27:18;60:16
prima (1)
  66:21
primarily (1)
  18:12
primary (1)
  10:17
printed (5)
  27:4;42:2;53:12;
  59:24,25
prior (16)
  26:16,17;34:10;40:9,
  19,22,24;49:20;60:21,
  22;61:6;62:5;76:16;
  95:16,19;144:15
prison (4)
  34:12;108:8,14;
  112:1
Private (1)
  8:16
privilege (5)
  37:2,3,6,10,16
privileged (1)
  49:7
privileges (1)
  26:12
probable (38)
  8:9;12:18,20;13:3;
  18:22;19:12;24:12;
  25:2,3,13;27:5,14,22;
  28:15;29:21;30:14;
  31:9,11,18,24;32:5;
  68:11;79:13;84:15;
  86:2;87:22;92:18,20;
  93:19;95:13,20,22;
  97:12;125:3;126:13;
  127:20;140:2;141:12
probably (12)
  14:25;17:22;35:11;
  53:20;68:19;73:24,24;
  81:11;126:17;131:7;
  137:8;143:22
probation (4)
  86:20,22,25;87:3
problem (4)
  35:3;37:10;56:21;
  57:21
problematic (3)
  67:13;136:12;137:3
problems (1)
  67:21
proceed (2)
  83:14;136:17
proceeded (1)
  63:7
proceeding (8)
  35:5,11,15;48:12;
  57:8;61:15;66:1;76:23
PROCEEDINGS (15)
  6:2;23:20;35:22;

41:24;52:7,21;54:13;
  55:10;56:25;78:1;
  107:5,10;130:17;
  133:2;147:1
process (20)
  12:13;26:12,14;30:4;
  36:16,18,20,23,25;
  37:16;64:21;68:4;86:1;
  88:11;96:8;104:10;
  108:11;111:4,6;143:1
processed (1)
  124:7
processing (2)
  33:2,5
produced (1)
  49:21
product (13)
  19:15,18;21:2;26:1,
  3,5,11,11;27:6;29:6;
  30:4;64:22;143:3
program (2)
  13:4;101:12
progress (4)
  17:4,23;83:8;117:23
promise (1)
  58:11
promised (4)
  53:18,25;58:23,24
promises (6)
  50:3,22;54:2;57:18;
  59:22;60:5
property (1)
  145:19
proposition (1)
  49:14
prosecute (5)
  56:13,24;57:6,22;
  61:18
prosecuted (3)
  57:11;61:23;63:1
prosecuting (1)
  28:11
prosecution (16)
  17:7;35:3;38:12;
  51:21;52:3,8;59:4;
  74:4;93:11;96:9;
  115:11;120:24;131:22;
  141:21;143:7;151:15
prosecutor (5)
  7:14;8:22;16:21;
  139:19;142:19
protection (2)
  45:5,13
provide (11)
  12:17;28:24;34:16;
  47:16;84:13;103:20;
  111:1,2;116:10;
  149:19;152:5
provided (20)
  16:22;29:10;30:1;
  32:22;47:20;56:3;
  72:12;97:4,15;101:11;
  104:13;105:10;106:16,

Case 2:22-cv-00196-CB    Document 83-27    Filed 07/01/24    Page 55 of 60

CHERON S HELTON/ROBERT THOMAS CONFIDENTIAL ATTORNEYS' EYES ONLY                KEVIN CHERNOSKY
COUNTY OF ALLEGHENY, et al.                                                     March 15, 2024

18,24;123:20;125:6;
142:21;152:10;153:25
**providing (2)**
8:4;103:23
**proving (1)**
67:21
**public (7)**
39:4;117:16;129:5;
143:13,20;144:1;
147:11
**publicity (2)**
128:25;129:18
**publicly (1)**
144:19
**pull (2)**
67:18;127:25
**pulled (1)**
76:2
**purpose (6)**
27:18;41:18;119:18;
124:25;141:10;147:22
**purposes (4)**
46:5;102:20;140:1;
141:12
**Pursuant (3)**
6:5;41:12;59:21
**pushed (2)**
39:1;136:21
**put (19)**
12:22;16:3;25:8,14;
35:15;48:25;49:7,12,
13;50:12;88:6;91:12;
100:13;103:19;112:2;
128:18,21;142:21;
143:2
**putting (1)**
93:5

**Q**

**qualify (1)**
41:6
**quick (2)**
23:19;77:25
**quickly (3)**
118:3,5;132:5
**quite (1)**
66:19
**quote (2)**
21:17;55:20
**quoting (1)**
53:18

**R**

**raised (1)**
129:18
**Ramaley (5)**
9:14;14:10;78:18;
80:12,22
**R-A-M-A-L-E-Y (1)**
9:14
**ran (1)**

46:15
**Rangos (3)**
50:13,19,24
**Rankin (2)**
10:22,25
**ranking (1)**
14:21
**Rather (3)**
125:23;126:2;133:10
**rational (1)**
103:17
**reach (3)**
103:23;105:7;117:22
**reached (5)**
32:14;34:12;59:8;
65:18;89:10
**read (12)**
8:8;24:16;25:7,10,
11;55:21;56:1;61:16;
74:1;126:24;139:4;
154:9
**readily (1)**
132:2
**real (3)**
15:17;23:19;77:24
**realize (1)**
46:20
**realized (1)**
29:14
**really (4)**
44:20;100:4;103:17;
109:20
**realtime (1)**
116:19
**rear (1)**
76:13
**reason (5)**
28:8,9;103:9;114:12;
132:25
**reasons (1)**
112:23
**Rebecca (1)**
110:11
**recall (126)**
13:1,12;19:22,25;
20:10,17;21:6,8,10,16;
22:3,9,14,18,19,21;
23:10,13,15,22,25;
29:2;30:24;35:2,12,23;
36:4,7;40:23,24;41:2,
2;47:18,20,22,23;48:1,
4;52:19;55:5;59:14,18;
67:24;68:1,1,22;69:2,
11,17,21,22;70:3;
71:10,16;72:21;74:14;
75:16,20,25;76:12,16,
18;77:3,4,9,13,14;
78:12;81:18;82:3,15;
85:19,22;86:18,19,21;
87:11,17,21,22;89:4;
90:5;91:24;93:3;94:11;
95:8;96:4;97:21;98:17;
99:6,19;105:2,10;

