IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ROBERT THOMAS, | ) | |
| | ) | |
| Plaintiff, | ) | 2:22-cv-00196-CB |
| | ) | |
| v. | ) | Judge Cathy Bissoon |
| | ) | |
| COUNTY OF ALLEGHENY, | ) | |
| PENNSYLVANIA, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

-----------------------------------------------------------------------------------------------------------

| | | |
|---|---|---|
| CHERON SHELTON, | ) | |
| | ) | |
| Plaintiff, | ) | 2:22-cv-00266-CB |
| v. | ) | |
| | ) | Judge Cathy Bissoon |
| COUNTY OF ALLEGHENY, | ) | |
| PENNSYLVANIA, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM AND ORDER**

**I. MEMORANDUM**

Defendants' Motions for Summary Judgment will be granted as to Plaintiff Cheron Shelton, and denied as to Plaintiff Robert Thomas. Plaintiffs' affirmative Motions for summary judgment do not warrant serious consideration and will be denied.

Counsel for the Plaintiffs overlook a rather significant flaw. Their central premise is that evidence tying Thomas to Shelton (mostly phone records) is flawed or "fabricated." While the theory makes sense from Thomas's perspective, it is significantly less useful to Shelton.

Plaintiffs' claims stem from the criminal investigation into the shooting deaths of five people (including an unborn child), and serious injury of three others, late in the evening on

March 9, 2016. The horrific incident since has been referred to by some as the "Wilkinsburg Massacre." The victims were attending a cookout, and they included Lamont Powell, who survived but was injured. Police learned from multiple sources that the massacre was in retaliation for the shooting-death of Calvin Doswell, in 2013. Doc. 87 in 2:22-cv-00266-CB at ¶¶ 20(a)-(g) (Plaintiffs' response to Defendants' statement of fact).[1] It was widely suspected in the community that Powell was involved in the Doswell murder. Shelton and Doswell "were very close friends [who] grew up in Homewood North (Hilltop) together." *Id.* at ¶ 23(l).

Although Plaintiffs essentially admit these things, their counsel engage in some unpersuasive "advocacy" in attempting to manufacture disputes of fact. For example, Plaintiffs deny that Shelton and Doswell were "best friends," because Doswell was liked in his community and "[e]veryone . . . was friends with [him]." *Id.* at ¶ 23(j). The denial is unhelpful, given: (a) the admission two subparagraphs later that Shelton and Doswell were "very close friends" who "grew up" together; and (b) the affidavit for Shelton's arrest warrant stated that Doswell's sister "confirmed" that they were "best friends." Doc. 69-1 at internal "Page 5of 13."

Then, after "[a]dmit[ing]" without qualification several assertions regarding the Doswell death as motive, Plaintiffs' counsel respond to paragraph 20(g): "Admitted that the [statements were] contained in Defendants' reports," but there was "[n]o evidence in the City['s] investigation file nam[ing] Powell as a suspect" in the Doswell murder. Doc. 87 at ¶ 20(g). They then claim that Defendants "used this manufactured theory to justify their actions in framing Plaintiff[s]." *Id.*

---

[1] Citations regarding Shelton will be to the docket in 2:22-cv-00266-CB. Although both side's filings are materially similar in the two cases, citations regarding Thomas will be to 2:22-cv-00196-CB.

2

Surely Plaintiffs' counsel do not suggest that the *witness statements* were "manufactured." They were offered by nine different people, including the statement of a disinterested neighbor less than 13 hours after the incident. Doc. 78-2 (sealed). The sentiment was echoed in the videotaped interview of Channel Falls, Shelton's girlfriend and the mother of his children, on March 13, 2016. Defs.' Ex. DD (video provided to and reviewed by the Court); Doc. 70-9 (Plaintiffs' transcript of C. Falls's interview). When asked what the "goals" of the attack might have been, Ms. Falls stated she did not know, but volunteered that she "[knew] a guy [Shelton] didn't like was" at the cookout; and that Shelton's distaste stemmed from the person's involvement in the Doswell shooting. Doc. 70-9 at 9. She also "agree[d]" regarding the senselessness of the crimes, "[a]ll because of a vendetta over Calvin [Doswell] getting killed" years earlier. *Id.* at 11-12.