106:17;113:8;114:17,
23;115:1,4,9,12,25;
119:8,11;120:15;
121:7,20;123:2,12;
126:7;129:21;130:3;
131:2,2,4,24;132:2;
133:5;138:19,20;
145:21;149:24;150:1,
2;151:18;153:16
**recap (1)**
57:3
**receive (3)**
45:15;63:20;70:10
**received (12)**
41:15;42:4,5;50:4;
57:24;58:8;104:2;
139:25;148:9;150:21;
151:16,19
**receiving (6)**
18:5;54:3;63:21;
70:5,6;103:24
**recognition (1)**
113:25
**recognize (4)**
53:1;108:18;139:3,4
**recognized (1)**
37:10
**recollection (73)**
13:19;22:1,4;24:1;
25:5;30:17;32:17;33:6;
34:11,24,25;38:3,19;
39:14,23;40:21;47:8;
48:3;53:3;60:1,7,11,
18;61:14;62:16;63:2,
13;69:8;70:9,13,14;
73:1;75:3;81:6;82:19;
86:10;89:8;90:9,11,18;
94:8,9,15,20,21;95:12,
18;96:24;98:24;99:7,
18,21;100:5;105:17;
106:23;107:1;113:14;
114:21;116:21;118:19;
120:6,19;121:11,14,15;
122:16;123:8,20,23;
124:11;146:3;152:24;
153:14
**recollections (1)**
39:10
**recommendation (3)**
110:16,16,18
**reconsidered (1)**
39:2
**record (22)**
7:4;22:22;23:22;
37:22;42:1,10,24;43:5;
48:25;49:7,13;50:13,
18;51:6;52:6,20;54:12,
17;55:9;93:25;98:21;
99:13
**recorded (1)**
95:19
**recording (3)**
29:17;77:10;137:8

**records (1)**
67:16
**recusal (2)**
68:5;69:3
**recused (2)**
67:25;69:10
**recusing (1)**
68:1
**ReeRee (1)**
22:12
**RE-EXAMINATION (5)**
130:19;147:5;
149:12;152:16;153:20
**refer (2)**
37:11;43:14
**reference (1)**
49:2
**referenced (5)**
43:3;45:9;63:11;
86:11;138:15
**referencing (2)**
43:15;49:19
**referred (2)**
54:23;94:10
**referring (6)**
23:5;59:12;91:8;
131:17,19;145:12
**reform (1)**
30:11
**refresh (1)**
60:18
**refreshed (1)**
53:3
**regard (5)**
34:12,25;67:17,18;
70:7
**regarding (7)**
22:23;28:24;49:15;
52:24;59:22;67:9;99:5
**regards (31)**
7:10;18:24;23:1,16;
24:2;29:2,20;30:2,7;
31:1,7,11;32:22,23;
34:16;44:16,22;49:23;
50:3;53:24;55:21;60:4,
9,19;64:20,24;69:7;
105:9;132:7,21;134:22
**registered (1)**
20:4
**regular (2)**
16:25;112:3
**regularly (2)**
117:20;118:9
**reinvent (1)**
24:21
**related (16)**
50:15;67:8;94:3,4;
95:9;96:19;111:11;
123:13;124:8;138:14;
139:8;143:7,10;146:8,
18;153:13
**relates (5)**
50:14;99:8;119:13;

120:2;122:25
**relative (1)**
125:1
**relatively (1)**
132:5
**relay (1)**
105:14
**relayed (4)**
98:13;127:20;
150:18;151:9
**relaying (2)**
128:13;129:14
**released (2)**
107:20;108:13
**relevance (1)**
20:24
**relocate (5)**
39:6;102:6;105:18,
23;131:8
**relocated (2)**
101:22;136:23
**relocating (1)**
38:22
**relocation (6)**
41:21;101:11;102:8;
103:15;104:3;131:7
**relying (3)**
84:13,19;128:13
**remember (36)**
10:8;11:21;14:12;
16:12,15;20:6,9;21:13,
14,23;30:10;35:4,4,9;
39:18;60:15;62:12;
66:12,12;69:24;74:2;
76:3,7;79:11;90:16;
97:19;115:3;119:12;
120:5;122:14,18;
124:18;127:7;129:11;
132:2;140:7
**removed (1)**
108:8
**rent (2)**
38:24;102:21
**repeat (2)**
108:1;151:7
**rephrase (3)**
19:19;23:7;96:10
**report (4)**
11:15;12:1;91:19;
125:1
**reporting (1)**
11:25
**reports (3)**
19:8,9;50:22;142:22;
146:22
**represent (8)**
49:18,19;63:15;
74:19;127:10;133:9;
138:4;139:6
**representation (7)**
49:10;53:24;54:6;
77:18;137:19;140:14;
149:21

CHERON S HELTON/ROBERT THOMAS
COUNTY OF ALLEGHENY, et al.
**CONFIDENTIAL  ATTORNEYS' EYES ONLY**
KEVIN CHERNOSKY
March 15, 2024