If Plaintiffs suggest that law enforcement "manufactured" the Doswell motive, all the way down to inventing the many witness statements, their counsel should have supplied a roll of aluminum foil along with the alleged conspiracy. The record flatly refutes the position. The Court will assume that counsels' response, then, is argument that Defendants have focused on the Doswell motive "to justify their actions in framing Plaintiff[s]." Even as advocacy, the "framing" assertion is over the top, but – more to the point – it has no place in discussions of material fact.

As to the merits, all of Shelton's claims fail because probable cause against him existed. Plaintiffs' central themes – their questions regarding phone-connections between Shelton and Thomas, and the County's reliance on unreliable confidential witnesses – matter not. Probable cause focuses on whether "the totality of the circumstances described in the affidavit provided a substantial basis . . . to conclude that there was a fair probability" a crime was

committed.  U.S. v. Stevenson, 832 F.3d 412, 430 (3d Cir. 2016) (citation and internal quotations omitted; similar parenthetical descriptors will be excluded from here on).  Even excising the evidence to which Plaintiffs' counsel object, the affidavit contained evidence of the following (the list is not exhaustive):[2]

- A police officer on patrol heard numerous gunshots at the time of the attack, and drove to the area.  Less than one tenth of a mile from the crime scene, he observed a black male get into a white Lincoln Continental vehicle.  The officer ran the vehicle's license plate, and the registration was in the names of Shelton's sister and mother.

- Video footage shows a black male exiting 1214 Nolan Court – Shelton's family home in Hilltop – and entering the white Lincoln Continental at approximately 10:28 p.m.

- The same black male moved the vehicle a short distance, exited the car and ran behind 1214 Nolan Court and into the back yard, where he recovered an object, returned to the vehicle and drove away at approximately 10:30 p.m.  *See* Doc. 87 at ⁋ 48 (more incriminating details regarding the object, which Plaintiffs contest, have been excised).

- Detectives recovered video footage from a private residence showing a vehicle that matched the description of the white Lincoln pulling onto Franklin Avenue at approximately 10:42 p.m.  *Id.* at ⁋ 49 (admitting the same).  Franklin Avenue is the street on which the massacre occurred.  Doc. 69-1 at "Page 3 of 13".

- Video depicted two males jumping a fence, coming from the direction of the woods behind Nolan Court at 11:45 p.m.  Plaintiffs deny this assertion because Defendants do not possess the video footage.  While this is unfortunate, counsel cite no legal authority, and the Court is unaware of any, compelling exclusion.  Principles regarding the spoliation of evidence are too context specific to apply on a blanket basis, and counsel offer no analysis.

---

[2] The affidavit as to Shelton, which was identical to the one for Thomas, can be found at Doc. 69-1 in 2:22-cv-00266-CB.

- Other facts denied based on counsels' "no video" objection:

    - One man entered the rear of 1214 Nolan Court (the Shelton-family home) at 11:46 p.m.; a second man entered at 11:47 p.m.; and the two men exited the residence at 12:23 a.m. carrying a black bag. One of the two men appeared to have changed his clothes.

    - The two men entered a gold Impala, directly from the Shelton family home, and drove from the location. Plaintiff Thomas testified at his deposition that Shelton picked him up during that timeframe, in a gold Impala. Doc. 80-1 (sealed). Helpfully, Plaintiffs clarify that Shelton was known to drive a gold Impala registered to his sister, Ashley Smith. Doc. 68 at ¶ 97; video recording (Pls.' Ex. 27) at timestamp 7:23:06.

- On March 21st, the officer who saw a black male enter the white Lincoln Continental (registered to Shelton's sister and mother) – less than one tenth of a mile from the crime scene just minutes after shots were fired – was shown a still image of the male observed in the Nolan Court surveillance video. The officer confirmed that the individual had the same physical description and clothing.