**representations (4)**
50:6;58:15;60:6;
134:22
**represented (2)**
53:18;141:15
**representing (8)**
76:17,18,22;77:5;
115:19;136:1;138:6;
139:18
**request (3)**
44:2;105:3;106:10
**requested (1)**
103:9
**requesting (3)**
68:18;87:18;89:15
**required (11)**
45:3;68:25;73:20;
102:10;104:23;109:9;
145:25;147:24;152:5,
8,12
**requirement (4)**
84:2;101:23;102:4;
103:19
**requirements (1)**
111:11
**requires (3)**
8:24;12:15,23
**resealed (1)**
144:15
**research (1)**
91:18
**residence (1)**
20:4
**respect (1)**
136:10
**response (7)**
22:22;116:10;
138:17;139:7,11;
141:7,15
**responsibility (2)**
104:18;136:5
**responsible (3)**
10:24;13:10,12
**responsive (3)**
42:8,12;153:3
**rest (1)**
120:2
**restate (1)**
30:11
**result (4)**
41:19;59:15;61:19;
106:8
**resumed (1)**
141:3
**retired (6)**
9:10,16,17,24;10:13;
11:21
**retirement (3)**
10:4,6,11
**retribution (2)**
121:4,5
**retrospect (1)**
62:5

**return (1)**
93:6
**returned (2)**
145:20;146:5
**review (22)**
12:18;25:12,18;26:9,
23;27:15;42:23;43:7;
55:18,25;61:2;68:10;
89:21;94:1;110:1,10,
14;121:8;125:15;
126:4,22;133:19
**reviewed (13)**
19:8;54:23;60:20;
79:12,19;86:22;88:14;
113:3,17;126:8,8,22;
129:23
**reviewing (19)**
19:4,12;26:16,17;
42:25;79:5;86:1;95:8,
13,18;96:25;98:19;
114:17,23;122:20;
123:12;125:3;133:24;
136:13
**reviews (1)**
11:3
**revolves (1)**
89:8
**reword (1)**
126:1
**rid (1)**
65:19
**rifle (1)**
20:14
**right (11)**
14:18,22;42:22;
49:17;50:11;61:14;
75:3;83:8;118:7;
119:23;121:14
**rises (1)**
101:3
**Road (3)**
4:4;20:6;81:11
**Rob (29)**
22:15,19,23;23:11,
16;33:13,24;64:13;
65:6,8,11,17,19;66:16;
67:1;81:3;92:22;93:1,
17,21;96:18;106:6;
123:10,14,23;150:16;
153:2,4,5
**Robert (12)**
6:25;86:7;96:15;
106:4;113:13;120:4,
15;123:5;139:9,13;
153:2;154:1
**Roberts (9)**
22:10;23:15;96:24;
97:13,20;151:17,19;
152:21;153:24
**Rocks (1)**
7:12
**Rodney (3)**
36:10;82:2,20

**ROHRER (18)**
138:2,4,22;139:1;
140:20,22;143:4;
144:5;145:13,14;
146:16;147:2;149:18;
151:21;152:18;153:8,
10,18
**role (4)**
8:20;20:22;78:19;
116:25
**rolled (2)**
38:18;90:14
**Ron (1)**
110:11
**rookie (1)**
80:13
**room (6)**
29:18;41:21;77:11;
85:14;120:17;132:15
**Ross (1)**
20:5
**rotation (1)**
78:23
**row (1)**
148:7
**rude (1)**
125:18
**rudimentary (1)**
46:2
**rule (7)**
8:23;10:5;12:15;
17:14;130:4,5;146:1
**ruled (2)**
49:23;69:9
**rules (4)**
7:18,24;71:21,21
**ruling (7)**
35:9;36:9,11;67:10;
73:4;136:11;137:3
**rulings (1)**
69:6
**run (1)**
41:16
**running (4)**
21:11;24:19,23;
115:25
**runs (2)**
41:18;43:23
**rush (1)**
93:9
**Russ (6)**
52:23;53:17;54:5,15;
58:14;60:5
**Russell (2)**
91:5,10

**S**

**safer (1)**
39:5
**saliva (1)**
92:9
**Sam (1)**

116:8
**same (24)**
11:23;14:21;25:16;
35:8;37:12;38:8;48:10;
51:23,25;62:10;72:5,5;
75:5;89:2;91:16;92:22;
93:4;109:13;113:12;
127:18;132:21;135:21;
140:11;146:19
**sample (3)**
92:3,6,8
**Samuel (1)**
81:20
**saw (1)**
27:20
**saying (14)**
20:15;21:18;25:8;
41:11,14;42:12;43:23;
56:17;71:12;81:13;
83:16;101:19;115:6;
145:9
**scanned (1)**
53:12
**scene (8)**
65:15;66:10;67:2;
92:13;118:13;119:4,8,
22
**scene-related (1)**
119:8
**scenes (1)**
119:1
**scheduled (5)**
36:12;47:23;98:16;
99:22;133:1
**scheme (1)**
129:8
**Schupansky (1)**
81:3
**Schurman (5)**
18:14,15;116:20,22;
117:11
**screening (1)**
17:6
**seal (4)**
6:11;68:23,25;
128:21
**sealed (8)**
143:6;144:7,10,16,
25;145:2,4;147:24
**sealing (3)**
144:24;145:22;148:1
**search (49)**
8:24;11:2;12:16;
13:11,13,23;17:15;
18:19;19:10;20:12;
24:21;25:4;26:19,21,
22;27:23;28:9;31:19;
32:1,2;68:7,9,13,13,24;
69:5,9;79:13;89:2;
92:21;117:13,17;
118:4;126:14;128:20;
138:13;144:7,21;
145:23,23;146:5,15,21;