- A search warrant was executed at 1214 Nolan Court, which revealed indicia of Shelton's residence. Firearms were recovered, including one with Shelton's left thumb print. Although the weapon was not used in the attack, Shelton is a convicted felon who is not permitted to possess firearms. Doc. 87 at ¶¶ 73-74. He was arrested and detained in the Allegheny County Jail.

- Shelton called his sister, Brittney, explaining that he would send a "kite," or letter, "lay[ing] it all out."

- Investigators intercepted the intended mailing per a search warrant. It contained two letters, one to "Pops" and one to "Brown Sugar." Plaintiffs helpfully explain that "Brown Sugar" was Shelton's girlfriend, Ms. Falls, and "Pops" was her father, Shawn Falls. Doc. 68 at ¶ 253. (It cannot be said that Plaintiffs' affirmative Motions for summary judgment had *no* utility, just not as they envisioned.)

- The letter to Pops read: "Round the corner at Bubbie house I got something there that I was workin on getn rid of… you don't got to do nutn but open the door and guide my n*gga to it. Its downstairs next to the lawn mower wrap & ready to be toss." Doc. 69-1 (improper grammar, misspellings, coarse language and

derivation of racial epithet in the original). The letter closed with the comment, "burn this when done reading LOL."[3]

Excising all of the contents forming the bases for Plaintiffs' conspiracy theories, "the totality of the circumstances described in the affidavit" easily "provided a substantial basis" to conclude that there was a "fair probability" of criminal activity. The existence of probable cause dooms Shelton's claims. It renders frivolous his affirmative Motion for summary judgment. And in light of what the record shows,[4] the filing would insult the intelligence of any disinterested officer of the Court (and, hopefully, bristle one's sense of morality).

---

[3] On April 6th (five days after his letter was intercepted), Shelton had an in-custody visit with his father. Video reviewed by the Court confirms, Shelton did not use the Jail's monitored two-way phone system, instead making hand gestures. The affidavit stated that Shelton "appeared to pantomime" holding a rifle, "squeezing . . . his right index finger" where the trigger would be; and then "pantomiming a lawn mower motion." Doc. 69-1 at "Page7[-8] of 13". Shelton's firearms gestures cannot reasonably be mistaken, his finger distinctively twitching where the trigger would be. The gesture(s) purportedly pantomiming a lawnmower are ambiguous. To eliminate doubt, the Court has excised these contents in assessing probable cause. But the evidence, coupled with the contents of Shelton's "kite," appears highly disadvantageous. Regardless of whether Thomas attempts to distance himself from Shelton (with whom he shares legal counsel), the evidence appears relevant to "Plaintiff's guilt as a defense." *See* discussion *infra* (citing Third Circuit model civil jury instructions). The admissibility of this or any other evidence is not presently before the Court, and it states no opinion.

[4] Other evidence not included in the affidavit only heighten suspicion. The statements of Ms. Falls, alone, reveal a timeline entirely consistent with the County's. Shelton was released from jail a day before the incident. Doc. 87 at ¶ 42. The night of the massacre, he left home around 9:30 p.m., ostensibly to obtain hamburgers and lunch meat. Doc. 70-9 at 8, 13. He responded to his girlfriend's text at 10:30 p.m., that he would return "in 20," then went off the grid until responding again at 12:00 a.m. (the attack occurred around 10:54 p.m.). *Id.* at 14, 22. He returned home at 4:00 a.m., wearing different clothes. *Id.* at 10. Shelton told Ms. Falls he changed clothes because he "spit up on himself," and did not explain his whereabouts and activities in the 6 ½ hours prior. *Id.* at 10, 14. The parallels are so strong they would make for dull fiction, and if this was a series of coincidences, Shelton is one of the unluckiest people ever. Although counsel appear to have carefully sidestepped the word "innocent," they do allege that Defendants "frame[d]" Shelton. *See, e.g.*, Doc. 88 at 18. To be "framed," one must be innocent. *See generally* Johnson v. U.S., 2014 WL 4545845, *7 n.9 (E.D.N.Y. Sept. 12, 2014). If he was in fact "framed," Shelton would have good reason to explain his whereabouts and activities – if only to establish an alibi. If he has good explanations,

6

Thomas presents a closer question. His case inherently is stronger, in light of the details. The County believed Shelton was "their guy," and it just needed to identify his cohort. While references to "fabrication" or "framing" significantly oversell the point, counsels' theories are – in Thomas – a more natural fit.