147:10,22,25;148:3;
150:10;151:10
**searched (1)**
20:8
**searches (1)**
59:16
**searching (1)**
145:24
**second (5)**
18:8;65:6;108:13;
123:22;133:20
**section (3)**
14:14,15,17
**security (2)**
38:24;111:24
**seeing (6)**
27:4;95:20;96:24;
121:7;122:14,16
**seems (1)**
62:14
**segment (1)**
148:7
**segregated (1)**
111:20
**seized (7)**
20:8;46:2;117:25;
120:17;141:2;145:20;
146:4
**select (1)**
109:16
**sending (1)**
125:23
**senior (3)**
80:24;81:7,10
**seniority (2)**
81:3,12
**sense (4)**
104:4;106:2;148:19,
20
**sent (20)**
17:3;42:8,11,14,17,
18,19,20;43:1;59:14,
19,23;76:4;88:13;
98:17,25;99:5;106:14;
110:9;120:20
**sentence (2)**
125:25;126:2
**separate (4)**
35:11,14,15;142:3
**separately (1)**
140:12
**sergeant (3)**
17:24;18:6;117:6
**seriousness (2)**
105:25;111:20
**serve (1)**
146:2
**served (3)**
145:18;148:2,4
**service (1)**
147:22
**serving (4)**
147:12,13,17,18

CHERON S HELTON/ROBERT THOMAS, CONFIDENTIAL  ATTORNEYS' EYES ONLY
COUNTY OF ALLEGHENY, et al.

KEVIN CHERNOSKY
March 15, 2024

session (1)
  8:10
set (4)
  98:12;105:18;108:8;
  116:13
severity (1)
  109:7
sex (1)
  17:10
Shaquan (7)
  22:10;23:15;96:23;
  151:16,19;152:21;
  153:24
sheet (4)
  145:1,19,23;146:5
Shelley (1)
  138:4
Shelton (37)
  7:1;21:7;30:18;
  70:16;71:11,13,22;
  75:18;76:17,18;77:6;
  86:7,18;87:9,19,24;
  92:3,4,20;93:4;95:9;
  96:15,19;109:3;
  112:17;124:22;128:1,
  3,7;129:5,19,25;138:9;
  140:8;141:21;145:15;
  154:1
Shelton's (7)
  20:3,7,19;23:5;
  29:14;123:10;152:25
shoes (1)
  120:16
shooter (1)
  92:10
shooters (1)
  143:23
shooting (7)
  11:3;63:9,18;69:18;
  119:4;127:11,16
short (1)
  130:15
show (11)
  51:11;58:18;108:14;
  130:24,25;131:10,12;
  133:14;137:4,11,15
showed (9)
  46:14,17;52:22;53:2;
  55:12,15;57:25;67:19;
  123:13
showing (7)
  51:2,14,23,25;58:20;
  65:12;127:25
shown (1)
  53:6
Shrager (1)
  8:16
shut (1)
  145:3
side (1)
  13:8
sides (1)
  13:7

sign (3)
  19:3;45:4;104:24
signature (2)
  46:16;139:5
signature's (1)
  138:21
signed (7)
  17:16;50:14,23,25;
  68:6;88:7;105:2
signing (1)
  18:2
similar (3)
  31:13;77:13;79:2
simply (1)
  125:15
sit (5)
  31:23;38:2;94:12;
  102:12;129:11
site (1)
  124:23
Sitting (3)
  91:2,25;123:12
situation (4)
  108:4;112:3;118:11;
  148:14
six (3)
  78:15,21;112:17
small (2)
  90:14;118:21
solid (1)
  93:5
somebody (1)
  85:6
someone (20)
  45:4;48:14;56:21;
  57:20;62:2;64:4;74:11,
  17;82:6;84:1;85:8;
  90:20;98:9;108:11;
  119:15;141:22;142:1,
  5;148:20;152:9
someone's (1)
  10:6
something's (2)
  126:6;135:2
sometime (3)
  24:1;62:5;74:24
sometimes (10)
  15:1;17:24;32:1;
  87:6;103:16;118:24;
  119:22;124:8;125:20,
  24
Somewhere (2)
  10:4;27:10
soon (1)
  8:3
sorry (58)
  8:6,11;10:9;14:17;
  16:25;18:13,15;20:2,
  19;24:8;26:19;29:16,
  22;31:3,8;32:10;33:21;
  34:22;39:10;44:5;
  45:22;52:18;53:23;
  57:6,15,19;58:17,19,

22;61:12;62:25;64:3,
  19;65:19;68:23;69:24;
  70:6;73:14;74:13,16,
  23;79:1;86:17;91:17;
  99:10;108:1;116:15;
  117:11;120:14;124:5;
  127:19;134:25;135:8;
  143:18;144:4;150:6;
  151:7;153:3
sort (2)
  24:25;31:24
sought (1)
  15:3
sound (1)
  70:4
sounds (2)
  82:18;118:24
source (4)
  42:11;151:9;152:21;
  153:7
sources (1)
  152:22
Spangler (6)
  11:17;15:6,10,11;
  38:5;110:11
speak (2)
  15:12;45:17
speaking (5)
  15:4;38:13;89:6;
  111:9;137:16
specialize (1)
  17:9
specialized (1)
  17:13
specializing (1)
  17:1
specific (47)
  13:19;21:23;22:25;
  23:25;30:12;32:17;
  33:6;34:25;36:7;39:10,
  14,23;40:21;41:22;
  46:18;47:8,13,18,22;
  48:5;49:2;50:19;60:7;
  62:15;64:18;70:9,13;
  71:16;72:25;86:9;89:8;
  90:19;92:25;106:23;
  109:20;112:22;118:18;
  119:12;120:6,19;
  121:11,20;123:22;
  130:3;131:4;142:2;
  146:3
specifically (25)
  18:19;24:10;26:5;
  27:17;28:20;29:25;
  35:13;49:22;50:10,20;
  55:8;60:4;72:21,23;
  74:2;79:11;87:11;94:4;
  104:14,15,18;115:9;
  120:21;124:6;139:20
specifics (2)
  111:10;131:9
specify (3)
  40:4;70:20;73:23