Thomas survives summary judgment under standards requiring a showing of "reckless disregard." Defendants question whether Thomas's claims should be analyzed under the Fourth Amendment or the Fourteenth amendment. Doc. 86 in 2:22-cv-00196-CB (citations hereafter are to the Thomas case). The Court agrees with Defendants that the Fourth Amendment controls, based on circumstances specific to Thomas.

"[T]he Fourth Amendment protects liberty interests only until trial, and the Fourteenth Amendment protects against unlawful seizures through and after trial." Mervilus v. Union Cty., 73 F.4th 185, 194 (3d Cir. 2023). Thomas's criminal charges were dismissed before trial, and the Fourteenth Amendment does not fit.

Plaintiffs' counsel may be grateful, because the standards governing a "stand-alone" fabrication of evidence claim under the Fourteenth Amendment is much more exacting. The intent requirement is "stringent," and "fabrication" is defined narrowly, or "every acquittal could spawn a fabrication claim." *Id.* at 193-94. "Evidence is not fabricated [merely because] it is incorrect or simply disputed." *Id.* Given the high hurdles, "it will be an unusual case in which a police officer cannot obtain a summary judgment in a civil action charging him with having fabricated evidence." *Id.*

---

they do not appear in the record. While the Fifth Amendment shields against self-incrimination in the criminal context, its assertion here would be the death knell of the civil claims. *See* discussion *infra* (for Defendants, guilt is a defense). His testimony also may have set a perjury trap.

Plaintiffs' counsel routinely have conflated allegations of "incorrect" or "simply disputed" evidence with aspersions of fabrication. Similar rhetoric is employed through their use of the word "framed." This is thinly veiled advocacy (legal conclusions) in the form of (purported) fact. There are insufficient bases for a jury reasonably to conclude that Defendants "fabricated" evidence against Plaintiffs, as the term is defined under controlling law. Nor can Plaintiffs, particularly Shelton, demonstrate "a reasonable likelihood that the [disputed] evidence could [be expected to] affect[] the judgment of the jury." Halsey v. Pfeiffer, 750 F.3d 273, 294-95 (3d Cir. 2014).

For these reasons, judgment will be granted in Defendants' favor on the Fourteenth Amendment claim in Count II (including its passing reference to the Sixth Amendment). *See* 2d Am. Compl. (Doc. 19 in 2:22-cv-00196-CB, amending Doc. 18). The ruling is without prejudice to Thomas's claims for malicious prosecution under federal and state law, *see* Counts I and VI; and Section 1983 conspiracy in Count III. The limitations are the ones described herein.

As for Thomas, overall, Defendants concede that their investigation was imperfect. That said, summary judgment presents a *much* closer question than his counsel appear to recognize (as evinced by Plaintiffs' affirmative Motions). And although actual innocence is not an *enumerated* element of his malicious prosecution claim, it is considered under the favorable-termination prong. Hector v. Watt, 235 F.3d 154, 156 (3d Cir. 2000) (noting "the horns of a dilemma" faced by a plaintiff whose actual innocence is disputed, because "false arrest does not permit damages incurred after an indictment," and "a plaintiff claiming malicious prosecution must be innocent of the crime charged in the underlying prosecution") (emphasis added). While Defendants have not pursued this angle on summary judgment, Thomas can be certain that evidence of his potential guilt (and that of his de facto litigation-partner, Shelton) will be at the

8

front and center of Defendants' presentations.  *See* 3D CIR. MODEL CIVIL JURY INSTRUCTION 4.13, SECTION 1983 – MALICIOUS PROSECUTION, at 191 (containing a whole section on "Plaintiff's guilt as a defense.") (underlining in original).