speculate (1)
  79:16
spell (2)
  7:4;9:6
spelling (1)
  7:6
spend (1)
  105:25
spending (1)
  103:20
spent (2)
  103:8;104:17
spoke (2)
  32:13;96:5
spoken (1)
  149:20
spot (3)
  9:12,16;143:2
spreadsheet (1)
  144:14
staff (1)
  18:12
stage (1)
  65:1
stamps (1)
  91:3
stand (1)
  12:24
standpoint (1)
  93:12
stands (1)
  12:25
start (7)
  15:4;17:1,5;68:9;
  89:10;101:9;118:7
started (11)
  11:4;35:2,13;40:10;
  80:7;81:1,15,16;118:2;
  127:16;136:13
starting (1)
  16:24
starts (1)
  66:8
State (26)
  10:20,24,25;27:10;
  35:11,17;45:1;48:23;
  67:11;82:22;84:4;
  99:23;100:3,6,11;
  136:12;141:19,23,23;
  142:2,5,9,14;151:23;
  152:4,10
stated (2)
  127:19;134:6
statement (24)
  22:21;23:1;33:13,19,
  22,24;63:19;64:1;65:8;
  72:12;74:18;93:22;
  95:9;96:25;97:14;
  123:13;128:12;129:23,
  25;139:24;141:1,8,11;
  152:11
statements (11)
  22:23;31:2,10;62:19;

63:1;74:15,19;75:4;
  95:19;96:20;127:1
states (2)
  12:20;18:21
statewide (1)
  17:2
status (1)
  47:11
statute (1)
  110:18
stay (1)
  111:24
step (1)
  67:13
Stephie (6)
  9:14,15,24;11:12,14;
  14:10
steps (1)
  37:13
still (16)
  9:9;39:19;44:24;
  45:19;49:7;50:1;65:10;
  66:3;88:24,25;112:8;
  116:11;118:12;136:3,
  15;141:14
stipulate (1)
  6:8
stipulated (1)
  51:8
stipulation (2)
  6:5;54:19
stir (1)
  21:25
stolen (1)
  94:17
stood (2)
  38:11;93:11
stories (1)
  129:10
straight (1)
  42:21
street (2)
  148:22,23
strike (1)
  35:24
structure (3)
  11:16;14:13;117:11
study (2)
  124:19,21
stuff (2)
  93:13;129:14
style (1)
  125:22
subject (3)
  19:20;52:24;111:25
submit (2)
  13:7;110:7
submitted (3)
  16:12;27:17;28:15
submitting (1)
  18:17
subpoena (4)
  42:8,13;43:3;100:11

**subpoenas (2)**
116:10;136:17
**subsequent (5)**
31:1;41:5,5;53:9;
63:16
**subsequently (2)**
54:5,9
**substantiated (3)**
77:11,22;102:5
**sufficient (2)**
18:22;32:5
**sufficiently (1)**
12:19
**suggests (2)**
148:21,22
**Suite (1)**
4:4
**summarize (1)**
65:6
**Superior (2)**
73:3;82:24
**superiors (1)**
12:1
**supervising (2)**
9:22;87:1
**supervisor (3)**
12:8;78:12;81:5
**supervisors (3)**
24:4,9,10
**support (1)**
125:11
**supposed (1)**
83:14
**suppress (2)**
138:18;139:7
**suppression (3)**
23:13;69:5;140:9
**Sure (16)**
8:1;19:22;25:8;
37:21;42:20;49:11;
57:23;66:25;67:16;
77:20;108:4;111:18;
119:21;126:15;131:1;
133:22
**surface (1)**
31:22
**surmised (1)**
153:6
**surprise (8)**
41:14;47:9;60:12;
102:13,15;103:10,12,
18
**surprising (1)**
60:15
**surrounding (2)**
23:16;138:8
**surveillance (1)**
75:17
**suspected (1)**
92:10
**suspects (7)**
30:22;66:14;86:13,
15;93:22;94:3;149:6

**swab (1)**
92:6
**switched (1)**
65:16
**sworn (1)**
6:18
**system (9)**
12:22;25:9;26:25;
79:8;113:22,22;
115:14;116:5;126:10

## T

**talk (15)**
13:20;14:20;58:2;
85:13,16;89:21;90:20;
105:4,5;110:14;
111:10;116:5;119:23;
121:16;128:10
**talked (17)**
14:8,10;30:12;39:18;
40:8;78:7;79:8;82:20,
21,23;88:16;92:19;
116:19;120:22;121:2;
132:4;140:13
**talking (18)**
12:6;33:23;40:6;
61:13;67:19,20;78:15;
80:11;95:22;99:17;
106:24;118:15;119:24;
120:2;133:21;140:14,
24;150:3
**taped (1)**
145:3
**team (1)**
14:7
**telephone (3)**
138:18;139:8;140:24
**telephones (1)**
141:2
**telling (4)**
57:21;97:19;133:3;
151:18
**term (1)**
123:4
**terms (2)**
69:3;119:20
**test (3)**
124:14;125:1,2
**testified (5)**
6:19;44:20;49:12;
138:12;143:5
**testifies (1)**
85:2
**testify (12)**
49:8;56:14,21;57:20;
61:17;62:2;64:6;106:3;
131:20;139:24;140:5;
149:21
**testifying (3)**
27:21;63:21;107:14
**testimony (8)**
49:15;50:21;56:24;