The Court hopes that Thomas (and his counsel) comprehend the challenges that will present at trial.  Thomas has tied himself to Shelton, for better or worse (in the Court's view, for the worse).  Thomas's recorded interview, on November 7, 2017, contains remarkably little in the way of inculpatory statements, to be fair.  But he acknowledges being with Shelton that evening and into the early morning.  *See, e.g.*, Doc. 82-2 at 18 (admitting that Shelton drove him that night, and affirmatively identifying him without prompting); *id.* at 25 (claiming that he coincidentally encountered Shelton in the woods); *id.* at 31 ("I'm not saying I never ran into Cheron [Shelton] that night."); *id.* at 32 (acknowledging that he went to the Shelton family home); *id.* at 39 (not disputing that he was with Shelton around 12:30 a.m.); *and id.* at 45 (responding to questions regarding "the Impala" that he sat in the "front passenger" seat).

Thomas cannot invoke Fifth Amendment privilege at trial and have much chance of success.  Nor does it seem likely that the jury will believe Shelton is likely guilty but Thomas was not.  Thomas's statements fit too neatly within the County's narrative and timeline.  Even should Thomas be able to "wiggle out" of the admissions (claiming investigators engaged leading questions, et cetera), this begs questions regarding counsels' representation of both Plaintiffs.  The County knew, from the physical evidence recovered, that there were two perpetrators.  Investigators believed they found one, in Shelton, and only needed to identify his cohort.  From Thomas's perspective, it did not matter whether Shelton was involved – only that Thomas was not.

On behalf of both Plaintiffs, counsel have pointed the finger at another individual, Shaquan Roberts, insinuating that he may have been one of the (two) perpetrators. *See, e.g.*, Doc. 96 at ¶ 85. While this position makes sense if Thomas and Shelton are aligned, it appears less beneficial to Thomas individually. Considering the evidence summarized above – and assuming Thomas might credibly dissociate from Shelton – a lawyer representing *only* Thomas may have pointed the finger in a different direction.

Counsel have superior knowledge regarding the case, the Court having only seen a snapshot. If conflicts – or the appearance thereof – present, the Court trusts that they will be raised at an appropriate time and in an appropriate manner.

Finally, the Court rejects Defendants' arguments on summary judgment thus far unmentioned: (a) Defendants' attempts to parse their individual involvement are rejected, for the reasons stated by Plaintiffs' counsel, and consistent with prior rulings. *See, e.g.*, text-Order at Doc. 65 in 2:22-cv-00196-CB (denying leave to file a third amended complaint on other grounds, and noting that Defendants had more "direct (alleged) involvement" in the investigation than the other detectives Plaintiffs wished to rejoin in the eleventh hour of discovery). (b) Defendants are not entitled to summary judgment based on qualified immunity. Andrews v. Scuilli, 853 F.3d 690, 705 (3d Cir. 2017) ("the right to be free from arrest except on probable cause [is] clearly established"). (c) Defendants' arguments on the 1983 conspiracy claim are conclusory, and do not demonstrate their entitlement to summary judgment. *See* Doc. 86 in 2:22-cv-00196-CB at 20-21. Had they prevailed on all of Plaintiffs' underlying claims, conspiracy too would fall away. That has proven so for Shelton, but not Thomas.

Consistent with the above, the Court enters the following:

## II. ORDER

Plaintiffs' Motions for summary judgment (**Doc. 76** in **2:22-cv-00196-CB** and **Doc. 66** in **2:22-cv-00266-CB**) are **DENIED**. Defendants' Motion for summary judgment in **Shelton** (**Doc. 74** in **2:22-cv-00266-CB**) is **GRANTED**, and final judgment under Rule 58 will be entered. Defendants' Motion for summary judgment in **Thomas** (**Doc. 84** in **2:22-cv-00196-CB**) is **DENIED**. Soon, the Court will enter an order in **Thomas** addressing next steps.

IT IS SO ORDERED.

March 31, 2025                              s/Cathy Bissoon
                                            Cathy Bissoon
                                            United States District Judge

cc (via ECF email notification):

All Counsel of Record