**61:3;75:10;79:2;**
141:10;142:23
**theirs (1)**
114:20
**theory (8)**
65:22;69:12;92:14;
93:4,16;121:3,3;152:7
**therefrom (1)**
50:22
**thin (1)**
122:6
**third (1)**
23:24
**Thomas (35)**
6:25;33:14,24;34:6;
64:13;65:6,9,11,17;
66:3,16,20;67:2;86:7;
92:22;93:1,17;96:15,
19;109:3;113:13,14;
120:5;123:24;129:5,
19;138:9;139:10,14,
20;141:22;145:15;
150:17;153:2,5
**Thomas's (14)**
22:15,20,24;23:11,
17;106:6;120:15;
123:5,11,14;129:25;
152:20,22;154:1
**thorough (1)**
27:25
**though (12)**
11:18;24:15;47:9;
68:20;81:1;82:24;
110:8;111:4;113:2;
118:14;133:25;147:11
**thought (5)**
64:2;77:21,22,22;
143:1
**thoughts (3)**
38:4,5;49:16
**threat (1)**
100:23
**threatened (3)**
100:19;101:6;105:15
**threats (3)**
35:6;100:18,25
**three (10)**
8:9;11:16,22;16:20;
37:24;38:8,9;76:2;
126:20,24
**three-person (1)**
110:10
**throughout (5)**
12:2;38:14;46:9;
47:3;72:22
**thrown (1)**
137:8
**tidy (1)**
131:1
**tied (3)**
89:21;104:14,14
**time/distance (2)**
124:18,21

**timeframe (2)**
15:6;75:21
**timeline (2)**
93:9,16
**timely (1)**
117:24
**times (6)**
12:5;41:22;55:3;
85:15;118:19;126:20
**timing (1)**
69:3
**tips (5)**
70:5,6,8;90:14;148:9
**tirelessly (1)**
90:10
**title (1)**
14:21
**today (14)**
7:2;8:2;31:24;54:19;
61:14,17;91:2,25;
94:12;99:17;123:12;
129:11;138:6,15
**today's (1)**
126:23
**Todd (1)**
18:7
**together (3)**
65:13;79:5;92:14
**told (5)**
8:5;57:11;60:8;
74:18;151:3,8
**ton (2)**
22:6,8
**took (4)**
8:23;9:12;51:13;
119:6
**tool (3)**
57:20;62:1;87:6
**top (7)**
20:16;53:13,15;58:7;
116:7;144:24;145:3
**topics (1)**
50:3
**tortured (1)**
63:4
**total (1)**
78:14
**touch (2)**
78:7;103:7
**touched (1)**
81:23
**toward (1)**
65:15
**towards (1)**
53:14
**town (2)**
48:13;74:11
**traces (1)**
116:1
**track (4)**
102:16,18;114:5;
144:14
**tracked (2)**

**27:10;113:25**
**tracking (1)**
103:3
**traditional (1)**
7:5
**traffic (1)**
10:21
**training (5)**
16:23;17:3,5,12;
45:16
**trainings (2)**
17:1,2
**transcript (11)**
49:23;51:3,12,24,25;
55:14;60:20;65:25;
133:15,16;137:12
**transcripts (4)**
50:19;54:23;98:19;
130:24
**transferred (1)**
106:11
**transfers (1)**
33:16
**transpired (1)**
76:11
**transported (1)**
48:12
**treated (1)**
6:10
**treating (1)**
6:9
**trial (23)**
11:18,19;15:10;17:8;
38:17;40:6,9,10;49:21;
52:18;77:18,20;81:6;
83:18,22;89:10;97:25;
99:21;108:5;110:12;
111:11;141:20,20
**triggered (1)**
32:2
**true (3)**
63:14;97:21;126:3
**truthful (1)**
128:12
**truthfulness (1)**
23:11
**Try (7)**
8:1;28:1,5;66:23;
90:18;91:11;96:10
**trying (7)**
23:9;37:24;46:21;
59:20;65:19,19;121:18
**turn (4)**
59:21;97:9;103:14;
133:18
**turned (9)**
49:3;59:6;60:10;
61:6,25;71:23;90:24;
114:24;121:12
**turning (2)**
59:9;134:16
**two (33)**
8:11;9:13,18;10:16,

Case 2:22-cv-00196-CB   Document 83-27   Filed 07/01/24   Page 59 of 60

CHERON S HELTON/ROBERT THOMAS, CONFIDENTIAL  ATTORNEYS' EYES ONLY        KEVIN CHERNOSKY
COUNTY OF ALLEGHENY, et al.                                              March 15, 2024

17;11:7;45:8;52:16;
56:4,11;57:3;58:6,9;
61:20,24;66:17;76:2;
80:5,5;90:3;92:14;
94:5,17;108:11;
114:13;123:8;128:4,
11,13;140:24;141:2;
143:23;146:23
**type (4)**
16:18;61:13;62:13;
125:14
**types (2)**
43:21;56:11
**typical (1)**
56:20
**typically (1)**
56:17
**typographical (1)**
12:21
**typos (1)**
25:7

**U**

**uh-huhs (1)**
7:24
**ultimately (8)**
27:19;28:12;39:21;
54:10;89:13;117:13;
119:25;125:12
**under (11)**
6:11;48:23;68:23,24;
93:4;98:7;100:11;
117:12;128:21;153:1,2
**underlying (10)**
31:20;49:1;69:11;
83:18;97:3;107:10;
110:24;121:8;124:3,6
**understood (2)**
7:20;151:10
**unit (24)**
8:22;9:13,19;10:15;
17:9,13,19;28:23;
30:25;31:3,4,5;32:22;
46:25;52:13;78:8,11;
79:4;81:11,12,17,19;
82:12;83:13
**units (1)**
10:16
**unless (3)**
6:12;74:17;99:11
**unnecessary (1)**
141:11
**unreliable (1)**
84:24
**unsafe (1)**
105:15
**unsealed (1)**
144:8
**unusual (1)**
68:6
**up (26)**
9:13;11:8;12:22;

23:15;25:9;35:18;42:2;
53:7;64:5;66:15;76:2;
78:23;85:15;87:3;
90:24;100:22;103:15;
105:18;110:3,11;
114:15;116:13;121:12,
17;122:19;143:11
**update (1)**
118:21
**updated (1)**
18:2;33:5;118:13
**updates (3)**
18:5,16;116:19
**updating (1)**
118:15
**uploaded (5)**
24:13;25:24;26:24;
79:20;126:9
**uploading (1)**
26:17
**upon (6)**
66:2;68:10;97:14;
103:19;105:16;139:24
**upper (2)**
111:22,23
**usable (1)**
152:11
**use (32)**
24:25;35:19;36:14;
47:25;55:7;56:13,23;
57:7,8,19;61:17,24;
62:22;74:3,14,17;75:7;
84:20;85:3,6,9,24;
87:6;95:5;97:25;
108:19,24;136:4,13,19,
20;141:20
**used (21)**
6:11;27:3,5;44:11,
14;45:24;46:5;56:14;
84:6;85:4,8;89:23;
90:6;91:8;98:22;
105:22;107:13;116:9;
121:8;123:3;142:2
**using (17)**
84:23;85:17;98:4;
123:17;132:20;134:1,
11;135:7,12,18,24;
136:10,11,18;137:20;
141:19;153:4
**utilizing (1)**
84:14

**V**

**vaguely (3)**
77:9,14;150:2
**various (7)**
12:5;13:13,22;14:9;
25:3;27:7;79:19
**vehicle (2)**
20:4;148:25
**vehicles (1)**
33:6

**veracity (1)**
95:10
**verification (1)**
50:24
**version (5)**
19:9;25:5,6;27:18;
134:6
**versions (1)**
25:1
**versus (5)**
81:20;82:2,9,13,16
**vest (1)**
20:16
**via (5)**
25:6,18,19;118:16,
17
**victim (1)**
27:2
**victims (1)**
69:13
**video (8)**
21:10;66:4;67:18;
76:12,17;77:13;
119:25;150:10
**videos (2)**
75:16,20
**view (3)**
20:23;57:10;132:6
**vigil (2)**
63:9,18
**violation (3)**
86:20,23;87:3
**violations (1)**
86:25
**Virginia (3)**
38:22;105:19;106:13
**visit (4)**
29:15;119:10,18;
120:4
**visits (1)**
119:9
**voicemail (3)**
115:6,14;116:1
**voluntary (1)**
64:1
**volunteered (1)**
48:11

**W**

**Wabby (1)**
110:12
**wait (1)**
10:6
**waited (2)**
93:12;127:15
**waiting (1)**
118:22
**waived (1)**
37:17
**walked (1)**
119:7
**Walker (2)**

52:12;82:16
**warnings (2)**
152:5,11
**warrant (22)**
18:20;19:3,4,10,22;
24:21;26:18,19,20,21;
31:19;32:1,3;138:13;
145:2,23,24;146:5;
147:22,25;148:3;
150:10
**warrants (44)**
8:25;11:2;12:16,16;
13:11,13,24;17:15;
18:1,17,24;19:25;
20:12;25:4;26:22;
27:23;28:10;68:7,9,13,
14,18,20,24;69:5,9;
79:13;89:2,3;92:21;
117:13,17;118:4;
126:14;128:20;144:7,
21;146:15,22;147:10,
12,13,17;151:10
**watch (1)**
150:19
**way (13)**
11:8;27:13;46:2;
77:19;86:13;109:25;
125:19;126:3,6;
132:21;149:9;151:9,10
**ways (1)**
149:5
**weapon (7)**
65:20;66:9;89:9,12;
91:11;120:23;121:12
**weapons (14)**
33:8;65:24;89:7,22,
22;90:3,8,10,11,13,17,
19,21,25
**week (3)**
23:24,25;119:4
**weeks (1)**
16:20
**weigh (1)**
28:9
**weighed (3)**
13:23;38:4,5
**weight (1)**
38:10
**weird (1)**
10:5
**Welcome (1)**
8:18
**weren't (5)**
96:4;98:12;132:19;
136:20;147:10
**Werner (7)**
14:16;37:24;38:8;
48:17;81:8;137:16,19
**W-E-R-N-E-R (1)**
14:17
**West (3)**
38:22;105:19;106:13
**What's (4)**

36:8;56:20;83:11;
127:20
**wheel (1)**
24:21
**white (6)**
20:4,8;55:23;62:20;
63:12;76:9
**White's (2)**
134:3,6
**whoever's (1)**
153:4
**whole (4)**
28:8,9;125:10;133:2
**who's (4)**
85:8;90:20;112:14;
133:21
**whose (5)**
10:10;20:6;46:16;
109:19;110:15
**Wider (1)**
148:19
**Wilkinsburg (19)**
48:7;50:16;51:20;
52:2;63:17;68:24;81:9;
86:3;87:19;90:16;
94:18;96:16;97:15;
115:7;121:4;122:24;
145:11;146:19;148:10
**winter (1)**
66:15
**wishes (1)**
110:5
**withdrawn (1)**
63:6
**within (5)**
33:16;108:16;109:9;
119:4;141:4
**without (10)**
26:13;29:16;30:23;
37:17;38:12;52:5;
66:22;68:3;83:16;
125:18
**WITNESS (56)**
4:1;35:7,18;36:13;
38:20;39:2,17,22;
41:16,20;44:7;45:4,13;
47:12;48:14;59:11;
60:3;71:18,21;72:6,12,
16;84:20;85:10,11;
96:3,20;97:25;98:4,8,8,
22;100:6,9,13;101:4,
10,19,24;104:1,3,14,
24;105:20;108:19;
124:1,6;128:6,12;
132:4,15,20;134:22;
135:24;136:16;142:3
**witnesses (31)**
16:17;22:4;27:12;
31:15;32:6,13,20;
38:12;44:17;70:15,21,
22,25;71:2,6,8,10,16;
83:2,22;84:5,15;85:11,
13;100:8,16;103:3;

CHERON S HELTON/ROBERT THOMAS **CONFIDENTIAL  ATTORNEYS' EYES ONLY**
COUNTY OF ALLEGHENY, et al.

KEVIN CHERNOSKY
March 15, 2024

107:14;113:5;127:14;
136:17
**Word (9)**
    24:20;25:5,11,18;
    79:13,20;100:16;
    125:25;148:20
**worded (1)**
    126:1
**words (3)**
    56:1,15;128:16
**work (17)**
    11:4;12:2;19:15,17;
    21:2;26:1,2,5,7,10;
    29:6;30:4;64:22;80:17;
    82:12;140:16;143:3
**worked (9)**
    80:3,19,22;82:7;
    90:10;93:13;100:10;
    104:1;116:8
**working (7)**
    80:10;81:19;83:3;
    92:14;100:15;117:19;
    121:22
**works (6)**
    45:3;46:6;79:5;
    104:10;109:25;116:11
**worth (1)**
    76:2
**write (2)**
    125:20;126:3
**writes (2)**
    102:14;110:3
**writing (2)**
    125:1;150:10
**written (4)**
    82:25;84:16;95:19;
    126:6
**wrong (2)**
    36:11;105:1
**wrote (1)**
    80:9

---

**Y**

**year (7)**
    35:4,10,12;39:18;
    40:4;47:22;81:7
**years (5)**
    7:9;47:2;80:5,22;
    90:7
**Yep (5)**
    11:13;25:23;51:15;
    53:16;135:15
**yesterday (2)**
    8:10;42:12

---

**Z**

**Zappala (8)**
    11:21;15:2;21:18;
    38:2;78:14;110:17;
    119:5,19
**Zealously (2)**

---

65:4,5

---

**1**

**1 (7)**
    51:4,5,12;54:24;
    55:13;58:10;60:19
**10 (3)**
    139:10,11;149:17
**10:20 (1)**
    75:21
**10:30 (1)**
    128:1
**100 (1)**
    109:24
**10th (3)**
    14:3,4;50:14
**11 (4)**
    137:14,15;139:22;
    149:17
**11:19 (1)**
    141:3
**11th (1)**
    137:12
**12 (1)**
    140:25
**1213 (1)**
    21:11
**1214 (9)**
    20:2,13,20;75:18,22;
    76:13,18;77:7;120:1
**13 (2)**
    140:23;141:7
**15 (5)**
    7:9;51:12;67:25;
    151:17;154:2
**15241 (1)**
    4:5
**15th (1)**
    91:5
**16 (10)**
    6:7;14:13;46:19;
    47:2;74:6,12;123:16;
    133:18,19,24
**17 (3)**
    39:22;50:20;74:13
**17th (1)**
    50:25
**18 (3)**
    9:11;74:23;106:25
**180 (1)**
    4:4
**18th (1)**
    21:16

---

**2**

**2 (6)**
    54:16,20;58:15,21;
    59:13;130:12
**2/15/18 (1)**
    50:22
**2:15-ish (1)**

---

130:13
**2:57 (1)**
    154:10
**20 (4)**
    47:18;80:21;126:17;
    131:13
**200 (1)**
    16:17
**2000 (1)**
    9:10
**2007 (1)**
    81:17
**2011 (1)**
    91:6
**2013 (3)**
    80:7;81:15,16
**2014 (3)**
    82:3,10,21
**2015 (2)**
    82:13,16
**2016 (43)**
    8:19;15:6;23:24;
    28:1;39:22;41:7;69:14;
    78:9,10;79:17,18;80:3,
    7,14;81:2,6,13;86:4,8,
    10,17;87:18,23;91:5;
    96:5,14,14;112:18;
    113:15;114:24;115:5;
    120:5;141:2,3;143:12;
    144:20;145:17;146:9,
    10,20,20;151:17;154:2
**2018 (37)**
    9:25;10:4,8;11:14;
    39:7,12,23;40:19,22,
    24;41:4,12;44:10;
    46:19;50:14;51:13;
    52:24;54:1,6,15;55:13;
    58:14;59:13;67:25;
    74:22;98:20;105:10;
    106:17;131:3,13;
    133:10,11,15;134:1;
    135:6,10;137:12
**2019 (2)**
    50:20,25
**2020 (15)**
    40:5;48:2;49:20;
    59:7,23,24;60:1,6,8,11,
    21,22;61:7;62:5;64:14
**2023 (1)**
    6:7
**23rd (6)**
    31:15;78:10;79:18;
    86:8;96:14;120:9
**24 (3)**
    86:17;87:18,23
**24th (1)**
    112:18
**25th (1)**
    112:18
**29 (1)**
    55:13

---

**3**

**3 (4)**
    138:23,25;139:2;
    149:16
**3/29/18 (1)**
    50:22
**3/9 (1)**
    123:16
**3/9/16 (2)**
    119:13;123:14
**30 (5)**
    52:24;54:1,15;
    144:11,13
**30th (2)**
    59:12,13
**3461 (4)**
    138:19;139:8;
    152:23,23

---

**4**

**4 (1)**
    139:10
**410 (1)**
    4:4
**412.881.6620 (1)**
    4:6
**412-378-3461 (1)**
    139:15
**47 (1)**
    6:7

---

**5**

**5 (1)**
    113:9

---

**6**

**6 (7)**
    55:13;58:9;96:14;
    114:24;115:5;120:5;
    131:13
**60 (3)**
    144:10,12,17
**60-day (1)**
    144:16
**6th (3)**
    31:14;113:15;143:12

---

**7**

**70-degree (1)**
    66:14
**762 (3)**
    20:14;90:6,15
**7-A (1)**
    113:8
**7-B (1)**
    113:9
**7-D (5)**

---

112:14,17;113:14;
114:24;115:5
**7th (2)**
    111:22;144:20

---

**8**

**8 (4)**
    98:20;133:10;134:1;
    135:10
**8:34 (1)**
    52:24
**8:59 (1)**
    42:6
**85 (1)**
    51:25
**8th (2)**
    111:22;131:3

---

**9**

**9 (8)**
    8:19;79:17;133:10,
    15;141:2,3;146:9,20
**9:50 (1)**
    141:2
**9th (2)**
    12:10;86:3

---